IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

- - - - - - - - - - - - - - - x
                              :
In re:                        :   Chapter 11
                              :
HAYES LEMMERZ INTERNATIONAL,  :   Case No. 09-11655 (__)
INC., et al.,                 :
                              :
            Debtors.          :   Joint Administration Pending
- - - - - - - - - - - - - - - x

**DECLARATION OF MARK BREBBERMAN IN SUPPORT
OF CHAPTER 11 PETITIONS AND FIRST DAY PLEADINGS**

I, Mark Brebberman, being duly sworn, deposes and says:

1.   I am the Vice President and Chief Financial Officer of Hayes Lemmerz International, Inc. ("Hayes" or the "Company"), a corporation organized under the laws of the state of Delaware and the ultimate parent corporation of the other debtors and debtors-in-possession (collectively, the "Affiliate Debtors")[1] in the above-captioned chapter 11 cases (collectively

---

[1]   The following of Hayes' U.S. subsidiaries and affiliates (including the last four digits of their respective taxpayer identification numbers) have filed petitions for relief under chapter 11 concurrently with Hayes (2578) and have requested joint administration therewith: Hayes Lemmerz Finance LLC (7731), Hayes Lemmerz International Import, Inc. (1655), Hayes Lemmerz International - California, Inc. (2337), Hayes Lemmerz International - Commercial Highway, Inc. (7674), Hayes Lemmerz International - Georgia, Inc. (6122), Hayes Lemmerz International - Howell, Inc. (9246), Hayes Lemmerz International - Huntington, Inc. (0825), Hayes Lemmerz International - Kentucky, Inc. (8246), Hayes Lemmerz International - Laredo, Inc. (8656), Hayes Lemmerz International - New York, Inc. (9278),

*(cont'd)*

with Hayes, the "Debtors").  I am authorized to submit this declaration (the "First Day Declaration") on behalf of the Debtors.

2.    As Chief Financial Officer of Hayes I am responsible for overseeing the financial activities of the Company, which includes, but is not limited to, monitoring cash flow, and tax and financial planning.  In that capacity, I have personal knowledge of the Debtors' financial condition, business, policies and procedures, and the events leading to the filing of these Chapter 11 cases.

3.    As a result of my tenure with the Debtors, my review of public and non-public documents, and my discussions with other members of the Debtors' management team, I am familiar with the Debtors' day-to-day operations, business affairs, and books and records.  Except as otherwise noted, I have personal knowledge of the matters set forth herein or have

---

*(cont'd from previous page)*

Hayes Lemmerz International - Sedalia, Inc. (7670), Hayes Lemmerz International - Technical Center, Inc. (7519), Hayes Lemmerz International - Wabash, Inc. (0301), HLI Brakes Holding Company, Inc. (2575), HLI Commercial Highway Holding Company, Inc. (2828), HLI Netherlands Holdings, Inc. (0015), HLI Operating Company, Inc. (7742), HLI Parent Company, Inc. (7832), HLI Powertrain Holding Company, Inc. (8269), HLI Realty, Inc. (1885), HLI Services Holding Company, Inc. (7840), HLI Suspension Holding Company, Inc. (0061), and HLI Wheels Holding Company, Inc. (7882) (collectively with Hayes, the "U.S. Debtors").  With the exception of Hayes Lemmerz Finance LLC - Luxembourg S.C.A. (Luxembourg: 0646; USA: 7731) (the "Non-U.S. Debtor"), none of the foreign affiliates or subsidiaries of Hayes are Debtors in these chapter 11 cases.

gained knowledge of such matters from the Debtors' employees or retained advisers that report to me in the ordinary course of my responsibilities and, if called as a witness, would testify competently thereto.

4.    I submit this First Day Declaration on behalf of the Debtors in support of the Debtors' (a) voluntary petitions for relief under Chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1330, as amended (the "Bankruptcy Code") and (b) "first-day" motions, which are being filed concurrently herewith (collectively, the "First Day Motions").[2]  The Debtors seek the relief set forth in the First Day Motions with the goal of minimizing the adverse effects of the commencement of the chapter 11 cases on their businesses.  I have reviewed the Debtors' petitions and the First Day Motions, or have otherwise had their contents explained to me, and it is my belief that the relief sought therein is essential to ensure the uninterrupted operation of the Debtors' businesses and the success of the Debtors' reorganization.

5.    I am authorized by each of the Debtors to submit this First Day Declaration.  Except as otherwise indicated, all

---

[2]    Unless otherwise defined herein, all capitalized terms shall have the meaning ascribed to them in the First Day Motions.

facts set forth in this First Day Declaration are based upon personal knowledge, my review of relevant documents or my opinion based upon experience, knowledge and information concerning the operations of the Debtors.  References to the Bankruptcy Code, the chapter 11 process and related legal matters are based on my understanding of such matters in reliance on explanation provided by, and advice of, counsel.  If called upon to testify, I would testify competently to the facts set forth in this First Day Declaration.

6.    Part I of this First Day Declaration provides an overview of the Debtors' businesses, a description of the Debtors' organizational structure, capital structure, and significant prepetition indebtedness, as well as a discussion of the Debtors' financial performance, and the events leading to the Debtors' chapter 11 filing.  Part II sets forth the relevant facts in support of the Debtors' various First Day Motions.

**Part I**

**A.    The Chapter 11 Filings**

7.    On May 11, 2009 (the "Petition Date"), the Debtors filed voluntary petitions for reorganization relief under the Bankruptcy Code, in the Bankruptcy Court for the District of Delaware (the "Court").  With the exception of one

4

entity,[3] Hayes' non-U.S. subsidiaries and affiliates (the "Non-Debtor Affiliates") are not chapter 11 debtors, will continue their business operations without supervision from the Bankruptcy Court, and will not be subject to the chapter 11 requirements of the U.S. Bankruptcy Code.  The Debtors continue to operate their businesses and manage their properties as debtors-in-possession.

8.    To enable the Debtors to operate efficiently following the Petition Date, the Debtors will request various types of relief via applications and motions that have been or will be filed with the Court.  The Debtors will request the Court to schedule (a) a "first day" hearing on or immediately after the Petition Date for the Court to consider granting the relief requested in the applications and motion, some of which on an interim basis and (b) a first omnibus hearing, to take place more than twenty days after the Petition Date, for the Court to consider additional applications and motions and whether to grant the interim relief, if any, on a final basis.

---

[3]   Hayes Lemmerz Finance LLC–Luxembourg S.C.A. is the only non-U.S. entity to file for chapter 11 relief.

5

**B.    Current Business Operations (Debtors and Non-Debtor Affiliates)**

9.    Hayes is the largest overall wheel producer in the world; the largest producer of commercial highway wheels in the world; the largest producer of light vehicle steel wheels in the world; and the sixth largest producer of light vehicle aluminum wheels in the world.  Hayes produced approximately 48.9 million wheels in the fiscal year ended January 31, 2009.  The Company was founded in 1908 as a manufacturer of wooden spoke wheels for the Ford Model T.  Since then, Hayes has become a leading worldwide producer of aluminum and steel wheels for passenger cars and light trucks, of steel wheels for commercial trucks and trailers and is a supplier of powertrain components for original equipment manufacturers and certain tier one suppliers.  The Company's total sales world-wide were $2.1 billion in fiscal year ending January 31, 2008 ("Fiscal 2007") and $1.9 billion in fiscal year ending January 31, 2009 ("Fiscal 2008").

10.    Headquartered in Northville, Michigan, Hayes has approximately 6,400 employees working in 23 facilities located in the United States and 12 other countries around the world. The Debtors' operations consist of the Company's world

headquarters, located in Northville, Michigan, two manufacturing facilities located in Akron, Ohio and Sedalia, Missouri and certain offices located in Laredo, Texas.  The Debtors also own three closed manufacturing facilities, in Howell, Michigan, Gainesville, Georgia[4] and Huntington, Indiana and a closed research and development facility in Ferndale, Michigan, all of which they are attempting to sell.  The Non-Debtor Affiliates' operations consist of 2 facilities in Mexico, 10 facilities in Europe and 7 facilities in South America, Asia and South Africa.

11.  Hayes sells products to almost every light vehicle Original Equipment Manufacturer ("OEM") and commercial highway vehicle customer throughout the world.  Hayes designs, manufactures and distributes cast aluminum wheels and fabricated steel wheels for the passenger car and light truck markets in North America, Europe, South America, South Africa and Asia. Its customers include major OEMs such as GM, Ford and Chrysler, as well as BMW, Daimler, Fiat, Honda, Hyundai, Kia, Nissan/Renault, PSA, Porsche, Toyota and Volkswagen.  It also sells aftermarket steel wheels, primarily for the winter tire

---

[4]   The Gainesville, Georgia facility is subject to purchase and sale agreement, but the buyer has refused to close the transaction and Hayes has commenced legal action to enforce specific performance.

market in Europe, to Alcar.  Hayes has cast aluminum wheel manufacturing facilities in Spain, Italy, the Czech Republic, Turkey, Brazil, South Africa, Thailand and Mexico.  It has fabricated steel wheel manufacturing facilities in Sedalia, Missouri as well as Spain, the Czech Republic, Turkey, India, Brazil and Germany.  Sales of light vehicle cast aluminum and fabricated steel wheels were approximately $1.5 billion, or 71 percent (71%) of total revenues, for Fiscal 2007, and $1.3 billion, or 67 percent (67%) of total revenues, for Fiscal 2008.

12.  Hayes also designs, manufactures and distributes wheels for commercial highway vehicles in North America, Europe, South America and Asia.  Principal customers for commercial highway wheels include AM General, Daimler, Ford, Iveco, MAN, Paccar, Renault, Scania and Volvo.  Hayes' commercial highway manufacturing facilities are in Akron, Ohio, Germany, Turkey, Brazil and India.  Commercial highway wheel sales were $516 million, or 24 percent (24%) of total revenues, for Fiscal 2007 and $567 million, or 30 percent (30%) of total revenues, for Fiscal 2008.

13.  The Company also designs, manufactures and distributes a variety of aluminum and polymer powertrain components.  Powertrain and engine components are produced in

8

North America and sold primarily to Chrysler, Ford and General Motors, and also to tier one suppliers such as Delphi, Bosch, Eaton and Magna.

**C.    The 2001 Chapter 11 Cases**

14.   In 2001 the Company was a vastly different enterprise, with more of its manufacturing operations located in the United States and several non-wheel businesses, such as automotive brakes, commercial highway hubs and drums, powertrain components, suspension components and an aluminum components business in Europe.  The Company was also over-leveraged in the face of declining earnings, could not integrate recent acquisitions and had several underperforming facilities.  The Company also restated its financial statements for fiscal years 1999 and 2000 and the first quarter of fiscal 2001.  On December 5, 2001, the Company's U.S. affiliates at the time and a Mexican affiliate filed for reorganization relief under chapter 11 (the "2001 Chapter 11 Cases") in this Court.  During the 2001 Chapter 11 Cases, the Company engaged in an aggressive operational restructuring, focusing on making its various business segments more efficient, including significantly reducing costs in every area of its business and centralizing financial controls and operations.  On June 3, 2003 (the "2003 Effective Date"), the

9

Company consummated a plan of reorganization (the "2003 Reorganization Plan") confirmed by the Court and emerged from chapter 11.

15.   Pursuant to the 2003 Reorganization Plan, 98 percent (98%)of the common stock of the reorganized (i.e., current) Company, certain warrants and a 2/3 interest in the HLI Creditor Trust formed pursuant to the 2003 Reorganization Plan (the "Trust") were distributed on the 2003 Effective Date to the Company's then existing secured and senior unsecured creditors. The remaining 2 percent (2%) of the Company's common stock, certain warrants and the remaining 1/3 interest in the Trust[5] were reserved for general unsecured creditors pending the Company's completion of claims administration in its role as "Disbursement Agent" under the 2003 Reorganization Plan.[6]   The Company has been unable to complete claims administration relating to the 2003 Reorganization Plan because of disputed

---

[5]   The 1/3 interest in the Trust has been liquidated and currently consists of approximately $4 million held by the Company in a bankruptcy remote escrow account pursuant to the Court's order terminating the Trust, discharging the trustee of the Trust, and directing the Company to hold and ultimately disburse the proceeds recovered by the Trust for general unsecured creditors pursuant to and in accordance with the 2003 Reorganization Plan.

[6]   Pursuant to the Plan, 98,000 shares of preferred stock were also distributed on the 2003 Effective Date to the secured and senior unsecured creditors and 2,000 shares of preferred stock were reserved for general unsecured creditors.

patent related claims which were being litigated in forums outside of the Delaware Court.  The Company prevailed at the trial court level with respect to the most significant of these claims (over $1 billion in damages was claimed) and, recently, the United States Court of Appeals for the Federal Circuit has upheld the trial court's favorable ruling.  Because of the resolution of this claim, the Company currently expects to be able to close the 2001 Chapter 11 Cases within the next few months, notwithstanding the commencement of the current chapter 11 cases (the "Chapter 11 Cases").[7]

**D.   Post Bankruptcy Strategy**

16.  After emerging from bankruptcy in 2003, Hayes continued to transform its business through a four-pronged, comprehensive strategy—investing in the right products, investing in the right geography, investing in the right customers and engaging in aggressive cost cutting including the restructuring of its operations.  Each of these strategies and the steps Hayes has taken in furtherance thereof are briefly described below.

---

[7]   The Company has paid all fees owed the United States Trustee in the 2001 Chapter 11 Cases prior to the Petition Date, and will pay any additional fees that accrue after the Petition Date.

17.   <u>Investing in the Right Products</u>.   Hayes' goal with respect to its products was to concentrate resources on those product lines in which it is a market leader and those with the best prospects for continued growth.   Post-bankruptcy, Hayes focused on its core business — the production of wheels. Through acquisitions prior to the 2001 Chapter 11 Cases, Hayes became involved in the manufacture of many non-wheel automotive parts, such as automotive brakes, commercial highway hubs and drums, powertrain components and suspension components in North America and an aluminum components business in Europe.   In 2004, roughly a third of Hayes' revenues came from the sale of products other than wheels.   Currently, all but 3 percent (3%) of Hayes' sales are wheels.   Another aspect of Hayes' "right products" strategy is maintaining the diversification of its wheels product lines in order to better insulate the Company from disruptions in the global market.   Estimated Fiscal 2008 sales by product types are relatively equally balanced among the three main categories of wheel products: light-vehicle steel (35%), commercial truck (33%) and light-vehicle aluminum (32%).

18.   <u>Invest in the Right Geography</u>.   The second prong of Hayes' strategy involved investing in manufacturing facilities in high growth, cost effective locations to provide

Hayes with access to expanding local and export markets.  As a result of this strategy, Hayes has substantially reduced its presence in the United States automobile market.  Sales in the United States were 45 percent (45%) of Hayes' global sales in 2004, but only 15 percent (15%) in 2008.  During this time, Hayes' sales to almost every other region of the globe increased.  For example, the Western European market, which in 2004 accounted for 29 percent (29%) of Hayes' global sales, represented 34 percent (34%) of Hayes' sales in Fiscal 2008.  Similar shifts took place in other regions: sales in Eastern Europe went from 10 percent (10%) of Hayes' global sales in 2004 to 23 percent (23%) in Fiscal 2008, sales in South America increased from just 4 percent (4%) to 14 percent (14%) and sales in Asia climbed from 4 percent (4%) to 6 percent (6%).  Simultaneously, Hayes made a concerted effort to strengthen its diverse geographic footprint.  Hayes has a total of 23 facilities located in the United States and 12 other countries around the world.  As a result, Hayes is in a strong position to benefit from the expected rebound in the world economy, wherever it first occurs.

19.   Invest in the Right Customers: Customer Diversity. The third prong of Hayes' strategy was the diversification of

its customer base.  In particular, Hayes reduced its exposure to GM, Ford and Chrysler in the United States from 29 percent (29%) of global sales in 2004 to an estimated 10 percent (10%) of global sales in Fiscal 2008.  Worldwide, Hayes enjoys a broad customer base.  Hayes' largest customers, as represented by their percentage of Hayes' global sales, are Ford (17%), General Motors (12%), Renault-Nissan (8%), Toyota (7%), Volkswagen (6%), Honda (5%), Volvo (3%) and PSA Peugeot Citroen (3%).  While Hayes' two largest customers globally remain Ford and General Motors, approximately two-thirds of Hayes' sales to these customers in Fiscal 2008 were outside the United States.

20.  Aggressive Cost Reductions.  The fourth prong of Hayes' strategy was aggressive cost reductions in an effort to improve Hayes' productivity through the implementation of specific management and production practices.  Since emerging from bankruptcy in 2003, Hayes has aggressively sought to cut costs and improve its productivity.  To that end, Hayes has divested substantially all of its non-core businesses, including a hubs and drums unit in 2005, several suspension manufacturing units from 2005 through 2007 and the MGG Group B.V. (makers of heat exchangers and intake manifolds) and automotive brakes and powertrain manufacturing units in Fiscal 2007.  It currently

14

operates only a single non-wheel manufacturing facility.  Hayes also restructured its wheels business unit and closed or sold unprofitable wheel manufacturing facilities.  Most recently, Hayes closed unprofitable operations in Gainesville, Georgia (U.S.) and Belgium in Fiscal 2008, which is expected to save Hayes approximately $30-40 million annually.

21.  As part of its cost-cutting strategy, Hayes has taken many steps to reduce its labor costs.  Since 2004, the Company reduced its senior leadership team by more than half, from 12 to 5 individuals, saving Hayes an estimated $5 million each year.  In Fiscal 2006, Hayes reduced compensation to its non-union employees in the United States by an average of 7.5 percent (7.5%).  Also in fiscal 2006, Hayes reduced labor costs by suspending the 5 percent (5%) to 8 percent (8%) defined contribution to its United States employees' 401(k) plan and suspending its 4 percent (4%) matching contributions to such plan.[8]  In fiscal 2006, Hayes also reduced the level of health benefits provided to certain employees for annual savings of $1.3 million.  In the last year, Hayes' workforce has been reduced by 25.3 percent (25.3%), from 8,900 in March 2008 to

_____

[8]    The Company reinstated the 4% match in 2007.

approximately 6,400 in March 2009, for annual savings of approximately $50 million.

**E.   Prepetition Capital Structure**

22.   On May 30, 2007, Hayes closed on a new offering of €130 million 8.25% senior unsecured notes due 2015 (the "Euro Notes") issued by Hayes Lemmerz Finance LLC – Luxembourg S.C.A. ("Hayes Luxembourg").  The Euro Notes contain customary covenants and restrictions.  The Euro Notes and the related indenture (the "Indenture") restrict Hayes' ability to, among other things, make certain restricted payments, incur debt and issue preferred stock, incur liens, permit dividends and other distributions by Hayes' subsidiaries, merge, consolidate, or sell assets and engage in transactions with affiliates.  The Euro Notes and the Indenture also contain customary events of default, including failure to pay principal or interest on the Euro Notes when due, among others.  The Euro Notes are fully and unconditionally guaranteed on a senior unsecured basis by substantially all of the Debtors and certain of the Non-Debtor Affiliates.  The organization chart attached hereto as Exhibit A lists the Debtors and the Non-Debtor Affiliates that have issued Euro Note guarantees.  Proceeds from the issuance of the Euro Notes, together with the proceeds from the Credit Facilities (as

16

described below), were used to refinance obligations under Hayes' Amended and Restated Credit Agreement (the "Initial Credit Facility"), dated as of April 11, 2005, to repay in full the approximately $21.8 million mortgage note on Hayes' headquarters building in Northville, Michigan, to pay related fees and expenses and for working capital and other general corporate purposes.  The Company previously entered into the Initial Credit Facility pursuant to the 2003 Reorganization Plan on the 2003 Effective Date.

23.  In May 2007, Hayes also distributed to stockholders of record as of April 10, 2007 non-transferable subscription rights to purchase 55,384,615 shares of Hayes common stock at a price of $3.25 per share.  The rights offering was fully subscribed and two outside investors, which backstopped the rights offering, exercised a right to purchase 4,038,462 shares of Hayes common stock at a price of $3.25 per share pursuant to a private placement.  On May 30, 2007, Hayes closed on the rights offering and private placement and issued 59,423,077 new shares of common stock.  Net proceeds were used to repurchase $162.5 million of then outstanding 10½% Senior Notes due 2010, with the excess being used to provide working capital and for general corporate purposes.

17

24.   Prior to May 30, 2007, under the Initial Credit Facility, Hayes had $625 million of senior secured debt, which consisted of a first lien $375 million term loan due June 3, 2009, a second lien $150 million term loan due June 3, 2009 and a $100 million revolving credit facility due June 3, 2008.  On May 30, 2007, Hayes amended and restated the Initial Credit Facility to establish three new senior credit facilities in the aggregate amount of approximately $495 million (the "Second Amended and Restated Credit Agreement" or the "Credit Facilities").  The proceeds from the Credit Facilities, together with the proceeds of other financing activities, were used to refinance Hayes' obligations under the Initial Credit Facility. Additional proceeds were used to replace existing letters of credit and to provide for working capital and other general corporate purposes and to pay the fees and expenses associated with the Credit Facilities.

25.   The Credit Facilities consist of a term loan facility of €260 million maturing in 2014 borrowed by Hayes Luxembourg (the "Term Loan Facility"), a revolving credit facility of $125 million maturing in 2013 available to HLI Operating Company, Inc. ("HLI Opco") and Hayes Luxembourg (the "Revolving Credit Facility") and a synthetic letter of credit

facility of €15 million available to both borrowers.  The interest rate for the term loan was initially the EURIBOR rate plus 2.75 percent (2.75%) per annum.  HLI Opco is the only borrower under the Revolving Credit Facility.  On January 29, 2009, Hayes amended the New Credit Facilities to favorably modify the financial covenants and make other changes.

26.  The obligations of HLI Opco and Hayes Luxembourg under the Credit Facilities are guaranteed by substantially all of the Debtors.  In addition, the obligations of Hayes Luxembourg under the Credit Facilities are guaranteed by certain of the Non-Debtor Affiliates.  The organization chart attached hereto as Exhibit A lists the Debtors and the Non-Debtor Affiliates that have guaranteed the Credit Facilities.  The obligations of HLI Opco and Hayes Luxembourg under the Credit Facilities and the guarantors' obligations under their respective guarantees of the Credit Facilities are, subject to certain exceptions, secured by a first priority perfected pledge of substantially all capital stock owned by the borrowers and the guarantors (but not more than 65 percent (65%) of the capital stock of Hayes Luxembourg or any Non-Debtor Affiliate can secure HLI Opco's obligations) and substantially all of the other assets owned by the borrowers and the guarantors.  All

19

foreign guarantees and collateral are subject to applicable restrictions on cross-stream and upstream guarantees and other legal restrictions, including financial assistance rules, thin capitalization rules and corporate benefit rules.

27.  As of January 31, 2009, Hayes had borrowed the entire $125 million available under the Revolving Credit Facility and had $19.1 million in letters of credit issued under the synthetic letter of credit facility.  Hayes had no borrowing availability under the Revolving Credit Facility as of January 31, 2009.

28.  In addition to amounts outstanding under the Credit Facilities and Euro Notes, the Non-Debtor Affiliates are indebted pursuant to short term bank borrowings and other notes in the aggregate amount of $46.6 million as of January 31, 2009. As of January 31, 2009, Hayes had approximately $670.1 million of total indebtedness.

29.  In addition, Hayes had a domestic accounts receivable securitization facility with a normal program limit of $25 million during Fiscal 2007 and 2008.  The facility has an expiration date of May 30, 2013.  Due to concentration limits and restrictions on financing certain receivables, the majority of the program has not been available.  There were $6 million of

20

borrowings under the programs as of January 31, 2009, which was the maximum amount available under this facility.  The facility limit was reduced to $5 million in April 2009 and no future advances will be made under the facility.  If the borrowing base falls below $5 million, amounts currently advanced in excess of the borrowing base will need to be repaid.

**F.    Events Leading to the Chapter 11 Filing: The Global Financial Crisis and the Automobile Industry**

30.  As set forth above, the 2001 Chapter 11 Cases were necessitated by and involved primarily operational restructuring issues.  ***In contrast, the current Chapter 11 Cases are the result of economic forces beyond Hayes' control and are necessary to implement a balance sheet restructuring.***  Hayes' post-2003 strategy was extremely successful; EBITDA on its continuing businesses increased from $139 million in 2005 to $192 million in 2007.  Unfortunately, in late Fiscal 2008, the current, unprecedented global economic crisis began, significantly affecting the automobile industry.  New passenger cars and light trucks are a major purchase for consumers and the purchase of these items is highly dependent upon the health of the overall economy.  Similarly, the purchase of new commercial vehicles is highly dependent upon macro-economic factors such as

Gross Domestic Product growth and interest rates.  Both the light vehicle and heavy vehicle markets are currently experiencing a severe downturn globally.

31.  Hayes' efforts to cut costs are not enough to overcome the severity of the global economic crisis.  Indeed, virtually all of Hayes' sales are to automobile manufacturers, and thus their decline threatens Hayes.  Because Hayes has high fixed production costs, even relatively small declines in customer production reduce or eliminate profitability.  The declines in Fiscal 2008 and expected declines in fiscal 2009 are substantial and have reduced, and will continue to reduce, Hayes' sales and profits.  Hayes' sales for Fiscal 2008 were $1.9 billion, down 10 percent (10%) from Fiscal 2007. Hayes' EBITDA for Fiscal 2008 was just $157 million–a decline of 23 percent (23%) from Fiscal 2007.  Because of the global meltdown in the automobile sector, EBITDA for fiscal 2009 is projected to be less than one-half of the Fiscal 2008 results.

32.  The global economic crisis has led to a substantial drop in Hayes' enterprise value.  The Company's stock price has fallen from a high of $4.05 per share in Fiscal 2008 to a current price of less than $0.23 per share.  Its bonds and bank debt are also selling at a deep discount to face value.

Hayes' production and sales volumes and products are down in most regions worldwide.  Hayes' sales in the fourth quarter of Fiscal 2008 were down 49 percent (49%) as compared to the fourth quarter of Fiscal 2007.  Hayes' prospects for the remainder of fiscal 2009 remain are less than optimal unless the global economy improves dramatically.  Hayes expects to have negative net cash flow until the global economy recovers.

33.  Hayes' financial forecasts reflect this downturn, as management anticipates Hayes' 2009 sales could be approximately $1.2 billion with EBITDA of $46.9 million.  In turn, Hayes' internal forecasts mirror the positive recovery expected for the global economy, as management currently estimates its sales from 2010 through 2013 could range from $1.34 million in 2010 to $1.7 billion in 2013 if automotive build rates increase over that period, with EBITDA rebounding in parallel based upon the same assumptions to potentially range from $108 million to $198 million over the same period.

34.  The global economic crisis has not only affected Hayes' sales, but also its cost of borrowing.  For example, in connection with the amendment of the Credit Facilities to obtain the lenders' waiver from certain covenants in the fourth quarter of Fiscal 2008, the lenders imposed an increase in the interest

rate to Euribor plus 6 percent (6%) from Euribor plus 2.75 percent (2.75%).

35.   Changes in the cost of raw materials have also reduced Hayes' profitability.  For example, Hayes generally enters into fixed-forward contracts for aluminum based on volume projections from Hayes' customers that coincide with the applicable customer pass through pricing adjustment periods.  In recent periods, customer volumes have decreased significantly relative to their projections while at the same time market prices for aluminum have fallen sharply.  As a result, Hayes has fixed-forward contracts for aluminum based on projected volumes at prices above the current market price.  Hayes therefore has an excess of aluminum purchased at prices above current levels that it cannot pass on to customers, which has adversely affected Hayes' operating margins and cash flows.

**G.   Liquidity and Credit Terms**

36.   Hayes' ability to maintain normal credit terms with its suppliers has become impaired.  Hayes has substantial levels of debt, including debt under the Euro Notes and the Credit Facilities. As of January 31, 2009, Hayes had approximately $670.1 million of total indebtedness and approximately $107.5 million of cash and cash equivalents.  In

24

recent months, the trade credit Hayes receives from suppliers has been reduced.  In January, the providers of credit insurance for the Non-Debtor Affiliates cancelled all such credit insurance programs.  On April 17, 2009, Hayes announced, among other things, that it would likely receive a going concern qualification from its auditors in connection with their audit of Hayes' financial statements for Fiscal 2008.  That announcement further exacerbated supplier concerns.

37.  Hayes has continued to work proactively with its suppliers to maintain the best credit terms possible.  However, if Hayes' liquidity constraints are not addressed, Hayes' suppliers will likely refuse to provide key products and services on a go-forward basis.  Hayes' financial condition and results of operations, in particular with regard to Hayes' potential failure to meet its debt obligations, may lead some customers to become reluctant to enter into long-term agreements with Hayes.  Hayes believes that the proposed debtor-in-possession financing will, if approved by the Court, provide Hayes with sufficient liquidity to manage its operations and calm customer and supplier concerns regarding Hayes' liquidity.

**H.    Negotiation of Proposed DIP Financing**

38.    On January 29, 2009, Hayes entered into the First Amendment to its Credit Facilities, which, among other things, authorized the lenders thereunder (the "Prepetition Lenders") to retain (a) Milbank, Tweed, Hadley, McCloy, LLP ("Milbank") as additional legal counsel (the Prepetition Lenders were previously and continue to also be represented by Weil, Gotshal & Manges, LLP ("Weil")) and (b) a financial advisor to represent the Prepetition Lenders in connection with Hayes' restructuring. In late February 2009, the Prepetition Lenders advised Hayes that Milbank, on behalf of the Prepetition Lenders, had retained Houlihan, Lokey, Howard & Zukin, LLP ("Houlihan"). Hayes, its investment banker, Lazard Frères & Co. LLC ("Lazard"), and Skadden, Arps, Slate, Meagher & Flom LLP ("Skadden") immediately began working with Houlihan, Milbank and Weil. From January 2009 through March 2009, Milbank and Houlihan performed substantial due diligence with respect to the Company, working with the Company and its professionals to become familiar with all of the relevant aspects of the business. As a result of these efforts, there was an in-person meeting with the Prepetition Lenders, which took place in New York on March 18,

2009.  During that meeting, Hayes, with the assistance of its advisors, explained that it would soon run out of cash and required additional financing, likely in the form of a debtor in possession ("DIP") loan to fund chapter 11 reorganization cases. After the March 18th meeting, the Prepetition Lenders and their advisors and the Company and its advisors spoke frequently, exchanged due diligence information and illustrative DIP financing term sheets as the Prepetition Lenders and the Company considered their potential options.  The Prepetition Lenders' advisors and certain of the Prepetition Lenders were also granted access to an electronic data room maintained by the Company for due diligence purposes.

39.  The Debtors and Lazard considered seeking DIP or other financing from commercial banks and hedge funds that have historically loaned money to or invested in distressed companies. However, the Prepetition Lender group is comprised of nearly 40 commercial banks and hedge funds, including most of the major institutions or entities that have experience providing distressed financing.  Accordingly, the Debtors and Lazard determined that, in effect, the Debtors had appropriately canvassed the commercial bank and hedge fund marketplace for

available financing by simply engaging in discussions with, and requesting additional financing from, the Prepetition Lenders.

40.   Separately, beginning in February 2009, Lazard, with the Company's assistance, began a sale process and identified approximately twelve potential financial investors it believed might be interested in lending to, investing in or acquiring the Company during its chapter 11 cases and providing sufficient debtor-in-possession financing to effectuate such transaction.[9]  Lazard identified the potential investors based on a number of factors, including, their known desire to invest in companies in the automotive sector, their desire to acquire financially distressed companies and their ability to quickly complete diligence and fund a transaction through a debtor-in-possession financing.  Of the financial investors Lazard contacted, six of them signed confidentiality agreements and conducted due diligence with respect to the Company, which

---

[9]   Lazard and the Company determined it was not in the Company's best interests to approach other automotive suppliers, which in most cases are also facing their own financial difficulties, prior to the Chapter 11 Cases because the Company was concerned about providing competitors with its proprietary and confidential information and was also worried that information regarding its financial condition and possible chapter 11 cases could leak to its customers and suppliers and damage those relationships.  The Company was also aware that strategic parties would have the opportunity to review and bid against any transaction the Company might propose in the Chapter 11 Cases.  Indeed, the Company and Lazard intend to reach out as broadly as possible to determine if any third parties remain interested in acquiring the Company.

included meeting with senior management to discuss the Company's business plan, reviewing numerous legal, financial and operating documents contained in the Company's electronic data room and having numerous discussions with the Company's legal and financial advisors.

41.   Ultimately, the Company received non-binding term sheets from four financial investors, each of which was subject to legal and financial due diligence as well as other conditions precedent.  Although the term sheets varied from each other on numerous terms, all four proposed acquiring ownership of the Company through funding a DIP loan during the Chapter 11 Cases and converting the outstanding balance thereof into a majority of the equity of the reorganized Company upon emergence from chapter 11.  Moreover, each proposal required the DIP loan to be secured on a first priority priming basis (with limited exceptions) on all of the Company's assets.

42.   The Company and its advisors spent significant time with each of the potential investors and their advisors discussing, among other things, the Company's corporate structure and collateral base available to secure a DIP loan, with particular emphasis on the interplay between collateral located inside and outside the United States, and also the lack

of significant unencumbered assets.  Similarly, the discussions focused on the fact that any DIP financing facility would need the support of the Prepetition Lenders.  Two of the potential investors withdrew from the process shortly after submitting their proposals, citing their inability to become comfortable with a DIP loan structure and the collateral base available to support such a loan.  While discussions with the remaining two potential investors continued, one of the proposals was clearly superior and the Company and its advisors focused their efforts on working with the higher bidder to memorialize its proposal in definitive documentation.

43.  The Company and its advisors kept the Prepetition Lenders, an *ad hoc* committee of Euro Note holders, and their respective counsel and advisors apprised regarding the status of the discussions and negotiations with third parties, including in-person meetings with the *ad hoc* committee in London on April 3, 2009 and the Prepetition Lenders in New York on April 13, 2009, among other in-person and telephonic meetings with the Prepetition Lenders.  The Company also continued working with the Prepetition Lender group, which is comprised of

approximately 30 commercial banks and hedge funds, on a potential DIP facility.[10]

44.   On or about April 20, 2009, the Company advised the Prepetition Lenders that the potential bidder informed the Company that its proposal would be withdrawn unless the Company (a) signed the definitive documentation negotiated and prepared by the parties with respect to, among other things, a DIP credit agreement and plan of reorganization term sheet, and (b) paid the DIP commitment fees set forth in the definitive documentation.  Hayes also advised that the definitive documentation including numerous conditions precedent to the transactions set forth therein, including the consent of more than half of the Prepetition Lenders holding more than two thirds of the Credit Facilities obligations.  After discussions among the Prepetition Lenders, the Company and their respective advisors, a majority of the Prepetition Lenders advised the Company that they (a) were not in favor of the transaction proposed by the high bidder, (b) were finalizing a DIP loan

---

[10]   The Company, with the assistance of its advisors, also solicited holders of the Euro Notes with respect to providing or participating in a potential DIP financing facility; advisors to the holders of the Euro Notes informed the Company and its advisors that the holders of the Euro Notes were not interested in providing or participating in any such financing facility.

proposal (the "DIP Financing Facility"), and (c) requested that the Company refrain from executing the definitive documentation.

45.   After evaluating, among other things, the transactions set forth in the definitive documents, including but not limited to the numerous conditions precedent, and the views and requests of the Prepetition Lenders, the Company declined to move forward with the third party financial investor and, instead, ultimately determined to proceed with the DIP Financing Facility proposed by the Prepetition Lenders as set forth in more detail in the First Day Motions and the descriptions thereof contained herein.

**I.   Objectives of the Chapter 11 Cases**

46.   Notwithstanding the global economic circumstances that contributed to Hayes' current liquidity challenges, Hayes is the global market leader in the manufacture and sale of automotive wheels.  Hayes is the largest wheel producer in the world, ranking first or second in most markets and product segments, with a broad customer base, low production costs and diversified product offerings and revenue streams in major regions of the world.  Hayes is also generally recognized as a global wheel technology innovator with technologically advanced manufacturing facilities.  Similarly, Hayes has an experienced

senior management team with significant automotive and best practices experience, as well as a proven track record of restructuring the Company's business.

47.   As its liquidity position became more perilous over the past several months, Hayes explored all reasonably available avenues to maximize its enterprise value, including a sale of all or substantially all of its assets (as set forth above), including the equity interest in its profitable, non-U.S. based operations.  As set forth above, there was (and is) interest in acquiring Hayes' businesses.  Potential investors, however, expressed concern about the complexity of the Debtors' capital structure, including the various guarantees by the Non-Debtor Affiliates of obligations under the Credit Facilities and the Euro Notes.  Ultimately, these parties opted for a conservative approach, whereby they would wait to see if Hayes can restructure its global financial obligations through a consensual arrangement or a litigated process.  If so, the parties have indicated they may still be interested in purchasing the restructured Company in connection with the bankruptcy process.

48.   The commencement of the Chapter 11 Cases affords Hayes the opportunity to adjust its debt levels and capital

33

structure in a manner that is commensurate with its projected cash flows.  Hopefully, this goal can be achieved through a process that will ultimately be consensual.  To that end, the DIP Financing Facility, which is provided by certain of the Prepetition Lenders, also provides for a path for the Debtors' emergence from Chapter 11.  Specifically, the DIP Financing Facility lenders have agreed that their DIP Financing Facility claims may be converted to new debt of and equity securities in reorganized Hayes upon the satisfaction of certain conditions. The Debtors anticipate filing a plan of reorganization in the near term in order to implement this proposal.  At the same time, the Debtors are required by the terms of the DIP Financing Facility to market the Debtors' businesses in an effort to determine whether third parties are willing to provide the Debtors with more value that will result from the plan of reorganization contemplated by the DIP Financing Facility.

49.    The Debtors' restructuring efforts are designed to result in greater profitability for Hayes and to solidify its position as the market leader in its product categories.  Hayes expects to emerge from Chapter 11 having rationalized its capital structure by reducing debt to levels commensurate with its cash flow generating capacity and industry norms.  Reducing

leverage should create financial flexibility for future operating requirements and capital expenditures and improve liquidity.  The Debtors believe that the efforts they have taken, and expect to take, will return the most value to Hayes' stakeholders.  However, in the event these efforts are not successful, Hayes current internal estimates indicate that a liquidation of Hayes funded by a $50 million wind-down facility could result in net liquidation proceeds ranging from $37.9 million to $86 million.

**Part II**

**A.   First Day Motions and Orders**

50.   In furtherance of the objective of successfully reorganizing, the Debtors have sought approval of the First Day Motions and related orders (the "Proposed Orders"), and respectfully request that the Court consider entering orders granting such First Day Motions.  For the avoidance of doubt, the Debtors seek authority, but not direction, to pay amounts or satisfy obligations with respect to the relief requested in any of the First Day Motions.  I have reviewed each of the First Day Motions and Proposed Orders (including the exhibits thereto), and the facts set forth therein are true and correct to the best of my knowledge, information and belief.  Moreover, I believe that the relief sought in each of the First Day Motions (a) is vital to enable the Debtors to make the transition to, and operate in, chapter 11 with a minimum of interruption or disruption to their businesses or loss of productivity or value and (b) constitutes a critical element in achieving the Debtors' successful reorganization.

B.    **Administrative and Procedural Motions**

(a)    Joint Administration Motion

51.    The Debtors seek the joint administration of their chapter 11 cases, twenty-five in total, for procedural purposes only.  Many of the motions, hearings, and other matters involved in these chapter 11 cases will affect all of the Debtors.  Thus, I believe that the joint administration of these cases will avoid the unnecessary time and expense of duplicative motions, applications, orders and other pleadings, thereby saving considerable time and expense for the Debtors and resulting in substantial savings for their estates.

(b)    GCG Retention Application

52.    The Debtors have filed an application to retain The Garden City Group, Inc. ("GCG") as noticing and claims agent for the Debtors' chapter 11 cases.  The size of the Debtors' creditor body makes it impracticable for the Debtors to, without assistance, undertake the task of sending notices and dealing with claims.  In light of the number of anticipated claimants and parties in interest, I submit that appointing GCG, an independent third party, to act as claims and noticing agent will provide the most effective and efficient means, and relieve the Debtors and/or the Clerk's Office of the administrative

burden, of administering claims and noticing.  The Debtors believe that GCG is well qualified to provide such services, expertise, consultation, and assistance based on its expertise in the industry and competitive fee structure.

**C.    Business Operation Motions**

(a)    Cash Management Motion

53.    The Debtors seek an order (I) authorizing continued use of existing (a) bank accounts, (b) cash management system, and (c) business forms and checks, (II) authorizing the continuation of intercompany transactions among Debtors and the Non-Debtor Affiliates and according superpriority status to all postpetition intercompany claims ("Intercompany Transactions") and (III) waiving the investment and deposit requirements of 11 U.S.C. § 345(b).

54.    The Bank Accounts: Prior to the commencement of these cases, in the ordinary course of business, the Debtors maintained approximately 27 bank accounts (the "Debtor Bank Accounts").  In addition, the Non-Debtor Affiliates maintained accounts located globally at non-U.S. financial institutions, including throughout the Europe, Asia, South Africa, Mexico, and Brazil through which Hayes manages cash receipts and disbursements for the Debtors' entire corporate enterprise (the

"Non-Debtor Global Bank Accounts" and, collectively with the Debtor Bank Accounts the "Bank Accounts").  The Bank Accounts include those maintained, among others, as concentration accounts, disbursement accounts, receipt and lockbox accounts, and investment accounts.  Nearly all Non-Debtor Global Bank Accounts are managed by the Non-Debtor Affiliates; certain of these accounts are denominated in U.S. currency and others are denominated in the currency of the country or region in which they are maintained.

55.  The Debtors routinely deposit, withdraw, and otherwise transfer funds to, from, and between the Bank Accounts by various methods including checks, automated clearing house ("ACH") transactions, electronic funds transfers and direct deposits.  The Debtors generate thousands of checks per month from the Bank Accounts.  I am informed that the Bank Accounts are generally in financially-stable banking institutions with the Federal Deposit Insurance Corporation ("FDIC"), the Federal Savings and Loan Insurance Corporation ("FSLIC"), or other appropriate government-guaranteed deposit protection insurance.

56.  Furthermore, the Bank Accounts are part of a carefully constructed and complex, automated cash management system (described more fully below) that ensures the Debtors'

39

ability to efficiently monitor and control all of their cash receipts and disbursements.  I believe that closing the existing Bank Accounts and opening new accounts inevitably would disrupt the Debtors' businesses and result in delays impeding the Debtors' ability to transition smoothly into chapter 11, and would likewise jeopardize the Debtors' efforts to successfully reorganize in a timely and efficient manner.

57.  In my opinion, it is thus essential that the Debtors be permitted to continue to maintain their existing Debtor Bank Accounts and, if necessary, open new accounts (and give notice to the U.S. Trustee of such newly opened accounts), wherever they are needed, irrespective of whether such banks are designated depositories in the District of Delaware; provided however, that any new bank account opened by the Debtors shall be with a bank that is insured by the FDIC or the FSLIC and organized under the laws of the United States of America or any state therein and shall be designated a "debtor-in-possession" or "DIP" account by the respective bank.

58.  The Debtors thus request that the Debtor Bank Accounts be deemed to be debtor-in-possession accounts, and that their maintenance and continued use, in the same manner and with

40

the same account numbers, styles, and document forms as those employed during the prepetition period, be authorized.

59.   I further believe that the Non-Debtor Global Bank Accounts are vital to the Debtors' ongoing business operations because such accounts are integral to the cash management system and the Debtors' financial transactions with their foreign affiliates and vendors.   Indeed, non-U.S. operations constitute a material part of the Debtors' business, and, therefore I believe that the Debtors simply cannot operate without the maintenance of their Non-Debtor Global Bank Accounts.

60.   The Cash Management System:   In order to ensure an orderly transition into chapter 11, the Debtors also request authority to continue to use their existing cash management system as required by the Debtors in the ordinary course of business.   Prior to the commencement of these cases, the Debtors used a complex, automated and integrated, centralized cash management system to collect, transfer, and disburse funds generated by their operations and to accurately record all such transactions as they are made (the "Cash Management System").

61.   As described more fully in the motion, the Cash Management System is complex, automated and computerized, and includes accounting controls needed to enable the Debtors, as

well as creditors and the Court, if necessary, to trace funds through the system and ensure that all transactions are adequately documented and readily ascertainable.  When manual transactions are made in the system, the Debtors closely monitor the accounts to ensure the transactions are appropriately documented.

62.  I believe that the cash management procedures utilized by the Debtors are ordinary, usual and essential business practices, and are similar to those used by other major corporate enterprises.  The Cash Management System provides significant benefits to the Debtors, including the ability to control corporate funds centrally, segregate cash flows, invest idle cash, ensure availability of funds when necessary, and reduce administrative expenses by facilitating the movement of funds and the development of more timely and accurate balance and presentment information.

63.  Requiring the Debtors to adopt new cash management systems at this critical stage of these cases would be expensive, would create unnecessary administrative burdens and problems, and would likely disrupt and adversely impact the Debtors' ability to reorganize successfully.  Indeed, I believe that requiring Cash Management System changes could irreparably

harm the Debtors, their estates and their creditors by creating cash flow interruptions while systems were changed.

64.   Business Forms and Checks:  Prior to the Petition Date, in the ordinary course of business, the Debtors used numerous business forms including, but not limited to, letterhead, purchase orders, invoices, contracts, and checks (collectively, the "Business Forms").

65.   In order to minimize expenses to their estates, the Debtors also request that they be authorized to continue to use all Business Forms existing immediately prior to the Petition Date, without reference to the Debtors' status as debtors-in-possession. I believe that changing Business Forms at this critical, early stage of their chapter 11 cases would be expensive and burdensome to the Debtors' estates, disruptive to the Debtors' business operations and would not confer any benefit upon those dealing with the Debtors.  Accordingly, I believe it would be appropriate for this Court to authorize the Debtors to use their existing Business Forms without being required to place the label "Debtor-in-Possession," an account type, or a so-called "debtor-in-possession number" thereon.

66.   Intercompany Transactions:  The Debtors' books and records also reflect numerous intercompany account balances

among various Debtors as of the Petition Date.  To ensure that each individual Debtor will not, at the expense of its creditors, fund the operations of another Debtor entity, the Debtors respectfully request that, pursuant to section 364(c)(1) of the Bankruptcy Code, all intercompany claims against a Debtor by another Debtor arising after the Petition Date as a result of intercompany transactions and allocations be accorded superpriority status, with priority over any and all administrative expenses.  The Debtors will continue to maintain records of such transfers, including records of all current intercompany accounts receivable and payable.

67.  In addition, in the ordinary course of business, the Debtors may periodically infuse capital into certain of their subsidiaries, including the Non-Debtor Affiliates and the Non-Cash Pool Entities.  These infusions of capital generally are accomplished through the making of intercompany loans.  The Debtors use repayments of such loans as a tax efficient method of managing cash throughout their worldwide business enterprise. Because the Non-Debtor Affiliates and the Non-Cash Pool Entities are part of the Hayes group of affiliated entities, the entirety of intercompany transactions among the Non-Debtor Affiliates and

the Non-Cash Pool Entities remain within the spectrum of the Debtors' control.

68.    I anticipate that the funding needs of the Non-Debtor Affiliates over the course of these cases will not exceed $45 million.  I believe that, in the exercise of the Debtors' reasonable business judgment, preservation of the going concern value of the Company as a worldwide enterprise, including the maintenance of the Non-Debtor Affiliates, is absolutely essential to the success of any reorganization plan for the Debtors.  This relief is necessary because certain of the Non-Debtor Affiliates may require intercompany advances in order to maintain their liquidity and going concern value.

69.    Investment and Deposit Guidelines:  As discussed in the motion, the Debtors maintain one investment account at Merrill Lynch.  The Investment Account is a money market account used to earn a greater rate of interest on excess funds from the Concentration Account.  The vast majority of the Debtors' other existing bank accounts are zero balance accounts.  I believe that the Debtors' use of the Bank Accounts, including the Investment Account, substantially conforms with the approved investment practices I am told are identified in section 345 of the Bankruptcy Code, and that all deposits and investments into

45

the Investment Account and their other Bank Accounts are safe, prudent and designed to yield the maximum reasonable net return on the funds invested.

(b)   Customer Programs Motion

70.   The Debtors seek authority, but not direction, to pay amounts related to the Debtors' practices to develop and sustain positive reputations with their customers and in the marketplace for their products (collectively, the "Customer Programs") in the ordinary course of business, and to continue their Customer Programs postpetition.

71.   An accurate and detailed description of the significant customer programs offered by the Debtors is set forth in paragraphs 10 through 19 of the Customer Programs Motion.   These programs include (a) customer price adjustments and/or rebates, (b) a steel resale program, (c) warranty obligations and (d) other commitments.

72.   The Debtors estimate that prepetition obligations related to their Customer Programs as of the Petition Date will total approximately $11,000.   The great majority of these estimated costs relate to customer price adjustments.

73.   The uninterrupted maintenance of the Customer Programs is essential to attracting new customers and

maintaining existing customer satisfaction.  The markets for certain of the Debtors' products are highly competitive, and the Debtors' Customer Programs are integral to their ability to induce customers to purchase certain of the Debtors' products. Thus, I believe that discontinuation of the Debtors' Customer Programs would disrupt their business operations, generate adverse publicity and undermine the Debtors' relationship with their customers.

(c)   Employee Obligations Motion

74.   The Debtors seek, in their discretion and in the exercise of their business judgment, an order (I) authorizing, but not directing, the Debtors to (a) pay or otherwise honor various employee-related prepetition obligations of the Debtors to, or for the benefit of, employees, (b) continue postpetition certain of the Debtors' employee benefit plans and programs in effect immediately prior to the filing of these bankruptcy cases, and (c) honor Debtors' workers' compensation obligations; (II) confirming that the Debtors are permitted, but not required, to pay any and all local, state and federal withholding and payroll-related or similar taxes relating to prepetition periods; and (III) directing all banks to honor prepetition checks for payment of the Debtors' prepetition employee obligations.

47

75.    The Debtors employ approximately 190 salaried employees and 415 hourly employees in the United States (collectively the "Employees").  I believe that the continued and uninterrupted service of the Employees is essential to the Debtors' continuing operations and to their ability to reorganize.  As set forth in Part I above, as part of the Company's cost-cutting strategy, Hayes has taken many steps to reduce its labor costs.

76.    To minimize the personal hardship to remaining Employees with respect to the efforts to reduce labor costs, and to maintain the Employees' morale during this critical time, I believe it is imperative that the Debtors be granted the authority, in their sole discretion, to pay the Employee Obligations.

77.    Salaries and Wages.  The average monthly payroll for the Debtors' salaried and hourly U.S. Employees is approximately $3.2 million.  Salaried Employees are paid on a semi-monthly basis and current as of their pay dates.  Direct deposits and payroll checks for all accrued payroll for salaried Employees through April 30, 2009 were issued on such date. Additionally, the Company has funded payroll through May 15, 2009. The Debtors estimate that no unpaid salaries and wages

48

will have accrued between the last respective pay date and the Petition Date, however, unexpected circumstances may result in de minimis outstanding payroll obligations.

78.  Independent Contractors.  In addition to the Employees described above, the Debtors employ approximately sixteen (16) independent contractors (the "Independent Contractors") to provide various services including, but not limited to, facility maintenance, construction, and technical consulting services.  Ensuring that the Independent Contractors are paid in the ordinary course just like the Employees is essential to the Debtors' continuing operations and, therefore, to their ability to reorganize.  As of the Petition Date, the total accrued but unpaid wages for the Independent Contractors is approximately $180,000.  The Debtors are seeking authorization, but not direction, to pay the prepetition amounts owed to the Independent Contractors to the extent such amounts do not exceed $10,950 with respect to each Independent Contractor.

79.  Vacations, Sick Leave and Holidays.  Paragraphs 17 through 19 of the Employee Obligations Motion provide an accurate and detailed description of the Debtors' vacation, sick leave and holiday policies.  As of the Petition Date, the amount

of accrued sick leave and holiday vacation liability for the Debtors is negligible.

80. The Debtors seek authority to honor all liabilities to their Employees that arose under their vacation, sick leave and holiday vacation policies prior to the Petition Date. The Debtors anticipate that their Employees will utilize any accrued vacation or sick leave in the ordinary course of business, without resulting in any material cash flow requirements beyond the Debtors' normal payroll obligations.

81. Severance Plan. Prior to the Petition Date, the Debtors maintained the Hayes Lemmerz International, Inc. Severance Pay Plan (as amended, the "Severance Plan"), which provides for the payment of severance pay and benefits to terminated salaried employees who elect to participate in the Severance Plan and execute a "Waiver and Release Agreement" pursuant to the Severance Plan. As of May 4, 2009, approximately 12 former employees are receiving benefits pursuant to the Severance Plan (the "Terminated Employees"). The Debtors' aggregate liability for severance pay and benefits owed to the 12 Terminated Employees is approximately $633,000. The Debtors seek authority to honor their obligations under the Severance Plan to Terminated Employees who have executed a

Waiver and Release Agreement. Further, the Debtors request authority, but not direction, to continue the Severance Plan on a go-forward basis for non-insider Employees terminated post-petition in the ordinary course of business.

82.   Existing Bonus Plan.   The Debtors offer incentive bonuses to certain Employee constituencies at the local plant level through plant gainsharing plans and special recognition awards, and at the corporate level through special recognition awards.   Bonuses may be awarded pursuant to these plans for, among other things, achieving local plant improvement goals, exceptional contributions to specific tasks and contributing to the realization of savings through participation in strategic initiatives.   Payments made by the Debtors pursuant to these plans occur once a year, generally in March, following the end of the Debtors' fiscal year on January 31st.   The Debtors made payments totaling $919,536.78 under the 2008 gainsharing plan to 567 participants on March 6, 2009.   As of April 30, 2009, approximately $220,000 has accrued under the 2009 gainsharing plan.   Additionally, the Debtors pay less than $100,000 towards other miscellaneous special recognition awards for Employees.

83.   Sedalia SUB Plan.   Prior to the Petition Date, the Debtors maintained the Hayes Lemmerz International, Inc.

Supplemental Unemployment Plan for Employees of the Sedalia

Plant (the "SUB Plan").  The SUB Plan holds assets in a trust

and pays supplemental benefits to eligible Employees during a

period of layoff.  Under the SUB Plan, the Debtors make a

contribution to the fund in an amount to be determined by

multiplying 5¢ by the total number of hours for which Eligible

Employees have worked for the Company in each pay period.  There

are approximately 300 eligible Employees at the Sedalia facility.

The Debtors contribute an average of $3,000 per month.  As of

the Petition Date, the Debtor's estimated liability for the SUB

Plan is less than $2,000.

84.  Miscellaneous Payroll Deductions.  The Debtors

withhold certain amounts from their Employees' paychecks to make

payments on behalf of Employees for, among other things, union

dues, court orders, charitable donations, U.S. savings bonds,

safety equipment, and miscellaneous health-related items

(collectively, the "Miscellaneous Payroll Deductions").  The

Debtors subsequently forward these deductions to appropriate

third party recipients.  The Debtors believe that, as of the

Petition Date, the amount of the Miscellaneous Payroll

Deductions deducted from their Employees' paychecks but not yet

remitted to the appropriate third-party recipients is insubstantial.

85.  Reimbursable Business Expenses.  In the ordinary course of the Debtors' businesses, many Employees incur a variety of business expenses that are typically reimbursed by the Debtors, pursuant to their normal business practices. Paragraph 25 of the Employee Obligations Motion provides an accurate description of such reimbursable business expenses.  As of the Petition Date, the Debtors estimate that approximately $400,000 in reimbursable business expenses have been incurred by certain Employees and have not yet been reimbursed to Employees.

86.  Medical and Insurance Benefits:  In the ordinary course of their business, the Debtors provide medical, dental and prescription drug insurance, long-and short-term disability insurance, life insurance, accidental death and dismemberment insurance, and other related insurance to their Employees (the "Medical and Insurance Benefits").  Paragraphs 26 through 27 of the Employee Obligations Motion provide an accurate and detailed description of the Medical and Insurance Benefits.

87.  The average monthly cost for all of the Debtors' Medical and Insurance Benefits is approximately $700,000, of which approximately 10 percent (10%) is withheld from Employee

payroll as their required contributions to the various benefit plans.  As of the Petition Date, the estimated outstanding unpaid amount for the Medical and Insurance Benefits the Debtors provide for their current Employees is approximately $1.25 million.

88.   Retirement Savings Plan.  The Debtors maintain the Hayes Lemmerz International, Inc. Retirement Savings Plan (the "Retirement Savings Plan") for its Employees.  The Retirement Savings Plan is a defined contribution retirement plan qualified under section 401(k) of the Internal Revenue Code. Under the Retirement Savings Plan, the Debtors make deductions from each participating salaried and hourly Employee's payroll check and transfer the withheld funds to the plan trustee. Additionally, the Debtors provide matching contributions of up to 4 percent (4%) of each salaried and hourly Employee's annual compensation.  The Debtors contribute an average of $1.2 million to the Retirement Savings Plan annually.  As of the Petition Date, the Debtors' estimated liability for the Retirement Savings Plan is less than $50,000.

89.   Pension Plan.  The Debtors provide certain retired Employees with a defined benefit pension plan, the Hayes Lemmerz International, Inc. Pension Plan (the "Pension Plan"),

pursuant to which a benefit is payable to the Employee or other designated beneficiary upon the Employee's retirement from the company, total and permanent disability, or death.  The Pension Plan was frozen as of December 31, 2002 and therefore no Employee is currently accruing any additional credited service or increased benefit amount, when measured at an assumed retirement age of 65.  As of the most recent actuarial analysis, on January 31, 2008 the Pension Plan was approximately fifty-eight percent (58%) funded, and its assets and liabilities had market values of approximately $96 million and $166 million, respectively.  As of March 31, 2009, assets in the plan were approximately $93 million.

90.    The Debtors had a quarterly pension payment of $1,133,581 due on April 15, 2009.  The Debtors paid $150,000 on April 15th and elected to defer consideration of payment of the remaining amounts.  Therefore, a minimum funding shortfall of approximately $984,000 exists.  Similar quarterly payments will come due on July 15th and October 15th, and a $614,000 contribution to the Pension Plan is due on September 15, 2009.

91. <u>Retiree Medical Benefits</u>.  The Debtors provide retiree medical benefits (the "<u>Retiree Medical Benefits</u>") to approximately 2,000 former Employees or surviving spouses.  The

Debtors provide different levels of medical, dental, life insurance and prescription drug programs to retired employees and to retired union workers pursuant to various collective bargaining agreements.  A portion of the Retiree Medical Benefits for Medicare-eligible retirees and their covered dependents is insured.  Plan types for the insured benefits include health maintenance organizations, among others, a majority of which are administered by Professional Benefit Services and Blue Care Network.  The remaining Retiree Medical Benefits liability is self-insured with claims administered by several third-party administrators, predominately CVS/Caremark, PBS/UA, and WEYCO, and paid by the Debtors.  During 2008, the annual expense of the Retiree Medical Benefits was approximately $14 million.  As of the Petition Date, the Debtors' estimated incurred, but not reported, expense for Retiree Medical Benefits is approximately $1.2 million.  Based on current actuarial analyses, the Debtors estimate that the Debtors' cumulative long-term liability for fully performing all of their existing Retiree Medical Benefits on behalf of all eligible retired employees and dependents and current Employees and dependents who have accrued rights to the Retiree Medical Benefits as of the Petition Date would total approximately $150 million.

92.   Other Programs.   The Debtors sponsor certain other programs, including a scholarship program, a tuition reimbursement program and a leased car program.   Paragraphs 34 through 38 of the Employee Obligations Motion provide an accurate and detailed description of such programs.

93.   Administration of Employee Benefits.   The Debtors utilize the services of professionals and consultants in the ordinary course of their business in order to facilitate the administration and maintenance of their books and records in respect of foregoing Employee benefit plans and programs and to administer their payroll.   These administrative services cost the Debtors approximately $50,000 per month.   The Debtors believe that unpaid processing costs will be de minimis.

94.   Workers' Compensation Obligations:   Under the laws of the various jurisdictions in which they operate, the Debtors are required to maintain workers' compensation policies and programs and to provide Employees with workers' compensation coverage for claims arising from or related to their employment with the Debtors.   Accordingly, the Debtors maintain workers' compensation programs in all states in which they operate pursuant to the applicable requirements of local law.

57

95.    Paragraphs 40 through 46 of the Employee Obligations Motion provide an accurate and detailed description of the Debtors' workers' compensation programs and obligations. If the Debtors are unable to pay their prepetition workers' compensation obligations, the Debtors expect that certain letters of credit will be drawn, resulting in potential claims against the estates.

96.    The Debtors' outstanding obligations relating to workers' compensation arise from incurred but not paid ("IBNP") claims and incurred but not reported ("IBNR") claims.  The Debtors estimate their IBNR through an actuarial process that is common in the insurance industry.  As of March 23, 2009, approximately 761 workers' compensation claims were pending against the Debtors arising out of Employees' alleged on-the-job injuries.  The Debtors estimate that the aggregate amount payable on account of IBNP claims, prepetition IBNR claims, and retrospectively rated premium rate adjustments from the Ohio Bureau of Workers' Compensation is approximately $4.4 million. The Debtors expect that cash payments related to workers' compensation claims for the next 12 months will be approximately $1.7 million.

97.    <u>Employment and Withholding Taxes.</u>  The Debtors accrue, in the ordinary course of business, state, local and federal employment and withholding taxes as wages are earned by the Debtors' Employees. These taxes are calculated based on statutorily mandated percentages of earned wages. Historically the Debtors have timely paid all federal, state and local Employment and Withholding Taxes to the relevant Taxing Authority, usually on a per pay period basis.

98.    In sum, I believe the relief requested in the Employee Obligations Motion is necessary and appropriate and is in the best interest of the Debtors' estates, creditors and other parties-in-interest.

(d)    <u>Tax Motion</u>

99.    The Debtors seek authorization, but not direction, to pay certain prepetition taxes and fees, including (1) sales, use, and gross receipts taxes, (2) property taxes against the Debtors' real property  and personal property, (3) franchise taxes and <u>de</u> <u>minimis</u> registration fees and (4) business license fees and annual report or bi-annual report taxes and certain other taxes (collectively, the "<u>Taxes</u>") to the respective federal, state and local taxing authorities (the "<u>Taxing Authorities</u>") in the ordinary course of the Debtors' business.

Prior to the Petition Date, the Debtors generally paid their tax obligations as they became due.

100. An accurate and detailed description of the Taxes is set forth in paragraphs 7 through 12 of the Tax Motion. The Debtors' failure to pay the Taxes could cause some states to challenge the Debtors' right to operate within their jurisdiction. Addressing any subsequent action taken by those states would be costly, place an administrative burden on management, and divert management's attention from the reorganization process.

(e)  Utilities Motion

101. In connection with the operation of their business and management of their properties, the Debtors obtain services ( the "Utility Services") from various providers of Utility Services (each a "Utility Company" and, collectively, the "Utility Companies").

102. I believe that uninterrupted Utility Services to the Debtors are vital to the continued operation of the Debtors' business enterprise and, consequently, to the success of their chapter 11 cases. The Debtors depend on the reliable delivery of power and other Utility Services to operate their facilities and manufacture their products. Thus, I submit that termination

of the Utility Services would result in substantial (and potentially) irreparable disruption to the Debtors' businesses that could decimate their revenue and profits and, therefore, substantially diminish or eliminate the Debtors' chances for a successful reorganization.  Accordingly, the relief requested in the Utilities Motion is necessary and in the best interests of the Debtors' estates and their creditors.

103. I believe that the Debtors have provided sufficient assurances of their future performance with respect to the Utility Companies.  Furthermore, the adequate assurance method proposed in this motion is a reasonable accommodation of the interests of the Utility Companies and the Debtors.  The total amount of cash proposed as the Adequate Assurance Deposit is $1.3 million.  The Debtors have availability under their proposed DIP financing to reserve such funds.

(f)   Insurance Financing Motion

104. The Debtors seek authorization, but not direction, to (i) maintain, and to pay all policy premiums and brokers' fees arising under, or in connection with, their various insurance policies (collectively, the "Insurance Policies") which the Debtors have obtained through several third-party insurance carriers (collectively, the "Insurance Carriers"); (ii)

61

continue honoring their obligations pursuant to prepetition insurance premium financing agreements for the purpose of financing the purchase of several forms of insurance coverage; and (iii) continue the grant of a security interest to the insurance premium finance companies. I estimate that brokers' fees relating to prepetition periods to be paid under this Motion total approximately $12,250, and further estimate that prepetition obligations related to the Debtors' prepetition insurance premium financing agreements will total approximately $945,000 as of the Petition Date.

105. In connection with the operation of their businesses and management of their properties, the Debtors maintain various Insurance Policies. The Insurance Policies include, but are not limited to, coverage for workers' compensation claims, automobile claims, fiduciary liability claims, claims for losses due to crime, directors' and officers' liability, certain general and excess liability claims and various casualty and property-related liabilities. I believe that the third-party claims that are covered by the Insurance Policies are neither unusual in amount, nor in number, in relation to the extent of the business operations conducted by the Debtors.

106. <u>Payment of the Insurance Premiums and Brokers'</u>
<u>Fees.</u>  Maintenance of insurance coverage under the various Insurance Policies is essential to the continued operation of the Debtors' businesses and is required under the United States Trustee's Operating Guidelines For Chapter 11 Cases (the "<u>Operating Guidelines</u>"), the laws of the various states in which the Debtors operate and the Debtors' various debt agreements. Thus, I believe the court should authorize the Debtors to continue to pay Insurance Policy premiums as such premiums come due in the ordinary course of the Debtors' business.

107. The Debtors have been represented in their negotiations with their various insurance underwriters by Jeff Merritt (Merritt Insurance Group) and Robert Skoczek (AON Risk Services).  Additionally, the Debtors entered into a Risk Management Fee Agreement with The Campbell Group ("<u>Campbell</u>"), under which the Debtors appointed Campbell to serve as Broker of Record for the Debtors' U.S. workers compensation program (excluding Ohio).  I believe that it is in the best interests of the Debtors' creditors and estates to continue their business relationship with Merritt Insurance Group, AON Risk Services and Campbell.

108. <u>Prepetition Insurance Premium Finance and Security Agreement</u>:  As described more fully in the Insurance Financing Motion, the Debtors participate in two insurance premium financing agreements and programs (the "<u>Financed Insurance Programs</u>").  The Debtors' insurance premium financing agreements (the "<u>Finance Agreements</u>") were executed for the purpose of financing the purchase of several forms of insurance coverage.  I believe that the terms of the Finance Agreements represent the best possible terms for financing the premiums of the Insurance Programs.  The Debtors' estates will benefit by maintaining this low-cost financing from AFCO Corporation and Premium Financing Specialists, Inc.  Moreover, any interruption of payments might adversely affect the Debtors' ability to obtain financing for future policies on favorable terms.  The 21 Insurance Policies subject to the Finance Agreements are essential to the preservation of the Debtors' businesses, properties, and assets.  In some cases the coverage is required by regulations, laws, and/or contracts that govern the Debtors' business obligations.

**D.   Continuing Vendor Motions**

(a)   <u>U.S. Creditor Motion</u>

109. The Debtors seek entry of an order authorizing but not directing (i) the Debtors to pay, in the ordinary course of business, the prepetition claims of certain suppliers, vendors, regulatory agencies, and other prepetition creditors located in the United States (collectively, the "<u>Essential U.S. Suppliers</u>," whose claims shall be identified as "<u>Essential U.S. Supplier Claims</u>") that provide goods or services to the Debtors that the Debtors deem in the exercise of their business judgment to be essential to the uninterrupted functioning of the Debtors' business operations (the "<u>Essential Goods and Services</u>") in an aggregate amount not to exceed $2.5 million on an interim basis and an additional $2.5 million on a final basis for a total of $5 million (the "<u>Essential U.S. Supplier Cap</u>"), and (ii) financial institutions to honor and process related checks and transfers.

110. The Debtors are highly mindful of their fiduciary obligations to seek to preserve and maximize the value of their estates.  Accordingly, the preservation and maximization of the going concern value of the Debtors' businesses, including the preservation of key business

relationships, are among management's primary goals as the Debtors transition into chapter 11.  Providing seamless service to customers, including the Debtors' original equipment manufacturing customers (collectively, the "OEM Customers"), which account for a substantial portion of the Debtors' global sales, is key to meeting those goals.  For these reasons, the Debtors seek to minimize the adverse business effects — as well as the cash flow impact — of their chapter 11 filing to the fullest extent possible by obtaining authority to pay certain vendors that are of paramount importance to their business operations.

111. The Debtors have two ongoing domestic manufacturing facilities that design, manufacture, and distribute a full line of fabricated steel and disc wheels as well as demountable rims and an assortment of other wheel-related products for the OEM Customers and others.  The Debtors are the leading supplier for several of these products to the North American markets.

112. The Supply Chain of the Debtors and Their Customers.  I believe payment of the Essential U.S. Supplier Claims is necessary because the Debtors' manufacturing facilities use the "just-in-time" supply method for processing

their products.  The just-in-time supply method is standard in the automotive industry and is used not only by other automotive equipment suppliers, but, more importantly, by the Debtors' OEM Customers.  Under the just-in-time model, even small disruptions in the supply chain have significant and costly ripple effects.

113. In connection with the commencement of these cases, the Debtors are making every effort to avoid interruptions in the supply chain and the adverse effects that even a temporary break in the supply chain could have on their businesses. Because the OEM Customers are aware of the potential deleterious effects of supply chain interruptions, they often take steps to divert business from financially troubled companies who are at risk for business interruptions.  The OEM Customers generally have multiple alternatives in the marketplace; I believe that if there were disruptions in the supply chain it is likely that the OEM Customers will take note of any instability in the Debtors' businesses when considering their future sourcing needs, and will be mindful of the efforts made by the Debtors to prevent such instability.

114. Accordingly, the Debtors are placing extreme emphasis on avoiding supply chain interruptions in the opening

days of their bankruptcy cases.  Because of the nature of the

Debtors' businesses, I believe that many vendors will make

credible threats that, unless paid on account of their

prepetition debt, they will cease to supply the Debtors with the

specialized goods and services necessary to maintain the smooth

operation of the Debtors' businesses.  Certain aspects of the

Debtors' business operations, which are described in detail in

the motion, demonstrate the Debtors' need for authority to make

payments on account of the prepetition claims of essential

vendors as required in the exercise of their business judgment,

and subject to appropriate terms and conditions, to preserve the

value of their businesses.

115. <u>The Identity of the Essential U.S. Suppliers.</u>
The Debtors also rely on the sole source supply method.  The

Debtors seek to avoid interruptions to their supply chain by

identifying those vendors that would have the ability — as well

as the willingness — to interrupt the supply chain described

above.  In general, such Essential U.S. Suppliers fall into three

main categories: materials suppliers, maintenance suppliers, and

other essential suppliers.

116. For these categories, there is a common concern:

the goods and services purchased from such vendors for use in

the operation of the Debtors' businesses (collectively, the "Single Source Goods and Services") are available, as a practical matter, only from a single supplier.  There are two possible reasons for the single source supplier; either the supplier is the only company which provides a particular good or service or an OEM Customer mandates that the Debtors use a particular supplier for that good or service.  A more detailed description of the Single Source Goods and Services is provided in the motion.

117. For all these reasons set forth herein and in the motion, the Debtors have determined that they must be able to satisfy the prepetition claims of the Essential U.S. Suppliers to ensure that these essential Single Source Goods and Services will continue to be available to them without interruption.

118. Suppliers of Raw Materials and Component Parts. The Debtors seek authority to pay Essential U.S. Suppliers of key direct materials, raw materials, components, equipment, supplies and other goods utilized in the Debtors' manufacturing processes (collectively, the "Materials Suppliers").

119. As discussed earlier, the Debtors' relationships with its OEM Customers and others requires that the Debtors

acquire most of its direct material suppliers from pre-approved suppliers.  The pre-approval process can be time consuming and last as long as six months.  Thus, it is difficult for the Debtors to change suppliers.

120. The Materials Suppliers are well aware of their market power and their importance to the Debtors' business operations as a result of the uniqueness of the materials or components that they supply.  The Debtors believe that these vendors, feeling confident that they possess the "upper hand" in their dealings with the Debtors, likely would demand prepetition payments as a condition of continuing to do business with the Debtors.  Although it is possible that some of these demands might amount to empty threats (and presumably would violate the Bankruptcy Code), the Debtors believe that many Materials Suppliers, at minimum, would stop shipping to the Debtors for a period of time, quickly causing production delays that would adversely impact the Debtors' ability to meet the needs of their customers.  As noted above, even a short interruption in the production of a small part could have devastating consequences to the Debtors' businesses.

121. Similarly, even if the Materials Supplier ultimately agreed to supply the Debtors with the goods essential

to their businesses, the harm to relations with the Materials Supplier could have a long-term adverse impact on the Debtors' businesses.  The Debtors rely on the Materials Suppliers to provide high levels of service to the Debtors, including regular accommodations to address pressing and unscheduled production demands.  Absent the payment of the Materials Suppliers' claims, the Debtors may be unable to obtain such accommodation for the occasional requirement for materials, components and finished goods on short notice a need that is driven by the nature of the Debtors' business and cannot be predicted or mitigated.  The inability to rely on such assistance would create an ongoing risk that could adversely impact the Debtors' ability to service their customers.

122. The Debtors estimate that, as of the Petition Date, the aggregate amount of Essential U.S. Supplier Claims held by Materials Suppliers was approximately $1.8 million.

123. <u>Maintenance Vendors</u>. The Debtors also utilize a highly skilled and specialized group of vendors to provide parts, materials, supplies, labor and services needed to maintain and operate the Debtors' machinery, equipment, and facilities utilized in their manufacturing operations (collectively, the "<u>Maintenance Vendors</u>").  In many such cases, the Debtors have

purchased machinery and equipment, much of which is protected by patents or other intellectual property rights, from Maintenance Vendors.  Often, as discussed earlier, a particular vendor is the only party that manufactures and distributes the necessary parts or has the requisite skill to perform certain essential repairs and maintenance for the machinery and equipment.  In other instances, Maintenance Vendors may provide specialized or proprietary materials such as oils, fluids or other specific materials that must be utilized in the maintenance of the machinery and equipment.  When they can, the Debtors seek to utilize vendors and service providers other than the manufacturers to repair and service their machinery, equipment and facilities, or seek to purchase maintenance materials from outside vendors due to the lower costs of such alternative vendors and service providers.  In some instances, however, only the original manufacturer is able to provide the goods or perform the tasks required.

124. Accordingly, for all of these reasons set forth herein and in the motion, the Debtors believe that there is substantial risk that the Maintenance Vendors will demand that their prepetition claims be satisfied before they will perform valuable services for the Debtors.  If the Maintenance Vendors

72

stopped doing business with the Debtors, serious damage to the Debtors' businesses would result.

125. The Debtors estimate that, as of the Petition Date, the aggregate amount of Essential U.S. Supplier Claims held by Maintenance Vendors was approximately $1.3 million.

126. In addition to the Materials Suppliers and Maintenance Vendors, the Debtors rely on other Essential U.S. Suppliers to provide services which are essential to the continuance of production and the ongoing operations of the Debtors.  The services that these suppliers provide include an array of administrative support services, including payroll, taxation, information technology, financial and janitorial.  If these other Essential U.S. Suppliers stopped doing business with the Debtors, the Debtors' production and operations would suffer significant damage.

127. I believe that the Debtors' management and employees have exercised high levels of care in reviewing the facts and circumstances of their Essential U.S. Suppliers and have identified a reasonable list of such vendors that they believe could cause material business disruptions of the kinds described above if the Debtors do not obtain the relief sought herein.  The Debtors intend to pay only certain of these vendors

and to require postpetition commitments from these vendors as a quid pro quo for, and as a condition to, the payment of the Essential U.S. Supplier Claims, as discussed in detail in the motion.  I therefore believe it is in the best interest of the Debtors for the court to grant them the authority, in their sole discretion, to pay the prepetition claims of the Essential U.S. Suppliers, up to the Essential U.S. Supplier Cap. Given the size of their businesses, the magnitude of the costs of any disruption in their operations and the demonstrated benefits to be obtained in exchange for any payments to the Essential U.S. Suppliers, I submit that this is a reasonable and appropriate cap on the expenditure of estate funds.

        (b)   Foreign Creditor Motion

        128. The Debtors seek entry of an order (a) authorizing but not directing the Debtors to pay, in their sole discretion and in the ordinary course of business, as and when due, prepetition claims (the "Foreign Claims") owing to vendors, service providers, regulatory agencies, and governments located in foreign jurisdictions (collectively, the "Foreign Creditors"), including, without limitation, claims for payment for goods (the "Goods") and services provided to the Debtors, as well as import or tax obligations, and (b) authorizing their banks to receive,

74

process, honor, and pay checks or electronic transfers used by the Debtors to pay prepetition obligations to the Foreign Creditors. The Foreign Creditors include, among others, foreign vendors and foreign governmental authorities. The Debtors have reviewed 2009 forecasted annual purchase volumes as well as actual disbursements made by the Debtors for, or related to, Foreign Creditors during the period from January through April, 2009. The average monthly payments for or related to Foreign Creditors during this period were, in the aggregate, approximately $1.3 million per month. Although it is difficult to estimate with precision, the Debtors estimate that the outstanding prepetition obligations owing to all Foreign Creditors as of the Petition Date is approximately $800,000.

129. I believe that if the Foreign Claims are not paid, the Foreign Creditors may take precipitous action against the Debtors based upon their belief that they are not subject to the jurisdiction of this Court and, thus, not subject to the automatic stay provisions of 11 U.S.C. § 362(a). The Foreign Creditors could, among other things, sue in a foreign court and obtain a judgment against the Debtors to collect prepetition amounts owed to them. They could immediately seek to attach or seize the Debtors' foreign assets even prior to obtaining a

judgment.  In addition, foreign governmental authorities might seize the Debtors' assets in such countries, including, without limitation, parts and other goods destined for the Debtors' manufacturing plants in the U.S.  The foreign governmental entities could also seek civil penalties against the Debtors.  More importantly, I believe the Debtors' foreign suppliers could refuse to do business with the Debtors.  The impact of such events on the Debtors' operations would be catastrophic.

130. Payment of the Foreign Claims is also necessary because the Debtors' manufacturing facilities use the "just-in-time" and "sole source" supply methods for processing their products, as set forth in greater detail above and in the motion.  Indeed, if the foreign suppliers fail to ship goods or refuse to do business with the Debtors because of a failure to pay the Foreign Claims, or if foreign governmental entities seize goods from sole-source suppliers because of a failure to pay the Foreign Claims owing to such entities, the Debtors' manufacturing facilities utilizing those parts would likely be forced to shut down, impairing the Debtor's ability to ship goods to their OEM customers.  I believe a line shutdown could cause the Debtors to suffer a loss of customer relations and goodwill.  In addition, if the Debtors' line shutdown forces the

OEM customers to halt production of their products, the OEM customers could assert damages against the Debtors.  The Debtors would also be harmed by continuing to incur the considerable fixed costs connected to the facilities idled by the failure to receive parts without generating any revenue to offset such fixed costs.  I believe the long term damage caused by such shutdowns to the Debtors' business would be both immeasurable and irreparable.

131. Furthermore, the failure to pay Foreign Claims could result in the Debtors' inability to continue their businesses in certain foreign jurisdictions.  Therefore, payment of the Foreign Claims is essential for the Debtors to maintain their trade relationships with foreign jurisdictions.  I believe the relief requested in this motion (the "Foreign Creditor Motion") is necessary and appropriate and is in the best interest of the Debtors' estates, creditors and other parties-in-interest.

(c)   Administrative Expense and 503(b)(9) Motion

132. The Debtors seek entry an order (i) confirming that their subcontractors, suppliers, and vendors (collectively, the "Vendors") will have administrative expense priority claims for those undisputed obligations arising from prepetition

purchase orders outstanding on the Petition Date (the "Outstanding Orders") relating to the Goods that are or will be received and accepted by the Debtors on or subsequent to the Petition Date and authorizing, but not directing, the Debtors to pay such obligations in the ordinary course of business and (ii) confirming the grant of administrative expense status to obligations arising from prepetition delivery of goods received within 20 days of the commencement date of these chapter 11 cases (the "20-day Goods") and authorizing, but not directing, the Debtors to pay such obligations in their discretion in the ordinary course of business.

133. In the ordinary operation of the Debtors' businesses, numerous Vendors provide the Debtors with hundreds of thousands of dollars of Goods on a daily basis.  Indeed, because of the Debtors' use of "just-in-time" inventory systems, the Debtors receive Goods from Vendors on a continuous basis. As of the Petition Date, and in the ordinary course of their businesses, the Debtors had a substantial number of Outstanding Orders with the Vendors.  I believe that as a result of the filing of the Debtors' chapter 11 cases, many of the Vendors may be concerned that delivery or shipment of Goods after the Petition Date pursuant to a prepetition purchase order will

78

render that Vendor a general unsecured creditor of the Debtors' estates.  Accordingly, without confirmation that claims for Goods shipped pursuant to Outstanding Orders will be entitled to administrative expense priority status, Vendors may decline to ship, or may instruct their shippers not to deliver, Goods destined for the Debtors unless the Debtors issue substitute, postpetition purchase orders, which could impose a significant administrative burden as it could require the Debtors to issue thousands of new purchase orders.  If this were to occur, I believe the Debtors supply chain would be disrupted.

134. The Debtors also request that the court confirm the grant of administrative expense status to obligations arising from prepetition delivery of the 20-day Goods.  I have been told that, as of the Petition Date, certain of the Vendors have not been paid for the 20-day Goods.  The Vendors' claims relating to the 20-day Goods are administrative expenses.  The Debtors ordered the Goods prepetition, and the Vendors delivered the Goods to the Debtors within 20 days of the commencement date of these cases.  The Debtors believe that, although they are not required to, they must pay the claims of the Vendors with respect to the 20-day Goods, or the Vendors may refuse to continue to do business with the Debtors.  The Debtors estimate

that approximately $5.62 million with respect to such 20-day Goods will become due and payable during the next sixty (60) days.  Payments of claims with respect to the 20 Day Goods – even if made to critical vendors – shall not count against the Essential U.S. Supplier Cap.

135. I believe that payment of claims for the Goods delivered as a result of the Outstanding Orders and the 20-day Goods are essential to enabling the Debtors to continue their business and for the Debtors to successfully reorganize.

(d)   Shipping Motion

136. The Debtors seek entry of an order authorizing them to pay prepetition shipping and import expenses, including customs duties, general order penalties, ocean freight, air freight, trucking charges, brokerage fees, detention and demurrage fees, surety bond premiums, amounts owed to Paying Agents (as defined below), consolidation and deconsolidation charges, and the like (collectively, the "Shipping Claims"), as the Debtors determine, in the exercise of their business judgment, may be necessary or appropriate to obtain goods in transit and to satisfy the liens, if any, in respect thereof. The Debtors also seek to pay certain warehousing charges relating to warehouses and storage facilities supporting their

distribution system (the "Warehousing Obligations").  Paragraphs 9 through 22 of the Shipping Motion provide an accurate and detailed description of these obligations.  On a weekly basis, the Debtors' total accrued, outstanding claims owed to any shippers, warehousemen or other transportation providers is approximately $195,000.  The Debtors estimate that their payments for prepetition Shipping Claims, Import Obligations (as defined in the Shipping Motion) and Warehousing Obligations will not exceed approximately $330,000.

137. The Debtors seek to pay the pre-petition Shipping Claims for several reasons.  First, if they are not paid, many independent shippers and distributors may refuse to perform additional services for the Debtors.  In such event, the Debtors will incur additional expenses (such as premium shipping costs) to replace these shippers and distributors, which amounts will likely exceed the amount of unpaid prepetition Shipping Claims that the Debtors request permission to pay hereunder.

138. Second, I believe that any delays in delivery with respect to goods that may be in the possession of shippers, warehousemen, customs brokers, and/or distributors as of the commencement of these cases will likely result in the assertion, under applicable law, of possessory liens upon the Debtors'

81

property in the possession of such shippers, warehousemen, customs brokers or distributors, and could disrupt the Debtors' inventory distribution network to the detriment of their operations.

139. Finally, I believe that failure of the Debtors to receive some of the goods at issue, can cause temporary shutdowns of the Debtors' manufacturing facilities, which could have global ramifications for the automotive industry. Because of the highly integrated nature of the automotive supply chain and the Debtors' central role within that chain, any disruptions to the Debtors' manufacturing facilities from not obtaining the necessary goods may cause similar shutdowns for their customers including Ford Motor Company and Chrysler. Such shutdowns will not only frustrate the expectations of their customers and erode customer goodwill, but also ruin the Debtors' reorganization efforts.

140. In addition, I believe that payment of the Debtors' Import Obligations will benefit the Debtors' estates because (a) the Debtors' manufacturing operations might otherwise be interrupted, (b) the eventual sale of the products so imported will generate substantial gross income, (c) forfeiture of goods for which the Debtors have already become

indirectly obligated will be avoided and (d) important customer goodwill, based upon the availability of advertised products, will be protected.

141. Paying Agent Fees.  In the ordinary course of business, the Debtors utilize third party paying agents (the "Paying Agents"), to pay the majority of the Debtors' shipping charges.  The Paying Agents collect invoices in connection with various Shipping Claims, reconcile such invoices against the Debtors' records and then periodically bill the Debtors for amounts owed to the Shippers.  Once payment from the Debtors is received, the Paying Agents pay the Debtors' shipping charges on the Debtors' behalf.

142. The Debtors do not have an alternative system in place to pay most of their Shipping Claims absent the use of the Paying Agents.  Therefore, I believe that the continued utilization of the Paying Agents to process invoices in connection with the Shipping Claims is critical to the Debtors' reorganization and believe it would be in the Debtors' best interest for the court to grant them authority to continue paying the Paying Agents all amounts owed for outstanding Shipping Claims, as well as the Paying Agents' standard fees for

83

processing and paying such Shipping Claims, including payment in the ordinary course of any prepetition amounts outstanding.

143. I believe that the relief requested in the Shipping Motion will ensure the continuous supply of Goods that are vital to the Debtors' continuous operations and integral to their successful reorganization. Absent the relief requested in this Motion, the Debtors would be required to expend substantial time and resources convincing shippers, distributors, and parties holding goods that they should not assert a lien on or hold goods in transit. The attendant disruption to the continuous flow of goods (including imported goods held by shippers, warehousemen, customs brokers and/or distributors) to the Debtors would likely result in a shortage of goods used by the Debtors in their operations. Without the goods, the Debtors' business would rapidly deteriorate and their opportunity to achieve a successful reorganization would be seriously jeopardized. Accordingly, I believe the relief requested is necessary and appropriate and is in the best interest of the Debtors' estates, creditors and other parties-in-interest.

(e)   <u>Lien Claimants Motion</u>

144. The Debtors seek entry of an order authorizing them to pay certain Contractors (as defined in the Lien Claimants Motion) for certain prepetition services in satisfaction of any liens according to the conditions outlined in the Lien Claimants Motion.  The Debtors estimate that the aggregate amount to be paid by the Debtors for such Contractor claims pursuant to the Lien Claimant Motion would be less than $250,000.

145. Paragraphs 7 through 12 of the Lien Claimants Motion provide an accurate and detailed description of the potential Contractor lien claims.  Although the Debtors have generally made timely payments to the Contractors, as of the Petition Date, a substantial number of the Contractors may not have been paid for certain prepetition goods and services provided.  As a result, I believe certain Contractors may refuse to perform their ongoing obligations.  Absent the Contractors' services, the physical condition of certain of the Debtors' facilities would deteriorate.  Additionally, the crafting and assembly of certain products would be delayed, if finished at all.  Ultimately, I believe the Contractors' failure to provide

ongoing services would adversely impact the Debtors' operations, and thus, hamper the Debtors' reorganization efforts.

146. Moreover, the Debtors' failure to pay the Contractors for prepetition goods and services may result in many of the Contractors having a right to assert mechanics' or artisans' liens ("Mechanics' Liens") against the relevant plant locations of the Debtors or the Debtors' goods, which Mechanics' Liens may be perfected notwithstanding the automatic stay established by section 362 of the Bankruptcy Code.  I believe that the existence and perfection of these Mechanics' Liens, particularly with respect to the Debtors' products, could adversely affect the Debtors' reorganization efforts.

(f)   Automatic Stay and Ipso Facto Motion

147. As described above, the Debtors, together with their non-Debtor global affiliates, have worldwide operations, with facilities located in 13 countries.  Many of the Debtors' creditors and contract counterparties do not transact business on a regular basis with companies that have filed for chapter 11, and are therefore unfamiliar with the scope of the debtor-in-possession's authority to conduct its business.  As a result, I believe that these parties are unaware of the protections of the

automatic stay and other provisions that assist debtors-in-possession in their reorganization.

148. Thus, various interested parties may attempt to seize assets located outside of the United States to the detriment of the Debtors, their estates and creditors, or take other actions in contravention of the automatic stay of section 362 of the Bankruptcy Code as it has been described to me.  In addition, upon learning of the Debtors' bankruptcy, counterparties to leases and executory contracts may attempt to terminate those leases or contracts pursuant to ipso facto provisions in contravention of section 365 of the Bankruptcy Code as it is described to me.  The Debtors hope that an order enforcing and restating the automatic stay and ipso facto provisions of the Bankruptcy Code as they relate to foreign creditors and contract counterparties from this Court will protect the Debtors from improper actions, particularly actions by unwitting parties in foreign jurisdictions who are not familiar with the Bankruptcy Code or its protections and who might otherwise violate those sections.

(g)  **DIP Financing Facility Motion**

149. The Debtors seek authority to enter into and borrow under the DIP Financing Facility being offered by the DIP Lenders, as defined in the DIP Financing Facility Motion.  With respect to the DIP Financing Facility, the Debtors seek interim and final approval to obtain postpetition secured loans and other financial accommodations in the aggregate principal amount of up to $100 million.  For the reasons set forth in the DIP Financing Facility Motion and below, the Court's approval of this First Day Motion is absolutely critical.

150. The DIP Financing Facility is necessary for the Debtors to maintain sufficient liquidity so that the Debtors may continue to operate their businesses in the ordinary course of business during the chapter 11 cases.  In this regard, the use of the DIP Financing Facility will allow the Debtors to preserve and maintain the going concern value of the Debtors' estates, which, in turn, is integral to maximizing recoveries for the Debtors' stakeholders.  Further, access to additional financing will provide the Debtors' customers and vendors with the requisite security that the Company will be able to continue

conducting its business in the ordinary course without interruption.

151. To secure continued shipment of goods, pay employees and maintain the operation of their businesses as they restructure, the Debtors must have immediate access to continued and additional financing in the form of the DIP Facility Financing.  The Debtors believe that such financing will enable them to begin restoring critical relationships and retain employees, and maintain or restore trade terms with suppliers. Moreover, access to such financing on an interim basis is necessary to avoid immediate and irreparable harm to the Debtors pending the final hearing.

152. The Debtors made all reasonable efforts to obtain financing on the best terms available in light of market circumstances.  Despite their efforts, the Debtors have not been able to obtain postpetition financing or other financing accommodations from any alterative prospective lender or group of lenders on more favorable terms and conditions that those for which approval is sought in the DIP Financing Facility Motion. The DIP Financing Facility was negotiated in good faith and at arm's length, extensively and diligently considered by the Debtors' management and submitted to the Board of Director's

89

approval.  The terms of the DIP Agreement are fair and reasonable in light of current market conditions (particularly the lack of a ready market for any financing, including debtor-in-possession financing) and are in the best interests of the Debtors' estates.

**E.    Conclusion**

153. The Debtors' ultimate goal is to reorganize their financial affairs pursuant to the terms of a confirmed chapter 11 plan.  In the near term, however, to minimize any loss of value of their businesses during their restructuring, the Debtors' immediate objective is to maintain a business as usual atmosphere during the early stages of these chapter 11 cases, with as little interruption or disruption to the Debtors' operations as possible.  I believe that if the Court grants the relief requested in each of the First Day Motions, the prospect for achieving these objectives and completing a successful reorganization of the Debtors' businesses will be substantially enhanced.

154. I hereby certify that the  foregoing statements are true and correct to the best of my knowledge, information and belief, and respectfully request that all of the relief

requested in the First Day Motions be granted, together with

such other and further relief as is just.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 11th day of May, 2009.

**Hayes Lemmerz International, Inc. et al.**
Debtors and Debtors in Possession

Mark Brebberman
Vice President and Chief Financial Officer

**EXHIBIT A**

**Corporate Organizational Chart**





Gurantor/Borrower/Issuer Status

*Guarantor of Lux Under Credit Agreement

**Guarantor of Lux Under Credit Agreement and Senior Notes

***Guarantor of Opco and Lux Under Credit Agreement and Senior Notes

****U.S. Borrower and Guarantor of Lux Under Credit Agreement

*****Luxembourg Borrower Under Credit Agreement and Issuer of Senior Notes

Participant in securitization | Dissolution in progress

(1) Less than 1% owned by Hayes Lemmerz Alukola, s.r.o.

(2) Less than 1% owned by Hayes Lemmerz Italy Holdings, S.r.l

(3) Less than 1% owned by Hayes Lemmerz Barcelona, S.L.

(4) Less than 1% held by HLI Powertrain Holding Company, Inc.