IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                                          :
In re:                                                    :  Chapter 11
                                                          :
HAYES LEMMERZ INTERNATIONAL,                              :  Case No. 09-11655 (MFW)
INC., et al.,                                             :
                                                          :
                                  Debtors.                :  Jointly Administered
                                                          :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x



# DISCLOSURE STATEMENT WITH RESPECT TO FIRST AMENDED JOINT PLAN OF REORGANIZATION OF HAYES LEMMERZ INTERNATIONAL, INC. AND ITS AFFILIATED DEBTORS AND DEBTORS-IN-POSSESSION

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
J. Eric Ivester
Stephen D. Williamson
Bennett S. Silverberg (New York Office)
155 North Wacker Drive
Chicago, Illinois 60606

Counsel for Debtors and Debtors in Possession

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Anthony W. Clark
Kimberly A. LaMaina
One Rodney Square
P.O. Box 636
Wilmington, DE 19899

Counsel for Debtors and Debtors in Possession

Dated:  September 2, 2009

THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT AS CONTAINING ADEQUATE INFORMATION WITHIN THE MEANING OF BANKRUPTCY CODE SECTION 1125(A).  HAYES LEMMERZ INTERNATIONAL, INC. AND ITS AFFILIATED DEBTORS AND DEBTORS-IN-POSSESSION EXPECT TO SEEK AN ORDER OF THE BANKRUPTCY COURT APPROVING (A) THIS DISCLOSURE STATEMENT AS HAVING CONTAINED ADEQUATE INFORMATION AND (B) THE SOLICITATION OF VOTES.  NEITHER THIS DISCLOSURE STATEMENT NOR THE PLAN DESCRIBED HEREIN HAS BEEN FILED WITH OR REVIEWED BY THE SECURITIES AND EXCHANGE COMMISSION (THE "SEC") OR ANY SECURITIES REGULATORY AUTHORITY OF ANY STATE UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR UNDER ANY STATE SECURITIES OR "BLUE SKY" LAWS.  THE PLAN HAS NOT BEEN APPROVED OR DISAPPROVED BY THE SEC OR ANY STATE SECURITIES COMMISSION, AND NEITHER THE SEC NOR ANY STATE SECURITIES COMMISSION HAS PASSED ON THE ACCURACY OR ADEQUACY OF THE INFORMATION CONTAINED HEREIN.  ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

**DISCLAIMER**

THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT RELATES TO THE FIRST AMENDED JOINT PLAN OF REORGANIZATION (THE "PLAN") OF HAYES LEMMERZ INTERNATIONAL, INC. AND ITS AFFILIATED DEBTORS AND DEBTORS-IN-POSSESSION (COLLECTIVELY, THE "DEBTORS"), WHICH IS ATTACHED HERETO AS APPENDIX A, AND IS INCLUDED HEREIN FOR PURPOSES OF SOLICITING ACCEPTANCES OF THE PLAN AND MAY NOT BE RELIED UPON FOR ANY PURPOSE OTHER THAN TO DETERMINE HOW TO VOTE ON THE PLAN. NO PERSON MAY GIVE ANY INFORMATION OR MAKE ANY REPRESENTATIONS, OTHER THAN THE INFORMATION AND REPRESENTATIONS CONTAINED IN THIS DISCLOSURE STATEMENT, REGARDING THE PLAN OR THE SOLICITATION OF ACCEPTANCES OF THE PLAN.

ALL CREDITORS ARE ADVISED AND ENCOURAGED TO READ THIS DISCLOSURE STATEMENT AND THE PLAN IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN. PLAN SUMMARIES AND STATEMENTS MADE IN THIS DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN, OTHER EXHIBITS ANNEXED OR REFERRED TO IN THE PLAN, AND THIS DISCLOSURE STATEMENT. THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE ONLY AS OF THE DATE HEREOF, AND THERE CAN BE NO ASSURANCE THAT THE STATEMENTS CONTAINED HEREIN WILL BE CORRECT AT ANY TIME AFTER THE DATE HEREOF.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND RULE 3016(c) OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE AND NOT NECESSARILY IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER LAWS GOVERNING DISCLOSURE OUTSIDE THE CONTEXT OF CHAPTER 11. THIS DISCLOSURE STATEMENT HAS BEEN NEITHER APPROVED NOR DISAPPROVED BY THE SEC, NOR HAS THE SEC PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED HEREIN. PERSONS OR ENTITIES TRADING IN OR OTHERWISE PURCHASING, SELLING OR TRANSFERRING SECURITIES OR CLAIMS OF THE DEBTORS AND DEBTORS-IN-POSSESSION IN THESE CASES SHOULD EVALUATE THIS DISCLOSURE STATEMENT AND THE PLAN IN LIGHT OF THE PURPOSE FOR WHICH THEY WERE PREPARED.

AS TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS, AND OTHER ACTIONS OR THREATENED ACTIONS, THIS DISCLOSURE STATEMENT SHALL NOT CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY, STIPULATION, OR WAIVER, BUT RATHER AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS. THIS DISCLOSURE STATEMENT SHALL NOT BE ADMISSIBLE IN ANY NON-BANKRUPTCY PROCEEDING NOR SHALL IT BE CONSTRUED TO BE CONCLUSIVE ADVICE ON THE TAX, SECURITIES, OR OTHER LEGAL EFFECTS OF THE PLAN AS TO HOLDERS OF CLAIMS AGAINST, OR EQUITY INTERESTS IN, HAYES LEMMERZ INTERNATIONAL, INC. OR ANY OF ITS AFFILIATED DEBTORS AND DEBTORS IN POSSESSION IN THESE BANKRUPTCY CASES.

ADDITIONAL INFORMATION REGARDING THE DEBTORS IS CONTAINED IN PUBLIC FILINGS WITH THE SEC AND ON THEIR RESTRUCTURING WEBSITE AT HTTP://WWW.HAYESLEMMERZREORG.COM.

THIS DISCLOSURE STATEMENT SUMMARIZES CERTAIN PROVISIONS OF THE PLAN, STATUTORY PROVISIONS, DOCUMENTS RELATED TO THE PLAN, EVENTS IN THE DEBTORS' BANKRUPTCY CASES, AND FINANCIAL INFORMATION. THE DEBTORS ARE SOLELY RESPONSIBLE FOR ALL STATEMENTS IN THIS DISCLOSURE STATEMENT. THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS BEEN PROVIDED BY MANAGEMENT UNLESS OTHERWISE NOTED. ALTHOUGH MANAGEMENT BELIEVES THAT THE PLAN AND RELATED DOCUMENT SUMMARIES ARE FAIR AND ACCURATE, SUCH INFORMATION IS QUALIFIED TO THE EXTENT THAT THEY DO NOT SET FORTH THE ENTIRE TEXT OF THE PLAN, SUCH DOCUMENTS OR ANY STATUTORY PROVISIONS THAT MAY BE REFERENCED THEREIN. THE DEBTORS BELIEVE THAT THE INFORMATION CONTAINED HEREIN IS CORRECT, BUT MAKE NO REPRESENTATION WITH RESPECT TO ITS ACCURACY OR COMPLETENESS.

IT IS EXPECTED THAT THERE WILL BE FEWER THAN 500 RECORD HOLDERS OF BOTH THE COMMON STOCK TO BE ISSUED UNDER THE PLAN (THE "NEW COMMON STOCK") AND WARRANTS PROVIDING HOLDERS THE RIGHT TO ACQUIRE ADDITIONAL SHARES OF NEW COMMON STOCK (THE "WARRANTS," AND TOGETHER WITH THE NEW COMMON STOCK, THE "NEW SECURITIES") AFTER THE ISSUANCE OF NEW SECURITIES UNDER THE PLAN. THEREFORE, REORGANIZED HAYES IS NOT EXPECTED TO BE A PUBLIC REPORTING COMPANY AND THE ORGANIZATIONAL DOCUMENTS OF REORGANIZED HAYES WILL PROHIBIT TRANSFERS OF THE NEW SECURITIES IF THE TRANSFERS COULD REQUIRE REORGANIZED HAYES TO BECOME A PUBLIC REPORTING COMPANY. AS A RESULT, FOLLOWING THE EFFECTIVE DATE OF THE PLAN, THERE WILL NOT BE PUBLICLY AVAILABLE CURRENT INFORMATION REGARDING REORGANIZED HAYES AND ITS FINANCIAL RESULTS.

FOLLOWING THE EFFECTIVE DATE OF THE PLAN, THE NEW SECURITIES WILL NOT BE LISTED OR QUOTED ON ANY SECURITIES EXCHANGE. AS A RESULT OF THESE FACTORS AND THE TRANSFER RESTRICTIONS DESCRIBED HEREIN, THERE WILL NOT BE ANY LIQUID MARKET FOR THE NEW SECURITIES AND THERE CAN BE NO ASSURANCE THAT ANY MARKET WILL EVER DEVELOP. REORGANIZED HAYES WILL NOT BE OBLIGATED TO COMPLETE ANY PUBLIC OFFERING FOLLOWING THE EFFECTIVE DATE OF THE PLAN OTHER THAN AS REQUIRED UNDER THE REGISTRATION RIGHTS AGREEMENTS BETWEEN REORGANIZED HAYES AND CERTAIN HOLDERS OF NEW COMMON STOCK OR AS DETERMINED BY THE BOARD OF DIRECTORS.

THE NEW SECURITIES ISSUED PURSUANT TO THE PLAN WILL BE SUBJECT TO CERTAIN TRANSFER AND OTHER RESTRICTIONS SET FORTH IN THE NEW CERTIFICATE OF INCORPORATION. THESE TRANSFER RESTRICTIONS WILL PROHIBIT A HOLDER OF THE NEW SECURITIES FROM TRANSFERRING ANY SUCH NEW SECURITIES TO ANY PERSON NOT ALREADY HOLDING SUCH SECURITIES IF SUCH TRANSFER WOULD RESULT IN THERE BEING MORE THAN 500 RECORD HOLDERS OF NEW SECURITIES AS DETERMINED BY REORGANIZED HAYES.

# EXECUTIVE SUMMARY

On May 11, 2009 (the "Petition Date"), Hayes Lemmerz International, Inc. ("HLI") and its affiliated debtors and debtors-in-possession in these jointly administered Bankruptcy Cases (collectively, the "Debtors") commenced voluntary cases for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). The Debtors submit this disclosure statement (the "Disclosure Statement") pursuant to Bankruptcy Code section 1125 for use in the solicitation of votes on the First Amended Joint Plan of Reorganization of Hayes Lemmerz International, Inc. and Its Affiliated Debtors and Debtors in Possession (the "Plan") dated July 2, 2009 (as amended on September 2, 2009), which was filed with the United States Bankruptcy Court for the District of Delaware (the "Court" and/or the "Bankruptcy Court"). The lead case number for the jointly administered Bankruptcy Cases is 09-11655 (MFW). A copy of the Plan is attached as Appendix A hereto.

*The following introduction and summary is only a general overview, which is qualified in its entirety by, and should be read in conjunction with, the more detailed discussions, information and financial statements and notes thereto appearing elsewhere in this Disclosure Statement and Plan.* All capitalized terms not defined in this Disclosure Statement have the meanings ascribed to such terms in the Plan. All references to fiscal year mean the Company's (as defined herein) year ended January 31 of the following year (e.g., "fiscal 2008" refers to the period beginning on February 1, 2008, and ending on January 31, 2009).

This Disclosure Statement contains, among other things, descriptions and summaries of provisions of the Plan being proposed by the Debtors as filed with the Bankruptcy Court on September 2, 2009. Certain provisions of the Plan, and thus the descriptions and summaries contained herein, are the subject of continuing negotiations among the Debtors and various parties, have not been finally agreed upon, and may be modified.

The Plan provides for an equitable distribution to creditors of the Debtors, preserves the value of the Debtors' businesses as a going concern, and preserves the jobs of employees. The Debtors believe that any alternative to confirmation of the Plan, such as liquidation or attempts by another party in interest to file a plan, could result in significant delays, litigation and costs, as well as the loss of jobs by the employees. Moreover, the Debtors believe that the Debtors' creditors will receive greater and earlier recoveries under the Plan than those that would be achieved in liquidation or under an alternative plan. FOR THESE REASONS THE DEBTORS URGE YOU TO RETURN YOUR BALLOT ACCEPTING THE PLAN.

THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS (THE "CREDITORS' COMMITTEE") SUPPORTS THE PLAN AND RECOMMENDS THAT ALL HOLDERS OF CLAIMS IN CLASS 7 NOTEHOLDER CLAIMS, CLASS 8 PBGC TERMINATION LIABILITY CLAIM, AND CLASS 9 OTHER UNSECURED CLAIMS VOTE TO ACCEPT THE PLAN. A letter expressing such support of the Plan is included in the solicitation package provided to Holders of Claims in such Classes.

## A.      Overview

The Company is a leading worldwide producer of aluminum and steel wheels for passenger cars and light trucks and of steel wheels for commercial trucks and trailers. In addition, the Company is also a supplier of automotive powertrain components for original equipment manufacturers ("OEMs") and certain tier one suppliers. The Company's operations are conducted through its world headquarters located in Northville, Michigan, and 23 facilities located in the United States and 12 other countries around the world.

On May 11, 2009, HLI and certain of its subsidiaries (collectively, the "Debtors") each commenced a reorganization case (collectively, the "Bankruptcy Cases") under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532, as in effect on the date hereof (as amended, the "Bankruptcy Code"). With the exception of Hayes Lemmerz Finance LLC – Luxembourg S.C.A., none of the Debtors are organized under the laws of any country other than the United States. Further, none of the Debtors have commenced insolvency proceedings in any other jurisdictions. The Debtors continue to operate their businesses in the ordinary course of business. HLI's non-Debtor subsidiaries continue to operate in the ordinary course of business.

The Debtors' decision to commence the Bankruptcy Cases was necessitated by a combination of factors that significantly affected the Company and its ability to service its debt. These factors included, among other

things, the global economic crisis, the severe downturn in the automobile industry, changes to the Debtors' credit facilities, increases in costs of borrowing, and the Company's cost structure for purchasing raw materials.

Over the last year, the Company has been negatively impacted by economic forces beyond the Company's control. In late fiscal 2008, the current, unprecedented global economic crisis deepened, significantly affecting the automobile industry. New passenger cars and light trucks are a major purchase for consumers and the purchase of these items is highly dependent upon the health of the overall economy. Similarly, the purchase of new commercial vehicles is highly dependent upon macro-economic factors such as Gross Domestic Product growth and interest rates. Both the light vehicle and heavy vehicle markets are currently experiencing a severe downturn globally. Because of the global meltdown in the automobile sector, the Company's earnings before interest, taxes, depreciation and amortization ("EBITDA") for fiscal 2009 is projected to be one-third of the fiscal 2008 results.

## B.    General Structure of the Plan

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. Under chapter 11, a debtor is authorized to reorganize its business for the benefit of its creditors. Upon the filing of a petition for relief under chapter 11, Bankruptcy Code section 362 provides for an automatic stay of substantially all acts and proceedings against the debtor and its property, including all attempts to collect claims or enforce liens that arose prior to the commencement of its chapter 11 case.

The consummation of a plan of reorganization is the principal objective of a chapter 11 case. A plan of reorganization sets forth the means for satisfying claims against and interests in a debtor. Confirmation of a plan of reorganization by the Bankruptcy Court makes the plan binding upon the debtor, any issuer of securities under the plan, any person or entity acquiring property under the plan, and any creditor of or equity security holder in the debtor, whether or not such creditor or equity security holder (1) is impaired under or has accepted the plan or (2) receives or retains any property under the plan.

Subject to certain limited exceptions and other than as provided in the Plan itself or the Confirmation Order, the Confirmation Order discharges the Debtors from any debt that arose prior to the Plan Effective Date, substitutes therefor the obligations specified under the confirmed Plan, and terminates all rights and interests of equity security holders. The terms of the Plan are based upon, among other things, the Debtors' assessment of their ability to achieve the goals of their Business Plan, make the distributions contemplated under the Plan, and pay certain of their continuing obligations in the ordinary course of the Reorganized Company's business. Under the Plan, Claims against, and Interests in, the Reorganizing Debtors are divided into Classes according to their relative seniority and other criteria.

Each Debtor is a proponent of the Plan within the meaning of Bankruptcy Code section 1129. The Plan does not contemplate the substantive consolidation of the Reorganizing Debtors, and thus the Plan constitutes a separate Plan for each Debtor. Except to the extent a Debtor expressly assumes an obligation or liability, the Plan will not operate to impose liability on any Debtor for the Claims against any other Debtor. From and after the Plan Effective Date, each Debtor will be separately liable only for its own debts and obligations.

For voting and distribution purposes, the Plan sets forth (1) separate classes for each Debtor and (2) separate plans of reorganization for each Debtor. A list of Debtors that are proponents of the Plan and their corresponding bankruptcy case number is attached to the Plan as Exhibit A.

After careful review of the Debtors' current and projected operations, estimated recoveries in a liquidation scenario, prospects as an ongoing business, and the strategic Business Plan developed by management, the Debtors have concluded that the recovery to the Debtors' stakeholders will be maximized by the Debtors' continued operation as a going concern. The Debtors believe that their businesses and assets have significant value that would not be realized in a liquidation, either in whole or in substantial part. According to the liquidation and other analyses prepared by the Debtors with the assistance of their financial advisors and other professionals, the value of the Debtors is considerably greater as a going concern than in a liquidation. For a complete discussion of the liquidation value of the Debtors, please refer to Appendix E attached hereto.

Accordingly, the Debtors believe that the Plan provides the best recoveries for the Debtors' stakeholders and therefore strongly recommend that, if you are entitled to vote, you vote to ACCEPT the Plan. The Debtors

believe any alternative to confirmation of the Plan, such as liquidation or attempts by another party in interest to file a plan, could result in significant delays, litigation, and costs, as well as the loss of jobs by employees and could ultimately significantly affect value negatively by causing unnecessary uncertainty within its key customer and supplier constituents. In addition, most of the Debtors' assets are subject to liens held by the DIP Lenders and Prepetition Secured Lenders, which require payment in full prior to distributions to, among others, holders of unsecured claims, including Noteholder Claims and Other Unsecured Claims.

The feasibility of the Plan is premised upon management's ability to continue the implementation of its strategic business plan (the "Business Plan"). The Business Plan and accompanying financial projections (the "Projections"), are set forth in Appendix D. While the Company believes that the Business Plan and Projections are reasonable and appropriate, they include a number of assumptions that may differ from actual results and are subject to a number of risk factors. Importantly, the Business Plan and Projections for the Company incorporate the Company's forecasts of the anticipated operating performance of the Company's numerous foreign subsidiaries and affiliates that are not subject to the Bankruptcy Cases.

## C.     The Proposed Plan

The Plan reflects and incorporates a settlement among the Creditors' Committee, the agent for the Debtors' post-petition secured lenders, and the Debtors.

Under the Plan, the Debtors' prepetition secured lenders (the "DIP Lenders") which funded the operations of the Debtors through $200 million of debtor-in-possession financing (the "DIP Financing") will receive majority ownership of the Reorganized Company upon emergence from chapter 11. Specifically, upon consummation of the Plan, the DIP Lenders will (1) receive their *pro rata* share of 84.50% of the new common stock to be issued by the Company upon consummation of the Plan (the "New Common Stock") on account of certain amounts the DIP Lenders advanced to the Debtors prior to the Petition Date the "DIP Lenders New Money Distribution Property") and (b) convert the principal amount of the outstanding amount, as of the Plan's effective date, of the new money loans provided to the Debtors pursuant to the debtor-in-possession financing into a secured term loan (the "DIP Lenders Roll-Up Distribution Property").

The remaining equity of the Debtors will be distributed to the Debtors' other prepetition secured lenders (i.e., those that are not DIP Lenders, Affiliates of DIP Lenders, or permitted successors and assigns of DIP Lenders) (the "Non-DIP Lenders" and together with the DIP Lenders, the "Prepetition Secured Lenders"), their noteholders (the "Noteholders") in exchange for the discharge of their claims under the Notes, and the PBGC in discharge of its claim for the difference between the value of pension plan assets and pension plan liabilities on the date of the pension plan's termination. Distributions will be made only to those Noteholders that do not reject the Plan. In addition, the Noteholders and PBGC will receive their agreed upon share of $5 million and two tranches of warrants that will permit them to purchase up to 10% of the New Common Stock (subject to certain dilution protections) upon the satisfaction of certain conditions. The terms of the warrants are set forth in the warrants agreements annexed to the Plan.

The Non-DIP Lenders will receive their *pro rata* share of 4% of the New Common Stock (the "Prepetition Secured Lenders Distribution Property") if they vote to accept the Plan. In addition, those Prepetition Secured Lenders that (1) are not DIP Lenders (including Affiliates of DIP Lenders or permitted successors and assigns of DIP Lenders) and (2) consented to the DIP Financing will receive a consent fee equal to their *pro rata* share of 8.5% of the New Common Stock.

Holders of certain other general unsecured claims (i.e., claims not entitled to priority under the Bankruptcy Code and claims not subordinated pursuant to Bankruptcy Code section 510(c)) (the "Other Unsecured Claims") will share *pro rata* in $250,000 provided the Prepetition Secured Lenders and Holders of Other Unsecured Claims vote to accept the Plan. Distributions will be made only to those Holders of Other Unsecured Claims who do not reject the Plan.

The Debtors' existing publicly traded common stock will be canceled and no distributions will be made to such holders of common stock. In addition, holders of any claims subordinated pursuant to Bankruptcy Code section 510(c) will not receive a distribution under the Plan.

Holders of Claims entitled to priority treatment under the Bankruptcy Code will be Unimpaired under the Plan.

The settlement embodied in the Plan provides that Noteholders who do not reject the Plan will release (or be deemed to have released) their Claims under the Notes against the non-Debtor Affiliates of the Debtors (the "Non-Debtor Affiliates") in exchange for the consideration to be provided under the Plan. Consummation of the Plan will also result in the release and satisfaction of any Claims the PBGC has against the Non-Debtor Affiliates.

As set forth in the Liquidation Analysis attached as Appendix E, outside the Plan structure proposed herein, holders of Claims of lesser priority and lien position than the DIP Lenders stand to receive little, if any, distribution in a liquidation. Because the obligations owed by the Debtors to the DIP Lenders greatly exceed the Debtors' value, little if any distributions would be made to holders of Claims against the Debtors, other than the DIP Lenders, absent consummation of the Plan described herein. Pursuant to the Plan, the DIP Lenders are agreeing to permit distributions to certain Claimholders who are junior to them, including the Prepetition Secured Lenders (who are not DIP Lenders), Noteholders, and Holders of Other Unsecured Claims.

The following table summarizes the classification and treatment of the principal prepetition Claims and Interests under the Plan and in each case reflects the amount and form of consideration that will be distributed in exchange for such Claims and Interests and in full satisfaction, settlement, release and discharge of such Claims and Interests. The classification and treatment for all Classes are described in more detail in the Plan. The estimated recovery percentages set forth below are based upon a valuation of the Reorganized Debtors enterprise value performed by the Debtors with the assistance of their professionals.

| Class Description | Treatment Under Plan |
|---|---|
| **Class 1** **Secured Tax Claims**<br><br>**Estimated Allowed Claims: up to $2 million** | Except as otherwise provided in and subject to Section 8.7 of the Plan, on the first Periodic Distribution Date occurring after the later of (a) the date a Secured Tax Claim becomes an Allowed Secured Tax Claim or (b) the date a Secured Tax Claim becomes payable pursuant to any agreement (if any) between the Debtors (or the Reorganized Debtors) and the Holder of such Secured Tax Claim, the Holder of such Class 1 Secured Tax Claim shall receive, in full satisfaction, settlement, release, and discharge of and in exchange for such Secured Tax Claim, (y) Cash equal to the amount of such Allowed Secured Tax Claim or (z) such other treatment as to which the Debtors (with the consent of Requisite DIP Lenders) or the Reorganized Debtors and such Claimholder shall have agreed in writing, provided that such treatment is not more favorable than the treatment in clause (y) above. The Debtors' failure to object to a Secured Tax Claim in the Bankruptcy Cases shall be without prejudice to the Reorganized Debtors' right to contest or otherwise defend against such Claim in the Bankruptcy Court or other appropriate non-bankruptcy forum (at the option of the Debtors or the Reorganized Debtors) when and if such Claim is sought to be enforced by the holder of the Secured Tax Claim.<br><br>Class 1 – Secured Tax Claims are not Impaired. The holders of such Claims, therefore, are not entitled to vote on, and deemed to accept, the Plan.<br><br>**Estimated percentage recovery: 100%** |
| **Class 2** **Other Secured Claims**<br><br>**Estimated Allowed Claims: up to $1 million** | Class 2 consists of each separate subclass for each Other Secured Claim. Each subclass is deemed to be a separate Class for all purposes under the Bankruptcy Code.<br><br>Except as otherwise provided in and subject to Section 8.7 of the Plan, on the first Periodic Distribution Date occurring after the later of (a) the date |

| Class Description | Treatment Under Plan |
|---|---|

an Other Secured Claim becomes an Allowed Other Secured Claim or (b) the date an Other Secured Claim becomes payable pursuant to any agreement (if any) between the Debtors (or the Reorganized Debtors) and the holder of such Other Secured Claim, the Debtors (with the consent of the Requisite DIP Lenders) or Reorganized Debtors shall, in full satisfaction, settlement, release, and discharge of and in exchange for such Class 2 Other Secured Claim, (x) pay Cash equal to the amount of such Allowed Other Secured Claim, (y) return the collateral to the secured creditor with respect to such Other Secured Claim, or (z) such Other Secured Claim shall be Reinstated. The Debtors' failure to object to an Other Secured Claim in the Bankruptcy Cases shall be without prejudice to the Reorganized Debtors' right to contest or otherwise defend against such Claim in the Bankruptcy Court or other appropriate non-bankruptcy forum (at the option of the Reorganized Debtors) when and if such Claim is sought to be enforced by the holder of the Secured Claim.

Class 2 – Other Secured Claims are not Impaired. The holders of such Claims, therefore, are not entitled to vote on, and deemed to accept, the Plan.

**Estimated percentage recovery: 100%**

**Class 3**    **Other Priority Claims**      Class 3 consists of all Other Priority Claims.

**Estimated Allowed Claims: up to $3 million**

Except as otherwise provided in and subject to Section 8.7 of the Plan, on the first Periodic Distribution Date occurring after the later of (a) the date an Other Priority Claim becomes an Allowed Other Priority Claim or (b) the date an Other Priority Claim becomes payable pursuant to any agreement (if any) between the Debtors (or the Reorganized Debtors) and the holder of such Other Priority Claim, each Class 3 Other Priority Claimholder shall receive, in full satisfaction, settlement, release, and discharge of, and in exchange for, such Other Priority Claim, (y) Cash in an amount equal to the amount of such Allowed Other Priority Claim or (z) such other treatment as to which the Debtors (with the consent of the Requisite DIP Lenders) or the Reorganized Debtors and such Claimholder shall have agreed upon in writing, provided that such treatment is not more favorable than the treatment in clause (y) above. The Debtors' failure to object to an Other Priority Claim in the Bankruptcy Cases shall be without prejudice to the Reorganized Debtors' right to contest or otherwise defend against such Claim in the Bankruptcy Court or other appropriate non-bankruptcy forum (at the option of the Debtors or the Reorganized Debtors) when and if such Claim is sought to be enforced by the holder of the Other Priority Claim.

Class 3 - Other Priority Claims are not Impaired. The holders of such Claims, therefore, are not entitled to vote on, and deemed to accept, the Plan.

**Estimated percentage recovery: 100%**

**Class 4**    **Intercompany Claims**      Class 4 consists of all Intercompany Claims.

Each Intercompany Claim will, with the consent of the Requisite DIP Lenders, be (a) released, waived and discharged as of the Plan Effective Date, (b) contributed to the capital of the obligor corporation, (c)

| Class Description | Treatment Under Plan |
|---|---|

dividended, or (d) remain unimpaired.

Class 4 - Intercompany Claims are not Impaired. The holders of such Claims, therefore, are not entitled to vote on, and deemed to accept, the Plan.

**Estimated percentage recovery: Not Applicable**

**Class 5**     **Subsidiary Interests**

Class 5 consists of all Subsidiary Interests.

Class 5 Subsidiary Interests shall be unaffected by the Plan, except to the extent required by the Restructuring Transactions.

Class 5 - Subsidiary Interests are not Impaired. The holders of such Claims, therefore, are not entitled to vote on, and deemed to accept, the Plan.

**Estimated percentage recovery: Not Applicable**

**Class 6**     **Prepetition Secured Obligations**

**Estimated Allowed Claims: $503 million (less the anticipated Senior Roll-Up Loans in the amount of $100 million)**

Class 6 consists of the Prepetition Secured Obligations. Notwithstanding any provision to the contrary herein, upon entry of the Confirmation Order, all Prepetition Secured Obligations shall be Allowed in the aggregate amount of no less than $503,381,544.77 (less the anticipated Senior Roll-Up Loans in the amount of $100 million) and shall constitute Allowed Claims for all purposes in these Bankruptcy Cases, not subject to any avoidance, reductions, set off, offset, recoupment, recharacterization, subordination (whether equitable, contractual, or otherwise), counterclaims, cross-claims, defenses, disallowance, impairment, objection, or any other challenges under any applicable law or regulation by any person or entity.

On the Plan Effective Date, Holders of Prepetition Secured Obligations in Class 6 shall receive their share of the Prepetition Secured Lender Distribution Property in full satisfaction of their claims; *provided that* such Holders of Class 6 Prepetition Secured Obligations vote as a class to accept the Plan. The Prepetition Secured Distribution Property will be distributed *Pro Rata* among the Holders of Prepetition Secured Obligations based upon the amount of Prepetition Secured Obligations held by such Holder in relation to the total amount of Prepetition Secured Obligations.

The Holders of Prepetition Secured Obligations who are DIP Lenders, Affiliates of DIP Lenders, or permitted successors and assigns of DIP Lenders under Section 11.2 of the DIP Credit Agreement agree to waive their distributions on account of their Class 6 Claims, with such waived distributions to be distributed *Pro Rata* to Holders of Prepetition Secured Obligations in Class 6 who are not DIP Lenders, affiliates of DIP Lenders, or permitted successors and assigns of DIP Lenders under Section 11.2 of the DIP Credit Agreement.

Any fees and expenses of the Prepetition Administrative Agent payable pursuant to the DIP Financing Facility Order shall be paid in full in cash in accordance with section 9.4 of the Plan.

Any adequate protection Claims of Holders of Prepetition Secured Obligations pursuant to the DIP Financing Facility Order shall be deemed

| Class Description | Treatment Under Plan |
|---|---|

satisfied by the treatment provided herein.

Class 6 - Prepetition Secured Obligations are Impaired. The holders of such Class 6 Prepetition Secured Obligations that are neither Disputed Claims nor Disallowed Claims, therefore, are entitled to vote on the Plan.

**Estimated percentage recovery: 1.1%**

**Class 7**  **Noteholder Claims**

Class 7 consists of all Noteholder Claims.

**Estimated Allowed Claims: $182.4 million**

On the Plan Effective Date, holders of Noteholder Claims <u>who do not reject the Plan</u> shall receive their *Pro Rata* share of 66.1% of the Foreign Creditor Distribution Property with such share to be determined by the amount of such Noteholders' Allowed Claim in relation to the Allowed Claims of Noteholders who do not reject the Plan.

Holders of Noteholder Claims that reject the Plan shall have the option to opt-out of the release of the Non-Debtor Affiliates set forth in Article X herein. Unless a holder of Noteholder Claims both rejects the Plan **and** opts-out of the release of Non-Debtor Affiliates, such holder of Noteholder Claims shall be deemed to have released the Non-Debtor Affiliates as provided for in Article X.

The distribution to Noteholders provided herein is in full satisfaction and discharge of any and all Claims that the Noteholders have against either the Debtors or their non-Debtor Affiliates.

Holders of Noteholder Claims <u>who reject the Plan</u> shall not receive any distribution under the Plan.

**Estimated percentage recovery: 5%**

**Class 8**  **PBGC Termination Liability Claim**

Class 8 consists of the PBGC Termination Liability Claim.

**Estimated Allowed Claim: $106.7 million**

On the Plan Effective Date, the PBGC shall receive its *Pro Rata* share of 33.9% of the Foreign Creditor Distribution Property.

**Estimated percentage recovery: 5%**

| Class Description | Treatment Under Plan |
|---|---|

**Class 9**     **Other Unsecured Claims**

**Estimated Allowed Claims: $817 million (including $398 million Deficiency Claim with respect to Prepetition Secured Lender Claims)**

Class 9 consists of all Other Unsecured Claims.

Except as otherwise provided in and subject to Section 8.7 of the Plan, on the first Periodic Distribution Date occurring after the Other Unsecured Claim becomes an Allowed Other Unsecured Claim, <u>Other Unsecured Claimholders who do not vote to reject the Plan</u> shall receive, in full satisfaction, release, and discharge of, and in exchange for, such Other Unsecured Claims, the Other Unsecured Claimholders Distribution Property on a *Pro Rata* basis in complete satisfaction of their Allowed Other Unsecured Claims.

A Holder of an Other Unsecured Claim, regardless of the number of Debtors against which such Claimholder may assert such Other Unsecured Claim, will receive only a single distribution on account of such Other Unsecured Claim.

Upon the Plan Effective Date, the Holders of Deficiency Claims with respect to Prepetition Secured Lender Claims agree to waive their distributions on account of such Deficiency Claims, with such waived distributions to be distributed *Pro Rata* to Holders of Other Unsecured Claims who do not vote to reject the Plan.

Class 9 – Other Unsecured Claims are Impaired. The holders of such Claims that are neither Disputed Claims nor Disallowed Claims, therefore, are entitled to vote on the Plan.

**Estimated percentage recovery: .03% - .06%**

**Class 10**    **Subordinated Securities Claims**

**Estimated Allowed Claims: None**

Class 10 consists of two separate subclasses for the Subordinated Securities Claims. Each subclass is deemed to be a separate Class for all purposes under the Bankruptcy Code. Both subclasses are deemed to have rejected the Plan and, therefore, neither subclass is entitled to vote.

Class 10a consists of all Subordinated Debt Securities Claims that may exist against the Debtors. Class 10b consists of all Subordinated Equity Securities Claims that may exist against the Debtors.

Subordinated Debt Securities Claims and Subordinated Equity Securities Claims shall be cancelled, released, and extinguished. Holders of Subordinated Securities Claims shall neither receive nor retain any property on account of their Claims.

Class 10 - Subordinated Securities Claims are Impaired and will receive no distribution under the Plan. The holders of such Claims, therefore, are deemed to have rejected the Plan and are not entitled to vote on the Plan.

**Estimated percentage recovery: 0%**

**Class 11**    **Class 11a Interests in Hayes and**

**Class 11b Old Preferred Stock and Old Preferred Stock Options**

Class 11a consists of all Interests in Hayes

All Holders of existing equity interests of Hayes shall be impaired with no distribution to be made to holders thereof. All Interests in Hayes shall be deemed cancelled as of the Plan Effective Date.

Class 11b consists of all Old Preferred Stock and Old Preferred Stock

| **Class Description** | **Treatment Under Plan** |
|---|---|

Options.

All Holders of Old Preferred Stock and Old Preferred Stock Options shall be impaired with no distribution to be made to holders thereof. All existing Old Preferred Stock and Old Preferred Stock Options shall be deemed cancelled as of the Plan Effective Date.

Class 11 - Interests in Hayes are Impaired and will receive no distributions under the Plan. The holders of such Interests, therefore, are deemed to have rejected the Plan and are not entitled to vote on the Plan.

**Estimated percentage recovery: 0%**

The Debtors have not yet completed their analysis of the above Claims. However, based upon the Debtors' preliminary analysis, the Debtors believe the aggregate amount of the Claims in certain Classes set forth above, particularly Class 9 Other Unsecured Claims, may be reduced substantially following consummation of the Plan and completion of the Claims resolution process. The Plan contemplates the rejection of several executory contracts and unexpired leases under Bankruptcy Code section 365. Rejection damages resulting from such rejection will be treated as Class 9 Other Unsecured Claims under the Plan. The total amount of rejection damages is not anticipated to be material or otherwise materially impact distributions to creditors in Class 9 Other Unsecured Claims. Further, there can be no assurance that the Claims ultimately will be Allowed in the amounts estimated above. In addition, additional Claims may be filed or identified during the Claims resolution process that may materially affect the estimates of Claims set forth above.

Section VIII.E herein describes the proposed Restructuring Transactions, which may implicate significant modifications to the Debtors' existing capital structure.

Consummation of the Plan is contingent upon the Debtors' entry into the Exit Credit Facility that is adequate to fund the working capital requirements of the Reorganized Debtors and other funding requirements pursuant to the Plan as of the Plan Effective Date. The committed amount of such an Exit Credit Facility will not exceed $150 million as of the Plan Effective Date. The Debtors believe that such a facility will be available.

**TABLE OF CONTENTS**

EXECUTIVE SUMMARY ..................................................................................................................... i
    A.    Overview ....................................................................................................................... i
    B.    General Structure of the Plan ....................................................................................... ii
    C.    The Proposed Plan ...................................................................................................... iii
II.    PLAN VOTING INSTRUCTIONS AND PROCEDURES ......................................................... 1
    A.    Notice to Holders of Claims and Interests .................................................................. 1
    B.    Solicitation Package ..................................................................................................... 2
    C.    General Voting Procedures, Ballots, and Voting Deadline........................................... 2
    D.    Confirmation Hearing and Deadline for Objections to Confirmation ........................... 3
III.    HISTORY OF THE DEBTORS ................................................................................................. 4
    A.    Overview of the Debtors .............................................................................................. 4
    B.    Background and Development of the Company ............................................................. 5
    C.    Discussion of the Debtors' Business Operations........................................................... 6
            *1.*    *Products and Services* ........................................................................... 6
            *2.*    *Material Source and Supply*.................................................................. 6
            *3.*    *Intellectual Property*............................................................................. 7
            *4.*    *Seasonality*........................................................................................... 7
            *5.*    *Customers* ............................................................................................. 7
            *6.*    *Backlog*................................................................................................. 7
            *7.*    *Competition*........................................................................................... 7
            *8.*    *Research and Development* ..................................................................... 7
            *9.*    *Environmental Compliance*.................................................................... 7
            *10.*    *Employees; Labor Matters* ................................................................... 8
            *11.*    *Properties* ........................................................................................... 11
            *12.*    *Legal Proceedings*............................................................................... 12
            *13.*    *Selected Financial Data*...................................................................... 12
    D.    Summary of Material Litigation Matters ................................................................... 13
            *1.*    *Kuhl Wheels, LLC Litigation* ............................................................ 13
            *2.*    *Lacks Incorporated Patent Infringement Litigation* ....................... 13
            *3.*    *Metalurgica FPS do Brasil Ltda Bankruptcy Liquidation Proceedings* ....................... 14
            *4.*    *Diversified Machine, Inc. Breach of Contract Litigation*................... 14
            *5.*    *Punch Property International Litigation* ............................................ 14
            *6.*    *Wrongful Death*................................................................................... 15
            *7.*    *Product Liability Cases* ...................................................................... 16
            *8.*    *Potential Environmental Litigation* ................................................... 16
IV.    **PREPETITION CAPITAL STRUCTURE OF THE DEBTORS** ...................................... 17
    A.    Equity......................................................................................................................... 17
    B.    Second Amended and Restated Credit Agreement...................................................... 17
    C.    Senior Unsecured Notes ............................................................................................. 18
    D.    Short Term Bank Borrowings..................................................................................... 18
    E.    Domestic Accounts Receivable Securitization Facility .............................................. 18
    F.    Non-U.S. Securitization Facilities ............................................................................. 18
V.    **CORPORATE STRUCTURE and management OF THE DEBTORS** ............................... 18
    A.    Current Corporate Structure........................................................................................ 18
    B.    Board of Directors of the Debtors .............................................................................. 19
    C.    Management of the Company ..................................................................................... 20
VI.    **EVENTS LEADING TO COMMENCEMENT OF THE BANKRUPTCY CASES**........... 22
    A.    Events Leading to the Debtors' Chapter 11 Filings.................................................... 22
            *1.*    *The 2001 Chapter 11 Cases* ............................................................... 22
            *2.*    *Post Bankruptcy Strategy*.................................................................... 22
    B.    Need for Restructuring and Chapter 11 Relief............................................................ 23
    C.    Development of Chapter 11 Plan ................................................................................ 25

|   |   | 1. | Debtors Efforts to Obtain Financing | 25 |
|---|---|---|---|---|
|   |   | 2. | Negotiation of the Proposed DIP Financing and Plan Term Sheet | 26 |
| VII. | **THE BANKRUPTCY CASES** |   |   | 27 |
|   | A. | Continuation of Business; Stay of Litigation |   | 27 |
|   | B. | Summary of Certain Relief Obtained at the Outset of the Bankruptcy Cases |   | 27 |
|   |   | 1. | Significant First Day Orders | 27 |
|   |   | 2. | Parties In Interest, Counsel and Advisors | 28 |
|   | C. | Post-Petition Financing |   | 29 |
|   | D. | Post-Petition Marketing Process |   | 30 |
|   | E. | Summary of Claims Process and Bar Date |   | 31 |
|   |   | 1. | Claims Process | 31 |
|   |   | 2. | Schedules and Statements of Financial Affairs | 31 |
|   |   | 3. | Claims Bar Date | 31 |
|   | F. | Euro Notes Guarantee Litigation |   | 31 |
|   | G. | Motion for Appointment of an Examiner |   | 32 |
|   | H. | Motion to Limit Trading in Equity Securities of Debtors |   | 32 |
| VIII. | **SUMMARY OF THE PLAN** |   |   | 32 |
|   | A. | Treatment of Claims and Interests – Administrative Claims |   | 33 |
|   |   | 1. | Administrative Claims | 33 |
|   |   | 2. | Administrative Claims Incurred In the Ordinary Course Of Business | 33 |
|   |   | 3. | Reclamation Claims | 33 |
|   |   | 4. | Priority Tax Claims | 33 |
|   |   | 5. | DIP Financing Facility Claims | 33 |
|   | B. | Treatment of Claims and Interests – Non-Administrative Claims |   | 34 |
|   |   | 1. | Introduction | 34 |
|   |   | 2. | Classification and Treatment of Claims Against and Interests In the Debtors | 35 |
|   | C. | Special Provisions for Treatment of Claims And Interests |   | 38 |
|   |   | 1. | Special Provisions Regarding Insured Claims | 38 |
|   |   | 2. | Reservation of Rights | 38 |
|   | D. | Acceptance or Rejection of the Plan; Effect of Rejection by One or More Impaired Classes of Claims or Interests |   | 39 |
|   |   | 1. | Impaired Classes of Claims Entitled to Vote | 39 |
|   |   | 2. | Classes Deemed to Accept Plan | 39 |
|   |   | 3. | Acceptance by Impaired Classes | 39 |
|   |   | 4. | Classes Deemed to Reject Plan | 39 |
|   |   | 5. | Confirmation Pursuant to Section 1129(b) of the Bankruptcy Code | 39 |
|   |   | 6. | Confirmability and Severability of a Plan | 39 |
|   | E. | Means for Implementation of the Plan |   | 40 |
|   |   | 1. | Continued Corporate Existence | 40 |
|   |   | 2. | Corporate Action | 40 |
|   |   | 3. | Certificate of Incorporation and Bylaws | 40 |
|   |   | 4. | Cancellation of Existing Securities and Agreements | 40 |
|   |   | 5. | Authorization and Issuance of New Common Stock, Tranche A Warrants, and Tranche B Warrants | 41 |
|   |   | 6. | Directors and Officers | 41 |
|   |   | 7. | Employment Incentive Compensation Programs | 42 |
|   |   | 8. | Post-Effective Date Financing | 42 |
|   |   | 9. | Restructuring Transactions and Alternative Structures | 43 |
|   |   | 10. | Preservation of Causes of Action | 43 |
|   |   | 11. | Exclusivity Period | 44 |
|   |   | 12. | Effectuating Documents; Further Transactions | 44 |
|   |   | 13. | Exemption From Certain Transfer Taxes and Recording Fees | 44 |
|   |   | 14. | Approval of Requisite DIP Lenders and Exit Credit Facility Lenders | 44 |
|   | F. | Unexpired Leases and Executory Contracts |   | 44 |
|   |   | 1. | Assumed Contracts and Leases | 44 |
|   |   | 2. | Rejected Contracts and Leases | 45 |

| | 3. | *Exhibits Not Admissions* | 45 |
| | 4. | *Payments Related to Assumption of Executory Contracts and Unexpired Leases* | 45 |
| | 5. | *Rejection Damages Bar Date* | 46 |
| G. | | Provisions Governing Distributions | 46 |
| | 1. | *Time of Distributions* | 46 |
| | 2. | *No Interest on Claims* | 46 |
| | 3. | *Disbursing Agent* | 46 |
| | 4. | *Surrender of Securities or Instruments* | 46 |
| | 5. | *Claims Administration Responsibility* | 46 |
| | 6. | *Delivery of Distributions* | 47 |
| | 7. | *Procedures for Treating and Resolving Disputed and Contingent Claims* | 47 |
| | 8. | *Conversion of Claims Asserted In Foreign Currencies* | 47 |
| | 9. | *Distribution of Foreign Creditor Distribution Property to Holders of Class 7 Noteholder Claims and Class 8 PBGC Termination Liability Claim* | 47 |
| H. | | Allowance and Payment of Certain Administrative Claims | 48 |
| | 1. | *Professional Claims* | 48 |
| | 2. | *Substantial Contribution Compensation and Expenses Bar Date* | 48 |
| | 3. | *Other Administrative Claims* | 48 |
| | 4. | *Compensation of Notes Indenture Trustee and Prepetition Administrative Agent.* | 49 |
| I. | | Effect of the Plan on Claims and Interests | 49 |
| | 1. | *Revesting of Assets* | 49 |
| | 2. | *Discharge of the Debtors* | 49 |
| | 3. | *Compromises and Settlements* | 50 |
| | 4. | *Release of Certain Parties* | 50 |
| | 5. | *Releases by Holders of Claims* | 51 |
| | 6. | *Setoffs* | 51 |
| | 7. | *Exculpation and Limitation of Liability* | 51 |
| | 8. | *Indemnification Obligations* | 52 |
| | 9. | *Injunction* | 52 |
| | 10. | *Plan Impact on Foreign Non-Debtor Subsidiaries' Guarantee of Notes* | 52 |
| | 11. | *Plan Impact on PBGC's Claims Against Non-Debtor Affiliates* | 52 |
| J. | | Miscellaneous Provisions | 52 |
| | 1. | *Binding Effect* | 52 |
| | 2. | *Modification and Amendments* | 52 |
| | 3. | *Withholding and Reporting Requirements* | 53 |
| | 4. | *Allocation of Plan Distributions Between Principal and Interest* | 53 |
| | 5. | *Creditors' Committee* | 53 |
| | 6. | *Payment of Statutory Fees* | 53 |
| | 7. | *Revocation, Withdrawal, or Non-Consummation* | 53 |
| | 8. | *Term of Injunctions or Stays* | 53 |
| | 9. | *Governing Law* | 54 |
| | 10. | *Waiver and Estoppel* | 54 |
| **IX.** | | **CERTAIN FACTORS TO BE CONSIDERED** | 54 |
| A. | | General Considerations | 54 |
| B. | | Potential Events of Default Under DIP Financing Facility | 54 |
| C. | | Failure to Obtain Release of Guarantees by Foreign Subsidiaries | 54 |
| D. | | Failure to Compromise OPEB and Pension Plan Liabilities | 54 |
| E. | | Failure to Confirm the Plan | 55 |
| F. | | Failure to Consummate the Plan | 55 |
| G. | | Changed Circumstances | 55 |
| H. | | Material United States Federal Income Tax Considerations | 56 |
| I. | | Inherent Uncertainty of Financial Projections | 56 |
| J. | | Unpredictability of Automotive Industry | 56 |
| K. | | Dividends | 56 |
| L. | | Access to Financing | 56 |
| M. | | Dependence on Major Customers | 57 |

| | N. | Leverage; Ability to Service Indebtedness | 57 |
|---|---|---|---|
| | O. | Restrictions Imposed by Indebtedness | 58 |
| | P. | Lack of Trading Market | 58 |
| | Q. | Claims Estimations | 58 |
| | R. | Litigation | 58 |
| | S. | Reliance on Key Personnel | 58 |
| | T. | Turmoil in Financial Markets | 59 |
| X. | | **RESALE OF SECURITIES RECEIVED UNDER THE PLAN** | 59 |
| | A. | Issuance of New Securities | 59 |
| | B. | Subsequent Transfers of New Securities | 59 |
| XI. | | **MATERIAL UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN** | 60 |
| | A. | Certain U.S. Federal Income Tax Consequences to the Debtors | 61 |
| | | 1. *Cancellation of Indebtedness Income* | 61 |
| | | 2. *Utilization of NOLs* | 61 |
| | | 3. *Applicable High Yield Discount Obligations* | 62 |
| | | 4. *Alternative Minimum Tax* | 62 |
| | | 5. *Alternative Taxable Structure* | 62 |
| | B. | Certain U.S. Federal Income Tax Consequences to Claimholders | 62 |
| | | 1. *Claimholders of Prepetition Secured Obligations Who Are Not DIP Lenders* | 63 |
| | | 2. *Claimholders of Prepetition Secured Obligations Who Are DIP Lenders* | 65 |
| | | 3. *Claimholders Who Are Noteholders* | 68 |
| | | 4. *Other Unsecured Claimholders.* | 69 |
| | C. | Information Reporting and Backup Withholding | 70 |
| | D. | Importance of Obtaining Professional Tax Assistance | 70 |
| XII. | | **FEASIBILITY OF THE PLAN AND THE "BEST INTERESTS" TEST** | 71 |
| | A. | Feasibility of the Plan | 71 |
| | B. | Acceptance of the Plan | 71 |
| | C. | "Best Interests" Test | 71 |
| | D. | Estimated Valuation of Reorganized Debtors | 72 |
| | E. | Application of the "Best Interests" Test to the Liquidation Analysis and the Valuation of the Reorganized Debtors | 72 |
| | F. | Confirmation Without Acceptance of All Impaired Classes: The "Cramdown" Alternative | 73 |
| | G. | Conditions to Confirmation and/or Consummation of the Plan | 74 |
| | | 1. *Conditions to Confirmation* | 74 |
| | | 2. *Conditions to Consummation* | 74 |
| | H. | Waiver of Conditions to Confirmation and/or Consummation | 76 |
| | I. | Retention of Jurisdiction | 76 |
| XIII. | | **ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN** | 77 |
| | A. | Continuation of the Bankruptcy Case | 77 |
| | B. | Alternative Plans of Reorganization | 77 |
| | C. | Liquidation Under Chapter 7 or Chapter 11 | 77 |
| XIV. | | **VOTING REQUIREMENTS** | 78 |
| | A. | Parties in Interest Entitled to Vote | 79 |
| | B. | Classes Unimpaired Under the Plan | 80 |
| | C. | Classes Impaired Under the Plan | 80 |
| | | 1. *Impaired Classes of Claims Entitled to Vote* | 80 |
| | | 2. *Impaired Classes of Claims and Interests Not Entitled to Vote* | 80 |
| | D. | Special Voting Procedures for Noteholders | 80 |
| XV. | | **CONCLUSION** | 80 |
| | A. | Hearing on and Objections to Confirmation | 80 |
| | | 1. *Confirmation Hearing* | 80 |
| | | 2. *Date Set for Filing Objections to Confirmation of the Plan* | 81 |
| | B. | Recommendation | 81 |

# APPENDICES

Appendix A &ndash; First Amended Joint Plan of Reorganization of Hayes Lemmerz International, Inc. and Its Affiliated Debtors and Debtors in Possession

Appendix B &ndash; Existing Organizational Structure of the Debtors

Appendix C &ndash; Securities and Exchange Commission Reports

  C-1 &ndash; Selected Financial Data of the Debtors

  C-2 &ndash; Annual Report on Form 10-K for the Fiscal Year Ended January 31, 2009 and Amended Annual Report on Form 10-K for the Fiscal Year Ended January 31, 2009

  C-3 &ndash; Quarterly Report on Form 10-Q for the Fiscal Quarter Ended April 30, 2009

Appendix D &ndash; Pro Forma Financial Projections

Appendix E &ndash; Liquidation Analysis

Appendix F &ndash; Valuation of Debtors

Appendix G &ndash; Warrants Term Sheet

## DISCLOSURE STATEMENT
## WITH RESPECT TO FIRST AMENDED JOINT PLAN OF REORGANIZATION OF
## HAYES LEMMERZ INTERNATIONAL, INC. AND ITS
## AFFILIATED DEBTORS AND DEBTORS IN POSSESSION

## I.     INTRODUCTION

On May 11, 2009 (the "<u>Petition Date</u>"), Hayes Lemmerz International, Inc. ("<u>HLI</u>") and its affiliated debtors and debtors-in-possession in these jointly administered Bankruptcy Cases (collectively, the "<u>Debtors</u>") commenced voluntary cases for relief under chapter 11 of title 11 of the United States Code (the "<u>Bankruptcy Code</u>"). The Debtors submit this disclosure statement (the "<u>Disclosure Statement</u>") pursuant to Bankruptcy Code section 1125 for use in the solicitation of votes on the First Amended Joint Plan of Reorganization of Hayes Lemmerz International, Inc. and Its Affiliated Debtors and Debtors in Possession (the "<u>Plan</u>") dated July 2, 2009 (as amended on September 2, 2009), which was filed with the United States Bankruptcy Court for the District of Delaware (the "<u>Court</u>" and/or the "<u>Bankruptcy Court</u>"). The lead case number for the Bankruptcy Cases is 09-11655 (MFW). A copy of the amended Plan is attached as <u>Appendix A</u> hereto.

This Disclosure Statement sets forth certain information regarding the Debtors' prepetition history, significant events that have occurred during the Bankruptcy Cases, and the anticipated organization, operations and financing of the Reorganized Debtors. This Disclosure Statement also describes in summary the Plan, certain alternatives to the Plan, certain effects of confirmation of the Plan, and the manner in which distributions will be made under the Plan. In addition, this Disclosure Statement discusses the confirmation process and the voting procedures that holders of Claims must follow for their votes to be counted.

FOR A DESCRIPTION OF THE PLAN AND VARIOUS RISK AND OTHER FACTORS PERTAINING TO THE PLAN AS IT RELATES TO HOLDERS OF CLAIMS AGAINST AND INTERESTS IN THE DEBTORS, PLEASE SEE <u>SECTION VIII</u> ( "SUMMARY OF THE PLAN") AND <u>SECTION IX</u> ("CERTAIN FACTORS TO BE CONSIDERED)."

THIS DISCLOSURE STATEMENT CONTAINS SUMMARIES OF CERTAIN PROVISIONS OF THE PLAN, CERTAIN STATUTORY PROVISIONS, CERTAIN DOCUMENTS RELATED TO THE PLAN, CERTAIN EVENTS IN THE BANKRUPTCY CASES, AND CERTAIN FINANCIAL INFORMATION. ALTHOUGH THE DEBTORS BELIEVE THAT THE PLAN AND RELATED DOCUMENTS AND OTHER SUMMARIES ARE FAIR AND ACCURATE, SUCH SUMMARIES ARE QUALIFIED TO THE EXTENT THAT THEY DO NOT SET FORTH THE ENTIRE TEXT OF SUCH DOCUMENTS OR STATUTORY PROVISIONS. FACTUAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS BEEN PROVIDED BY THE DEBTORS' MANAGEMENT, EXCEPT WHERE OTHERWISE SPECIFICALLY NOTED. THE DEBTORS MAKE NO REPRESENTATION WITH RESPECT TO THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN.

## II.     PLAN VOTING INSTRUCTIONS AND PROCEDURES

### A.     Notice to Holders of Claims and Interests

The Debtors are causing this Disclosure Statement to be transmitted to certain Claimholders for the purpose of soliciting votes on the Plan and to others for informational purposes. The purpose of this Disclosure Statement is to provide adequate information to enable the Claimholder to make a reasonably informed decision with respect to the Plan prior to exercising the right to vote to accept or reject the Plan.

By order entered on September [●], 2009, the Bankruptcy Court entered an order (the "<u>Solicitation Procedures Order</u>") (1) approving this Disclosure Statement as containing information of a kind and in sufficient and adequate detail to enable Claimholders that are entitled to vote on the Plan to make an informed judgment with respect to acceptance or rejection of the Plan, (2) setting procedures for voting on the Plan, and (3) scheduling the hearing on confirmation of the Plan (the "<u>Confirmation Hearing</u>"). **THE BANKRUPTCY COURT'S APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE EITHER A GUARANTY**

**OF THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN OR AN ENDORSEMENT OF THE PLAN BY THE BANKRUPTCY COURT.**

ALL CLAIMHOLDERS ARE ENCOURAGED TO READ THIS DISCLOSURE STATEMENT AND ITS APPENDICES CAREFULLY AND IN THEIR ENTIRETY AND CONSULT WITH THEIR LEGAL AND/OR BUSINESS ADVISORS AS DEEMED APPROPRIATE BEFORE DECIDING TO VOTE EITHER TO ACCEPT OR TO REJECT THE PLAN.

THIS DISCLOSURE STATEMENT AND THE OTHER MATERIALS INCLUDED IN THE SOLICITATION PACKAGE ARE THE ONLY DOCUMENTS AUTHORIZED BY THE BANKRUPTCY COURT TO BE USED IN CONNECTION WITH THE SOLICITATION OF VOTES ON THE PLAN. No solicitation of votes may be made except after distribution of this Disclosure Statement, and no person has been authorized to distribute any information concerning the Debtors or the Plan other than the information contained herein.

CERTAIN OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS BY ITS NATURE FORWARD-LOOKING AND CONTAINS ESTIMATES, ASSUMPTIONS AND PROJECTIONS THAT MAY BE MATERIALLY DIFFERENT FROM ACTUAL, FUTURE RESULTS. Except with respect to the projections set forth in Appendix D attached hereto (the "Projections"), and except as otherwise specifically and expressly stated herein, this Disclosure Statement does not reflect any events that may occur subsequent to the date hereof and that may have a material impact on the information contained in this Disclosure Statement. Neither the Debtors nor the Reorganized Company intend to update the Projections for the purposes hereof; thus, the Projections will not reflect the impact of any subsequent events not already accounted for in the assumptions underlying the Projections. Further, the Debtors do not anticipate that any amendments or supplements to this Disclosure Statement will be distributed to reflect such occurrences. Accordingly, the delivery of this Disclosure Statement does not imply that the information herein is correct or complete as of any time subsequent to the date hereof.

EXCEPT WHERE SPECIFICALLY NOTED, THE FINANCIAL INFORMATION CONTAINED HEREIN HAS NOT BEEN AUDITED BY A CERTIFIED PUBLIC ACCOUNTANT AND MAY NOT HAVE BEEN PREPARED IN ACCORDANCE WITH GENERALLY ACCEPTED ACCOUNTING PRINCIPLES ("GAAP").

**B.      Solicitation Package**

Accompanying this Disclosure Statement are copies of (1) the Plan; (2) the notice of, among other things, (a) the time for submitting ballot forms (the "Ballots") that are distributed to Claimholders who are included in Classes that are entitled to vote to accept or reject the Plan; (b) the date, time and place of the Confirmation Hearing and related matters; and (c) the time for filing objections to the confirmation of the Plan (such notice, the "Confirmation Hearing Notice"); (3) as applicable, either (x) a Ballot for the Class in which you are entitled to vote, to be used by you in voting to accept or reject the Plan, or (y) in lieu of a Ballot, a notice explaining why you are not entitled to vote; and (4) the Final Order of the Bankruptcy Court approving the adequacy of information contained in the Disclosure Statement.

**C.      General Voting Procedures, Ballots, and Voting Deadline**

If you are a Claimholder entitled to vote on the Plan and a Ballot is included herewith, after carefully reviewing the Plan, this Disclosure Statement and the detailed instructions accompanying your Ballot, please indicate your acceptance or rejection of the Plan by voting in favor of or against the Plan on the enclosed Ballot. Please complete and sign your original Ballot (copies will not be accepted) and return it in the envelope provided.

Each Ballot has been coded to reflect the Class of Claims it represents. Accordingly, in voting to accept or reject the Plan, you must use only the coded Ballot or Ballots sent to you with this Disclosure Statement.

TO HAVE YOUR VOTE COUNTED, YOUR BALLOT MUST BE PROPERLY COMPLETED AS SET FORTH ABOVE AND IN ACCORDANCE WITH THE VOTING INSTRUCTIONS ON THE BALLOT AND **RECEIVED NO LATER THAN OCTOBER 5, 2009 AT 5:00 P.M. (PREVAILING EASTERN TIME)** (THE "VOTING DEADLINE") BY THE APPROPRIATE VOTING AGENT.

> **IF YOU HOLD A CLAIM IN CLASS 6 PREPETITION SECURED OBLIGATIONS, CLASS 8 PBGC TERMINATION LIABILITY CLAIM, OR CLASS 9 OTHER UNSECURED CLAIMS, YOU MUST RETURN YOUR BALLOT TO THE GARDEN CITY GROUP, INC. ("GCG") TO ONE OF THE FOLLOWING ADDRESSES:**
>
> **If By First-Class Mail:**          **If By Hand Delivery Or Overnight Courier:**
> The Garden City Group, Inc.          The Garden City Group, Inc.
> Attn: Hayes Lemmerz International, Inc.          Attn: Hayes Lemmerz International, Inc.
> P.O. Box 9000 #6531          105 Maxess Road
> Merrick, NY 11566-9000          Melville, NY 11747
>
> If you have any questions about (1) the procedure for voting your Claim with respect to the packet of materials that you have received or (2) the amount of your Claims, please email HayesInfo@gardencitygroup.com, contact GCG at one of the above addresses, or call GCG at 1-800-327-3664 (domestic toll-free) or +1 (614) 553-1313 (international callers).

> **IF YOU HOLD A CLAIM IN CLASS 7 NOTEHOLDER CLAIMS YOU MUST ALLOW SUFFICIENT TIME FOR YOUR BALLOT TO BE PROCESSED BY YOUR ACCOUNTHOLDER AND TRANSMITTED TO THE FINANCIAL BALLOTING GROUP, LLC ("FBG"), THE SPECIAL VOTING AGENT FOR CLASS 7 NOTEHOLDER CLAIMS, IN ADVANCE OF THE VOTING DEADLINE. YOUR ACCOUNTHOLDER WILL PROCESS YOUR BALLOT AND FORWARD YOUR VOTE DIRECTLY TO FBG. DO NOT SEND YOUR BALLOT DIRECTLY TO GCG OR FBG.**
>
> If you have any questions about (1) the procedure for voting your Claim with respect to the packet of materials that you have received or (2) the amount of your Claims, please email HayesBallotingInfo@fbgllc.com, contact FBG at 1-(866)-734-9393 (domestic toll-free) or +1 (646) 282-1800 (international callers).
>
> **Please consult Section XIV herein regarding special procedures with respect to the solicitation process for Class 7 Noteholder Claims.**

Electronic copies of the Plan and Disclosure Statement (including, after the Exhibit Filing Date, all exhibits, schedules and appendices to the foregoing) and all pleadings and orders of the Bankruptcy Court are publicly available on the Bankruptcy Court's website, http://www.deb.uscourts.gov for a fee (a PACER account is required), or at the Company's restructuring website, http://www.hayeslemmerzreorg.com, free of charge. In addition, if you wish to obtain an additional copy of the Plan, this Disclosure Statement, or any exhibits or appendices to such documents, you may contact GCG at the address immediately above or counsel for the Debtors.

FOR FURTHER INFORMATION AND INSTRUCTION ON VOTING TO ACCEPT OR REJECT THE PLAN, SEE SECTION XIV HEREIN.

**D.      Confirmation Hearing and Deadline for Objections to Confirmation**

Pursuant to Bankruptcy Code section 1128 and Bankruptcy Rule 3017(c), the Bankruptcy Court has scheduled the Confirmation Hearing to begin on October 15, 2009 at 2:00 p.m. (prevailing Eastern time) before the Honorable Mary F. Walrath, Bankruptcy Court Judge for the United States Bankruptcy Court for the District of Delaware, 824 North Market Street, 5th Floor, Wilmington, Delaware 19801. The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for the announcement of the adjournment date made at the Confirmation Hearing or at any subsequent adjourned Confirmation Hearing. The Bankruptcy Court has directed that objections, if any, to confirmation of the Plan be filed with the Clerk of the Bankruptcy Court and served so that they are ACTUALLY RECEIVED on or before October 6, 2009 at 4:00 p.m. (prevailing Eastern time) by:

**Counsel for the Debtors:**
Skadden, Arps, Slate, Meagher & Flom LLP
155 N. Wacker Drive, Suite 2700
Chicago, Illinois 60606-1720
Attn: J. Eric Ivester, Esq.
Attn: Stephen D. Williamson, Esq.

**United States Trustee:**
The Office of the United States Trustee
J. Caleb Boggs Federal Building
844 North King Street, Room 2207, Lockbox 35
Wilmington, DE 19801
Attn: Joseph J. McMahon, Jr., Esq.

**Counsel for the Creditors' Committee:**
Bifferato Gentilotti LLC
800 N. King Street
Plaza Level 1
Wilmington, DE 19801
Attn: Garvan F. McDaniel, Esq.

**Counsel for the Prepetition Administrative Agent:**
Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153
Attn: Lori Fife, Esq.

**Counsel for the Retiree Committee:**
Schnader Harrison Segal & Lewis
824 North Market Street
Suite 1001
Wilmington, DE
Attn: Richard A. Barkasy, Esq.

**Counsel for the Debtors:**
Skadden, Arps, Slate, Meagher & Flom LLP
One Rodney Square
P.O. Box 636
Wilmington, DE 19899
Attn: Anthony W. Clark, Esq.
Attn: Kimberly A. LaMaina, Esq.

**Counsel for the Creditors' Committee:**
Lowenstein Sandler PC
65 Livingston Avenue
Roseland, NJ 07068
Attn: Kenneth A. Rosen, Esq.
Attn: Sharon L. Levine, Esq.
Attn: Mary E. Seymour, Esq.

**Counsel for the DIP Administrative Agent:**
Milbank, Tweed, Hadley & McCloy LLP
1 Chase Manhattan Plaza
New York, NY 10005-1413
Attn: Abhilash Raval, Esq.
Attn: Tyson Lomazow, Esq.
Attn: Brian Kinney, Esq.

**Counsel for the Retiree Committee:**
Stahl Cowen Crowely Addis LLC
55 West Monroe Street, Suite 1200
Chicago, IL 60603
Attn: Jon D. Cohen, Esq.
Attn: Trent P. Cornell, Esq.

## III. HISTORY OF THE DEBTORS

### A. Overview of the Debtors

HLI and its direct and indirect subsidiaries (collectively, the "Subsidiaries" and, together with HLI, the "Company") are a leading worldwide producer of aluminum and steel wheels for passenger cars and light trucks and of steel wheels for commercial trucks and trailers. In addition, the Company is also a supplier of automotive powertrain components for original equipment manufacturers and certain tier one suppliers. The Company's operations are conducted through its world headquarters located in Northville, Michigan, and as of May 31, 2009, the Company had approximately 6,250 employees working in 23 facilities located in the United States and 12 other countries around the world. The Debtors' fiscal year ends January 31 each year.

The Company sells products to almost every light vehicle Original Equipment Manufacturer ("OEM") and commercial highway vehicle customer throughout the world. The Company designs, manufactures and distributes cast aluminum wheels and fabricated steel wheels for the passenger car and light truck markets in North America, Europe, South America, South Africa and Asia. Its customers include major OEMs such as General Motors, Ford and Chrysler, as well as BMW, Daimler, Fiat, Honda, Hyundai, Kia, Renault/Nissan, PSA, Porsche, Toyota and Volkswagen. The Company also sells aftermarket steel wheels, primarily for the winter tire market in Europe, to Alcar. The Company has cast aluminum wheel manufacturing facilities in Spain, Italy, the Czech Republic, Turkey, Brazil, South Africa, Thailand and Mexico. The Company has fabricated steel wheel manufacturing facilities in Akron, Ohio and Sedalia, Missouri as well as Spain, the Czech Republic, Turkey, India, Brazil and Germany.

The Company also designs, manufactures and distributes wheels for commercial highway vehicles in North America, Europe, South America and Asia. Principal customers for commercial highway wheels include AM General, Daimler, Ford, Iveco, MAN, Paccar, Renault, Scania and Volvo. The Company's commercial highway manufacturing facilities are in Akron, Ohio, Germany, Turkey, Brazil and India. Additionally, the Company designs, manufactures and distributes a variety of aluminum and polymer powertrain components. Powertrain and engine components are produced in North America and sold primarily to Chrysler, Ford and General Motors, and also to tier one suppliers such as Delphi, Bosch, Eaton and Magna.

Worldwide, the Company enjoys a broad customer base. As of April 30, 2009, the Company's largest customers, as represented by their percentage of HLI's global sales, are Ford (17%), General Motors (17%), Volkswagen (9%), Toyota (8%), Renault-Nissan (6%), Daimler (5%), PSA Peugeot Citroen (4%), Tata (3%), BMW (2%), Volvo (2%), Honda (2%), Fiat (2%), and Chrysler (2%). While the Company's two largest customers globally remain Ford and General Motors, approximately two-thirds of the Company's sales to these customers in fiscal 2008 were outside the United States.

**B.      Background and Development of the Company**

The Company was founded in 1908 as a manufacturer of wooden spoke wheels for the Ford Model T, and has since grown to become a leading worldwide producer of aluminum and steel wheels for passenger cars and light trucks and of steel wheels for commercial trucks and trailers, and is a supplier of automotive powertrain components. The Company produced approximately 48.9 million wheels in the fiscal year ended January 31, 2009.

Since 2003, the Company has taken a number of steps to strengthen its competitive position by expanding operations in countries with lower operational costs, divesting non-core assets, rationalizing production capacity, and focusing on improving its operating performance.

In fiscal 2008, the Company divested its aluminum wheel operations in Hoboken, Belgium. In fiscal 2007, the Company divested its North American suspension operations in Bristol, Indiana and Montague, Michigan and its aluminum components operations in Tegelen and Nieuw Bergen, The Netherlands and Antwerp, Belgium. The Company also divested its automotive brake operations in Homer, Michigan and Monterrey, Mexico and its powertrain components facility in Wabash, Indiana. In fiscal 2006, the Company divested its machining operations in Southfield, Michigan and announced the closure of its technical center in Ferndale, Michigan. In fiscal 2005, the Company sold a ductile iron foundry in Cadillac, Michigan, a facility in Au Gres, Michigan that designed and manufactured factory equipment, and a business that sold electronic brake controllers for towing vehicles. Also in fiscal 2005, the Company divested its operations in Berea, Kentucky; Chattanooga, Tennessee; and Mexico City, Mexico, which manufactured hubs and brake drums for commercial highway vehicles.

In November 2005, the Company acquired an additional 20% interest in Jantas Aluminyum Jant Sanayi ve Ticaret, A.S., a Turkish aluminum wheel joint venture in which it held a 40% interest, which was then merged into Hayes Lemmerz — Inci Jant Sanayi A.S., in which it also hold a 60% interest. In January 2004, the Company acquired 100% of a cast aluminum wheel plant in Chihuahua, Mexico formerly operated as part of a joint venture in which the Company was a minority investor. In November 2003, the Company acquired a 60% interest in Hayes Lemmerz Jantas Jant Sanayi ve Ticaret A.S., a Turkish steel wheel joint venture in which the Company was a minority investor. In fiscal 2002, the Company acquired the remaining interest in its South African cast aluminum wheel joint venture in which the Company previously held a 76% interest. In addition to these acquisitions in low cost countries, the Company has also invested in its existing facilities in Brazil, India, Thailand, and the Czech Republic.

The Company closed its facilities in Gainesville, Georgia in fiscal 2008; Huntington, Indiana in fiscal 2006; La Mirada, California and Campiglione, Italy in fiscal 2005; Howell, Michigan in fiscal 2004; and Bowling Green, Kentucky in fiscal 2003. Production at these facilities was transferred to other facilities with excess capacity. The Company has also focused on continuing to improve operating performance by implementing lean manufacturing and Six Sigma initiatives, centralizing certain accounting, finance, information technology, and other functions, streamlining marketing and general and administrative overhead, and improving internal controls.

**C. Discussion of the Debtors' Business Operations**

    1.       Products and Services

        The Company is organized based primarily on markets served and products produced. Under this organizational structure, the operating segments have been aggregated into two reportable segments: Automotive Wheels and Other. The Automotive Wheels segment includes results from the Company's operations that primarily design and manufacture fabricated steel and cast aluminum wheels for original equipment manufacturers in the global passenger car, light vehicle, and heavy duty truck markets. The Other segment includes the results of the Company's powertrain components facility in Nuevo Laredo, Mexico and financial results related to the corporate office and the elimination of certain intercompany activities.

        The Automotive Wheels segment includes three principal classes of products: cast aluminum wheels for passenger cars and light trucks, fabricated steel and aluminum wheels for passenger cars and light trucks, and fabricated steel wheels for commercial trucks and trailers. The Company designs, manufactures, and distributes a full line of cast aluminum wheels to OEMs in North America, Europe, South America, South Africa, and Asia. The Company manufactures aluminum wheels with bright finishes such as GemTech® machining, clads, and premium paints. Cast aluminum wheel sales for passenger car and light trucks were $602.9 million or 31.7% of total revenues for the fiscal year ended January 31, 2009 and $66.5 million or 27.0% for the first quarter of 2009. The Company also designs, manufactures, and distributes fabricated wheels for passenger cars and light trucks in North America, Europe, Asia and South America. The Company's fabricated wheel products include steel and aluminum wheels that can be made in drop-center, bead seat attached, and full-face designs, in a variety of finishes, including chrome and clads. Fabricated wheel sales for passenger car and light trucks were $670 million or 35.6% of total revenues for the fiscal year ended January 31, 2009 and $112.8 million or 45.7% for the first quarter of 2009. In addition, the Company designs, manufactures, and distributes wheels for commercial highway vehicles in North America, Europe, South America, and Asia. Commercial highway wheel sales were $536.8 million or 28.2% of total revenues for the fiscal year ended January 31, 2009 and $67.4 million or 27.3% for the first quarter of 2009.

        The Other Segment includes the Company's powertrain components products. The Company designs, manufactures, and distributes a variety of aluminum and polymer powertrain components including engine intake manifolds, engine covers, and water crossovers. The Company's powertrain and engine components are primarily produced and sold in North America, and a majority of the powertrain components are sold to Chrysler, Ford and General Motors.

    2.       Material Source and Supply

        Most of the raw materials (such as steel and aluminum) and semi-processed or finished items (such as castings) used in the Company's products, of both the Automotive Wheels and Other segments, are purchased from suppliers located within the geographic regions of the Company's operating units. In many cases, these materials are available from several qualified sources in quantities sufficient for the Company's needs. However, shortages of a particular material or part occasionally occur and metal markets can experience significant pricing and supply volatility. In addition, particularly with respect to semi-processed or finished items, changing suppliers may require the approval of the Company's customers, which can involve significant time and expense.

        In recent periods there has been significant volatility in the global prices of steel, which have had and may continue to have an impact on the business of both the Automotive Wheels and Other segments. The Company has been able to largely offset the impact of steel cost increases through higher scrap sales recoveries and by passing some of these costs through to certain of its customers, although it may not be able to continue to do so in the future. The full impact of steel prices is uncertain given the volatility in the global steel market. Aluminum costs have also been volatile in recent periods. However, the Company's contracts with customers generally provide that the prices of the products are based on established aluminum price indices. This generally allows the Company to largely pass along the increased costs of aluminum to its customers. Conversely, the prices for the Company's customers would decrease should the costs of aluminum decrease.

        To enable the Company to better manage its supply chain, the Company purchases key materials through a centralized materials and logistics function.

3. Intellectual Property

The Company owns significant intellectual property including numerous United States and foreign patents, trade secrets, trademarks, and copyrights. The protection of this intellectual property is important to the Company's business. The Company's policy is to seek statutory protection for all significant intellectual property embodied in patents and trademarks. The Company relies on a combination of patents, trade secrets, trademarks, and copyrights to provide protection in this regard. From time to time, the Company grants licenses under its patents and technology and receives licenses under patents and technology of others

4. Seasonality

While the Company's business is not seasonal in the traditional sense, July (in North America), August (in Europe) and December are typically lower sales volume months. This is because OEMs typically perform model changeovers or take vacation shutdowns during the summer and assembly plants typically are closed for a period from shortly before the year-end holiday season until after New Year's Day.

5. Customers

In fiscal 2008, the Company's most significant customers were Ford and General Motors, which accounted for approximately 29% of its fiscal 2008 net sales on a worldwide basis, while sales to these customers in the United States accounted for approximately 10% of total sales in fiscal 2008. Other significant customers include Daimler, Renault/Nissan, Toyota, and Volkswagen.

The loss of a significant portion of the Company's sales to any of its principal customers could have a material adverse impact on the Company. The Company has been doing business with each of its principal customers for many years, and sales are composed of a number of different product lines and of different part numbers within product lines and are made to individual divisions of such customers. In addition, the Company supplies products to many of these customers in multiple geographic locations, which reduces the Company's reliance on any single market.

6. Backlog

Generally, the Company's products are not on a backlog status. These products are produced from readily available materials, have a relatively short manufacturing cycle and have short customer lead times. Each operating unit maintains its own inventories and production schedules.

7. Competition

The major domestic and foreign markets for the Company's products are highly competitive. Competition is based primarily on price, technology, quality, delivery, and overall customer service. The Company's global competitors include a large number of other well-established suppliers. Competitors typically vary among each of the Company's products and geographic markets.

8. Research and Development

The Company engages in ongoing engineering, research, and development activities to improve the reliability, performance, and cost-effectiveness of its existing products and to design and develop new products for existing and new applications. The Company's spending on engineering, research, and development programs was $12.4 million for the fiscal year ended January 31, 2009, $9.6 million for the fiscal year ended January 31, 2008, and $4.4 million for the fiscal year ended January 31, 2007.

9. Environmental Compliance

The Company believes it is in material compliance with all environmental laws, ordinances, and regulations. All of the Company's manufacturing facilities worldwide have implemented comprehensive environmental management systems and are registered under ISO 14001. The Company does not anticipate any material capital expenditures for environmental compliance or any adverse effect on its earnings or competitive position as a result of environmental matters.

10.       Employees; Labor Matters

      (a)      Employees

As of May 31, 2009, the Company employed approximately 6,250 employees working in 23 facilities located in the United States and 12 other countries around the world. Certain of the Debtors' employees are unionized. The U.S. unionized employees are represented by the United Steel Workers Union. All such U.S. unionized employees are located at the Debtors' facility in Akron, Ohio. The Debtors' current contract with the United Steel Workers Union expires in fiscal 2010, and, as part of the Bankruptcy Cases, the Debtors must determine whether to accept, reject, or seek a modification of this contract. As is common in Mexico and many European jurisdictions, substantially all of the Debtors' employees in Europe and Mexico are covered by country-wide collective bargaining agreements, which are subject to negotiations on an annual basis. Although the Debtors believe that their relations with their employees are good, a dispute between the Debtors and their employees could have a material adverse effect on the Debtors' business.

      (b)      Retirement Savings Plan

The Debtors maintain the Hayes Lemmerz International, Inc. Retirement Savings Plan (the "Retirement Savings Plan") for their employees. The Retirement Savings Plan is a defined contribution retirement plan qualified under section 401 of the Internal Revenue Code. Under the Retirement Savings Plan, the Debtors make deductions from each participating salaried and hourly employee's payroll check and transfer the withheld funds to the plan trustee. Additionally, the Debtors make matching contributions of up to 4% of each participating salaried and hourly employee's annual compensation. The Debtors contribute an average of $1.2 million to the Retirement Savings Plan annually. The Debtors have continued the Retirement Savings Plan during these Bankruptcy Cases and intend to continue the Retirement Savings Plan following the Plan Effective Date.

      (c)      Pension Plan

The Debtors provide certain retired employees with a defined benefit pension plan, the Hayes Lemmerz International, Inc. Retirement Income Plan (the "Pension Plan"), pursuant to which a benefit is payable to the employee or other designated beneficiary upon the employee's retirement from the company, total and permanent disability, or death. The Pension Plan was frozen as of December 31, 2002 and therefore no employee is currently accruing any additional credited service or increased benefit amount, when measured at an assumed retirement age of 65. As of the most recent actuarial analysis, on January 31, 2008 the Pension Plan was approximately 58% funded, and its assets and liabilities had market values of approximately $96 million and $166 million, respectively. As of May 31, 2009, assets in the plan were approximately $105 million. The Debtors are seeking to reduce their pension liabilities through a consensual process with the Pension Benefit Guaranty Corporation or through termination of the pension plans. In the event the Debtors and the PBGC cannot reach an agreement, the Debtors may seek a distressed termination of the Pension Plan or pursue other alternatives.

At this time, the Debtors and the Pension Benefit Guaranty Corporation ("PBGC") have not reached any agreement concerning the Pension Plan. The Debtors have not filed the notice necessary to commence termination of the Pension Plan and the Pension Plan remains ongoing. If the Pension Plan is terminated, the Debtors will be jointly and severally liable for, among other things, the Pension Plan's unfunded benefit liabilities. PBGC currently estimates the Pension Plan's unfunded benefit liabilities as $106.7 million.

The Debtors do not anticipate being able to reorganize pursuant to the Plan unless the Pension Plan is terminated. However, if the Debtors were able to reorganize (if the Pension Plan was not terminated) and the Pension Plan is not terminated, then the Debtors will continue to be responsible for funding and administering the Pension Plan as required by law.

(d)       Retiree Medical Programs

The Debtors provide retiree medical benefits (the "Retiree Medical Benefits") to approximately 2,000 former employees or surviving spouses.  The Debtors provide different levels of medical, dental, life insurance and prescription drug programs to retired employees and to retired union workers pursuant to various collective bargaining agreements.  A portion of the Retiree Medical Benefits for Medicare-eligible retirees and their covered dependents is insured.  Plan types for the insured benefits include health maintenance organizations, among others, a majority of which are administered by Professional Benefit Services and Blue Care Network.  The remaining Retiree Medical Benefits liability is self-insured with claims administered by several third-party administrators, predominately CVS/Caremark, PBS/UA, and WEYCO, and paid by the Debtors.  During 2008, the annual expense of the Retiree Medical Benefits was approximately $14 million.  Through May 31, 2009, the annual expense of the Retiree Medical Benefits was approximately $4.4 million.

As of the Petition Date, the Debtors' estimated incurred, but not reported, expense for Retiree Medical Benefits is approximately $1.2 million.  Based on current actuarial analyses, the Debtors estimate that the Debtors' cumulative long-term liability for fully performing all of their existing Retiree Medical Benefits on behalf of all eligible retired employees and dependents and current employees and dependents who have accrued rights to the Retiree Medical Benefits as of the Petition Date would total approximately $150 million.

On June 10, 2009, pursuant to section 1114(c) and (d), the Bankruptcy Court entered an order approving the formation and appointment of a committee of retired employees (the "Retiree Committee") by the U.S. Trustee (Docket No. 206).  On July 7, 2009, the U.S. Trustee appointed members to the Retiree Committee  (Docket No. 311).

The Debtors are in the process of seeking authority to reduce their other post-employment benefits ("OPEB") obligations to employees (OPEB) through a process predicated on Bankruptcy Code section 1114.  On August 21, 2009, the Debtors filed the Application of Debtors to Modify Retiree Benefits Under 11 U.S.C. § 1114 (Docket No. 510) (the "Retiree Benefits Motion"), seeking an order under section 1114(g) modifying the Debtors' payments for retiree health benefits and life insurance.  Pursuant to the Retiree Benefits Motion, the Debtors seek authority to eliminate the Debtors' obligations to provide Retiree Benefits on the terms set forth therein.

Following the appointment of the Retiree Committee and filing the Retiree Benefits Motion, the Debtors have been negotiating with the Retiree Committee, the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union ("USW"), and the International Union, United Automobile, Aerospace and Agricultural Implement Workers of America ("UAW") – to reach an agreed modification of Retiree Medical Benefits.  As of the date of this Disclosure Statement, the parties have not agreed upon the scope of modification of the Retiree Medical Benefits.  The Bankruptcy Court will begin hearing argument with respect to the Debtors' proposed modifications to the Retiree Medical Benefits on September 9, 2009.

The Debtors will continue the Retiree Medical Programs after the Plan Effective Date based on the outcome of the foregoing and as may be required by the Bankruptcy Court.

(e)       Existing Bonus Plan

The Debtors offer incentive bonuses to certain employee constituencies at the local plant level through plant gainsharing plans and special recognition awards, and at the corporate level through special recognition awards.  Bonuses may be awarded pursuant to these plans for, among other things, achieving local plant improvement goals, exceptional contributions to specific tasks and contributing to the realization of savings through participation in strategic initiatives.  Payments made by the Debtors pursuant to these plans occur once a year, generally in May, following the end of the Debtors' fiscal year on January 31st.  As of May 31, 2009, approximately $268,000 has accrued under the 2009 gainsharing plan.  Additionally, the Debtors pay less than $100,000 towards other miscellaneous special recognition awards for employees.  The Debtors obtained authority from the Bankruptcy Court to continue to honor and perform under the existing bonus program (as described above) (a) for non-insiders, irrespective of whether such obligations, together with unpaid prepetition wages for each non-insider, exceed $10,950 and (b) for insiders, solely to the extent such obligations, together with unpaid prepetition wages for each insider, do not exceed $10,950.

(f)     Workers' Compensation Programs

The Debtors maintain workers' compensation programs in all states in which they operate pursuant to the applicable requirements of local law to provide employees with workers' compensation coverage for claims arising from or related to their employment with the Debtors.

In all states other than Ohio, the Debtors insure their workers' compensation liabilities through a workers' compensation policy issued by Hartford Fire Insurance Company ("Hartford").  Pursuant to the Hartford policy, employees seeking reimbursement for work-related injuries file their claims directly against the Debtors.  Hartford investigates the claims against the Debtors and validates those deemed meritorious.  The Hartford policy has step deductible amounts of $350,000 and $500,000 per claim, whereby a claimant gets a $500,000 deductible applied one time and then for all other claims in the policy year the deductible drops to $350,000.  The Debtors are obligated to reimburse Hartford for any policy deductible amounts.  In support of the deductible obligation, the Debtors have obtained, and there is currently outstanding, one letter of credit in the amount of $3 million, issued by Citibank for the benefit of Hartford.  Hartford has made a partial draw down on the letter of credit to cover prepetition deductible amounts for which the Debtors have not reimbursed Hartford.  If the Debtors fail to satisfy their deductible obligations with respect to postpetition claims under the Hartford policies, Hartford may draw on the letter of credit to satisfy such amounts.  The letter of credit issued for the benefit of Hartford is set to expire on February 1, 2010.  Upon the earlier of this expiration date or the date the Debtors emerge from chapter 11, it is expected that Hartford will draw down further on the letter of credit completely based on their estimated future liability for the remaining open prepetition workers' compensation claims.

Before obtaining the Hartford policy, the Debtors formerly insured their workers' compensation liabilities through policies issued by many different companies including, among others, Kemper Insurance Company and Pacific Employers Insurance Company.  The Debtors still have obligations to workers that were covered by such former insurance policies.  In connection with those various former policies, the Debtors obtained, and there are currently outstanding, seven letters of credit in the aggregate amount of approximately $6.2 million, issued for the benefit of the workers compensation.  Certain of these letters of credit cover actual claims and "tail off" for the Debtors' liabilities related to claims that arose while those former insurance programs were in effect.  Five of the outstanding letters of credit aggregating approximately $2.3 million expired at the end of May 2009.

In Ohio, the Debtors' plants participate in the "monopolistic" workers' compensation insurance program, which is funded through, and administered by, the Ohio Bureau of Workers' Compensation (the "OBWC").  Until 2002, the Debtors paid 10-year retrospectively rated premiums to the OBWC.  All workers' compensation claims paid under Ohio's monopolistic program are administered by the OBWC.  Prior to the Petition Date, the retrospectively rated premium (for pre-2002 policy years only) was  adjusted on an annual basis for each policy year for a period of 10 years based on the development of claims for policies subject to the retrospectively rated premium.  The current program (since 2002) is a first-dollar fully-insured program (i.e., the Company pays premiums only and incurs no future reimbursement obligations).  Upon the Petition Date, the Company advised the OBWC that the Company could no longer meet their prepetition obligations to the OBWC, including paying the annual retrospectively rated premiums for the open pre-2002 policy years.

In addition, until 2008, the Debtors maintained a self-insurance program for facilities in the state of Michigan, as well as a self-insurance program for its facilities in the state of Indiana.  Self-insured claims under the Indiana program continues to be administered by a third party administrator, Mackinaw Administrators ("Mackinaw"), which pays claims on the Debtors' behalf from an account which is refreshed monthly by the Debtors as needed.  Upon the Petition Date, the Company advised the Michigan Bureau of Workers' Compensation that the Company could no longer meet their prepetition obligations under their self-insurance program.  In response, the State of Michigan, Self-Insurers' Security Fund drew down on a letter of credit posted with Michigan Bureau of Workers' Compensation to ensure their performance under the self-insurance program and secured the claim files from Mackinaw.  On or about May 18, 2009, the Michigan Bureau of Workers' Compensation sent notices to all Michigan-based claimants advising them that they were in the process of assuming the administration of these claims.  If the Debtors are unable to pay their prepetition workers' compensation obligations under the Indiana self-insurance programs, the Debtors expect that further draws on their letters of credit will be made, resulting in potential claims against the estates.

The Debtors' outstanding obligations relating to workers' compensation arise from incurred but not paid claims (the "IBNP") and incurred but not reported (the "IBNR") claims. The Debtors estimate their IBNR through an actuarial process that is common in the insurance industry. As of March 23, 2009, approximately 761 workers' compensation claims were pending against the Debtors arising out of employees' alleged on-the-job injuries. The Debtors estimate that the aggregate amount payable on account of prepetition IBNP claims, prepetition IBNR claims, and retrospectively rated premium rate adjustments from the Ohio Bureau of Workers' Compensation is approximately $4.4 million. The Debtors, however, upon commencement of these Bankruptcy Cases have advised their workers' compensation insurance carriers that they do not intend to satisfy their obligations to reimburse their insurance carriers for deductibles relating to pre-Petition Date claims. It is possible that such insurance carriers may pursue such unpaid deductibles against available security, including letters of credit. As of July 1, 2009, the Debtors have four remaining letters of credit outstanding with a total face value of $6,790,500 to secure their workers' compensation obligations. The Debtors expect that their exposure on account of post-Petition Date workers' compensation claims for the next 12 months will be less than $300,000.

The Debtors obtained authority from the Bankruptcy Court to pay amounts related to workers' compensation claims that arose prior to the Petition Date, as they become due, in the ordinary course of the Debtors' business. The Debtors, to date, have not made any such payments. Additionally, the Debtors intend to reject, pursuant to Bankruptcy Code section 365, certain of their existing workers' compensation policies. In response to such rejection, the Debtors expect claims to be made against collateral they posted to secure their workers' compensation obligations.

*11.     Properties*

The Company's world headquarters are located in Northville, Michigan. The Company has a worldwide network of 23 facilities comprised of 6 operating facilities in North America, 10 facilities in Europe, and 7 facilities in South America, Asia, and South Africa. The Company believes that its plants are adequate and suitable for the manufacturing of products for the markets in which it sells.

The following table summarizes the Company's operating facilities:

| Location | Segment | Purpose | Owned/Leased |
|---|---|---|---|
| **North America** | | | |
| Akron, OH | Automotive Wheels | Manufacturing | Owned |
| Chihuahua, Mexico | Automotive Wheels | Manufacturing | Owned |
| Laredo, Texas | Other | Warehouse | Leased |
| Northville, MI | Other | World Headquarters, R&D | Owned |
| Nuevo Laredo, Mexico | Other | Manufacturing | Owned |
| Sedalia, MO | Automotive Wheels | Manufacturing | Owned |
| **Europe** | | | |
| Barcelona, Spain | Automotive Wheels | Manufacturing | Owned |
| Dello, Italy | Automotive Wheels | Manufacturing | Owned |
| Königswinter, Germany (2 facilities) | Automotive Wheels | Manufacturing | Owned |
| Manisa, Turkey (3 facilities) | Automotive Wheels | Manufacturing | Owned |
| Manresa, Spain | Automotive Wheels | Manufacturing | Owned |
| Ostrava, Czech Republic (2 facilities) | Automotive Wheels | Manufacturing | Owned |
| **Rest of the World** | | | |
| Bangkok, Thailand | Automotive Wheels | Manufacturing | Leased |
| Johannesburg, S. Africa | Automotive Wheels | Manufacturing | Owned |
| Pune, India | Automotive Wheels | Manufacturing | Owned |
| Pune, India | Automotive Wheels | Manufacturing | Leased |
| Sao Paulo, Brazil (2 facilities) | Automotive Wheels | Manufacturing | Owned |
| Yokohama, Japan | Automotive Wheels | Sales Office | Leased |

The Debtors have retained the services of Newmark Detroit, Inc. (d/b/a Newmark Knight Frank) ("Newmark") as their real estate broker to assist with the disposition of three unused parcels of real property owned by the Debtors in Huntington, Indiana, Howell, Michigan, and Ferndale, Michigan. Newmark continues to actively market these properties for sale.

### 12. Legal Proceedings

As of the Petition Date, the Debtors were parties to several legal proceedings which are set forth below in Section III.D. Due to the commencement of the Debtors' Bankruptcy Cases, prepetition litigation against the Debtors is subject to the automatic stay. In certain instances, as set forth in Section III.D below, the automatic stay has been modified to permit the litigation to proceed.

### 13. Selected Financial Data

Set forth in Appendix C-1 is certain consolidated financial data with respect to the Company for each of the last five fiscal years ended January 31, 2009. The information set forth therein should be read in conjunction with the Company's consolidated financial statements, related notes thereto, and the other information included in the Company's Annual Report on Form 10-K for the Fiscal Year Ended January 31, 2009 (together with the Company's Amended Annual Report) and the Company's Quarterly Report on Form 10-Q for the Nine Months Ended April 30, 2009, each of which is attached hereto as Appendix C-2 and Appendix C-3, respectively. In addition, the Debtors file monthly operating reports with the Bankruptcy Court. These monthly operating reports reflect certain unaudited financial data of the Debtors on a monthly basis.

The projections of the Company for fiscal years ended January 31, 2010, 2011, 2012, 2013 and 2014 as set forth in Appendix D (the "Projections") are unaudited and should be read in conjunction with the assumptions, qualifications and footnotes set forth therein, this Disclosure Statement, the historical financial information (including the notes and schedules thereto) and other information set forth in the Company's Annual Report on Form 10-K for the fiscal year ended January 31, 2009 and in the Quarterly Report on Form 10-Q for the Fiscal Quarter ended April 30, 2009, each as previously filed with the Securities and Exchange Commission (the "SEC") and included in Appendix C-2 and C-3, respectively, to this Disclosure Statement. The Company expects that the Plan Effective Date will occur at the end of the third quarter of fiscal 2009. For purposes of the Projections, the Plan Effective Date is assumed to be November 1, 2009. The Projections were prepared to show the estimated consolidated financial positions, results of operations, and cash flows of the Company and take into account the estimated effects on the capitalization of the Company as defined in the Plan. As such, the Projections consider the ongoing operations of the Reorganized Debtors and its subsidiaries and its proposed strategies for managing its operations and do not take into account the effects of the principles of "fresh start" accounting.

THE PROJECTIONS WERE NOT PREPARED WITH A VIEW TOWARD COMPLIANCE WITH THE GUIDELINES ESTABLISHED BY THE AICPA, THE FINANCIAL ACCOUNTING STANDARDS BOARD (THE "FASB") OR THE RULES AND REGULATIONS OF THE SEC. FURTHERMORE, THE PROJECTIONS HAVE NOT BEEN AUDITED, REVIEWED OR SUBJECTED TO ANY PROCEDURES DESIGNED TO PROVIDE ANY LEVEL OF ASSURANCE BY THE COMPANY'S INDEPENDENT PUBLIC ACCOUNTANTS, KPMG LLP. WHILE PRESENTED WITH NUMERICAL SPECIFICITY, THE PROJECTIONS ARE BASED UPON A VARIETY OF ESTIMATES AND ASSUMPTIONS, WHICH, ALTHOUGH DEVELOPED AND CONSIDERED REASONABLE BY MANAGEMENT, MAY NOT BE REALIZED AND ARE SUBJECT TO SIGNIFICANT BUSINESS, ECONOMIC AND COMPETITIVE UNCERTANTIES AND CONTINGENCIES, MANY OF WHICH ARE BEYOND THE CONTROL OF THE COMPANY'S MANAGEMENT. THESE UNCERTAINTIES INCLUDE, AMONG OTHER THINGS, THE ULTIMATE OUTCOME AND CONTENTS OF A CONFIRMED PLAN OF REORGANIZATION AND THE TIMING OF THE CONFIRMATION OF SUCH PLAN. CONSEQUENTLY, THE PROJECTIONS SHOULD NOT BE REGARDED AS A REPRESENTATION OR WARRANTY BY THE COMPANY, OR ANY OTHER PERSON, AS TO THE ACCURACY OF THE PROJECTIONS OR THAT THE PROJECTIONS WILL BE REALIZED. ACTUAL RESULTS MAY VARY MATERIALLY FROM THOSE PRESENTED IN THE PROJECTIONS.

**D.    Summary of Material Litigation Matters**

*1.    Kuhl Wheels, LLC Litigation*

HLI was party to a license agreement with Kuhl Wheels, LLC ("Kuhl"), whereby Kuhl granted HLI an exclusive patent license concerning "high vent" steel wheel technology known as the Kuhl Wheel ("Kuhl Wheel"), which agreement was terminated as of January 10, 2003 pursuant to a stipulation between HLI and Kuhl in connection with HLI's 2001 Chapter 11 Cases.  The original license agreement (as amended, the "License Agreement"), dated May 11, 1999, granted HLI a non-exclusive license for the Kuhl Wheel technology. The License Agreement was subsequently amended to provide HLI with an exclusive worldwide license.  On January 14, 2003, HLI filed a Complaint for Declaratory and Injunctive Relief against Kuhl and its affiliate, Epilogics Group, in the U.S. District Court for the Eastern District of Michigan.  HLI commenced such action seeking a declaration of non-infringement of two U.S. patents and injunctive relief to prevent Epilogics Group and Kuhl from asserting claims of patent infringement against HLI, and disclosing and using its technologies, trade secrets, and confidential information to develop, market, license, manufacture, or sell automotive wheels.  The district court granted summary judgment to the Company at the end of 2007.  Kuhl appealed to the Federal Circuit Court of Appeals, which, on February 24, 2009, upheld the district court's ruling.  Kuhl did not file a notice of appeal in the Federal Circuit Court, and did not file a petition for certiorari in the Supreme Court of the United States.  Therefore, this litigation has concluded.

*2.    Lacks Incorporated Patent Infringement Litigation*

The litigation with Lacks Incorporation ("Lacks"), which began in 1996, is presently pending in the United States District Court for the Eastern District of Michigan (Case No. 96-75692) before the Honorable John Feikens pursuant to a remand order by the Federal Circuit Court of Appeals issued on November 21, 2008.  The action is stayed as to HLI.  HLI's co-defendant, McKechnie Vehicle Components USA, Inc. ("McKechnie"), filed a motion to also stay the litigation as to it, which motion was denied.

HLI is the defendant in a patent infringement matter filed in 1996 in the U.S. District Court for the Eastern District of Michigan (the "District Court").  Lacks alleged that HLI and a co-defendant, McKechnie, infringed on three patents held by Lacks relating to chrome-plated plastic cladding for steel wheels.  Prior to fiscal 2000, the District Court dismissed all claims relating to two of the three patents that Lacks claimed were infringed and dismissed many of the claims relating to the third patent.  The remaining claims relating to the third patent were submitted to a Special Master.  In January 2001, the Special Master issued a report finding that HLI infringed on the third patent, but that the third patent was invalid and recommending that Lacks' remaining claims be dismissed.  The District Court accepted these recommendations in April 2001.

Lacks appealed this matter to the Federal Circuit Court of Appeals.  The Federal Circuit Court upheld the District Court's finding that HLI infringed on the third patent but vacated the District Court's ruling that the third patent was invalid and remanded the matter back to the District Court for further proceedings.

In 2005, HLI and Lacks filed cross motions for summary judgment on the third patent.  On August 15, 2007, the Special Master issued a report finding that the remaining claims at issue in the third patent are invalid and recommending that the District Court judge grant judgment for HLI and against Lacks.  On November 20, 2007, the District Court accepted the Special Master's recommendation and issued judgment in favor of HLI and McKechnie ruling that the remaining claims of the third Lacks' patent are invalid.  Lacks appealed the District Court's ruling to the Federal Circuit Court of Appeals.

On November 21, 2008, the Federal Circuit Court of Appeals issued an opinion affirming the District Court's denial of summary judgment in favor of Lacks but reversing the District Court's grant of summary judgment in favor of HLI finding that there were questions of material fact.  The Federal Circuit Court of Appeals remanded the case to the District Court for further proceedings.  Trial on the remanded issues has not yet been scheduled.

On March 18, 2009, HLI and its co-defendant, McKechnie, filed a Petition for Writ of Certiorari with the U.S. Supreme Court requesting that the Court review the decision by the Federal Circuit.  That Petition was denied.  In addition, on March 3, 2009, HLI filed a request with the U.S. Patent and Trademark Office ("USPTO") requesting that it re-examine the Lacks' patent and invalidate the claims which are the subject of the case remanded

to the District Court, which request was granted on May 1, 2009. Further, on April 6, 2009, Lacks filed a motion for summary judgment in the District Court.

After the commencement of the Bankruptcy Cases, a notice of stay was filed by HLI. McKechnie thereafter filed a motion to stay the litigation based upon the USPTO re-examination and HLI's bankruptcy. The Special Master has recommended denying the stay as to McKechnie, and McKechnie filed objections with the District Court. On July 13, 2009, Lacks responded to the objections raised by McKechnie and opposed the stay. On July 17, 2009, the District Court entered an order denying McKechnie's motion to stay the litigation.

### 3. Metalurgica FPS do Brasil Ltda Bankruptcy Liquidation Proceedings

HLI's aluminum wheel plant in Brazil ("Borlem Aluminio") has used in its operations certain assets owned by Metalurgica FPS do Brasil Ltda. ("FPS"), which is in bankruptcy liquidation proceedings in Brazil. In addition, certain assets owned by FPS are stored in Borlem Aluminio's warehouse and Borlem Aluminio leased the same real estate that was previously leased by FPS as its plant. Such real estate was subsequently acquired by Borlem Aluminio from a third party. Borlem Aluminio hired some of FPS's former employees and Hayes Lemmerz Barcelona was a minority shareholder of both FPS and Borlem Aluminio. One of FPS's creditors, the Brazilian bankruptcy trustee, and the public prosecutor claimed that the bankruptcy court should disregard the separate existence of FPS and extend the bankruptcy proceeding to Borlem Aluminio and Hayes Lemmerz Barcelona. In July 2006, the Brazilian bankruptcy court issued a decision in favor of the Company, declining to disregard the existence of Borlem Aluminio and Hayes Lemmerz Barcelona as separate from that of FPS. One of FPS's creditors has appealed the bankruptcy court's decision. In view of some commercial aspects and negotiation carried out by the creditor and the Company, the creditor dismissed the appeal. On November 18, 2008, the Court of Appeals ratified the dismissal of the appeal; however, the other party challenged the dismissal claiming its attorney did not have authority to waive the appeal. In May 2009, the Court of Appeals held that the attorney did not have authority to dismiss the appeal. Thus, the Court of Appeals shall rule on the appeal and review the decision awarded by the Bankruptcy Court. The date for the hearing and ruling on the appeal has not yet been set. Borlem Aluminio and FPS are continuing to negotiate a potential settlement of this dispute.

### 4. Diversified Machine, Inc. Breach of Contract Litigation

On February 1, 2007, the Company entered into a Stock Purchase Agreement (the "SPA") under which Diversified Machine, Inc. ("DMI") purchased all of the stock in Hayes Lemmerz International – Homer, Inc. and Hayes Lemmerz International – Bristol, Inc. As part of the agreement, DMI placed $2.5 million into escrow. DMI has released $1 million, and the remaining $1.5 million was to be released on February 14, 2009. On February 13, 2009, DMI sent a letter to the Company, alleging various breaches by the Company of the SPA and resulting damages of approximately $6.2 million. The Company sent DMI a response, asserting that DMI's claims were without merit, and requesting that DMI release the $1.5 million immediately, pursuant to the SPA. DMI neither replied to the Company's response nor released the escrow amount. Accordingly, during the week of March 16, 2009, the Company filed a Michigan state court action styled HLI Operating Co., Inc. and HLI Suspension Holding Co., Inc. v. Diversified Machine Inc., Wayne County Circuit Court Case No. 09-006683-CZ (the "Wayne County Litigation") against DMI seeking (i) a declaration that the Debtors are entitled to funds in an escrow account that was set up pursuant to the SPA and an escrow agreement and (ii) an award of HLI's attorneys' fees and costs. On April 14, 2009, DMI filed a counterclaim alleging various breaches by the Company of the SPA and seeking damages of approximately $6 million. On June 7, 2009, the Bankruptcy Court entered an order terminating the automatic stay with respect to DMI's compulsory counterclaims. The Wayne County Litigation is proceeding.

### 5. Punch Property International Litigation

On June 13, 2008, Hayes Lemmerz International – Georgia, Inc. ("HLI – Georgia") and Punch Property International NV ("Punch Property") entered into an Agreement of Purchase and Sale for certain real estate and equipment located in Gainesville, Georgia for a total purchase price of $5,000,000 (the "Property Agreement"). The Agreement was amended on October 31, 2008 to add certain additional equipment and increase the purchase price to $5,125,000. The Agreement provided that the closing was to occur on the earlier of 5 days following notice from HLI – Georgia that it had ceased business operations on the property or June 30, 2009. On January 23, 2009, HLI – Georgia gave notice that it had ceased business operations on the property and was prepared to close the purchase and sale on January 30, 2009. Prior to January 30, 2009, Seller delivered into escrow all items required to be

delivered pursuant to the agreement. Punch Property did not submit any required documents or the purchase price to escrow and the closing has not occurred. On February 9, 2009, HLI – Georgia filed suit against Punch Property in the United States District Court for the Northern District of Georgia (the "Georgia Court") seeking specific performance of the agreement and damages (the "Georgia Litigation"). On March 30, 2008, Punch Property asserted a counterclaim against HLI - Georgia alleging that Punch Property was fraudulently induced to enter into the Property Agreement and seeking to recover a $1,000,000 earnest money deposit and punitive damages. In addition, Punch Property argues, as part of the Georgia Litigation, that venue for the Georgia Litigation is improper to resolve any disputes relating to the Property Agreement (the "Venue Dispute"). Briefs with respect to the Venue Dispute have been submitted to the Georgia Court and a ruling is expected in due course.

On June 13, 2008, BBS International GmbH ("BBS") and Hayes Lemmerz, S.r.l. ("HLI – Italy") entered into a Share Purchase Agreement for the purchase by BBS of shares of Hayes Lemmerz Belgie BVBA (the "Share Agreement"). On March 27, 2009, Punch International NV and Punch Property (collectively, the "Punch Parties") initiated a lawsuit against HLI, HLI – Georgia, and HLI – Italy in the Commercial Court in Antwerp, Belgium alleging that, in order to induce the execution of the Share Agreement and the Property Agreement, HLI made fraudulent representations to the Punch Parties related to future business to be provided by certain customers to Hayes Lemmerz Belgie BVBA, while at the same time HLI was negotiating with those same customers to induce them to re-source the business to other Company facilities (the "Belgium Litigation"). The suit is seeking to annul the Purchase Agreement and damages in the amount of U.S. $5,000,000.

Concerning a related matter, on October 31, 2008, the parties had entered into an agreement to resolve a number of issues related to the Share Agreement. Pursuant to this agreement, BBS was to pay HLI – Italy €1,000,000 in two installments of €500,000 each on or before November 8, 2008 and December 15, 2008. BBS never made the second payment. In February 2009, HLI – Italy filed a suit against BBS to collect the unpaid installment.

On May 26, 2009, the Debtors filed the Debtors' Motion For An Order Lifting Automatic Stay To Allow Certain Litigation To Proceed in the Bankruptcy Court (Docket No. 105) (the "Georgia Lift Stay Motion"). On July 7, 2009, the Court entered an order modifying the automatic stay for the sole purpose of permitting the Georgia Litigation to proceed to judgment (Docket No. 315) (the "Georgia Lift Stay Order"). The Georgia Lift Stay Order did not address the automatic stay with respect to the Belgium Litigation and reserved the parties' rights with respect to the Belgium Litigation.

On July 10, 2009, shortly after the Bankruptcy Court entered the Georgia Lift Stay Order, the Punch Parties filed their request to modify the automatic stay with respect to the Belgium Litigation (Docket No. 336) (the "Belgium Lift Stay Motion"). At a hearing on July 30, 2009, the Bankruptcy Court ruled that the automatic stay would be modified to permit the Punch Parties to proceed with the Belgium Litigation to the extent, and only to the extent, the Georgia Court determines, in a final non-appealable judgment in the Venue Dispute, that the Debtors are required to litigate the enforceability of the Property Agreement in Belgium. Absent such a final judgment in the Georgia Litigation, the Belgium Lift Stay Motion is denied, and the automatic stay remains in place as to the Belgium Litigation. The Court entered an order to this effect on August 25, 2009 (Docket No. 521).

The Debtors have received an unsolicited offer for the real property Punch Property agreed to purchase under the Property Agreement, and are considering whether to move forward with negotiations with the potential third party buyer. In the event the Debtors consummate a sale of their property, they will modify their complaint against Punch Property from seeking specific performance to money damages for any short-fall in the sale price.

6.      *Wrongful Death*

On October 20, 2008, a truck driver operating a semi tractor-trailer owned by his own company, Acme Cartage, was killed in an accident involving another semi tractor-trailor while making a delivery to the Company's Sedalia, Missouri plant. Neither the deceased nor the driver of the tractor-trailer was employed by the Company. On March 13, 2009, the wife, mother and daughters of the deceased filed suit against a number of defendants, including Hayes Lemmerz International – Sedalia, Inc. ("HLI – Sedalia"). Plaintiffs also served discovery on HLI – Sedalia. No specific demand has been made by Plaintiffs to HLI – Sedalia and no trial date has been set. This litigation has been stayed during the Bankruptcy Cases by virtue of the automatic stay.

The Debtors maintain insurance which is available to minimize the Debtors' exposure to any potential claimants subject to the Debtors' satisfaction of certain self-insured retentions. With respect to prepetition tort claims, the self-insured retention portion of any tort claim (which is up to $1.5 million) will be treated as a Class 9 Other Unsecured Claim.

### 7. Product Liability Cases

During the week of March 24, 2008, the Company and several other companies (including General Motors), were named as defendants in a product liability case. The case involves injuries allegedly sustained by plaintiff when a 16.5 inch wheel was fitted with a 16 inch tire. On November 26, 2008, the Company argued and lost a motion for summary judgment based on the statute of limitations. The Company has filed an interlocutory appeal of the court's ruling on the motion. The Company believes it has strong defenses in the case but cannot estimate its potential exposure at this time. On approximately March 9, 2009, a case evaluation award of $125,000 was issued as to Hayes, with different awards being issued as to the other defendants. The Company rejected the evaluation award and the case will proceed toward litigation. This litigation has been stayed as to the Company during the Bankruptcy Cases by virtue of the automatic stay.

During the week of March 19, 2007, the Company learned about a potential product liability case that may be filed against the Company, along with General Motors and Bridgestone/Firestone. The potential case involves a product manufactured by one of the Company's predecessors in the 1960s, which product allegedly caused injuries to an individual. Bridgestone/Firestone manufactured one of the components of the product, and the Company expects that if named as a defendant in the pending action, it will co-defend the case with Bridgestone/Firestone.

The Debtors maintain insurance which is available to minimize the Debtors' exposure to any potential claimants subject to the Debtors' satisfaction of certain self-insured retentions. With respect to prepetition tort claims, the self-insured retention portion of any tort claim (which is $1.5 million) will be treated as a Class 9 Other Unsecured Claim.

### 8. Potential Environmental Litigation

The Company believes it is in material compliance with all environmental laws, ordinances, and regulations. All of the Company's manufacturing facilities worldwide have implemented comprehensive environmental management systems and are registered under ISO 14001. The Company does not anticipate any material capital expenditures for environmental compliance or any adverse effect on its earnings or competitive position as a result of environmental matters.

Under the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended ("CERCLA"), the Company currently has potential environmental liability arising out of both of its wheel and non-wheel businesses at 17 Superfund sites (the "Sites"). Five of the Sites were related to the operations of Motor Wheel prior to the divestiture of that business by The Goodyear Tire & Rubber Co. ("Goodyear"). In connection with the 1986 purchase of Motor Wheel by MWC Holdings, Inc. ("Holdings"), Goodyear agreed to retain all liabilities relating to these Sites and to indemnify and hold Holdings harmless with respect thereto. Goodyear has acknowledged this responsibility and is presently representing the Company's interests with respect to all matters relating to these five Sites.

As a result of activities that took place at the Company's Howell, Michigan facility prior to the acquisition of it, the U.S. Environmental Protection Agency ("EPA") recently performed under CERCLA, remediation of PCB's from soils on the Company's property and sediments in the adjacent south branch of the Shiawassee River. The Michigan Department of Environmental Quality has indicated it intends to perform additional remediation of these soils and river sediments. Under the terms of a consent judgment entered into in 1981 by Cast Forge, Inc. ("Cast Forge") (the previous owner of this site) and the State of Michigan, any additional remediation of the PCBs is the financial responsibility of the State of Michigan and not of Cast Forge or its successors or assigns (including the Debtors). The EPA concurred in the consent judgment.

The Company is working with various government agencies and the other parties identified by the applicable agency as "potentially responsible parties" to resolve its liability with respect to nine Sites. The Company's potential liability at each of these Sites is not currently anticipated to be material.

Furthermore, the Company has potential environmental liability at the two Sites arising out of businesses presently operated by Kelsey-Hayes. Kelsey-Hayes has assumed and agreed to indemnify the Company with respect to any liabilities associated with these Sites. Kelsey-Hayes has acknowledged this responsibility and is presently representing the Company's interests with respect to these sites.

Kelsey-Hayes and, in certain cases, the Company may remain liable with respect to environmental cleanup costs in connection with certain divested businesses relating to aerospace, heavy-duty truck components, and farm implements under federal and state laws and under agreements with purchasers of these divested businesses. The Company believes, however, that such costs in the aggregate will not have a material adverse effect on its consolidated operations or financial condition and, in any event, Kelsey-Hayes has assumed and agreed to indemnify the Company with respect to any liabilities arising out of or associated with these divested businesses.

In addition to the Sites, the Company also has potential environmental liability at two state-listed sites in Michigan and one in California. One of the Michigan sites is covered under the indemnification agreement with Goodyear described above. The Company is presently working with the Michigan Department of Environmental Quality to resolve its liability with respect to the second Michigan site, for which no significant costs are anticipated. The California site is a former wheel manufacturing site operated by Kelsey-Hayes in the early 1980's. The Company is working with two other responsible parties and with the State of California on the investigation and remediation of this site.

Currently, the Debtors estimate the retained liability for environmental obligations to be up to $2.2 million. This amount may be revised upon receipt of additional information, including the receipt of any claims by environmental authorities received prior to the Governmental Bar Date (as defined herein).

## IV. PREPETITION CAPITAL STRUCTURE OF THE DEBTORS

### A. Equity

As of April 30, 2009, the Company had 101,819,594 shares of common stock outstanding and approximately 105 record holders. On May 29, 2009, the Nasdaq Stock Market Inc. decided to remove from listing the common stock of Hayes, effective at the opening of the trading session on June 8, 2009. The common stock of Hayes formerly traded on the NASDAQ Global Markets under the symbol "HAYZ."

### B. Second Amended and Restated Credit Agreement

Prior to May 30, 2007, under the Amended and Restated Credit Agreement (the "Initial Credit Facility"), dated as of April 11, 2005, Hayes had $625 million of senior secured debt, which consisted of a first lien $375 million term loan due June 3, 2009, a second lien $150 million term loan due June 3, 2009 and a $100 million revolving credit facility due June 3, 2008. On May 30, 2007, Hayes amended and restated the Initial Credit Facility to establish three new senior credit facilities in the aggregate amount of approximately $495 million (the "Second Amended and Restated Credit Agreement" or the "Credit Facilities"). The proceeds from the Credit Facilities, together with the proceeds of other financing activities, were used to refinance Hayes' obligations under the Initial Credit Facility. Additional proceeds were used to replace existing letters of credit and to provide for working capital and other general corporate purposes and to pay the fees and expenses associated with the Credit Facilities.

The Credit Facilities consist of a term loan facility of €260 million maturing in 2014 borrowed by Hayes Lemmerz Finance LLC – Luxembourg S.C.A. ("Hayes Luxembourg") (the "Term Loan Facility"), a revolving credit facility of $125 million (available in U.S. dollars or Euros) maturing in 2013 available to HLI Operating Company, Inc. ("HLI Opco") and Hayes Luxembourg (the "Revolving Credit Facility") and a synthetic letter of credit facility of €15 million available to both borrowers. The interest rate for the term loan was initially the Euribor rate plus 2.75% per annum and was increased to Euribor plus 6.0% in connection with the amendment of the Credit Facilities in January 2009. HLI Opco is the only borrower under the Revolving Credit Facility. On January 29, 2009, Hayes amended the New Credit Facilities to favorably modify the financial covenants and make other changes.

The obligations of HLI Opco and Hayes Luxembourg under the Credit Facilities are guaranteed by substantially all of the Debtors. In addition, the obligations of Hayes Luxembourg under the Credit Facilities are guaranteed by certain non-Debtor subsidiaries. The obligations of HLI Opco and Hayes Luxembourg under the

Credit Facilities and the guarantors' obligations under their respective guarantees of the Credit Facilities are, subject to certain exceptions, secured by a first priority perfected pledge of substantially all capital stock owned by the borrowers and the guarantors (but not more than 65% of the capital stock of Hayes Luxembourg or any non-Debtor subsidiary can secure HLI Opco's obligations) and substantially all of the other assets owned by the borrowers and the guarantors. All foreign guarantees and collateral are subject to applicable restrictions on cross-stream and upstream guarantees and other legal restrictions, including financial assistance rules, thin capitalization rules, and corporate benefit rules.

As of April 30, 2009, Hayes had borrowed the entire $125 million available under the Revolving Credit Facility and had $15.7 million in letters of credit issued under the synthetic letter of credit facility. Hayes had no borrowing availability under the Revolving Credit Facility as of April 30, 2009.

## C. Senior Unsecured Notes

On May 30, 2007, Hayes closed on a new offering of €130 million 8.25% senior unsecured notes due 2015 (the "Notes") issued by Hayes Luxembourg. The Notes contain customary covenants and restrictions. The Notes and the related indenture (the "Indenture") restrict Hayes' ability to, among other things, make certain restricted payments, incur debt and issue preferred stock, incur liens, permit dividends and other distributions by Hayes' subsidiaries, merge, consolidate, or sell assets and engage in transactions with affiliates. The Notes and the Indenture also contain customary events of default, including failure to pay principal or interest on the Notes when due, among others. The Notes are fully and unconditionally guaranteed on a senior unsecured basis by substantially all of the Debtors and certain of the non-Debtor Subsidiaries. The corporate chart attached hereto as Appendix B lists the Debtors and the non-Debtor subsidiaries that have guaranteed the Notes. Proceeds from the issuance of the Notes, together with the proceeds from the Credit Facilities, were used to refinance obligations under Hayes' Initial Credit Facility, to repay in full the approximately $21.8 million mortgage note on Hayes' headquarters building in Northville, Michigan, to pay related fees and expenses and for working capital and other general corporate purposes.

## D. Short Term Bank Borrowings

In addition to amounts outstanding under the Credit Facilities and Notes, certain non-Debtor subsidiaries are indebted pursuant to short term bank borrowings and other notes in the aggregate amount of $34.5 million as of April 30, 2009.

## E. Domestic Accounts Receivable Securitization Facility

In addition, Hayes had a domestic accounts receivable securitization facility with a normal program limit of $25 million during fiscal 2007 and 2008. Due to concentration limits and restrictions on financing certain receivables, the majority of the program has not been available. There were $5 million of borrowings under the programs as of April 30, 2009, which was the maximum amount available under this facility. The facility was terminated following the commencement of the Bankruptcy Cases and all amounts advanced have been repaid.

## F. Non-U.S. Securitization Facilities

The Company has an accounts receivable financing program in Germany with a local financial institution. The program limit was €25 million as of April 30, 2009. Borrowings under this program of approximately €12.3 million as of April 30, 2009. The Debtors are not obligors under this facility.

The Company also has an accounts receivable factoring program in the Czech Republic with a local financial institution. The program limit is 480 million Czech Crown or approximately $24 million as of April 30, 2009. As of April 30, 2009 approximately 240.8 million Czech Crown or $11.9 million was factored under this program. The Debtors are not parties to this facility.

## V. CORPORATE STRUCTURE AND MANAGEMENT OF THE DEBTORS

## A. Current Corporate Structure

HLI is a Delaware corporation that owns, either directly or indirectly, substantially all of the equity interests in each of its subsidiaries, other than four joint ventures in which it owns a majority of the equity interests.

HLI is the parent corporation of the 24 affiliated Debtors in these jointly-administered Bankruptcy Cases, as well as 29 additional non-Debtor subsidiaries and affiliates, 27 of which are located outside of the United States. With the exception of Hayes Luxembourg, none of HLI's affiliates located outside the United States sought reorganization relief either in the United States or in its domicile. Appendix B presents the existing organizational structure of the Debtors.

**B.      Board of Directors of the Debtors**

The following persons comprised the Board of Directors of HLI (the "Board") as of the Petition Date:

*Curtis J. Clawson, Chairman of the Board, President and Chief Executive Officer*. Mr. Clawson serves as the Chairman of the Board, President and Chief Executive Officer of HLI, and has held such positions since August 2001 (President and Chief Executive Officer) and September 2001 (Chairman). From 1999 to July 2000, Mr. Clawson was President and Chief Operating Officer of American National Can. Mr. Clawson has 17 years of experience in the automotive industry. He began his career in automotive-related businesses at Arvin Industries where he spent 9 years, from 1986 to 1995, including a position as General Manager of the business unit that supplied Arvin exhaust products, tenures in sales and marketing and tenures in production and plant management. From 1995 until the time that he joined American National Can, Mr. Clawson worked for AlliedSignal, Inc. as President of AlliedSignal's Filters (Fram) and Spark Plugs (Autolite) Group, a $500 million automotive components business, and then as President of AlliedSignal's Laminate Systems Group. Mr. Clawson earned his Bachelor of Science and Bachelor of Arts degrees from Purdue University and a Master of Business Administration from Harvard Business School.

*William H. Cunningham, Director*. Mr. Cunningham has served as a Director of HLI since 2003 and has been a Professor of Marketing at the University of Texas at Austin since 1979. Dr. Cunningham has occupied the James L. Bayless Chair for Free Enterprise at the University of Texas since 1985. Dr. Cunningham was the Dean of the University of Texas' College of Business Administration/Graduate School of Business from 1982 to 1985, and President of the University of Texas at Austin from 1985 to 1992. Dr. Cunningham was also the Chancellor (chief executive officer) of the University of Texas System from 1992 to 2000. Dr. Cunningham is a director of the following publicly-traded companies: Lincoln National Corporation, an insurance company, Southwest Airlines, a national air carrier, Introgen Therapeutics, a gene therapy company, and Hicks Acquisition Company I, Inc., a "blank check" company formed to acquire one or more additional companies. He is also a member of the board of John Hancock Mutual Funds. Dr. Cunningham received a Ph.D., a Master of Business Administration and a Bachelor of Business Administration from Michigan State University.

*Cynthia L. Feldmann, Director*. Ms. Feldmann has served as a Director of HLI since 2006 and has served as President and Founder of Jetty Lane Associates, a consulting firm, since December 2005. Previously, Ms. Feldmann served as the Life Sciences Business Development Officer for the Boston law firm Palmer & Dodge, LLP from November 2003 to September 2005 and was with the global accounting firm, KPMG LLP, from July 1994 to September 2002, holding various leadership roles in the firm's Medical Technology and Health Care & Life Sciences industry groups, including Partner, Northeast Regional Relationships. Ms. Feldmann also spent 19 years with the accounting firm Coopers & Lybrand (now PricewaterhouseCoopers), ultimately as National Partner-in-Charge of their Life Sciences practice. Ms. Feldmann is also a director of STERIS Corporation, a developer of products and services to prevent infection and contamination, and Hanger Orthopedic Group, Inc., a provider of orthotic and prosthetic patient care services. Ms. Feldmann earned a Bachelor of Science degree in accounting from Boston College and is a Certified Public Accountant.

*George T. Haymaker, Jr., Lead Director*. Mr. Haymaker has served as a Director of HLI since 2003 and serves as the Lead Director. Mr. Haymaker served as non-executive Chairman of the Board of Kaiser Aluminum Corporation from October 2001 through June 2006. Mr. Haymaker served as Chairman of the Board and Chief Executive Officer of Kaiser Aluminum Corporation from January 1994 until January 2000, and as non-executive Chairman of the Board of Kaiser Aluminum Corporation from January 2000 through May 2001. From May 1993 to December 1993, Mr. Haymaker served as President and Chief Operating Officer of Kaiser Aluminum Corporation. Mr. Haymaker is also a director of Pool Corporation, a distributor of swimming pool products. Mr. Haymaker received his Bachelor of Science degree in metallurgy and Master of Science degree in Industrial Management from the Massachusetts Institute of Technology and a Master of Business Administration from the University of Southern California.

*Mohsen Sohi, Director.* Mr. Sohi has served as a Director of HLI since 2004 and is the President and CEO of Freudenberg-NOK. Prior to joining Freudenberg, Mr. Sohi was employed by NCR Corporation from 2001 until 2003. Mr. Sohi's last position with NCR was as the Senior Vice President, Retail Solutions Division. Before serving in this position, Mr. Sohi spent more than 14 years at AlliedSignal, Inc. and its post-merger successor, Honeywell International Inc. From July 2000 to January 2001, he served as President of Honeywell Electronic Materials. From August 1999 to July 2000, Mr. Sohi was President, Commercial Vehicle Systems, at AlliedSignal. Prior to that, from 1997 to August 1999, he was Vice President and General Manager of Turbocharging Systems, and from 1995 to 1997, he was Director of Product Development and Technical Excellence at AlliedSignal. Mr. Sohi is a director of STERIS Corporation, a developer of products and services to prevent infection and contamination, and Harris Stratex Networks, Inc., a developer of microwave communications equipment. Mr. Sohi received his Bachelor of Science degree in Mechanical and Aerospace Engineering from the University of Missouri, a Doctor of Science degree in Mechanical Engineering from Washington University, and a Master of Business Administration from the University of Pennsylvania's Wharton School of Business.

*Henry D. G. Wallace, Director.* Mr. Wallace has served as a Director of HLI since 2003 and was employed by Ford Motor Company from 1971 until his retirement in 2001. Mr. Wallace's last position with Ford was as the Group Vice President, Mazda & Asia Pacific Operations. Before serving in this capacity, Mr. Wallace occupied a number of different positions, including Group Vice President and Chief Financial Officer; Vice President, European Strategic Planning and Chief Financial Officer of Ford of Europe, Inc.; President and Chief Executive Officer of Mazda Motor Corporation; and President of Ford Venezuela. Mr. Wallace is a director of Diebold, Inc., a leading provider of ATM, security and electronic voting systems, Ambac Financial Group, Inc., a financial services company and Lear Corporation, an automotive components supplier. Mr. Wallace received a Bachelor of Arts degree in Economics from the University of Leicester.

*Richard F. Wallman, Director.* Mr. Wallman has served as a Director of HLI since 2003 and was employed by Honeywell International, Inc. from 1999 until his retirement in 2003. Mr. Wallman's last position with Honeywell was as Senior Vice President and Chief Financial Officer. From 1995 to 1999, Mr. Wallman held the same position at AlliedSignal, Inc., until its merger with Honeywell. Before joining AlliedSignal, Mr. Wallman occupied a number of different positions with IBM Corporation, Chrysler Corporation and Ford Motor Company. Mr. Wallman is also a director of Ariba, Inc., a software company, Convergys Corporation, a relationship management company, Lear Corporation, an automotive components supplier, and Roper Industries, a diversified supplier of industrial products. Mr. Wallman received his Bachelor of Science degree in Electrical Engineering from Vanderbilt and a Master of Business Administration from the University of Chicago.

## C. Management of the Company

The Company's current management team is comprised of highly regarded industry veterans who have significant experience in the automotive supply market. The following is a list of the members of the Company's management team as of May 11, 2009, their positions with the Company as of that date, the date on which they were appointed to such positions and their business experience during the past five years. All positions shown are with HLI or its subsidiaries unless otherwise indicated. All executive officers are elected by the Board of the Company and serve at its pleasure. The compensation for the last three completed fiscal years for certain members of the Debtors' management is described in the Debtors' previously filed Securities and Exchange Commission Reports annexed herein as <u>Appendix C</u>. Any material changes to compensation of senior management will be disclosed prior to the Confirmation Hearing.

*Curtis J. Clawson, President, Chief Executive Officer* and *Chairman of the Board.* Mr. Clawson's background information is included in Section V.B, above.

*Fred Bentley, Chief Operating Officer and President, Global Wheel Group.* Mr. Bentley has held the position of Chief Operating Officer since July 2007 and has held the position of President, Global Wheel Group since January 2006, when the group was formed by combining the Company's North American and International Wheel Groups. His duties as Chief Operating Officer include managing the Company's day-to-day global operations and reporting them to the chief executive officer. He is also responsible for overseeing all aspects of the Company's global wheel business. Mr. Bentley joined the Company in October of 2001 as President of the Commercial Highway and Aftermarket business and was appointed President of the International Wheel Group in June 2003. He is a Six Sigma Black Belt, has a solid background of operations strategy, lean manufacturing,

leadership of global businesses and business repositioning. Prior to joining the Company, he was Managing Director for Honeywell's Holts European and South Africa automotive after-market operations. In addition, while at Honeywell, Mr. Bentley also served as Heavy Duty Filter (Fram) General Manager and Plant Manager for operations in Greenville, Ohio and Clearfield, Utah. Before joining Honeywell in 1995, Mr. Bentley worked in various capacities at Frito Lay, Inc. (PepsiCo) for a total of eight years. Mr. Bentley earned his Bachelor of Science degree in Industrial Engineering from the University of Cincinnati, Ohio, and a Master of Business Administration from the University of Phoenix. He also attended the Harvard Business School Advanced Management Program.

*Mark Brebberman, Vice President and Chief Financial Officer.* Mr. Brebberman has held this position since August 1, 2008. His duties as Chief Financial Officer include overseeing the financial activities of the Company, including monitoring cash flow, tax, and financial planning. Mr. Brebberman most recently served with the Company as Corporate Controller since July 2007; as Controller, Operations from April 2004 to July 2007; and Controller, North American Wheel Group Business Unit from December 2001 to April 2004. Mr. Brebberman originally joined Hayes Lemmerz in December 2001 as the North American Wheel Group Business Unit Controller. Mr. Brebberman was promoted to Corporate Controller, Operations and Corporate Controller in April 2004 and July 2007, respectively. Prior to joining the Company, Mr. Brebberman spent 14 years with Compagnie De Saint-Gobain, a French multi-national manufacturer of building materials and other engineered products. Mr. Brebberman's professional experience also includes four years with the public accounting firms of Deloitte Haskins & Sells, and Geo. S. Olive & Company. Mr. Brebberman earned a Bachelor degree in Accounting from the University of Notre Dame. Additionally, he received a Master of Business Administration degree from Brigham Young University, in Provo, Utah. Mr. Brebberman is a Certified Public Accountant.

*Patrick C. Cauley, Vice President, General Counsel and Secretary.* Mr. Cauley has held this position since January 2004. As General Counsel, he is responsible for all global legal matters, including mergers and acquisitions, litigation, SEC filings, contracts and any other issues of a legal nature. He also oversees the human resources, travel, public relations, and risk management departments, as well as the management of the Northville facility. He previously served as Interim General Counsel and before that as Assistant General Counsel. Prior to joining the Company in 1999, Mr. Cauley was a partner at the Detroit based law firm of Bodman LLP, where he engaged in all aspects of corporate practice, including mergers and acquisitions, commercial lending and financing, tax, and real estate transactions. Mr. Cauley earned his Bachelor of Science degree in Business Administration, with a major in Accounting and his Juris Doctor degree from the University of Michigan. Mr. Cauley is also a Certified Public Accountant.

*John A. Salvette, Vice President, Business Development.* Mr. Salvette has held this position since August 2001. As Vice President of Business Development, he directs the Company's global divestiture, merger and acquisition efforts. He also oversees the Company's information technology department. After serving in various financial positions with Rockwell International's Automotive Operations and serving as Vice President and Chief Financial Officer of Stahl Manufacturing, an automotive supplier in Redford, Michigan, Mr. Salvette joined Kelsey-Hayes in 1990 as Controller for the North American Aluminum Wheel Business Unit. From May 1993 to January 1995, Mr. Salvette served as Director of Investor Relations and Business Planning and, from February 1995 to June 1997, as Corporate Treasurer to the Company. From July 1997 to January 1999, Mr. Salvette was Group Vice President of Finance of Hayes Lemmerz Europe. Following the acquisition of CMI International in February 1999, Mr. Salvette was appointed Vice President of Finance, Cast Components Group. Mr. Salvette received a Bachelor of Arts degree in Economics from the University of Michigan and a Master of Business Administration from the University of Chicago.

*Kevin Carmody, Chief Restructuring Officer.* Mr. Carmody is a managing director with AP Services LLC and specializes in complex corporate restructurings and reorganizations for distressed companies. Mr. Carmody has served as a financial and restructuring advisor to clients in a variety of industries such as automotive, heavy manufacturing, distribution, financial services, consumer products, telecommunications, media, home building, and retail. Specifically, his engagements with automotive Tier-1 suppliers include restructuring financial advisor to Dura Automotive and Federal-Mogul. Mr. Carmody has developed cash forecasting models, created comprehensive business plans, completed asset divestitures, valued companies and individual business segments to support mergers and acquisitions strategies, and negotiated DIP and exit financing facilities. Prior to joining AP Services LLC, Mr. Carmody worked at PricewaterhouseCoopers LLP. Mr. Carmody received a Bachelor of Business Administration

degree from Western Michigan University and a Master of Business Administration from the University of Detroit-Mercy.

## VI.        EVENTS LEADING TO COMMENCEMENT OF THE BANKRUPTCY CASES

### A.        Events Leading to the Debtors' Chapter 11 Filings

#### 1.        The 2001 Chapter 11 Cases

In 2001, the Company was a vastly different enterprise, with more of its manufacturing operations located in the United States and several non-wheel businesses, such as automotive brakes, commercial highway hubs and drums, powertrain components, suspension components and an aluminum components business located in Europe. The Company was also over-leveraged in the face of declining earnings, could not integrate recent acquisitions, and had several underperforming facilities. The Company also restated its financial statements for fiscal years 1999 and 2000 and the first quarter of fiscal 2001. On December 5, 2001, the Company's U.S. affiliates at the time and a Mexican affiliate filed for reorganization relief under chapter 11 (the "2001 Chapter 11 Cases") in the United States Bankruptcy Court for the District of Delaware. During the 2001 Chapter 11 Cases, the Company engaged in an aggressive operational restructuring, focusing on making its various business segments more efficient, including significantly reducing costs in every area of its business and centralizing financial controls and operations. On June 3, 2003 (the "2003 Effective Date"), the Company consummated a plan of reorganization (the "2003 Reorganization Plan") confirmed by the Court and emerged from chapter 11.

Pursuant to the 2003 Reorganization Plan, 98% of the common stock of the reorganized (i.e., current) Company, certain warrants and a 2/3 interest in the HLI Creditor Trust formed pursuant to the 2003 Reorganization Plan (the "Trust") were distributed on the 2003 Effective Date to the Company's then existing secured and senior unsecured creditors. The remaining 2% of the Company's common stock, certain warrants and the remaining 1/3 interest in the Trust were reserved for general unsecured creditors pending the Company's completion of claims administration in its role as "Disbursement Agent" under the 2003 Reorganization Plan. The Company has been unable to complete claims administration relating to the 2003 Reorganization Plan and obtain a final decree with respect to the 2001 Chapter 11 Cases because certain disputed patent related claims remain unresolved. The Company prevailed at the trial court level with respect to the most significant of these claims (over $1 billion in damages was claimed) and, recently, the United States Court of Appeals for the Federal Circuit upheld the trial court's favorable ruling. Because of the resolution of this claim, the Company currently expects to be able to close the 2001 Chapter 11 Cases and obtain a final decree within the next few months, notwithstanding the commencement of the current Bankruptcy Cases.

#### 2.        Post Bankruptcy Strategy

After emerging from bankruptcy in 2003, the Company continued to transform its business through a four-pronged, comprehensive strategy—investing in the right products, investing in the right geography, investing in the right customers, and engaging in aggressive cost cutting including the restructuring of its operations. Each of these strategies and the steps the Company has taken in furtherance thereof are briefly described below.

Investing in the Right Products. The Company's goal with respect to its products was to concentrate resources on those product lines in which it is a market leader and those with the best prospects for continued growth. Post-bankruptcy, the Company focused on its core business — the production of wheels. Through acquisitions prior to the 2001 Chapter 11 Cases, the Company became involved in the manufacture of many non-wheel automotive parts, such as automotive brakes, commercial highway hubs and drums, powertrain components, and suspension components in North America and an aluminum components business in Europe. In 2004, roughly a third of the Company's revenues came from the sale of products other than wheels. Currently, all but 3% of the Company's sales are wheels. Another aspect of the Company's "right products" strategy is maintaining the diversification of its wheels product lines in order to better insulate the Company from disruptions in the global market. Estimated fiscal 2008 sales by product types are relatively equally balanced among the three main categories of wheel products: light-vehicle steel (35%), commercial truck (33%) and light-vehicle aluminum (32%).

Invest in the Right Geography. The second prong of the Company's strategy involved investing in manufacturing facilities in high growth, cost effective locations to provide the Company with access to expanding

local and export markets. As a result of this strategy, the Company has substantially reduced its presence in the United States automobile market. Sales in the United States were 45% of Hayes' global sales in 2004, but only 15% in 2008. During this time, the Company's sales to almost every other region of the globe increased. For example, the Western European market, which in 2004 accounted for 29% of the Company's global sales, represented 34% of the Company's sales in fiscal 2008. Similar shifts took place in other regions: sales in Eastern Europe went from 10% of the Company's global sales in 2004 to 23% in fiscal 2008, sales in South America increased from just 4% to 14% and sales in Asia climbed from 4% to 6%. Simultaneously, the Company made a concerted effort to strengthen its diverse geographic footprint. The Company has a total of 23 facilities located in the United States and 12 other countries around the world. As a result, the Company is in a strong position to benefit from the expected rebound in the world economy, wherever it first occurs.

<u>Invest in the Right Customers</u>. The third prong of the Company's strategy was the diversification of its customer base. In particular, the Company reduced its exposure to GM, Ford and Chrysler in the United States from 29% of global sales in 2004 to an estimated 10% of global sales in fiscal 2008. Worldwide, the Company enjoys a broad customer base. As of April 30, 2009, the Company's largest customers, as represented by their percentage of HLI's global sales, are Ford (17%), General Motors (17%), Volkswagen (9%), Toyota (8%), Renault-Nissan (6%), Daimler (5%), PSA Peugeot Citroen (4%), Tata (3%), BMW (2%), Volvo (2%), Honda (2%), Fiat (2%), and Chrysler (2%). While the Company's two largest customers globally remain Ford and General Motors, approximately two-thirds of the Company's sales to these customers in fiscal 2008 were outside the United States.

<u>Aggressive Cost Reductions</u>. The fourth prong of the Company's strategy was aggressive cost reductions in an effort to improve the Company's productivity through the implementation of specific management and production practices. Since emerging from bankruptcy in 2003, the Company has aggressively sought to cut costs and improve its productivity. To that end, the Company has divested substantially all of its non-core businesses, including a hubs and drums unit in 2005, several suspension manufacturing units from 2005 through 2007 and the MGG Group B.V. (makers of heat exchangers and intake manifolds) and automotive brakes and powertrain manufacturing units in fiscal 2007. It currently operates only a single non-wheel manufacturing facility. The Company also restructured its wheels business unit and closed or sold unprofitable wheel manufacturing facilities. Most recently, the Company closed unprofitable operations in Gainesville, Georgia (U.S.) and Belgium in fiscal 2008, which is expected to save the Company approximately $30-40 million annually.

As part of its cost-cutting strategy, the Company has taken many steps to reduce its labor costs. Since 2004, the Company reduced its senior leadership team by more than half, from 12 to 5 individuals, saving Hayes an estimated $5 million each year. In fiscal 2006, the Company reduced compensation to its non-union employees in the United States by an average of 7.5%. Also in fiscal 2006, the Company reduced labor costs by suspending the 5% to 8% defined contribution to its United States employees' 401(k) plan and suspending its 4% matching contributions to such plan (matching contributions were reinstated in 2007). In fiscal 2006, the Company also reduced the level of health benefits provided to certain employees for annual savings of $1.3 million. In the last year, the Company's workforce has been reduced by 25.3%, from 8,900 in March 2008 to approximately 6,400 in March 2009, for annual savings of approximately $50 million.

**B.      Need for Restructuring and Chapter 11 Relief**

As set forth above, the 2001 Chapter 11 Cases were necessitated by and involved primarily operational restructuring issues. In contrast, the current Bankruptcy Cases are the result of economic forces beyond the Company's control and are necessary to implement a balance sheet restructuring. The Company's post-2003 strategy was extremely successful: EBITDA on its continuing businesses increased from $139 million in 2005 to $192 million in 2007. Unfortunately, in late fiscal 2008, the current, unprecedented global economic crisis deepened, significantly affecting the automobile industry. New passenger cars and light trucks are a major purchase for consumers and the purchase of these items is highly dependent upon the health of the overall economy. Similarly, the purchase of new commercial vehicles is highly dependent upon macro-economic factors such as Gross Domestic Product growth and interest rates. Both the light vehicle and heavy vehicle markets are currently experiencing a severe downturn globally.

The Company's efforts to cut costs are not enough to overcome the severity of the global economic crisis. Indeed, virtually all of the Company's sales are to automobile manufacturers, and thus their decline threatens the Company. Because the Company has high fixed production costs, even relatively small declines in customer

production reduce or eliminate profitability. The declines in fiscal 2008 and expected declines in fiscal 2009 are substantial and have reduced, and will continue to reduce, the Company's sales and profits. The Company's sales for fiscal 2008 were $1.9 billion, down 10% from fiscal 2007. The Company's EBITDA for fiscal 2008 was just $157 million – a decline of 23% from fiscal 2007. Because of the global meltdown in the automobile sector, EBITDA for fiscal 2009 is projected to be less than one-third of the fiscal 2008 results.

The global economic crisis has led to a substantial drop in the Company's enterprise value. The Company's stock price has fallen from a high of $4.05 per share on June 3, 2008 to $0.29 immediately prior to its chapter 11 filing. Its bonds and bank debt are also trading at a deep discount to face value. The Company's production and sales volumes are down in most regions worldwide. The Company's sales in the fourth quarter of fiscal 2008 were down 49% as compared to the fourth quarter of fiscal 2007. The Company's prospects for the remainder of fiscal 2009 are less than optimal unless the global economy improves dramatically. The Company expects to have negative net cash flow until the global economy recovers.

The Company's financial forecasts reflect this downturn, as management anticipates 2009 sales could be approximately $1.2 billion with EBITDA of $41.5 million. In turn, the Company's internal forecasts mirror the positive recovery expected for the global economy, as management currently estimates its sales from 2010 through 2013 could range from $1.3 billion in 2010 to $1.7 billion in 2013 if automotive build rates increase over that period, with EBITDA rebounding in parallel based upon the same assumptions to potentially range from $73 million to $166 million over the same period.

The global economic crisis has not only affected the Company's sales, but also its cost of borrowing. For example, in connection with the amendment of the Credit Facilities to obtain the lenders' waiver from certain covenants in the fourth quarter of fiscal 2008, the lenders imposed an increase in the interest rate on the Term Loan Facility to Euribor plus 6% from Euribor plus 2.75%, with a 3.5% Euribor floor.

Changes in the cost of raw materials have also reduced the Company's profitability. For example, the Company generally enters into fixed-forward contracts for aluminum based on volume projections from the Company's customers that coincide with the applicable customer pass through pricing adjustment periods. In recent periods, customer volumes have decreased significantly relative to their projections while at the same time market prices for aluminum have fallen sharply. As a result, the Company has fixed-forward contracts for aluminum based on projected volumes at prices above the current market price. The Company therefore has an excess of aluminum purchased at prices above current levels that it cannot pass on to customers, which has adversely affected the Company's operating margins and cash flows.

The Company's ability to maintain normal credit terms with its suppliers has become impaired. The Company has substantial levels of debt, including debt under the Notes and the Credit Facilities. As of January 31, 2009, the Company had approximately $670.1 million of total indebtedness and approximately $107.5 million of cash and cash equivalents. In the months prior to commencing the Bankruptcy Cases, the trade credit the Company received from suppliers was reduced. In January, the providers of credit insurance for the non-Debtor subsidiaries cancelled all such credit insurance programs. On April 17, 2009, the Company announced, among other things, that it would likely receive a going concern qualification from its auditors in connection with their audit of the Company's financial statements for fiscal 2008. That announcement further exacerbated supplier concerns.

Leading up to the commencement of the Bankruptcy Cases, the Company continued to work proactively with its suppliers to maintain the best credit terms possible. However, the Company's liquidity constraints were not sufficiently addressed. It became increasingly likely that without an infusion of cash or additional credit availability, the Company's suppliers would likely refuse to provide key products and services on a go-forward basis. The Company was concerned that its financial condition and results of operations, in particular with regard to the Company's potential failure to meet its debt obligations, would lead some customers to become reluctant to enter into long-term agreements with the Company. Thus, the Debtors commenced these Bankruptcy Cases to addresses these and other concerns. The Debtors' debtor-in-possession financing has provided the Company with sufficient liquidity to manage its operations and calm customer and supplier concerns regarding the Company's liquidity during these Bankruptcy Cases.

The Debtors' restructuring efforts are designed to result in greater profitability for the Company and to solidify its position as the market leader in its product categories. The Company expects to emerge from chapter 11

following consummation of the Plan, having rationalized its capital structure by reducing debt to levels commensurate with its cash flow generating capacity and industry norms. Reducing leverage should create financial flexibility for future operating requirements and capital expenditures and improve liquidity. The Debtors believe that the efforts they have taken, and expect to take, will return the most value to the Company's stakeholders.

## C.    Development of Chapter 11 Plan

### 1.    Debtors Efforts to Obtain Financing

On January 29, 2009, the Debtors entered into the First Amendment to its Credit Facilities, which, among other things, authorized the Prepetition Secured Lenders to retain (a) Milbank, Tweed, Hadley, McCloy, LLP ("Milbank") as additional legal counsel (the Prepetition Lenders were previously and continue to be represented by Weil, Gotshal & Manges, LLP ("Weil")) and (b) a financial advisor to represent the Prepetition Secured Lenders in connection with Hayes' restructuring. In late February 2009, the Prepetition Secured Lenders advised the Company that Milbank, on behalf of the Prepetition Lenders, had retained Houlihan, Lokey, Howard & Zukin, LLP ("Houlihan").

Hayes, Lazard Frères & Co., LLC ("Lazard"), and Skadden, Arps, Slate, Meagher & Flom LLP ("Skadden") immediately began working with Houlihan, Milbank and Weil to prepare for an in-person meeting with the Prepetition Secured Lenders, which took place in New York on March 18, 2009. During that meeting, Hayes and its advisors explained that it was quickly running out of cash and required additional financing, likely in the form of a debtor in possession ("DIP") loan to fund chapter 11 reorganization cases. After the March 18th meeting, the Prepetition Secured Lenders and their advisors and the Company and its advisors spoke frequently, exchanged due diligence information and illustrative DIP financing term sheets as the Prepetition Secured Lenders and the Company considered their potential options. The Prepetition Secured Lenders' advisors and certain of the Prepetition Secured Lenders were also granted access to an electronic data room maintained by the Company for due diligence purposes.

The Debtors and Lazard considered seeking DIP or other financing from commercial banks and hedge funds that have historically loaned money to or invested in distressed companies. However, the Prepetition Secured Lender group is comprised of nearly 40 commercial banks and hedge funds, including most of the major institutions or entities that have experience providing DIP loans. Accordingly, the Debtors and Lazard determined that the Debtors had appropriately canvassed the commercial bank and hedge fund marketplace for available financing by simply engaging in discussions with, and requesting additional financing from, the Prepetition Secured Lenders. Additional efforts to obtain financing from any other banks or funds outside the Prepetition Lender group were considered to be an ineffective use of the Debtors' resources.

Separately, beginning in February 2009, Lazard, with the Company's assistance, began a sale process and identified approximately twelve potential financial investors it believed might be interested in investing in or acquiring the Company during its chapter 11 case and providing the Company with sufficient DIP financing to effectuate such transaction.

Lazard and the Debtors determined it was not in the Company's best interests to approach strategic investors - other automotive suppliers – prior to the commencing the Bankruptcy Cases for a number of reasons. For the most part, these potential strategic partners are facing their own financial difficulties. Additionally, the Company was concerned about providing competitors with its proprietary and confidential information and was also worried that information regarding its financial condition and possible chapter 11 cases could leak to its customers and suppliers and damage those relationships. The Company and Lazard were also aware that strategic parties would have the opportunity to review and bid against any transaction the Company might propose in the Bankruptcy Cases.

Lazard identified the potential investors based on a number of factors, including their known desire to invest in companies in the automotive sector, their desire to acquire financially distressed companies and their ability to quickly complete diligence and fund a transaction through debtor in possession financing. Of the financial investors Lazard contacted, six of them signed confidentiality agreements and conducted due diligence with respect to the Company, which included meeting with senior management to discuss the Company's business plan,

reviewing numerous legal, financial and operating documents contained in the Company's electronic data room and having numerous discussions with the Company's legal and financial advisors.

Ultimately, the Company received non-binding term sheets from four financial investors, each of which was subject to legal and financial due diligence as well as other conditions precedent. The four proposals had an implied enterprise valuation for the Company of between $220,000,000 - $250,000,000. Further, at the time these proposals were prepared and submitted, the Company was forecasting EBITDA for 2009 of approximately $61 million, or 39% higher than the Debtors are currently forecasting. Although the term sheets varied from each other on numerous terms, all four proposed acquiring ownership of the Company through funding a DIP loan during the Bankruptcy Cases and converting the outstanding balance thereof into a majority of the equity of the Reorganized Company upon emergence from chapter 11. Moreover, each proposal required the DIP loan to be secured on a first priority priming basis on virtually all of the Company's assets.

The Company and its advisors, including Lazard, spent significant time with each of the potential investors and their advisors discussing, among other things, the Company's corporate structure and collateral base available to secure a DIP loan, with particular emphasis on the interplay between collateral located inside and outside the United States, and also the lack of significant unencumbered assets. Similarly, the discussions focused on the fact that any DIP loan facility would need the support of the Prepetition Secured Lenders. Two of the potential investors withdrew from the process shortly after submitting their proposals, citing their inability to become comfortable with a DIP loan structure and the collateral base available to support such a loan. While discussions with the remaining two potential investors continued, one of the proposals was clearly superior and the Company and its advisors focused their efforts on working with the higher bidder to memorialize its proposal in definitive documentation.

The Company and its advisors kept the Prepetition Secured Lenders, an *ad hoc* committee of Noteholders, and their respective advisors apprised regarding the status of the discussions and negotiations with third parties, including in-person meetings with the *ad hoc* committee in London on April 3, 2009 and the Prepetition Secured Lenders in New York on April 13, 2009, among other in-person and telephonic meetings with the Prepetition Secured Lenders. The Company also continued working with the Prepetition Secured Lender group on a potential DIP facility.

The Company, with the assistance of its advisors, including Lazard, also solicited the Noteholders with respect to providing or participating in a potential DIP facility; advisors to the Noteholders informed the Company and its advisors that the Noteholders were not interested in providing or participating in any such financing facility.

2.     *Negotiation of the Proposed DIP Financing and Plan Term Sheet*

On or about April 20, 2009, the Company advised the Prepetition Secured Lenders that the potential bidder informed the Company that its proposal would be withdrawn unless the Company (a) signed the definitive documentation negotiated and prepared by the parties with respect to, among other things, a DIP credit agreement and plan of reorganization term sheet, and (b) paid the DIP commitment fees set forth in the definitive documentation. Hayes also informed the Prepetition Secured Lenders that the definitive documentation included numerous conditions precedent to the transactions set forth therein, including the required consent of more than half of the Prepetition Secured Lenders holding more than two thirds of the Credit Facilities obligations. After discussions among the Prepetition Secured Lenders, the Company and their advisors, a majority of the Prepetition Secured Lenders advised the Company that they (a) were not in favor of the transaction proposed by the high bidder, (b) were finalizing a DIP loan proposal, and (c) requested that the Company not execute the definitive documentation.

After evaluating, among other things, the transactions set forth in the definitive documents, including but not limited to, the numerous conditions precedent, and the views and requests of the Prepetition Secured Lenders, the Company declined to move forward with the third party financial investor and, instead, determined to work towards obtaining DIP financing provided by the Prepetition Lenders.

On April 24, 2009, certain of the Prepetition Secured Lenders delivered proposed term sheets for the DIP Financing and restructuring terms to the Debtors. Before commencing these cases, the Company concluded that the terms of the reorganization reached with certain of the Prepetition Secured Lenders provided the Debtors with the best — indeed, the only — opportunity to maximize the value of their assets.

# VII. THE BANKRUPTCY CASES

## A. Continuation of Business; Stay of Litigation

Since the Petition Date, the Debtors have continued to operate as debtors-in-possession subject to the supervision of the Court in accordance with the Bankruptcy Code. While the Debtors are authorized to operate in the ordinary course of business, transactions out of the ordinary course of business require Court approval. In addition, the Court has approved the Debtors' employment of attorneys, financial advisors and other professionals as required by the Bankruptcy Code to assist with its restructuring efforts and to guide the Company through its Bankruptcy Cases.

An immediate effect of the filing of the Debtors' bankruptcy petitions was the imposition of the automatic stay under Bankruptcy Code section 362(a) which, with limited exceptions, enjoined the commencement or continuation of all collection efforts by creditors, the enforcement of liens against property of the Debtors and the continuation of litigation against the Debtors. This relief provided the Debtors with the "breathing spell" necessary to assess and reorganize its business. The automatic stay remains in effect, unless modified by the Court or applicable law, until the Plan Effective Date.

## B. Summary of Certain Relief Obtained at the Outset of the Bankruptcy Cases

### 1. Significant First Day Orders

Shortly after the Petition Date, the Debtors obtained relief from the Bankruptcy Court pursuant to certain "first day orders." The first day orders entered by the Bankruptcy Court are intended to ease the transition between a debtor's prepetition and postpetition business operations by approving certain normal business conduct that may not be specifically authorized under the Bankruptcy Code or as to which the Bankruptcy Code specifies prior approval by the Court must be obtained. The "first day" orders in these Bankruptcy Cases authorized, among other things:

- the joint administration of the Bankruptcy Cases;

- the retention of Garden City Group as claims and noticing agent to the Debtors;

- the maintenance of the Debtors' existing bank accounts and continued operation of its cash management system substantially as it existed prior to the Petition Date;

- the payment in the Debtors' discretion, and in the ordinary course of business, of certain prepetition obligations related to their Customer Programs and continuation of the prepetition Customer Programs;

- the payment of certain employee obligations wages and continuation of certain employee benefit programs;

- the remittance of an adequate assurance deposit to utilities and prohibition by the utilities from altering or discontinuing their services;

- the payment of certain prepetition taxes;

- the continuation of the Debtors insurance premium financing programs;

- the payment of claims held by certain "critical" vendors;

- the payment of certain claims held by foreign creditors;

- the payment of obligations arising from goods ordered prepetition, but delivered to the Debtors postpetition, which were granted administrative expense status, and the payment of

obligations arising from prepetition delivery of goods received by the Debtors within 20 days of the Petition Date;

- the payment of certain shipping, warehousing, and import obligations;

- the payment of certain contractor claims relating to mechanic's liens; and

- the authority to obtain postpetition financing and to use cash collateral.

2.    *Parties In Interest, Counsel and Advisors*

The parties described below have been, among others, major parties in interest, or counsel and/or advisors to them, in the Bankruptcy Cases to date.

(a)    The Bankruptcy Court

The Honorable Mary F. Walrath, United States Bankruptcy Judge for the Bankruptcy Court for the District of Delaware, has presided over the Debtors' Bankruptcy Cases since the Petition Date.  She also presides over the 2001 Bankruptcy Cases.

(b)    The United States Trustee

The United States Trustee for the District of Delaware has been actively involved in the Debtors' Bankruptcy Cases.

(c)    Counsel and Advisors to the Debtors

On June 10, 2009, the Bankruptcy Court entered an order approving the retention of Skadden as the Debtors' bankruptcy counsel under a general retainer in the Bankruptcy Cases.  Leading up to and during the Bankruptcy Cases, Skadden has, among other things:  advised the Debtors with respect to their powers and duties as Debtors and debtors-in-possession; assisted the Debtors with respect to employee matters; reviewed and prepared on behalf of the Debtors all pleadings, motions, administrative and procedural applications, answers, orders, reports, and supporting schedules and statements; attended meetings and negotiated with representatives of creditors and other parties-in-interest; and advised and consulted the Debtors and other parties-in-interest on the conduct of the Bankruptcy Cases, including all of the legal and administrative requirements of operating in chapter 11.

On July 8, 2009, the Bankruptcy Court entered an order approving the retention of Lazard as the Debtors' investment banker and financial advisor.  During the Bankruptcy Cases, Lazard has, among other things, reviewed the Company's Business Plan, evaluated the Company's debt capacity in light of its projected cash flows, determined a range of values for the Company on a going concern basis, ran a postpetition market check on a potential sale of the Debtors, assisted in the determination of an appropriate capital structure for Reorganized Debtors, assisted the Debtors in the negotiation of the Plan, assisted the Debtors in the arrangement of the DIP Financing Facility and an Exit Credit Facility, and provided other investment banking services as requested by the Company from time to time.  In consideration for such services and pursuant to its engagement letter dated as of January 1, 2009, upon confirmation of the Plan, Lazard would be entitled, subject to final approval of the Bankruptcy Court, total fees and expenses (including amounts paid prepetition under the engagement agreement) of no more than $6.25 million.

On July 8, 2009, the Bankruptcy Court entered an order approving the retention of AP Services, LLC ("APS"), as crisis managers to the Debtors.  APS consultants were retained to provide a broad range of management and restructuring services including serving as interim Chief Restructuring Officer of the Company.  In consideration for such services and pursuant to its engagement letter effective as of May 11, 2009, upon confirmation of the Plan, APS would be entitled, subject to final approval of the Bankruptcy Court, to a contingent performance-based fee, in addition to any hourly fees and expenses for services provided.

On July 8, 2009, the Bankruptcy Court entered an order approving the Debtors' retention of KPMG, LLP ("KPMG") as independent auditors to the Debtors.

On June 17, 2009, the Debtors filed an application seeking Bankruptcy Court approval for the retention of Kasowitz, Benson, Torres & Friedman LLP ("KBTF") as special litigation and conflicts counsel to the Debtors. KBTF's retention has not yet been approved.

On July 30, 2009, the Bankruptcy Court entered an order approving the Debtors' retention of Deloitte & Touche, LLP ("Deloitte") as tax consultants and advisors to the Debtors.

On July 31, 2009, the Bankruptcy Court entered an order approving the Debtors' retention of Newmark Detroit, Inc., d/b/a Newmark Knight Frank ("Newmark") as real estate broker to the Debtors.

On June 10, 2009, the Bankruptcy Court entered an order approving the Debtors' retention of Groom Law Group, Chartered ("Groom") as special employee benefits counsel to the Debtors.

The Debtors intend to seek approval of their retention of Grant Thornton LLP as provider of emergence-related accounting and valuation services to the Debtors and Young Conaway Stargatt & Taylor, LLP as special litigation counsel to the Debtors.

On June 10, 2009, the Bankruptcy Court entered an order approving the Debtors' retention of various ordinary course professionals to represent them in matters unrelated to the Bankruptcy Cases. Under the terms of that order, from time to time since the Petition Date, the Company retained certain additional ordinary course professionals to assist it with matters outside of the Bankruptcy Cases.

(d)     Appointment of the Creditors' Committee

On May 21, 2009, the United States Trustee appointed, pursuant to Bankruptcy Code section 1102, an official committee of unsecured creditors (the "Creditors' Committee"). The following creditors comprise the Creditors' Committee as of the date of this Disclosure Statement: (a) Pioneer Euro High Yield Fund; (b) U.S. Bank, N.A., as Indenture Trustee; and (c) Pension Benefit Guaranty Corporation. The Creditors' Committee's legal counsel are Lowenstein Sandler PC ("Lowenstein") and Bifferato Gentilotti LLC, its financial advisor is Chanin Capital Partners LLP ("Chanin"), and its compensation consultant is Watson Wyatt Worldwide.

(e)     Appointment of the Retiree Committee

On June 10, 2009, the Bankruptcy Court entered an order approving the formation and appointment of an official committee of the retirees (the "Retiree Committee") by the U.S. Trustee (the "Retiree Order"). Pursuant to the Retiree Order, the U.S. Trustee formed the Retiree Committee on July 7, 2009. The Retiree Committee's legal counsel are Stahl Cowen Crowley Addis LLC and Schneder Harrison Segal & Lewis LLP and its financial advisor is Development Specialists, Inc.

## C.     Post-Petition Financing

In connection with the Chapter 11 filing, the Company, HLI Opco and Hayes Luxembourg (collectively the "Borrowers"), the lenders party thereto, Deutsche Bank AG New York Branch, as DIP Administrative Agent, Deutsche Bank Securities Inc. and General Electric Capital Corporation, as Joint Book-Running Lead Managers, Joint Lead Arrangers, and Joint Syndication Agents for the DIP Facilities, and Deutsche Bank Securities Inc., as Documentation Agent for the DIP Facilities, entered into Amendment No. 2, dated as of May 12, 2009, and Amendment No. 3, dated as of May 19, 2009, to the Company's Second Amended and Restated Credit Agreement, dated as of May 30, 2007, as amended by Amendment No. 1, dated as of January 30, 2009, with the lenders party thereto (the "Credit Agreement"). Pursuant to the amended Credit Agreement (the "DIP Credit Agreement") debtor-in-possession loan tranches (the "DIP Loans") were added to the Credit Agreement, including up to $100 million of additional liquidity to provide operating funds to the Company and its subsidiaries during the Bankruptcy Cases.

The initial DIP Loans consisted of a committed senior secured debtor-in-possession new money term loan facility (the "New Money DIP Loans") in an aggregate principal amount of up to $100 million and a senior secured debtor-in-possession roll-up loan facility (the "Roll-Up Loans") in an aggregate principal amount of up to $100 million. The Roll-up Loans will be issued to the pre-petition lenders under the Credit Agreement who make New Money DIP Loans in exchange for the pre-petition loans such lenders hold under the Credit Agreement; the Roll-up

Loans will be deemed issued to the lenders upon the occurrence of certain triggering event as provided in the DIP Credit Agreement (the "Roll-Up Loan Elevation Date"). If the Roll-Up Loan Elevation Date has not otherwise occurred immediately prior to the Plan Effective Date, the Roll-Up Loan Elevation Date shall be deemed to have occurred at such time for all purposes automatically without further action of any party. The DIP Loans benefit from a super-priority claim and lien on the assets of the Borrowers pursuant to a Bankruptcy Court order. On May 14, 2009, the Bankruptcy Court approved an interim order (the "Interim DIP Order") that authorized the borrowing of up to $30 million of New Money DIP Loans, which was borrowed on May 14, 2009. On June 15, 2009, the Bankruptcy Court granted final approval of the DIP Credit Agreement. As a result, an additional $70 million of New Money DIP Loans became available to the Borrowers.

The proceeds of the New Money DIP Loans incurred under the DIP Credit Agreement are available (i) to pay costs, fees, and expenses related to the execution and delivery of the DIP Credit Agreement, (ii) to repay certain of the pre-petition loans (through the exchange of Roll-up Loans), (iii) to provide working capital from time to time for the Debtors and the Company's non-U.S. subsidiaries, (iv) for other general corporate purposes of the Debtors and the Company's non-U.S. subsidiaries, and (v) to pay administrative costs of the Bankruptcy Cases and claims or amounts approved by the Bankruptcy Court. The proceeds of the DIP Loan are deposited in depositary accounts and can be withdrawn no more than twice per week and then only to the extent needed to pay permitted expenses payable in the five business days following each withdrawal in accordance with approved budgets.

The New Money DIP Loans bear cash interest at the rate of LIBOR (with a floor of 6.00% per annum), plus 14% per annum, and interest paid-in-kind (the "PIK Interest") at a rate of 6.00% per annum. After the Roll-Up Loans are deemed to be borrowed, borrowings under the New Money DIP Loans and Roll-Up Loans will bear cash interest at the rate of LIBOR (with a floor of 3.00% per annum), plus 7% per annum, plus PIK Interest of 3.00% per annum. During the continuance of an event of default under the DIP Credit Agreement, borrowings will bear interest at an additional 2.00% per annum. In addition, the DIP Credit Agreement obligates the Debtors to pay certain fees to the agents and lenders thereunder.

Obligations under the DIP Credit Agreement are secured by a lien on substantially all of the assets of the Debtors (which lien has a first priority with respect to substantially all of the Debtors' assets) and a super-priority administrative expense claim in each of the Bankruptcy Cases. The obligations under the DIP Credit Agreement are guaranteed by the Company and its domestic subsidiaries pursuant to a Guaranty, dated as of May 12, 2009. Subject to local law and other impediments, certain of the Company's foreign subsidiaries are required to take commercially reasonable actions to guarantee the obligations under the DIP Credit Agreement and grant liens on their assets in support of those guarantees.

The maturity date of the obligations under the DIP Credit Agreement is the earliest of: (i) six months following the date on which the Bankruptcy Court granted interim approval of the DIP Credit Agreement (which may be extended by up to three months by a majority of the DIP lenders); (ii) the effective date of a plan of reorganization for any Debtor; (iii) the acceleration of obligations under the DIP Credit Agreement or termination of the new money term loan commitments under the DIP Credit Agreement, including, without limitation, as a result of the occurrence of an event of default.

In addition, non-DIP Lenders that consented to the DIP Financing, but did not participate in the DIP Financing, will receive a consent fee equal to their *pro rata* share of 8.5% of the New Common Stock upon the occurrence of the Plan Effective Date.

## D.      Post-Petition Marketing Process

Following the approval of the Interim DIP Order, Lazard and the Debtors began a sale process ("Sale Process") as required under Section 7.17.A of the DIP Credit Agreement. Lazard, with the Company's assistance identified approximately 40 potential investors it believed might be interested in acquiring the Company during the Bankruptcy Cases.

The Company and Lazard approached both strategic (other automotive suppliers) and financial investors in its Sale Process. The Debtors and Lazard determined it was in the Company's best interests to reach out as broadly as possible to determine if any third parties remain interested in acquiring the Company. Lazard identified the potential investors based on a number of factors, including, their known desire to invest in companies in the

automatic sector, their desire to acquire financially distressed companies and their ability to quickly complete diligence and fund a transaction. Lazard also approached those investors who expressed an interest in the Company during the pre-petition process to see if there was continuing interest.

An initial diligence package which contains information on the Company's operations, factors leading to the commencement of the Bankruptcy Cases, and historical and projected financial information was distributed to 13 interested parties. These interested parties were invited to attend a "town hall style" management presentation, prior to which they were able to submit questions in writing for management to address at the presentation.

The Debtors received limited interest from third-parties interested in purchasing their assets, receiving only two bids. The high end of the range of bids received was at the low end of the estimated enterprise value for the Reorganized Debtors as determined by the Debtors' financial advisors. These bids were not satisfactory in the opinion of the Debtors' management and Requisite DIP Lenders. Accordingly, the Debtors are proceeding towards confirmation of their proposed Plan versus sale of their assets to a third party.

## E.    Summary of Claims Process and Bar Date

### 1.    Claims Process

In chapter 11 cases, claims against a debtor are established either as a result of being listed in the debtor's schedules of liabilities or through assertion by the creditor in a timely filed proof of claim form. Once established, the claims are either allowed or disallowed. If allowed, the claim will be recognized and treated pursuant to a plan of reorganization. If disallowed, the creditor will have no right to obtain any recovery on, or to otherwise enforce, the claim against the debtor.

### 2.    Schedules and Statements of Financial Affairs

On June 9, 2009, the Debtors filed with the Bankruptcy Court their Schedules of Assets and Liabilities ("Schedules") and Statements of Financial Affairs ("Statements"). Separate Schedules and Statements were filed for each of the twenty-five (25) Debtors. On June 23, 2009, the Debtors filed a supplement to the previously filed Schedule F for HLI Opco.

### 3.    Claims Bar Date

On June 10, 2009, the Bankruptcy Court entered an order (the "Bar Date Order") fixing the bar date for filing proofs of claim against the Debtors. The general bar date for Claims established by the Bankruptcy Court was July 27, 2009 (the "Bar Date"). The bar date relating to the Claims of governmental units is November 9, 2009 (the "Governmental Bar Date"). GCG provided notice of the Bar Date by mailing to each person listed in the Schedules (and any amendments thereto) a notice of the Bar Date and a proof of claim form. In addition, the Debtors published notice of the Bar Date on June 25, 2009 in the following publications: The Wall Street Journal, Akron Beacon Journal, Detroit Free Press, The Detroit News, and Sedalia Democrat.

As of August 6, 2009, 965 proofs of claims asserting claims in the aggregate amount of approximately $19 billion were filed in the Bankruptcy Cases. The Debtors believe the Allowed amount of claims will be significantly less than the dollar value of claims asserted against the Debtors.

## F.    Euro Notes Guarantee Litigation

On July 24, 2009, HLI, Hayes Luxembourg, and thirteen non-Debtor foreign subsidiaries filed an adversary proceeding (the "Declaratory Judgment Action") by filing a complaint in the Bankruptcy Court, naming U.S. Bank, as the indenture trustee for the Notes (the "Notes Indenture Trustee"), as defendant. The adversary case number is 09-51530 (MFW). The complaint requests the Bankruptcy Court to enter a declaratory judgment that, pursuant to the terms of the Indenture, the guarantees of the Notes entered into by the foreign subsidiaries thereunder will terminate or be released upon consummation of the Plan. The Complaint further seeks a permanent injunction against the Notes Indenture Trustee from bringing suit against any of the foreign subsidiaries in conjunction with their guarantees of the Notes. The Bankruptcy Court has not yet entered a scheduling order for this adversary

proceeding. The relief sought through the Declaratory Judgement Action is resolved through the settlement among the Debtors, the DIP Agent, and the Committee.

## G. Motion for Appointment of an Examiner

On August 11, 2009, the Creditors' Committee filed a motion seeking (1) appointment of an examiner to investigate certain matters related to the Debtors' cases, (2) an extension of the Creditors' Committee deadline to contest the validity of the Prepetition Secured Lenders' liens on their collateral, and (3) an adjournment of the hearing to consider approval of Disclosure Statement (Docket No. 444) (the "Examiner Motion"). The Creditors' Committee requested the appointment of an examiner pursuant to Bankruptcy Code section 1104(c) to investigate the Debtors and their non-Debtor affiliates, their respective directors and senior officers regarding, among other things, the development of the Plan. On August 17, 2009, the U.S. Trustee filed a response to the Examiner Motion asserting that the appointment of an examiner to investigate the affairs of the Debtors is mandatory because the requirements of section 1104(c)(2) are satisfied. On August 20, 2009, the Debtors and DIP Administrative Agent filed responses to the Examiner Motion in which they disputed the need for the appointment of an examiner or, in the alternative, sought to limit the role of an examiner and sought an examination of the Creditors' Commtitee. Pursuant to the Settlement described in Section VIII.I.3 herein, the Committee has agreed to withdraw the Examiner Motion. The U.S. Trustee expressly reserved its rights to seek the appointment of an examiner.

## H. Motion to Limit Trading in Equity Securities of Debtors

On July 31, 2009, the Debtors filed their Motion to Approve Order Establishing Notification and Hearing Procedures for Trading in Equity Securities (Docket No. 420) (the "Equity Trading Motion"). This motion requested authority to establish procedures with respect to trading in their equity securities in an attempt to preserve their tax attributes, which include (as of January 31, 2009), net operating losses of approximately $425 million, capital loss carryovers of approximately $130 million, and basis in its assets of approximately $1.25 billion. In order to minimize the burden on the Bankruptcy Court, and the stakeholders in Hayes, the Debtors delayed filing this motion until later in the Bankruptcy Cases, and requested a substantially less burdensome restriction than customarily obtained by other chapter 11 debtors, both as to the duration of the Order and its operation. On August 19, 2009, the Debtors filed a certificate of no objection to the Equity Trading Motion, and on August 20, 2009, the Bankruptcy Court entered the Order Establishing Notification and Hearing Procedures for Trading in Equity Securities (Docket No. 492) (the "Equity Trading Order"). The Equity Trading Order approves the procedures set forth by the Debtors for trading in the equity securities of Hayes and provides that any purchase, sale or other transfer of equity securities in Hayes that is in violation of such procedures shall be null and void *ab initio* as an act in violation of the automatic stay under section 362.


# VIII. SUMMARY OF THE PLAN

THIS SECTION CONTAINS A SUMMARY OF THE STRUCTURE OF, CLASSIFICATION, AND TREATMENT OF CLAIMS AND INTERESTS IN, AND IMPLEMENTATION OF THE PLAN, AND IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE PLAN, WHICH ACCOMPANIES THIS DISCLOSURE STATEMENT, AND TO THE EXHIBITS ATTACHED THERETO OR REFERRED TO THEREIN.

THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT INCLUDE SUMMARIES OF THE PROVISIONS CONTAINED IN THE PLAN AND IN DOCUMENTS REFERRED TO THEREIN. THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT DO NOT PURPORT TO BE PRECISE OR COMPLETE STATEMENTS OF ALL THE TERMS AND PROVISIONS OF THE PLAN OR DOCUMENTS REFERRED TO THEREIN, AND REFERENCE IS MADE TO THE PLAN AND TO SUCH DOCUMENTS FOR THE FULL AND COMPLETE STATEMENTS OF SUCH TERMS AND PROVISIONS.

THE PLAN ITSELF AND THE DOCUMENTS REFERRED TO THEREIN, WHICH ARE OR WILL HAVE BEEN FILED WITH THE COURT, WILL CONTROL THE TREATMENT OF CREDITORS AND EQUITY SECURITY HOLDERS UNDER THE PLAN AND WILL, UPON THE EFFECTIVE DATE OF THE PLAN, BE BINDING UPON HOLDERS OF CLAIMS AGAINST, OR INTERESTS IN, THE DEBTORS,

REORGANIZED DEBTORS AND OTHER PARTIES IN INTEREST, REGARDLESS OF WHETHER OR HOW THEY HAVE VOTED ON THE PLAN. ALL CAPITALIZED TERMS NOT DEFINED IN THIS SUMMARY HAVE THE MEANINGS ASCRIBED TO SUCH TERMS IN THE PLAN.

## A. Treatment of Claims and Interests – Administrative Claims

### 1. Administrative Claims

Subject to the other provisions of Article II and Article IX of the Plan, after the later of (a) the Plan Effective Date, (b) the date an Administrative Claim becomes an Allowed Administrative Claim or (c) the date an Administrative Claim becomes payable pursuant to any agreement between a Debtor (or a Reorganized Debtor) and the holder of such Administrative Claim, an Allowed Administrative Claimholder in any Debtor's Bankruptcy Case shall receive, in full satisfaction, settlement, release, and discharge of and in exchange for such Allowed Administrative Claim, (x) Cash equal to the unpaid portion of such Allowed Administrative Claim or (y) such other treatment as to which the Debtors (or the Reorganized Debtors) and such Claimholder shall have agreed upon in writing, satisfactory to Requisite DIP Lenders in their sole discretion.

### 2. Administrative Claims Incurred In the Ordinary Course Of Business

Notwithstanding the treatment of Administrative Claims set forth in Section 2.1 of the Plan, Allowed Administrative Claims with respect to liabilities incurred by the Debtors in the ordinary course of business during the Bankruptcy Cases shall be paid in the ordinary course of the business in accordance with the terms and conditions of any agreements relating thereto and not limited to being paid on a Periodic Distribution Date. For the avoidance of doubt, such ordinary course of business Administrative Claims shall not include a postpetition obligation that is contingent or disputed or subject to liquidation through pending or prospective litigation, including, but not limited to, alleged obligations arising from personal injury, property damage, products liability, consumer complaints, employment law, secondary payor liability, or any other contingent, disputed, or unliquidated legal or equitable claim based on tort, statute, contract, equity, or common law, be considered to be an obligation which is payable in the ordinary course of business

### 3. Reclamation Claims

Reclamation Claims that are not Allowed Section 503(b)(9) Claims shall receive the treatment accorded to Other Unsecured Claims.

### 4. Priority Tax Claims

With respect to each Allowed Priority Tax Claim in any Debtor's Bankruptcy Case, at the sole option of the Debtors, subject to the consent of the Requisite DIP Lenders, (or the Reorganized Debtors), the Allowed Priority Tax Claimholder shall be entitled to receive on account of such Priority Tax Claim, in full satisfaction, settlement, release, and discharge of and in exchange for such Priority Tax Claim, (a) equal Cash payments made in accordance with Bankruptcy Code section 1129(a)(9)(C) on the last Business Day of every three (3) month period following the Plan Effective Date, over a period not exceeding six years after the assessment of the tax on which such Claim is based, totaling the principal amount of such Claim plus simple interest on any outstanding balance from the Plan Effective Date calculated at the interest rate available on ninety (90) day United States Treasuries on the Plan Effective Date, (b) such other treatment agreed to by the Allowed Priority Tax Claimholder and the Debtors (or the Reorganized Debtors), provided such treatment is on more favorable terms to the Debtors (or the Reorganized Debtors) than the treatment set forth in subsection (a) above, or (c) payment in full in Cash on the Plan Effective Date.

### 5. DIP Financing Facility Claims

The DIP Financing Facility Claims are Allowed in full and shall not be subject to any avoidance, reductions, set off, offset, recharacterization, subordination (whether equitable, contractual, or otherwise), counterclaims, cross-claims, defenses, disallowance, impairment, objection, or any other challenges under any applicable law or regulation by any person or entity.

Upon the Plan Effective Date, the DIP Lenders shall receive in full satisfaction of the principal amounts owed to them pursuant to the DIP Financing Facility:

(i)     The DIP Lenders New Money Distribution Property, which shall be distributed to the New Money DIP Lenders on a *Pro Rata* basis (*i.e.*, based upon the amount of New Money DIP Term Loans made or held by a New Money DIP Lender in relation to the total amount of New Money DIP Term Loans);

(ii)    The DIP Lenders Roll-Up Distribution Property, which shall be distributed to the DIP Lenders who hold Senior Roll-Up Loans on a *Pro Rata* basis (*i.e.*, based upon the amount of Senior Roll-Up Loans held by a DIP Lender in relation to the total amount of Senior Roll-Up Loans);

(iii)   All fees and expenses of the DIP Agents and DIP Lenders shall be paid in full in cash on the Plan Effective Date; and

(iv)    All accrued and unpaid costs and charges on the DIP Financing Facility (including the DIP Supplemental Applicable Margin (as defined in section 1.1 of the DIP Credit Agreement) shall be paid in full in cash on the Plan Effective Date.

(v)     All unpaid interest on the DIP Financing Facility (including interest attributable to the DIP Supplemental Applicable Margin, whether or not capitalized) shall be paid in full in cash on the Plan Effective Date.

On the Plan Effective Date, the Prepetition Secured Lenders who are entitled to a Consent Fee under the DIP Credit Agreement (which shall not include any person or entity that is or was a DIP Lender or the Affiliate of a DIP Lender) shall receive their *Pro Rata* share of 850,000 shares of New Common Stock equal to 8.5% of the New Common Stock that is to be issued hereunder (prior to dilution from the Long Term Incentive Plan, the Tranche A Warrants, and the Tranche B Warrants) as more fully set forth in the DIP Credit Agreement.

**B.     Treatment of Claims and Interests – Non-Administrative Claims**

*1.     Introduction*

Pursuant to Bankruptcy Code section 1122, set forth below is a designation of classes of Claims against and Interests in the Debtors.  The treatment for each class of Claims or Interests under the Plan is also specified.  A Claim or Interest is placed in a particular Class for purposes of voting on the Plan and of receiving distributions pursuant to the Plan only to the extent that such Claim or Interest is an Allowed Claim or an Allowed Interest in that Class and such Claim or Interest has not been paid, released or otherwise settled prior to the Plan Effective Date.  In accordance with Bankruptcy Code section 1123(a)(1), Administrative Claims and Priority Tax Claims of the kinds specified in Bankruptcy Code sections 507(a)(2) and 507(a)(8) have not been classified, and their treatment is set forth in Article II herein.

The Plan, though proposed jointly, constitutes a separate Plan proposed by each Debtor.  Therefore, the classifications set forth in Section 3.2 of the Plan shall be deemed to apply separately with respect to each Plan proposed by each Debtor.

2.      Classification and Treatment of Claims Against and Interests In the Debtors

Unimpaired Classes of Claims and Interests (deemed to have accepted the Plan and, therefore, not entitled to vote on the Plan)

| | |
|---|---|
| Class 1 – Secured Tax Claims | Class 1 consists of all Secured Tax Claims. |
| | Except as otherwise provided in and subject to Section 8.7 of the Plan, on the first Periodic Distribution Date occurring after the later of (a) the date a Secured Tax Claim becomes an Allowed Secured Tax Claim or (b) the date a Secured Tax Claim becomes payable pursuant to any agreement (if any) between the Debtors (or the Reorganized Debtors) and the Holder of such Secured Tax Claim, the Holder of such Class 1 Secured Tax Claim shall receive, in full satisfaction, settlement, release, and discharge of and in exchange for such Secured Tax Claim, (y) Cash equal to the amount of such Allowed Secured Tax Claim or (z) such other treatment as to which the Debtors (with the consent of Requisite DIP Lenders) or the Reorganized Debtors and such Claimholder shall have agreed in writing, provided that such treatment is not more favorable than the treatment in clause (y) above.  The Debtors' failure to object to a Secured Tax Claim in the Bankruptcy Cases shall be without prejudice to the Reorganized Debtors' right to contest or otherwise defend against such Claim in the Bankruptcy Court or other appropriate non-bankruptcy forum (at the option of the Debtors or the Reorganized Debtors) when and if such Claim is sought to be enforced by the holder of the Secured Tax Claim. |
| Class 2 – Other Secured Claims | Class 2 consists of each separate subclass for each Other Secured Claim.  Each subclass is deemed to be a separate Class for all purposes under the Bankruptcy Code. |
| | Except as otherwise provided in and subject to Section 8.7 of the Plan, on the first Periodic Distribution Date occurring after the later of (a) the date an Other Secured Claim becomes an Allowed Other Secured Claim or (b) the date an Other Secured Claim becomes payable pursuant to any agreement (if any) between the Debtors (with the consent of the Requisite DIP Lenders) or the Reorganized Debtors and the holder of such Other Secured Claim, the Debtors (or Reorganized Debtors) shall, in full satisfaction, settlement, release, and discharge of and in exchange for such Class 2 Other Secured Claim, (x) pay Cash equal to the amount of such Allowed Other Secured Claim, (y) return the collateral to the secured creditor with respect to such Other Secured Claim, or (z) such Other Secured Claim shall be Reinstated.  The Debtors' failure to object to an other Secured Claim in the Bankruptcy Cases shall be without prejudice to the Reorganized Debtors' right to contest or otherwise defend against such Claim in the Bankruptcy Court or other appropriate non-bankruptcy forum (at the option of the Reorganized Debtors) when and if such Claim is sought to be enforced by the holder of the Secured Claim. |
| Class 3 – Other Priority Claims | Class 3 consists of all Other Priority Claims. |
| | Except as otherwise provided in and subject to Section 8.7 of the Plan, on the first Periodic Distribution Date occurring after the later of (a) the date an Other Priority Claim becomes an Allowed Other Priority Claim or (b) the date an Other Priority Claim becomes payable pursuant to any agreement (if any) between the Debtors or the Reorganized Debtors and the holder of such Other Priority Claim, each Class 3 Other Priority Claimholder shall receive, in full satisfaction, settlement, release, and discharge of, and in exchange for, such Other Priority Claim, (y) Cash in an amount equal to the amount of such Allowed Other Priority Claim or (z) such other treatment as to which the Debtors (with the consent of Requisite DIP Lenders) or the Reorganized Debtors and such Claimholder shall have agreed upon in writing, provided that such treatment is not more favorable than the treatment in clause (y) above.  The Debtors' failure to object to an Other Priority Claim in the Bankruptcy Cases shall be without prejudice to the |

| | Reorganized Debtors' right to contest or otherwise defend against such Claim in the Bankruptcy Court or other appropriate non-bankruptcy forum (at the option of the Debtors or the Reorganized Debtors) when and if such Claim is sought to be enforced by the holder of the Other Priority Claim. |
|---|---|
| Class 4 – Intercompany Claims | Class 4 consists of all Intercompany Claims.<br><br>Each Intercompany Claim will, with the consent of the Requisite DIP Lenders, be (a) released, waived and discharged as of the Plan Effective Date, (b) contributed to the capital of the obligor corporation, (c) dividended, or (d) remain unimpaired. |
| Class 5 – Subsidiary Interests | Class 5 consists of all Subsidiary Interests.<br><br>Class 5 Subsidiary Interests shall be unaffected by the Plan, except to the extent required by the Restructuring Transactions. |

Impaired Classes of Claims and Interests (entitled to vote on the Plan)

| | |
|---|---|
| Class 6 – Prepetition Secured Obligations | Class 6 consists of the Prepetition Secured Obligations. Notwithstanding any provision to the contrary herein, upon entry of the Confirmation Order, all Prepetition Secured Obligations shall be Allowed in the aggregate amount of no less than $503,381,544.77 (less the anticipated Senior Roll-Up Loans in the amount of $100 million) and shall constitute Allowed Claims for all purposes in these Bankruptcy Cases, not subject to any avoidance, reductions, set off, offset, recoupment, recharacterization, subordination (whether equitable, contractual, or otherwise), counterclaims, cross-claims, defenses, disallowance, impairment, objection, or any other challenges under any applicable law or regulation by any person or entity.<br><br>On the Plan Effective Date, Holders of Prepetition Secured Obligations in Class 6 shall receive their share of the Prepetition Secured Lender Distribution Property in full satisfaction of their claims; *provided that* such Holders of Class 6 Prepetition Secured Obligations vote as a class to accept the Plan. The Prepetition Secured Distribution Property will be distributed *Pro Rata* among the Holders of Prepetition Secured Obligations based upon the amount of Prepetition Secured Obligations held by such Holder in relation to the total amount of Prepetition Secured Obligations.<br><br>The Holders of Prepetition Secured Obligations who are DIP Lenders, Affiliates of DIP Lenders, or permitted successors and assigns of DIP Lenders under Section 11.2 of the DIP Credit Agreement agree to waive their distributions on account of their Class 6 Claims, with such waived distributions to be distributed *Pro Rata* to Holders of Prepetition Secured Obligations in Class 6 who are not DIP Lenders, affiliates of DIP Lenders, or permitted successors and assigns of DIP Lenders under Section 11.2 of the DIP Credit Agreement.<br><br>Any fees and expenses of the Prepetition Administrative Agent payable pursuant to the DIP Financing Facility Order shall be paid in full in cash on the Plan Effective Date.<br><br>Any adequate protection Claims of Holders of Prepetition Secured Obligations pursuant to the DIP Financing Facility Order shall be deemed satisfied by the treatment provided herein. |
| Class 7 – Noteholder Claims | Class 7 consists of all Noteholder Claims. |

| | On the Plan Effective Date, holders of Noteholder Claims <u>who do not reject the Plan</u> shall receive their *Pro Rata* share of 66.1% of the Foreign Creditor Distribution Property with such share to be determined by the amount of such Noteholders' Allowed Claim in relation to the Allowed Claims of Noteholders who do not reject the Plan. |
|---|---|
| | Holders of Noteholder Claims that reject the Plan shall have the option to opt-out of the release of the Non-Debtor Affiliates set forth in Article X herein. Unless a holder of Noteholder Claims both rejects the Plan **and** opts-out of the release of Non-Debtor Affiliates, such holder of Noteholder Claims shall be deemed to have released the Non-Debtor Affiliates as provided for in Article X. |
| | The distribution to Noteholders provided herein is in full satisfaction and discharge of any and all Claims that the Noteholders have against either the Debtors or their non-Debtor Affiliates. |
| | Holders of Noteholder Claims <u>who reject the Plan</u> shall not receive any distribution under the Plan. |
| Class 8 – PBGC Termination Liability Claim | Class 8 consists of the PBGC Termination Liability Claim. |
| | On the Plan Effective Date, the PBGC shall receive its *Pro Rata* share of 33.9% of the Foreign Creditor Distribution Property. |
| Class 9 – Other Unsecured Claims | Class 9 consists of all Other Unsecured Claims. |
| | Except as otherwise provided in and subject to Section 8.7 of the Plan, on the first Periodic Distribution Date occurring after the Other Unsecured Claim becomes an Allowed Other Unsecured Claim, <u>Other Unsecured Claimholders who do not vote to reject the Plan</u> shall receive, in full satisfaction, release, and discharge of, and in exchange for, such Other Unsecured Claims, the Other Unsecured Claimholders Distribution Property on a *Pro Rata* basis in complete satisfaction of their Allowed Other Unsecured Claims. |
| | A Holder of an Other Unsecured Claim, regardless of the number of Debtors against which such Claimholder may assert such Other Unsecured Claim, will receive only a single distribution on account of such Other Unsecured Claim. |
| | Upon the Plan Effective Date, the Holders of Deficiency Claims with respect to Prepetition Secured Lender Claims agree to waive their distributions on account of such Deficiency Claims, with such waived distributions to be distributed *Pro Rata* to Holders of Other Unsecured Claims who do not vote to reject the Plan. |
| | Class 9 – Other Unsecured Claims are Impaired. The holders of such Claims that are neither Disputed Claims nor Disallowed Claims, therefore, are entitled to vote on the Plan. |

<u>Impaired Classes of Claims and Interests (deemed to have rejected the Plan and therefore not entitled to vote on the Plan)</u>

| Class 10 – Subordinated Securities Claims | Class 10 consists of two separate subclasses for the Subordinated Securities Claims. Each subclass is deemed to be a separate Class for all purposes under the Bankruptcy Code. Both subclasses are deemed to have rejected the Plan and, therefore, neither subclass is entitled to vote. |
|---|---|
| | Class 10a consists of all Subordinated Debt Securities Claims that may exist against the Debtors. Class 10b consists of all Subordinated Equity Securities Claims that may exist against the Debtors. |

| | |
|---|---|
| | Subordinated Debt Securities Claims and Subordinated Equity Securities Claims shall be cancelled, released, and extinguished. Holders of Subordinated Securities Claims shall neither receive nor retain any property on account of their Claims. |
| Class 11a Interests in Hayes and<br><br>Class 11b Old Preferred Stock and Old Preferred Stock Options. | Class 11a consists of all Interests in Hayes.<br><br>All Holders of existing equity interests of Hayes shall be impaired with no distribution to be made to holders thereof. All Interests in Hayes shall be deemed cancelled as of the Plan Effective Date.<br><br>Class 11b consists of all Old Preferred Stock and Old Preferred Stock Options.<br><br>All Holders of Old Preferred Stock and Old Preferred Stock Options shall be impaired with no distribution to be made to holders thereof. All existing Old Preferred Stock and Old Preferred Stock Options shall be deemed cancelled as of the Plan Effective Date. |

## C. Special Provisions for Treatment of Claims And Interests

### 1. *Special Provisions Regarding Insured Claims*

(a) Distributions under the Plan to each holder of an Insured Claim shall be in accordance with the treatment provided under the Plan for Other Unsecured Claims; provided, however, that the maximum amount of any Claim under the Plan on account of an Allowed Insured Claim upon which a distribution shall be made shall be limited to an amount equal to the applicable self-insured retention under the relevant insurance policy; provided further, however, that, to the extent a holder has an Allowed Insured Claim the amount of which exceeds the total coverage available from the relevant insurance policies of the Debtors, such holder shall have an Allowed Other Unsecured Claim in the amount of the applicable self-insured retention plus the amount by which such Allowed Insured Claim exceeds the coverage available from the relevant Debtors' insurance policies. Nothing in Section 4.1 of the Plan shall constitute a waiver or release of any Retained Actions or Avoidance Claims the Debtors may hold against any Person, including the Debtors' insurance carriers; and nothing in Section 4.1 of the Plan is intended to, shall, or shall be deemed to preclude any holder of an Allowed Insured Claim from seeking and/or obtaining a distribution or other recovery from any insurer of the Debtors in addition to (but not in duplication of) any distribution such holder may receive under the Plan; provided, however, that the Debtors do not waive, and expressly reserve their rights to assert that any insurance coverage is property of the Estates to which they are entitled.

(b) The Plan shall not expand the scope of, or alter in any other way, the rights and obligations of the Debtors' insurers under their policies, and the Debtors' insurers shall retain any and all defenses to coverage that such insurers may have, including the right to contest and/or litigate with any party, including the Debtors, the existence, primacy and/or scope of available coverage under any alleged applicable policy. This Plan shall not operate as a waiver of any other Claims the Debtors' insurers have asserted or may assert in any proof of claim or the Debtors' rights and defenses to such proofs of claim.

### 2. *Reservation of Rights*

Except as otherwise explicitly provided in the Plan, nothing shall affect the Debtors' or the Reorganized Debtors' rights and defenses, both legal and equitable, with respect to any Claims, including, but not limited to, all rights with respect to legal and equitable defenses to alleged rights of setoff or recoupment of Claims. Except to the extent a Reorganized Debtor expressly assumes an obligation or liability of a Debtor or another Reorganized Debtor, the Plan shall not operate to impose liability on any Reorganized Debtor for the Claims against any other Debtor or the debts and obligations of any other Debtor or Reorganized Debtor, and from and after the Plan Effective Date, each Reorganized Debtor, subject to the Restructuring Transactions, will be separately liable for its own obligations.

**D. Acceptance or Rejection of the Plan; Effect of Rejection by One or More Impaired Classes of Claims or Interests**

*1. Impaired Classes of Claims Entitled to Vote*

Holders of Claims and Interests in each Impaired Class of Claims or Interests are entitled to vote as a Class to accept or reject the Plan, other than Classes that are deemed to accept the Plan as provided in Section 5.2 of the Plan or reject the Plan as provided in Section 5.4 of the Plan. Accordingly, the votes of holders of Claims in Class 6 (Prepetition Secured Obligations), Class 7 (Noteholder Claims), Class 8 (PBGC Termination Liability Claim) and Class 9 (Other Unsecured Claims) shall be solicited with respect to the Plan.

*2. Classes Deemed to Accept Plan*

Class 1 Secured Tax Claims, Class 2 Other Secured Claims, Class 3 Other Priority Claims, Class 4 Intercompany Claims and Class 5 Subsidiary Interests are Unimpaired by the Plan. Under section 1126(f) of the Bankruptcy Code and/or the Solicitation Procedures Order, Holders of Claims and Interests in each Unimpaired Class of Claims or Interests are conclusively presumed to have accepted the Plan, and the votes of such Claimholders will not be solicited. Accordingly, the votes of Holders of Claims in Class 1 Secured Tax Claims, Class 2 Other Secured Claims, Class 3 Other Priority Claims, Clan 4 Intercompany Claims, as well as votes of Holders of Class 5 Subsidiary Interests, shall not be solicited with respect to the Plan. Holders of claims and interests deemed to accept the Plan are not deemed to accept the releases contained in section 10 of the Plan.

*3. Acceptance by Impaired Classes*

Class 6 Prepetition Secured Obligations, Class 7 Noteholder Claims, Class 8 PBGC Termination Liability Claim and Class 9 Other Unsecured Claims are Impaired under the Plan. Pursuant to section 1126(c) of the Bankruptcy Code, and except as provided in section 1126(e) of the Bankruptcy Code, an Impaired Class has accepted the Plan if the Plan is accepted by the Holders of at least two-thirds (⅔) in dollar amount and more than one-half (½) in number of the Allowed Claims of such Class that have timely and properly voted to accept or reject the Plan.

*4. Classes Deemed to Reject Plan*

Because Holders of (a) Claims in Class 10a Subordinated Debt Securities Claims and Class 10b Subordinated Equity Securities and (b) Interests in Class 11a Interests in Hayes, Class 11b Old Preferred Stock, and Old Preferred Stock Options are not receiving or retaining any property under the Plan on account of such Claims or Interests, they are conclusively presumed to have rejected the Plan, and the votes of such Holders will not be solicited.

*5. Confirmation Pursuant to Section 1129(b) of the Bankruptcy Code*

To the extent that any Impaired Class entitled to vote rejects the Plan or is deemed to have rejected it, the Debtors will, with the consent of Requisite DIP Lenders, request confirmation of the Plan, as it may be modified from time to time, under section 1129(b) of the Bankruptcy Code.

*6. Confirmability and Severability of a Plan*

Subject to Section 13.2 of the Plan, the Debtors reserve the right, subject to the consent of Requisite DIP Lenders, to alter, amend, modify, revoke or withdraw the Plan as it applies to the Debtors or any particular Debtor. A determination by the Bankruptcy Court that the Plan, as it applies to the Debtors or any particular Debtor, is not confirmable pursuant to section 1129 of the Bankruptcy Code shall not limit or affect: (a) the confirmability of the Plan as it applies to the other Debtor(s); or (b) the Debtors' ability, with the consent of Requisite DIP Lenders, to modify the Plan, as it applies to the Debtors or to any particular Debtor, to satisfy the requirements of section 1129 of the Bankruptcy Code.

### E. Means for Implementation of the Plan

#### 1. Continued Corporate Existence

Subject to any Restructuring Transactions contemplated by the Plan, each of the Debtors shall continue to exist as a Reorganized Debtor after the Plan Effective Date as a separate corporate entity, with all the powers of a corporation or limited liability company, as applicable, under applicable law in the jurisdiction in which each applicable Debtor is organized and pursuant to the Organizational Documents in effect prior to the Plan Effective Date, except to the extent such Organizational Documents are amended by the Plan, without prejudice to any right to terminate such existence (whether by merger or otherwise) under applicable law after the Plan Effective Date.

#### 2. Corporate Action

Each of the matters provided for under the Plan involving the corporate structure of the Debtors or corporate action to be taken by or required of the Debtors, shall, as of the Plan Effective Date, be deemed to have occurred and be effective as provided herein, and shall be authorized, approved and, to the extent taken prior to the Plan Effective Date, ratified in all respects without any requirement of further action by stockholders, creditors, or directors of any of the Debtors or the Reorganized Debtors.

#### 3. Certificate of Incorporation and Bylaws

The Organizational Documents shall be amended as necessary to satisfy the provisions of the Plan and the Bankruptcy Code. The certificate of incorporation or formation for Reorganized Hayes, in form and substance satisfactory to the Requisite DIP Lenders, is attached to the Plan as <u>Exhibit E</u> and the bylaws for Reorganized Hayes, in form and substance satisfactory to the Requisite DIP Lenders, is attached to the Plan as <u>Exhibit F</u>. The Organizational Documents of each Reorganized Subsidiary Debtor, in form and substance satisfactory to the Requisite DIP Lenders.

#### 4. Cancellation of Existing Securities and Agreements

On the Plan Effective Date, except as otherwise specifically provided for herein,

(a) the Existing Securities, Notes, and any other note, bond, Notes Indenture (including any covenant, guarantees, or other agreements contained therein or related thereto), or other instrument or document evidencing or creating any indebtedness or obligation of or ownership interest in the Debtors, except such notes or other instruments evidencing indebtedness or obligations of or Interests in the Debtors that are Reinstated under the Plan, shall be cancelled, terminated, and of no further force or effect; *provided however,* notwithstanding the entry of the Confirmation Order or the occurrence of the Effective Date, the Notes Indenture shall continue in effect solely to (1) allow Noteholders to receive distributions provided for hereunder, (2) allowing the Note Indenture Trustee to make distributions under the Plan as provided herein, and deduct therefrom such compensation, fees, and expenses due thereunder or incurred in making such distributions, to the extent not paid by the Debtors, (3) allowing the Notes Indenture Trustee to exercise its charging liens against any such distributions, (4) preserve the right of the Notes Indenture Trustee under the Notes Indenture against the Noteholders, including, without limitation, its charging liens and rights to indemnification. The charging liens held by the Notes Indenture Trustee against distributions to Holders shall be deemed released only upon the payment of the Notes Indenture Trustees fees and expenses in full; provided further however that nothing in this section shall affect the discharge of Claims pursuant to the Bankruptcy Code, the Confirmation Order, or the Plan or result in any liability or expense to the Reorganized Debtors.

(b) the obligations of, Claims against, and/or Interests in the Debtors under, relating, or pertaining to any agreements, indenture, certificates of designation, bylaws, or certificate or articles of incorporation or similar document governing the Existing Securities, Notes, and any other note, bond, indenture, or other instrument or document evidencing or creating any indebtedness or obligation of the Debtors or ownership interest in the Debtors, except such notes or other instruments evidencing indebtedness or obligations of or interests in the Debtors that are Reinstated under the Plan, as the case may be, shall be released and discharged;

(c) based upon the consideration provided by the Plan, as contemplated by the plan term sheet attached to the DIP Credit Agreement (the "<u>Plan Term Sheet</u>") and with the consent of the Prepetition Secured Lenders (as demonstrated by the record at the hearing on the DIP Financing Facility Order and as set forth in the

DIP Financing Facility Order) to, among other things, the Plan Term Sheet, each Holder of a Prepetition Secured Lender Claim and the Prepetition Agents shall be deemed to have forever waived, released, and discharged the non-Debtor Affiliates of the Debtors of any Liens, Claims, claims, causes of action, rights, or liabilities arising from the guarantees, liens, and asset pledges granted to the Holders of the Prepetition Secured Lender Claims and the Prepetition Agents under the Prepetition Loan Facility. In addition, the Confirmation Order shall authorize and direct the Prepetition Agents to take whatever action may be necessary or appropriate, in their reasonable discretion, to effectuate the foregoing, including, without limitation, providing a release of the liens securing such obligations and a release of such guarantees; and

5. *Authorization and Issuance of New Common Stock, Tranche A Warrants, and Tranche B Warrants*

The Organizational Documents for the Reorganized Company shall authorize 20,000,000 shares of New Common Stock. A summary description of the New Common Stock is set forth in <u>Exhibit C</u> to the Plan. Of the total number of shares authorized, 10,000,000 shares of New Common Stock shall be issued and outstanding on the Plan Effective Date. All of the shares of New Common Stock, Tranche A Warrants, and Tranche B Warrants issued pursuant to the Plan shall be duly authorized, validly issued, and if applicable, fully paid and non-assessable. The New Common Stock (including the New Common Stock issued in connection with the exercises of the Tranche A Warrants and Tranche B Warrants) shall be subject to economic and legal dilution from exercises of stock options and restricted stock issuable pursuant to the Long Term Incentive Plan, exercises of the Tranche A Warrants and Tranche B Warrants, and any other shares of New Common Stock issued after the Plan Effective Date. At the sole election of any entity that is entitled to receive New Common Stock in accordance with the terms of the Plan, such entity may elect to instead receive 1 share of common stock with limited voting rights for each share of New Common Stock it would otherwise receive hereunder. A summary description of such common stock is also set forth in <u>Exhibit C</u> to the Plan. Each holder of New Common Stock, as a precondition to receiving such New Common Stock, will be required to enter into a stockholders' agreement and registration rights agreement upon terms and conditions acceptable to the Requisite DIP Lenders; provided that any party that receives the New Common Stock or similar equity based incentives through or on account of any management incentive plan or the like shall be required to execute a separate management stockholders' agreement prior to receipt of such New Common Stock or incentive which shall be in form and substance acceptable to the Requisite DIP Lenders in their sole discretion and the Reorganized Debtors. The forms of stockholders' agreement, registration rights agreement, and management stockholders' agreement (in a form acceptable to the Requisite DIP Lenders) are attached to the Plan at Exhibit M. The issuance of the New Common Stock (including the New Common Stock issued in connection with the exercises of the Tranche A Warrants and Tranche B Warrants), Tranche A Warrants, and Tranche B Warrants, and any other securities pursuant to the Plan and any subsequent sales, resales, transfers, or other distributions of such securities shall be exempt from any federal or state securities laws registration requirements pursuant to Bankruptcy Code section 1145.

6. *Directors and Officers*

On the Effective Date, the term of the current members of the board of directors of Hayes shall expire. The initial board of directors of Reorganized Hayes will consist of seven (7) directors. Six of the board members will be designated by the Requisite DIP Lenders, in their sole discretion. The Reorganized Company's CEO will serve on the board of directors and will be its Chairman as the seventh member. The identities of the initial board of directors is set forth in <u>Exhibit G</u> to the Plan.

The existing directors of each Subsidiary Debtor shall remain in their current capacities as directors of the applicable Reorganized Subsidiary Debtor, subject to the ordinary rights and powers of the board of directors or equityholders to replace them.

Each such initial director, with the exception of the Chief Executive Officer, shall be "independent" and "disinterested". For purposes of the immediately preceding sentence, an individual will be deemed to be "independent" and "disinterested" if such individual (x) is not an employee or affiliate of the corporation or any of its subsidiaries or any stockholder or any of its affiliates and (y) does not have any material business or close personal relationship or any history of any material business or close personal relationships with the corporation or any of its subsidiaries or any stockholder or any of its affiliates. The foregoing requirements for independence and disinterestedness shall remain in place until such time as the Board of Reorganized Hayes, in accordance with Reorganized Hayes' Organizational Documents, terminates, modified or alters such requirements.

The individuals identified in Exhibit G to the Plan shall serve as the initial officers of the Reorganized Debtors in the capacities set forth therein. All other existing officers or managing members of the Debtors (unless expressly replaced as set forth in Exhibit G) shall remain in their current capacities as officers or managing members of the Debtors, subject to the ordinary rights and powers of the board of directors or equityholders, as the case may be, to replace them.

Each director of Reorganized Hayes shall execute a directors' indemnification agreement with Reorganized Hayes, on terms and conditions acceptable to the DIP Requisite Lenders in their sole discretion. The compensation or summaries of any employment agreements for senior management will be disclosed prior to the Confirmation Hearing. The Requisite DIP Lenders are currently negotiating compensation matters with numerous members of senior management. Other provisions governing the service, term and continuance in office of the directors of Reorganized Hayes shall be as set forth in the Organizational Documents of Reorganized Hayes or the other exhibits thereto.

7. *Employment Incentive Compensation Programs*

***Long Term Incentive Plan.*** Reorganized Hayes shall adopt the Long Term Incentive Plan for the benefit of senior management, selected employees and directors of Reorganized Hayes and its Affiliates. Such Long Term Incentive Plan shall be effective as of the Plan Effective Date and shall be subject to such terms and conditions as the Debtors and the Requisite DIP Lenders shall mutually agree. Allocations under the Long Term Incentive Plan shall be mutually agreed upon by the CEO and the Requisite DIP Lenders.

***Executive Employment Agreements.*** The Debtors shall assume the existing employment agreements and/or implement the new employment agreements identified in Exhibit H to the Plan (collectively, the "Executive Employment Agreements"). The assumption of or entering into the Executive Employment Agreements (or any amendments thereto) shall be in the form and substance satisfactory to the Requisite DIP Lenders in their sole discretion. For the avoidance of doubt, entry into or assumption of any Executive Employment Agreement or other employment agreement shall not be a condition precedent to the confirmation or consummation of the Plan.

***Annual Incentive Plan and Key Employee Incentive Plan.*** The Debtors shall assume any remaining obligations under the Bankruptcy Court approved Annual Incentive Plan and KEIP. Subject to any modifications required by the Requisite DIP Lenders, in their sole discretion and as identified in Exhibit I to the Plan, the Debtors shall assume any remaining obligations under the supplemental executive retirement plan.

***Retiree Benefits.*** Notwithstanding anything to the contrary herein, following the Plan Effective Date, with respect to the payment of "retiree benefits" (as such term is defined in Bankruptcy Code section 1114) related to medical, surgical, or hospital care benefits, or benefits in the event of sickness, accident, disability, or death, such payment shall continue at the levels established pursuant to subsections (e)(1)(B) or (g) of Bankruptcy Code section 1114, at any time prior to confirmation the Plan, for the duration of the periods the Debtors have obligated themselves to provide such benefits, if any, and subject to any contractual rights to terminate or modify.

Except for the Long Term Incentive Plan, the Executive Employment Agreements, the Annual Incentive Plan, and the KEIP, the Debtors shall not continue, assume, or enter into any benefit, compensation, incentive or similar plans and agreements other than (1) such programs or agreements implemented or executed in the ordinary course of their business (excluding any supplemental executive retirement plan), (2) as consented to by the Requisite DIP Lenders, or (3) as approved by the board of directors of the Reorganized Company.

8. *Post-Effective Date Financing*

On the Plan Effective Date, the Reorganized Debtors shall (a) enter into the Exit Credit Facility together with all guarantees evidencing obligations of the Reorganized Debtors thereunder and security documents, (b) execute the Exit Credit Facility Documents together with such other documents the Exit Credit Facility Lenders may require, and (c) deliver insurance and customary opinions, all of which items in clauses (a) – (c) shall be in form and substance satisfactory to the Exit Credit Facility Lenders, and such documents and all other documents, instruments and agreements to be entered into, delivered or contemplated thereunder shall become effective in accordance with their terms on the Plan Effective Date.

The amount, form and substance of the Exit Credit Facility shall be on terms and conditions and subject to the approval of the Requisite DIP Lenders in their sole discretion; *provided however*, that the committed amount of the Exit Credit Facility as of the Plan Effective Date shall not exceed $150 million.

In the Confirmation Order, the Bankruptcy Court shall approve the Exit Credit Facility on the terms and conditions disclosed to the Bankruptcy Court, with such changes that are not materially adverse to the Debtors or the Reorganized Debtors that may be agreed upon by the parties thereto, and authorize the Reorganized Debtors to execute the Exit Credit Facility Documents together with such other documents as the Exit Credit Facility Lenders may require in order to effectuate the treatment afforded to such parties under the Exit Credit Facility.

9.      *Restructuring Transactions and Alternative Structures*

The Debtors explored taking several actions in connection with consummation of the Plan (collectively, the "Restructuring Transactions"): (i) the execution and delivery of appropriate agreements or other documents of merger, consolidation or reorganization containing terms that are consistent with the terms of the Plan and that satisfy the requirements of applicable law; (ii) the execution and delivery of appropriate instruments of transfer, assignment, assumption or delegation of any property, right, liability, duty or obligation on terms consistent with the terms of the Plan; (iii) the filing of appropriate Organizational Documents with the appropriate governmental authorities under applicable law; and (iv) all other actions that such Debtor or Reorganized Debtor determines are necessary or appropriate.

The Debtors, after having explored several potential Restructuring Transactions, do not contemplate consummating any significant Restructuring Transactions on or before the Plan Effective Date.

The Debtors and the Reorganized Debtors reserve their rights to cause their non-Debtor subsidiaries to engage in any Restructuring Transactions that are otherwise permitted by applicable law, including without limitation, (i) potential transactions whereby the stock of Hayes Lemmerz Holding GmbH and Hayes Lemmerz Konigswinter GmbH would be sold to a subsidiary of Hayes that is not a subsidiary of Hayes Lemmerz Finance LLC-Luxembourg S.C.A., (ii) potential transactions where the stock (or other ownership interests) of Hayes Lemmerz-Inci-Jant Sanayi, A.S, Hayes Lemmerz Jantas Jant Sanayi ve Ticaret A.S., and Kalyani Hayes Lemmerz Limited is transferred to a newly formed subsidiary or subsidiaries of their respective current owners, which newly formed subsidiary would not guaranty the debt of any Hayes entity, or (iii) potential transactions where the holders of DIP Financing Facility Claims or Prepetition Secured Obligations foreclose on the stock of one or more non-Debtors.. In addition, they reserve the right to dissolve or otherwise dispose of certain subsidiaries (including subsidiaries that are Debtors) with no material assets or assets that are not necessary to the operations of the Reorganized Debtors.

10.      *Preservation of Causes of Action*

In accordance with Bankruptcy Code section 1123(b)(3) and except as otherwise provided in the Plan, the Reorganized Debtors shall retain and may, in their sole discretion, enforce or prosecute all Retained Actions. The Reorganized Debtors, in their sole and absolute discretion, will determine whether to bring, settle, release, or compromise any Retained Actions (or decline to do any of the foregoing). The Reorganized Debtors or any successors may prosecute (or decline to prosecute) such Retained Actions in accordance with the best interests of the Reorganized Debtors or any successors holding such rights of action.

Except as otherwise provided herein, the failure of the Debtors to specifically list any Claim, right of action, suit or proceeding in the Schedules or in Exhibit D attached to the Plan does not, and will not be deemed to, constitute a waiver or release by the Debtors of such claim, right of action, suit or proceeding, and the Reorganized Debtors will retain the right to pursue such claims, rights of action, suits or proceedings in their sole discretion and, therefore, no preclusion doctrine, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise) or laches will apply to such claim, right of action, suit or proceeding upon or after the confirmation or consummation of the Plan.

As set forth on Exhibit D, the Debtors reserve their rights with respect to all avoidance actions arising under Chapter 5 of the Bankruptcy Code. The Debtors have not undertaken a thorough analysis of the value of potential avoidance actions. The Debtors estimate, based on information contained in their schedules, their

prepetition payments potentially subject to avoidance actions would not exceed $70 million (excluding normal payroll related payments to non-insiders and financing transactions between affiliates). The Debtors believe a substantial portion of that amount may be subject to customary defenses to avoidance actions. For the purpose of the liquidation analysis, prepared in connection with this Disclosure Statement, the Debtors have assumed that the avoidance actions have no value.

Upon the Plan Effective Date and satisfaction of the condition to the Plan Effective Date specified in sections 11.2(g) and 11.2(s) of the Plan, the Declaratory Judgment Action shall be deemed dismissed with prejudice. The parties to the Declaratory Judgment Action shall take such steps as are reasonably necessary to effectuate such dismissal.

### 11. Exclusivity Period

Subject to the terms set forth herein, the Debtors shall retain the exclusive right to amend or modify the Plan, and to solicit acceptances of any amendments to or modifications of the Plan, through and until the Plan Effective Date.

### 12. Effectuating Documents; Further Transactions

The chairman of the board of directors, the chief executive officer, the chief financial officer, the general counsel, or any other executive officer or managing member of the Debtors shall be authorized to execute, deliver, file, or record such contracts, instruments, releases, indentures, and other agreements or documents, and take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan. The secretary or assistant secretary of the Debtors shall be authorized to certify or attest to any of the foregoing actions.

### 13. Exemption From Certain Transfer Taxes and Recording Fees

Pursuant to Bankruptcy Code section 1146(c), any transfers from a Debtor to a Reorganized Debtor or to any other Person or entity pursuant to the Plan (including, without limitation, pursuant to any grant of collateral under the Exit Credit Facility), or any agreement regarding the transfer of title to or ownership of any of the Debtors' real or personal property, will not be subject to any document recording tax, stamp tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording tax, or other similar tax or governmental assessment, and the Confirmation Order will direct the appropriate state or local governmental officials or agents to forego the collection of any such tax or governmental assessment and to accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

### 14. Approval of Requisite DIP Lenders and Exit Credit Facility Lenders

For purposes of the Plan, when approval or consent is required from the Requisite DIP Lenders or Exit Credit Facility Lenders, such approval or consent shall be provided in writing (which may be by e-mail or other electronic means) by the DIP Administrative Agent or Exit Credit Facility Agent (or their respective counsel), respectively.

## F. Unexpired Leases and Executory Contracts

### 1. Assumed Contracts and Leases

On the Plan Effective Date, all executory contracts or unexpired leases of the Debtors (except those executory contracts and unexpired leases to which the Debtors are a party that are specifically listed on the schedule of rejected contracts and leases annexed to the Plan as Exhibit J) will be assumed in accordance with, and subject to, the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code. The Confirmation Order shall constitute an order of the Bankruptcy Court approving such assumptions, pursuant to section 365(b)(1) of the Bankruptcy Code and, to the extent applicable, section 365(b)(3) of the Bankruptcy Code, as of the Plan Effective Date and a finding by the Bankruptcy Court that each such assumption is in the best interests of the Debtors, their Estates, and all parties in interest in these cases. In addition, the Confirmation Order shall constitute a finding of fact and conclusion of law that (i) each executory contract or unexpired lease is an executory contract which may be

assumed by the Debtors, (ii) there are no defaults of the Debtors, no cure payments owing (except as established through the procedure set forth in Section 7.4(b) of the Plan), no compensation due for any actual pecuniary loss, and there is adequate assurance of future performance with respect to of each executory contract or unexpired lease, (iii) such assumption is in the best interest of the Debtors and their Estates, (iv) upon the Plan Effective Date, the assumed executory contracts or unexpired leases constitute legal, valid, binding and enforceable contracts in accordance with the terms thereof, and (v) the counter party to each assumed executory contract or unexpired lease is required to and ordered to perform under and honor the terms of the assumed executory contract or unexpired lease. Each executory contract and unexpired lease assumed pursuant to this Article VII shall be Reinstated and be fully enforceable by the respective Reorganized Debtor in accordance with its terms, without amendment or modification.

Each executory contract and unexpired lease that is assumed and relates to the use, ability to acquire, or occupancy of real property shall include (a) all modifications, amendments, supplements, restatements, or other agreements made directly or indirectly by any agreement, instrument, or other document that in any manner affect such executory contract or unexpired lease and (b) all executory contracts or unexpired leases appurtenant to the premises, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, powers, uses, reciprocal easement agreements, and any other interests in real estate or rights *in rem* related to such premises, unless any of the foregoing agreements has been rejected pursuant to a Final Order of the Bankruptcy Court or is otherwise rejected as a part of the Plan.

All counterparties to executory contracts or unexpired leases to be assumed pursuant to the Plan shall receive notice of the Plan Effective Date.

2.      *Rejected Contracts and Leases*

Except with respect to executory contracts and unexpired leases that have previously been assumed or are the subject of a motion to assume, or a notice of assumption served pursuant to an order of the Bankruptcy Court, on or before the Confirmation Date, all executory contracts and unexpired leases listed on Exhibit J annexed to the Plan shall be deemed automatically rejected as of the Effective Date. The Confirmation Order shall constitute an order of the Bankruptcy Court approving such rejections pursuant to section 365 of the Bankruptcy Code. The Debtors reserve the right to file a motion on or before the Confirmation Date to reject any executory contract or unexpired lease.

The Debtors may, with the consent of the Requisite DIP Lenders, remove or add any contract or lease from Exhibit J to the Plan until the Plan Effective Date by filing a notice of such removal with the Bankruptcy Court prior to the Plan Effective Date.

Any counterparty to any executory contract and unexpired lease rejected under the Plan or contract terminated under the Plan (including any indentures) shall be barred from enforcing the terms of such contracts and leases against the Debtors. Such counterparties shall also be barred from pursuing any amounts due under such contracts or leases or damages incurred as a consequence of such rejection or termination against the Debtors or Reorganized Debtors beyond those the remedies expressly provided for under the Plan or Confirmation Order.

3.      *Exhibits Not Admissions*

Neither the inclusion by the Debtors of a contract or lease on Exhibit J nor anything contained in the Plan shall constitute an admission by the Debtors that such lease or contract is an unexpired lease or executory contract or that any Debtor, or any of their Affiliates, has any liability thereunder.

4.      *Payments Related to Assumption of Executory Contracts and Unexpired Leases*

The provisions (if any) of each executory contract or unexpired lease to be assumed and Reinstated under the Plan which are or may be in default shall be satisfied solely by Cure. Objections to assumption or rejection including, without limitation, to Cure related to non-monetary defaults, must be raised in an objection to be filed no later than the date by which objections are required to be filed with respect to confirmation of the Plan. Any such Objections will be litigated at the Confirmation Hearing or at such other time as the Bankruptcy Court may schedule.

The Solicitation Procedures Order shall establish the procedures for determining and resolving disputed Cure amounts. Any party failing to follow such Cure procedures shall be forever barred from asserting, collecting, or seeking to collect any amounts relating thereto against the Debtors or Reorganized Debtors.

The Debtors estimate that Cure payments will be approximately $250,000.

5.      *Rejection Damages Bar Date*

If rejection of an executory contract or unexpired lease rejected pursuant to the Plan results in a Claim, then such Claim shall be forever barred and shall not be enforceable against either the Debtors or the Reorganized Debtors or such entities' properties unless a proof of claim is filed with the clerk of the Bankruptcy Court and served upon counsel to the Debtors within thirty (30) days after service of the earlier of (a) notice of entry of the Confirmation Order or (b) other notice that the executory contract or unexpired lease has been rejected. Any Claim that may be Allowed as a result of the rejection of an executory contract or unexpired lease shall be treated as an Other Unsecured Claim. The Debtors do not believe that aggregate rejection damages resulting from the rejection of executory contracts and unexpired leases will materially impact the distribution to Allowed Class 9 Other Unsecured Claims.

## G.      **Provisions Governing Distributions**

1.      *Time of Distributions*

Except as otherwise provided for herein, or ordered by the Bankruptcy Court, distributions under the Plan shall be made on a Periodic Distribution Date or as soon as reasonably practical thereafter.

2.      *No Interest on Claims*

Unless otherwise specifically provided for in the Plan, the Confirmation Order, DIP Financing Order or the DIP Credit Agreement, Postpetition Interest shall not accrue or be paid on Claims, and no Claimholder shall be entitled to interest accruing on or after the Petition Date on any Claim, right, or Interest. Additionally, and without limiting the foregoing, interest shall not accrue or be paid on any Disputed Claim in respect of the period from the Effective Date to the date a final distribution is made when and if such Disputed Claim becomes an Allowed Claim.

3.      Disbursing Agent

The Disbursing Agent shall make all distributions required under the Plan.

4.      *Surrender of Securities or Instruments*

On or before the Distribution Date, or as soon as practicable thereafter, each holder of a Certificate, shall surrender such Certificate to the Disbursing Agent or, with respect to indebtedness that is governed by other agreement, the respective servicer, and such Certificate shall be cancelled. No distribution of property hereunder shall be made to or on behalf of any such holder unless and until such Certificate is received by the Disbursing Agent or the respective servicer or the unavailability of such Certificate is reasonably established to the satisfaction of the Disbursing Agent or the respective servicer. Any holder who fails to surrender or cause to be surrendered such Certificate, or fails to execute and deliver an affidavit of loss and indemnity reasonably satisfactory to the Disbursing Agent or the respective servicer prior to the first anniversary of the Plan Effective Date, shall be deemed to have forfeited all rights and Claims in respect of such Certificate and shall not participate in any distribution hereunder, and all property in respect of such forfeited distribution, including any dividends or interest attributable thereto, shall revert to the Reorganized Debtors notwithstanding any federal or state escheat laws to the contrary.

5.      *Claims Administration Responsibility*

The Reorganized Debtors will have sole and absolute discretion in administering, disputing, objecting to, compromising or otherwise resolving all Claims against the Debtors (the "Claims Administration"). The Reorganized Debtors shall bear the responsibility for any fees, costs, expenses or other liabilities incurred by the Disbursing Agent in connection with the Claims Administration.

6. *Delivery of Distributions*

Distributions under the Plan to holders of Allowed Prepetition Secured Lender Claims shall be made to or at the direction of the Prepetition Administrative Agent and shall be distributed by the Prepetition Administrative Agent in accordance with the Prepetition Credit Agreement. Distributions under the Plan to holders of DIP Financing Facility Claims shall be made to or at the direction of the DIP Administrative Agent and shall be distributed by the DIP Administrative Agent in accordance with the DIP Credit Agreement. Distributions under the Plan to holders of Notes Claims, if any, shall be made to or at the direction of the Notes Indenture Trustee and shall be distributed by the Notes Indenture Trustee in accordance with the indenture governing the Notes. Distributions under the Plan to all other Allowed Claimholders shall be made by the Disbursing Agent. If any Claimholder's distribution is returned as undeliverable, no further distributions to such Claimholder shall be made unless and until the Disbursing Agent or the appropriate servicer is notified of such Claimholder's then current address, at which time all missed distributions shall be made to such Claimholder without interest. Amounts in respect of undeliverable distributions shall be returned to the Reorganized Debtors until such distributions are claimed. All claims for undeliverable distributions shall be made on or before the second anniversary of the Effective Date. After such date, all unclaimed property shall revert to the Reorganized Debtors. Upon such reversion, the claim of any Claimholder, or their successors, with respect to such property shall be discharged and forever barred notwithstanding any federal or state escheat laws to the contrary.

7. *Procedures for Treating and Resolving Disputed and Contingent Claims*

*No Distributions Pending Allowance.* No payments or distributions will be made with respect to all or any portion of a Disputed Claim unless and until all objections to such Disputed Claim have been settled or withdrawn or have been determined by a Final Order of the Bankruptcy Court, and the Disputed Claim has become an Allowed Claim. All objections to Claims must be filed on or before the Claims Objection Deadline.

*Distributions After Allowance.* Payments and distributions to each respective Claimholder on account of a Disputed Claim, to the extent that it ultimately becomes an Allowed Claim, will be made in accordance with provisions of the Plan that govern distributions to such Claimholders. Subject to the other provisions of this <u>Article VIII</u>, on the first Periodic Distribution Date following the date when a Disputed Claim becomes an Allowed Claim, the Disbursing Agent will distribute to the Claimholder any Cash or other Plan consideration that would have been distributed on the dates distributions were previously made to Claimholders had such Allowed Claim been an Allowed Claim on such dates, together with any dividends, payments, or other distributions made on account of, as well as any obligations arising from, the distributed property as if such Allowed Claim had been an Allowed Claim on the dates distributions were previously made to Allowed Claimholders included in the applicable class.

8. *Conversion of Claims Asserted In Foreign Currencies*

Except as otherwise provided in the Notes Indenture, any Claim asserted in non-United States currency shall, for distribution purposes, be converted to United States dollars at such rate quoted in the <u>Wall Street Journal</u> on the Petition Date. For the purpose of calculating the pro rata share of each DIP Lender in the DIP Lenders Distribution Property, all DIP Term Loans of such DIP Lender that are denominated in Euros shall be converted to United States dollars at an exchange rate of 1:1.3606. For the purpose of calculating the pro rata share of each holder of Prepetition Secured Obligations in the Prepetition Secured Distribution Property, all Prepetition Secured Obligations of such holders of Prepetition Secured Obligations that are denominated in Euros shall be converted to United States dollars at an exchange rate of 1:1.3606. For the purpose of calculating the pro rata share of each holder of Prepetition Secured Obligations entitled to a Consent Fee under the DIP Loan Agreement, all Consent Fee Entitlements of such holders that are denominated in Euros shall be converted to United States dollars at an exchange rate of 1:1.3606.

9. *Distribution of Foreign Creditor Distribution Property to Holders of Class 7 Noteholder Claims and Class 8 PBGC Termination Liability Claim*

The Noteholders and PBGC have agreed to share the Foreign Creditor Distribution Property in the percentages set forth in section 3.2(b) of the Plan provided the Confirmation Date occurs on or before November 30, 2009. In the event Confirmation Date occurs after November 30, 2009, the Creditors' Committee shall instruct the Debtors as to the appropriate distribution of the Foreign Creditor Distribution Property on the Plan Effective Date.

## H. Allowance and Payment of Certain Administrative Claims

### 1. Professional Claims

***Final Fee Applications.*** All final requests for payment of Professional Claims must be filed no later than forty-five (45) days after the Plan Effective Date. After notice and a hearing in accordance with the procedures established by the Bankruptcy Code and prior orders of the Bankruptcy Court, the allowed amounts of such Professional Claims shall be determined by the Bankruptcy Court.

***Payment of Interim Amounts.*** Subject to the Holdback Amount, on the Plan Effective Date, the Debtors or the Reorganized Debtors shall pay all amounts owing to Professionals for all outstanding amounts relating to prior periods through the Plan Effective Date. In order to receive payment on the Plan Effective Date for unbilled fees and expenses incurred through such date, no later than two (2) days prior to the Plan Effective Date, the Professionals shall estimate fees and expenses due for periods that have not been billed as of the Plan Effective Date and shall deliver such estimate to counsel for the Debtors, the Prepetition Agent, and the DIP Agent. Within fifteen (15) days after the Plan Effective Date, a Professional receiving payment for the estimated period shall submit a detailed invoice (the "Final Invoice") covering such period in the manner and providing the detail as set forth in the Professional Fee Order. In the event the Final Invoice reflects that amounts are due to a Professional, the Reorganized Debtors shall promptly pay such amounts; excess amounts paid by the Debtors to a Professional shall be promptly remitted to the Reorganized Debtors.

On the Plan Effective Date, the Debtors or the Reorganized Debtors shall pay to the Disbursing Agent, in order to fund the Holdback Escrow Account, Cash equal to the aggregate Holdback Amount for all Professionals. The Disbursing Agent shall maintain the Holdback Escrow Account in trust for the Professionals with respect to whom fees have been held back pursuant to the Professional Fee Order. Such funds shall not be considered property of the Reorganized Debtors. The remaining amount of Professional Claims owing to the Professionals first shall be paid to such Professionals by the Disbursing Agent from the Holdback Escrow Account when such claims are finally allowed by the Bankruptcy Court and, to the extent funds held in the Holdback Escrow Account are insufficient, such amounts shall be paid by the Reorganized Debtors. When all Professional Claims have been paid in full, amounts remaining in the Holdback Escrow Account, if any, shall be paid to the Reorganized Debtors.

Upon the Plan Effective Date, any requirement that professionals comply with Bankruptcy Code sections 327 through 331 in seeking retention or compensation for services rendered after such date will terminate.

All amounts payable to Professionals under this Plan are subject to final allowance by the Bankruptcy Court.

### 2. Substantial Contribution Compensation and Expenses Bar Date

Any Person who requests compensation or expense reimbursement for making a substantial contribution in the Bankruptcy Cases pursuant to Bankruptcy Code sections 503(b)(3), 503(b)(4), and 503(b)(5) must file an application with the clerk of the Bankruptcy Court, on or before the 503 Deadline, and serve such application on counsel for the Debtors and as otherwise required by the Bankruptcy Court and the Bankruptcy Code on or before the 503 Deadline, or be forever barred from seeking such compensation or expense reimbursement.

### 3. Other Administrative Claims

All other requests for payment of an Administrative Claim (other than as set forth in Sections 2.5, 9.1 and 9.2 of the Plan, and other than with respect to Cure Claims) must be filed with the Bankruptcy Court and served on counsel for the Debtors no later the Administrative Claims Bar Date. Unless the Debtors or the Reorganized Debtors object to an Administrative Claim by the Claims Objection Deadline, such Administrative Claim shall be deemed allowed in the amount requested. In the event that the Debtors or the Reorganized Debtors object to an Administrative Claim, the Bankruptcy Court shall determine the allowed amount of such Administrative Claim. Notwithstanding the foregoing, no request for payment of an Administrative Claim need be filed with respect to an Administrative Claim (i) which is paid or payable by any Debtor in the ordinary course of business or (ii) the payment of which has been approved by the Bankruptcy Court.

4. *Compensation of Notes Indenture Trustee and Prepetition Administrative Agent.*

Notwithstanding anything to the contrary contained herein, the Debtors shall pay, within ten (10) Business Days of the Plan Effective Date, the reasonable (a) Notes Indenture Trustee's fees, expenses and compensation incurred through the Plan Effective Date as provided by the Notes Indenture, including the reasonable fees and documented out-of-pocket expenses of Drinker Biddle & Reath, LLP, as counsel to the Notes Indenture Trustee, and (b) Prepetition Administrative Agent's fees, expenses and compensation incurred through the Plan Effective Date as provided by the Prepetition Credit Facility, including the reasonable fees and documented out-of-pocket expenses of Weil Gotshal & Manges LLP, as counsel to the Prepetition Administrative Agent, without the need of these parties to file fee applications with the Bankruptcy Court; provided that the Notes Indenture Trustee, Prepetition Administrative Agent, and their respective counsel shall provide the Debtors with the invoices (or other documentation as the Debtors may reasonably request) for which they seek payment on or before five (5) days after the Plan Effective Date and provided that the Debtors have no objection to such fees.

To the extent that the Debtors object to any of the fees or expenses of the Notes Indenture Trustee, Prepetition Administrative Agent, or their respective counsel, the Debtor shall not be required to pay any disputed portion of such fees until a resolution of such objection agreed to by the Debtors and the Notes Indenture Trustee, Prepetition Administrative Agent, and/or their counsel or a further order of the Bankruptcy Court upon a motion by the Notes Indenture Trustee or Prepetition Administrative Agent, as applicable.

## I. Effect of the Plan on Claims and Interests

### 1. *Revesting of Assets*

Except as otherwise explicitly provided in the Plan, on the Plan Effective Date all property comprising the Estates (including Retained Actions) shall revest in each of the Debtors and, ultimately, in the Reorganized Debtors, free and clear of all Claims, Liens and Interests of creditors and equity security Holders (other than as expressly provided herein). As of the Plan Effective Date, each of the Reorganized Debtors may operate its business and use, acquire, and dispose of property and settle and compromise Claims without supervision of the Bankruptcy Court, free of any restrictions of the Bankruptcy Code or Bankruptcy Rules, other than those restrictions expressly imposed by the Plan and the Confirmation Order.

### 2. *Discharge of the Debtors*

Pursuant to and to the fullest extent permitted by Bankruptcy Code section 1141(d), except as otherwise specifically provided in the Plan or in the Confirmation Order, confirmation of the Plan discharges and releases, effective as of the Confirmation Date (but subject to the occurrence of the Plan Effective Date), the Debtors, the Reorganized Debtors and the Estates (a) from all Claims and Causes of Action, whether known or unknown, and (b) from liabilities of, liens on, obligations of, rights against, and Interests in the Debtors or any of their assets or properties, in each case regardless of whether any property has been distributed or retained pursuant to the Plan on account of such Claims, Causes of Action, rights, liabilities, liens, obligations and Interests, and in each case including, but not limited to, demands and (x) Claims, Causes of Actions, rights, liabilities, liens, obligations and Interests that arose before the Confirmation Date, (y) any Claims, Causes of Actions, rights, liabilities (including withdrawal liabilities), liens, obligations and Interests to the extent such Claims, Causes of Actions, rights, liabilities (including withdrawal liabilities), liens, obligations and Interests relate to services performed by employees of the Debtors prior to the Petition Date and that arise from a termination of employment or a termination of any employee or retiree benefit program regardless of whether such termination occurred prior to or after the Confirmation Date, and (z) all Claims of the kind specified in Bankruptcy Code sections 502(g), 502(h) or 502(i), in each case whether or not (i) a proof of claim or interest based upon such Claims, Causes of Actions, rights, liabilities, liens, obligations and Interests or Interest is filed or deemed filed under Bankruptcy Code section 501, (ii) a Claim or Interest based upon such Claims, Causes of Actions, rights, liabilities, liens, obligations and Interests is allowed under Bankruptcy Code section 502, or (iii) the Holder of such a Claim, Cause of Action, right, liability, lien, obligation or Interests accepted the Plan. The Confirmation Order shall be a judicial determination of the discharge of all liabilities of and Interests in the Debtors, subject to the Plan Effective Date occurring.

As of the Plan Effective Date, except as provided in the Plan or in the Confirmation Order or under the terms of the documents evidencing and order approving the Exit Credit Facility, all Persons shall be precluded from

asserting against the Debtors or the Reorganized Debtors any other or further claims, debts, rights, causes of action, claims for relief, liabilities, or equity interests relating to the Debtors based upon any act, omission, transaction, occurrence, or other activity of any nature that occurred prior to the Plan Effective Date. In accordance with the foregoing, except as provided in the Plan or the Confirmation Order, the Confirmation Order shall be a judicial determination of discharge of all such Claims and other debts and liabilities against the Debtors and termination of all Interests in Hayes pursuant to Bankruptcy Code sections 524 and 1141, and such discharge shall void any judgment obtained against the Debtors at any time, to the extent that such judgment relates to a discharged Claim or terminated Interest.

If the Pension Plan is not terminated, then no provision of, or proceeding within, the Debtors' reorganization proceedings, the Plan, nor the Confirmation Order shall in any way be construed as discharging, releasing or relieving the Debtors, the Reorganized Debtors, or any other party in any capacity, from any liability with respect to the Pension Plan under any law, governmental policy or regulatory provision. In the event the Pension Plan is not terminated, PBGC and the Pension Plan shall not be enjoined or precluded from enforcing liability, if any, relating to the Pension Plan because of any of the provisions of the Plan or the Plan's confirmation. Regardless of whether the Pension Plan is terminated, no provision of or proceeding within the Debtors' reorganization proceedings, the Plan, nor the Confirmation Order shall in any way be construed as discharging, releasing or relieving the Debtors, the Reorganized Debtors, or any other party in any capacity, from any liability for breach of fiduciary duty concerning the Pension Plan.

     *3.    Compromises and Settlements*

     (a)    Pursuant to the Settlement and Bankruptcy Code section 363 and Bankruptcy Rule 9019, the Debtors, the DIP Agent, and the Creditors' Committee have agreed to the global settlement of certain Claims asserted against Debtors and their Non-Debtor Affiliates by the Noteholders and PBGC. These Claims are classified in Class 7 Noteholder Claims and Class 8 PBGC Termination Liability Claim. Specifically, certain Holders of Claims in such Classes shall receive their *Pro Rata* share of (1) 3.0% of the New Common Stock; (2) $5.0 million cash; (3) Tranche A Warrants to be issued under the Plan, and (4) Tranche B Warrants to be issued under the Plan. This consideration will be divided between the PBGC and Noteholders in the relative percentages of 33.9% and 66.1%, respectively. Assuming the Plan Effective Occurs, Holders of such Claims will receive the treatment provided under the Plan and will release or be prohibited from asserting any such claims against the Reorganized Debtors or their Non-Debtor Affiliates following the Plan Effective Date. In consideration for the distributions and other benefits provided pursuant to the Plan, the provisions of the Plan shall constitute a good faith compromise and settlement of the Declaratory Judgment Action and the PBGC Termination Liability Claim with respect to all Claims that the Noteholders and the PBGC may have against the Debtors and their non-Debtor Affiliates. The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromises and settlements with the Noteholders and the PBGC and the Bankruptcy Court's finding that such compromises and settlements are in the best interests of the Debtors, their estates, and the holders of such Claims and is fair, equitable, and reasonable. Absent the settlement, the Plan would be contested by the Committee, the Noteholders, and the PBGC, among other parties. Litigation would continue to ensue, engulfing these cases and recoveries to all creditors. The settlement resolves numerous complex issues that could have plagued these cases including but not limited to issues concerning valuation of the Company.

     (b)    Pursuant to Bankruptcy Code section 363 and Bankruptcy Rule 9019, the Debtors, with the consent of Requisite DIP Lenders, may compromise and settle various Claims (a) against them and (b) that they have against other Persons. The Debtors expressly reserve the right (with Bankruptcy Court approval, following appropriate notice and opportunity for a hearing) to compromise and settle Claims against them and claims that they may have against other Persons up to and including the Plan Effective Date. After the Plan Effective Date, such right shall pass to the Reorganized Debtors as contemplated in Section 10.1 of the Plan, without any need for Bankruptcy Court approval.

     4.    Release of Certain Parties

As of the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, the Debtors, the Reorganized Debtors and any Person seeking to exercise the rights of the Estates, including, without

limitation, any successor to the Debtors or any estate representative appointed or selected pursuant to Bankruptcy Code section 1123(b)(3) shall be deemed to forever release, waive, and discharge the Released Parties of all claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, and liabilities which the Debtors or the Estates are entitled to assert, whether known or unknown, liquidated or unliquidated, fixed or contingent, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in law, equity, or otherwise, based in whole or in part upon any act or omission, transaction, or occurrence taking place on or prior to the Plan Effective Date in any way relating to the Debtors, the Estates, the conduct of the Debtors' businesses, the Bankruptcy Cases, the Plan or the Reorganized Debtors with respect to each of the Released Parties; except for willful misconduct, gross negligence, intentional fraud, and/or criminal conduct. The Debtors do not believe that they hold any claims against the Released Parties notwithstanding the release provided pursuant to section 10.4 of the Plan.

     *5.*     *Releases by Holders of Claims*

***As of the Plan Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, each holder of a Claim that affirmatively votes in favor of the Plan hereby forever releases, waives, and discharges all claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action, and liabilities whatsoever against the Released Parties, arising under or in connection with or related to the Debtors, the Estates, the conduct of the Debtors' business, the Bankruptcy Cases, the DIP Financing Facility, the Plan (other than the rights under the Plan and the contracts, instruments, releases, indentures, and other agreements or documents delivered hereunder) or the Reorganized Debtors, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereunder arising, in law, equity, or otherwise, that are based in whole or part on any act, omission, transaction, event, or other occurrence taking place on or*** prior ***to the Plan Effective Date in any way relating to the Debtors, the Estates, the conduct of the Debtors' businesses, the Bankruptcy Cases, the Plan or the Reorganized Debtors except for willful misconduct, gross negligence, intentional fraud, and/or criminal conduct. Holders of claims or interests that are deemed to accept the Plan pursuant to section 5.2 of the Plan will not be bound this release of claims.*** The Debtors do not believe that holders of Claims hold any claims against the Released Parties notwithstanding the release provided pursuant to section 10.5 of the Plan.

     *6.*     *Setoffs*

Except with respect to Claims specifically Allowed under the Plan, the Debtors may, but shall not be required to, set off against any Claim, and the payments or other distributions to be made pursuant to the Plan in respect of such Claim, claims of any nature whatsoever that the Debtors may have against such Claimholder; but neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtors or the Reorganized Debtors of any such claim that the Debtors or the Reorganized Debtors may have against such Claimholder.

     *7.*     *Exculpation and Limitation of Liability*

***Except as otherwise specifically provided in the Plan, the Released Parties, the Debtors, and the Reorganized Debtors shall not have or incur, and are hereby released from, any claim, obligation, right, Cause of Action and liability to one*** another ***or to any Claimholder or Interestholder, or any other party-in-interest, or any of their respective agents, employees, representatives, financial advisors, investment bankers, attorneys or Affiliates, or any of their successors or assigns, for any act or omission in connection with, relating to, or arising out of (i) the filing and prosecution of the Bankruptcy Cases, (ii) the negotiation and filing of the Plan, (iii) the negotiation and execution of the DIP Financing Facility, (iv) the pursuit of confirmation of the Plan, (v) the negotiation and pursuit of approval of the Disclosure Statement, (vi) the consummation of the Plan, and (vii) the administration of the Plan or the property to be distributed under the Plan, and in all respects shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities under the Plan. Notwithstanding anything to the contrary contained herein, Section 10.7 of the Plan shall not release any party from any claim, obligation, right, Cause of Action or liability arising from any act or omission committed which constitutes willful misconduct, gross negligence, intentional fraud, and/or criminal conduct.***

8. *Indemnification Obligations*

Indemnification Obligations owed to any Director or Officer, whether pursuant to charter, bylaws, contract or otherwise, shall be deemed to be and shall be treated as though they are, executory contracts that are assumed pursuant to Bankruptcy Code section 365 under the Plan and shall continue in force with respect to the applicable Reorganized Debtor, and such Indemnification Obligations (subject to any defense thereto) shall survive confirmation of the Plan, irrespective of whether indemnification is owed in connection with a pre-Petition Date or post-Petition Date occurrence.

The Debtors or Reorganized Debtors, as the case may be, covenant to use commercially reasonable efforts to purchase and maintain D&O Insurance providing coverage to the Directors and Officers for a period of six years after the Plan Effective Date, insuring such parties in respect of any claims, demands, suits, Causes of Action, or proceedings against such Directors or Officers based upon any act or omission related to the service with, for, or on behalf of the Debtors or the Reorganized Debtors by such Directors or Officers in form, amount, cost and structure satisfactory to the Debtors and the Requisite DIP Lenders.

The Debtors or Reorganized Debtors covenant to use commercially reasonable efforts to purchase and maintain D&O Insurance providing coverage to the directors and officers of the Reorganized Debtors in form and substance satisfactory to the directors of the Reorganized Debtors.

9. *Injunction*

**The satisfaction, release, and discharge pursuant to <u>Article X</u> of the Plan shall also act as an injunction against any Person commencing or continuing any action, employment of process, or act to collect, offset, or recover any Claim or Cause of Action satisfied, released, or discharged under the Plan to the fullest extent authorized or provided by the Bankruptcy Code, including, without limitation, to the extent provided for or authorized by Bankruptcy Code sections 524 and 1141.**

10. *Plan Impact on Foreign Non-Debtor Subsidiaries' Guarantee of Notes*

Each Noteholder that has not (i) voted to reject the Plan and (ii) opted out of the release of the Non-Debtor Affiliates, has and shall be deemed to consent and agree to a full and complete release of any and all claims that such Noteholder has against the Non-Debtor Affiliates.

11. *Plan Impact on PBGC's Claims Against Non-Debtor Affiliates*

Upon the Plan Effective Date, the PBGC's Claims against the non-Debtor Affiliates shall be waived, released, and discharged in exchange for the treatment provided under the Plan. The Confirmation Order shall contain findings and decrees consistent with this release, waiver, and discharge of the PBGC Termination Liability Claim against the non-Debtor Affiliates as contemplated by in Plan section 10.11.

**J.      Miscellaneous Provisions**

1. *Binding Effect*

As of the Plan Effective Date, the Plan shall be binding upon and inure to the benefit of the Debtors, the Reorganized Debtors, all present and former Claimholders, all present and former Interestholders, other parties-in-interest and their respective heirs, successors, and assigns.

2. *Modification and Amendments*

The Debtors may alter, amend, or modify the Plan or any Exhibits thereto under Bankruptcy Code section 1127(a), in a form that is satisfactory to the Requisite DIP Lenders in their sole discretion, at any time prior to the Confirmation Hearing. After the Confirmation Date and prior to substantial consummation of the Plan as defined in Bankruptcy Code section 1101(2), the Debtors may, with the consent of the Requisite DIP Lenders in their sole discretion, under Bankruptcy Code section 1127(b), institute proceedings in the Bankruptcy Court to remedy any defect or omission or reconcile any inconsistencies in the Plan, the Disclosure Statement, or the Confirmation Order, and such matters as may be necessary to carry out the purposes and effects of the Plan.

3. *Withholding and Reporting Requirements*

In connection with the Plan and all instruments issued in connection therewith and distributions thereunder, the Debtors shall comply with all withholding and reporting requirements imposed by any federal, state, local, or foreign taxing authority, and all distributions hereunder shall be subject to any such withholding and reporting requirements.

4. *Allocation of Plan Distributions Between Principal and Interest*

To the extent that any Allowed Claim entitled to a distribution under the Plan is composed of indebtedness and accrued but unpaid interest thereon, such distribution shall, for United States federal income tax purposes, be allocated to the principal amount of the Claim first and then, to the extent the consideration exceeds the principal amount of the Claim, to accrued but unpaid interest.

5. *Creditors' Committee*

Effective on the Plan Effective Date, the Creditors' Committee shall dissolve automatically, whereupon its members, professionals, and agents shall be released from any further duties and responsibilities in the Bankruptcy Cases and under the Bankruptcy Code, except with respect to applications for Professional Claims. The professionals retained by the Creditors' Committee shall not be entitled to compensation and reimbursement of expenses for services rendered after the Plan Effective Date, except for services rendered in connection with (a) the implementation of the transactions contemplated to occur on the Plan Effective Date hereunder and (b) applications for allowance of compensation and reimbursement of expenses pending on the Plan Effective Date or filed after the Plan Effective Date pursuant to Section 9.1 of the Plan.

6. *Payment of Statutory Fees*

All fees payable pursuant to section 1930 of title 28 of the United States Code, as of the entry of the Confirmation Order as determined by the Bankruptcy Court at the Confirmation hearing, shall be paid on the Plan Effective Date. The Reorganized Debtors will continue to pay fees pursuant to section 1930 of title 28 of the United States Code as required by that section.

7. *Revocation, Withdrawal, or Non-Consummation*

***Right to Revoke or Withdraw.*** Each Debtor reserves the right to revoke or withdraw the Plan at any time prior to the first day of the Confirmation Hearing. Each Debtor may, with the consent of the Requisite DIP Lenders, revoke or withdraw the Plan at any time prior to the Plan Effective Date.

***Effect of Withdrawal, Revocation, or Non-Consummation.*** If the Debtors revoke or withdraw the Plan pursuant to Section 13.7 of the Plan prior to the Plan Effective Date, or if the Confirmation Date or the Plan Effective Date does not occur on or before November 12, 2009, then the Plan, any settlement, or compromise embodied in the Plan (including the fixing or limiting to an amount certain any Claim or Interest or Class of Claims or Interests), the assumption or rejection of executory contracts or unexpired leases effected by the Plan, and any document or agreement executed pursuant to the Plan shall be null and void. In such event, nothing contained herein, and no acts taken in preparation for consummation of the Plan, shall be deemed to constitute a waiver or release of any Claims by or against or Interests in the Debtors or any other Person, to prejudice in any manner the rights of the Debtors or any other Person in any further proceedings involving the Debtors, or to constitute an admission of any sort by the Debtors or any other Person.

8. *Term of Injunctions or Stays*

Unless otherwise provided herein or in the Confirmation Order, all injunctions or stays provided for in the Bankruptcy Cases under Bankruptcy Code sections 105 or 362 or otherwise, and extant on the Confirmation Date, shall remain in full force and effect until the Plan Effective Date.

9. *Governing Law*

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) or unless otherwise specifically stated herein or in the relevant governing agreement, document or instrument, the laws of the State of Delaware (except those provisions that would require the application of the law of a different jurisdiction) shall govern the construction and implementation of the Plan, any agreements, documents, and instruments executed in connection with the Plan.

10. *Waiver and Estoppel*

Each Claimholder or Interestholder shall be deemed to have waived any right to assert that its Claim or Interest should be Allowed in a certain amount, in a certain priority, secured or not subordinated by virtue of an agreement made with the Debtors and/or their counsel, the Creditors' Committee and/or its counsel, or any other Person, if such agreement was not disclosed in the Plan, the Disclosure Statement, or papers filed with the Bankruptcy Court prior to the Confirmation Date.

## IX.  CERTAIN FACTORS TO BE CONSIDERED

The holder of a Claim against the Debtors should read and carefully consider the following factors, as well as the other information set forth in this Disclosure Statement (and the documents delivered together herewith and/or incorporated by reference herein), before deciding whether to vote to accept or to reject the Plan.

### A.  General Considerations

The formulation of a reorganization plan is the principal purpose of a chapter 11 case.  The Plan sets forth the means for satisfying the holders of Claims against and Interests in the Debtors.  Certain Claims may receive partial distributions pursuant to the Plan, and in some instances, no distributions at all.  The recapitalization of the Debtors realizes the going concern value of the Debtors for their Claimholders.  Moreover, reorganization of the Debtors' business and operations under the proposed Plan also avoids the potentially adverse impact of a liquidation on the Debtors' employees, and many of its customers, trade vendors, suppliers of goods and services, and lessors.

### B.  Potential Events of Default Under DIP Financing Facility

The Debtors' DIP Financing Facility contains numerous covenants and events of default.  If the Debtors fail to comply with the covenants, or are otherwise in default of the DIP Credit Agreement, the DIP Lenders have the right to accelerate the total amount due under the DIP Financing Facility (including the Senior Roll-Up Loans) and require the immediate payment in full in cash of such amounts. Following such a demand, if the Debtors were unable to secure alternative financing on an immediate basis to repay the DIP Financing Facility Claims, the DIP Lenders would have the right, subject to the terms of the DIP Financing Facility Order, to foreclose upon the assets of the Debtors.

### C.  Failure to Obtain Release of Guarantees by Foreign Subsidiaries

As described herein, the Notes are fully and unconditionally guaranteed on a senior unsecured basis by certain of the non-Debtor foreign subsidiaries (the "Foreign Guarantees").  A condition to consummation of the Plan, as described in Article XII.G.2.d herein, is the release or disposition of the Foreign Guarantees in a manner acceptable to the Requisite DIP Lenders in their sole discretion.  Absent the consensual resolution of the Foreign Guarantees with the indenture trustee for the Notes in a manner acceptable to the Requisite DIP Lenders, the Debtors will proceed with Noteholder Litigation described in Article VII herein.  Litigation is inherently uncertain and the Debtors cannot be certain that they will prevail in the Noteholder Litigation.  Moreover, the Debtors cannot be certain that a court will enter an order in a form acceptable to the Requisite DIP Lenders.  Any protracted appeal by the Noteholders could further delay consummation of the Plan and jeopardize the Debtors' reorganization.

### D.  Failure to Compromise OPEB and Pension Plan Liabilities

As set forth herein, the Debtors will attempt to reduce their Pension Plan and OPEB obligations during the Bankruptcy Cases.  The Debtors' financial projections were prepared assuming a significant reduction of their Pension Plan and OPEB liabilities.  The projections demonstrate that the Debtors will need further financial

reorganization unless their Pension Plan and OPEB liabilities are reduced significantly. Additionally, resolution of these liabilities is a condition to consummation of the Plan. Further, the valuation of the Debtors (as discussed in Section XII herein and Appendix F) assumes no Pension Plan or OPEB liabilities for the Reorganized Company. To the extent such obligations are not compromised, there could be a material impact of the value of the Reorganized Company. Additionally, such Pension Plan and OPEB liabilities must be resolved in a manner satisfactory to the Requisite DIP Lenders in their sole discretion. If the Debtors are unable to resolve these liabilities consensually with union representatives and the PBGC, they will seek authority under the Bankruptcy Code to achieve such a reduction. Litigation is inherently uncertain and the Debtors cannot be certain that they will prevail in reducing their Pension Plan and OPEB obligations in a manner satisfactory to the Requisite DIP Lenders. Thus, it is possible that the Debtors will be unable to consummate the Plan. Protracted litigation with the PBGC and/or their labor unions could jeopardize the Debtors' reorganization.

**E.      Failure to Confirm the Plan**

Even if all Impaired voting classes vote in favor of the Plan and, with respect to any Impaired Class deemed to have rejected the Plan, the requirements for "cramdown" are met, the Bankruptcy Court, which is a court of equity may exercise substantial discretion and may still choose not to confirm the Plan. Section 1129 of the Bankruptcy Code requires, among other things, a showing that confirmation of the Plan will not be followed by liquidation or the need for further financial reorganization of the Debtors and that the value of distributions to dissenting holders of Claims may not be less than the value such holders would receive if the Debtors were liquidated under Chapter 7 of the Bankruptcy Code. Although the Debtors believe that the Plan will meet such tests (See Section XIII of this Disclosure Statement, entitled "Feasibility of the Plan and the "Best Interests" Test"), there can be no assurance that the Bankruptcy Court will reach the same conclusions.

**F.      Failure to Consummate the Plan**

The Plan provides for certain conditions that must be fulfilled prior to consummation of the Plan and the Plan Effective Date, including, but not limited to, the Debtors obtaining, entering into and borrowing under the Exit Credit Facility in order to obtain the funds necessary to repay the DIP Facility Claims, make other payments required to be made on the Plan Effective Date, and conduct their post-reorganization operations. There can be no assurance that any or all of the conditions in the Plan will be met (or waived) or that the other conditions to consummation, if any, will be satisfied. Accordingly, even if the Plan is confirmed by the Bankruptcy Court, there can be no assurance that the Plan will be consummated and the restructuring completed.

If the Plan is not confirmed and consummated, there can be no assurance that the Bankruptcy Cases will continue rather than be converted to a liquidation, or that any alternative plan of reorganization would be on terms as favorable to the Claimholders as the terms of the Plan. If a liquidation or protracted reorganization were to occur, there is a risk that there would be little, if any, value available for distribution to the holders of Claims. See Appendix E attached to this Disclosure Statement for a liquidation analysis.

**G.      Changed Circumstances**

The Debtors have proposed the Plan because they believe it represents the best available opportunity to reasonably maximize value and, thus, recoveries for all stakeholders based on the facts and circumstances existing as of the date hereof. Until the Plan is confirmed and consummated, however, the Debtors, subject to certain conditions, may modify (and if necessary resolicit) the Plan or withdraw the Plan and propose and solicit different reorganization plans if the current circumstances change and cause the Debtors to determine, in their discretion, that the Plan no longer represents the best available reasonable opportunity to maximize value for their stakeholders. Before determining to propose the current Plan, the Debtors evaluated various other alternatives, including, but not limited to, a liquidation of the Debtors, a sale of all or substantially all of the Debtors' assets, and possible transactions with third parties. During the Bankruptcy Cases, the Debtors have received, and may continue to receive, certain indications of interest from different parties with respect to potential transactions of varying magnitudes, certain of which potentially could be alternatives to the current Plan. The Debtors have reviewed all such pending matters and have determined that, when considering the totality of the circumstances as of the date hereof, no such alternative currently represents a better reasonable opportunity to maximize value for the Debtors' stakeholders than the Plan. Until the Plan is confirmed and consummated, however, circumstances could change and the Debtors may be required to re-consider or consider anew any such alternatives, particularly if the Debtors

determine that any such alternative presents a better reasonable opportunity to maximize value and recoveries for the Debtors' stakeholders.

**H.  Material United States Federal Income Tax Considerations**

**THERE ARE A NUMBER OF MATERIAL UNITED STATES FEDERAL INCOME TAX CONSIDERATIONS, RISKS AND UNCERTAINTIES ASSOCIATED WITH CONSUMMATION OF THE PLAN. INTERESTED PARTIES SHOULD READ CAREFULLY THE DISCUSSION SET FORTH IN SECTION XI OF THIS DISCLOSURE STATEMENT, ENTITLED "MATERIAL UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN," FOR A DISCUSSION OF THE MATERIAL UNITED STATES FEDERAL INCOME TAX CONSEQUENCES AND RISKS FOR THE DEBTORS AND FOR U.S. HOLDERS OF CLAIMS THAT ARE ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN RESULTING FROM THE TRANSACTIONS OCCURRING IN CONNECTION WITH THE PLAN.**

**I.  Inherent Uncertainty of Financial Projections**

The *pro forma* Projections attached as <u>Appendix D</u> to this Disclosure Statement cover the Debtors' operations through fiscal 2013. These Projections are based on numerous assumptions including the timing, confirmation and consummation of the Plan in accordance with its terms, the anticipated future performance of Reorganized Debtors, the availability and terms of new financing, industry performance, general business and economic conditions and other matters, many of which are beyond the control of Reorganized Debtors and some or all of which may not materialize. In addition, unanticipated events and circumstances occurring subsequent to the date that this Disclosure Statement was approved by the Bankruptcy Court may affect the actual financial results of the Reorganized Debtors' operations. These variations may be material and may adversely affect the ability of Reorganized Debtors to make payments with respect to post-Plan Effective Date indebtedness. Because the actual results achieved throughout the periods covered by the Projections may vary from the projected results, the Projections should not be relied upon as a guaranty, representation or other assurance of the actual results that will occur.

Except with respect to the Projections and except as otherwise specifically and expressly stated herein, this Disclosure Statement does not reflect any events that may occur subsequent to the date hereof and that may have a material impact on the information contained in this Disclosure Statement. Neither the Debtors nor the Reorganized Debtors intend to update the Projections; thus, the Projections will not reflect the impact of any subsequent events not already accounted for in the assumptions underlying the Projections.

**J.  Unpredictability of Automotive Industry**

The Company's principal operations are directly related to domestic and foreign automotive, commercial highway vehicle and heavy duty production. Industry sales and production are cyclical in nature, difficult to predict and can be affected by numerous factors, including, but not limited to, the strength of the economy generally, consumer spending or, in specific regions such as North America or Europe, by prevailing interest rates and by other factors which may have an effect on the level of the Company's sales. The Projections assume certain automotive sales and production levels and economic conditions that ultimately may not occur. Any decline in demand for new automobiles, particularly in the United States, could have a material adverse impact on the Company's performance and financial condition and could adversely impact the results of operations.

**K.  Dividends**

The Reorganized Debtors do not anticipate that dividends will be paid with respect to the New Common Stock in the near term.

**L.  Access to Financing**

The Debtors' operations are dependent on the availability of working capital financing and may be adversely affected by any shortage or increased cost of such financing. The Debtors' postpetition operations are financed from operating cash flow and borrowings pursuant to the DIP Credit Agreement, as well as borrowings

under certain foreign credit lines by the Debtors' foreign non-Debtor subsidiaries. The Debtors believe that substantially all of their needs for funds necessary to consummate the Plan and for post-Plan Effective Date working capital financing will be met by projected operating cash flow and the Exit Credit Facility. There can be no assurance that the Debtors will be successful in consummating the Exit Credit Facility. Moreover, if the Debtors or Reorganized Debtors require working capital greater than that provided by the Exit Credit Facility, they may be required either to (a) seek to increase the availability under the Exit Credit Facility, (b) obtain other sources of financing, or (c) curtail their operations. The Debtors believe that the recapitalization to be accomplished through the Plan will facilitate the ability to obtain additional or replacement working capital financing. No assurance can be given, however, that any additional replacement financing will be available on terms that are favorable or acceptable to the Debtors or the Reorganized Debtors.

**M.      Dependence on Major Customers**

The loss of any major customers could affect the financial health of the Company. In fiscal 2008, the Company's most significant customers were Ford and General Motors, which accounted for approximately 29% of its fiscal 2008 net sales on a worldwide basis, while sales to these customers in the United States accounted for approximately 10% of total sales in fiscal 2008. In addition, the Company's five largest customers (Ford, General Motors, Volkswagen, Toyota, and Renault-Nissan) and their subsidiaries accounted for approximately 54% of the Company's global sales in fiscal 2008. The Company has been a supplier of these companies for many years, and continually engages in efforts to improve and expand relations with each of its customers. Management cannot guarantee that the Company will maintain or improve these relationships or that the Company will continue to supply these customers at current levels. The loss of a significant portion of sales to the Company's largest customers could have a material adverse effect on the Company and its financial performance. In addition, certain of the Company's customers are currently facing significant financial challenges. General Motors and Chrysler have recently filed for bankruptcy protection and others may do so in the future. The bankruptcy filings could result in adverse changes in these customers' production levels, pricing, and payment terms and could limit the Company's ability to collect receivables, which could harm the Company's business or results of operations.

The Debtors believe that relationships with their customers will be maintained if the Bankruptcy Cases proceed as proposed in the Plan and discussed herein. However, if there is a protracted chapter 11 process, the Debtors believe their relationships with their customers likely would be adversely impacted and the Debtors' operations likely would be materially affected. Weakened operating results could adversely affect the Debtors' ability to complete solicitation of acceptances of the Plan or, if such solicitation is successfully completed, to obtain confirmation of the Plan. In the event that the Debtors fail to confirm the Plan, the risks associated with a protracted chapter 11 process or liquidation must also be considered.

**N.      Leverage; Ability to Service Indebtedness**

The Reorganized Debtors will have material levels of debt subsequent to emergence from the Bankruptcy Cases due to the Exit Credit Facility and post-Plan Effective Date secured indebtedness owed to the DIP Lenders. The Reorganized Debtors also may incur additional indebtedness in the future. The degree to which the Reorganized Debtors will be leveraged could have important consequences, including, but not limited to, the following: (i) a substantial portion of the Reorganized Debtors' cash flow from operations will be required to be for debt service and will not be available to the Reorganized Debtors for their operations, (ii) the Reorganized Debtors' ability to obtain additional financing in the future for acquisitions, capital expenditures, working capital or general corporate purposes could be limited, and (iii) the Reorganized Debtors could have increased vulnerability to adverse general economic and industry conditions. The Reorganized Debtors' ability to make scheduled payments of principal of, to pay interest on, or to refinance their indebtedness depends on their future performance and financial results, which, to a certain extent, are subject to general economic, financial, competitive, legislative, regulatory and other factors beyond the Reorganized Debtors' control. There can be no assurance that the Reorganized Debtors' businesses will generate sufficient cash flow from operations or that future working capital borrowings will be available in an amount sufficient to enable the Reorganized Debtors to service their indebtedness or to make necessary capital expenditures. Furthermore, a substantial portion of the Reorganized Debtors' cash flows are expected to be generated by the Company's non-U.S. subsidiaries. The Reorganized Debtors' ability to repatriate these cash flows in a tax efficient manner is uncertain.

**O.      Restrictions Imposed by Indebtedness**

The Exit Credit Facility is expected to contain certain restrictive covenants that may limit the Reorganized Debtors' ability to, among other things, incur additional indebtedness, issue debt and/or preferred stock, pay dividends or make other restricted payments, sell assets, enter into transactions with certain affiliates, create liens or enter into sale and leaseback transactions.  In addition, the Reorganized Debtors may be required to satisfy certain financial covenants under the Exit Credit Facility which may include, among other things, minimum financial performance thresholds as well as minimum coverage and maximum leverage ratios.  The ability of the Reorganized Debtors to comply with any of the foregoing provisions may be affected by events beyond the Reorganized Debtors' control.  The breach of any of these covenants could result in a default under the New Credit Facility, which may result in amounts borrowed under the Exit Credit Facility being declared due and payable.

**P.      Lack of Trading Market**

Immediately following the Plan Effective Date, Reorganized Hayes will be a private company that will not be required to file reports, proxy statements or other information with the SEC and the New Securities will not be listed or traded on any stock exchange nor will quotes for the New Securities be available on any other quotation system.  Thus, it is not known whether or when markets for any of such New Securities will ever develop.  The Debtors do not intend to register the New Securities under the Exchange Act.  There can be no assurance that the Reorganized Debtors will be successful or that any trading market will exist for the New Securities following consummation of the Plan.  Accordingly, a holder of the New Securities could find it difficult to dispose of, or to obtain accurate quotations as to the market value of such securities, following the consummation of the Plan.

The New Securities will be distributed pursuant to the Plan without registration under the Securities Act of 1933 and without qualification or registration under state securities laws, pursuant to exemptions from such registration and qualification contained  Bankruptcy Code section 1145(a).  With respect to certain Persons who receive such New Securities pursuant to the Plan, these Bankruptcy Code exemptions apply only to the distribution of the New Securities under the Plan and not to any subsequent sale, exchange, transfer or other disposition of the New Securities by such Persons.  Therefore, "subsequent sales, exchanges, transfers or other dispositions" of the New Common Stock by "underwriters" or "issuers" would not be exempted by Bankruptcy Code section 1145 from registration under the Securities Act of 1933 or state securities laws.  Such holders of New Common Stock will be able to sell their New Common Stock only if a registration statement relating to such New Common Stock is then in effect, or if such transaction is exempt from the registration requirements of the Securities Act of 1933, and the New Common Stock are qualified for sale or exempt from qualification under the applicable securities laws of the states in which the purchaser of such shares resides.

**Q.      Claims Estimations**

There can be no assurance that the estimated Claim amounts set forth herein are correct, and the actual allowed amounts of Claims may differ from the estimates.  The estimated amounts are subject to certain risks, uncertainties and assumptions.  Should one or more of these risks or uncertainties materialize, or should underlying assumptions prove incorrect, the actual allowed amounts of Claims may vary from those estimated herein.

**R.      Litigation**

The Reorganized Debtors will be subject to various claims and legal actions arising in the ordinary course of their businesses.  The Debtors are not able to predict the nature and extent of any such claims and actions and cannot guarantee that the ultimate resolution of such claims and actions will not have a material adverse effect on the Reorganized Debtors.

**S.      Reliance on Key Personnel**

One of the Debtors' primary assets is their highly skilled personnel, who have the ability to leave the Debtors and so deprive them of the skill and knowledge essential for performance of existing and new business. The Debtors' business is highly dependent on their customers' belief that the Debtors will produce products of the highest quality over an extended period of time.  Deterioration of the Debtors' businesses, or the loss of a significant

number of key personnel, will have a material adverse effect on the Debtors and may threaten their ability to survive as going concerns.

**T.      Turmoil in Financial Markets**

The recent unprecedented deterioration in the global economy, global credit markets and the financial services industry has severely and negatively affected the automotive and U.S. housing industries, and, as a result, the Company's business, financial position and liquidity.  The current economic crisis arising out of the subprime mortgage market collapse and the resulting worldwide financial industry turmoil has resulted in a severe and global tightening of credit and a liquidity crisis.  As a result, nearly every major economy in the world now faces a widespread reduction of business activity, seized-up credit markets and increased unemployment.  The recent unprecedented deterioration in global and U.S. economic conditions, the current downturn in the automotive and U.S. housing industries and the business condition of the Company's major customers has already negatively affected the Company's revenues, profitability, operating results and cash flow, and the continuation or worsening of these industry conditions would exacerbate these effects and may make it necessary for the Company to take further restructuring actions and charges.

# X.      RESALE OF SECURITIES RECEIVED UNDER THE PLAN

**A.      Issuance of New Securities**

Bankruptcy Code section 1145(a)(1) exempts the offer and sale of securities under a plan of reorganization from registration under section 5 of the Securities Act of 1933 (the "Securities Act") and state laws if three principal requirements are satisfied:  (a) the securities must be offered and sold under a plan of reorganization and must be securities of the debtor, of an affiliate participating in joint plan with the debtor, or of a successor to the debtor under the plan; (b) the recipients of the securities must hold prepetition or administrative expense claims against the debtor or interests in the debtor; and (c) the securities must be issued entirely in exchange for the recipient's claim against or interest in the debtor, or principally in exchange for such claims or interests and partly for cash or property.  The Debtors believe that the offer and sale of the New Common Stock satisfies the requirements of section 1145(a)(1) of the Bankruptcy Code and is, therefore, exempt from registration under the Securities Act and state securities laws.

**B.      Subsequent Transfers of New Securities**

The New Common Stock to be issued pursuant to the Plan may be freely transferred by most recipients following initial issuance under the Plan, and all resales and subsequent transactions in the New Common Stock are exempt from registration under federal and state securities laws, unless the holder is an "underwriter" with respect to such securities.  Bankruptcy Code section 1145(b) defines four types of "underwriters":

(1)      persons who purchase a claim against, an interest in, or a claim for an administrative expense against the debtor with a view to distributing any security received in exchange for such a claim or interest;

(2)      persons who offer to sell securities offered under a plan for the holders of such securities;

(3)      persons who offer to buy such securities from the holders of such securities, if the offer to buy is:

(a)      with a view to distributing such securities; and

(b)      under an agreement made in connection with the plan, the consummation of the plan, or with the offer or sale of securities under the plan; or

(4)      a person who is an "issuer" with respect to the securities, as the term "issuer" is defined in section 2(11) of the Securities Act.

Under section 2(11) of the Securities Act, an "issuer" includes any person directly or indirectly controlling or controlled by the issuer, or any person under direct or indirect common control of the issuer.

To the extent that Persons who receive the New Common Stock pursuant to the Plan are deemed to be "underwriters," resales by such persons would not be exempted by Bankruptcy Code section 1145 from registration under the Securities Act or other applicable law. Persons deemed to be underwriters would, however, be permitted to sell the New Common Stock without registration pursuant to the provisions of Rule 144 under the Securities Act. These rules permit the public sale of securities received by "underwriters" if current information regarding the issuer is publicly available and if volume limitations and certain other conditions are met.

Whether or not any particular person would be deemed to be an "underwriter" with respect to the New Common Stock to be issued pursuant to the Plan would depend upon various facts and circumstances applicable to that person. Accordingly, the Debtors express no view as to whether any particular Person receiving the New Common Stock under the Plan would be an "underwriter" with respect to such New Common Stock.

Given the complex and subjective nature of the question of whether a particular holder may be an underwriter, the Debtors make no representation concerning the right of any person to trade in the New Common Stock. The Debtors recommend that potential recipients of the New Common Stock consult their own counsel concerning whether they may freely trade the New Common Stock without compliance with the Securities Act or the Securities Exchange Act of 1934 (the "Exchange Act").

## XI.  MATERIAL UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

The following discussion summarizes the material United States federal income tax consequences of the Plan to the Debtors and to certain Claimholders. This description is for informational purposes only and, due to a lack of definitive judicial or administrative authority or interpretation, substantial uncertainties exist with respect to various tax consequences of the Plan as discussed herein. Generally, only the principal consequences of the Plan for the Debtors and for Claimholders who are entitled to vote to accept or reject the Plan are described below. No opinion of counsel has been sought or obtained with respect to any tax consequences of the Plan. No rulings or determinations of the Internal Revenue Service (the "IRS") or any other tax authorities have been or will be sought or obtained with respect to the tax consequences of the Plan, and the discussion below is not binding upon the IRS or such other authorities. The Debtors are not making any representations regarding the particular tax consequences of the confirmation or implementation of the Plan as to any Claimholder. No assurance can be given that the IRS would not assert, or that a court would not sustain, a different position from any discussed herein.

The discussion of material United States federal income tax consequences below is based upon the Internal Revenue Code of 1986, as amended (the "IRC"), the Treasury regulations (including temporary regulations) promulgated and proposed thereunder, judicial authorities, published opinions of the IRS and other applicable authorities, all as in effect on the date hereof and all of which are subject to change (possibly with retroactive effect) by legislation, administrative action or judicial decision. The following discussion does not address foreign, state or local tax consequences of the Plan, nor does it purport to address the United States federal income tax consequences of the Plan to special classes of taxpayers (e.g., banks and certain other financial institutions, insurance companies, tax-exempt organizations, Claimholders that are, or hold their Claims through, pass-through entities, persons whose functional currency is not the United States dollar, and dealers in securities). The following discussion assumes that Claimholders hold their Claims as capital assets for United States federal income tax purposes. Furthermore, the following discussion does not address United States federal taxes other than income taxes.

For purposes of this discussion, a "U.S. person" is any of the following:

- an individual who is a citizen or resident of the United States;

- a corporation or partnership created or organized under the laws of the United States or any state or political subdivision thereof;

- an estate, the income of which is subject to United States federal income taxation regardless of its source; or

- a trust that (a) is subject to the primary supervision of a United States court and which has one or more United States fiduciaries who have the authority to control all substantial decisions of

the trust, or (b) has a valid election in effect under applicable United States Treasury regulations to be treated as a U.S. person.

As used herein, the term "U.S. Holder" means a Claimholder that is a U.S. person, and the term "Non-U.S. Holder" means a person other than a U.S. person.

**Each Claimholder is strongly urged to consult its own tax advisor regarding the United States federal, state, local and any foreign tax consequences of the transactions described herein or in the Plan.**

**IRS CIRCULAR 230 NOTICE: TO ENSURE COMPLIANCE WITH IRS CIRCULAR 230, HOLDERS OF CLAIMS OR INTERESTS ARE HEREBY NOTIFIED THAT: (I) ANY DISCUSSION OF FEDERAL TAX ISSUES CONTAINED OR REFERRED TO IN THIS DISCLOSURE STATEMENT IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, BY HOLDERS OF CLAIMS OR INTERESTS FOR THE PURPOSE OF AVOIDING PENALTIES THAT MAY BE IMPOSED ON THEM UNDER THE IRC, (II) SUCH DISCUSSION IS WRITTEN IN CONNECTION WITH THE PROMOTION OR MARKETING OF THE TRANSACTIONS OR MATTERS DISCUSSED HEREIN, AND (III) HOLDERS OF CLAIMS OR INTERESTS SHOULD SEEK ADVICE BASED ON THEIR PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.**

## A. Certain U.S. Federal Income Tax Consequences to the Debtors

As described in <u>Section VIII</u> herein, several alternative structures for the post-emergence capital structure of the Debtors are being explored. Under certain of the alternative structures, one or more newly organized entities would acquire the Debtors, or the assets of the Debtors. Other alternative structures involve the Debtors entering into certain transactions prior to the Plan Effective Date in order to modify the overall corporate structure of the Debtors and/or otherwise structure their businesses for corporate or operational reasons. Accordingly, the following discussion will begin with a description of certain U.S. federal income tax consequences of the Plan to the Debtors under the anticipated structure for the reorganization of the Debtors, and then will briefly describe certain U.S. federal income tax considerations that may be applicable with respect to an alternative taxable transaction.

### 1. Cancellation of Indebtedness Income

Under general U.S. federal income tax principles, each Debtor will realize cancellation of indebtedness ("COD") income to the extent that its obligation to a Claimholder is discharged pursuant to the Plan for an amount that is less than the adjusted issue price of such Claimholder's Claim (in most cases, the adjusted issue price of a Claim equals the amount that a Debtor received upon incurring the obligation, with certain adjustments). For this purpose, the amount paid to a Claimholder in discharge of its Claim generally will equal the sum of the amount of Cash paid to such Claimholder, the "issue price" of any debt issued to such Claimholder, and the fair market value of any other property paid to such Claimholder.

The Debtors expect to realize a substantial amount of COD income as a result of the discharge of obligations pursuant to the Plan. However, because each Debtor will be a debtor in a bankruptcy case at the time it realizes COD income, the Debtors will not be required to include such COD income in their gross income for U.S. federal income tax purposes, but rather will be required to reduce certain of their respective U.S. federal income tax attributes by the amounts of COD income so excluded. The excluded COD income is expected to result in a substantial reduction of the Debtors' net operating losses ("NOLs") and NOL carryovers, and of certain other U.S. federal income tax attributes of the Debtors, including basis in assets.

### 2. Utilization of NOLs

Under IRC section 382, generally when there is a more than fifty percent owner shift of a corporation during a three year testing period (an "ownership change"), the ability of the corporation to utilize its NOL carryovers and certain subsequently recognized built-in losses to offset post-ownership change taxable income may be subject to an annual limitation. The Debtors have been attempting to monitor whether the corporation has undergone an ownership change that would affect its ability to utilize their NOL carryovers. While the matter is not free from doubt, due in part to the limited availability of information to the Debtors, the Debtors anticipate taking the position that there had been no ownership change as of the Petition Date.

The issuance of New Common Stock pursuant to the Plan will constitute an ownership change. Although certain special rules applicable to ownership changes in bankruptcy may substantially increase the amount of the annual IRC section 382 limitation over that otherwise applicable outside bankruptcy, the Debtors' utilization of any NOL carryovers or other tax attributes (including deductions attributable to realized built-in losses) remaining after implementation of the Plan may still be substantially limited after an ownership change. Such a limitation would be in addition to any prior NOL limitation described in the prior paragraph that may apply.

### 3. Applicable High Yield Discount Obligations

If a debt instrument is considered to be an applicable high yield discount obligation ("AHYDO"), the issuing corporation is disallowed a deduction with respect to a portion of the original issue discount ("OID") on that debt instrument, and no deduction is allowable for the remaining amounts until such OID is actually paid. A debt instrument is considered to be an AHYDO instrument if its maturity date is more than five years from the date of issuance, the yield-to-maturity is greater than or equal to five percentage points higher than the AFR, and the instrument has significant OID. It is possible, if the DIP Lenders New Money Distribution Property has a maturity date that is more than five years from the issue date, that the DIP Lenders New Money Distribution Property will be considered AHYDO instruments for purposes of U.S. federal income tax law. If this were the case, the Debtors would be denied a portion of the deductions for OID paid on the DIP Lenders New Money Distribution Property, and would be required to deduct the remaining portion of such amounts only as and when it is paid.

### 4. Alternative Minimum Tax

A corporation may incur alternative minimum tax liability even in the case that NOL carryovers and other U.S. federal income tax attributes are sufficient to eliminate its taxable income as computed under the regular corporate income tax. It is possible that the Debtors may be liable for the alternate minimum tax with respect to taxable years beginning after the Effective Date.

### 5. Alternative Taxable Structure

If the reorganization of the Debtors were to be consummated pursuant to an alternative taxable structure, the Debtors would recognize gain or loss for U.S. federal income tax purposes in an amount equal to the difference between the fair market value of their assets and their adjusted tax basis in such assets. It is expected that any gain recognized would be sheltered by the Debtors' NOLs, however, there could be taxes other than federal income taxes payable in connection with such an alternative structure. If an alternative structure is treated as a taxable asset transfer, the entities that would acquire the Debtors' assets (or would be treated as acquiring such assets for U.S. federal income tax purposes) would generally obtain an aggregate tax basis in such assets that is equal to their fair market value, and such entities would generally not succeed to any tax attributes of the Debtors. This would result in a significant reduction in the tax basis of the Debtors' assets, which would result in a corresponding reduction in depreciation and amortization deductions of those assets for U.S. federal income tax purposes after the Effective Date. Accordingly, such reduction would result in a corresponding increase in taxable income to the Debtors, and could result in an increase in the U.S. federal income tax payable by the Debtors in such years.

## B. Certain U.S. Federal Income Tax Consequences to Claimholders

The U.S. federal income tax consequences of the transactions contemplated by the Plan to Claimholders that are U.S. Holders and Non-U.S. Holders generally will be as described below. These consequences (including the character, timing and amount of income, gain or loss recognized) will depend upon, among other things: (i) the manner in which a Claimholder acquired a Claim; (ii) the length of time the Claim has been held; (iii) the Claimholder's method of tax accounting; (iv) whether the Claimholder has taken a bad debt deduction with respect to the Claim (or any portion of the Claim) in the current or prior taxable years; (v) whether the Claim was acquired at a discount; (vi) whether the Claimholder has previously included in its taxable income accrued but unpaid interest with respect to the Claim; (vii) whether the Claim is an installment obligation for U.S. federal income tax purposes; (viii) whether the Claim constitutes a "security" for U.S. federal income tax purposes; and (ix) whether the Claim constitutes a "United States real property interest" for U.S. federal income tax purposes. Therefore, each Claimholder is strongly urged to consult its own tax advisor regarding information that may be relevant to its particular situation and circumstances and the tax consequences to it of the transactions contemplated by the Plan.

The U.S. federal income tax consequences to Claimholders that are U.S. Holders and Non-U.S. Holders may depend upon the manner in which the reorganization of the Debtors is consummated. As described in <u>Section VIII</u> herein, several alternative structures for the post-emergence capital structure of the Debtors are being explored. Under certain of the alternative structures, one or more newly organized entities would acquire the Debtors, or the assets of the Debtors, in a taxable transaction. Other alternative structures involve the Debtors entering into certain transactions prior to the Plan Effective Date in order to modify the overall corporate structure of the Debtors and/or otherwise structure their businesses for corporate or operational reasons. Accordingly, the following discussion will describe certain U.S. federal income tax consequences to U.S. Holders and Non-U.S. Holders under the anticipated structure for the reorganization of the Debtors and, where applicable will briefly describe tax consequences of an alternative taxable structure.

1.    *Claimholders of Prepetition Secured Obligations Who Are Not DIP Lenders*

    (a)    U.S. Holders

        (i)    Receipt of New Common Stock

The receipt by a U.S. Holder of a Prepetition Secured Obligation who is not a DIP Lender of New Common Stock should be treated as a taxable transaction for U.S. federal income tax purposes. As a result, except as described in the next sentence, such a U.S. Holder who is not a DIP Lender generally should recognize capital gain or loss for U.S. federal income tax purposes in an amount equal to the difference between (i) the fair market value, on the Effective Date, of the New Common Stock and (ii) such U.S. Holder's adjusted tax basis in its Prepetition Secured Obligation. A U.S. Holder should, however, recognize ordinary income to the extent it receives such consideration in respect of accrued interest or accrued market discount that has not already been included in the U.S. Holder's gross income for U.S. federal income tax purposes. Any capital gain or loss recognized will be long-term capital gain or loss if the U.S. Holder's holding period with respect to its Prepetition Secured Obligation is more than one (1) year on the Effective Date. The deductibility of capital loss is subject to limitations.

A U.S. Holder of a Prepetition Secured Obligation who is not a DIP Lender's tax basis in its New Common Stock received pursuant to the Plan generally should be equal to the fair market value of such New Common Stock on the Effective Date. The holding period with respect to such New Common Stock will begin on the day following the Effective Date.

The IRS may take the position that some portion of the total consideration paid to the U.S. Holders of Prepetition Secured Obligation who are not DIP Lenders should not be treated as part of the exchange, but should instead be treated as a separate payment in the nature of compensation for such U.S. Holder's consent to the Plan. To the extent that any portion of the consideration is so treated, that portion will not be taken into account in determining the consequences of the exchange to such U.S. Holder, as described above, but would instead be taxable to such U.S. Holder as ordinary income.

If the reorganization of the Debtors were to be consummated pursuant to an alternative taxable structure, the Debtors, or the assets of the Debtors, would be acquired by one or more newly organized entities. In such a case, the taxation of a U.S. Holder of a Prepetition Secured Obligation who is not a DIP Lender would be substantially similar to that described above.

        (ii)    Distributions on New Common Stock

The gross amount of any distribution of cash or property made to a U.S. Holder of a Prepetition Secured Obligation who is not a DIP Lender with respect to New Common Stock generally will be includible in gross income by such a U.S. Holder as dividend income to the extent such distributions are paid out of the current or accumulated earnings and profits of the Reorganized Debtors as determined under U.S. federal income tax principles. Dividends received by non-corporate holders in taxable years beginning before January 1, 2011 may qualify for a reduced rate of taxation if certain holding period and other requirements are met. A distribution which is treated as a dividend for U.S. federal income tax purposes may qualify for the 70% dividends-received deduction if such amount is distributed to a U.S. Holder that is a corporation and certain holding period and taxable income requirements are satisfied. Any dividend received by a U.S. Holder that is a corporation may be subject to the "extraordinary dividend" provisions of the IRC.

A distribution in excess of the Reorganized Debtors' current and accumulated earnings and profits will first be treated as a return of capital to the extent of the U.S. Holder's adjusted tax basis in its New Common Stock and will be applied against and reduce such basis dollar-for-dollar (thereby increasing the amount of gain and decreasing the amount of loss recognized on a subsequent taxable disposition of the New Common Stock). To the extent that such distribution exceeds the U.S. Holder's adjusted tax basis in its New Common Stock, the distribution will be treated as capital gain, which will be treated as long-term capital gain if such U.S. Holder's holding period in its New Common Stock exceeds one year as of the date of the distribution.

(iii)     Conversion of New Common Stock

The New Common Stock will consist of both Full Voting New Common Stock and Limited Voting New Common Stock. Each entity that is to receive New Common Stock shall have the option to choose to take its New Common Stock in the form of Full Voting New Common Stock or Limited Voting New Common Stock. Each share of Limited Voting New Common Stock will be convertible at the option of the holder, exercisable at any time, into one share of Full Voting New Common Stock.

The conversion of Limited Voting New Common Stock to Full Voting New Common Stock will be considered a "recapitalization" for U.S. federal income tax purposes. Accordingly, a U.S. Holder of New Common Stock should not recognize gain or loss upon such a conversion. A U.S. Holder's basis in its shares of Full Voting New Common Stock will be the same as that U.S. Holder's basis in its converted shares of Limited Voting New Common Stock. A U.S. Holder's holding period in its shares of Full Voting New Common Stock will include the U.S. Holder's holding period in its Limited Voting New Common Stock.

(iv)     Sale, Exchange, or Other Taxable Disposition of New Common Stock

A U.S. Holder generally will recognize capital gain or loss on the sale, exchange or other taxable disposition of any of its New Common Stock in an amount equal to the difference, if any, between the amount realized for the New Common Stock and the holder's adjusted tax basis in the New Common Stock. Capital gains of non-corporate U.S. Holders derived with respect to a sale, exchange or other disposition of New Common Stock held for more than one year may be eligible for reduced rates of taxation. The deductibility of capital losses is subject to limitations. U.S. Holders are urged to consult their own tax advisors regarding such limitations.

(b)     Non-U.S. Holders

(i)     Receipt of New Common Stock

A Non-U.S Holder of a Prepetition Secured Obligation who is not a DIP Lender generally will not be subject to U.S. federal withholding tax with respect to gain, if any, realized on the receipt of New Common Stock pursuant to the Plan. A Non-U.S. Holder generally also will not be subject to U.S. federal income tax with respect to such gain unless (i) the gain is effectively connected with the conduct of a trade or business within the U.S. by the Non-U.S. Holder and, if required by an applicable tax treaty, is attributable to a permanent establishment or fixed base within the U.S. or (ii) in the case of a Non-U.S. Holder that is a nonresident alien individual, such Non-U.S. Holder is present in the U.S. for 183 or more days in the taxable year of the Effective Date and certain other conditions are satisfied. In the case described in clause (i) above, gain recognized generally will be subject to U.S. federal income tax in the same manner as if such gain were recognized by a U.S. person and, in the case of a Non-U.S. Holder that is a corporation, may also be subject to the branch profits tax (currently imposed at a rate of thirty percent (30%), or a lower applicable treaty rate).

As noted above the IRS may take the position that some portion of the total consideration paid to the Non-U.S. Holders of Prepetition Secured Obligations who are not DIP Lenders should not be treated as part of the exchange, but should instead be treated as a separate payment in the nature of compensation for such Non-U.S. Holder's consent to the Plan. To the extent that any portion of the consideration is so treated, it is possible that this portion will be subject to U.S. federal withholding tax, at a rate of thirty percent (30%), or a lower applicable treaty rate. The Debtors will determine how they will treat this issue for purposes of information reporting and withholding.

If the reorganization of the Debtors were to be consummated pursuant to an alternative taxable structure, the Debtors, or the assets of the Debtors, would be acquired by one or more newly organized entities. In such a case, the taxation of a Non-U.S. Holder of a Prepetition Secured Obligation who is not a DIP Lender would be substantially similar to that described above.

(ii)        Distributions on New Common Stock

In general, any distribution treated as a dividend for U.S. federal income tax purposes received by a Non-U.S. Holder of a Prepetition Secured Obligation who is not a DIP Lender in respect of the New Common Stock will be subject to a U.S. federal withholding tax at a rate of thirty percent (30%), or a lower applicable treaty rate.

(iii)       Effectively Connected Income

If any gain, dividends, or other income realized by a Non-U.S. Holder in respect of the New Common Stock is effectively connected with the conduct of a trade or business in the United States by the Non-U.S. Holder, such Non-U.S. Holder generally will be subject to U.S. federal income tax on such effectively connected income at standard U.S. federal income tax rates. In addition, if the Non-U.S. Holder is a foreign corporation, it may be subject to a branch profits tax equal to 30% of its "effectively connected earnings and profits" within the meaning of the IRC for the taxable year, as adjusted for certain items, unless it qualifies for a lower rate under an applicable income tax treaty.

2.       *Claimholders of Prepetition Secured Obligations Who Are DIP Lenders*

        (a)       U.S. Holders

                (i)       Receipt of DIP Lenders Roll-Up Distribution Property and DIP Lenders New Money Distribution Property

The receipt by a U.S. Holder who is a DIP Lender of a portion of the DIP Lenders Roll-Up Distribution Property (consisting of New Common Stock) received by such U.S. Holder in all capacities should be considered to be in exchange for its Prepetition Secured Obligations and should be treated as a taxable transaction for U.S. federal income tax purposes. The balance of such DIP Lenders Roll-Up Distribution Property should be received for, and allocated to, the New Money DIP Term Loans and the Senior Roll-Up Loans. Although the Plan distinguishes between the Prepetition Secured Obligations and Senior Roll-Up Loans held by DIP Lenders and certain related parties, it would appear that the two classes of obligations should more likely than not be treated together for U.S. federal income tax purposes, as a matter of economic substance. As a result, except as described in the next sentence and subject to the qualifications discussed below, such a U.S. Holder of a Prepetition Secured Obligation who is a DIP Lender generally should recognize capital gain or loss for U.S. federal income tax purposes in an amount equal to the difference between (i) the fair market value, on the Effective Date, of that portion of the DIP Lenders Roll-Up Distribution Property received in exchange for its Prepetition Secured Obligations and Senior Roll-Up Loans and (ii) such U.S. Holder's adjusted tax basis in its Prepetition Secured Obligation and Senior Roll-Up Loans. The remaining portion of the DIP Lenders Roll-Up Distribution Property should be treated as received in exchange for the New Money DIP Term Loans and should increase the amount realized in respect thereto. A U.S. Holder of a Prepetition Secured Obligation who is a DIP Lender should, however, recognize ordinary income to the extent it receives such consideration in respect of accrued interest or accrued market discount that has not already been included in the U.S. Holder's gross income for U.S. federal income tax purposes. Any capital gain or loss recognized will be long-term capital gain or loss if the U.S. Holder's holding period with respect to its Prepetition Secured Obligation or Senior Roll-Up Loan is more than one (1) year on the Effective Date. The deductibility of capital loss is subject to limitations.

The remaining portion of the DIP Lenders Roll-Up Distribution Property in excess of that attributable to the Senior Roll-Up Loans and New Money DIP Term Loans should be considered to be received by such U.S. Holder as a premium on the New Money DIP Term Loan, and such premium will be taken into account in calculating the amount realized by such holder with respect to the New Money DIP Term Loan. A U.S. Holder is encouraged to consult its own tax advisor regarding the U.S. federal, state, local and non-U.S. tax consequences of such a transaction.

The tax law provides different rules which depend upon whether property is "publicly traded." The determination of whether a debt obligation is actively traded is made by taking into account activity that takes place in a 60-day period that would end 30 days after the Effective Date. The Debtors believe that both the Prepetition Secured Obligations are not, and the DIP Lenders New Money Distribution Property will not, be publicly traded. Accordingly, although the issue is not free from doubt, the Debtors believe and intend to take the position that a U.S. Holder's tax basis in the DIP Lenders New Money Distribution Property will be equal to the stated principal amount of such property. A U.S. Holder's tax basis in the DIP Lenders Roll-Up Distribution Property will be the excess, if any, of the fair market value of the amount exchanged for the DIP Lenders New Money Distribution Property and the DIP Lenders Roll-Up Distribution Property, over the stated principal amount of the DIP Lenders New Money Distribution Property. As a result of the allocation described above, the "issue price" of the DIP Lenders New Money Distribution Property would be equal to the stated redemption price of the DIP Lenders New Money Distribution Property at maturity, and would thus not create an OID obligation for a U.S. Holder. Although it is not anticipated that any of the debt obligations will be actively traded, that possibility cannot be ruled out. If any of the debt obligations were to be actively traded, the issue price of the DIP Lenders New Money Distribution Property will be determined by taking into account the fair market value of the debt obligation that is actively traded. In such a case, the DIP Lenders New Money Distribution Property will be issued with OID. Similarly, if, contrary to the Debtors' position outlined above, a U.S. Holder's tax basis in the DIP Lenders New Money Distribution Property and the DIP Lenders Roll-Up Distribution Property were allocated in accordance with the relative fair market value of each instrument, the "issue price" of the DIP Lenders New Money Distribution Property would be below the stated redemption price at maturity, creating an OID obligation. Accordingly, each DIP Lender should be aware that, regardless of its method of tax accounting, in that event it would be required to recognize interest income with respect to the DIP Lenders New Money Distribution Property in advance of cash payments attributable to such income pursuant to the rules governing original issue discount. Each U.S. Holder of Prepetition Secured Obligations who is a DIP Lender is strongly urged to consult its own tax advisor regarding the U.S. federal, state, local and non-U.S. tax consequences of holding such Claims.

There is no direct guidance as to how to allocate the amounts received by Prepetition Secured Lenders who are DIP Lenders. Accordingly, there is uncertainty. In addition to the treatment outlined above, another possible treatment would be to respect the form of the transaction and treat the DIP Lenders as exchanging the Prepetition Secured Obligations for the DIP Lenders Roll-Up Distribution Property. Were the IRS to challenge the Debtors' proposed treatment, it is not certain that the method outlined in the paragraphs above would be upheld.

If the reorganization of the Debtors were to be consummated pursuant to an alternative taxable structure, the Debtors, or the assets of the Debtors, would be acquired by one or more newly organized entities. In such a case, the taxation of a U.S. Holder would be substantially similar to that described above.

        (ii)        Distributions on, and Conversions of, New Common Stock

Distributions on New Common Stock held by a U.S. Holder of a Prepetition Secured Obligation who is a DIP Lender will be treated substantially as described above in <u>Section XI.B.1.(a).(ii)</u> above. Conversions of New Common Stock by a U.S. Holder will be treated substantially as described in <u>Section XI.B.1.(a).(iii)</u> above.

        (iii)        Interest on DIP Lenders New Money Distribution Property

A U.S. Holder who is a DIP Lender will be required to include stated interest on the DIP Lenders New Money Distribution Property in income in accordance with such U.S. Holder's regular method of accounting. In addition, subject to a *de minimis* exception, if the DIP Lenders New Money Distribution Property is determined to be an OID obligation, a U.S. Holder will be required to include any OID, within the meaning of the IRC, in income over the period that such U.S. Holder holds the Roll-Up Loan, in accordance with a constant yield-to-maturity method, whether or not the U.S. Holder is a cash or accrual method taxpayer, and regardless of when the U.S. Holder receives payments of interest on the DIP Lenders New Money Distribution Property.

        (iv)        Sale, Exchange, or Other Taxable Disposition of New Common Stock and DIP Lenders New Money Distribution Property

For United States federal income tax purposes, a U.S. Holder generally will recognize capital gain or loss on the sale, exchange or other taxable disposition of any of its New Common Stock or DIP Lenders New Money

Distribution Property in an amount equal to the difference, if any, between the amount realized for such asset and the U.S. Holder's adjusted tax basis in that asset. Capital gains of non-corporate U.S. Holders derived with respect to a sale, exchange or other disposition of New Common Stock held for more than one year may be eligible for reduced rates of taxation. The deductibility of capital losses is subject to limitations. U.S. Holders are urged to consult their own tax advisors regarding such limitations.

    (b)        Non-U.S. Holders

           (i)        Receipt of New Common Stock and DIP Lenders New Money Distribution Property

A Non-U.S. Holder of a Prepetition Secured Obligation who is a DIP Lender generally will not be subject to U.S. federal withholding tax with respect to gain, if any, realized on the receipt of DIP Lenders New Money Distribution Property and New Common Stock pursuant to the Plan. A Non-U.S. Holder generally also will not be subject to U.S. federal income tax with respect to such gain unless (i) the gain is effectively connected with the conduct of a trade or business within the U.S. by the Non-U.S. Holder and, if required by an applicable tax treaty, is attributable to a permanent establishment or fixed base within the U.S. or (ii) in the case of a Non-U.S. Holder that is a nonresident alien individual, such Non-U.S. Holder is present in the U.S. for 183 or more days in the taxable year of the Effective Date and certain other conditions are satisfied. In the case described in clause (i) above, gain recognized generally will be subject to U.S. federal income tax in the same manner as if such gain were recognized by a U.S. person and, in the case of a Non-U.S. Holder that is a corporation, may also be subject to the branch profits tax (currently imposed at a rate of thirty percent (30%), or a lower applicable treaty rate).

If the reorganization of the Debtors were to be consummated pursuant to an alternative taxable structure, the Debtors, or the assets of the Debtors, would be acquired by one or more newly organized entities. In such a case, the taxation of a Non-U.S. Holder of a Prepetition Secured Obligation who is a DIP Lender would be substantially similar to that described above.

           (ii)        Distributions on New Common Stock

In general, any dividend received by a Non-U.S. Holder of a Prepetition Secured Obligation who is a DIP Lender in respect of the New Common Stock will be subject to a U.S. federal withholding tax at a rate of thirty percent (30%), or a lower applicable treaty rate.

           (iii)        Interest and Accrual of Original Issue Discount on DIP Lenders New Money Distribution Property

Assuming the issuer of the DIP Lenders New Money Distribution Property is a U.S. corporation, under the "portfolio interest exception," a Non-U.S. Holder who is a DIP Lender should not be subject to U.S. federal income tax on payments of interest or on any accrual of OID on the DIP Lenders New Money Distribution Property, provided that (i) the Non-U.S. Holder does not actually or constructively own 10% or more of the total combined voting power of all classes of the Reorganized Debtors' stock entitled to vote, (ii) the Non-U.S. Holder is not, and is not treated as, a bank receiving interest on an extension of credit pursuant to a loan agreement entered into in the ordinary course of its trade or business, (iii) the Non-U.S. Holder is not a "controlled foreign corporation" that is related to the Reorganized Debtors (directly or indirectly) through stock ownership and (iv) certain certification requirements are met.

If the "portfolio interest" exception does not apply to any interest or OID attributable to the DIP Lenders New Money Distribution Property, such interest or OID generally will be subject to U.S. federal income and withholding tax at a rate of thirty percent (30%) (in the case of OID, such withholding obligation arises with respect to the payments or sales proceeds that are attributable to previously accrued OID), unless that tax is reduced or eliminated pursuant to an applicable income tax treaty or the interest or OID is effectively connected with the conduct of a U.S. trade or business and, in either case, the appropriate statement has been provided.

In the event that the issuer of the DIP Lenders New Money Distribution Property is a foreign entity, Non-U.S. Holders will not be subject to U.S. federal tax on any interest or OID attributable to the DIP Lenders New Money Distribution Property.

(iv)     Effectively Connected Income

If any gain, dividends, interest or other income realized by a Non-U.S. Holder in respect of the New Common Stock and DIP Lenders New Money Distribution Property is effectively connected with the conduct of a trade or business in the United States by the Non-U.S. Holder, such Non-U.S. Holder generally will be subject to U.S. federal income tax on such effectively connected income at standard U.S. federal income tax rates. In addition, if the Non-U.S. Holder is a foreign corporation, it may be subject to a branch profits tax equal to 30% of its "effectively connected earnings and profits" within the meaning of the IRC for the taxable year, as adjusted for certain items, unless it qualifies for a lower rate under an applicable income tax treaty.

*3.        Claimholders Who Are Noteholders*

(a)     U.S. Holders

(i)     Receipt of New Common Stock and Warrants

The receipt by a U.S. Holder who is a Noteholder of New Common Stock, Cash and Warrants should be treated as a taxable transaction for U.S. federal income tax purposes. As a result, except as described in the next sentence, such a U.S. Holder generally should recognize capital gain or loss for U.S. federal income tax purposes in an amount equal to the difference between (i) the fair market value, on the Effective Date, of the New Common Stock, Cash and the Warrants received and (ii) such U.S. Holder's adjusted tax basis in its Notes. A U.S. Holder should, however, recognize ordinary income to the extent it receives such consideration in respect of accrued interest or accrued market discount that has not already been included in the U.S. Holder's gross income for U.S. federal income tax purposes. Any capital gain or loss recognized will be long-term capital gain or loss if the U.S. Holder's holding period with respect to its Notes is more than one (1) year on the Effective Date. The deductibility of capital loss is subject to limitations. A U.S. Holder's basis in the New Common Stock and the Warrants will be the fair market value of these items on the issue date. A U.S. Holder's holding period for the New Common Stock and Warrants will begin on the day following the exchange.

It is possible that the IRS may take the position that some portion of the total consideration paid to U.S. Holders who are Noteholders should not be treated as part of the exchange, but should instead be treated as a separate payment in the nature of compensation for the U.S. Holders' consent to the Plan. To the extent that any portion of the consideration is so treated, that portion will not be taken into account in determining the consequences to such U.S. Holders of the exchange, as described above, but would instead be taxable to the U.S. Holder as ordinary income.

If the reorganization of the Debtors were to be consummated pursuant to an alternative taxable structure, the Debtors, or the assets of the Debtors, would be acquired by one or more newly organized entities. In such a case, the taxation of a U.S. Holder who is a Noteholder would be substantially similar to that described above.

(ii)     Distributions on, and Conversions of, New Common Stock

Distributions on New Common Stock held by a U.S. Holder who is a Noteholder will be treated substantially as described above in Section XI.B.1.(a).(ii) above. Conversions of New Common Stock by a U.S. Holder will be treated substantially as described in Section XI.B.1.(a).(iii) above.

(iii)     Sale, Exchange, or Other Taxable Disposition of New Common Stock

Distributions on New Common Stock held by a U.S. Holder who is a Noteholder will be treated substantially as described above in Section XI.B.1.(a).(iv) above

(iv)     Exercise of Warrants

A U.S. Holder will not recognize gain or loss on the exercise of a Warrant. The U.S. Holder's tax basis in New Common Stock received as a result of the exercise of the Warrant will equal the sum of the exercise price paid for the New Common Stock and the U.S. Holder's tax basis in the Warrant determined as described in the relevant section above. The holding period for the New Common Stock received as a result of the exercise of a Warrant will begin on the exercise date.

(v)     Sale, Exchange, or Other Taxable Disposition of Warrants

If a U.S. Holder sells, exchanges or otherwise disposes Warrants in a taxable disposition, the U.S. Holder generally will recognize capital gain or loss equal to the difference, if any, between the amount realized for the Warrants and the U.S. Holder's tax basis in the Warrants. Capital gains of non-corporate holders derived with respect to a sale, exchange or other disposition of Warrants in which the U.S. Holder has a holding period exceeding one year (determined as described in the relevant section above) may be eligible for reduced rates of taxation. The deductibility of capital loss is subject to limitations. U.S. Holders are urged to consult their own tax advisors regarding such limitations.

(vi)     Expiration of Warrants

A U.S. Holder that allows a Warrant to expire generally should recognize capital loss equal to the U.S. Holder's tax basis in the Warrant, which will be treated as long-term or short-term capital loss depending upon whether such U.S. Holder's holding period in the Warrant exceeds one year as of the date of the expiration (determined as described in the relevant section above). The deductibility of capital losses is subject to limitations. U.S. Holders are urged to consult their own tax advisors regarding such limitations.

(b)     Non-U.S. Holders

(i)     Receipt of New Common Stock and Warrants

The U.S. federal income tax consequences to a Non-U.S. Holder who is a Noteholder will be substantially similar to that of a U.S. Holder of a Noteholder Claim, as described above. It is possible that the IRS may take the position that some portion of the total consideration paid to the Non-U.S. Holders who are Noteholders should not be treated as part of the exchange, but should instead be treated as a separate payment in the nature of compensation for such Non-U.S. Holders' consent to the Plan. To the extent that any portion of the consideration is so treated, it is possible that this portion will be subject to U.S. federal withholding tax, at a rate of thirty percent (30%), or a lower applicable treaty rate.

(ii)     Distributions on New Common Stock

In general, any dividend received by a Non-U.S. Holder who is a Noteholder in respect of the New Common Stock will be subject to a U.S. federal withholding tax at a rate of thirty percent (30%), or a lower applicable treaty rate.

(iii)     Effectively Connected Income

The "effectively connected income" of a Non-U.S. Holder who is a Noteholder will be treated substantially as described in <u>Section XI.B.1.(b).(iii)</u> above.

*4.     Other Unsecured Claimholders*

(a)     U.S. Holders

Pursuant to the Plan, the Other Unsecured Claimholders will receive Other Unsecured Claimholders Distribution Property (consisting of $250,000 Cash) in exchange for their Other Unsecured Claims. The receipt by a U.S. Holder of an Other Unsecured Claim of Cash should be treated as a taxable transaction for U.S. federal income tax purposes. As a result, except as described in the next sentence, such a U.S. Holder who is a holder of an Other Unsecured Claim generally should recognize capital gain or loss for U.S. federal income tax purposes in an amount equal to the difference between (i) the amount of cash received and (ii) such U.S. Holder's adjusted tax basis in its Other Unsecured Claim. A U.S. Holder of an Other Unsecured Claim should, however, recognize ordinary income to the extent it receives such consideration in respect of accrued interest or accrued market discount that has not already been included in the U.S. Holder's gross income for U.S. federal income tax purposes. Any capital gain or loss recognized will be long-term capital gain or loss if the U.S. Holder's holding period with respect to its Other Unsecured Claim is more than one (1) year on the Effective Date. The deductibility of capital loss is subject to limitations. Any U.S. Holder who is an Other Unsecured Claimholder who does not hold its Other Unsecured Claims as a capital asset should consult its tax advisor.

It is possible that the IRS may take the position that some portion of the total consideration paid to the Other Unsecured Claimholders should not be treated as part of the exchange, but should instead be treated as a separate payment in the nature of compensation for such Other Unsecured Claimholders' consent to the Plan. To the extent that any portion of the consideration is so treated, that portion will not be taken into account in determining the consequences to such Claimholder of the exchange, as described above, but would instead be taxable to the Other Unsecured Claimholder as ordinary income.

If the reorganization of the Debtors were to be consummated pursuant to an alternative taxable structure, the Debtors, or the assets of the Debtors, would be acquired by one or more newly organized entities. In such a case, the taxation of an Other Unsecured Claimholder who is a U.S. Holder would be substantially similar to that described above.

> (b)     Non-U.S. Holder

A Non-U.S Holder who is an Other Unsecured Claimholder generally will not be subject to U.S. federal withholding tax with respect to gain, if any, realized on the receipt of its Other Unsecured Claimholders Distribution Property (consisting of $250,000 Cash) pursuant to the Plan. A Non-U.S. Holder generally also will not be subject to U.S. federal income tax with respect to such gain unless (i) the gain is effectively connected with the conduct of a trade or business within the U.S. by the Non-U.S. Holder and, if required by an applicable tax treaty, is attributable to a permanent establishment or fixed base within the U.S. or (ii) in the case of a Non-U.S. Holder that is a nonresident alien individual, such Non-U.S. Holder is present in the U.S. for 183 or more days in the taxable year of the Effective Date and certain other conditions are satisfied. In the case described in clause (i) above, gain recognized generally will be subject to U.S. federal income tax in the same manner as if such gain were recognized by a U.S. person and, in the case of a Non-U.S. Holder that is a corporation, may also be subject to the branch profits tax (currently imposed at a rate of thirty percent (30%), or a lower applicable treaty rate).

It is possible that the IRS may take the position that some portion of the total consideration paid to the Non-U.S. Holders who are Other Unsecured Claimholders should not be treated as part of the exchange, but should instead be treated as a separate payment in the nature of compensation for such Non-U.S. Holders' consent to the Plan. To the extent that any portion of the consideration is so treated, it is possible that this portion will be subject to U.S. federal withholding tax, at a rate of thirty percent (30%), or a lower applicable treaty rate.

## C.     Information Reporting and Backup Withholding

Certain payments, including the distributions or payments in respect of Claims pursuant to the Plan, generally are subject to information reporting by the Payor to the IRS. Moreover, such reportable payments are subject to backup withholding (currently at a rate of twenty-eight percent (28%)) under certain circumstances. Under the IRC's backup withholding rules, a Claimholder may be subject to backup withholding with respect to distributions or payments made pursuant to the Plan unless the Claimholder (i) comes within certain exempt categories (which generally include corporations) and, when required, demonstrates this fact or (ii) timely provides a correct U.S. taxpayer identification number and makes certain certifications under penalties of perjury.

Backup withholding is not an additional tax. Amounts withheld under the backup withholding rules may be credited against a Claimholder's U.S. federal income tax liability, and such Claimholder may obtain a refund of any excess amounts withheld under the backup withholding rules by timely filing an appropriate claim for refund with the IRS.

## D.     Importance of Obtaining Professional Tax Assistance

**THE FOREGOING DISCUSSION IS INTENDED ONLY AS A SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING WITH A TAX PROFESSIONAL. THE ABOVE DISCUSSION IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT TAX ADVICE. THE TAX CONSEQUENCES ARE IN MANY CASES UNCERTAIN AND MAY VARY DEPENDING ON A CLAIMHOLDER'S PARTICULAR CIRCUMSTANCES. ACCORDINGLY, EACH CLAIMHOLDER IS STRONGLY URGED TO CONSULT ITS OWN TAX ADVISOR REGARDING THE U.S. FEDERAL, STATE, LOCAL AND**

NON-U.S. TAX CONSEQUENCES OF THE TRANSACTIONS DESCRIBED HEREIN OR CONTEMPLATED BY THE PLAN.

## XII.    FEASIBILITY OF THE PLAN AND THE "BEST INTERESTS" TEST

### A.    Feasibility of the Plan

To confirm the Plan, the Court must find that confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtors. This requirement is imposed by Bankruptcy Code section 1129(a)(11) and is referred to as the "feasibility" requirement. The Debtors believe that they will be able to timely perform all obligations described in the Plan and, therefore, that the Plan is feasible.

To demonstrate the feasibility of the Plan, the Debtors have prepared the Projections, as set forth in Appendix D attached to this Disclosure Statement. The period covered by the Projections extends to fiscal 2013. The Projections indicate that Reorganized Debtors should have sufficient cash flow to pay and service their debt obligations, including the Exit Credit Facility, and to fund its operations. Accordingly, the Debtors believe that the Plan satisfies the feasibility requirement of Bankruptcy Code section 1129(a)(11). As noted in the Projections, however, the Debtors caution that no representations can be made as to the accuracy of the Projections or as to the Reorganized Debtors' ability to achieve the projected results. Many of the assumptions upon which the Projections are based are subject to uncertainties outside the control of the Debtors. Some assumptions inevitably will not materialize, and events and circumstances occurring after the date on which the Projections were prepared may be different from those assumed or may be unanticipated and may adversely affect the Debtors' financial results. Therefore, the actual results may vary from the projected results, and the variations may be material and adverse. See Section IX ("Certain Factors to Be Considered") for a discussion of certain risk factors that may affect financial feasibility of the Plan.

THE PROJECTIONS WERE NOT PREPARED WITH A VIEW TOWARD COMPLIANCE WITH THE GUIDELINES ESTABLISHED BY THE AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS OR THE RULES AND REGULATIONS OF THE SECURITIES AND EXCHANGE COMMISSION REGARDING PROJECTIONS. FURTHERMORE, THE PROJECTIONS HAVE NOT BEEN AUDITED BY THE DEBTORS' INDEPENDENT CERTIFIED PUBLIC ACCOUNTANTS. ALTHOUGH PRESENTED WITH NUMERICAL SPECIFICITY, THE PROJECTIONS ARE BASED UPON A VARIETY OF ASSUMPTIONS, SOME OF WHICH IN THE PAST HAVE NOT BEEN ACHIEVED AND WHICH MAY NOT BE REALIZED IN THE FUTURE, AND ARE SUBJECT TO SIGNIFICANT BUSINESS, ECONOMIC AND COMPETITIVE UNCERTAINTIES AND CONTINGENCIES, MANY OF WHICH ARE BEYOND THE CONTROL OF THE DEBTORS. CONSEQUENTLY, THE PROJECTIONS SHOULD NOT BE REGARDED AS A REPRESENTATION OR WARRANTY BY THE DEBTORS, OR ANY OTHER PERSON, THAT THE PROJECTIONS WILL BE REALIZED. ACTUAL RESULTS MAY VARY MATERIALLY FROM THOSE PRESENTED IN THE PROJECTIONS.

### B.    Acceptance of the Plan

As a condition to confirmation, the Bankruptcy Code requires that each Class of Impaired Claims and Interests vote to accept the Plan, except under certain circumstances.

Bankruptcy Code section 1126(c) defines acceptance of a plan by a class of impaired claims as acceptance by holders of at least two-thirds in dollar amount and more than one-half in number of claims in that class but, for that purpose, counts only those who actually vote to accept or to reject the Plan. Thus, a Class of Claims will have voted to accept the Plan only if two-thirds in amount and a majority in number actually voting cast their Ballots in favor of acceptance.

### C.    "Best Interests" Test

Even if a plan is accepted by each class of holders of claims, the Bankruptcy Code requires a bankruptcy court to determine that the plan is in the "best interests" of all holders of claims that are impaired by the plan and that have not accepted the plan. The "best interests" test, as set forth in Bankruptcy Code section 1129(a)(7), requires a bankruptcy court to find either that (i) all members of an impaired class of claims have accepted the plan

or (ii) the plan will provide a member who has not accepted the plan with a recovery of property of a value, as of the effective date of the plan, that is not less than the amount that such holder would recover if the debtor were liquidated under chapter 7 of the Bankruptcy Code.

To calculate the probable distribution to members of each impaired class of holders of claims if the debtor were liquidated under chapter 7, a bankruptcy court must first determine the aggregate dollar amount that would be generated from the debtor's assets if its chapter 11 case were converted to a chapter 7 case under the Bankruptcy Code. This "liquidation value" would consist primarily of the proceeds from a forced sale of the debtor's assets by a chapter 7 trustee.

The amount of liquidation value available to unsecured creditors would be reduced by, first, the claims of secured creditors to the extent of the value of their collateral and, second, by the costs and expenses of liquidation, as well as by other administrative expenses and costs of both the chapter 7 case and the Chapter 11 Case. Costs of liquidation under chapter 7 of the Bankruptcy Code would include the compensation of a trustee, as well as of counsel and other professionals retained by the trustee, asset disposition expenses, all unpaid expenses incurred by the debtor in its bankruptcy case (such as compensation of attorneys, financial advisors and restructuring consultants) that are allowed in the chapter 7 case, litigation costs and claims arising from the operations of the debtor during the pendency of the bankruptcy case. The liquidation itself would trigger certain priority payments that otherwise would be due in the ordinary course of business. Those priority claims would be paid in full from the liquidation proceeds before the balance would be made available to pay general unsecured claims or to make any distribution in respect of equity interests. The liquidation also would prompt the rejection of a large number of executory contracts and unexpired leases and thereby create a significantly higher number of unsecured claims.

Once the court ascertains the recoveries in liquidation of secured creditors and priority claimants, it must determine the probable distribution to general unsecured creditors and equity security holders from the remaining available proceeds in liquidation. If such probable distribution has a value greater than the distributions to be received by such creditors and equity security holders under a debtor's plan, then such plan is not in the best interests of creditors and equity security holders.

## D.     Estimated Valuation of Reorganized Debtors

In order to provide information to parties in interest regarding the possible range of values of their distributions under the Plan, it is necessary to ascribe an estimated value, or range of values, to the New Common Stock. The Debtors have been advised by Lazard, their investment banker and financial advisor, with respect to the estimated value of the Company, which includes a valuation of the Reorganized Debtors on a going concern basis. Solely for purposes of the Plan, the estimated range of reorganization value of the Company, including the Reorganized Debtors, was assumed to be approximately $230 million to $295 million (with a mid-point estimate of $262.5 million) as of an assumed Plan Effective Date of November 1, 2009. Lazard's estimate of a range of reorganization values does not constitute an opinion as to fairness from a financial point of view of the consideration to be received under the Plan or of the terms and provisions of the Plan. A discussion of the methodology used by Lazard to arrive at the Company's value is attached hereto as <u>Appendix F</u>.

The Debtors believe that their valuation approach is valid and the Committee's supports the Debtors' valuation. Furthermore, the bids received by the Debtors for the purchase of their assets (which were at the low end of the range of the estimated reorganized value of the Company) support the reorganized enterprise valuation derived by the Debtors' professionals.

## E.     Application of the "Best Interests" Test to the Liquidation
## Analysis and the Valuation of the Reorganized Debtors

A liquidation analysis prepared with respect to each of the Debtors is attached as <u>Appendix E</u> to this Disclosure Statement. The Debtors believe that any liquidation analysis is speculative. For example, the liquidation analysis necessarily contains an estimate of the amount of Claims which will ultimately become Allowed Claims. This estimate is based solely upon the Debtors' incomplete review of Claims filed and the Debtors' books and records. No order or finding has been entered by the Bankruptcy Court estimating or otherwise fixing the amount of Claims at the projected amounts of Allowed Claims set forth in the liquidation analysis. The estimate of the amount of Allowed Claims set forth in the liquidation analysis should not be relied on for any other purpose, including,

without limitation, any determination of the value of any distribution to be made on account of Allowed Claims under the Plan. In addition, as noted above, the valuation analysis of the Company also contains numerous estimates and assumptions. For example, the value of the New Common Stock cannot be determined with precision due to the absence of a public market for the New Common Stock.

As set forth on Exhibit D, the Debtors reserve their rights with respect to all avoidance actions arising under Chapter 5 of the Bankruptcy Code. The Debtors have not undertaken a thorough analysis of the value of potential avoidance actions. The Debtors estimate, based on information contained in their schedules, their prepetition payments potentially subject to avoidance actions would not exceed $70 million (excluding normal payroll related payments to non-insiders and financing transactions between affiliates). The Debtors believe a substantial portion of that amount may be subject to customary defenses to avoidance actions. For the purpose of the liquidation analysis, prepared in connection with this Disclosure Statement, the Debtors have assumed that the avoidance actions have no value.

Notwithstanding the difficulties in quantifying recoveries to creditors with precision, the Debtors believe that, taking into account the liquidation analysis and the valuation analysis of Reorganized Debtors, the Plan meets the "best interests" test of Bankruptcy Code section 1129(a)(7). The Debtors believe that the members of each impaired class will receive at least as much under the Plan than they would in a liquidation in a hypothetical chapter 7 case. Creditors will receive a better recovery through the distributions contemplated by the Plan because the continued operation of the Debtors as going concerns rather than a forced liquidation will allow the realization of more value for the Debtors' assets. Moreover, as a result of the reorganization of the Debtors, creditors such as the Debtors' employees would retain their jobs and most likely make few if any other claims against the estate. Lastly, in the event of liquidation, the aggregate amount of unsecured claims which would receive no distribution would no doubt increase significantly. All of these factors lead to the conclusion that recoveries under the Plan would be at least as much, and in many cases significantly greater, than the recoveries available in a chapter 7 liquidation.

The Debtors believe the methodology used to prepare the liquidation analysis attached hereto as Appendix E is appropriate and that the assumptions and conclusions set forth therein are fair and reasonable under the circumstances and represent a reasonable exercise of the Debtors' business judgment with respect to such matters.

## F.    Confirmation Without Acceptance of All Impaired Classes: The "Cramdown" Alternative

Bankruptcy Code section 1129(b) provides that a plan can be confirmed even if it has not been accepted by all impaired classes as long as at least one impaired class of Claims has accepted it. The Court may confirm the Plan at the request of the Debtors notwithstanding the Plan's rejection (or deemed rejection) by impaired Classes as long as the Plan "does not discriminate unfairly" and is "fair and equitable" as to each impaired Class that has not accepted it. A plan does not discriminate unfairly within the meaning of the Bankruptcy Code if a dissenting class is treated equally with respect to other classes of equal rank.

A plan is fair and equitable as to a class of secured claims that rejects such plan if the plan provides (1)(a) that the holders of claims included in the rejecting class retain the liens securing those claims whether the property subject to those liens is retained by the debtor or transferred to another entity, to the extent of the allowed amount of such claims, and (b) that each holder of a claim of such class receives on account of that claim deferred cash payments totaling at least the allowed amount of that claim, of a value, as of the effective date of the plan, of at least the value of the holder's interest in the estate's interest in such property; (2) for the sale, subject to section 363(k) of the Bankruptcy Code, of any property that is subject to the liens securing the claims included in the rejecting class, free and clear of the liens, with the liens to attach to the proceeds of the sale, and the treatment of the liens on proceeds under clause (1) or (2) of this subparagraph; or (3) for the realization by such holders of the indubitable equivalent of such claims.

A plan is fair and equitable as to a class of unsecured claims which rejects a plan if the plan provides (1) for each holder of a claim included in the rejecting class to receive or retain on account of that claim property that has a value, as of the effective date of the plan, equal to the allowed amount of such claim; or (2) that the holder of any claim or interest that is junior to the claims of such rejecting class will not receive or retain on account of such junior claim or interest any property at all.

A plan is fair and equitable as to a class of equity interests that rejects a plan if the plan provides (1) that each holder of an interest included in the rejecting class receive or retain on account of that interest property that has a value, as of the effective date of the plan, equal to the greatest of the allowed amount of any fixed liquidation preference to which such holder is entitled, any fixed redemption price to which such holder is entitled, or the value of such interest; or (2) that the holder of any interest that is junior to the interest of such rejecting class will not receive or retain under the plan on account of such junior interest any property at all. Because holders of the Old Common Stock (and interests related thereto) are receiving no distribution on account of such Interests under the Plan, their votes are not being solicited and they are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Accordingly, the Debtors are seeking confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to such Classes and may seek confirmation pursuant thereto as to other Classes if such Classes vote to reject the Plan.

## G.  Conditions to Confirmation and/or Consummation of the Plan

### 1.  Conditions to Confirmation

The following are conditions precedent to confirmation of the Plan that may be satisfied or waived in accordance with Section 11.3 of the Plan:

(a)  The Bankruptcy Court shall have approved a disclosure statement with respect to the Plan in form and substance satisfactory to the Debtors and the Requisite DIP Lenders in their sole discretion.

(b)  The Confirmation Order and the Plan (excluding any exhibits thereto, other than the Tranche A Warrants Agreement and Tranche B Warrants Agreement) shall be in form and substance satisfactory to the Debtors, the Creditors' Committee, and the Requisite DIP Lenders in their sole discretion.

(c)  The exhibits to the Plan shall be in a form and substance satisfactory to the Debtors and the Requisite DIP Lenders in their sole discretion.

(d)  Prior to the date that is five (5) days prior to the 1st day of the Confirmation Hearing (as such date may be adjourned from time to time), the completion of due diligence to the Requisite DIP Lenders' sole satisfaction with respect to the Debtors and their Affiliates, including without limitation, due diligence with respect to (i) the business, operations, assets, liabilities (including, without limitation, environmental liabilities), condition (financial or otherwise) or prospects of the Debtors and their Affiliates, (ii) any investigations, claims, causes of action or suits filed or asserted (or threatened) by any governmental entity with respect to the Debtors or any of their Affiliates or any of their respective employees, officers, or directors, (iii) any claims or causes of action filed or asserted (or threatened) by any party with respect to the Debtors or any of their Affiliates or any of their respective employees, officers or directors, and (iv) the size of the administrative expense and priority claims pools as of the Plan Effective Date (including amounts paid prior to the Plan Effective Date).

### 2.  Conditions to Consummation

The following are conditions precedent to the occurrence of the Plan Effective Date, each of which may be satisfied or waived in accordance with Section 11.3 of the Plan:

(a)  The Bankruptcy Court shall have entered one or more orders, satisfactory to the Requisite DIP Lenders in their sole discretion (which may include the Confirmation Order) authorizing the assumption and rejection of unexpired leases and executory contracts by the Debtors as contemplated by Article VII of the Plan.

(b)  The Debtors shall have entered into the Exit Credit Facility, and all conditions precedent to the consummation thereof shall have been waived (subject to any applicable consent requirements) or satisfied in accordance with the terms thereof.

(c)  The Confirmation Order and the Plan (excluding any exhibits thereto) (i) shall be in form and substance acceptable to the Debtors, the Creditors' Committee, and the Requisite DIP Lenders, in their sole discretion (ii) shall be a Final Order, and (iii) no request for revocation of the Confirmation Order under Bankruptcy Code section 1144 shall have been made, or, if made, shall remain pending.

(d)     The Tranche A Warrants Agreement and Tranche B Warrants Agreement shall be consistent with the warrant term sheet attached to the Disclosure Statement as <u>Appendix G</u>, with such other terms and conditions as may be agreed to by the Debtors, Requisite DIP Lenders, and the Creditors' Committee.

(e)     The bylaws, certificate of incorporation, exit financing documentation, stockholders' agreement, registration rights agreement, and management stockholders' agreement shall be in form and substance reasonably acceptable to the Creditors' Committee with respect to any provisions directly impacting to the distributions received by Class 7 and Class 8 under the Plan.

(f)     The exhibits to the Plan shall be in form and substance acceptable to the Debtors and the Requisite DIP Lenders, in their sole discretion.

(g)     All guaranties of the Prepetition Secured Obligations shall have been released or otherwise addressed in a manner acceptable to the Requisite DIP Lenders in their sole discretion; and all liens and pledges securing the Prepetition Secured Obligations (or any guarantee thereof) shall have been released or otherwise addressed in a manner acceptable to the Requisite DIP Lenders in their sole discretion.

(h)     The Requisite DIP Lenders shall have determined, in their sole discretion, that no party shall have enforced the Notes Indenture and/or the Notes Guarantees (or have taken any actions or initiated any proceedings with respect to such enforcement) in any jurisdiction worldwide or, if any such enforcement action has been taken or initiated, that it has been addressed in a manner acceptable to the Requisite DIP Lenders in their sole discretion.

(i)     There shall not have occurred any event, development or circumstance since the date of the Debtors' last audited financial statement, that has had, or could reasonably be expected to have, a material adverse effect on the financial condition, business, results of operation, assets or liabilities of the Debtors or any of their Affiliates.

(j)     There shall not have occurred a Force Majeure Event.

(k)     No default or event of default has occurred and is continuing under the DIP Credit Agreement.

(l)     The conditions to Plan consummation in the DIP Credit Agreement have either been satisfied or waived in accordance with the terms of the DIP Credit Agreement.

(m)     OPEB, pension, collective bargaining agreements, and related matters, issues, and liabilities (including without limitation, the pension obligations of the German and other non-Debtor subsidiaries of Hayes) have been reduced and/or resolved to the satisfaction of the Requisite DIP Lenders in their sole discretion.

(n)     All of the non-Debtor Obligors' employment agreements, incentive plans, severance plans, retention plans, and similar agreements or plans are reasonably acceptable to the Requisite DIP Lenders.

(o)     If the Requisite DIP Lenders have requested in writing that one or more non-Debtor Affiliates should (i) become a Debtor(s) in the Bankruptcy Case subject to and a Debtor for all purposes under the Plan and/or (ii) file insolvency (or similar) proceedings in the jurisdiction of their organization and/or operation, then such filing (or in the case of a foreign proceeding, the successful completion of such proceeding) shall have occurred.

(p)     All authorizations, consents, and regulatory approvals worldwide, if any, required in connection with the consummation of the Plan are obtained and not revoked, and any waiting period in connection therewith shall have expired, including, without limitation, those under the Hart-Scott-Rodino Antitrust Improvement Act of 1976, or other antitrust or competition rules or laws.

(q)     All actions, documents and agreements necessary to implement the Plan, including, without limitation, the stockholders' agreement, the D&O Insurance for the Reorganized Debtors, and each Exhibit, shall be in form and substance satisfactory to the Debtors and the Requisite DIP Lenders, in their sole discretion, and shall have been effected or executed as applicable.

(r)     Assuming all other conditions to the Plan Effective Date have been satisfied, the New Common Stock, the Tranche A Warrants, and the Tranche B Warrants shall be issued as required by this Plan.

(s)     No more than 24% in principal amount of the Notes have both rejected the Plan and opted out of the Release of Non-Debtor Affiliates, as described in Section 3.2(b) of the Plan with respect to Class 7.

(t)     All actions required under the Plan to be taken on or before the Plan Effective Date shall have been taken.

## H.     Waiver of Conditions to Confirmation and/or Consummation

The conditions to confirmation and consummation of the Plan (other than Section XII.G.(s) above) may be waived by the Debtors with the prior consent of the Requisite DIP Lenders in their sole discretion without any notice to any other parties-in-interest or the Bankruptcy Court and without a hearing.  The conditions set forth in Section XII.G.(f) and (s) above may be waived by the Debtors with the prior consent of the Requisite DIP Lenders in their sole discretion without any notice to any other parties-in-interest or the Bankruptcy Court and without a hearing. The conditions set forth in Section XII.G.(c) may be waived by the Debtors, the DIP Agent, and the Creditors' Committee (requiring both the DIP Agent's and Creditors' Committee consent) in their respective sole discretion without any notice to any other parties-in-interest or the Bankruptcy Court and without a hearing.  The failure of the Debtors in their sole discretion to exercise any of the foregoing rights shall not be deemed a waiver of any other rights, and each such right shall be deemed an ongoing right, which may be asserted at any time.

## I.     Retention of Jurisdiction

Pursuant to sections 105(a) and 1142 of the Bankruptcy Code, and as more particularly described in Article XIII of the Plan, the Court will have exclusive jurisdiction of all matters arising out of, and related to, the Bankruptcy Cases and the Plan, including, among other things:  (A) the assumption or rejection of executory contracts or unexpired leases and the amount of any damages Claims or Cure payments with respect thereto; (B) to adjudicate any and all pending adversary proceedings, applications and contested matters; (C) to adjudicate any and all disputes arising from the distribution of the New Common Stock, the Tranche A Warrants, and the Tranche B Warrants; (D) to ensure that distributions to holders of Allowed Claims  are accomplished as provided in the Plan; (E) to hear and determine any and all objections to the allowance of Claims and the estimation of Claims; (F) to enter and implement such orders as may be appropriate if the Confirmation Order is for any reason stayed, revoked, modified or vacated; (G) to hear and determine disputes arising under, and issue orders in aid of, execution, implementation, or consummation of the Plan; (H) to consider any modifications of the Plan; (I) to hear and determine all applications for compensation and reimbursement of Professional Claims; (J) to hear and determine disputes arising from Claims entitled to priority treatment under section 507(a)(1) of the Bankruptcy Code; (K) to hear and determine matters concerning state, local and federal taxes; (L) to hear and determine all disputes involving the existence, nature or scope of the Debtors' discharge; (M) to hear and determine any and all matters relating to the Retained Actions; and (N) to enter a final decree closing the Bankruptcy Cases.

### XIII. ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

The Debtors believe that the Plan affords holders of Claims the potential for the greatest realization on the Debtors' assets and, therefore, is in the best interests of such holders.

If the Plan is not confirmed, however, the theoretical alternatives include: (a) continuation of the pending Bankruptcy Cases; (b) an alternative plan or plans of reorganization; or (c) liquidation of the Debtors under chapter 7 or chapter 11 of the Bankruptcy Code.

### A. Continuation of the Bankruptcy Case

If they remain in chapter 11, the Debtors could continue to operate their businesses and manage their properties as debtors-in-possession, but they would remain subject to the restrictions imposed by the Bankruptcy Code. It is not clear whether the Debtors could survive as a going concern in protracted Bankruptcy Cases. The Debtors could have difficulty sustaining the high costs and the erosion of market confidence which may be caused if the Debtors remain chapter 11 debtors in possession.

### B. Alternative Plans of Reorganization

If the Plan is not confirmed, the Debtors, or, after the expiration of the Debtors' exclusive period in which to propose and solicit a reorganization plan, any other party in interest in the Bankruptcy Cases, could propose a different plan or plans. Additionally, until the Plan is consummated, subject to certain conditions, the Debtors may determine to withdraw the Plan and propose and solicit different reorganization plans. Any such plans proposed by the Debtors or others might involve either a reorganization and continuation of the Debtors' businesses, or an orderly liquidation of its assets, or a combination of both.

### C. Liquidation Under Chapter 7 or Chapter 11

If no plan is confirmed, the Debtors' Bankruptcy Cases may be converted to cases under chapter 7 of the Bankruptcy Code. In a chapter 7 case, a trustee or trustees would be appointed to liquidate the assets of the Debtors. It is impossible to predict precisely how the proceeds of the liquidation would be distributed to the respective holders of Claims against or Interests in the Debtors.

However, the Debtors believe that creditors would lose the substantially higher going concern value if the Debtors were forced to liquidate. In addition, the Debtors believe that in liquidation under chapter 7, before creditors received any distribution, additional administrative expenses involved in the appointment of a trustee or trustees and attorneys, accountants and other professionals to assist such trustees would cause a substantial diminution in the value of the Estates. The assets available for distribution to creditors would be reduced by such additional expenses and by Claims, some of which would be entitled to priority, which would arise by reason of the liquidation and from the rejection of leases and other executory contracts in connection with the cessation of operations and the failure to realize the greater going concern value of the Debtors' assets.

The Debtors may also be liquidated pursuant to a chapter 11 plan. In a liquidation under chapter 11, the Debtors' assets could be sold in an orderly fashion over a more extended period of time than in a liquidation under chapter 7. Thus, a chapter 11 liquidation might result in larger recoveries than a chapter 7 liquidation, but the delay in distributions could result in lower present values received and higher administrative costs. Because a trustee is not required in a chapter 11 case, expenses for professional fees could be lower than in a chapter 7 case, in which a trustee must be appointed. Any distribution to the Claimholders under a chapter 11 liquidation plan probably would be delayed substantially.

The Debtors' liquidation analysis, prepared with its accountants and financial advisors, is premised upon a hypothetical liquidation in a chapter 7 case and is attached as <u>Appendix E</u> to this Disclosure Statement. In the analysis, the Debtors have taken into account the nature, status and underlying value of their assets, the ultimate realizable value of their assets and the extent to which such assets are subject to liens and security interests.

The likely form of any liquidation would be the sale of individual assets. Based on this analysis, a liquidation of the Debtors' assets likely would produce less value for distribution to creditors than that recoverable

in each instance under the Plan. In the opinion of the Debtors, the recoveries projected to be available in liquidation are not likely to afford holders of Claims as great a realization potential as does the Plan.

## XIV.    VOTING REQUIREMENTS

On September [●], 2009, the Bankruptcy Court entered the Solicitation Procedures Order which, among other things, set procedures for voting on the Plan, established the record dates to determine which Claimholders are entitled to vote on the Plan, and scheduled the Confirmation Hearing. A copy of the Confirmation Hearing Notice is enclosed with this Disclosure Statement. The Confirmation Hearing Notice sets forth in detail, among other things, the voting deadlines and objection deadlines with respect to the Plan. The Confirmation Hearing Notice and the instructions attached to the Ballots should be read in connection with this article.

TO HAVE YOUR VOTE COUNTED, YOUR BALLOT MUST BE PROPERLY COMPLETED AS SET FORTH ABOVE AND IN ACCORDANCE WITH THE VOTING INSTRUCTIONS ON THE BALLOT AND **RECEIVED** NO LATER THAN OCTOBER 5, 2009 AT 5:00 P.M. (PREVAILING EASTERN TIME) (THE "VOTING DEADLINE") BY THE APPROPRIATE VOTING AGENT.

---

**IF YOU HOLD A CLAIM IN CLASS 6 PREPETITION SECURED OBLIGATIONS, CLASS 8 PBGC TERMINATION LIABILITY CLAIM, OR CLASS 9 OTHER UNSECURED CLAIMS, YOU MUST RETURN YOUR BALLOT TO THE GARDEN CITY GROUP, INC. ("GCG") TO ONE OF THE FOLLOWING ADDRESSES:**

| **If By First-Class Mail:** | **If By Hand Delivery Or Overnight Courier:** |
|---|---|
| The Garden City Group, Inc. | The Garden City Group, Inc. |
| Attn: Hayes Lemmerz International, Inc. | Attn: Hayes Lemmerz International, Inc. |
| P.O. Box 9000 #6531 | 105 Maxess Road |
| Merrick, NY 11566-9000 | Melville, NY 11747 |

If you have any questions about (1) the procedure for voting your Claim with respect to the packet of materials that you have received or (2) the amount of your Claims, please email HayesInfo@gardencitygroup.com, contact GCG at one of the above addresses, or call GCG at 1-800-327-3664 (domestic toll-free) or +1 (614) 553-1313 (international callers).

---

**IF YOU HOLD A CLAIM IN CLASS 7 NOTEHOLDER CLAIMS YOU MUST ALLOW SUFFICIENT TIME FOR YOUR BALLOT TO BE PROCESSED BY YOUR ACCOUNTHOLDER AND TRANSMITTED TO THE FINANCIAL BALLOTING GROUP, LLC ("FBG"), THE SPECIAL VOTING AGENT FOR CLASS 7 NOTEHOLDER CLAIMS, IN ADVANCE OF THE VOTING DEADLINE. YOUR ACCOUNTHOLDER WILL PROCESS YOUR BALLOT AND FORWARD YOUR VOTE DIRECTLY TO FBG. DO NOT SEND YOUR BALLOT DIRECTLY TO GCG OR FBG.**

If you have any questions about (1) the procedure for voting your Claim with respect to the packet of materials that you have received or (2) the amount of your Claims, please email HayesBallotingInfo@fbgllc.com, contact FBG at 1-(866)-734-9393 (domestic toll-free) or +1 (646) 282-1800 (international callers).

---

Electronic copies of the Plan and Disclosure Statement (including, after the Exhibit Filing Date, all exhibits, schedules and appendices to the foregoing) and all pleadings and orders of the Bankruptcy Court are publicly available on the Bankruptcy Court's website, http://www.deb.uscourts.gov for a fee (a PACER account is required), or at the Company's restructuring website, http://www.hayeslemmerzreorg.com, free of charge. In addition, if you wish to obtain an additional copy of the Plan, this Disclosure Statement, or any exhibits or appendices to such documents, you may contact GCG at the address immediately above or counsel for the Debtors.

The Bankruptcy Court may confirm the Plan only if the Bankruptcy Court determines that the Plan complies with the technical requirements of chapter 11 of the Bankruptcy Code and that the disclosures by the Debtors concerning the Plan have been adequate and have included information concerning all payments made or promised by the Debtors in connection with the Plan and the Bankruptcy Cases. In addition, the Bankruptcy Court

must determine that the Plan has been proposed in good faith and not by any means forbidden by law and, under Bankruptcy Rule 3020(b)(2), the Bankruptcy Court may do so without receiving evidence if no objection is timely filed.

In particular, and as described in more detail above, the Bankruptcy Code requires the Bankruptcy Court to find, among other things, that (A) the Plan has been accepted by the requisite votes of all Classes of Impaired Claims and Interests unless approval will be sought under Bankruptcy Code section 1129(b) in spite of the non-acceptance by one or more such Classes; (B) the Plan is "feasible," which means that there is a reasonable probability that the Reorganized Debtors will be able to perform their obligations under the Plan and continue to operate their businesses without further financial reorganization or liquidation; and (C) the Plan is in the "best interests" of all Claimholders and Interest holders, which means that such holders will receive at least as much under the Plan as they would receive in a liquidation under chapter 7 of the Bankruptcy Code.

THE BANKRUPTCY COURT MUST FIND THAT ALL CONDITIONS MENTIONED ABOVE ARE MET BEFORE IT CAN CONFIRM THE PLAN. THUS, EVEN IF ALL THE CLASSES OF IMPAIRED CLAIMS WERE TO ACCEPT THE PLAN BY THE REQUISITE VOTES, THE BANKRUPTCY COURT MUST STILL MAKE AN INDEPENDENT FINDING THAT THE PLAN SATISFIES THESE REQUIREMENTS OF THE BANKRUPTCY CODE, THAT THE PLAN IS FEASIBLE, AND THAT THE PLAN IS IN THE BEST INTERESTS OF THE HOLDERS OF CLAIMS AGAINST AND INTERESTS IN THE DEBTORS.

**UNLESS THE BALLOT BEING FURNISHED WITH THIS DISCLOSURE STATEMENT IS TIMELY SUBMITTED TO THE VOTING AGENT SO THAT IT IS RECEIVED ON OR PRIOR TO OCTOBER 5, 2009 AT 5:00 P.M. (PREVAILING EASTERN TIME) TOGETHER WITH ANY OTHER DOCUMENTS REQUIRED BY SUCH BALLOT, THE DEBTORS MAY, IN THEIR SOLE DISCRETION, REJECT SUCH BALLOT AS INVALID AND, THEREFORE, DECLINE TO COUNT IT AS AN ACCEPTANCE OR REJECTION OF THE PLAN. IN NO CASE SHOULD A BALLOT BE DELIVERED TO THE DEBTORS OR ANY OF THEIR ADVISORS.**

## A. Parties in Interest Entitled to Vote

Under Bankruptcy Code section 1124, a class of claims or interests is deemed to be "impaired" under a plan unless (1) the plan leaves unaltered the legal, equitable, and contractual rights to which such claim or interest entitles the holder thereof or (2) notwithstanding any legal right to an accelerated payment of such claim or interest, the plan cures all existing defaults (other than defaults resulting from the occurrence of events of bankruptcy) and reinstates the maturity of such claim or interest as it existed before the default.

In general, a holder of a claim or interest may vote to accept or to reject a plan if (1) the claim or interest is "allowed," which generally means that no party in interest has objected to such claim or interest, and (2) the claim or interest is impaired by the plan. If the holder of an impaired claim or impaired interest will not receive any distribution under the plan in respect of such claim or interest, the Bankruptcy Code deems such holder to have rejected the plan. If the claim or interest is not impaired, the Bankruptcy Code deems that the holder of such claim or interest has accepted the plan and the plan proponent need not solicit such holder's vote.

The holder of a Claim that is Impaired under the Plan is entitled to vote to accept or reject the Plan if (1) the Plan provides a distribution in respect of such Claim and (2)(a) the Claim has been scheduled by the respective Debtor (and such Claim is not scheduled as disputed, contingent, or unliquidated); (b) such Claimholder has timely filed a proof of claim as to which no objection has been filed; or (c) such Claimholder has timely filed a motion pursuant to Bankruptcy Rule 3018(a) seeking temporary allowance of such Claim for voting purposes only and the Debtors have not opposed the motion or objected to the Claim, in which case the holder's vote will be counted only upon order of the Bankruptcy Court.

A vote may be disregarded if the Bankruptcy Court determines, pursuant to section 1126(e) of the Bankruptcy Code, that it was not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code. The Solicitation Procedures Order also sets forth assumptions and procedures for tabulating Ballots, including Ballots that are not completed fully or correctly.

## B.    Classes Unimpaired Under the Plan

The following Classes of Claims and Interests are Unimpaired under the Plan: Class 1 Secured Tax Claims, Class 2 Other Secured Claims, Class 3 Other Priority Claims, Class 4 Intercompany Claims, and Class 5 Subsidiary Interests.  Under section 1126(f) of the Bankruptcy Code and the Solicitation Procedures Order, such Claimholders and Interest Holders, as applicable, are conclusively presumed to have accepted the Plan.  Their votes to accept or reject the Plan will not be solicited.

## C.    Classes Impaired Under the Plan

### 1.    Impaired Classes of Claims Entitled to Vote

The following Classes of Claims are Impaired under the Plan, and are entitled to vote to accept or reject the Plan: Class 6 Prepetition Secured Obligations, Class 7 Noteholder Claims, Class 8 PBGC Termination Liability Claim, and Class 9 Other Unsecured Claims.

### 2.    Impaired Classes of Claims and Interests Not Entitled to Vote

The following Classes of Claims and Interests are not entitled to receive any distribution under the Plan on account of their Claims and Interests: Class 10a Subordinated Debt Securities Claims, Class 10b Subordinated Equity Securities Claims, Class 11a Interests in HLI, and Class 11b Old Preferred Stock and Old Preferred Stock Options.  Pursuant to section 1126(g) of the Bankruptcy Code.  Under section 1126(g) of the Bankruptcy Code and the Solicitation Procedures Order, such Claimholders and Interest Holders, as applicable, are conclusively presumed to have rejected the Plan.  Their votes to accept or reject the Plan will not be solicited.

## D.    Special Voting Procedures for Noteholders

Holders of Noteholder Claims in Class 7 will have four options with respect to voting their Claims:  (1) vote to accept the Plan and accept the releases contained in the Plan; (2) vote to reject the Plan and not opt-out of the releases contained in the Plan; (3) vote to reject the Plan and opt-out of the releases contained in the Plan; and (4) abstain from voting and accept the releases contained in the Plan.  The Debtors will be soliciting the votes of Noteholders through the international clearing system depositories, Clearstream Bank ("Clearstream") and Euroclear Bank ("Euroclear"), and the banks, brokers, and other accountholders ("Accountholders") holding through Clearstream and Euroclear.  The Debtors are not conducting a "record date" solicitation with respect to Class 7 Noteholder Claims.  Therefore, any Holder of a Noteholder Claim (including those parties that purchase Noteholder Claims during the solicitation period) may vote such Noteholder Claims any time prior to the expiration of the Voting Deadline.

Once a Noteholder's vote is recorded by the appropriate Accountholder, the underlying Notes position will be "blocked" within the international depository system.  This account blocking is necessary to facilitate the tabulation of votes to accept or reject the Plan and opt-outs of releases and to ensure that Plan consideration can be paid to the correct Noteholders.  VOTING NOTEHOLDERS WILL BE UNABLE TO TRADE THEIR NOTES ONCE THEIR POSITION IS BLOCKED.  In order to receive a distribution, Noteholders that do not cast a vote with respect to the Plan, must ultimately instruct their accountholder to block their positions.  Distributions that would otherwise be paid to abstaining Noteholders will be treated as unclaimed property under the Plan if their positions are not blocked within the requisite period of time after the Plan Effective Date.

## XV.    CONCLUSION

## A.    Hearing on and Objections to Confirmation

### 1.    Confirmation Hearing

The hearing on confirmation of the Plan has been scheduled for October 15, 2009 at 2:00 p.m. (prevailing Eastern time).  Such hearing may be adjourned from time to time by announcing such adjournment in open court, all without further notice to parties in interest, and the Plan may be modified by the Debtors pursuant to section 1127 of the Bankruptcy Code prior to, during, or as a result of that hearing, without further notice to parties in interest.

2. *Date Set for Filing Objections to Confirmation of the Plan*

The time by which all objections to confirmation of the Plan must be filed with the Court and received by the parties listed in the Confirmation Hearing Notice has been set for October 6, 2009 at 4:00 p.m. (prevailing Eastern time). A copy of the Confirmation Hearing Notice is enclosed with this Disclosure Statement.

**B.    Recommendation**

The Plan provides for an equitable distribution to creditors of the Debtors, preserves the value of the Debtors' businesses as a going concern, and preserves the jobs of employees. The Debtors believe that any alternative to confirmation of the Plan, such as liquidation or attempts by another party in interest to file a plan, could result in significant delays, litigation and costs, as well as the loss of jobs by the employees. Moreover, the Debtors believe that the Debtors' creditors will receive greater and earlier recoveries under the Plan than those that would be achieved in liquidation or under an alternative plan. Finally, the Committee supports the Plan. FOR THESE REASONS, THE DEBTORS URGE YOU TO RETURN YOUR BALLOT ACCEPTING THE PLAN.

.

Dated: Wilmington, Delaware
September 2, 2009

HAYES LEMMERZ INTERNATIONAL, INC.
AND ITS SUBSIDIARIES THAT ARE ALSO
DEBTORS AND DEBTORS-IN-POSSESSION IN
THE BANKRUPTCY CASES


By: /s/ Mark Brebberman
Mark Brebberman
Vice President and Chief Financial Officer

SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP
155 N. Wacker Drive, Suite 2700
Chicago, Illinois 60606-1720
J. Eric Ivester, Esq.
Stephen D. Williamson, Esq.
Bennett S. Silverberg, Esq. (New York Office)

– and –

SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP
One Rodney Square
P.O. Box 636
Wilmington, Delaware 19899
Anthony W. Clark, Esq.
Kimberly A. LaMaina, Esq.

COUNSEL FOR HAYES LEMMERZ
INTERNATIONAL, INC. AND ITS SUBSIDIARIES
THAT ARE ALSO DEBTORS AND DEBTORS-
IN-POSSESSION IN THE BANKRUPTCY CASES

**APPENDIX A**

**FIRST AMENDED JOINT PLAN OF REORGANIZATION OF HAYES
LEMMERZ INTERNATIONAL, INC. AND ITS AFFILIATED
<u>DEBTORS AND DEBTORS-IN-POSSESSION</u>**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

- - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                            :
In re:                             :   Chapter 11
                                            :
HAYES LEMMERZ INTERNATIONAL, :   Case No. 09-11655 (MFW)
INC., et al.,                       :
                                            :
                     Debtors.   :   Jointly Administered
                                            :
- - - - - - - - - - - - - - - - - - - - - - - - - - - x

# FIRST AMENDED JOINT PLAN OF REORGANIZATION OF HAYES LEMMERZ INTERNATIONAL, INC. AND ITS AFFILIATED DEBTORS AND DEBTORS-IN-POSSESSION

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
J. Eric Ivester
Stephen D. Williamson
Bennett S. Silverberg (New York Office)
155 North Wacker Drive
Chicago, Illinois 60606

- and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Anthony W. Clark
Kimberly A. LaMaina
One Rodney Square
P.O. Box 636
Wilmington, Delaware 19899

Counsel for Debtors and Debtors-in-Possession

Dated: Wilmington, Delaware
      July 2, 2009 (amended September 2, 2009)

# TABLE OF CONTENTS

**PAGE**

ARTICLE I DEFINITIONS, RULES OF INTERPRETATION, AND
COMPUTATION OF TIME ........................................................................ 2

    A.    Scope of Definitions ................................................................ 2

    B.    Definitions ............................................................................... 2

          1.1    "503 Deadline" .................................................................. 2

          1.2    "Administrative Claim" .................................................... 2

          1.3    "Administrative Claims Bar Date" .................................. 2

          1.4    "Affiliates" ....................................................................... 2

          1.5    "Allowed Claim" .............................................................. 3

          1.6    "Allowed Class __ Claim" ............................................... 3

          1.7    "Annual Incentive Plan" .................................................. 3

          1.8    "Avoidance Claims" ......................................................... 3

          1.9    "Bankruptcy Case(s)" ...................................................... 3

          1.10    "Bankruptcy Code" ........................................................... 3

          1.11    "Bankruptcy Court" .......................................................... 4

          1.12    "Bankruptcy Rules" .......................................................... 4

          1.13    "Business Day" .................................................................. 4

          1.14    "Cash" ............................................................................... 4

          1.15    "Causes of Action" ........................................................... 4

          1.16    "Certificate" ...................................................................... 4

          1.17    "Claim" ............................................................................. 4

          1.18    "Claimholder" ................................................................... 4

          1.19    "Claims Administration" .................................................. 4

          1.20    "Claims Objection Deadline" ........................................... 4

          1.21    "Class" .............................................................................. 5

          1.22    "Confirmation Date" ......................................................... 5

          1.23    "Confirmation Hearing" ................................................... 5

          1.24    "Confirmation Order" ....................................................... 5

          1.25    "Consent Fee" ................................................................... 5

          1.26    "Creditors' Committee" .................................................... 5

          1.27    "Cure" ............................................................................... 5

          1.28    "D&O Insurance" .............................................................. 6

          1.29    "Debtors" .......................................................................... 6

          1.30    "Declaratory Judgement Action" ..................................... 6

          1.31    "Deficiency Claim" ........................................................... 6

          1.32    "DIP Administrative Agent" ............................................. 6

          1.33    "DIP Agents" .................................................................... 6

          1.34    "DIP Credit Agreement" ................................................... 6

          1.35    "DIP Financing Facility" .................................................. 6

          1.36    "DIP Financing Facility Claims" ...................................... 6

1.37   "DIP Financing Facility Order" ............................................................. 6
1.38   "DIP Lenders" ..................................................................................... 7
1.39   "DIP Lenders New Money Distribution Property" ............................... 7
1.40   "DIP Lenders Roll-Up Distribution Property" ..................................... 7
1.41   "Directors" ............................................................................................ 7
1.42   "Disallowed Claim" .............................................................................. 7
1.43   "Disbursing Agent" ............................................................................... 8
1.44   "Disclosure Statement" ......................................................................... 8
1.45   "Disputed Claim" .................................................................................. 8
1.46   "Distribution Date" ............................................................................... 8
1.47   "Estates" ................................................................................................ 8
1.48   "Executive Employment Agreements" .................................................. 8
1.49   "Exhibit" ............................................................................................... 8
1.50   "Exhibit Filing Date" ............................................................................ 8
1.51   "Existing Securities" ............................................................................. 8
1.52   "Exit Credit Facility" ............................................................................ 9
1.53   "Exit Credit Facility Agent" ................................................................. 9
1.54   "Exit Credit Facility Documents" ......................................................... 9
1.55   "Exit Credit Facility Lenders" .............................................................. 9
1.56   "Face Amount" ...................................................................................... 9
1.57   "Final Order" ........................................................................................ 9
1.58   "Fiscal Quarter" .................................................................................... 9
1.59   "Force Majuere Event" .......................................................................... 9
1.60   "Foreign Creditor Distribution Property" ............................................. 9
1.61   "HLI Opco" .......................................................................................... 10
1.62   "Hayes" ................................................................................................ 10
1.63   "Hayes Non-Debtor" ............................................................................ 10
1.64   "Holdback Amount" ............................................................................. 10
1.65   "Holdback Escrow Amount" ................................................................ 10
1.66   "Holder" ............................................................................................... 10
1.67   "Impaired" ............................................................................................ 10
1.68   "Incremental New Money DIP Term Loan" ......................................... 10
1.69   "Incremental New Money DIP Term Loan
       Commitment" ....................................................................................... 10
1.70   "Indemnification Obligations" ............................................................. 10
1.71   "Insured Claim" .................................................................................... 10
1.72   "Intercompany Claim" .......................................................................... 10
1.73   "Interest" .............................................................................................. 11
1.74   "Interestholder" .................................................................................... 11
1.75   "KEIP" .................................................................................................. 11
1.76   "Lien" ................................................................................................... 11
1.77   "Long Term Incentive Plan" ................................................................ 11
1.78   "New Common Stock" .......................................................................... 11
1.79   "New Money DIP Lender" .................................................................... 11

1.80 "New Money DIP Term Loans" ............................................ 11
1.81 "New Money DIP Term Loan Commitments" ....................... 11
1.82 "Non-Debtor Affiliate" ...................................................... 12
1.83 "Noteholder(s)" ................................................................. 12
1.84 "Noteholder Claims" ......................................................... 12
1.85 "Notes" ............................................................................. 12
1.86 "Notes Guarantees" ........................................................... 12
1.87 "Notes Indenture" ............................................................. 12
1.88 "Notes Indenture Trustee" ................................................ 12
1.89 "OPEB" ............................................................................ 12
1.90 "Officers" ......................................................................... 12
1.91 "Old Common Stock" ....................................................... 12
1.92 "Old Common Stock Options" .......................................... 12
1.93 "Old Preferred Stock" ...................................................... 12
1.94 "Old Preferred Stock Options" ......................................... 12
1.95 "Ordinary Course Professional Order" ............................. 13
1.96 "Organizational Documents" ............................................ 13
1.97 "Other Priority Claim" ..................................................... 13
1.98 "Other Secured Claim" ..................................................... 13
1.99 "Other Unsecured Claim" ................................................. 13
1.100 "Other Unsecured Claimholders Distribution Property" ........ 13
1.101 "PBGC" ............................................................................ 14
1.102 "PBGC Termination Liability Claim" .............................. 14
1.103 "Pension Plan" ................................................................. 14
1.104 "Periodic Distribution Date" ........................................... 14
1.105 "Person" ........................................................................... 14
1.106 "Petition Date" ................................................................. 14
1.107 "Plan" ............................................................................... 14
1.108 "Plan Effective Date" ....................................................... 14
1.109 "Postpetition Interest" ..................................................... 14
1.110 "Prepetition Administrative Agent" ................................. 14
1.111 "Prepetition Agents" ........................................................ 15
1.112 "Prepetition Credit Agreement" ...................................... 15
1.113 "Prepetition Credit Facility" ........................................... 15
1.114 "Prepetition Secured Lenders" ........................................ 15
1.115 "Prepetition Secured Lender Claims" .............................. 15
1.116 "Prepetition Secured Lenders Distribution Property" ............. 15
1.117 "Prepetition Secured Obligations" ................................... 15
1.118 "Priority Claim" ............................................................... 15
1.119 "Priority Tax Claim" ........................................................ 15
1.120 "Pro Rata" ........................................................................ 15
1.121 "Professional" .................................................................. 16
1.122 "Professional Claim" ....................................................... 16
1.123 "Professional Fee Order" ................................................. 16

1.124 "Reclamation Claims".................................................................16
1.125 "Reinstated" or "Reinstatement"........................................16
1.126 "Released Parties"........................................................................16
1.127 "Reorganized . . ."........................................................................17
1.128 "Reorganized Debtors"..............................................................17
1.129 "Requisite DIP Lenders"............................................................17
1.130 "Restructuring Transaction(s)"...............................................17
1.131 "Retained Actions".....................................................................17
1.132 "Retiree Committee"..................................................................17
1.133 "Roll-Up Loan Elevation Date".................................................17
1.134 "Scheduled"....................................................................................17
1.135 "Schedules"....................................................................................17
1.136 "Section 503(b)(9) Claims".......................................................17
1.137 "Secured Tax Claim".....................................................................18
1.138 "Security".........................................................................................18
1.139 "Senior Roll-Up Loans"................................................................18
1.140 "Solicitation Procedures Order"...............................................18
1.141 "Subordinated Debt Securities Claim" ..................................18
1.142 "Subordinated Equity Securities Claim"................................18
1.143 "Subordinated Securities Claim" ............................................18
1.144 "Subsidiary Debtors"...................................................................18
1.145 "Subsidiary Interests".................................................................18
1.146 "Total Enterprise Value"............................................................18
1.147 "Tranche A Warrants"..................................................................19
1.148 "Tranche A Warrants Agreement" ..........................................19
1.149 "Tranche B Warrants".................................................................19
1.150 "Tranche B Warrants Agreement".........................................19
1.151 "Unimpaired"...................................................................................19
1.152 "Voting Deadline" ........................................................................19
C.    Rules of Interpretation ........................................................................19
D.    Computation of Time............................................................................20
E.    Exhibits .....................................................................................................20

ARTICLE II ADMINISTRATIVE EXPENSES AND PRIORITY TAX
CLAIMS .................................................................................................20
2.1    Administrative Claims ............................................................20
2.2    Administrative Claims Incurred In the Ordinary Course
Of Business...............................................................................20
2.3    Reclamation Claims ................................................................21
2.4    Priority Tax Claims ..................................................................21
2.5    DIP Financing Facility Claims ..............................................21

ARTICLE III CLASSIFICATION AND TREATMENT OF CLAIMS AND
INTERESTS ..........................................................................................22

|        | 3.1  | Introduction ...................................................................... | 22 |
|--------|------|------|------|
|        | 3.2  | Classification and Treatment of Claims Against and Interests In the Debtors ........................................... | 23 |

ARTICLE IV SPECIAL PROVISIONS FOR TREATMENT OF CLAIMS AND INTERESTS .................................................................. 28

|        | 4.1  | Special Provisions Regarding Insured Claims ...................... | 28 |
|--------|------|------|------|
|        | 4.2  | Reservation of Rights........................................................... | 29 |

ARTICLE V ACCEPTANCE OR REJECTION OF THE PLAN; EFFECT OF REJECTION BY ONE OR MORE IMPAIRED CLASSES OF CLAIMS OR INTERESTS ............................................................. 29

|        | 5.1  | Impaired Classes of Claims Entitled to Vote ........................ | 29 |
|--------|------|------|------|
|        | 5.2  | Classes Deemed to Accept Plan ........................................... | 29 |
|        | 5.3  | Acceptance by Impaired Classes .......................................... | 30 |
|        | 5.4  | Classes Deemed to Reject Plan ............................................ | 30 |
|        | 5.5  | Confirmation Pursuant to Section 1129(b) of the Bankruptcy Code ................................................................. | 30 |
|        | 5.6  | Confirmability and Severability of a Plan............................ | 30 |

ARTICLE VI MEANS FOR IMPLEMENTATION OF THE PLAN ...................... 30

|        | 6.1  | Continued Corporate Existence ............................................ | 30 |
|--------|------|------|------|
|        | 6.2  | Corporate Action.................................................................. | 31 |
|        | 6.3  | Certificate of Incorporation and Bylaws .............................. | 31 |
|        | 6.4  | Cancellation of Existing Securities and Agreements............. | 31 |
|        | 6.5  | Authorization and Issuance of New Common Stock, Tranche A Warrants, and Tranche B Warrants ..................... | 32 |
|        | 6.6  | Directors and Officers ......................................................... | 33 |
|        | 6.7  | Employment Incentive Compensation Programs ................... | 34 |
|        | 6.8  | Post-Effective Date Financing.............................................. | 35 |
|        | 6.9  | Restructuring Transactions and Alternative Structures ......... | 36 |
|        | 6.10 | Preservation of Causes of Action ......................................... | 36 |
|        | 6.11 | Effectuating Documents; Further Transactions..................... | 37 |
|        | 6.12 | Exemption From Certain Transfer Taxes and Recording Fees ...................................................................................... | 37 |
|        | 6.13 | Approval of Requisite DIP Lenders and Exit Credit Facility Lenders .................................................................... | 37 |
|        | 6.14 | Compromise of Declaratory Judgment Action and PBGC Termination Liability Claim....................................... | 38 |

ARTICLE VII UNEXPIRED LEASES AND EXECUTORY CONTRACTS .......... 38

|        | 7.1  | Assumed Contracts and Leases ............................................ | 38 |
|--------|------|------|------|
|        | 7.2  | Rejected Contracts and Leases ............................................. | 39 |
|        | 7.3  | Exhibits Not Admissions...................................................... | 40 |

|       | 7.4  | Payments Related to Assumption of Executory Contracts and Unexpired Leases | 40 |
|       | 7.5  | Rejection Damages Bar Date | 40 |

ARTICLE VIII PROVISIONS GOVERNING DISTRIBUTIONS ........................... 40

|       | 8.1  | Time of Distributions | 40 |
|       | 8.2  | No Interest on Claims | 40 |
|       | 8.3  | Disbursing Agent | 41 |
|       | 8.4  | Surrender of Securities or Instruments | 41 |
|       | 8.5  | Claims Administration Responsibility | 41 |
|       | 8.6  | Delivery of Distributions | 41 |
|       | 8.7  | Procedures for Treating and Resolving Disputed and Contingent Claims | 42 |
|       | 8.8  | Conversion of Claims Asserted In Foreign Currencies | 42 |
|       | 8.9  | Distribution of Foreign Creditor Distribution Property to Holders of Class 7 Noteholder Claims and Class 8 PBGC Termination Liability Claim. | 43 |

ARTICLE IX ALLOWANCE AND PAYMENT OF CERTAIN ADMINISTRATIVE CLAIMS ........................... 43

|       | 9.1  | Professional Claims | 43 |
|       | 9.2  | Substantial Contribution Compensation and Expenses Bar Date. | 44 |
|       | 9.3  | Other Administrative Claims | 44 |
|       | 9.4  | Compensation of Notes Indenture Trustee and Prepetition Administrative Agent. | 45 |

ARTICLE X EFFECT OF THE PLAN ON CLAIMS AND INTERESTS ........................... 46

|       | 10.1  | Revesting of Assets | 46 |
|       | 10.2  | Discharge of the Debtors | 46 |
|       | 10.3  | Compromises and Settlements | 47 |
|       | 10.4  | Release of Certain Parties | 47 |
|       | 10.5  | Releases by Holders of Claims | 48 |
|       | 10.6  | Setoffs | 48 |
|       | 10.7  | Exculpation and Limitation of Liability | 48 |
|       | 10.8  | Indemnification Obligations | 49 |
|       | 10.9  | Injunction | 49 |
|       | 10.10 | Plan Impact on Foreign Non-Debtor Subsidiaries' Guarantees of Notes | 50 |
|       | 10.11 | Plan Impact on PBGC's Claims Against Non-Debtor Affiliates | 50 |

ARTICLE XI CONDITIONS PRECEDENT ........................... 50

|       | 11.1  | Conditions to Confirmation | 50 |

| 11.2 | Conditions to Consummation | 51 |
| 11.3 | Waiver of Conditions to Confirmation or Consummation | 53 |

ARTICLE XII RETENTION OF JURISDICTION ................................................. 53

ARTICLE XIII MISCELLANEOUS PROVISIONS ............................................. 55

| 13.1 | Binding Effect | 55 |
| 13.2 | Modification and Amendments | 56 |
| 13.3 | Withholding and Reporting Requirements | 56 |
| 13.4 | Allocation of Plan Distributions Between Principal and Interest | 56 |
| 13.5 | Creditors' Committee | 56 |
| 13.6 | Payment of Statutory Fees | 56 |
| 13.7 | Revocation, Withdrawal, or Non-Consummation | 57 |
| 13.8 | Notices | 57 |
| 13.9 | Term of Injunctions or Stays | 58 |
| 13.10 | Governing Law | 58 |
| 13.11 | Waiver and Estoppel | 58 |

## EXHIBITS

| | |
|---|---|
| Exhibit A | Plan Proponents |
| Exhibit B | Summary of Long Term Incentive Plan |
| Exhibit C | Summary Description of the Terms of the New Common Stock |
| Exhibit D | Schedule of Retained Actions |
| Exhibit E | Certificate of Incorporation for the Reorganized Company |
| Exhibit F | Bylaws for the Reorganized Company |
| Exhibit G | Initial Directors and Officers of the Reorganized Debtors |
| Exhibit H | Form of Executive Employment Agreements |
| Exhibit I | Modifications to Supplemental Executive Retirement Plan |
| Exhibit J | Schedule of Rejected Contracts and Leases |
| Exhibit K | Material Terms of Post-Plan Effective Date Secured Term Loan |
| Exhibit L | Form of Warrants Agreement |
| Exhibit M | Form of Stockholders' Agreement, Registration Rights Agreement and Management Stockholders' Agreement |

# INTRODUCTION

Hayes Lemmerz International, Inc. ("Hayes") and 24 of its direct and indirect subsidiaries and affiliates, debtors and debtors-in-possession (collectively, the "Debtors") in the above-captioned jointly-administered chapter 11 reorganization cases, hereby propose the following joint reorganization plans for the resolution of outstanding creditor claims against, and equity interests in, each of the Debtors. This Plan, though proposed jointly, constitutes a separate plan proposed by each Debtor. Therefore, the classifications of Claims set forth in Articles II and III herein shall be deemed to apply separately with respect to each plan proposed by each Debtor.

Reference is made to the Disclosure Statement for a discussion of the Debtors' history, business, properties, results of operations, projections for future operations, risk factors, and a summary and analysis of this Plan and certain related matters, including distributions to be made under this Plan. Each Debtor is a proponent of the plan contained herein within the meaning of Bankruptcy Code section 1129. Capitalized terms used but not defined in this Introduction have the meanings ascribed to them in Article I of this Plan. The Debtors who are proponents of this Plan, their chapter 11 case numbers, and their jurisdictions of incorporation or formation are identified in Exhibit A attached hereto.

This Plan contemplates the reorganization of each of the Debtors upon consummation of this Plan and the resolution of the outstanding Claims against, and Interests in, the Debtors pursuant to Bankruptcy Code sections 1123, 1129 and 1141. Certain of the Debtors may be dissolved or merged (or combined in another form of transaction with another Debtor or non-Debtor as a means of implementation of the Plan).

These reorganization cases have been consolidated for procedural purposes only and are being jointly administered pursuant to an order of the United States Bankruptcy Court for the District of Delaware. The Plan does not contemplate the substantive consolidation of any of the Debtors.

Under section 1125(b) of the Bankruptcy Code, a vote to accept or reject this Plan may not be solicited from a Claimholder or Interestholder until the Disclosure Statement has been approved by the Bankruptcy Court and distributed to Claimholders and Interestholders. ALL CLAIMHOLDERS WHO ARE ELIGIBLE TO VOTE ON THIS PLAN ARE ENCOURAGED TO READ THIS PLAN AND THE DISCLOSURE STATEMENT IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THIS PLAN.

Subject to the restrictions on modifications set forth in Bankruptcy Code section 1127, Bankruptcy Rule 3019, and Article XIII of this Plan, the Debtors expressly reserve their right to alter, amend, revoke, withdraw or modify this Plan, one or more times, before this Plan's substantial consummation.

# ARTICLE I

## DEFINITIONS, RULES OF INTERPRETATION, AND COMPUTATION OF TIME

### A.    Scope of Definitions

Any term used in this Plan that is not defined herein, but is defined in the Bankruptcy Code or the Bankruptcy Rules, shall have the meaning ascribed to that term in the Bankruptcy Code or the Bankruptcy Rules, as applicable.  Whenever it appears appropriate from the context, each term stated in the singular or the plural includes the singular and the plural, and each pronoun stated in the masculine, feminine or neuter includes the masculine, feminine and neuter.

### B.    Definitions

**1.1    "503 Deadline"** means the date which is 30 days after the date of the Confirmation Hearing and which shall be the last date on which a Person or entity may request compensation or expense reimbursement for making a substantial contribution in the Bankruptcy Cases pursuant to Bankruptcy Code sections 503(b)(3), 503(b)(4) and 503(b)(5) as set forth in Article IX herein.

**1.2    "Administrative Claim"** means a Claim for payment of an administrative expense of a kind specified in Bankruptcy Code section 503(b) and entitled to priority pursuant to Bankruptcy Code section 507(a)(2), including, but not limited to, the actual, necessary costs and expenses, incurred after the Petition Date, of preserving the Estates and operating the businesses of the Debtors, including wages, salaries or commissions for services rendered after the commencement of the Bankruptcy Cases, DIP Financing Facility Claims, Professional Claims, and all fees and charges assessed against the Estates under chapter 123 of title 28 of the United States Code, and all Allowed Claims that are entitled to be treated as Administrative Claims pursuant to a Final Order of the Bankruptcy Court under Bankruptcy Code section 546(c)(2)(A).

**1.3    "Administrative Claims Bar Date"** means the date which is thirty (30) days after the Plan Effective Date d which shall be the last date on which a Person or entity may request payment of Administrative Claims (other than those specifically identified in Sections 9.1 (professional fee claims) and 9.2 (substantial contribution claims) of the Plan as set forth in Article IX herein.

**1.4    "Affiliates"** means, with respect to any person or entity  (a) a person or entity that directly or indirectly, through one or more intermediaries, controls or is controlled by or is under common control with such person or entity or (b) a person or

entity that would be an "affiliate" within the meaning ascribed to such term by Bankruptcy Code section 101(2) if such person or entity were a debtor.

1.5 **"Allowed Claim"** means a Claim or any portion thereof, (a) that has been allowed by a Final Order of the Bankruptcy Court (or such other court as a Reorganized Debtor and the Holder of such Claim agree may adjudicate such Claim and objections thereto), or (b) which (i) is not the subject of a proof of claim timely filed with the Bankruptcy Court but (ii) is Scheduled as liquidated and noncontingent, other than a Claim that is Scheduled at zero, in an unknown amount, or as disputed, but only to the extent such Claim is Scheduled as liquidated and noncontingent and as to which either (x) no objection to its allowance has been filed within the periods of limitation fixed by this Plan, the Bankruptcy Code or by any order of the Bankruptcy Court or (y) any objection to its allowance has been settled or withdrawn, or has been denied by a Final Order of the Bankruptcy Court, or (c) for which a proof of claim in a liquidated amount has been timely filed with the Bankruptcy Court pursuant to the Bankruptcy Code, any Final Order of the Bankruptcy Court or other applicable bankruptcy law, and as to which either (i) no objection to its allowance has been filed within the periods of limitation fixed by this Plan, the Bankruptcy Code or by any order of the Bankruptcy Court or (ii) any objection to its allowance has been settled or withdrawn, or has been denied by a Final Order of the Bankruptcy Court, or (d) that is expressly allowed in a liquidated amount in this Plan.

1.6 **"Allowed Class __ Claim"** means an Allowed Claim in the specified Class.

1.7 **"Annual Incentive Plan"** means the annual incentive plan maintained by the Debtors to compensate officers and employees by utilizing a direct financial incentive to encourage such officers and employees to achieve results that lead to a more effective operation of the business, administered by the compensation committee of Hayes' board of directors.

1.8 **"Avoidance Claims"** means Causes of Action of the Debtors and their Estates arising under any of Bankruptcy Code sections 544, 545, 547, 548, 550, 551 and 553, or under related state or federal statutes and common law, including fraudulent transfer laws, whether or not litigation is commenced to prosecute such Causes of Action.

1.9 **"Bankruptcy Case(s)"** means the chapter 11 case(s) of the Debtors pending in the Bankruptcy Court.

1.10 **"Bankruptcy Code"** means the Bankruptcy Reform Act of 1978, as amended and codified in title 11 of the United States Code, 11 U.S.C. §§ 101-1532, as in effect on the date hereof but, with respect to amendments to the Bankruptcy Code subsequent to commencement of the Bankruptcy Cases, only to the extent that

such amendments were made expressly applicable to bankruptcy cases which were filed as of the enactment of such amendments.

**1.11** **"Bankruptcy Court"** means the United States Bankruptcy Court for the District of Delaware.

**1.12** **"Bankruptcy Rules"** means the Federal Rules of Bankruptcy Procedure and the Official Bankruptcy Forms, as amended, the Federal Rules of Civil Procedure, as amended, as applicable to the Bankruptcy Cases or proceedings therein, and the Local Rules of the Bankruptcy Court, as applicable to the Bankruptcy Cases or proceedings therein, as the case may be.

**1.13** **"Business Day"** means any day on which commercial banks in New York City are not required or permitted to be closed.

**1.14** **"Cash"** means legal tender of the United States or equivalents thereof.

**1.15** **"Causes of Action"** means any and all actions, claims, proceedings, causes of action, suits, accounts, controversies, agreements, promises, rights to legal remedies, rights to equitable remedies, and rights to payment, whether known, unknown, reduced to judgment, not reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, secured or unsecured, and whether asserted or assertable directly or derivatively, in law, equity or otherwise, including actions brought prior to the Petition Date, Avoidance Actions, and actions against any Person for failure to pay for products or services provided or rendered by the Debtors, all claims, suits or proceedings relating to enforcement of the Debtors' intellectual property rights, including patents, copyrights and trademarks, and all claims or causes of action seeking recovery of the Debtors' or the Reorganized Debtors' accounts receivable or other receivables or rights to payment created or arising in the ordinary course of the Debtors' or the Reorganized Debtors' businesses.

**1.16** **"Certificate"** means an instrument evidencing a Claim, other than the Noteholder Claims.

**1.17** **"Claim"** means a claim against the Debtors (all or any of them), whether or not asserted, as defined in Bankruptcy Code section 101(5).

**1.18** **"Claimholder"** means a Holder of a Claim.

**1.19** **"Claims Administration"** shall have the meaning ascribed to it in Section 8.5 hereof.

**1.20** **"Claims Objection Deadline"** means that day which is one hundred eighty (180) days after the Plan Effective Date, as the same may be from time to time extended by the Bankruptcy Court without further notice to parties-in-interest. The

filing of a motion to extend the Claims Objection Deadline shall automatically extend the Claims Objection Deadline until a Final Order is entered on such motion. In the event that such motion to extend the Claims Objection Deadline is denied, the Claims Objection Deadline shall be the later of the current Claims Objection Deadline (as previously extended, if applicable) or 30 days after the Bankruptcy Court's entry of an order denying the motion to extend the Claims Objection Deadline.

1.21  **"Class"** means a category of Claimholders or Interestholders described in Article III of this Plan.

1.22  **"Confirmation Date"** means the date of entry of the Confirmation Order.

1.23  **"Confirmation Hearing"** means the hearing before the Bankruptcy Court on confirmation of this Plan and related matters under Bankruptcy Code section 1128, as such hearing may be adjourned or continued from time to time.

1.24  **"Confirmation Order"** means the order entered by the Bankruptcy Court confirming this Plan.

1.25  **"Consent Fee"** means the fee payable to those Holders of Prepetition Secured Obligations (or their permitted successors and assigns under section 11.2 of the DIP Credit Agreement) other than DIP Lenders, affiliates of DIP Lenders and permitted successors and assigns of DIP Lenders under section 11.2 of the DIP Credit Agreement, who executed Amendment No. 2 to the Prepetition Credit Agreement and *inter alia* consented to the DIP Credit Agreement and the transactions contemplated hereby and thereby.

1.26  **"Creditors' Committee"** means the Official Committee of Unsecured Creditors appointed in the Bankruptcy Cases pursuant to Bankruptcy Code section 1102(a).

1.27  **"Cure"** means the payment or other honor of all obligations required to be paid or honored in connection with assumption of an executory contract or unexpired lease pursuant to Bankruptcy Code section 365, including (a) the cure of any non-monetary defaults to the extent required, if at all, pursuant to Bankruptcy Code section 365, and (b) with respect to monetary defaults, the distribution, within a reasonable period of time following the Plan Effective Date, of Cash, or such other property as may be agreed upon by the parties or ordered by the Bankruptcy Court, with respect to the assumption (or assumption and assignment) of an executory contract or unexpired lease, pursuant to Bankruptcy Code section 365(b), in an amount equal to all unpaid monetary obligations or such other amount as may be agreed upon by the parties, under such executory contract or unexpired lease, to the extent such obligations are enforceable under the Bankruptcy Code and applicable non-bankruptcy law.

**1.28** **"D&O Insurance"** means insurance maintained by the Debtors which covers, among others, the directors, officers and managing members of the Debtors or any of them.

**1.29** **"Debtors"** means Hayes Lemmerz International, Inc. and certain of its direct and indirect subsidiaries and affiliates which commenced Bankruptcy Cases as identified in <u>Exhibit A</u>.

**1.30** **"Declaratory Judgement Action"** means the adversary proceeding the Debtors and certain non-Debtor Affiliates commenced against the Notes Indenture Trustee, case number is 09-51530 (MFW), requesting the Bankruptcy Court to enter a declaratory judgment that, pursuant to the terms of the Notes Indenture, the Notes Guarantee will terminate or be released upon the Plan Effective Date.

**1.31** **"Deficiency Claim"** means, in the case of a Claimholder who asserts a Secured Claim or Prepetition Lender Claim against the Debtors, a Claim equal to the amount by which such Claim exceeds the secured portion thereof as determined pursuant to Bankruptcy Code section 506.

**1.32** **"DIP Administrative Agent"** means Deutsche Bank AG, New York branch, the administrative agent for the DIP Lenders under the DIP Credit Agreement.

**1.33** **"DIP Agents"** has the meaning ascribed to it in section 1.1 of the DIP Credit Agreement.

**1.34** **"DIP Credit Agreement"** means the Prepetition Credit Agreement as amended and modified by Amendment No. 2, Amendment No. 3, and Amendment No. 4 (as may be further amended and modified).

**1.35** **"DIP Financing Facility"** means the debtor-in-possession secured financing facility provided to the Debtors by the DIP Lenders pursuant to the DIP Credit Agreement and agreements related thereto as authorized by the Bankruptcy Court pursuant to the DIP Financing Facility Order and as the same may be amended from time-to-time in accordance with the terms of the DIP Financing Facility Order.

**1.36** **"DIP Financing Facility Claims"** means all Claims and other obligations of the DIP Agents and the DIP Lenders arising under or pursuant to or related to the DIP Financing Facility including all DIP Obligations as defined in the DIP Credit Agreement.

**1.37** **"DIP Financing Facility Order"** means, collectively, the (a) *Interim Order (I) Authorizing Debtors (A) To Obtain Postpetition Financing Pursuant To 11 U.S.C. §§ 105, 361, 362 , And 364, (B) To Use Cash Collateral Pursuant To 11 U.S.C. § 363, (II) Granting Adequate Protection To Prepetition Secured Parties Pursuant To 11 U.S.C. §§ 361, 362, 363, And 364, And (III) Scheduling Final Hearing Pursuant*

*To Bankruptcy Rules 4001(b) And (c)* that was entered by the Bankruptcy Court on May 14, 2009, (b) the *Order Authorizing Debtors' Entry Into First Amendment To DIP Credit Agreement, Payment Of Commitment Fee With Respect To Certain Incremental Loans, And Providing Certain Associated Relief In Connection Therewith* that was entered by the Bankruptcy Court on May 22, 2009, and (c) the *Final Order (I) Authorizing Debtors (A) To Obtain Postpetition Financing Pursuant To 11 U.S.C. §§ 105, 361, 362 , And 364, (B) To Use Cash Collateral Pursuant To 11 U.S.C. § 363, (II) Granting Adequate Protection To Prepetition Secured Parties Pursuant To 11 U.S.C. §§ 361, 362, 363, And 364, And (III) Scheduling Final Hearing Pursuant To Bankruptcy Rules 4001(b) And (c)* that was entered by the Bankruptcy Court on June 15, 2009, authorizing and approving the DIP Financing Facility and the agreements related thereto, and any further orders entered by the Bankruptcy Court approving any extensions and modifications of the DIP Financing Facility.

      **1.38** **"DIP Lenders"** means the lenders from time to time party to the DIP Financing Facility.

      **1.39** **"DIP Lenders New Money Distribution Property"** means a secured term loan in the principal amount equal to the outstanding amount, as of the Plan Effective Date, of any New Money DIP Term Loans, and Incremental New Money DIP Term Loans, in form and substance acceptable to the Requisite DIP Lenders in their sole discretion, the material terms of which are set forth on <u>Exhibit K</u> attached hereto.

      **1.40** **"DIP Lenders Roll-Up Distribution Property"** means the 8,450,000 shares of New Common Stock representing 84.50% of the total amount of all New Common Stock to be issued by Reorganized Hayes hereunder (prior to dilution from the Long Term Incentive Plan, Tranche A Warrants, and Tranche B Warrants) on account of the Senior Roll-Up Loans.

      **1.41** **"Directors"** means all individuals who served as directors of the Debtors at any time during the period the Bankruptcy Cases were pending through the Plan Effective Date.

      **1.42** **"Disallowed Claim"** means a Claim or any portion thereof, that (a) has been disallowed by a Final Order of the Bankruptcy Court, (b) is Scheduled at zero or as unknown, contingent, unliquidated, or disputed and as to which a proof of claim bar date has been established but no proof of claim has been timely filed with the Bankruptcy Court pursuant to either the Bankruptcy Code or any Final Order of the Bankruptcy Court or (c) is not Scheduled and as to which a proof of claim bar date has been set but no proof of claim has been timely filed with the Bankruptcy Court pursuant to either the Bankruptcy Code or any Final Order of the Bankruptcy Court.

**1.43** **"Disbursing Agent"** means the Reorganized Debtors or any Person designated by the Reorganized Debtors (and who accepts such designation), with the consent of the Requisite DIP Lenders (with such consent not to be unreasonably withheld), to serve as a disbursing agent under <u>Article VIII</u> of this Plan.

**1.44** **"Disclosure Statement"** means the written disclosure statement that relates to this Plan, as approved by the Bankruptcy Court pursuant to Bankruptcy Code section 1125 and Bankruptcy Rule 3017 on September [●], 2009, as such disclosure statement may be amended, modified or supplemented from time to time.

**1.45** **"Disputed Claim"** means a Claim or any portion thereof, that is neither an Allowed Claim nor a Disallowed Claim and includes, without limitation, Claims that (a) (i) have not been Scheduled by the Debtors (or any of them) or have been Scheduled at zero or as unknown, contingent, unliquidated or disputed, and (ii) are not the subject of an objection filed in the Bankruptcy Court or as to which the time for filing an objection has not yet expired, (b) that are the subject of a proof of claim or interest that differs in nature, amount or priority from the Schedules, or (c) are the subject of an objection filed with the Bankruptcy Court, which objection has not been withdrawn or overruled by a Final Order of the Bankruptcy Court.

**1.46** **"Distribution Date"** means the date upon which the initial distributions will be made to Holders of Allowed Claims (except as expressly set forth herein) pursuant to this Plan, which shall be not more than twenty (20) Business Days after the Plan Effective Date.

**1.47** **"Estates"** means the bankruptcy estates of the Debtors created pursuant to Bankruptcy Code section 541.

**1.48** **"Executive Employment Agreements"** has the meaning ascribed to it in Section 6.7 hereof.

**1.49** **"Exhibit"** means an exhibit, in form and substance acceptable to the Requisite DIP Lenders, annexed to either this Plan or as an appendix to the Disclosure Statement, as the same may be modified and amended, with the consent of the Requisite DIP Lenders in their sole discretion.

**1.50** **"Exhibit Filing Date"** means the date on which Exhibits to this Plan or the Disclosure Statement shall be filed with the Bankruptcy Court, which date shall be at least ten (10) days prior to the date objections are due to confirmation of this Plan or such later date as may be approved by the Bankruptcy Court.

**1.51** **"Existing Securities"** means, collectively, the Old Common Stock, Old Preferred Stock and all options (including Old Common Stock Options and Old Preferred Stock Options), warrants, rights and other instruments evidencing an ownership interest in any Debtor (whether fixed or contingent, matured or unmatured,

disputed or undisputed), contractual, legal, equitable or otherwise, to acquire any of the foregoing; provided that, Existing Securities shall not include Subsidiary Interests.

**1.52** **"Exit Credit Facility"** means the post-Plan Effective Date secured credit facility on terms, conditions and in an amount satisfactory to the Requisite DIP Lenders in their sole discretion.

**1.53** **"Exit Credit Facility Agent"** means the administrative agent for the Exit Credit Facility Lenders under the Exit Credit Facility.

**1.54** **"Exit Credit Facility Documents"** means all documents comprising the definitive documentation of the Exit Credit Facility, including without limitation, all collateral, guarantee, and security documents and intercreditor agreements contemplated thereby, each in form and substance satisfactory to the Requisite DIP Lenders in their sole discretion.

**1.55** **"Exit Credit Facility Lenders"** means the lenders to the Exit Credit Facility.

**1.56** **"Face Amount"** means, (a) when used in reference to a Disputed Claim or Disallowed Claim, the full stated liquidated amount claimed by the Claimholder in any proof of claim timely filed with the Bankruptcy Court or otherwise Allowed by any Final Order of the Bankruptcy Court and (b) when used in reference to an Allowed Claim, the allowed amount of such Claim.

**1.57** **"Final Order"** means an order or judgment of the Bankruptcy Court, or other Court of competent jurisdiction, as entered on the docket in the Bankruptcy Cases, or the docket of any such other court, the operation or effect of which has not been stayed, reversed or amended and as to which order or judgment (or any revision, modification or amendment thereof) the time to appeal or seek review, rehearing or leave to appeal (other than under Rule 60(b) of the Federal Rules of Civil Procedure or Bankruptcy Rule 9024) has expired and as to which no appeal or petition for review or rehearing was filed or, if filed, remains pending.

**1.58** **"Fiscal Quarter"** means a three-month period over which the Debtors determine earnings and profits (i.e., January 31, April 30, July 31, and October 31).

**1.59** **"Force Majuere Event"** means a significant global disruption in the financial markets caused by outbreak of war, terrorism, or other incidents, but not adverse changes in the financial, banking or capital markets generally.

**1.60** **"Foreign Creditor Distribution Property"** means (a) $5 million United States dollars (b) the 300,000 shares of New Common Stock representing 3.00% of the total amount of all New Common Stock to be issued hereunder (prior to

dilution from the Long Term Incentive Plan, Tranche A Warrants, and Tranche B Warrants), (c) Tranche A Warrants, and (d) Tranche B Warrants.

1.61    **"HLI Opco"** means HLI Operating Company, Inc.

1.62    **"Hayes"** has the meaning ascribed to it in the Introduction hereof.

1.63    **"Hayes Non-Debtor"** means a subsidiary or affiliate of Hayes that is not a Debtor in these Bankruptcy Cases.

1.64    **"Holdback Amount"** means the amount equal to 20% of fees billed to the Debtors in a given month that was retained by the Debtors as a holdback on payment of Professional Claims pursuant to the Professional Fee Order.

1.65    **"Holdback Escrow Amount"** means the escrow account established by the Disbursing Agent into which Cash equal to the Holdback Amount shall be deposited on the Plan Effective Date for the payment of Allowed Professional Claims to the extent not previously paid or disallowed.

1.66    **"Holder"** means an entity holding a Claim or Interest.

1.67    **"Impaired"** refers to any Claim or Interest that is impaired within the meaning of Bankruptcy Code section 1124.

1.68    **"Incremental New Money DIP Term Loan"** has the meaning set forth in Section 2.03A(a) of the DIP Credit Agreement.

1.69    **"Incremental New Money DIP Term Loan Commitment"** has the meaning set forth in Section 2.03A(b)(ii) of the DIP Credit Agreement.

1.70    **"Indemnification Obligations"** means any obligations (as limited by applicable law or the agreement creating such obligation) of the Debtors (or any of them) to indemnify, reimburse, advance or contribute to the losses, liabilities or expenses of the Directors or Officers pursuant to a Debtor's Organizational Documents, or pursuant to any applicable law or specific agreement in respect of any claims, demands, suits, causes of action or proceedings against a Director or Officer based upon any act or omission related to a Director or Officer's service with, for or on behalf of the Debtors (or any of them).

1.71    **"Insured Claim"** means any Claim or portion of a Claim that is insured under the Debtors' insurance policies, but only to the extent of such coverage.

1.72    **"Intercompany Claim"** means (a) a Claim by any Debtor against another Debtor; (b) a claim by any Debtor against a Hayes Non-Debtor; or (c) a Claim by any Hayes Non-Debtor against a Debtor.

**1.73** **"Interest"** means (a) the legal, equitable contractual and other rights (whether fixed or contingent, matured or unmatured, disputed or undisputed) of any Person with respect to Old Common Stock, Old Common Stock Options, Old Preferred Stock. Old Preferred Stock Options or any other equity securities of the Debtors (or any of them) and (b) the legal, equitable, contractual and other rights, whether fixed or contingent, matured or unmatured, disputed or undisputed, of any Person to purchase, sell, subscribe to, or otherwise acquire or receive (directly or indirectly) any of the foregoing.

**1.74** **"Interestholder"** means a Holder of an Interest.

**1.75** **"KEIP"** means that certain Key Employee Incentive Plan adopted by Hayes' compensation committee of the board of directors and approved by a Final Order of the Bankruptcy Court on [●], 2009, as amended.

**1.76** **"Lien"** means a lien, security interest or charge against or interest in property of the Debtors to secure payment of a debt or performance of an obligation owed by the Debtors.  For purposes of this Plan, the term shall not include (a) a lien resulting from the provisions of Chapter 5 of the Bankruptcy Code or (b) a lien that has been or may be avoided pursuant to Chapter 5 of the Bankruptcy Code.

**1.77** **"Long Term Incentive Plan"** means that certain long term incentive plan to be implemented on or after the Plan Effective Date, in form and substance acceptable to Requisite DIP Lenders in their sole discretion, and as is more specifically described at Exhibit B attached hereto, by which the Reorganized Debtors shall provide incentive compensation to certain management, employees, and directors of the Reorganized Debtors and their Affiliates.

**1.78** **"New Common Stock"** means shares of common stock, $0.0001 par value per share, of Reorganized Hayes to be authorized and issued on or after the Plan Effective Date on terms and conditions acceptable to the Requisite DIP Lenders in their sole discretion, and which may include common stock with limited voting rights as set forth in Exhibit C.

**1.79** **"New Money DIP Lender"** means each DIP Lender that has a New Money DIP Term Loan Commitment or that holds a New Money DIP Term Loan (including each DIP Lender that has an Incremental New Money DIP Term Loan Commitment or that holds an Incremental New Money DIP Term Loan).

**1.80** **"New Money DIP Term Loans"** has the meaning specified in Section 1.1 of the DIP Credit Agreement.

**1.81** **"New Money DIP Term Loan Commitments"** means with respect to each New Money DIP Lender, the commitment of such New Money DIP Lender to make New Money DIP Term Loans to the borrowers under the DIP Credit Agreement

in the aggregate principal amount outstanding not to exceed the amount set forth in (and in accordance with) the DIP Credit Agreement.

**1.82** **"Non-Debtor Affiliate"** means any Affiliate of a Debtor that is not itself a Debtor.

**1.83** **"Noteholder(s)"** means the holders of the Notes.

**1.84** **"Noteholder Claims"** means any and all Claims relating to the Notes, excluding any Subordinated Debt Securities Claims.

**1.85** **"Notes"** means the €130 million of 8.25% senior unsecured notes issued by Hayes Lemmerz Finance LLC — Luxembourg S.C.A. due in 2015 issued pursuant to that certain Indenture dated May 30, 2007, with U.S. Bank, N.A. as indenture trustee.

**1.86** **"Notes Guarantees"** means those certain guarantees executed by certain non-Debtor Affiliates in favor of the Notes Indenture Trustee whereby such non-Debtor Affiliates guaranteed certain obligations owed pursuant to the Notes Indenture.

**1.87** **"Notes Indenture"** means the indenture with respect to the Notes.

**1.88** **"Notes Indenture Trustee"** means U.S. Bank National Association, not individually but in its capacity as the indenture trustee for the Notes.

**1.89** **"OPEB"** means other post-employment benefits obligations.

**1.90** **"Officers"** means all individuals who served as officers of the Debtors at any time during the period the Bankruptcy Cases were pending through the Plan Effective Date.

**1.91** **"Old Common Stock"** means the shares of common stock of Hayes that were authorized, issued and outstanding prior to the Effective Date.

**1.92** **"Old Common Stock Options"** means all equity securities (as such term is defined in section 101(16) of the Bankruptcy Code) in Hayes (other than the Old Common Stock) and all options, warrants and rights (whether fixed or contingent, matured or unmatured, disputed or undisputed), contractual, legal, equitable or otherwise, to acquire shares of Old Common Stock or other equity interests in Hayes.

**1.93** **"Old Preferred Stock"** means the shares of preferred stock of HLI Opco that were authorized, issued and outstanding prior to the Plan Effective Date.

**1.94** **"Old Preferred Stock Options"** means all equity securities (as such term is defined in section 101(16) of the Bankruptcy Code) in HLI Opco (other than

the Old Preferred Stock and all common stock of HLI Opco held by HLI Parent Company, Inc.) and all options, warrants and rights (whether fixed or contingent, matured or unmatured, disputed or undisputed), contractual, legal, equitable or otherwise, to acquire shares of Old Common Stock or other equity interests in HLI Opco.

1.95 **"Ordinary Course Professional Order"** means the Bankruptcy Court's Order Under 11 U.S.C. § 327 of the Bankruptcy Code Authorizing the Debtors to Employ Professionals Utilized in the Ordinary Course of Business (Docket No. 408).

1.96 **"Organizational Documents"** means the bylaws, articles of incorporation, corporate charters, certificates of formation, limited liability agreements or other documents or agreements that govern or affect the corporate formation and governance of the Debtors (or any of them) and the Reorganized Debtors (or any of the them).

1.97 **"Other Priority Claim"** means a Claim entitled to priority pursuant to Bankruptcy Code section 507(a) other than a Priority Tax Claim or an Administrative Claim.

1.98 **"Other Secured Claim"** means a Claim, other than a Prepetition Secured Lender Claim, secured by a security interest in or a lien on property in which a Debtor's Estate has an interest or that is subject to setoff under section 553 of the Bankruptcy Code, to the extent of the value, as of the Plan Effective Date or such other date as is established by the Bankruptcy Court, of such Claim Holder's interest in the applicable Estate's interest in such property or to the extent of the amount subject to setoff, as applicable, as determined by a Final Order of the Bankruptcy Court pursuant to Bankruptcy Code section 506(a) or, in the case of setoff, pursuant to Bankruptcy Code section 553, or as otherwise agreed upon in writing by the Debtors and the holder of such Claim.

1.99 **"Other Unsecured Claim"** means a Claim that is not an Administrative Claim (including Reclamation Claims), a Priority Tax Claim, a Class 1 Secured Tax Claim, a Class 2 Other Secured Claim, a Class 3 Other Priority Claim, a Class 4 Intercompany Claim, a Class 6 Prepetition Secured Obligation, a Class 7 Noteholder Claim, Class 8 PBGC Termination Liability Claim, or a Class 11 Subordinated Securities Claim; provided that Other Unsecured Claims shall not include a Claim that is disallowed or released, whether by operation of law or pursuant to a Final Order of the Bankruptcy Court, written release or settlement, the provisions of this Plan or otherwise. Other Unsecured Claims include Deficiency Claims (including those arising out of the Prepetition Secured Lender Claims).

1.100 **"Other Unsecured Claimholders Distribution Property"** means $250,000.

**1.101 "PBGC"** means the Pension Benefit Guaranty Corporation.

**1.102 "PBGC Termination Liability Claim"** means the Claim of the PBGC for the difference between the value of Pension Plan assets and Pension Plan liabilities on the date of the Pension Plan's termination.

**1.103 "Pension Plan"** means the Hayes Lemmerz International, Inc. Retirement Income Plan.

**1.104 "Periodic Distribution Date"** means (a) the Distribution Date, as to the first distribution made by the Disbursing Agent, and (b) thereafter, (i) the first Business Day occurring 20 days after the end of a Fiscal Quarter or (ii) such other Business Day as the Disbursing Agent may designate.

**1.105 "Person"** means an individual, corporation, partnership, joint venture, association, joint stock company, limited liability company, limited liability partnership, trust, estate, unincorporated organization, governmental unit (as defined in Bankruptcy Code section 101(27)), or other entity.

**1.106 "Petition Date"** means the date on which each Debtor filed its voluntary petition commencing its Bankruptcy Case, that is with respect to all of the Debtors, May 11, 2009.

**1.107 "Plan"** means this first amended joint plan of reorganization, which is jointly proposed by the Debtors for the resolution of outstanding Claims and Interests in the Bankruptcy Cases, as such plan may be further amended from time to time in accordance with the Bankruptcy Code, Bankruptcy Rules and Section 13.2, and the exhibits hereto.

**1.108 "Plan Effective Date"** means the Business Day on which all conditions to the consummation of this Plan set forth in Section 11.2 hereof have been either satisfied or waived as provided in Section 11.3 hereof and is the day upon which this Plan is substantially consummated.

**1.109 "Postpetition Interest"** means, collectively, such interest, reasonable fees, costs, or charges provided for under the agreements between a Debtor and a Claimholder whose Claim is secured by property of the Estates to the extent such items have accrued and are payable pursuant to the provisions of the Bankruptcy Code including, without limitation, Bankruptcy Code section 506(b).

**1.110 "Prepetition Administrative Agent"** means Citicorp North America, Inc., the administrative agent for the Prepetition Lenders under the Prepetition Credit Agreement.

**1.111 "Prepetition Agents"** has the meaning ascribed to it in section 1.1 of the DIP Credit Agreement.

**1.112 "Prepetition Credit Agreement"** means the Second Amended and Restated Credit Agreement, dated as of May 30, 2007 (as amended, restated, supplemented or otherwise modified from time to time, including by that certain Amendment No. 1 to Credit Agreement, dated January 30, 2009).

**1.113 "Prepetition Credit Facility"** means the financing accommodations, swap, and hedging transactions evidenced by the Prepetition Credit Agreement and related documents, including all Loan Documents (as such term is defined in the DIP Credit Agreement).

**1.114 "Prepetition Secured Lenders"** means those Persons holding a Prepetition Secured Lender Claim.

**1.115 "Prepetition Secured Lender Claims"** mean all Claims of the Prepetition Agents and the Prepetition Secured Lenders arising under or pursuant to the Prepetition Credit Facility including, without limitation, the Claims of the Prepetition Secured Lenders for Postpetition Interest calculated at the default rate and all Prepetition Obligations (as such term is defined in the DIP Credit Agreement).

**1.116 "Prepetition Secured Lenders Distribution Property"** means the 400,000 shares of New Common Stock equal to 4% of the New Common Stock that is to be issued hereunder (prior to dilution from the Long Term Incentive Plan, Tranche A Warrants, and Tranche B Warrants), to be distributed to the Prepetition Secured Lenders on a *Pro Rata* basis in full satisfaction of the amounts owed to the Prepetition Secured Lenders pursuant to the Prepetition Credit Facility.

**1.117 "Prepetition Secured Obligations"** means all Claims arising under the Prepetition Credit Facility.

**1.118 "Priority Claim"** means a Claim entitled to priority pursuant to Bankruptcy Code section 507.

**1.119 "Priority Tax Claim"** means a Claim entitled to priority pursuant to Bankruptcy Code section 507(a)(8).

**1.120 "Pro Rata"** means, from time to time, unless this Plan specifically provides otherwise, with respect to Claims, the proportion that the Face Amount of a Claim in a particular Class bears to the aggregate Face Amount of all Claims (including Disputed Claims, but excluding Disallowed Claims) in such Class; provided however that with respect to any Senior Roll-Up Loans or Prepetition Secured Lender Claims denominated in Euros, such Senior Roll-Up Loan shall be converted to U.S. Dollars at an exchange rate of 1 Euro to 1.3606 U.S. Dollars.

**1.121 "Professional"** means those Persons employed in the Bankruptcy Cases pursuant to Bankruptcy Code sections 327 and 1103, or otherwise; provided, however, that "Professional" does not include those Persons retained and paid exclusively pursuant to the Ordinary Course Professional Order.

**1.122 "Professional Claim"** means a Claim of a Professional for compensation or reimbursement of costs and expenses relating to services rendered or expenses incurred after the Petition Date and prior to and including the Plan Effective Date.

**1.123 "Professional Fee Order"** means the order entered by the Bankruptcy Court on June 10, 2009, authorizing the interim payment of Professional Claims subject to the Holdback Amount.

**1.124 "Reclamation Claims"** means Claims for the reclamation of goods delivered to the Debtors asserted under Bankruptcy Code section 546(c).

**1.125 "Reinstated" or "Reinstatement"** means (a) leaving unaltered the legal, equitable and contractual rights to which a Claim entitles the Claimholder so as to leave such Claim Unimpaired in accordance with Bankruptcy Code section 1124, or (b) notwithstanding any contractual provision or applicable law that entitles the Claimholder to demand or receive accelerated payment of such Claim after the occurrence of a default, (i) curing any such default that occurred before or after the Petition Date, other than a default of a kind specified in Bankruptcy Code section 365(b)(2); (ii) reinstating the maturity of such Claim as such maturity existed before such default; (iii) compensating the Claimholder for any damages incurred as a result of any reasonable reliance by such Claimholder on such contractual provision or such applicable law; and (iv) not otherwise altering the legal, equitable or contractual rights to which such Claim entitles the Claimholder; provided, however, that any contractual right that does not pertain to the payment when due of principal and interest on the obligation on which such Claim is based, including, but not limited to, financial covenant ratios, negative pledge covenants, covenants or restrictions on merger or consolidation, "going dark" provisions, and affirmative covenants regarding corporate existence prohibiting certain transactions or actions contemplated by this Plan, or conditioning such transactions or actions on certain factors, shall not be required to be cured or reinstated in order to accomplish Reinstatement.

**1.126 "Released Parties"** means, collectively, (a) the current, former, or future DIP Agents, (b) the current, former, or future DIP Lenders, (c) the current, former, or future Prepetition Agents, (d) the current, former, or future Prepetition Secured Lenders, (e) the Creditors' Committee and its individual members (in their capacities as Creditors' Committee members), (f) the Notes Indenture Trustee, (g) the respective current, former, and future officers, directors, employees, members, representatives, agents, partners, Affiliates, financial advisors, professionals, accountants, and attorneys, of each of the foregoing, (h) the Directors, (i) the Officers,

and (j) the Debtors and the Reorganized Debtors (except as otherwise provided for herein) and their financial advisors, professionals, accountants, and attorneys serving in such capacities during the Bankruptcy Cases.

**1.127 "Reorganized . . ."** means the applicable Debtor or Debtors, as applicable, from and after the Plan Effective Date.

**1.128 "Reorganized Debtors"** means, collectively, all Debtors from and after the Plan Effective Date.

**1.129 "Requisite DIP Lenders"** has the meaning specified in Section 1.1 of the DIP Credit Agreement.

**1.130 "Restructuring Transaction(s)"** means the transactions set forth in Section 6.9 of this Plan.

**1.131 "Retained Actions"** means all Claims, Causes of Action, rights of action, suits, and proceedings, whether in law or in equity, whether known or unknown, which (a) any Debtor or any Debtor's Estate may hold against any Person, including without limitation, Claims and Causes of Action brought prior to the Plan Effective Date, (b) identified in the Schedules, or (c) listed in the schedule attached hereto as <u>Exhibit D</u>, other than Claims explicitly released under this Plan or by a Final Order of the Bankruptcy Court.

**1.132 "Retiree Committee"** means the Official Committee of Retirees appointed in the Bankruptcy Cases pursuant to Bankruptcy Code section 1102(a).

**1.133 "Roll-Up Loan Elevation Date"** has the meaning specified in Section 1.1 of the DIP Credit Agreement. If the Roll-Up Loan Elevation Date has not otherwise occurred immediately prior to the Plan Effective Date, the Roll-Up Loan Elevation Date shall be deemed to have occurred immediately prior to the Plan Effective Date for all purposes automatically without further action of any party.

**1.134 "Scheduled"** means, with respect to any Claim or Interest, the status, priority and amount, if any, of such Claim or Interest as set forth in the Schedules.

**1.135 "Schedules"** means the schedules of assets and liabilities and the statements of financial affairs filed in the Bankruptcy Cases by the Debtors, as such schedules or statements have been or may be amended or supplemented from time to time in accordance with Bankruptcy Rule 1009 or orders of the Bankruptcy Court.

**1.136 "Section 503(b)(9) Claims"** means Claims asserted under Bankruptcy Code section 503(b)(9) equal to the value of any goods received by the Debtors within 20 days before the Petition Date in which the goods have been sold to the Debtors in the Debtors' ordinary course of business.

**1.137 "Secured Tax Claim"** means a Secured Claim arising prior to the Petition Date against any of the Debtors for taxes owed to a governmental unit.

**1.138 "Security"** shall have the meaning ascribed to it in Bankruptcy Code section 101(49).

**1.139 "Senior Roll-Up Loans"** has the meaning specified in Section 2.1A(b)(i) of the DIP Credit Agreement.

**1.140 "Solicitation Procedures Order"** means the order of the Bankruptcy Court approved on September [●], 2009 pursuant to which the Bankruptcy Court, inter alia, approved the Disclosure Statement and set various procedures for soliciting and tabulating votes on this Plan.

**1.141 "Subordinated Debt Securities Claim"** means a Claim subject to subordination under Bankruptcy Code section 510(b) that arises from the rescission of a purchase or sale of a debt Security of any Debtor, or for damages arising from the purchase or sale of such debt Security, or for reimbursement, indemnification, or contribution allowed under Bankruptcy Code section 502 on account of such Claim.

**1.142 "Subordinated Equity Securities Claim"** means a Claim subject to subordination under Bankruptcy Code section 510(b) that arises from the rescission of a purchase or sale of an equity Security of any Debtor, or for damages arising from the purchase or sale of such equity Security, or for reimbursement, indemnification, or contribution allowed under Bankruptcy Code section 502 on account of such Claim.

**1.143 "Subordinated Securities Claim"** means, collectively, all Subordinated Debt Securities Claims and all Subordinated Equity Securities Claims.

**1.144 "Subsidiary Debtors"** means the direct and indirect subsidiaries of Hayes that are Debtors.

**1.145 "Subsidiary Interests"** means, collectively, all of the issued and outstanding shares of stock, membership interests, other equity interests or other instruments evidencing an ownership interest in the applicable Subsidiary Debtor as of the Plan Effective Date (including all equity securities (as such term is defined in section 101(16) of the Bankruptcy Code) in such Subsidiary Debtor), and all options, warrants and rights (whether fixed or contingent, matured or unmatured, disputed or undisputed), contractual, legal, equitable or otherwise, to acquire shares of stock, membership interests or other equity interests in the applicable Subsidiary Debtors, as of the Plan Effective Date; provided, however, Subsidiary Interest shall not include the Old Preferred Stock and Old Preferred Stock Options.

**1.146 "Total Enterprise Value"** means the estimated value of the Reorganized Debtors and their non-Debtor affiliates calculated in a manner and

frequency consistent with the Tranche A Warrants Agreement and Tranche B Warrants Agreement.

**1.147 "Tranche A Warrants"** means warrants to acquire New Common Stock on the terms and conditions set forth in the Tranche A Warrants Agreement.

**1.148 "Tranche A Warrants Agreement"** means the agreement substantially in the form attached hereto as <u>Exhibit L</u> and incorporating the terms of the Tranche A Warrants as set forth therein.

**1.149 "Tranche B Warrants"** means warrants to acquire New Common Stock on the terms and conditions set forth in the Tranche B Warrants Agreement.

**1.150 "Tranche B Warrants Agreement"** means the agreement substantially in the form attached hereto as <u>Exhibit L</u> and incorporating the terms of the Tranche B Warrants as set forth therein..

**1.151 "Unimpaired"** refers to any Claim which is not Impaired.

**1.152 "Voting Deadline"** means October 5, 2009, at 5:00 p.m. (prevailing Eastern time).

**C.    <u>Rules of Interpretation</u>**

For purposes of this Plan (a) any reference in this Plan to a contract, instrument, release, indenture or other agreement or document being in a particular form or on particular terms and conditions means that such document shall be in such form or on such terms and conditions, (b) any reference in this Plan to an existing document or Exhibit filed or to be filed means such document or Exhibit as it may have been or may be amended, modified or supplemented, (c) unless otherwise specified, all references in this Plan to Sections, Articles, Schedules and Exhibits are references to Sections, Articles, Schedules and Exhibits of or to this Plan, (d) the words "herein" and "hereto" refer to this Plan in its entirety rather than to a particular portion of this Plan, (e) captions and headings to Articles and Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of this Plan, (f) the rules of construction set forth in Bankruptcy Code section 102 and in the Bankruptcy Rules shall apply, (g) to the extent the Disclosure Statement is inconsistent with the terms of this Plan, this Plan shall control, (h) to the extent this Plan is inconsistent with the Confirmation Order, the Confirmation Order shall control, and (i) to the extent this Plan is inconsistent with the transaction documents for the Restructuring Transactions, the Restructuring Transaction documents shall control.

**D.**    **Computation of Time**

In computing any period of time prescribed or allowed by this Plan, unless otherwise expressly provided, the provisions of Bankruptcy Rule 9006(a) shall apply.

**E.**    **Exhibits**

All Exhibits are incorporated into and are a part of this Plan as if set forth in full herein and, to the extent not annexed hereto, such Exhibits shall be filed with the Bankruptcy Court on or before the Exhibit Filing Date. After the Exhibit Filing Date, copies of Exhibits can be obtained upon written request to Skadden, Arps, Slate, Meagher & Flom LLP, 155 North Wacker Drive, Chicago, Illinois 60606 (Attn: J. Eric Ivester, Esq. and Stephen D. Williamson, Esq.), counsel to the Debtors. In addition, imaged copies of the Exhibits will be available on the Bankruptcy Court's website (www.deb.uscourts.gov), for a nominal charge (a PACER account is required and to obtain a PACER password, go to the PACER website, http://pacer.psc.uscourts.gov), or at the Debtors' restructuring website (www.hayeslemmerzreorg.com), free of charge. To the extent any Exhibit is inconsistent with the terms of the body of this Plan, unless otherwise ordered by the Bankruptcy Court, the terms of the relevant Exhibit shall control.

# ARTICLE II

## ADMINISTRATIVE EXPENSES
## AND PRIORITY TAX CLAIMS

**2.1**    **Administrative Claims**. Subject to the other provisions of this Article and Article IX of this Plan, after the later of (a) the Plan Effective Date, (b) the date an Administrative Claim becomes an Allowed Administrative Claim or (c) the date an Administrative Claim becomes payable pursuant to any agreement between a Debtor (or a Reorganized Debtor) and the holder of such Administrative Claim, an Allowed Administrative Claimholder in any Debtor's Bankruptcy Case shall receive, in full satisfaction, settlement, release, and discharge of and in exchange for such Allowed Administrative Claim, (x) Cash equal to the unpaid portion of such Allowed Administrative Claim or (y) such other treatment as to which the Debtors (or the Reorganized Debtors) and such Claimholder shall have agreed upon in writing, satisfactory to Requisite DIP Lenders in their sole discretion.

**2.2**    **Administrative Claims Incurred In the Ordinary Course Of Business**. Notwithstanding the treatment of Administrative Claims set forth in Section 2.1 herein, Allowed Administrative Claims with respect to liabilities incurred by the Debtors in the ordinary course of business during the Bankruptcy Cases shall be paid in the ordinary course of the business in accordance with the terms and conditions of any agreements relating thereto and not limited to being paid on a

Periodic Distribution Date. For the avoidance of doubt, such ordinary course of business Administrative Claims shall not include a postpetition obligation that is contingent or disputed or subject to liquidation through pending or prospective litigation, including, but not limited to, alleged obligations arising from personal injury, property damage, products liability, consumer complaints, employment law, secondary payor liability, or any other contingent, disputed, or unliquidated legal or equitable claim based on tort, statute, contract, equity, or common law, be considered to be an obligation which is payable in the ordinary course of business.

**2.3     Reclamation Claims**.  Reclamation Claims that are not Allowed Section 503(b)(9) Claims shall receive the treatment accorded to Other Unsecured Claims.

**2.4     Priority Tax Claims**.  With respect to each Allowed Priority Tax Claim in any Debtor's Bankruptcy Case, at the sole option of the Debtors, subject to the consent of the Requisite DIP Lenders, (or the Reorganized Debtors), the Allowed Priority Tax Claimholder shall be entitled to receive on account of such Priority Tax Claim, in full satisfaction, settlement, release, and discharge of and in exchange for such Priority Tax Claim, (a) equal Cash payments made in accordance with Bankruptcy Code section 1129(a)(9)(C) on the last Business Day of every three (3) month period following the Plan Effective Date, over a period not exceeding six years after the assessment of the tax on which such Claim is based, totaling the principal amount of such Claim plus simple interest on any outstanding balance from the Plan Effective Date calculated at the interest rate available on ninety (90) day United States Treasuries on the Plan Effective Date, (b) such other treatment agreed to by the Allowed Priority Tax Claimholder and the Debtors (or the Reorganized Debtors), provided such treatment is on more favorable terms to the Debtors (or the Reorganized Debtors) than the treatment set forth in subsection (a) above, or (c) payment in full in Cash on the Plan Effective Date.

**2.5     DIP Financing Facility Claims**.

(a)     The DIP Financing Facility Claims are Allowed in full and shall not be subject to any avoidance, reductions, set off, offset, recharacterization, subordination (whether equitable, contractual, or otherwise), counterclaims, cross-claims, defenses, disallowance, impairment, objection, or any other challenges under any applicable law or regulation by any person or entity.

(b)     Upon the Plan Effective Date, the DIP Lenders shall receive in full satisfaction of the amounts owed to them pursuant to the DIP Financing Facility:

(i)     The DIP Lenders New Money Distribution Property, which shall be distributed to the New Money DIP Lenders on a *Pro Rata* basis (*i.e.*, based upon the amount of New Money DIP Term Loans made or held by

a New Money DIP Lender in relation to the total amount of New Money DIP Term Loans);

        (ii)      The DIP Lenders Roll-Up Distribution Property, which shall be distributed to the DIP Lenders who hold Senior Roll-Up Loans on a *Pro Rata* basis (*i.e.*, based upon the amount of Senior Roll-Up Loans held by a DIP Lender in relation to the total amount of Senior Roll-Up Loans);

        (iii)      All fees and expenses of the DIP Agents and DIP Lenders shall be paid in full in cash on the Plan Effective Date; and

        (iv)      All accrued and unpaid costs and charges on the DIP Financing Facility (including the DIP Supplemental Applicable Margin (as defined in section 1.1 of the DIP Credit Agreement) shall be paid in full in cash on the Plan Effective Date.

        (v)      All unpaid interest on the DIP Financing Facility (including interest attributable to the DIP Supplemental Applicable Margin, whether or not capitalized) shall be paid in full in cash on the Plan Effective Date.

        (c)      On the Plan Effective Date, the Prepetition Secured Lenders who are entitled to a Consent Fee under the DIP Credit Agreement (which shall not include any person or entity that is or was a DIP Lender or the Affiliate of a DIP Lender) shall receive their *Pro Rata* share of 850,000 shares of New Common Stock equal to 8.5% of the New Common Stock that is to be issued hereunder (prior to dilution from the Long Term Incentive Plan, the Tranche A Warrants, and Tranche B Warrants) as more fully set forth in the DIP Credit Agreement.

## ARTICLE III

## CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS

### 3.1    Introduction.

    Pursuant to Bankruptcy Code section 1122, set forth below is a designation of classes of Claims against and Interests in the Debtors.  The treatment for each class of Claims or Interests under the Plan is also specified.  A Claim or Interest is placed in a particular Class for purposes of voting on this Plan and of receiving distributions pursuant to this Plan only to the extent that such Claim or Interest is an Allowed Claim or an Allowed Interest in that Class and such Claim or Interest has not been paid, released or otherwise settled prior to the Plan Effective Date.  In accordance with Bankruptcy Code section 1123(a)(1), Administrative Claims and Priority Tax

Claims of the kinds specified in Bankruptcy Code sections 507(a)(2) and 507(a)(8) have not been classified, and their treatment is set forth in <u>Article II</u> herein.

This Plan, though proposed jointly, constitutes a separate Plan proposed by each Debtor. Therefore, the classifications set forth in Section 3.2 herein shall be deemed to apply separately with respect to each Plan proposed by each Debtor.

**3.2** **Classification and Treatment of Claims Against and Interests In the Debtors**.

(a) Unimpaired Classes of Claims and Interests (deemed to have accepted this Plan and, therefore, not entitled to vote on this Plan).

| Class 1 – Secured Tax Claims | Class 1 consists of all Secured Tax Claims.<br><br>Except as otherwise provided in and subject to Section 8.7 herein, on the first Periodic Distribution Date occurring after the later of (a) the date a Secured Tax Claim becomes an Allowed Secured Tax Claim or (b) the date a Secured Tax Claim becomes payable pursuant to any agreement (if any) between the Debtors (or the Reorganized Debtors) and the Holder of such Secured Tax Claim, the Holder of such Class 1 Secured Tax Claim shall receive, in full satisfaction, settlement, release, and discharge of and in exchange for such Secured Tax Claim, (y) Cash equal to the amount of such Allowed Secured Tax Claim or (z) such other treatment as to which the Debtors (with the consent of Requisite DIP Lenders) or the Reorganized Debtors and such Claimholder shall have agreed in writing, provided that such treatment is not more favorable than the treatment in clause (y) above. The Debtors' failure to object to a Secured Tax Claim in the Bankruptcy Cases shall be without prejudice to the Reorganized Debtors' right to contest or otherwise defend against such Claim in the Bankruptcy Court or other appropriate non-bankruptcy forum (at the option of the Debtors or the Reorganized Debtors) when and if such Claim is sought to be enforced by the holder of the Secured Tax Claim. |
|---|---|
| Class 2 – Other Secured Claims | Class 2 consists of each separate subclass for each Other Secured Claim. Each subclass is deemed to be a separate Class for all purposes under the Bankruptcy Code.<br><br>Except as otherwise provided in and subject to Section 8.7 herein, on the first Periodic Distribution Date occurring after the later of (a) the date an Other Secured Claim becomes an Allowed Other Secured Claim or (b) the date an Other Secured Claim |

| | |
|---|---|
| | becomes payable pursuant to any agreement (if any) between the Debtors (with the consent of the Requisite DIP Lenders) or the Reorganized Debtors and the holder of such Other Secured Claim, the Debtors (or Reorganized Debtors) shall, in full satisfaction, settlement, release, and discharge of and in exchange for such Class 2 Other Secured Claim, (x) pay Cash equal to the amount of such Allowed Other Secured Claim, (y) return the collateral to the secured creditor with respect to such Other Secured Claim, or (z) such Other Secured Claim shall be Reinstated.  The Debtors' failure to object to an other Secured Claim in the Bankruptcy Cases shall be without prejudice to the Reorganized Debtors' right to contest or otherwise defend against such Claim in the Bankruptcy Court or other appropriate non-bankruptcy forum (at the option of the Reorganized Debtors) when and if such Claim is sought to be enforced by the holder of the Secured Claim. |
| Class 3 – Other Priority Claims | Class 3 consists of all Other Priority Claims.<br><br>Except as otherwise provided in and subject to Section 8.7 herein, on the first Periodic Distribution Date occurring after the later of (a) the date an Other Priority Claim becomes an Allowed Other Priority Claim or (b) the date an Other Priority Claim becomes payable pursuant to any agreement (if any) between the Debtors or the Reorganized Debtors and the holder of such Other Priority Claim, each Class 3 Other Priority Claimholder shall receive, in full satisfaction, settlement, release, and discharge of, and in exchange for, such Other Priority Claim, (y) Cash in an amount equal to the amount of such Allowed Other Priority Claim or (z) such other treatment as to which the Debtors (with the consent of Requisite DIP Lenders) or the Reorganized Debtors and such Claimholder shall have agreed upon in writing, provided that such treatment is not more favorable than the treatment in clause (y) above.  The Debtors' failure to object to an Other Priority Claim in the Bankruptcy Cases shall be without prejudice to the Reorganized Debtors' right to contest or otherwise defend against such Claim in the Bankruptcy Court or other appropriate non-bankruptcy forum (at the option of the Debtors or the Reorganized Debtors) when and if such Claim is sought to be enforced by the holder of the Other Priority Claim. |
| Class 4 – Intercompany | Class 4 consists of all Intercompany Claims.<br><br>Each Intercompany Claim will, with the consent of the Requisite |

| | |
|---|---|
| Claims | DIP Lenders, be (a) released, waived and discharged as of the Plan Effective Date, (b) contributed to the capital of the obligor corporation, (c) dividended, or (d) remain unimpaired. |
| Class 5 – Subsidiary Interests | Class 5 consists of all Subsidiary Interests. Class 5 Subsidiary Interests shall be unaffected by this Plan, except to the extent required by the Restructuring Transactions. |

        (b)      Impaired Classes of Claims and Interests (entitled to vote on this Plan).

| | |
|---|---|
| Class 6 – Prepetition Secured Obligations | Class 6 consists of the Prepetition Secured Obligations. Notwithstanding any provision to the contrary herein, upon entry of the Confirmation Order, all Prepetition Secured Obligations shall be Allowed in the aggregate amount of no less than $503,381,544.77 (less the anticipated Senior Roll-Up Loans in the amount of $100 million) and shall constitute Allowed Claims for all purposes in these Bankruptcy Cases, not subject to any avoidance, reductions, set off, offset, recoupment, recharacterization, subordination (whether equitable, contractual, or otherwise), counterclaims, cross-claims, defenses, disallowance, impairment, objection, or any other challenges under any applicable law or regulation by any person or entity. On the Plan Effective Date, Holders of Prepetition Secured Obligations in Class 6 shall receive their share of the Prepetition Secured Lender Distribution Property in full satisfaction of their claims; *provided that* such Holders of Class 6 Prepetition Secured Obligations vote as a class to accept the Plan. The Prepetition Secured Distribution Property will be distributed P*ro Rata* among the Holders of Prepetition Secured Obligations based upon the amount of Prepetition Secured Obligations held by such Holder in relation to the total amount of Prepetition Secured Obligations. The Holders of Prepetition Secured Obligations who are DIP Lenders, Affiliates of DIP Lenders, or permitted successors and assigns of DIP Lenders under section 11.2 of the DIP Credit Agreement agree to waive their distributions on account of their Class 6 Claims, with such waived distributions to be distributed *Pro Rata* to Holders of Prepetition Secured Obligations in Class 6 who are not DIP Lenders, affiliates of DIP Lenders, or |

| | |
|---|---|
| | permitted successors and assigns of DIP Lenders under section 11.2 of the DIP Credit Agreement.<br><br>Any fees and expenses of the Prepetition Administrative Agent payable pursuant to the DIP Financing Facility Order shall be paid in full in cash in accordance with section 9.4 of the Plan.<br><br>Any adequate protection Claims of Holders of Prepetition Secured Obligations pursuant to the DIP Financing Facility Order shall be deemed satisfied by the treatment provided herein. |
| Class 7 – Noteholder Claims | Class 7 consists of all Noteholder Claims.<br><br>On the Plan Effective Date, holders of Noteholder Claims who do not reject the Plan shall receive their *Pro Rata* share of 66.1% of the Foreign Creditor Distribution Property with such share to be determined by the amount of such Noteholders' Allowed Claim in relation to the Allowed Claims of Noteholders who do not reject the Plan.<br><br>Holders of Noteholder Claims that reject the Plan shall have the option to opt-out of the release of the Non-Debtor Affiliates set forth in Article X herein. Unless a holder of Noteholder Claims both rejects the Plan **and** opts-out of the release of Non-Debtor Affiliates, such holder of Noteholder Claims shall be deemed to have released the Non-Debtor Affiliates as provided for in Article X.<br><br>The distribution to Noteholders provided herein is in full satisfaction and discharge of any and all Claims that the Noteholders have against either the Debtors or their non-Debtor Affiliates.<br><br>Holders of Noteholder Claims who reject the Plan shall not receive any distribution under the Plan. |
| Class 8 – PBGC Termination Liability Claim | Class 8 consists of the PBGC Termination Liability Claim.<br><br>On the Plan Effective Date, the PBGC shall receive its *Pro Rata* share of 33.9% of the Foreign Creditor Distribution Property. |
| Class 9 – Other Unsecured Claims | Class 9 consists of all Other Unsecured Claims.<br><br>Except as otherwise provided in and subject to Section 8.7 herein, on the first Periodic Distribution Date occurring after the |

| | |
|---|---|
| | Other Unsecured Claim becomes an Allowed Other Unsecured Claim, <u>Other Unsecured Claimholders who do not vote to reject the Plan</u> shall receive, in full satisfaction, release, and discharge of, and in exchange for, such Other Unsecured Claims, the Other Unsecured Claimholders Distribution Property on a *Pro Rata* basis in complete satisfaction of their Allowed Other Unsecured Claims.<br><br>A Holder of an Other Unsecured Claim, regardless of the number of Debtors against which such Claimholder may assert such Other Unsecured Claim, shall receive only a single distribution on account of such Other Unsecured Claim.<br><br>Upon the Plan Effective Date, the Holders of Deficiency Claims with respect to Prepetition Secured Lender Claims agree to waive their distributions on account of such Deficiency Claims, with such waived distributions to be distributed *Pro Rata* to Holders of Other Unsecured Claims who do not vote to reject the Plan. |

      (c)     Impaired Classes of Claims and Interests (deemed to have rejected this Plan and therefore not entitled to vote on this Plan).

| | |
|---|---|
| Class 10 – Subordinated Securities Claims | Class 10 consists of two separate subclasses for the Subordinated Securities Claims. Each subclass is deemed to be a separate Class for all purposes under the Bankruptcy Code. Both subclasses are deemed to have rejected this Plan and, therefore, neither subclass is entitled to vote.<br><br>Class 10a consists of all Subordinated Debt Securities Claims that may exist against the Debtors. Class 10b consists of all Subordinated Equity Securities Claims that may exist against the Debtors.<br><br>Subordinated Debt Securities Claims and Subordinated Equity Securities Claims shall be cancelled, released, and extinguished. Holders of Subordinated Securities Claims shall neither receive nor retain any property on account of their Claims. |
| Class 11a Interests in Hayes and<br><br>Class 11b Old Preferred Stock | Class 11a consists of all Interests in Hayes.<br><br>All Holders of existing equity interests of Hayes shall be impaired with no distribution to be made to holders thereof. All Interests in Hayes shall be deemed cancelled as of the Plan |

| | |
|---|---|
| and Old Preferred Stock Options. | Effective Date.<br><br>Class 11b consists of all Old Preferred Stock and Old Preferred Stock Options.<br><br>All Holders of Old Preferred Stock and Old Preferred Stock Options shall be impaired with no distribution to be made to holders thereof. All existing Old Preferred Stock and Old Preferred Stock Options shall be deemed cancelled as of the Plan Effective Date. |

## ARTICLE IV

## SPECIAL PROVISIONS FOR TREATMENT OF CLAIMS AND INTERESTS

**4.1** **Special Provisions Regarding Insured Claims**.

(a) Distributions under this Plan to each holder of an Insured Claim shall be in accordance with the treatment provided under this Plan for Other Unsecured Claims; provided, however, that the maximum amount of any Claim under this Plan on account of an Allowed Insured Claim upon which a distribution shall be made shall be limited to an amount equal to the applicable self-insured retention under the relevant insurance policy; provided further, however, that, to the extent a holder has an Allowed Insured Claim the amount of which exceeds the total coverage available from the relevant insurance policies of the Debtors, such holder shall have an Allowed Other Unsecured Claim in the amount of the applicable self-insured retention plus the amount by which such Allowed Insured Claim exceeds the coverage available from the relevant Debtors' insurance policies. Nothing in this section shall constitute a waiver or release of any Retained Actions or Avoidance Claims the Debtors may hold against any Person, including the Debtors' insurance carriers; and nothing in this section is intended to, shall, or shall be deemed to preclude any holder of an Allowed Insured Claim from seeking and/or obtaining a distribution or other recovery from any insurer of the Debtors in addition to (but not in duplication of) any distribution such holder may receive under this Plan; provided, however, that the Debtors do not waive, and expressly reserve their rights to assert that any insurance coverage is property of the Estates to which they are entitled.

(b) This Plan shall not expand the scope of, or alter in any other way, the rights and obligations of the Debtors' insurers under their policies, and the Debtors' insurers shall retain any and all defenses to coverage that such insurers may have, including the right to contest and/or litigate with any party, including the Debtors, the existence, primacy and/or scope of available coverage under any alleged applicable policy. This Plan shall not operate as a waiver of any other Claims the

Debtors' insurers have asserted or may assert in any proof of claim or the Debtors' rights and defenses to such proofs of claim.

**4.2     Reservation of Rights**.  Except as otherwise explicitly provided in this Plan, nothing shall affect the Debtors' or the Reorganized Debtors' rights and defenses, both legal and equitable, with respect to any Claims, including, but not limited to, all rights with respect to legal and equitable defenses to alleged rights of setoff or recoupment of Claims.  Except to the extent a Reorganized Debtor expressly assumes an obligation or liability of a Debtor or another Reorganized Debtor, this Plan shall not operate to impose liability on any Reorganized Debtor for the Claims against any other Debtor or the debts and obligations of any other Debtor or Reorganized Debtor, and from and after the Plan Effective Date, each Reorganized Debtor, subject to the Restructuring Transactions, will be separately liable for its own obligations.

# ARTICLE V

## ACCEPTANCE OR REJECTION OF THE PLAN;
## EFFECT OF REJECTION BY ONE OR MORE
## IMPAIRED CLASSES OF CLAIMS OR INTERESTS

**5.1     Impaired Classes of Claims Entitled to Vote**.  Holders of Claims and Interests in each Impaired Class of Claims or Interests are entitled to vote as a Class to accept or reject this Plan, other than Classes that are deemed to accept this Plan as provided in Section 5.2 herein or reject this Plan as provided in Section 5.4 herein.  Accordingly, the votes of holders of Claims in Class 6 (Prepetition Secured Obligations), Class 7 (Noteholder Claims), Class 8 (PBGC Termination Liability Claim), and Class 9 (Other Unsecured Claims) shall be solicited with respect to this Plan.

**5.2     Classes Deemed to Accept Plan**.  Class 1 Secured Tax Claims, Class 2 Other Secured Claims, Class 3 Other Priority Claims, Class 4 Intercompany Claims and Class 5 Subsidiary Interests are Unimpaired by this Plan.  Under section 1126(f) of the Bankruptcy Code and/or the Solicitation Procedures Order, Holders of Claims and Interests in each Unimpaired Class of Claims or Interests are conclusively presumed to have accepted this Plan, and the votes of such Claimholders will not be solicited.  Accordingly, the votes of Holders of Claims in Class 1 Secured Tax Claims, Class 2 Other Secured Claims, Class 3 Other Priority Claims, Clan 4 Intercompany Claims, as well as votes of Holders of Class 5 Subsidiary Interests, shall not be solicited with respect to this Plan.  Holders of claims and interests deemed to accept the Plan pursuant to this section are not deemed to accept the releases contained in Article X of the Plan.

**5.3 Acceptance by Impaired Classes**. Class 6 Prepetition Secured Obligations, Class 7 Noteholder Claims, Class 8 PBGC Termination Liability Claim, and Class 9 Other Unsecured Claims are Impaired under this Plan. Pursuant to section 1126(c) of the Bankruptcy Code, and except as provided in section 1126(e) of the Bankruptcy Code, an Impaired Class has accepted this Plan if this Plan is accepted by the Holders of at least two-thirds (⅔) in dollar amount and more than one-half (½) in number of the Allowed Claims of such Class that have timely and properly voted to accept or reject this Plan.

**5.4 Classes Deemed to Reject Plan**. Because Holders of (a) Claims in Class 10a Subordinated Debt Securities Claims and Class 10b Subordinated Equity Securities and (b) Interests in Class 11a Interests in Hayes, Class 11b Old Preferred Stock and Old Preferred Stock Options are not receiving or retaining any property under this Plan on account of such Claims or Interests, they are conclusively presumed to have rejected this Plan, and the votes of such Holders will not be solicited.

**5.5 Confirmation Pursuant to Section 1129(b) of the Bankruptcy Code**. To the extent that any Impaired Class entitled to vote rejects this Plan or is deemed to have rejected it, the Debtors will, with the consent of Requisite DIP Lenders, request confirmation of this Plan, as it may be modified from time to time, under section 1129(b) of the Bankruptcy Code.

**5.6 Confirmability and Severability of a Plan**. Subject to Section 13.2, the Debtors reserve the right, subject to the consent of Requisite DIP Lenders, to alter, amend, modify, revoke or withdraw this Plan as it applies to the Debtors or any particular Debtor. A determination by the Bankruptcy Court that this Plan, as it applies to the Debtors or any particular Debtor, is not confirmable pursuant to section 1129 of the Bankruptcy Code shall not limit or affect: (a) the confirmability of this Plan as it applies to the other Debtor(s); or (b) the Debtors' ability, with the consent of Requisite DIP Lenders, to modify this Plan, as it applies to the Debtors or to any particular Debtor, to satisfy the requirements of section 1129 of the Bankruptcy Code.

# ARTICLE VI

## MEANS FOR IMPLEMENTATION OF THE PLAN

**6.1 Continued Corporate Existence**. Subject to any Restructuring Transactions contemplated by this Plan, each of the Debtors shall continue to exist as a Reorganized Debtor after the Plan Effective Date as a separate corporate entity, with all the powers of a corporation or limited liability company, as applicable, under applicable law in the jurisdiction in which each applicable Debtor is organized and pursuant to the Organizational Documents in effect prior to the Plan Effective Date, except to the extent such Organizational Documents are amended by this Plan,

without prejudice to any right to terminate such existence (whether by merger or otherwise) under applicable law after the Plan Effective Date.

6.2     **Corporate Action**.  Each of the matters provided for under this Plan involving the corporate structure of the Debtors or corporate action to be taken by or required of the Debtors, shall, as of the Plan Effective Date, be deemed to have occurred and be effective as provided herein, and shall be authorized, approved and, to the extent taken prior to the Plan Effective Date, ratified in all respects without any requirement of further action by stockholders, creditors, or directors of any of the Debtors or the Reorganized Debtors.

6.3     **Certificate of Incorporation and Bylaws**.  The Organizational Documents shall be amended as necessary to satisfy the provisions of this Plan and the Bankruptcy Code.  The certificate of incorporation or formation for Reorganized Hayes, in form and substance satisfactory to the Requisite DIP Lenders, is attached hereto as <u>Exhibit E</u> and the bylaws for Reorganized Hayes, in form and substance satisfactory to the Requisite DIP Lenders, is attached hereto as <u>Exhibit F</u>.  The Organizational Documents of each Reorganized Subsidiary Debtor, in form and substance satisfactory to the Requisite DIP Lenders.

6.4     **Cancellation of Existing Securities and Agreements**.  On the Plan Effective Date, except as otherwise specifically provided for herein,

(a)     the Existing Securities, Notes, and any other note, bond, Notes Indenture (including any covenant, guarantees, or other agreements contained therein or related thereto), or other instrument or document evidencing or creating any indebtedness or obligation of or ownership interest in the Debtors, except such notes or other instruments evidencing indebtedness or obligations of or Interests in the Debtors that are Reinstated under this Plan, shall be cancelled, terminated, and of no further force or effect; *provided however,* notwithstanding the entry of the Confirmation Order or the occurrence of the Plan Effective Date, the Notes Indenture shall continue in effect solely to (1) allow Noteholders to receive distributions provided for hereunder, (2) allow the Note Indenture Trustee to make distributions under the Plan as provided herein, and deduct therefrom such compensation, fees, and expenses due thereunder or incurred in making such distributions, to the extent not paid by the Debtors, (3) allow the Notes Indenture Trustee to exercise its charging liens against any such distributions, (4) preserve the right of the Notes Indenture Trustee under the Notes Indenture against the Noteholders, including, without limitation, its charging liens and rights to indemnification.  The charging liens held by the Notes Indenture Trustee against distributions to Holders shall be deemed released only upon the payment of the Notes Indenture Trustees fees and expenses in full; provided further however that nothing in this section shall affect the discharge of Claims pursuant to the Bankruptcy Code, the Confirmation Order, or the Plan or result in any liability or expense to the  Reorganized Debtors.

(b)    the obligations of, Claims against, and/or Interests in the Debtors under, relating, or pertaining to any agreements, indenture, certificates of designation, bylaws, or certificate or articles of incorporation or similar document governing the Existing Securities, Notes, and any other note, bond, indenture, or other instrument or document evidencing or creating any indebtedness or obligation of the Debtors or ownership interest in the Debtors, except such notes or other instruments evidencing indebtedness or obligations of or interests in the Debtors that are Reinstated under this Plan, as the case may be, shall be released and discharged; and

(c)    based upon the consideration provided by this Plan, as contemplated by the plan term sheet attached to the DIP Credit Agreement (the "Plan Term Sheet") and with the consent of the Prepetition Secured Lenders (as demonstrated by the record at the hearing on the DIP Financing Facility Order and as set forth in the DIP Financing Facility Order) to, among other things, the Plan Term Sheet, each Holder of a Prepetition Secured Lender Claim and the Prepetition Agents shall be deemed to have forever waived, released, and discharged the non-Debtor Affiliates of the Debtors of any Liens, Claims, claims, causes of action, rights, or liabilities arising from the guarantees, liens, and asset pledges granted to the Holders of the Prepetition Secured Lender Claims and the Prepetition Agents under the Prepetition Loan Facility.  In addition, the Confirmation Order shall authorize and direct the Prepetition Agents to take whatever action may be necessary or appropriate, in their reasonable discretion, to effectuate the foregoing, including, without limitation, providing a release of the liens securing such obligations and a release of such guarantees.

**6.5    Authorization and Issuance of New Common Stock, Tranche A Warrants, and Tranche B Warrants**.

(a)    The Organizational Documents for the Reorganized Company shall authorize 20,000,000 shares of New Common Stock.  A summary description of the New Common Stock is set forth as Exhibit C.  Of the total number of shares authorized, 10,000,000 shares of New Common Stock shall be issued and outstanding on the Plan Effective Date.

(b)    All of the shares of New Common Stock, Tranche A Warrants, and Tranche B Warrants issued pursuant to this Plan shall be duly authorized, validly issued, and if applicable, fully paid and non-assessable.

(c)    The New Common Stock (including the New Common Stock issued in connection with the exercises of the Tranche A Warrants and Tranche B Warrants) shall be subject to economic and legal dilution from exercises of stock options and restricted stock issuable pursuant to the Long Term Incentive Plan, exercises of the Tranche A Warrants and Tranche B Warrants, and any other shares of New Common Stock issued after the Plan Effective Date.

(d)     At the sole election of any entity that is entitled to receive New Common Stock in accordance with the terms of this Plan, such entity may elect to instead receive 1 share of common stock with limited voting rights for each share of New Common Stock it would otherwise receive hereunder.  A summary description of such common stock is also set forth in <u>Exhibit C</u>.

(e)     Each holder of New Common Stock, as a precondition to receiving such New Common Stock, will be required to enter into a stockholders' agreement and registration rights agreement upon terms and conditions acceptable to the Requisite DIP Lenders; <u>provided</u> <u>that</u> any party that receives the New Common Stock or similar equity based incentives through or on account of any management incentive plan or the like shall be required to execute a separate management stockholders' agreement prior to receipt of such New Common Stock or incentive which shall be in form and substance acceptable to the Requisite DIP Lenders in their sole discretion and the Reorganized Debtors.  The forms of stockholders' agreement, registration rights agreement, and management stockholders' agreement (each in a form acceptable to the Requisite DIP Lenders) are attached hereto as <u>Exhibit M</u>.

(f)     The issuance of the New Common Stock (including the New Common Stock issued in connection with the exercises of the Tranche A Warrants and Tranche B Warrants), Tranche A Warrants, and Tranche B Warrants, and any other securities pursuant to this Plan and any subsequent sales, resales, transfers, or other distributions of such securities shall be exempt from any federal or state securities laws registration requirements pursuant to Bankruptcy Code section 1145.

**6.6     Directors and Officers**.

(a)     On the Effective Date, the term of the current members of the board of directors of Hayes shall expire.  The initial board of directors of Reorganized Hayes will consist of seven (7) directors.  Six of the board members will be designated by the Requisite DIP Lenders, in their sole discretion.  The Reorganized Company's CEO will serve on the board of directors and will be its Chairman as the seventh member.  The identities of the initial board of directors is set forth in <u>Exhibit G</u>.

(b)     The existing directors of each Subsidiary Debtor shall remain in their current capacities as directors of the applicable Reorganized Subsidiary Debtor, subject to the ordinary rights and powers of the board of directors or equityholders to replace them.

(c)     Each such initial director, with the exception of the Chief Executive Officer, shall be "independent" and "disinterested".  For purposes of the immediately preceding sentence, an individual will be deemed to be "independent" and "disinterested" if such individual (x) is not an employee or affiliate of the corporation or any of its subsidiaries or any stockholder or any of its affiliates and (y)

does not have any material business or close personal relationship or any history of any material business or close personal relationships with the corporation or any of its subsidiaries or any stockholder or any of its affiliates. The foregoing requirements for independence and disinterestedness shall remain in place until such time as the Board of Reorganized Hayes, in accordance with Reorganized Hayes' Organizational Documents, terminates, modified or alters such requirements.

(d)     The individuals identified in <u>Exhibit G</u> shall serve as the initial officers of the Reorganized Debtors in the capacities set forth therein. All other existing officers or managing members of the Debtors (unless expressly replaced as set forth in <u>Exhibit G</u>) shall remain in their current capacities as officers or managing members of the Debtors, subject to the ordinary rights and powers of the board of directors or equityholders, as the case may be, to replace them.

(e)     Each director of Reorganized Hayes shall execute a directors' indemnification agreement with Reorganized Hayes, on terms and conditions acceptable to the DIP Requisite Lenders in their sole discretion. Other provisions governing the service, term and continuance in office of the directors of Reorganized Hayes shall be as set forth in the Organizational Documents of Reorganized Hayes or the other exhibits thereto.

### 6.7     Employment Incentive Compensation Programs.

(a)     ***Long Term Incentive Plan.*** Reorganized Hayes shall adopt the Long Term Incentive Plan for the benefit of senior management, selected employees and directors of Reorganized Hayes and its Affiliates. Such Long Term Incentive Plan shall be effective as of the Plan Effective Date and shall be subject to such terms and conditions as the Debtors and the Requisite DIP Lenders shall mutually agree. Allocations under the Long Term Incentive Plan shall be mutually agreed upon by the CEO and the Requisite DIP Lenders.

(b)     ***Executive Employment Agreements.*** The Debtors shall assume the existing employment agreements and/or implement the new employment agreements identified in <u>Exhibit H</u> (collectively, the "<u>Executive Employment Agreements</u>"). The assumption of or entering into the Executive Employment Agreements (or any amendments thereto) shall be in the form and substance satisfactory to the Requisite DIP Lenders in their sole discretion. For the avoidance of doubt, entry into or assumption of any Executive Employment Agreement or other employment agreement shall not be a condition precedent to the confirmation or consummation of this Plan.

(c)     ***Annual Incentive Plan, Supplemental Executive Retirement Plan, and Key Employee Incentive Plan.*** The Debtors shall assume any remaining obligations under the Bankruptcy Court approved Annual Incentive Plan and KEIP. Subject to any modifications required by the Requisite DIP Lenders, in their sole

discretion and as identified in <u>Exhibit I</u>, the Debtors shall assume any remaining obligations under the supplemental executive retirement plan.

        (d)    ***Retiree Benefits.***    Notwithstanding anything to the contrary herein, following the Plan Effective Date, with respect to the payment of "retiree benefits" (as such term is defined in Bankruptcy Code section 1114) related to medical, surgical, or hospital care benefits, or benefits in the event of sickness, accident, disability, or death, such payment shall continue at the levels established pursuant to subsections (e)(1)(B) or (g) of Bankruptcy Code section 1114, at any time prior to confirmation this Plan, for the duration of the periods the Debtors have obligated themselves to provide such benefits, if any, and subject to any contractual rights to terminate or modify.

        (e)    Except for the Long Term Incentive Plan, the Executive Employment Agreements, the Annual Incentive Plan, and the KEIP, the Debtors shall not continue, assume, or enter into any benefit, compensation, incentive or similar plans and agreements other than (1) such programs or agreements implemented or executed in the ordinary course of their business (excluding any supplemental executive retirement plan), (2) as consented to by the Requisite DIP Lenders, or (3) as approved by the board of directors of the Reorganized Company.

        **6.8**    **Post-Effective Date Financing**.

        (a)    On the Plan Effective Date, the Reorganized Debtors shall (a) enter into the Exit Credit Facility together with all guarantees evidencing obligations of the Reorganized Debtors thereunder and security documents, (b) execute the Exit Credit Facility Documents together with such other documents the Exit Credit Facility Lenders may require, and (c) deliver insurance and customary opinions, all of which items in clauses (a) – (c) shall be in form and substance satisfactory to the Exit Credit Facility Lenders, and such documents and all other documents, instruments and agreements to be entered into, delivered or contemplated thereunder shall become effective in accordance with their terms on the Plan Effective Date.

        (b)    The amount, form and substance of the Exit Credit Facility shall be on terms and conditions and subject to the approval of the Requisite DIP Lenders in their sole discretion; *provided however*, that the committed amount of the Exit Credit Facility as of the Plan Effective Date shall not exceed $150 million.

        (c)    In the Confirmation Order, the Bankruptcy Court shall approve the Exit Credit Facility on the terms and conditions disclosed to the Bankruptcy Court, with such changes that are not materially adverse to the Debtors or the Reorganized Debtors that may be agreed upon by the parties thereto, and authorize the Reorganized Debtors to execute the Exit Credit Facility Documents together with such other documents as the Exit Credit Facility Lenders may require in order to effectuate the treatment afforded to such parties under the Exit Credit Facility.

**6.9     Restructuring Transactions and Alternative Structures**.

(a)     Subject to the prior agreement of the Requisite DIP Lenders, the Debtors or the Reorganized Debtors, as the case may be, may take such actions as may be necessary or appropriate to effect certain restructuring transactions which may include the following (collectively, the "Restructuring Transactions"): (i) the execution and delivery of appropriate agreements or other documents of merger, consolidation or reorganization containing terms that are consistent with the terms of this Plan and that satisfy the requirements of applicable law; (ii) the execution and delivery of appropriate instruments of transfer, assignment, assumption or delegation of any property, right, liability, duty or obligation on terms consistent with the terms of this Plan; (iii) the filing of appropriate Organizational Documents with the appropriate governmental authorities under applicable law; and (iv) all other actions that such Debtor or Reorganized Debtor determines are necessary or appropriate.

(b)     As of the date of this Plan, the Debtors do not contemplate consummating any significant Restructuring Transactions on or before the Plan Effective Date.

(c)     The Debtors and the Reorganized Debtors reserve their rights to cause their non-Debtor subsidiaries to engage in any Restructuring Transactions that are otherwise permitted by applicable law, including without limitation, (i) potential transactions whereby the stock of Hayes Lemmerz Holding GmbH and Hayes Lemmerz Konigswinter GmbH would be sold to a subsidiary of Hayes that is not a subsidiary of Hayes Lemmerz Finance LLC-Luxembourg S.C.A., (ii) potential transactions where the stock (or other ownership interests) of Hayes Lemmerz-Inci-Jant Sanayi, A.S, Hayes Lemmerz Jantas Jant Sanayi ve Ticaret A.S., and Kalyani Hayes Lemmerz Limited is transferred to a newly formed subsidiary or subsidiaries of their respective current owners, which newly formed subsidiary would not guaranty the debt of any Hayes entity, or (iii) potential transactions where the holders of DIP Financing Facility Claims or Prepetition Secured Obligations foreclose on the stock of one or more non-Debtors.

(d)     The Debtors reserve the right to dissolve certain subsidiaries (including subsidiaries that are Debtors) upon the Plan Effective Date that either have no assets or do not have assets that are necessary for the Debtors' reorganization.

**6.10     Preservation of Causes of Action**.

(a)     In accordance with Bankruptcy Code section 1123(b)(3) and except as otherwise provided in this Plan, the Reorganized Debtors shall retain and may, in their sole discretion, enforce or prosecute all Retained Actions. The Reorganized Debtors, in their sole and absolute discretion, will determine whether to bring, settle, release, or compromise any Retained Actions (or decline to do any of the foregoing). The Reorganized Debtors or any successors may prosecute (or decline to

prosecute) such Retained Actions in accordance with the best interests of the Reorganized Debtors or any successors holding such rights of action.

(b)      Except as otherwise provided herein, the failure of the Debtors to specifically list any Claim, right of action, suit or proceeding in the Schedules or in Exhibit D hereto does not, and will not be deemed to, constitute a waiver or release by the Debtors of such claim, right of action, suit or proceeding, and the Reorganized Debtors will retain the right to pursue such claims, rights of action, suits or proceedings in their sole discretion and, therefore, no preclusion doctrine, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise) or laches will apply to such claim, right of action, suit or proceeding upon or after the confirmation or consummation of this Plan.

(c)      Upon the Plan Effective Date and satisfaction of the condition to the Plan Effective Date specified in sections 11.2(g) and 11.2(s) of the Plan, the Declaratory Judgment Action shall be deemed dismissed with prejudice. The parties to the Declaratory Judgment Action shall take such steps as are reasonably necessary to effectuate such dismissal.

**6.11    Effectuating Documents; Further Transactions**. The chairman of the board of directors, the chief executive officer, the chief financial officer, the general counsel, or any other executive officer or managing member of the Debtors shall be authorized to execute, deliver, file, or record such contracts, instruments, releases, indentures, and other agreements or documents, and take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of this Plan. The secretary or assistant secretary of the Debtors shall be authorized to certify or attest to any of the foregoing actions.

**6.12    Exemption From Certain Transfer Taxes and Recording Fees**. Pursuant to Bankruptcy Code section 1146(c), any transfers from a Debtor to a Reorganized Debtor or to any other Person or entity pursuant to this Plan (including, without limitation, pursuant to any grant of collateral under the Exit Credit Facility), or any agreement regarding the transfer of title to or ownership of any of the Debtors' real or personal property, will not be subject to any document recording tax, stamp tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording tax, or other similar tax or governmental assessment, and the Confirmation Order will direct the appropriate state or local governmental officials or agents to forego the collection of any such tax or governmental assessment and to accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

**6.13    Approval of Requisite DIP Lenders and Exit Credit Facility Lenders**. For purposes of this Plan, when approval or consent is required from the Requisite DIP Lenders or Exit Credit Facility Lenders, such approval or consent shall be provided in writing (which may be by email or other electronic means) by the DIP

Administrative Agent or Exit Credit Facility Agent (or their respective counsel), respectively.

**6.14    Compromise of Declaratory Judgment Action and PBGC Termination Liability Claim**.  Pursuant to section 363 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the distributions and other benefits provided pursuant to the Plan, the provisions of the Plan shall constitute a good faith compromise and settlement of the Declaratory Judgment Action and the PBGC Termination Liability Claim with respect to all Claims that the Noteholders and the PBGC may have against the Debtors and their non-Debtor Affiliates.  The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromises and settlements with the Noteholders and the PBGC and the Bankruptcy Court's finding that such compromises and settlements are in the best interests of the Debtors, their estates, and the holders of such Claims and is fair, equitable, and reasonable.


# ARTICLE VII

## UNEXPIRED LEASES AND EXECUTORY CONTRACTS

**7.1    Assumed Contracts and Leases**.

(a)    On the Plan Effective Date, all executory contracts or unexpired leases of the Debtors (except those executory contracts and unexpired leases to which the Debtors are a party that are specifically listed on the schedule of rejected contracts and leases annexed hereto as <u>Exhibit J</u>) will be assumed in accordance with, and subject to, the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code.  The Confirmation Order shall constitute an order of the Bankruptcy Court approving such assumptions, pursuant to section 365(b)(1) of the Bankruptcy Code and, to the extent applicable, section 365(b)(3) of the Bankruptcy Code, as of the Plan Effective Date and a finding by the Bankruptcy Court that each such assumption is in the best interests of the Debtors, their Estates, and all parties in interest in these cases.  In addition, the Confirmation Order shall constitute a finding of fact and conclusion of law that (i) each executory contract or unexpired lease is an executory contract which may be assumed by the Debtors, (ii) there are no defaults of the Debtors, no cure payments owing (except as established through the procedure set forth in Section 7.4(b) herein), no compensation due for any actual pecuniary loss, and there is adequate assurance of future performance with respect to of each executory contract or unexpired lease, (iii) such assumption is in the best interest of the Debtors and their Estates, (iv) upon the Plan Effective Date, the assumed executory contracts or unexpired leases constitute legal, valid, binding and enforceable contracts in accordance with the terms thereof, and (v) the counter party to each assumed executory contract or unexpired lease is required to and ordered to perform under and honor the terms of the assumed executory contract or

unexpired lease. Each executory contract and unexpired lease assumed pursuant to this Article VII shall be Reinstated and be fully enforceable by the respective Reorganized Debtor in accordance with its terms, without amendment or modification.

(b) Each executory contract and unexpired lease that is assumed and relates to the use, ability to acquire, or occupancy of real property shall include (a) all modifications, amendments, supplements, restatements, or other agreements made directly or indirectly by any agreement, instrument, or other document that in any manner affect such executory contract or unexpired lease and (b) all executory contracts or unexpired leases appurtenant to the premises, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, powers, uses, reciprocal easement agreements, and any other interests in real estate or rights in rem related to such premises, unless any of the foregoing agreements has been rejected pursuant to a Final Order of the Bankruptcy Court or is otherwise rejected as a part of this Plan.

(c) All counterparties to executory contracts or unexpired leases to be assumed pursuant to this Plan shall receive notice of the Plan Effective Date.

**7.2 Rejected Contracts and Leases**.

(a) Except with respect to executory contracts and unexpired leases that have previously been assumed or are the subject of a motion to assume, or a notice of assumption served pursuant to an order of the Bankruptcy Court, on or before the Confirmation Date, all executory contracts and unexpired leases listed on Exhibit J to this Plan shall be deemed automatically rejected as of the Effective Date. The Confirmation Order shall constitute an order of the Bankruptcy Court approving such rejections pursuant to section 365 of the Bankruptcy Code. The Debtors reserve the right to file a motion on or before the Confirmation Date to reject any executory contract or unexpired lease.

(b) The Debtors may, with the consent of the Requisite DIP Lenders, remove or add any contract or lease from Exhibit J until the Plan Effective Date by filing a notice of such removal with the Bankruptcy Court prior to the Plan Effective Date.

(c) Any counterparty to any executory contract and unexpired lease rejected under the Plan or contract terminated under the Plan (including any indentures) shall be barred from enforcing the terms of such contracts and leases against the Debtors. Such counterparties shall also be barred from pursuing any amounts due under such contracts or leases or damages incurred as a consequence of such rejection or termination against the Debtors or Reorganized Debtors beyond those the remedies expressly provided for under the Plan or Confirmation Order.

**7.3     Exhibits Not Admissions**.  Neither the inclusion by the Debtors of a contract or lease on Exhibit J nor anything contained in this Plan shall constitute an admission by the Debtors that such lease or contract is an unexpired lease or executory contract or that any Debtor, or any of their Affiliates, has any liability thereunder.

**7.4     Payments Related to Assumption of Executory Contracts and Unexpired Leases**.

(a)     The provisions (if any) of each executory contract or unexpired lease to be assumed and Reinstated under this Plan which are or may be in default shall be satisfied solely by Cure.  Objections to assumption or rejection including, without limitation, to Cure related to non-monetary defaults, must be raised in an objection to be filed no later than the date by which objections are required to be filed with respect to confirmation of the Plan.  Any such Objections will be litigated at the Confirmation Hearing or at such other time as the Bankruptcy Court may schedule.

(b)     The Solicitation Procedures Order shall establish the procedures for determining and resolving disputed Cure amounts.  Any party failing to follow such Cure procedures shall be forever barred from asserting, collecting, or seeking to collect any amounts relating thereto against the Debtors or Reorganized Debtors.

**7.5     Rejection Damages Bar Date**.  If rejection of an executory contract or unexpired lease rejected pursuant to this Plan results in a Claim, then such Claim shall be forever barred and shall not be enforceable against either the Debtors or the Reorganized Debtors or such entities' properties unless a proof of claim is filed with the clerk of the Bankruptcy Court and served upon counsel to the Debtors within thirty (30) days after service of the earlier of (a) notice of entry of the Confirmation Order or (b) other notice that the executory contract or unexpired lease has been rejected.  Any Claim that may be Allowed as a result of the rejection of an executory contract or unexpired lease shall be treated as an Other Unsecured Claim.

**ARTICLE VIII**

**PROVISIONS GOVERNING DISTRIBUTIONS**

**8.1     Time of Distributions**.  Except as otherwise provided for herein, or ordered by the Bankruptcy Court, distributions under this Plan shall be made on a Periodic Distribution Date or as soon as reasonably practical thereafter.

**8.2     No Interest on Claims**.  Unless otherwise specifically provided for in this Plan, the Confirmation Order, DIP Financing Order or the DIP Credit Agreement, Postpetition Interest shall not accrue or be paid on Claims, and no Claimholder shall

be entitled to interest accruing on or after the Petition Date on any Claim, right, or Interest. Additionally, and without limiting the foregoing, interest shall not accrue or be paid on any Disputed Claim in respect of the period from the Effective Date to the date a final distribution is made when and if such Disputed Claim becomes an Allowed Claim.

**8.3** **Disbursing Agent**. The Disbursing Agent shall make all distributions required under this Plan.

**8.4** **Surrender of Securities or Instruments**. On or before the Distribution Date, or as soon as practicable thereafter, each holder of a Certificate, shall surrender such Certificate to the Disbursing Agent or, with respect to indebtedness that is governed by other agreement, the respective servicer, and such Certificate shall be cancelled. No distribution of property hereunder shall be made to or on behalf of any such holder unless and until such Certificate is received by the Disbursing Agent or the respective servicer or the unavailability of such Certificate is reasonably established to the satisfaction of the Disbursing Agent or the respective servicer. Any holder who fails to surrender or cause to be surrendered such Certificate, or fails to execute and deliver an affidavit of loss and indemnity reasonably satisfactory to the Disbursing Agent or the respective servicer prior to the first anniversary of the Plan Effective Date, shall be deemed to have forfeited all rights and Claims in respect of such Certificate and shall not participate in any distribution hereunder, and all property in respect of such forfeited distribution, including any dividends or interest attributable thereto, shall revert to the Reorganized Debtors notwithstanding any federal or state escheat laws to the contrary.

**8.5** **Claims Administration Responsibility**. The Reorganized Debtors will have sole and absolute discretion in administering, disputing, objecting to, compromising or otherwise resolving all Claims against the Debtors (the "Claims Administration"). The Reorganized Debtors shall bear the responsibility for any fees, costs, expenses or other liabilities incurred by the Disbursing Agent in connection with the Claims Administration.

**8.6** **Delivery of Distributions**. Distributions under this Plan to holders of Allowed Prepetition Secured Lender Claims shall be made to or at the direction of the Prepetition Administrative Agent and shall be distributed by the Prepetition Administrative Agent in accordance with the Prepetition Credit Agreement. Distributions under this Plan to holders of DIP Financing Facility Claims shall be made to or at the direction of the DIP Administrative Agent and shall be distributed by the DIP Administrative Agent in accordance with the DIP Credit Agreement. Distributions under this Plan to holders of Notes Claims, if any, shall be made to or at the direction of the Notes Indenture Trustee and shall be distributed by the Notes Indenture Trustee in accordance with the indenture governing the Notes. Distributions under this Plan to all other Allowed Claimholders shall be made by the

Disbursing Agent. If any Claimholder's distribution is returned as undeliverable, no further distributions to such Claimholder shall be made unless and until the Disbursing Agent or the appropriate servicer is notified of such Claimholder's then current address, at which time all missed distributions shall be made to such Claimholder without interest. Amounts in respect of undeliverable distributions shall be returned to the Reorganized Debtors until such distributions are claimed. All claims for undeliverable distributions shall be made on or before the second anniversary of the Effective Date. After such date, all unclaimed property shall revert to the Reorganized Debtors. Upon such reversion, the claim of any Claimholder, or their successors, with respect to such property shall be discharged and forever barred notwithstanding any federal or state escheat laws to the contrary.

**8.7    Procedures for Treating and Resolving Disputed and Contingent Claims**.

(a)    *No Distributions Pending Allowance.*    No payments or distributions will be made with respect to all or any portion of a Disputed Claim unless and until all objections to such Disputed Claim have been settled or withdrawn or have been determined by a Final Order of the Bankruptcy Court, and the Disputed Claim has become an Allowed Claim. All objections to Claims must be filed on or before the Claims Objection Deadline.

(b)    *Distributions After Allowance.*    Payments and distributions to each respective Claimholder on account of a Disputed Claim, to the extent that it ultimately becomes an Allowed Claim, will be made in accordance with provisions of this Plan that govern distributions to such Claimholders. Subject to the other provisions of this Article VIII, on the first Periodic Distribution Date following the date when a Disputed Claim becomes an Allowed Claim, the Disbursing Agent will distribute to the Claimholder any Cash or other Plan consideration that would have been distributed on the dates distributions were previously made to Claimholders had such Allowed Claim been an Allowed Claim on such dates, together with any dividends, payments, or other distributions made on account of, as well as any obligations arising from, the distributed property as if such Allowed Claim had been an Allowed Claim on the dates distributions were previously made to Allowed Claimholders included in the applicable class.

**8.8    Conversion of Claims Asserted In Foreign Currencies**.

(a)    Except as otherwise provided in the Notes Indenture, any Claim asserted in non-United States currency shall, for distribution purposes, be converted to United States dollars at such rate quoted in the Wall Street Journal on the Petition Date.

(b)    For the purpose of calculating the *pro rata* share of each DIP Lender in the DIP Lenders Distribution Property, all DIP Term Loans of such DIP

Lender that are denominated in Euros shall be converted to United States dollars at an exchange rate of 1:1.3606.

(c) For the purpose of calculating the *pro rata* share of each holder of Prepetition Secured Obligations in the Prepetition Secured Distribution Property, all Prepetition Secured Obligations of such holders of Prepetition Secured Obligations that are denominated in Euros shall be converted to United States dollars at an exchange rate of 1:1.3606.

(d) For the purpose of calculating the *pro rata* share of each holder of Prepetition Secured Obligations entitled to a Consent Fee under the DIP Loan Agreement, all Consent Fee Entitlements of such holders that are denominated in Euros shall be converted to United States dollars at an exchange rate of 1:1.3606.

**8.9** **Distribution of Foreign Creditor Distribution Property to Holders of Class 7 Noteholder Claims and Class 8 PBGC Termination Liability Claim.** The Noteholders and PBGC have agreed to share the Foreign Creditor Distribution Property in the percentages set forth in section 3.2(b) of the Plan provided the Confirmation Date occurs on or before November 30, 2009. In the event Confirmation Date occurs after November 30, 2009, the Creditors' Committee shall instruct the Debtors as to the appropriate distribution of the Foreign Creditor Distribution Property on the Plan Effective Date.

## ARTICLE IX

### ALLOWANCE AND PAYMENT OF CERTAIN ADMINISTRATIVE CLAIMS

**9.1** **Professional Claims**.

(a) *Final Fee Applications.* All final requests for payment of Professional Claims must be filed no later than forty-five (45) days after the Plan Effective Date. After notice and a hearing in accordance with the procedures established by the Bankruptcy Code and prior orders of the Bankruptcy Court, the allowed amounts of such Professional Claims shall be determined by the Bankruptcy Court.

(b) *Payment of Interim Amounts.* Subject to the Holdback Amount, on the Plan Effective Date, the Debtors or the Reorganized Debtors shall pay all amounts owing to Professionals for all outstanding amounts relating to prior periods through the Plan Effective Date. In order to receive payment on the Plan Effective Date for unbilled fees and expenses incurred through such date, no later than two (2) days prior to the Plan Effective Date, the Professionals shall estimate fees and expenses due for periods that have not been billed as of the Plan Effective Date and

shall deliver such estimate to counsel for the Debtors, the Prepetition Agent, and the DIP Agent. Within fifteen (15) days after the Plan Effective Date, a Professional receiving payment for the estimated period shall submit a detailed invoice (the "Final Invoice") covering such period in the manner and providing the detail as set forth in the Professional Fee Order. In the event the Final Invoice reflects that amounts are due to a Professional, the Reorganized Debtors shall promptly pay such amounts; excess amounts paid by the Debtors to a Professional shall be promptly remitted to the Reorganized Debtors.

(c)     On the Plan Effective Date, the Debtors or the Reorganized Debtors shall pay to the Disbursing Agent, in order to fund the Holdback Escrow Account, Cash equal to the aggregate Holdback Amount for all Professionals. The Disbursing Agent shall maintain the Holdback Escrow Account in trust for the Professionals with respect to whom fees have been held back pursuant to the Professional Fee Order. Such funds shall not be considered property of the Reorganized Debtors. The remaining amount of Professional Claims owing to the Professionals first shall be paid to such Professionals by the Disbursing Agent from the Holdback Escrow Account when such claims are finally allowed by the Bankruptcy Court and, to the extent funds held in the Holdback Escrow Account are insufficient, such amounts shall be paid by the Reorganized Debtors. When all Professional Claims have been paid in full, amounts remaining in the Holdback Escrow Account, if any, shall be paid to the Reorganized Debtors.

(d)     Upon the Plan Effective Date, any requirement that professionals comply with Bankruptcy Code sections 327 through 331 in seeking retention or compensation for services rendered after such date will terminate.

(e)     All amounts payable to Professionals under this Plan are subject to final allowance by the Bankruptcy Court.

**9.2     Substantial Contribution Compensation and Expenses Bar Date.** Any Person who requests compensation or expense reimbursement for making a substantial contribution in the Bankruptcy Cases pursuant to Bankruptcy Code sections 503(b)(3), 503(b)(4), and 503(b)(5) must file an application with the clerk of the Bankruptcy Court, on or before the 503 Deadline, and serve such application on counsel for the Debtors and as otherwise required by the Bankruptcy Court and the Bankruptcy Code on or before the 503 Deadline, or be forever barred from seeking such compensation or expense reimbursement.

**9.3     Other Administrative Claims.**

(a)     All other requests for payment of an Administrative Claim (other than as set forth in Sections 2.5, 9.1 and 9.2 of this Plan, and other than with respect to Cure Claims) must be filed with the Bankruptcy Court and served on counsel for the Debtors no later the Administrative Claims Bar Date. Unless the

Debtors or the Reorganized Debtors object to an Administrative Claim by the Claims Objection Deadline, such Administrative Claim shall be deemed allowed in the amount requested. In the event that the Debtors or the Reorganized Debtors object to an Administrative Claim, the Bankruptcy Court shall determine the allowed amount of such Administrative Claim. Notwithstanding the foregoing, no request for payment of an Administrative Claim need be filed with respect to an Administrative Claim (i) which is paid or payable by any Debtor in the ordinary course of business or (ii) the payment of which has been approved by the Bankruptcy Court.

**9.4** **Compensation of Notes Indenture Trustee and Prepetition Administrative Agent.**

(a)    Notwithstanding anything to the contrary contained herein, the Debtors shall pay, within ten (10) Business Days of the Plan Effective Date, the reasonable (a) Notes Indenture Trustee's fees, expenses and compensation incurred through the Plan Effective Date as provided by the Notes Indenture, including the reasonable fees and documented out-of-pocket expenses of Drinker Biddle & Reath, LLP, as counsel to the Notes Indenture Trustee, and (b) Prepetition Administrative Agent's fees, expenses and compensation incurred through the Plan Effective Date as provided by the Prepetition Credit Facility, including the reasonable fees and documented out-of-pocket expenses of Weil Gotshal & Manges LLP, as counsel to the Prepetition Administrative Agent, without the need of these parties to file fee applications with the Bankruptcy Court; provided that the Notes Indenture Trustee, Prepetition Administrative Agent, and their respective counsel shall provide the Debtors with the invoices (or other documentation as the Debtors may reasonably request) for which they seek payment on or before five (5) days after the Plan Effective Date and provided that the Debtors have no objection to such fees.[1]

(b)    To the extent that the Debtors object to any of the fees or expenses of the Notes Indenture Trustee, Prepetition Administrative Agent, or their respective counsel, the Debtor shall not be required to pay any disputed portion of such fees until a resolution of such objection agreed to by the Debtors and the Notes Indenture Trustee, Prepetition Administrative Agent, and/or their counsel or a further order of the Bankruptcy Court upon a motion by the Notes Indenture Trustee or Prepetition Administrative Agent, as applicable.

# ARTICLE X

## EFFECT OF THE PLAN ON CLAIMS AND INTERESTS

**10.1    Revesting of Assets**.  Except as otherwise explicitly provided in this Plan, on the Plan Effective Date all property comprising the Estates (including Retained Actions) shall revest in each of the Debtors and, ultimately, in the Reorganized Debtors, free and clear of all Claims, Liens and Interests of creditors and equity security Holders (other than as expressly provided herein).  As of the Plan Effective Date, each of the Reorganized Debtors may operate its business and use, acquire, and dispose of property and settle and compromise Claims without supervision of the Bankruptcy Court, free of any restrictions of the Bankruptcy Code or Bankruptcy Rules, other than those restrictions expressly imposed by this Plan and the Confirmation Order.

**10.2    Discharge of the Debtors**. Pursuant to and to the fullest extent permitted by Bankruptcy Code section 1141(d), except as otherwise specifically provided in this Plan or in the Confirmation Order, confirmation of this Plan discharges and releases, effective as of the Confirmation Date (but subject to the occurrence of the Plan Effective Date), the Debtors, the Reorganized Debtors and the Estates (a) from all Claims and Causes of Action, whether known or unknown, and (b) from liabilities of, liens on, obligations of, rights against, and Interests in the Debtors or any of their assets or properties, in each case regardless of whether any property has been distributed or retained pursuant to this Plan on account of such Claims, Causes of Action, rights, liabilities, liens, obligations and Interests, and in each case including, but not limited to, demands and (x) Claims, Causes of Actions, rights, liabilities, liens, obligations and Interests that arose before the Confirmation Date, (y) any Claims, Causes of Actions, rights, liabilities (including withdrawal liabilities), liens, obligations and Interests to the extent such Claims, Causes of Actions, rights, liabilities (including withdrawal liabilities), liens, obligations and Interests relate to services performed by employees of the Debtors prior to the Petition Date and that arise from a termination of employment or a termination of any employee or retiree benefit program regardless of whether such termination occurred prior to or after the Confirmation Date, and (z) all Claims of the kind specified in Bankruptcy Code sections 502(g), 502(h) or 502(i), in each case whether or not (i) a proof of claim or interest based upon such Claims, Causes of Actions, rights, liabilities, liens, obligations and Interests or Interest is filed or deemed filed under Bankruptcy Code section 501, (ii) a Claim or Interest based upon such Claims, Causes of Actions, rights, liabilities, liens, obligations and Interests is allowed under Bankruptcy Code section 502, or (iii) the Holder of such a Claim, Cause of Action, right, liability, lien, obligation or Interests accepted this Plan.  The Confirmation Order shall be a judicial determination of the discharge of all liabilities of and Interests in the Debtors, subject to the Plan Effective Date occurring.

As of the Plan Effective Date, except as provided in this Plan or in the Confirmation Order or under the terms of the documents evidencing and order approving the Exit Credit Facility, all Persons shall be precluded from asserting against the Debtors or the Reorganized Debtors any other or further claims, debts, rights, causes of action, claims for relief, liabilities, or equity interests relating to the Debtors based upon any act, omission, transaction, occurrence, or other activity of any nature that occurred prior to the Plan Effective Date. In accordance with the foregoing, except as provided in this Plan or the Confirmation Order, the Confirmation Order shall be a judicial determination of discharge of all such Claims and other debts and liabilities against the Debtors and termination of all Interests in Hayes pursuant to Bankruptcy Code sections 524 and 1141, and such discharge shall void any judgment obtained against the Debtors at any time, to the extent that such judgment relates to a discharged Claim or terminated Interest.

If the Pension Plan is not terminated, then no provision of, or proceeding within, the Debtors' reorganization proceedings, the Plan, nor the Confirmation Order shall in any way be construed as discharging, releasing or relieving the Debtors, the Reorganized Debtors, or any other party in any capacity, from any liability with respect to the Pension Plan under any law, governmental policy or regulatory provision. In the event the Pension Plan is not terminated, PBGC and the Pension Plan shall not be enjoined or precluded from enforcing liability, if any, relating to the Pension Plan because of any of the provisions of the Plan or the Plan's confirmation. Regardless of whether the Pension Plan is terminated, no provision of or proceeding within the Debtors' reorganization proceedings, the Plan, nor the Confirmation Order shall in any way be construed as discharging, releasing or relieving the Debtors, the Reorganized Debtors, or any other party in any capacity, from any liability for breach of fiduciary duty concerning the Pension Plan.

**10.3 Compromises and Settlements**. Pursuant to Bankruptcy Rule 9019(a), the Debtors, with the consent of Requisite DIP Lenders, may compromise and settle various Claims (a) against them and (b) that they have against other Persons. The Debtors expressly reserve the right (with Bankruptcy Court approval, following appropriate notice and opportunity for a hearing) to compromise and settle Claims against them and claims that they may have against other Persons up to and including the Plan Effective Date. After the Plan Effective Date, such right shall pass to the Reorganized Debtors as contemplated in Section 10.1 of this Plan, without any need for Bankruptcy Court approval.

**10.4 Release of Certain Parties**. As of the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, the Debtors, the Reorganized Debtors and any Person seeking to exercise the rights of the Estates, including, without limitation, any successor to the Debtors or any estate representative appointed or selected pursuant to Bankruptcy Code section 1123(b)(3) shall be deemed to forever release, waive, and discharge the Released Parties of all

claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, and liabilities which the Debtors or the Estates are entitled to assert, whether known or unknown, liquidated or unliquidated, fixed or contingent, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in law, equity, or otherwise, based in whole or in part upon any act or omission, transaction, or occurrence taking place on or prior to the Plan Effective Date in any way relating to the Debtors, the Estates, the conduct of the Debtors' businesses, the Bankruptcy Cases, this Plan or the Reorganized Debtors with respect to each of the Released Parties; except for willful misconduct, gross negligence, intentional fraud, and/or criminal conduct.

**10.5    Releases by Holders of Claims.  As of the Plan Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, each holder of a Claim that affirmatively votes in favor of this Plan hereby forever releases, waives, and discharges all claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action, and liabilities whatsoever against the Released Parties, arising under or in connection with or related to the Debtors, the Estates, the conduct of the Debtors' business, the Bankruptcy Cases, the DIP Financing Facility, this Plan (other than the rights under this Plan and the contracts, instruments, releases, indentures, and other agreements or documents delivered hereunder) or the Reorganized Debtors, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereunder arising, in law, equity, or otherwise, that are based in whole or part on any act, omission, transaction, event, or other occurrence taking place on or prior to the Plan Effective Date in any way relating to the Debtors, the Estates, the conduct of the Debtors' businesses, the Bankruptcy Cases, this Plan or the Reorganized Debtors except for willful misconduct, gross negligence, intentional fraud, and/or criminal conduct.  Holders of claims or interests that are deemed to accept the plan pursuant to section 5.2 of this Plan shall not be bound by the releases contained in this paragraph.**

**10.6    Setoffs**.  Except with respect to Claims specifically Allowed under the Plan, the Debtors may, but shall not be required to, set off against any Claim, and the payments or other distributions to be made pursuant to this Plan in respect of such Claim, claims of any nature whatsoever that the Debtors may have against such Claimholder; but neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtors or the Reorganized Debtors of any such claim that the Debtors or the Reorganized Debtors may have against such Claimholder.

**10.7    Exculpation and Limitation of Liability**.  *Except as otherwise specifically provided in this Plan, the Released Parties, the Debtors, and the Reorganized Debtors shall not have or incur, and are hereby released from, any*

*claim, obligation, right, Cause of Action and liability to one another or to any Claimholder or Interestholder, or any other party-in-interest, or any of their respective agents, employees, representatives, financial advisors, investment bankers, attorneys or Affiliates, or any of their successors or assigns, for any act or omission in connection with, relating to, or arising out of (i) the filing and prosecution of the Bankruptcy Cases, (ii) the negotiation and filing of this Plan, (iii) the negotiation and execution of the DIP Financing Facility, (iv) the pursuit of confirmation of this Plan, (v) the negotiation and pursuit of approval of the Disclosure Statement, (vi) the consummation of this Plan, and (vii) the administration of this Plan or the property to be distributed under this Plan, and in all respects shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities under this Plan. Notwithstanding anything to the contrary contained herein, this Section 10.7 shall not release any party from any claim, obligation, right, Cause of Action or liability arising from any act or omission committed which constitutes willful misconduct, gross negligence, intentional fraud, and/or criminal conduct.*

**10.8    Indemnification Obligations**.

(a)    Indemnification Obligations owed to any Director or Officer, whether pursuant to charter, bylaws, contract or otherwise, shall be deemed to be and shall be treated as though they are, executory contracts that are assumed pursuant to Bankruptcy Code section 365 under the Plan and shall continue in force with respect to the applicable Reorganized Debtor, and such Indemnification Obligations (subject to any defense thereto) shall survive confirmation of the Plan, irrespective of whether indemnification is owed in connection with a pre-Petition Date or post-Petition Date occurrence.

(b)    The Debtors or Reorganized Debtors, as the case may be, covenant to use commercially reasonable efforts to purchase and maintain D&O Insurance providing coverage to the Directors and Officers for a period of six years after the Plan Effective Date, insuring such parties in respect of any claims, demands, suits, Causes of Action, or proceedings against such Directors or Officers based upon any act or omission related to the service with, for, or on behalf of the Debtors or the Reorganized Debtors by such Directors or Officers in form, amount, cost and structure satisfactory to the Debtors and the Requisite DIP Lenders.

(c)    The Debtors or Reorganized Debtors covenant to use commercially reasonable efforts to purchase and maintain D&O Insurance providing coverage to the directors and officers of the Reorganized Debtors in form and substance satisfactory to the directors of the Reorganized Debtors.

**10.9    Injunction. The satisfaction, release, and discharge pursuant to this <u>Article X</u> of this Plan shall also act as an injunction against any Person commencing or continuing any action, employment of process, or act to collect,**

offset, or recover any Claim or Cause of Action satisfied, released, or discharged under this Plan to the fullest extent authorized or provided by the Bankruptcy Code, including, without limitation, to the extent provided for or authorized by Bankruptcy Code sections 524 and 1141.

**10.10  Plan Impact on Foreign Non-Debtor Subsidiaries' Guarantees of Notes**.  Each Noteholder that has not (i) voted to reject the Plan and (ii) opted out of the release of the Non-Debtor Affiliates, has and shall be deemed to consent and agree to a full and complete release of any and all claims that such Noteholder has against the Non-Debtor Affiliates.

**10.11  Plan Impact on PBGC's Claims Against Non-Debtor Affiliates**. Upon the Plan Effective Date, the PBGC's Claims against the non-Debtor Affiliates shall be waived, released, and discharged in exchange for the treatment provided under this Plan.   The Confirmation Order shall contain findings and decrees consistent with this release, waiver, and discharge of the PBGC Termination Liability Claim against the non-Debtor Affiliates as contemplated by this section 10.11.

## ARTICLE XI

## <u>CONDITIONS PRECEDENT</u>

**11.1    Conditions to Confirmation**.  The following are conditions precedent to confirmation of this Plan that must be satisfied unless waived in accordance with Section 11.3 of this Plan:

(a)    The Bankruptcy Court shall have approved a disclosure statement with respect to this Plan in form and substance satisfactory to the Debtors and the Requisite DIP Lenders in their sole discretion.

(b)    The Confirmation Order and the Plan (excluding any exhibits thereto, other than the Tranche A Warrants Agreement and Tranche B Warrants Agreement) shall be in form and substance satisfactory to the Debtors, the Creditors' Committee, and the Requisite DIP Lenders in their sole discretion.

(c)    The exhibits to the Plan shall be in a form and substance satisfactory to the Debtors and the Requisite DIP Lenders in their sole discretion.

(d)    Prior to the date that is five (5) days prior to the 1st day of the Confirmation Hearing (as such date may be adjourned from time to time), the completion of due diligence to the Requisite DIP Lenders' sole satisfaction with respect to the Debtors and their Affiliates, including without limitation, due diligence with respect to (i) the business, operations, assets, liabilities (including, <u>without limitation</u>, environmental liabilities), condition (financial or otherwise) or prospects

of the Debtors and their Affiliates, (ii) any investigations, claims, causes of action or suits filed or asserted (or threatened) by any governmental entity with respect to the Debtors or any of their Affiliates or any of their respective employees, officers, or directors, (iii) any claims or causes of action filed or asserted (or threatened) by any party with respect to the Debtors or any of their Affiliates or any of their respective employees, officers or directors, and (iv) the size of the administrative expense and priority claims pools as of the Plan Effective Date (including amounts paid prior to the Plan Effective Date).

**11.2    Conditions to Consummation**.    The following are conditions precedent to the occurrence of the Plan Effective Date, each of which must be satisfied unless waived in accordance with Section 11.3 of this Plan:

(a)    The Bankruptcy Court shall have entered one or more orders, satisfactory to the Requisite DIP Lenders in their sole discretion (which may include the Confirmation Order) authorizing the assumption and rejection of unexpired leases and executory contracts by the Debtors as contemplated by Article VII hereof.

(b)    The Debtors shall have entered into the Exit Credit Facility, and all conditions precedent to the consummation thereof shall have been waived (subject to any applicable consent requirements) or satisfied in accordance with the terms thereof.

(c)    The Confirmation Order and the Plan (excluding any exhibits thereto) (i) shall be in form and substance acceptable to the Debtors, the Creditors' Committee, and the Requisite DIP Lenders, in their sole discretion (ii) shall be a Final Order, and (iii) no request for revocation of the Confirmation Order under Bankruptcy Code section 1144 shall have been made, or, if made, shall remain pending.

(d)    The Tranche A Warrants Agreement and Tranche B Warrants Agreement shall be consistent with the warrant term sheet attached to the Disclosure Statement as Appendix G, with such other terms and conditions as may be agreed to by the Debtors, Requisite DIP Lenders, and the Creditors' Committee.

(e)    The bylaws, certificate of incorporation, exit financing documentation, stockholders' agreement, registration rights agreement, and management stockholders' agreement shall be in form and substance reasonably acceptable to the Creditors' Committee with respect to any provisions directly impacting the distributions received by Class 7 and Class 8 under the Plan.

(f)    The exhibits to the Plan shall be in form and substance acceptable to the Debtors and the Requisite DIP Lenders, in their sole discretion.

(g) All guaranties of the Prepetition Secured Obligations shall have been released or otherwise addressed in a manner acceptable to the Requisite DIP Lenders in their sole discretion; and all liens or pledges securing the Prepetition Secured Obligations (or any guarantee thereof) shall have been released or otherwise addressed in a manner acceptable to the Requisite DIP Lenders in their sole discretion.

(h) The Requisite DIP Lenders shall have determined, in their sole discretion, that no party shall have enforced the Notes Indenture and/or the Notes Guarantees (or have taken any actions or initiated any proceedings with respect to such enforcement) in any jurisdiction worldwide or, if any such enforcement action has been taken or initiated, that it has been addressed in a manner acceptable to the Requisite DIP Lenders in their sole discretion.

(i) There shall not have occurred any event, development or circumstance since the date of the Debtors' last audited financial statement, that has had, or could reasonably be expected to have, a material adverse effect on the financial condition, business, results of operation, assets or liabilities of the Debtors or any of their Affiliates.

(j) There shall not have occurred a Force Majeure Event.

(k) No default or event of default has occurred and is continuing under the DIP Credit Agreement.

(l) The conditions to Plan consummation in the DIP Credit Agreement have either been satisfied or waived in accordance with the terms of the DIP Credit Agreement.

(m) OPEB, pension, collective bargaining agreements, and related matters, issues, and liabilities (including without limitation, the pension obligations of the German and other non-Debtor subsidiaries of Hayes) have been reduced and/or resolved to the satisfaction of the Requisite DIP Lenders in their sole discretion.

(n) All of the non-Debtor Obligors' employment agreements, incentive plans, severance plans, retention plans, and similar agreements or plans are reasonably acceptable to the Requisite DIP Lenders.

(o) If the Requisite DIP Lenders have requested in writing that one or more non-Debtor Affiliates should (i) become a Debtor(s) in the Bankruptcy Case subject to and a Debtor for all purposes under this Plan and/or (ii) file insolvency (or similar) proceedings in the jurisdiction of their organization and/or operation, then such filing (or in the case of a foreign proceeding, the successful completion of such proceeding) shall have occurred.

(p)    All authorizations, consents, and regulatory approvals worldwide, if any, required in connection with the consummation of this Plan are obtained and not revoked, and any waiting period in connection therewith shall have expired, including, without limitation, those under the Hart-Scott-Rodino Antitrust Improvement Act of 1976, or other antitrust or competition rules or laws.

(q)    All actions, documents and agreements necessary to implement this Plan, including, without limitation, the stockholders' agreement, the D&O Insurance for the Reorganized Debtors, and each Exhibit, shall be in form and substance satisfactory to the Debtors and the Requisite DIP Lenders, in their sole discretion, and shall have been effected or executed as applicable.

(r)    Assuming all other conditions to the Plan Effective Date have been satisfied, the New Common Stock, the Tranche A Warrants, and the Tranche B Warrants shall be issued as required by this Plan.

(s)    No more than 24% in principal amount of the Notes have both rejected the Plan and opted out of the Release of Non-Debtor Affiliates, as described in Section 3.2(b) of the Plan with respect to Class 7.

(t)    All actions required under this Plan to be taken on or before the Plan Effective Date shall have been taken.

**11.3    Waiver of Conditions to Confirmation or Consummation**.  The conditions set forth in Sections 11.1 and 11.2 of this Plan (other than Section 11.2 (f) and (s) of this Plan) may be waived by the Debtors with the prior consent of the Requisite DIP Lenders in their sole discretion without any notice to any other parties-in-interest or the Bankruptcy Court and without a hearing.  The conditions set forth in Section 11.2(c) of this Plan may be waived by the Debtors, the DIP Agent, and the Creditors' Committee (requiring both the DIP Agent's and Creditors' Committee's consent) in their respective sole discretion without any notice to any other parties-in-interest or the Bankruptcy Court and without a hearing.  The failure of the Debtors in their sole discretion to exercise any of the foregoing rights shall not be deemed a waiver of any other rights, and each such right shall be deemed an ongoing right, which may be asserted at any time.

# ARTICLE XII

## RETENTION OF JURISDICTION

Pursuant to Bankruptcy Code sections 105(a) and 1142, the Bankruptcy Court shall have exclusive jurisdiction of all matters arising out of, and related to, the Bankruptcy Cases and this Plan (except in the case of the Exit Credit Facility Documents and New Common Stock which shall be subject to the jurisdiction

indicated in the definitive documentation thereof), including, among others, the following matters:

(a) to hear and determine pending motions for (i) the assumption or rejection or (ii) the assumption and assignment of executory contracts or unexpired leases to which the Debtors are a party or with respect to which the Debtors may be liable, and to hear and determine the allowance of Claims resulting therefrom including the amount of Cure, if any, required to be paid;

(b) to adjudicate any and all adversary proceedings, applications, and contested matters that may be commenced or maintained pursuant to the Bankruptcy Cases or this Plan, proceedings to adjudicate the allowance of Disputed Claims, and all controversies and issues arising from or relating to any of the foregoing;

(c) to adjudicate any and all disputes arising from the distribution of the New Common Stock, the Tranche A Warrants, and the Tranche B Warrants;

(d) to ensure that distributions to Allowed Claimholders are accomplished as provided herein;

(e) to hear and determine any and all objections to the allowance of Claims and the estimation of Claims, both before and after the Confirmation Date, including any objections to the classification of any Claim, and to allow or disallow any Claim, in whole or in part;

(f) to enter and implement such orders as may be appropriate if the Confirmation Order is for any reason stayed, revoked, modified, or vacated;

(g) to issue orders in aid of execution, implementation, or consummation of this Plan;

(h) to consider any modifications of this Plan, to cure any defect or omission, or to reconcile any inconsistency in any order of the Bankruptcy Court, including, without limitation, the Confirmation Order;

(i) to hear and determine all applications for compensation and reimbursement of Professional Claims under this Plan or under Bankruptcy Code sections 330, 331, 503(b), 1103, and 1129(a)(4);

(j) to determine requests for the payment of Claims entitled to priority under Bankruptcy Code section 507(a)(1), including compensation of and reimbursement of expenses of parties entitled thereto;

(k)     to hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of this Plan or the Confirmation Order, including, without limitation, disputes arising under agreements, documents, or instruments executed in connection with this Plan;

(l)     to hear and determine all suits or adversary proceedings to recover assets of the Debtors and property of its Estates, wherever located;

(m)     to hear and determine matters concerning state, local, and federal taxes in accordance with Bankruptcy Code sections 346, 505, and 1146;

(n)     to hear any other matter not inconsistent with the Bankruptcy Code;

(o)     to hear and determine all disputes involving the existence, nature, or scope of the Debtors' discharge, including any dispute relating to any liability arising out of the termination of employment or the termination of any employee or retiree benefit program, regardless of whether such termination occurred prior to or after the Plan Effective Date;

(p)     to hear and determine all disputes among the Debtors and the Pension Benefit Guarantee Corporation;

(q)     to hear and determine all disputes involving the releases and exculpations granted herein and the injunctions established herein;

(r)     to enter a final decree closing the Bankruptcy Cases; and

(s)     to enforce all orders previously entered by the Bankruptcy Court.

Unless otherwise specifically provided herein or in a prior order of the Bankruptcy Court, the Bankruptcy Court shall have exclusive jurisdiction to hear and determine disputes concerning Claims, Interests, and the Retained Actions, and any motions to compromise or settle such disputes.

## ARTICLE XIII

## MISCELLANEOUS PROVISIONS

**13.1    Binding Effect**.  As of the Plan Effective Date, this Plan shall be binding upon and inure to the benefit of the Debtors, the Reorganized Debtors, all present and former Claimholders, all present and former Interestholders, other parties-in-interest and their respective heirs, successors, and assigns.

**13.2  Modification and Amendments**.  The Debtors may alter, amend, or modify this Plan or any Exhibits hereto under Bankruptcy Code section 1127(a), in a form that is satisfactory to the Requisite DIP Lenders in their sole discretion, at any time prior to the Confirmation Hearing.  After the Confirmation Date and prior to substantial consummation of this Plan as defined in Bankruptcy Code section 1101(2), the Debtors may, with the consent of the Requisite DIP Lenders in their sole discretion, under Bankruptcy Code section 1127(b), institute proceedings in the Bankruptcy Court to remedy any defect or omission or reconcile any inconsistencies in this Plan, the Disclosure Statement, or the Confirmation Order, and such matters as may be necessary to carry out the purposes and effects of this Plan.

**13.3  Withholding and Reporting Requirements**.  In connection with this Plan and all instruments issued in connection therewith and distributions thereunder, the Debtors shall comply with all withholding and reporting requirements imposed by any federal, state, local, or foreign taxing authority, and all distributions hereunder shall be subject to any such withholding and reporting requirements.

**13.4  Allocation of Plan Distributions Between Principal and Interest**.  To the extent that any Allowed Claim entitled to a distribution under this Plan is composed of indebtedness and accrued but unpaid interest thereon, such distribution shall, for United States federal income tax purposes, be allocated to the principal amount of the Claim first and then, to the extent the consideration exceeds the principal amount of the Claim, to accrued but unpaid interest.

**13.5  Creditors' Committee**.  Effective on the Plan Effective Date, the Creditors' Committee shall dissolve automatically, whereupon its members, professionals, and agents shall be released from any further duties and responsibilities in the Bankruptcy Cases and under the Bankruptcy Code, except with respect to applications for Professional Claims.  The professionals retained by the Creditors' Committee shall not be entitled to compensation and reimbursement of expenses for services rendered after the Plan Effective Date, except for services rendered in connection with (a) the implementation of the transactions contemplated to occur on the Plan Effective Date hereunder and (b) applications for allowance of compensation and reimbursement of expenses pending on the Plan Effective Date or filed after the Plan Effective Date pursuant to Section 9.1 hereof.

**13.6  Payment of Statutory Fees**.  All fees payable pursuant to section 1930 of title 28 of the United States Code, as of the entry of the Confirmation Order as determined by the Bankruptcy Court at the Confirmation hearing, shall be paid on the Plan Effective Date.  The Reorganized Debtors will continue to pay fees pursuant to section 1930 of title 28 of the United States Code as required by that section.

### 13.7 Revocation, Withdrawal, or Non-Consummation.

(a) *Right to Revoke or Withdraw.* Each Debtor reserves the right to revoke or withdraw this Plan at any time prior to the first day of the Confirmation Hearing. Each Debtor may, with the consent of the Requisite DIP Lenders, revoke or withdraw this Plan at any time prior to the Plan Effective Date.

(b) *Effect of Withdrawal, Revocation, or Non-Consummation.* If the Debtors revoke or withdraw this Plan pursuant to section 13.7 of this Plan prior to the Plan Effective Date, or if the Confirmation Date or the Plan Effective Date does not occur on or before November 12, 2009, then this Plan, any settlement, or compromise embodied in this Plan (including the fixing or limiting to an amount certain any Claim or Interest or Class of Claims or Interests), the assumption or rejection of executory contracts or unexpired leases effected by this Plan, and any document or agreement executed pursuant to this Plan shall be null and void. In such event, nothing contained herein, and no acts taken in preparation for consummation of this Plan, shall be deemed to constitute a waiver or release of any Claims by or against or Interests in the Debtors or any other Person, to prejudice in any manner the rights of the Debtors or any other Person in any further proceedings involving the Debtors, or to constitute an admission of any sort by the Debtors or any other Person.

### 13.8 Notices.
Any notice required or permitted to be provided to the Debtors, the Creditors' Committee, the Prepetition Administrative Agent, the DIP Administrative Agent, or the Requisite DIP Lenders under this Plan shall be in writing and served by (a) certified mail, return receipt requested, (b) hand delivery, or (c) overnight delivery service, to be addressed as follows:

If to the Debtors:

Hayes Lemmerz International, Inc.
15300 Centennial Drive
Northville, MI 48168
Attn: Patrick C. Cauley, Esq., General Counsel

with copies to:

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
155 North Wacker Drive
Chicago, Illinois 60606-1285
Attn: J. Eric Ivester, Esq. and Stephen D. Williamson, Esq.

If to the Creditors' Committee:

> LOWENSTEIN SANDLER PC
> 65 Livingston Avenue
> Roseland, NJ 07068
> Attn: Kenneth A. Rosen, Esq., Sharon L. Levine, Esq., and
> Mary E. Seymour, Esq.

If to the Prepetition Administrative Agent:

> WEIL, GOTSHAL & MANGES LLP
> 767 Fifth Avenue
> New York, NY 10153
> Attn: Lori Fife, Esq.

If to the Retiree Committee:

> STAHL COWEN CROWLEY ADDIS LLC
> 55 West Monroe Street, Ste. 1200
> Chicago, IL 60603
> Attn: Jon D. Cohen, Esq. and Trent P. Cornell, Esq.

If to the DIP Administrative Agent:

> MILBANK, TWEED, HADLEY & McCLOY LLP
> 1 Chase Manhattan Plaza
> New York, NY 10005-1413
> Attn: Abhilash Raval, Esq., Tyson Lomazow, Esq., and Brian
> Kinney, Esq.

**13.9    Term of Injunctions or Stays**.  Unless otherwise provided herein or in the Confirmation Order, all injunctions or stays provided for in the Bankruptcy Cases under Bankruptcy Code sections 105 or 362 or otherwise, and extant on the Confirmation Date, shall remain in full force and effect until the Plan Effective Date.

**13.10    Governing Law**.  Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) or unless otherwise specifically stated herein or in the relevant governing agreement, document or instrument, the laws of the State of Delaware (except those provisions that would require the application of the law of a different jurisdiction) shall govern the construction and implementation of this Plan, any agreements, documents, and instruments executed in connection with this Plan.

**13.11    Waiver and Estoppel**.  Each Claimholder or Interestholder shall be deemed to have waived any right to assert that its Claim or Interest should be

Allowed in a certain amount, in a certain priority, secured or not subordinated by virtue of an agreement made with the Debtors and/or their counsel, the Creditors' Committee and/or its counsel, or any other Person, if such agreement was not disclosed in this Plan, the Disclosure Statement, or papers filed with the Bankruptcy Court prior to the Confirmation Date.

Dated: Wilmington, Delaware
September 2, 2009

HAYES LEMMERZ INTERNATIONAL, INC. AND ITS
AFFILIATED DEBTORS AND DEBTORS-IN-
POSSESSION IN THE BANKRUPTCY CASES

By: _/s/ Mark Brebberman_____
Mark Brebberman
Vice President and Chief Financial Officer

ATTORNEYS FOR HAYES LEMMERZ
INTERNATIONAL, INC. AND
ITS SUBSIDIARIES AND AFFILIATES THAT ARE
ALSO DEBTORS AND DEBTORS-IN-POSSESSION
IN THE BANKRUPTCY CASES

By: _/s/ J. Eric Ivester_____
J. Eric Ivester
Stephen D. Williamson
Bennett S. Silverberg (New York Office)
SKADDEN, ARPS, SLATE, MEAGHER &
FLOM LLP
155 North Wacker Drive
Chicago, Illinois 60606

- and -

Anthony W. Clark
Kimberly A. LaMaina
SKADDEN, ARPS, SLATE, MEAGHER &
FLOM LLP
One Rodney Square
P.O. Box 636
Wilmington, Delaware 19899

# **Exhibit A**

## **Plan Proponents**

| DEBTOR (Other names, if any, used by the Debtor in the last 6 years appear in brackets) | ADDRESS | CASE NO. | EID # | State of Incorporation |
|---|---|---|---|---|
| Hayes Lemmerz International, Inc. [HLI Holding Company, Inc. of Delaware, HLI Holding Company, Inc.] | 15300 Centennial Drive Northville, MI 48168 | 09-11655 (MFW) | 32-0072578 | Delaware |
| Hayes Lemmerz Finance LLC | 15300 Centennial Drive Northville, MI 48168 | 09-11656 (MFW) | 98-0537731 | Delaware |
| Hayes Lemmerz Finance LLC – Luxembourg, S.C.A. | Centre Mercure, 5th Floor 41 avenue de la Gare, 5ème Etage, L-1611 Luxembourg | 09-11657 (MFW) | 98-0537731 (USA) 2007 2300 646 (Luxembourg) | Luxembourg |
| Hayes Lemmerz International Import, Inc. [Hayes Lemmerz Aftermarket, Inc., Hayes Wheels Aftermarket, Inc., Hayes Wheels, Hayes Wheels International] | 15300 Centennial Drive Northville, MI 48168 | 09-11659 (MFW) | 38-3311655 | Delaware |
| Hayes Lemmerz International – California, Inc. [Hayes Wheels International - California, Inc., Hayes Wheels, Hayes Wheels International, Western Wheel] | 15300 Centennial Drive Northville, MI 48168 | 09-11660 (MFW) | 33-0042337 | Delaware |
| Hayes Lemmerz International – Commercial Highway, Inc. | 15300 Centennial Drive Northville, MI 48168 | 09-11661 (MFW) | 77-0597674 | Delaware |
| Hayes Lemmerz International – Georgia, Inc. [Hayes Wheels International – Georgia, Inc., Hayes Wheels, Hayes Wheels International, Western Wheel] | 15300 Centennial Drive Northville, MI 48168 | 09-11662 (MFW) | 58-2046122 | Delaware |
| Hayes Lemmerz International – Howell, Inc. [Hayes Wheels, Western Wheel, Hayes Lemmerz International – Michigan, Inc., Hayes Wheels International – Michigan, Inc., Hayes Wheels International] | 15300 Centennial Drive Northville, MI 48168 | 09-11664 (MFW) | 38-1799246 | Michigan |
| Hayes Lemmerz International – Huntington, Inc. [Hayes Lemmerz International – Indiana, Inc., Hayes Wheels International – Indiana, Inc., Hayes Wheels, Hayes Wheels International, Western Wheel] | 15300 Centennial Drive Northville, MI 48168 | 09-11665 (MFW) | 62-1240825 | Delaware |
| Hayes Lemmerz International – Kentucky, Inc. [Alumitech] | 15300 Centennial Drive Northville, MI 48168 | 09-11666 (MFW) | 61-1148246 | Delaware |
| Hayes Lemmerz International – Laredo, Inc. [CMI – Texas, Inc.] | 15300 Centennial Drive Northville, MI 48168 | 09-11667 (MFW) | 74-2418656 | Texas |
| Hayes Lemmerz International – New York, Inc. | 15300 Centennial Drive Northville, MI 48168 | 09-11668 (MFW) | 80-0369278 | New York |
| Hayes Lemmerz International – Sedalia, Inc. | 15300 Centennial Drive Northville, MI 48168 | 09-11669 (MFW) | 77-0597670 | Delaware |

| | | | | |
|---|---|---|---|---|
| Hayes Lemmerz International – Technical Center, Inc.<br>[CMI – Tech Center, Inc., CMI – Engineering] | 15300 Centennial Drive<br>Northville, MI 48168 | 09-11670 (MFW) | 38-2257519 | Michigan |
| Hayes Lemmerz International – Wabash, Inc.<br>[CMI – Wabash Cast, Inc.] | 15300 Centennial Drive<br>Northville, MI 48168 | 09-11671 (MFW) | 38-2170301 | Indiana |
| HLI Brakes Holding Company, Inc. | 15300 Centennial Drive<br>Northville, MI 48168 | 09-11672 (MFW) | 32-0072575 | Delaware |
| HLI Commercial Highway Holding Company, Inc. | 15300 Centennial Drive<br>Northville, MI 48168 | 09-11673 (MFW) | 35-2202828 | Delaware |
| HLI Netherlands Holdings, Inc.<br>[Sandman Corporation] | 15300 Centennial Drive<br>Northville, MI 48168 | 09-11674 (MFW) | 38-3640015 | Delaware |
| HLI Operating Company, Inc.<br>[Hayes Wheels, Hayes Wheels International, Western Wheel] | 15300 Centennial Drive<br>Northville, MI 48168 | 09-11675 (MFW) | 30-0167742 | Delaware |
| HLI Parent Company, Inc. | 15300 Centennial Drive<br>Northville, MI 48168 | 09-11676 (MFW) | 61-1447832 | Delaware |
| HLI Powertrain Holding Company, Inc. | 15300 Centennial Drive<br>Northville, MI 48168 | 09-11677 (MFW) | 30-0168269 | Delaware |
| HLI Realty, Inc.<br>[T C Realty, Inc.] | 15300 Centennial Drive<br>Northville, MI 48168 | 09-11678 (MFW) | 38-2781885 | Michigan |
| HLI Services Holding Company, Inc. | 15300 Centennial Drive<br>Northville, MI 48168 | 09-11679 (MFW) | 61-1447840 | Delaware |
| HLI Suspension Holding Company, Inc.<br>[CMI - Ventures, Inc., CMI International, Inc., Hayes Lemmerz International - CMI, Inc.] | 15300 Centennial Drive<br>Northville, MI 48168 | 09-11680 (MFW) | 38-1650061 | Michigan |
| HLI Wheels Holding Company, Inc. | 15300 Centennial Drive<br>Northville, MI 48168 | 09-11681 (MFW) | 38-367882 | Delaware |

# Exhibit B

## Summary of Long Term Incentive Plan

**[TO BE FILED WITH THE BANKRUPTCY COURT AT A LATER DATE]**

**<u>Exhibit C</u>**

**Summary Description of the Terms of the New Common Stock**

# LIMITED VOTING NEW COMMON STOCK

The New Common Stock shall consist of a class of full-voting common stock (the "Full Voting New Common Stock") and a separate class of limited-voting common stock (the "Limited Voting New Common Stock"). Each entity that is to receive New Common Stock pursuant to the terms of the Plan Term Sheet shall have the option to choose to take its New Common Stock in the form of Full Voting New Common Stock or Limited Voting Common Stock.

Each share of Limited Voting New Common Stock will be convertible at the option of the holder, exercisable at any time, into one share of Full Voting New Common Stock.

The economic rights of the Full Voting New Common Stock and Limited Voting New Common Stock shall be identical. The Limited Voting New Common Stock will not be entitled to general voting rights, but will be entitled to vote (to the same extent that holders of Full Voting New Common Stock have the right to vote thereon) on an "as converted" basis (together with the holders of the Full Voting New Common Stock, as a single class) on certain non-ordinary course transactions, including (i) any authorization of, or increase in the number of authorized shares of, any class of capital stock ranking *pari passu* with or senior to the New Common Stock as to dividends or liquidation preference, including additional New Common Stock, (ii) any amendment to the Reorganized Company's certificate of incorporation or by-laws, (iii) any amendment to any shareholders agreement, (iv) any sale, lease or other disposition of all or substantially all of the assets of the Reorganized Company through one or more transactions, (v) any recapitalization, reorganization, consolidation or merger of the Reorganized Company, (vi) any issuance or entry into an agreement for the issuance of capital stock (or any options or other securities convertible into capital stock) of the Reorganized Company, except as may be provided for under any management incentive plan, and (vii) any redemption, purchase or other acquisition by the Reorganized Company of any of its capital stock (except for purchases from employees upon termination of employment).

The Limited Voting New Common Stock will be entitled to a separate class vote, on a majority basis, on any amendment or modification of any rights or privileges of the Limited Voting New Common Stock that does not equally affect the Full Voting New Common Stock. In any liquidation, dissolution or winding up of the Company, all assets will be distributed to holders of the New Common Stock on a pro rata basis.

# **Exhibit D**

## **Schedule of Retained Actions**

### Schedule of Retained Actions

In accordance with section 1123(b)(3) of the Bankruptcy Code[1] and except as otherwise provided in the Plan, the Reorganized Debtors shall retain and may, in their sole discretion, enforce or prosecute all Retained Actions, including those set forth in the Plan and identified in this exhibit to the Plan.  The Debtors or the Reorganized Debtors, in their sole and absolute discretion, will determine whether to bring, settle, release, compromise, or enforce such rights (or decline to do any of the foregoing).  The Reorganized Debtors or any successors may prosecute (or decline to prosecute) such Retained Actions in accordance with the best interests of the Reorganized Debtors or any successors holding such rights of action.  Except as otherwise provided herein, the failure of the Debtors to specifically list any Claim, right of action, suit or proceeding does not, and will not be deemed to, constitute a waiver or release by the Debtors of such claim, right of action, suit or proceeding, and the Reorganized Debtors will retain the right to pursue such claims, rights of action, suits or proceedings in their sole discretion and, therefore, no preclusion doctrine, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise) or laches will apply to such claim, right of action, suit or proceeding upon or after the confirmation or consummation of this Plan.

For the avoidance of any confusion, the Debtors and Reorganized Debtors expressly retain any and all claims, Causes of Action, rights of action, suits, and proceedings in favor of the Debtors arising under Chapter 5 of the Bankruptcy Code, and other similar avoidance actions available under applicable non-bankruptcy law.

The Debtors reserve their right to modify this Exhibit.

---

1  Capitalized terms used in this Exhibit and not otherwise defined have the meanings ascribed to such terms in the Plan.

## Exhibit E

## Certificate of Incorporation for the Reorganized Company

**[TO BE FILED WITH THE BANKRUPTCY COURT AT A LATER DATE]**

# Exhibit F

## Bylaws for the Reorganized Company

**[TO BE FILED WITH THE BANKRUPTCY COURT AT A LATER DATE]**

**Exhibit G**

**Initial Directors and Officers of the Reorganized Debtors**

**[TO BE FILED WITH THE BANKRUPTCY COURT AT A LATER DATE]**

# **Exhibit H**

## **Form of Executive Employment Agreements**

**[TO BE FILED WITH THE BANKRUPTCY COURT AT A LATER DATE]**

# Exhibit I

## Modifications to Supplemental Executive Retirement Plan

**[TO BE FILED WITH THE BANKRUPTCY COURT AT A
LATER DATE]**

# Exhibit J

## Schedule of Rejected Contracts and Leases

**[TO BE FILED WITH THE BANKRUPTCY COURT AT A LATER DATE]**

**<u>Exhibit K</u>**

**Material Terms of Post-Plan Effective Date Secured Term Loan**

**[TO BE FILED WITH THE BANKRUPTCY COURT AT A LATER DATE]**

## **Exhibit L**

## **Form of Warrants Agreement**

HAYES LEMMERZ INTERNATIONAL, INC.

and

[BNY MELLON SHAREOWNER SERVICES],

as Warrant Agent

_____

WARRANT AGREEMENT

Dated as of _____, 2009

_____

Warrants to Purchase Common Stock, par value $[.01] per share

_____

**TABLE OF CONTENTS**

**Page**

ARTICLE I ISSUANCE OF WARRANTS AND EXECUTION AND DELIVERY OF WARRANT CERTIFICATES ................................................................. 2

    Section 1.01    Issuance of Warrants. ................................................... 2

    Section 1.02    Execution and Delivery of Warrant Certificates. ........... 2

    Section 1.03    Issuance of Warrant Certificates. ................................. 3

ARTICLE II WARRANT PRICE, DURATION AND EXERCISE OF WARRANTS ............... 3

    Section 2.01    Exercise Price. ........................................................... 3

    Section 2.02    Duration of Warrants. ................................................. 4

    Section 2.03    Exercise of Warrants. ................................................. 4

    Section 2.04    Reservation of Warrant Shares .................................... 9

ARTICLE III OTHER PROVISIONS RELATING TO RIGHTS OF HOLDERS OF WARRANT ............................................................................ 9

    Section 3.01    No Rights as Stockholder Conferred by Warrants or Warrant Certificates. ................................................. 9

    Section 3.02    Lost, Mutilated, Stolen or Destroyed Warrant Certificates. ............ 9

    Section 3.03    General Information to be Provided by the Company. ................. 10

    Section 3.04    Notice of Certain Events ........................................... 10

ARTICLE IV EXCHANGE AND TRANSFER ........................................................ 10

    Section 4.01    Exchange and Transfer. ............................................. 10

    Section 4.02    Restrictions on Transfer; Restrictive Legend ............... 11

    Section 4.03    Treatment of Holders of Warrant Certificates. ............. 13

    Section 4.04    Cancellation of Warrant Certificates. .......................... 13

ARTICLE V ADJUSTMENT OF WARRANT PRICE AND NUMBER OF WARRANT SECURITIES ................................................................... 13

    Section 5.01    Adjustments Generally. ............................................. 13

    Section 5.02    Stock Dividends; Split-Ups. ...................................... 14

    Section 5.03    Aggregation of Shares. ............................................. 14

    Section 5.04    Adjustments in Exercise Price. ................................... 14

    Section 5.05    Replacement of Securities upon Reorganization. ........... 14

    Section 5.06    Notices of Changes in Warrant. .................................. 15

    Section 5.07    No Fractional Shares. ................................................ 15

    Section 5.08    Form of Warrant. ..................................................... 15

    Section 5.09    Extraordinary Transactions. ...................................... 15

Section 5.10          De Minimis Adjustments. ...........................................................15

ARTICLE VI CONCERNING THE WARRANT AGENT .......................................................16

Section 6.01          Warrant Agent. ...........................................................................16
Section 6.02          Conditions of Warrant Agent's Obligations. ...............................16
Section 6.03          Resignation and Appointment of Successor................................18

ARTICLE VII REGISTRATION RIGHTS ...........................................................................19

Section 7.01          S-3 Registration. .........................................................................19
Section 7.02          Piggyback Registration. ..............................................................19
Section 7.03          Registration Procedures..............................................................20
Section 7.04          Holder Obligations......................................................................23
Section 7.05          Registration Expenses. ................................................................24

ARTICLE VIII MISCELLANEOUS.....................................................................................25

Section 8.01          Amendment. ................................................................................25
Section 8.02          Notices and Demands to the Company and Warrant Agent..........25
Section 8.03          Addresses.....................................................................................25
Section 8.04          Applicable Law............................................................................25
Section 8.05          Obtaining of Governmental Approval. .......................................25
Section 8.06          Persons Having Rights Under Warrant Agreement......................26
Section 8.07          Headings. .....................................................................................26
Section 8.08          Counterparts. ...............................................................................26
Section 8.09          Inspection of Agreement. ............................................................26
Section 8.10          Notices to Holders of Warrants. .................................................26

WARRANT AGREEMENT

THIS AGREEMENT dated as of _____, 2009 (the "Effective Date") between HAYES LEMMERZ INTERNATIONAL, INC., a Delaware corporation (the "Company"), and [BNY MELLON SHAREOWNER SERVICES], a [        ] duly incorporated and existing under the laws of [     ], as Warrant Agent (the "Warrant Agent").

W I T N E S S E T H :

WHEREAS, on May 11, 2009, the Company and certain of the Company's direct and indirect subsidiaries each filed a voluntary petition in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") initiating cases under chapter 11 of title 11 of the United States Code §§ 101-1330 and continued in the possession of their assets and in the management of their businesses pursuant to sections 1107 and 1108 of the Bankruptcy Code; and

WHEREAS, the [Plan of Reorganization of [Hayes Lemmerz International, Inc., et al.], as confirmed on [_____], 2009 by an order of the Bankruptcy Court entered on [_____], 2009 (the "Plan"), provides that the Company shall issue to certain holders of the 8.25 % Senior Notes due 2015 of Hayes Lemmerz Finance LLC – Luxembourg S.C.A. (the "Noteholders") and to the Pension Benefit Guaranty Corporation (together with the Noteholders, the "Holders") Series A Warrants of the Company (the "Series A Warrants" or the "Warrants"), entitling the Holders to purchase shares (the "Warrant Shares") of the Company's Class A Common Stock, par value $[0.01] per share (the "Common Stock"); and

WHEREAS, the Plan provides that the Company shall also issue to the Holders Series B Warrants of the Company (the "Series B Warrants"), entitling the Holders to purchase shares of the Common Stock; and

WHEREAS, the Company desires the Warrant Agent to act on behalf of the Company in connection with the issuance, transfer, exchange, exercise and replacement of the certificates representing the Warrant Shares (the "Warrant Certificates"), and in this Agreement wishes to set forth, among other things, the form and provisions of the Warrant Certificates and the terms and conditions on which they may be issued, transferred, exchanged, exercised and replaced;

NOW, THEREFORE, in consideration of the premises and of the mutual agreements herein contained, the parties hereto agree as follows:

# ARTICLE I
## ISSUANCE OF WARRANTS AND EXECUTION AND DELIVERY OF WARRANT CERTIFICATES

Section 1.01    Issuance of Warrants.  The Warrants shall be evidenced by one or more Warrant Certificates.  Each Warrant evidenced thereby shall represent the right, subject to the provisions contained herein and therein, to purchase one share of the Warrant Shares.  The Company, on the date hereof shall deliver to each Holder duly executed Warrant Certificates registered in the name of each Holder for the number of Warrant Shares required pursuant to the Plan.  Upon exercise for cash, the Warrants shall initially entitle the Holders of such Warrants to 555,555 shares of Common Stock, as such amount may be adjusted from time to time pursuant to this Agreement.

Section 1.02    Execution and Delivery of Warrant Certificates.

(a)    Each Warrant, shall be evidenced by a Warrant Certificate in registered form substantially in the form set forth in Exhibit A hereto, shall be dated and may have such letters, numbers or other marks of identification or designation and such legends or endorsements printed, lithographed or engraved thereon as the officers of the Company executing the same may approve (execution thereof to be conclusive evidence of such approval) and as are not inconsistent with the provisions of this Agreement, or as may be required to comply with any law or with any rule or regulation made pursuant thereto.  The Warrant Certificates shall be signed on behalf of the Company by its chairman or vice chairman of the Board of Directors of the Company (the "Board of Directors"), the chief financial officer, the president, any vice president, any assistant vice president, the treasurer or any assistant treasurer of the Company, which may but need not be attested by its secretary or one of its assistant secretaries.  Such signatures may be manual or facsimile signatures of such authorized officers and may be imprinted or otherwise reproduced on the Warrant Certificates.

(b)    No Warrant Certificate shall be valid for any purpose, and no Warrant evidenced thereby shall be exercisable, until such Warrant Certificate has been countersigned by the Warrant Agent by manual signature.  Such signature by the Warrant Agent upon any Warrant Certificate executed by the Company shall be conclusive evidence, and the only evidence, that the Warrant Certificate so countersigned has been duly issued hereunder.

(c)    In case any officer of the Company who shall have signed any of the Warrant Certificates either manually or by facsimile signature shall cease to be such officer before the Warrant Certificates so signed shall have been countersigned and delivered by the Warrant Agent as provided herein, such Warrant Certificates may be countersigned and delivered notwithstanding that the person who signed such Warrant Certificates ceased to be such officer of the Company; and any Warrant Certificate may be signed on behalf of the Company by such persons as, at the actual date of the execution of such Warrant Certificate, shall be the proper officers of the Company, although at the date of the execution of this Agreement any such person was not such officer.

(d)     The term "Holder," when used with respect to any Warrant Certificate, shall mean any person in whose name at the time such Warrant Certificate shall be registered upon the books to be maintained by the Warrant Agent for that purpose.

Section 1.03     Issuance of Warrant Certificates.

(a)     Warrant Certificates evidencing the right to purchase the Warrant Shares (except as provided in Sections 2.03, 3.02 and 4.01) may be executed by the Company and delivered to the Warrant Agent upon the execution of this Warrant Agreement.  The Warrant Agent shall, upon receipt of Warrant Certificates duly executed on behalf of the Company, countersign Warrant Certificates evidencing Warrants representing the right to purchase Warrant Shares and shall deliver such Warrant Certificates to or upon the order of the Company. Subsequent to such original issuance of the Warrant Certificates, the Warrant Agent shall countersign a Warrant Certificate only if the Warrant Certificate is issued in exchange or substitution for one or more previously countersigned Warrant Certificates or in connection with their transfer as hereinafter provided.

(b)     Pending the preparation of definitive Warrant Certificates evidencing Warrants, the Company may execute and the Warrant Agent shall countersign and deliver temporary Warrant Certificates evidencing such Warrants (printed, lithographed, typewritten or otherwise produced, in each case in form satisfactory to the Warrant Agent).  Such temporary Warrant Certificates shall be issuable substantially in the form of the definitive Warrant Certificates but with such omissions, insertions and variations as may be appropriate for temporary Warrant Certificates, all as may be determined by the Company with the concurrence of the Warrant Agent.  Such temporary Warrant Certificates may contain such reference to any provisions of this Warrant Agreement as may be appropriate.  Every such temporary Warrant Certificate shall be executed by the Company and shall be countersigned by the Warrant Agent upon the same conditions and in substantially the same manner, and with like effect, as the definitive Warrant Certificates.  Without unreasonable delay, the Company shall execute and shall furnish definitive Warrant Certificates and thereupon such temporary Warrant Certificates may be surrendered in exchange therefor without charge pursuant to and subject to the provisions of Section 4.01, and the Warrant Agent shall countersign and deliver in exchange for such temporary Warrant Certificates definitive Warrant Certificates of authorized denominations evidencing a like aggregate number of Warrants evidenced by such temporary Warrant Certificates.  Until so exchanged, such temporary Warrant Certificates shall be entitled to the same benefits under this Warrant Agreement as definitive Warrant Certificates.

## ARTICLE II
## WARRANT PRICE, DURATION AND EXERCISE OF WARRANTS

Section 2.01     Exercise Price.  The initial exercise price for each Warrant shall be $[    ] (the "Exercise Price"), subject to adjustment as provided herein.[1]

---

[1]  The respective Exercise Prices of the Series A Warrants and Series B Warrants shall be determined by (a) (i) subtracting from the below-referenced aggregate enterprise values, the Company's term debt as of the Plan Effective Date (excluding borrowings under any revolving credit or receivables financing facilities) and (ii) adding back to the

*(cont'd)*

Section 2.02  <u>Duration of Warrants</u>.  Subject to the provisions of this Agreement, each Warrant may be exercised in whole or in part at any time prior to the Expiration Date, as specified herein, on any day other than a Saturday, Sunday or a day on which banking institutions in the State of New York are authorized or obligated by law or executive order to close (a "Business Day") prior to 5:00 p.m. New York City time, at the offices of the Warrant Agent at _____ (the "Warrant Agent Office") on _____, 2016; *provided however, that* any Warrants not exercised in connection with a Sale Transaction (as defined below) in which the holders of Common Stock receive only cash consideration, shall automatically expire upon consummation of such Sale Transaction (in either case, such date and such time, the "Expiration Date"); *provided further, that* for the avoidance of doubt, the foregoing proviso shall not affect a Holder's entitlement to replacement securities pursuant to Section 5.05 hereof.  Each Warrant not exercised at or before the Expiration Date shall become void, and all rights of the Holder and any beneficial owners of the Warrant Certificate evidencing such Warrant under this Agreement shall cease.

Section 2.03  <u>Exercise of Warrants</u>.

(a)  Warrants may be exercised, at the option of the Holder, in whole or in part, at any time or from time to time, by presentation of the Warrant Certificate duly executed and simultaneous payment of the Exercise Price to the Company.  Payment of the Exercise Price shall be made, (i) by certified or official bank check payable to the Company, or by wire transfer in immediately available funds, in the amount of the aggregate Exercise Price for such Warrant Shares or (ii) if exercising in connection with a Triggering Event (as defined below) or at anytime on or after the expiration of all lock-up periods imposed by the underwriters of a firm commitment underwritten public offering of shares of the Common Stock of the Company (an "IPO"), by Cashless Exercise (as defined and in the manner described below in Section 2.03(c)). The Company shall give or cause to be given written notice to each Holder, by press release or at the last address set forth for such Holder in the register books of the Warrant Agent, of an IPO or any Triggering Event; provided that such notice of any Triggering Event shall be given to the Holders not less than thirty (30) days prior to any such Triggering Event.  Failure to give such notice, or any defect therein, shall not affect the legality or validity of such event.  As used herein, a "Triggering Event" shall mean: (i) immediately prior to the consummation of a Sale Transaction pursuant to which the Holders of the Warrants have the opportunity to exchange all of their Warrant Shares for cash and/or readily marketable securities and (ii) upon receipt from the Company of a notice regarding completion of a Company Valuation (as defined below) and a

_____

*(cont'd from previous page)*

below-referenced aggregate enterprise values the Company's cash on hand as of the Plan Effective Date (provided that for purposes of determining the Exercise Price, cash on hand shall not include "trapped cash" as of the Plan Effective Date, as determined by the Company on a basis consistent with past practice, or cash collateralizing letters of credit or guarantees outstanding as of the Plan Effective Date), and (b) dividing the resulting amount by (i) the sum of the number of shares of Common Stock outstanding on the Plan Effective Date, and (ii) in the case of the Series A Warrants, all Warrant Shares to be issued upon exercise of all Series A Warrants, and, in the case of the Series B Warrants, all Warrant Shares to be issued upon exercise of all Warrants.  The Exercise Price for the Series A Warrants shall be equivalent to the per share price of the Common Stock on the Plan Effective Date, assuming the Company had on the Plan Effective Date an aggregate enterprise value of $350 million and the Exercise Price for the Series B Warrants shall be equivalent to the per share price of the Common Stock on the Plan Effective Date, assuming the Company had on the Plan Effective Date an aggregate enterprise value of $375 million.

"Sale Transaction" shall mean: (i) a merger, consolidation, or other similar transaction or series of transactions to which the Company is a party and pursuant to which (a) the Company is not the surviving person in such transaction or (b) if the Company is the surviving person, the holders of shares of Common Stock immediately prior to such transaction (including for this purpose the shares issuable upon exercise of the Warrants and shares of Common Stock to be issued or reserved for issuance under any management incentive plan of the Company (the "Management Incentive Shares")) represent less than 50% of the shares of Common Stock outstanding immediately following such transaction (including for this purpose the shares issuable upon exercise of the Series A Warrants and Series B Warrants and the Management Incentive Shares), (ii) the sale or other disposition of all or substantially all of the assets of the Company and its subsidiaries, taken as a whole, (iii) a sale, other disposition or issuance, in a single transaction or series of related transactions, of 35% or more of the then outstanding shares of Common Stock, and (iv) any other transaction in which holders of Common Stock have "drag along" rights pursuant to and to the extent provided in that certain Stockholders Agreement entered into on the date hereof among the Company and its stockholders (as may be amended, the "Stockholders Agreement").

(b)     In the event that a Triggering Event or an IPO has not occurred prior to the 90th day prior to the Expiration Date (the "Valuation Date"), the Board of Directors shall as promptly as practicable thereafter select, and provide notice to the holders of the Series A Warrants and Series B Warrants of such selection (the "Appraisal Notice"), of a qualified nationally recognized independent investment banking firm that has not provided any material services to the Company within the twenty four (24) month period prior to the Valuation Date (as selected pursuant to this Section 2.03(b), an "Independent Appraiser") to determine the aggregate enterprise value of the Company as of the Valuation Date, together with the per share value of the Common Stock calculated based upon the aggregate enterprise value of the Company as of the Valuation Date without regard to marketability or other similar liquidity discounts (a "Company Valuation"). The Company's selection of an Independent Appraiser set forth in the Appraisal Notice shall be deemed to be acceptable to the holders of the Series A Warrants and Series B Warrants, if the Company has not, within ten (10) days from the date the Company delivered the Appraisal Notice to the holders of the Series A Warrants and Series B Warrants, received written notice from holders of not less than a majority of the Series A Warrants and Series B Warrants taken together (the "Requisite Holders"), indicating the Requisite Holders' reasonable opposition to the Company's choice of Independent Appraiser and the basis of such opposition, together with the names of three (3) alternate Independent Appraisers (each, an "Alternate Appraiser") which are acceptable to the Requisite Holders (an "Opposition Notice"). If the Company timely receives from the Requisite Holders an Opposition Notice, it shall be entitled, in its sole discretion, to choose any of the Alternate Appraisers to perform the Company Valuation; provided, that if none of the Alternate Appraisers are reasonably acceptable to the Company, the Company shall so notify the Requisite Holders and the Company and the Requisite Holders shall each choose one Independent Appraiser, which shall, within five (5) days of their selection, jointly select a third Independent Appraiser not previously selected by the Company or the Requisite Holders to perform the Company Valuation. The selection of the Independent Appraiser pursuant to the provisions of this Section 2.03(b) shall be binding on the Company and the Requisite Holders. The Company shall notify the Holders of the result of the Company Valuation not later than the 30th day prior to the Expiration Date, together with the

Current Market Price (as defined below) of the Common Stock, which shall be final and binding on the Company and the Requisite Holders.

(c)     In lieu of paying the aggregate Exercise Price under the conditions specified in Section 2.03(a), each Warrant shall entitle the Holder, at the election of such Holder, to exercise the Warrant by authorizing the Company to withhold from issuance a number of Warrant Shares issuable upon exercise of the Warrant which when multiplied by the Current Market Price of the Common Stock is equal to the aggregate Exercise Price of all Warrants being exercised, and such withheld Warrant Shares shall no longer be issuable under the Warrant (a "Cashless Exercise").  The formula for determining the number of Warrant Shares to be issued in a Cashless Exercise is as follows:

$$X = \frac{(A-B) \times C}{A}$$

where:

X = the number of Warrant Shares issuable upon exercise of the Warrant pursuant to this subsection (c).

A = the Current Market Price of the Common Stock on the Business Day immediately preceding the date on which the Holder delivers the Warrant and pursuant to subsection (e) below.

B = the Exercise Price.

C = the number of Warrant Shares as to which a Warrant is then being exercised including the withheld Warrant Shares.

If the foregoing calculation results in a negative number, then no Warrant Shares shall be issuable via a Cashless Exercise.

(d)     For purposes of this Section 2.03, the "Current Market Price" shall equal, in the event the Warrants are exercised (a) following an IPO pursuant to which the shares of Common Stock are listed or admitted to trading on the New York Stock Exchange or the Nasdaq Stock Market (each, a "National Exchange"), the average closing price as reported on such National Exchange of the Common Stock for the ten (10) consecutive trading days immediately prior to the exercise of the Warrant or, if not listed or admitted to trading on a National Exchange, the volume-weighted average of the closing bid and asked prices of the Common Stock in the over-the-counter market during the ten (10) consecutive trading days immediately prior to the exercise of the Warrant; (b) in connection with a Sale Transaction, the per share fair market value of the consideration being paid by the third party in connection with such Sale Transaction or (c) in connection with a Company Valuation, the per share equity value of the Common Stock, as determined by the Independent Appraiser pursuant to Section 2.03(b). The fair market value of the per share consideration to be paid by the third party in a Sale Transaction shall be determined by adding (i) the per share cash consideration, (ii) for consideration in the form of publicly traded securities, if the per share valuation of such securities is not otherwise set forth in the definitive agreement entered into in connection with

such Sale Transaction, the average closing price for the ten (10) consecutive trading days ending on the second (2nd) Business Day prior to the Sale Transaction, and (iii) the per share fair market value of consideration in the form of any other securities or assets as determined in good faith by the Board of Directors of the Company.

(e)     The date on which payment in full of the Exercise Price is received by the Warrant Agent or deemed to be received in the case of a Cashless Exercise shall, subject to receipt of the Warrant Certificate as aforesaid, be deemed to be the date on which the Warrant is exercised. The Warrant Agent shall promptly deposit all funds received by it in payment for the exercise of Warrants in an account of the Company maintained with it (or in such other account as may be designated by the Company) and shall advise the Company, by telephone or by facsimile transmission or other form of electronic communication available to both parties, at the end of each day on which a payment for the exercise of Warrants is received of the amount so deposited to its account. The Warrant Agent shall promptly confirm such advice to the Company in writing.

(f)     Upon such surrender of a Warrant Certificate and payment of the Exercise Price, or the deemed payment of the Exercise Price in connection with a Cashless Exercise, the Warrant Agent shall requisition from the transfer agent for the Common Stock (the "Transfer Agent") for issuance and delivery to or upon the written order of the Holder of such Warrant Certificate and in such name or names as the Holder may designate, a certificate or certificates for the Warrant Shares issuable upon the exercise of the Warrant or Warrants evidenced by such Warrant Certificate, less any Warrant Shares withheld in connection with a Cashless Exercise. Upon receipt thereof, the Company shall, as promptly as practicable, and in any event within three (3) Business Days thereafter, cause to be issued to the Holder the aggregate number of whole Warrant Shares issuable upon such exercise and deliver to the Holder written confirmation that such Warrant Shares have been duly issued and recorded on the books of the Company as hereinafter provided. The Warrant Shares so issued shall be registered in the name of the Holder or such other name as shall be designated in the order delivered by the Holder. Such certificate or certificates shall be deemed to have been issued and any person so designated to be named therein shall be deemed to have become the holder of record of such Warrant Shares as of the date of surrender of such Warrant Certificate at the Warrant Agent Office duly executed by the Holder thereof and upon payment of the Exercise Price or the deemed payment of the Exercise Price in connection with a Cashless Exercise. Notwithstanding any provision herein to the contrary, the Company shall not be required to register Warrant Shares in the name of any person who acquired any Warrant or any Warrant Shares otherwise than in accordance with this Agreement.

(g)     In case an exercise of Warrants is in part only, a new Warrant or Warrants of like tenor, calling in the aggregate on the face or faces of the Warrant Certificate or Warrant Certificates for the number of shares of Common Stock equal (without giving effect to any adjustment thereof) to the number of such shares called for on the face of the Warrant Certificate minus the number of such shares designated by the Holder upon such exercise together with any Warrant Shares withheld in connection with a Cashless Exercise, shall be issued and delivered to the Holder or its registered assigns.

(h)     The Company shall not be required to pay any stamp or other tax or other governmental charge required to be paid in connection with any transfer involved in the issuance of the Warrant Shares, and in the event that any such transfer is involved, the Company shall not be required to issue or deliver any Warrant Share until such tax or other charge shall have been paid or it has been established to the Company's satisfaction that no such tax or other charge is due.

(i)     Any exercise of a Warrant pursuant to the terms of this Agreement shall be irrevocable and shall constitute a binding agreement between the Holder and the Company, enforceable in accordance with its terms; *provided however, that* if a Holder validly exercises its Warrants by way of a Cashless Exercise in connection with the occurrence of a Triggering Event, and such Triggering Event is not subsequently consummated, then such exercise shall be automatically revoked and such Warrant shall continue in full force and effect.

(j)     The Warrant Agent shall:

(i)     examine all exercised Warrants and all other documents delivered to it by or on behalf of Holders as contemplated hereunder to ascertain whether or not, on their face, such exercised Warrants and any such other documents have been executed and completed in accordance with their terms and the terms hereof;

(ii)     where an exercised Warrant or other document appears on its face to have been improperly completed or executed or some other irregularity in connection with the exercise of the Warrants exists, the Warrant Agent shall endeavor to inform the appropriate parties (including the person submitting such instrument) of the need for fulfillment of all requirements, specifying those requirements which appear to be unfulfilled;

(iii)     inform the Company of and cooperate with and assist the Company in resolving any reconciliation problems between exercised Warrants received and delivery of Warrants to the Warrant Agent's account;

(iv)     advise the Company no later than three Business Days after receipt of an exercised Warrant, of (i) the receipt of such exercised Warrant and the number of Warrants exercised in accordance with the terms and conditions of this Agreement and (ii) such other information as the Company shall reasonably require; and

(k)     All questions as to the validity, form and sufficiency (including time of receipt) of an exercised Warrant will be determined by the Company in its sole discretion, which determination shall be final and binding.  The Company reserves the right to reject any and all exercised Warrants not in proper form or for which any corresponding agreement by the Company to exchange would, in the opinion of the Company, be unlawful.  Such determination by the Company shall be final and binding on the Holders, absent manifest error.  Moreover, the Company reserves the absolute right to waive any of the conditions to the exercise of Warrants or defects in the exercise thereof with regard to any particular exercise of Warrants.  Neither the

Company nor the Warrant Agent shall be under any duty to give notice to the Holders of the Warrants of any irregularities in any exercise of Warrants, nor shall it incur any liability for the failure to give such notice.

(l) Prior to a Qualified Public Offering (as defined in the Stockholders Agreement), as a condition to the issuance of Warrant Shares pursuant to the exercise of the Warrant, each Holder shall be required to execute and become a party to (unless such Holder is already a party thereto) any Stockholders Agreement in effect at the time of exercise of such Holder's Warrant.

Section 2.04    Reservation of Warrant Shares

(a) For the purpose of enabling it to satisfy any obligation to issue Warrant Shares upon exercise of Warrants, the Company will at all times through the Expiration Date, reserve and keep available out of its aggregate authorized but unissued or treasury shares of Common Stock, the number of Warrant Shares deliverable upon the exercise of all outstanding Warrants, and the Company's Transfer Agent is hereby irrevocably authorized and directed at all times to reserve such number of authorized and unissued or treasury shares of Common Stock as shall be required for such purpose. The Company will keep a copy of this Agreement on file with the Transfer Agent. The Warrant Agent is hereby irrevocably authorized to requisition from time to time from such Transfer Agent stock certificates issuable upon exercise of outstanding Warrants, and the Company will supply such Transfer Agent with duly executed stock certificates for such purpose.

(b) The Company covenants that all shares of Common Stock issued upon exercise of the Warrants will, upon issuance in accordance with the terms of this Agreement, be fully paid and nonassessable and free from all taxes, liens, charges and security interests created by or imposed upon the Company with respect to the issuance and holding thereof.

## ARTICLE III
## OTHER PROVISIONS RELATING TO RIGHTS OF HOLDERS OF WARRANT

Section 3.01    No Rights as Stockholder Conferred by Warrants or Warrant Certificates. No Warrant Certificate or Warrant evidenced thereby shall, and nothing contained in this Agreement or in the Warrant Certificate shall be construed to, entitle the Holder or any beneficial owner thereof to any of the rights of a holder or beneficial owner of Warrant Shares, including, without limitation, the right to vote or to consent or to receive notice as a stockholder in respect of any meeting of stockholders for the election of directors of the Company or any other matter, to receive dividends on Warrant Shares or any rights whatsoever as stockholders of the Company.

Section 3.02    Lost, Mutilated, Stolen or Destroyed Warrant Certificates. Upon receipt by the Warrant Agent of evidence reasonably satisfactory to it and the Company of the ownership of and the loss, mutilation, theft or destruction of any Warrant Certificate and of such security or indemnity as may be required by the Company and the Warrant Agent to hold each of them and any agent of them harmless and, in the case of mutilation of a Warrant Certificate,

upon surrender thereof to the Warrant Agent for cancellation, then, in the absence of notice to the Company or the Warrant Agent that such Warrant Certificate has been acquired by a bona fide purchaser, the Company shall execute, and an authorized officer of the Warrant Agent shall manually countersign and deliver, in exchange for or in lieu of the lost, mutilated, stolen or destroyed Warrant Certificate, a new Warrant Certificate of the same tenor and evidencing a like number of Warrants.  Upon the issuance of any new Warrant Certificate under this Section 3.02, the Company may require the payment of a sum sufficient to cover any stamp or other tax or other governmental charge that may be imposed in relation thereto and any other expenses (including the fees and expenses of the Warrant Agent) in connection therewith.  Every substitute Warrant Certificate executed and delivered pursuant to this Section 3.02 in lieu of any lost, mutilated, stolen or destroyed Warrant Certificate shall represent an additional contractual obligation of the Company, whether or not the lost, stolen or destroyed Warrant Certificate shall be at any time enforceable by anyone, and shall be entitled to the benefits of this Agreement equally and proportionately with any and all other Warrant Certificates duly executed and delivered hereunder.  The provisions of this Section 3.02 are exclusive and shall preclude (to the extent lawful) all other rights and remedies with respect to the replacement of lost, mutilated, stolen or destroyed Warrant Certificates.

Section 3.03    General Information to be Provided by the Company.  The Company shall provide to each Holder the same information and reports to which a holder of the Common Stock is entitled pursuant to Section [3.1] of the Stockholders Agreement, subject to execution of an appropriate confidentiality agreement by each such Holder.

Section 3.04    Notice of Certain Events.  The Company shall (i) provide at least fifteen (15) days prior written notice to each Holder, at the last address set forth for such Holder in the register books of the Warrant Agent, of any record date relating to the payment by the Company of a cash dividend on the Common Stock and (ii) provide prior notice, not later than the time notice is given to eligible stockholders under the Stockholders Agreement, at the last address set forth for such Holder in the register books of the Warrant Agent, of any transaction involving the right of a holder of New Common Stock to exercise "tag along" rights under the Stockholders Agreement.

## ARTICLE IV
## EXCHANGE AND TRANSFER

Section 4.01    Exchange and Transfer.

(a)    Upon surrender at the Warrant Agent Office, Warrant Certificates evidencing Warrants may be exchanged for Warrant Certificates in other authorized denominations evidencing such Warrants or the transfer thereof may be registered in whole or in part; provided, however, that such other Warrant Certificates shall evidence the same aggregate number of Warrants as the Warrant Certificates so surrendered.

(b)    The Warrant Agent shall keep, at the Warrant Agent Office, books in which, subject to such reasonable regulations as it may prescribe, it shall register Warrant Certificates and exchanges and transfers of outstanding Warrant Certificates upon surrender of

such Warrant Certificates to the Warrant Agent at the Warrant Agent Office for exchange or registration of transfer, properly endorsed.

(c) No service charge shall be made for any exchange or registration of transfer of Warrant Certificates, but the Company may require payment of a sum sufficient to cover any stamp or other tax or other governmental charge that may be imposed in connection with any such exchange or registration of transfer.

(d) Whenever any Warrant Certificates, are so surrendered for exchange or registration of transfer, an authorized officer of the Warrant Agent shall manually countersign and deliver to the person or persons entitled thereto a Warrant Certificate or Warrant Certificates, duly authorized and executed by the Company, as so requested. The Warrant Agent shall not effect any exchange or registration of transfer which will result in the issuance of a Warrant Certificate, evidencing a fraction of a Warrant or a number of full Warrants and a fraction of a Warrant.

(e) All Warrant Certificates, issued upon any exchange or registration of transfer of Warrant Certificates shall be the valid obligations of the Company, evidencing the same obligations, and entitled to the same benefits under this Agreement, as the Warrant Certificates surrendered for such exchange or registration or transfer.

Section 4.02    Restrictions on Transfer; Restrictive Legend

(a) Prior to a Qualified Public Offering (as defined in the Stockholders Agreement), the Warrants shall not be transferable, other than transfers to (i) other Holders, (ii) holders of the Common Stock and (iii) the Company; *provided, however that*, a Holder shall be entitled to transfer its Warrants in whole or in part (but in part only if there are sixty (60) or fewer holders of the Series A Warrants and the Series B Warrants, taken together), if such Holder is an individual, to any member of his immediate family or any estate or trust in which he is the settlor or otherwise by will or the laws of descent or distribution, and if such Holder is not an individual, to such Holder's partners, members or Affiliates, provided that in each case, such transferee agrees in writing to be bound by the terms of the Warrant Agreement prior to such transfer. As used herein, "Affiliates" shall mean, with respect to any specified person, any other person directly or indirectly controlling or controlled by or under direct or indirect common control with such specified person. For the purposes of this definition, "control" when used with respect to any specified person means the power to direct the management and policies of such person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise; and the terms "controlling" and "controlled" have meanings correlative to the foregoing.

(b) Notwithstanding Section 4.02(a), each Holder shall not transfer any Warrants unless (i) such transfer complies with the provisions of this Agreement, and (ii) (x) such transfer is pursuant to an effective registration statement under the Securities Act of 1933, as amended, and the rules and regulations promulgated thereunder (the "Securities Act") and has been registered under all applicable state securities or "blue sky" laws or (y) if reasonably requested by the Company, such Holder shall have furnished the Company with an opinion of counsel, which opinion of counsel shall be reasonably satisfactory to the Company, to the effect

that no such registration is required because of the availability of an exemption from registration under the Securities Act and all applicable state securities or "blue sky" laws.

(c)     Prior to a Qualified Public Offering (as defined in the Stockholders Agreement, without the prior written consent of the Board of Directors, a Holder shall not transfer any Warrants if, as a result of such transfer, any class of equity securities of the Company would be held of record by more than five hundred (500) persons or otherwise in circumstances that the Board of Directors determines could require the Company to file reports under the Securities Exchange Act of 1934, as amended, and the rules and regulations promulgated thereunder (the "Exchange Act"), if it is not otherwise then subject to such requirements.

(d)     All such transfers of Warrants will be subject to the Company's being provided advance written notice of the proposed transfer and terms of such transfer.

(e)     Notwithstanding anything herein to the contrary, the Warrants shall be subject to restrictions on transfer intended to preserve the value of tax attributes (including net operating losses) if (i) the Board of Directors determines that such restrictions on transfer are reasonably necessary to preserve the value of such tax attributes and (ii) substantially similar restrictions apply to or will also be imposed on the holders of Common Stock.

(f)     Any attempted or purported transfer of all or a portion of the Warrants held by a Holder in violation of this Section 4.02 shall be null and void and of no force or effect whatsoever, such purported transferee will not be treated as an owner of the Warrants for purposes of this Agreement or otherwise, and the Company will not register such transfer.

(g)     Each Warrant Certificate and certificate representing Warrant Shares issued upon the exercise of a Warrant shall be stamped or otherwise imprinted with a legend in the following or a comparable form:

THE SECURITIES REPRESENTED BY THIS CERTIFICATE (THE "SECURITIES") WERE ORIGINALLY ISSUED IN RELIANCE UPON AN EXEMPTION FROM THE REGISTRATION REQUIREMENT OF SECTION 5 OF THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), PROVIDED BY SECTION 1145 OF THE BANKRUPTCY CODE, 11 U.S.C. 1145.  THE SECURITIES HAVE NOT BEEN REGISTERED UNDER THE ACT OR ANY STATE SECURITIES LAW, AND TO THE EXTENT HOLDER OF THE SECURITIES IS AN "UNDERWRITER," AS DEFINED IN SECTION 1145(B)(1) OF THE BANKRUPTCY CODE, THE SECURITIES MAY NOT BE SOLD OR TRANSFERRED IN THE ABSENCE OF AN EFFECTIVE REGISTRATION STATEMENT UNDER THE ACT OR AN EXEMPTION FROM REGISTRATION THEREUNDER.

If at the time of issuance of Warrant Shares the Stockholders Agreement is still in effect, each certificate representing Warrant Shares issued upon the exercise of a Warrant shall also be stamped or otherwise imprinted with a legend in the following or a comparable form:

THE SALE, ASSIGNMENT, PLEDGE, ENCUMBRANCE OR OTHER TRANSFER OF THE SECURITIES REPRESENTED BY THIS CERTIFICATE IS RESTRICTED BY THE TERMS OF, AND THE HOLDER HEREOF IS SUBJECT TO CERTAIN OTHER OBLIGATIONS PURSUANT TO, THE PROVISIONS OF A STOCKHOLDERS AGREEMENT, DATED AS OF [____], 2009, AMONG THE COMPANY AND CERTAIN HOLDERS OF ITS SECURITIES, A COPY OF WHICH IS ON FILE AT THE PRINCIPAL EXECUTIVE OFFICE OF THE COMPANY.

(h)     A holder (or its transferee, as applicable) shall be entitled to receive from the Company, without expense, new securities of like tenor not bearing the legends set forth above when (i) such Warrant Certificates or restricted shares of Common Stock shall have been (A) effectively registered under the Securities Act and disposed of in accordance with a registration statement covering such securities, (B) disposed of pursuant to the provisions of Rule 144 or any comparable rule under the Securities Act, or (C) when, in the written reasonable opinion of independent counsel for the holder thereof experienced in Securities Act matters, which counsel and opinion shall be reasonably satisfactory to the Company, such restrictions are no longer required in order to insure compliance with the Securities Act (including when the provisions of Rule 144(k) or any comparable rule under the Securities Act have been satisfied) and (ii) in the case of the restricted shares of Common Stock only, such restricted shares of Common Stock are no longer subject to the Stockholders Agreement.

Section 4.03    <u>Treatment of Holders of Warrant Certificates</u>.  Each Holder of a Warrant Certificate, by accepting the same, consents and agrees with the Company, the Warrant Agent and every subsequent Holder of such Warrant Certificate that until the transfer of such Warrant Certificate is registered on the books of such Warrant Agent, the Company and the Warrant Agent may treat the registered Holder of such Warrant Certificate as the absolute owner thereof for any purpose and as the person entitled to exercise the rights represented by the Warrants evidenced thereby, any notice to the contrary notwithstanding.

Section 4.04    <u>Cancellation of Warrant Certificates</u>.  Any Warrant Certificate surrendered for exchange or registration of transfer or exercise of the Warrants evidenced thereby shall, if surrendered to the Company, be delivered to the Warrant Agent, and all Warrant Certificates surrendered or so delivered to the Warrant Agent shall be promptly cancelled by the Warrant Agent and shall not be reissued and, except as expressly permitted by this Agreement, no Warrant Certificate shall be issued hereunder in exchange therefor or in lieu thereof.  The Warrant Agent shall cause all cancelled Warrant Certificates to be destroyed and shall deliver a certificate of such destruction to the Company.

## ARTICLE V
## ADJUSTMENT OF WARRANT PRICE AND NUMBER OF WARRANT SECURITIES

Section 5.01    <u>Adjustments Generally</u>.  The Exercise Price, the number of Warrant Shares issuable upon exercise of Warrants and the number of Warrants outstanding are subject to adjustment from time to time upon the occurrence of the events enumerated in this Article V, as determined to be necessary or appropriate in the reasonable discretion of the Board of Directors of the Company.

Section 5.02    Stock Dividends; Split-Ups.  If after the date hereof, and subject to the provisions of Section 5.07, the number of outstanding shares of Common Stock is increased by a stock dividend payable in shares of Common Stock, or by a split-up of shares of Common Stock, or other similar event, then, on the effective date of such stock dividend, split-up or similar event, the number of shares of Common Stock issuable on exercise of each Warrant shall be increased in proportion to such increase in outstanding shares of Common Stock.

Section 5.03    Aggregation of Shares.  If after the date hereof, and subject to the provisions of Section 5.07, the number of outstanding shares of Common Stock is decreased by a consolidation, combination, reverse stock split or reclassification of shares of Common Stock or other similar event, then, on the effective date of such consolidation, combination, reverse stock split, reclassification or similar event, the number of shares of Common Stock issuable on exercise of each Warrant shall be decreased in proportion to such decrease in outstanding shares of Common Stock.

Section 5.04    Adjustments in Exercise Price.  Whenever the number of shares of Common Stock purchasable upon the exercise of the Warrants is adjusted, as provided in Sections 5.02 and 5.03, the Exercise Price shall be adjusted (to the nearest cent) by multiplying such Exercise Price immediately prior to such adjustment by a fraction (x) the numerator of which shall be the number of shares of Common Stock purchasable upon the exercise of the Warrants immediately prior to such adjustment, and (y) the denominator of which shall be the number of shares of Common Stock so purchasable immediately thereafter.

Section 5.05    Replacement of Securities upon Reorganization.  In case of any reclassification or reorganization of the outstanding shares of Common Stock (other than a change covered by Section 5.02 or 5.03 or that solely affects the par value of such shares of Common Stock), or in the case of any merger or consolidation of the Company with or into another corporation (other than a consolidation or merger in which the Company is the continuing corporation and that does not result in any reclassification or reorganization of the outstanding shares of Common Stock), or in the case of any sale or conveyance to another corporation or entity of the assets or other property of the Company as an entirety or substantially as an entirety in connection with which the Company is dissolved, except in each case, with respect to any such transaction pursuant to which holders of the outstanding Common Stock are entitled to receive cash consideration for such shares, the Holders shall thereafter have the right to purchase and receive, upon the basis and upon the terms and conditions specified in the Warrants and in lieu of the shares of the Warrant Shares immediately theretofore purchasable and receivable upon the exercise of the rights represented thereby, the kind and amount of shares of stock or other securities or property (including cash) receivable upon such reclassification, reorganization, merger or consolidation, or upon a dissolution following any such sale or transfer, that the Holder would have received if such Holder had exercised his, her or its Warrant(s) immediately prior to such event; and if any reclassification also results in a change in shares of Common Stock covered by Section 5.02 or 5.03, then such adjustment shall be made pursuant to Sections 5.02, 5.03, 5.04 and this Section 5.05.  The provisions of this Section 5.05 shall similarly apply to successive reclassifications, reorganizations, mergers or consolidations, sales or other transfers.

Section 5.06   Notices of Changes in Warrant.  Upon every adjustment of the Exercise Price or the number of shares issuable upon exercise of a Warrant, the Company shall give written notice thereof to the Warrant Agent, which notice shall state the Exercise Price resulting from such adjustment and the increase or decrease, if any, in the number of shares of Common Stock purchasable at such price upon the exercise of a Warrant, setting forth in reasonable detail the method of calculation and the facts upon which such calculation is based. Upon the occurrence of any event specified in Section 5.02, 5.03, 5.04 or 5.05, then, in any such event, the Company shall give or cause to be given written notice to each Holder, by press release or at the last address set forth for such Holder in the register books of the Warrant Agent, of the record date or the effective date of the event.  Failure to give such notice, or any defect therein, shall not affect the legality or validity of such event.

Section 5.07   No Fractional Shares.  Notwithstanding any provision contained in this Agreement to the contrary, the Company shall not issue fractional shares upon exercise of Warrants.  If, by reason of any adjustment made pursuant to this Article V, any Holder would be entitled, upon the exercise of such Warrant, to receive a fractional interest in a share of Common Stock, the Company shall, upon such exercise, round down to the nearest whole number the number of the shares of Common Stock to be issued to the Holder.

Section 5.08   Form of Warrant.  The form of Warrant or Warrant Certificate need not be changed because of any adjustment pursuant to this Article V, and Warrants Certificates issued after such adjustment may state the same Exercise Price and the same number of shares as is stated in the Warrant Certificates initially issued pursuant to this Agreement. However, the Company may at any time in its sole discretion make any change in the form of Warrant or Warrant Certificate that the Company may deem appropriate and that does not affect the substance thereof, and any Warrant Certificates thereafter issued or countersigned, whether in exchange or substitution for an outstanding Warrant Certificate or otherwise, may be in the form as so changed.

Section 5.09   Extraordinary Transactions.  If the Company, shall distribute property (other than cash or shares of Common Stock) to the holders of Common Stock, other than as described in Section 5.02, 5.03 or 5.05, in connection with a spin-off, sale of a material subsidiary or similar extraordinary transaction (an "Extraordinary Transaction"), then in connection with such Extraordinary Transaction, the number of shares of Common Stock issuable upon exercise of the Warrants and/or the Warrant Price, as appropriate, shall be equitably and proportionately adjusted to reflect such Extraordinary Transaction, as determined in good faith by the Company's Board of Directors.

Section 5.10   De Minimis Adjustments.  No adjustment in the number of Warrant Shares purchasable hereunder shall be required unless such adjustment would require an increase or decrease of at least one percent (1%) in the number of Warrant Shares purchasable upon the exercise of each Warrant; provided, however, that any adjustments which by reason of this paragraph (c) are not required to be made shall be carried forward and taken into account in any subsequent adjustment.  All calculations shall be made to the nearest cent and to the nearest one-hundredth of a Warrant Share, as the case may be.

## ARTICLE VI
## CONCERNING THE WARRANT AGENT

Section 6.01    Warrant Agent.

The Company hereby appoints [BNY Mellon Shareowner Services] as Warrant Agent of the Company in respect of the Warrants and the Warrant Certificates upon the terms and subject to the conditions herein and in the Warrant Certificates; and [BNY Mellon Shareowner Services] hereby accepts such appointment.  The Warrant Agent shall have the powers and authority granted to and conferred upon it in the Warrant Certificates and herein and such further powers and authority to act on behalf of the Company as the Company may hereafter grant to or confer upon it.  All of the terms and provisions with respect to such powers and authority contained in the Warrant Certificates are subject to and governed by the terms and provisions hereof.

Section 6.02    Conditions of Warrant Agent's Obligations.

(a)    The Warrant Agent accepts its obligations herein set forth upon the terms and conditions hereof, including the following, to all of which the Company agrees and to all of which the rights hereunder of the Holders from time to time of the Warrant Certificates shall be subject:

(i)    *Compensation and Indemnification*.  The Company agrees promptly to pay the Warrant Agent the compensation to be agreed upon with the Company for all services rendered by the Warrant Agent and to reimburse the Warrant Agent for reasonable out-of-pocket expenses incurred by the Warrant Agent without negligence, bad faith or willful misconduct or breach of this Agreement on its part in connection with the services rendered hereunder by the Warrant Agent.  The Company also agrees to indemnify the Warrant Agent for, and to hold it harmless against, any loss, liability or expense incurred without negligence, bad faith or willful misconduct on the part of the Warrant Agent, arising out of or in connection with its acting as Warrant Agent hereunder, as well as the reasonable costs and expenses of defending against any claim of such liability.

(ii)    *Agent for the Company*.  In acting under this Agreement and in connection with the Warrants and the Warrant Certificates, the Warrant Agent is acting solely as agent of the Company and does not assume any obligation or relationship of agency or trust for or with any of the Holders of Warrant Certificates or beneficial owners of Warrants.

(iii)    *Counsel*.  The Warrant Agent may consult with counsel satisfactory to it in its reasonable judgment (who may be counsel for the Company), and the advice of such counsel shall be full and complete authorization and protection in respect of any action taken, suffered or omitted by it hereunder in good faith and in accordance with the advice of such counsel.

(iv)     *Documents*.  Subject to Section 2.03(j), the Warrant Agent shall be protected and shall incur no liability for or in respect of any action taken or thing suffered by it in reliance upon any Warrant Certificate, notice, direction, consent, certificate, affidavit, statement or other paper or document reasonably believed by it to be genuine and to have been presented or signed by the proper parties.

(v)     *Certain Transactions*.  The Warrant Agent, and its officers, directors and employees, may become the owner of, or acquire any interest in, Warrants, with the same rights that it or they would have if it were not the Warrant Agent hereunder, and, to the extent permitted by applicable law, it or they may engage or be interested in any financial or other transaction with the Company and may act on, or as depositary, trustee or agent for, any committee or body of holders of Warrant Shares or other obligations of the Company as freely as if it were not the Warrant Agent hereunder.

(vi)     *No Liability for Interest*.  The Warrant Agent shall have no liability for interest on any monies at any time received by it pursuant to any of the provisions of this Agreement or of the Warrant Certificates.

(vii)     *No Liability for Invalidity*.  The Warrant Agent shall not be under any responsibility with respect to the validity or sufficiency of this Agreement or the execution and delivery hereof (except the due authorization to execute this Agreement and the due execution and delivery hereof by the Warrant Agent) or subject to Section 2.03(j), with respect to the validity or execution of any Warrant Certificates (except its countersignature thereof).

(viii)     *No Liability for Recitals*.  The recitals contained herein shall be taken as the statements of the Company and the Warrant Agent assumes no liability for the correctness of the same.

(ix)     *No Implied Obligations*.  The Warrant Agent shall be obligated to perform only such duties as are herein and in the Warrant Certificates specifically set forth and no implied duties or obligations shall be read into this Agreement or the Warrant Certificates against the Warrant Agent.  The Warrant Agent shall not be under any obligation to take any action hereunder which may tend to involve it in any expense or liability, the payment of which within a reasonable time is not, in its reasonable opinion, assured to it.  The Warrant Agent shall not be accountable or under any duty or responsibility for the use by the Company of any of the Warrant Certificates countersigned by the Warrant Agent and delivered by it to the Company pursuant to this Agreement or for the application by the Company of the proceeds of the Warrant Certificates. The Warrant Agent shall have no duty or responsibility in case of any default by the Company in the performance of its covenants or agreements contained herein or in the Warrant Certificates or in the case of the receipt of any written demand from a Holder of a Warrant Certificate with respect to such default, including, without limiting the generality of the foregoing, any duty or responsibility to

initiate or attempt to initiate any proceedings at law or otherwise or, except as provided in Section 8.02, to make any demand upon the Company.

Section 6.03    Resignation and Appointment of Successor.

(a)    The Company agrees, for the benefit of the Holders from time to time of the Warrant Certificates, that there shall at all times be a Warrant Agent hereunder until all the Warrants have been exercised or are no longer exercisable.

(b)    The Warrant Agent may at any time resign as such by giving written notice of its resignation to the Company, specifying the desired date on which its resignation shall become effective; provided, however, that such date shall be not less than 90 days after the date on which such notice is given unless the Company agrees to accept shorter notice. Upon receiving such notice of resignation, the Company shall promptly appoint a successor Warrant Agent (which shall be a bank or trust company in good standing, authorized under the laws of the jurisdiction of its organization to exercise corporate trust powers) by written instrument in duplicate signed on behalf of the Company, one copy of which shall be delivered to the resigning Warrant Agent and one copy to the successor Warrant Agent. The Company may, at any time and for any reason, remove the Warrant Agent and appoint a successor Warrant Agent (qualified as aforesaid) by written instrument in duplicate signed on behalf of the Company and specifying such removal and the date when it is intended to become effective, one copy of which shall be delivered to the Warrant Agent being removed and one copy to the successor Warrant Agent. Any resignation or removal of the Warrant Agent and any appointment of a successor Warrant Agent shall become effective upon acceptance of appointment by the successor Warrant Agent as provided in this subsection (b). In the event a successor Warrant Agent has not been appointed and accepted its duties within 90 days of the Warrant Agent's notice of resignation, the Warrant Agent may apply to any court of competent jurisdiction for the designation of a successor Warrant Agent. Upon its resignation or removal, the Warrant Agent shall be entitled to the payment by the Company of the compensation and to the reimbursement of all reasonable out-of-pocket expenses incurred by it hereunder as agreed to in Section 6.02(a).

(c)    The Company shall remove the Warrant Agent and appoint a successor Warrant Agent if the Warrant Agent (i) shall become incapable of acting, (ii) shall be adjudged bankrupt or insolvent, (iii) shall commence a voluntary case or other proceeding seeking liquidation, reorganization or other relief with respect to it or its debts under any bankruptcy, insolvency or other similar law now or hereafter in effect or seeking the appointment of a trustee, receiver, liquidator, custodian or other similar official of it or any substantial part of its property, (iv) shall consent to, or shall have had entered against it a court order for, any such relief or to the appointment of or taking possession by any such official in any involuntary case or other proceedings commenced against it, (v) shall make a general assignment for the benefit of creditors or (vi) shall fail generally to pay its debts as they become due. Upon the appointment as aforesaid of a successor Warrant Agent and acceptance by it of such appointment, the predecessor Warrant Agent shall, if not previously disqualified by operation of law, cease to be Warrant Agent hereunder.

(d)    Any successor Warrant Agent appointed hereunder shall execute, acknowledge and deliver to its predecessor and the Company an instrument accepting such

appointment hereunder, and thereupon such successor Warrant Agent, without any further act, deed or conveyance, shall become vested with all the authority, rights, powers, immunities, duties and obligations of such predecessor with like effect as if originally named as Warrant Agent hereunder, and such predecessor shall thereupon become obligated to transfer, deliver and pay over, and such successor Warrant Agent shall be entitled to receive, all monies, securities and other property on deposit with or held by such predecessor as Warrant Agent hereunder.

(e)     Any corporation into which the Warrant Agent hereunder may be merged or converted or any corporation with which the Warrant Agent may be consolidated, or any corporation resulting from any merger, conversion or consolidation to which the Warrant Agent shall be a party, or any corporation to which the Warrant Agent shall sell or otherwise transfer all or substantially all the assets and business of the Warrant Agent, provided that it shall be qualified as aforesaid, shall be the successor Warrant Agent under this Agreement without the execution or filing of any paper or any further act on the part of any of the parties hereto.

### ARTICLE VII
### REGISTRATION RIGHTS

Section 7.01    S-3 Registration.  Until the earlier of such time that all Warrant Shares have been issued and the Expiration Date, and so long as the Current Market Price of the shares of Common Stock is greater than 85% of the Exercise Price of the Warrants and the Company is eligible to use Form S-3 or any successor thereto, the Company shall use its commercially reasonable efforts to register and maintain under the Act on Form S-3 or any successor thereto (an "S-3 Registration"), for sale upon the exercise of the Warrants, the Warrant Shares.  Whenever the Company is required by this Section 7.01 to use its commercially reasonable efforts to effect the registration of Warrant Shares, each of the applicable procedures and requirements of Sections 7.03(b), 7.03(c) and 7.03(i) shall apply to such registration.  As used herein, "Registration Statement" shall mean any registration statement of the Company filed under the Securities Act that covers any of the Warrant Shares pursuant to the provisions of this Article VII, including the related Prospectus, all amendments and supplements to such registration statement, including pre- and post-effective amendments, all exhibits thereto and all material incorporated by reference or deemed to be incorporated by reference in such registration statement.  The term "Registration Statement" shall also include any registration statement filed pursuant to Rule 462(b) to register additional securities in connection with any offering.  As used herein, "Prospectus" shall mean the prospectus included in any Registration Statement (including a prospectus that discloses information previously omitted from a prospectus filed as part of an effective registration statement in reliance upon Rule 430A), as amended or supplemented by any prospectus supplement, with respect to the terms of the offering of any portion of the Warrant Shares covered by such Registration Statement and all other amendments and supplements to such prospectus, including post-effective amendments, and all material incorporated by reference or deemed to be incorporated by reference in such prospectus, including any free writing prospectus.

Section 7.02    Piggyback Registration.

(a)     Right to Piggyback.  If there shall not be currently effective an S-3 Registration and the Exercise Price of the Warrants is greater than the Current Market Price of

the Common Stock, then at any time the Company proposes to file a registration statement under the Securities Act with respect to a public offering by the Company for its own account of securities of the same type as the Warrant Shares (other than a registration statement (i) in connection with the IPO, or (ii) on Form S-8 or Form S-4 or any successor forms thereto, or (iii) filed solely in connection with a dividend reinvestment plan or an employee benefit plan covering only officers or directors of the Company or its Affiliates), the Company shall give written notice of such proposed filing to the Holders and holders of Warrant Shares at least fifteen (15) days before the anticipated filing date. Such notice shall offer such holders the opportunity to register such amount of Warrant Shares as they may request (a "Piggyback Registration"). Subject to 7.02(b), the Company shall include in each such Piggyback Registration all Warrant Shares with respect to which the Company has received written requests for inclusion therein within ten (10) days after notice has been given to the Holders and holders of Warrant Shares. Each such holder shall be permitted to withdraw all or any portion of the Warrant Shares of such holder from a Piggyback Registration at any time prior to the effective date of such Piggyback Registration.

(b)    Priority on Piggyback Registrations. The Company shall permit the Holders and holders of Warrant Shares to include all such Warrant Shares on the same terms and conditions as any similar securities, if any, of the Company or any other persons included therein. Notwithstanding the foregoing, if the Company or the managing underwriter or underwriters participating in such offering advise the Holders and holders of Warrant Shares in writing that the total amount of securities requested to be included in such Piggyback Registration exceeds the amount which can be sold in (or during the time of) such offering without delaying or jeopardizing the success of the offering (including the price per share of the securities to be sold), then the amount of securities to be offered for the account of the such holders and other holders of securities who have piggyback registration rights with respect thereto shall be reduced (to zero if necessary) pro rata on the basis of the number of Common Stock or Common Stock equivalents requested to be registered by each such holder or other holder participating in such offering.

(c)    Right to Abandon. Nothing in this Section 7.02 shall create any liability on the part of the Company to the Holders or holders of any Warrant Shares if the Company in its sole discretion should decide not to file a registration statement proposed to be filed pursuant to Section 7.02(a) or to withdraw such registration statement subsequent to its filing, regardless of any action whatsoever that a holder may have taken, whether as a result of the issuance by the Company of any notice hereunder or otherwise. Any such determination not to file or to withdraw a registration statement shall not affect the obligations of the Company to pay or to reimburse all Registration Expenses pursuant to Section 7.05.

Section 7.03    Registration Procedures. In connection with the registration obligations of the Company pursuant to and in accordance with Sections 7.01 and 7.02 (and subject to Sections 7.01 and 7.02), the Company shall use commercially reasonable efforts to effect such registration to permit the sale of such Warrant Shares in accordance with the intended method or methods of disposition thereof, and pursuant thereto the Company shall as expeditiously as possible:

(a)     prepare and file with the Securities and Exchange Commission ("SEC") a Registration Statement for the sale of the Warrant Shares on any form for which the Company then qualifies or which counsel for the Company shall deem appropriate in accordance with such Holders' or Warrant Shares holders' intended method or methods of distribution thereof, and, subject to the Company's right to terminate or abandon a registration pursuant to Section 7.02(c), use commercially reasonable efforts to cause such Registration Statement to become effective and remain effective as provided herein;

(b)     prepare and file with the SEC such amendments (including post-effective amendments) to such Registration Statement, and such supplements to the related Prospectus, as may be required by the rules, regulations or instructions applicable to the Securities Act during the applicable period in accordance with the intended methods of disposition specified by the holders whose Warrant Shares are covered by such Registration Statement, make generally available earnings statements satisfying the provisions of Section 11(a) of the Securities Act (provided that the Company shall be deemed to have complied with this Section 7.03 if it has complied with Rule 158 under the Securities Act), and cause the related Prospectus as so supplemented to be filed pursuant to Rule 424 under the Securities Act; provided, however, that before filing a Registration Statement or Prospectus, or any amendments or supplements thereto (other than reports required to be filed by it under the Exchange Act that are incorporated or deemed to be incorporated by reference into the Registration Statement and the Prospectus except to the extent that such reports related primarily to the offering), the Company shall furnish to the holders whose Warrant Shares are covered by such Registration Statement and their counsel for review and comment, copies of all documents required to be filed;

(c)     notify the holders whose Warrant Shares are covered by such Registration Statement promptly and (if requested) confirm such notice in writing, (i) when a Prospectus or any Prospectus supplement or post-effective amendment has been filed, and, with respect to such Registration Statement or any post-effective amendment, when the same has become effective, (ii) of any request by the SEC for amendments or supplements to such Registration Statement or the related Prospectus or for additional information regarding the Company or the Holders, (iii) of the issuance by the SEC of any stop order suspending the effectiveness of such Registration Statement or the initiation of any proceedings for that purpose, (iv) of the receipt by the Company of any notification with respect to the suspension of the qualification or exemption from qualification of any of the Warrant Shares for sale in any jurisdiction or the initiation or threatening of any proceeding for such purpose, and (v) of the happening of any event that requires the making of any changes in such Registration Statement, Prospectus or documents incorporated or deemed to be incorporated therein by reference so that they will not contain any untrue statement of a material fact or omit to state any material fact required to be stated therein or necessary to make the statements therein not misleading;

(d)     use commercially reasonable efforts to prevent the issuance of any order suspending the effectiveness of such Registration Statement or the qualification or exemption from qualification of any Warrant Shares for sale in any jurisdiction in the United States, and to obtain the lifting or withdrawal of any such order at the earliest practicable time;

(e)     furnish to the holder whose Warrant Shares are covered by such Registration Statement and who so requests in writing, each counsel for such holders and each

managing underwriter, if any, without charge, one conformed copy of such Registration Statement, as declared effective by the SEC, and of each post-effective amendment thereto, in each case including financial statements and schedules and all exhibits and reports incorporated or deemed to be incorporated therein by reference; and deliver, without charge, such number of copies of the preliminary prospectus, any amended preliminary prospectus, any free writing prospectus, each final Prospectus and any post-effective amendment or supplement thereto, as such holder may reasonably request in order to facilitate the disposition of the Warrant Shares of such holder covered by such Registration Statement in conformity with the requirements of the Securities Act;

(f)     prior to any public offering of Warrant Shares covered by such Registration Statement, use commercially reasonable efforts to register or qualify such Warrant Shares for offer and sale under the securities or "Blue Sky" laws of such jurisdictions as the holders of such Warrant Shares shall reasonably request in writing; provided, however, that the Company shall in no event be required to qualify generally to do business as a foreign corporation or as a dealer in any jurisdiction where it is not at the time required to be so qualified or to execute or file a general consent to service of process in any such jurisdiction where it has not theretofore done so or to take any action that would subject it to general service of process or taxation in any such jurisdiction where it is not then subject;

(g)     upon the occurrence of any event contemplated by Section 7.03(c)(v), prepare a supplement or post-effective amendment to such Registration Statement or the related Prospectus or any document incorporated or deemed to be incorporated therein by reference and file any other required document so that, as thereafter delivered to the purchasers of the Warrant Shares being sold thereunder, such Prospectus will not contain an untrue statement of a material fact or omit to state any material fact required to be stated therein or necessary to make the statements therein, in light of the circumstances under which they were made, not misleading;

(h)     use commercially reasonable efforts to cause all Warrant Shares covered by such Registration Statement to be listed on each securities exchange or automated interdealer quotation system, if any, on which similar securities issued by the Company are then listed or quoted, or, if none, on such securities exchange or automated interdealer quotation system reasonably selected by the Company;

(i)     on or before the effective date of such Registration Statement, provide the transfer agent of the Company for the Warrant Shares with printed certificates for the Warrant Shares covered by such Registration Statement, which are in a form eligible for deposit with The Depository Trust Company;

(j)     if such offering is an underwritten offering, make available for inspection by any holder whose Warrant Shares are included in such Registration Statement, any underwriter participating in any offering pursuant to such Registration Statement, and any attorney, accountant or other agent retained by any such holder or underwriter (collectively, the "Inspectors"), all financial and other records and other information, pertinent corporate documents and properties of any of the Company and its subsidiaries and affiliates (collectively, the "Records"), as shall be reasonably necessary to enable them to exercise their due diligence

responsibilities; provided, however, that the Records that the Company determines, in good faith, to be confidential and which it notifies the Inspectors in writing are confidential shall not be disclosed to any Inspector unless such Inspector signs a confidentiality agreement reasonably satisfactory to the Company, which shall permit the disclosure of such Records in such Registration Statement or the related Prospectus if (i) necessary to avoid or correct a material misstatement in or material omission from such Registration Statement or Prospectus or (ii) the release of such Records is ordered pursuant to a subpoena or other order from a court of competent jurisdiction; provided further, however, that (A) any decision regarding the disclosure of information pursuant to subsection (i) shall be made only after consultation with counsel for the applicable Inspectors and the Company and (B) with respect to any release of Records pursuant to subsection (ii), each holder of Warrant Shares shall, promptly after learning that disclosure of such Records is sought in a court having jurisdiction, give notice to the Company so that the Company, at the Company's expense, may undertake appropriate action to prevent disclosure of such Records;

(k)     if such offering is an underwritten offering, enter into such agreements (including an underwriting agreement in form, scope and substance as is customary in underwritten offerings) and take all such other appropriate and reasonable actions requested by the holders of a majority of the Warrant Shares being sold in connection therewith (including those reasonably requested by the managing underwriters) in order to expedite or facilitate the disposition of such Warrant Shares, and in such connection, (i) use commercially reasonable efforts to obtain opinions of counsel to the Company and updates thereof (which counsel and opinions (in form, scope and substance) shall be reasonably satisfactory to the managing underwriters and counsel to the holders of the Warrant Shares being sold), addressed to each selling holder of Warrant Shares covered by such Registration Statement and each of the underwriters as to the matters customarily covered in opinions requested in underwritten offerings and such other matters as may be reasonably requested by such counsel and underwriters, (ii) use commercially reasonable efforts to obtain "cold comfort" letters and updates thereof from the independent certified public accountants of the Company (and, if necessary, any other independent certified public accountants of any subsidiary of the Company or of any business acquired by the Company for which financial statements and financial data are, or are required to be, included in the Registration Statement), addressed to each selling holder of Warrant Shares covered by the Registration Statement (unless such accountants shall be prohibited from so addressing such letters by applicable standards of the accounting profession) and each of the underwriters, such letters to be in customary form and covering matters of the type customarily covered in "cold comfort" letters in connection with underwritten offerings, (iii) if requested and if an underwriting agreement is entered into, provide indemnification provisions and procedures customary for underwritten public offerings.  The above shall be done at each closing under such underwriting or similar agreement, or as and to the extent required thereunder.

Section 7.04    Holder Obligations.The Company may require each holder of Warrant Shares covered by a Registration Statement to furnish such information regarding such holder and such holder's intended method of disposition of such Warrant Shares as it may from time to time reasonably request in writing.  If any such information is not furnished within a reasonable period of time after receipt of such request, the Company may exclude such holder's Warrant Shares from such Registration Statement.  In addition if such offering is an underwritten offering, the Company may require the holders of Warrants and Warrant Shares to enter into

such agreements (including an underwriting agreement in form, scope and substance as is customary in underwritten offerings) and take all such other appropriate and reasonable actions requested by the Company (including that such holders exercise their Warrants and any other actions reasonably requested by the managing underwriters) in order to expedite or facilitate the disposition of such Warrant Shares;

(b)     Upon receipt of any notice from the Company of the happening of any event of the kind described in Section 7.03(c)(ii), 7.03(c)(iii), 7.03(c)(iv) or 7.03(c)(v), each holder of Warrant Shares covered by a Registration Statement shall discontinue disposition of any Warrant Shares covered by such Registration Statement or the related Prospectus until receipt of the copies of the supplemented or amended Prospectus contemplated by Section 7.03(g), or until such holder is advised in writing by the Company that the use of the applicable Prospectus may be resumed, and has received copies of any amended or supplemented Prospectus or any additional or supplemental filings which are incorporated, or deemed to be incorporated, by reference in such Prospectus and, if requested by the Company, the Holder shall deliver to the Company (at the expense of the Company) all copies then in its possession, other than permanent file copies then in such holder's possession, of the Prospectus covering such Warrant Shares at the time of receipt of such request;

(c)     Each holder of Warrant Shares covered by a Registration Statement shall not to utilize any material other than the applicable current preliminary prospectus, free writing prospectus, road show or Prospectus in connection with the offering of such Warrant Shares; and

(d)     If (i) the Company shall file a registration statement (other than in connection with the registration of securities issuable pursuant to an employee stock option, stock purchase or similar plan or pursuant to a merger, exchange offer or a transaction of the type specified in Rule 145(a) under the Securities Act) with respect to an underwritten public offering of Common Stock or securities convertible into, or exchangeable or exercisable for, such securities, (ii) with reasonable prior notice, the managing underwriter or underwriters of a public offering advises the Company in writing (in which case the Company shall notify the Holders) that a public sale or distribution of Warrant Shares would materially adversely impact such offering and (iii) the underwriter or underwriters have obtained written lock-up agreements from the Company, each executive officer of the Company and the stockholders party to the Stockholders Agreement ("Lock-up Agreements"), then each Holder shall, to the extent not inconsistent with applicable law, refrain from effecting any public sale or distribution of Warrant Shares during the ten (10) days prior to the effective date of such registration statement and until the earlier of the abandonment of such offering and the expiration of all lock-up periods imposed in connection with the Lock-Up Agreements. Notwithstanding the foregoing, any obligations of the Holders under this Section 7.04(d) shall terminate in the event that the Company or any underwriter terminates, releases or waives, in whole of in part, the Lock-Up Agreements with respect to the Company, any executive officer of the Company or any such other person who has been granted registration rights by the Company.

Section 7.05     Registration Expenses.  Whether or not any Registration Statement is filed or becomes effective, the Company shall pay all costs, fees and expenses incident to the Company's performance of or compliance with this Article VII, including (i) all registration and

filing fees, including NASD filing fees, (ii) all fees and expenses of compliance with securities or "Blue Sky" laws, including reasonable fees and disbursements of counsel in connection therewith, (iii) printing expenses (including expenses of printing certificates for Warrant Shares and of printing prospectuses if the printing of prospectuses is requested by the Holders or holders of Warrant Shares or the managing underwriter, if any) and expenses associated with a road show, (iv) messenger, telephone and delivery expenses, (v) fees and disbursements of counsel for the Company, (vi) fees and disbursements of all independent certified public accountants of the Company (including expenses of any "cold comfort" letters required in connection with this Agreement) and all other persons retained by the Company in connection with such Registration Statement, (vii) fees and disbursements of one counsel, other than the Company's counsel, selected by holders of a majority of the Warrant Shares being registered, to represent all such holders, (viii) fees and disbursements of underwriters customarily paid by the issuers or sellers of securities and (ix) all other costs, fees and expenses incident to the Company's performance or compliance with this Article VII. Notwithstanding the foregoing, the fees and expenses of any persons retained by any holder, other than one counsel for all such holders, and any discounts, commissions or brokers' fees or fees of similar securities industry professionals and any transfer taxes relating to the disposition of the Warrant Shares by a holder, will be payable by such holder and the Company will have no obligation to pay any such amounts.

## ARTICLE VIII
## MISCELLANEOUS

Section 8.01    Amendment.  The terms of the Warrants may be amended by the Company together with the affirmative vote or consent of the Holders of a majority of the Warrants.

Section 8.02    Notices and Demands to the Company and Warrant Agent.  If the Warrant Agent shall receive any notice or demand addressed to the Company by the Holder of a Warrant Certificate pursuant to the provisions of the Warrant Certificates, the Warrant Agent shall promptly forward such notice or demand to the Company.

Section 8.03    Addresses.  Any communication from the Company to the Warrant Agent with respect to this Agreement shall be addressed to [          ], Attention: [          ], and any communication from the Warrant Agent to the Company with respect to this Agreement shall be addressed to Hayes Lemmerz International, Inc., 15300 Centennial Drive, Northville, MI 48167, Attention: General Counsel (or such other address as shall be specified in writing by the Warrant Agent or by the Company).

Section 8.04    Applicable Law.  The validity, interpretation and performance of this Agreement and each Warrant Certificate issued hereunder and of the respective terms and provisions hereof and thereof shall be governed by, and construed in accordance with, the laws of the State of Delaware.

Section 8.05    Obtaining of Governmental Approval.  The Company from time to time will use its best efforts to obtain and keep effective any and all permits, consents and approvals of governmental agencies and authorities and to make any necessary filings under federal or state securities laws, which may become requisite in connection with the issuance, sale,

transfer and delivery of the Warrant Certificates, the exercise or conversion of the Warrants, the issuance, sale, transfer and delivery of the Warrant Shares.

Section 8.06 <u>Persons Having Rights Under Warrant Agreement</u>. Nothing contained in the Warrant shall be construed as conferring upon the Holder the right to vote or to consent or to receive notice as a stockholder in respect of any meeting of stockholders for the election of directors of the Company or any other matter, to receive dividends or any rights whatsoever as stockholders of the Company. Each Holder shall be entitled to receive the same information and reports to which a holder of the Common Stock is entitled pursuant to the Stockholders Agreement then in effect, subject to execution of an appropriate confidentiality agreement.

Section 8.07 <u>Headings</u>. The descriptive headings of the several Articles and Sections of this Agreement are inserted for convenience only and shall not control or affect the meaning or construction of any of the provisions hereof.

Section 8.08 <u>Counterparts</u>. This Agreement may be executed in any number of counterparts, each of which as so executed shall be deemed to be an original, but such counterparts shall together constitute but one and the same instrument.

Section 8.09 <u>Inspection of Agreement</u>. A copy of this Agreement shall be available at all reasonable times at the principal corporate trust office of the Warrant Agent for inspection by the Holder of any Warrant Certificate. The Warrant Agent may require such Holder to submit his Warrant Certificate for inspection by it.

Section 8.10 <u>Notices to Holders of Warrants</u>. Any notice to Holders of Warrants evidenced by Warrant Certificates which by any provisions of this Warrant Agreement is required or permitted to be given shall be given by first class mail prepaid at such Holder's address as it appears on the books of the Warrant Agent.

[SIGNATURE PAGE FOLLOWS]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed.

HAYES LEMMERZ INTERNATIONAL, INC.

By: _____
     Name:
     Title:


[BNY MELLON SHAREOWNER SERVICES]

By: _____
     Name:
     Title:

[FORM OF WARRANT CERTIFICATE]

[Face]

EXERCISABLE ONLY IF AUTHENTICATED BY THE WARRANT
AGENT AS PROVIDED HEREIN

VOID AFTER THE CLOSE OF BUSINESS ON _____, 2016
HAYES LEMMERZ INTERNATIONAL, INC.

Warrant Certificate representing
Series A[2] Warrants to purchase
Class A Common Stock, par value $.[01] per share
as described herein

_____

Warrants

     This certifies that [_____] or registered assigns is the registered owner of the above indicated number of  Series A Warrants[3] (each, a "Warrant"), each Warrant entitling such registered owner to purchase, one share of the Class A Common Stock, par value $.[01] per share (the "Warrant Shares") of Hayes Lemmerz International, Inc. (the "Company") on the following basis.

     The Warrant may be exercised in whole or in part at any time on or before the close of business on _____, 2016; *provided that*, any Warrants not exercised in connection with a Sale Transaction in which the holders of Common Stock receive only cash consideration, shall automatically expire upon consummation of such Sale Transaction (in either case, such date and such time, the "Expiration Date"); *provided further, that* for the avoidance of doubt, the foregoing proviso shall not affect a Holder's entitlement to replacement securities pursuant to Section 5.05 of the Warrant Agreement.  Each Warrant not exercised at or before the Expiration Date shall become void, and all rights of the Holder and any beneficial owners of the Warrant Certificate evidencing such Warrant under the Warrant Agreement shall cease.

     Prior to the Expiration Date, each Warrant shall entitle the Holder thereof, subject to the provisions of this Agreement, to purchase from the Company one Warrant Share at the Exercise Price of [$_____  ] (the "Exercise Price").  The Holder of this Warrant Certificate may exercise

---

[2] Series B Warrant Certificate will state "Series B"

[3] Series B Warrant Certificate will state "Series B"

the Warrants evidenced hereby, in whole or in part, by surrendering this Warrant Certificate, with the purchase form set forth hereon duly completed, accompanied by payment in full, in lawful money of the United States of America, in immediately available funds, or deemed payment in full in connection with a "cashless" exercise, the Exercise Price for each Warrant exercised, to the Warrant Agent (as hereinafter defined), at the corporate trust office of [                    ], or its successor as warrant agent (the "Warrant Agent") at the addresses specified on the reverse hereof and upon compliance with and subject to the conditions set forth herein and in the Warrant Agreement dated as of _____, 2009 (the "Warrant Agreement").  Capitalized terms used, but not otherwise defined, herein, shall have the meaning ascribed to such terms in the Warrant Agreement.

The term "Holder" as used herein shall mean the person in whose name at the time this Warrant Certificate shall be registered upon the books to be maintained by the Warrant Agent for that purpose pursuant to Section 4.01 of the Warrant Agreement.

Any whole number of Warrants evidenced by this Warrant Certificate may be exercised to purchase Warrant Shares in registered form.  Upon any exercise of fewer than all of the Warrants evidenced by this Warrant Certificate, a new Warrant or Warrants of like tenor, calling in the aggregate on the face or faces of this Warrant Certificate or Warrant Certificates for the number of shares of Common Stock equal (without giving effect to any adjustment thereof) to the number of such shares called for on the face of the Warrant Certificate minus the number of such shares designated by the Holder upon such exercise together with any Warrant Shares withheld in connection with a Cashless Exercise, shall be issued and delivered to the Holder or its registered assigns.

This Warrant Certificate is issued under and in accordance with the Warrant Agreement, between the Company and the Warrant Agent and is subject to the terms and provisions contained in the Warrant Agreement, to all of which terms and provisions the Holder of this Warrant Certificate consents by acceptance hereof.  Copies of the Warrant Agreement are on file at the above-mentioned office of the Warrant Agent.

After authentication by the Warrant Agent and prior to the expiration of this Warrant Certificate, this Warrant Certificate may be exchanged at the corporate trust office of the Warrant Agent for Warrant Certificates representing the same aggregate number of Warrants.

Neither this Warrant Certificate nor the Warrant evidenced hereby, shall, and nothing contained in the Warrant Agreement shall be construed to entitle the registered owner hereof, or any beneficial owner, to any of the rights of a registered holder or beneficial owner of the Warrant Shares, including, without limitation, the right to vote or to consent or to receive notice as a stockholder in respect of any meetings of stockholders for the election of directors of the Company or any other matter, to receive dividends on Warrant Shares or any rights whatsoever as stockholders of the Company.

Reference is hereby made to the further provisions of this Warrant Certificate set forth on the reverse hereof, which further provisions shall for all purposes have the same effect as if set forth at this place.

This Warrant Certificate shall not be valid or obligatory for any purpose until authenticated by the Warrant Agent.

IN WITNESS WHEREOF, the Company has caused this Warrant Certificate to be duly executed.

Dated:_____

                                        HAYES LEMMERZ INTERNATIONAL, INC

                                        By:_____

Attest:

_____

                        Certificate of Authentication

This is one of the Warrant Certificates referred to in the within-mentioned Warrant Agreement.

_____
            As Warrant Agent

By:_____
        Authorized Signature

## [REVERSE] [FORM OF WARRANT CERTIFICATE]
### (Instructions for Exercise of Warrants)

To exercise any Warrants evidenced hereby, the Holder of this Warrant Certificate must pay by certified check or official bank check or by bank wire transfer, in each case, in immediately available funds, unless such exercise is a Cashless Exercise, then by tendering Warrants equal to, the aggregate Exercise Price in full for each of the Warrants exercised, to _____, Corporate Trust Department, _____, Attn: _____, which payment should specify the name of the Holder of this Warrant Certificate and the number of Warrants exercised by such Holder. A Cashless Exercise shall only be permitted in connection with an IPO or a Triggering Event, as provided in the Warrant Agreement. In addition, the Holder of this Warrant Certificate should complete the information required below and present in person or mail by registered mail this Warrant Certificate to the Warrant Agent at the addresses set forth below.

## [FORM OF EXERCISE]
### (To be executed upon exercise of Warrants.)

The undersigned hereby irrevocably elects to exercise _____ Warrants, represented by this Warrant Certificate, to purchase _____ shares of Class A Common Stock, par value $.[01] per share (the "Warrant Shares") of Hayes Lemmerz International, Inc. and represents that he has tendered payment for such Warrant Shares by (check one):

☐     certified check or official bank check or by bank wire transfer, in each case, in immediately available funds, to the order of Hayes Lemmerz International, Inc., c/o [      ] in the amount of $_____ ,

or

☐     tendering _____ Warrants, in connection with a Cashless Exercise, as set forth in Section 2.03(c) of the Warrant Agreement, equal to the aggregate Exercise Price,

in accordance with the terms of the Warrant Agreement. The undersigned requests the Warrant Shares to which the Holder is entitled be in fully registered form, in the authorized denominations, registered in such names and delivered, all as specified in accordance with the instructions set forth below.

If said amount of Warrant Shares is less than all of the Warrant Shares purchasable hereunder, the undersigned requests that a new Warrant Certificate or Warrants of like tenor representing the remaining balance of the Warrants evidenced hereby be issued and delivered to the undersigned unless otherwise specified in the instructions below.

Dated:_____

Name_____

(Please Print)

_____
(Insert Social Security or Other
Identifying Number of Holder)

Address _____
_____

Signature_____
(Signed exactly as name appears
on the other side of this Warrant
Certificate)

This Warrant may be exercised at the following addresses:

By hand at _____
_____
_____
_____

By mail at _____
_____
_____
_____

(Instructions as to form and delivery of Warrant Shares and/or Warrant Certificates):

[FORM OF ASSIGNMENT]

(TO BE EXECUTED TO TRANSFER THE WARRANT CERTIFICATE)

FOR VALUE RECEIVED _____ hereby sells, assigns and transfers unto
Please insert social
security or other
identifying number)

_____

_____
(Please print name and address
including zip code)

_____
__ the right represented by the within Warrant Certificate and does hereby irrevocably constitute
and appoint _____, Attorney, to transfer said Warrant Certificate on the books of
the Warrant Agent with full power of substitution.

Dated: _____

_____
Signature
(Signed exactly as name appears on the
other side of this Warrant Certificate)

Signature Guarantee:

_____
Participant in a recognized Signature
Guarantee Medallion Program (or other
signature guarantor program reasonably
acceptable to the Warrant Agent)

A-7

# Exhibit M

**Form of Stockholders' Agreement, Registration Rights Agreement and Management Stockholders' Agreement**

**[TO BE FILED WITH THE BANKRUPTCY COURT AT A LATER DATE]**

**APPENDIX B**

**EXISTING ORGANIZATIONAL STRUCTURE OF THE DEBTORS**



Hayes Lemmerz International, Inc. (HAYZ)****

HLI Parent Company, Inc.***

HLI Operating Company, Inc.****

| Guarantor/Borrower/Issuer Status | Participant in securitization | Dissolution in progress | Japan | Luxembourg | Turkey | Brazil | South Africa | USA (DE) |
|---|---|---|---|---|---|---|---|---|
| *Guarantor of Lux Under Credit Agreement | (1) Less than 1% owned by Hayes Lemmerz Alükola, s.r.o. | | Thailand | Germany | Netherlands | Italy | USA (NY) | USA (MI) |
| **Guarantor of Lux Under Credit Agreement and Senior Notes | (2) Less than 1% owned by Hayes Lemmerz Italy Holdings, S.r.l | | Mexico | India | Spain | Czech | USA (TX) | USA (IN) |
| ***Guarantor of Opco and Lux Under Credit Agreement and Senior Notes | (3) Less than 1% owned by Hayes Lemmerz Barcelona, S.L. | | | | | | | |
| ****U.S. Borrower and Guarantor of Lux Under Credit Agreement | (4) Less than 1% held by HLI Powertrain Holding Company, Inc. | | | | | | | |
| *****Luxembourg Borrower Under Credit Agreement and Issuer of Senior Notes | | | | | | | | |

B-2

**APPENDIX C**

<u>**SECURITIES AND EXCHANGE COMMISSION REPORTS**</u>

**APPENDIX C-1**

**SELECTED FINANCIAL DATA OF THE DEBTORS**

## Hayes Lemmerz International, Inc. and Subsidiaries
## Selected Financial Data
## ($ US millions)

| | Year Ended January 31, 2009 | Year Ended January 31, 2008 | Year Ended January 31, 2007 | Year Ended January 31, 2006 | Year Ended January 31, 2005 |
|---|---|---|---|---|---|
| **Income Statement Data:** | | | | | |
| Net sales | $ 1,904.3 | $ 2,126.7 | $ 1,796.8 | $ 1,726.2 | $ 1,552.7 |
| Depreciation and amortization | 104.5 | 112.1 | 111.5 | 120.8 | 124.0 |
| Asset impairments and other restructuring charges | 22.2 | 85.5 | 32.8 | 23.1 | 8.6 |
| Goodwill and other intangibles impairment | 238.0 | — | — | 185.5 | — |
| Interest expense, net | 61.1 | 62.2 | 75.2 | 64.1 | 42.2 |
| Income tax expense | 30.7 | 29.9 | 40.2 | 5.4 | 13.2 |
| Loss from continuing operations before cumulative effect of change in accounting principle | (370.2) | (181.8) | (121.5) | (276.4) | (38.0) |
| Income (loss) from discontinued operations, net of tax of ($0.8), $0.6, ($1.1), ($5.2) and $6.4, respectively | 0.9 | 2.2 | (43.0) | (185.0) | (26.9) |
| (Loss) gain on sale of discontinued operations, net of tax of $0.0, $2.0, $0.0 and $3.8 and $0.0 respectively | (2.4) | (14.8) | (2.4) | 3.9 | — |
| Cumulative effect of change in accounting principle, net of tax of $0.8 | — | — | — | — | 2.6 |
| Net Loss | $ (371.7) | $ (194.4) | $ (166.9) | $ (457.5) | $ (62.3) |
| **Balance sheet data:** | | | | | |
| Total assets | $ 1,096.2 | $ 1,805.9 | $ 1,691.2 | $ 1,799.2 | $ 2,302.0 |
| Bank borrowings and current portion of long-term debt | 668.7 | 37.7 | 33.5 | 40.5 | 8.4 |
| Long-term debt | 1.4 | 572.2 | 659.4 | 668.7 | 630.9 |
| Cash dividends paid | — | — | — | — | — |
| Stockholders' equity | (292.9) | 202.3 | 101.8 | 183.3 | 701.3 |
| **Per Share Data** | | Restated | Restated | Restated | Restated |
| Loss from continuing operations before cumulative effect of a change in accounting principle | $ (3.65) | $ (2.09) | $ (2.10) | $ (4.82) | $ (0.67) |
| Net loss | (3.67) | (2.23) | (2.89) | (7.99) | (1.10) |
| Average number of shares outstanding (in thousands) | 101,345 | 87,040 | 57,836 | 57,285 | 56,768 |

**APPENDIX C-2**

<u>**ANNUAL REPORT ON FORM 10-K FOR THE FISCAL YEAR
ENDED JANUARY 31, 2009**</u>

<u>**AMENDED ANNUAL REPORT ON FORM 10-K FOR THE FISCAL
YEAR ENDED JANUARY 31, 2009**</u>

# UNITED STATES SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

# Form 10-K

(Mark One)

☑ **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d)
OF THE SECURITIES EXCHANGE ACT OF 1934**
For the fiscal year ended January 31, 2009

or

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d)
OF THE SECURITIES EXCHANGE ACT OF 1934**
For the transition period from          to

**Commission file number: 000-50303**

# Hayes Lemmerz International, Inc.

*(Exact name of Registrant as Specified in its Charter)*

| | |
|---|---|
| **Delaware** | **32-0072578** |
| *(State or Other Jurisdiction of Incorporation or Organization)* | *(I.R.S. Employer Identification No.)* |
| **15300 Centennial Drive, Northville, Michigan** | **48168** |
| *(Address of Principal Executive Offices)* | *(Zip Code)* |

**Registrant's telephone number, including area code:
(734) 737-5000**

**Securities Registered Pursuant to Section 12(b) of the Act:**

| Title of Each Class | Name of Each Exchange on Which Registered: |
|---|---|
| **Common Stock, par value $0.01 per share** | **The NASDAQ Stock Market LLC** |

**Securities Registered Pursuant to Section 12(g) of the Act:**
**None**

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. Yes ☐     No ☑

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act. Yes ☐     No ☑

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☑     No ☐

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T (§ 229.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files). Yes ☐     No ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K (§ 229.405 of this chapter) is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. ☑

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company. See the definitions of "large accelerated filer," "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act. (Check one):

Large accelerated filer ☐          Accelerated filer ☑          Non-accelerated filer ☐          Smaller reporting company ☐
(Do not check if a smaller reporting company)

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Act). Yes ☐     No ☑

The aggregate market value of the registrant's common stock held by non-affiliates was $235 million based on the reported last sale price of common stock on July 31, 2008, which is the last business day of the registrant's most recently completed second fiscal quarter. For purposes of this calculation, shares held by affiliates are limited to shares beneficially owned by the registrant's current officers and directors, which represented approximately 1% of all shares as of April 30, 2009.

Indicate by check mark whether the registrant has filed all documents and reports required to be filed by Section 12, 13 or 15(d) of the Securities Exchange Act of 1934 subsequent to the distributions of securities under a plan confirmed by a court. Yes ☑     No ☐

As of May 6, 2009, the number of shares of common stock outstanding of Hayes Lemmerz International, Inc. was 101,819,597 shares.

**DOCUMENTS INCORPORATED BY REFERENCE**

Document Description                                                                                    Form 10-K Part

Portions of the Registrant's notice of annual meeting of shareholders and proxy statement to pursuant to Regulation 14A or an amendment to this Annual Report on Form 10-K, in either case to be filed within 120 days after the Registrant's fiscal year end of January 31, 2009

Part III

**HAYES LEMMERZ INTERNATIONAL, INC.**

**FORM 10-K ANNUAL REPORT**

**TABLE OF CONTENTS**

|  |  | Page |
|---|---|---|
| **PART I** | | |
| Item 1. | Business | 3 |
| Item 1A. | Risk Factors | 10 |
| Item 1B. | Unresolved Staff Comments | 20 |
| Item 2. | Properties | 20 |
| Item 3. | Legal Proceedings | 21 |
| Item 4. | Submission of Matters to a Vote of Security Holders | 23 |
| **PART II** | | |
| Item 5. | Market for Registrant's Common Equity, Related Stockholder Matters, and Issuer Purchases of Equity Securities | 23 |
| Item 6. | Selected Financial Data | 26 |
| Item 7. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 26 |
| Item 7A. | Quantitative and Qualitative Disclosures about Market Risk | 44 |
| Item 8. | Financial Statements and Supplementary Data | 46 |
| Item 9. | Changes in and Disagreements with Accountants on Accounting and Financial Disclosure | 101 |
| Item 9A. | Controls and Procedures | 101 |
| Item 9B | Other Information | 101 |
| **PART III** | | |
| Item 10. | Directors, Executive Officers, and Corporate Governance | 102 |
| Item 11. | Executive Compensation | 102 |
| Item 12. | Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters | 102 |
| Item 13. | Certain Relationships and Related Transactions and Director Independence | 102 |
| Item 14. | Principal Accounting Fees and Services | 102 |
| **PART IV** | | |
| Item 15. | Exhibits and Financial Statement Schedules | 103 |
| Signatures | | 105 |
| EX-10.12 | | |
| EX-21 | | |
| EX-24 | | |
| EX-31.1 | | |
| EX-31.2 | | |
| EX-32.1 | | |
| EX-32.2 | | |

# FORWARD-LOOKING STATEMENTS

*Unless otherwise indicated, references to "we," "us," or "our" mean Hayes Lemmerz International, Inc., a Delaware corporation, and our subsidiaries. References to fiscal year means the 12-month period commencing on February 1st of that year and ending January 31st of the following year (e.g., fiscal 2008 means the period beginning February 1, 2008, and ending January 31, 2009). This report contains forward looking statements with respect to our financial condition, results of operations, and business. All statements other than statements of historical fact made in this Annual Report on Form 10-K are forward-looking. Such forward-looking statements include, among others, those statements including the words "expect," "anticipate," "intend," "believe," and similar language. These forward looking statements involve certain risks and uncertainties. Our actual results may differ significantly from those projected in the forward-looking statements. Factors that may cause actual results to differ materially from those contemplated by such forward looking statements include, among others: (1) competitive pressure in our industry; (2) fluctuations in the price of steel, aluminum, and other raw materials and our ability to maintain credit terms with our suppliers; (3) changes in general economic conditions; (4) our dependence on the automotive industry (which has historically been cyclical) and on a small number of major customers for the majority of our sales; (5) pricing pressure from automotive industry customers and the potential for re-sourcing of business to lower-cost providers; (6) changes in the financial markets or our debt ratings affecting our financial structure and our ability to borrow money or find alternative sources of additional liquidity; (7) the uncertainties inherent in international operations and foreign currency fluctuations; (8) the impact of a Chapter 11 bankruptcy filing on our business; and (9) the risks described in Section 1A, "Risk Factors." You are cautioned not to place undue reliance on the forward-looking statements, which speak only as of the date of this Annual Report on Form 10-K. We have no duty to update the forward looking statements in this Annual Report on Form 10-K and we do not intend to provide such updates.*

2

**PART I**

**Item 1.** *Business*

Unless otherwise indicated, references to "we," "us," or "our" mean Hayes Lemmerz International, Inc., a Delaware corporation, and our subsidiaries. References to a fiscal year means the 12-month period commencing on February 1st of that year and ending on January 31st of the following year (i.e., "fiscal 2008" refers to the period beginning February 1, 2008 and ending January 31, 2009, "fiscal 2007" refers to the period beginning February 1, 2007 and ending January 31, 2008, and "fiscal 2006" refers to the period beginning February 1, 2006 and ending January 31, 2007).

**Business Overview and Development**

Originally founded in 1908, we are a leading worldwide producer of aluminum and steel wheels for passenger cars and light trucks and of steel wheels for commercial trucks and trailers. We are also a supplier of automotive powertrain components. We have global operations with 23 facilities, including business and sales offices and manufacturing facilities located in 12 countries around the world. We sell our products to every major North American, Japanese, and European manufacturers of passenger cars and light trucks and to commercial highway vehicle customers throughout the world.

Since 2003, we have taken a number of steps to strengthen our competitive position by expanding our operations in low cost countries, divesting non-core assets, rationalizing production capacity, and focusing on improving our operating performance.

In fiscal 2008 we divested our aluminum wheel operations in Hoboken, Belgium. In fiscal 2007 we divested our North American suspension operations in Bristol, Indiana and Montague, Michigan and our aluminum components operations in Tegelen and Nieuw Bergen, The Netherlands and Antwerp, Belgium. We also divested our automotive brake operations in Homer, Michigan and Monterrey, Mexico and our powertrain components facility in Wabash, Indiana. In fiscal 2006 we divested our machining operations in Southfield, Michigan and announced the closure of our technical center in Ferndale, Michigan. In fiscal 2005 we sold a ductile iron foundry in Cadillac, Michigan, a facility in Au Gres, Michigan that designed and manufactured factory equipment, and a business that sold electronic brake controllers for towing vehicles. Also in fiscal 2005 we divested our operations in Berea, Kentucky; Chattanooga, Tennessee; and Mexico City, Mexico (Hub and Drum business), which manufactured hubs and brake drums for commercial highway vehicles.

In November 2005 we acquired an additional 20% interest in Jantas Aluminyum Jant Sanayi ve Ticaret, A.S., a Turkish aluminum wheel joint venture in which we held a 40% interest, which was then merged into Hayes Lemmerz — Inci Jant Sanayi A.S., in which we also hold a 60% interest. In January 2004 we acquired 100% of a cast aluminum wheel plant in Chihuahua, Mexico formerly operated as part of a joint venture in which we were a minority investor. In November 2003 we acquired a 60% interest in Hayes Lemmerz Jantas Jant Sanayi ve Ticaret A.S., a Turkish steel wheel joint venture in which we were a minority investor. In fiscal 2002 we acquired the remaining interest in our South African cast aluminum wheel joint venture in which we previously held a 76% interest. In addition to these acquisitions in low cost countries, we have also invested in our existing facilities in Brazil, India, Thailand, and the Czech Republic.

We closed our facilities in Gainesville, Georgia in fiscal 2008; Huntington, Indiana in fiscal 2006; La Mirada, California and Campiglione, Italy in fiscal 2005; Howell, Michigan in fiscal 2004; and Bowling Green, Kentucky in fiscal 2003. Production at these facilities was transferred to other facilities with excess capacity. We have also focused on continuing to improve operating performance by implementing lean manufacturing and Six Sigma initiatives, centralizing certain accounting, finance, information technology, and other functions, streamlining marketing and general and administrative overhead, and improving internal controls.

**Going Concern Matters**

Our independent registered public accounting firm has included in its report on our consolidated financial statements as of and for the year ended January 31, 2009 an explanatory paragraph indicating substantial doubt

about our ability to continue as a going concern. In addition, in January 2009, we favorably modified the leverage ratio and interest coverage ratio covenants under our New Credit Facilities for the fourth quarter of fiscal 2008 and for each quarter of fiscal 2009 (see Note 8, Bank Borrowings, Other Notes, and Long-Term Debt, to the consolidated financial statements included herein). Absent the amendment, we would have been in default of our covenants as of January 31, 2009. In addition, we expect that we will not be in compliance with the covenants in future quarters. In accordance with Emerging Issues Task Force 86-30 (EITF 86-30), "Classification of Obligations When a Violation Is Waived by the Creditor," we reclassified our debt to current as of January 31, 2009. The lenders under our New Credit Facility have, however, waived defaults under our New Credit Facilities that result from our receipt of such a going concern explanatory paragraph. Our ability to continue as a going concern is dependent upon, among other things, our ability to recapitalize the Company and restructure our outstanding indebtedness pursuant to a voluntary bankruptcy filing under Chapter 11 of the U.S. Bankruptcy Code (Chapter 11).

To that end, we are currently engaged in continuing discussions with the representatives of the lenders under our New Credit Facility, the holders of our Notes, and others regarding a recapitalization of the Company and restructuring of our existing indebtedness through Chapter 11 proceeding, and we have retained legal and financial advisors to assist us in this regard. A majority of the lenders under our New Credit Facility have, subject to approval of the bankruptcy court in connection with Chapter 11, agreed to provide us with debtor-in-possession financing (DIP Financing) in an aggregate amount of up to $100 million ($80 million of which is committed pursuant to the terms and conditions of a commitment letter). A Chapter 11 filing will result in a default under our New Credit Facility, our Notes, and certain of our other debt obligations, and those debts will become automatically due and payable, subject to an automatic stay of any action to collect, assert, or recover a claim against us under applicable bankruptcy law.

We believe that our currently outstanding common stock will have no value and will be cancelled under any plan of reorganization we may propose under Chapter 11. We also believe that the holders of our Notes are unlikely to receive more than a de minimis distribution on account of their interests in the Notes and that such interests could be cancelled under any plan of reorganization we may propose under Chapter 11. The proposed DIP Financing contemplates a plan of reorganization in which the lenders of the DIP Financing will be able to convert their loans under the DIP Financing into substantially all of the equity interests in the newly reorganized entity. There can be no assurance, however, that any agreement regarding a recapitalization and restructuring of the Company under Chapter 11 will be obtained on acceptable terms with the necessary parties. Should the bankruptcy court not approve our proposed DIP Financing, or should we be unable to develop, propose, and implement a successful plan of reorganization, we may be forced to discontinue operations and liquidate the Company.

## Segment Information

We are organized based primarily on markets served and products produced. Under this organizational structure, our operating segments have been aggregated into two reportable segments: Automotive Wheels and Other. The Automotive Wheels segment includes results from our operations that primarily design and manufacture fabricated steel and cast aluminum wheels for original equipment manufacturers in the global passenger car, light vehicle, and heavy duty truck markets. The Other segment includes the results of our powertrain components facility in Nuevo Laredo, Mexico and financial results related to the corporate office and the elimination of certain intercompany activities.

For financial information about each segment, see Management's Discussion and Analysis of Financial Condition and Results of Operations and Note 18, Segment Information to the consolidated financial statements included herein.

## Automotive Wheels Products

Our Automotive Wheels segment includes three principal classes of products: cast aluminum wheels for passenger cars and light trucks, fabricated steel and aluminum wheels for passenger cars and light trucks, and fabricated steel wheels for commercial trucks and trailers.

*Cast Aluminum Wheels for Passenger Cars and Light Trucks*

We design, manufacture, and distribute a full line of cast aluminum wheels to automotive original equipment manufacturers (OEMs) in North America, Europe, South America, South Africa, and Asia. We manufacture aluminum wheels with bright finishes such as GemTech ® machining, clads, and premium paints. Cast aluminum wheel sales for passenger car and light trucks were $602.9 million or 31.7% of total revenues for the fiscal year ended January 31, 2009.

*Europe.*   We are one of the leading suppliers of cast aluminum wheels to the passenger car and light truck markets in Europe, where we also design, manufacture, and distribute a full line of cast aluminum wheels. In Europe, our OEM customers demand a wide variety of styles and sizes of cast aluminum wheels and we maintain substantial capabilities to meet this demand.

*Customers.*   Substantially all of our European cast aluminum wheels are sold to BMW, Daimler, Fiat, Ford, General Motors, Honda, Nissan/Renault, Peugeot, Porsche, Toyota, and Volkswagen.

*Competition.*   Our primary competitors in the European cast aluminum wheel market for passenger cars are Ronal GmbH, Borbet Leichtmetallräder and CMS. The European cast aluminum wheel market is more fragmented than that of North America, with numerous producers possessing varying levels of financial resources and market positions.

*Manufacturing.*   We have four cast aluminum wheel manufacturing facilities in Europe, which are located in Barcelona, Spain; Dello, Italy; Ostrava, Czech Republic; and Manisa, Turkey. We utilize low pressure casting technologies to manufacture aluminum wheels in our European facilities. Engineering, research, and development for our European cast aluminum wheel operations are performed at our Dello, Italy facility.

*North America.*   We also supply cast aluminum wheels to the passenger car and light truck markets in North America where we design, manufacture, and distribute a full line of cast aluminum wheels.

*Customers.*   In fiscal 2008 we sold the majority of our North American cast aluminum wheel production to Chrysler, Ford, Honda, Nissan, and Toyota for use on vehicles produced in North America.

*Competition.*   Our primary competitors in the North American cast aluminum wheel market are Superior Industries International, Inc., Enkei International, Inc., Dicastal, and other suppliers operating in North America and exports from countries such as China.

*Manufacturing.*   We currently have one cast aluminum manufacturing facility in North America located in Chihuahua, Mexico. Engineering, research, and development for our North American cast aluminum operations are performed at our Northville, Michigan facility.

*South America, South Africa, and Asia.*   We also design, manufacture, and distribute a full line of cast aluminum wheels to OEMs in South America, South Africa, and Asia. We operate an office in Japan that provides sales, engineering, and service support for the Japanese wheel market.

*Customers.*   Our largest customers for South American cast aluminum wheels are Ford, Honda, Nissan/Renault, and Toyota. The largest customers for our South African cast aluminum wheels are BMW, Daimler, Toyota, and Volkswagen. The largest customers for our Asian cast aluminum wheels are Nissan and Toyota.

*Competition.*   Our primary competitors in the South American cast aluminum wheel market for passenger cars are Italspeed S.A. and Mangels Industrial S.A. Our primary competitor in the South African cast aluminum wheel market for passenger cars is Borbet. Our primary competitor in the Asian cast aluminum wheel market for passenger cars is Enkei International, Inc.

*Manufacturing.*   In these markets we have cast aluminum wheel manufacturing facilities located near Sao Paulo, Brazil; Johannesburg, South Africa; and Bangkok, Thailand. Engineering, research, and development for our South American, South African, and Asian cast aluminum wheel operations is currently performed at our facilities located in Dello, Italy and Johannesburg, South Africa.

### Fabricated Wheels for Passenger Cars and Light Trucks

We design, manufacture, and distribute fabricated wheels for passenger cars and light trucks in North America, Europe, Asia and South America. Our fabricated wheel products include steel wheels that can be made in drop-center, bead seat attached and full-face designs, in a variety of finishes, including chrome and clads. Fabricated wheel sales for passenger car and light trucks were $678.8 million or 35.6% of total revenues for the fiscal year ended January 31, 2009.

*Europe.*   We design, manufacture, and distribute a full line of fabricated steel wheels to both OEMs and the automotive aftermarket throughout Europe. We are the leading supplier of fabricated steel wheels manufactured in Europe.

*Customers.*   Our principal customers in Europe include Alcar, Daimler, Ford, General Motors, Hyundai, Kia, Porsche, PSA, Renault/Nissan, Toyota, and Volkswagen Group.

*Competition.*   Our principal competitors for the sale of fabricated steel wheels in Europe include Mefro and Magnetto. Ford and Volkswagen also have in house production capabilities.

*Manufacturing.*   We have four fabricated steel wheel manufacturing facilities in Europe, located in Königswinter, Germany; Manresa, Spain; Manisa, Turkey; and Ostrava, Czech Republic. Our Manresa, Spain facility produces wheels for light trucks, recreational vehicles, and vans. Our Manisa, Turkey facility produces wheels for the Turkish market and also exports both OEM and aftermarket wheels to Western Europe. Engineering, research, and development for our European fabricated wheel operations are performed at our facility in Königswinter, Germany.

*North America.*   We design, manufacture, and distribute a full line of fabricated wheels in North America where we are the largest supplier of fabricated steel wheels.

*Customers.*   We sell substantially all of our North American fabricated steel wheels to Chrysler, Ford, General Motors and Nissan.

*Competition.*   Our primary competitors in the North American steel wheel market for passenger cars and light trucks are ArvinMeritor, Inc., Topy Industries Ltd., and Central Manufacturing Company.

*Manufacturing.*   We manufacture fabricated steel wheels in North America at our facility in Sedalia, Missouri. Engineering, research, and development for our North American fabricated wheel operations are performed at our Northville, Michigan facility.

*South America and Asia.*   We design, manufacture, and distribute a full line of fabricated steel wheels to both OEMs and the automotive aftermarket throughout Brazil, Argentina and India. We also import wheels manufactured in Brazil for sale in North America.

*Customers.*   Our principal customers in Brazil and Argentina include Ford, General Motors, PSA, Nissan/Renault, and Volkswagen. Our principal customer in India is Fiat.

*Competition.*   Our principal competitor for the sale of fabricated steel wheels in Brazil and Argentina is ArvinMeritor, Inc. Our principal competitors for the sale of fabricated steel wheels in India include Steel Strips and Wheels India.

*Manufacturing.*   We have one fabricated steel wheel manufacturing facility in South America located near Sao Paulo, Brazil. This facility has its own engineering, research, and development facility. In addition to serving the local market, this facility exports fabricated steel wheels to North America. We have one fabricated steel wheel manufacturing facility in India located in Pune, India, launched at the end of 2008.

### Commercial Highway Wheels

We design, manufacture, and distribute wheels for commercial highway vehicles in North America, Europe, South America, and Asia. Commercial highway wheel sales were $536.8 million or 28.2% of total revenues for the fiscal year ended January 31, 2009.

*Europe.*   We design, manufacture, and distribute steel truck and trailer wheels for sale to manufacturers of commercial highway vehicles in Europe at our facility in Königswinter, Germany and Jantas facility in Manisa, Turkey. In addition, we produce wheels for the forklift truck market at our Ostrava, Czech Republic facility.

*Customers.*   Our principal customers for steel wheels for commercial highway vehicles are Daimler, Ford, Iveco, Man, Paccar, Renault/Nissan, Scania, and Volvo.

*Competition.*   Our principal competitors for the sale of commercial highway wheels in Europe are Mefro and Magnetto.

*Manufacturing.*   In Europe, we manufacture steel truck and trailer wheels at our Königswinter, Germany facility where we produce a variety of wheels for commercial highway vehicles and perform engineering, research, and development for our European commercial highway operations. We also manufacture steel truck and trailer wheels at our facility in Manisa, Turkey.

*North America.*   We manufacture disc wheels and demountable rims for sale to manufacturers of commercial highway vehicles in North America. We also manufacture two-piece, take-apart wheels for certain special applications, including the military's High Mobility Multiple Purpose Wheeled Vehicle (Humvee).

*Customers.*   Our largest customers for commercial highway wheels and rims include Daimler, AM General, Volvo, Hyundai, and Utility Trailer. Our commercial highway wheel and rim sales are to truck and trailer OEMs, original equipment servicers, and aftermarket distributors.

*Competition.*   Our principal competitor for the sale of commercial highway steel wheels and rims is Accuride Corp.

*Manufacturing.*   Wheels and rims for the commercial highway market are produced at our facility in Akron, Ohio. Engineering, research, and development for our commercial highway operations are performed at our Northville, Michigan facility.

*South America and Asia.*   We design, manufacture, and distribute steel truck and trailer wheels to OEMs in South America and Asia.

*Customers.*   Our principal customers for steel wheels for commercial highway vehicles in South America are Daimler and Ford, Our largest customers for steel wheels for commercial highway vehicles in Asia are Tata and Volvo.

*Competition.*   Our principal competitor for the sale of commercial highway wheels in South America is Maxion. Our principal competitor for the sale of commercial highway wheels in Asia is Wheels India.

*Manufacturing.*   We manufacture steel truck and trailer wheels in South America at our Sao Paulo, Brazil facility and in Asia at our Pune, India facility.

## Other Products

The Other segment includes our powertrain components products. We design, manufacture, and distribute a variety of aluminum and polymer powertrain components including engine intake manifolds, engine covers, water crossovers, and ductile iron exhaust manifolds. Our powertrain and engine components are primarily produced and sold in North America.

*Customers.*   We sell most of our powertrain components to Chrysler, Ford, and General Motors. We also sell powertrain components to other Tier 1 suppliers such as General Products, Detroit Diesel, Bosch, Magna, Delphi, & Eaton.

*Competition.*   Our primary competitors in aluminum intake manifolds are Fort Wayne Foundry, Bocar, and DMI. Key competitors in polymer intake manifolds include Mahle, Mann+Hummel Group, Montaplast GmbH, Delphi, and Mark IV Industries.

*Manufacturing.*   Our powertrain component manufacturing facility is located in Nuevo Laredo, Mexico. We conduct engineering, research, and development for our powertrain components operations at our Northville, Michigan facility.

## Material Source and Supply

We purchase most of the raw materials (such as steel and aluminum) and semi-processed or finished items (such as castings) used in the products of both the Automotive Wheels and Other segments from suppliers located within the geographic regions of our operating units. In many cases, these materials are available from several qualified sources in quantities sufficient for our needs. However, shortages of a particular material or part occasionally occur and metal markets can experience significant pricing and supply volatility. In addition, particularly with respect to semi-processed or finished items, changing suppliers may require the approval of our customers, which can involve significant time and expense.

In recent periods there has been significant volatility in the global prices of steel, which have had and may continue to have an impact on the business of both the Automotive Wheels and Other segments. We have been able to largely offset the impact of steel cost increases through higher scrap sales recoveries and by passing some of these costs through to certain of our customers, although we may not be able to continue to do so in the future. The full impact of steel prices is uncertain given the volatility in the global steel market.

Aluminum costs have also been volatile in recent periods. However, our contracts with customers generally provide that the prices of the products are based on established aluminum price indices. This generally allows us to largely pass along the increased costs of aluminum to our customers. Conversely, our prices to our customers would decrease should the costs of aluminum decrease.

To enable us to better manage our supply chain, we purchase key materials through a centralized materials and logistics function.

A Chapter 11 proceeding could result in the loss of a significant amount of trade credit from our suppliers or a refusal to ship products without advance payment.

## Intellectual Property

We believe we are an industry leader in product and process technology. We own significant intellectual property including numerous U.S. and foreign patents, trade secrets, trademarks, and copyrights. The protection of this intellectual property is important to our business. Our policy is to seek statutory protection for all significant intellectual property embodied in patents and trademarks. We rely on a combination of patents, trade secrets, trademarks, and copyrights to provide protection in this regard. From time to time, we grant licenses under our patents and technology and receive licenses under patents and technology of others.

Although intellectual property is important to our business operations and in the aggregate constitutes a valuable asset, we do not believe that any single patent, trade secret, trademark, copyright, or group thereof is critical to the success of the business.

## Seasonality

Although our business is not seasonal in the traditional sense, July (in North America), August (in Europe), and December are usually lower sales months because OEMs typically perform model changeovers or take vacation shutdowns during the summer, and assembly plants typically are closed for a period from shortly before the year-end holiday season until after New Year's Day.

## Working Capital

The most significant elements of our working capital are cash and cash equivalents, inventory, accounts receivable, and accounts payable. We, and the automotive supply industry, generally operate on a "just in time" basis and typically do not maintain large inventories of raw materials, work-in-process, or finished goods. Materials are ordered and finished products are produced based on customer orders. Payment terms on accounts receivable

and accounts payable vary by country and typically range from 30 to 60 days in the U.S. and 30 to 90 days elsewhere. We maintain accounts receivable securitization or financing programs in several countries where we have operations to enable us to more quickly convert a portion of our receivables into cash.

**Customer Dependence**

In fiscal 2008, our most significant customers were Ford and General Motors, which accounted for approximately 29% of our fiscal 2008 net sales on a worldwide basis, while sales to these customers in the U.S. accounted for approximately 12% of total sales in fiscal 2008. Other significant customers include Daimler, Renault/Nissan, Toyota, and Volkswagen. A Chapter 11 proceeding, particularly if the bankruptcy court does not approve our proposed DIP Financing, could result in the loss of a significant amount of sales and accounts receivables with our key customers.

Ford and General Motors are currently facing significant financial difficulties, which could result in significantly reduced sales and accounts receivables with these customers. The loss of a major portion of sales to any of our significant customers, including Ford and General Motors, could have a material adverse impact on our business. We have been doing business with each of our significant customers for many years, and sales are composed of a number of different product lines and of different part numbers within product lines and are made to individual divisions of such customers. In addition, we supply products to many of these customers in multiple geographic locations, which reduces our reliance on any single market.

**Backlog**

Generally, our products are not on a backlog status. Products are produced from readily available materials, have a relatively short manufacturing cycle, and have short customer lead times. Each operating unit maintains its own inventories and production schedules.

**Competition**

The major domestic and foreign markets for our products are highly competitive. Competition is based primarily on price, quality, delivery, technology, and overall customer service. Competitors typically vary among each of our products and geographic markets. The significant competitors for each of our product lines are discussed above under "Automotive Wheels Products" and "Other Products."

**Research and Development**

We engage in ongoing engineering, research, and development activities to improve the reliability, performance, and cost-effectiveness of our existing products and to design and develop new products for existing and new applications. Our spending on engineering, research, and development programs was $12.4 million for the fiscal year ended January 31, 2009, $9.6 million for the fiscal year ended January 31, 2008, and $4.4 million for the fiscal year ended January 31, 2007.

**Environmental Compliance**

We believe we are in material compliance with all environmental laws, ordinances, and regulations. All of our manufacturing facilities worldwide have implemented comprehensive environmental management systems and are registered under ISO 14001. We do not anticipate any material capital expenditures for environmental compliance or any adverse effect on our earnings or competitive position as a result of environmental matters.

**Employees**

At March 31, 2009, we had approximately 6,400 employees. We consider our relations with our employees to be good.

**Financial Information about Geographic Areas**

We currently have operations in 12 countries including the U.S., Germany, Italy, Spain, Czech Republic, Turkey, Brazil, South Africa, Mexico, Thailand, India, and Japan. We operate four facilities in the U.S. and 19 facilities in foreign countries. Of our foreign operations, 18 facilities are part of the Automotive Wheels segment and one is part of the Other segment.

As we do not prepare consolidated financial statements by country, providing a breakdown of long-lived assets by geographic areas in which we operate is impracticable. The following table sets forth revenues from external customers attributable to the U.S. and other foreign countries from which we derive revenues and is based on external sales by plant location (dollars in millions):

|  | Year Ended January 31, | | |
|---|---|---|---|
|  | **2009** | **2008** | **2007** |
| **Revenues:** | | | |
| Germany | $ 346.0 | $ 355.5 | $ 264.7 |
| United States | 339.1 | 435.6 | 454.8 |
| Brazil | 274.8 | 241.2 | 191.7 |
| Czech Republic | 213.9 | 239.7 | 193.9 |
| Turkey | 207.9 | 201.6 | 126.3 |
| Other foreign countries | 522.6 | 653.1 | 565.4 |
| Total | $1,904.3 | $2,126.7 | $1,796.8 |

Our Automotive Wheels segment is substantially dependent upon foreign operations. In fiscal 2008 approximately 84% of the net sales of the Automotive Wheels segment were from foreign operations. For a discussion of the risks attributable to foreign operations, see Item 1A, Risk Factors, "We have significant international operations that subject us to risks not faced by domestic competitors."

**Available Information**

Our internet website address is www.hayes-lemmerz.com . Our annual reports on Form 10-K, quarterly reports on Form 10-Q, current reports on Form 8-K, and any amendments to those reports filed or furnished pursuant to section 13(a) or 15(d) of the Exchange Act are available free of charge through our website as soon as reasonably practicable after those reports are electronically filed with, or furnished to, the SEC.

**Item 1A.** *Risk Factors.*

**Risks Related to our Ability to Continue as a Going Concern**

*Our independent registered public accounting firm has included an explanatory paragraph with respect to our ability to continue as a going concern in its report on our consolidated financial statements for the year ended January 31, 2009.*

Our independent registered public accounting firm has included in its report on our consolidated financial statements as of and for the year ended January 31, 2009 an explanatory paragraph indicating substantial doubt about our ability to continue as a going concern. In addition, in January 2009, we favorably modified the leverage ratio and interest coverage ratio covenants under our New Credit Facilities for the fourth quarter of fiscal 2008 and for each quarter of fiscal 2009. Absent the amendment, we would have been in default of our covenants as of January 31, 2009. In addition, we expect that we will not be in compliance with the covenants in future quarters. In accordance with EITF 86-30, we reclassified our debt to current as of January 31, 2009. The lenders under our New Credit Facility have waived defaults under our senior credit facility that result from our receipt of this going concern explanatory paragraph. However, we currently do not have sufficient funds to continue as a going concern through May 2009 and are engaged in discussions with representatives of the lenders under our New Credit Facility, the holders of our Notes, and others regarding a recapitalization of the Company and restructuring of our existing indebtedness through a Chapter 11 proceeding. The presence of the going concern explanatory paragraph and any

bankruptcy proceedings may adversely affect our relationship with third parties with whom we do business, including our customers, vendors, and employees, which could have a material adverse effect on our business, results of operations, financial condition, and prospects. In addition, if the bankruptcy court does not approve our proposed DIP Financing and any plan of reorganization we propose, or if we cannot reach an acceptable agreement with our creditors to recapitalize the Company and propose and implement a successful plan of reorganization, we may be unable to continue as a going concern, and we may be forced to discontinue operations and liquidate the Company.

### *If we are unable to successfully recapitalize the Company and restructure our indebtedness under Chapter 11, we may be forced to liquidate the Company.*

We are currently engaged in discussions with the representatives of the lenders under our New Credit Facility, the holders of our Notes, and others regarding a recapitalization of the Company and restructuring of our existing indebtedness through a Chapter 11 proceeding. A majority of the lenders under our New Credit Facility have, subject to approval of the bankruptcy court in which we file petitions under Chapter 11, agreed to provide us with DIP Financing in an aggregate amount of up to $100 million ($80 million of which is committed pursuant to the terms and conditions of a commitment letter). There can be no assurance that the amounts of cash from operations, together with amounts available under the proposed DIP Financing, will be sufficient to fund our operations. In the event that cash flows and available borrowings under the proposed DIP Financing are not sufficient to meet our liquidity requirements, we may be required to seek additional financing. There can be no assurance that such additional financing will be available or, if available, will be offered on acceptable terms. Failure to secure any necessary additional financing would adversely affect our operations and may even force us to discontinue operations.

### *We expect to file for bankruptcy protection, and, if we do, our business and operations will be subject to various risks.*

A bankruptcy filing by us or any of our subsidiaries would subject our business and operations to various risks, including the following:

- a bankruptcy filing would increase the difficulty of our obtaining additional financing and would likely result in the loss of a significant portion of our accounts receivable financing programs;

- the coordination of a bankruptcy filing and operating under protection of the bankruptcy court would involve significant costs, including expenses of legal counsel and other professional advisors;

- we will have difficulty obtaining and maintaining trade credit and payment terms with suppliers and contracts necessary to continue our operations and at affordable rates with competitive terms;

- customers may move business to other suppliers, particularly if they experience any disruptions in our ability to deliver products;

- transactions outside the ordinary course of business would be subject to the prior approval of the bankruptcy court, which may limit our ability to respond timely to certain events or take advantage of certain opportunities;

- we may not be able to obtain court approval or such approval may be delayed with respect to motions made in the reorganization cases;

- we may be unable to retain and motivate key executives and employees through the process of reorganization, and we may have difficulty attracting new employees;

- there can be no assurance as to our ability to maintain or obtain sufficient financing sources for operations or to fund any reorganization plan and meet future obligations;

- there can be no assurance that we would be able to successfully develop, prosecute, confirm, and consummate one or more plans of reorganization that are acceptable to the bankruptcy court and our creditors, equity holders, and other parties in interest; and

11

- our common stock is likely to cease to be listed on a national securities exchange, which will make it difficult for stockholders and investors to sell our common stock or to obtain an accurate quotation of the price of our common stock.

In addition, we believe that our currently outstanding common stock will have no value and will be cancelled under any plan of reorganization we may propose under Chapter 11. We also believe that the holders of our Notes are unlikely to receive more than a de minimis distribution on account of their interests in the Notes and that such interests could be cancelled under any plan of reorganization we may propose under Chapter 11. There can be no assurance, however, that any agreement regarding the recapitalization and restructuring of the Company under Chapter 11 will be obtained on acceptable terms with the necessary parties. Should the bankruptcy court not approve our proposed DIP Financing, or should we be unable to develop, propose, and implement a successful plan of reorganization, we may be forced to discontinue operations and liquidate the Company.

Our continuation as a going concern would be dependent upon, among other things, our ability to obtain approval of the proposed DIP Financing and to develop, obtain confirmation or approval of, and implement a comprehensive restructuring plan; generate cash from operations, maintain adequate cash on hand and obtain sufficient other financing during any Chapter 11 proceedings and thereafter; resolve ongoing issues with creditors and other third parties; and return to profitability. Even assuming a successful emergence from any Chapter 11 proceedings, there could be no assurance as to the long-term viability of all or any part of our business. In addition, a long period of operating under Chapter 11 of the Bankruptcy Code may exacerbate the potential harm to our business and further restrict our ability to pursue certain business strategies or require us to take actions that we otherwise would not. These challenges are in addition to business, operational, and competitive challenges that we would normally face even absent any Chapter 11 proceedings.

### During the pendency of any Chapter 11 proceedings, our financial results may be unstable and may not reflect historical trends.

During the pendency of any Chapter 11 proceedings to which we may be subject, our financial results may fluctuate as they reflect asset impairments, asset dispositions, restructuring activities, contract terminations and rejections, and claims assessments. As a result, our historical financial performance may not be indicative of our financial performance following the date on which we file voluntary petitions under Chapter 11. Further, we may sell or otherwise dispose of assets or businesses and liquidate or settle liabilities, with court approval, for amounts other than those reflected in our historical financial statements. Any such sale or disposition and any comprehensive restructuring plan could materially change the amounts and classifications reported in our historical consolidated financial statements, which do not give effect to any adjustments to the carrying value of assets or amounts of liabilities that might be necessary as a consequence of a comprehensive restructuring plan.

## Risks Related to our Business and the Automotive Industry

### Our business depends on the automotive industry, and reductions in the demand for new vehicles will adversely affect our business.

Most of our sales are to automotive and commercial vehicle original equipment manufacturers (OEMs). Therefore, our financial performance is subject to conditions in the automotive industry, which are cyclical and generally depend on conditions in the U.S. and global economies. In North America and elsewhere, the automotive industry is currently characterized by significant overcapacity, fierce competition, rapidly declining sales and production volumes, and high fixed costs. General Motors has indicated that there is substantial doubt about its ability to continue as a going concern, and Chrysler has sought protection under federal bankruptcy laws. During the second half of fiscal 2008, the weakening of the U.S. and global economies and limited availability of commercial and consumer credit resulted in significant reductions in consumer and capital spending and in the demand for automobiles, light trucks, and commercial vehicles. These conditions have led to decreased production by our customers, which in turn have adversely affected our sales and financial performance during the fiscal year. Demand for new vehicles may be adversely affected by other factors that are beyond our control, such as interest rates, the availability of credit and levels of disposable income. Our sales are also affected by our customers' inventory levels and production schedules. Because of the present uncertainty in the economy, some of our

customers have been reducing their forecasts for new vehicle production in future periods. Decreases in demand for new vehicles or in new vehicle production may have a significant negative impact on our business. Because we have high fixed production costs, relatively small declines in our customers' production could significantly reduce our profitability. A prolonged downturn in the North American or European automotive industries or a significant change in product mix due to consumer demand could require us to further slow production in, or shut down, plants or incur impairment charges.

### *We depend on a small number of significant customers.*

We derived approximately 29% of our fiscal 2008 sales from direct sales to Ford and General Motors and their subsidiaries globally and 12% of our fiscal 2008 sales from sales to these OEM's in the U.S.. In addition, our five largest customers (Ford, General Motors, Renault/Nissan, Daimler, and Toyota) and their subsidiaries accounted for approximately 54% of our global sales in fiscal 2008. Ford and General Motors are currently facing significant financial difficulties, which could result in significantly reduced sales and receivables with these customers. Our sales also depend on the particular vehicle platforms that include our products. If production of those vehicle platforms were to be decreased or discontinued, our sales would be reduced.

A Chapter 11 proceeding, particularly if the bankruptcy court does not approve our proposed DIP Financing, could result in the loss of a significant amount of sales and accounts receivables with our key customers. The loss of a significant portion of sales to any of our significant customers could have a material adverse effect on our business. In addition, certain of our customers are currently facing significant financial challenges and may file for bankruptcy protection in the future. This could result in adverse changes in these customers' production levels, pricing, and payment terms and could limit our ability to collect receivables, which could harm our business or results of operations.

### *Our customers' cost cutting efforts and purchasing practices may adversely impact our business.*

Our customers are continually seeking to lower their costs of manufacturing, particularly in light of their current financial challenges. These cost reductions may reduce the amount we receive for sales of our products and may include relocation of our customers' operations to countries with lower production costs. Customers might find it less costly to manufacture themselves at relocated facilities or to rely on foreign suppliers with lower production costs, whether or not the customers' production is relocated, either of which may have a significant negative impact on our business. Changes in our customers' purchasing policies or payment practices could also have an adverse effect on our business.

### *We operate in the highly competitive automotive supply industry.*

The automotive supply industry is highly competitive, both domestically and internationally, with a large number of suppliers competing to provide products to a relatively small number of OEMs. Competition is based primarily on price, quality, timely delivery, and overall customer service. Many of our competitors are larger and have greater financial and other resources than we do. Further consolidation in the industry may result in fewer, larger suppliers who benefit from purchasing and distribution economies of scale. We may not be able to compete successfully with these or other companies.

Furthermore, the rapidly evolving nature of the automotive industry may attract new entrants, particularly in low cost countries such as China. We may not be able to offer our products at prices competitive with those of competitors in low-cost countries and pricing pressure created by such competitors could reduce our sales and margins. These factors have led to a re-sourcing of certain future business to foreign competitors in the past and may continue to do so in the future. In addition, any of our competitors may develop superior products, produce similar products at a lower cost than we do, or adapt more quickly to new technologies or evolving customer requirements. As a result, our products may not be able to compete successfully. A number of our competitors have been forced to seek bankruptcy protection partially as a result of highly competitive market conditions in our industry.

### *We may be unable to maintain trade credit with our suppliers.*

We currently maintain trade credit with certain of our key suppliers and utilize such credit to purchase significant amounts of raw material and other supplies with payment terms and our ability to continue to do so is critical to our ability to maintain adequate liquidity. As conditions in the automotive supply industry have become less favorable, credit insurance, which is used by suppliers to manage their payment risk in connection with providing payment terms, has become significantly more expensive or unavailable. As a result, key suppliers have been seeking to shorten trade credit terms, reduce credit limits, or require cash in advance for payment. If we commence a Chapter 11 proceeding, our key suppliers may seek to further restrict or eliminate our ability to obtain trade credit, or they may require payment on more restricted terms, particularly if we are unable to obtain court approval of our proposed DIP Financing. If a significant number of our key suppliers were to shorten or eliminate our trade credit, our inability to finance large purchases of key supplies and raw materials would increase our costs and negatively impact our liquidity and cash flow, which could have a material adverse effect on our business, results of operations, or financial condition and on our ability to successfully restructure our existing indebtedness.

### *Increased cost of supplies and raw materials could affect our financial health.*

Our business is subject to the risk of price increases and periodic delays in the delivery of raw materials and supplies. The availability and price of these commodities are subject to market forces largely beyond our control. Fluctuations in prices or availability of these raw materials or supplies will affect our profitability and could have a material adverse effect on our business, results of operations, or financial condition. In addition, if any of our suppliers seek bankruptcy relief or otherwise cannot continue their business as anticipated, the availability or price of raw materials could be adversely affected.

In recent periods there has been significant volatility in the global prices of steel, aluminum, and natural gas, which have had an impact on our business. Continued volatility in the price of steel, aluminum, natural gas, or other key materials and supplies may have a material adverse effect on our business, results of operations, or financial condition. Although we have been able to pass some of the supply and raw material cost increases onto our customers in the past, current competitive and marketing pressures may prevent us from doing so in the future. In addition, our customers are not contractually obligated to accept certain of these price increases and, in light of current market conditions, they may be less likely to accept the increases currently and in the future than they have been in the past. Moreover, we sometimes use fixed-forward contracts to hedge against fluctuations in the prices of certain commodities, which could result in our paying greater than market prices for these commodities. Where we pass through the costs of raw materials to our customers, customer pricing will decrease as raw material market prices decrease, regardless of the cost of our fixed forward contracts. For example, we generally enter into fixed-forward contracts for aluminum based on volume projections from our customers that coincide with the applicable pass through pricing adjustment periods. In recent periods, customer volumes have decreased significantly relative to their projections while at the same time market prices for aluminum have fallen sharply. As a result, we have fixed-forward contracts for aluminum based on projected volumes at prices that are well above current market levels, while the amount of the cost we can pass through to the customer has decreased to reflect the lower market cost. This potential inability to pass on price increases to our customers could adversely affect our operating margins and cash flow and result in lower operating income and profitability.

### *The financial distress of our suppliers could harm our results of operations.*

The conditions in the automotive industry have adversely affected our supplier base. Continued financial distress among our supply base could lead to commercial disputes, write offs and possibly supply chain interruptions. The continuation or worsening of conditions in the supply base could have a material adverse effect on our business, financial condition, or results of operations.

*We have significant international operations that subject us to risks not faced by domestic competitors.*

Approximately 82% of our consolidated net sales in fiscal 2008 were from operations outside the U.S.. We expect sales from our international operations to continue to represent a substantial and growing portion of our business. Risks inherent in international operations include the following:

- agreements may be difficult to enforce and receivables difficult to collect through a foreign country's legal system;

- foreign customers may have longer payment cycles;

- foreign countries may impose additional withholding taxes or otherwise tax our foreign income, impose tariffs, or adopt other restrictions on foreign trade or investment, including foreign exchange controls;

- foreign laws or regulations may restrict our ability to repatriate cash from foreign operations;

- necessary export licenses or customs clearances may be difficult to obtain;

- intellectual property rights may be more difficult to enforce in foreign countries;

- political or economic conditions or exposure to local social unrest, including any resultant acts of war, terrorism, violence related to criminal activities such as drug trafficking, or similar events in the countries in which we operate could have an adverse effect on our earnings from operations in those countries;

- unexpected adverse changes in foreign laws or regulatory requirements may occur;

- compliance with a variety of foreign laws and regulations may be difficult;

- in certain countries we are subject to nationwide collective labor agreements that we did not negotiate;

- labor laws in certain countries may make it more difficult or expensive to reduce our labor force in response to reduced demand;

- differing foreign tax structures may subject us to additional taxes or affect our ability to repatriate cash from our foreign subsidiaries;

- fluctuations in exchange rates between the operating currencies of our international operations relative to the U.S. dollar may adversely affect the value of our international assets and results of operations as reported in U.S. dollars, as well as the comparability of period-to-period results of operations; and

- an inability to use the proposed DIP Financing to fund our foreign operations could result in local insolvency proceedings in certain foreign jurisdictions.

Any of these factors could have a material adverse effect on our business, cash flows, financial condition, and results of operations.

*Unexpected equipment failures, delays in deliveries, or catastrophic loss at any of our manufacturing facilities could lead to production curtailments or shutdowns.*

Equipment failure, interruption of supply, labor disputes, or other causes could significantly reduce production of our products, which would reduce our sales and earnings for the affected period. In addition, we generally produce our products on a "just in time" basis and do not hold large inventories. If production is interrupted at any of our manufacturing facilities, even if only temporarily or as a result of events that are beyond our control, delivery times could be severely affected. Any significant delay in deliveries to our customers could lead to returns or cancellations and cause us to lose future sales, as well as expose us to claims for damages. Our manufacturing facilities are also subject to the risk of catastrophic loss due to unanticipated events such as fires, explosions, or violent weather conditions. We have in the past and may in the future experience plant shutdowns or periods of reduced production as a result of equipment failure, power outages, and delays in deliveries, or catastrophic loss, which could have a material adverse effect on our results of operations or financial condition.

### *We may not be able to successfully implement our planned operational improvements or realize the benefits of those plans already implemented.*

As part of our ongoing focus on being a low-cost provider of high quality products, we continually analyze our business to further improve our operations and identify cost-cutting measures. If we do not identify and implement operational improvements or if implemented improvements do not generate the expected benefits, we may be unable to offer products at a competitive price and generate sufficient operating funds to service our debt or make necessary capital expenditures. If that were to happen, alternative sources of financing may not be available to us on commercially reasonable terms or at all.

### *We may not be able to timely or successfully launch new products.*

In order to effectively compete in the automotive supply industry, we must be able to launch new products to meet our customers' demand. As a result of our currently liquidity situation and covenants limiting the amount of our capital expenditures, we may not be able to make the investments needed to launch production of new products. We may not be able to install and obtain customer approval of the equipment needed to produce products for new programs in time for the start of production. In addition, transitioning our manufacturing facilities and resources to full production under new product programs may impact production rates or other operational efficiency measures. Moreover, our customers may delay or cancel the launch of new product programs or actual production may be below planned quantities. Our failure to successfully launch new products, or a failure by our customers to successfully launch new programs in the quantities anticipated, could adversely affect our results.

### *Our success will depend on our ability to attract and retain qualified employees.*

Our successes depend in part on our ability to attract, hire, train, and retain qualified engineering, managerial, technical, sales, and marketing personnel. We face significant competition for these types of employees. Our current financial condition creates uncertainty that may lead to an increase in unwanted attrition and may affect our ability to attract and retain qualified new employees. Additionally, as conditions in the automotive industry decline and we implement measures to improve our cost structure, employee morale may suffer. We may be unsuccessful in attracting and retaining the personnel we require and key personnel may leave and compete against us. We may be unsuccessful in replacing key managers who either resign or retire. The loss of any member of our senior management team or other experienced, senior employees could impair our ability to execute our business plan, including the restructuring of our indebtedness, cause us to lose customers and reduce our sales, or lead to the loss of other key employees. In any such event, our financial condition, results of operations, and cash flows could be adversely affected.

### *We might fail to adequately protect our intellectual property or third parties might assert that our technologies infringe on their intellectual property.*

We rely on a combination of patents, trade secrets, trademarks and copyrights to protect our intellectual property, but this protection might be inadequate. For example, our pending or future patent applications might not be approved or, if allowed, they might not be of sufficient strength or scope. Conversely, third parties might assert that our technologies infringe their proprietary rights. We are currently involved in litigation in which the plaintiff has asserted that we have infringed on its patents. This litigation, and possible future litigation, could result in substantial costs and diversion of our efforts and could adversely affect our business, whether or not we are ultimately successful. For more information on this litigation, see the section entitled "Legal Proceedings."

### *Our products may be rendered obsolete or less attractive by changes in regulatory requirements or competitive technologies.*

Changes in legislative, regulatory or industry requirements or in competitive technologies may render certain of our products obsolete or less attractive. Our ability to anticipate changes in technology and regulatory standards and to successfully develop and introduce new and enhanced products on a timely basis will be a significant factor in our ability to remain competitive. Certain of our products may become obsolete and we may not be able to achieve the technological advances necessary for us to remain competitive. We are also subject to the risks generally

16

associated with new product introductions and applications, including lack of market acceptance, delays in product development, and failure of products to operate properly.

### *A high percentage of our customers' employees and certain of our employees are unionized or covered by collective bargaining agreements.*

Many employees of our major customers and certain of our employees are unionized. Certain of our employees in the U.S. are represented by the United Steel Workers Union, all of whom are employed at our facility in Akron, Ohio. Our current contract with the United Steel Workers Union expires in fiscal 2010. As is common in Mexico and many European jurisdictions, substantially all of our employees in Europe and Mexico are covered by country-wide collective bargaining agreements, which are subject to negotiations on an annual basis. Although we believe that our relations with our employees are good, a dispute between us and our employees could have a material adverse effect on our business. In addition, significant percentages of the workforces at certain of our major customers and their suppliers are unionized. Strikes or labor disputes at a major customer or one of their key suppliers could result in reduced production of vehicles incorporating our products. This would reduce demand for our products and could have a material adverse effect on our sales and results of operations during the affected periods.

### *We are subject to potential exposure to environmental liabilities.*

We are subject to various foreign, federal, state, and local environmental laws, ordinances, and regulations, including those governing discharges into the air and water, the storage, handling and disposal of solid and hazardous wastes, the remediation of contaminated soil and groundwater, and the health and safety of our employees. We are also required to obtain permits from governmental authorities for certain operations. We may not be in complete compliance with these permits at all times. If we fail to comply with these permits, we could be fined or otherwise sanctioned by regulators and the fine or sanction could be material. The nature of our operations and the history of industrial uses at some of our facilities expose us to the risk of environmental liabilities that could have a material adverse effect on our business. For example, we may be liable for the costs of removal or remediation of contamination that may be present on our property, even if we did not know about or cause the contamination and even if the practices that resulted in the contamination were legal when they occurred.

### *We may suffer future asset impairments and other restructuring charges, including write downs of goodwill or intangible assets.*

We record asset impairment losses when we determine that our estimates of the future undiscounted cash flows from an operation will not be sufficient to recover the carrying value of that facility's building, fixed assets, and production tooling. During fiscal 2008 we recorded asset impairment losses, other restructuring charges, and facility exit costs of $22.2 million and goodwill and other intangible asset impairments of $238 million and we may incur significant similar losses and charges in the future. In connection with our emergence from Chapter 11 in 2003 and the application of fresh start accounting, we recorded significant increases in goodwill and intangible assets. At January 31, 2009 we had approximately $112.4 million in other intangible assets recorded on our Consolidated Balance Sheets. We are required to evaluate annually whether our goodwill and other intangible assets have been impaired or are not recoverable. Future market conditions may indicate that these assets are not recoverable based on changes in forecasts of future business performance and the estimated useful life of these assets, and this may trigger further write-downs of these assets. Any future write-off of a significant portion of our intangible assets would have an adverse effect on our financial condition and results of operations.

### *The nature of our business exposes us to product liability, recall, and warranty claims and other legal proceedings.*

We are subject to litigation in the ordinary course of our business. The risk of product liability, recall, and warranty claims are inherent in the design, manufacture, and sale of automotive products, the failure of which could result in property damage, personal injury, or death. Although we currently maintain what we believe to be suitable and adequate product liability insurance, we may not be able to maintain this insurance on acceptable terms and this insurance may not provide adequate protection against potential liabilities. In addition, we may be required to participate in a recall involving our products. Such a recall would not be covered by our insurance. Furthermore, our

17

customers can initiate a recall of our products without our agreement and offset their costs of the recall against payments due to us for other products. A successful product liability claim in excess of available insurance coverage or a requirement to participate in a product recall could have a material adverse effect on our business. In addition, we are involved in other legal proceedings, which could adversely affect our cash flows, financial condition, or results of operations.

### *Our pension and other postretirement employee benefits expense could materially increase.*

Certain of our current and former employees participate in defined benefit pension plans. The plans are currently underfunded. Declines in interest rates or the market values of the securities held by the plans, or certain other changes, could materially increase the amount by which the plans are underfunded, affect the level and timing of required contributions, and significantly increase our pension expenses and reduce profitability. The value of the securities held by the plans have decreased significantly during the past fiscal year, significantly increasing the amount by which the plans are underfunded. We also sponsor other postretirement employee benefit plans that cover certain current and former employees and eligible dependents. We fund these obligations on a pay-as-you-go basis. Increases in the expected cost of the benefits, particularly health care, in excess of our assumptions could increase our actuarially determined liability and related expense along with future cash outlays.

## Risks Related to Our Capital Structure

### *We have substantial levels of debt and debt service that divert a significant amount of cash from our business operations.*

We have substantial levels of debt, including debt under our New Credit Facility and Notes and other debt instruments. As of January 31, 2009 we had approximately $731.5 million of total indebtedness, which includes our debt, letters of credit, and bank guarantees, and our cash and cash equivalents were approximately $107.5 million. A Chapter 11 filing will result in a default under our New Credit Facility, our Notes, and certain of our other debt obligations, and those debts will become automatically due and payable, subject to an automatic stay of any action to collect, assert, or recover a claim against us under applicable bankruptcy law. In addition to the debt under our New Credit Facility and under the Notes, we may incur significant additional debt in the future, including the proposed DIP Financing. The degree to which we are leveraged could have important consequences, including:

- requiring a substantial portion of our cash flow from operations to be dedicated to debt service and therefore not available for our operations, capital expenditures, and future business opportunities;

- increasing our vulnerability to a downturn in general economic conditions or in our business;

- limiting our ability to adjust to changing market conditions, placing us at a competitive disadvantage compared to our competitors that have relatively less debt; and

- limiting our ability to obtain additional financing or access additional funds under our New Credit Facility for capital expenditures, working capital, or general corporate purposes.

### *We may be unable to refinance, extend, or otherwise restructure our indebtedness.*

We are currently engaged in discussions with representatives of the lenders under our New Credit Facilities, the holders of our Notes, and others regarding a recapitalization of the Company and restructuring of our existing indebtedness through a Chapter 11 proceeding. A majority of the lenders under our New Credit Facilities have, subject to approval of the bankruptcy court in which we file petitions under Chapter 11, agreed to provide us with DIP Financing in an aggregate amount of up to $100 million ($80 million of which is committed pursuant to the terms and conditions of a commitment letter). There can be no assurance, however, that any agreement regarding a recapitalization and restructuring of the Company under Chapter 11 will be obtained on acceptable terms with the necessary parties. Should the bankruptcy court not approve our proposed DIP Financing, or should we be unable to develop, propose, and implement a successful plan of reorganization, we may be forced to discontinue operations and liquidate the Company.

18

*Restrictions and covenants in the indenture governing the Notes and the New Credit Facility limit our ability to take certain actions, and we may be unable to comply with these obligations.*

Our New Credit Facility, the indenture under which the Notes have been issued, and our other debt agreements contain a number of significant covenants that affect our ability to operate our business, including, among other things, covenants that restrict our ability, and the ability of our subsidiaries, to:

- make capital expenditures

- declare dividends or redeem or repurchase capital stock;

- cancel, prepay, redeem, or repurchase debt;

- incur liens and engage in sale-leaseback transactions;

- make loans and investments;

- incur indebtedness;

- amend or otherwise alter certain debt documents;

- engage in mergers, acquisitions, and asset sales;

- enter into transactions with affiliates; and

- alter the business we conduct.

In addition, our New Credit Facility requires us to satisfy certain financial covenants. These covenants may prevent us from accessing any revolving credit line and may limit our liquidity. Compliance with the covenants could cause us to conduct our business, or to forgo opportunities, in such a manner as to materially harm our business.

If we are unable to comply with the covenants under any of our debt instruments, there would be an event of default that could result in acceleration of our debt and potentially in our bankruptcy. Additionally, a default resulting from our failure to comply with such covenants or the applicable borrowing conditions would preclude us from borrowing additional funds. While the lenders under our New Credit Facility waived defaults under the New Credit Facility that result from our receipt of the going concern explanatory paragraph of our consolidated financial statements, there can be no assurance that they will waive any other possible defaults.

A Chapter 11 filing will result in a default under our New Credit Facilities, our Notes, and certain of our other debt obligations, and those debts will become automatically due and payable, subject to an automatic stay of any action to collect, assert, or recover a claim against us under applicable bankruptcy law. In addition, the proposed DIP Financing contains certain highly restrictive covenants that require us, among other things, to maintain our corporate existence, make certain payments, perform our obligations under existing agreements, purchase insurance, and provide financial records. The proposed DIP Financing also limits or prohibits our ability to incur indebtedness, make prepayments on or purchase indebtedness in whole or in part, pay dividends, make investments, lease properties, create liens, consolidate or merge with another entity (or allow one of our subsidiaries to do so), sell assets, and acquire facilities or other businesses. There can be no assurance that we will be able to comply with these and other restrictive covenants in the proposed DIP Financing. Furthermore, any advances under the proposed DIP Financing are at the discretion of the lenders under the DIP Financing, and these lenders may decide not to provide additional financing.

*We do not generate sufficient cash flow to operate our business and fund required capital expenditures, and we will accordingly need additional financing in the future, which we may be unable to obtain.*

Our business requires us to make significant capital expenditures to acquire equipment needed to produce products for new customer programs, maintain existing equipment, and implement technologies to reduce production costs in response to customer pricing pressure. In addition, lower sales or unanticipated expenses could give rise to additional financing requirements. We currently do not generate sufficient cash flow from operations to fund future capital expenditure requirements and operate our business. As a result, we will need to

successfully restructure our current debt in a Chapter 11 proceeding. To successfully recapitalize the Company and restructure our indebtedness, we will need the proposed DIP Financing to be approved by the bankruptcy court in which we may file petitions under Chapter 11. If available borrowings under the DIP Facility are not sufficient to meet our cash requirements, we may be required to obtain additional financing or take other steps to reduce expenses or generate cash. There can, however, be no assurance that additional financing will be available or, if it is available, that it will be offered on acceptable terms. If we file for protection under Chapter 11 of the Bankruptcy Code, our access to additional financing will likely be very limited. If adequate funds are not available on acceptable terms, and if we are unable to develop, propose, and implement a successful plan of reorganization, we will not be able to continue as a going concern and will be forced to liquidate the Company.

### *Our exposure to variable interest rates and foreign currency fluctuations may negatively affect our results.*

A portion of our debt, including our borrowings under our New Credit Facility, bears interest at variable rates. Any increase in the interest rates will increase our expenses and reduce funds available for our operations and future business opportunities. Increases in interest rates will also increase the risks resulting from our significant debt levels. Due to the increase in our operations outside the U.S., we have experienced increased foreign currency exchange gains and losses in the ordinary course of our business. Fluctuations in exchange rates may have a material impact on our financial condition, since Euro-denominated debt is converted into U.S. dollars for financial reporting, and cash flows generated in other currencies will be used, in part, to service the dollar-denominated portion of our debt. This fluctuation could result in an increase in our overall leverage and could result in less cash flow available for our operations, capital expenditures, and repayment of our obligations. In addition, fluctuations in foreign currency exchange rates may affect the value of our foreign assets as reported in U.S. dollars and may adversely affect reported earnings and, accordingly, the comparability of period-to-period results of operations. Changes in currency exchange rates may affect the relative prices at which we and foreign competitors sell products in the same market. In addition, changes in the value of the relevant currencies may affect the cost of certain items required in our operations. Although we attempt to hedge against fluctuations in interest rates or exchange rates, such fluctuations may have a material adverse effect on our financial condition or results of operations, or cause significant fluctuations in quarterly and annual results.

### *Our credit rating may be downgraded in the future.*

Our debt is rated by nationally recognized statistical rating organizations. Our debt ratings were recently downgraded and such ratings will likely be further downgraded upon commencement of Chapter 11 proceedings. While these actions do not affect our current cost of borrowing, they could significantly affect our ability to obtain or maintain trade credit with suppliers, reduce our access to the debt markets and increase the cost of incurring additional debt. There can be no assurance that we will be able to maintain our current credit ratings. Should we be unable to maintain our current credit ratings, we could experience a reduction in credit terms, an increase in our borrowing costs or difficulty accessing capital markets. Such a development could adversely affect our financial condition and results of operations.

### Item 1B. *Unresolved Staff Comments*

None.

### Item 2. *Properties*

We operate 6 facilities in North America, 10 facilities in Europe, and 7 facilities in South America, Asia, and South Africa. We believe that our plants are adequate and suitable for the manufacturing of products for the markets in which we sell. Our properties in Czech Republic, Germany, Mexico, Spain, and the U.S. are subject to mortgages or deeds of trust granted to Citibank North America, Inc. to secure our obligations under the New Credit Facility.

The following table summarizes our operating facilities:

| Location | Segment | Purpose | Owned/Leased |
|---|---|---|---|
| **North America** | | | |
| Akron, OH | Automotive Wheels | Manufacturing | Owned |
| Chihuahua, Mexico | Automotive Wheels | Manufacturing | Owned |
| Laredo, Texas | Other | Warehouse | Lease |
| Northville, MI | Other | World Headquarters, R&D | Owned |
| Nuevo Laredo, Mexico | Other | Manufacturing | Owned |
| Sedalia, MO | Automotive Wheels | Manufacturing | Owned |
| **Europe** | | | |
| Barcelona, Spain | Automotive Wheels | Manufacturing | Owned |
| Dello, Italy | Automotive Wheels | Manufacturing | Owned |
| Königswinter, Germany (2 facilities) | Automotive Wheels | Manufacturing | Owned |
| Manisa, Turkey (3 facilities) | Automotive Wheels | Manufacturing | Owned |
| Manresa, Spain | Automotive Wheels | Manufacturing | Owned |
| Ostrava, Czech Republic (2 facilities) | Automotive Wheels | Manufacturing | Owned |
| **Rest of the World** | | | |
| Bangkok, Thailand | Automotive Wheels | Manufacturing | Leased |
| Johannesburg, S. Africa | Automotive Wheels | Manufacturing | Owned |
| Pune, India | Automotive Wheels | Manufacturing | Owned |
| Pune, India | Automotive Wheels | Manufacturing | Leased |
| Sao Paulo, Brazil (2 facilities) | Automotive Wheels | Manufacturing | Owned |
| Yokohama, Japan | Automotive Wheels | Sales Office | Leased |

## Item 3. *Legal Proceedings*

We were party to a license agreement with Kuhl Wheels, LLC (Kuhl), whereby Kuhl granted us an exclusive patent license concerning "high vent" steel wheel technology known as the Kuhl Wheel (Kuhl Wheel), which agreement was terminated as of January 10, 2003 pursuant to a stipulation between us and Kuhl in connection with our bankruptcy proceeding. The original license agreement (as amended, the License Agreement), dated May 11, 1999, granted us a non-exclusive license for the Kuhl Wheel technology. The License Agreement was subsequently amended to provide us with an exclusive worldwide license. On January 14, 2003 we filed a Complaint for Declaratory and Injunctive Relief against Kuhl and its affiliate, Epilogics Group, in the U.S. District Court for the Eastern District of Michigan. We commenced such action seeking a declaration of non-infringement of two U.S. patents and injunctive relief to prevent Epilogics Group and Kuhl from asserting claims of patent infringement against us, and disclosing and using our technologies, trade secrets, and confidential information to develop, market, license, manufacture, or sell automotive wheels. We subsequently dismissed our claims regarding Kuhl's alleged use of our technologies. We filed summary judgment motions seeking rulings that we do not infringe Kuhl's patents, that Kuhl's patents are invalid, and finding in our favor on Kuhl's non-patent claims in the case. On November 30, 2007 the court awarded summary judgment in our favor on non-infringement of Kuhl's patents and on Kuhl's non-patent claims. Kuhl appealed to the Federal Circuit Court of Appeals, which, on February 24, 2009, upheld the district court's ruling. The deadline for Kuhl to have filed a petition for rehearing has passed.

We are the defendant in a patent infringement matter filed in 1997 in the U.S. District Court for the Eastern District of Michigan. Lacks Incorporated (Lacks) alleged that we infringed on three patents held by Lacks relating to chrome-plated plastic cladding for wheels. Prior to fiscal 2000, the Federal District Court dismissed all claims relating to two of the three patents that Lacks claimed were infringed and dismissed many of the claims relating to the third patent. The remaining claims relating to the third patent were submitted to a special master. In January 2001 the special master issued a report finding that Lacks' third patent was invalid and recommending that Lacks'

remaining claims be dismissed; the trial court accepted these recommendations. Lacks appealed this matter to the Federal Circuit Court. The Federal Circuit Court vacated the trial court's ruling that the third patent was invalid and remanded the matter back to the trial court for further proceedings. Discovery on the remanded claims is ongoing. In July 2003 Lacks filed an administrative claim in the Bankruptcy Court for $12 million relating to the alleged patent infringement. On August 15, 2007 the special master issued a report finding that the remaining claims at issue in the third patent are invalid and recommending that the trial court grant judgment for us and against Lacks. On November 20, 2007 the trial court accepted the special master's recommendation. On November 29, 2007 Lacks filed a notice with the trial court that it is appealing the trial court's ruling to the Federal Circuit Court of Appeals.

The nature of our business subjects us to litigation in the ordinary course of our business. In addition, we are from time to time involved in other legal proceedings. Although claims made against us prior to May 12, 2003, the date on which the Plan of Reorganization was confirmed, except as described in the immediately following paragraph, were discharged and are entitled only to the treatment provided in the Plan of Reorganization or in connection with settlement agreements that were approved by the Bankruptcy Court prior to our emergence from bankruptcy, we cannot guarantee that any remaining or future claims will not have a significant negative impact on our results of operations and profitability. In addition, certain claims made after the date of our bankruptcy filing may not have been discharged in the bankruptcy proceeding.

Claims made against us prior to the date of the bankruptcy filing or the confirmation date may not have been discharged if the claimant had no notice of the bankruptcy filing or various deadlines in the Plan of Reorganization. Although certain parties have informally claimed that their claims were not discharged, we are not presently aware of any party that is seeking to enforce claims that we believe were discharged or a judicial determination that their claims were not discharged by the Plan of Reorganization. In addition, in other bankruptcy cases, states have challenged whether their claims could be discharged in a federal bankruptcy proceeding if they never made an appearance in the case. This issue has not been finally settled by the U.S. Supreme Court. Therefore, we can give no assurance that our emergence from bankruptcy resulted in a discharge of all claims against us with respect to periods prior to the date we filed for bankruptcy protection. Any such claim not discharged could have a material adverse effect on our financial condition and profitability; however, we are not presently aware of any such claims. Moreover, our European operations and certain other foreign operations did not file for bankruptcy protection, and claims against them are not affected by our bankruptcy filing.

In the ordinary course of our business, we are a party to other judicial and administrative proceedings involving our operations and products, which may include allegations as to manufacturing quality, design, and safety. We carry insurance coverage in such amounts in excess of our self-insured retention as we believe to be reasonable under the circumstances and which may or may not cover any or all of our liabilities in respect of claims and lawsuits. After reviewing the proceedings that are currently pending (including the probable outcomes, reasonably anticipated costs and expenses, availability and limits of insurance rights under indemnification agreements, and established reserves for uninsured liabilities), we believe that the outcome of these proceedings will not have a material adverse effect on the financial condition or ongoing results of our operations.

We are exposed to potential product liability and warranty risks that are inherent in the design, manufacture and sale of automotive products, the failure of which could result in property damage, personal injury, or death. Accordingly, individual or class action suits alleging product liability or warranty claims could result. Although we currently maintain what we believe to be suitable and adequate product liability insurance in excess of our self-insured amounts, there can be no assurance that we will be able to maintain such insurance on acceptable terms or that such insurance will provide adequate protection against potential liabilities. In addition, we may be required to participate in a recall involving such products, for which we maintain only limited insurance. A successful claim brought against us in excess of available insurance coverage, if any, or a requirement to participate in any product recall, could have a material adverse effect on our results of operations or financial condition.

Under the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended (CERCLA), we currently have potential environmental liability arising out of both of our wheel and non-wheel businesses at 17 Superfund sites (Sites). Five of the Sites were related to the operations of Motor Wheel prior to the divestiture of that business by The Goodyear Tire & Rubber Co. (Goodyear). In connection with the 1986 purchase of Motor Wheel by MWC Holdings, Inc. (Holdings), Goodyear agreed to retain all liabilities relating to these Sites

and to indemnify and hold Holdings harmless with respect thereto. Goodyear has acknowledged this responsibility and is presently representing our interests with respect to all matters relating to these five Sites.

As a result of activities that took place at our Howell, Michigan facility prior to our acquisition of it, the U.S. Environmental Protection Agency (EPA) recently performed under CERCLA, remediation of PCB's from soils on our property and sediments in the adjacent south branch of the Shiawassee River. The Michigan Department of Environmental Quality has indicated it intends to perform additional remediation of these soils and river sediments. Under the terms of a consent judgment entered into in 1981 by Cast Forge, Inc. (Cast Forge) (the previous owner of this site) and the State of Michigan, any additional remediation of the PCBs is the financial responsibility of the State of Michigan and not of Cast Forge or its successors or assigns (including us). The EPA concurred in the consent judgment.

We are working with various government agencies and the other parties identified by the applicable agency as "potentially responsible parties" to resolve our liability with respect to nine Sites. Our potential liability at each of these Sites is not currently anticipated to be material.

We have potential environmental liability at the two remaining Sites arising out of businesses presently operated by Kelsey-Hayes. Kelsey-Hayes has assumed and agreed to indemnify us with respect to any liabilities associated with these Sites. Kelsey-Hayes has acknowledged this responsibility and is presently representing our interests with respect to these sites.

Kelsey-Hayes and, in certain cases, we may remain liable with respect to environmental cleanup costs in connection with certain divested businesses relating to aerospace, heavy-duty truck components, and farm implements under federal and state laws and under agreements with purchasers of these divested businesses. We believe, however, that such costs in the aggregate will not have a material adverse effect on our consolidated operations or financial condition and, in any event, Kelsey-Hayes has assumed and agreed to indemnify us with respect to any liabilities arising out of or associated with these divested businesses.

In addition to the Sites, we also have potential environmental liability at two state-listed sites in Michigan and one in California. One of the Michigan sites is covered under the indemnification agreement with Goodyear described above. We are presently working with the Michigan Department of Environmental Quality to resolve our liability with respect to the second Michigan site, for which no significant costs are anticipated. The California site is a former wheel manufacturing site operated by Kelsey-Hayes in the early 1980's. We are working with two other responsible parties and with the State of California on the investigation and remediation of this site.

**Item 4.** *Submission of Matters to a Vote of Security Holders*

None.

## PART II

**Item 5.** *Market for Registrant's Common Equity, Related Stockholder Matters, and Issuer Purchases of Equity Securities*

We had 101,819,597 shares of common stock outstanding and 68 record holders as of April 30, 2009. Our common stock trades under the symbol "HAYZ" on the NASDAQ Global Market. On May 4, 2009, we received a letter from the NASDAQ Stock Market indicating that we no longer complied with the continued listing requirements set forth in NASDAQ Listing Rule 5250(c)(1). The letter was issued as a result of our failure to timely file our Annual Report on Form 10-K for the fiscal year ended January 31, 2009. Pursuant to the notification letter, we are required to submit a plan to regain compliance with NASDAQ's filing requirements for continued listing within 60 calendars days of the date of the notification letter. However, we expect our common stock to be delisted from the NASDAQ Global Market following the filing of a Chapter 11 proceeding and therefore do not anticipate that we will submit a compliance plan to the NASDAQ Stock Market.

The range of sale prices for our common stock as reported by the NASDAQ Global Market from February 1, 2008 through January 31, 2009 ranged from a high of $4.05 per share on June 3, 2008 to a low of $0.07 per share on

January 27, 2009. The range of sale prices for our common stock as reported by the NASDAQ Global Market from February 1, 2007 through January 31, 2008 ranged from a high of $7.98 per share on April 4, 2007 to a low of $3.05 per share on January 31, 2008.

The following table sets forth, for the fiscal quarters indicated, the high and low sale prices per share as reported by the NASDAQ Global Market from February 1, 2007 through January 31, 2009:

|  | High | Low |
| --- | --- | --- |
| **Fiscal 2008:** | | |
| Fourth quarter | $1.40 | $0.07 |
| Third quarter | 3.43 | 0.97 |
| Second quarter | 4.05 | 2.11 |
| First quarter | 3.65 | 2.75 |
| **Fiscal 2007:** | | |
| Fourth quarter | $5.02 | $3.05 |
| Third quarter | 5.02 | 3.70 |
| Second quarter | 6.37 | 4.34 |
| First quarter | 7.98 | 4.26 |

Although the foregoing prices have been obtained from sources we believe to be reliable, we cannot assure you as to the accuracy of such prices or as to whether other prices higher or lower than those set forth above have been quoted. In addition, such prices reflect interdealer prices that may not include retail mark-up, mark down, or commission and may not necessarily represent actual transactions.

We did not pay cash dividends on our common stock in fiscal 2008 or fiscal 2007 and do not intend to pay dividends on our common stock in the foreseeable future. We are prohibited from paying cash dividends on our common stock by the terms of our New Credit Facility.

24

The following graph shows the change in our cumulative total stockholder return for the period from June 9, 2003, the date upon which market data for shares of our common stock became available following our emergence from bankruptcy on June 3, 2003, through the end of our fiscal year ended January 31, 2009, based upon the market price of our common stock, compared with the cumulative total return on the NASDAQ National Market and publicly traded peer group companies in the automotive industry. The graph assumes a total initial investment of $100 as of June 9, 2003, and shows a total return that assumes reinvestment of dividends, if any, and is based on market capitalization at the beginning of each period. The peer group consists of American Axle & Manufacturing Holdings Inc.; ArvinMeritor Inc.; Autoliv, Inc.; BorgWarner Inc.; Lear Corp.; Standard Motor Products Inc.; Superior Industries International Inc.; Tenneco Inc.; and Visteon Corp. The performance on the following graph is not necessarily indicative of future stock price performance.



| Date | Cumulative Total Return | | |
|------|-------------------------|---|---|
| | Hayes Lemmerz International, Inc. | Peer Group | Nasdaq Composite |
| 6/9/03 | 100.00 | 100.00 | 100.00 |
| 1/31/04 | 166.67 | 148.02 | 128.94 |
| 1/31/05 | 72.84 | 124.93 | 128.58 |
| 1/31/06 | 33.88 | 101.91 | 143.76 |
| 1/31/07 | 41.51 | 130.50 | 153.61 |
| 1/31/08 | 31.97 | 107.78 | 149.00 |
| 1/31/09 | 0.82 | 20.27 | 92.05 |

## Item 6.  *Selected Financial Data*

The following table sets forth our selected consolidated financial data for the last five fiscal years ended January 31, 2009. The information set forth below should be read in conjunction with our consolidated financial statements, related notes thereto, and the other information included elsewhere herein. For a discussion of events that may materially affect the comparability of the information reflected in the summary financial data, see Item 1. Business — Business Overview and Development. The data reflected in the summary financial information may not be indicative of future results due to the uncertainties described in Item 1A. Risk Factors.

| | Year Ended January 31, 2009 | Year Ended January 31, 2008 | Year Ended January 31, 2007 | Year Ended January 31, 2006 | Year Ended January 31, 2005 |
|---|---|---|---|---|---|
| **Income Statement Data:** | | | | | |
| Net sales | $ 1,904.3 | $ 2,126.7 | $ 1,796.8 | $ 1,726.2 | $ 1,552.7 |
| Depreciation and amortization | 104.5 | 112.1 | 111.5 | 120.8 | 124.0 |
| Asset impairments and other restructuring charges | 22.2 | 85.5 | 32.8 | 23.1 | 8.6 |
| Goodwill and other intangibles impairment | 238.0 | — | — | 185.5 | — |
| Interest expense, net | 61.1 | 62.2 | 75.2 | 64.1 | 42.2 |
| Income tax expense | 30.7 | 29.9 | 40.2 | 5.4 | 13.2 |
| Loss from continuing operations before cumulative effect of change in accounting principle | (370.2) | (181.8) | (121.5) | (276.4) | (38.0) |
| Income (loss) from discontinued operations, net of tax of ($0.8), $0.6, ($1.1), ($5.2) and $6.4, respectively | 0.9 | 2.2 | (43.0) | (185.0) | (26.9) |
| (Loss) gain on sale of discontinued operations, net of tax of $0.0, $2.0, $0.0 and $3.8 and $0.0 respectively | (2.4) | (14.8) | (2.4) | 3.9 | — |
| Cumulative effect of change in accounting principle, net of tax of $0.8 | — | — | — | — | 2.6 |
| Net Loss | $ (371.7) | $ (194.4) | $ (166.9) | $ (457.5) | $ (62.3) |
| **Balance sheet data:** | | | | | |
| Total assets | $ 1,096.2 | $ 1,805.9 | $ 1,691.2 | $ 1,799.2 | $ 2,302.0 |
| Bank borrowings and current portion of long-term debt | 668.7 | 37.7 | 33.5 | 40.5 | 8.4 |
| Long-term debt | 1.4 | 572.2 | 659.4 | 668.7 | 630.9 |
| Cash dividends paid | — | — | — | — | — |
| Stockholders' equity | (292.9) | 202.3 | 101.8 | 183.3 | 701.3 |
| **Per Share Data** | | Restated | Restated | Restated | Restated |
| Loss from continuing operations before cumulative effect of a change in accounting principle | $ (3.65) | $ (2.09) | $ (2.10) | $ (4.82) | $ (0.67) |
| Net loss | (3.67) | (2.23) | (2.89) | (7.99) | (1.10) |
| Average number of shares outstanding (in thousands) | 101,345 | 87,040 | 57,836 | 57,285 | 56,768 |

## Item 7.  *Management's Discussion and Analysis of Financial Condition and Results of Operations*

The following discussion and analysis should be read in conjunction with our consolidated financial statements, related notes thereto, and the other information included elsewhere herein.

## Executive Summary

### *Company Overview*

Originally founded in 1908, we are a leading worldwide producer of aluminum and steel wheels for passenger cars and light trucks and of steel wheels for commercial trucks and trailers. We are also a supplier of automotive powertrain components. We have global operations with 23 facilities, including business and sales offices, manufacturing facilities, and technical centers, located in 12 countries around the world. We sell our products to the major manufacturers of passenger cars and light trucks and to commercial highway vehicle customers throughout the world.

Sales of our wheels and powertrain components produced in North America are directly affected by the overall level of passenger car, light truck, and commercial highway vehicle production of North American OEMs, while sales of our wheels in Europe are directly affected by the overall vehicle production in Europe. The North American and European automotive industries are sensitive to the overall strength of their respective economies.

We are organized based primarily on markets served and products produced. Under this organizational structure, our operating segments have been aggregated into two reportable segments: Automotive Wheels and Other. The Automotive Wheels segment includes results from our operations that primarily design and manufacture fabricated steel and cast aluminum wheels for original equipment manufacturers in the global passenger car, light vehicle, and heavy duty truck markets. The Other segment includes the results of our powertrain components facility in Nuevo Laredo, Mexico and financial results related to the corporate office and the elimination of certain intercompany activities.

In fiscal 2008 we had sales of $1.9 billion, with approximately 82% of our net sales for that period derived from international markets. In fiscal 2007 we had sales of $2.1 billion, with approximately 80% of our net sales for that period derived from international markets.

We are currently reviewing strategic and financing alternatives available to us in light of the deteriorating condition of the automotive industry and our financial condition, and we have retained legal and financial advisors to assist us in this regard. We are engaged in continuing discussions with the lenders under our New Credit Facility, the holders of our Notes, and others regarding a restructuring of our capital structure. Such a restructuring would likely affect the terms of our New Credit Facility, our other debt obligations, including our Notes, and our common stock and may be affected through negotiated modifications to the agreements related to our debt obligations or through other forms of restructurings, including under court supervision pursuant to a voluntary bankruptcy filing under Chapter 11. There can be no assurance, however, that an agreement regarding any such restructuring will be obtained on acceptable terms with the necessary parties.

**Results of Operations**

*Consolidated Results — Comparison of Fiscal 2008 to Fiscal 2007*

The following table presents selected information about our consolidated results of operations for the fiscal years indicated (dollars in millions):

| | Year Ended January 31, | | | |
| | 2009 | 2008 | $ Change | % Change |
|---|---|---|---|---|
| Net sales: | | | | |
| Automotive Wheels | $1,848.4 | $2,051.9 | $(203.5) | (9.9)% |
| Other | 55.9 | 74.8 | (18.9) | (25.3)% |
| Total | $1,904.3 | $2,126.7 | $(222.4) | (10.5)% |
| Gross profit | $ 187.4 | $ 209.0 | $ (21.6) | (10.3)% |
| Marketing, general, and administrative | 145.2 | 153.5 | (8.3) | (5.4)% |
| Amortization of intangible assets | 10.7 | 10.2 | 0.5 | 4.9% |
| Asset impairments and other restructuring charges | 22.2 | 85.5 | (63.3) | (74.0)% |
| Goodwill and other intangible assets impairment | 238.0 | — | 238.0 | N/C |
| Other expense (income), net | 23.6 | (1.5) | 25.1 | 1673.3% |
| Loss from operations | (252.3) | (38.7) | (213.6) | 551.9% |
| Interest expense, net | 61.1 | 62.2 | (1.1) | (1.8)% |
| Other non-operating expense | 3.2 | 8.5 | (5.3) | (62.4)% |
| Loss on early extinguishment of debt | 6.5 | 21.5 | (15.0) | (69.8)% |
| Income tax expense | 30.7 | 29.9 | 0.8 | 2.7% |
| Minority interest | 16.4 | 21.0 | (4.6) | (21.9)% |
| Loss from continuing operations | (370.2) | (181.8) | (188.4) | 103.6% |
| Loss from discontinued operations, net of tax | (1.5) | (12.6) | 11.1 | (88.1)% |
| Net loss | $ (371.7) | $ (194.4) | $(177.3) | 91.2% |

N/C — Not calculable

*Net sales*

Our net sales decreased 10.5% or $222.4 million to $1,904.3 million during fiscal 2008 from $2,126.7 million during fiscal 2007. Lower volumes in the latter half of the year, partially offset by favorable mix, were the primary reason for the decrease, resulting in a reduction of sales of $273 million. Volumes have decreased due to ongoing trends and conditions facing North American and European vehicle manufacturers, which have been negatively impacted due to the global credit crisis, troubled capital markets, volatile commodity prices, and plunging consumer confidence. We expect the trend in lower volumes to continue during fiscal 2009. The lower sales volumes and favorable mix were partially offset by favorable foreign currency exchange rates relative to the US Dollar of $86 million. The prior year includes sales of $61 million as compared to current year sales of $19 million from our Hoboken, Belgium aluminum wheel facility, which we sold during the second quarter of fiscal 2008. The prior year sales also include $28 million of sales from our Wabash, Indiana powertrain facility, which was sold during the second quarter of fiscal 2007. The remainder of the sales variance from the prior year is primarily due to fluctuations in aluminum and steel costs.

*Gross profit*

Our gross profit decreased 10.3% or $21.6 million from $209.0 million in fiscal 2007 to $187.4 million in fiscal 2008. Volume reductions, partially offset by favorable mix, caused a decline in gross profit of $67 million. Favorable foreign currency exchange rates relative to the US Dollar improved gross profit by $13 million. Higher utility costs impacted gross profit by $16 million, but was offset by reductions in direct material spending,

28

manufacturing efficiencies, and pension and retiree medical expenses. We made improvements to gross profit of $12 million due to the closure of the Gainesville, Georgia facility during fiscal 2008, the sale of the Hoboken, Belgium aluminum wheel facility in the second quarter of fiscal 2008, and the sale of the Wabash, Indiana powertrain facility in the second quarter of fiscal 2007. The remainder of the variance is primarily due to fluctuations in aluminum and steel costs from year to year.

### Marketing, general, and administrative

Our marketing, general, and administrative expenses decreased 5.4% or $8.3 million from $153.5 million in fiscal 2007 to $145.2 million in fiscal 2008. The decrease is primarily attributable to lower employee costs, which were the result of headcount reductions in order to respond to the declining market conditions in the automotive industry during the last half of fiscal 2008. Foreign currency fluctuations increased marketing, general, and administrative expenses by $8 million, but were mostly offset by reductions in outside services and property taxes, rents, and insurance costs.

### Asset impairments and other restructuring charges

Asset impairment charges decreased from the prior year by $63.3 million, from $85.5 million during fiscal 2007 to $22.2 million during fiscal 2008.

The expense for fiscal 2008 includes $9 million of severance expense, which was primarily the result of headcount reductions globally in order to align production with the reduction in volumes due to the downturn in the automotive industry during the last half of fiscal 2008. We also recorded additional facility closure and impairment costs of $6 million for our Gainesville, Georgia facility. The Gainesville facility was classified as an asset held for sale as of January 31, 2009. We have a definitive agreement with Punch Property International NV for the sale of the facility. Punch Property International NV has not completed the purchase of the property as contemplated by the agreement and we have commenced litigation seeking specific performance of the agreement and damages. Additional impairments of $3 million were recorded to reduce the balances of our Howell, Michigan and Huntington, Indiana facilities to fair market value due to declining market conditions, and continuing closure costs for these facilities were $1 million in fiscal 2008. The Howell facility was removed from the asset held for sale classification as of January 31, 2009 in accordance with Financial Accounting Standards Board (FASB) Statement of Financial Accounting Standard (SFAS) 144, "Accounting for the Impairment or Disposal of Long-Lived Assets" (SFAS 144) as we are not confident that the property will sell within one year. We are currently marketing the Huntington facility and it is classified as held for sale as of January 31, 2009.

The prior year expense included $11 million of impairments that were recorded for our Hoboken, Belgium aluminum wheel facility, which we sold in fiscal 2008, as well as impairments and restructuring costs of $32 million for our Nuevo Laredo, Mexico powertrain facility. The Nuevo Laredo was classified as an asset held for sale as of January 31, 2008, however negotiations with an interested buyer have failed due to the buyer's inability to secure financing. Our Nuevo Laredo, Mexico powertrain components facility was reclassified as held and used as of January 31, 2009. Impairments of $18 million were also recorded in the prior year for our Chihuahua, Mexico aluminum wheel facility. We also recorded $20 million of impairments for our Gainesville, Georgia aluminum wheel facility. The remainder of the impairment and restructuring costs in the prior year relate to continuing closure costs for our Huntington, Indiana; Howell, Michigan; Ferndale, Michigan facilities, which were closed prior to fiscal 2007.

### Goodwill and other intangible assets impairment

During the period from November 1, 2008 through January 31, 2009, there was a significant adverse change in the business climate as expected volumes in the short and medium-term declined significantly. As a result of this triggering event, we tested our goodwill and other non-amortized intangible assets for impairment as of January 31, 2009 in addition to the work performed based on November 1, 2008 balances per SFAS 142, "Goodwill and Other Intangible Assets" (SFAS - 142). Based on our testing, we recorded an impairment of $238 million for the year ended January 31, 2009, of which $211 million relates to goodwill and $27 million relates to trade names. As of January 31, 2009, our goodwill balance was $0 and trade names was $16 million.

### Other Expense (income), net

Other expense (income) increased from the prior year by $25.1 million from $1.5 million of income in fiscal 2007 to $23.6 million of expense in fiscal 2008. We recorded a loss on the sale of our Hoboken, Belgium facility of $36 million during fiscal 2008 as compared to a loss on the sale of our Wabash, Indiana facility of $11 million during fiscal 2007. The remainder of the items recorded to other expense (income) includes license and royalty income, gains or losses on tooling sales, realized exchange gains or losses, export incentives, and other miscellaneous items that are not considered part of cost of goods sold. None of these items individually or in the aggregate were considered material.

### Interest expense, net

Interest expense decreased from the prior year by $1.1 million from $62.2 million in fiscal 2007 to $61.1 million in fiscal 2008. Included in the interest expense is a $5.6 million expense to reclassify unrealized losses from accumulated other comprehensive income related to our interest rate swaps as well as a loss of $3.2 million on the settlement of an interest rate swap in January 2009. The remainder of the variance in interest expense was driven by the restructuring of our debt during fiscal 2007, which reduced both overall debt levels and interest rates, partially offset by higher short-term interest rates and the impact of foreign exchange rates relative to the U.S. dollar on interest payable on our Euro-denominated debt.

### Other non-operating expense

During fiscal 2008 we recognized $3.2 million of other non-operating expense as compared to $8.5 million in the prior year. The fiscal 2008 expense includes realized foreign currency losses of $1.7 million in fiscal 2008 as compared to $2.4 million in fiscal 2007. The fiscal 2008 expense includes a $1.4 million increase in the liability recognized for a put option agreement with the minority shareholders at our Kalyani, India joint venture, as compared to an increase in the liability of $4.1 million in the previous year. The fiscal 2007 expense also includes $5.5 million of realized foreign currency exchange loss on the net investment hedge resulting from the liquidation of HLI Netherlands BV.

### Income taxes

Income tax expense was $30.7 million for fiscal 2008 and $29.9 million for fiscal 2007. The income tax rate varies from the U.S. statutory income tax rate of 35% due primarily to losses in the U.S. without recognition of a corresponding income tax benefit, as well as effective income tax rates in certain foreign jurisdictions that are different than the U.S. statutory rates. Accordingly, our worldwide tax expense may not bear a normal relationship to earnings before taxes on income.

### Discontinued operations

Discontinued operations consist of our Automotive Brake Components division (Brakes business), which was sold in November 2007; MGG Group B.V. (MGG Group), which was sold in June 2007; and our suspension components business (Suspension business), which we sold in early fiscal 2007.

The current year loss is primarily due to amounts settled for certain disputes arising out of the share purchase agreement with MGG Group. We recorded $0.8 million of income tax benefit for our Brakes Business due to the allocation of tax expense associated with provision to return adjustment. The prior year includes income from our Brakes business of $18 million, and losses from our MGG Group and Suspension business of $27 million and $4 million, respectively.

### Net loss

Due to factors mentioned above, net loss during fiscal 2008 was $371.7 million as compared to $194.4 million during fiscal 2007.

*Segment Results — Comparison of Fiscal 2008 to Fiscal 2007*

### Automotive Wheels

The following table presents net sales, (loss) earnings from operations, and other information for the Automotive Wheels segment for the fiscal years indicated (dollars in millions):

| | Year Ended January 31, | | |
| | 2009 | 2008 | $ Change |
| --- | --- | --- | --- |
| Net sales | $1,848.4 | $2,051.9 | $(203.5) |
| Asset impairments and other restructuring charges: | | | |
|    Facility closure costs | $ 3.0 | $ 3.3 | $ (0.3) |
|    Asset impairments | 9.4 | 49.5 | (40.1) |
|    Goodwill and other intangible assets impairment | 238.0 | — | 238.0 |
|    Severance and other restructuring costs | 8.7 | — | 8.7 |
| Total asset impairments and other restructuring charges | $ 259.1 | $ 52.8 | $ 206.3 |
| (Loss) earnings from operations | $ (262.3) | $ 36.7 | $(299.0) |

#### Net sales

Net sales in our Automotive Wheels segment decreased by $203.5 million from $2,051.9 million during fiscal 2007 to $1,848.4 million during fiscal 2008. Lower volumes, partially offset by favorable mix, accounted for $281 million of the decrease, but was partially offset by $86 million of favorable foreign exchange rates relative to the U.S. dollar. Higher metal pass-through pricing increased sales $36 million. The sale of the Hoboken, Belgium facility also resulted in a decrease of $42 million of sales.

#### Asset impairments and other restructuring charges

The expense for fiscal 2008 includes $238 million of goodwill and other intangible assets impairment. During the period from November 1, 2008 through January 31, 2009, there was a significant adverse change in the business climate as expected volumes in the short and medium-term declined significantly. As a result of this triggering event, we tested our goodwill and other long term assets for impairment as of January 31, 2009 in addition to the work performed based on November 1, 2008 balances per SFAS 142. Based on our testing, we recorded an impairment of $211 million for goodwill and $27 million for trade names. We also recorded $8.7 million of severance expense, which was primarily the result of headcount reductions globally in order to align production with the reduction in volumes due to the downturn in the automotive industry during the last half of fiscal 2008. We also recorded additional facility closure and asset impairment costs of $5.9 million for our Gainesville, Georgia facility. The Gainesville facility was classified as an asset held for sale as of January 31, 2009. We have a definitive agreement with Punch Property International NV for the sale of the facility. Punch Property International NV has not completed the purchase of the property as contemplated by the agreement and we have commenced litigation seeking specific performance of the agreement and damages. Impairments of $2.6 million were recorded to reduce the balances of our Howell, Michigan and Huntington, Indiana facilities to fair market value due to declining market conditions, and continuing closure costs for these facilities were $1.2 million in fiscal 2008. The Howell, Michigan facility was removed from the asset held for sale classification as of January 31, 2009 in accordance with SFAS 144 as we are not confident that the property will sell within one year. We are currently marketing the Huntington facility and it is classified as held for sale as of January 31, 2009. Additional impairments of $1.4 million were recorded for our aluminum wheel facilities in Chihuahua, Mexico and Hoboken, Belgium. We also recorded an impairment for machinery and equipment of $1.3 million at our Manresa, Spain facility for flow-forming equipment that was no longer in use.

The expense for fiscal 2007 includes $11 million of impairments that were recorded for our Hoboken, Belgium aluminum wheel facility, which we sold in fiscal 2008. Impairments of $18 million were also recorded in the prior year for our Chihuahua, Mexico aluminum wheel facility. We also recorded $20 million of impairments for our Gainesville, Georgia aluminum wheel facility. Continuing closure costs of $3.3 million were recorded for our Huntington, Indiana; Howell, Michigan; and Ferndale, Michigan technical center, which were closed prior to fiscal 2007.

### *(Loss) earnings from operations*

We recorded a loss from operations of $262.3 million during fiscal 2008 as compared to earnings from operations of $36.7 million during fiscal 2007. The unfavorable variance of $299 million includes an impairment of $238 million for the year ended January 31, 2009 based on the results of our SFAS 142 intangible assets impairment testing; the impairment consisted of $211 million for goodwill and $27 million for trade names. As of January 31, 2009, our goodwill balance was $0 and trade names was $16 million. In the current year, we also recorded a loss of $36 million for the sale of our Hoboken, Belgium aluminum wheel facility, partially offset by improvements to earnings of $12 million due to the sale of the Hoboken facility and closure of the Gainesville, Georgia facility. Reduced volumes, mix, and pricing resulted in lower earnings of $76 million, partially offset by lower asset impairment and restructuring charges of $32 million. Intercompany royalty and trademark fees decreased earnings from operations by $18 million, which is eliminated in the consolidated financial statements. The impact of foreign exchange rate relative to the U.S. dollar decreased earnings from operations by $4.6 million.

### <u>*Other*</u>

The following table presents net sales, earnings (loss) from operations, and other information for the Other segment for the fiscal years indicated (dollars in millions):

| | Year Ended January 31, | | $ Change |
|---|---|---|---|
| | **2009** | **2008** | |
| Net sales | $55.9 | $ 74.8 | $ (18.9) |
| Asset impairments and other restructuring charges: | | | |
| Facility closure costs | $ 0.4 | $ 0.3 | $ 0.1 |
| Asset impairments | — | 31.6 | (31.6) |
| Severance and other restructuring costs | 0.7 | 0.8 | (0.1) |
| Total asset impairments and other restructuring charges | $ 1.1 | $ 32.7 | $ (31.6) |
| Earnings (loss) from operations | $10.0 | $(75.4) | $ 85.4 |

### *Net sales*

Net sales in our Other segment decreased $18.9 million from $74.8 million during fiscal 2007 to $55.9 million during fiscal 2008. The sale of the Wabash, Indiana powertrain facility in fiscal 2007 resulted in a decrease in sales of $28 million in fiscal 2008 as compared to the prior year. Sales were $8 million higher due to a new program in the current year for intake manifold sales for the GMC Acadia, which are produced at our powertrain plant in Nuevo Laredo, Mexico.

### *Asset impairments and other restructuring charges*

Asset impairment losses and other restructuring charges during fiscal 2008 were $1.1 million, which consisted primarily of $0.4 million of continuing facility closure costs related to our technical center in Ferndale, Michigan and $0.7 million of severance relate to our corporate offices in Northville, Michigan and our powertrain facility in Nuevo Laredo, Mexico.

Asset impairment losses and other restructuring charges during fiscal 2007 were $32.7 million, which included impairments and restructuring costs of $32 million for our Nuevo Laredo, Mexico powertrain facility. This facility was classified as an asset held for sale as of January 31, 2008, however negotiations with an interested buyer have failed due to the buyer's inability to secure financing. This facility was reclassified as held and used as of January 31, 2009. The remainder of facility closure costs and severance expense relate to our technical center in Ferndale, Michigan and our corporate offices in Northville, Michigan.

### *Earnings (loss) from operations*

Earnings from operations increased $85.4 million from a loss of $75.4 million in fiscal 2007 to earnings of $10.0 million in fiscal 2008. The sale of the Wabash, Indiana facility improved earnings during fiscal 2008 by

approximately $14 million as did lower depreciation of $4 million. Lower asset impairment and restructuring charges also improved earnings by approximately $32 million. Lower employee costs, primarily related to headcount reductions, improved earnings by $7 million. A decrease in the use of outside services improved earnings by $6 million. Intercompany royalty and trademark fees increased earnings from operation by $18 million during fiscal 2008, which are eliminated in the consolidated financial statements.

## Results of Operations

### Consolidated Results — Comparison of Fiscal 2007 to Fiscal 2006

The following table presents selected information about our consolidated results of operations for the fiscal years indicated (dollars in millions):

|  | Year Ended January 31, | | | |
|  | **2008** | **2007** | **$ Change** | **% Change** |
|---|---|---|---|---|
| Net sales: | | | | |
| Automotive Wheels | $2,051.9 | $1,671.9 | $ 380.0 | 22.7% |
| Other | 74.8 | 124.9 | (50.1) | (40.1)% |
| Total | $2,126.7 | $1,796.8 | $ 329.9 | 18.4% |
| Gross profit | $ 209.0 | $ 159.0 | $ 50.0 | 31.4% |
| Marketing, general, and administrative | 153.5 | 125.3 | 28.2 | 22.5% |
| Amortization of intangible assets | 10.2 | 10.2 | — | 0.0% |
| Asset impairments and other restructuring charges | 85.5 | 32.8 | 52.7 | 160.7% |
| Other income, net | (1.5) | (13.8) | 12.3 | (89.1)% |
| (Loss) earnings from operations | (38.7) | 4.5 | (43.2) | (960.0)% |
| Interest expense, net | 62.2 | 75.2 | (13.0) | (17.3)% |
| Other non-operating expense | 8.5 | — | 8.5 | N/C |
| Loss on early extinguishment of debt | 21.5 | — | 21.5 | N/C |
| Income tax expense | 29.9 | 40.2 | (10.3) | (25.6)% |
| Minority interest | 21.0 | 10.6 | 10.4 | 98.1% |
| Loss from continuing operations | (181.8) | (121.5) | (60.3) | 49.6% |
| Loss from discontinued operations, net of tax | (12.6) | (45.4) | 32.8 | (72.2)% |
| Net loss | $ (194.4) | $ (166.9) | $ (27.5) | 16.5% |

### Net sales

Our net sales increased 18.4% or $329.9 million to $2,126.7 million during fiscal 2007 from $1,796.8 million during fiscal 2006. Higher volumes increased sales by $94 million and resulted primarily from an increase in international wheels demand, partially offset by a decrease in domestic volumes. Favorable fluctuations in foreign exchange rates relative to the U.S. dollar and the impact of higher metal pass-through pricing increased sales by $139 million and $60 million, respectively. Favorable product mix increased sales by $79 million, partially offset by lower pricing. Sales decreased by $36 million due to the sale of our Wabash, Indiana powertrain facility in July 2007.

### Gross profit

Our gross profit increased 31.4% or $50.0 million from $159.0 million in fiscal 2006 to $209.0 million in fiscal 2007. Higher volumes and favorable product mix increased gross profit by $23 million, while favorable foreign exchange rate fluctuations and lower U.S. pension and retiree medical expenses increased gross profit by $18 million. The sale of the Wabash, Indiana facility, which had been experiencing ongoing losses, improved gross profit by approximately $8 million compared to fiscal 2006.

### Marketing, general, and administrative

Our marketing, general, and administrative expenses increased 22.5% or $28.2 million from $125.3 million in fiscal 2006 to $153.5 million in fiscal 2007. Approximately $8 million of the increase was due to foreign exchange fluctuations. In addition, expenses were $10 million higher due to the effects of the equitable adjustments on stock based compensation (see Note 15, Stock Based Benefit Plans, to the consolidated financial statements included herein) and the settlement of a lawsuit with certain of our former directors. The remainder of the increase was due to higher fees for professional services, primarily fees incurred related to the capital restructuring, and increased employee expenses.

### Asset impairments and other restructuring charges

The fiscal 2007 expense includes $11 million of impairments that were recorded for our Hoboken, Belgium aluminum wheel facility, which we sold in fiscal 2008, as well as impairments and restructuring costs of $32 million for our Nuevo Laredo, Mexico powertrain facility. The Nuevo Laredo was classified as an asset held for sale as of January 31, 2008, however negotiations with an interested buyer have failed due to the buyer's inability to secure financing. As of January 31, 2009 our Nuevo Laredo, Mexico powertrain components facility was reclassified as held and used. Impairments of $18 million were also recorded for our Chihuahua, Mexico aluminum wheel facility. We also recorded $20 million of impairments for our Gainesville, Georgia aluminum wheel facility. The remainder of the impairment and restructuring costs relate to continuing closure costs for our Huntington, Indiana; Howell, Michigan; and Ferndale, Michigan facilities, which were closed prior to fiscal 2007.

During fiscal 2006 we recorded facility closure, employee restructuring, and asset impairment charges of $32.8 million. In the Automotive Wheels segment we recorded expense of $24.5 million, which included continuing facility closure costs of $3.6 million related to our facilities located in Huntington, Indiana; Howell, Michigan; La Mirada, California; and Bowling Green, Kentucky. Impairments of $16.8 million were also recorded for our Huntington, Indiana; Howell, Michigan; and Hoboken, Belgium facilities. Severance charges of $4.1 million were related to our Huntington, Indiana; Dello, Italy; and Hoboken, Belgium facilities. The asset impairment losses and other restructuring charges for the Other segment were $8.3 million, which consisted of facility and machinery and equipment impairments of $4.7 million for our Wabash, Indiana facility as well as $0.5 million of impairments at our corporate offices in Northville, Michigan. The Other segment expense also included severance charges of $3.1 million including $1.2 million for a reduction-in-force at our Ferndale, Michigan technical center, other restructuring charges of $1.1 million at our Nuevo Laredo, Mexico facility, and severance of $0.8 million at our corporate offices.

### Other income, net

Other income, net decreased by $12.3 million from $13.8 million in fiscal 2006 to $1.5 million in fiscal 2007. This change is largely due to the loss on sale of our Wabash, Indiana facility of $11.0 million recorded during fiscal 2007. Excluding the loss on the sale of the Wabash, Indiana facility, the other income included license and royalty income, gains or losses on tooling sales, realized exchange gains or losses, export incentives, and other miscellaneous items that are not considered part of cost of goods sold. None of these items individually or in the aggregate were considered material.

### Interest expense, net

Interest expense decreased by $13.0 million, from $75.2 million in fiscal 2006 to $62.2 million in fiscal 2007. The decrease was driven by the restructuring of our debt during fiscal 2007, which reduced both overall debt levels and interest rates, partially offset by higher short-term interest rates and the impact of foreign exchange rates relative to the U.S. dollar on interest payable on our Euro-denominated debt. As of January 31, 2008 our variable rate and fixed rate debt were 38% and 62% of total debt, respectively.

### Other non-operating expense

During fiscal 2007 we recognized $8.5 million of other non-operating expense. This includes $5.5 million of realized foreign currency exchange loss on a net investment hedge resulting from the liquidation of HLI

Netherlands BV, $4.1 million due to a liability recognized for a put option agreement with the minority shareholders at our Pune, India joint venture, partially offset by $1.1 million at our Brazil aluminum plant for a realized foreign currency exchange gain.

### Income taxes

Income tax expense was $29.9 million for fiscal 2007 and $40.2 million for fiscal 2006. The income tax rate varies from the U.S. statutory income tax rate of 35% due primarily to losses in the U.S. without recognition of a corresponding income tax benefit, as well as effective income tax rates in certain foreign jurisdictions that are different than the U.S. statutory rates. Accordingly, our worldwide tax expense may not bear a normal relationship to earnings before taxes on income.

### Discontinued operations

The loss from discontinued operations in fiscal 2007 was $12.6 million, an improvement of $32.8 million over the fiscal 2006 loss of $45.4 million, primarily due to lower operating losses from businesses sold during fiscal 2007. Fiscal 2007 includes income of $18 million for our Brakes business, offset by $32 million of losses for the MGG Group and Suspension business. Also included in fiscal 2007 discontinued operations were $0.7 million of adjustments recorded to income for our Hub and Drum operations, which were sold in fiscal 2005. In fiscal 2006, the Brakes business had income of $8 million and MGG Group and Suspension business had losses totaling $53 million.

### Net loss

Due to factors mentioned above, net loss during fiscal 2007 was $194.4 million as compared to $166.9 million during fiscal 2006.

### Segment Results — Comparison of Fiscal 2007 to Fiscal 2006

#### Automotive Wheels

The following table presents net sales, earnings from operations, and other information for the Automotive Wheels segment for the fiscal years indicated (dollars in millions):

| | Year Ended January 31, | | |
|---|---|---|---|
| | **2008** | **2007** | **$ Change** |
| Net sales | $2,051.9 | $1,671.9 | $ 380.0 |
| Asset impairments and other restructuring charges: | | | |
| Facility closure costs | $ 3.3 | $ 3.6 | $ (0.3) |
| Asset impairments | 49.5 | 16.8 | 32.7 |
| Severance and other restructuring costs | — | 4.1 | (4.1) |
| Total asset impairments and other restructuring charges | $ 52.8 | $ 24.5 | $ 28.3 |
| Earnings from operations | $ 36.7 | $ 53.3 | $ (16.6) |

### Net sales

Net sales in our Automotive Wheels segment improved by $380.0 million from $1,671.9 million during fiscal 2006 to $2,051.9 million during fiscal 2007. Volumes at our international locations accounted for approximately $113 million of the increase. In addition, foreign exchange rates relative to the U.S. dollar increased sales approximately $139 million. Higher metal pass-through pricing increased sales $60 million. The remainder of the increase in sales was due to favorable product mix, partially offset by lower pricing.

### Asset impairments and other restructuring charges

Asset impairment losses and other restructuring charges during fiscal 2007 were $52.8 million, which included facility closure costs of $3.3 million related to our facilities located in Huntington, Indiana; Howell, Michigan; and

La Mirada, California. Impairments of $49.5 million were recorded for our Gainesville, Georgia; Chihuahua, Mexico; Hoboken, Belgium; and Sao Paulo, Brazil facilities.

The asset impairment losses and other restructuring charges during fiscal 2006 were $24.5 million, which included continuing facility closure costs of $3.6 million related to our facilities located in Huntington, Indiana; Howell, Michigan; La Mirada, California; and Bowling Green, Kentucky. Impairments of $16.8 million were also recorded for our Huntington, Indiana and Howell, Michigan facilities and Hoboken, Belgium facility. Severance charges of $4.1 million were related to our Huntington, Indiana; Dello, Italy; and Hoboken, Belgium facilities.

### Earnings from operations

Earnings from operations decreased by $16.6 million from $53.3 million during fiscal 2006 to $36.7 million during fiscal 2007. Higher unit volumes, favorable product mix, and price changes, net of higher metal costs, increased earnings by approximately $35 million. Favorable foreign exchange rates of $15 million were offset by higher manufacturing costs. In addition, higher asset impairments of $28 million and increased marketing, general, and administrative expenses of $23 million also reduced earnings in fiscal 2007.

### Other

The following table presents net sales, loss from operations, and other information for the Other segment for the fiscal years indicated (dollars in millions):

|  | Year Ended January 31, | | |
|  | 2008 | 2007 | $ Change |
| --- | --- | --- | --- |
| Net sales | $ 74.8 | $124.9 | $ (50.1) |
| Asset impairments and other restructuring charges: | | | |
| Facility closure costs | $ 0.3 | $ — | $ 0.3 |
| Asset impairments | 31.6 | 5.2 | 26.4 |
| Severance and other restructuring costs | 0.8 | 3.1 | (2.3) |
| Total asset impairments and other restructuring charges | $ 32.7 | $ 8.3 | $ 24.4 |
| Loss from operations | $(75.4) | $(48.8) | $ (26.6) |

### Net sales

Net sales in our Other segment decreased $50.1 million from $124.9 million during fiscal 2006 to $74.8 million during fiscal 2007. The sale of the Wabash, Indiana facility in fiscal 2007 resulted in a decrease of sales of $36 million as compared to fiscal 2006. The remainder of the decrease is primarily due to lower volumes at our powertrain facility in Nuevo Laredo, Mexico.

### Asset impairments and other restructuring charges

The asset impairment losses and other restructuring charges during fiscal 2007 were $32.7 million, which included $0.3 million of facility closure costs related to our technical center in Ferndale, Michigan as well as impairments of $31.3 million and severance of $0.6 million for our Nuevo Laredo, Mexico powertrain facility. The remainder of the impairment and severance expense was primarily related to our corporate offices.

The asset impairment losses and other restructuring charges during fiscal 2006 were $8.3 million. Facility and machinery and equipment impairments of $4.7 million were recorded for our Wabash, Indiana facility and $0.5 million of impairments were recorded at our corporate offices in Northville, Michigan. The severance charges of $3.1 million including $1.2 million for a reduction-in-force at our Ferndale, Michigan technical center, other restructuring charges of $1.1 million at our Nuevo Laredo, Mexico facility, and severance of $0.8 million at our corporate offices.

### Loss from operations

Loss from operations increased $26.6 million from $48.8 million in fiscal 2006 to $75.4 million in fiscal 2007. The sale of the Wabash, Indiana facility improved earnings during fiscal 2007 by approximately $5 million as did lower depreciation of $4 million. In addition, asset impairments and other restructuring charges were $24 million higher as compared to fiscal 2006 and fiscal 2007 includes $12 million of losses recorded on the sale of Wabash, Indiana facility as compared to no losses recorded in fiscal 2006.

### Liquidity and Capital Resources

#### Sources of Liquidity

The principal sources of liquidity for our operating, capital expenditure, debt service, restructuring, and reorganization requirements are expected to be (i) cash flows from continuing operations, (ii) cash and cash equivalents on hand, and (iii) proceeds related to our trade receivable securitization and financing programs. Availability under our domestic trade receivable securitization program has been significantly reduced due to the inability to finance receivables from Ford and General Motors. Total availability has been capped at $5.0 million and no additional advances will be made under this program. Our foreign receivable financing programs provide the other parties with significant discretion to discontinue financing receivables from certain customers, which could reduce availability under these facilities as well, particularly in light of our receipt of a going concern explanatory paragraph from our auditors. All of our accounts receivable facilities were fully utilized as of January 31, 2009. In addition, we may need to repay amounts currently borrowed under certain these facilities, which would further reduce our liquidity. As of January 31, 2009 the Revolving Credit Facility was fully drawn, and any repayments under the Revolving Credit Facility are prohibited unless we have achieved EBITDA of at least $200 million for the twelve months preceding the date of the repayment. In light of the continuing deterioration in the global economy and the automotive industry in particular, these sources of liquidity are not sufficient to meet our likely requirements and may not continue to be available.

Our current sources of liquidity are not sufficient to fund our operations through May 2009. As a result of current conditions in the automotive industry and our recurring operating losses, negative cash flows, and need for additional financing, the independent auditor's report relating to our consolidated financial statements for the year ended January 31, 2009 contains an explanatory paragraph regarding our ability to continue as a going concern. While the lenders under our New Credit Facility waived defaults under our New Credit Facility that result from our receipt of such a going concern explanatory paragraph, we will need to reach an acceptable agreement with our creditors regarding a recapitalization of the Company and restructuring of our indebtedness in a Chapter 11 proceeding.

A majority of the lenders under our New Credit Facility have, subject to approval of the bankruptcy court in which we file petitions under Chapter 11, agreed to provide us with DIP Financing in an aggregate amount of up to $100 million ($80 million of which is committed pursuant to the terms and conditions of a commitment letter). A Chapter 11 filing will result in a default under our New Credit Facility, our Notes, and certain of our other debt obligations, and those debts will become automatically due and payable, subject to an automatic stay of any action to collect, assert, or recover a claim against us under applicable bankruptcy law.

We believe that our currently outstanding common stock will have no value and will be cancelled under any plan of reorganization we may propose under Chapter 11. We also believe that the holders of our Notes are unlikely to receive more than a de minimis distribution on account of their interests in the Notes and that such interests could be cancelled under any plan of reorganization we may propose under Chapter 11. There can be no assurance, however, that any agreement regarding the recapitalization and restructuring of the Company under Chapter 11 will be obtained on acceptable terms with the necessary parties. Should the bankruptcy court not approve our proposed DIP Financing, or should we be unable to develop, propose, and implement a successful plan of reorganization, we would not be able to continue as a going concern.

### *Capital Resources*

We had a domestic accounts receivable securitization facility with a normal program limit of $25 million during fiscal 2008 and fiscal 2007. Due to concentration limits and restrictions on financing certain receivables, the

37.1

majority of the program limit was not available. There were $6.0 million of borrowings under the program as of January 31, 2009, which was the maximum amount then available under this facility, and no borrowing under the program as of January 31, 2008. The program limit was reduced to $5.0 million in April 2009 and no future advances will be made under the program. If the borrowing base falls below $5.0 million, amounts currently advanced in excess of the borrowing base will need to be repaid. The facility will be terminated upon the filing of a Chapter 11 proceeding.

We have an accounts receivable financing program in Germany with a local financial institution. The program limit was €25 million as of January 31, 2009 and €0 million as of January 31, 2008. Borrowings under this program of approximately €19.7 million or $25.3 million at January 31, 2009, which was the maximum amount available under this facility, and €20.0 million or $29.6 million at January 31, 2008, are included in short term bank borrowings. The financial institution providing this program has expressed an intention to discontinue the program in October 2009. We are currently seeking alternative programs to replace this facility.

We also have an accounts receivable factoring program in the Czech Republic with a local financial institution. The program limit is 480 million Czech Crown or approximately $22 million and $28 million as of January 31, 2009 and January 31, 2008, respectively. As of January 31, 2009 and January 31, 2008, approximately 246.4 million Czech Crown or $11.4 million and 344.0 million Czech Crown or $19.7 million, respectively, was factored under this program. The transactions are accounted for as sales of receivables under the provisions of SFAS 140, "Accounting for Transfers and Servicing of Financial Assets and Extinguishments of Liabilities" (SFAS 140) and the receivables are removed from the Consolidated Balance Sheets.

At January 31, 2009 we had commitments for capital expenditures of approximately $4.5 million and we anticipate capital expenditures during fiscal 2009 to range between $23 million and $33 million. The purposes of such commitments for capital expenditures include completion of a new commercial truck wheel line in Brazil and maintenance of existing facilities and equipment. We anticipate funding our capital expenditures primarily from cash flows from operations and, in the event of a Chapter 11 filing, any available DIP Financing.

### *Cash Flows*

*Operating Activities:*   Cash used for operating activities from our continuing operations were $62.4 million in fiscal 2008 as compared to cash provided of $107.7 million in the prior year. The $170.1 million unfavorable variance in cash flows from operations is primarily due to higher use of cash from working capital of $130 million and lower gross profits of $21.6 million due to reductions in volumes. In the prior year, accounts payable was positively affected by improved vendor terms, including special year end terms, which resulted from the improved liquidity due to the rights offering and debt refinancing during the second quarter, and payment timing in January 2007. The variance for special payment terms and timing of payments resulted in lower cash flows from operations of $79 million in fiscal 2008 as compared to the prior year. Operating cash flows from our accounts receivable securitization program in the U.S. increased by $38 million as our year end receivable balances on the amounts securitized were lower as compared to the prior year, primarily due to the lower sales volumes. The remainder of the unfavorable cash flow from working capital was due to a lag in adjusting our working capital to the lower volumes experienced in the fourth quarter of fiscal 2008 due to the length of the supply chain.

*Investing Activities:*   Cash used for investing activities was $104.2 million in fiscal 2008 as compared to $100.1 million in fiscal 2007. Our capital expenditures decreased by $22.2 million in fiscal 2008 as compared to fiscal 2007. We also had negative cash flows on the sale of businesses in the current year, primarily due to a contribution of $27 million as part of the sale of our Hoboken, Belgium facility in June 2008.

*Financing Activities:*   Cash provided by financing activities was $125.0 million in fiscal 2008, compared to $15.5 million in fiscal 2007. In the prior year, we received net proceeds from our stock rights offering of $185.4 million, partially offset by debt restructuring of $135.5 million. In the prior year, we also paid $9.0 million for the call premium on the redemption of our Senior Notes. We had positive cash flows in fiscal 2008 of $19.8 million due to increased short term bank borrowings as well as borrowings of $125 million in the current year from our Revolver. Bank fees were $12 million lower during fiscal 2008 as compared to the prior year, as fees were higher in the prior year primarily due to our debt restructuring.

### Credit Ratings

The following table represents our credit rating as of January 31, 2009:

|  | S&P | Moody's | Fitch |
|---|---|---|---|
| Corporate rating | B− | Caa1 | B− |
| Bank debt rating | B+ | B3 | B+/RR2 |
| New Senior Notes rating | CCC+ | Caa3 | CCC/RR6 |

In February 2009 Fitch downgraded our corporate rating from B− to CCC; bank debt rating from B+/RR2 to B−/RR3; and New Senior Notes rating from CCC/RR6 to C/RR6. In April 2009, Fitch further downgraded our corporate rating from CCC to C and bank debt rating from B−/RR3 to CC/RR3.

In February 2009 S&P downgraded our corporate rating from B− to CCC+; bank debt rating from B+ to B−; and New Senior Notes rating from CCC+ to CCC−. In May 2009, S&P further downgraded our corporate rating from CCC+ to CC; bank debt rating from B− to CCC−; and New Senior Notes rating from CCC− to C.

In April 2009 Moody's downgraded our corporate rating from Caa1 to Caa3, bank debt rating from B3 to Caa2, and New Senior Notes rating from Caa3 to Ca.

It is likely that our credit ratings will be further downgraded upon the commencement of Chapter 11 proceedings.

### Off Balance Sheet Arrangements

We have a domestic accounts receivable securitization facility with an interest rate equal to LIBOR plus 2.25% or Prime plus 1.25% The facility limit was reduced to $5.0 million in April 2009 and no future advances will be made under the program beyond the current $5.0 million advanced. If the borrowing base falls below $5.0 million, amounts currently advanced in excess of the borrowing base will need to be repaid. The facility will be terminated upon the filing of a Chapter 11 proceeding.

Pursuant to the securitization facility, certain of our consolidated subsidiaries sell substantially all U.S. short term trade receivables to a non-consolidated special purpose entity (SPE I) at face value and no gains or losses are recognized in connection with the sales. The purchase price for the receivables sold to SPE I is paid in a combination of cash and short term notes. The short term notes appear in other receivables on our Consolidated Balance Sheets and represent the difference between the face amount of accounts receivables sold and the cash received for the sales. SPE I resells the receivables to a non-consolidated qualifying special purpose entity (SPE II) at an annualized discount of 2.4% to 4.4%. SPE II pays the purchase price for the receivables with cash received from borrowings and equity in SPE II for the excess of the purchase price of the receivables over the cash payment. SPE II pledges the receivables to secure borrowings from commercial lenders. This debt is not included in our consolidated financial statements.

Collections for the receivables are serviced by HLI Opco and deposited into an account controlled by the program agent. The servicing fees payable to HLI Opco are set off against interest and other fees payable to the program agent and lenders. The program agent uses the proceeds to pay off the short term borrowings from commercial lenders and returns the excess collections to SPE II, which in turn pays down the short term note issued to SPE I. SPE I then pays down the short term notes issued to the consolidated subsidiaries.

The securitization transactions are accounted for as sales of the receivables under the provisions of SFAS 140 and are removed from the Consolidated Balance Sheets. The proceeds received are included in cash flows from operating activities in the Consolidated Statements of Cash Flows. Costs associated with the receivables facility are recorded as other expense in the Consolidated Statements of Operations.

As of January 31, 2009 and 2008 the outstanding balances of receivables sold to special purpose entities were $21.4 million and $48.3 million, respectively. Our net retained interests as of January 31, 2009 and 2008 were $15.4 million and $48.3 million, respectively, which are disclosed as Other Receivables on the Consolidated Balance Sheets and in cash flows from operating activities in the Consolidated Statements of Cash Flows. There were $6.0 million in advances from lenders as of January 31, 2009 and no advances as of January 31, 2008.

*Contractual Obligations*

The following table identifies our significant contractual obligations as of January 31, 2009 (dollars in millions):

| | Payment Due by Period | | | | |
|---|---|---|---|---|---|
| | Less Than 1 Year | 2-3 Years | 4-5 Years | After 5 Years | Total |
| Short-term borrowings | $    46.6 | $    — | $    — | $    — | $  46.6 |
| Long-term debt | 622.1 | 0.7 | — | 0.7 | 623.5 |
| Operating leases | 3.8 | 1.8 | 0.6 | — | 6.2 |
| Capital expenditures | 4.5 | — | — | — | 4.5 |
| United States pension contributions | 5.1 | 41.0 | 31.0 | 17.4 | 94.5 |
| Tax reserves | 0.1 | — | — | 4.7 | 4.8 |
| Total obligations | $    682.2 | $43.5 | $31.6 | $22.8 | $780.1 |

*Other Cash Requirements*

We anticipate the following approximate significant cash requirements in fiscal 2009 (dollars in millions):

| | |
|---|---|
| Interest | $67.2 |
| Taxes | 28.8 |
| International pension and other post-retirement benefits funding | 24.9 |

*Other Matters*

*Inflation*

We do not believe that sales of our products are materially affected by inflation, although such an effect may occur in the future. In accordance with industry practice, the costs or benefits of fluctuations in aluminum prices are generally passed through to customers. In addition, we have successfully negotiated to pass through a portion of fluctuations in steel costs to customers. We adjust the sales prices from time to time, if necessary, to fully reflect any increase or decrease in the price of aluminum or, to the extent applicable, steel. As a result, our net sales are adjusted, although gross profit is not materially affected. From time to time, we enter into futures contracts or purchase commitments solely to hedge against possible price changes that may occur between the dates of price adjustments. We also occasionally enter into forward purchase commitments to mitigate fluctuations in natural gas prices.

*Critical Accounting Estimates*

The preparation of consolidated financial statements in conformity with U.S. generally accepted accounting principles (GAAP) requires us to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the consolidated financial statements and the reported amounts of revenues and expenses during the reporting period. Considerable judgment is often involved in making these determinations; the use of different assumptions could result in significantly different results. We believe our assumptions and estimates are reasonable and appropriate; however, actual results could differ from those estimates.

*Impairment testing*

Impairment testing requires the use of numerous assumptions for future sales, profitability, and cash flows. Forecasts for future periods involve projections for factors including growth by region, pricing, product mix, foreign exchange rate levels, raw material prices, and manufacturing efficiencies. These forecasts are developed using internal and external sources, and are reviewed by management for reasonableness. Due to divestitures of non-core businesses, all intangible assets and the vast majority of fixed assets are contained within the Global Wheels segment.

We utilized a five-year forecast of our operations for our impairment testing, which included lower sales and gross profits during fiscal 2009 due to current declines in the automotive industry, with growth expected each year from fiscal 2010 through fiscal 2013. Our compound annual growth rate is expected to be approximately 6% from fiscal 2010 through fiscal 2013, and gross profit compound growth rates are expected to be approximately 21% over the same period of time. The increased profitability will be driven by improved cost structure due to the volume recovery after fiscal 2009, capacity rationalizations undertaken over the past few years, primarily in North America and Western Europe, and investments in leading-cost regions. Cash flows for Global Wheels are anticipated to increase over the period as capital requirements for expansions diminish and operating cash flows improve due to operating efficiencies. Net income improvement over the next five years will be driven by the aforementioned gross profit increases, significantly lower restructuring requirements, and tax initiatives to reduce tax expense.

Because we have high fixed production costs, relatively small declines in our customers' production could significantly impact our profitability and cash flows. Due to prior and ongoing capacity rationalizations and divestitures, we have substantially reduced our reliance on the North American market and do not anticipate significant valuation issues resulting from declining market share of our largest North American customers. Sustained reductions in global customer demand, however, would necessitate review of our expectations for potential impacts on asset values.

### *Asset impairment losses and other restructuring charges*

Our Consolidated Statements of Operations included herein reflect an element of operating expenses described as asset impairments and other restructuring charges. We periodically evaluate whether events and circumstances have occurred that indicate that the remaining useful life of any of our long lived assets may warrant revision or that the remaining balance might not be recoverable. When factors indicate that the long lived assets should be evaluated for possible impairment, we use an estimate of the future undiscounted cash flows generated by the underlying assets to determine if a write-down is required. If the future undiscounted cash flows generated by the underlying assets are less than the book value of the assets, a write-down is required and we adjust the book value of the impaired long-lived assets to their estimated fair values. Fair value is determined through third party appraisals or discounted cash flow calculations. The related charges are recorded as asset impairment or, in the case of certain exit costs in connection with a plant closure or restructuring, a restructuring or other charge in the Consolidated Statements of Operations.

### *Goodwill and other intangible assets impairment testing*

Goodwill and other indefinite-lived intangible assets are tested for impairment annually as of November 1st of each fiscal year, or more frequently should circumstances change or events occur that would more likely than not reduce the fair value of a reporting unit below its carrying amount, as provided for in SFAS 142. To conduct our impairment testing, we compare the fair value of our reporting units to the related net book value. If the fair value of a reporting unit exceeds its net book value, goodwill is considered not to be impaired. If the net book value of a reporting unit exceeds its fair value, an impairment loss is measured and recognized. Other definite-lived intangible assets are amortized on a straight line basis over their estimated lives.

We utilize an income approach to estimate the fair value of each of our reporting units. The income approach is based on projected debt-free cash flow, which is discounted to the present value using discount factors that consider the timing and risk of cash flows. We believe that this approach is appropriate because it provides a fair value estimate based upon the reporting unit's expected long-term operating cash flow performance. This approach also mitigates the impact of cyclical downturns that occur in the industry. Fair value is estimated using recent automotive industry and specific platform production volume projections, which are based on both third-party and internally-developed forecasts, as well as commercial, wage and benefit, inflation, and discount rate assumptions. Other significant assumptions include terminal value growth rates, terminal value margin rates, future capital expenditures, and changes in future working capital requirements. While there are inherent uncertainties related to the assumptions used and to management's application of these assumptions to this analysis, we believe that the income approach provides a reasonable estimate of the fair value of our reporting units.

During the period from November 1, 2008 through January 31, 2009, there was a significant adverse change in the business climate as expected volumes in the short and medium-term declined significantly. As a result of this triggering event, we tested our goodwill and other non-amortized intangible assets for impairment as of January 31, 2009 in addition to the work performed based on November 1, 2008 balances. Based on our testing, we recorded an impairment of $238 million for the year ended January 31, 2009, which $211 million is related to goodwill and $27 million is related to trade names. As of January 31, 2009 we had no goodwill and $16 million of trade names.

### *Pension and postretirement benefits other than pensions*

Annual net periodic expense and benefit liabilities under our defined benefit plans are determined on an actuarial basis. Assumptions used in the actuarial calculations have a significant impact on plan obligations and expense. Each January, we review the actual experience compared to the more significant assumptions used and make adjustments to the assumptions, if warranted. The healthcare trend rates are reviewed with the actuaries based upon the results of their review of claims experience. Discount rates are based upon an expected benefit payments duration analysis and the equivalent average yield rate for high-quality fixed-income investments.

Pension benefits, other than in Germany, are funded through deposits with trustees and the expected long-term rate of return on fund assets is based upon actual historical returns modified for known changes in the market and any expected change in investment policy. German pension benefits and other postretirement benefits are not funded and our policy is to pay these benefits as they become due.

Effective January 31, 2007, we adopted SFAS 158, "Employers' Accounting for Defined Benefit Pension and Other Postretirement Plans" (SFAS 158). SFAS 158 requires an employer to recognize the over funded or under funded status of defined benefit pension and postretirement plans (other than a multi employer plan) as an asset or liability in its statement of financial position and to recognize changes in that funded status in the year in which the changes occur through comprehensive income. This Statement also requires an employer to measure the funded status of a plan as of the date of its year-end statement of financial position, with limited exceptions. During the first quarter of fiscal 2008, we recorded $1.2 million as a decrease of beginning retained earnings and $0.6 million as a decrease of accumulated other comprehensive income due to the change in measurement date.

The adoption resulted in the recognition of income for fiscal 2006 of $36.2 million in other comprehensive income, net of tax effect of $0.7 million, and a corresponding reduction in pension liability of $36.9 million as of January 31, 2007.

### *Income Taxes*

In accordance with the provisions of FASB SFAS 109, "Accounting for Income Taxes," we account for income taxes using the asset and liability method. The asset and liability method requires the recognition of deferred tax assets and liabilities for expected future tax consequences of temporary differences that currently exist between the tax bases and financial reporting bases of our assets and liabilities. In assessing the realizability of deferred tax assets, we consider whether it is more likely than not that some or a portion of the deferred tax assets will not be realized. A valuation allowance is provided for deferred income tax assets when, in our judgment, based upon currently available information and other factors, it is more likely than not that a portion of such deferred income tax assets will not be realized. The determination of the need for a valuation allowance is based on an on-going evaluation of current information including, among other things, estimates of future earnings in different tax jurisdictions and the expected timing of deferred income tax asset reversals. We believe that the determination to record a valuation allowance to reduce deferred income tax assets is a critical accounting estimate because it is based on an estimate of future taxable income in the U.S. and certain other jurisdictions, which is susceptible to change and may or may not occur, and because the impact of adjusting a valuation allowance may be material.

Effective February 1, 2007, we adopted FASB Interpretation No. 48, *"Accounting for Uncertainty in Income Taxes, an interpretation of FASB Statement No. 109"* (FIN 48). FIN 48 provides guidance on financial statement recognition and measurement of tax positions taken, or expected to be taken, in tax returns. Our policy is to report interest related to unrecognized tax benefits in interest expense and penalties, if any, related to unrecognized tax benefits in income tax expense in our Consolidated Statements of Operations. The initial adoption of FIN 48 did not have a material impact on our financial statements.

### New Accounting Pronouncements

In December 2008, the FASB issued FASB Staff Position (FSP) SFAS 132(R)-1, "Employers' Disclosures about Postretirement Benefit Plan Assets" (FSP SFAS 132(R)-1). FSP SFAS 132(R)-1 provides enhanced disclosures with regard to assets held by postretirement plans, including how investment allocations are made, the major categories of plan assets, the inputs and valuation techniques used to measure the fair value of plan assets, the effect of fair value measurements using Level 3 inputs, as defined in SFAS 157, "Fair Value Measurements" (SFAS 157) and an understanding of significant concentrations of risk within plan assets. FSP SFAS 132(R)-1 is effective for fiscal years ending after December 15, 2009, with early application permitted. We are currently assessing the potential impacts, if any, on our consolidated financial statements.

In March 2008 the FASB issued SFAS 161, " *Disclosures about Derivative Instruments and Hedging Activities — an amendment of FASB Statement No. 133*" (SFAS 161). This standard requires enhanced disclosures about an entity's derivative and hedging activities. SFAS 161 requires qualitative disclosures about objectives and strategies for using derivatives, quantitative disclosures about fair value amounts of gains and losses on derivative instruments, and disclosures about credit-risk-related contingent features in derivative agreements. This standard is effective for financial statements issued for fiscal years and interim periods beginning after November 15, 2008 and only requires disclosures for earlier periods presented for comparative purposes beginning in the first year after the year of initial adoption. We do not anticipate that the adoption of SFAS 161 will have a significant impact on our financial condition or results of operations.

In December 2007 the FASB issued SFAS 141R, " *Business Combinations*" (SFAS 141R). This standard establishes principles and requirements for how the acquirer recognizes and measures the acquired identifiable assets, assumed liabilities, noncontrolling interest in the acquiree, and acquired goodwill or gain from a bargain purchase. SFAS 141R also determines what information the acquirer must disclose to enable users of the financial statements to evaluate the nature and financial effects of the business combination. SFAS 141R applies prospectively to business combinations for which the acquisition date is on or after January 1, 2009. We do not anticipate that the adoption of SFAS 141R will have a significant impact on our financial condition or results of operations.

In December 2007 the FASB issued SFAS 160, " *Noncontrolling Interests in Consolidated Financial Statements — an amendment of ARB No. 51* " (SFAS 160). This standard establishes accounting and reporting standards for the noncontrolling interest in a subsidiary and for the deconsolidation of a subsidiary. SFAS 160 clarifies that a noncontrolling interest in a subsidiary is an ownership interest in the consolidated entity that should be reported as equity in the consolidated financial statements. SFAS 160 is effective for us as of February 1, 2009 with early adoption prohibited. SFAS 160 shall be applied prospectively as of the beginning of the fiscal year in which this standard is initially applied. The presentation and disclosure requirements of this standard shall be applied retrospectively for all periods presented and will impact how we present and disclose noncontrolling interests and income from noncontrolling interests in our financial statements.

In September 2006 the FASB issued SFAS 157, *"Fair Value Measurements"* . SFAS 157 establishes a framework for measuring fair value and expands disclosures about fair value measurements. The changes to current practice resulting from the application of SFAS 157 relate to the definition of fair value, the methods used to measure fair value, and the expanded disclosures about fair value measurements. We adopted the provisions of SFAS 157 with our fiscal year beginning February 1, 2008. The adoption of SFAS 157 did not have a significant impact on our consolidated financial statements. In February 2008, the FASB issued FASB Staff Position (FSP) 157-2, "Effective Date of FASB Statement No. 157" (FSP 157-2). This FSP delays the effective date of SFAS 157 for all nonfinancial assets and nonfinancial liabilities, except those that are recognized or disclosed at fair value in the financial statements on a recurring basis (at least annually). The effective date for nonfinancial assets and nonfinancial liabilities has been delayed by one year to fiscal years beginning after November 15, 2008 and interim periods within those fiscal years. We do not anticipate that the adoption of FSP 157-2 will have a significant impact on our financial condition and results of operations.

**Item 7A.**  *Quantitative and Qualitative Disclosures about Market Risk*

### Market Risks

In the normal course of business we are exposed to market risks arising from changes in foreign exchange rates, interest rates, raw material, and utility prices. We selectively use derivative financial instruments to manage these risks, but do not enter into any derivative financial instruments for trading purposes.

### Foreign Exchange

We have global operations and thus make investments and enter into transactions in various foreign currencies. In order to minimize the risks associated with foreign currency fluctuations, we first seek to internally net foreign exchange exposures, and may use derivative financial instruments to hedge any remaining net exposure. We use forward foreign currency exchange contracts on a limited basis to reduce the earnings and cash flow impact of non-functional currency denominated transactions. The gains and losses from these hedging instruments generally offset the gains or losses from the hedged items and are recognized in the same period the hedged items are settled.

The value of our consolidated assets and liabilities located outside the U.S. (translated at period-end exchange rates) and income and expenses (translated using average rates prevailing during the period), generally denominated in the Euro, Czech Crown, and the Brazilian Real, are affected by the translation into our reporting currency (the U.S. dollar). Such translation adjustments are reported as a separate component of stockholders' equity. In future periods, foreign exchange rate fluctuations could have an increased impact on our reported results of operations. However, due to the self-sustaining nature of our foreign operations, we believe we can effectively manage the effect of these currency fluctuations. In addition, in order to further hedge against such currency rate fluctuations, we have, from time to time, entered into certain foreign currency swap arrangements.

In January 2006 we entered into a foreign currency swap agreement in Euros with a total notional value of $50 million to hedge our net investment in certain of our foreign subsidiaries. During the first quarter of fiscal 2007 the foreign currency swap agreement was effective. During the second quarter of 2007 we terminated the swap due to our debt restructuring. During the fourth quarter of fiscal 2007 we recognized the loss associated with the swap due to the liquidation of the related foreign subsidiaries.

At January 31, 2009 and January 31, 2008 approximately €407 million or $524 million and €410 million **o** $607 million, respectively, of our debt was denominated in Euros. A hypothetical 10% adverse movement in the foreign currency exchange rate on our Euro denominated debt would affect earnings by approximately $5.2 million on an annual basis.

### Interest Rates

We generally manage our risk associated with interest rate movements through the use of a combination of variable and fixed rate debt. We have from time to time entered into interest rate swap arrangements to further hedge against interest rate fluctuations.

In January 2006 we entered into an interest rate swap agreement with a total notional value of $50 million to hedge the variability of interest payments associated with our variable-rate term debt. The swap agreement was expected to settle in January 2009, and qualified for cash flow hedge accounting treatment. During the first quarter of fiscal 2007 the swap was effective. During the second quarter of 2007 we terminated the swap due to our debt restructuring and recognized the loss associated with the swap.

During the second quarter of fiscal 2007 we entered into interest rate swaps with total notional amount of €70 million. The swaps became effective on August 28, 2007 and mature on August 28, 2012. The fair value of the interest rate swaps was $3.3 million as of January 31, 2009.

During the third quarter of fiscal 2007 we entered into interest rate swaps with total notional amount of €50 million. The swaps became effective on September 30, 2007 and mature on September 30, 2012. The fair value of the interest rate swaps was $2.3 million as of January 31, 2009.

During the first quarter of fiscal 2008 we entered into interest rate swaps with total notional amount of €50 million. The swaps became effective on February 28, 2008 and were to mature on February 28, 2012. During the fourth quarter of fiscal 2008 we terminated the swap and recognized a loss of $3.2 million, which was included in interest expense in our Consolidated Statements of Operations.

Subsequent to January 31, 2009, our swaps will no longer be effective and any losses will be recognized in the Consolidated Statements of Operations as interest expense.

At January 31, 2009 and January 31, 2008 approximately $325 million and $234 million, respectively, of our debt was variable rate debt after considering the impact of the swaps. A hypothetical 10% adverse movement in the interest rate on variable rate debt would affect interest expense by approximately $2.8 million on an annual basis.

### Commodities

We rely on the supply of certain raw materials and other inputs in our production process, including aluminum, steel, and natural gas. We manage the exposure associated with these commitments primarily through the terms of our supply and procurement contracts. In recent periods there has been significant volatility in the global prices of steel, aluminum, and natural gas, which have had an impact on our business. We typically use forward-fixed contracts to hedge against changes in commodity prices for a majority of our outstanding purchase commitments. We also enter into forward purchase commitments for natural gas to mitigate market fluctuations in natural gas prices. The use of fixed-forward contracts could result in our paying greater than market prices for these commodities.

In accordance with industry practice, we generally pass through fluctuations in the price of aluminum to our customers. We generally enter into fixed-forward contracts for aluminum based on volume projections from our customers that coincide with the applicable pass-through pricing adjustment periods. In recent periods, customer volumes have decreased significantly relative to their projections, while at the same time market prices for aluminum have fallen sharply. As a result, we have fixed-forward contracts for aluminum based on projected volumes at prices that are well above current market levels, while the amount of the cost we can pass through to the customer has decreased to reflect the lower market cost of aluminum. This potential inability to pass on price increases to our customers could adversely affect our operating margins and cash flow, and result in lower operating income and profitability. The full impact of these fixed-forward contracts will depend on the fixed-forward contract price relative to the market prices for aluminum that are used to determine customer pricing,

We have also been successful in negotiating with some of our customers to pass through a portion of fluctuations in the price of steel. If our costs for steel increase, we will attempt to mitigate the impact of the higher material costs through pricing actions with our customers, although those actions may not be sufficient to offset increased costs. In addition, our customers are not contractually obligated to accept certain of these price increases, and in light of current market conditions, they may be less likely to accept the increases currently and in the future than they have been in the past.

**Item 8.** *Financial Statements and Supplementary Data*

## HAYES LEMMERZ INTERNATIONAL, INC.

## INDEX TO FINANCIAL STATEMENTS

| | Page |
|---|---|
| Report of Independent Registered Public Accounting Firm | 47 |
| Consolidated Statements of Operations | 49 |
| Consolidated Balance Sheets | 50 |
| Consolidated Statements of Cash Flows | 51 |
| Consolidated Statements of Changes in Stockholders' Equity | 52 |
| Notes to Consolidated Financial Statements | 53 |

## Report of Independent Registered Public Accounting Firm

The Board of Directors and Stockholders
Hayes Lemmerz International, Inc.:

We have audited the accompanying consolidated balance sheets of Hayes Lemmerz International, Inc. and subsidiaries (the Company) as of January 31, 2009 and 2008, and the related consolidated statements of operations, changes in stockholders' equity, and cash flows for each of the years in the three-year period ended January 31, 2009. In connection with our audits of the consolidated financial statements, we have also audited the financial statement schedule listed in Item 15. We also have audited the Company's internal control over financial reporting as of January 31, 2009, based on criteria established in *Internal Control — Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO). The Company's management is responsible for these consolidated financial statements and financial statement schedule, for maintaining effective internal control over financial reporting, and for its assessment of the effectiveness of internal control over financial reporting, included in the accompanying Management's Annual Report on Internal Control Over Financial Reporting Item 9A (b). Our responsibility is to express an opinion on these consolidated financial statements and an opinion on the Company's internal control over financial reporting based on our audits.

We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (U.S.). Those standards require that we plan and perform the audits to obtain reasonable assurance about whether the financial statements are free of material misstatement and whether effective internal control over financial reporting was maintained in all material respects. Our audits of the consolidated financial statements included examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, and evaluating the overall financial statement presentation. Our audit of internal control over financial reporting included obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, and testing and evaluating the design and operating effectiveness of internal control based on the assessed risk. Our audits also included performing such other procedures as we considered necessary in the circumstances. We believe that our audits provide a reasonable basis for our opinions.

A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (1) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (2) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (3) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of Hayes Lemmerz International, Inc. and subsidiaries as of January 31, 2009 and 2008, and the results of their operations and their cash flows for each of the years in the three-year period ended January 31, 2009, in conformity with U.S. generally accepted accounting principles. Also in our opinion, the Company maintained, in all material respects, effective internal control over financial reporting as of January 31, 2009, based on criteria established in *Internal Control — Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO).

The accompanying consolidated financial statements have been prepared assuming that the Company will continue as a going concern. As discussed in Note 1 to the consolidated financial statements, the Company is

engaged in discussions with the lenders of their credit facility, holders of their senior notes and others regarding restructuring of the debt. If the Company does not reach an acceptable agreement with their creditors and obtain additional sources of liquidity, it is unlikely they will be able to make scheduled interest payments on their debt or satisfy other conditions and requirements under their debt obligations. These factors, together with continued operating losses and the impact of adverse industry conditions, raise substantial doubt about the Company's ability to continue as a going concern. Management's plans in regard to these matters are also described in Note 1, Description of Business. The accompanying consolidated financial statements and financial statement schedule do not include any adjustments that might result from the outcome of this uncertainty.

As discussed in Note 20 to the consolidated financial statements, the Company restated its financial statements for the years ended January 31, 2008 and 2007.

As discussed in Note 2 to the consolidated financial statements, effective January 31, 2007, the Company adopted the balance sheet provisions of Statement of Financial Accounting Standards No. 158, *Employers' Accounting for Defined Benefit Pension and Other Post Retirement Plans — an amendment of FASB No. 87, 88, 106 and 132(R)* and on February 1, 2008 adopted the measurement provisions. As discussed in Note 2 to the consolidated financial statements, effective February 1, 2007, the Company changed its method of accounting for income taxes pursuant to FASB Interpretation No. 48, *Accounting for Uncertainty in Income Taxes — an Interpretation of FASB Statement No. 109* .

/s/  KPMG LLP

Detroit, Michigan
May 4, 2009

**HAYES LEMMERZ INTERNATIONAL, INC. AND SUBSIDIARIES**

**CONSOLIDATED STATEMENTS OF OPERATIONS**

| | | Year Ended | | |
|---|---|---|---|---|
| | | January 31, 2009 | January 31, 2008 | January 31, 2007 |
| | | (Dollars in millions, except per share amounts) | | |
| Net sales | | $ 1,904.3 | $ 2,126.7 | $ 1,796.8 |
| Cost of goods sold | | 1,716.9 | 1,917.7 | 1,637.8 |
| Gross profit | | 187.4 | 209.0 | 159.0 |
| Marketing, general, and administrative | | 145.2 | 153.5 | 125.3 |
| Amortization of intangible assets | Note 7 | 10.7 | 10.2 | 10.2 |
| Asset impairments and other restructuring charges | Note 11 | 22.2 | 85.5 | 32.8 |
| Goodwill and other intangible assets impairment | Note 7 | 238.0 | — | — |
| Other expense (income), net | | 23.6 | (1.5) | (13.8) |
| (Loss) earnings from operations | | (252.3) | (38.7) | 4.5 |
| Interest expense, net | | 61.1 | 62.2 | 75.2 |
| Other non-operating expense | | 3.2 | 8.5 | — |
| Loss on early extinguishment of debt | Note 8 | 6.5 | 21.5 | — |
| Loss from continuing operations before taxes and minority interest | | (323.1) | (130.9) | (70.7) |
| Income tax expense | Note 14 | 30.7 | 29.9 | 40.2 |
| Loss from continuing operations before minority interest | | (353.8) | (160.8) | (110.9) |
| Minority interest | Note 16 | 16.4 | 21.0 | 10.6 |
| Loss from continuing operations | | (370.2) | (181.8) | (121.5) |
| Discontinued operations: | | | | |
| Earnings (loss) from discontinued operations, net of tax of ($0.8), $0.6, and ($1.1), respectively | Note 12 | 0.9 | 2.2 | (43.0) |
| Loss on sale of discontinued operations, net of tax of $0.0, $2.0, and $0.0, respectively | Note 12 | (2.4) | (14.8) | (2.4) |
| Total loss from discontinued operations, net of tax | Note 12 | (1.5) | (12.6) | (45.4) |
| Net loss | | $ (371.7) | $ (194.4) | $ (166.9) |
| **Loss per common share data** | | | | |
| *Basic and diluted:* | | | **Restated** | **Restated** |
| Loss from continuing operations | Notes 2 & 20 | $ (3.65) | $ (2.09) | $ (2.10) |
| Earnings (loss) from discontinued operations | | — | 0.03 | (0.75) |
| Loss on sale of discontinued operations | | (0.02) | (0.17) | (0.04) |
| Net loss | Notes 2 & 20 | $ (3.67) | $ (2.23) | $ (2.89) |
| Weighted average shares outstanding (in thousands) | Notes 2 & 20 | 101,345 | 87,040 | 57,836 |

See accompanying notes to consolidated financial statements.

49

## HAYES LEMMERZ INTERNATIONAL, INC. AND SUBSIDIARIES

## CONSOLIDATED BALANCE SHEETS

| | | January 31, 2009 | January 31, 2008 |
|---|---|---|---|
| | | (Dollars in millions) | |
| **ASSETS** | | | |
| Current assets: | | | |
| Cash and cash equivalents | Note 2 | $ 107.5 | $ 160.2 |
| Receivables, net | Note 2 | 157.3 | 305.6 |
| Other receivables | Note 17 | 15.4 | 48.3 |
| Inventories | Note 4 | 156.9 | 179.1 |
| Assets held for sale | Note 6 | 8.1 | 21.4 |
| Deferred tax assets | Note 14 | 3.2 | 5.0 |
| Prepaid expenses | | 7.7 | 7.2 |
| Total current assets | | 456.1 | 726.8 |
| Property, plant, and equipment, net | Note 5 | 499.2 | 616.8 |
| Goodwill | Note 7 | — | 240.5 |
| Customer relationships, net | Note 7 | 87.8 | 103.7 |
| Other intangible assets, net | Note 7 | 24.6 | 65.0 |
| Deferred tax assets | Note 14 | — | 4.2 |
| Other assets | | 28.5 | 48.9 |
| Total assets | | $ 1,096.2 | $ 1,805.9 |
| **LIABILITIES AND STOCKHOLDERS' EQUITY** | | | |
| Current liabilities: | | | |
| Bank borrowings and other notes | Note 8 | $ 46.6 | $ 32.9 |
| Current portion of long-term debt | Note 8 | 622.1 | 4.8 |
| Accounts payable | | 133.0 | 372.0 |
| Accrued payroll and employee benefits | | 53.2 | 76.4 |
| Liabilities held for sale | Note 6 | — | 8.2 |
| Other accrued liabilities | | 66.3 | 61.6 |
| Total current liabilities | | 921.2 | 555.9 |
| Long-term debt, net of current portion | Note 8 | 1.4 | 572.2 |
| Deferred tax liabilities | Note 14 | 46.7 | 76.1 |
| Pension and other long-term liabilities | Note 10 | 354.0 | 328.9 |
| Minority interest | Note 16 | 65.8 | 70.5 |
| Commitments and contingencies | Note 13 | | |
| Stockholders' equity: | | | |
| Preferred stock, 1,000,000 shares authorized, none issued or outstanding at January 31, 2009 or January 31, 2008 | | — | — |
| Common stock, par value $0.01 per share: | | | |
| 200,000,000 shares authorized; 101,819,597 and 101,057,966 issued and outstanding at January 31, 2009 and January 31, 2008, respectively | | 1.0 | 1.0 |
| Additional paid in capital | | 887.1 | 882.0 |
| Accumulated deficit | | (1,302.1) | (928.7) |
| Accumulated other comprehensive income | Note 2 | 121.1 | 248.0 |
| Total stockholders' equity | | (292.9) | 202.3 |
| Total liabilities and stockholders' equity | | $ 1,096.2 | $ 1,805.9 |

See accompanying notes to consolidated financial statements.

**HAYES LEMMERZ INTERNATIONAL, INC. AND SUBSIDIARIES**

**CONSOLIDATED STATEMENTS OF CASH FLOWS**

| | January 31, 2009 | January 31, 2008 | January 31, 2007 |
|---|---|---|---|
| | | (Dollars in millions) | |
| Cash flows from operating activities: | | | |
| Net loss | $ (371.7) | $ (194.4) | $ (166.9) |
| Adjustments to reconcile net loss to net cash provided by (used for) operating activities: | | | |
| Net loss from discontinued operations | 1.5 | 12.6 | 45.4 |
| Depreciation and tooling amortization | 93.8 | 101.9 | 101.3 |
| Amortization of intangibles | 10.7 | 10.2 | 10.2 |
| Amortization of deferred financing fees and accretion of discount | 2.3 | 3.4 | 5.7 |
| Change in deferred income taxes | (14.9) | (5.4) | 16.2 |
| Asset impairments | 9.4 | 81.1 | 22.0 |
| Goodwill and other intangible assets impairment | 238.0 | — | — |
| Minority interest | 16.4 | 21.0 | 10.6 |
| Equity compensation expense | 4.9 | 11.1 | 2.0 |
| Loss on early extinguishment of debt | 6.5 | 21.5 | — |
| Loss (gain) on sale of assets and businesses | 36.9 | 11.5 | (2.3) |
| Changes in operating assets and liabilities that increase (decrease) cash flows: | | | |
| Receivables | 104.6 | (39.9) | (30.9) |
| Other receivables | 32.9 | (5.1) | 57.7 |
| Inventories | (6.7) | (9.1) | (6.9) |
| Prepaid expenses and other | 8.8 | (10.9) | 1.3 |
| Accounts payable and accrued liabilities | (235.8) | 98.2 | 5.3 |
| Cash (used for) provided by operating activities | (62.4) | 107.7 | 70.7 |
| Cash flows from investing activities: | | | |
| Purchase of property, plant, equipment, and tooling | (80.2) | (102.4) | (70.4) |
| Sale of assets and businesses | (24.0) | 2.3 | 10.2 |
| Capital contributed by minority shareholders | — | — | 0.4 |
| Cash used for investing activities | (104.2) | (100.1) | (59.8) |
| Cash flows from financing activities: | | | |
| Changes in bank borrowings and credit facilities | 21.0 | 1.2 | 1.6 |
| Proceeds from issuance of long term debt | — | 524.1 | — |
| Proceeds from revolver | 125.0 | — | — |
| Repayment of long-term debt | (4.3) | (659.6) | (20.9) |
| Dividends to minority shareholders | (12.4) | (11.8) | (3.9) |
| Call premium on redemption of Senior Notes | — | (9.0) | — |
| Bank finance fees paid | (2.8) | (14.8) | (4.0) |
| Fees paid for extinguishment of debt | (1.5) | — | — |
| Net proceeds from issuance of common stock | — | 185.4 | — |
| Cash provided by (used for) financing activities | 125.0 | 15.5 | (27.2) |
| Cash flows of discontinued operations: | | | |
| Net cash provided by operating activities | 2.2 | 2.7 | 26.2 |
| Net cash (used for) provided by investing activities | (2.4) | 94.6 | (2.9) |
| Net cash used for financing activities | — | (4.9) | (13.4) |
| Net cash (used for) provided by discontinued operations | (0.2) | 92.4 | 9.9 |
| Effect of exchange rate changes on cash and cash equivalents | (10.9) | 6.2 | 2.4 |
| (Decrease) increase in cash and cash equivalents | (52.7) | 121.7 | (4.0) |
| Cash and cash equivalents at beginning of period | 160.2 | 38.5 | 42.5 |
| Cash and cash equivalents at end of period | $ 107.5 | $ 160.2 | $ 38.5 |

See accompanying notes to consolidated financial statements.

## HAYES LEMMERZ INTERNATIONAL, INC. AND SUBSIDIARIES

## CONSOLIDATED STATEMENTS OF CHANGES IN STOCKHOLDERS' EQUITY

| | Shares | Par Value | Paid in Capital | Accumulated Deficit | Accumulated Other Comprehensive Income | Total |
|---|---|---|---|---|---|---|
| | | | (Dollars in millions, except share amounts) | | | |
| Balance at January 31, 2006 | 37,991,269 | $ 0.4 | $ 675.9 | $ (566.3) | $ 73.3 | $ 183.3 |
| Preferred stock dividends declared | — | — | — | (0.4) | — | (0.4) |
| Comprehensive income (loss): | | | | | | |
| Net loss | — | — | — | (166.9) | — | (166.9) |
| Currency translation adjustment, net of tax of $0.8 | — | — | — | — | 44.8 | 44.8 |
| Minimum pension liability adjustment, net of tax of $3.1 | — | — | — | — | 4.6 | 4.6 |
| Unrealized loss on derivatives | — | — | — | — | (2.5) | (2.5) |
| Total comprehensive loss | | | | | | (120.0) |
| Shares issued due to vesting of restricted stock units | 474,092 | — | — | — | — | — |
| Shares of redeemable preferred stock of subsidiary converted into common stock | 5,073 | | | | | |
| Adjustment resulting from adoption of SFAS 158, net of tax of $0.7 | — | — | — | — | 36.2 | 36.2 |
| Equity compensation expense | — | — | 2.7 | — | — | 2.7 |
| Balance at January 31, 2007 | 38,470,434 | 0.4 | 678.6 | (733.6) | 156.4 | $ 101.8 |
| Preferred stock dividends declared | — | $ — | $ — | $ (0.7) | $ — | $ (0.7) |
| Comprehensive income (loss): | | | | | | |
| Net loss | — | — | — | (194.4) | — | (194.4) |
| Currency translation adjustment, net of tax of $2.6 | — | — | — | — | 55.2 | 55.2 |
| Change in retirement plans' funding status, net of tax of $4.5 | — | — | — | — | 36.7 | 36.7 |
| Change in unrealized loss on derivatives, net of tax of $0.0 | — | — | — | — | (0.3) | (0.3) |
| Total comprehensive loss | | | | | | (102.8) |
| Shares issued for options exercised and restricted stock units vested | 2,025,503 | — | — | — | — | — |
| Common stock issued to note holders | 1,049,020 | — | 5.3 | — | — | 5.3 |
| Common stock issued, net of fees | 59,423,077 | 0.6 | 184.8 | — | — | 185.4 |
| Shares of redeemable preferred stock of subsidiary converted into common stock | 89,932 | — | 2.1 | — | — | 2.1 |
| Equity compensation expense | — | — | 11.2 | — | — | 11.2 |
| Balance at January 31, 2008 | 101,057,966 | $ 1.0 | $ 882.0 | $ (928.7) | 248.0 | $ 202.3 |
| Preferred stock dividends declared | — | — | — | (0.5) | — | (0.5) |
| Comprehensive income: | | | | | | |
| Net loss | — | — | — | (371.7) | — | (371.7) |
| Currency translation adjustment, net of tax ($0.8) | — | — | — | — | (60.4) | (60.4) |
| Change in retirement plans' funding status, net of tax of $1.3 | — | — | — | — | (70.6) | (70.6) |
| Change in unrealized loss on derivatives, net of tax of $0.0 | — | — | — | — | 4.7 | 4.7 |
| Total comprehensive loss | — | — | — | — | — | (498.0) |
| Shares of redeemable preferred stock of subsidiary converted into common stock | 14,152 | — | 0.2 | — | — | 0.2 |
| Shares issued for vested restricted stock units | 747,479 | — | — | — | — | — |
| Pension measurement date adjustment | — | — | — | (1.2) | (0.6) | (1.8) |
| Equity compensation expense | — | — | 4.9 | — | — | 4.9 |
| Balance at January 31, 2009 | 101,819,597 | $ 1.0 | $ 887.1 | $ (1,302.1) | 121.1 | $(292.9) |

See accompanying notes to consolidated financial statements.

HAYES LEMMERZ INTERNATIONAL, INC. AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

Years Ended January 31, 2009, 2008, and 2007

**Note 1.   Description of Business**

Unless otherwise indicated, references to "we," "us," or "our" mean Hayes Lemmerz International, Inc., a Delaware corporation, and our subsidiaries. References to a fiscal year means the 12-month period commencing on February 1st of that year and ending on January 31st of the following year (i.e., "fiscal 2008" refers to the period beginning February 1, 2008 and ending January 31, 2009, "fiscal 2007" refers to the period beginning February 1, 2007 and ending January 31, 2008, and "fiscal 2006" refers to the period beginning February 1, 2006 and ending January 31, 2007).

Originally founded in 1908, we are a leading worldwide producer of aluminum and steel wheels for passenger cars and light trucks and of steel wheels for commercial trucks and trailers. We are also a supplier of automotive powertrain components. We have global operations with 23 facilities, including business and sales offices and manufacturing facilities located, in 12 countries around the world. We sell our products to the major manufacturers of passenger cars and light trucks and to commercial highway vehicle customers throughout the world.

Our current sources of liquidity are not sufficient to fund our operations through May 2009. As a result of current conditions in the automotive industry and our recurring operating losses, negative cash flows, and need for additional financing, the audit report relating to our consolidated financial statements for the year ended January 31, 2009 contains an explanatory paragraph regarding our ability to continue as a going concern. While the lenders under our New Credit Facility have waived defaults under our New Credit Facility that result from our receipt of such a going concern explanatory paragraph, we will need to reach an acceptable agreement with our creditors regarding a recapitalization of the Company and restructuring of our indebtedness in a Chapter 11 proceeding.

A majority of the lenders under our New Credit Facilities have, subject to approval of the bankruptcy court in which we file petitions under Chapter 11, agreed to provide us with DIP Financing in an aggregate amount of up to $100 million ($80 million of which is committed pursuant to the terms and conditions of a commitment letter). A Chapter 11 filing will result in a default under our New Credit Facility, our Notes, and certain of our other debt obligations, and those debts will become automatically due and payable, subject to an automatic stay of any action to collect, assert, or recover a claim against us under applicable bankruptcy law.

We believe that our currently outstanding common stock will have no value and will be cancelled under any plan of reorganization we may propose under Chapter 11. We also believe that the holders of our Notes are unlikely to receive more than a de minimis distribution on account of their interests in the Notes and that such interests could be cancelled under any plan of reorganization we may propose under Chapter 11. There can be no assurance, however, that any agreement regarding the recapitalization and restructuring of the Company under Chapter 11 will be obtained on acceptable terms with the necessary parties. Should the bankruptcy court not approve our proposed DIP Financing, or should we be unable to propose and implement a successful plan of reorganization, we would not be able to continue as a going concern.

**Note 2.   Basis of Presentation and Summary of Significant Accounting Policies**

*Basis of Presentation*

The preparation of consolidated financial statements in conformity with U.S. generally accepted accounting principles (GAAP) requires us to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the consolidated financial statements and the reported amounts of revenues and expenses during the reporting period. Considerable judgment is often involved in making these determinations; the use of different assumptions could result in significantly different results. We believe our assumptions and estimates are reasonable and appropriate; however, actual results could differ from those estimates.

**HAYES LEMMERZ INTERNATIONAL, INC. AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

The accompanying consolidated financial statements have been prepared on a going concern basis which contemplates continuity of operations, realization of assets, and payment of liabilities in the ordinary course of

53.1

**HAYES LEMMERZ INTERNATIONAL, INC. AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

business and do not reflect adjustments that might result if we are unable to continue as a going concern. Our recent history of significant losses, deficit in stockholders' equity and issues related to non-compliance with debt covenants raise substantial doubt about our ability to continue as a going concern. Continuing as a going concern is dependent upon, among other things, our ability to successfully complete a restructuring of our existing indebtedness and find sources of additional liquidity, the success of future business operations, and the generation of sufficient cash from operations and financing sources to meet our obligations.

### *Summary of Significant Accounting Policies*

*Principles of Consolidation:* Our consolidated financial statements include the accounts of our majority-owned subsidiaries. All significant intercompany balances and transactions have been eliminated in consolidation. Our minority investments in joint ventures are accounted for under the equity method. The financial position as of January 31, 2009, 2008, and 2007 and results of operations for all periods presented for these joint ventures were not material to our consolidated financial statements.

*Cash and Cash Equivalents:* Cash and cash equivalents include short-term investments with original maturities of 90 days or less. As of January 31, 2009 and 2008, we had restricted cash of $2.3 million and $2.2 million, respectively. The balance in both years includes $1.6 million of cash held in escrow that was related to the sale of our Bristol, Indiana and Montague, Michigan facilities (see Note 3, Acquisitions and Divestitures of Businesses, for additional information on the sale of these facilities). The cash held in escrow is to secure the indemnification obligations under the stock purchase agreement for these facilities. The remainder of the restricted cash in both years is for cash held in escrow related to the sale of our Romulus, Michigan facility in January 1998 and is to be used for the remediation of environmental liabilities. We also had cash balances of $5.0 million and $3.0 million for the years ending January 31, 2009 and 2008, respectively, primarily related to compensating balances at our German plant for the accounts receivable securitization program as well as collateral at our Spain facility in order to obtain favorable pricing with our steel supplier.

*Accounts Receivable:* Receivables are presented net of allowances for doubtful accounts of approximately $0.3 million and $1.5 million at January 31, 2009 and January 31, 2008, respectively. Trade accounts receivable are recorded at the invoiced amount and do not bear interest. The allowance for doubtful accounts provides for losses believed to be inherent within our receivables (primarily trade receivables). We evaluate both the creditworthiness of specific customers and the overall probability of losses based upon an analysis of the overall aging of receivables, past collection trends, and general economic conditions. Accounts receivable are written off when it becomes apparent such amounts will not be collected. We believe that the allowance for uncollectible accounts is adequate to cover potential losses. Actual results may vary as a result of unforeseen economic events and the impact those events could have on our customers. See Note 17, Off Balance Sheet Arrangements, for a description of our domestic accounts receivable securitization facility.

*Inventories:* Inventories are stated at the lower of cost or market, with cost determined principally by the first-out or average cost method. Cost includes the cost of materials, direct labor, and the applicable share of manufacturing overhead. Spare parts and indirect supply inventories are stated at cost and charged to earnings as used. Cash flows from the sale of inventory are classified in the operating activities section of the Consolidated Statements of Cash Flows.

*Property, Plant, and Equipment:* Property, plant, and equipment are recorded at cost. Depreciation is generally provided on a straight-line basis at rates that are designed to write off the assets over their estimated useful lives, principally as follows:

| | |
|---|---|
| Buildings | 12-25 years |
| Machinery and equipment | 1-10 years |

Our policy for repair and maintenance costs incurred in connection with planned major maintenance activities is to expense items as incurred.

**HAYES LEMMERZ INTERNATIONAL, INC. AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

*Special Tooling:* Expenditures made to meet special tooling requirements are capitalized. Special tooling, which is reimbursable by the customer, is classified as either a current asset in accounts receivable or as other current assets in the Consolidated Balance Sheets, depending upon the expected time of reimbursement, and was $6.1 million and $8.5 million as of January 31, 2009 and 2008, respectively. Special tooling that is not reimbursable by the customer is classified as a non-current asset and is charged to cost of goods sold on a straight-line basis over a five year period or the estimated useful life, whichever is shorter.

*Goodwill and Other Intangible Assets:* Goodwill and other indefinite-lived intangible assets are tested for impairment annually. We test goodwill for impairment as of November 1st of each fiscal year, or more frequently should circumstances change or events occur that would more likely than not reduce the fair value of a reporting unit below its carrying amount, as provided for in Financial Accounting Standards Board (FASB) Statement of Financial Accounting Standards (SFAS) 142, "Goodwill and Other Intangible Assets" (SFAS 142). To conduct our impairment testing, we compare the fair value of our reporting units to the related net book value. If the fair value of a reporting unit exceeds its net book value, goodwill is considered not to be impaired. If the net book value of a reporting unit exceeds its fair value, an impairment loss is measured and recognized. Other definite-lived intangible assets continue to be amortized on a straight line basis over their estimated lives.

We utilize an income approach to estimate the fair value of each of our reporting units. The income approach is based on projected debt-free cash flow, which is discounted to the present value using discount factors that consider the timing and risk of cash flows. We believe that this approach is appropriate because it provides a fair value estimate based upon the reporting unit's expected long-term operating cash flow performance. This approach also mitigates the impact of cyclical downturns that occur in the industry. Fair value is estimated using recent automotive industry and specific platform production volume projections, which are based on both third-party and internally-developed forecasts, as well as commercial, wage and benefit, inflation, and discount rate assumptions. Other significant assumptions include terminal value growth rates, terminal value margin rates, future capital expenditures, and changes in future working capital requirements. While there are inherent uncertainties related to the assumptions used and to management's application of these assumptions to this analysis, we believe that the income approach provides a reasonable estimate of the fair value of our reporting units.

*Impairment of Long-lived Assets:* We review the carrying value of long-lived assets, including definite-lived intangible assets, for impairment whenever events or changes in circumstances indicate that the carrying amount of an asset may not be recoverable in accordance with FASB SFAS 144, "Accounting for the Impairment or Disposal of Long-Lived Assets," (SFAS 144). Recoverability of assets to be held and used is measured by a comparison of the carrying amount of the assets to the undiscounted future net cash flows expected to be generated by the assets. If such assets are considered to be impaired, the impairment to be recognized is measured by the amount by which the carrying amount of the assets exceeds the fair value of the assets. Assets to be disposed of are reported at the lower of the carrying amount or fair values less costs to sell and are no longer depreciated (see Note 11, Asset Impairments and Other Restructuring Charges).

*Financial Instruments:* We enter into futures contracts and purchase commitments from time to time to hedge our exposure to future increases in commodity prices. Outstanding contracts represent future commitments and are not included in the Consolidated Balance sheets. Substantially all of such contracts mature within a period of three months to six months. Gains or losses resulting from the liquidation of futures contracts are recognized in the Consolidated Statements of Operations as part of cost of goods sold.

We enter into swap agreements from time to time to hedge our exposure to fluctuations in interest rates on our variable rate debt. We apply hedge accounting to our swaps, as provided for in SFAS 133, "Accounting for Derivative Instruments and Hedging Activities." We assess hedge effectiveness at least quarterly and recognize any gain/loss for the ineffective portion of the hedge in our Consolidated Statements of Operations.

*Pension and Postretirement Benefits Other Than Pension:* Annual net periodic expense and benefit liabilities under our defined benefit plans are determined on an actuarial basis. Assumptions used in the actuarial calculations

**HAYES LEMMERZ INTERNATIONAL, INC. AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

have a significant impact on plan obligations and expense. Each January, we review the actual experience compared to the more significant assumptions used and make adjustments to the assumptions, if warranted. The healthcare trend rates are reviewed with the actuaries based upon the results of their review of claims experience. Discount rates are based upon an expected benefit payments duration analysis and the equivalent average yield rate for high-quality fixed-income investments.

Pension benefits, other than in Germany, are funded through deposits with trustees and the expected long-term rate of return on fund assets is based upon actual historical returns modified for known changes in the market and any expected change in investment policy. German pension benefits and other postretirement benefits are not funded and our policy is to pay these benefits as they become due.

Effective January 31, 2007, we adopted SFAS 158, "Employers' Accounting for Defined Benefit Pension and Other Postretirement Plans" (SFAS 158). SFAS 158 requires an employer to recognize the over funded or under funded status of defined benefit pension and postretirement plans (other than a multi employer plan) as an asset or liability in its statement of financial position and to recognize changes in that funded status in the year in which the changes occur through comprehensive income. This Statement also requires an employer to measure the funded status of a plan as of the date of its year-end statement of financial position, with limited exceptions. During the first quarter of fiscal 2008, we recorded $1.2 million as a decrease of beginning retained earnings and $0.6 million as a decrease of accumulated other comprehensive income due to the change in measurement date.

The adoption resulted in the recognition of income for fiscal 2006 of $36.2 million in other comprehensive income, net of tax effect of $0.7 million, and a corresponding reduction in pension liability of $36.9 million as of January 31, 2007.

*Accumulated Other Comprehensive Income:*  SFAS 130, "Reporting Comprehensive Income," establishes standards for the reporting and display of comprehensive income. Comprehensive income is defined as all changes in a Company's net assets except changes resulting from transactions with shareholders. It differs from net income in that certain items currently recorded to equity would be a part of comprehensive income. Disclosure of comprehensive income (loss) is incorporated into the Consolidated Statements of Changes in Stockholders' Equity.

The balance of accumulated other comprehensive income consisted of the following for the years indicated (in millions):

|  | Year Ended January 31, | | |
|  | **2009** | **2008** | **2007** |
|---|---|---|---|
| Currency translation adjustment | $124.8 | $185.2 | $130.0 |
| Pension adjustments | (3.7) | 67.5 | 30.8 |
| Unrealized loss on derivatives — cash flow hedge | — | (4.7) | 0.3 |
| Unrealized loss on derivatives — net investment hedge | — | — | (4.7) |
| Total | $121.1 | $248.0 | $156.4 |

*Revenue Recognition:*  Sales are recognized in accordance with GAAP, including the Securities and Exchange Commission's Staff Accounting Bulletin 104, "Revenue Recognition in Financial Statements," which requires that sales be recognized when there is evidence of a sales agreement, the delivery of goods has occurred, the sales price is fixed or determinable, and collection of related billings is reasonably assured. Revenues are recognized upon shipment of product and transfer of ownership to the customer. Provisions for customer sales allowances and incentives are recorded as a reduction of sales at the time of product shipment.

*Research and Development Costs:*  Research and development costs are expensed as incurred. Amounts expensed during the years ended January 31, 2009, 2008, and 2007 were approximately $12.4 million, $9.6 million, and $4.4 million, respectively.

56

**HAYES LEMMERZ INTERNATIONAL, INC. AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

*Asset Impairment Losses and Other Restructuring Charges:* Our Consolidated Statements of Operations included herein reflect an element of operating expenses described as asset impairments and other restructuring charges. We periodically evaluate whether events and circumstances have occurred that indicate that the remaining useful life of any of our long lived assets may warrant revision or that the remaining balance might not be recoverable. When factors indicate that the long lived assets should be evaluated for possible impairment, we use an estimate of the future undiscounted cash flows generated by the underlying assets to determine if a write-down is required. If a write-down is required, we adjust the book values of the impaired long-lived assets to their estimated fair values. Fair value is determined through third party appraisals or discounted cash flow calculations. The related charges are recorded as an asset impairment or, in the case of certain exit costs in connection with a plant closure or restructuring, a restructuring or other charge in the Consolidated Statements of Operations.

*Product Warranties:* Accruals for estimated warranty costs are based on historical experience and adjusted from time to time depending on actual experience. Warranty reserves are evaluated for adequacy on a regular basis. Accrual adjustments may be required when actual warranty claim experience differs from estimates.

The balance of our product warranty liability consisted of the following for the years indicated (in millions):

|  | Year Ending January 31, | | |
| --- | ---: | ---: | ---: |
|  | **2009** | **2008** | **2007** |
| Balance at the beginning of year | $ 0.1 | $ 0.1 | $ 2.6 |
| Change in accrual | 0.5 | 0.1 | (0.1) |
| Cash payments | (0.5) | (0.1) | (2.4) |
| Balance at the end of year | $ 0.1 | $ 0.1 | $ 0.1 |

*Sale of Receivables:* We sell receivables in securitization sales transactions to fund our operations and to maintain liquidity. In our securitization transactions, we surrender control over these assets by selling receivables to securitization special purpose entities (SPEs). Securitization entities are a common, required element of securitization transactions to meet certain legal and transaction requirements that assure that the sold assets have been isolated from our creditors and us.

Receivables are considered sold for accounting purposes when the receivables are transferred beyond the reach of our creditors, the transferee has the right to pledge or exchange the assets, and we have surrendered control over the rights and obligations of the receivables. If these criteria are satisfied, the receivables are removed from our balance sheet at the time they are sold.

For off-balance sheet sales of receivables, estimated gains or losses are recognized in the period in which the sale occurs. We retain certain interests in receivables sold in securitization transactions. These interests are recorded at fair value with unrealized gains or losses recorded, net of tax, in accumulated other comprehensive income, a component of stockholders' equity.

Certain sales of receivables do not qualify for off-balance sheet treatment. As a result, the sold receivables and associated debt are not removed from our balance sheet and no gain or loss is recorded for these transactions.

*Foreign Currency Translation/Transaction:* Assets and liabilities of subsidiaries denominated in foreign currencies are translated at the rate of exchange in effect on the balance sheet date; income and expenses are translated at the average rates of exchange prevailing during the year. The related translation adjustments are reflected as a component of accumulated other comprehensive income in the stockholders' equity section of the Consolidated Balance Sheets. In fiscals 2008, 2007, and 2006 we recorded foreign currency transaction losses of $1.7 million, $2.4 million, and $1.5 million, respectively. Foreign currency transaction losses are included in the Consolidated Statements of Operations as a component of other income, net.

*Taxes on Income:* Deferred tax assets and liabilities are recognized for the future tax consequences attributable to differences between the financial statement carrying amounts of existing assets and liabilities

# HAYES LEMMERZ INTERNATIONAL, INC. AND SUBSIDIARIES

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

and their respective tax bases and operating loss and tax credit carryforwards. Deferred tax assets and liabilities are measured using enacted tax rates expected to apply to taxable income in the years in which those temporary differences are expected to be recovered or settled. The effect on deferred tax assets and liabilities of a change in tax rates is recognized in income in the period that includes the enactment date. A valuation allowance is recognized to reduce the deferred tax assets to the amount that is more likely than not to be realized. We have not recorded a deferred tax liability for temporary differences related to investments in foreign subsidiaries that are essentially permanent in duration. These temporary differences may become taxable upon a repatriation of assets from the subsidiaries or a sale or liquidation of the subsidiaries. We have a liability for taxes that may become payable as a result of future audits of past years by tax authorities. The amounts are analyzed periodically and adjustments are made as events occur to warrant adjustment.

We account for the recognition and measurement of tax positions taken in accordance with FASB Interpretation No. 48, *"Accounting for Uncertainty in Income Taxes, an interpretation of FASB Statement No. 109"* (FIN 48). FIN 48 provides guidance on financial statement recognition and measurement of tax positions taken, or expected to be taken, in tax returns. Our policy is to report interest related to unrecognized tax benefits in interest expense and penalties, if any, related to unrecognized tax benefits in income tax expense in our Consolidated Statements of Operations.

*Taxes Collected from Customers and Remitted to Governmental Authorities:* Taxes assessed by various governmental authorities, such as value added taxes and sales taxes, are excluded from revenues and costs and are reported on a net basis.

*Environmental Costs.* Costs related to environmental assessments and remediation efforts at current operating facilities, previously owned or operated facilities, and U.S. Environmental Protection Agency Superfund or other waste site locations are accrued when it is probable that a liability has been incurred and the amount of that liability can be reasonably estimated. Estimated costs are recorded at undiscounted amounts, based on experience and assessments, and are regularly evaluated. The liabilities are recorded in other current liabilities and long-term liabilities in the consolidated balance sheets.

*Weighted Average Shares Outstanding:* Basic earnings per share are calculated by dividing net earnings (losses) by the weighted average shares outstanding during the period. Diluted earnings per share reflect the weighted average impact of all potentially dilutive securities from the date of issuance. Weighted average shares outstanding used in calculating earnings per share were (in thousands):

| | January 31, | | |
| --- | --- | --- | --- |
| | 2009 | 2008 | 2007 |
| Basic weighted average shares outstanding | 101,345 | 87,040 | 57,836 |
| Dilutive effect of options and warrants | — | — | — |
| Diluted weighted average shares outstanding | 101,345 | 87,040 | 57,836 |

For the years ended January 31, 2009, 2008, and 2007 approximately 2.0 million, 2.6 million, and 2.3 million shares, respectively, attributable to options and warrants and 79,378, 81,118, and 97,034 shares, respectively, of subsidiary preferred stock, which are convertible into our common stock, were excluded from the calculation of weighted average shares outstanding as the effect was anti-dilutive. See Note 20, Prior Period Accounting Errors, for additional information on the calculation of weighted average shares and earnings per share.

**HAYES LEMMERZ INTERNATIONAL, INC. AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

*Statements of Cash Flows:* The following is additional information to the Consolidated Statements of Cash Flows for the years indicated (dollars in millions):

|  | January 31, | | |
| --- | --- | --- | --- |
|  | **2009** | **2008** | **2007** |
| Supplemental cash flow disclosures: | | | |
| Cash paid for interest | $53.1 | $59.1 | $70.7 |
| Net cash paid for income taxes on continuing operations | 45.8 | 33.4 | 18.7 |
| Net cash (received) paid for income taxes on discontinued operations | — | (0.4) | 2.6 |

*Stock-Based Compensation:* We account for stock based compensation in accordance with SFAS 123R, "Share-Based Payment" (SFAS 123R), which we adopted on February 1, 2006. SFAS 123R requires entities to recognize the cost of employee services received in exchange for awards of equity instruments based on the grant-date fair value of those awards. Expense is recognized based on the vesting period of the awards. There was no material adjustment to our Consolidated Statement of Operations upon adoption of SFAS 123R.

**Note 3.  Acquisitions and Divestitures of Businesses**

On June 13, 2008 we sold our Hoboken, Belgium subsidiary to BBS International GmbH (BBS), a subsidiary of Punch International NV (Punch). Under the agreement, BBS acquired all of the outstanding shares of stock of Hayes Lemmerz Belgie B.V.B.A., which had operations in Hoboken (near Antwerp, Belgium). The Hoboken factory produced cast aluminum wheels for passenger cars and employed approximately 315 people. The purchase price of the transaction was not material to either party. We recorded a loss on the sale of approximately $35.7 million in fiscal 2008, which is included in other income, net in the Consolidated Statements of Operations, and we contributed $27.0 million in cash as part of the transaction.

On November 9, 2007 we completed the sale of our Automotive Brake Components division (Brakes business) to Brembo North America, Inc. Under the agreement, Brembo North America, Inc., a subsidiary of Brembo S.p.A., acquired all of the stock of two subsidiary companies that run the brake manufacturing operations in Homer, Michigan and Monterrey, Mexico, and certain assets used in connection with the division's sales, marketing and engineering group located at our headquarters in Northville, Michigan. Proceeds from the sale were approximately $57 million. We recognized a gain on the sale of approximately $16.8 million. See Note 12, Discontinued Operations, for the operating results of the business.

During the second quarter of fiscal 2007 we classified our Wabash, Indiana facility as an asset held for sale. On July 5, 2007 we sold our Wabash facility. We recorded a loss on the sale of $11.0 million, which is included in other income, net in the Consolidated Statements of Operations.

On June 29, 2007 our wholly owned subsidiary, Hayes Lemmerz Holding GmbH, completed the sale of all of the issued and outstanding shares of capital stock of MGG Group B.V. (MGG Group) to an affiliate of ECF Group, a privately held company based in the Netherlands and Switzerland. MGG Group and its subsidiaries operate aluminum casting and machining facilities located in Tegelen and Nieuw Bergen, the Netherlands and in Antwerp, Belgium, and represented our International Components business. We received proceeds of approximately $17.5 million. We recorded a loss on the sale of $27.5 million. See Note 12, Discontinued Operations, for the operating results of the business.

In the beginning of fiscal 2007 we sold the outstanding shares of stock of Hayes Lemmerz International — Bristol, Inc. and Hayes Lemmerz International — Montague, Inc., which operated our suspension business operations in Bristol, Indiana and Montague, Michigan. We received consideration for the sale of approximately $26.2 million, which consisted of approximately $21.1 million in cash plus the assumption of approximately $5.1 million of debt under capital leases for equipment at the facilities. We recorded a loss on the sale of $3.6 million. In October 2006 we sold the outstanding shares of stock of Hayes Lemmerz International — Southfield Inc., which operated our Southfield,

**HAYES LEMMERZ INTERNATIONAL, INC. AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

Michigan iron suspension components machining plant. We received net cash proceeds of approximately $18 million and recorded a loss on the sale of $1.7 million. On December 5, 2005 we sold the outstanding shares of stock of Hayes Lemmerz International — Cadillac, Inc., a wholly-owned subsidiary that produced ductile iron castings operating in Cadillac, Michigan, to a group of private investors. There were no proceeds associated with the sale of our Cadillac facility and we recorded a loss on sale of $4.7 million. These facilities made up our suspension components business (Suspension business) and were part of our previous Components segment. We divested these operations in order to streamline our business in North America, provide us with greater financial flexibility, and focus our global resources on core businesses. See Note 12, Discontinued Operations, for the operating results of the business.

### Note 4. Inventories

The major classes of inventory are as follows (dollars in millions):

| | January 31, 2009 | January 31, 2008 |
|---|---|---|
| Raw materials | $ 48.0 | $ 41.4 |
| Work-in-process | 18.7 | 41.8 |
| Finished goods | 60.2 | 62.4 |
| Spare parts and supplies | 30.0 | 33.5 |
| Total | $ 156.9 | $ 179.1 |

### Note 5. Property, Plant, and Equipment

The major classes of property, plant, and equipment are as follows (dollars in millions):

| | January 31, 2009 | January 31, 2008 |
|---|---|---|
| Land | $ 39.5 | $ 46.4 |
| Buildings | 156.0 | 196.7 |
| Machinery and equipment | 702.0 | 758.7 |
| | 897.5 | 1,001.8 |
| Accumulated depreciation | (398.3) | (385.0) |
| Property, plant, and equipment, net | $ 499.2 | $ 616.8 |

Depreciation expense and tooling amortization are as follows (dollars in millions):

| | Year Ended January 31, | | |
|---|---|---|---|
| | 2009 | 2008 | 2007 |
| Depreciation expense | $87.1 | $ 94.5 | $ 90.6 |
| Tooling amortization | 6.7 | 7.4 | 10.7 |
| Total | $93.8 | $101.9 | $101.3 |

60

## HAYES LEMMERZ INTERNATIONAL, INC. AND SUBSIDIARIES

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

### Note 6.   Assets Held for Sale

Assets held for sale consist of the following (dollars in millions):

| | January 31, 2009 | | January 31, 2008 | |
|---|---|---|---|---|
| Gainesville, Georgia facility | $ | 5.3 | $ | — |
| Huntington, Indiana facility | | 1.7 | | 2.7 |
| Ferndale, Michigan facility | | 1.1 | | — |
| Nuevo Laredo, Mexico business | | — | | 16.0 |
| Howell, Michigan facility | | — | | 2.7 |
| Total | $ | 8.1 | $ | 21.4 |

The Gainesville, Georgia facility was classified as an asset held for sale as of January 31, 2009. We have a definitive agreement with Punch Property International NV for the sale of the facility. Punch Property International NV has not completed the purchase of the property as contemplated by the agreement and we have commenced litigation seeking specific performance of the agreement and damages. During fiscal 2008, we reduced the fair value of our Huntington, Indiana facility based on declining market conditions. We classified our Ferndale, Michigan technical facility as an asset held for sale as of January 31, 2009 per the criteria in SFAS 144. The Nuevo Laredo, Mexico facility was classified as an asset held for sale as of January 31, 2008. However negotiations with an interested buyer have failed due to the buyer's inability to secure financing. The Nuevo Laredo, Mexico powertrain components facility was reclassified as held and used as of January 31, 2009. As of January 31, 2009, we reclassified our Howell, Michigan facility as held and used since we no longer believe that the sale of the building will be completed within a one year period as per SFAS 144.

The balances of assets and liabilities of our Nuevo Laredo facility classified as held for sale were as follows (dollars in millions):

| | January 31, 2009 | | January 31, 2008 | |
|---|---|---|---|---|
| Receivables | $ | — | $ | 11.3 |
| Inventories | | — | | 4.1 |
| Prepaid expenses and other assets | | — | | 0.1 |
| Property, plant, and equipment, net | | — | | 0.5 |
| Total assets held for sale | $ | — | $ | 16.0 |
| Accounts payable and accrued liabilities | $ | — | $ | 8.0 |
| Total liabilities held for sale | $ | — | $ | 8.0 |

As of January 31, 2008, we also had a balance of $0.2 million in accrued liabilities held for sale for our suspension business.

61

HAYES LEMMERZ INTERNATIONAL, INC. AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

### Note 7.  Goodwill and Other Intangible Assets

Goodwill and other intangible assets consist of the following (dollars in millions):

| | Weighted Average Useful Life | January 31, 2009 | | | January 31, 2008 | | |
|---|---|---|---|---|---|---|---|
| | | Gross Carrying Amount | Accumulated Amortization | Net Carrying Amount | Gross Carrying Amount | Accumulated Amortization | Net Carrying Amount |
| Amortized intangible assets: | | | | | | | |
| Customer relationships | 30 years | $ 108.8 | $ (21.0) | $ 87.8 | $ 123.4 | $ (19.7) | $ 103.7 |
| Customer contracts | 6 years | 21.9 | (21.3) | 0.6 | 25.1 | (21.8) | 3.3 |
| Unpatented technology | 8 years | 27.9 | (19.9) | 8.0 | 31.2 | (18.4) | 12.8 |
| | 15 years | $ 158.6 | $ (62.2) | $ 96.4 | $ 179.7 | $ (59.9) | $ 119.8 |
| Non-amortized intangible assets: | | | | | | | |
| Trade names | | $ 16.0 | | | $ 48.9 | | |
| Goodwill | | $ — | | | $ 240.5 | | |

Total amortization expense for amortized intangible assets was $10.7 million, $10.2 million, and $10.2 million for fiscal 2008, fiscal 2007, and fiscal 2006, respectively. We expect that ongoing amortization expense will decline from approximately $7.6 million to approximately $3.6 million over the next five fiscal years.

The changes in the net carrying amount of goodwill by segment are as follows (dollars in millions):

| | Automotive Wheels | Other | Total |
|---|---|---|---|
| Balance as of January 31, 2008 | $ 240.5 | $ — | $ 240.5 |
| Purchase of Brazil minority interest | 1.5 | — | 1.5 |
| Goodwill impairment | (211.4) | — | (211.4) |
| Effects of currency translation | (30.6) | — | (30.6) |
| Balance as of January 31, 2009 | $ — | $ — | $ — |

We test goodwill for impairment as of November 1st of each fiscal year, or more frequently should circumstances change or events occur that would more likely than not reduce the fair value of a reporting unit below its carrying amount, as provided for in SFAS 142. See Note 2, Basis of Presentation and Summary of Significant Accounting Policies, for our testing methodology.

During the period from November 1, 2008 through January 31, 2009, there was a significant adverse change in the business climate as expected volumes in the short and medium-term declined significantly. As a result of this triggering event, we tested our goodwill and other non-amortized intangible assets for impairment as of January 31, 2009 in addition to the work performed based on November 1, 2008 balances. Based on our testing, we recorded an impairment of $238 million for the year ended January 31, 2009, of which $211 million relates to goodwill and $27 million relates to trade names.

### Note 8.  Bank Borrowings, Other Notes, and Long-Term Debt

Short term bank borrowings and other notes were $46.6 million as of January 31, 2009 with a weighted average interest rate of 5.4%, and $32.9 million as of January 31, 2008 with a weighted average interest rate of 6.0%. These consisted primarily of short-term credit facilities at our foreign subsidiaries.

# HAYES LEMMERZ INTERNATIONAL, INC. AND SUBSIDIARIES

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

Long-term debt consists of the following (dollars in millions):

| | January 31, 2009 | January 31, 2008 |
|---|---|---|
| Various foreign bank and government loans maturing through 2014, weighted average interest rates of 3.9% and 4.0% at January 31, 2009 and 2008, respectively | $ 2.3 | $ 3.3 |
| Term Loan maturing 2014, weighted average interest rate of 10.2% and 7.4% as of January 31, 2009 and January 31, 2008, respectively | 328.9 | 381.5 |
| 8.25% New Senior Notes due 2015 | 167.3 | 192.2 |
| Revolving Credit Facility at 8.5% as of January 31, 2009 | 125.0 | — |
| | 623.5 | 577.0 |
| Less current portion of long-term debt | 622.1 | 4.8 |
| Long-term debt, net of current portion | $ 1.4 | $ 572.2 |

In January 2009, we favorably modified the leverage ratio and interest coverage ratio covenants under our New Credit Facilities for the fourth quarter of fiscal 2008 and for each quarter of fiscal 2009. Absent the amendment, we would have been in default of our covenants as of January 31, 2009. In addition, due to the continuing deterioration in the global economy and the automotive industry in particular, it will be increasingly difficult for us to achieve continued compliance in subsequent periods without repaying borrowings under the Revolving Credit Facility, absent a waiver or a further amendment from our lenders. In accordance with Emerging Issues Task Force 86-30, "Classification of Obligations When a Violation Is Waived by the Creditor," we reclassified our debt to current as of January 31, 2009. The long-term debt repayment schedule for the next five fiscal years is as follows (dollars in millions):

| | 2009 | 2010 | 2011 | 2012 | 2013 | Total |
|---|---|---|---|---|---|---|
| Various foreign bank and government loans | $ 0.9 | $0.7 | $ — | $ — | $ — | $ 1.6 |
| Term loan | 328.9 | — | — | — | — | 328.9 |
| 8.25% Senior notes | 167.3 | — | — | — | — | 167.3 |
| Revolving credit facility | 125.0 | — | — | — | — | 125.0 |
| Total | $622.1 | $0.7 | $ — | $ — | $ — | $622.8 |

### Euro Denominated Debt

The balance of our Term Loan maturing 2014 was approximately €255.4 million and €258.1 million as of January 31, 2009 and January 31, 2008, respectively. The balance of our 8.25% New Senior Notes due 2015 was €130 million as of January 31, 2009 and January 31, 2008. The US Dollar balance of the Term Loan maturing 2014 decreased from $381.5 million as of January 31, 2008 to $328.9 million as of January 31, 2009, which was primarily due to strengthening of the dollar relative to the euro compared to the prior year. The US Dollar balance of the 8.25% New Senior Notes due 2015 decreased from $192.2 million as of January 31, 2008 to $167.3 million as of January 31, 2009, also due to the strengthening of the dollar relative to the euro.

### Rights Offering

In May 2007, we distributed to stockholders of record as of April 10, 2007 non-transferable subscription rights to purchase 55,384,615 shares of our common stock at a price of $3.25 per share in connection with the Rights Offering. Stockholders on the record date received 1.3970 rights for each share of our common stock held on the record date. The Rights Offering was fully subscribed. Deutsche Bank Securities, Inc. also exercised its right to purchase 4,038,462 shares of our common stock at a price of $3.25 per share pursuant to the Direct Investment. On

**HAYES LEMMERZ INTERNATIONAL, INC. AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

May 30, 2007 we closed on the Rights Offering and Direct Investment and issued 59,423,077 new shares of common stock. Net proceeds of $185.4 million, after fees and expenses of $7.7 million, were used to repurchase the outstanding 10 $^1$/$_2$% Senior Notes due 2010 (Old Notes) pursuant to the tender offer described below, with the excess being used to provide working capital and for general corporate purposes.

### Old Notes

As of January 31, 2007, HLI Operating Company, Inc. (HLI Opco) had $162.5 million aggregate principal amount of Old Notes that were to mature on June 15, 2010. Interest on the Old Notes accrued at a rate of 10 $^1$/$_2$% per annum and was payable semi-annually in arrears on June 15 and December 15. During the first quarter of fiscal 2007, we issued common stock in exchange for $5.0 million of the Old Notes, reducing the principal amount outstanding from $162.5 million to $157.5 million. During the second quarter of fiscal 2007 these notes were repurchased by HLI Opco pursuant to the tender offer.

### Tender Offer for Senior Notes

On May 8, 2007, HLI Opco commenced a cash tender offer to repurchase all of its outstanding Old Notes, which had an aggregate principal amount outstanding of $157.5 million. Concurrently with the tender offer, HLI Opco solicited consents to amend the indenture governing the Old Notes. The tender offer expired at 11:59 p.m., Eastern Standard time, on Tuesday, June 5, 2007. The purchase price for the tendered Old Notes was based on a fixed spread of 50 basis points over the yield on the 3.625% U.S. Treasury Note due June 30, 2007. Holders who validly tendered their Old Notes and delivered their consents to the proposed amendments to the indenture on or prior to 5:00 p.m., Eastern Standard time, on May 21, 2007, were paid, in addition to the purchase price for the Old Notes, a consent payment equal to $30.00 per $1,000 in principal amount of Old Notes. Holders of approximately $154.2 million principal amount tendered their Old Notes and consented to the amendments to the Indenture. On June 6, 2007 the remaining $3.3 million in Senior Notes were tendered for redemption.

### New Senior Notes

On May 30, 2007 we closed on a new offering of €130 million 8.25% senior unsecured notes (New Notes) issued by Hayes Lemmerz Finance LLC — Luxembourg S.C.A., a newly formed European subsidiary (Hayes Luxembourg). The New Notes mature in 2015 and contain customary covenants and restrictions. The New Notes and the related Indenture restrict our ability to, among other things, make certain restricted payments, incur debt and issue preferred stock, incur liens, permit dividends and other distributions by our subsidiaries, merge, consolidate, or sell assets, and engage in transactions with affiliates. The New Notes and the Indenture also contain customary events of default, including failure to pay principal or interest on the Notes or the guarantees when due, among others. The New Notes are fully and unconditionally guaranteed on a senior unsecured basis by us and substantially all of our direct and indirect domestic subsidiaries and certain of our indirect foreign subsidiaries. Proceeds from the issuance of the New Notes, together with the proceeds from the New Credit Facilities (as described below), were used to refinance obligations under our Amended and Restated Credit Agreement, dated as of April 11, 2005, to repay in full the approximately $21.8 million mortgage note on our headquarters building in Northville, Michigan, to pay related fees and expenses, and for working capital and other general corporate purposes.

### Credit Facility

Prior to May 30, 2007, we had a $625 million senior secured credit facility (Old Credit Facility), which consisted of a first lien $375 million term loan due June 3, 2009 (Term Loan B), a second lien $150 million term loan due June 3, 2009 (Term Loan C) and a $100 million revolving credit facility due June 3, 2008.

On May 30, 2007 we amended and restated the Old Credit Facility to establish three new senior secured credit facilities in an amount of approximately $495 million (New Credit Facilities). The proceeds from the New Credit Facilities, together with the proceeds of other financing activities, were used to refinance our obligations under the

# HAYES LEMMERZ INTERNATIONAL, INC. AND SUBSIDIARIES

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

Old Credit Facility. Additional proceeds were used to replace existing letters of credit and to provide for working capital and other general corporate purposes, and to pay the fees and expenses associated with the New Credit Facilities.

The New Credit Facilities consist of a term loan facility of €260 million maturing in 2014 borrowed by Hayes Luxembourg, a revolving credit facility of $125 million maturing in 2013 available to HLI Opco and Hayes Luxembourg (Revolving Credit Facility), and a synthetic letter of credit facility of €15 million available to both borrowers. The interest rate for the term loan was initially the EURIBOR rate plus 2.75% per annum. The interest rate for the Revolving Credit Facility was initially the Citibank base rate plus 2.0% per annum for borrowings by HLI Opco, which was the only borrower under the Revolving Credit Facility. On January 29, 2009 we amended the New Credit Facilities to favorably modify the financial covenants and make other changes. In connection with these amendments, the interest rate on the term loan was increased to the EURIBOR rate plus 6.0% per annum, with a EURIBOR floor of 3.50% and the interest rate on the Revolving Credit Facility was increased to Citibank base rate plus 5.25% per annum for borrowings by HLI Opco.

The obligations of HLI Opco and Hayes Luxembourg under the New Credit Facility are guaranteed by us and substantially all of our direct and indirect domestic subsidiaries. In addition, the obligations of Hayes Luxembourg under the New Credit Facilities are guaranteed, subject to certain exceptions, by certain of our foreign subsidiaries. The obligations of HLI Opco and Hayes Luxembourg under the New Credit Facilities and the guarantors' obligations under their respective guarantees of the New Credit Facilities are, subject to certain exceptions, secured by a first priority perfected pledge of substantially all capital stock owned by the borrowers and the guarantors (but not more than 65% of the capital stock of Hayes Luxembourg or any foreign subsidiary can secure HLI Opco's obligations) and substantially all of the other assets owned by the borrowers and the guarantors. All foreign guarantees and collateral are subject to applicable restrictions on cross-stream and upstream guarantees and other legal restrictions, including financial assistance rules, thin capitalization rules, and corporate benefit rules.

The New Credit Facilities contain negative covenants restricting our ability and the ability of our subsidiaries to, among other actions, declare dividends or repay or repurchase capital stock, cancel, prepay, redeem or repurchase debt, incur liens and engage in sale-leaseback transactions, make loans and investments, incur indebtedness, amend or otherwise alter certain debt documents, engage in mergers, acquisitions and asset sales, engage in transactions with affiliates, and alter their respective businesses. The financial covenants under the New Credit Facilities include covenants regarding a maximum total leverage ratio, a minimum interest coverage ratio and a maximum capital expenditures amount. The New Credit Facilities contain customary events of default including, without limitation, failure to pay principal and interest when due, material inaccuracy of any representation or warranty, failure to comply with any covenant, cross-defaults, failure to satisfy or stay execution of judgments in excess of specified amounts, bankruptcy or insolvency, the existence of certain materially adverse employee benefit liabilities in excess of a certain specified amount, the invalidity or impairment of any loan documents and a change of control.

As of January 31, 2009 we borrowed $125 million under the Revolving Credit Facility and issued $19.1 million in letters of credit under the synthetic letter of credit facility. Pursuant to the amendment to the Credit Facility on January 29, 2009, HLI Opco is restricted from repaying current borrowings of $125 million under the Revolving Credit Facility unless we have achieved EBITDA of at least $200 million for the twelve months preceding the date of the repayment. As of January 31, 2008 there were no outstanding borrowings, approximately $0.8 million in letters of credit issued under the Revolving Credit Facility, and approximately $20.8 million in letters of credit issued under the synthetic letter of credit facility. There were no available funds under the Revolving Credit Facility as of January 31, 2009 and $124.2 million available as of January 31, 2008. The amount available to issue under the synthetic letter of credit at January 31, 2009 and January 31, 2008 was $0.3 million and $1.3 million, respectively.

**HAYES LEMMERZ INTERNATIONAL, INC. AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

### Covenant Compliance

As of January 31, 2009, we were in compliance with all applicable covenants and restrictions of our New Credit Facilities, as amended. However, in light of the continuing deterioration in the global economy and the automotive industry in particular, it will be increasingly difficult for us to achieve continued compliance in subsequent periods without repaying borrowings under the Revolving Credit Facility, absent a waiver or a further amendment from our lenders. Therefore, we can give no assurance that we will be able to continue to retain borrowings under the Revolving Credit Facility without restrictions or otherwise comply with the amended covenants in future periods. Such an event could result in a significant reduction in our available liquidity or the acceleration of amounts due under the New Credit Facilities and the New Notes.

Our independent registered public accounting firm has included in its report on our consolidated financial statements an explanatory paragraph indicating substantial doubt about our ability to continue as a going concern. The lenders under our New Credit Facilities have, however, waived defaults under our New Credit Facilities that result from our receipt of this going concern explanatory paragraph. Our ability to continue as a going concern is dependent upon our ability to recapitalize the Company and restructure our outstanding indebtedness pursuant to a voluntary bankruptcy filing under Chapter 11. We are currently engaged in discussions with representatives of the lenders under our New Credit Facilities, the holders of our New Notes, and others regarding a recapitalization of the Company and restructuring of our existing indebtedness through a Chapter 11 proceeding. A majority of the lenders under our New Credit Facilities have, subject to approval of the bankruptcy court in which we file petitions under Chapter 11, agreed to provide us with DIP Financing in an aggregate amount of up to $100 million ($80 million of which is committed pursuant to the terms and conditions of a commitment letter). There can be no assurance, however, that an agreement regarding a recapitalization and restructuring of the Company under Chapter 11 will be obtained on acceptable terms with the necessary parties. Should the bankruptcy court not approve our proposed DIP Financing, or should we be unable to develop, propose, and implement a successful plan of reorganization, we would not be able to continue as a going concern.

### Loss on early extinguishment of debt

In January 2009 we recorded a loss on early extinguishment of debt of $6.5 million related to the amendment of our Term Loan credit agreement, which primarily consisted of $5.0 million in unamortized debt expenses and $1.5 million of fees paid to creditors. The loss of $21.5 million during fiscal 2007 primarily consisted of $9.0 million paid to note holders for the call premium on the redemption of the Old Notes and $12.2 million in unamortized debt expenses and other expenses.

## Note 9. Derivative Instruments and Hedging Activities

In January 2006 we entered into a foreign currency swap agreement in Euros with a total notional value of $50 million to hedge our net investment in certain of our foreign subsidiaries. During the first quarter of fiscal 2007 the foreign currency swap agreement was effective. During the second quarter of 2007 we terminated the swap due to our debt restructuring. During the fourth quarter of fiscal 2007 we recognized the loss associated with the swap due to the liquidation of the related foreign subsidiaries, which is included in Other income, net in our Consolidated Statements of Operations.

In addition, we are exposed to fluctuations in interest rates on our variable rate debt. In January 2006 we entered into an interest rate swap agreement with a total notional value of $50 million to hedge the variability of interest payments associated with our variable-rate term debt. The swap agreement was expected to settle in January 2009, and qualified for cash flow hedge accounting treatment. During the first quarter of fiscal 2007 the swap was effective. During the second quarter of 2007 we terminated the swap due to our debt restructuring and recognized the loss associated with the swap. During the second quarter of fiscal 2007, we entered into interest rate swaps with total notional amount of €70 million. The swaps became effective on August 28, 2007 and mature on August 28,

**HAYES LEMMERZ INTERNATIONAL, INC. AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

2012. During the third quarter of fiscal 2007, we entered into interest rate swaps with total notional amount of €50 million. The swaps became effective on September 30, 2007 and mature on September 30, 2012. During the

66.1

# HAYES LEMMERZ INTERNATIONAL, INC. AND SUBSIDIARIES

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

first quarter of fiscal 2008 we entered into an interest rate swap with total notional amount of €50 million. The swap became effective on February 28, 2008 and was to mature on February 28, 2012. During the fourth quarter of fiscal 2008 we terminated the swap and recognized the loss of $3.2 million, which was included in interest expense in our Consolidated Statements of Operations. In addition, we reclassified unrealized losses of $5.6 million related to our interest rate swaps from accumulated other comprehensive income to interest expense. Subsequent to January 31, 2009, our swaps will no longer be effective and any losses will be recognized in the Consolidated Statements of Operations as interest expense.

We held €120 million in derivative financial instruments at January 31, 2009 and January 31, 2008. During the years ended January 31, 2009, 2008, and 2007, we recorded the change to the unrealized loss balances of $4.7 million, ($0.3) million and ($2.5) million, respectively, on instruments designated as hedges in accumulated other comprehensive income.

## Note 10.  Pension Plans and Postretirement Benefits Other Than Pensions

We sponsor several defined benefit pension plans (Pension Benefits) and health care and life insurance benefits (Other Benefits) for certain employees around the world. Other than our German pension plan, we fund the Pension Benefits based upon the funding requirements of the U.S. and international laws and regulations in advance of benefit payments and the Other Benefits and German pension plan as benefits are provided to the employees.

The following tables provide a reconciliation of the change in benefit obligation, the change in plan assets, and the net amount recognized in the Consolidated Balance Sheets as of January 31 for the fiscal years indicated. The current year balances for international plans include our facilities in Turkey, however the prior year balances for Turkey are reflected in the adjustments line as the activity was not significant to the prior year. The information for fiscal 2007 is based on an October 31 measurement date for the US plans and January 31 for the non US plan. Due to the application of the measurement date provision of SFAS 158, the fiscal 2008 information is based on a measurement date of January 31 for all plans. Adjustments are made for the gap period from October 31, 2007 to January 31, 2008 as indicated below (by fiscal year).

| | United States Plans | | | | International Plans | |
| | Pension Benefits | | Other Benefits | | Pension Benefits | |
| | 2008 | 2007 | 2008 | 2007 | 2008 | 2007 |
|---|---|---|---|---|---|---|
| **Change in Benefit Obligation:** | | | | | | |
| Benefit obligation at beginning of year | $174.7 | $189.3 | $157.7 | $172.4 | $153.2 | $150.9 |
| Adjustments for gap period: | | | | | | |
|   Service and interest cost during gap period | 2.8 | N/A | 2.3 | N/A | N/A | N/A |
|   Gap period cash flow | (3.8) | N/A | (3.5) | N/A | N/A | N/A |
| Service cost | 1.0 | 1.0 | — | — | 0.6 | 0.7 |
| Interest cost | 10.3 | 10.4 | 9.3 | 9.5 | 7.9 | 7.3 |
| Employee contributions | — | — | — | — | 0.1 | 0.1 |
| Actuarial gain | (3.4) | (10.8) | (5.7) | (9.2) | (4.8) | (14.4) |
| Adjustments | — | — | — | — | 6.2 | 1.1 |
| Plan amendments | — | — | — | — | 0.6 | — |
| Plan settlements | — | — | — | — | (4.4) | (1.8) |
| Benefits and expenses paid | (15.3) | (15.2) | (12.6) | (15.0) | (10.7) | (10.2) |
| Exchange rate changes | — | — | — | — | (20.0) | 19.5 |
|   Benefit obligation at end of year | $166.3 | $174.7 | $147.5 | $157.7 | $128.7 | $153.2 |

## HAYES LEMMERZ INTERNATIONAL, INC. AND SUBSIDIARIES

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

| | United States Plans | | | | International Plans | |
|---|---|---|---|---|---|---|
| | Pension Benefits | | Other Benefits | | Pension Benefits | |
| | 2008 | 2007 | 2008 | 2007 | 2008 | 2007 |
| **Change in Plan Assets:** | | | | | | |
| Fair value of plan assets at beginning of year | $168.7 | $153.4 | $ — | $ — | $ 14.6 | $ 14.2 |
| Adjustments for gap period: | | | | | | |
|    Additional experience during gap period | (15.7) | N/A | — | N/A | N/A | N/A |
|    Gap period cash flow | (1.2) | N/A | — | N/A | N/A | N/A |
| Actual return on plan assets | (47.0) | 19.6 | — | — | 1.0 | 0.8 |
| Company contributions | 6.0 | 10.9 | 12.6 | 15.0 | 10.5 | 9.9 |
| Employee contributions | — | — | — | — | 0.1 | 0.1 |
| Adjustments | — | — | — | — | (2.6) | 0.4 |
| Plan settlements | — | — | — | — | (4.4) | (1.8) |
| Benefits paid and plan expenses | (15.3) | (15.2) | (12.6) | (15.0) | (10.7) | (10.2) |
| Exhange rate changes | — | — | — | — | (2.6) | 1.2 |
|    Fair value of plan assets at end of year | $ 95.5 | $168.7 | $ — | $ — | $ 5.9 | $ 14.6 |
| **Funded Status:** | | | | | | |
| Funded status of plan | $ (70.8) | $ (6.0) | $(147.5) | $(157.7) | $(122.8) | $(138.6) |
| Company contributions | N/A | 2.6 | N/A | 3.4 | N/A | — |
|    Net amount recognized | $ (70.8) | $ (3.4) | $(147.5) | $(154.3) | $(122.8) | $(138.6) |
| **Net Liability Recognized:** | | | | | | |
| Noncurrent assets | $ — | $ — | $ — | $ — | $ — | $ 1.3 |
| Current liabilities | (0.1) | (0.2) | (13.2) | (13.9) | (9.6) | (9.2) |
| Noncurrent liabilities | (70.7) | (3.2) | (134.3) | (140.4) | (113.2) | (130.7) |
|    Net amount recognized | $ (70.8) | $ (3.4) | $(147.5) | $(154.3) | $(122.8) | $(138.6) |
| **AOCI Recognized:** | | | | | | |
| Net prior service cost | $ — | $ — | $ — | $ — | $ 1.5 | $ — |
| Net actuarial loss (gain) | 43.6 | (33.2) | (33.5) | (29.5) | (9.9) | (7.2) |
|    Net amount recognized | $ 43.6 | $(33.2) | $ (33.5) | $ (29.5) | $ (8.4) | $ (7.2) |
| **Determination of adjustment due to FAS 158 Measurement Date Adoption:** | | | | | | |
| Increase/(decrease) in retained earnings | $ 0.7 | N/A | $ (1.9) | N/A | N/A | N/A |
| Increase/(decrease) in AOCI | (0.2) | N/A | (0.4) | N/A | N/A | N/A |

The projected benefit obligation, accumulated projected benefit obligation (APBO), and fair value of plan assets for the benefit plans with accumulated benefit obligations in excess of plan assets for the U.S. plans were $166.3 million, $147.5 million, and $95.5 million, respectively, as of January 31, 2009 and $174.7 million, $157.7 million, and $168.7 million, respectively, as of January 31, 2008. The estimated amount that will be amortized from accumulated other comprehensive income in fiscal 2009 is $1.4 million.

# HAYES LEMMERZ INTERNATIONAL, INC. AND SUBSIDIARIES

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

The components of net periodic benefit costs included in operating results for the following fiscal years are as follows (dollars in millions):

| | United States Plans | | | | | |
|---|---|---|---|---|---|---|
| | Pension Benefits | | | Other Benefits | | |
| | 2008 | 2007 | 2006 | 2008 | 2007 | 2006 |
| **Components of net periodic benefit cost (income):** | | | | | | |
| Service cost | $ 1.0 | $ 1.0 | $ 1.0 | $ — | $ — | $ 0.1 |
| Interest cost | 10.3 | 10.4 | 11.1 | 9.3 | 9.5 | 10.6 |
| Expected return on plan assets | (13.2) | (12.3) | (10.7) | — | — | — |
| Net amortization and deferral | (0.9) | — | — | (1.5) | (0.3) | (0.2) |
| Net benefit cost | $ (2.8) | $ (0.9) | $ 1.4 | $ 7.8 | $ 9.2 | $10.5 |
| **Amount recognized in other comprehensive income:** | | | | | | |
| Net (loss) gain | $(75.6) | $ 17.9 | $ 15.3 | $ 5.9 | $ 9.1 | $20.9 |
| Net amortization | (1.2) | — | — | (1.9) | (0.3) | (0.2) |
| Amount recognized in other comprehensive income | $(76.8) | $ 17.9 | $ 15.3 | $ 4.0 | $ 8.8 | $20.7 |

| | International Plans — Pension Benefits | | |
|---|---|---|---|
| | 2008 | 2007 | 2006 |
| **Components of net periodic benefit cost (income):** | | | |
| Service cost | $ 0.6 | $ 0.7 | $ 0.8 |
| Interest cost | 7.9 | 7.3 | 6.1 |
| Expected return on plan assets | (0.9) | (0.8) | (0.5) |
| Curtailment loss recognized | 0.6 | — | — |
| Settlement (gain) loss recognized | (0.5) | 0.2 | — |
| Net amortization and deferral | — | — | 0.2 |
| Net benefit cost | $ 7.7 | $ 7.4 | $ 6.6 |
| **Amount recognized in other comprehensive income:** | | | |
| Net prior service cost | $(0.6) | $ — | $ — |
| Net gain | 3.5 | 14.5 | 8.2 |
| Net amortization | — | — | 0.2 |
| Amount recognized in other comprehensive income | $ 2.9 | $14.5 | $ 8.4 |

# HAYES LEMMERZ INTERNATIONAL, INC. AND SUBSIDIARIES

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

The actuarial assumptions used in determining the net periodic benefit cost information shown above are as follows for the fiscal years indicated:

| | United States Plans | | | | International Plans | |
| | Pension Benefits | | Other Benefits | | Pension Benefits | |
| | 2008 | 2007 | 2008 | 2007 | 2008 | 2007 |
|---|---|---|---|---|---|---|
| **Weighted average assumptions:** | | | | | | |
| Discount rate | 6.25% | 5.75% | 6.25% | 5.75% | 5.60% | 4.70% |
| Expected return on plan assets | 8.25% | 8.25% | N/A | N/A | 6.98% | 5.68% |
| Rate of compensation increase | N/A | N/A | N/A | N/A | 2.70% | 2.65% |

The actuarial assumptions used in determining the benefit obligation and funded status information are as follows for the fiscal years indicated:

| | United States Plans | | | | International Plans | |
| | Pension Benefits | | Other Benefits | | Pension Benefits | |
| | 2008 | 2007 | 2008 | 2007 | 2008 | 2007 |
|---|---|---|---|---|---|---|
| **Weighted average assumptions:** | | | | | | |
| Discount rate | 7.00% | 6.25% | 7.00% | 6.25% | 6.15% | 5.60% |
| Rate of compensation increase | N/A | N/A | N/A | N/A | 2.65% | 2.70% |

The discount rate for the US plans was developed using spot interest rates at one-half year increments for each of the next 30 years and is developed based on pricing and yield information for high quality corporate bonds. We included corporate bonds rated AA by Moody's where the time to maturity is between 0.5 and 30 years and that are denominated in U.S. dollars.

At January 31, 2009, the assumed annual health care cost trend rate used in measuring the APBO approximated 8% declining to 4.5% in 20 years and thereafter. Increasing the assumed cost trend rate by 1% each year would have increased the APBO and service and interest cost components by approximately $12.6 million and $0.8 million, respectively, for fiscal year beginning in 2008. Decreasing the assumed cost trend rate by 1% each year would have decreased the APBO and service and interest cost components by approximately $10.9 million and $0.7 million, respectively, for fiscal year beginning in 2008.

### Expected Return on Assets

To develop the expected long-term rate of return on assets assumption for our U.S. plans, we considered the historical returns and the future expectations for returns for each asset class, as well as the target asset allocation of the pension portfolio. To develop the expected long-term rate of return on assets assumption for our international plans, we considered the historical returns and the future expectations for returns for each asset class. This resulted in the selection of the 8.25% and 6.98% long-term rate of return on assets assumption of the U.S. and international plans, respectively.

### Plan Contributions

We contributed $6.0 million, $12.6 million, and $10.5 million to our U.S. pension, U.S. postretirement benefit, and international pension plans, respectively, during fiscal 2008. We expect to contribute $5.3 million, $13.2 million, and $11.7 million to our U.S. pension, U.S. postretirement benefit, and international pension plans, respectively, during fiscal 2009.

**HAYES LEMMERZ INTERNATIONAL, INC. AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

*Projected U.S. Benefit Payments*

We expect that our U.S. pension and other postretirement benefit plans will pay participant benefits by fiscal year as follows (dollars in millions):

|  | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 — 2018 | Total |
|---|---|---|---|---|---|---|---|
| US Pension plans | $14.8 | $14.7 | $14.6 | $14.4 | $14.2 | $ 69.8 | $142.5 |
| US Health care and life insurance benefit plans | 13.2 | 13.3 | 13.3 | 13.2 | 13.1 | 62.3 | 128.4 |
| Non US Pension plans | 11.2 | 10.0 | 10.4 | 10.1 | 10.6 | 54.5 | 106.8 |

*Impact of Medicare Part D Subsidy*

The measurement of our postretirement medical obligations includes the anticipated impact of the federal subsidy enabled by the Medicare Prescription Drug, Improvement, and Modernization Act of 2003. These effects are incorporated into the measurement in accordance with the FASB Staff Position (FSP 106-2). The effects of the subsidy on key postretirement medical items are as follows (dollars in millions):

| **Decrease (increase) due to Medicare Part D Subsidy as of January 31, 2009:** | |
|---|---|
| APBO | $ 6.3 |
| Accrued benefit cost | $(5.4) |
| **Decrease (increase) due to Medicare Part D Subsidy on expense for fiscal 2008:** | |
| Service cost | $ — |
| Interest cost | 0.3 |
| Amortization of gain (loss) | (0.2) |
| Net periodic postretirement benefit cost | $ 0.1 |

Final regulations have been issued on qualifications for the subsidy and the determination of actuarial equivalence. These measurements are believed to be reasonable best estimates based on the "two-pronged" approach to subsidy determination as set forth in the regulations. Under this standard, during fiscal 2008 certain of our post-Medicare prescription drug plans are "actuarially equivalent (AE)" as the aggregate value of the plan benefits exceeds the aggregate value of Medicare Part D benefits less participant premiums. Based on the actuarial valuation, the projected postretirement benefit payments by fiscal year for the Medicare Part D Subsidy are as follows (dollars in millions):

|  | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 — 2018 | Total |
|---|---|---|---|---|---|---|---|
| Gross benefit payment | $13.7 | $13.8 | $13.8 | $13.8 | $13.7 | $ 65.1 | $133.9 |
| Impact of Medicare Subsidy | 0.5 | 0.5 | 0.5 | 0.6 | 0.6 | 2.8 | 5.5 |
| Net benefit payment | $13.2 | $13.3 | $13.3 | $13.2 | $13.1 | $ 62.3 | $128.4 |

**HAYES LEMMERZ INTERNATIONAL, INC. AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

*Pension Benefit Asset Information*

Our U.S. pension plans' weighted-average pension asset allocation by asset category for fiscals 2008 and 2007 are as follows:

| | 2008 | 2007 |
|---|---|---|
| **Asset Category:** | | |
| Equity | 55.8% | 72.6% |
| Fixed income | 42.2% | 25.7% |
| Other | 2.0% | 1.7% |
| Total | 100.0% | 100.0% |

In addition to the broad asset allocation described above, the following policies apply to individual asset classes:

- Fixed income investments are oriented toward risk averse, investment grade securities. With the exception of U.S. Government securities, in which the plan may invest the entire fixed income allocation, fixed income investments are required to be diversified among individual securities and sectors. There is no limit on the maximum maturity of securities held. Short sales, margin purchases and similar speculative transactions are prohibited.

- Equity investments are diversified among capitalization and style and are required to be diversified among industries and economic sectors. Limitations are placed on the overall allocation to any individual security. Short sales, margin purchases, and similar speculative transactions are prohibited.

The Board of Directors has established the Investment Committee (the Committee) to manage the operations and administration of all benefit plans and related trusts. The Committee has an investment policy for the pension plan assets that establishes target asset allocations for the above listed asset classes as follows:

| | Policy Target | Policy Range |
|---|---|---|
| **Asset Class:** | | |
| Domestic equity | 45.0% | 35-75% |
| International equity | 25.0% | 25-30% |
| Fixed income | 30.0% | 25-35% |

The asset allocation policy was developed with consideration to the long-term nature of the obligations and the investment objectives of achieving a return on assets consistent with the funding requirements of the plan, maximizing portfolio return, and minimizing the impact of market fluctuations on the value of the plan assets. The Committee is committed to diversification to reduce the risk of large losses. To that end, the Committee has adopted policies requiring that each asset class will be diversified, and multiple managers with differing styles of management will be employed. On a quarterly basis, the Committee reviews progress towards achieving the pension plans' and individual managers' performance objectives.

*Other Benefits*

We also have contributory employee retirement savings plans covering substantially all of our domestic employees. The employer contribution totaled approximately $1.5 million, $1.5 million and $1.7 million for the years ended January 31, 2009, 2008, and 2007, respectively.

**HAYES LEMMERZ INTERNATIONAL, INC. AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

**Note 11.   Asset Impairments and Other Restructuring Charges**

Asset impairments and other restructuring charges by segment are as follows (dollars in millions):

| | Automotive Wheels | Other | Total |
|---|---|---|---|
| **Fiscal 2008** | | | |
| Facility closure costs | $    3.0 | $  0.4 | $  3.4 |
| Asset impairments | 9.4 | — | 9.4 |
| Severance and other restructuring costs | 8.7 | 0.7 | 9.4 |
| Total | $   21.1 | $  1.1 | $22.2 |
| **Fiscal 2007** | | | |
| Facility closure costs | $    3.3 | $  0.3 | $  3.6 |
| Asset impairments | 49.5 | 31.6 | 81.1 |
| Severance and other restructuring costs | — | 0.8 | 0.8 |
| Total | $   52.8 | $32.7 | $85.5 |
| **Fiscal 2006** | | | |
| Facility closure costs | $    3.6 | $   — | $  3.6 |
| Asset impairments | 16.8 | 5.2 | 22.0 |
| Severance and other restructuring costs | 4.1 | 3.1 | 7.2 |
| Total | $   24.5 | $  8.3 | $32.8 |

*Asset Impairment Losses and Other Restructuring Charges for the Year Ended January 31, 2009*

We recorded total asset impairment losses and other restructuring charges of $22.2 million for the year ended January 31, 2009

*Automotive Wheels:*   The expense for fiscal 2008 includes $8.7 million of severance expense, which was primarily the result of headcount reductions globally in order to align production with the reduction in volumes due to the downturn in the automotive industry during the last half of fiscal 2008. We also recorded additional facility closure and impairment costs of $5.9 million for our Gainesville, Georgia facility. The Gainesville facility was classified as an asset held for sale as of January 31, 2009. We have a definitive agreement with Punch Property International NV for the sale of the facility. Punch Property International NV has not completed the purchase of the property as contemplated by the agreement and we have commenced litigation seeking specific performance of the agreement and damages. Impairments of $2.6 million were recorded to reduce the balances of our Howell, Michigan and Huntington, Indiana facilities to fair market value due to declining market conditions, and continuing closure costs for these facilities were $1.2 million in fiscal 2008. The Howell Michigan facility was removed from the asset held for sale classification as of January 31, 2009 in accordance with SFAS 144 as we are not confident that the property will sell within one year. We are currently marketing the Huntington facility and it is classified as held for sale as of January 31, 2009. Additional impairments of $1.4 million were recorded for our aluminum wheel facilities in Chihuahua, Mexico and Hoboken, Belgium. We also recorded an impairment for machinery and equipment of $1.3 million at our Manresa, Spain facility for flow-forming equipment that was no longer in use.

*Other:*   Asset impairment losses and other restructuring charges during fiscal 2008 were $1.1 million, which consisted primarily of $0.4 million of continuing facility closure costs related to our technical center in Ferndale, Michigan and $0.7 million of severance relate to our corporate offices in Northville, Michigan and our powertrain facility in Nuevo Laredo, Mexico.

## HAYES LEMMERZ INTERNATIONAL, INC. AND SUBSIDIARIES

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

### *Asset Impairment Losses and Other Restructuring Charges for the Year Ended January 31, 2008*

We recorded total asset impairment losses and other restructuring charges of $85.5 million for the year ended January 31, 2008. We impaired several of our facilities based on the analysis of discounted future cash flows in accordance with SFAS 144.

*Automotive Wheels:* The asset impairment losses and other restructuring charges for the Automotive Wheels segment were $52.8 million, which included facility closure costs of $3.3 million related to our facilities located in Huntington, Indiana; Howell, Michigan; and La Mirada, California. Impairments of $49.0 million were recorded for our Gainesville, Georgia; Chihuahua, Mexico; and Hoboken, Belgium facilities. Impairments of $0.5 million were recorded for machinery and equipment at our Sao Paulo, Brazil facility.

*Other:* The asset impairment losses and other restructuring charges for the Other segment were $32.7 million, which consisted primarily of impairments of $31.3 million and severance of $0.6 million for our Nuevo Laredo, Mexico facility as well as $0.3 million of facility closure costs related to our technical center in Ferndale, Michigan. The remainder of the impairment and severance expenses primarily relate to our corporate offices.

### *Asset Impairment Losses and Other Restructuring Charges for the Year Ended January 31, 2007*

We recorded total asset impairment losses and other restructuring charges of $32.8 million for the year ended January 31, 2007.

*Automotive Wheels:* The asset impairment losses and other restructuring charges for the Automotive Wheels segment were $24.5 million, which included continuing facility closure costs of $3.6 million related to our facilities located in Huntington, Indiana; Howell, Michigan; La Mirada, California; and Bowling Green, Kentucky. Impairments of $16.8 million were also recorded for our Huntington, Indiana and Howell, Michigan facilities and Hoboken, Belgium facility. Severance charges of $4.1 million were related to our Huntington, Indiana; Dello, Italy; and Hoboken, Belgium facilities.

*Other:* The asset impairment losses and other restructuring charges for the Other segment were $8.3 million. Facility and machinery and equipment impairments of $4.7 million were recorded for our Wabash, Indiana facility as well as $0.5 million of impairments at our corporate offices in Northville, Michigan. The severance charges of $3.1 million included $1.2 million for a reduction-in-force at our Ferndale, Michigan technical center, other restructuring charges of $1.1 million at our Nuevo Laredo, Mexico facility, and severance of $0.8 million at our corporate offices.

### *Severance and Other Restructuring Accrued Expense*

The following table describes the activity in the severance and other restructuring accrued expense account for the year ended January 31, 2009 (dollars in millions):

|  | January 31, 2008 | Amounts Accrued | Cash Payments and Effects of Foreign Currency | January 31, 2009 |
|---|---|---|---|---|
| Facility closure costs | $ — | $ 3.4 | $ (3.2) | $ 0.2 |
| Severance and other restructuring charges | 0.2 | 9.4 | (5.6) | 4.0 |
|  | $ 0.2 | $ 12.8 | $ (8.8) | $ 4.2 |

## Note 12.  Discontinued Operations

As discussed in Note 3, Acquisitions and Divestitures of Businesses, we divested our Brakes Business, MGG Group, and Suspension business during fiscal 2007. We also divested our Hub and Drum business in fiscal 2005 for cash proceeds of $53.9 million with a gain of $13.1 million. The Hub and Drum business included our operations in

HAYES LEMMERZ INTERNATIONAL, INC. AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

Berea, Kentucky; Chattanooga, Tennessee; and Mexico City, Mexico and was included in our Other segment. The aforementioned businesses comprise our discontinued operations and were reported in accordance with SFAS 144.

Operating results for our discontinued operations for the year ended January 31, 2009 were as follows (dollars in millions):

| | Brakes Business | MGG Group | Suspension | Total |
|---|---|---|---|---|
| Net sales | $ — | $ — | $ — | $ — |
| (Loss) earnings before income tax expense | — | (2.4) | 0.1 | (2.3) |
| Income tax benefit | (0.8) | — | — | (0.8) |
| Net income (loss) | $ 0.8 | $ (2.4) | $ 0.1 | $(1.5) |

During the third quarter of fiscal 2008, we settled certain disputes arising out of the share purchase agreement for the MGG Group resulting in a loss of $2.4 million. We also recorded an adjustment of $0.1 million for the Suspension business due to a reversal of severance expense. We recorded $0.8 million of income tax benefit for our Brakes Business due to the allocation of tax expense associated with provision to return adjustment.

Operating results for our discontinued operations for the year ended January 31, 2008 were as follows (dollars in millions):

| | Brakes Business | MGG Group | Suspension | Hub and Drum | Total |
|---|---|---|---|---|---|
| Net sales | $ 83.6 | $ 55.5 | $ 6.8 | $ — | $145.9 |
| Earnings (loss) before income tax expense | 21.4 | (27.8) | (4.3) | 0.7 | (10.0) |
| Income tax expense (benefit) | 3.2 | (0.6) | — | — | 2.6 |
| Net income (loss) | $ 18.2 | $ (27.2) | $ (4.3) | $ 0.7 | $ (12.6) |

The $0.7 million of earnings before income tax expense for the Hub and Drum business was due to a subsequent adjustment recorded on the sale of the business.

Operating results for our discontinued operations for the year ended January 31, 2007 were as follows (dollars in millions):

| | Brakes Business | MGG Group | Suspension | Total |
|---|---|---|---|---|
| Net sales | $ 119.8 | $ 139.9 | $ 229.8 | $489.5 |
| Earnings (loss) before income tax expense | 8.6 | (6.6) | (48.7) | (46.7) |
| Income tax expense (benefit) | 0.7 | (1.8) | — | (1.1) |
| Minority interest | — | (0.2) | — | (0.2) |
| Net income (loss) | $ 7.9 | $ (4.6) | $ (48.7) | $ (45.4) |

## Note 13.  Commitments and Contingencies

### *Legal Proceedings*

On May 3, 2002 a class action lawsuit was filed against thirteen of our former directors and officers (but not us) and KPMG LLP, our independent registered public accounting firm, in the U.S. District Court for the Eastern District of Michigan, seeking damages for a class of persons who purchased our bonds between June 3, 1999 and September 5, 2001 and who claim to have been injured because they relied on our allegedly materially false and misleading financial statements. Additionally, before the commencement of the Chapter 11 Bankruptcy case, four other class actions were filed in the U.S. District Court for the Eastern District of Michigan against us and certain of our directors and officers on behalf of a class of purchasers of our common stock from June 3, 1999 to December 13,

# HAYES LEMMERZ INTERNATIONAL, INC. AND SUBSIDIARIES

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

2001, based on similar allegations of securities fraud. Pursuant to our Plan of Reorganization, we agreed, subject to certain conditions, to indemnify certain of our former directors against certain liabilities, including those matters described above, up to an aggregate of $10 million. During fiscal 2007 we settled with all but one of the plaintiffs. In February 2008 we settled with the final plaintiff and the case has been dismissed. The amount of the settlements was not material.

We were party to a license agreement with Kuhl Wheels, LLC (Kuhl), whereby Kuhl granted us an exclusive patent license concerning "high vent" steel wheel technology known as the Kuhl Wheel (Kuhl Wheel), which agreement was terminated as of January 10, 2003 pursuant to a stipulation between us and Kuhl in connection with our bankruptcy proceeding. The original license agreement (as amended, the License Agreement), dated May 11, 1999, granted us a non-exclusive license for the Kuhl Wheel technology. The License Agreement was subsequently amended to provide us with an exclusive worldwide license. On January 14, 2003 we filed a Complaint for Declaratory and Injunctive Relief against Kuhl and its affiliate, Epilogics Group, in the U.S. District Court for the Eastern District of Michigan. We commenced such action seeking a declaration of non-infringement of two U.S. patents and injunctive relief to prevent Epilogics Group and Kuhl from asserting claims of patent infringement against us, and disclosing and using our technologies, trade secrets, and confidential information to develop, market, license, manufacture, or sell automotive wheels. We subsequently dismissed our claims regarding Kuhl's alleged use of our technologies. We filed summary judgment motions seeking rulings that we do not infringe Kuhl's patents, that Kuhl's patents are invalid, and finding in our favor on Kuhl's non-patent claims in the case. On November 30, 2007 the court awarded summary judgment in our favor on non-infringement of Kuhl's patents and on Kuhl's non-patent claims. Kuhl appealed to the Federal Circuit Court of Appeals, which, on February 24, 2009, upheld the district court's ruling. The deadline for Kuhl to have filed a petition for rehearing has passed.

We are the defendant in a patent infringement matter filed in 1997 in the U.S. District Court for the Eastern District of Michigan. Lacks Incorporated (Lacks) alleged that we infringed on three patents held by Lacks relating to chrome-plated plastic cladding for wheels. Prior to fiscal 2000, the Federal District Court dismissed all claims relating to two of the three patents that Lacks claimed were infringed and dismissed many of the claims relating to the third patent. The remaining claims relating to the third patent were submitted to a special master. In January 2001 the special master issued a report finding that Lacks' third patent was invalid and recommending that Lacks' remaining claims be dismissed; the trial court accepted these recommendations. Lacks appealed this matter to the Federal Circuit Court. The Federal Circuit Court vacated the trial court's ruling that the third patent was invalid and remanded the matter back to the trial court for further proceedings. Discovery on the remanded claims is ongoing. In July 2003 Lacks filed an administrative claim in the Bankruptcy Court for $12 million relating to the alleged patent infringement. On August 15, 2007 the special master issued a report finding that the remaining claims at issue in the third patent are invalid and recommending that the trial court grant judgment for us and against Lacks. On November 20, 2007 the trial court accepted the special master's recommendation. On November 29, 2007 Lacks filed a notice with the trial court that it is appealing the trial court's ruling to the Federal Circuit Court of Appeals.

The nature of our business subjects us to litigation in the ordinary course of our business. In addition, we are from time to time involved in other legal proceedings. Although claims made against us prior to May 12, 2003, the date on which the Plan of Reorganization was confirmed, except as described in the immediately following paragraph, were discharged and are entitled only to the treatment provided in the Plan of Reorganization or in connection with settlement agreements that were approved by the Bankruptcy Court prior to our emergence from bankruptcy, we cannot guarantee that any remaining or future claims will not have a significant negative impact on our results of operations and profitability. In addition, certain claims made after the date of our bankruptcy filing may not have been discharged in the bankruptcy proceeding.

Claims made against us prior to the date of the bankruptcy filing or the confirmation date may not have been discharged if the claimant had no notice of the bankruptcy filing or various deadlines in the Plan of Reorganization. Although certain parties have informally claimed that their claims were not discharged, we are not presently aware of any party that is seeking to enforce claims that we believe were discharged or a judicial determination that their

76

# HAYES LEMMERZ INTERNATIONAL, INC. AND SUBSIDIARIES

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

claims were not discharged by the Plan of Reorganization. In addition, in other bankruptcy cases, states have challenged whether their claims could be discharged in a federal bankruptcy proceeding if they never made an appearance in the case. This issue has not been finally settled by the U.S. Supreme Court. Therefore, we can give no assurance that our emergence from bankruptcy resulted in a discharge of all claims against us with respect to periods prior to the date we filed for bankruptcy protection. Any such claim not discharged could have a material adverse effect on our financial condition and profitability; however, we are not presently aware of any such claims. Moreover, our European operations and certain other foreign operations did not file for bankruptcy protection, and claims against them are not affected by our bankruptcy filing.

In the ordinary course of our business, we are a party to other judicial and administrative proceedings involving our operations and products, which may include allegations as to manufacturing quality, design, and safety. We carry insurance coverage in such amounts in excess of our self-insured retention as we believe to be reasonable under the circumstances and which may or may not cover any or all of our liabilities in respect of claims and lawsuits. After reviewing the proceedings that are currently pending (including the probable outcomes, reasonably anticipated costs and expenses, availability and limits of insurance rights under indemnification agreements, and established reserves for uninsured liabilities), we believe that the outcome of these proceedings will not have a material adverse effect on the financial condition or ongoing results of our operations.

We are exposed to potential product liability and warranty risks that are inherent in the design, manufacture and sale of automotive products, the failure of which could result in property damage, personal injury, or death. Accordingly, individual or class action suits alleging product liability or warranty claims could result. Although we currently maintain what we believe to be suitable and adequate product liability insurance in excess of our self-insured amounts, there can be no assurance that we will be able to maintain such insurance on acceptable terms or that such insurance will provide adequate protection against potential liabilities. In addition, we may be required to participate in a recall involving such products, for which we maintain only limited insurance. A successful claim brought against us in excess of available insurance coverage, if any, or a requirement to participate in any product recall, could have a material adverse effect on our results of operations or financial condition.

Under the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended (CERCLA), we currently have potential environmental liability arising out of both of our wheel and non-wheel businesses at 17 Superfund sites (Sites). Five of the Sites were related to the operations of Motor Wheel prior to the divestiture of that business by The Goodyear Tire & Rubber Co. (Goodyear). In connection with the 1986 purchase of Motor Wheel by MWC Holdings, Inc. (Holdings), Goodyear agreed to retain all liabilities relating to these Sites and to indemnify and hold Holdings harmless with respect thereto. Goodyear has acknowledged this responsibility and is presently representing our interests with respect to all matters relating to these five Sites.

As a result of activities that took place at our Howell, Michigan facility prior to our acquisition of it, the U.S. Environmental Protection Agency (EPA) recently performed under CERCLA, remediation of PCB's from soils on our property and sediments in the adjacent south branch of the Shiawassee River. The Michigan Department of Environmental Quality has indicated it intends to perform additional remediation of these soils and river sediments. Under the terms of a consent judgment entered into in 1981 by Cast Forge, Inc. (Cast Forge) (the previous owner of this site) and the State of Michigan, any additional remediation of the PCBs is the financial responsibility of the State of Michigan and not of Cast Forge or its successors or assigns (including us). The EPA concurred in the consent judgment.

We are working with various government agencies and the other parties identified by the applicable agency as "potentially responsible parties" to resolve our liability with respect to nine Sites. Our potential liability at each of these Sites is not currently anticipated to be material.

We have potential environmental liability at the two remaining Sites arising out of businesses presently operated by Kelsey-Hayes. Kelsey-Hayes has assumed and agreed to indemnify us with respect to any liabilities

**HAYES LEMMERZ INTERNATIONAL, INC. AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

associated with these Sites. Kelsey-Hayes has acknowledged this responsibility and is presently representing our interests with respect to these sites.

Kelsey-Hayes and, in certain cases, we may remain liable with respect to environmental cleanup costs in connection with certain divested businesses relating to aerospace, heavy-duty truck components, and farm implements under federal and state laws and under agreements with purchasers of these divested businesses. We believe, however, that such costs in the aggregate will not have a material adverse effect on our consolidated operations or financial condition and, in any event, Kelsey-Hayes has assumed and agreed to indemnify us with respect to any liabilities arising out of or associated with these divested businesses.

In addition to the Sites, we also have potential environmental liability at two state-listed sites in Michigan and one in California. One of the Michigan sites is covered under the indemnification agreement with Goodyear described above. We are presently working with the Michigan Department of Environmental Quality to resolve our liability with respect to the second Michigan site, for which no significant costs are anticipated. The California site is a former wheel manufacturing site operated by Kelsey-Hayes in the early 1980's. We are working with two other responsible parties and with the State of California on the investigation and remediation of this site.

*Leases*

We lease certain production facilities and equipment under various agreements expiring in fiscal years ending January 31, 2010 to 2014 and later. The following is a schedule, by fiscal year, of future minimum rental payments required under operating leases that have initial or remaining non-cancelable lease terms in excess of one year as of January 31, 2009 (dollars in millions):

| | |
|---|---|
| 2009 | $3.8 |
| 2010 | 1.2 |
| 2011 | 0.6 |
| 2012 | 0.4 |
| 2013 and later years | 0.2 |
| Total minimum payments required | $6.2 |

Rent expense was $10.4 million, $13.1 million, and $14.3 million for the years ended January 31, 2009, 2008, and 2007, respectively.

**Note 14.   Taxes on Income**

Income tax expense was calculated based upon the following components of income from continuing operations before income tax for the fiscal years indicated (dollars in millions):

| | 2008 | 2007 | 2006 |
|---|---|---|---|
| U.S. loss | $  (97.7) | $(187.1) | $(125.6) |
| Foreign income | (225.4) | 56.2 | 54.9 |
| Total | $(323.1) | $(130.9) | $  (70.7) |

78

# HAYES LEMMERZ INTERNATIONAL, INC. AND SUBSIDIARIES

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

The income tax expense attributable to continuing operations is summarized as follows for the fiscal years indicated (dollars in millions):

| | 2008 | 2007 | 2006 |
|---|---|---|---|
| **Current:** | | | |
| Federal | $ (1.8) | $ 0.6 | $ 0.2 |
| State and local | 0.7 | (0.3) | 1.5 |
| Foreign | 46.0 | 40.8 | 30.0 |
| | $ 44.9 | $ 41.1 | $31.7 |
| **Deferred:** | | | |
| Federal | $ 1.1 | $ (0.9) | $ — |
| State and local | 0.3 | (0.1) | 0.6 |
| Foreign | (15.6) | (10.2) | 7.9 |
| | (14.2) | (11.2) | 8.5 |
| Income tax expense | $ 30.7 | $ 29.9 | $40.2 |

The income tax expense for fiscal 2006 includes an expense of $7.9 million for the recognition of a valuation allowance against the deferred tax assets of Hoboken, Belgium. The income tax expense for fiscal 2008 includes an expense of $4.8 million for the establishment of a valuation allowance against the net deferred tax assets of the Spanish consolidated group, as well as the Mexican subsidiaries.

A reconciliation of tax benefit computed at the U.S. Federal statutory rate of 35% to the actual income tax expense attributable to continuing operations follows for the fiscal years indicated (dollars in millions):

| | 2008 | 2007 | 2006 |
|---|---|---|---|
| Federal tax benefit computed at statutory rate | $(113.0) | $(45.8) | $(24.8) |
| Increase (decrease) resulting from: | | | |
| State and other taxes | 3.3 | — | 1.8 |
| Goodwill impairment | 67.8 | 0.3 | — |
| Non-deductible expenses | 4.1 | 2.8 | 2.9 |
| Foreign statutory tax rate differential | 6.3 | (9.3) | (22.6) |
| Change in foreign tax rates | (0.5) | (6.4) | (0.4) |
| Tax holidays | (0.8) | (1.4) | (3.1) |
| Loss (gain) on sale of subsidiary stock and restructuring | (6.8) | (8.3) | 6.2 |
| Intercompany financing | 1.8 | (0.7) | (3.0) |
| Tax exempt income | (0.2) | (0.2) | (0.1) |
| Parent taxation of subsidiary earnings | 19.2 | 66.3 | 1.4 |
| Change in valuation allowance | 54.7 | 20.7 | 82.3 |
| Mexican MAQUILLA/Asset/IETU | 0.7 | 15.6 | 0.9 |
| All other items | (5.9) | (3.7) | (1.3) |
| Income tax expense | $ 30.7 | $ 29.9 | $ 40.2 |

We were granted tax holidays in the Czech Republic and Thailand based upon investments made at our facilities located in those countries. We expect to reach the maximum benefit allowed under the Czech Republic tax holiday in fiscal 2009. Similarly, we expect to fully utilize the total benefit approved in Thailand by fiscal 2012.

HAYES LEMMERZ INTERNATIONAL, INC. AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

Deferred tax assets (liabilities) result from differences in the bases of assets and liabilities for tax and financial statement purposes. The approximate tax effect of each type of temporary difference and carryforward that gives rise to a significant portion of the deferred tax assets and liabilities follows for the fiscal years indicated (dollars in millions):

|  | 2008 | 2007 |
|---|---|---|
| Deferred tax assets attributable to: |  |  |
| Accrued liabilities | $ 14.3 | $ 18.0 |
| Operating loss carryforwards | 285.2 | 210.9 |
| Property, plant, and equipment | 16.5 | 21.7 |
| Pension | 45.2 | 49.7 |
| Inventories | 2.8 | 3.9 |
| Other | 6.9 | 8.1 |
| Total gross deferred tax assets | 370.9 | 312.3 |
| Less valuation allowance | (325.8) | (264.9) |
| Net deferred tax assets | $ 45.1 | $ 47.4 |
| Deferred tax liabilities attributable to: |  |  |
| Property, plant, and equipment | $ (27.3) | $ (34.9) |
| Intangible assets | (34.7) | (52.9) |
| Intercompany notes | — | (0.3) |
| Other | (26.8) | (26.9) |
| Total gross deferred tax liabilities | (88.8) | (115.0) |
| Net deferred tax liabilities | $ (43.7) | $ (67.6) |

Deferred tax assets (liabilities) are presented within the Consolidated Balance Sheets for the following fiscal years (dollars in millions):

|  | 2008 | 2007 |
|---|---|---|
| Current assets | $ 3.2 | $ 5.0 |
| Current liabilities | (0.2) | (0.7) |
| Non current assets | — | 4.2 |
| Non current liabilities | (46.7) | (76.1) |
| Net deferred tax liabilities | $(43.7) | $(67.6) |

We have U.S. Federal net operating loss carryforwards of $424.0 million expiring in 2025 through 2028. Our previously disclosed Rights Offering did not result in an "ownership change" and did not limit our ability to fully utilize these net operating loss carryforwards in the future. We also have foreign net operating loss carryforwards of $309.8 million, of which $31.7 million expire in years 2009 through 2020, and $278.1 million may be carried forward indefinitely. In addition, we have U.S. Federal capital loss carryforwards of $129.5 million, which expire in 2009 through 2013 and state net operating loss carryforwards of $154.0 million, which expire in 2009 through 2029.

In assessing the realizability of deferred tax assets, management considers whether it is more likely than not that some portion or all of the deferred tax assets will not be realized. Management considers the scheduled reversal of deferred tax liabilities, projected future taxable income, and tax planning strategies in making this assessment. We expect the deferred tax assets at January 31, 2009, net of the valuation allowance, to be realized as a result of the

**HAYES LEMMERZ INTERNATIONAL, INC. AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

reversal of existing taxable temporary differences in the U.S. and as a result of projected future taxable income and the reversal of existing taxable temporary differences in certain foreign locations.

We increased the valuation allowance for continuing operations during fiscals 2008, 2007, and 2006 by $60.9 million, $20.7 million, and $82.3 million, respectively.

Due to the debt restructuring and loan guarantees in fiscal year 2007, we no longer have temporary differences related to investments in certain foreign subsidiaries that are essentially permanent in duration. The amounts of such undistributable earnings as of January 31, 2009 and 2008 were estimated to be $63.0 million and $63.6 million, respectively.

We have determined that a valuation allowance is required against all net deferred tax assets in the U.S. and certain deferred tax assets in foreign jurisdictions. As such, there is no federal income tax benefit recorded against current losses incurred in the U.S.

A reconciliation of the beginning and ending amount of total unrecognized tax benefits is as follows (in millions):

| | |
|---|---:|
| Balance at February 1, 2008 | $11.1 |
| Decreases related to prior year tax positions | (4.5) |
| Increases related to current year tax positions | 0.4 |
| Settlements | — |
| Reclassifications | — |
| Lapse of statute of limitations | (2.2) |
| Balance at January 31, 2009 | $ 4.8 |

Included in the balance of total unrecognized tax benefits at January 31, 2009 and January 31, 2008 are potential benefits of $4.8 million and $8.1 million, respectively, that if recognized would affect the effective rate on income from continuing operations.

Our policy is to report interest related to unrecognized tax benefits in interest expense and penalties, if any, related to unrecognized tax benefits in income tax expense in our Consolidated Statements of Operations. Interest expense and penalties recognized in the statement of operations related to uncertain tax positions in fiscal 2008 and 2007 are $0.0 million and $1.3 million, respectively. In fiscal 2006 we reversed $0.5 million. Total accrued interest and penalties as of January 31, 2009, 2008, and 2007 are $0.0 million, $1.3 million and $0.4 million respectively, and were included in other accrued liabilities.

We have open tax years from primarily 2001 to 2008 with various significant taxing jurisdictions including the U.S., Germany, Italy, Brazil, Turkey and the Czech Republic. These open years contain matters that could be subject to differing interpretations of applicable tax laws and regulations as they relate to the amount, timing or inclusion of revenue and expenses or the sustainability of income tax credits for a given audit cycle. We have recorded a tax benefit only for those positions that meet the more-likely-than-not standard.

The amount of unrecognized tax benefits may increase or decrease in the future for various reasons including adding amounts for current tax year positions, expiration of open income tax returns due to the statutes of limitation, changes in management's judgment about the level of uncertainty, status of examinations, litigation and legislative activity, and the addition or elimination of uncertain tax positions. We estimate that unrecognized tax benefits will decrease in the following 12 months by $0.1 million due to resolutions of open tax positions.

There are currently no U.S. federal or significant state income tax audits in process. Income tax audits have been initiated and are still in process in Italy, Spain and Mexico for tax years including 2004 through 2006.

**HAYES LEMMERZ INTERNATIONAL, INC. AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

**Note 15. Stock Based Benefit Plans**

We have a Long Term Incentive Plan (LTIP) that provides for the grant of incentive stock options (ISOs), stock options that do not qualify as ISOs, restricted shares of common stock, and restricted stock units (collectively, the awards). Any officer, director, or key employee of Hayes Lemmerz International, Inc. or any of its subsidiaries is eligible to be designated as a participant in the LTIP. We follow the provisions of SFAS 123R, which we adopted on February 1, 2006.

In July 2007 the Board of Directors approved adjustments to (i) our Series B Warrants (Warrants), (ii) the Series A Preferred Stock of our wholly owned subsidiary, HLI Operating Company, Inc. (Opco Preferred Stock), which Opco Preferred Stock can be exchanged for shares of our common stock, and (iii) awards granted under the LTIP. The adjustments were made as a result of dilution resulting from the $180,000,000 Rights Offering and $13,125,002 Direct Investment by Deutsche Bank Securities Inc. Pursuant to these transactions, we issued and sold 59,423,077 shares of our common stock at a price per share of $3.25 on May 30, 2007.

The LTIP requires us to make an equitable adjustment to awards granted under the plan as a result of the Rights Offering and Direct Investment. In July 2007 the Compensation Committee of the Board of Directors recommended, and the Board of Directors approved, an adjustment to the exercise price and number of shares subject to stock options awarded under the LTIP according to the formulas used for the Warrants. An analogous adjustment was also made to the number of shares subject to restricted stock units. We recorded $8.5 million of expense through fiscal 2008 due to these adjustments.

For the years ending January 31, 2009, 2008, and 2007, we recorded $4.9 million, $11.2 million, and $2.7 million of compensation cost for our stock based benefit plans, respectively. For the outstanding, unvested options and restricted stock as of January 31, 2009, we expect to record additional expense of $3.2 million through fiscal 2012. The expense of $1.0 million related to the outstanding unvested options and $2.2 million related to the outstanding unvested restricted stock are expected to be recognized over a weighted average period of 1.3 and 1.6 years, respectively.

82

**HAYES LEMMERZ INTERNATIONAL, INC. AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

Stock option activity for the years ended January 31, 2009, 2008, and 2007 under the LTIP is as follows:

| | Number of Shares | Weighted Average Exercise Price |
|---|---|---|
| Outstanding at January 31, 2006 | 1,722,235 | $ 10.16 |
| Granted | — | — |
| Exercised | — | — |
| Cancelled/forfeited | (387,596) | 10.65 |
| Outstanding at January 31, 2007 | 1,334,639 | $ 10.01 |
| Granted | 1,883,244 | 5.17 |
| Exercised | (7,790) | 4.52 |
| Cancelled/forfeited | (227,317) | 9.67 |
| Outstanding at January 31, 2008 | 2,982,776 | $ 7.00 |
| Granted | 1,272,984 | 2.45 |
| Exercised | — | — |
| Expired | (4,493) | 10.35 |
| Cancelled/forfeited | (337,367) | 6.54 |
| Outstanding at January 31, 2009 | 3,913,900 | $ 5.55 |
| Balance vested at: | | |
| January 31, 2007 | 1,334,639 | $ 10.01 |
| January 31, 2008 | 1,617,323 | $ 9.70 |
| January 31, 2009 | 2,007,909 | $ 7.96 |
| Weighted average grant date fair value for options granted during the year ending: | | |
| January 31, 2007 | — | $ — |
| January 31, 2008 | 1,883,244 | $ 2.44 |
| January 31, 2009 | 1,272,984 | $ 1.39 |

The following table summarizes information about stock options outstanding at January 31, 2009:

| | Outstanding | | | | Exercisable | | |
|---|---|---|---|---|---|---|---|
| Range of Exercisable Prices: | Number of Shares Vested | Number of Shares Unvested | Weighted Average Exercise Price | Weighted Average Remaining Contractual Life | Number of Shares | Weighted Average Exercise Price | Weighted Average Remaining Contractual Life |
| $ 1.90 - $ 3.79 | 604,255 | 1,905,991 | $ 3.12 | 8.9757 | 634,854 | $ 3.47 | 8.7057 |
| $ 3.80 - $ 5.68 | 96,390 | — | 4.34 | 7.4659 | 65,791 | 4.42 | 6.8520 |
| $ 5.69 - $ 7.57 | 12,408 | — | 6.87 | 5.6920 | 12,408 | 6.87 | 5.6920 |
| $ 7.58 - $ 9.47 | 10,484 | — | 7.66 | 5.6646 | 10,484 | 7.66 | 5.6646 |
| $ 9.48 - $11.36 | 1,270,910 | — | 10.35 | 4.2309 | 1,270,910 | 10.35 | 4.2309 |
| $11.37 - $13.25 | 13,462 | — | 13.07 | 4.8953 | 13,462 | 13.07 | 4.8953 |
| | 2,007,909 | 1,905,991 | $ 5.55 | 7.3645 | 2,007,909 | $ 7.96 | 5.7526 |

HAYES LEMMERZ INTERNATIONAL, INC. AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

The fair values of stock options granted in fiscal 2008 and 2007 were estimated on the respective dates of grant using the Black-Scholes option-pricing model. The weighted average fair values and related assumptions were:

|  | January 31, 2009 | January 31, 2008 |
| --- | --- | --- |
| Risk free interest rate | 2.6-3.3% | 3.3-4.9% |
| Expected life | 5.2-6.5 | 3.0-6.5 |
| Expected volatility | 59.8-60.6% | 61.0-61.8% |
| Expected dividends | 0% | 0% |

A summary of our restricted stock activity for the years ended January 31, 2009, 2008, and 2007 is as follows:

|  | Number of Shares | | Weighted Average Grant Date Fair Value |
| --- | --- | --- | --- |
| Outstanding at January 31, 2006 | 1,357,705 | $ | 12.14 |
| Granted | 921,500 | | 2.94 |
| Exercised | (371,074) | | 12.38 |
| Forfeited | (231,132) | | 12.11 |
| Outstanding at January 31, 2007 | 1,676,999 | $ | 7.03 |
| Granted | 1,830,556 | | 4.97 |
| Exercised | (1,908,793) | | 7.29 |
| Forfeited | (146,147) | | 6.68 |
| Outstanding at January 31, 2008 | 1,452,615 | $ | 4.13 |
| Granted | 1,099,470 | | 2.45 |
| Exercised | (855,449) | | 4.05 |
| Forfeited | (172,745) | | 3.68 |
| Outstanding at January 31, 2009 | 1,523,891 | $ | 3.06 |

## Note 16.  Minority Interest in Equity of Consolidated Subsidiaries

The consolidated financial statements include those majority-owned subsidiaries in which we have control. The balance sheets and results of operations of controlled subsidiaries where ownership is greater than 50%, but less than 100%, are included in the consolidated financial statements and are offset by a related minority interest expense and liability recorded for the minority interest ownership.

Minority interest in equity of consolidated affiliates includes common shares in consolidated affiliates and preferred stock issued by our subsidiary HLI Opco. The preferred stock is redeemable by HLI Opco at any time after June 3, 2013 and may be exchanged at the option of the holders at any time for shares of our common stock. The holders of the preferred stock are entitled to cash dividends of 8% of the liquidation preference per annum when, as, and if declared by the board of directors of HLI Opco. Dividends accrue without interest from the date of issuance until declared and paid or until the shares are redeemed by HLI Opco or exchanged by the holders thereof.

The balance of minority interest is summarized as follows:

|  | January 31, 2009 | January 31, 2008 |
| --- | --- | --- |
| Minority interest in consolidated affiliates | $ 54.3 | $ 59.3 |
| Minority interest in preferred stock | 11.5 | 11.2 |
| Total minority interest | $ 65.8 | $ 70.5 |

84

**HAYES LEMMERZ INTERNATIONAL, INC. AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

**Note 17.   Off Balance Sheet Arrangements**

We have a domestic accounts receivable securitization facility with an interest rate equal to LIBOR plus 2.25% or Prime plus 1.25% The facility limit was reduced to $5.0 million in April 2009 and no future advances will be made under the program beyond the current $5.0 million advanced. If the borrowing base falls below $5.0 million, amounts currently advanced in excess of the borrowing base will need to be repaid.

Pursuant to the securitization facility, certain of our consolidated subsidiaries sell substantially all U.S. short term trade receivables to a non-consolidated special purpose entity (SPE I) at face value and no gains or losses are recognized in connection with the sales. The purchase price for the receivables sold to SPE I is paid in a combination of cash and short term notes. The short term notes appear in other receivables on our Consolidated Balance Sheets and represent the difference between the face amount of accounts receivables sold and the cash received for the sales. SPE I resells the receivables to a non-consolidated qualifying special purpose entity (SPE II) at an annualized discount of 2.4% to 4.4%. SPE II pays the purchase price for the receivables with cash received from borrowings and equity in SPE II for the excess of the purchase price of the receivables over the cash payment. SPE II pledges the receivables to secure borrowings from commercial lenders. This debt is not included in our consolidated financial statements.

Collections for the receivables are serviced by HLI Opco and deposited into an account controlled by the program agent. The servicing fees payable to HLI Opco are set off against interest and other fees payable to the program agent and lenders. The program agent uses the proceeds to pay off the short term borrowings from commercial lenders and returns the excess collections to SPE II, which in turn pays down the short term note issued to SPE I. SPE I then pays down the short term notes issued to the consolidated subsidiaries.

The securitization transactions are accounted for as sales of the receivables under the provisions of SFAS 140 and are removed from the Consolidated Balance Sheets. The proceeds received are included in cash flows from operating activities in the Consolidated Statements of Cash Flows. Costs associated with the receivables facility are recorded as other expense in the Consolidated Statements of Operations.

As of January 31, 2009 and 2008 the outstanding balances of receivables sold to special purpose entities were $21.4 million and $48.3 million, respectively. Our net retained interests as of January 31, 2009 and 2008 were $15.4 million and $48.3 million, respectively, which are disclosed as Other Receivables on the Consolidated Balance Sheets and in cash flows from operating activities in the Consolidated Statements of Cash Flows. There were $6.0 million in advances from lenders as of January 31, 2009 and no advances as of January 31, 2008.

**Note 18.   Segment Information**

We are organized based primarily on markets served and products produced. Under this organizational structure, our operating segments have been aggregated into two reportable segments: Automotive Wheels and Other. The Automotive Wheels segment includes results from our operations that primarily design and manufacture fabricated steel and cast aluminum wheels for original equipment manufacturers in the global passenger car, light vehicle, and heavy duty truck markets. The Other segment includes results from our operations that primarily design and manufacture powertrain components for the passenger car and light vehicle markets as well as financial results related to the corporate office and the elimination of certain intercompany activities.

**HAYES LEMMERZ INTERNATIONAL, INC. AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

The following tables present revenues and other financial information by business segment (dollars in millions):

|  | Year Ended January 31, | | |
|  | 2009 | 2008 | 2007 |
|---|---|---|---|
| **Revenues:** | | | |
| Automotive Wheels | $1,848.4 | $2,051.9 | $1,671.9 |
| Other | 55.9 | 74.8 | 124.9 |
| Total | $1,904.3 | $2,126.7 | $1,796.8 |
| **Earnings (loss) from operations:** | | | |
| Automotive Wheels | $ (262.3) | $   36.7 | $   53.3 |
| Other | 10.0 | (75.4) | (48.8) |
| Total | $ (252.3) | $  (38.7) | $    4.5 |
| **Interest expense, net:** | | | |
| Automotive Wheels | $    2.6 | $    5.1 | $    8.5 |
| Other | 58.5 | 57.1 | 66.7 |
| Total | $   61.1 | $   62.2 | $   75.2 |
| **Income tax expense (benefit):** | | | |
| Automotive Wheels | $   32.6 | $   36.4 | $   42.9 |
| Other | (1.9) | (6.5) | (2.7) |
| Total | $   30.7 | $   29.9 | $   40.2 |
| **Depreciation and amortization:** | | | |
| Automotive Wheels | $  100.7 | $  104.0 | $   99.0 |
| Other | 3.8 | 8.1 | 12.5 |
| Total | $  104.5 | $  112.1 | $  111.5 |
| **Capital expenditures:** | | | |
| Automotive Wheels | $   77.6 | $   91.6 | $   65.4 |
| Other | 2.6 | 10.8 | 5.0 |
| Total | $   80.2 | $  102.4 | $   70.4 |

The following table presents certain balance sheet information by business segment (dollars in millions):

|  | January 31, 2009 | January 31, 2008 |
|---|---|---|
| **Total assets:** | | |
| Automotive Wheels | $ 1,171.8 | $ 1,956.6 |
| Other | (75.6) | (150.7) |
| Total | $ 1,096.2 | $ 1,805.9 |
| **Goodwill:** | | |
| Automotive Wheels | $      — | $  240.5 |
| Other | — | — |
| Total | $      — | $  240.5 |

86

**HAYES LEMMERZ INTERNATIONAL, INC. AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

*Customer Concentration*

During fiscal 2008, approximately 28.9% of our revenues were from two automotive manufacturers and their affiliates. The loss of a major portion of sales to either of these customers could have a material adverse impact on our business. The following is a summary by segment of the percentage of revenues from direct sales to these major customers on a worldwide basis (there were no other customers with revenues greater than 10% of our total revenues):

| | Year Ended January 31, 2009 | | |
| | Automotive Wheels | Other | Total |
|---|---|---|---|
| Ford Motor Company | 16.2% | 0.4% | 16.6% |
| General Motors Corporation | 11.2% | 1.1% | 12.3% |
| Total | 27.4% | 1.5% | 28.9% |

| | Year Ended January 31, 2008 | | |
| | Automotive Wheels | Other | Total |
|---|---|---|---|
| Ford Motor Company | 16.7% | 0.8% | 17.5% |
| General Motors Corporation | 12.8% | 0.2% | 13.0% |
| Total | 29.5% | 1.0% | 30.5% |

| | Year Ended January 31, 2007 | | |
| | Automotive Wheels | Other | Total |
|---|---|---|---|
| Ford Motor Company | 17.7% | 1.3% | 19.0% |
| General Motors Corporation | 17.1% | 0.5% | 17.6% |
| Total | 34.8% | 1.8% | 36.6% |

The following table sets forth revenues from external customers attributable to the U.S. and other foreign countries from which we derive revenues (dollars in millions):

| | Year Ended January 31, 2009 | | |
| | Automotive Wheels | Other | Total |
|---|---|---|---|
| Germany | $ 346.0 | $ — | $ 346.0 |
| United States | 294.0 | 45.1 | 339.1 |
| Brazil | 274.8 | — | 274.8 |
| Czech Republic | 213.9 | — | 213.9 |
| Turkey | 207.9 | — | 207.9 |
| Other foreign countries | 511.8 | 10.8 | 522.6 |
| Total | $ 1,848.4 | $55.9 | $1,904.3 |

87

**HAYES LEMMERZ INTERNATIONAL, INC. AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

| | Year Ended January 31, 2008 | | |
|---|---|---|---|
| | Automotive Wheels | Other | Total |
| United States | $ 373.9 | $61.7 | $ 435.6 |
| Germany | 355.5 | — | 355.5 |
| Brazil | 241.2 | — | 241.2 |
| Czech Republic | 239.7 | — | 239.7 |
| Turkey | 201.6 | — | 201.6 |
| Other foreign countries | 640.0 | 13.1 | 653.1 |
| Total | $ 2,051.9 | $74.8 | $2,126.7 |

| | Year Ended January 31, 2007 | | |
|---|---|---|---|
| | Automotive Wheels | Other | Total |
| United States | $ 349.8 | $105.0 | $ 454.8 |
| Germany | 264.7 | — | 264.7 |
| Czech Republic | 193.9 | — | 193.9 |
| Brazil | 191.7 | — | 191.7 |
| Turkey | 126.3 | — | 126.3 |
| Other foreign countries | 545.5 | 19.9 | 565.4 |
| Total | $ 1,671.9 | $124.9 | $1,796.8 |

**Note 19.  Selected Quarterly Financial Data (Unaudited)**

The following represents our selected quarterly financial data (dollars in millions, except per share amounts):

| | Quarter Ended | | | | Year Ended |
|---|---|---|---|---|---|
| | April 30, 2008 | July 31, 2008 | October 31, 2008 | January 31, 2009 | January 31, 2009 |
| Net sales | $ 573.8 | $563.5 | $ 497.0 | $ 270.0 | $ 1,904.3 |
| Gross profit (loss) | 63.7 | 71.9 | 56.6 | (4.8) | 187.4 |
| Loss from continuing operations | $ (12.8) | $(47.0) | $ (8.1) | $ (302.3) | $ (370.2) |
| (Loss) income from discontinued operations | — | — | (2.3) | 0.8 | (1.5) |
| Net loss | $ (12.8) | $(47.0) | $ (10.4) | $ (301.5) | $ (371.7) |
| Basic and diluted net loss per share from continuing operations | $ (0.13) | $(0.46) | $ (0.08) | $ (2.97) | $ (3.65) |
| Basic and diluted net loss per share from discontinued operations | — | — | (0.02) | 0.01 | (0.02) |
| Basic and diluted net loss per share | $ (0.13) | $(0.46) | $ (0.10) | $ (2.96) | $ (3.67) |

88

HAYES LEMMERZ INTERNATIONAL, INC. AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

| | Quarter Ended | | | | Year Ended |
|---|---|---|---|---|---|
| | April 30, 2007 | July 31, 2007 | October 31, 2007 | January 31, 2008 | January 31, 2008 |
| Net sales as reported in filed Form 10-Qs | $ 561.0 | $ 570.3 | $ 554.9 | $ 529.1 | $ 2,215.3 |
| Less discontinued operations — MGG Group | 31.7 | — | — | — | 31.7 |
| Less discontinued operations — Brakes business | 30.7 | 26.2 | — | — | 56.9 |
| Reconciliation to Form 10-K sales | $ 498.6 | $ 544.1 | $ 554.9 | $ 529.1 | $ 2,126.7 |
| Gross profit as reported in filed Form 10-Qs | $ 61.5 | $ 56.7 | $ 58.1 | $ 41.6 | $ 217.9 |
| Less discontinued operations | 5.3 | 3.6 | | | 8.9 |
| Reconciliation to Form 10-K gross profit | $ 56.2 | $ 53.1 | $ 58.1 | $ 41.6 | $ 209.0 |
| Loss from continuing operations as reported in filed Form 10-Qs | $ (10.8) | $ (61.2) | $ (62.7) | $ (44.4) | $ (179.1) |
| Less discontinued operations | 1.8 | 0.9 | — | — | 2.7 |
| Reconciliation to Form 10-K loss from continuing operations | $ (12.6) | $ (62.1) | $ (62.7) | $ (44.4) | $ (181.8) |
| Loss from discontinued operations as reported in filed Form 10-Qs | $ (4.5) | $ (25.9) | $ — | $ 15.1 | $ (15.3) |
| Less discontinued operations | (1.8) | (0.9) | — | — | (2.7) |
| Reconciliation to Form 10-K loss from discontinued operations | $ (2.7) | $ (25.0) | $ — | $ 15.1 | $ (12.6) |
| Net loss | $ (15.3) | $ (87.1) | $ (62.7) | $ (29.3) | $ (194.4) |
| **Loss per common share data(1)** | | | | | |
| *Basic and diluted* | **Restated** | **Restated** | | | **Restated** |
| Loss from continuing operations | $ (0.21) | $ (0.72) | $ (0.62) | $ (0.44) | $ (2.09) |
| Loss from discontinued operations | (0.05) | (0.29) | — | 0.15 | (0.14) |
| Net loss | $ (0.26) | $ (1.01) | $ (0.62) | $ (0.29) | $ (2.23) |
| | **Restated** | **Restated** | | | **Restated** |
| Weighted average shares outstanding (in thousands) | 59,304 | 86,652 | 100,382 | 100,900 | 87,040 |

(1) See Note 20, Prior Period Accounting Errors, for additional information.

## Note 20.  Prior Period Accounting Errors

In the Consolidated Statement of Operations for the years ended January 31, 2008 and 2007, weighted average shares outstanding were inadvertently not retroactively adjusted for the Rights Offering on May 30, 2007 in accordance with FASB SFAS 128, "Earnings per Share" (SFAS 128). SFAS 128 provides that if a rights issue is offered to all existing stockholders at an exercise price that is less than the fair value of the stock, then the weighted average shares outstanding and basic and diluted earnings per share shall be adjusted retroactively for the bonus element for all periods presented. Because we had a loss in all relevant periods, there is no difference between basic and diluted earnings per share. See Note 8, Bank Borrowings, Other Notes, and Long-Term Debt, for additional information on the Rights Offering. As a result of this error, weighted average shares outstanding were understated and loss per share were overstated for those years.

**HAYES LEMMERZ INTERNATIONAL, INC. AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

The restated weighted average shares outstanding and restated loss per share as presented in our previously filed Form 10-Ks are as follows (shares in thousands, dollars in millions):

|  | Year Ended January 31, | |
| --- | --- | --- |
|  | 2008 | 2007 |
| Net loss as presented | $(194.4) | $(166.9) |
|  |  |  |
| Weighted average shares (in thousands) as presented | 80,533 | 38,307 |
| Corrected weighted average shares | 87,040 | 57,836 |
|  |  |  |
| Loss per share as presented | $ (2.41) | $ (4.36) |
| Corrected loss per share | $ (2.23) | $ (2.89) |

## Note 21.  New Accounting Pronouncements

In December 2008, the FASB issued FASB Staff Position (FSP) SFAS 132(R)-1, "Employers' Disclosures about Postretirement Benefit Plan Assets" (FSP SFAS 132(R)-1). FSP SFAS 132(R)-1 provides enhanced disclosures with regard to assets held by postretirement plans, including how investment allocations are made, the major categories of plan assets, the inputs and valuation techniques used to measure the fair value of plan assets, the effect of fair value measurements using Level 3 inputs, as defined in SFAS 157, "Fair Value Measurements" (SFAS 157) and an understanding of significant concentrations of risk within plan assets. FSP SFAS 132(R)-1 is effective for fiscal years ending after December 15, 2009, with early application permitted. We are currently assessing the potential impacts, if any, on our consolidated financial statements.

In March 2008 the FASB issued SFAS 161, " *Disclosures about Derivative Instruments and Hedging Activities — an amendment of FASB Statement No. 133*" (SFAS 161). This standard requires enhanced disclosures about an entity's derivative and hedging activities. SFAS 161 requires qualitative disclosures about objectives and strategies for using derivatives, quantitative disclosures about fair value amounts of gains and losses on derivative instruments, and disclosures about credit-risk-related contingent features in derivative agreements. This standard is effective for financial statements issued for fiscal years and interim periods beginning after November 15, 2008 and only requires disclosures for earlier periods presented for comparative purposes beginning in the first year after the year of initial adoption. We do not anticipate that the adoption of SFAS 161 will have a significant impact on our financial condition or results of operations.

In December 2007 the FASB issued SFAS 141R, " *Business Combinations*" (SFAS 141R). This standard establishes principles and requirements for how the acquirer recognizes and measures the acquired identifiable assets, assumed liabilities, noncontrolling interest in the acquiree, and acquired goodwill or gain from a bargain purchase. SFAS 141R also determines what information the acquirer must disclose to enable users of the financial statements to evaluate the nature and financial effects of the business combination. SFAS 141R applies prospectively to business combinations for which the acquisition date is on or after January 1, 2009. We do not anticipate that the adoption of SFAS 141R will have a significant impact on our financial condition or results of operations.

In December 2007 the FASB issued SFAS 160, " *Noncontrolling Interests in Consolidated Financial Statements — an amendment of ARB No. 51* " (SFAS 160). This standard establishes accounting and reporting standards for the noncontrolling interest in a subsidiary and for the deconsolidation of a subsidiary. SFAS 160 clarifies that a noncontrolling interest in a subsidiary is an ownership interest in the consolidated entity that should be reported as equity in the consolidated financial statements. SFAS 160 is effective for us as of February 1, 2009 with early adoption prohibited. SFAS 160 shall be applied prospectively as of the beginning of the fiscal year in which this standard is initially applied. The presentation and disclosure requirements of this standard shall be applied retrospectively for all periods presented and will impact how we present and disclose noncontrolling interests and income from noncontrolling interests in our financial statements.

**HAYES LEMMERZ INTERNATIONAL, INC. AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

In September 2006 the FASB issued SFAS 157, *"Fair Value Measurements"* . SFAS 157 establishes a framework for measuring fair value and expands disclosures about fair value measurements. The changes to current practice resulting from the application of SFAS 157 relate to the definition of fair value, the methods used to measure fair value, and the expanded disclosures about fair value measurements. We adopted the provisions of SFAS 157 with our fiscal year beginning February 1, 2008. The adoption of SFAS 157 did not have a significant impact on our consolidated financial statements. In February 2008, the FASB issued FASB Staff Position (FSP) 157-2, "Effective Date of FASB Statement No. 157" (FSP 157-2). This FSP delays the effective date of SFAS 157 for all nonfinancial assets and nonfinancial liabilities, except those that are recognized or disclosed at fair value in the financial statements on a recurring basis (at least annually). The effective date for nonfinancial assets and nonfinancial liabilities has been delayed by one year to fiscal years beginning after November 15, 2008 and interim periods within those fiscal years. We do not anticipate that the adoption of FSP 157-2 will have a significant impact on our financial condition and results of operations.

**Note 22.   Fair Value Measurement**

On February 1, 2008 we adopted SFAS 157 for fair value measurements of financial assets and financial liabilities that are recognized or disclosed at fair value in the financial statements on a recurring basis. SFAS 157 defines fair value as the price that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date. SFAS 157 also establishes a framework for measuring fair value and expands disclosures about fair value measurements. As a basis for considering market participant assumptions in fair value measurements, SFAS 157 establishes a fair-value hierarchy that prioritizes inputs for valuation techniques used to measure fair value as follows:

Level 1:  Observable inputs, such as quoted market prices in active markets, for identical assets or liabilities that are accessible at the measurement date.

Level 2:  Inputs, other than quoted market prices included in Level 1, that are observable either directly or indirectly for the asset or liability.

Level 3:  Unobservable inputs that reflect the entity's own assumptions about the exit price of the asset or liability. Unobservable inputs may be used if there is little or no market data for the asset or liability at the measurement date.

Assets and liabilities measured at fair value are based on one or more of the following three valuation techniques noted in SFAS 157:

Market approach:   Uses prices and other relevant information generated by market transactions involving identical or comparable assets or liabilities.

Income approach:   Uses valuation techniques to convert future amounts to a single present value amount based on current market expectations.

Cost approach:   The amount that would be required to replace the service capacity of the asset (replacement costs).

Our financial instruments include cash, marketable securities, trade receivables, other receivables, trade payables, and short-term debt. Due to the short-term nature of these instruments, the book value approximates fair value. The financial statements as of and for the year ended January 31, 2009 do not include any nonrecurring fair value measurements relating to assets or liabilities for which we have adopted the provisions of SFAS 157. All nonrecurring fair value measurements for fiscal 2008 involved nonfinancial assets and we will not adopt the provisions of SFAS 157 for nonrecurring fair value measurements involving nonfinancial assets and nonfinancial liabilities until February 1, 2009. Therefore, the provisions of SFAS 157 were not applied to fair value measurements of our reporting units for the Step 1 and Step 2 of goodwill impairment tests, for which we followed the provisions of SFAS 142, or for the testing of our long-lived assets for impairment, for which we followed the

**HAYES LEMMERZ INTERNATIONAL, INC. AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

provisions of SFAS 144. See Note 7, Goodwill and Other Intangible Assets, and Note 11, Asset Impairments and Other Restructuring Charges, for additional information.

We generally manage our interest rate risks associated with interest rate movements through the use of a combination of variable and fixed rate debt. From time to time, we have entered into interest rate swap arrangements to further hedge against interest rate fluctuations (cash flow hedge). As of January 31, 2009, we have four interest rate swaps, two with Deutsche Bank and two with UBS Bank.

The following table provides a summary of the interest rate swaps as of January 31, 2009 (in millions):

|  | Hedge Type | Notional Amount | Maturity |
|---|---|---|---|
| Deutsche Bank Swap | Cash flow hedge | € 40.0 | 8/28/2012 |
| Deutsche Bank Swap | Cash flow hedge | € 30.0 | 8/28/2012 |
| UBS Swap | Cash flow hedge | € 25.0 | 9/30/2012 |
| UBS Swap | Cash flow hedge | € 25.0 | 9/30/2012 |

The fair value related to the interest rate swaps as shown in the following table are included in other accrued liabilities on the Consolidated Balance Sheets for the years indicated (dollars in millions):

|  | Carrying Value | January 31, 2009 Fair Value | January 31, 2009 Fair Value Hierarchy |
|---|---|---|---|
| Deutsche Bank Swap, €40 million | $ 1.9 | $ 1.9 | Level 2 |
| Deutsche Bank Swap, €30 million | 1.4 | 1.4 | Level 2 |
| UBS Swap, €25 million | 1.2 | 1.2 | Level 2 |
| UBS Swap, €25 million | 1.1 | 1.1 | Level 2 |
| Total swaps | $ 5.6 | $ 5.6 | |

The fair values of the financial instruments shown in the above table as of January 31, 2009 represent management's best estimates of the amounts that would be paid to transfer those liabilities in an orderly transaction between market participants at that date. Those fair value measurements maximize the use of observable inputs.

**Note 23.  Condensed Consolidating Financial Statements**

The following condensed consolidating financial statements present the financial information required with respect to those entities that guarantee certain of our debt.

The condensed consolidating financial statements are presented based on the equity method of accounting. Under this method, the investments in subsidiaries are recorded at cost and adjusted for our share of the subsidiaries' cumulative results of operations, capital contributions, distributions, and other equity changes. The principal elimination entries eliminate investments in subsidiaries and intercompany balances and transactions.

*Guarantor and Nonguarantor Financial Statements*

As of January 31, 2009 Hayes Lemmerz International, Inc. (Hayes), HLI Parent Company, Inc. (Parent), HLI Opco, and substantially all of our domestic subsidiaries and certain of our foreign subsidiaries (collectively, excluding Hayes, the Guarantors) fully and unconditionally guaranteed, on a joint and several basis, the New Notes. This guarantor structure is a result of the restructuring of our debt as discussed in Note 8, Bank Borrowings, Other Notes, and Long Term Debt. At January 31, 2009 certain of our foreign subsidiaries were not obligated to guaranty the New Notes, nor were our domestic subsidiaries that are special purpose entities formed for domestic accounts receivable securitization programs (collectively, the Nonguarantor Subsidiaries). In lieu of providing separate unaudited financial statements for each of the Guarantors, we have included the unaudited supplemental guarantor

HAYES LEMMERZ INTERNATIONAL, INC. AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

condensed consolidating financial statements. We do not believe that separate financial statements for each of the Guarantors are material to investors. Therefore, separate financial statements and other disclosures concerning the Guarantors are not presented. In order to present comparable financial statements, we have presented them as if the current guarantor structure had been in place for all periods presented.

### CONDENSED CONSOLIDATING STATEMENTS OF OPERATIONS

### For the Year Ended January 31, 2009

| | Parent | Issuer | Guarantor Subsidiaries | Nonguarantor Subsidiaries | Eliminations | Total |
|---|---|---|---|---|---|---|
| | | | (Dollars in millions) | | | |
| Net sales | $ — | $ — | $ 1,201.4 | $ 770.4 | $ (67.5) | $1,904.3 |
| Cost of goods sold | 0.2 | — | 1,116.0 | 667.4 | (66.7) | 1,716.9 |
| Gross (loss) profit | (0.2) | — | 85.4 | 103.0 | (0.8) | 187.4 |
| Marketing, general, and administrative | — | 1.4 | 105.3 | 38.5 | — | 145.2 |
| Equity in (earnings) losses of subsidiaries and joint ventures | 371.5 | — | — | — | (371.5) | — |
| Asset impairments and other restructuring charges | — | — | 9.6 | 12.6 | — | 22.2 |
| Goodwill and other intangible assets impairment | — | — | — | 238.0 | — | 238.0 |
| Amortization of intangibles | — | — | 0.6 | 10.1 | — | 10.7 |
| Other (income) expense, net | — | — | (6.1) | 10.7 | 19.0 | 23.6 |
| (Loss) earnings loss from operations | (371.7) | (1.4) | (24.0) | (206.9) | 351.7 | (252.3) |
| Interest expense (income), net | — | 79.8 | (36.5) | 17.8 | — | 61.1 |
| Other non-operating (income) expense | — | — | (2.7) | 1.6 | 4.3 | 3.2 |
| Loss on early extinguishment of debt | — | 5.5 | 1.0 | — | — | 6.5 |
| (Loss) earnings from continuing operations before taxes on income and minority interest | (371.7) | (86.7) | 14.2 | (226.3) | 347.4 | (323.1) |
| Income tax expense | — | 1.6 | 30.2 | (1.1) | — | 30.7 |
| (Loss) earnings from continuing operations before minority interest | (371.7) | (88.3) | (16.0) | (225.2) | 347.4 | (353.8) |
| Minority interest | — | — | — | 16.4 | — | 16.4 |
| (Loss) earnings from continuing operations | (371.7) | (88.3) | (16.0) | (241.6) | 347.4 | (370.2) |
| Loss from discontinued operations, net of tax | — | — | (1.5) | — | — | (1.5) |
| Net (loss) income | $(371.7) | $(88.3) | $ (17.5) | $ (241.6) | $ 347.4 | $ (371.7) |

HAYES LEMMERZ INTERNATIONAL, INC. AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

CONDENSED CONSOLIDATING STATEMENTS OF OPERATIONS

For the Year Ended January 31, 2008

| | Parent | Issuer | Guarantor Subsidiaries | Nonguarantor Subsidiaries | Eliminations | Total |
|---|---|---|---|---|---|---|
| | | | (Dollars in millions) | | | |
| Net sales | $ — | $ — | $ 1,356.9 | $ 861.0 | $ (91.2) | $2,126.7 |
| Cost of goods sold | 0.2 | — | 1,265.3 | 743.4 | (91.2) | 1,917.7 |
| Gross (loss) profit | (0.2) | — | 91.6 | 117.6 | — | 209.0 |
| Marketing, general, and administrative | — | 0.4 | 119.1 | 34.0 | — | 153.5 |
| Equity in losses (earnings) of subsidiaries and joint ventures | 194.2 | 88.6 | — | — | (282.8) | — |
| Asset impairments and other restructuring charges | — | — | 74.3 | 11.2 | | 85.5 |
| Other expense (income), net | — | 30.8 | (22.3) | (112.0) | 112.2 | 8.7 |
| (Loss) earnings from operations | (194.4) | (119.8) | (79.5) | 184.4 | 170.6 | (38.7) |
| Interest expense, net | — | 38.9 | 6.0 | 17.3 | — | 62.2 |
| Other non-operating expense (income) | — | — | 4.4 | (15.2) | 19.3 | 8.5 |
| Loss on early extinguishment of debt | — | — | 21.5 | — | — | 21.5 |
| (Loss) earnings from continuing operations before taxes on income and minority interest | (194.4) | (158.7) | (111.4) | 182.3 | 151.3 | (130.9) |
| Income tax expense | — | 0.2 | 16.0 | 13.7 | — | 29.9 |
| (Loss) earnings from continuing operations before minority interest | (194.4) | (158.9) | (127.4) | 168.6 | 151.3 | (160.8) |
| Minority interest | — | — | — | 21.0 | — | 21.0 |
| (Loss) earnings from continuing operations | (194.4) | (158.9) | (127.4) | 147.6 | 151.3 | (181.8) |
| (Loss) earnings from discontinued operations, net of tax | — | — | (20.0) | 7.4 | — | (12.6) |
| Net (loss) income | $(194.4) | $(158.9) | $ (147.4) | $ 155.0 | $ 151.3 | $ (194.4) |

94

HAYES LEMMERZ INTERNATIONAL, INC. AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

CONDENSED CONSOLIDATING STATEMENTS OF OPERATIONS

For the Year Ended January 31, 2007

| | Parent | Issuer | Guarantor Subsidiaries | Nonguarantor Subsidiaries | Eliminations | Total |
|---|---|---|---|---|---|---|
| | | | (Dollars in millions) | | | |
| Net sales | $ — | $ — | $ 1,231.2 | $ 644.6 | $ (79.0) | $1,796.8 |
| Cost of goods sold | 0.2 | — | 1,155.5 | 561.5 | (79.4) | 1,637.8 |
| Gross (loss) profit | (0.2) | — | 75.7 | 83.1 | 0.4 | 159.0 |
| Marketing, general, and administrative | — | — | 89.8 | 35.5 | — | 125.3 |
| Equity in losses (earnings) of subsidiaries and joint ventures | 166.7 | — | — | — | (166.7) | — |
| Asset impairments and other restructuring charges | — | — | 16.6 | 16.2 | — | 32.8 |
| Other (income) expense, net | — | — | (185.7) | 182.1 | — | (3.6) |
| (Loss) earnings from operations | (166.9) | — | 155.0 | (150.7) | 167.1 | 4.5 |
| Interest expense, net | — | — | 71.9 | 3.3 | — | 75.2 |
| Other non-operating (income) expense | — | — | (1.6) | 0.1 | 1.5 | — |
| (Loss) earnings from continuing operations before taxes on income and minority interest | (166.9) | — | 84.7 | (154.1) | 165.6 | (70.7) |
| Income tax expense | — | — | 22.2 | 18.0 | — | 40.2 |
| (Loss) earnings from continuing operations before minority interest | (166.9) | — | 62.5 | (172.1) | 165.6 | (110.9) |
| Minority interest | — | — | — | 10.6 | — | 10.6 |
| (Loss) earnings from continuing operations | (166.9) | — | 62.5 | (182.7) | 165.6 | (121.5) |
| Loss from discontinued operations, net of tax | — | — | (20.6) | (24.8) | — | (45.4) |
| Net (loss) income | $(166.9) | $ — | $ 41.9 | $ (207.5) | $ 165.6 | $ (166.9) |

95

**HAYES LEMMERZ INTERNATIONAL, INC. AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

**CONDENSED CONSOLIDATING BALANCE SHEETS**

**As of January 31, 2009**

| | Parent | Issuer | Guarantor Subsidiaries | Nonguarantor Subsidiaries | Eliminations | Total |
|---|---|---|---|---|---|---|
| | | | (Dollars in millions) | | | |
| Cash and cash equivalents | $ — | $ 5.8 | $ 61.2 | $ 40.5 | $ — | $ 107.5 |
| Receivables | — | — | 84.6 | 72.7 | | 157.3 |
| Other receivables | — | — | 15.4 | 15.4 | (15.4) | 15.4 |
| Inventories | — | — | 100.5 | 56.4 | | 156.9 |
| Assets held for sale | — | — | 8.1 | — | | 8.1 |
| Prepaid expenses and other | — | — | 7.4 | 4.3 | (0.8) | 10.9 |
| Total current assets | — | 5.8 | 277.2 | 189.3 | (16.2) | 456.1 |
| Property, plant, and equipment, net | — | — | 293.1 | 206.2 | (0.1) | 499.2 |
| Goodwill and other assets | (292.9) | 702.7 | 496.2 | 48.4 | (813.5) | 140.9 |
| Total assets | $ (292.9) | $ 708.5 | $ 1,066.5 | $ 443.9 | $ (829.8) | $ 1,096.2 |
| Bank borrowings and other notes | $ — | $ — | $ 25.3 | $ 21.3 | $ — | $ 46.6 |
| Current portion of long term debt | — | 496.1 | 125.2 | 0.8 | | 622.1 |
| Liabilities held for sale | — | — | — | — | | — |
| Accounts payable and accrued liabilities | — | 6.6 | 166.3 | 92.4 | (12.8) | 252.5 |
| Total current liabilities | — | 502.7 | 316.8 | 114.5 | (12.8) | 921.2 |
| Long term debt, net of current portion | — | — | 0.6 | 0.8 | | 1.4 |
| Pension and other long term liabilities | — | — | 331.4 | 73.6 | (4.3) | 400.7 |
| Minority interest | — | — | 11.6 | 55.2 | (1.0) | 65.8 |
| Parent loans | — | (3.2) | (50.4) | 143.4 | (89.8) | — |
| Common stock | 1.0 | — | — | — | — | 1.0 |
| Additional paid-in capital | 887.1 | 399.9 | 1,077.8 | 334.9 | (1,812.6) | 887.1 |
| Retained earnings (accumulated deficit) | (1,302.1) | (237.8) | (590.7) | (364.0) | 1,192.5 | (1,302.1) |
| Accumulated other comprehensive income (loss) | 121.1 | 46.9 | (30.6) | 85.5 | (101.8) | 121.1 |
| Total stockholders' equity | (292.9) | 209.0 | 456.5 | 56.4 | (721.9) | (292.9) |
| Total liabilities and stockholder's equity | $ (292.9) | $ 708.5 | $ 1,066.5 | $ 443.9 | $ (829.8) | $ 1,096.2 |

96

# HAYES LEMMERZ INTERNATIONAL, INC. AND SUBSIDIARIES

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

### CONDENSED CONSOLIDATING BALANCE SHEETS

#### As of January 31, 2008

| | Parent | Issuer | Guarantor Subsidiaries | Nonguarantor Subsidiaries | Eliminations | Total |
|---|---|---|---|---|---|---|
| | | | (Dollars in millions) | | | |
| Cash and cash equivalents | $ — | $ 84.7 | $ 30.3 | $ 45.2 | $ — | $ 160.2 |
| Receivables | — | — | 151.1 | 154.5 | — | 305.6 |
| Other receivables | — | — | 48.3 | 48.3 | (48.3) | 48.3 |
| Inventories | — | — | 111.3 | 67.8 | — | 179.1 |
| Assets held for sale | — | — | 21.4 | — | — | 21.4 |
| Prepaid expenses and other | — | — | 7.0 | 5.3 | (0.1) | 12.2 |
| Total current assets | — | 84.7 | 369.4 | 321.1 | (48.4) | 726.8 |
| Property, plant, and equipment, net | — | — | 376.5 | 240.4 | (0.1) | 616.8 |
| Goodwill and other assets | 202.3 | 811.0 | 112.6 | 346.3 | (1,009.9) | 462.3 |
| Total assets | $ 202.3 | $ 895.7 | $ 858.5 | $ 907.8 | $ (1,058.4) | $1,805.9 |
| Bank borrowings and other notes | $ — | $ — | $ 29.6 | $ 3.3 | $ — | $ 32.9 |
| Current portion of long term debt | — | 3.8 | — | 1.0 | — | 4.8 |
| Liabilities held for sale | — | — | 8.2 | — | — | 8.2 |
| Accounts payable and accrued liabilities | — | 6.2 | 288.5 | 263.7 | (48.4) | 510.0 |
| Total current liabilities | — | 10.0 | 326.3 | 268.0 | (48.4) | 555.9 |
| Long term debt, net of current portion | — | 569.9 | 0.6 | 1.7 | — | 572.2 |
| Pension and other long term liabilities | — | — | 287.8 | 117.2 | — | 405.0 |
| Minority interest | — | — | 11.2 | 60.5 | (1.2) | 70.5 |
| Parent loans | — | 487.9 | (543.3) | 78.1 | (22.7) | — |
| Common stock | 1.0 | — | — | — | — | 1.0 |
| Additional paid-in capital | 882.0 | (54.3) | 1,249.4 | 304.5 | (1,499.6) | 882.0 |
| Retained earnings (accumulated deficit) | (928.7) | (149.2) | (590.4) | (101.5) | 841.1 | (928.7) |
| Accumulated other comprehensive income (loss) | 248.0 | 31.4 | 116.9 | 179.3 | (327.6) | 248.0 |
| Total stockholders' equity | 202.3 | (172.1) | 775.9 | 382.3 | (986.1) | 202.3 |
| Total liabilities and stockholder's equity | $ 202.3 | $ 895.7 | $ 858.5 | $ 907.8 | $ (1,058.4) | $1,805.9 |

**HAYES LEMMERZ INTERNATIONAL, INC. AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

**CONDENSED CONSOLIDATING STATEMENTS OF CASH FLOWS**

**For the Year Ended January 31, 2009**

| | Parent | Issuer | Guarantor Subsidiaries | Nonguarantor Subsidiaries | Eliminations | Total |
|---|---|---|---|---|---|---|
| | | | (Dollars in millions) | | | |
| Cash (used for) provided by operating activities | $ (0.2) | $ (80.6) | $ 26.7 | $ (5.8) | $ (2.5) | $ (62.4) |
| Cash flows from investing activities: | | | | | | |
| Purchase of property, plant, equipment, and tooling | — | — | (33.7) | (46.5) | — | (80.2) |
| Investment in subsidiaries | (41.1) | (0.5) | (427.8) | 72.4 | 397.0 | — |
| Sale of assets and businesses | — | — | 0.5 | (27.7) | 3.2 | (24.0) |
| Cash (used for) provided by investing activities | (41.1) | (0.5) | (461.0) | (1.8) | 400.2 | (104.2) |
| Cash flows from financing activities: | | | | | | |
| Changes in bank borrowings and credit facility | — | — | 1.3 | 19.7 | | 21.0 |
| Fees paid for extinguishment of debt | — | (1.5) | — | — | — | (1.5) |
| Proceeds from revolver | — | — | 125.0 | — | — | 125.0 |
| Repayment of long-term debt | — | (3.6) | 0.2 | (0.9) | — | (4.3) |
| Bank finance fees paid | | (1.6) | (1.2) | — | | (2.8) |
| Increase (decrease) from parent investment | 41.3 | 437.6 | (2.2) | (82.2) | (394.5) | — |
| Dividends paid to minority shareholders | — | — | — | (12.4) | | (12.4) |
| Cash provided by (used for) financing activities | 41.3 | 430.9 | 123.1 | (75.8) | (394.5) | 125.0 |
| (Decrease) increase in parent loans and advances | — | (427.6) | 344.6 | 86.2 | (3.2) | — |
| Net cash used for discontinued operations | | | (0.2) | | | (0.2) |
| Effect of exchange rates on cash and cash equivalents | — | (1.1) | (2.4) | (7.4) | — | (10.9) |
| (Decrease) increase in cash and cash equivalents | — | (78.9) | 30.8 | (4.6) | — | (52.7) |
| Cash and cash equivalents at beginning of period | — | 84.7 | 30.3 | 45.2 | — | 160.2 |
| Cash and cash equivalents at end of period | $ — | $ 5.8 | $ 61.1 | $ 40.6 | $ — | $ 107.5 |

98

**HAYES LEMMERZ INTERNATIONAL, INC. AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

**CONDENSED CONSOLIDATING STATEMENTS OF CASH FLOWS**

**For the Year Ended January 31, 2008**

| | Parent | Issuer | Guarantor Subsidiaries | Nonguarantor Subsidiaries | Eliminations | Total |
|---|---|---|---|---|---|---|
| | | | (Dollars in millions) | | | |
| Cash flows (used for) provided by operating activities | $ (0.2) | $ (32.8) | $ 8.6 | $ 151.4 | $ (19.3) | $ 107.7 |
| Cash flows from investing activities: | | | | | | |
| Purchase of property, plant, equipment, and tooling | — | — | (47.1) | (55.3) | — | (102.4) |
| Proceeds from disposal of assets and businesses | — | — | 1.7 | 0.6 | — | 2.3 |
| Investment in subsidiaries | 0.3 | (875.4) | 684.7 | 479.4 | (289.0) | — |
| Cash provided by (used for) investing activities | 0.3 | (875.4) | 639.3 | 424.7 | (289.0) | (100.1) |
| Cash flows from financing activities: | | | | | | |
| Changes in bank borrowings and credit facilities | — | — | (0.6) | 1.8 | — | 1.2 |
| Proceeds from issuance of long term debt | — | 524.1 | — | — | — | 524.1 |
| Repayment of long-term debt | — | (2.8) | (655.8) | (1.0) | — | (659.6) |
| Net proceeds from issuance of common stock | 185.4 | — | — | — | — | 185.4 |
| Proceeds from parent investment | — | (0.8) | 423.6 | (571.5) | 148.7 | — |
| Dividends to minority shareholders | — | — | — | (11.8) | — | (11.8) |
| Bank finance fees paid | — | (9.2) | (14.6) | — | — | (23.8) |
| Cash provided by (used for) financing activities | 185.4 | 511.3 | (247.4) | (582.5) | 148.7 | 15.5 |
| (Decrease) increase in parent loans and advances | (185.5) | 480.8 | (420.2) | (34.7) | 159.6 | — |
| Net cash provided by discontinued operations | — | — | 40.6 | 51.8 | — | 92.4 |
| Effect of exchange rates on cash and cash equivalents | — | 0.8 | 1.2 | 4.2 | — | 6.2 |
| Increase in cash and cash equivalents | — | 84.7 | 22.1 | 14.9 | — | 121.7 |
| Cash and cash equivalents at beginning of period | — | — | 8.2 | 30.3 | — | 38.5 |
| Cash and cash equivalents at end of period | $ — | $ 84.7 | $ 30.3 | $ 45.2 | $ — | $ 160.2 |

99

**HAYES LEMMERZ INTERNATIONAL, INC. AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

**CONDENSED CONSOLIDATING STATEMENTS OF CASH FLOWS**

**For the Year Ended January 31, 2007**

| | Parent | Issuer | Guarantor Subsidiaries | Nonguarantor Subsidiaries | Eliminations | Total |
|---|---|---|---|---|---|---|
| | | | (Dollars in millions) | | | |
| Cash flows (used for) provided by operating activities | $ (0.2) | $ — | $ (0.2) | $ 72.6 | $ (1.5) | $ 70.7 |
| Cash flows from investing activities: | | | | | | |
| Purchase of property, plant, equipment, and tooling | — | — | (37.2) | (33.2) | — | (70.4) |
| Investment in subsidiaries | 0.2 | — | (263.3) | 206.0 | 57.1 | — |
| Proceeds from sale of assets | — | — | 9.9 | 0.3 | — | 10.2 |
| Capital contributed by minority shareholders | — | — | — | 0.4 | — | 0.4 |
| Cash provided by (used for) investing activities | 0.2 | — | (290.6) | 173.5 | 57.1 | (59.8) |
| Cash flows from financing activities: | | | | | | |
| Changes in bank borrowings and credit facilities | — | — | 0.6 | 1.0 | — | 1.6 |
| Repayment of long-term debt | — | — | (19.9) | (1.0) | — | (20.9) |
| Increase (decrease) from parent investment | — | — | 431.2 | (390.2) | (41.0) | — |
| Dividends to minority shareholders | — | — | — | (3.9) | — | (3.9) |
| Bank finance fees paid | — | — | (4.0) | — | — | (4.0) |
| Cash provided by (used for) financing activities | — | — | 407.9 | (394.1) | (41.0) | (27.2) |
| (Decrease) increase in parent loans and advances | — | — | (83.5) | 98.1 | (14.6) | — |
| Net cash (used for) provided by discontinued operations | — | — | (27.1) | 37.0 | — | 9.9 |
| Effect of exchange rates on cash and cash equivalents | — | — | (1.1) | 3.5 | — | 2.4 |
| Increase (decrease) in cash and cash equivalents | — | — | 5.4 | (9.4) | — | (4.0) |
| Cash and cash equivalents at beginning of period | — | — | 2.8 | 39.7 | — | 42.5 |
| Cash and cash equivalents at end of period | $ — | $ — | $ 8.2 | $ 30.3 | $ — | $ 38.5 |

100

**Item 9.** *Changes in and Disagreements with Accountants on Accounting and Financial Disclosure*

Not applicable.

**Item 9A.** *Controls and Procedures*

**a) Evaluation of Disclosure Controls and Procedures**

We maintain a disclosure committee (the Disclosure Committee) reporting to our Chief Executive Officer to assist the Chief Executive Officer and Chief Financial Officer in fulfilling their responsibility in designing, establishing, maintaining, and reviewing our Disclosure Controls and Procedures. The Disclosure Committee is currently chaired by our Vice President, Finance and Chief Financial Officer and includes our Chief Operating Officer and President, Global Wheel Group; Vice President, General Counsel and Secretary; Director of Compensation and Benefits; Treasurer; Assistant General Counsel; Director of Internal Audit; Director of Tax; and Corporate Controller as its other members.

As of the end of the period covered by this report, our Chief Executive Officer and Chief Financial Officer, along with the Disclosure Committee, evaluated the effectiveness of the design and operation of our disclosure controls and procedures pursuant to Rules 13a-15(e) and 15d-15(e) of the Securities Exchange Act of 1934. Based upon that evaluation, our Chief Executive Officer and Chief Financial Officer concluded that our disclosure controls and procedures were effective as of January 31, 2009 to ensure that information required to be disclosed by the Company in the reports that it files and submits under the Securities Exchange Act of 1934 is accumulated and submitted to the Company's management as appropriate to allow timely decisions regarding required disclosure.

**b) Management's Annual Report on Internal Control over Financial Reporting**

Our management is responsible for establishing and maintaining adequate internal control over financial reporting as defined in Exchange Act Rule 13a-15(f). Our internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with GAAP.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

Under the supervision and with the participation of our management, including the Chief Executive Officer and Chief Financial Officer, we conducted an assessment of the effectiveness of our internal control over financial reporting as of January 31, 2009. In making our assessment of internal control over financial reporting, management used the criteria established in the framework Internal Control — Integrated Framework, issued by the Committee of Sponsoring Organizations of the Treadway Commission. Based on our assessment, we determined that our internal control over financial reporting was effective as of January 31, 2009.

The effectiveness of our internal control over financial reporting as of January 31, 2009 has been audited by KPMG LLP, an independent registered public accounting firm, as stated in their report included herein.

**c) Changes in Internal Control Over Financial Reporting**

As described in Note 20, Prior Period Accounting Errors, the weighted average shares and earnings per share for the periods ended January 31, 2007 and 2006 failed to include a retroactive adjustment for the bonus element related to the issuance of shares from a stock rights offering in May 2007. As a result, weighted average shares and earnings per share were restated for the fiscal years ending January 31, 2007 and 2006. We have implemented changes to our internal controls over financial reporting to address this matter. These included the implementation of procedures for the calculation and review of the retroactive adjustment and additional training for the financial reporting function.

**Item 9B.** *Other Information*

None.

# PART III

## Item 10.  *Directors, Executive Officers, and Corporate Governance*

Information regarding our directors, executive officers, and corporate governance will be set forth in our Notice of Annual Meeting of Shareholders and Proxy Statement (Proxy Statement) or an amendment to this Annual Report on Form 10-K (Amended Form 10-K) to be filed within 120 days after our fiscal year ended January 31, 2009, which information is incorporated herein by reference.

## Item 11.  *Executive Compensation*

Incorporated herein by reference from the Proxy Statement or the Amended Form 10-K.

## Item 12.  *Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters*

We had the following equity compensation plans in effect at January 31, 2009:

| Plan Category — Equity Compensation Plans | Number of Securities to be Issued Upon Exercise of Outstanding Option, Warrants, and Rights (a)(1) | Weighted Average Exercise Price of Outstanding Options, Warrants, and Rights (b)(2) | | Number of Securities Remaining Available for Future Issuance Under Equity Compensation Plans (Excluding Securities Reflected in Column (a))(c) |
|---|---|---|---|---|
| Plans approved by security holders | 5,437,791 | $ | 5.55 | 955,374 |
| Plans not approved by security holders | — | | — | — |
| Total | 5,437,791 | $ | 5.55 | 955,374 |

(1) Consists of 3,913,900 options and 1,523,891 restricted stock units.

(2) Weighted average exercise price includes 3,913,900 options and excludes 1,523,891 restricted stock units, which do not have an exercise price.

Information regarding security ownership of certain beneficial owners, directors and executive officers is set forth under "Common Stock Ownership of Certain Beneficial Owners and Management" in the Proxy Statement or the Amended Form 10-K., which information is incorporated herein by reference.

Information regarding our equity compensation plan is set forth under "Executive Compensation — Equity Compensation Plan Information" in the Proxy Statement or the Amended Form 10-K., which information is incorporated herein by reference.

## Item 13.  *Certain Relationships and Related Transactions and Director Independence*

Incorporated herein by reference from the Proxy Statement or the Amended Form 10-K.

## Item 14.  *Principal Accountant Fees and Services*

Incorporated herein by reference from the Proxy Statement or the Amended Form 10-K.

## PART IV

**Item 15.** *Exhibits, Financial Statement Schedules*

Financial Statement Schedule

Schedule II — Valuation and Qualifying Accounts for fiscals 2008, 2007, and 2006.

All other schedules are omitted as the information required to be contained therein is disclosed elsewhere in the financial statements or the amounts involved are not sufficient to require submission or the schedule is otherwise not required to be submitted.

Exhibits

2.1 Modified First Amended Joint Plan of Reorganization of Hayes Lemmerz International, Inc. and Its Affiliated Debtors and Debtors in Possession, as Further Modified (incorporated by reference to Exhibit 2.1 to our Current Report on Form 8-K, filed May 21, 2003).

3.1 Certificate of Incorporation of HLI Holding Company, Inc., effective as of May 6, 2003, as amended to date (incorporated by reference to Exhibit 3.1 to our Annual Report on Form 10-K for the fiscal year ended January 31, 2007, filed April 10, 2008).

3.2 By-Laws of Hayes Lemmerz International, Inc., effective as of May 30, 2003, as amended to date. (incorporated by reference to Exhibit 3.1 to our Current Report on Form 8-K , filed September 26, 2009.

4.1 Amended and Restated Equity Purchase and Commitment Agreement, dated as of April 16, 2007, by and between Hayes Lemmerz International, Inc. and Deutsche Bank Securities, Inc. (incorporated by reference to Exhibit 99.2 to our Current Report on Form 8-K, filed April 18, 2007).

4.2 Indenture, dated as of May 30, 2007, by and among Hayes Lemmerz Finance LLC — Luxembourg S.C.A., the Guarantors named therein, U.S. Bank National Association, as Trustee, and Deutsche Bank AG, London Branch, as London Paying Agent (incorporated by reference to Exhibit 4.1 to our Current Report on Form 8-K, filed June 5, 2007).

4.3 Supplemental Indenture and Guaranty Release, dated as of November 9, 2007, by and among Hayes Lemmerz Finance LLC — Luxembourg S.C.A., the Guarantors named therein, and U.S. Bank National Association, as Trustee.* (incorporated by reference to Exhibit 4.3 to our Annual Report on Form 10-K for the fiscal year ended January 31, 2007, filed April 10, 2008).

4.4 Form of 8.25% Senior Notes due 2015 (attached as Exhibit A to the Indenture filed as Exhibit 4.1 to our Current Report on Form 8-K, filed June 5, 2007).

4.5 Registration Rights Agreement, dated as of May 30, 2007, by and between Hayes Lemmerz Finance LLC — Luxembourg S.C.A., the Guarantors named therein, and Deutsche Bank AG, London Branch, Citigroup Global Markets Inc., and UBS Limited (incorporated by reference to Exhibit 4.2 to our Current Report on Form 8-K, filed June 5, 2007).

4.6 Registration Rights Agreement, dated as of May 30, 2007, by and between Hayes Lemmerz International, Inc., Deutsche Bank Securities Inc. (incorporated by reference to Exhibit 4.3 to our Current Report on Form 8-K, filed June 5, 2007).

4.7 Exchange Agreement, dated as of June 3, 2003, by and between Hayes Lemmerz International, Inc., HLI Parent Company, Inc. and HLI Operating Company, Inc. regarding the Series A Preferred Stock issued by HLI Operating Company, Inc. (incorporated by reference to Exhibit 4.3 to our Quarterly Report on Form 10-Q for the quarterly period ended April 30, 2003, filed June 16, 2003).

10.1 Amended and Restated Employment Agreement between Hayes and Curtis J. Clawson, dated September 26, 2001 (incorporated by reference from our Quarterly Report on Form 10-Q for the quarter ended October 31, 2001, filed on April 18, 2002).

10.2 Form of Employment Agreement between Hayes and certain of its officers (incorporated by reference from our Quarterly Report on Form 10-Q for the quarter ended October 31, 2001, filed on April 18, 2002).

10.3 Hayes Lemmerz International, Inc. Long Term Incentive Plan (incorporated by reference to Exhibit 10.1 to our Registration Statement No. 333-110684 on Form S-8, filed on November 21, 2003).

10.4 Hayes Lemmerz International, Inc. Critical Employee Retention Plan (incorporated by reference to Exhibit 10.2 to our Registration Statement No. 333-110684 on Form S-8, filed on November 21, 2003).

10.5 Amendment No. 1 to Hayes Lemmerz International, Inc. Long Term Incentive Plan (incorporated by reference to Appendix A to our definitive proxy statement on Schedule 14A for our 2007 Annual Meeting of Stockholders, filed on May 31, 2007).

| 10.6 | Form of Directors Indemnification Agreement (incorporated by reference to Exhibit 10.49 to our Quarterly Report on Form 10-Q for the quarterly period ended July 31, 2003, filed September 15, 2003, as amended). |
|------|---|
| 10.7 | Stock Purchase Agreement dated as of October 14, 2005 by and among HLI Operating Company, Inc., HLI Commercial Highway Holding Company, Inc., and Hayes Lemmerz International — Commercial Highway, Inc. and Precision Partners Holding Company, as amended by an Amendment to Stock Purchase Agreement dated November 11, 2005 (incorporated by reference to Exhibit 10.25 to our Quarterly Report on Form 10-Q filed on December 9, 2005). |
| 10.8 | Stock Purchase Agreement among HLI Operating Company, Inc., HLI Suspension Holding Company, Inc. and Diversified Machine, Inc. dated February 1, 2007 (incorporated by reference to Exhibit 23.1 to our Quarterly Report on Form 10-Q for the quarter ended April 30, 2007, filed on June 8, 2007). |
| 10.9 | Stock Purchase Agreement, dated as of November 9, 2007, between HLI Brakes Holding Company, Inc., and Brembo North America, Inc. (incorporated by reference to Exhibit 10.24 to our Quarterly Report on Form 10-Q for the quarterly period ended October 31, 2007, filed on December 10, 2007). |
| 10.10 | Framework Agreement on the Ongoing Purchase of Receivables dated as of October 10, 2005 by and between Hayes Lemmerz Werke GmbH and MHB Financial Services GmbH & Co. KG (incorporated by reference to Exhibit 10.24 to our Quarterly Report on Form 10-Q filed on December 9, 2005). |
| 10.11 | Second Amended and Restated Credit Agreement, dated as of May 30, 2007, among HLI Operating Company, Inc., Hayes Lemmerz Finance LLC — Luxembourg S.C.A., Hayes Lemmerz International, Inc., the lenders from time to time party thereto, Citicorp North America, Inc., as Administrative Agent and as Documentation Agent, and Deutsche Bank Securities Inc., as Syndication Agent (incorporated by reference to Exhibit 10.1 to our Current Report on Form 8-K, filed June 5, 2007). |
| 10.12 | Amendment No. 1 to Credit Agreement, dated as of January 30, 2009, among HLI Operating Company, Inc., Hayes Lemmerz Finance LLC — Luxembourg S.C.A., Hayes Lemmerz International, Inc., the lenders party thereto, and Citicorp North America, Inc., as Administrative Agent.* |
| 10.13 | Second Amended and Restated Pledge and Security Agreement, dated as of May 30, 2007, among Hayes Lemmerz International, Inc. and HLI Operating Company, Inc., as Grantors, the other Grantors party thereto, Citicorp North America, Inc., as Administrative Agent, and Deutsche Bank Securities Inc., as Syndication Agent (incorporated by reference to Exhibit 10.2 to our Current Report on Form 8-K, filed June 5, 2007). |
| 10.14 | Second Amended and Restated Guaranty, dated as of May 30, 2007, among Hayes Lemmerz International, Inc. and HLI Operating Company, Inc., the other Guarantors party thereto, and Citicorp North America, Inc., as Administrative Agent (incorporated by reference to Exhibit 10.23 to our Quarterly Report on Form 10-Q for the quarterly period ended July 31, 2007, filed on September 7, 2007). |
| 10.15 | Hayes Lemmerz International, Inc. Performance Cash Plan (incorporated by reference to Exhibit 10.1 to our Current Report on Form 8-K filed on July 17, 2008). |
| 10.16 | Form of Award Agreement under Hayes Lemmerz International, Inc. Performance Cash Plan (incorporated by reference to Exhibit 10.2 to our Current Report on Form 8-K filed on July 17, 2008). |
| 14 | Code of Ethics (incorporated by reference to Exhibit 10.8 to our Annual Report on Form 10-K filed on April 12, 2004). |
| 21 | Hayes Subsidiaries.* |
| 24 | Powers of Attorney.* |
| 31.1 | Certification of Curtis J. Clawson, Chairman of the Board, President and Chief Executive Officer, pursuant to Section 302 of the Sarbanes-Oxley Act of 2002.* |
| 31.2 | Certification of Mark A. Brebberman, Vice President, Finance and Chief Financial Officer, pursuant to Section 302 of the Sarbanes-Oxley Act of 2002.* |
| 32.1 | Certification of Curtis J. Clawson, Chairman of the Board, President and Chief Executive Officer, Pursuant to 18 U.S.C. Section 1350, as Adopted Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002.* |
| 32.2 | Certification of Mark A. Brebberman, Vice President, Finance and Chief Financial Officer, Pursuant to 18 U.S.C. Section 1350, as Adopted Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002.* |
| 99.1 | Amended and Restated Certificate of Incorporation of HLI Operating Company, Inc., effective as of May 30, 2003 (incorporated by reference to Exhibit 4.3 to our Quarterly Report on Form 10-Q for the quarterly period ended April 30, 2003, filed June 16, 2003). |

---

* Filed electronically herewith.

## SIGNATURES

Pursuant to the requirements of Section 13 of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized, on the 11th day of May, 2009.

HAYES LEMMERZ INTERNATIONAL, INC.

By:  /s/  MARK A. BREBBERMAN
Mark A. Brebberman
*Vice President, Finance and*
*Chief Financial Officer*

May 11, 2009

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below by the following persons on behalf of the registrant in the capacities and on the dates indicated:

| Signature | Title | Date |
|---|---|---|
| /s/  CURTIS J. CLAWSON<br>Curtis J. Clawson | Chairman of the Board of Directors<br>Chief Executive Officer,<br>President and Director | May 11, 2009 |
| /s/  MARK A. BREBBERMAN<br>Mark A. Brebberman | Vice President, Finance and<br>Chief Financial Officer | May 11, 2009 |
| /s/  DAVID JORGENSEN<br>David Jorgensen | Corporate Controller | May 11, 2009 |
| /s/  WILLIAM C. CUNNINGHAM*<br>William C. Cunningham | Director | May 11, 2009 |
| /s/  GEORGE T. HAYMAKER, JR.*<br>George T. Haymaker, Jr. | Lead Director | May 11, 2009 |
| /s/  CYNTHIA FELDMANN*<br>Cynthia Feldmann | Director | May 11, 2009 |
| /s/  MOHSEN SOHI*<br>Mohsen Sohi | Director | May 11, 2009 |
| /s/  HENRY D.G. WALLACE*<br>Henry D.G. Wallace | Director | May 11, 2009 |
| /s/  RICHARD F. WALLMAN*<br>Richard F. Wallman | Director | May 11, 2009 |
| *  /s/  PATRICK C. CAULEY<br>Patrick C. Cauley<br>*Attorney-in-fact* | | |

**HAYES LEMMERZ INTERNATIONAL, INC. AND SUBSIDIARIES**

**SCHEDULE II — VALUATION AND QUALIFYING ACCOUNTS**

| Allowance for doubtful accounts: | Year Ending January 31, | | |
| --- | --- | --- | --- |
| | 2009 | 2008 | 2007 |
| | (Dollars in millions) | | |
| Balance at beginning of year | $ 1.5 | $ 1.8 | $ 3.5 |
| Additions charged to costs and expenses | — | 0.1 | 0.5 |
| Deductions | (1.2) | (0.4) | (2.2) |
| Balance at end of year | $ 0.3 | $ 1.5 | $ 1.8 |

106

## EXHIBIT INDEX

| | |
|---|---|
| 2.1 | Modified First Amended Joint Plan of Reorganization of Hayes Lemmerz International, Inc. and Its Affiliated Debtors and Debtors in Possession, as Further Modified (incorporated by reference to Exhibit 2.1 to our Current Report on Form 8-K, filed May 21, 2003). |
| 3.1 | Certificate of Incorporation of HLI Holding Company, Inc., effective as of May 6, 2003, as amended to date (incorporated by reference to Exhibit 3.1 to our Annual Report on Form 10-K for the fiscal year ended January 31, 2007, filed April 10, 2008). |
| 3.2 | By-Laws of Hayes Lemmerz International, Inc., effective as of May 30, 2003, as amended to date. (incorporated by reference to Exhibit 3.1 to our Current Report on Form 8-K , filed September 26, 2009. |
| 4.1 | Amended and Restated Equity Purchase and Commitment Agreement, dated as of April 16, 2007, by and between Hayes Lemmerz International, Inc. and Deutsche Bank Securities, Inc. (incorporated by reference to Exhibit 99.2 to our Current Report on Form 8-K, filed April 18, 2007). |
| 4.2 | Indenture, dated as of May 30, 2007, by and among Hayes Lemmerz Finance LLC — Luxembourg S.C.A., the Guarantors named therein, U.S. Bank National Association, as Trustee, and Deutsche Bank AG, London Branch, as London Paying Agent (incorporated by reference to Exhibit 4.1 to our Current Report on Form 8-K, filed June 5, 2007). |
| 4.3 | Supplemental Indenture and Guaranty Release, dated as of November 9, 2007, by and among Hayes Lemmerz Finance LLC — Luxembourg S.C.A., the Guarantors named therein, and U.S. Bank National Association, as Trustee.* (incorporated by reference to Exhibit 4.3 to our Annual Report on Form 10-K for the fiscal year ended January 31, 2007, filed April 10, 2008). |
| 4.4 | Form of 8.25% Senior Notes due 2015 (attached as Exhibit A to the Indenture filed as Exhibit 4.1 to our Current Report on Form 8-K, filed June 5, 2007). |
| 4.5 | Registration Rights Agreement, dated as of May 30, 2007, by and between Hayes Lemmerz Finance LLC — Luxembourg S.C.A., the Guarantors named therein, and Deutsche Bank AG, London Branch, Citigroup Global Markets Inc., and UBS Limited (incorporated by reference to Exhibit 4.2 to our Current Report on Form 8-K, filed June 5, 2007). |
| 4.6 | Registration Rights Agreement, dated as of May 30, 2007, by and between Hayes Lemmerz International, Inc., Deutsche Bank Securities Inc. (incorporated by reference to Exhibit 4.3 to our Current Report on Form 8-K, filed June 5, 2007). |
| 4.7 | Exchange Agreement, dated as of June 3, 2003, by and between Hayes Lemmerz International, Inc., HLI Parent Company, Inc. and HLI Operating Company, Inc. regarding the Series A Preferred Stock issued by HLI Operating Company, Inc. (incorporated by reference to Exhibit 4.3 to our Quarterly Report on Form 10-Q for the quarterly period ended April 30, 2003, filed June 16, 2003). |
| 10.1 | Amended and Restated Employment Agreement between Hayes and Curtis J. Clawson, dated September 26, 2001 (incorporated by reference from our Quarterly Report on Form 10-Q for the quarter ended October 31, 2001, filed on April 18, 2002). |
| 10.2 | Form of Employment Agreement between Hayes and certain of its officers (incorporated by reference from our Quarterly Report on Form 10-Q for the quarter ended October 31, 2001, filed on April 18, 2002). |
| 10.3 | Hayes Lemmerz International, Inc. Long Term Incentive Plan (incorporated by reference to Exhibit 10.1 to our Registration Statement No. 333-110684 on Form S-8, filed on November 21, 2003). |
| 10.4 | Hayes Lemmerz International, Inc. Critical Employee Retention Plan (incorporated by reference to Exhibit 10.2 to our Registration Statement No. 333-110684 on Form S-8, filed on November 21, 2003). |
| 10.5 | Amendment No. 1 to Hayes Lemmerz International, Inc. Long Term Incentive Plan (incorporated by reference to Appendix A to our definitive proxy statement on Schedule 14A for our 2007 Annual Meeting of Stockholders, filed on May 31, 2007). |
| 10.6 | Form of Directors Indemnification Agreement (incorporated by reference to Exhibit 10.49 to our Quarterly Report on Form 10-Q for the quarterly period ended July 31, 2003, filed September 15, 2003, as amended). |
| 10.7 | Stock Purchase Agreement dated as of October 14, 2005 by and among HLI Operating Company, Inc., HLI Commercial Highway Holding Company, Inc., and Hayes Lemmerz International — Commercial Highway, Inc. and Precision Partners Holding Company, as amended by an Amendment to Stock Purchase Agreement dated November 11, 2005 (incorporated by reference to Exhibit 10.25 to our Quarterly Report on Form 10-Q filed on December 9, 2005). |

10.8   Stock Purchase Agreement among HLI Operating Company, Inc., HLI Suspension Holding Company, Inc. and Diversified Machine, Inc. dated February 1, 2007 (incorporated by reference to Exhibit 23.1 to our Quarterly Report on Form 10-Q for the quarter ended April 30, 2007, filed on June 8, 2007).

10.9   Stock Purchase Agreement, dated as of November 9, 2007, between HLI Brakes Holding Company, Inc., and Brembo North America, Inc. (incorporated by reference to Exhibit 10.24 to our Quarterly Report on Form 10-Q for the quarterly period ended October 31, 2007, filed on December 10, 2007).

10.10   Framework Agreement on the Ongoing Purchase of Receivables dated as of October 10, 2005 by and between Hayes Lemmerz Werke GmbH and MHB Financial Services GmbH & Co. KG (incorporated by reference to Exhibit 10.24 to our Quarterly Report on Form 10-Q filed on December 9, 2005).

10.11   Second Amended and Restated Credit Agreement, dated as of May 30, 2007, among HLI Operating Company, Inc., Hayes Lemmerz Finance LLC — Luxembourg S.C.A., Hayes Lemmerz International, Inc., the lenders from time to time party thereto, Citicorp North America, Inc., as Administrative Agent and as Documentation Agent, and Deutsche Bank Securities Inc., as Syndication Agent (incorporated by reference to Exhibit 10.1 to our Current Report on Form 8-K, filed June 5, 2007).

10.12   Amendment No. 1 to Credit Agreement, dated as of January 30, 2009 among HLI Operating Company, Inc., Hayes Lemmerz Finance LLC — Luxembourg S.C.A., Hayes Lemmerz International, Inc., the lenders party thereto, Citicorp North America, Inc., as Administrative Agent.*

10.13   Second Amended and Restated Pledge and Security Agreement, dated as of May 30, 2007, among Hayes Lemmerz International, Inc. and HLI Operating Company, Inc., as Grantors, the other Grantors party thereto, Citicorp North America, Inc., as Administrative Agent, and Deutsche Bank Securities Inc., as Syndication Agent (incorporated by reference to Exhibit 10.2 to our Current Report on Form 8-K, filed June 5, 2007).

10.14   Second Amended and Restated Guaranty, dated as of May 30, 2007, among Hayes Lemmerz International, Inc. and HLI Operating Company, Inc., the other Guarantors party thereto, and Citicorp North America, Inc., as Administrative Agent (incorporated by reference to Exhibit 10.23 to our Quarterly Report on Form 10-Q for the quarterly period ended July 31, 2007, filed on September 7, 2007).

10.15   Hayes Lemmerz International, Inc. Performance Cash Plan (incorporated by reference to Exhibit 10.1 to our Current Report on Form 8-K filed on July 17, 2008).

10.16   Form of Award Agreement under Hayes Lemmerz International, Inc. Performance Cash Plan (incorporated by reference to Exhibit 10.2 to our Current Report on Form 8-K filed on July 17, 2008).

14   Code of Ethics (incorporated by reference to Exhibit 10.8 to our Annual Report on Form 10-K filed on April 12, 2004).

21   Hayes Subsidiaries.*

24   Powers of Attorney.*

31.1   Certification of Curtis J. Clawson, Chairman of the Board, President and Chief Executive Officer, pursuant to Section 302 of the Sarbanes-Oxley Act of 2002.*

31.2   Certification of Mark A. Brebberman, Vice President, Finance and Chief Financial Officer, pursuant to Section 302 of the Sarbanes-Oxley Act of 2002.*

32.1   Certification of Curtis J. Clawson, Chairman of the Board, President and Chief Executive Officer, Pursuant to 18 U.S.C. Section 1350, as Adopted Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002.*

32.2   Certification of Mark A. Brebberman, Vice President, Finance and Chief Financial Officer, Pursuant to 18 U.S.C. Section 1350, as Adopted Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002.*

99.1   Amended and Restated Certificate of Incorporation of HLI Operating Company, Inc., effective as of May 30, 2003 (incorporated by reference to Exhibit 4.3 to our Quarterly Report on Form 10-Q for the quarterly period ended April 30, 2003, filed June 16, 2003).

---

\*  Filed electronically herewith.



AMENDMENT NO. 1 TO CREDIT AGREEMENT

This AMENDMENT NO. 1, dated as of January 30, 2009 (this " *Amendment* "), among HLI OPERATING COMPANY, INC. , a Delaware corporation (the " *U.S. Borrower* "), HAYES LEMMERZ FINANCE LLC — LUXEMBOURG S.C.A. , a *société en commandite par actions* organized under the laws of the Grand Duchy of Luxembourg (the " *Luxembourg Borrower* " and together with the U.S. Borrower, the " *Borrowers* "), HAYES LEMMERZ INTERNATIONAL, INC. , a Delaware corporation (" *Holdings* "), and CITICORP NORTH AMERICA, INC. (" *CNAI* "), as Administrative Agent (as defined below) on behalf of each Lender executing a Lender Consent (as defined below), amends certain provisions of the Second Amended and Restated Credit Agreement, dated as of May 30, 2007 (as amended, restated, supplemented or otherwise modified from time to time, the " *Credit Agreement* "), among the Borrowers, Holdings, the Lenders and Issuers (in each case as defined therein) party thereto, CNAI, as administrative agent for the Lenders and the Issuers (in such capacity, and as agent for the Secured Parties under the other Loan Documents, the " *Administrative Agent* "), DEUTSCHE BANK SECURITIES INC ., as Syndication Agent, CNAI , as Documentation Agent, and CITIGROUP GLOBAL MARKETS INC . and DEUTSCHE BANK SECURITIES INC ., as Joint Book-Running Lead Managers and Joint Lead Arrangers.

W I T N E S S E T H:

WHEREAS , the Borrowers have requested that the Administrative Agent and the Lenders agree to certain amendments to the Credit Agreement as set forth herein *;* and

WHEREAS , the Lenders party to the attached Lender Consent and the Administrative Agent agree, subject to the terms and conditions set forth herein, to amend the Credit Agreement as set forth herein;

NOW, THEREFORE , in consideration of the premises and the covenants and obligations contained herein the parties hereto agree as follows:

## SECTION 1. AMENDMENTS TO THE CREDIT AGREEMENT

The Credit Agreement is, effective as of the Amendment No. 1 Effective Date (as defined below) and subject to the satisfaction (or due waiver) of the conditions set forth in *Section 4 (Conditions Precedent to the Effectiveness of this Amendment)* hereof, hereby amended as follows:

(a) *Amendments to Article I (Definitions, Interpretation and Accounting Terms)*

(i) The definition of " *Applicable Margin* " in *Section 1.1 (Defined Terms)* of the Credit Agreement is hereby amended and restated in its entirety to read as follows:

" *Applicable Margin* " means:

(a) with respect to the Revolving Loans maintained as (i) Eurocurrency Rate Loans, a rate equal to **6.00** % *per annum* and (ii) Base Rate Loans, a rate equal to **5.25** % *per annum* ;

(b) with respect to Term Loans maintained as Eurocurrency Rate Loans, a rate equal to **6.00** % *per annum* .

(ii) The definition of " *EURIBOR* " in *Section 1.1 (Defined Terms)* of the Credit Agreement is hereby amended and restated in its entirety to read as follows:

" *EURIBOR* " means, in relation to any Loan in Euro **, the greater of (i) 3.50% and (i)** (a) the applicable Screen Rate or (b) if no Screen Rate is available for the Interest Period of that Loan, the arithmetic mean of the rates (rounded upwards to four decimal places) as supplied to the Administrative Agent at its request quoted by three major banks selected by the Administrative Agent to leading banks in the European interbank market, at or about 11 a.m. Brussels time on the second full Business Day next preceding the first day of the relevant Interest Period in relation to which such rate is calculated.

(iii) The definition of " *German Foreign Receivables Purchase Program* " in *Section 1.1 (Defined Terms)* of the Credit Agreement is hereby amended by deleting the words "in an amount not to exceed € 20,000,000 at any time".

(iv) The definition of " *Guaranty Obligations* " in *Section 1.1 (Defined Terms)* of the Credit Agreement is hereby amended by deleting the first parenthetical thereto in its entirety and inserting in its place the following:

(or, with regard to trade payables not constituting Indebtedness, of a Foreign Subsidiary of such Person that is not a Foreign Subsidiary Guarantor)

(v) The definition of " *Investment* " in *Section 1.1 (Defined Terms)* of the Credit Agreement is hereby amended by adding the following proviso at the end thereof:

; *provided* , *however* , that in the case of the Loan Parties, "Investments" shall not include any Tax Planning Transactions.

(vi) The definition of " *LIBOR Rate* " in *Section 1.1 (Defined Terms)* of the Credit Agreement is hereby amended and restated in its entirety to read as follows:

" *LIBOR Rate* " means, with respect to any Interest Period **, the greater of (i) 2.50% and (ii)** the rate *per annum* determined by the Administrative Agent at approximately 11:00 a.m. (London time) on the date that is two Business Days prior to the commencement of such Interest Period (or, if different, the date on which quotations would customarily be provided by leading banks in the London Interbank Market for deposits of amounts in the relevant currency for delivery on the first day of such Interest Period) by reference to the applicable Screen Rate for deposits in Dollars (as set forth by any service selected by the Agent that has been nominated by the British Bankers' Association as an authorized information vendor for the purpose of displaying such rates), for a period equal to such Interest Period; *provided* that, to the extent that an interest rate is not ascertainable pursuant to the foregoing provisions of this definition, the "LIBOR Rate" shall be the interest rate *per annum* determined by the Administrative Agent to be the average of the rates *per annum* at which deposits in Dollars are offered for such relevant Interest Period to major banks in the London interbank market in London, England by the Administrative Agent at approximately 11:00 a.m. (London time) on the date that is two Business Days prior to the beginning of such Interest Period.

(vii) The definition of " *Net Cash Proceeds* " in *Section 1.1 (Defined Terms)* of the Credit Agreement is hereby amended and restated in its entirety to read as follows:

" *Net Cash Proceeds* " means proceeds received by any Loan Party or any of its Subsidiaries after the Effective Date in cash or Cash Equivalents from any (a) Asset Sale, other than an Asset Sale permitted under *Section 8.4(a)* , *(b)* , *(c)* , *(e)* , *(f)* , *(g), (h)* or *(i) (Sale of Assets)* , net of (i) the reasonable cash costs of sale, assignment or other disposition, (ii) taxes paid or reasonably estimated to be payable as a result thereof, (iii) any amount required to be paid or prepaid on Indebtedness (other than the Obligations) secured by the assets subject to such Asset Sale **and (iv) in the case of an Asset Sale permitted under** *Section 8. 4(j)* **of assets that were used in terminated operations, the reasonable cash costs incurred to terminate such operations, including severance and other employee termination or transfer costs, equipment decommissioning and refurbishing costs and costs for post-termination taxes, maintenance and services related to such assets** ; *provided* , *however* , that evidence of each of *(i)* , *(ii)* , *(iii)* **and** *(iv)* above is provided to the Administrative Agent in form and substance reasonably satisfactory to the Administrative Agent or (b) Property Loss Event (other than a Property Loss Event arising solely from any loss of or damage to property owned by a Securitization SPV), in each case, net of brokers' and advisors' fees and other costs incurred in connection with such transaction.

(viii) The definition of " *Reinvestment Deferred Amount* " in *Section 1.1 (Defined Terms)* of the Credit Agreement is hereby amended by deleting the words "Asset Sale or".

(ix) The definition of " *Reinvestment Event* " in *Section 1.1 (Defined Terms)* of the Credit Agreement is hereby amended by deleting the words "Asset Sale or".

(x) The definition of " *Reinvestment Notice* " in *Section 1.1 (Defined Terms)* of the Credit Agreement is hereby amended by deleting the words "an Asset Sale or" and inserting in their place "a".

(xi) The definition of " *Reinvestment Prepayment Amount* " in *Section 1.1 (Defined Terms)* of the Credit Agreement is hereby amended by deleting the words ", in the case of a Property Loss Event,".

(xii) The definition of " *Reinvestment Prepayment Date* " in *Section 1.1 (Defined Terms)* of the Credit Agreement is hereby amended by deleting the words ", in the case of a Property Loss Event," from the parenthetical.

(xiii) The following definitions are hereby inserted in *Section 1.1 (Defined Terms)* of the Credit Agreement in the appropriate place to preserve the alphabetical order of the definitions in such section:

" *Amendment No. 1* " means that certain Amendment No. 1, dated as of January 30, 2009, among the U.S. Borrower, the Luxembourg Borrower, Holdings and the Administrative Agent.

" *Amendment No. 1 Effective Date* " means January 30, 2009.

" *New Second Lien Notes* " has the meaning specified in *Section 8. 6(b) (Prepayment and Cancellation of Indebtedness)* .

" *Tax Planning Transactions* " means certain restructuring transactions among Holdings and its Subsidiaries to be entered into in connection with Holdings' global tax planning as consented to by the Administrative Agent pursuant to Section 2 of Amendment No. 1.

(b) *Amendment to Article II (The Facilities)* .

(i)  *Section 2. 3(a) (Swing Loans)* of the Credit Agreement is hereby amended by deleting "$35,000,000" and inserting in its place "$10,000,000".

(ii)  *Section 2. 9(a) (Optional Prepayments)* of the Credit Agreement is hereby amended by inserting the words "Subject to *Section 8. 6 (b)(i) (Prepayment and Cancellation of Indebtedness)* " at the beginning thereof.

(c) *Amendment to Article IV (Representations and Warranties)*

(i)  *Section 4. 3(b) (Ownership; Subsidiaries)* of the Credit Agreement is hereby amended by deleting the second sentence thereof in its entirety and inserting in its place the following:

> All of the outstanding capital stock of the U.S. Borrower has been validly issued, is fully paid and non-assessable and is owned beneficially and of record by the Parent, all of the outstanding capital stock of the Parent has been validly issued, is fully paid and non-assessable and is owned beneficially and of record by Holdings, all of the outstanding capital stock of the Luxembourg Borrower has been validly issued, is fully paid and non-assessable and is owned beneficially and of record by the U.S. Borrower **and Hayes Lemmerz Finance LLC,** in each case, free and clear of all Liens other than the Lien in favor of the Administrative Agent for the benefit of the Secured Parties created by the Collateral Documents.

(ii)  *Section 4. 8(a) (Taxes)* of the Credit Agreement is hereby amended by deleting the second sentence thereof in its entirety and inserting in its place the following:

> If any Tax Return of the U.S. Borrower or any of its Tax Affiliates is under audit or examination by any Governmental Authority and one or more material issues has arisen in the course of such audit or examination, an explanation of such issue or issues is provided in *Schedule 4.8 (Taxes)* , as the same may be updated from time to time by written notice to the Administrative Agent.

(iii)  *Section 4. 8(b) (Taxes)* of the Credit Agreement is hereby amended by deleting the words "the filing of any Tax Return or" from clause (i) thereof.

(d) *Amendments to Article V (Financial Covenants)*

(i)  *Section 5. 1(a) (Maximum Leverage Ratio)* of the Credit Agreement is hereby amended and restated in its entirety to read as follows:

> *Maximum Leverage Ratio* . Holdings shall maintain, as of the last day of each Fiscal Quarter set forth below, a Leverage Ratio of not more than the maximum ratio set forth below opposite such Fiscal Quarter:

| Fiscal Quarter Ending On or About | Maximum Leverage Ratio |
|---|---|
| July 31, 2007 | 4.50 to 1 |
| October 31, 2007 | 4.50 to 1 |
| January 31, 2008 | 4.00 to 1 |

| FISCAL QUARTER ENDING ON OR ABOUT | MAXIMUM LEVERAGE RATIO |
|---|---|
| April 30, 2008 | 4.00 to 1 |
| July 31, 2008 | 3.75 to 1 |
| October 31, 2008 | 3.75 to 1 |
| January 31, 2009 | 5.50 to 1 |
| April 30, 2009 | 5.75 to 1 |
| July 31, 2009 | 7.00 to 1 |
| October 31, 2009 | 7.25 to 1 |
| January 31, 2010 | 5.50 to 1 |
| April 30, 2010 and thereafter | 3.00 to 1 |

(ii) *Section 5. 1(b) (Minimum Interest Coverage Ratio)* of the Credit Agreement is hereby amended and restated in its entirety to read as follows:

*Minimum Interest Coverage Ratio* . Holdings shall maintain an Interest Coverage Ratio, as determined as of the last day of each Fiscal Quarter set forth below, for the four Fiscal Quarters ending on such day, of at least the minimum ratio set forth below opposite such Fiscal Quarter:

| FISCAL QUARTER ENDING ON OR ABOUT | MINIMUM INTEREST COVERAGE RATIO |
|---|---|
| July 31, 2007 | 2.00 to 1 |
| October 31, 2007 | 2.00 to 1 |
| January 31, 2008 | 2.25 to 1 |
| April 30, 2008 | 2.25 to 1 |
| July 31, 2008 | 2.50 to 1 |
| October 31, 2008 | 2.50 to 1 |
| January 31, 2009 | 2.25 to 1 |
| April 30, 2009 | 1.75 to 1 |
| July 31, 2009 | 1.55 to 1 |
| October 31, 2009 | 1.35 to 1 |
| January 31, 2010 | 2.15 to 1 |
| April 30, 2010 and thereafter | 3.50 to 1 |

(iii) *Section 5. 1(c) (Capital Expenditures)* of the Credit Agreement is hereby amended and restated in its entirety to read as follows:

*Capital Expenditures* . Holdings shall not make or incur, or permit to be made or incurred, Capital Expenditures (excluding Capital Expenditures funded with up to 50% of the proceeds of a Specified Asset Sale constituting a Reinvestment Event) during each of the Fiscal Years set forth below to be, in the aggregate, in excess of the maximum amount set forth below for such Fiscal Year:

| FISCAL YEAR ENDING ON OR ABOUT | MAXIMUM CAPITAL EXPENDITURES |
|---|---|
| January 31, 2007 | $110,000,000 |
| January 31, 2008 | $110,000,000 |
| January 31, 2009 | $90,000,000 |
| January 31, 2010 | $50,000,000 |
| January 31, 2011 | $75,000,000 |
| January 31, 2012 | $75,000,000 |
| January 31, 2013 | $75,000,000 |
| January 31, 2014 | $75,000,000 |

**provided,** that the cumulative Capital Expenditures for each Fiscal Quarter in the Fiscal Year ending on or about January 31, 2010 shall not, in the aggregate, exceed the maximum amount set forth below:

| FISCAL QUARTER ENDING ON OR ABOUT | MAXIMUM CUMULATIVE CAPITAL EXPENDITURES |
|---|---|
| April 30, 2009 | $15,000,000 |
| July 31, 2009 | $30,000,000 |
| October 31, 2009 | $40,000,000 |
| January 31, 2010 | $50,000,000 |

*provided* , *further* , that to the extent that actual Capital Expenditures for any such Fiscal Year shall be less than the maximum amount set forth above for such Fiscal Year (without giving effect to the carryover permitted by this proviso), 50% of the difference between said stated maximum amount and such actual Capital Expenditures shall, in addition, be available for Capital Expenditures in the next succeeding Fiscal Year. Notwithstanding anything in this *Section 5. 1(c)* to the contrary, (i) Capital Expenditures funded with the Net Cash Proceeds of a Property Loss Event, to the extent such Net Cash Proceeds are not required to prepay the loans pursuant to *Section 2.10 (Mandatory Prepayments)* , will not be included in the calculation of Capital Expenditures for purposes of this *Section 5.1(c)* , and (ii) if all or a portion of amounts payable in connection with a Permitted Acquisition is classified as a Capital Expenditure under GAAP, the amount so classified will not be included in the calculation of Capital Expenditures for purposes of this *Section 5.1(c)* .

    (e) **Amendments to Section 6.1 (Financial Statements)** . *Section 6.1 (Financial Statements* ) of the Credit Agreement is hereby amended by inserting the following clauses (h), (i) and (j) at the end thereof:

        (h) *Cash Flow Forecast* . Commencing on February 13, 2009, and every second Friday thereafter, a 13-week rolling cash flow forecast detailing cash receipts and cash disbursements on a weekly basis for the next 13 weeks, plus a comparison of the actual cash flows for the two most recently completed weeks to the most recent forecast for such weeks, the form of which shall be reasonably satisfactory to the Administrative Agent; *provided* , that such cash flow forecasts shall not be required after January 31, 2010.

(i)     *Monthly Reports* .  On or prior to the 30 th day following the end of each month, financial information regarding Holdings and its Subsidiaries consisting of Consolidated unaudited balance sheets as of the close of the preceding month and the related Consolidated unaudited statement of income for such month and that portion of the Fiscal Year ending as of the close of such month, prepared in accordance with GAAP (subject to the absence of footnote disclosure and normal year-end audit adjustments).

(j) *Preliminary Compliance Certificate* .  On or prior to June 1, 2009, a preliminary Compliance Certificate showing in reasonable detail the calculations used in determining the Leverage Ratio and demonstrating compliance with each of the financial covenants contained in *Article V (Financial Covenants)* using the preliminary financial information (subject to adjustment in connection with the preparation of the final financial statements for the quarter) contained in the April 30, 2009 monthly financial statements delivered pursuant to *clause (i)* above.

(f) ***Amendments to Section 7 (Affirmative Covenants)***

(i)  *Section 7.13 (Post-Closing Covenants)* of the Credit Amendment is hereby amended and restated in its entirety to read as follows:

The Borrowers shall comply with the terms and conditions set forth on *Schedule 7.13(a)* , *Schedule 7. 13(b)* **and** *Schedule 7.13(c)* .

(ii)  *Section 7 (Affirmative Covenants)* of the Credit Agreement is hereby amended by inserting a new *Section 7.15 (Compliance with Financial Covenants)* at the end thereof:

**Section 7.15 (Compliance with Financial Covenants)** .  Holdings shall use commercially reasonable efforts to maintain compliance with its financial covenants, including, but not limited to, reducing its outstanding Indebtedness and Interest Expense.

(g) ***Amendments to Section 8.1 (Indebtedness)***

(i)  *Section 8. 1(c) (Indebtedness)* of the Credit Agreement is hereby amended by deleting clause (ii) thereof in its entirety and by deleting the second proviso thereof in its entirety.

(ii)  *Section 8. 1(g) (Indebtedness)* of the Credit Agreement is hereby amended and restated in its entirety to read as follows:

Indebtedness arising from intercompany loans (including Guaranty Obligations incurred by any Foreign Subsidiary of any Borrower with respect thereto under the Intercompany Guaranties); *provided, however,* that such intercompany loans are permitted (i) under **Section 8. 3(e) or** *Section 8. 3(f) (Investments)* and (ii) other intercompany Indebtedness incurred by any Foreign Subsidiary described on *Exhibit K (2007 Corporate Restructuring)* ;

(iii)  *Section 8. 1(k) (Indebtedness)* of the Credit Agreement is hereby amended and restated in its entirety to read as follows:

(k) Guaranty Obligations in respect of trade payables of Foreign Subsidiaries **that are not Foreign Subsidiary Guarantors** not constituting Indebtedness and reimbursement obligations owed to issuers of credit insurance **or bank guaranties** covering such

trade payables; *provided* , *however* , that the Dollar Equivalent of the aggregate outstanding principal amount of all such Guaranty Obligations and reimbursement obligations shall not exceed at any time $50,000,000;

(iv) *Section 8. 1(m) (Indebtedness)* of the Credit Agreement is hereby amended by deleting clause (i)(B) in its entirety.

(v) *Section 8. 1(n) (Indebtedness)* of the Credit Agreement is hereby amended and restated in its entirety to read as follows:

(n) secured or unsecured Indebtedness of the Borrowers or any Subsidiary Guarantor **(including, without limitation, any New Second Lien Notes)** not otherwise permitted under this *Section 8.1* ; *provided* , *however* , that the aggregate outstanding principal amount of all such Indebtedness shall not exceed $100,000,000 at any time; ***provided*** **,** ***further*** **, that the terms and provisions of any intercreditor and subordination agreement to be entered into between the Administrative Agent and the agent for the lenders under such Indebtedness shall be reasonably satisfactory to the Requisite Lenders** .

(h) ***Amendments to Section 8.4 (Sale of Assets)*** . The first paragraph of *Section 8.4 (Sale of Assets)* of the Credit Agreement is hereby amended by deleting the second parenthetical thereof and inserting in its place the following:

(any such disposition **, not including any Tax Planning Transactions,** being an " *Asset Sale* ")

(i) ***Amendments to Section 8.5 (Restricted Payments)*** . *Section 8.5(a) (Restricted Payments)* of the Credit Agreement is hereby amended by inserting the following parenthetical at the end thereof:

(or, where any Subsidiary is a joint venture with another Person, Restricted Payments by such Subsidiary to another Subsidiary and such other Person in accordance with their respective equity interests in such joint venture Subsidiary)

(j) ***Amendments to Section 8.6 (Prepayment and Cancellation of Indebtedness)***

(i) *Section 8. 6(b) (Prepayment and Cancellation of Indebtedness)* of the Credit Agreement is hereby amended by adding the following proviso to the end of clause (i):

*provided* , that neither Borrower shall deliver any notice of prepayment of an Revolving Loans, or prepay any Revolving Loans, in accordance with *Section 2. 9(a) (Optional Prepayments)* unless (A) EBITDA for the twelve full calendar months preceding the date of the notice of such prepayment (and the date of the prepayment) exceeds $200,000,000 and (B) such notice of prepayment is accompanied by a certificate of Responsible Officer of the U.S. Borrower showing in reasonable detail the calculations in determining EBITDA on such dates.

(ii) *Section 8. 6(b) (Prepayment and Cancellation of Indebtedness)* of the Credit Agreement is hereby amended by adding the parenthetical "(other than the Senior Notes or the New Second Lien Notes)" to the end of clause (viii).

(iii) *Section 8. 6(b) (Prepayment and Cancellation of Indebtedness)* of the Credit Agreement is hereby amended by inserting the following clause (xiii) at the end thereof:

- 8 -

(xiii) exchange all or a portion of the Senior Notes for new notes or loans (the " *New Second Lien Notes* "), *provided* , *however* , that (1) the aggregate principal amount of New Second Lien Notes shall not exceed the aggregate principal amount of the Senior Notes, (2) the maturity date of any New Second Lien Notes shall not be earlier than the maturity date of the Senior Notes, (3) any Liens securing the New Second Lien Notes shall be permitted under *Section 8.2(j)* , (4) any such transaction or series of transactions pursuant to this clause (xiii) shall not increase the Cash Interest Expense of Holdings, and (5) the other terms and provisions of the New Second Lien Notes shall be reasonably satisfactory to the Administrative Agent;

(k) ***Amendments to Section 11.2 (Assignments and Participations)*** . *Section 11.2(a) (Assignments and Participations)* of the Credit Agreement is hereby amended by deleting clause (iii) thereof and inserting in its place the following:

(iii) in the case of an assignment with respect to a Revolving Loan, if such Eligible Assignee is not, prior to the date of such assignment, a Lender or an Affiliate or Approved Fund of a Lender, such assignment shall be subject to the prior consent of the Administrative Agent and the Borrowers (which consent shall not be unreasonably withheld or delayed);

(l) ***Amendments to Schedules*** . The Schedules to the Credit Agreement are hereby amended by inserting a new *Schedule II* as set forth as Exhibit C hereto and a new *Schedule 7.13(c)* as set forth as Exhibit D hereto.

## SECTION 2. CONSENT TO TAX TRANSACTIONS

Effective as of the Amendment No. 1 Effective Date and subject to the satisfaction (or due waiver) of the conditions set forth in *Section 4 (Conditions Precedent to the General Effectiveness of this Amendment)* hereof, the Lenders party to the Lenders' Consent, constituting the Requisite Lenders, hereby agree that certain restructuring transactions among Holdings and its Subsidiaries to be entered into in connection with Holdings' global tax planning (the " *Tax Planning Transactions* ") may be consented to by the Administrative Agent (not to be unreasonably withheld) on behalf of the Requisite Lenders and that such Tax Planning Transactions shall not constitute "Investments" or "Asset Sales" for purposes of the limitations in *Section 8.3 (Investments)* and *Section 8.4 (Sale of Assets)* of the Credit Agreement; *provided* , *however* , that the Administrative Agent shall withhold its consent (and shall be deemed to be acting reasonably in withholding such consent) to any such transactions that (i) adversely affect the perfection or priority of the Liens granted pursuant to the Collateral Documents, except to the extent any such Liens are replaced by perfected Liens with the same priority on assets with substantially equivalent value, as determined by the Administrative Agent in its sole discretion, (ii) adversely affect the value of any Collateral, including any Stock pledged pursuant to the Collateral Documents, except to the extent any such Collateral is replaced with assets with substantially equivalent value, as determined by the Administrative Agent in its sole discretion, or (iii) release any Subsidiary Guarantors from its Obligations under the Guaranty or any Foreign Guaranty, as applicable, except to the extent any such guaranty is replaced with a replacement guaranty or other credit support with substantially equivalent value, as determined by the Administrative Agent in its sole discretion.

## SECTION 3. FINANCIAL ADVISOR, ETC.

The Borrowers agree that the Requisite Lenders may appoint one financial advisor for the Lenders reasonably satisfactory to the Borrowers pursuant to engagement documentation and related documentation satisfactory to the Requisite Lenders (including provision for the Ad Hoc Committee (as defined below), the Term Lenders or the Revolving Lenders (or counsel to the Ad Hoc Committee or

counsel to the Lenders) separately to instruct the Financial Advisor to produce work product solely for the benefit of the Ad Hoc Committee (as defined below), the Term Lenders or the Revolving Lenders, as the case may be). The U.S. Borrower agrees upon demand to pay, or reimburse the Lenders (or the Administrative Agent on behalf of the Lenders) for, the reasonable fees and expenses of such financial advisor.

The U.S. Borrower agrees upon demand to pay, or reimburse the Ad Hoc Committee (as defined below) for, the reasonable fees and expenses of Milbank, Tweed, Hadley & McCloy LLP, special New York counsel to the ad hoc committee of Lenders constituting Requisite Lenders specified in a letter to Skadden, Arps, Slate, Meagher & Flom, LLP, counsel to the Borrowers dated January 30, 2009 (as the composition of such ad hoc committee may change from time to time, the " *Ad Hoc Committee* ").

**SECTION 4. CONDITIONS PRECEDENT TO THE EFFECTIVENESS OF THIS AMENDMENT**

This Amendment shall become effective as of the date first written above when, and only when, each of the following conditions precedent shall have been satisfied (the " *Amendment No. 1 Effective Date* ") or duly waived by the Administrative Agent:

(a) *Certain Documents.* The Administrative Agent shall have received each of the following, each dated the Amendment No. 1 Effective Date (unless otherwise agreed by the Administrative Agent), in form and substance satisfactory to the Administrative Agent:

(i) this Amendment, executed by the Borrowers, Holdings and the Administrative Agent;

(ii) the Consent and Agreement, in the form attached hereto as *Exhibit A* (each, a " *Subsidiary Consent")* , executed by each of the Guarantors;

(iii) the Acknowledgment and Consent, in the form attached hereto as *Exhibit B* (each, a " *Lender Consent* "), executed by the Lenders which, when combined, constitute the Requisite Lenders;

(iv) a certificate of a Responsible Officer to the effect that each of the conditions set forth in clauses *(c)* , *(d)* , and *(e)* below has been satisfied;

(v) except as set forth on Schedule 7.13(c), such amendments to, confirmations of and consents to the Foreign Collateral Documents as are necessary to preserve the Administrative Agent's valid and perfected security interest in the Foreign Collateral; and

(vi) such additional documentation as the Lenders party to the Lenders' Consent or the Administrative Agent may reasonably require.

(b) *Corporate and Other Proceedings* . All corporate and other proceedings, and all documents, instruments and other legal matters in connection with the transactions contemplated by this Amendment shall be satisfactory in all respects to the Administrative Agent and each Lender;

(c) *Representations and Warranties.* Each of the representations and warranties contained in *Article IV (Representations and Warranties)* of the Credit Agreement, the other Loan Documents or in any certificate, document or financial or other statement furnished at any time under or in connection therewith are true and correct in all material respects on and as of the date hereof and the

Amendment No. 1 Effective Date, in each case as if made on and as of such date and except to the extent that such representations and warranties specifically relate to a specific date, in which case such representations and warranties shall be true and correct in all material respects as of such specific date; *provided* , *however* , that references therein to the " *Credit Agreement* " shall be deemed to refer to the Credit Agreement as amended by this Amendment and after giving effect to the consents and waivers set forth herein;

(d) *No Default or Event of Default* . After giving effect to this Amendment, no Default or Event of Default (except for those that may have been duly waived) shall have occurred and be continuing, either on the date hereof or on the Amendment No. 1 Effective Date;

(e) *No Litigation* . No litigation shall have been commenced against any Loan Party or any of its Subsidiaries, either on the date hereof or the Amendment No. 1 Effective Date, seeking to restrain or enjoin (whether temporarily, preliminarily or permanently) the performance of any action by any Loan Party required or contemplated by this Amendment or the Credit Agreement or any Loan Document, in either case as amended hereby; and

(f) *Fees and Expenses Paid* . The Borrowers shall have paid all Obligations due, after giving effect to this Amendment, on or before the later of the date hereof and the Amendment No. 1 Effective Date including, without limitation, the fees set forth in *Section 6 (Fees and Expenses)* hereof and all reasonable and documented costs and expenses of the Administrative Agent in connection with the preparation, reproduction, execution and delivery of this Amendment and all other Loan Documents entered into in connection herewith (including, without limitation, the reasonable fees and out-of-pocket expenses of counsel for the Administrative Agent with respect thereto and all other Loan Documents) and all other costs, expenses and fees due under any Loan Document.

## SECTION 5. REPRESENTATIONS AND WARRANTIES

On and as of the date hereof and as of the Amendment No. 1 Effective Date, after giving effect to this Amendment and the completion of the post-closing covenants set forth on *Schedule 7.13(c)* , the Borrowers hereby represent and warrant to the Administrative Agent and each Lender as follows:

(a) this Amendment has been duly authorized, executed and delivered by the Borrowers and consented to by each Guarantor and constitutes a legal, valid and binding obligation of the Borrowers and each Guarantor, enforceable against the Borrowers and each Guarantor in accordance with its terms and the Credit Agreement as amended by this Amendment and constitutes the legal, valid and binding obligation of the Borrowers and each Guarantor, enforceable against the Borrowers and each Guarantor in accordance with its terms;

(b) each of the representations and warranties contained in *Article IV (Representations and Warranties)* of the Credit Agreement, the other Loan Documents or in any certificate, document or financial or other statement furnished at any time under or in connection therewith are true and correct in all material respects on and as of the date hereof and the Amendment No. 1 Effective Date, in each case as if made on and as of such date and except to the extent that such representations and warranties specifically relate to a specific date, in which case such representations and warranties shall be true and correct in all material respects as of such specific date; *provided* , *however* , that references therein to the " *Credit Agreement* " shall be deemed to refer to the Credit Agreement as amended hereby and after giving effect to the consents and waivers set forth herein;

(c) no Default or Event of Default has occurred and is continuing (except for those that are duly waived); and

(d) no litigation has been commenced against any Loan Party or any of its Subsidiaries seeking to restrain or enjoin (whether temporarily, preliminarily or permanently) the performance of any action by any Loan Party required or contemplated by this Amendment, the Credit Agreement or any Loan Document, in each case as amended hereby (if applicable).

## SECTION 6. FEES AND EXPENSES

(a) As consideration for the execution of this Amendment, the Borrowers and each other Loan Party jointly and severally agrees to pay to the Administrative Agent for the account of each Lender for which the Administrative Agent shall have received (by facsimile or otherwise) an executed Lender Consent (or a release from escrow of a Lender Consent previously delivered in escrow) for this Amendment by 5 p.m. (New York time) on January 29, 2009 (or such later date or time as the Administrative Agent and the Borrowers may agree), an amendment fee equal to 0.50% of the sum of such Lender's Revolving Credit Commitments then in effect plus the amount of such Lender's outstanding Term Loans.

(b) The Borrowers and each other Loan Party agrees to pay on demand all reasonable and documented costs and expenses of (i) the Administrative Agent in connection with the preparation, reproduction, execution and delivery of this Amendment and all other Loan Documents entered into in connection herewith, including, without limitation, the reasonable fees and out-of-pocket expenses of counsel for the Administrative Agent with respect thereto and all other Loan Documents, and (ii) the reasonable fees and out-of-pocket expenses of one additional counsel for the Lenders with respect to the negotiation of this Amendment.

## SECTION 7. REFERENCE TO THE EFFECT ON THE LOAN DOCUMENTS

(a) As of the Amendment No. 1 Effective Date, each reference in the Credit Agreement to " *this Agreement* ," " *hereunder* ," " *hereof* ," " *herein* ," or words of like import, and each reference in the other Loan Documents to the Credit Agreement (including, without limitation, by means of words like " *thereunder* ", " *thereof* " and words of like import), shall mean and be a reference to the Credit Agreement as amended hereby, and this Amendment and the Credit Agreement shall be read together and construed as a single instrument. Each of the table of contents and lists of Exhibits and Schedules of the Credit Agreement shall be amended to reflect the changes made in this Amendment as of the Amendment No. 1 Effective Date.

(b) Except as expressly amended hereby or specifically waived above, all of the terms and provisions of the Credit Agreement and all other Loan Documents are and shall remain in full force and effect and are hereby ratified and confirmed.

(c) The execution, delivery and effectiveness of this Amendment shall not, except as expressly provided herein, operate as a waiver of any right, power or remedy of the Lenders, Issuers, Arranger or the Administrative Agent under any of the Loan Documents, nor constitute a waiver or amendment of any other provision of any of the Loan Documents or for any purpose except as expressly set forth herein.

(d) This Amendment is a Loan Document.

## SECTION 8. EXECUTION IN COUNTERPARTS

This Amendment may be executed in any number of counterparts and by different parties in separate counterparts, each of which when so executed shall be deemed to be an original and all of

which taken together shall constitute one and the same agreement. Signature pages may be detached from multiple separate counterparts and attached to a single counterpart so that all signature pages are attached to the same document. Delivery of an executed counterpart by telecopy shall be effective as delivery of a manually executed counterpart of this Amendment.

## SECTION 9. GOVERNING LAW

This Amendment shall be governed by and construed in accordance with the law of the State of New York.

## SECTION 10. SECTION TITLES

The section titles contained in this Amendment are and shall be without substantive meaning or content of any kind whatsoever and are not a part of the agreement between the parties hereto, except when used to reference a section. Any reference to the number of a clause, sub-clause or subsection of any Loan Document immediately followed by a reference in parenthesis to the title of the section of such Loan Document containing such clause, sub-clause or subsection is a reference to such clause, sub-clause or subsection and not to the entire section; *provided* , *however* , that, in case of direct conflict between the reference to the title and the reference to the number of such section, the reference to the title shall govern absent manifest error. If any reference to the number of a section (but not to any clause, sub-clause or subsection thereof) of any Loan Document is followed immediately by a reference in parenthesis to the title of a section of any Loan Document, the title reference shall govern in case of direct conflict absent manifest error.

## SECTION 11. NOTICES

All communications and notices hereunder shall be given as provided in the Credit Agreement or, as the case may be, the Guaranty.

## SECTION 12. SEVERABILITY

The fact that any term or provision of this Agreement is held invalid, illegal or unenforceable as to any person in any situation in any jurisdiction shall not affect the validity, enforceability or legality of the remaining terms or provisions hereof or the validity, enforceability or legality of such offending term or provision in any other situation or jurisdiction or as applied to any person

## SECTION 13. SUCCESSORS

The terms of this Amendment shall be binding upon, and shall inure to the benefit of, the parties hereto and their respective successors and assigns.

## SECTION 14. WAIVER OF JURY TRIAL

EACH OF THE PARTIES HERETO IRREVOCABLY WAIVES TRIAL BY JURY IN ANY ACTION OR PROCEEDING WITH RESPECT TO THIS AMENDMENT OR ANY OTHER LOAN DOCUMENT.

[SIGNATURE PAGES FOLLOW]

**IN WITNESS WHEREOF**, the parties hereto have caused this Amendment to be executed by their respective officers and general partners thereunto duly authorized, as of the date first written above.

HLI OPERATING COMPANY, INC.,
as U.S. Borrower

By: /s/ Mark A. Brebberman
    Name: Mark A Brebberman
    Title: CFO

HAYES LEMMERZ FINANCE LLC — LUXEMBOURG
S.C.A., as Luxembourg Borrower

By: HAYES LEMMERZ FINANCE LLC,
its Managing Partner

By: /s/ Mark A. Brebberman
    Name: Mark A Brebberman
    Title: CFO

HAYES LEMMERZ INTERNATIONAL, INC., as Holdings

By: /s/ Mark A. Brebberman
    Name: Mark A Brebberman
    Title: CFO

CITICORP NORTH AMERICA INC.,
as Administrative Agent

By: /s/ Brendan Mackay
    Name: Brendan Mackay
    Title: Vice President

- 14 -

Exhibit 21

HLI Parent Company, Inc. (Delaware)
HLI Operating Company, Inc. (Delaware)
HLI Wheels Holding Company, Inc. (Delaware)
Hayes Lemmerz International — Sedalia, Inc. (Delaware)
Hayes Lemmerz International — Howell, Inc. (Michigan)
Hayes Lemmerz International — Huntington, Inc. (Indiana)
Hayes Lemmerz International — Georgia, Inc. (Delaware)
Hayes Lemmerz International Import, Inc. (Delaware)
Hayes Lemmerz International — California, Inc. (Delaware)
HLI Commercial Highway Holding Company, Inc. (Delaware)
Hayes Lemmerz International — Commercial Highway, Inc. (Delaware)
HLI Powertrain Holding Company, Inc. (Delaware)
Hayes Lemmerz International — Wabash, Inc. (Indiana)
Hayes Lemmerz International — Laredo, Inc. (Texas)
Industrias Fronterizas HLI, S.A. de C.V. (Mexico)
HLI Brakes Holding Company, Inc. (Delaware)
HLI Suspension Holding Company, Inc. (Delaware)
HLI Services Holding Company, Inc. (Delaware)
Hayes Lemmerz International — Technical Center, Inc. (Michigan)
HLI Realty, Inc. (Michigan)
Hayes Funding I, LLC (Delaware)
Hayes Funding II, Inc. (Delaware)
Hayes Lemmerz International — Kentucky, Inc. (Delaware)
HLI Netherlands Holdings, Inc. (Delaware)
Hayes Lemmerz International — New York, Inc. (New York)
Hayes Lemmerz Finance LLC (Delaware)
Hayes Lemmerz Japan, K.K . (Japan)
Hayes Lemmerz Finance LLC — Luxembourg S.C.A.(Luxembourg)
Hayes Lemmerz Luxembourg Holdings S.a r.l. (Luxembourg)
HLI European Holdings ETVE, S.L. (Spain)
HLI European Holdings S.a r.l. (Luxembourg)
Hayes Lemmerz Czech Holdings s.r.o. (Czech Republic)
Hayes Lemmerz Germany Holdings GmbH (Germany)Hayes Lemmerz Aluminio S. de R. L. de C.V. (Mexico)
Hayes Lemmerz Manresa, S.L. (Spain)
Hayes Lemmerz Fabricated Holdings B.V. (Netherlands)
Hayes Lemmerz Italy Holdings, S.r.l. (Italy)
Hayes Lemmerz, S.r.l (Italy)
Automotive Overseas Investments (Proprietary) Limited (South Africa)
Hayes Lemmerz South Africa (Proprietary) Limited (South Africa)
Borlem Aluminio S.A. (Brazil)
Hayes Lemmerz Alukola, s.r.o. (Czech Republic)
Hayes Lemmerz Barcelona, S.A. (Spain)
Siam Lemmerz Co., Ltd. (Thailand)
Hayes Lemmerz Holding GmbH (Germany)
Hayes Lemmerz Werke GmbH (Germany)
Hayes Lemmerz Konigswinter GmbH (Germany)
Kalyani Lemmerz Limited (India)
Hayes Lemmerz Immobilien GmbH & Co. KG Partnership (Germany)
Hayes Lemmerz Autokola, a.s (Czech Republic)
Hayes Lemmerz Inci Jant Sanayi, A.S (Turkey)
Hayes Lemmerz Jantas Jant Sanayi ve Ticaret A.S. (Turkey)
Borlem S.A. Empreendimentos Industriais (Brazil)

**EXHIBIT 24**

## POWER OF ATTORNEY

The person whose signature appears below hereby appoints Patrick C. Cauley and any Assistant Secretary of Hayes Lemmerz International, Inc. (The "Company"), and each of them as his true and lawful agent and attorney-in-fact, with full power of substitution and resubstitution, to execute and deliver on behalf of the undersigned: (1) any Annual Reports on Form 10-K required to be filed by the Company with the United States Securities Exchange Commission (the "SEC"), and any amendments thereto; (2) any reports required to be filed with the SEC by the undersigned pursuant to Section 16 of the Securities Exchange Act of 1934, as amended (the "1934 Act"), respecting transactions involving the equity securities of the Company, including without limitation reports on Forms 3, 4 and 5 (and any amendments thereto); and (3) any reports of the undersigned to the SEC on Form 144 promulgated pursuant to the Securities Act of 1933, as amended, respecting sales of the Company's equity securities. This Power of Attorney shall grant to the aforesaid persons the power to file any or all of the foregoing reports with the SEC and generally to do anything else necessary or proper in connection therewith. The authority of the aforesaid persons under this Power of Attorney shall continue until the undersigned is no longer a director of the Company or until otherwise revoked in writing. The undersigned acknowledges that the aforesaid persons are not assuming any of the undersigned's responsibilities to comply with Section 16 of the 1934 Act.

/s/ William C. Cunningham
—————————————————————
William C. Cunningham

Dated: July 3, 2003

**POWER OF ATTORNEY**

The person whose signature appears below hereby appoints Patrick C. Cauley and any Assistant Secretary of Hayes Lemmerz International, Inc. (The "Company"), and each of them as his true and lawful agent and attorney-in-fact, with full power of substitution and resubstitution, to execute and deliver on behalf of the undersigned: (1) any Annual Reports on Form 10-K required to be filed by the Company with the United States Securities Exchange Commission (the "SEC"), and any amendments thereto; (2) any reports required to be filed with the SEC by the undersigned pursuant to Section 16 of the Securities Exchange Act of 1934, as amended (the "1934 Act"), respecting transactions involving the equity securities of the Company, including without limitation reports on Forms 3, 4 and 5 (and any amendments thereto); and (3) any reports of the undersigned to the SEC on Form 144 promulgated pursuant to the Securities Act of 1933, as amended, respecting sales of the Company's equity securities. This Power of Attorney shall grant to the aforesaid persons the power to file any or all of the foregoing reports with the SEC and generally to do anything else necessary or proper in connection therewith. The authority of the aforesaid persons under this Power of Attorney shall continue until the undersigned is no longer a director of the Company or until otherwise revoked in writing. The undersigned acknowledges that the aforesaid persons are not assuming any of the undersigned's responsibilities to comply with Section 16 of the 1934 Act.

/s/ George T. Haymaker, Jr.

George T. Haymaker, Jr.

Dated: April 7, 2004

# POWER OF ATTORNEY

The person whose signature appears below hereby appoints Patrick C. Cauley, Steven Esau and any Assistant Secretary of Hayes Lemmerz International, Inc. (The "Company"), and each of them as his true and lawful agent and attorney-in-fact, with full power of substitution and resubstitution, to execute and deliver on behalf of the undersigned: (1) any Annual Reports on Form 10-K required to be filed by the Company with the United States Securities Exchange Commission (the "SEC"), and any amendments thereto; (2) any reports required to be filed with the SEC by the undersigned pursuant to Section 16 of the Securities Exchange Act of 1934, as amended (the "1934 Act"), respecting transactions involving the equity securities of the Company, including without limitation reports on Forms 3, 4 and 5 (and any amendments thereto); and (3) any reports of the undersigned to the SEC on Form 144 promulgated pursuant to the Securities Act of 1933, as amended, respecting sales of the Company's equity securities. This Power of Attorney shall grant to the aforesaid persons the power to file any or all of the foregoing reports with the SEC and generally to do anything else necessary or proper in connection therewith. The authority of the aforesaid persons under this Power of Attorney shall continue until the undersigned is no longer a director of the Company or until otherwise revoked in writing. The undersigned acknowledges that the aforesaid persons are not assuming any of the undersigned's responsibilities to comply with Section 16 of the 1934 Act.

/s/ Cynthia L. Feldmann
_____
Cynthia L. Feldmann

Dated: September 17, 2006

# POWER OF ATTORNEY

The person whose signature appears below hereby appoints Patrick C. Cauley and any Assistant Secretary of Hayes Lemmerz International, Inc. (The "Company"), and each of them as his true and lawful agent and attorney-in-fact, with full power of substitution and resubstitution, to execute and deliver on behalf of the undersigned: (1) any Annual Reports on Form 10-K required to be filed by the Company with the United States Securities Exchange Commission (the "SEC"), and any amendments thereto; (2) any reports required to be filed with the SEC by the undersigned pursuant to Section 16 of the Securities Exchange Act of 1934, as amended (the "1934 Act"), respecting transactions involving the equity securities of the Company, including without limitation reports on Forms 3, 4 and 5 (and any amendments thereto); and (3) any reports of the undersigned to the SEC on Form 144 promulgated pursuant to the Securities Act of 1933, as amended, respecting sales of the Company's equity securities. This Power of Attorney shall grant to the aforesaid persons the power to file any or all of the foregoing reports with the SEC and generally to do anything else necessary or proper in connection therewith. The authority of the aforesaid persons under this Power of Attorney shall continue until the undersigned is no longer a director of the Company or until otherwise revoked in writing. The undersigned acknowledges that the aforesaid persons are not assuming any of the undersigned's responsibilities to comply with Section 16 of the 1934 Act.

/s/ Mohsen Sohi
_____
Mohsen Sohi

Dated: June 4, 2004

# POWER OF ATTORNEY

    The person whose signature appears below hereby appoints Patrick C. Cauley and any Assistant Secretary of Hayes Lemmerz International, Inc. (The "Company"), and each of them as his true and lawful agent and attorney-in-fact, with full power of substitution and resubstitution, to execute and deliver on behalf of the undersigned: (1) any Annual Reports on Form 10-K required to be filed by the Company with the United States Securities Exchange Commission (the "SEC"), and any amendments thereto; (2) any reports required to be filed with the SEC by the undersigned pursuant to Section 16 of the Securities Exchange Act of 1934, as amended (the "1934 Act"), respecting transactions involving the equity securities of the Company, including without limitation reports on Forms 3, 4 and 5 (and any amendments thereto); and (3) any reports of the undersigned to the SEC on Form 144 promulgated pursuant to the Securities Act of 1933, as amended, respecting sales of the Company's equity securities. This Power of Attorney shall grant to the aforesaid persons the power to file any or all of the foregoing reports with the SEC and generally to do anything else necessary or proper in connection therewith. The authority of the aforesaid persons under this Power of Attorney shall continue until the undersigned is no longer a director of the Company or until otherwise revoked in writing. The undersigned acknowledges that the aforesaid persons are not assuming any of the undersigned's responsibilities to comply with Section 16 of the 1934 Act.

/s/ Henry D.G. Wallace
_____
Henry D.G. Wallace

Dated: April 7, 2004

# POWER OF ATTORNEY

The person whose signature appears below hereby appoints Patrick C. Cauley and any Assistant Secretary of Hayes Lemmerz International, Inc. (The "Company"), and each of them as his true and lawful agent and attorney-in-fact, with full power of substitution and resubstitution, to execute and deliver on behalf of the undersigned: (1) any Annual Reports on Form 10-K required to be filed by the Company with the United States Securities Exchange Commission (the "SEC"), and any amendments thereto; (2) any reports required to be filed with the SEC by the undersigned pursuant to Section 16 of the Securities Exchange Act of 1934, as amended (the "1934 Act"), respecting transactions involving the equity securities of the Company, including without limitation reports on Forms 3, 4 and 5 (and any amendments thereto); and (3) any reports of the undersigned to the SEC on Form 144 promulgated pursuant to the Securities Act of 1933, as amended, respecting sales of the Company's equity securities. This Power of Attorney shall grant to the aforesaid persons the power to file any or all of the foregoing reports with the SEC and generally to do anything else necessary or proper in connection therewith. The authority of the aforesaid persons under this Power of Attorney shall continue until the undersigned is no longer a director of the Company or until otherwise revoked in writing. The undersigned acknowledges that the aforesaid persons are not assuming any of the undersigned's responsibilities to comply with Section 16 of the 1934 Act.

|                                   |
| --------------------------------- |
| /s/ Richard F. Wallman            |
| Richard F. Wallman                |

Dated: April 7, 2004

**EXHIBIT 31.1**

## CERTIFICATIONS

I, Curtis J. Clawson, certify that:

1. I have reviewed this Annual Report on Form 10-K of Hayes Lemmerz International, Inc.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15 (f) and 15d-15(f)) for the registrant and have:

    a. Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    b. Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    c. Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    d. Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    a. All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting that are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    b. Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

*s/ Curtis J. Clawson*
Curtis J. Clawson
*President and Chief Executive Officer*

Date: May 11, 2009

EXHIBIT 31.2

# CERTIFICATIONS

I, Mark A. Brebberman, certify that:

1. I have reviewed this Annual Report on Form 10-K of Hayes Lemmerz International, Inc.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15 (f) and 15d-15(f)) for the registrant and have:

a. Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

b. Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

c. Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d. Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

a. All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting that are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b. Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

*/s/ Mark A. Brebberman*
Mark A. Brebberman
*Vice President, Finance and Chief Financial Officer*

Date: May 11, 2009

**EXHIBIT 32.1**

**CERTIFICATION PURSUANT TO 18 U.S.C. SECTION 1350, AS ADOPTED
PURSUANT TO SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002.**

In connection with the Annual Report of Hayes Lemmerz International, Inc. (the "Company") on Form 10-K for the annual period ended January 31, 2009 as filed with the Securities and Exchange Commission on the date hereof (the "Report"), I, Curtis J. Clawson, President and Chief Executive Officer of the Company, certify, pursuant to 18 U.S.C. section 1350, as adopted pursuant to section 906 of the Sarbanes-Oxley Act of 2002, that, to the best of my knowledge:

  1. The Report fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

  2. The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

*/s/ Curtis J. Clawson*

Curtis J. Clawson
*President and Chief Executive Officer*

Date: May 11, 2009

**EXHIBIT 32.2**

**CERTIFICATION PURSUANT TO 18 U.S.C. SECTION 1350, AS ADOPTED
PURSUANT TO SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002.**

In connection with the Annual Report of Hayes Lemmerz International, Inc. (the "Company") on Form 10-K for the annual period ended January 31, 2009 as filed with the Securities and Exchange Commission on the date hereof (the "Report"), I, James A. Yost, Executive Vice President and Chief Financial Officer of the Company, certify, pursuant to 18 U.S.C. section 1350, as adopted pursuant to section 906 of the Sarbanes-Oxley Act of 2002, that, to the best of my knowledge:

    1. The Report fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

    2. The information contained in the Report fairly presents, in all material respects the financial condition and results of operations of the Company.

*/s/ Mark A. Brebberman*
_____
Mark A. Brebberman
*Vice President, Finance and Chief Financial Officer*

Date: May 11, 2009

# UNITED STATES SECURITIES AND EXCHANGE COMMISSION
## Washington, D.C. 20549

# Form 10-K/A
### Amendment No. 1

(Mark One)

☑     **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

       **For the fiscal year ended January 31, 2009**

or

☐     **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

       **For the transition period from _____to _____**

**Commission file number: 000-50303**

# Hayes Lemmerz International, Inc.

*(Exact name of Registrant as Specified in its Charter)*

| | |
|---|---|
| **Delaware** | **32-0072578** |
| *(State or Other Jurisdiction of Incorporation or Organization)* | *(I.R.S. Employer Identification No.)* |
| **15300 Centennial Drive,** | |
| **Northville, Michigan** | **48168** |
| *(Address of Principal Executive Offices)* | *(Zip Code)* |

**Registrant's telephone number, including area code: (734) 737-5000**

**Securities Registered Pursuant to Section 12(b) of the Act:**

| Title Of Each Class | Name of Each Exchange on which Registered: |
|---|---|
| Common Stock, par value $0.01 per share | The NASDAQ Stock Market LLC |

**Securities Registered Pursuant to Section 12(g) of the Act: None**

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. Yes ☐ No ☑

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act. Yes ☐ No ☑

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☑ No ☐

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T (§ 229.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files). Yes ☐ No ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K (§229.405 of this chapter) is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. ☑

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company. See the definitions of "large accelerated filer," "accelerated filer," and "smaller reporting company" in Rule 12b-2 of the Exchange Act.

Large accelerated filer ☐      Accelerated filer ☑      Non-accelerated filer ☐      Smaller reporting company ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Act). Yes ☐ No ☑

The aggregate market value of the registrant's common stock held by non-affiliates was $235 million based on the reported last sale price of common stock on July 31, 2008, which is the last business day of the registrant's most recently completed second fiscal quarter. For purposes of this calculation, shares held by affiliates are limited to shares beneficially owned by the registrant's current officers and directors, which represented approximately 1% of all shares as of April 30, 2009.

Indicate by check mark whether the registrant has filed all documents and reports required to be filed by Section 12, 13 or 15(d) of the Securities Exchange Act of 1934 subsequent to the distributions of securities under a plan confirmed by a court. Yes ☑ No ☐

As of May 6, 2009, the number of shares of common stock outstanding of Hayes Lemmerz International, Inc. was 101,819,597 shares.

## DOCUMENTS INCORPORATED BY REFERENCE

None

**Explanatory Note**

This Amendment No. 1 on Form 10-K/A (Form 10-K/A) to our Annual Report on Form 10-K for the fiscal year ended January 31, 2009, initially filed with the United States Securities and Exchange Commission (the SEC) on May 11, 2009 (Original Filing), is being filed solely to provide the information required by Part III of Form 10-K. The information required by Part III of Form 10-K was previously omitted from the Original Filing in reliance on General Instruction G(3) to Form 10-K.

In accordance with Rule 12b-15 under the Exchange Act of 1934, as amended, this Form 10-K/A amends and restates in their entirety Item 10. Directors, Executive Officers and Corporate Governance; Item 11. Executive Compensation; Item 12. Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters; Item 13. Certain Relationships and Related Transactions; and Item 14. Principal Accountant Fees and Services. In addition, as required by Rule 12b-15, this Form 10-K/A includes as exhibits the certifications required of our principal executive officer and principal financial officer under Section 302 of the Sarbanes-Oxley Act of 2002. We have included Part IV, Item 15 in this Form 10-K/A solely to reflect the filing of these exhibits with this Form 10-K/A. We are not including certifications under Section 906 of the Sarbanes-Oxley Act of 2002 because no financial statements are being filed with this Form 10-K/A.

This Form 10-K/A does not amend, supplement, or otherwise update any other information contained in the Original Filing, including the exhibits thereto, and does not give effect to subsequent events, including the filing on May 11, 2009, by the Company and certain of its subsidiaries of petitions for relief under the United States Bankruptcy Code. This Form 10-K/A should accordingly be read in conjunction with the Original Filing and with our filings with the SEC subsequent to the Original Filing.

**HAYES LEMMERZ INTERNATIONAL, INC.**
**FORM 10-K ANNUAL REPORT**
**TABLE OF CONTENTS**

| | Page |
|---|---|
| **PART III** | |
| Item 10. Directors, Executive Officers, and Corporate Governance | 5 |
| Item 11. Executive Compensation | 8 |
| Item 12. Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters | 29 |
| Item 13. Certain Relationships and Related Transactions and Director Independence | 32 |
| Item 14. Principal Accounting Fees and Services | 32 |
| **PART IV** | |
| Item 15. Exhibits and Financial Statement Schedules | 33 |
| Signatures | 34 |
| Exhibit 31.1 | |
| Exhibit 31.2 | |

## FORWARD-LOOKING STATEMENTS

*Unless otherwise indicated, references to "we," "us," or "our" mean Hayes Lemmerz International, Inc., a Delaware corporation, and our subsidiaries. References to fiscal year means the 12-month period commencing on February 1 st of that year and ending January 31 st of the following year (e.g., fiscal 2008 means the period beginning February 1, 2008, and ending January 31, 2009). This report contains forward looking statements with respect to our financial condition, results of operations, and business. All statements other than statements of historical fact made in this Amendment No. 1 on Form 10-K/A to our Annual Report on Form 10-K are forward-looking. Such forward-looking statements include, among others, those statements including the words "expect," "anticipate," "intend," "believe," and similar language. These forward looking statements involve certain risks and uncertainties. Our actual results may differ significantly from those projected in the forward-looking statements. Factors that may cause actual results to differ materially from those contemplated by such forward looking statements include, among others: (1) competitive pressure in our industry; (2) fluctuations in the price of steel, aluminum, and other raw materials and our ability to maintain credit terms with our suppliers; (3) changes in general economic conditions; (4) our dependence on the automotive industry (which has historically been cyclical) and on a small number of major customers for the majority of our sales; (5) pricing pressure from automotive industry customers and the potential for re-sourcing of business to lower-cost providers; (6) changes in the financial markets or our debt ratings affecting our financial structure and our ability to borrow money or find alternative sources of additional liquidity; (7) the uncertainties inherent in international operations and foreign currency fluctuations; (8) the impact of our Chapter 11 bankruptcy filing on our business; and (9) the risks described in Section 1A, "Risk Factors" of the Original Filing You are cautioned not to place undue reliance on the forward-looking statements, which speak only as of the date of this Amendment No. 1 on Form 10-K/A to our Annual Report on Form 10-K. We have no duty to update the forward looking statements in this Amendment No. 1 on Form 10-K/A to our Annual Report on Form 10-K and we do not intend to provide such updates.*

# PART III

**Item 10.** *Directors, Executive Officers, and Corporate Governance*

## Board of Directors

The following table sets forth for each member of our Board of Directors his or her name, age, positions held with us, class and the years in which he or she became a director and in which his or her current term will end. There are no family relationships among any of the directors or between any of the directors and any executive officers, and there is no arrangement or understanding between any of the directors and any other person pursuant to which he was selected as a director.

| Name | Age | Position Held With Us | Class | Year First Became Director | Term as Director Will Expire (1) |
|------|-----|----------------------|-------|---------------------------|----------------------------------|
| Curtis J. Clawson | 49 | President, Chief Executive Officer and Chairman of the Board | I | 2001 | 2010 |
| George T. Haymaker, Jr. | 71 | Lead Director | I | 2003 | 2010 |
| William H. Cunningham | 65 | Director | II | 2003 | 2011 |
| Mohsen Sohi | 50 | Director | II | 2004 | 2011 |
| Henry D. G. Wallace | 63 | Director | III | 2003 | 2009 |
| Richard F. Wallman | 58 | Director | III | 2003 | 2009 |
| Cynthia L. Feldmann | 56 | Director | III | 2006 | 2009 |

(1) Directors' terms of office are scheduled to expire at the annual meeting of stockholders to be held in the year indicated.

**Curtis J. Clawson** serves as our President, Chief Executive Officer and Chairman of the Board and has held such positions since August 2001 (President and Chief Executive Officer) and September 2001 (Chairman). From 1999 to July 2000, Mr. Clawson was President and Chief Operating Officer of American National Can. Mr. Clawson has 17 years of experience in the automotive industry. He began his career in automotive-related businesses at Arvin Industries where he spent 9 years, from 1986 to 1995, including a position as General Manager of the business unit that supplied Arvin exhaust products, tenures in sales and marketing and tenures in production and plant management. From 1995 until the time that he joined American National Can, Mr. Clawson worked for AlliedSignal, Inc. as President of AlliedSignal's Filters (Fram) and Spark Plugs (Autolite) Group, a $500 million automotive components business, and then as President of AlliedSignal's Laminate Systems Group. Mr. Clawson earned his Bachelor of Science and Bachelor of Arts degrees from Purdue University and a Master of Business Administration from Harvard Business School. He is fluent in Portuguese, Spanish and French.

**William H. Cunningham** has been a Professor of Marketing at the University of Texas at Austin since 1979. Dr. Cunningham has occupied the James L. Bayless Chair for Free Enterprise at the University of Texas since 1985. Dr. Cunningham was the Dean of the University of Texas' College of Business Administration/Graduate School of Business from 1982 to 1985, and President of the University of Texas at Austin from 1985 to 1992. Dr. Cunningham was also the Chancellor (chief executive officer) of the University of Texas System from 1992 to 2000. Dr. Cunningham is a director of the following publicly-traded companies: Lincoln National Corporation, an insurance company, Southwest Airlines, a national air carrier, Introgen Therapeutics, a gene therapy company, and Hicks Acquisition Company I, Inc., a "blank check" company formed to acquire one or more additional companies. He is also a member of the board of John Hancock Mutual Funds. Dr. Cunningham received a Ph.D., a Master of Business Administration and a Bachelor of Business Administration from Michigan State University.

**Cynthia L. Feldmann** has served as President and Founder of Jetty Lane Associates, a consulting firm, since December 2005. Previously, Ms. Feldmann served as the Life Sciences Business Development Officer for the Boston law firm Palmer & Dodge, LLP from November 2003 to September 2005 and was with the global accounting firm, KPMG LLP, from July 1994 to September 2002, holding various leadership roles in the firm's Medical Technology and Health Care & Life Sciences industry groups, including Partner, Northeast Regional Relationships. Ms. Feldmann also spent 19 years with the accounting firm Coopers & Lybrand (now PricewaterhouseCoopers), ultimately as National Partner-in-Charge of their Life Sciences practice. Ms. Feldmann is a director of STERIS Corporation, a developer of products and services to prevent infection and contamination, and Hanger Orthopedic Group, Inc., a provider of orthotic and prosthetic patient care services. Ms. Feldmann earned a Bachelor of Science degree in accounting from Boston College and is a Certified Public Accountant.

**George T. Haymaker, Jr.** serves as our Lead Director. Mr. Haymaker served as non-executive Chairman of the Board of Kaiser Aluminum Corporation from October 2001 through June 2006. Mr. Haymaker served as Chairman of the Board and Chief Executive Officer of Kaiser Aluminum Corporation from January 1994 until January 2000, and as non-executive Chairman of the Board of Kaiser Aluminum Corporation from January 2000 through May 2001. From May 1993 to December 1993, Mr. Haymaker served as President and Chief Operating Officer of Kaiser Aluminum Corporation. Mr. Haymaker is a director of Pool Corporation, a distributor of swimming pool products. Mr. Haymaker received his Bachelor of Science degree in metallurgy and Master of Science degree in Industrial Management from the Massachusetts Institute of Technology and a Master of Business Administration from the University of Southern California.

**Mohsen Sohi** is the President and CEO of Freudenberg-NOK. Prior to joining Freudenberg, Mr. Sohi was employed by NCR Corporation from 2001 until 2003. Mr. Sohi's last position with NCR was as the Senior Vice President, Retail Solutions Division. Before serving NCR in this position, Mr. Sohi spent more than 14 years at AlliedSignal, Inc. and its post-merger successor, Honeywell International Inc. From July 2000 to January 2001, he served as President, Honeywell Electronic Materials. From August 1999 to July 2000, Mr. Sohi was President, Commercial Vehicle Systems, at AlliedSignal. Prior to that, from 1997 to August 1999, he was Vice President and General Manager, Turbocharging Systems, and from 1995 to 1997, he was Director of Product Development and Technical Excellence at AlliedSignal. Mr. Sohi is a director of STERIS Corporation, a developer of products and services to prevent infection and contamination, and Harris Stratex Networks, Inc., a developer of microwave communications equipment. Mr. Sohi received his Bachelor of Science degree in Mechanical and Aerospace Engineering from the University of Missouri, a Doctor of Science degree in Mechanical Engineering from Washington University and a Master of Business Administration from the University of Pennsylvania's Wharton School of Business.

**Henry D. G. Wallace** was employed by Ford Motor Company from 1971 until his retirement in 2001. Mr. Wallace's last position with Ford was as the Group Vice President, Mazda & Asia Pacific Operations. Before serving Ford in this capacity, Mr. Wallace occupied a number of different positions, including Group Vice President and Chief Financial Officer; Vice President, European Strategic Planning and Chief Financial Officer, Ford of Europe, Inc.; President and Chief Executive Officer, Mazda Motor Corporation; and President, Ford Venezuela. Mr. Wallace is a director of Diebold, Inc., a provider of ATM, security and electronic voting systems, Ambac Financial Group, Inc., a financial services company and Lear Corporation, an automotive components supplier. Mr. Wallace received a Bachelor of Arts degree in Economics from the University of Leicester.

**Richard F. Wallman** was employed by Honeywell International, Inc. from 1999 until his retirement in 2003. Mr. Wallman's last position with Honeywell was as Senior Vice President and Chief Financial Officer. From 1995 to 1999, Mr. Wallman held the same position at AlliedSignal, Inc., until its merger with Honeywell. Before joining AlliedSignal, Mr. Wallman occupied a number of different positions with IBM Corporation, Chrysler Corporation and Ford Motor Company. Mr. Wallman is a director of Ariba, Inc., a software company, Convergys Corporation, a relationship management company, Lear Corporation, an automotive components supplier, and Roper Industries, a diversified supplier of industrial products. Mr. Wallman received his Bachelor of Science degree in Electrical Engineering from Vanderbilt and a Master of Business Administration from the University of Chicago.

### Executive Officers

The following table contains the names and ages of our current executive officers and their positions, followed by a description of their business experience during the past five years. All positions shown are with us or our subsidiaries unless otherwise indicated. All executive officers are appointed by the Board of Directors and serve at its pleasure. There are no family relationships among any of the executive officers or between any of the executive officers and any directors, and there is no arrangement or understanding between any of the executive officers and any other person pursuant to which he was selected as an officer. Each individual below is a U.S. citizen and the business address of each individual is 15300 Centennial Drive, Northville, Michigan 48168.

| Name | Age | Position |
|------|-----|----------|
| Curtis J. Clawson | 49 | President, Chief Executive Officer and Chairman of the Board |
| Fred Bentley | 43 | Chief Operating Officer and President, Global Wheel Group |
| Mark A. Brebberman | 48 | Vice President and Chief Financial Officer |
| Patrick C. Cauley | 49 | Vice President, General Counsel and Secretary |
| John A. Salvette | 53 | Vice President, Business Development |

Biographical information for Mr. Clawson is provided with the other members of the Board of Directors.

**Fred Bentley** , Chief Operating Officer and President, Global Wheel Group, has held the position of Chief Operating Officer since July 2007 and has held the position of President, Global Wheel Group since January 2006, when the group was formed by combining the Company's North American and International Wheel Groups. Mr. Bentley joined the Company in October of 2001 as President of the Commercial Highway and Aftermarket business and was appointed President of the International Wheel Group in June 2003. He is a Six Sigma Black Belt, has a solid background of operations strategy, lean manufacturing, leadership of global businesses and business repositioning. Prior to joining the Company, he was Managing Director for Honeywell's Holts European and South Africa automotive after-market operations. In addition, while at Honeywell, Mr. Bentley also served as Heavy Duty Filter (Fram) General Manager and Plant Manager for operations in Greenville, Ohio and Clearfield, Utah. Before joining Honeywell in 1995, Mr. Bentley worked in various capacities at Frito Lay, Inc. (PepsiCo) for a total of eight years. Mr. Bentley earned his Bachelor of Science degree in Industrial Engineering from the University of Cincinnati, Ohio, and a Master of Business Administration from the University of Phoenix. He also attended the Harvard Business School Advanced Management Program.

6

**Mark A. Brebberman** , Vice President and Chief Financial Officer has held this position since August 1, 2008. He previously served as Corporate Controller from July 2007 until August 2008, as Controller, Operations from April 2004 to July 2007 and as Controller, North American Wheel Group Business Unit from December 2001 to April 2004. Prior to joining the Company in 2001, Mr. Brebberman served from 1988 – 2001 in a variety of financial positions with Compagnie de Saint-Gobain, a French multi-national manufacturer of building materials and other engineered products. He also worked in public accounting with Deloitte Haskins + Sells. Mr. Brebberman is a Certified Public Accountant and has a Bachelor of Business Administration degree from the University of Notre Dame and an MBA from Brigham Young University.

**Patrick C. Cauley** , Vice President, General Counsel and Secretary, has held this position since January 2004. He previously served as Interim General Counsel and before that as Assistant General Counsel. Prior to joining the Company in 1999, Mr. Cauley was a partner at the Detroit based law firm of Bodman LLP, where he engaged in all aspects of corporate practice, including mergers and acquisitions, commercial lending and financing, tax and real estate transactions. Mr. Cauley earned his Bachelor of Science degree in Business Administration, with a major in Accounting and his Juris Doctor degree from the University of Michigan. Mr. Cauley is also a Certified Public Accountant.

**John A. Salvette** , Vice President, Business Development, has held this position since August 2001. After serving in various financial positions with Rockwell International's Automotive Operations and serving as Vice President and Chief Financial Officer of Stahl Manufacturing, an automotive supplier in Redford, Michigan, Mr. Salvette joined Kelsey-Hayes in 1990 as Controller for the North American Aluminum Wheel Business Unit. From May 1993 to January 1995, Mr. Salvette served as Director of Investor Relations and Business Planning and, from February 1995 to June 1997, as Corporate Treasurer to the Company. From July 1997 to January 1999, Mr. Salvette was Group Vice President of Finance of Hayes Lemmerz Europe. Following the acquisition of CMI International in February 1999, Mr. Salvette was appointed Vice President of Finance, Cast Components Group. Mr. Salvette received a Bachelor of Arts degree in Economics from the University of Michigan in 1977 and a Master of Business Administration from the University of Chicago in 1979.

On May 11, 2009, Hayes Lemmerz International, Inc., 20 of its wholly owned domestic subsidiaries and one wholly owned Luxembourg subsidiary filed voluntary petition under the Chapter 11 of the United States Bankruptcy Code in the District of Delaware. Each of the executive officers named above was an executive officer of some or all of these entities at the time of filing.

**Section 16(a) Beneficial Ownership Reporting Compliance**

Section 16(a) of the Exchange Act requires our directors and executive officers, and persons who own more than ten percent of a registered class of our equity securities, to file with the SEC initial reports of ownership and reports of changes in ownership of our common stock and other equity securities. Officers, directors and greater than ten percent stockholders are required by SEC regulation to furnish us with copies of all Section 16(a) forms they file.

To our knowledge, based solely on a review of the copies of such reports furnished to us and written representations from our directors and executive officers that no other reports were required, during the fiscal year ended January 31, 2009, our officers, directors and greater than ten percent beneficial owners complied with all applicable Section 16(a) filing requirements.

**Corporate Governance Matters**

*Code of Ethics for Chief Executive and Senior Financial Officers*

In January 2004 our Board of Directors adopted a code of ethics for our chief executive and senior financial officers. A copy of this code of ethics is available on our corporate website at www.hayes-lemmerz.com on the "Investor Relations" page at the "Corporate Governance" link. Any material change to, or waiver from, this code of ethics will be disclosed on our website within five business days after such change or waiver. This code of ethics requires each of these officers to, among other things:

- Avoid situations in which their own interests conflict, or may appear to conflict, with the interests of the Company and to promptly disclose any actual or apparent conflicts of interest to our General Counsel.

- Work to ensure that we fully, fairly and accurately disclose information in a timely and understandable manner in all reports and documents that we file or submit to the SEC and in other public communications made by us.

- Comply with applicable laws, rules and regulations that govern the conduct of our business and report any suspected violations of the code to the Audit Committee of the Board of Directors.

*Procedures for Stockholders to Recommend Nominees for the Board of Directors*

There have been no changes to the procedures by which stockholders may recommend nominees to our Board of Directors. Those procedures are disclosed in the Proxy Statement for our 2008 Annual Meeting of Stockholders filed with the SEC on May 28, 2008.

*Audit Committee*

The Board of Directors has a separately-designated standing Audit Committee. The current members of our Audit Committee are Cynthia L. Feldmann (Chair), George T. Haymaker, Jr., and Mohsen Sohi, all of whom are independent as defined by Nasdaq listing standards. Our Board of Directors has determined that Ms. Feldmann is qualified as an "audit committee financial expert" as that term is defined in the applicable SEC rules and in satisfaction of Nasdaq audit committee requirements.

## Item 11.  *Executive Compensation*

### Compensation Discussion and Analysis

*Objectives and Principles of Executive Compensation*

The objectives of our executive compensation programs are to attract, retain and reward executive officers who contribute to our success, to align the financial interests of executive officers with Company performance, to strengthen the relationship between executive pay and stockholder value, to motivate executive officers to achieve our business objectives and to reward individual performance.

In designing executive compensation programs intended to achieve these goals, we follow a number of key principles. These principles include the following:

- Compensation should be competitive with that offered by other companies of similar size and in similar industries.

- Compensation among executives should be equitable, based on their respective roles and responsibilities.

- Compensation should be tied to the achievement of corporate and individual performance goals and objectives.

- Compensation programs should provide an appropriate balance between guaranteed and "at risk" components so as to provide significant upside for outstanding performance without encouraging improper behavior.

- The percentage of total compensation that is "at risk" should increase as the level of responsibility of an executive increases.

- Compensation programs should provide an appropriate balance between short-term and long-term objectives and decision making.

- Each element of compensation should be easy to understand.

- Compensation programs should be flexible so as to allow compensation to be modified in response to changing industry conditions or other factors while continuing to support achievement of the Company's goals.

- Compensation programs should encourage ethical behavior by our executives.

*Use of Compensation Consultants and Benchmarking*

The Compensation Committee engaged Towers Perrin, a nationally-recognized compensation consulting firm, to provide guidance in connection with our fiscal 2008 executive compensation programs. Towers Perrin does not provide any significant services to the Company other than acting as compensation consultant to the Compensation Committee. During 2008, Towers Perrin advised the Compensation Committee on the overall structure of the executive compensation programs, the appropriate mix of the various elements of compensation and the target compensation levels for each of our executive officers, including the executive officers named in the Summary Compensation Table (our "Named Executive Officers"). The compensation consultant also assisted us in developing a peer group of similar companies for purposes of benchmarking our executive compensation programs.

The peer group consisted of 31 manufacturing companies including eight automotive suppliers. The peer group had median annual revenue of approximately $2 billion, which is similar to the revenue of the Company, with annual revenue ranging from approximately $800 million to approximately $4.6 billion. The peer group was comprised of companies with business operations, complexity and size similar to those of the Company and was selected to provide robust market data for analyzing

competitive executive pay as well as to minimize year-to-year volatility in pay for specific positions. The peer group consisted of American Axle & Manufacturing Holdings, Inc., A. Schulman, Inc., Barnes Group, Inc., BorgWarner, Inc., Briggs & Stratton Corporation, Cameron International Corporation, Cooper Standard Automotive, Inc., Cooper Tire & Rubber Company, Donaldson Company, Inc., EnPro Industries Inc., Fleetwood Enterprises, Inc., Harsco Corporation, Herman Miller, Inc., HNI Corporation, IDEX Corporation, JLG Industries, Inc., MSC Industrial Direct Co., Inc., Metaldyne Corporation, Modine Manufacturing Company, Monaco Coach Corporation, Nissan North America, Inc., Oshkosh Truck Corporation, Packaging Corporation of America, Polaris Industries, Inc., PolyOne Corporation, Rayonier, Inc., Sonoco Products Company, Steelcase, Inc., Superior Industries International, Inc., Teledyne Technologies, Inc., and The Toro Company.

*Role of Management*

Members of management participate in the process of setting executive compensation in a number of ways. Mr. Clawson, our Chief Executive Officer, generally makes recommendations to the Compensation Committee regarding each element of compensation for the other Named Executive Officers and participates in some of the Compensation Committee's discussions related to the compensation of these Named Executive Officers. However, all decisions regarding the compensation of our Named Executive Officers are made by the Compensation Committee. In fiscal 2008, Mr. Clawson made recommendations to the Compensation Committee regarding base salary increases and the amount of long-term compensation awards for the other Named Executive Officers. Mr. Clawson does not make recommendations regarding his own compensation and is not present for discussions of his compensation by the Compensation Committee.

Management also plays a significant role in structuring our incentive compensation plans. In fiscal 2008, management recommended to the Compensation Committee the financial metrics and targets on which short-term and long-term cash incentive awards should be determined so as to align this component of executive compensation with corporate financial targets that are important to our stockholders as well as non-financial metrics that are important to our customers and employees. Management determines, in consultation with our Board of Directors, our annual budgets and operating plans, including the overall cost and cash flow impact of our executive compensation programs. From time to time, management may also recommend changes to executive compensation based on our then current financial situation. Management recommendations are only one of several factors considered by the Compensation Committee in establishing compensation programs and levels, and the Compensation Committee remains free to modify or disregard management's recommendations in its sole discretion.

*Allocation Among Components of Compensation*

Our executive compensation package in 2008 consisted of the following components: base salary, short-term cash incentives, long-term cash incentives, long-term equity incentives, benefit programs and perquisites. The Compensation Committee reviews the executive compensation practices of the peer group in establishing levels of total compensation and the allocation of total compensation among the various compensation components. In general, we target total executive compensation to be competitive with the median total compensation of the peer group, taking into account individual factors such as responsibilities, experience and performance.

One important principle followed by the Compensation Committee in establishing the allocation of total compensation among the various components is that the portion of an executive's total target compensation that is "at risk" and subject to the achievement of performance goals or tied to stockholder returns should increase as the responsibilities of the executive within the Company increase. Accordingly, the percentage of total target compensation that is "at risk" is highest for our Chief Executive Officer and is higher for our Chief Operating Officer than it is for the other Named Executive Officers. The following table sets forth for each Named Executive Officer (during the period in which he served as a Named Executive Officer) the targeted allocation on a percentage basis of fiscal 2008 compensation among base salary, target short-term and long-term cash incentives and target long-term equity incentives:

| Name | Base Salary | Short-term Cash Incentives | Long-term Cash Incentives | Long-term Equity Incentives | Total |
|---|---|---|---|---|---|
| Curtis J. Clawson | 25% | 25% | 30% | 20% | 100% |
| Mark A Brebberman | 38% | 24% | 23% | 15% | 100% |
| Fred Bentley | 30% | 30% | 24% | 16% | 100% |
| Patrick C. Cauley | 38% | 24% | 23% | 15% | 100% |
| John A. Salvette | 38% | 24% | 23% | 15% | 100% |
| James A. Yost | 38% | 24% | 23% | 15% | 100% |

*Base Salary*

The base salary component of total compensation, which is not "at risk," is intended to provide a fair and reasonable level of minimum pay for the performance of the regular duties and responsibilities of each position. In determining base salaries that are fair and reasonable, the Compensation Committee considers the importance to the Company of the duties and responsibilities of each position, the relative experience of the executive, the base salaries being paid by the members of the peer group for similar positions and how each executive's base salary compares to the other members of the executive team. We target base salary to be at approximately the median of the peer group.

Base salary is the basis for determining the amounts of the other components of compensation, which are typically calculated as a multiple of base salary. For instance, target and maximum short-term cash incentives are expressed as percentages of base salary, as are the expected annual values of long-term incentive compensation. In addition, certain benefit programs such as retirement benefits and life and long-term disability insurance provide benefits that are based on percentages or multiples of base salary.

Base salary is reviewed annually by the Compensation Committee. Each of the Named Executive Officers received a three percent increase in base salary effective February 1, 2008. Effective August 1, 2008, Mr. Brebberman's base salary was increased to the current level in connection with his appointment as Chief Financial Officer.

*Short-Term Cash Incentives*

Short-term cash incentive compensation is intended to reward the achievement of corporate performance goals for the current fiscal year. The criteria used to evaluate corporate performance for short-term incentive compensation are established at the beginning of each fiscal year and emphasize the achievement of business results that management and the Board of Directors determine to be most important during the year. Historically, these metrics have included measurements such as return on investment, adjusted earnings before interest, taxes, depreciation and amortization, earnings before interest and taxes, earnings from operations and cash flow. As with base salaries, the Compensation Committee consults with its executive compensation consultant and considers the practices of the peer group, other automotive suppliers and market trends in setting the metrics and target levels for short-term cash incentives. We target short-term cash incentives to be, on average, at the median of the peer group.

Consistent with the principle that a greater percentage of total compensation should be "at risk" for our Chief Executive Officer and Chief Operating Officer than for our other Named Executive Officers, in 2008 the target short-term cash incentive award was 100% of base salary for Messrs. Clawson and Bentley and was 60% of base salary for each of the other Named Executive Officers. Short-term cash incentive award payouts to our Named Executive Officers may be adjusted up or down by up 20% of the actual award achieved in the discretion of the Compensation Committee based on individual performance. In general, any upward adjustment is offset by a downward adjustment to other participants in the 2008 short-term incentive plan ("STIP"), such that the maximum amount paid under the STIP to all participants does not exceed the aggregate amount of the actual awards achieved without adjustment. However, the Compensation Committee does retain the discretion to permit upward adjustments to STIP awards that are not entirely offset by downward adjustments to other awards.

Under the STIP, the metrics for our short-term cash incentives were earnings before interest and taxes, adjusted to eliminate the impact of asset impairments, sales of businesses and certain other one-time items during the fiscal year ("EBIT"), free cash flow, which is cash from operations and asset sales minus capital expenditures, with certain additional adjustments ("Free Cash Flow"), quality measured by defective parts per million produced ("PPM") and incident rate for reportable injuries at the Company's facilities ("Incident Rate"). Management recommended, and the Compensation Committee approved, EBIT, Free Cash Flow, PPM and Incident Rate as the key performance metrics for short-term incentive compensation awards for several reasons, including:

- Focusing our Named Executive Officers on reducing costs and improving productivity, liquidity, quality and safety.

- Aligning incentive compensation to key metrics used by stockholders to evaluate our financial performance and by customers to evaluate the quality of our products.

- Establishing performance metrics that are easy for individuals throughout the Company to understand and comprehend how individual actions can impact achievement of financial metrics and promote the goals of customer satisfaction and safety throughout the organization.

For purposes of the STIP, EBIT was calculated from our audited financial statements by starting with loss from operations, then eliminating the impact of non-cash asset impairments and the impact of the sale of our Hoboken, Belgium aluminum wheel facility. Free Cash Flow was calculated from our audited financial statements by starting with cash provided by operating activities minus cash used for investing activities, then eliminating the impact of our accounts receivable securitization facility and the impact of the sale of our Hoboken, Belgium aluminum wheel facility. PPM was calculated using customer quality metrics and Incident Rate was defined as the number of injuries requiring medical attention per 200,000 hours worked.

The fiscal 2008 EBIT target was $97.3 million, the Free Cash Flow target was $1.0 million, the PPM target was 75 and the Incident Rate target was 1.85, which are consistent with the targets for these metrics in the Company's annual operating plan. Each metric is considered separately in determining the amount of the STIP award earned. EBIT would account for 50%, Free Cash Flow would account for 30% and PPM and Incident Rate would each account for 10% of the total STIP award if all are achieved at the target levels. The maximum amount of a STIP award is 200% of the target STIP award, prior to any discretionary adjustments by the Compensation Committee. Additionally, the maximum payout with respect to either financial metric may not exceed 200% of the award payable with respect to such metric at the target level.

EBIT performance must be at least 80% of the target to receive a payout with respect this component, at which point this component of the award will be paid at 50% of target. The percentage awarded with respect to the EBIT component increases by 2.5 percentage points for each percentage point improvement above the threshold up to the EBIT target. After achieving the target, the percentage awarded with respect to the EBIT component increases by 5.0 percentage points for each percentage point improvement above the target up to the maximum EBIT award at 120% of target. Free Cash Flow performance must be at least negative $14 million to receive a payout and the Free Cash Flow award increases on a one-to-one straight-line basis up to the maximum award at Free Cash Flow of $16 million. The PPM and Incident Rate awards also increase on a one-to-one straight-line basis from thresholds of 95 PPM and Incident Rate of 2.1 up to the maximum awards at PPM of 55 and Incident Rate of 1.6.

Due to the severe impact on the automotive industry of the global economic downturn, performance with respect to the EBIT and Free Cash Flow metrics was below the threshold for any payment. Actual PPM achieved was 56 resulting in a calculated award of 195% with respect to the PPM component. Actual Incident Rate achieved was 1.95, resulting in a calculated award of 60% with respect to the Incident Rate component and a total STIP award payment of 25.5% of target.

The Compensation Committee did not make discretionary adjustments to the STIP awards of any of our Named Executive Officers. In light of the Company's filing for protection under Chapter 11 of the U.S. Bankruptcy Code ("Chapter 11"), management recommended to the Compensation Committee that STIP awards not be paid to any of the Named Executive Officers for fiscal 2008, but that STIP awards be paid to the other participants in the STIP. The Compensation Committee approved management's recommendation.

Because of the Chapter 11 filings the metrics for the 2009 STIP, which must be approved by the bankruptcy court, have not been established. We anticipate that the 2009 STIP will be based, at least in part, on metrics that are tied to the success of the Company's restructuring in Chapter 11.

### *Long-Term Cash Incentives*

In fiscal 2008, the Board adopted the Hayes Lemmerz International, Inc. Performance Cash Plan (the "PCP") to add a cash component to total long-term compensation. The adoption of the PCP did not increase the annual expected value of total long-term compensation as a percentage of base salary, but rather reallocated a portion of the total currently allocated to long-term equity incentives such as stock options and restricted stock units to long-term cash incentives. The annual expected value of total long-term incentive compensation to each Named Executive Officer is determined as a percentage of base salary, with the annual expected value of long-term compensation set at 200% of base salary for Mr. Clawson, 137% of base salary for Mr. Bentley and 100% of base salary for the remaining Named Executive Officers.

The Compensation Committee decided to include a cash component to total long-term compensation in fiscal 2008 because the Company has substantially completed the process of divesting certain under-performing and non-wheel businesses during the fiscal year, which allows for the definition of consistent performance targets over multiple years, which would have been difficult where the divestitures significantly changed the operations of the Company from year to year. The Compensation Committee also considered that the shares available for grants under the LTIP would not be sufficient to support competitive target long-term compensation consisting solely of equity-based awards. The target cash portion of total long-term compensation was 40% in fiscal 2008. In determining the allocation between long-term cash and equity incentives, the Compensation Committee considered several factors, including the practices of the peer group and broader market data and trends provided by the compensation consultant.

In fiscal 2008, the Compensation Committee granted awards under the PCP to each of the Named Executive Officers. The actual amount of the awards payable will be determined by the Company's performance relative to target levels of return on invested capital for each performance period. The Compensation Committee chose return on invested capital as the metric for the performance cash plan to provide an incentive for the Company to achieve a return on invested capital at least equal to its weighted average cost of capital by the end of the performance period. The amount of the actual awards will increase or decrease from the amount of the target awards by one percent for each .02 percentage points that actual return on invested capital is greater or less than the established targets, subject to a maximum award of 200% of the target award. The awards have two performance periods, one from February 1, 2008 through January 31, 2010 and one from February 1, 2008 through January 31, 2011. The target award for each performance period is equal to 50% of the total target award. If earned, awards would be paid out within 120 days following the end of each performance period. We expect that the PCP and all existing awards will be cancelled in connection with our Chapter 11 proceeding.

### *Long-Term Equity Compensation*

The key objectives of our long-term equity compensation program are to directly align the interests of our Named Executive Officers with the interests of our stockholders and to provide a retention incentive to our Named Executive Officers, as equity compensation awards vest over a period of years following the grant date. Past equity awards have included grants of stock options, restricted stock and restricted stock units, which are payable in either stock or the equivalent value in cash on the vesting date as determined by the Compensation Committee. In consultation with Towers Perrin, its compensation consultant, the Compensation Committee has established guidelines for annual equity incentive compensation grants based on the long-term incentive programs of other companies in the peer group and which target long-term equity compensation to be at approximately the median of the peer group. The Compensation Committee has not established specific policies regarding the timing of equity incentive grants.

The long-term equity incentive compensation awards during 2008 accounted for 60% of total long-term compensation and were divided between stock options and restricted stock units, with 40% of the annual expected value of total long-term compensation allocated to stock options and 20% of the annual expected value allocated to restricted stock units. In determining the allocation between options and restricted stock units, the Compensation Committee considered several factors, including the practices of the peer group and broader market data and trends provided by the compensation consultant. The Compensation Committee wanted the value of the long-term equity incentives to be closely tied to Company performance. The Compensation Committee determined that stock options, which have value to the executive only if the price our stock increases, are more strongly tied to corporate performance than restricted stock units, which have some value to the executive regardless of our stock price performance over the vesting period. For purposes of determining the number of options and restricted stock units awarded, the options were valued at approximately $1.64 per option and the restricted stock units were valued at approximately $2.12 per share. The values were determined using a valuation methodology consistent with that used in a survey provided by the compensation consultant and using the most recent closing price of our common stock available on the day before the awards were made. The number of options and restricted stock units awarded to each of our Named Executive Officers in fiscal 2008 is set forth in the Grants of Plan Based Awards Table.

The stock options become exercisable in three equal installments on February 1, 2009, February 1, 2010 and February 1, 2011. The restricted stock units vest as to 100% of the award on February 1, 2011. In setting the vesting schedules, the Compensation Committee considered the equity incentive vesting practices provided by the compensation consultant as well as the retention objective of the awards. The Compensation Committee believes that the three-year vesting period provides a strong retention incentive by requiring continued employment over a period of years for the awards to vest fully, while not having them vest so far in the future that the retention value is diluted. We expect that all currently outstanding equity compensation awards will be canceled in connection with our Chapter 11 proceeding.

### *Stock Ownership Guidelines*

The Board of Directors has approved stock ownership guidelines for our executives. The Board of Directors believes that stock ownership guidelines are important to align the economic interests of our executives with those of our stockholders. The guidelines were developed with input from our compensation consultant and established target stock ownership using a multiple of the peer group median salary for chief executive officers and other executives, which was converted into a fixed number of shares using our approximate share price at the time the guidelines were adopted. The multiple was set at five times median salary for our Chief Executive Officer and two times median salary for the other Named Executive Officers. Pursuant to the guidelines, our Chief Executive Officer is expected to own 696,000 shares of our common stock and the other Named Executive Officers are expected to own 117,000 shares of our common stock on or before the later of September 18, 2012 or five years following the date of his or her appointment to such a position. For purposes of determining executive stock ownership pursuant to this requirement, shares of our stock purchased in the market, stock beneficially owned by the executive, stock held by the executive in any Company benefit plan, stock acquired on the exercise of stock options and held by the executive, vested and unvested shares of restricted stock and vested and unvested restricted stock units are included. Unexercised stock options are not included. If an executive fails to comply with the stock ownership guidelines by the relevant date, then 50% of any cash incentive compensation earned by that executive will be paid in shares of restricted stock until compliance with the stock ownership guidelines is achieved. See Item 12 of this Amendment No. 1 to Annual Report on Form 10-K/A for a description of current stock ownership by our Named Executive Officers. We expect that all of our common stock and equity compensation awards will be cancelled in connection with our current Chapter 11 proceedings, and that the current stock ownership guidelines will be revised or terminated. The Company does not have any policies regarding hedging the economic risk of executive stock ownership.

### Benefits, Perquisites and Foreign Tax Equalization

Our executive benefit plans provide benefits customary in the automotive supply industry. Benefit programs are established taking into account benefits being offered by industry and peer group companies, market trends and the impact of the costs of the benefit programs on our financial performance. Most benefit plans provided to our executive officers are also provided to all non-union employees in the United States. Basic benefit plans include medical and dental insurance and prescription drug plans, life insurance and long-term disability insurance.

*Retirement Benefits.* The Named Executive Officers participate in the Company's 401(k) Retirement Savings Plan (the "401 (k) Plan"), which is the same tax qualified retirement plan available to all other non-union employees in the United States. We matched 100% of the first four percent of eligible compensation that was deferred into the 401(k) Plan by eligible employees, including the Named Executive Officers.

In addition to the 401(k) Plan, the Named Executive Officers participate in a non-qualified Supplemental Executive Retirement Plan ("SERP"). The intent of the SERP is to replace the benefits that would have been available under the 401(k) Plan, but for the limits on contributions to tax-qualified plans under the Internal Revenue Code. Contributions to the SERP were reinstated on January 1, 2007 at four percent of eligible compensation, the same rate as matching contributions to the 401(k) Plan, less the amount actually contributed to the 401(k) Plan. The SERP contributions are held in a Rabbi Trust and are available to satisfy the claims of creditors in our Chapter 11 proceeding.

We no longer offer a defined benefit pension plan to any of our employees in the United States. Participation in our prior defined benefit pension plan was closed to new participants on December 31, 1994 and service credits were frozen on that date. Mr. Salvette is the only Named Executive Officer with any vested benefits under the defined benefit pension plan.

*Perquisites.* We provide limited perquisites to our executives. In 2008, we provided each Named Executive Officer with a leased vehicle that is available for personal use and we paid all of the costs associated with those vehicles, which is a customary perquisite in the automotive supply industry. Rather than providing additional perquisites such as life and long-term disability insurance, tax preparation, financial planning, country club dues and the like, we provided each Named Executive Officer a perquisite allowance of $35,000 for our Named Executive Officers other than Mr. Clawson and $40,000 for Mr. Clawson. The perquisite allowance is paid in cash over the course of the year and the Named Executive Officers have complete discretion over how it will be used. The amount was determined by considering the perquisites provided at similar companies and estimating the cost of providing a similar perquisite package. The Compensation Committee elected to establish the cash perquisite allowance rather than to increase base salaries to enable it to more easily compare this element of compensation among the peer group and because it does not believe that this element of compensation should be considered in determining the amounts of other compensation that are calculated as a percentage or multiple of base salary. To help ensure that the Named Executive Officers are physically able to execute their duties, we also pay all the expenses associated with an annual comprehensive physical examination, taken at the option of the Named Executive Officer. We may also provide nominal additional perquisites or personal benefits from time to time in addition to those described above, such as occasional spousal travel to corporate events. We do not maintain a corporate aircraft, but we charter private jets from time to time for executive business travel. These are not available to our Named Executive Officers for personal use.

*Tax Equalization Payments.* When an employee, including a Named Executive Officer, is posted to an overseas assignment in a jurisdiction with tax rates different from those in the employee's home country, we typically adjust the employee's compensation so that there is no difference between what the employee's after-tax compensation would have been in his or her home country and the actual after-tax compensation in the foreign jurisdiction. Where foreign tax rates are higher, the equalization results in an increase in total compensation. The Compensation Committee believes this additional compensation is appropriate so that an employee who accepts an overseas assignment, which can cause significant hardship for the employee and his or her family, is made no worse off by the tax situation in the foreign jurisdiction. Because these payments represent income to the employee in the foreign jurisdictions in the years when taxes are actually paid rather than the years in which the services are provided in the foreign jurisdiction, foreign tax equalization payments may continue after an employee has returned to his or her home country. Further, these tax equalization payments result in foreign tax credits which may reduce individual U.S. income tax in subsequent years. To the extent that these foreign tax credits are realized, the executive reimburses the Company for the portion that arose during the time the executive received tax equalization payments. None of our Named Executive Officers received tax equalization payments in 2008, although Mr. Bentley received such payments in 2006 and 2007 related to services he provided while assigned to our European headquarters in Königswinter, Germany.

### Severance and Change in Control Arrangements

The Compensation Committee believes severance and change in control arrangements are necessary to recruit talented executives from successful careers at other respected companies and to ensure that the interests of the Named Executive Officers remain aligned with the interests of our stockholders in transactions that could result in the termination of a Named Executive Officer's employment. We also provide these benefits to ease the impact on the Named Executive Officers of a termination of employment and to take into account the fact that it can take a significant amount of time for senior executives to find comparable positions in other companies. These arrangements are set forth in the employment agreements we have executed with each of our Named Executive Officers or, with respect to awards under certain long-term compensation plans, in the plan documents. Additional information regarding our severance and change in control arrangements is set forth in "Potential

Payments Upon Termination or Change in Control." Severance and change in control arrangements are generally not considered by the Compensation Committee in setting the amounts of other compensation.

The employment agreements and incentive compensation plans also provide for certain benefits upon a change in control. Certain of these benefits include a "single trigger" provision, meaning that the benefits become payable on a change of control, whether or not the employment of the Named Executive Officer is terminated in connection with the change of control. The Named Executive Officers other than Mr. Clawson are entitled to payment of a portion of their annual STIP prorated through the date of the change in control on a single trigger basis. All of the Named Executive Officers (together with all other participants in the applicable plans who are not Named Executive Officers) will receive the following benefits on a single trigger basis following a change of control:

- Vesting of all unvested stock options and restricted stock units and lapse of restrictions on shares of restricted stock.

- Payment of an amount equal to the greater of the target or current anticipated payout, as determined by the Compensation Committee, under the Performance Cash Plan.

- Vesting of any unvested contributions to the 401(k) Plan and the SERP.

We believe that a single trigger provision is appropriate for equity awards to more closely align the interests of key employees with those of our stockholders in connection with such a transaction. We also believe that key employees who are not terminated in the transaction should have the same ability as those who are terminated to realize the benefits of the transaction with respect to our equity at the time it is completed. We believe a single trigger provision is appropriate for the participants in the Performance Cash Plan to receive a payout at the target amounts since new management may change the capital and investment priorities of the Company so that they are no longer consistent with the targets to which the participants had previously been managing the business. We also believe that a single trigger is appropriate for vesting contributions to retirement plans because we believe that employees terminated in connection with a change in control should not have to forfeit these benefits and we do not want to treat employees remaining with surviving company less favorably than those who were terminated. All of our current Named Executive Officers are already fully vested with respect to all contributions to the 401(k) Plan and the SERP by virtue of their length of service with the Company.

In addition to benefits payable on a single trigger basis (but in lieu of any benefits that would be payable upon such a termination in the absence of a change in control), all of our Named Executive Officers are entitled to severance and other benefits if terminated by us or our successor without cause or by them with good reason or, in the case of Mr. Clawson only, without good reason, following a change of control. We believe that these benefits are appropriate to provide an incentive to our Named Executive Officers to complete transactions that benefit our stockholders, but may result in their termination or substantial changes to the conditions of their employment. We believe a double trigger payment provision is appropriate for these benefits to avoid a windfall payment to Named Executive Officers who continue with the Company following the transaction. We believe that providing payment to Mr. Clawson if he terminates his employment without good reason following a change in control is appropriate in light of the importance of the efforts of the Chief Executive Officer to the completion of such a transaction and the unique nature of the position of the Chief Executive Officer in needing to work closely with the Board of Directors following a change of control. We believe that providing such a provision more closely aligns the interests of Mr. Clawson with that of the other stockholders considering the importance of Mr. Clawson to the successful completion of the transaction and the uncertainty of the nature or conditions of his continued future employment with the Company or its successor following the transaction.

The employment agreements and incentive compensation plans also contain provisions regarding the benefits to be received in the event of termination of employment upon disability, death, and other certain circumstances, which we believe are typical and customary.

Pursuant to the Named Executive Officers' employment agreements, we will pay additional "gross up" amounts if any payments or benefits paid to our Named Executive Officers under their employment agreements or any other plan, arrangement or agreement with us are subject to the federal excise tax on excess parachute payments or any similar state or local tax, or if our Named Executive Officers incur any interest or penalties with respect thereto, such that following these payments the Named Executive Officers are put in the same position as if no excise taxes had been imposed.

### Section 162(m) Policy

Section 162(m) of the Internal Revenue Code, as amended, generally provides that publicly held companies may not deduct compensation paid to certain executive officers to the extent such compensation exceeds $1 million per officer in any year. However, pursuant to regulations issued by the Treasury Department, certain limited exceptions to Section 162(m) apply with respect to "performance-based compensation." Awards of stock options granted under our Long Term Incentive Plan constitute qualified performance-based compensation eligible for this exception. The Compensation Committee considers the applicability of Section 162(m) to our ongoing compensation arrangements, but believes it is appropriate to retain the flexibility to authorize payments of compensation that may not qualify for deductibility under Section 162(m) if, in the Compensation Committee's judgment, it is in the Company's best interest to do so.

## Compensation Committee Report

The Compensation Committee has reviewed and discussed the foregoing Compensation Discussion and Analysis with management. Based on that review and discussion, the Compensation Committee recommended to the Board of Directors that the Compensation Discussion and Analysis be included in the Company's Amendment No. 1 to Annual Report on Form 10K/A.

*The Compensation Committee*

William H. Cunningham (Chair)
Mohsen Sohi
Henry D. G. Wallace
Richard F. Wallman

## Summary Compensation Table

The following table and accompanying notes and narrative discussion set forth and discuss all compensation awarded to, earned by or paid to each of our Chief Executive Officer, Chief Financial Officer and our other most highly compensated officers for fiscal years 2006, 2007 and 2008:

| Name and Principal Position | Year | Salary (1) | Bonus (2) | Stock Awards (3) | Option Awards (4) | Non-Equity Incentive Plan Compensation (5) | Change in Pension Value and Nonqualified Deferred Compensation Earnings (6) | All Other Compensation (7) | Total ($) |
|---|---|---|---|---|---|---|---|---|---|
| Curtis J. Clawson, President, Chief Executive Officer and Chairman of the Board | 2008 | $ 817,662 | — | $ 381,605 | $ 582,975 | — | — | $ 155,708 | $1,937,950 |
| | 2007 | 759,660 | 453,000 | 2,169,355 | 1,061,092 | 960,000 | — | 176,241 | 5,579,348 |
| | 2006 | 735,972 | 108,378 | 1,036,910 | — | 2,233,510 | — | 78,986 | 4,193,756 |
| Mark A. Brebberman, Vice President and Chief Financial Officer (8) | 2008 | 245,388 | 46,507 | 61,778 | 95,128 | — | — | 46,466 | 495,266 |
| Fred Bentley, Chief Operating Officer and President, Global Wheel Group | 2008 | 418,754 | — | 133,873 | 204,516 | — | — | 102,361 | 859,504 |
| | 2007 | 380,750 | 244,000 | 470,753 | 247,211 | 492,000 | — | 297,841 | 2,132,555 |
| | 2006 | 352,437 | 46,375 | 165,684 | — | 807,667 | — | 298,250 | 1,670,413 |
| Patrick C. Cauley, Vice President, General Counsel and Secretary | 2008 | 312,577 | — | 72,941 | 111,430 | — | — | 87,394 | 584,343 |
| | 2007 | 286,200 | 135,016 | 278,957 | 154,259 | 220,320 | — | 82,087 | 1,156,839 |
| | 2006 | 268,400 | 35,148 | 116,985 | — | 611,727 | — | 64,646 | 1,096,906 |
| John A. Salvette, Vice President, Business Development | 2008 | 278,838 | 25,000 | 65,067 | 99,404 | — | — | 76,064 | 544,373 |
| | 2007 | 262,609 | 93,000 | 294,870 | 155,555 | 196,560 | — | 72,540 | 1,075,134 |
| | 2006 | 256,478 | 22,184 | 141,173 | — | 401,904 | $ 2,802 | 57,508 | 882,049 |
| James A. Yost, Executive Vice President and Chief Financial Officer (Resigned) (9) | 2008 | 142,364 | — | — | — | — | — | 76,047 | 281,411 |
| | 2007 | 433,125 | 160,000 | 458,283 | 246,771 | 324,000 | — | 87,492 | 1,709,671 |
| | 2006 | 415,226 | 54,918 | 203,991 | — | 956,448 | — | 55,304 | 1,685,887 |

*Explanatory Notes and Narrative Discussion*

(1)  This column reflects total base salary paid to our Named Executive Officers during the fiscal year and reflects a two-day unpaid furlough taken by all Named Executive Officers during the fiscal year. Pursuant to employment agreements executed with each of our Named Executive Officers, base salary is to be reviewed annually and may be increased, but not decreased, by the Compensation Committee. The current base salaries of Messrs. Clawson, Brebberman, Bentley, Cauley and Salvette are $824,000, $266,500, $422,000, $315,000 and $281,000, respectively.

(2) For 2008, this column reflects a one-time bonus to Mr. Salvette in connection with his assuming responsibility for the Company's information technology department in addition to business development and a bonus to Mr. Brebberman based on a retention agreement entered into before he became a Named Executive Officer, which provided that he would receive a bonus equal to $125,000, less the actual amount of the prior year's STIP payment made in the current fiscal year.

For 2007, this column reflects a one-time bonus intended to partially compensate the Named Executive Officers for below-market equity incentive awards in fiscal 2006. With respect to Mr. Cauley only, this column also includes a discretionary adjustment to his STIP award in the amount of $11,016.

For 2006, the column reflects the discretionary portion of the 2006 STIP awards. In fiscal 2006 the STIP included a discretionary award and a non-discretionary award. The amounts of the discretionary awards were determined by the Compensation Committee based on individual or business unit performance. Discretionary awards were targeted to be 20% of the total STIP award achieved, with the maximum possible discretionary STIP award equal to twice the targeted discretionary award.

(3) This column reflects the compensation cost recognized by the Company for grants of restricted stock units pursuant to Statement of Financial Accounting Standards No. 123R ("FAS 123R"). For fiscal 2007, it includes the FAS 123R cost related to the non-compensatory anti-dilution adjustments made to unvested restricted stock units in connection with the equity rights offering and private placement completed in fiscal 2007. The FAS 123R cost is determined based on the fair value of the award on the grant date, which may have no correlation to the current market value of the shares or the market value of the shares on the day they vest. The assumptions used in valuing the restricted stock units are disclosed in Note 15 to the Consolidated Financial Statements at Item 8 of the Original Filing. The amount of compensation for the fiscal year is determined by pro rating the fair value of the awards and the anti-dilution adjustments over each vesting period and including the compensation attributable to the portions of the vesting periods occurring within the fiscal year. Compensation reflected in this column results from:

- In fiscal 2006 and 2007, a grant of restricted stock units made on July 28, 2003 with a FAS 123R fair value of $14.00 per share which vested as to one-third of the grant on July 28, 2006 and as to the other two-thirds of the grant on July 28, 2007.

- In fiscal 2006, 2007 and 2008, a grant of restricted stock units made on September 17, 2006 with a FAS 123R fair value of $2.67 per share which vested as to one-half of the grant on September 17, 2007 and which will vest as to the other one-half of the grant on September 17, 2008.

- In fiscal 2007 and 2008, a grant of restricted stock units made on August 10, 2007 with a FAS 123R fair value of $3.79 per share which will vest on February 1, 2010.

- In fiscal 2007 and 2008, for Mr. Salvette only, a grant of restricted stock units made on November 27, 2007 with a FAS 123R fair value of $4.00 per share which will vest on February 1, 2010.

- In fiscal 2007 and 2008, the additional restricted stock units received pursuant to the anti-dilution adjustments approved July 17, 2007 with a FAS 123R fair value of $5.88 per share, portions of which vested on July 28, 2007 and September 17, 2007, and the remainder of which will vest on September 17, 2008.

- In fiscal 2008, for all Named Executive Officers other than Mr. Yost, a grant of restricted stock units made on July 13, 2008 with a FAS 123R fair value of $2.45 per share which will vest on February 1, 2011.

- In fiscal 2008, for Mr. Brebberman only, a grant of restricted stock units made on July 30, 2009 with a FAS 123R fair value of $2.36 per share which will vest on February 1, 2011.

The restricted stock units are convertible into shares of our common stock or the equivalent amount in cash, as determined by the Compensation Committee, on the vesting dates. Although risk of forfeiture is not considered in determining the FAS 123R value for the Summary Compensation Table, the awards are subject to forfeiture and no value will be realized by a Named Executive Officer if he is no longer employed on the vesting dates. In addition, it is likely that any unvested restricted stock units will be cancelled as part of any plan of reorganization approved in the Company's Chapter 11 proceeding. The value actually realized by our Named Executive Officers with respect to restricted stock units that vested during the fiscal year is set forth in the Options Exercised and Stock Vested table.

(4) This column reflects the compensation cost recognized by the Company for grants of stock options pursuant to FAS 123R. For fiscal 2007, it includes the FAS 123R cost related to the non-compensatory anti-dilution adjustments made to outstanding stock options in connection with the equity rights offering and private placement completed in fiscal 2007. The FAS 123R cost is determined based on the fair value of the award on the grant date, which may have no correlation to the difference between the exercise price of a stock option and the market value of the underlying shares. The assumptions used in valuing the stock options are disclosed in Note 15 to the Consolidated Financial Statement included at Item 8 of the Original Filing. The amount of compensation for the fiscal year is determined by pro rating the fair value of the awards over each vesting period and including the compensation attributable to the portions of the vesting periods occurring within the fiscal year. Compensation reflected in this column results from:

- In fiscal 2007 and 2008, a grant of stock options made on August 10, 2007 with a FAS 123R fair value of approximately $2.35 per option which will become exercisable as to one-third of such options on each of February 1, 2008, February 1, 2009 and February 1, 2010.

- In fiscal 2007 and 2008, for Mr. Salvette only, a grant of stock options made on November 27, 2007 with a FAS 123R fair value of approximately $2.38 per option which will become exercisable as to one-third of such options on each of February 1, 2008, February 1, 2009 and February 1, 2010.

- In fiscal 2007, a change in the exercise price and increase in the number of shares subject to outstanding stock options pursuant to the anti-dilution adjustments approved July 17, 2007, which adjustment had a FAS 123R value of approximately $2.84 per share for each option as so adjusted. The options were fully vested at the time of the adjustment.

- In fiscal 2008, for all Named Executive Officers other than Mr. Yost, a grant of incentive and non-qualified stock options made on July 13, 2008 with a FAS 123R fair value of approximately $1.45 per option which will become exercisable as to one-third of such options on each of February 1, 2009, February 1, 2010 and February 1, 2011.

- In fiscal 2008, for Mr. Brebberman only, a grant of incentive and non-qualified stock options made on July 30, 2008 with a FAS 123R fair value of approximately $1.40 per option which will become exercisable as to one-third of such options on each of February 1, 2009, February 1, 2010 and February 1, 2011.

Although risk of forfeiture is not considered in determining the FAS 123R value for the Summary Compensation Table, unvested stock options are subject to forfeiture if the Named Executive Officer is no longer employed by the Company. Stock options generally have a term of 10 years from the date of grant and, unless they expire earlier by their terms, will expire 90 days following termination of employment for Named Executive Officers with less than ten years of service with the Company, or two years following the date of termination for Named Executive Officers with ten or more years of service. However, it is likely that any unvested stock options will be cancelled as part of any plan of reorganization approved in the Company's Chapter 11 proceeding.

(5) Although STIP payments were earned at 25.5% of target for fiscal 2008, the Compensation Committee determined not to make STIP payments to the Named Executive Officers due to the Company's anticipated Chapter 11 proceeding.

For fiscal 2007, this column consists of incentive compensation earned under the STIP. A discretionary increase to Mr. Cauley's 2007 STIP award approved by the Compensation Committee appears in the Bonus column. STIP awards in 2007 were based on performance relative to EBIT and Free Cash Flow targets and were paid at 120% of the target, prior to discretionary adjustments.

For fiscal 2006, this column consists of the non-discretionary portion of incentive compensation earned under the STIP and compensation earned under the Officer Bonus Plan ("OBP"). The amounts of compensation attributable to each of the STIP and OBP in fiscal 2006 are set forth in the following table:

| Name | STIP | OBP |
|------|------|-----|
| Curtis J. Clawson | $ 433,510 | $ 1,800,000 |
| Fred Bentley | 123,667 | 684,000 |
| Patrick C. Cauley | 93,727 | 518,000 |
| John A. Salvette | 88,737 | 313,167 |
| James A. Yost | 146,448 | 810,000 |

The OBP awards were paid in three equal installments, with the final installment paid in July 2008. Payment of Mr. Yost's final OBP installment was forfeited when he resigned from the Company in May 2008.

17

(6) The amount in this column represents the change in the actuarial present value of the accumulated benefits of Mr. Salvette under our defined benefit pension plan. The value of the accumulated benefits decreased in 2007 and 2008, although SEC rules do not permit the use of negative amounts in the Summary Compensation Table. The value of the accumulated benefits for Mr. Salvette decreased by $2,206 in 2007 and by $2,981 in 2008. Participation in the plan and all accrued benefits were frozen in 1994 and Mr. Salvette is the only Named Executive Officers who was a participant in the plan in fiscal 2008. None of our Named Executive Officers received above-market or preferential earnings on the Supplemental Executive Retirement Plan or on any other deferred compensation that is not tax-qualified.

(7) This column includes all other items of compensation. In fiscal 2008, this amount includes for all of our Named Executive Officers: (i) contributions to our 401(k) Retirement Savings Plan and the nonqualified Supplemental Executive Retirement Plan, (ii) tax gross ups or reimbursements and (iii) perquisites and personal benefits. The incremental cost to the Company for each individual item of such compensation other than perquisites and personal benefits was less than $10,000 for any Named Executive Officer in Fiscal 2008, except as set forth in the following table:

| Name | Retirement Plan Contributions |
|---|---|
| Curtis J. Clawson. | $ 95,106 |
| Mark A. Brebberman | 15,558 |
| Fred Bentley | 45,550 |
| Patrick C. Cauley. | 28,663 |
| John A. Salvette | 24,192 |
| James A. Yost | 19,725 |

For all of our Named Executive Officers perquisites and personal benefits include a cash perquisite allowance of $35,000 for each Named Executive Officer other than Mr. Clawson and $40,000 for Mr. Clawson, as well as the cost of automobiles provided by the Company and available for the personal use. For Messrs. Bentley, Cauley and Salvette perquisites and personal benefits include their spouses accompanying them to an executive retreat during 2008. For Mr. Clawson perquisites and personal benefits include a comprehensive physical examination not provided to other employees, including travel and living expenses incurred in connection with such examination. For Mr. Bentley perquisites and personal benefits include tax preparation assistance. No individual perquisite or personal benefit received by any of our Named Executive Officers other than the cash perquisite allowances exceeded $25,000 in fiscal 2008.

(8) Mr. Brebberman was appointed as Vice President and Chief Financial Officer on July 30, 2008.

(9) Mr. Yost resigned from the Company on May 21, 2008. However, SEC regulations define him as a Named Executive Officer for purposes of reporting fiscal 2008 compensation.

18

## Grants of Plan-Based Awards

The following table and accompanying notes and narrative discussion set forth and discuss awards during the fiscal year to our Named Executive Officers pursuant to the STIP, Performance Cash Plan and our Long Term Incentive Plan ("LTIP"):

| Name | Type of Award | Grant Date | Estimated Possible Payouts Under Non-Equity Incentive Plan Awards (1) Target ($) | Maximum ($) | All Other Stock Awards: Number of Shares of Stock or Units(#) (2) | All Other Stock Awards: Number of Securities Underlying Options(#) (3) | Exercise or Base Price of Option Awards ($/Sh) | Grant Date Fair Value of Stock and Option Awards (4) |
|---|---|---|---|---|---|---|---|---|
| Curtis J. Clawson | RSU | 7/13/08 | — | — | 155,757 | — | — | $ 381,605 |
| | Option (5) | 7/13/08 | — | — | — | 40,816 | $ 2.45 | 59,038 |
| | Option (6) | 7/13/08 | — | — | — | 362,227 | 2.45 | 523,937 |
| | STIP | — | $ 824,000 | $ 1,648,000 | — | — | — | — |
| | Performance Cash | — | 659,000 | 1,318,000 | — | — | — | — |
| | | | | | | | | |
| Mark A. Brebberman | RSU | 7/13/08 | — | — | 21,903 | — | — | 53,662 |
| | Option (5) | 7/13/08 | — | — | — | 14,169 | 2.45 | 20,495 |
| | RSU | 7/30/08 | — | — | 3,439 | — | — | 8,116 |
| | Option (5) | 7/30/08 | — | — | — | 27,664 | 2.36 | 38,660 |
| | Option (6) | 7/30/08 | — | — | — | 25,741 | 2.36 | 35,973 |
| | STIP | — | 159,900 | 319,800 | — | — | — | — |
| | Performance Cash | — | 107,000 | 214,000 | — | — | — | — |
| | | | | | | | | |
| Fred Bentley | RSU | 7/13/08 | — | — | 54,642 | — | — | 133,873 |
| | Option (5) | 7/13/08 | — | — | — | 40,816 | 2.45 | 59,038 |
| | Option (6) | 7/13/08 | — | — | — | 100,577 | 2.45 | 145,478 |
| | STIP | — | 422,000 | 844,000 | — | — | — | — |
| | Performance Cash | — | 231,000 | 462,000 | — | — | — | — |
| | | | | | | | | |
| Patrick C. Cauley | RSU | 7/13/08 | — | — | 29,772 | — | — | 72,941 |
| | Option (5) | 7/13/08 | — | — | — | 40,816 | 2.45 | 59,038 |
| | Option (6) | 7/13/08 | — | — | — | 36,222 | 2.45 | 52,393 |
| | STIP | — | 189,000 | 378,000 | — | — | — | — |
| | Performance Cash | — | 126,000 | 252,000 | — | — | — | — |
| | | | | | | | | |
| John A. Salvette | RSU | 7/13/08 | — | — | 26,558 | — | — | 65,067 |
| | Option (5) | 7/13/08 | — | — | — | 40,816 | 2.45 | 59,038 |
| | Option (6) | 7/13/08 | — | — | — | 27,907 | 2.45 | 40,366 |
| | STIP | — | 168,600 | 337,200 | — | — | — | — |
| | Performance Cash | — | 112,000 | 224,000 | — | — | — | — |

*Explanatory Notes and Narrative Discussion*

(1)   These columns reflect the target and maximum STIP and Performance Cash Plan payouts.

STIP payouts are based on achievement relative to performance targets based on EBIT, Free Cash Flow, PPM and Incident Rate. There is no or minimum payment under the STIP. The target payment is equal to 100% of base salary for Messrs. Clawson and Bentley and 60% of base salary for the other Named Executive Officers. The maximum payment based on achievement of performance targets is twice the target award. The amount of the award actually paid can be increased or decreased at the discretion of the Compensation Committee by up to 20% of the award actually achieved. Although STIP awards were earned for fiscal 2008, the Compensation Committee determined not to make STIP payments to the Named Executive Officers due to the Company's anticipated Chapter 11 proceeding.

Performance Cash Plan payouts are based on return on invested capital. There is no minimum payment under the PCP. The target payment is equal to 80% of base salary for Mr. Clawson, 55% of base salary for Mr. Bentley and 40% of base salary for the other Named Executive Officers. The award is based on achievement of targets for two performance periods from February 1, 2008 through January 31, 2010 and February 1, 2008 through January 31, 2011, each of which accounts for 50% of the total award.

(2) This column reflects awards of restricted stock units under the LTIP. The awards will vest on February 1, 2011. These awards are payable in either stock or the equivalent value in cash on the vesting date as determined by the Compensation Committee. Vesting of these awards is accelerated upon a change in control, as more fully discussed in "Potential Payments Upon Termination or Change in Control."

(3) This column reflects awards of stock options under the LTIP. The stock options become exercisable in three equal installments on February 1, 2009, February 1, 2010 and February 1, 2011; provided that if the number of shares subject to an option is not evenly divisible by three, the additional share or shares will be included in the first and, if applicable, third installments. Vesting of the stock options is accelerated upon a change in control, as more fully discussed in "Potential Payments Upon Termination or Change in Control." These awards consist of incentive stock options up to the maximum amount permitted under the Internal Revenue Code and non-qualified stock options for the remainder.

(4) The grant date fair value of the restricted stock units is determined by multiplying the number of units granted times the FAS 123R fair value per share of our common stock on the grant date, without taking into account any risk of forfeiture. The grant date fair value of our common stock was $2.45 per share. The grant date fair value of the stock options was determined by multiplying the number of options granted times the FAS 123R fair value per option on the grant date, without taking into account any risk of forfeiture. The grant date fair value of each option is set forth in notes 5 and 6 below.

(5) Incentive stock options with a grant date fair values of approximately $1.45 per share for grants made July 13, 2008 and $1.40 per share for grants made July 30, 2008.

(6) Non-qualified stock options with a grant date fair values of approximately of $1.45 per share for grants made July 13, 2008 and $1.40 per share for grants made July 30, 2008.

**Outstanding Equity Awards at Fiscal Year-End**

The following table and accompanying notes includes information on unexercised stock options and unvested restricted stock units held by our Named Executive Officers at the end of the fiscal year:

| | Option Awards | | | | Stock Awards | |
|---|---|---|---|---|---|---|
| **Name** | **Number of Securities Underlying Unexercised Options (#) Exercisable** | **Number of Securities Underlying Unexercised Options (#) Unexercisable (1)** | **Option Exercise Price ($)** | **Option Expiration Date** | **Number of Shares or Units of Stock that Have Not Vested (#) (2)** | **Market Value of Shares or Units of Stock that Have Not Vested ($) (3)** |
| Curtis J. Clawson | 554,506 | — | $ 10.35 | 7/28/2013 | — | — |
| | 137,762 | 275,522 | 3.79 | 8/10/2017 | — | — |
| | — | 403,043 | 2.45 | 7/13/2018 | — | — |
| | — | — | — | — | 291,734 | $ 26,256 |
| | | | | | | |
| Mark A. Brebberman | 14,689 | — | 10.35 | 7/28/2013 | — | — |
| | 6,919 | 13,837 | 3.79 | 8/10/2017 | — | — |
| | — | 14,169 | 2.45 | 7/13/2008 | — | — |
| | — | 53,405 | 2.36 | 7/30/2018 | — | — |
| | — | — | — | — | 41,277 | 3,715 |
| | | | | | | |
| Fred Bentley | 73,444 | — | 10.35 | 7/28/2013 | — | — |
| | 48,217 | 96,432 | 3.79 | 8/10/2017 | — | — |
| | — | 141,393 | 2.45 | 7/13/2008 | — | — |
| | — | — | — | — | 102,234 | 9,201 |
| | | | | | | |
| Patrick C. Cauley | 58,756 | — | 10.35 | 7/28/2013 | — | — |
| | 26,347 | 52,694 | 3.79 | 8/10/2017 | — | — |
| | — | 77,038 | 2.45 | 7/13/2008 | — | — |
| | — | — | — | — | 55,578 | 5,020 |
| | | | | | | |
| John A. Salvette | 75,513 | — | 10.35 | 7/28/2013 | — | — |
| | 13,949 | 27,896 | 3.79 | 8/10/2017 | — | — |
| | 9,567 | 19,133 | 4.00 | 11/27/2017 | — | — |
| | — | 68,723 | 2.45 | 7/13/2008 | — | — |
| | — | — | — | — | 49,726 | 4,475 |
| | | | | | | |
| James A. Yost | — | — | — | — | — | — |

*Explanatory Notes*

(1) This column sets forth unvested stock options. The stock options become exercisable in three equal installments on February 1 of the next three years following the grant date, except that if the number of shares subject to an option is not evenly divisible by three, the additional share or shares will be included in the first and, if applicable, third installments. Vesting of the options is accelerated upon a change in control, as more fully discussed in "Potential Payments Upon Termination or Change in Control."

(2) This column sets forth unvested restricted stock units. The dates on which the restricted stock units are scheduled to vest and the number of shares vesting on each date are set forth in the following table:

| **Name** | **Vesting on 2/1/2010** | **Vesting on 2/1/2011** |
|---|---|---|
| Curtis J. Clawson | 135,977 | 155,757 |
| Mark A Brebberman | 15,935 | 25,342 |
| Fred Bentley | 47,592 | 54,642 |
| Patrick C. Cauley | 26,006 | 29,772 |
| John A. Salvette | 23,168 | 26,558 |

Vesting of the restricted stock units is accelerated upon a change in control, as more fully discussed in "Potential Payments Upon Termination or Change in Control."

(3) The market value of the unvested restricted stock units is determined by multiplying the number of unvested restricted stock units outstanding on the last day of our fiscal year by $0.09, the closing price of a share of our common stock on the last day of the fiscal year.

### Option Exercises and Stock Vested

None of our Named Executive Officers exercised stock options during the fiscal year. The following table and accompanying notes include information on restricted stock units held by our Named Executive Officers that vested during the fiscal year:

| | Stock Awards | |
|---|---|---|
| | Number of Shares Acquired on Vesting (#) | Value Realized on Vesting ($) (1) |
| **Name** | | |
| Curtis J. Clawson | 205,369 | $ 599,677 |
| Mark A. Brebberman | 16,430 | 47,976 |
| Fred Bentley | 58,325 | 170,309 |
| Patrick C. Cauley | 29,573 | 86,353 |
| John A. Salvette | 27,930 | 81,556 |

*Explanatory Note*

(1) The value realized on vesting is determined by multiplying the number of shares acquired on the vesting date, September 17, 2008, times $2.92, the closing price per share of our common stock on the vesting date. The value realized on vesting has no relationship to the amount of compensation expense recognized by the Company during the fiscal year and included in the Summary Compensation Table.

### Pension Benefits

We no longer offer a defined benefit pension plan to any of our employees in the United States. Participation in the defined benefit pension plan was closed to new participants on December 31, 1994 and service credits were frozen on that date. Mr. Salvette is the only Named Executive Officer to participate in our defined benefit pension plan. The plan provides a benefit at age 65 and after 30 years of credited service that would equal 30% of final average salary. However, retirement benefits were frozen at accrued levels in 1994. The valuation method and material assumptions applied in quantifying the present value of the current accrued benefits are described in Note 11 to our Consolidated Financial Statements at Item 8 of the Original Filing and assume retirement at age 65. The plan allows for an actuarially reduced benefit if retiring earlier than age 65, as well as retiring with less than 30 years of service. Mr. Salvette is not currently eligible to receive early retirement benefits under the plan. The following table and accompanying notes set forth certain information with respect to the accumulated benefits of Mr. Salvette under our defined benefit pension plan:

| Name | Plan Name | Number of Years Credited Service (#) (1) | Present Value of Accumulated Benefits ($) |
|---|---|---|---|
| John A. Salvette | Hayes Lemmerz International, Inc. Retirement Income Plan | 4.78 | $ 46,528 |

(1) Mr. Salvette's number of years of credit service under the plan differs from his number of years of service with the Company because service credits were frozen on December 13, 1994.

### Nonqualified Deferred Compensation

We provide our executive officers with a Supplemental Executive Retirement Plan (the "SERP"). The intent of the SERP is to replace the benefits that would have been available under our 401(k) Retirement Savings Plan (the "401(k) Plan"), but for the limits on contributions to tax-qualified plans under Section 402(g) of the Code. During fiscal 2008 the Company contributed an amount equal to four percent of cash compensation paid during the year, including base salary, STIP awards, bonus and OBP payments, less amounts contributed to the 401(k) Plan. In addition to Company contributions, the Company may permit participants to defer a portion of their eligible compensation in an amount determined by the Company on a year-by-year basis. No such amounts were deferred in 2008 and no Named Executive Officer made any contributions to the SERP.

The Named Executive Officers have the discretion to determine how the amounts in SERP are allocated among one or more investment options in a program determined by the Company. The Named Executive Officers may change their investment elections at any time. Amounts in the plan are fully vested after three years of service. Distributions from the SERP may be made in the event of the participants' death, disability, termination of employment, attainment of age 60 or certain unforeseeable emergencies. The SERP contributions are held in a Rabbi Trust and are available to satisfy the claims of creditors in our Chapter 11 proceeding.

The following table and accompanying notes set forth certain information the SERP:

| Name | Registrant Contributions in Last Fiscal Year ($) (1) | Aggregate Earnings in Last Fiscal Year ($) (2) | Aggregate Withdrawals/ Distributions ($) (3) | Aggregate Balance at Last Fiscal Year-End ($) (4) |
|---|---|---|---|---|
| Curtis J. Clawson | $ 85,826 | $ 34,917 | $ 1,719,601 | $ 37,576 |
| Mark A. Brebberman | 6,220 | 15 | — | 6,235 |
| Fred Bentley | 36,310 | (96,766) | — | 186,464 |
| Patrick C. Cauley | 19,433 | (45,230) | — | 78,417 |
| John A. Salvette | 14,965 | (116,547) | — | 230,465 |
| James A. Yost | 12,025 | (90,634) | 269,357 | — |

*Explanatory Notes*

(1) This column sets forth the Company's contributions to the SERP during the fiscal year. All of these amounts are included in the Summary Compensation Table for fiscal 2008.

(2) This column sets forth the earnings on each Named Executive Officer's SERP account during the fiscal year. Because these earnings are not above-market, no amounts were included in the Summary Compensation Table for fiscal 2008. The mix of investments selected by Messrs. Bentley, Cauley, Salvette and Yost declined in value during 2008, resulting in negative earnings during the fiscal year.

(3) Distribution from Mr. Clawson's account was made pursuant to a divorce decree. Distribution from Mr. Yost's account was made upon termination of his employment.

(4) The following table sets forth the aggregate amounts of nonqualified deferred compensation that were included in the Summary Compensation Table as compensation for previous years, except with respect to Mr. Brebberman, who has not previously been a Named Executive Officer:

| Name | Amount in Prior Summary Compensation Tables |
|---|---|
| Curtis J. Clawson | $ 1,121,540 |
| Fred Bentley | 116,379 |
| Patrick C. Cauley | 28,972 |
| John A. Salvette | 17,943 |
| James A. Yost | 262,332 |

In some cases, the aggregate amount previously disclosed in prior Summary Compensation Tables exceeds the year-end balance set forth in the Nonqualified Deferred Compensation Table above. This excess is due to market losses and/or withdrawals or distributions from the executive's account.

### Potential Payments Upon Termination or Change in Control

*Background.* Potential benefits to be received by our Named Executive Officers upon termination or a change in control are set forth in each Named Executive Officer's employment agreement and in the applicable plans and associated grant agreements under which they receive benefits. These plans include the 401(k) Plan, the SERP, the STIP, the LTIP, the PCP and, with respect to Mr. Salvette only, the Retirement Income Plan, our former defined benefit pension plan. Additional information regarding potential payments upon a termination or change in control is included in "Compensation Discussion and Analysis—Severance and Change in Control Arrangements."

The following discussion quantifies and explains the benefits that would be payable to our Named Executive Officers in the following scenarios: (i) retirement; (ii) termination without cause or for good reason; (iii) termination as a result of death or disability; and (iv) upon a change in control. SEC rules require these amounts to be determined as if the termination or change in control occurred on the last day of fiscal 2008. Except as described below with respect to Mr. Clawson terminating his employment without good reason following a change in control, none of our Named Executive Officers is entitled to any benefits or payments other than accrued salary, unpaid vacation and benefits vested through the termination date if terminated by us for cause or by him without good reason. These benefits are payable in any termination scenario and are not separately described below. In certain of the termination scenarios described below, any unvested benefits under the 401(k) Plan and the SERP would become vested pursuant to the terms of the plans. However, all Named Executive Officers are already fully vested in their benefits under these plans by virtue of their length of service with the Company.

All cash payments upon termination or a change in control are payable in a lump sum, less applicable withholding taxes, other than salary continuation payments to Mr. Clawson following termination without cause, for good reason or upon a change in control, which are paid in accordance with the Company's payroll policies. Each Named Executive Officer other than Mr. Clawson is required to sign a mutual release agreement in order to obtain the post-termination or change in control benefits described below. The employment agreements also contain post-termination covenants prohibiting the Named Executives Officers from competing with or soliciting the customers or employees of the Company for a period of time following termination. For additional information regarding payments to our Named Executive Officers upon termination or a change in control, see "Compensation Discussion and Analysis—Severance and Change in Control Arrangements."

Mr. Yost voluntarily resigned from the Company without good reason effective May 21, 2008. He was paid his base salary and accrued and unused vacation and received standard employee benefits through his last day of employment and the vested balances in his 401(k) and SERP accounts. He received no additional compensation in connection with his resignation. Accordingly, Mr. Yost has been omitted from the following discussion of potential future termination benefits.

*Retirement.* Upon retirement each of our Named Executive Officers would be entitled to their vested benefits under the 401(k) Plan, the SERP, and with respect to Mr. Salvette, under the Retirement Income Plan, our defined benefit pension plan. The 401(k) Plan is generally available to all salaried employees in the United States and does not discriminate in scope, terms or operation in favor of executive officers. The vested benefits of each Named Executive Officer under the SERP at January 31, 2009 are set forth in the Non-qualified Deferred Compensation Table in the "Aggregate Balance at Last Fiscal Year-End" column. Mr. Salvette's benefits under the Retirement Income Plan are described in the Pension Benefits table and accompanying notes.

*Termination Without Cause or for Good Reason.* The benefits to be received by our Named Executive Officers upon termination of employment without "cause" or for "good reason" are set forth in their respective employment agreements. The Named Executive Officers' employment agreements define "cause" as:

- Willful failure to perform his material duties that have been duly assigned and are commensurate with those of the position in which he is then employed, if failure is not cured within 15 days after receipt of written notice identifying the manner in which he has willfully failed to perform.

- Engaging in willful conduct which is demonstrably injurious to the Company, monetarily or otherwise.

- Conviction of any crime or offense constituting a felony.

- Failure to comply with any material provision of his employment agreement, if the failure is not cured within 15 days after receipt of written notice.

The employment agreements define "good reason" as:

- A material adverse alteration in the nature or status of the Named Executive Officer's position, duties, responsibilities or authority.

- A material reduction in base salary or level of employee benefits other than across-the-board reductions in employee benefits applied similarly to all of the Company's senior executives.

- Failure to pay or provide any of the compensation set forth in the employment agreements (except for an across-the-board deferral of compensation applied similarly to all of the Company's senior executives) which is not cured within 15 days after receipt by the Company of written notice.

- Relocation of the principal place of employment more than 30 miles from its current location except for required travel on Company business.

- Assignment of duties or responsibilities which are materially inconsistent with the provisions of his employment agreement.

- Failure by the Company to comply with any material provision of the employment agreement, if the failure is not cured within 15 days after receipt of written notice.

Mr. Clawson's agreement defines "good reason" to also include the failure to continue his seat on the Board of Directors following his initial election or appointment to the Board of Directors. Mr. Bentley's employment agreement defines good reason to also include additional events that would constitute a material adverse alteration in the nature or status of his position, duties, responsibilities or authority. If Mr. Clawson is terminated without cause or terminates his employment for good reason, he is entitled to receive:

- Continuing payments on normal payroll dates for a period of two years at the rate of 160% of his base salary in effect on the date of termination.

- The continuation of health and welfare benefits for Mr. Clawson and covered family members for a period of two years.

- Executive level outplacement services.

If any of the other Named Executive Officers is terminated without cause or terminates his employment for good reason, he is entitled to receive:

- A lump sum severance payment equal to one year of base salary.

- A portion of the target STIP payment prorated through the termination date.

- Continuation of health and welfare benefits for the Named Executive Officer and covered family members for a period of one year.

- Executive level outplacement services.

- Title to the vehicle provided by the Company.

Termination without cause or for good reason would not trigger any tax reimbursement payments for any of our Named Executive Officers. All Named Executive Officers would also be entitled to amounts in the 401(k) Plan and the SERP, which are described in "Potential Payments Upon Termination or Change in Control — Retirement."

The following table sets forth the benefits (other than 401(k) Plan and SERP balances) payable to each Named Executive Officer upon termination without cause or with good reason, assuming the termination occurred on January 31, 2009:

| Name | Salary Continuation/ Severance | Prorated STIP Payments (1) | Health Insurance (2) | Out-placement (3) | Automobile (4) | Total |
|---|---|---|---|---|---|---|
| Curtis J. Clawson | $ 2,636,800 | — | $ 15,426 | $ 247,200 | — | $2,899,426 |
| Mark A. Brebberman | 266,500 | 159,900 | 10,110 | 63,960 | 25,845 | 526,315 |
| Fred Bentley | 422,000 | 422,000 | 9,798 | 126,600 | 21,215 | 1,001,613 |
| Patrick C. Cauley | 315,000 | 189,000 | 9,994 | 75,600 | 40,801 | 630,395 |
| John A. Salvette | 281,000 | 168,600 | 3,032 | 67,440 | 13,000 | 533,072 |

*Explanatory Notes*

(1) Because SEC rules require these calculations to be made as of the last day of the fiscal year, the prorated portion of the STIP payment is equal to 100% of target.

(2) This column reflects the estimated cost of COBRA continuation coverage at current coverage levels and assuming current rates for two years in the case of Mr. Clawson and one year in the case of each other Named Executive Officer. These benefits will be reduced to the extent that the Named Executive Officer receives comparable benefits from a successor employer.

(3) Outplacement cost is estimated at 15% of base salary plus target STIP.

(4) The column represents the estimated cost to buy out the remaining lease payments on the vehicles we lease for the Named Executive Officers and to transfer title into the name of the Named Executive Officers.

*Death or Disability.* The benefits to be received by our Named Executive Officers upon death or disability are set forth in their respective employment agreements. If any of the Named Executive Officers is terminated as the result of death or disability, he (or his estate in the event of death) is entitled to receive:

- A lump sum payment equal to one year of base salary.

- A portion of the target STIP payment prorated through the termination date.

- A portion of the target Performance Cash Plan payment prorated through the termination date.

- Continuation of health and welfare benefits for the Named Executive Officer and/or covered family members for a period of one year.

Termination upon death or disability would not trigger any tax reimbursement payments for any of our Named Executive Officers. All Named Executive Officers (or their estates) would also be entitled to their vested benefits under the 401(k) Plan and the SERP.

The following table sets forth the benefits (other than 401(k) Plan and SERP balances) payable to each Named Executive Officer, upon a termination as the result of death or disability, assuming the termination occurred on January 31, 2009:

| Name | Severance | Prorated STIP Payments (1) | Performance Cash Plan Payments (2) | Health Insurance (3) | Total |
|------|-----------|---------------------------|-----------------------------------|---------------------|-------|
| Curtis J. Clawson | $ 824,000 | $ 494,400 | $ 274,583 | $ 7,713 | $ 1,600,696 |
| Mark A. Brebberman | 266,500 | 159,900 | 44,583 | 10,110 | 481,093 |
| Fred Bentley | 422,000 | 422,000 | 96,250 | 9,798 | 950,048 |
| Patrick C. Cauley | 315,000 | 189,000 | 52,500 | 9,994 | 566,494 |
| John A Salvette | 281,000 | 168,600 | 46,667 | 3,032 | 499,299 |

*Explanatory Notes*

(1) Because SEC rules require these calculations to be made as of the last day of the fiscal year, the prorated portion of the STIP payment is equal to 100% of target.

(2) This column reflects the pro rated portion of the Performance Cash Plan award, which is based on the actual awards achieved at the end of the performance periods pro rated based on the number of months during each performance period that the Named Executive Officer was employed by the Company and which are assumed to be achieved at target for purposes of this table. These awards are paid on the normal payment dates following the end of each performance period.

(3) This column reflects the estimated cost of COBRA continuation coverage at current coverage levels and assuming current rates for one year. These benefits will be reduced to the extent that the Named Executive Officer receives comparable benefits from a successor employer.

*Change in Control.* The benefits to be received by our Named Executive Officers upon a change of control are set forth in their respective employment agreements and in the plan documents for the Long Term Incentive Plan and the Performance Cash Plan.

If Mr. Clawson is terminated without cause or resigns, with or without good reason, following a change of control, he is entitled to receive:

- Continuing payments on normal payroll dates for a period of two years at the rate of 160% of his base salary in effect on the date of termination.

- Immediate vesting of all stock options and restricted stock units.

- Payment of all awards under the Performance Cash Plan.

- Continuation of life, disability and health benefits for Mr. Clawson and covered family members for a period of two years.

- Continuation of the cash perquisite allowance for a period of two years.

- Executive level outplacement services.

Certain of these benefits are payable on a "single trigger" basis, meaning they are payable whether or not Mr. Clawson's employment is terminated in connection with the change in control, as noted in the footnotes to the table below.

If any of the other Named Executive Officers is terminated without cause or for good reason following a change in control, he is entitled to receive:

- A lump sum severance payment equal to two years of base salary plus two years of the target STIP payment plus an additional payment of $100,000.

- A portion of his STIP payment, prorated through the date of the change of control, calculated at the higher of the target payment or the estimated actual payment determined by the Company.

- Immediate vesting of all stock options and restricted stock units.

- Payment of all awards under the Performance Cash Plan.

- Continuation of life, disability and health benefits for the Named Executive Officer and covered family members for a period of two years.

- Continuation of the cash perquisite allowance for a period of two years.

- Executive level outplacement services.

Certain of these benefits are payable on a single trigger basis, as noted in the footnotes to the table below. In addition, if the payments made in connection with a termination following a change in control constitute "excess parachute payments" subject to excise tax under Section 280G of the Internal Revenue Code, the Named Executive Officers will receive a tax gross-up payment such that the amount they will receive after payment of the excise tax is equivalent to the amount they would have received if such payments were not subject to the excise tax. The estimated payments to be made in connection with a change in control as of the end of fiscal 2008 would trigger tax gross-up payments only for Mr. Brebberman.

The following table sets forth the benefits (other than vested 401(k) Plan and SERP balances) payable to each Named Executive Officer, if terminated in connection with a change in control, assuming both the change in control and termination occurred on January 31, 2009, with the single trigger benefits noted in the accompanying notes:

| Name | Salary Continuation/ Severance | STIP Payments (1) | RSU Vesting (2) | Performance Cash Plan Payments (3) | Insurance Benefits (4) | Perquisite Allow- ance (5) | Outplace- ment (6) | Tax Gross-up | Total |
|---|---|---|---|---|---|---|---|---|---|
| Curtis J. Clawson | $ 2,636,800 | — | $ 26,256 | $ 659,000 | $ 21,153 | $ 80,000 | $ 247,200 | — | $3,670,409 |
| Mark A. Brebberman | 952,800 | $ 159,900 | 3,715 | 107,000 | 23,138 | 70,000 | 63,960 | 547,734 | 1,928,247 |
| Fred Bentley | 1,788,000 | 422,000 | 9,201 | 231,000 | 23,298 | 70,000 | 126,600 | — | 2,670,099 |
| Patrick C. Cauley | 1,108,000 | 189,000 | 5,020 | 126,000 | 23,151 | 70,000 | 75,600 | — | 1,596,771 |
| John A Salvette | 999,200 | 168,600 | 4,475 | 112,000 | 9,056 | 70,000 | 67,440 | — | 1,430,772 |

*Explanatory Notes*

(1) The amounts in this column represent target STIP payments, prorated through the date of the change in control, and assume that estimated actual performance to date is less than or equal to the target performance. These amounts are payable upon a change in control, with or without termination. Because SEC rules require these calculations to be made as of the last day of the fiscal year, the prorated portion of the STIP payment to be received would be equal to 100% of target.

(2) This column represents the value of restricted units that will vest upon a change of control, based on the closing price of a share of our common stock on January 31, 2009 of $0.09. Unvested stock options also vest upon a change in control, but none of our Named Executive Officers had any unvested stock options that were in-the-money on January 31, 2009. Accordingly, no amounts have been included in this table with respect to the vesting of out-of-the-money stock options. Awards to all participants under the Long Term Incentive Plan (not just Named Executive Officers) will vest upon a change in control, with or without termination.

(3) This column represents the amounts of Performance Cash Plan payments, which are payable at the greater of the target award amount or anticipated actual award as determined by the Compensation Committee and which are assumed to be achieved at target for purposes of this table. These amounts are payable to all participants under the Long Term Incentive Plan (not just Named Executive Officers) as soon as practicable following a change in control, with or without termination.

(4) This column includes the estimated cost of COBRA continuation coverage at current coverage levels and assuming current rates for two years. This column also includes the cost of life and disability insurance benefits at current coverage levels and assuming current rates for two years. These benefits will be reduced to the extent that the Named Executive Officer receives comparable benefits from a successor employer.

(5) This column reflects the cost of the flexible perquisite allowance for two years. This benefit will be reduced to the extent that the Named Executive Officer receives a comparable benefit from a successor employer.

(6) Outplacement cost is estimated at 15% of base salary plus target STIP.

### Director Compensation

Each of our non-employee directors other than the Lead Director currently receives an annual cash retainer of $60,000 as compensation for his or her service as a director. The Lead Director, currently Mr. Haymaker, receives an annual cash retainer of $100,000. The chair of the Audit Committee receives an additional annual fee of $10,000, while the chairs of the Compensation Committee and the Nominating and Corporate Governance Committee each receive an additional annual fee of $5,000. Director compensation is paid in quarterly installments following the end of each fiscal quarter and is prorated based on the number of months a director served in the applicable capacities during the fiscal quarter.

Each of our non-employee directors is eligible to receive grants of restricted stock, restricted stock units and options to purchase shares of our common stock under our Long Term Incentive Plan. Each of our directors received a grant of 30,001 shares of restricted stock and stock options to purchase 24,064 shares of common stock with an exercise price of $2.45 per share in 2008. The options and restricted stock units vested as to 100% of the grants on December 1, 2008.

We provide our directors with occasional perquisites in connection with attendance at Board of Directors meetings, but the aggregate amount of these perquisites is less than $10,000 for any single director. Our standard arrangements with our directors also provide that if any of our non-employee directors is asked to perform services for us in his or her capacity as a director, we will pay that director $5,000 per day for those services. No directors performed any additional services during fiscal 2008.

The following table sets forth the total compensation of each of our non-employee directors with respect to fiscal 2008:

| Name | Fees Earned or Paid in Cash ($) | Stock Awards ($) (1) | Option Awards ($) (2) | Total ($) |
|---|---|---|---|---|
| William H. Cunningham | $ 65,000 | $ 73,502 | $ 32,246 | $ 170,748 |
| Cynthia L. Feldmann | 70,000 | 73,502 | 32,246 | 175,748 |
| George T. Haymaker, Jr. | 100,000 | 73,502 | 32,246 | 205,748 |
| Mohsen Sohi | 60,000 | 73,502 | 32,246 | 165,748 |
| Henry D. G. Wallace | 65,000 | 73,502 | 32,246 | 170,748 |
| Richard F. Wallman | 60,000 | 73,502 | 32,246 | 165,748 |

*Explanatory Notes*

(1) This column reflects the compensation cost recognized by the Company for grants of restricted stock units pursuant to FAS 123R. The FAS 123R cost is determined based on the fair value of the award on the grant date, which may have no correlation the current market value of the shares or the market value of the shares on the day they vest. The assumptions used in valuing the stock options are disclosed in Note 15 to the Consolidated Financial Statements included at Item 8 of the Original Filing. Compensation reflected in this column results from:

  • A grant of restricted stock units made on September 17, 2006 with a FAS 123R fair value of $2.67 per share which vested as to one-half of the grant on September 17, 2007 and which will vest as to the other one-half of the grant on September 17, 2008.

  • A grant of restricted stock made on July 13, 2008 with a FAS 123R fair value of $2.45 per share. The restrictions lapsed as to 100% of the grant on December 1, 2008.

(2) This column reflects the compensation cost recognized by the Company for grants of stock options pursuant to FAS 123R. This cost is determined based on the fair value of the award on the grant date, which may have no correlation to the difference between the exercise price of a stock option and the market value of the underlying shares. Compensation reflected in this column results from a grant of non-qualified stock options made on July 13, 2008 with a FAS 123R fair value of approximately $1.34 per option. The stock options became exercisable as to 100% of the grant on December 1, 2008.

*Stock Ownership Guidelines.* The Board of Directors believes that ownership of the Company's stock by its directors is important to align the economic interests of the directors and the Company's stockholders and has adopted stock ownership guidelines for our directors. Pursuant to the guidelines, each director is expected to own 35,000 shares of common stock in the Company on or before the later of May 17, 2010 or five years following his or her election to the Board. For purposes of determining director stock ownership pursuant to this requirement, shares of the Company's stock purchased in the market, stock beneficially owned by the director, stock acquired upon the exercise of stock options and held by the director, vested and unvested shares of restricted stock and vested and unvested restricted stock units are included. Unexercised stock options are not included. See Item 12 of this Amendment No. 1 to Annual Report on Form 10-K/A for a description of current stock ownership by our directors. We expect that all of our common stock and equity compensation awards will be cancelled in connection with our current Chapter 11 proceedings, and that the current stock ownership guidelines may be revised or terminated.

**Compensation Committee Interlocks and Insider Participation**

The following individuals served as members of our Compensation Committee during fiscal 2008: William H. Cunningham (Chair), Mohsen Sohi, Henry D. G. Wallace and Richard F. Wallman. None of the members of the Compensation Committee: (i) was during fiscal 2008 an officer or employee of the Company or any of our subsidiaries, (ii) was formerly an officer of the Company or any of our subsidiaries or (iii) had any relationship requiring disclosure by us under the SEC's rules requiring disclosure of related party transactions. During fiscal 2008, no officer of the Company served as a director or member of the compensation committee (or other board committee performing similar functions) of any other entity.

**Item 12.** *Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters*

Based on the most recent information made available to us, the following table sets forth certain information regarding the ownership of our common stock as of May 29, 2009 by: (a) each director; (b) each of the individuals named in the Summary Compensation Table (the "Named Executive Officers"); (c) all of our executive officers and directors as a group; and (d) each person, or group of affiliated persons, known to us (solely on the basis of filing with the U.S. Securities and Exchange Commission) to be beneficial owners of 5% or more of our common stock as of such date. A person generally "beneficially owns" shares if he has either the right to vote those shares or dispose of them. More than one person may be considered to beneficially own the same shares. In the table below, unless otherwise noted, and subject to community property laws where applicable, a person has sole voting and dispositive power for those shares shown as beneficially owned by such person.

| Name and Address of Beneficial Owner (1) | Amount and Nature of Beneficial Ownership (2) | Percent of Class |
|---|---|---|
| *5% Stockholders:* | | |
| Douglas Troob and Peter Troob (3) | 9,720,809 | 9.5% |
| Rutabaga Capital Management LLC (4) | 9,133,920 | 9.0 |
| Nikos Hecht (5) | 8,538,318 | 8.4 |
| Sopris Capital Advisors, LLC (5) | 7,223,298 | 7.1 |
| Troob Capital Management (Offshore) LLC (3) | 6,767,925 | 6.6 |
| Barclays Global Investors, NA (6) | 5,686,036 | 5.6 |
| Jana Partners LLC (7) | 5,600,000 | 5.5 |
| Dimensional Fund Advisors LP (8) | 5,559,863 | 5.5 |
| Sopris Capital, LLC (5) | 5,213,074 | 5.1 |
| | | |
| *Named Executive Officers and Directors:* | | |
| Curtis J. Clawson | 964,378 | * |
| Mark A. Brebberman | 51,050 | * |
| Fred Bentley | 217,009 | * |
| Patrick C. Cauley | 137,130 | * |
| John A. Salvette | 145,452 | * |
| James A. Yost (9) | 0 | * |
| William H. Cunningham | 202,999 | * |
| Cynthia L. Feldmann | 55,254 | * |
| George T. Haymaker, Jr. | 53,513 | * |
| Mohsen Sohi | 49,800 | * |
| Henry D. G. Wallace | 53,513 | * |
| Richard F. Wallman | 53,513 | * |
| All current directors and executive officers as a group (10 persons) | 1,983,611 | 1.9 |

———————————

\*   Less than one percent (1%).

(1)   Unless otherwise indicated, the address of each person named in the table is Hayes Lemmerz International, Inc., 15300 Centennial Drive, Northville, Michigan 48168. This table is based upon the Company's books and records, information supplied by officers, directors and principal stockholders and Schedules 13D and 13G filed with the SEC. Applicable percentages are based on 101,819,597 shares outstanding shares on May 29, 2009, adjusted as required by rules promulgated by the SEC.

(2)   Except with respect to Mr. Cunningham and Ms. Feldmann, the amounts set forth in this table for our Named Executive Officers and directors consist solely of shares that are subject to options that are either currently exercisable or will become exercisable within 60 days of May 29, 2009. With respect to Mr. Cunningham, the amount also includes 149,486 shares of our common stock. With respect to Ms. Feldmann, the amount also includes 16,430 shares of our common stock.

(3)   Information reflected in this table and the notes thereto with respect to Douglas M. Troob and Peter J. Troob is based on the Schedule 13G/A, dated December 31, 2008, filed by them and other reporting persons on February 17, 2009. The amount set forth consists of:

- 92,325 shares with respect to which TCM MPS Ltd. SPC — Distressed Portfolio ("Distressed Portfolio") has shared voting and dispositive power.

- 3,272,730 shares with respect to which TCM MPS Ltd. SPC — S Portfolio ("S Portfolio") has shared voting and dispositive power.

- 3,399,870 shares with respect to which TCM MPS Ltd. SPC — ORYX Portfolio ("ORYX Portfolio") has shared voting and dispositive power.

- 6,767,925 shares with respect to which Troob Capital Management (Offshore) LLC ("Offshore Management LLC") has shared voting and dispositive power.

- 2,952,884 shares with respect to which Troob Capital Advisors LLC ("Advisors LLC") has shared voting and dispositive power.

- 9,720,809 shares with respect to which Douglas M. Troob has shared voting and dispositive power.

- 9,720,809 shares with respect to which Peter J. Troob has shared voting and dispositive power.

The Distressed Portfolio, S Portfolio, ORYX Portfolio, Offshore Management LLC, Advisors LLC, Douglas M. Troob and Peter J. Troob are collectively referred to herein as the "Troob Reporting Persons." Offshore Management LLC is deemed to beneficially own the shares held by the Distressed Portfolio, S Portfolio and ORYX Portfolio. Advisors LLC is deemed to beneficially own 2,952,884 shares held in accounts it separately manages. Douglas Troob and Peter Troob are deemed to beneficially own the shares held by Offshore Management LLC and Advisors LLC. Collectively, the Troob Reporting Persons beneficially own 9,720,809 shares of common stock. The principal business address for each of the Troob Reporting Persons is 777 Westchester Avenue, Suite 203, White Plains, New York 10604.

(4)   Information reflected in this table and the notes thereto with respect to Rutabaga Capital Management LLC ("Rutabaga") is based on the Schedule 13G/A, dated December 31, 2008, filed by Rutabaga on February 5, 2009. The amount set forth consists of 9,133,920 shares with respect to which Rutabaga has sole dispositive power, 5,870,198 shares with respect to which Rutabaga Capital Management has sole voting power and 3,263,722 shares with respect to which Rutabaga Capital Management has shared voting power. The address of Rutabaga is 64 Broad Street, 3rd Floor, Boston, Massachusetts 02109.

(5)   Information reflected in this table and the notes thereto with respect to Nikos Hecht and Sopris Capital Advisors, LLC is based on the Schedule 13G/A, dated December 31, 2008, filed by him and other reporting persons on February 12, 2009. The amount set forth consists of:

- 1,315,020 shares with respect to which Aspen Advisors LLC ("Aspen Advisors") has shared voting and dispositive power.

- 7,223,298 shares with respect to which Sopris Capital Advisors, LLC ("Sopris Advisors") has shared voting and dispositive power.

- 4,674,074 shares with respect to which Sopris Partners Series A, of Sopris Capital Partners, L.P. ("Sopris Partners") has shared voting and dispositive power.

- 5,213,074 shares with respect to which Sopris Capital, LLC ("Sopris Capital") has shared voting and dispositive power.

- 8,538,318 shares with respect to which Mr. Hecht has shared voting and dispositive power.

Of the shares included in this table, 4,674,074 are owned directly by Sopris Partners, 1,315,020 shares are owned by private clients of Aspen Advisors, 2,010,224 are owned by private clients of Sopris Advisors and 539,000 are owned by an investment partnership with Sopris Capital as its general partner and Sopris Advisors as its manager. Sopris Capital is the general partner of Sopris Partners and the investment partnership and, as such, may be deemed to share beneficial ownership of the shares owned directly by such partnerships . Mr. Hecht is the managing member of each of Aspen Advisors and of Sopris Advisors and the sole member of the managing member of Sopris Capital. As the managing member of Aspen Advisors and Sopris Advisors, the sole member of the managing member of Sopris Capital and the owner of a majority of the membership interests in each of Sopris Capital, Aspen Advisors and of Sopris Advisors, Mr. Hecht may be deemed to be the controlling person of Sopris Capital, Aspen Advisors and of Sopris Advisors, and through Sopris Capital, Sopris Partners. Each of Aspen Advisors and Sopris Advisors, as investment manager for their respective private clients, and with respect to Sopris Advisors, also as investment manager for Sopris Partners, has discretionary investment authority over the shares held by their respective private clients and Sopris Partners, as applicable. Accordingly, Mr. Hecht may be deemed to be the beneficial owner of the Common Stock held by Sopris Partners and the private clients of Aspen Advisors and Sopris Advisors. Each of Sopris Partners and Sopris Capital disclaims any beneficial interest in the shares owned by the accounts managed by Sopris Advisors and Aspen Advisors. The principal business office of each of Sopris Advisors and Mr. Hecht is 314 S. Galena Street, Suite 300, Aspen, Colorado 81611.

(6) Information reflected in this table and the notes thereto with respect to Barclays Global Investors, NA ("Barclays") is based on the Schedule 13G, dated December 31, 2008, filed by Dimensional on February 6, 2009. The amount set forth consists of 2,747,060 shares with respect to which Barclays Global Investors, NA has sole voting power, 3,125,967 shares with respect to which Barclays Global Investors, NA has sole dispositive power, and 2,560,069 shares with respect to which Barclays Global Fund Advisors has sole voting power and sole dispositive power. The address of Barclays Global Investors, NA and Barclays Global Fund Advisors is 400 Howard Street, San Francisco, California 94105.

(7) Information reflected in this table and the notes thereto with respect to Jana Partners LLC ("Jana") is based on Schedule 13G/A, dated December 31, 2008, filed by Jana on February 17, 2009. The amount set forth consists of 5,600,000 shares with respect to which Jana has sole voting power and sole dispositive power. Jana is a private money management firm which holds the shares in various accounts under its management and control. The address of Jana is 767 Fifth Avenue, 8 th Floor, New York, New York 10153.

(8) Information reflected in this table and the notes thereto with respect to Dimensional Fund Advisors LP ("Dimensional") is based on the Schedule 13G/A, dated December 31, 2008, filed by Dimensional on February 9, 2009. The amount set forth consists of 5,476,865 shares with respect to which Dimensional has sole voting power and 5,559,863 shares with respect to which Dimensional has sole dispositive power. Dimensional, an investment advisor registered under Section 203 of the Investment Advisors Act of 1940, furnishes investment advice to four investment companies registered under the Investment Company Act of 1940, and serves as investment manager to certain other commingled group trusts and separate accounts. These investment companies, trusts and accounts are the "Funds." In its role as investment advisor or manager, Dimensional possesses investment and/or voting power over the securities described in this table that are owned by the Funds, and may be deemed to be the beneficial owner of the shares held by the Funds. However, all securities reported in this schedule are owned by the Funds. Dimensional disclaims beneficial ownership of such securities. The address of Dimensional is 1299 Ocean Avenue, Santa Monica, California 90401.

(9) Mr. Yost's address is Dana Holding Corporation, P.O. Box 1000, Toledo, Ohio 43697. Mr. Yost resigned as an officer of the Company on May 21, 2008.

**Changes in Control**

We believe that our common stock will be cancelled under any plan of reorganization we may propose under Chapter 11. On May 12, 2009 and May 21, 2009, the Company entered into Amendment No. 2 and Amendment No. 3, respectively, to its New Credit Facility, pursuant to which certain lenders under our New Credit Facility agreed to provide up to $100 million of new debtor-in-possession financing and $100 million of roll-up loans to finance our Chapter 11 restructuring (DIP Credit Facility). The DIP Credit Facility includes a Plan Term Sheet which contemplates that the lenders under the DIP Credit Facility will receive 87.25% of the new common stock to be issued upon emergence from Chapter 11 on account of their roll-up loans, the holders of the pre-petition secured obligations that are entitled to a consent fee under the DIP Credit Facility will receive 8.5% of the new common stock to be issued upon emergence from Chapter 11 and the holders of the pre-petition secured obligations that are not lenders under the DIP Credit Facility will receive 4% of the new common stock to be issued upon emergence from Chapter 11.

**Securities Authorized for Issuance Under Equity Compensation Plans**

The Company has the following equity compensation plans in effect at January 31, 2009:

| Plan Category — Equity Compensation Plans | Number of Securities to be Issued Upon Exercise of Outstanding Option, Warrants, and Rights (a) (1) | Weighted Average Exercise Price of Outstanding Options, Warrants, and Rights (b) (2) | Number of Securities Remaining Available for Future Issuance Under Equity Compensation Plans (Excluding Securities Reflected in Column (a)) (c) |
|---|---|---|---|
| Plans approved by security holders | 5,437,791 | $ 5.55 | 955,374 |
| Plans not approved by security holders | — | — | — |
| Total | 5,437,791 | $ 5.55 | 955,374 |

(1) Consists of 3,913,900 options and 1,523,891 restricted stock units.

(2) Weighted average exercise price includes 3,913,900 options and excludes 1,523,891 restricted stock units, which do not have an exercise price.

**Item 13.** *Certain Relationships and Related Transactions and Director Independence*

**Transactions with Related Persons**

Since February 1, 2008, there has not been, nor is there currently proposed, any transaction to which we were or are to be a participant in which the amount involved exceeds $120,000 and in which anyone who during such time was a director, nominee for director, executive officer or a beneficial owner of more than 5% of our common stock, or an immediate family member (as defined in the applicable SEC rules) or person (other than a tenant or employee) sharing the household of any of the foregoing, had or will have a direct or indirect interest material interest (other than executive officer and director compensation arrangements disclosed elsewhere in this proxy statement or approved by the Compensation Committee of the Board of Directors).

The Audit Committee of the Board of Directors is responsible for reviewing and approving, ratifying or disapproving transactions that would be required to be reported in our proxy statements or other filings with the SEC and has adopted written policies and procedures with respect to the review, approval, ratification or disapproval of such transactions. All transactions that could potentially be required to be reported are covered by the policies and procedures. Each executive officer and director is required to report the details of any significant potential transactions between the Company and any individuals or entities that are considered to be related persons because of a relationship with such director or officer. Each executive officer and director is also required to certify to the Company in writing on an annual basis that he or she has reported all such transactions. For persons or entities that are beneficial owners of more than 5% of our common stock, a responsible individual designated by the Company is required to report the details of potential transactions between the 5% beneficial owner and the Company. The Audit Committee (or the Chair if a meeting of the Audit Committee cannot be called on a timely basis) reviews all of the facts and circumstances of the proposed transaction, including:

- The benefits to the Company.

- The impact on a director's independence in the event the related person is a director, an immediate family member of a director or an entity in which a director is a partner, shareholder or executive officer.

- The availability of other sources for comparable products or services.

- The terms of the transaction.

- The terms available to unrelated third parties or to employees generally.

No member of the Audit Committee may participate in any review, consideration or approval of any such transaction if such member or any of his or her immediate family members is the related person. The Audit Committee (or the Chair) may approve or ratify only those Related Person Transactions that are in, or are not inconsistent with, the best interests of the Company and its stockholders, as the Committee (or the Chair) determines in good faith.

**Director Independence**

Our Board of Directors has determined that each of Dr. Cunningham, Ms. Feldmann, Mr. Haymaker, Dr. Sohi, Mr. Wallace and Mr. Wallman meet the independence requirements of the Nasdaq listing standards

**Item 14.** *Principal Accountant Fees and Services*

The following table presents fees for professional services rendered by KPMG LLP for the audit of our annual financial statements for fiscal 2007 and fiscal 2008 and fees billed for audit-related services, tax services and all other services rendered by KPMG LLP for fiscal 2007 and fiscal 2008:

|  | 2007 | 2008 |
|---|---|---|
| Audit Fees | $ 3,684,000 | $ 3,689,000 |
| Audit-Related Fees (1) | 147,000 | 62,000 |
| Tax Fees (2) | 66,000 | 30,000 |
| All Other Fees | — | — |
| Total | $ 3,897,000 | $ 3,781,000 |

(1) Aggregate fees billed for assurance and related services that were reasonably related to the performance of the audit or review of our consolidated financial statements, which have not been included in "Audit Fees." These services primarily include accounting and financial reporting consultations.

(2) Aggregate fees billed for professional services rendered for tax compliance, tax advice and tax planning, including preparation of tax forms and consulting for domestic and foreign taxes.

The Audit Committee reviews, and in its sole discretion pre-approves, our independent auditors' annual engagement letter including proposed fees and all audit and non-audit services provided by the independent auditors. Accordingly, 100% of the services described under "Audit Fees," "Audit Related Fees," "Tax Fees" and "All Other Fees" were pre-approved by our Audit Committee. The Audit Committee may not engage the independent auditors to perform the non-audit services proscribed by law or regulation. The Audit Committee may delegate pre-approval authority to a member of the Audit Committee, and authority delegated in such manner must be reported at the next scheduled meeting of the Audit Committee.

Proposed non-audit services are presented to the Audit Committee for approval at regularly scheduled Audit Committee meetings. The Company and/or KPMG LLP must describe to the Audit Committee the nature of the proposed non-audit services to be provided, the benefit to the Company of the proposed services being provided by KPMG LLP rather than another provider, the total cost of the services, and whether or not providing the services would negatively impact KPMG LLP's independence. Although the Audit Committee retains sole discretion as to whether to pre-approve non-audit services, it will generally approve such services where the Audit Committee determines that there is a benefit to the Company, such as cost or time savings, from having KPMG LLP provide the services and that doing so will not negatively impact KPMG's independence.

## PART IV

**Item 15. *Exhibits, Financial Statement Schedules***

Exhibits

| | |
|---|---|
| 31.1 | Certification of Curtis J. Clawson, Chairman of the Board, President and Chief Executive Officer, pursuant to Section 302 of the Sarbanes-Oxley Act of 2002.* |
| 31.2 | Certification of Mark A. Brebberman, Vice President, Finance and Chief Financial Officer, pursuant to Section 302 of the Sarbanes-Oxley Act of 2002.* |

\* Filed electronically herewith.

**SIGNATURES**

Pursuant to the requirements of Section 13 of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

HAYES LEMMERZ INTERNATIONAL, INC.

By: */s/ MARK A. BREBBERMAN*
Mark A. Brebberman
*Vice President, Finance and Chief Financial Officer*

Dated: June 1, 2009

34

## EXHIBIT INDEX

31.1 Certification of Curtis J. Clawson, Chairman of the Board, President and Chief Executive Officer, pursuant to Section 302 of the Sarbanes-Oxley Act of 2002.*

31.2 Certification of Mark A. Brebberman, Vice President, Finance and Chief Financial Officer, pursuant to Section 302 of the Sarbanes-Oxley Act of 2002.*

---

\*     Filed electronically herewith.

35

**EXHIBIT 31.1**

**CERTIFICATIONS**

I, Curtis J. Clawson, certify that:

1. I have reviewed this Amendment No. 1 on Form 10-K/A to our Annual Report on Form 10-K of Hayes Lemmerz International, Inc.; and

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

*/s/ Curtis J. Clawson*
Curtis J. Clawson
*President and Chief Executive Officer*

Dated: June 1, 2009

**EXHIBIT 31.2**

**CERTIFICATIONS**

I, Mark A. Brebberman, certify that:

    1. I have reviewed this Amendment No. 1 to Annual Report on Form 10-K/A to our Form 10-K of Hayes Lemmerz International, Inc.; and

    2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

                          */s/ Mark A. Brebberman*
                          Mark A. Brebberman
                          *Vice President, Finance and Chief Financial Officer*

Dated: June 1, 2009

**APPENDIX C-3**

**QUARTERLY REPORT ON FORM 10-Q FOR THE FISCAL QUARTER ENDED APRIL 30, 2009**

# UNITED STATES SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

# Form 10-Q

**(Mark One)**

☑ **QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the quarterly period ended April 30, 2009

or

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the transition period from     to

Commission file number: 000-50303

——————————————

# Hayes Lemmerz International, Inc.

*(Exact name of registrant as specified in its charter)*

| | |
|---|---|
| **Delaware** | **32-0072578** |
| *(State or other jurisdiction of incorporation or organization)* | *(IRS Employer Identification No.)* |
| **15300 Centennial Drive** | **48168** |
| **Northville, Michigan** | *(Zip Code)* |
| *(Address of principal executive offices)* | |

**Registrant's telephone number, including area code:**
**(734) 737-5000**

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☑   No ☐

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files). Yes ☐   No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company. See the definition of "large accelerated filer", "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act. (Check one):

Large accelerated filer ☐     Accelerated filer ☑     Non-accelerated filer ☐     Smaller reporting company ☐
(Do not check if a smaller reporting company)

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act). Yes ☐   No ☑

As of June 18, 2009, the number of shares of common stock outstanding of Hayes Lemmerz International, Inc. was 101,819,597 shares.

# HAYES LEMMERZ INTERNATIONAL, INC.
## QUARTERLY REPORT ON FORM 10-Q
### TABLE OF CONTENTS

**Page**

### PART I. FINANCIAL INFORMATION

Item 1. Financial Statements   3
    Consolidated Statements of Operations   3
    Condensed Consolidated Balance Sheets   4
    Consolidated Statements of Cash Flows   5
    Consolidated Statements of Changes in Stockholders' Equity   6
    Notes to Consolidated Financial Statements   7
Item 2. Management's Discussion and Analysis of Financial Condition and Results of Operations   24
Item 3. Quantitative and Qualitative Disclosures about Market Risk   33
Item 4. Controls and Procedures   33

### PART II. OTHER INFORMATION

Item 1. Legal Proceedings   34
Item 1A. Risk Factors   34
Item 2. Unregistered Sales of Equity Securities and Use of Proceeds   42
Item 3. Defaults upon Senior Securities   42
Item 4. Submission of Matters to a Vote of Security Holders   42
Item 5. Other Information   42
Item 6. Exhibits   43
Signature   44
    EX-31.1
    EX-31.2
    EX-32.1
    EX-32.2

*Unless otherwise indicated, references to "we," "us," or "our" mean Hayes Lemmerz International, Inc., a Delaware corporation, and its subsidiaries. References to fiscal year means the 12-month period commencing on February 1 $^{st}$ of that year and ending January 31 $^{st}$ of the following year (e.g., fiscal 2009 means the period beginning February 1, 2009 and ending January 31, 2010). This report contains forward looking statements with respect to our financial condition, results of operations, and business. All statements other than statements of historical fact made in this Quarterly Report on Form 10-Q are forward-looking. Such forward-looking statements include, among others, those statements including the words "expect," "anticipate," "intend," "believe," and similar language. These forward looking statements involve certain risks and uncertainties. Our actual results may differ significantly from those projected in the forward-looking statements. Factors that may cause actual results to differ materially from those contemplated by such forward looking statements include, among others: (1) competitive pressure in our industry; (2) fluctuations in the price of steel, aluminum, and other raw material and our ability to maintain credit terms with our suppliers; (3) changes in general economic conditions; (4) our dependence on the automotive industry (which has historically been cyclical) and on a small number of major customers for the majority of our sales; (5) pricing pressure from automotive industry customers and the potential for re-sourcing of business to lower-cost providers; (6) changes in the financial markets or our debt ratings affecting our financial structure and our ability to borrow money or find alternative sources of additional money; (7) the uncertainties inherent in international operations and foreign currency fluctuations;(8) the outcome and consequences of our Chapter 11 bankruptcy filing; and (9) the risks described in this Quarterly Report on Form 10-Q. You are cautioned not to place undue reliance on the forward-looking statements, which speak only as of the date of this Quarterly Report on Form 10-Q. We have no duty to update the forward looking statements in this Quarterly Report on Form 10-Q and we do not intend to provide such updates*

**Item 1.** *Financial Statements*

**HAYES LEMMERZ INTERNATIONAL, INC. AND SUBSIDIARIES**

**CONSOLIDATED STATEMENTS OF OPERATIONS**
**(Unaudited)**

| | | Three Months Ended April 30, | |
|---|---|---|---|
| | | 2009 | 2008 |
| | | (Dollars in millions, except per share amounts) | |
| Net sales | | $ 258.2 | $ 573.8 |
| Cost of goods sold | | 258.6 | 510.1 |
| Gross profit | | (0.4) | 63.7 |
| Marketing, general, and administrative | | 35.4 | 39.3 |
| Amortization of intangibles | | 2.0 | 2.8 |
| Asset impairments and other restructuring charges | Note 7 | 4.2 | 3.3 |
| Other income, net | | (1.0) | (3.4) |
| (Loss) earnings from operations | | (41.0) | 21.7 |
| Interest expense, net | | 22.0 | 13.3 |
| Other non-operating (income) expense | | (2.3) | 1.7 |
| (Loss) earnings from operations before taxes | | (60.7) | 6.7 |
| Income tax (benefit) expense | Note 9 | (1.6) | 13.0 |
| Consolidated net loss | | (59.1) | (6.3) |
| Less: Net (loss) income attributable to noncontrolling interest | Note 11 | (0.6) | 6.5 |
| Net loss attributable to Hayes Lemmerz International, Inc. | | $ (58.5) | $ (12.8) |
| | | | |
| **Loss per common share data** | | | |
| *Basic and diluted:* | | | |
| Net loss attributable to Hayes Lemmerz International, Inc. | | $ (0.57) | $ (0.13) |
| Weighted average shares outstanding (in thousands) | Note 8 | 101,820 | 101,071 |

See accompanying notes to consolidated financial statements.

3

**HAYES LEMMERZ INTERNATIONAL, INC. AND SUBSIDIARIES**

**CONSOLIDATED BALANCE SHEETS**

|  |  | April 30, 2009 | January 31, 2009 |
|---|---|---|---|
|  |  | (Dollars in millions) (Unaudited) | |
| **ASSETS** | | | |
| **Current assets:** | | | |
| Cash and cash equivalents | | $ 56.7 | $ 107.5 |
| Receivables, net of allowance of $0.8 and $0.3 at April 30, 2009 and January 31, 2009, respectively | | 136.8 | 157.3 |
| Other receivables | | 28.9 | 15.4 |
| Inventories | Note 3 | 151.8 | 156.9 |
| Assets held for sale | Note 4 | 8.6 | 8.1 |
| Deferred tax assets | Note 9 | 2.9 | 3.2 |
| Prepaid expenses | | 8.6 | 7.7 |
| Total current assets | | 394.3 | 456.1 |
| Property, plant, and equipment, net of accumulated depreciation of $430.2 and $398.3 as of April 30, 2009 and January 31, 2009, respectively | | 496.4 | 499.2 |
| Customer relationships, net of amortization of $22.5 and $21.0 at April 30, 2009 and January 31, 2009, respectively | | 89.0 | 87.8 |
| Other intangible assets, net of amortization of $43.3 and $41.2 at April 30, 2009 and January 31, 2009, respectively | | 24.2 | 24.6 |
| Other assets | | 20.2 | 28.5 |
| Total assets | | $ 1,024.1 | $ 1,096.2 |
| | | | |
| **LIABILITIES AND STOCKHOLDERS' DEFICIT** | | | |
| **Current liabilities:** | | | |
| Bank borrowings and other notes | Note 5 | $ 34.5 | $ 46.6 |
| Current portion of long-term debt | Note 5 | 635.3 | 622.1 |
| Accounts payable | | 116.5 | 133.0 |
| Accrued payroll and employee benefits | | 56.6 | 53.2 |
| Other accrued liabilities | | 66.4 | 66.3 |
| Total current liabilities | | 909.3 | 921.2 |
| Long-term debt, net of current portion | Note 5 | 1.6 | 1.4 |
| Deferred tax liabilities | Note 9 | 43.6 | 46.7 |
| Pension and other long-term liabilities | Note 6 | 350.1 | 354.0 |
| Total liabilities | | 1,304.6 | 1,323.3 |
| | | | |
| **Stockholders' deficit:** | | | |
| Preferred stock, 1,000,000 shares authorized, none issued or outstanding at April 30, 2009 or January 31, 2009 | | — | — |
| Common stock, par value $0.01 per share: | | | |
| 200,000,000 shares authorized; 101,819,597 issued and outstanding at April 30, 2009 and January 31, 2009 | | 1.0 | 1.0 |
| Additional paid in capital | | 887.7 | 887.1 |
| Accumulated deficit | | (1,360.7) | (1,302.1) |
| Accumulated other comprehensive income | | 129.0 | 121.9 |
| Total Hayes Lemmerz International, Inc. stockholders' deficit | | (343.0) | (292.9) |
| Noncontrolling interests | Note 11 | 62.5 | 65.8 |
| Total stockholders' deficit | | (280.5) | (227.1) |
| Total liabilities and stockholders' deficit | | $ 1,024.1 | $ 1,096.2 |

See accompanying notes to consolidated financial statements.

4

**HAYES LEMMERZ INTERNATIONAL, INC. AND SUBSIDIARIES**
**CONSOLIDATED STATEMENTS OF CASH FLOWS**
**(Unaudited)**

| | Three Months Ended April 30, | |
|---|---|---|
| | 2,009.0 | 2,008.0 |
| | (Dollars in millions) | |
| Cash flows from operating activities: | | |
| Net loss | $ (58.5) | $ (12.8) |
| | | |
| Adjustments to reconcile net loss from operations to net cash provided by (used for) operating activities: | | |
| Depreciation and amortization | 22.5 | 27.8 |
| Amortization and write-off of deferred financing fees | 9.5 | 0.6 |
| Asset impairments | 0.6 | 2.7 |
| Interest rate swap adjustments | (3.5) | — |
| Deferred income taxes | (4.7) | (0.8) |
| Noncontrolling interests | (0.6) | 6.5 |
| Equity compensation expense | 0.6 | 1.0 |
| Loss (gain) on sale of assets | 0.2 | (0.1) |
| Changes in operating assets and liabilities that increase (decrease) cash flows: | | |
| Receivables | 26.0 | (16.8) |
| Other receivables | (13.5) | 0.6 |
| Inventories | 10.0 | (15.2) |
| Prepaid expenses and other | (1.5) | (9.0) |
| Accounts payable and accrued liabilities | (20.2) | (16.3) |
| Cash used for operating activities | (33.1) | (31.8) |
| Cash flows from investing activities: | | |
| Purchase of property, plant, equipment, and tooling | (2.5) | (19.2) |
| Proceeds from sale of assets | 0.2 | 0.5 |
| Cash used for investing activities | (2.3) | (18.7) |
| Cash flows from financing activities: | | |
| Changes in bank borrowings and credit facilities | (12.2) | 2.1 |
| Proceeds from long-term debt | 0.2 | — |
| Repayment of long-term debt | (0.1) | (0.1) |
| Dividends paid to minority shareholders | (3.7) | (7.3) |
| Cash used for financing activities | (15.8) | (5.3) |
| Cash flows of discontinued operations: | | |
| Net cash used for operating activities | (0.7) | — |
| Net cash used for investing activities | — | — |
| Net cash used for financing activities | — | — |
| Net cash used for discontinued operations | (0.7) | — |
| Effect of exchange rate changes on cash and cash equivalents | 1.1 | 2.4 |
| Decrease in cash and cash equivalents | (50.8) | (53.4) |
| Cash and cash equivalents at beginning of period | 107.5 | 160.2 |
| Cash and cash equivalents at end of period | $ 56.7 | $ 106.8 |
| | | |
| Supplemental data: | | |
| Cash paid for interest | $ 12.7 | $ 9.4 |
| Cash paid for income taxes | $ 3.5 | $ 9.3 |

See accompanying notes to consolidated financial statements.

# HAYES LEMMERZ INTERNATIONAL, INC. AND SUBSIDIARIES

## CONSOLIDATED STATEMENTS OF STOCKHOLDERS' EQUITY
### (Unaudited)

| | Shares | Total | Comprehensive Income | Common Stock | Additional Paid in Capital | Accumulated Deficit | Accumulated Other Comprehensive Income | Noncontrolling Interest |
|---|---|---|---|---|---|---|---|---|
| | | | (Dollars in millions, except share amounts) | | | | | |
| Balance at January 31, 2009 | 101,819,597 | $(227.1) | | $ 1.0 | $ 887.1 | $ (1,302.1) | $ 121.1 | $ 65.8 |
| Preferred stock dividends accrued | — | (0.1) | | — | — | (0.1) | — | — |
| Comprehensive income: | | | | | | | | |
| Net loss | — | (59.1) | $ (59.1) | — | — | (58.5) | — | (0.6) |
| Currency translation adjustment | — | 8.9 | 8.9 | — | — | — | 7.9 | 1.0 |
| Dividend paid | — | (3.7) | (3.7) | — | — | — | — | (3.7) |
| Total comprehensive loss | — | (53.9) | $ (53.9) | — | — | — | — | — |
| Equity compensation expense | — | 0.6 | | — | 0.6 | — | — | — |
| Balance at April 30, 2009 | 101,819,597 | $(280.5) | | $ 1.0 | $ 887.7 | $ (1,360.7) | $ 129.0 | $ 62.5 |
| | | | | | | | | |
| Balance at January 31, 2008 | 101,057,966 | $ 272.8 | | $ 1.0 | $ 882.0 | $ (928.7) | $ 248.0 | $ 70.5 |
| Preferred stock dividends accrued | — | (0.2) | | — | — | (0.2) | — | — |
| Comprehensive income: | | | | | | | | |
| Net loss | — | (6.3) | $ (6.3) | — | — | (12.8) | — | 6.5 |
| Currency translation adjustment | — | 8.3 | 8.3 | — | — | — | 5.6 | 2.7 |
| Dividend paid | — | (7.3) | (7.3) | — | — | — | — | (7.3) |
| Pension measurement date adjustment | — | (1.8) | (1.8) | — | — | (1.2) | (0.6) | — |
| Change in unrealized gain/(loss) on derivatives | — | 3.0 | 3.0 | — | — | — | 3.0 | — |
| Total comprehensive loss | — | (4.1) | $ (4.1) | — | — | — | — | — |
| Shares issued for vested RSUs | 20,687 | — | | | — | — | — | — |
| Equity compensation expense | — | 1.0 | | — | 1.0 | — | — | — |
| Balance at April 30, 2008 | 101,078,653 | $ 269.5 | | $ 1.0 | $ 883.0 | $ (942.9) | $ 256.0 | $ 72.4 |

See accompanying notes to consolidated financial statements.

6

**HAYES LEMMERZ INTERNATIONAL, INC. AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**Three months ended April 30, 2009 and 2008**
**(Unaudited)**
**(Dollars in millions, unless otherwise stated)**

## Note 1. Description of Business

These financial statements should be read in conjunction with our Annual Report on Form 10-K for the fiscal year ended January 31, 2009 as filed with the Securities and Exchange Commission on May 11, 2009.

### *Description of Business*

Unless otherwise indicated, references to "us," "we," or "our" mean Hayes Lemmerz International, Inc., a Delaware corporation, and our subsidiaries, and references to "fiscal year" mean our fiscal year commencing on February 1 of that year and ending on January 31 of the following year (e.g., "fiscal 2009" refers to the period beginning February 1, 2009 and ending January 31, 2010, "fiscal 2008" refers to the period beginning February 1, 2008 and ending January 31, 2009).

Originally founded in 1908, Hayes Lemmerz International, Inc. is a leading worldwide producer of aluminum and steel wheels for passenger cars and light trucks and of steel wheels for commercial trucks and trailers. We are also a supplier of automotive powertrain components. We have global operations with 23 facilities, including business and sales offices and manufacturing facilities located in 12 countries around the world. We sell our products to every major North American, Japanese, and European manufacturer of passenger cars and light trucks and to commercial highway vehicle customers throughout the world.

On May 11, 2009, we and certain of our subsidiaries (collectively, the Debtors) filed voluntary petitions for reorganization under Chapter 11 of Title 11 of the United States Code (Bankruptcy Code) in the United States Bankruptcy Court for the District of Delaware (Bankruptcy Court). The cases are being jointly administered under Case No. 09-11655 (MFW). With the exception of Hayes Lemmerz Finance LLC—Luxembourg S.C.A. (Hayes Luxembourg), a borrower under our secured credit facility and the issuer of our 8.25% Senior Notes due 2015 (Senior Notes), the Company's subsidiaries and operations outside the United States were not included in the filing, are not debtors in the Chapter 11 cases or any other proceeding outside the United States, and are expected to and will continue to operate in the ordinary course of business outside and unaffected by the Chapter 11 cases and process.

The filing of the Chapter 11 petitions constituted an event of default under certain of our debt obligations, and those debt obligations became automatically and immediately due and payable, subject to an automatic stay of any action to collect, assert, or recover a claim against the Debtors and the application of applicable bankruptcy law.

In connection with the Chapter 11 filing, we, HLI Operating Company, Inc. (HLI Opco), Hayes Luxembourg, the Lenders party thereto, Deutsche Bank AG New York Branch, as DIP Administrative Agent, Deutsche Bank Securities Inc. and General Electric Capital Corporation, as Joint Book-Running Lead Managers, Joint Lead Arrangers, and Joint Syndication Agents for the Debtor in Possession (DIP) Facilities, and Deutsche Bank Securities Inc., as Documentation Agent for the DIP Facilities, entered into Amendment No. 2, dated as of May 12, 2009, and amendment No. 3 dated as of May 19, 2009, to our Second Amended and Restated Credit Agreement, dated as of May 30, 2007, as amended by Amendment No. 1, dated as of January 30, 2009, with the lenders party thereto (Credit Agreement). Pursuant to the amended Credit Agreement (DIP Credit Agreement) debtor-in-possession loan tranches (DIP Loans) were added to the Credit Agreement, including up to $100 million of additional liquidity to provide operating funds to us and our subsidiaries during the restructuring.

The DIP Loans consist of a senior secured debtor-in-possession new money term loan facility (New Money DIP Loans) in an aggregate principal amount of up to $100 million and a senior secured debtor-in-possession roll-up loan facility (Roll-up Loans) in an aggregate principal amount of up to $100 million. The Roll-up Loans will be issued to the pre-petition lenders under the Credit Agreement who make New Money DIP Loans in exchange for the pre-petition loans such lenders hold under the Credit Agreement; the Roll-up Loans will be deemed issued to the lenders upon the occurrence of a triggering event in the future. The DIP Loans benefit from a super-priority claim and lien on the assets of the Borrowers pursuant to a Bankruptcy Court order.

We cannot provide any assurance as to what values, if any, will be ascribed in our bankruptcy proceedings to our various pre-petition liabilities, common stock, and other securities. On June 8, 2009, our common stock was delisted from the NASDAQ Stock

Market following our filings under Chapter 11. We believe that our currently outstanding common stock will have no value and will be cancelled under any plan of reorganization we may propose under Chapter 11. We also believe that the holders of our Senior Notes are unlikely to receive more than a de minimis distribution on account of their interests in the Senior Notes and that such interests could be cancelled under any plan of reorganization the Company may propose under Chapter 11.

There can be no assurance, however, that we will be able to develop, propose, and implement a successful plan of reorganization. Should we be unable to develop, propose, and implement a successful plan of reorganization, we may be forced to discontinue operations and liquidate the Company.

**Note 2. Basis of Presentation**

Our unaudited interim consolidated financial statements do not include all of the disclosures required by U.S. generally accepted accounting principles (GAAP) for annual financial statements. In our opinion, all adjustments considered necessary for a fair presentation of the interim period results have been included. Operating results for the fiscal 2009 interim period presented are not necessarily indicative of the results that may be expected for the full fiscal year ending January 31, 2010.

The preparation of consolidated financial statements in conformity with GAAP requires us to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the consolidated financial statements and the reported amounts of revenues and expenses during the reporting period. Considerable judgment is often involved in making these determinations; the use of different assumptions could result in significantly different results. We believe our assumptions and estimates are reasonable and appropriate; however, actual results could differ from those estimates.

The accompanying consolidated financial statements have been prepared on a going concern basis which contemplates continuity of operations, realization of assets, and payment of liabilities in the ordinary course of business and do not reflect adjustments that might result if we are unable to continue as a going concern.

**Note 3. Inventories**

The major classes of inventory were as follows (dollars in millions):

|  | April 30, 2009 | January 31, 2009 |
|---|---|---|
| Raw materials | $ 47.9 | $ 48.0 |
| Work-in-process | 21.8 | 18.7 |
| Finished goods | 51.1 | 60.2 |
| Spare parts and supplies | 31.0 | 30.0 |
| Total | $ 151.8 | $ 156.9 |

**Note 4. Assets Held for Sale**

Assets held for sale consist of the following (dollars in millions):

|  | April 30, 2009 | January 31, 2009 |
|---|---|---|
| Gainesville, Georgia facility | $ 5.2 | $ 5.3 |
| Huntington, Indiana facility | 1.7 | 1.7 |
| Ferndale, Michigan facility | 1.1 | 1.1 |
| Howell, Michigan facility | 0.6 | — |
| Total | $ 8.6 | $ 8.1 |

We have a definitive agreement with Punch Property International NV for the sale of our Gainesville, Georgia facility. Punch Property International NV has not completed the purchase of the property as contemplated by the agreement and we have commenced litigation seeking specific performance of the agreement and damages, which is currently subject to the automatic stay in our Chapter 11 proceeding.

As of April 30, 2009, we reclassified our Howell, Michigan facility as held for sale as we anticipate the sale of the building to be complete within one year as per Statement of Financial Accounting Standard (SFAS) 144, "Accounting for the Impairment or Disposal of Long-Lived Assets" (SFAS 144).

## Note 5. Bank Borrowings, Other Notes, and Long-Term Debt

Short term bank borrowings and other notes were $34.5 million as of April 30, 2009 with a weighted average interest rate of 4.7% and $46.6 million as of January 31, 2009 with a weighted average interest rate of 5.4%. These consist primarily of short-term credit facilities at our foreign subsidiaries.

Long-term debt consists of the following (dollars in millions):

|  | April 30, 2009 | January 31, 2009 |
|---|---|---|
| Various foreign bank and government loans, weighted average interest rates of 3.5% and 3.9% at April 30, 2009 and January 31, 2009, respectively | $ 2.5 | $ 2.3 |
| Term Loan, weighted average interest rate of 10.5% and 10.2% at April 30, 2009 and January 31, 2009, respectively | 337.6 | 328.9 |
| 8.25% Senior Notes | 171.8 | 167.3 |
| Revolving Credit Facility, weighted average interest rate of 8.5% at both April 30, 2009 and January 31, 2009 | 125.0 | 125.0 |
|  | 636.9 | 623.5 |
| Less current portion of long-term debt | 635.3 | 622.1 |
| Total long-term debt | $ 1.6 | $ 1.4 |

### Classification of Debt

In January 2009, we favorably modified the leverage ratio and interest coverage ratio covenants under our Pre-petition Credit Facilities for the fourth quarter of fiscal 2008 and for each quarter of fiscal 2009. Absent the amendment, we would have been in default of our covenants as of January 31, 2009. In addition, due to the continuing deterioration in the global economy and the automotive industry in particular, it will be increasingly difficult for us to achieve continued compliance in subsequent periods without repaying borrowings under the Revolving Credit Facility, absent a waiver or a further amendment from our lenders. In accordance with Emerging Issues Task Force 86-30, "Classification of Obligations When a Violation Is Waived by the Creditor," we reclassified our debt to current as of January 31, 2009.

### Euro Denominated Debt

The balance of our Term Loan, which is described more fully below, was approximately € 255.4 million at both April 30, 2009 and January 31, 2009. The balance of our Senior Notes was € 130 million at both April 30, 2009 and January 31, 2009. The US dollar balance of the Term Loan increased from $328.9 million as of January 31, 2009 to $337.6 million as of April 30, 2009, which was due to the fluctuation of foreign currency exchange rates. The US dollar balance of the 8.25% Senior Notes increased from $167.3 million as of January 31, 2009 to $171.8 million as of April 30, 2009 due to the fluctuation of foreign currency exchange rates. As a result of our Chapter 11 filings, we are in default under both our Term Loan, which is scheduled to mature in 2014, and our Senior Notes, which are scheduled to mature in 2015, subject to an automatic stay of any action to collect, assert, or recover a claim against us under applicable bankruptcy law.

### Senior Notes

Our Senior Notes consist of € 130 million 8.25% of senior unsecured notes issued by Hayes Lemmerz Finance LLC — Luxembourg S.C.A (Hayes Luxembourg), an indirect, wholly-owned subsidiary of the Company. The Senior Notes are scheduled to mature in 2015 but, as a result of our Chapter 11 filings, are currently in default, subject to an automatic stay of any action to collect, assert, or recover a claim against us under applicable bankruptcy law. The Senior Notes are fully and unconditionally guaranteed on a senior unsecured basis by us and substantially all of our direct and indirect domestic subsidiaries and certain of our indirect foreign subsidiaries.

### Credit Facility

On June 3, 2003 HLI Opco entered into a $550 million senior secured credit facility (Original Credit Facility), which initially consisted of a $450 million six-year amortizing term loan and a five-year $100 million revolving credit facility.

On April 11, 2005 we amended and restated the Original Credit Facility to establish a new second lien $150 million term loan, from which 50% of the net proceeds were to be used for general corporate purposes, with the remainder of the net proceeds used to repay a portion of the existing term loan.

On May 30, 2007 we amended and restated the Original Credit Facility to establish three new senior secured credit facilities in an amount of approximately $495 million (Pre-petition Credit Facilities). The Pre-petition Credit Facilities consist of a term loan facility of € 260 million borrowed by Hayes Luxembourg (Term Loan), a revolving credit facility of $125 million available to HLI Opco and Hayes Luxembourg (Revolving Credit Facility), and a synthetic letter of credit facility of € 15 million available to both borrowers. The interest rate for the Term Loan and synthetic letter of credit facility is the EURIBOR rate plus 6.0% per annum with a EURIBOR floor of 3.5%. The interest rate for the Revolving Credit Facility is the Citibank base rate plus 5.25% per annum. Prior to the January 2009 amendment to the Pre-petition Credit Facilities, the interest rate for the Term Loan and synthetic letter of credit facility was EURIBOR plus 2.75% per annum and the interest rate for the Revolving Credit Facility was the Citibank base rate plus 2.0%. As a result of our failure to comply with certain financial covenants under the Pre-petition Credit Facilities, the interest rates above were increased by 2.0% per annum from and after the date of default.

As of April 30, 2009, the obligations of HLI Opco and Hayes Luxembourg under the Pre-petition Credit Facilities were guaranteed by us and substantially all of our direct and indirect domestic subsidiaries. In addition, the obligations of Hayes Luxembourg under the Pre-petition Credit Facilities were guaranteed, subject to certain exceptions, by certain of our foreign subsidiaries. As of April 30, 2009, the obligations of HLI Opco and Hayes Luxembourg under the Pre-petition Credit Facilities and the guarantors' obligations under their respective guarantees of the Pre-petition Credit Facilities were, subject to certain exceptions, secured by a first priority perfected pledge of substantially all capital stock owned by the borrowers and the guarantors (but not more than 65% of the capital stock of Hayes Luxembourg or any foreign subsidiary can secure HLI Opco's obligations) and substantially all of the other assets owned by the borrowers and the guarantors. The guarantees and security for the Pre-petition Credit Facilities are subordinated to priming liens granted by the Bankruptcy Court in connection with the DIP Financing and other liens granted as security for the DIP Loans. All foreign guarantees and collateral are subject to applicable restrictions on cross-stream and upstream guarantees and other legal restrictions, including financial assistance rules, thin capitalization rules, and corporate benefit rules.

As of April 30, 2009, the Pre-petition Credit Facilities contained negative covenants restricting our ability and the ability of our subsidiaries to, among other actions, declare dividends or repay or repurchase capital stock, cancel, prepay, redeem or repurchase debt, incur liens and engage in sale-leaseback transactions, make loans and investments, incur indebtedness, amend or otherwise alter certain debt documents, engage in mergers, acquisitions and asset sales, engage in transactions with affiliates, and alter their respective businesses. The financial covenants under the Pre-petition Credit Facilities include covenants regarding a maximum total leverage ratio, a minimum interest coverage ratio and a maximum capital expenditures amount. These covenants have been supplemented by the covenants in the DIP Credit Agreement.

As of April 30, 2009 there were $125 million of borrowings and no letters of credit issued under the Revolving Credit Facility, and $15.7 million in letters of credit issued under the synthetic letter of credit facility. As of January 31, 2009 we had borrowed $125 million under the Revolving Credit Facility and had issued $19.1 million in letters of credit under the synthetic letter of credit facility. HLI Opco is restricted from repaying current borrowings of $125 million under the Revolving Credit Facility unless we have achieved EBITDA of at least $200 million for the twelve months preceding the date of the repayment. There were no funds available to borrow under the Revolving Credit Facility at April 30 or January 31, 2009. There was no amount available for the issuance of letters of credit under the synthetic letter of credit at April 30, 2009 and $0.3 million available at January 31, 2009.

### Covenant Compliance

As of April 30, 2009, we were in violation the leverage ratio and interest coverage ratio covenants of our Pre-petition Credit Facilities. The failure to meet these covenants and our subsequent Chapter 11 filings were events of default under the Pre-petition Credit Facilities and also resulted in a default under the Senior Notes. As a result, those long-term debt obligations became automatically and immediately due and payable, subject to an automatic stay of any action to collect, assert, or recover a claim against the Debtors and the application of applicable bankruptcy law. In accordance with Emerging Issues Task Force 86-30, "Classification of Obligations When a Violation Is Waived by the Creditor," we reclassified our debt to current as of January 31, 2009 due to the anticipation of the likely covenant violation as of April 30, 2009.

10

**Note 6. Pension Plans and Postretirement Benefits Other Than Pensions**

We sponsor several defined benefit pension plans (Pension Benefits) and health care and life insurance benefits (Other Benefits) for certain employees around the world. We fund the Pension Benefits based upon the funding requirements of United States and international laws and regulations in advance of benefit payments and the Other Benefits as benefits are provided to the employees.

The fiscal 2009 and fiscal 2008 amounts shown below present the Pension Benefits and Other Benefits expense for the three months ended April 30, 2009 and 2008 (dollars in millions):

| | Pension Benefits - US | | Other Benefits - US | | Pension Benefits - International | |
| | | | Three Months Ended April 30, | | | |
| | 2009 | 2008 | 2009 | 2008 | 2009 | 2008 |
|---|---|---|---|---|---|---|
| Service cost | $ 0.3 | $ 0.3 | $ — | $ — | $ 0.1 | $ 0.2 |
| Interest cost | 2.8 | 2.6 | 2.5 | 2.3 | 1.7 | 1.9 |
| Expected return on plan assets | (1.9) | (3.3) | — | — | (0.1) | (0.3) |
| Amortization of net loss (gain) | 0.7 | (0.2) | (1.0) | (0.4) | — | — |
| Amortization of prior service cost | — | — | — | — | 0.1 | — |
| Net periodic benefit cost | $ 1.9 | $ (0.6) | $ 1.5 | $ 1.9 | $ 1.8 | $ 1.8 |

We contributed $0.2 million to our U.S. Pension Benefits plan and $3.1 million to our U.S. Other Benefits plan during the first three months of fiscal 2009. We are unable to provide expected contributions to our U.S. Pension Benefit and U.S. Other Benefits plans for the remainder of fiscal 2009 as these are subject to review and approval of the Bankruptcy Court. We contributed $2.4 million to our international Pension Benefits plan during the first three months of fiscal 2009 and expect to contribute an additional $9.3 million during the remainder of fiscal 2009.

Effective January 31, 2007, we adopted SFAS 158, "Employers' Accounting for Defined Benefit Pension and Other Postretirement Plans" (SFAS 158), which amends SFAS 87, "Employers' Accounting for Pensions," SFAS 88, "Employers' Accounting for Settlements and Curtailments of Defined Benefit Pension Plan and for Termination Benefits," SFAS 106, "Employers' Accounting for Postretirement Benefits Other Than Pensions," and SFAS 132 (revised 2003), "Employers' Disclosures about Pensions and Other Postretirement Benefits." SFAS 158 requires an employer to recognize the over funded or under funded status of defined benefit pension and postretirement plans (other than a multi employer plan) as an asset or liability in its statement of financial position and to recognize changes in that funded status in the year in which the changes occur through comprehensive income. This Statement also requires an employer to measure the funded status of a plan as of the date of its year-end statement of financial position, with limited exceptions. During the first quarter of fiscal 2008, we recorded $1.2 million as a decrease of beginning retained earnings and $0.6 million as a decrease of accumulated other comprehensive income due to the change in measurement date.

## Note 7. Asset Impairments and Other Restructuring Charges

Asset impairment losses and other restructuring charges for the three months ended April 30, 2009 and 2008 were as follows (dollars in millions):

| | Three Months Ended April 30, 2009 | | |
|---|---|---|---|
| | Automotive Wheels | Other | Total |
| Facility closure costs | $ 0.6 | $ 0.1 | $ 0.7 |
| Impairment of facility, machinery, and equipment | 0.6 | — | 0.6 |
| Severance and other restructuring costs | 2.4 | 0.5 | 2.9 |
| Total | $ 3.6 | $ 0.6 | $ 4.2 |

| | Three Months Ended April 30, 2008 | | |
|---|---|---|---|
| | Automotive Wheels | Other | Total |
| Facility closure costs | $ 0.3 | $ 0.1 | $ 0.4 |
| Impairment of facility, machinery, and equipment | 2.7 | — | 2.7 |
| Severance and other restructuring costs | 0.1 | 0.1 | 0.2 |
| Total | $ 3.1 | $ 0.2 | $ 3.3 |

***Asset Impairment Losses and Other Restructuring Charges for the Three Months Ended April 30, 2009***

During the first quarter of fiscal 2009, we recorded facility closure, employee restructuring charges, and asset impairments of $4.2 million.

In the Automotive Wheels segment we recorded expense of $3.6 million. Facility closure costs of $0.6 million were related to ongoing costs for our idle aluminum wheel facilities in Howell, Michigan, which was reclassified as an asset held for sale as of April 30, 2009, and Huntington, Indiana, as well as our aluminum wheel facility in Gainesville, Georgia, which is subject to a definitive agreement of the facility to for the sale with Punch Property International NV for the sale (see *Note 4, Asset Held for Sale* for additional information). Asset impairments of $0.6 million were related to our idle aluminum wheel facility in Howell, Michigan, based on an offer received from an interested buyer with whom we are in negotiations for the sale of the facility. Severance and other restructuring costs of $2.4 million were related to headcount reductions at our facilities in Manresa, Spain; Chihuahua, Mexico; Königswinter, Germany; Manisa, Turkey; and Alrode, South Africa facilities in order to align headcount with the lower sales volumes.

Expense of $0.1 million in the Other segment was related to facility closure costs for our Ferndale, Michigan technical center, which was closed in fiscal 2007. Expense of $0.5 million in Other segment was related to severance and other restructuring costs for our powertrain facility in Nuevo Laredo, Mexico.

***Asset Impairment Losses and Other Restructuring Charges for the Three Months Ended April 30, 2008***

During the first quarter of fiscal 2008, we recorded facility closure, employee restructuring charges, and asset impairments of $3.3 million.

In the Automotive Wheels segment we recorded expense of $3.1 million. Facility closure costs of $0.3 million were related to ongoing costs for our aluminum wheel facilities in Howell, Michigan and Huntington, Indiana. Asset impairments of $2.7 million were related to our aluminum wheel facilities in Howell, Michigan and Chihuahua, Mexico, which were impaired to the fair value in accordance with SFAS 144, and Hoboken, Belgium, which was sold during the second quarter of fiscal 2008. Severance and other restructuring costs of $0.1 million were related to our aluminum wheel facility in Dello, Italy.

Expense of $0.2 million in the Other segment consists of $0.1 million for facility closure cost and severance of $0.1 million for our Ferndale, Michigan technical center, which was closed in fiscal 2007.

*Facility Exit Costs and Severance Accruals*

The following tables shows the activity in the balance sheet accounts affected by severance and other facility exit costs during the periods indicated (dollars in millions):

| | Three Months Ended April 30, 2009 | | | |
| | January 31, 2009 Accrual | Expense | Cash Payments and Effects of Foreign Currency | April 30, 2009 Accrual |
|---|---|---|---|---|
| Facility closure costs | $    0.2 | $    0.7 | $        (0.7) | $    0.2 |
| Severance and other restructuring costs | 4.0 | 2.9 | (3.2) | 3.7 |
| Total | $    4.2 | $    3.6 | $        (3.9) | $    3.9 |

| | Three Months Ended April 30, 2008 | | | |
| | January 31, 2008 Accrual | Expense | Cash Payments and Effects of Foreign Currency | April 30, 2008 Accrual |
|---|---|---|---|---|
| Facility closure costs | $    — | $    0.4 | $        (0.4) | $    — |
| Severance and other restructuring costs | 0.2 | 0.2 | (0.2) | 0.2 |
| Total | $    0.2 | $    0.6 | $        (0.6) | $    0.2 |

## Note 8. Weighted Average Shares Outstanding

Shares outstanding for the three months ended April 30, 2009 and 2008 were as follows (thousands of shares):

| | Three Months Ended April 30, | |
| | 2009 | 2008 |
|---|---|---|
| Basic weighted average shares outstanding | 101,820 | 101,071 |
| Dilutive effect of unvested restricted stock and options | — | — |
| Diluted weighted average shares outstanding | 101,820 | 101,071 |

For the three months ended April 30, 2009 and 2008 all options and unvested restricted stock units were excluded from the calculation of diluted loss per share on the Consolidated Statements of Operations as the effect was anti-dilutive due to the net loss in those periods.

On June 8, 2009 we were delisted from the NASDAQ Stock Market following the filing of our Chapter 11 proceeding. We believe that our currently outstanding common stock will have no value and will be cancelled under any plan of reorganization we may propose under Chapter 11. The opportunity for any recovery by holders of our common stock under such reorganization plan is unlikely and our shares are likely to be cancelled without any compensation pursuant to such plan.

## Note 9. Taxes on Income

Income tax expense allocated to continuing operations for the three months ended April 30, 2009 and 2008 were as follows (dollars in millions):

| | Three Months Ended April 30, | | | |
| | 2009 | | 2008 | |
| | US | Foreign | US | Foreign |
|---|---|---|---|---|
| Pre-tax income (loss) | $(34.6) | $(26.1) | $(18.1) | $24.8 |
| Income tax expense (benefit) | 0.8 | (2.4) | 0.3 | 12.7 |

The tax benefit in the current quarter primarily relates to international tax losses generated, which we expect to utilize in the future, partially offset by withholding tax expense in the US. Income tax expense for the three months ended April 30, 2008 was primarily the result of tax expense in foreign jurisdictions and various states.

13

We have determined that a valuation allowance is required against all net deferred tax assets in the United States and certain deferred tax assets in foreign jurisdictions. As such, there is no federal income tax benefit recorded against current losses incurred in the United States.

The amount of unrecognized tax benefits was $4.9 million and $4.8 million at April 30, 2009 and January 31, 2009 respectively, without related accrued interest and penalties. The amount of unrecognized tax benefits may increase or decrease in the future for various reasons including adding amounts for current tax year positions, expiration of open income tax returns due to the statutes of limitation, changes in management's judgment about the level of uncertainty, status of examinations, litigation and legislative activity, and the addition or elimination of uncertain tax positions. Our policy is to report interest related to unrecognized tax benefits in interest expense and penalties, if any, related to unrecognized tax benefits in income tax expense in our Consolidated Statements of Operations.

We have open tax years from primarily 2001 to 2008 with various significant taxing jurisdictions including the United States, Germany, Italy, Brazil, Turkey, Spain and Czech Republic. These open years contain matters that could be subject to differing interpretations of applicable tax laws and regulations as they relate to the amount, timing or inclusion of revenue and expenses or the sustainability of income tax credits for a given audit cycle. We have recorded a tax benefit only for those positions that meet the more-likely-than-not standard.

## Note 10. Segment Reporting

We are organized based primarily on markets served and products produced. Under this organizational structure, our operating segments have been aggregated into two reportable segments: Automotive Wheels and Other. The Automotive Wheels segment includes results from our operations that primarily design and manufacture fabricated steel and cast aluminum wheels for original equipment manufacturers in the global passenger car, light vehicle, and commercial vehicle markets. The Other segment includes results from our operations that primarily design and manufacture powertrain components for the passenger car and light vehicle markets as well as financial results related to the corporate office and the elimination of certain intercompany activities.

The following tables present revenues and other financial information by business segment (dollars in millions):

| | Three Months Ended April 30, 2009 | | |
| | Automotive Wheels | Other | Total |
|---|---|---|---|
| Net sales | $247.1 | $ 11.1 | $258.2 |
| Asset impairments and other restructuring charges | 3.6 | 0.6 | 4.2 |
| Loss from operations | (30.2) | (10.8) | (41.0) |

| | Three Months Ended April 30, 2008 | | |
| | Automotive Wheels | Other | Total |
|---|---|---|---|
| Net sales | $562.0 | $11.8 | $573.8 |
| Asset impairments and other restructuring charges | 3.1 | 0.2 | 3.3 |
| Earnings from operations | 16.8 | 4.9 | 21.7 |

| | As of April 30, 2009 | | |
| | Automotive Wheels | Other | Total |
|---|---|---|---|
| Total assets | $1,156.1 | $(132.0) | $1,024.1 |

| | As of January 31, 2009 | | |
| | Automotive Wheels | Other | Total |
|---|---|---|---|
| Total assets | $1,171.8 | $(75.6) | $1,096.2 |

As we do not prepare consolidated financial statements by country, providing a breakdown of net assets by geographic areas in which we operate is impracticable **.**

### Note 11. Noncontrolling Interest in Consolidated Financial Statements

In December 2007, the FASB issued SFAS 160, "Noncontrolling Interests in Consolidated Financial Statements" (SFAS 160). SFAS 160 became effective for fiscal years beginning on or after December 15, 2008. We adopted SFAS 160 on a prospective basis on February 1, 2009, except for the presentation and disclosure requirements which were applied retrospectively for all periods presented. The adoption of SFAS 160 had an impact on the presentation and disclosure of noncontrolling interests in the consolidated financial statements. The former "minority interest" is now called "noncontrolling interest" in the consolidated financial statements. The presentation of the mezzanine section of the minority interest is now part of the equity on the consolidated balance sheet. Additionally, the adoption of SFAS 160 had the effect of reclassifying income (loss) attributable to the noncontrolling interest in the consolidated statements of operations from minority interest to separate line items and net income (loss) be adjusted to include net income (loss) attributable to both noncontrolling interest and controlling interest.

The consolidated financial statements include the accounts of our majority-owned subsidiaries in which we have control. The balance sheet and results of operations of controlled subsidiaries where ownership is greater than 50 percent are included in the consolidated financial statements and are offset by a related adjustment to equity and interest expense for the noncontrolling interest ownership.

Noncontrolling interest includes common shares in consolidated subsidiaries where our ownership is less than 100 percent and preferred stock issued by HLI Opco. The preferred stock is redeemable by HLI Opco at any time after June 3, 2013, and may be exchanged at the option of the holders at any time for shares of our common stock. The holders of the preferred stock are entitled to cash dividends of 8% of the liquidation preference per annum when, as, and if declared by the Board of Directors of HLI Opco. Dividends accrue without interest from the date of issuance until declared and paid or until the shares are redeemed by HLI Opco or exchanged by the holders thereof.

The balance of noncontrolling interest is summarized as follows (dollars in millions):

|  | April 30, 2009 | January 31, 2009 |
|---|---|---|
| Noncontrolling interest in consolidated affiliates | $ 50.8 | $ 54.3 |
| Noncontrolling interest in preferred stock | 11.7 | 11.5 |
| Total noncontrolling interest | $ 62.5 | $ 65.8 |

### Note 12. Fair Value Measurement

On February 1, 2008 we adopted SFAS 157 for fair value measurements of financial assets and financial liabilities that are recognized or disclosed at fair value in the financial statements on a recurring basis. In February 2008, the FASB issued FASB Staff Position 157-2, "Effective Date of FASB Statement No. 157" (FSP 157-2). This FSP delays the effective date of SFAS 157 for all nonfinancial assets and nonfinancial liabilities, except those that are recognized or disclosed at fair value in the financial statements on a recurring basis (at least annually). The effective date for nonfinancial assets and nonfinancial liabilities has been delayed by one year to fiscal years beginning after November 15, 2008 and interim periods within those fiscal years. We adopted FSP 157-2 on February 1, 2009.

SFAS 157 defines fair value as the price that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date. SFAS 157 also establishes a framework for measuring fair value and expands disclosures about fair value measurements. As a basis for considering market participant assumptions in fair value measurements, SFAS 157 establishes a fair-value hierarchy that prioritizes inputs for valuation techniques used to measure fair value as follows:

Level 1: Observable inputs, such as quoted market prices in active markets, for identical assets or liabilities that are accessible at the measurement date.

Level 2: Inputs, other than quoted market prices included in Level 1, that are observable either directly or indirectly for the asset or liability.

Level 3: Unobservable inputs that reflect the entity's own assumptions about the exit price of the asset or liability. Unobservable inputs may be used if there is little or no market data for the asset or liability at the measurement date.

Assets and liabilities measured at fair value are based on one or more of the following three valuation techniques noted in SFAS 157:

Market approach: Uses prices and other relevant information generated by market transactions involving identical or comparable assets or liabilities.

Income approach: Uses valuation techniques to convert future amounts to a single present value amount based on current market expectations.

Cost approach: The amount that would be required to replace the service capacity of the asset (replacement costs).

Our financial instruments include cash, marketable securities, trade receivables, other receivables, trade payables, and short-term debt. Due to the short-term nature of these instruments, the book value approximates fair value.

We generally manage our interest rate risks associated with interest rate movements through the use of a combination of variable and fixed rate debt. From time to time, we have entered into interest rate swap arrangements to further hedge against interest rate fluctuations (cash flow hedge). As of April 30, 2009 and January 31, 2009, we had four interest rate swaps, two with Deutsche Bank and two with UBS Bank.

The following table provides a summary of the interest rate swaps as of April 30 and January 31, 2009 (in millions):

|  | Hedge Type | Notional Amount | Maturity |
|---|---|---|---|
| Deutsche Bank Swap | Cash flow hedge | €40.0 | 8/28/2012 |
| Deutsche Bank Swap | Cash flow hedge | €30.0 | 8/28/2012 |
| UBS Swap | Cash flow hedge | €25.0 | 9/30/2012 |
| UBS Swap | Cash flow hedge | €25.0 | 9/30/2012 |

The fair value related to the interest rate swaps as shown in the following table are included in other accrued liabilities on the Consolidated Balance Sheets for the years indicated (dollars in millions):

|  | April 30, 2009 | | | January 31, 2009 | | |
|---|---|---|---|---|---|---|
|  | Carrying Value | Fair Value | Fair Value Hierarchy | Carrying Value | Fair Value | Fair Value Hierarchy |
| Deutsche Bank Swap, €40 million | $ 1.0 | $ 1.0 | Level 3 | $ 1.9 | $ 1.9 | Level 2 |
| Deutsche Bank Swap, €30 million | 0.7 | 0.7 | Level 3 | 1.4 | 1.4 | Level 2 |
| UBS Swap, €25 million | 0.2 | 0.2 | Level 3 | 1.2 | 1.2 | Level 2 |
| UBS Swap, €25 million | 0.2 | 0.2 | Level 3 | 1.1 | 1.1 | Level 2 |
| Total swaps | $ 2.1 | $ 2.1 | | $ 5.6 | $ 5.6 | |

The fair values of the financial instruments shown in the above table as of April 30 and January 31, 2009 represent management's best estimates of the amounts that would be paid to transfer those liabilities in an orderly transaction between market participants at those dates. Those fair value measurements maximize the use of unobservable inputs as of April 30, 2009 and observable inputs as of January 31, 2009. The inputs used in calculating the fair value of the interest rate swaps as of April 30, 2009 were based on ongoing restructuring negotiations with our creditors. For the three months ended April 30, 2009, we recorded income of 3.5 million due to the fair value adjustment, which is included in interest expense, net in our consolidated statements of operations.

## Note 13. Derivative Instruments and Hedging Activities

In March 2008 the FASB issued SFAS 161, "Disclosures about Derivative Instruments and Hedging Activities, an amendment of FASB Statement No. 133" (SFAS 161). This statement is intended to improve transparency in financial reporting by requiring enhanced disclosures of an entity's derivative instruments and hedging activities and their effects on the entity's financial position, financial performance, and cash flows. SFAS 161 applies to all derivative instruments within the scope of SFAS 133, "Accounting for Derivative Instruments and Hedging Activities" (SFAS 133) as well as related hedged items, bifurcated derivatives, and nonderivative instruments that are designated and qualify as hedging instruments. Entities with instruments subject to SFAS 161 must provide more robust qualitative disclosures and expanded quantitative disclosures. SFAS 161 is effective prospectively for financial statements issued for fiscal years and interim periods beginning after November 15, 2008, with early application permitted. The adoption of this statement did not have a material effect on the Company's financial statements.

We generally manage our risk associated with interest rate movements through the use of a combination of variable and fixed rate debt. We have from time to time entered into interest rate swap arrangements to further hedge against interest rate fluctuations.

We are exposed to fluctuations in interest rates on our variable rate debt. During the second quarter of fiscal 2007, we entered into interest rate swaps with total notional amount of € 70 millinn. The swaps became effective on August 28, 2007 and were scheduled to mature on August 28, 2012. During the third quarter of fiscal 2007, we entered into interest rate swaps with total notional amount of € 50 million. The swaps became effective on September 30, 2007 and were scheduled to mature on September 30, 2012. Due to the amendment to our credit agreement in January 2009, our swaps were not effective during the quarter ended April 30, 2009 and income of $3.5 million was recognized in the consolidated statements of operations as interest expense, net. We recorded a gain of $3.0 million to other comprehensive income for the quarter ended April 30, 2008 as the swaps were effective at that time. In May 2009, these interest rate swap agreements were terminated due to our bankruptcy filing on May 11, 2009, which was in violation of the swap agreements.

See *Note 12, Fair Value Measurement* for the fair value calculations of our interest rate swaps.

## Note 14. New Accounting Pronouncements

In June 2009 the FASB issued SFAS 167, "Amendments to FASB Interpretation No. 46(R)" (SFAS 167). SFAS 167 eliminates Interpretation 46(R)'s exceptions to consolidating qualifying special-purpose entities, contains new criteria for determining the primary beneficiary, and increases the frequency of required reassessments to determine whether a company is the primary beneficiary of a variable interest entity. SFAS 167 also contains a new requirement that any term, transaction, or arrangement that does not have a substantive effect on an entity's status as a variable interest entity, a company's power over a variable interest entity, or a company's obligation to absorb losses or its right to receive benefits of an entity must be disregarded in applying Interpretation 46(R)'s provisions. The elimination of the qualifying special-purpose entity concept and its consolidation exceptions means more entities will be subject to consolidation assessments and reassessments. SFAS 167 will be effective for our fiscal year beginning February 1, 2010. We are currently assessing the potential impacts, if any, on our consolidated financial statements.

In June 2009 the FASB issued SFAS 166, "Accounting for Transfers of financial Assets — an amendment of FASB Statement No. 140" (SFAS 166). SFAS 166 eliminates the concept of a qualifying special-purpose entity, creates more stringent conditions for reporting a transfer of a portion of a financial asset as a sale, clarifies other sale-accounting criteria, and changes the initial measurement of a transferor's interest in transferred financial assets. SFAS 166 will be effective for our fiscal year beginning February 1, 2010. We are currently assessing the potential impacts, if any, on our consolidated financial statements.

In May 2009 the FASB issued SFAS 165, "Subsequent Events" (SFAS 165). SFAS 165 establishes general standards of accounting for and disclosure of events that occur after the balance sheet date but before financial statements are issued or are available to be issued. It should not result in significant changes in the subsequent events that an entity reports, either through recognition or disclosure in its financial statements. SFAS 165 introduces the concept of financial statements being *available to be issued.* It requires the disclosure of the date through which an entity has evaluated subsequent events and the basis for that date, that is, whether that date represents the date the financial statements were issued or were available to be issued. This disclosure should alert all users of financial statements that an entity has not evaluated subsequent events after that date in the set of financial statements being presented. SFAS 165 will apply to both interim financial statements and annual financial statements after June 15, 2009. We do not anticipate that the adoption of SFAS 165 will have a significant impact on our financial condition or results of operations.

In December 2008 the FASB issued FASB Staff Position SFAS 132(R)-1, "Employers' Disclosures about Postretirement Benefit Plan Assets" (FSP SFAS 132(R)-1). FSP SFAS 132(R)-1 provides enhanced disclosures with regard to assets held by postretirement plans, including how investment allocations are made, the major categories of plan assets, the inputs and valuation techniques used to measure the fair value of plan assets, the effect of fair value measurements using Level 3 inputs, as defined in SFAS 157, "Fair Value Measurements" (SFAS 157) and an understanding of significant concentrations of risk within plan assets. FSP SFAS 132(R)-1 is effective for fiscal years ending after December 15, 2009, with early application permitted. We are currently assessing the potential impacts, if any, on our consolidated financial statements.

**Note 15. Condensed Consolidating Financial Statements**

The following condensed consolidating financial statements present the financial information required with respect to those entities that guarantee certain of our debt.

The condensed consolidating financial statements are presented based on the equity method of accounting. Under this method, the investments in subsidiaries are recorded at cost and adjusted for our share of the subsidiaries' cumulative results of operations, capital contributions, distributions, and other equity changes. The principal elimination entries eliminate investments in subsidiaries and intercompany balances and transactions.

*Guarantor and Nonguarantor Financial Statements*

As of April 30, 2009 Hayes Lemmerz International, Inc. (Hayes), HLI Parent Company, Inc. (Parent), HLI Opco, and substantially all of our domestic subsidiaries and certain of our foreign subsidiaries (collectively, excluding Hayes, the Guarantors) fully and unconditionally guaranteed, on a joint and several basis, the Senior Notes. This guarantor structure is a result of the restructuring of our debt in May of 2007. At April 30, 2009 certain of our foreign subsidiaries were not obligated to guaranty the Senior Notes, nor were our domestic subsidiaries that are special purpose entities formed for domestic accounts receivable securitization programs (collectively, the Nonguarantor Subsidiaries). In lieu of providing separate unaudited financial statements for each of the Guarantors, we have included the unaudited supplemental guarantor condensed consolidating financial statements. We do not believe that separate financial statements for each of the Guarantors are material to investors. Therefore, separate financial statements and other disclosures concerning the Guarantors are not presented.

### CONDENSED CONSOLIDATING STATEMENTS OF OPERATIONS
#### For the Three Months Ended April 30, 2009
#### (Unaudited)

| | Parent | Issuer | Guarantor Subsidiaries | Nonguarantor Subsidiaries | Eliminations | Total |
|---|---|---|---|---|---|---|
| | | | (Dollars in millions) | | | |
| Net sales | $ — | $ — | $ 172.5 | $ 88.7 | $ (3.0) | $258.2 |
| Cost of goods sold | — | — | 174.4 | 87.0 | (2.8) | 258.6 |
| Gross profit | — | — | (1.9) | 1.7 | (0.2) | (0.4) |
| Marketing, general, and administrative | — | 0.3 | 30.1 | 5.0 | — | 35.4 |
| Equity in losses (earnings) of subsidiaries and joint ventures | 58.4 | — | — | — | (58.4) | — |
| Amortization of intangibles | — | — | 0.2 | 1.8 | — | 2.0 |
| Asset impairments and other restructuring charges | — | — | 2.6 | 1.6 | — | 4.2 |
| Other income, net | — | — | (0.9) | (0.1) | — | (1.0) |
| (Loss) earnings from operations | (58.4) | (0.3) | (33.9) | (6.6) | 58.2 | (41.0) |
| Interest expense (income), net | — | 17.0 | 2.5 | 2.5 | — | 22.0 |
| Other non-operating income | — | (0.1) | (1.5) | (0.7) | — | (2.3) |
| (Loss) earnings from operations before taxes | (58.4) | (17.2) | (34.9) | (8.4) | 58.2 | (60.7) |
| Income tax expense (benefit) | — | 0.3 | (1.0) | (0.9) | — | (1.6) |
| Consolidated net (loss) income | (58.4) | (17.5) | (33.9) | (7.5) | 58.2 | (59.1) |
| Less: Net loss attributable to noncontrolling interest | — | — | — | (0.6) | — | (0.6) |
| Net loss (income) attributable to Hayes Lemmerz International, Inc | (58.4) | (17.5) | (33.9) | (6.9) | 58.2 | (58.5) |

18

**CONDENSED CONSOLIDATING STATEMENTS OF OPERATIONS**
**For the Three Months Ended April 30, 2008**
**(Unaudited)**

| | Parent | Issuer | Guarantor Subsidiaries | Nonguarantor Subsidiaries | Eliminations | Total |
|---|---|---|---|---|---|---|
| | | | (Dollars in millions) | | | |
| Net sales | $ — | $ — | $ 360.3 | $ 237.2 | $ (23.7) | $ 573.8 |
| Cost of goods sold | — | — | 328.7 | 205.1 | (23.7) | 510.1 |
| Gross profit | — | — | 31.6 | 32.1 | — | 63.7 |
| Marketing, general, and administrative | — | 0.3 | 27.5 | 11.5 | — | 39.3 |
| Equity in losses (earnings) of subsidiaries and joint ventures | 12.8 | — | — | — | (12.8) | — |
| Amortization of intangibles | — | — | 0.2 | 2.6 | — | 2.8 |
| Asset impairments and other restructuring charges | — | — | 2.4 | 0.9 | — | 3.3 |
| Other income, net | — | — | (2.2) | (1.2) | — | (3.4) |
| (Loss) earnings from operations | (12.8) | (0.3) | 3.7 | 18.3 | 12.8 | 21.7 |
| Interest expense, net | — | 20.2 | (9.8) | 2.9 | — | 13.3 |
| Other non-operating expense | — | — | 0.9 | — | 0.8 | 1.7 |
| (Loss) earnings from operations before taxes | (12.8) | (20.5) | 12.6 | 15.4 | 12.0 | 6.7 |
| Income tax expense | — | — | 7.5 | 5.5 | — | 13.0 |
| Consolidated net (loss) income | (12.8) | (20.5) | 5.1 | 9.9 | 12.0 | (6.3) |
| Less: Net income attributable to noncontrolling interest | — | — | — | 6.5 | — | 6.5 |
| Net loss (income) attributable to Hayes Lemmerz International, Inc | (12.8) | (20.5) | 5.1 | 3.4 | 12.0 | (12.8) |

19

**CONDENSED CONSOLIDATING BALANCE SHEETS**
**As of April 30, 2009**
**(Unaudited)**

| | Parent | Issuer | Guarantor Subsidiaries | Nonguarantor Subsidiaries | Eliminations | Total |
|---|---|---|---|---|---|---|
| | | | (Dollars in millions) | | | |
| **Current Assets:** | | | | | | |
| Cash and cash equivalents | $ — | $ 5.8 | $ 28.1 | $ 22.8 | $ — | $ 56.7 |
| Receivables, net | — | — | 71.9 | 64.9 | — | 136.8 |
| Other receivables | — | — | 28.9 | 28.9 | (28.9) | 28.9 |
| Inventories | — | — | 98.3 | 53.5 | — | 151.8 |
| Assets held for sale | — | — | 8.6 | — | — | 8.6 |
| Prepaid expenses and other current assets | — | — | 8.4 | 3.9 | (0.8) | 11.5 |
| Total current assets | — | 5.8 | 244.2 | 174.0 | (29.7) | 394.3 |
| Property, plant, and equipment, net | — | — | 290.4 | 206.1 | (0.1) | 496.4 |
| Intangible and other assets, net | (343.0) | 716.7 | 530.1 | 47.4 | (817.8) | 133.4 |
| Total assets | $ (343.0) | $ 722.5 | $ 1,064.7 | $ 427.5 | $ (847.6) | $ 1,024.1 |
| | | | | | | |
| **Current Liabilities:** | | | | | | |
| Bank borrowings and other notes | $ — | $ — | $ 17.8 | $ 16.7 | $ — | $ 34.5 |
| Current portion of long-term debt | — | 509.4 | 125.2 | 0.7 | — | 635.3 |
| Accounts payable and other accrued liabilities | — | 10.7 | 172.5 | 82.6 | (26.3) | 239.5 |
| Total current liabilities | — | 520.1 | 315.5 | 100.0 | (26.3) | 909.3 |
| Long-term debt, net of current portion | — | — | 0.8 | 0.8 | — | 1.6 |
| Pension and other long-term liabilities | — | — | 324.5 | 73.6 | (4.4) | 393.7 |
| Parent loans | — | 5.5 | (134.2) | 151.4 | (22.7) | — |
| Total liabilities | — | 525.6 | 506.6 | 325.8 | (53.4) | 1,304.6 |
| | | | | | | |
| **Stockholders' Deficit:** | | | | | | |
| Common stock | 1.0 | — | — | — | — | 1.0 |
| Additional paid-in capital | 887.7 | 399.9 | 1,127.6 | 327.7 | (1,855.2) | 887.7 |
| Retained earnings (accumulated deficit) | (1,360.7) | (255.3) | (622.5) | (373.2) | 1,251.0 | (1,360.7) |
| Accumulated other comprehensive income (loss) | 129.0 | 52.3 | 41.3 | 95.4 | (189.0) | 129.0 |
| Total Hayes lemmerz International, Inc. stockholders' (deficit) equity | (343.0) | 196.9 | 546.4 | 49.9 | (793.2) | (343.0) |
| Noncontrolling interest | — | — | 11.7 | 51.8 | (1.0) | 62.5 |
| Total stockholders' (deficit) equity | (343.0) | 196.9 | 558.1 | 101.7 | (794.2) | (280.5) |
| Total liabilities and stockholders' (deficit) equity | $ (343.0) | $ 722.5 | $ 1,064.7 | $ 427.5 | $ (847.6) | $ 1,024.1 |

20

**CONDENSED CONSOLIDATING BALANCE SHEETS**
**As of January 31, 2009**

| | Parent | Issuer | Guarantor Subsidiaries | Nonguarantor Subsidiaries | Eliminations | Total |
|---|---|---|---|---|---|---|
| | | | (Dollars in millions) | | | |
| **Current Assets:** | | | | | | |
| Cash and cash equivalents | $ — | $ 5.8 | $ 61.2 | $ 40.5 | $ — | $ 107.5 |
| Receivables, net | — | — | 84.6 | 72.7 | — | 157.3 |
| Other receivables | — | — | 15.4 | 15.4 | (15.4) | 15.4 |
| Inventories | — | — | 100.5 | 56.4 | — | 156.9 |
| Assets held for sale | — | — | 8.1 | — | — | 8.1 |
| Prepaid expenses and other current assets | — | — | 7.4 | 4.3 | (0.8) | 10.9 |
| Total current assets | — | 5.8 | 277.2 | 189.3 | (16.2) | 456.1 |
| Property, plant, and equipment, net | — | — | 293.1 | 206.2 | (0.1) | 499.2 |
| Intangible and other assets, net | (292.9) | 702.7 | 496.2 | 48.4 | (813.5) | 140.9 |
| Total assets | $ (292.9) | $ 708.5 | $ 1,066.5 | $ 443.9 | $ (829.8) | $ 1,096.2 |
| | | | | | | |
| **Current Liabilities:** | | | | | | |
| Bank borrowings and other notes | $ — | $ — | $ 25.3 | $ 21.3 | $ — | $ 46.6 |
| Current portion of long-term debt | — | 496.1 | 125.2 | 0.8 | — | 622.1 |
| Liabilities held for sale | — | — | — | — | — | — |
| Accounts payable and other accrued liabilities | — | 6.6 | 166.3 | 92.4 | (12.8) | 252.5 |
| Total current liabilities | — | 502.7 | 316.8 | 114.5 | (12.8) | 921.2 |
| Long-term debt, net of current portion | — | — | 0.6 | 0.8 | — | 1.4 |
| Pension and other long-term liabilities | — | — | 331.4 | 73.6 | (4.3) | 400.7 |
| Parent loans | — | (3.2) | (50.4) | 143.4 | (89.8) | — |
| Total liabilities | — | 499.5 | 598.4 | 332.3 | (106.9) | 1,323.3 |
| | | | | | | |
| **Stockholders' Deficit:** | | | | | | |
| Common stock | 1.0 | — | — | — | — | 1.0 |
| Additional paid-in capital | 887.1 | 399.9 | 1,077.8 | 334.9 | (1,812.6) | 887.1 |
| Retained earnings (accumulated deficit) | (1,302.1) | (237.8) | (590.7) | (364.0) | 1,192.5 | (1,302.1) |
| Accumulated other comprehensive income (loss) | 121.1 | 46.9 | (30.6) | 85.5 | (101.8) | 121.1 |
| Total Hayes lemmerz International, Inc. stockholders' (deficit) equity | (292.9) | 209.0 | 456.5 | 56.4 | (721.9) | (292.9) |
| Noncontrolling interest | — | — | 11.6 | 55.2 | (1.0) | 65.8 |
| Total stockholders' (deficit) equity | (292.9) | 209.0 | 468.1 | 111.6 | (722.9) | (227.1) |
| Total liabilities and stockholder's (deficit) equity | $ (292.9) | $ 708.5 | $ 1,066.5 | $ 443.9 | $ (829.8) | $ 1,096.2 |

**CONDENSED CONSOLIDATING STATEMENTS OF CASH FLOWS**
**For the Three Months Ended April 30, 2009**
**(Unaudited)**

| | Parent | Issuer | Guarantor Subsidiaries | Nonguarantor Subsidiaries | Eliminations | Total |
|---|---|---|---|---|---|---|
| | | | (Dollars in millions) | | | |
| Cash flows used for operating activities | $ — | $ (8.9) | $ (14.8) | $ (9.4) | $ — | $ (33.1) |
| Cash flows from investing activities: | | | | | | |
| Purchase of property, plant, equipment, and tooling | — | — | (1.0) | (1.5) | — | (2.5) |
| Investments in subsidiaries | (0.6) | (0.2) | 4.2 | (1.6) | (1.8) | — |
| Proceeds from sale of assets | — | — | 0.2 | — | — | 0.2 |
| Cash provided by (used for) investing activities | (0.6) | (0.2) | 3.4 | (3.1) | (1.8) | (2.3) |
| Cash flows from financing activities: | | | | | | |
| Changes in bank borrowings and credit facilities | — | — | (8.2) | (4.0) | — | (12.2) |
| Proceeds from long term debt | — | — | 0.2 | — | — | 0.2 |
| Repayment of long-term debt | — | — | — | (0.1) | | (0.1) |
| Dividends paid to minority shareholders | — | — | — | (3.7) | | (3.7) |
| Proceeds from parent investments | 0.6 | — | (0.6) | — | — | — |
| Cash (used for) provided by financing activities | 0.6 | — | (8.6) | (7.8) | — | (15.8) |
| (Decrease) increase in parent loans and advances | — | 8.3 | (12.7) | 2.6 | 1.8 | — |
| Cash flows from discontinued operations | — | — | (0.7) | | | (0.7) |
| Effect of exchange rates on cash and cash equivalents | — | 0.8 | 0.3 | | | 1.1 |
| (Decrease) increase in cash and cash equivalents | — | — | (33.1) | (17.7) | | (50.8) |
| Cash and cash equivalents at beginning of period | — | 5.8 | 61.2 | 40.5 | — | 107.5 |
| Cash and cash equivalents at end of period | $ — | $ 5.8 | $ 28.1 | $ 22.8 | $ — | $ 56.7 |

22

**CONDENSED CONSOLIDATING STATEMENTS OF CASH FLOWS**
**For the Three Months Ended April 30, 2008**
**(Unaudited)**

| | Parent | Issuer | Guarantor Subsidiaries | Nonguarantor Subsidiaries | Eliminations | Total |
|---|---|---|---|---|---|---|
| | | | (Dollars in millions) | | | |
| Cash flows used for operating activities | $ — | $ (14.8) | $ (9.3) | $ (6.9) | $ (0.8) | $ (31.8) |
| Cash flows from investing activities: | | | | | | |
| Purchase of property, plant, equipment, and tooling | — | — | (7.4) | (11.8) | — | (19.2) |
| Investments in subsidiaries | — | (0.6) | (29.3) | (35.4) | 65.3 | — |
| Proceeds from sale of assets | — | — | 0.3 | 0.2 | — | 0.5 |
| Cash (used for) provided by investing activities | — | (0.6) | (36.4) | (47.0) | 65.3 | (18.7) |
| Cash flows from financing activities: | | | | | | |
| Changes in bank borrowings and credit facilities | — | — | — | 2.1 | — | 2.1 |
| Repayment of long-term debt | — | — | — | (0.1) | — | (0.1) |
| Dividends paid to minority shareholders | — | — | — | (7.3) | — | (7.3) |
| Proceeds from parent investments | — | — | 38.7 | 27.8 | (66.5) | — |
| Cash provided by (used for) financing activities | — | — | 38.7 | 22.5 | (66.5) | (5.3) |
| (Decrease) increase in parent loans and advances | — | (25.9) | (5.4) | 29.3 | 2.0 | — |
| Effect of exchange rates on cash and cash equivalents | — | 2.3 | 0.6 | (0.5) | — | 2.4 |
| Decrease in cash and cash equivalents | — | (39.0) | (11.8) | (2.6) | — | (53.4) |
| Cash and cash equivalents at beginning of period | — | 84.7 | 30.3 | 45.2 | — | 160.2 |
| Cash and cash equivalents at end of period | $ — | $ 45.7 | $ 18.5 | $ 42.6 | $ — | $ 106.8 |

### Note 16. Subsequent Events

On May 11, 2009, the Debtors filed voluntary petitions for reorganization under Chapter 11 of the Bankruptcy Code. On May 12, 2009 and May 19, 2009 we, HLI Opco and Hayes Luxembourg, entered into amendments to the Credit Agreement to provide up to $100 million in New Money DIP Loans and $100 million in Roll-up Loans, respectively. The Bankruptcy Court granted final approval of the DIP Credit Agreement on June 15, 2009. With the exception of Hayes Luxembourg, the Company's subsidiaries and operations outside the United States were not included in the filing are not debtors in the Chapter 11 cases or any other proceeding outside the United States, and are expected to continue to operate in the ordinary course of business outside and unaffected by the Chapter 11 cases process.

We cannot provide any assurance as to what values, if any, will be ascribed in our bankruptcy proceedings to our various pre-petition liabilities, common stock, and other securities. On June 8, 2009, our common stock was delisted from the NASDAQ Global Market following our filings under Chapter 11. We believe that our currently outstanding common stock will have no value and will be cancelled under any plan of reorganization we may propose under Chapter 11. We also believe that the holders of our Senior Notes are unlikely to receive more than a de minimis distribution on account of their interests in the Senior Notes and that such interests could be cancelled under any plan of reorganization the Company may propose under Chapter 11. There can, however, be no assurance, however, that the Company will be able to develop, propose, and implement a successful plan of reorganization.

On June 8 2009 we were delisted from the NASDAQ Stock Market following the filing of our Chapter 11 proceeding. We believe that our currently outstanding common stock will have no value and will be cancelled under any plan of reorganization we may propose under Chapter 11.

In May 2009 our interest rate swap agreements were terminated due to our bankruptcy filing on May 11, 2009.

## Item 2. *Management's Discussion and Analysis of Financial Condition and Results of Operations*

### Executive Summary and Chapter 11 Matters

This discussion should be read in conjunction with the our Annual Report on Form 10-K for the fiscal year ended January 31, 2009 as filed with the Securities and Exchange Commission on May 11, 2009, and the other information included herein. Unless otherwise indicated, references to "we," "us," or "our" mean Hayes Lemmerz International, Inc., a Delaware corporation, and its subsidiaries. References to a fiscal year means the 12-month period commencing on February 1 of that year and ending on January 31 of the following year (i.e., "fiscal 2009" refers to the period beginning February 1, 2009 and ending January 31, 2010, "fiscal 2008" refers to the period beginning February 1, 2008 and ending January 31, 2009).

#### Company Overview

Originally founded in 1908, we are a leading worldwide producer of aluminum and steel wheels for passenger cars and light trucks and of steel wheels for commercial trucks and trailers. We are also a supplier of automotive powertrain components. We have global operations with 23 facilities, including business and sales offices and manufacturing facilities located in 12 countries around the world. We sell our products to every major North American, Japanese, and European manufacturer of passenger cars and light trucks and to commercial highway vehicle customers throughout the world.

Sales of our wheels and powertrain components produced in North America are directly affected by the overall level of passenger car, light truck, and commercial highway vehicle production of North American OEMs, while sales of our wheels in Europe are directly affected by the overall vehicle production in Europe. The North American and European automotive industries are sensitive to the overall strength of their respective economies.

We are organized based primarily on markets served and products produced. Under this organizational structure, our operating segments have been aggregated into two reportable segments: Automotive Wheels and Other. The Automotive Wheels segment includes results from our operations that primarily design and manufacture fabricated steel and cast aluminum wheels for original equipment manufacturers in the global passenger car, light vehicle, and commercial vehicle markets. The Other segment includes results from our operations that primarily design and manufacture powertrain components for passenger car and light vehicle markets as well as financial results related to the corporate office and the elimination of certain intercompany activities.

In the first three months of fiscal 2009 we had net sales of $258.2 million with approximately 74% derived from international markets. In the three months of fiscal 2008 we had net sales of $573.8 million with approximately 84% derived from international markets. We had loss from operations of $41.0 million for the first three months of fiscal 2009 compared to earnings from operations of $21.7 million for the first three months of fiscal 2008.

### Chapter 11 Bankruptcy Filings

On May 11, 2009, we and certain of our subsidiaries (together with us, Debtors) filed voluntary petitions for reorganization under Chapter 11 of Title 11 of the United States Code (Bankruptcy Code) in the United States Bankruptcy Court for the District of Delaware (Bankruptcy Court). The cases are being jointly administered under Case No. 09-11655 (MFW). With the exception of Hayes Lemmerz Finance LLC—Luxembourg S.C.A. (Hayes Luxembourg), the Company's subsidiaries and operations outside the United States were not included in the filing, are not debtors in the Chapter 11 cases or any other proceeding outside the United States, and are expected to continue to operate in the ordinary course of business outside and unaffected by the Chapter 11 cases and process.

We cannot provide any assurance as to what values, if any, will be ascribed in our bankruptcy proceedings to our various pre-petition liabilities, common stock, and other securities. We believe that our currently outstanding common stock will have no value and will be canceled under any plan of reorganization we may propose under Chapter 11. We also believe that the holders of our Senior Notes are unlikely to receive more than a de minimis distribution on account of their interests in the Senior Notes and that such interests could be cancelled under any plan of reorganization the Company may propose under Chapter 11. There can, however, be no assurance, that the Company will be able to develop, propose, and implement a successful plan of reorganization. Accordingly, caution should be exercised with respect to existing and future investments in any of these liabilities or securities. Trading of our common stock on the NASDAQ Stock Market was suspended on May 21, 2009, and our common stock was delisted from the NASDAQ Stock Market on June 8, 2009.

The filing of the Chapter 11 petitions constituted an event of default under certain of our debt obligations, and those debt obligations became automatically and immediately due and payable, subject to an automatic stay of any action to collect, assert, or recover a claim against the Debtors and the application of applicable bankruptcy law.

The following discussion provides general background information regarding our Chapter 11 proceedings and is not intended to be an exhaustive summary. Additional information about our bankruptcy filings may be obtained at our web site, www.hayeslemmerzreorg.com , and Bankruptcy Court filings and claims information can also be accessed through this web site. Information contained on our web sites is not incorporated into this Quarterly Report on Form 10-Q.

### Chapter 11 Process

The Debtors are currently operating as "debtors in possession" under the jurisdiction of the Bankruptcy Court and in accordance with the applicable provisions of the Bankruptcy Code and orders of the Bankruptcy Court. In general, as debtors in possession, we are authorized under Chapter 11 to continue to operate as an ongoing business, but we may not engage in transactions outside the ordinary course of business without the prior approval of the Bankruptcy Court.

The Bankruptcy Court has approved payment of certain of the Debtors' pre-petition obligations, including, among other things, employee wages, salaries, and benefits, and the Bankruptcy Court has approved the Company's payment of vendors and other providers in the ordinary course for goods and services received from and after the Petition Date and other business-related payments necessary to maintain the operation of our businesses. The Debtors have retained, subject to Bankruptcy Court approval, legal and financial professionals and certain other "ordinary course" professionals to advise the Debtors on the bankruptcy proceedings. From time to time, the Debtors may seek Bankruptcy Court approval for the retention of additional professionals.

Shortly after the Petition Date, the Debtors began notifying all known current or potential creditors of the Chapter 11 filing. Subject to certain exceptions under the Bankruptcy Code, the Debtors' Chapter 11 filing automatically enjoined, or stayed, the continuation of any judicial or administrative proceedings or other actions against the Debtors or their property to recover on, collect, or secure a claim arising prior to the Petition Date. Thus, for example, most creditor actions to obtain possession of property from the Debtors, or to create, perfect, or enforce any lien against the property of the Debtors, or to collect on monies owed or otherwise exercise rights or remedies with respect to a pre-petition claim are enjoined unless and until the Bankruptcy Court lifts the automatic stay. Vendors are being paid for goods furnished and services provided after the Petition Date in the ordinary course of business.

As required by the Bankruptcy Code, the United States Trustee for the District of Delaware appointed an official committee of unsecured creditors (Creditors' Committee). The Creditors' Committee and its legal representatives have a right to be heard on all matters that come before the Bankruptcy Court with respect to the Debtors. There can be no assurance that the Creditors' Committee will support the Debtors' positions on matters to be presented to the Bankruptcy Court in the future or on any plan of reorganization, once proposed. Disagreements between the Debtors and the Creditors' Committee could protract the Chapter 11 proceedings, adversely affect the Debtors' ability to operate, and delay the Debtors' emergence from the Chapter 11 proceedings.

Under Section 365 and other relevant sections of the Bankruptcy Code, we may assume, assume and assign, or reject certain executory contracts and unexpired leases, including, without limitation, leases of real property and equipment, subject to the approval of the Bankruptcy Court and certain other conditions. Any description of an executory contract or unexpired lease in this report, including when applicable our express termination rights or a quantification of our obligations, must be read in conjunction with, and is qualified by, any overriding rejection rights we have under Section 365 of the Bankruptcy Code.

In order to successfully exit the Chapter 11 proceedings, the Debtors will need to propose, and obtain confirmation by the Bankruptcy Court of a plan of reorganization that satisfies the requirements of the Bankruptcy Code. A plan of reorganization would, among other things, resolve the Debtors' pre-petition obligations, set forth the revised capital structure of the newly reorganized entity, and provide for corporate governance subsequent to exit from bankruptcy.

The Debtors have the exclusive right for 120 days after the Petition Date to file a plan of reorganization and, if we do so, 60 additional days to obtain necessary acceptances of our plan. We may file one or more motions to request extensions of these periods. If the Debtors' exclusivity period lapses, any party in interest will be able to file a plan of reorganization for any of the Debtors. In addition to being voted on by holders of impaired claims and equity interests, a plan of reorganization must satisfy certain requirements of the Bankruptcy Code and must be approved, or confirmed, by the Bankruptcy Court in order to become effective.

The timing of filing a plan of reorganization by us will depend on the timing and outcome of numerous other ongoing matters in the Chapter 11 proceedings. There can be no assurance at this time that a plan of reorganization will be confirmed by the Bankruptcy Court or that any such plan will be implemented successfully. If we are unable to successfully recapitalize the Company and restructure our indebtedness under Chapter 11, we may be forced to liquidate the Company.

We have incurred and will continue to incur significant costs associated with our reorganization. The amount of these costs, which are being expensed as incurred, are expected to significantly affect our results of operations.

Under the priority scheme established by the Bankruptcy Code, unless creditors agree otherwise, pre-petition liabilities and post-petition liabilities must be satisfied in full before our stockholders are entitled to receive any distribution or retain any property under a plan of reorganization. The ultimate recovery to creditors and stockholders, if any, will not be determined until confirmation of a plan or plans of reorganization. No assurance can be given as to what values, if any, will be ascribed in the Chapter 11 cases to each of these constituencies or what types or amounts of distributions, if any, they would receive. We believe that our currently outstanding common stock will have no value and will be cancelled under any plan of reorganization we may propose under Chapter 11. We also believe that the holders of our Senior Notes are unlikely to receive more than a de minimis distribution on account of their interests in the Senior Notes and that such interests could be cancelled under any plan of reorganization the Company may propose. Because of such possibilities, the value of our liabilities and securities, including our common stock, is highly speculative. Appropriate caution should be exercised with respect to existing and future investments in any of the liabilities and securities of the Debtors. At this time there is no assurance we will be able to restructure as a going concern or successfully propose or implement a plan of reorganization.

### Chapter 11 Financing

In connection with the Chapter 11 filing, the Company, HLI Operating Company, Inc., (HLI Opco) and Hayes Luxembourg, the Lenders party thereto, Deutsche Bank AG New York Branch, as DIP Administrative Agent, Deutsche Bank Securities Inc. and General Electric Capital Corporation, as Joint Book-Running Lead Managers, Joint Lead Arrangers, and Joint Syndication Agents for the DIP Facilities, and Deutsche Bank Securities Inc., as Documentation Agent for the DIP Facilities, entered into Amendment No. 2, dated as of May 12, 2009, and Amendment No. 3, dated as of May 19, 2009, to the Company's Second Amended and Restated Credit Agreement, dated as of May 30, 2007, as amended by Amendment No. 1, dated as of January 30, 2009, with the lenders party thereto (Credit Agreement). Pursuant to the amended Credit Agreement (DIP Credit Agreement) debtor-in-possession loan tranches (DIP Loans) were added to the Credit Agreement, including up to $100 million of additional liquidity to provide operating funds to the Company and its subsidiaries during the restructuring.

26

The initial DIP Loans consisted of a committed senior secured debtor-in-possession new money term loan facility (New Money DIP Loans) in an aggregate principal amount of up to $100 million and a senior secured debtor-in-possession roll-up loan facility (Roll-up Loans) in an aggregate principal amount of up to $100 million. The Roll-up Loans will be issued to the pre-petition lenders under the Credit Agreement who make New Money DIP Loans in exchange for the pre-petition loans such lenders hold under the Credit Agreement; the Roll-up Loans will be deemed issued to the lenders upon the occurrence of a triggering event in the future. The DIP Loans benefit from a super-priority claim and lien on the assets of the Borrowers pursuant to a Bankruptcy Court order. On May 14, 2009, the Bankruptcy Court approved an interim order (Interim DIP Order) that authorized the borrowing of up to $30 million of New Money DIP Loans, which was borrowed on May 14, 2009.

On May 14, 2009, the Honorable Judge Mary F. Walrath of the Bankruptcy Court approved an interim order that authorized the borrowing of up to $30 million of New Money DIP Loans. On June 15, 2009, the Bankruptcy Court granted final approval of the DIP Credit Agreement. As a result, an additional $70 million of New Money DIP Loans has become available to the Borrowers.

The proceeds of the New Money DIP Loans incurred under the DIP Credit Agreement will be used (i) to pay costs, fees, and expenses related to the execution and delivery of the DIP Credit Agreement, (ii) to repay certain of the pre-petition loans (through the exchange of Roll-up Loans), (iii) to provide working capital from time to time for the Debtors and the Company's non-U.S. subsidiaries, (iv) for other general corporate purposes of the Debtors and the Company's non-U.S. subsidiaries, and (v) to pay administrative costs of the Chapter 11 cases and claims or amounts approved by the Bankruptcy Court. The proceeds of the DIP Loan are deposited in depositary accounts and can be withdrawn no more than twice per week and then only to the extent needed to pay permitted expenses payable in the five business days following each withdrawal in accordance with approved budgets.

The New Money DIP Loans will bear cash interest at the rate of LIBOR (with a floor of 6.00% per annum), plus 14% per annum, and interest paid-in-kind (PIK Interest) at a rate of 6.00% per annum. After the Roll-up Loans are deemed to be borrowed, borrowings under the New Money DIP Loans and Roll-up Loans will bear cash interest at the rate of LIBOR (with a floor of 3.00% per annum), plus 7% per annum, plus PIK Interest of 3.00% per annum. During the continuance of an event of default under the DIP Credit Agreement, borrowings will bear interest at an additional 2.00% per annum. In addition, the DIP Credit Agreement obligates the Debtors to pay certain fees to the agents and lenders thereunder.

Obligations under the DIP Credit Agreement are secured by a lien on substantially all of the assets of the Debtors (which lien will have a first priority with respect to substantially all of the Debtors' assets) and a super-priority administrative expense claim in each of the Chapter 11 cases. The obligations under the DIP Credit Agreement are guaranteed by the Company and its domestic subsidiaries pursuant to a Guaranty, dated as of May 12, 2009. Subject to local law and other impediments, certain of the Company's foreign subsidiaries are required to take commercially reasonable actions to guarantee the obligations under the DIP Credit Agreement and grant liens on their assets in support of those guarantees.

The maturity date of the obligations under the DIP Credit Agreement will be earliest of: (i) six months following the date on which the Bankruptcy Court grants interim approval of the DIP Credit Agreement (which may be extended by up to three months by a majority of the DIP lenders); (ii) the effective date of a plan of reorganization for any Debtor; (iii) forty days after the date on which the Bankruptcy Court granted interim approval of the DIP Credit Agreement, if the Bankruptcy Court has not granted final approval of the DIP Credit Agreement; and (iv) the acceleration of obligations under the DIP Credit Agreement or termination of the new money term loan commitments under the DIP Credit Agreement, including, without limitation, as a result of the occurrence of an event of default.

## Results of Operations

### *Consolidated Results — Comparison of the Three Months Ended April 30, 2009 to the Three Months Ended April 30, 2008*

The following table presents selected information about our consolidated results of operations for the periods indicated (dollars in millions):

|  | Three Months Ended April 30, | | $ Change | % Change |
|---|---|---|---|---|
|  | **2009** | **2008** |  |  |
| Net sales: | | | | |
|   Automotive Wheels | $ 247.1 | $ 562.0 | $ (314.9) | (56.0%) |
|   Other | 11.1 | 11.8 | (0.7) | (5.9%) |
|     Total | $ 258.2 | $ 573.8 | $ (315.6) | (55.0%) |
| | | | | |
| Gross profit | $ (0.4) | $ 63.7 | $ (64.1) | (100.6%) |
| Marketing, general, and administrative | 35.4 | 39.3 | (3.9) | (9.9%) |
| Amortization of intangibles | 2.0 | 2.8 | (0.8) | (28.6%) |
| Asset impairments and other restructuring charges | 4.2 | 3.3 | 0.9 | 27.3% |
| Other income, net | (1.0) | (3.4) | 2.4 | (70.6%) |
|   Loss (earnings) from operations | (41.0) | 21.7 | (62.7) | (288.9%) |
| Interest expense, net | 22.0 | 13.3 | 8.7 | 65.4% |
| Other non-operating (income) expense | (2.3) | 1.7 | (4.0) | (235.3%) |
|   (Loss) earnings from operations before taxes | (60.7) | 6.7 | (67.4) | (1006.0%) |
| Income tax (benefit) expense | (1.6) | 13.0 | (14.6) | 112.3% |
|   Consolidated net loss | (59.1) | (6.3) | (52.8) | (838.1%) |
|   Less: Net (loss) income attributable to noncontrolling interest | (0.6) | 6.5 | (7.1) | 109.2% |
|     Net loss attributable to Hayes Lemmerz International, Inc | $ (58.5) | $ (12.8) | $ (45.7) | (357.0%) |

*Sales*

    Our net sales decreased 55.0% or $315.6 million to $258.2 million in the first quarter of fiscal 2009 from $573.8 million in the first quarter of fiscal 2008. Lower volumes and mix decreased sales by $258.2 million due to ongoing trends and conditions facing North American and European vehicle manufacturers, which have been negatively impacted due to the global recession, troubled capital markets and volatile commodity prices. Unfavorable foreign currency exchange rates relative to the US dollar decreased sales by $43.8 million as the Euro and other currencies have declined during the quarter ended April 30, 2009 as compared to the same period of time in the prior year. The sale of our Hoboken, Belgium facility during the second quarter of fiscal 2008 caused net sales to decrease by $15.0 million.

*Gross profit*

    Our gross profit decreased 100.6% or $64.1 million during the first quarter of fiscal 2009 to loss of $0.4 million compared to profit of $63.7 million during the first quarter of fiscal 2008. Lower volumes and mix decreased gross profit by $70.4 million. The sale of the Hoboken, Belgium plant during the second quarter of fiscal 2008, which had been experiencing losses, improved gross profit by $4.3 million.

*Marketing, general, and administrative*

    Our marketing, general, and administrative expense decreased $3.9 million to $35.4 million during the first quarter of fiscal 2009 from $39.3 million in the first quarter of fiscal 2008. During the first quarter of fiscal 2009, we experienced $8.8 million of higher professional service fees, which relate primarily to expenses incurred associated with our restructuring initiatives. Fluctuations in foreign currency exchange rates improved our marketing, general, and administrative expenses by $3.2 million. Headcount reductions due to the lower volumes improved our expenses by $3.1 million, and reductions on our long-term incentive plans improved expenses by $1.0 million. The remainder of the variance is primarily due to decreased controllable expenses as a result of cost savings initiatives.

*Asset impairments and other restructuring charges*

    Impairments and restructuring charges were $0.9 million higher as compared to the same period in the prior year. For the quarter ended April 30, 2009, we recorded $2.9 million of restructuring severance in order to align our headcount with the decrease in volumes. The current quarter also includes $0.6 million to impair the value of our Howell, Michigan facility to its fair value and the facility was recorded as an asset held for sale as of April 30, 2009. We also recorded $0.4 million of continuing closure costs for our Gainesville, Georgia facility. Punch Property International NV has not completed the purchase of the Gainesville property as

contemplated by a purchase and sale agreement and we have commenced litigation seeking specific performance of the agreement and damages, which is currently subject to the automatic stay in our Chapter 11 proceeding. The remainder of the current quarter expense is related to continuing closure costs at our Huntington, Indiana and Ferndale, Michigan technical center facilities.

During the first quarter of fiscal 2008, we recorded facility closure, employee restructuring charges, and asset impairments of $3.3 million. Facility closure costs of $0.3 million were related to our idle facilities in Howell, Michigan and Huntington, Indiana. Asset impairments of $2.7 million were related to our aluminum wheel facilities in Howell, Michigan; Hoboken, Belgium, which was sold during the second quarter of fiscal 2008; and Chihuahua, Mexico. Severance and other restructuring costs of $0.1 million were related to our aluminum wheel facility in Dello, Italy. Expense of $0.2 million in the Other segment consists of $0.1 million for facility closure cost and severance of $0.1 million for our Ferndale, Michigan technical center, which was closed in fiscal 2007.

*Other income, net*

Other income, net decreased from the prior year by $2.4 million from $3.4 million during the first quarter of fiscal 2008 to $1.0 million during the first quarter of fiscal 2009. The decrease in income is primarily attributable to realized foreign currency exchange losses. The items recorded to other income includes license and royalty income, gains or losses on tooling sales, realized exchange gains or losses, export incentives, and other miscellaneous items that are not considered part of cost of goods sold. None of these items individually or in the aggregate were considered material.

*Interest expense, net*

Interest expense increased $8.7 million to $22.0 million for the first quarter of fiscal 2009 from $13.3 million for the first quarter of fiscal 2008. Due to the violation of our debt covenants as of April 30, 2009, we expensed the remainder of our unamortized debt costs of approximately $9 million to interest expense for the quarter ended April 30, 2009. Partially offsetting the unamortized debt expense was $3.5 million of interest income due to the mark-to-market and fair value adjustments recorded for our interest rate swaps. The remainder of the variance is due to higher interest expense due to the January 30, 2009 credit amendment.

*Other non-operating (income) expense*

During the first quarter of fiscal 2009 we recognized $2.3 million of other non-operating income as compared to $1.7 million of expense in the prior year. The expense for the first quarter of fiscal 2009 includes a $1.3 million decrease in the liability recognized for a put option agreement with the minority shareholders at our Kalyani, India joint venture, as compared to an increase in the liability of $1.6 million in the previous year. The remainder of the (income) expense in both years is related to realized foreign currency exchange (gains) losses.

*Income tax (benefit) expense*

Income tax benefit was $1.6 million for the first quarter of fiscal 2009 compared to expense of $13.0 million for the first quarter of fiscal 2008. The tax benefit in the current quarter primarily relates to international tax losses generated, which we expect to utilize in the future, partially offset by withholding tax expense in the US. The tax expense recorded in the prior year quarter relates to taxable income. The income tax rate varies from the United States statutory income tax rate of 35% due primarily to losses in the United States without recognition of a corresponding income tax benefit, as well as effective income tax rates in certain foreign jurisdictions that are different than the United States statutory rates. Accordingly, our worldwide tax expense may not bear a normal relationship to earnings before taxes on income.

*Net loss*

Due to the factors mentioned above, the net loss during the first quarter of fiscal 2009 was $58.5 million compared to $12.8 million in the first quarter of fiscal 2008.

29

*Segment Results — Comparison of the Three Months Ended April 30, 2009 to the Three Months Ended April, 30, 2008*

*Automotive Wheels*

The following table presents net sales, (loss) earnings from operations, and other information for the Automotive Wheels segment for the periods indicated (dollars in millions):

| | Three Months Ended April 30, | | |
| | 2009 | 2008 | $ Change |
|---|---|---|---|
| Net sales | $ 247.1 | $ 562.0 | $ (314.9) |
| Asset impairments and other restructuring charges: | | | |
|    Facility closure costs | $ 0.6 | $ 0.3 | $ 0.3 |
|    Impairment of facility, machinery, and equipment | 0.6 | 2.7 | (2.1) |
|    Severance and other restructuring costs | 2.4 | 0.1 | 2.3 |
|      Total asset impairments and other restructuring charges | $ 3.6 | $ 3.1 | $ 0.5 |
| (Loss) earnings from operations | $ (30.2) | $ 16.8 | $ (47.0) |

*Net sales*

Net sales from our Automotive Wheels segment decreased $314.9 million to $247.1 million during the first quarter of fiscal 2009 from $562.0 million during the first quarter of fiscal 2008. Lower volumes and mix decreased sales by $264.4 million. The sale of our Hoboken, Belgium facility during the second quarter of fiscal 2008 caused net sales to decrease by $15.0 million. The remainder of the variance is primarily due to unfavorable foreign currency exchange rates relative to the US dollar as the Euro and other currencies have declined during the quarter ended April 30, 2009 as compared to the same period in the prior year.

*Asset impairments and other restructuring charges*

Asset impairment and restructuring charges were $0.5 million higher as compared to the prior year, up from $3.1 million for the quarter ended April 30, 2008 as compared to $3.6 million for the quarter ended April 30, 2009. The current year expense of $3.6 million was primarily related to ongoing facility closure costs for our idle aluminum wheel facilities in Howell, Michigan; Huntington, Indiana; and Gainesville, Georgia; as well as severance and other restructuring costs at our facilities in Manresa, Spain; Chihuahua, Mexico; Königswinter, Germany; Manisa, Turkey; and Alrode, South Africa, in order to align headcount with the lower sales volumes. The prior year impairment and restructuring expense consisted primarily of asset impairments related to our aluminum wheel facilities in Gainesville, Georgia; Hoboken, Belgium; and Chihuahua, Mexico.

*(Loss) earnings from operations*

We recorded a loss from operations of $30.2 million for the quarter ended April 30, 2009 as compared to earnings of $16.8 million during the same period of time in the prior year. Gross profit was $62.9 million lower, primarily due to the decrease in volumes as well as mix. Employee costs were approximately $3 million lower during the first quarter of 2009 as compared to the prior year due to reductions in personnel in order to align headcount with the lower production volumes. Fluctuations in foreign currency exchange rates improved earnings from operations by approximately $3 million. Changes in expenses allocated from the corporate offices decreased expenses by $3 million. The remainder of the variance is primarily due to decreased controllable expenses as a result of cost savings initiatives.

**Other**

The following table presents net sales, total asset impairments and other restructuring charges, and (loss) earnings from operations for the Other segment for the periods indicated (dollars in millions):

| | Three Months Ended April 30, | | |
| | 2009 | 2008 | $ Change |
|---|---|---|---|
| Net sales | $ 11.1 | $11.8 | $ (0.7) |
| Total asset impairments and other restructuring charges | 0.6 | 0.2 | 0.4 |
| (Loss) earnings from operations | (10.8) | 4.9 | (15.7) |

*Net Sales*

Net sales decreased by $0.7 million from $11.8 million during the first quarter of fiscal 2008 to $11.1 million during the first quarter of fiscal 2009. The decrease is primarily related to lower prototype sales as compared to the prior year.

*Asset impairments and other restructuring charges*

Asset impairment and restructuring charges were $0.4 million higher as compared to the prior year, up from $0.2 million for the quarter ended April 30, 2008 as compared to $0.6 million for the quarter ended April 30, 2009. The current year expense relates to severance expense due to headcount reductions at our Nuevo Laredo, Mexico facility. The prior year expense consisted of $0.1 million of continuing facility closure costs at our Ferndale, Michigan technical center, which was closed in fiscal 2007, and $0.1 million of severance expense at our corporate offices due to headcount reductions.

*(Loss) earnings from operations*

We recorded a loss from operations in the first quarter of fiscal 2009 of $10.8 million compared to earnings of $4.9 million during the first quarter of fiscal 2008. Higher professional service fees related to our ongoing restructuring increased expenses during the first quarter of fiscal 2008 by $8.9 million. Royalty and trademark fee income was $3.9 million lower due to the decrease in sales volumes. Changes in expenses allocated to the Automotive Wheels segment increased expenses by $3 million.

### Liquidity and Capital Resources

*Sources of Liquidity*

The principal sources of liquidity for our operating, capital expenditure, facility closure, restructuring, and reorganization requirements during the Chapter 11 proceedings are expected to be (i) proceeds of the New Money DIP Loans, (ii) cash flows from continuing operations, (iii) cash and cash equivalents on hand, and (iv) proceeds related to our international trade receivable financing programs.

We will need to obtain additional financing in order to emerge from our Chapter 11 bankruptcy proceedings. There can be no assurance that such financing will be available on acceptable terms or at all. If we are unable to obtain additional financing, we would unlikely be able to successfully complete our restructuring and continue as a going concern.

The filing of our Chapter 11 petitions constituted an event of default under our Pre-petition Credit Facilities and Senior Notes and the obligations under those debt instruments became automatically and immediately due and payable, subject to an automatic stay of any action to collect, assert, or recover a claim against the Debtors and the application of applicable bankruptcy law. The filing of the Chapter 11 petitions was also an event of termination under our domestic accounts receivable program.

On June 15, 2009, the Bankruptcy Court issued a final order approving the DIP Credit Agreement. The DIP Credit Agreement provides for an aggregate commitment for New Money DIP Loans of up to $100 million. The proceeds of the New Money DIP Loans are deposited in depositary accounts and can be withdrawn no more than twice per week and then only to the extent needed to pay permitted expenses payable in the five business days following each withdrawal in accordance with budgets approved in the sole discretion of the lenders under the DIP Credit Agreement. There can be no assurance that the amounts of cash from operations and amounts made available under our DIP Credit Agreement will be sufficient to fund our operations. In the event that cash flows and available borrowings under the DIP Credit Agreement are not sufficient to meet our liquidity requirements, our operations would be adversely affected and we may not be able to continue as a going concern. For additional information on the DIP Credit Agreement, see *Executive Summary and Chapter 11 Matters—Chapter 11 Financing* .

*Capital Resources*

We had a domestic accounts receivable securitization facility with an interest rate equal to LIBOR plus 2.25% at April 30, 2009. The facility limit was reduced to $5.0 million in April 2009 and no additional advances were made under the program beyond the $5.0 million advanced. The facility was terminated upon our filing of Chapter 11 bankruptcy proceedings in May 2009. There were $5.0 million and $6.0 million of borrowings under this program as of April 30 and January 31, 2009, respectively.

We have an accounts receivable financing program in Germany with a local financial institution. The program limit was € 25 million as of April 30 and January 31, 2009. Borrowings under this program of approximately € 12.3 million or $16.3 million and € 19.7 million or $25.3 million at April 30, 2009 and January 31, 2009, respectively, are included in short term bank borrowings.

We also have an accounts receivable factoring program in the Czech Republic with a local financial institution. The program limit is 480 million Czech Crown or approximately $24 million and $22 million as of April 30, 2009 and January 31, 2009, respectively.

As of April 30, 2009 and January 31, 2009, approximately 240.8 million Czech Crown or $11.9 million and 246.4 million Czech Crown or $11.4 million, respectively, was factored under this program. The transactions are accounted for as sales of receivables under the provisions of SFAS 140, "Accounting for Transfers and Servicing of Financial Assets and Extinguishments of Liabilities" (SFAS 140) and the receivables are removed from the Consolidated Balance Sheets.

*Cash Flows*

*Operating Activities:* Cash used for operations was $33.1 million in the first three months of fiscal 2009 compared to $31.8 million in the first three months of fiscal 2008. The $1.3 million increased use of cash is primarily due to lower profits offset by a decrease in working capital, both attributable to lower sales volumes during the first quarter of fiscal 2009 as compared to the first quarter of fiscal 2008.

*Investing Activities:* Cash used for investing activities was $2.3 million during the first three months of fiscal 2009 compared to $18.7 million in the first three months of fiscal 2008. The decreased use of cash was primarily due to lower capital expenditures for property, plant, and equipment, which declined from $19.2 million in the first quarter of fiscal 2008 to $2.5 million in the first quarter of fiscal 2009.

*Financing Activities:* Cash used for financing activities was $15.8 million in the first three months of fiscal 2009 compared to $5.3 million in the first three months of fiscal 2008. During the first quarter of fiscal 2009, we reduced the outstanding balances of our short term debt borrowings from local banks at our international locations. Dividends paid to minority shareholders were also lower during the first quarter of fiscal 2009 as compared to fiscal 2008.

*Off Balance Sheet Arrangements*

As of April 30, 2009, we had a domestic accounts receivable securitization facility with a program limit of $5 million as of April 30, 2009 and $25 million as of January 31, 2009. The facility had an interest rate equal to LIBOR plus 2.25%. This program was terminated in May 2009 as a result of our Chapter 11 filings.

The securitization transactions are accounted for as sales of the receivables under the provisions of SFAS 140 and are removed from the Consolidated Balance Sheets. The proceeds received are included in cash flows from operating activities in the Consolidated Statements of Cash Flows. Costs associated with the receivables facility are recorded as other expense in the Consolidated Statements of Operations.

At April 30, 2009 and January 31, 2009 the outstanding balances of receivables sold to special purpose entities were $33.9 million and $21.4 million, respectively. Our net retained interests at April 30, 2009 and January 31, 2009 were $28.9 million and $15.4 million, respectively, which are disclosed as Other Receivables on the Consolidated Balance Sheets and in cash flows from operating activities in the Consolidated Statements of Cash Flows. There was $5.0 million and $6.0 million in advances from lenders at April 30, 2009 and January 31, 2009, respectively.

*Credit Ratings*

As of April 30, 2009 our credit ratings were as follows:

|  | S&P | Moody's | Fitch |
|---|---|---|---|
| Corporate rating | CCC+ | Caa3 | C |
| Bank debt rating | B- | Caa2 | CC/RR3 |
| Senior Notes rating | CCC- | Ca | C/RR6 |

In May 2009 S&P downgraded our corporate rating from CCC+ to CC; bank debt rating from B- to CCC-; and Senior Notes rating from CCC- to C. After we filed for bankruptcy on May 11, 2009, S&P further downgraded our corporate rating from CC to D; bank debt rating from CCC- to D; and Senior Notes rating from C to D.

After we filed for bankruptcy on May 11, 2009, Moody downgraded our corporate rating from Caa3 to Ca; bank debt rating from Caa2 to Caa3; and Senior Notes rating from Ca to C.

After we filed for bankruptcy on May 11, 2009, Fitch downgraded our corporate rating from C to D; bank debt rating from CC/RR3 to C/RR4; and Senior Notes affirmed at C/RR6.

*New Accounting Pronouncements*

In June 2009 the FASB issued SFAS 167, "Amendments to FASB Interpretation No. 46(R)" (SFAS 167). SFAS 167 eliminates Interpretation 46(R)'s exceptions to consolidating qualifying special-purpose entities, contains new criteria for determining the primary beneficiary, and increases the frequency of required reassessments to determine whether a company is the primary beneficiary of a variable interest entity. SFAS 167 also contains a new requirement that any term, transaction, or arrangement that does not have a substantive effect on an entity's status as a variable interest entity, a company's power over a variable interest entity, or a company's obligation to absorb losses or its right to receive benefits of an entity must be disregarded in applying Interpretation 46(R)'s provisions. The elimination of the qualifying special-purpose entity concept and its consolidation exceptions means more entities will be subject to consolidation assessments and reassessments. SFAS 167 will be effective for our fiscal year beginning February 1, 2010. We are currently assessing the potential impacts, if any, on our consolidated financial statements.

In June 2009 the FASB issued SFAS 166, "Accounting for Transfers of financial Assets — an amendment of FASB Statement No. 140" (SFAS 166). SFAS 166 eliminates the concept of a qualifying special-purpose entity, creates more stringent conditions for reporting a transfer of a portion of a financial asset as a sale, clarifies other sale-accounting criteria, and changes the initial measurement of a transferor's interest in transferred financial assets. SFAS 166 will be effective for our fiscal year beginning February 1, 2010. We are currently assessing the potential impacts, if any, on our consolidated financial statements.

In May 2009 the FASB issued SFAS 165, "Subsequent Events" (SFAS 165). SFAS 165 establishes general standards of accounting for and disclosure of events that occur after the balance sheet date but before financial statements are issued or are available to be issued. It should not result in significant changes in the subsequent events that an entity reports, either through recognition or disclosure in its financial statements. SFAS 165 introduces the concept of financial statements being *available to be issued.* It requires the disclosure of the date through which an entity has evaluated subsequent events and the basis for that date, that is, whether that date represents the date the financial statements were issued or were available to be issued. This disclosure should alert all users of financial statements that an entity has not evaluated subsequent events after that date in the set of financial statements being presented. SFAS 165 will apply to both interim financial statements and annual financial statements after June 15, 2009. We do not anticipate that the adoption of SFAS 165 will have a significant impact on our financial condition or results of operations.

In December 2008 the FASB issued FASB Staff Position SFAS 132(R)-1, "Employers' Disclosures about Postretirement Benefit Plan Assets" (FSP SFAS 132(R)-1). FSP SFAS 132(R)-1 provides enhanced disclosures with regard to assets held by postretirement plans, including how investment allocations are made, the major categories of plan assets, the inputs and valuation techniques used to measure the fair value of plan assets, the effect of fair value measurements using Level 3 inputs, as defined in SFAS 157, "Fair Value Measurements" (SFAS 157) and an understanding of significant concentrations of risk within plan assets. FSP SFAS 132(R)-1 is effective for fiscal years ending after December 15, 2009, with early application permitted. We are currently assessing the potential impacts, if any, on our consolidated financial statements.

## Item 3. *Quantitative and Qualitative Disclosures About Market Risk*

In the normal course of business we are exposed to market risks arising from changes in foreign exchange rates, interest rates, raw material, and utility prices. We selectively use derivative financial instruments to manage these risks, but do not enter into any derivative financial instruments for trading purposes. There have been no significant changes to our foreign exchange and commodities risks from those previously disclosed in our Form 10-K as filed with the Securities and Exchange Commission on May 11, 2009. Our interest rate risks as of April 30, 2009 have not changed significantly from those disclosed in our Form 10-K, although our interest rate swap agreements were terminated in May 2009 (see *Note 13, Derivative Instruments and Hedging Activities* in the notes to the consolidated financial statements included herein for additional detail on the termination of our interest rate swap agreements).

## Item 4. *Controls and Procedures*

We maintain a disclosure committee (the Disclosure Committee) reporting to our Chief Executive Officer to assist the Chief Executive Officer and Chief Financial Officer in fulfilling their responsibility in designing, establishing, maintaining, and reviewing our Disclosure Controls and Procedures. The Disclosure Committee is currently chaired by our Vice President and Chief Financial Officer and includes our Chief Operating Officer and President, Global Wheel Group; Vice President, General Counsel and Secretary; Director of Compensation and Benefits; Treasurer; Assistant General Counsel; Director of Internal Audit; Director of Tax; and Corporate Controller as its other members.

As of the end of the period covered by this report, our Chief Executive Officer and Chief Financial Officer, along with the Disclosure Committee, evaluated the effectiveness of the design and operation of our disclosure controls and procedures pursuant to Rules 13a-15(e) and 15d-15(e) of the Securities Exchange Act of 1934. Based upon that evaluation, our Chief Executive Officer and Chief Financial Officer concluded that our disclosure controls and procedures were effective as of April 30, 2009 to ensure that information required to be disclosed by the Company in the reports that it files and submits under the Securities Exchange Act of 1934 is accumulated and submitted to the Company's management as appropriate to allow timely decisions regarding required disclosure.

# PART II. OTHER INFORMATION

## Item 1. *Legal Proceedings*

In general, all pending litigation involving the Debtors was stayed upon the filing of our Chapter 11 proceedings and, absent further order of the Bankruptcy Court, no party, subject to certain exceptions, may take any action, also subject to certain exceptions, to recover on pre-petition claims against the Debtors. At this time, it is not possible to predict the outcome of the Chapter 11 cases or their effect on our business. There have been no other material developments to our legal proceedings since our Annual Report on Form 10-K filed on May 11, 2009.

## Item 1A. *Risk Factors*

The risk factors as previously disclosed in our most recent Annual Report on Form 10-K filed on May 11, 2009 are superseded in their entirety as set forth in this Quarterly Report on Form 10-Q:

## Risks Related to our Bankruptcy Filings

### *We filed for protection under Chapter 11 of the Bankruptcy Code on May 11, 2009.*

During our Chapter 11 proceedings, our operations, including our ability to execute our business plan, are subject to the risks and uncertainties associated with our bankruptcy. Risks and uncertainties associated with our Chapter 11 proceedings include the following:

- Actions and decisions of our creditors and other third parties with interests in our Chapter 11 proceedings, which may be inconsistent with our plans;

- Our ability to obtain court approval with respect to motions in the Chapter 11 proceedings made from time to time;

- Our ability to develop, prosecute, confirm, and consummate a plan of reorganization with respect to the Chapter 11 proceedings;

- Our ability to obtain and maintain commercially reasonable terms with vendors and service providers;

- Our ability to maintain contracts that are critical to our operations;

- Our ability to retain management and other key individuals; and

- Risks associated with third parties' seeking and obtaining court approval to terminate or shorten the exclusivity period for us to propose and confirm a plan of reorganization, to appoint a trustee under Chapter 11, or to convert the cases into liquidations under Chapter 7 of the Bankruptcy Code.

These risks and uncertainties could affect our business and operations in various ways. For example, negative events or publicity associated with our Chapter 11 proceedings could adversely affect our sales and relationships with our customers, as well as with vendors and employees, which in turn could adversely affect our operations and financial condition, particularly if the Chapter 11 proceedings are protracted. Also, transactions outside the ordinary course of business are subject to the prior approval of the Bankruptcy Court, which may limit our ability to respond timely to certain events or take advantage of certain opportunities. In addition, in order to successfully emerge from our Chapter 11 proceedings, our senior management will be required to spend significant amounts of time developing a comprehensive plan of reorganization, instead of concentrating exclusively on our business operations. Further, we have made, and will continue to make, judgments as to whether we should limit investment in, exit, or dispose of certain businesses. Our Chapter 11 proceedings and development of a plan of reorganization may result in the sale or divestiture of

assets or businesses, but we can provide no assurance that we will be able to complete any sale or divestiture on acceptable terms or at all. Any decision by our management to further limit investment in, exit, or dispose of businesses may result in the recording of additional charges.

Because of the risks and uncertainties associated with our Chapter 11 proceedings, the ultimate impact that events that occur during these proceedings will have on our business, financial condition and results of operations cannot be accurately predicted or quantified. We cannot provide any assurance as to what values, if any, will be ascribed in our bankruptcy proceedings to our various pre-petition liabilities, common stock, and other securities. We believe that our currently outstanding common stock will have no value and will be cancelled under any plan of reorganization we may propose under Chapter 11. We also believe that the holders of our Senior Notes are unlikely to receive more than a de minimis distribution on account of their interests in the Senior Notes and that such interests could be cancelled under any plan of reorganization the Company may propose under Chapter 11.

***Our liquidity position imposes significant challenges to our ability to continue our operations.***

As global economic conditions have deteriorated since September 2008, we have experienced significant pressure on our business, including our liquidity position. Our Chapter 11 proceedings may increase this pressure. Because of the public disclosure of our liquidity constraints, our ability to maintain normal credit terms with our suppliers has become impaired. The terms of the trade credit we receive from suppliers has been reduced. If liquidity problems persist, our suppliers could refuse to provide key products and services in the future. Our financial condition and results of operations, in particular with regard to our potential failure to meet our debt obligations, may lead some customers to become reluctant to enter into long-term agreements with us. In addition to the cash requirements necessary to fund our continuing operations, we anticipate that we will incur significant professional fees and other restructuring costs in connection with the Chapter 11 proceedings and the restructuring of our business operations.

We are currently operating under the DIP Credit Agreement, which provides for an aggregate commitment for New Money DIP Loans of up to $100 million. The proceeds of the loans under the DIP Credit Agreement are deposited in depositary accounts and can be withdrawn no more than twice per week and then only to the extent needed to pay permitted expenses payable in the five business days following each withdrawal in accordance with budgets approved in the sole discretion of the lenders under the DIP Credit Agreement. There can be no assurance that the amounts of cash from operations and amounts made available under our DIP Credit Agreement will be sufficient to fund our operations. In the event that cash flows and available borrowings under the DIP Credit Agreement are not sufficient to meet our liquidity requirements, our operations would be adversely affected and we may not be able to continue as a going concern. For additional information on the DIP Credit Agreement, see *Item 2. Management's Discussion and Analysis of Financial Condition and Results of Operations—Executive Summary and Chapter 11 Matters—Chapter 11 Financing* .

***Our stock is no longer listed on a national securities exchange. It will likely be more difficult for stockholders and investors to sell our common stock or to obtain accurate quotations of the share price of our common stock.***

Effective June 8, 2009, the NASDAQ Stock Market delisted our common stock from trading, and, as a result, stockholders and investors will likely find it more difficult to sell our common stock or to obtain an accurate quotation of the price of our common stock. We can provide no assurance that we will re-list our common stock on a national securities exchange or that the stock will continue to be traded on an over-the-counter market. As a result of the delisting of our common stock, our suppliers, customers, and employees may lose confidence in the Company, and institutional investors may lose interest in our common stock. We believe that our currently outstanding common stock will have no value and will be cancelled under any plan of reorganization we may propose under Chapter 11. The opportunity for any recovery by holders of our common stock under such reorganization plan is unlikely and our shares are likely to be cancelled without any compensation pursuant to such plan.

***During the pendency of our Chapter 11 proceedings, our financial results may be unstable and may not reflect historical trends.***

During the pendency of our Chapter 11 proceedings, our financial results may fluctuate as they reflect asset impairments, asset dispositions, restructuring activities, contract terminations and rejections, and claims assessments. As a result, our historical financial performance may not be indicative of our financial performance following the Petition Date. Further, we may sell or otherwise dispose of assets or businesses and liquidate or settle liabilities, with court approval, for amounts other than those reflected in our historical financial statements. Any such sale or disposition and any comprehensive restructuring plan could materially change the amounts and classifications reported in our historical consolidated financial statements, which do not give effect to any adjustments to the carrying value of assets or amounts of liabilities that might be necessary as a consequence of a comprehensive restructuring plan.

*Any "ownership change" of the Company could limit our ability to use our net operating loss carryforwards.*

Under United States federal income tax law, a corporation is generally permitted to deduct from taxable income in any year net operating losses carried forward from prior years. As of January 31, 2009, we had approximately $707.5 of federal and state net operating loss carryforwards. We expect to undergo an "ownership change" for purposes of Section 382 of the Internal Revenue Code of 1986, as amended, during or as a result of our Chapter 11 proceedings. As a result, our ability to deduct net operating loss carryforwards could be subject to significant limitations.

## Risks Related to our Business

*Our business depends on the automotive industry, and reductions in the demand for new vehicles will adversely affect our business.*

Most of our sales are to automotive and commercial vehicle original equipment manufacturers (OEMs). Therefore, our financial performance is subject to conditions in the automotive industry, which are cyclical and depend on conditions in the U.S. and global economies generally. In North America and elsewhere, the automotive industry is currently characterized by significant overcapacity, fierce competition, rapidly declining sales and production volumes, and high fixed costs. During the second half of fiscal 2008, the weakening of the U.S. and global economies and limited availability of commercial and consumer credit resulted in significant reductions in consumer and capital spending and in the demand for automobiles, light trucks, and commercial vehicles. These conditions have led to decreased production by our customers, which in turn has adversely affected our sales and financial performance during fiscal 2008 and the first quarter of fiscal 2009. Demand for new vehicles may be adversely affected by other factors that are beyond our control, such as interest rates, the availability of credit and levels of disposable income. Our sales are also affected by our customers' inventory levels and production schedules. Because of the present uncertainty in the economy, some of our customers have been reducing their forecasts for new vehicle production in future periods and have announced significant production shut downs during the second and third quarters of fiscal 2009. Decreases in demand for new vehicles or in new vehicle production may have a significant negative impact on our business. Because we have high fixed production costs, relatively small declines in our customers' production could significantly reduce our profitability. A prolonged downturn in the North American or European automotive industries or a significant change in product mix due to consumer demand, including as a result of our Chapter 11 proceedings, could require us to further slow production in, or shut down, plants or incur impairment charges.

*We depend on a small number of significant customers.*

We derived approximately 29% of our fiscal 2008 sales from direct sales to Ford and General Motors and their subsidiaries globally and 12% of our fiscal 2008 sales from sales to these OEM's in the United States. In addition, our five largest customers (Ford, General Motors, Renault/Nissan, Daimler, and Toyota) and their subsidiaries accounted for approximately 54% of our global sales in fiscal 2008. We may not be able to maintain our current relationships with these customers or continue to supply them at current levels. Our filing for protection under Chapter 11 of the Bankruptcy Code and the associated risks and uncertainties of the Chapter 11 proceedings may affect our customers' perception of our business and increase the possibility of our losing key customers. Our sales also depend on the particular vehicle platforms that include our products. If production of those vehicle platforms were to be decreased or discontinued, our sales would be reduced. The loss of a significant portion of sales to any of our significant customers could have a material adverse effect on our business. In addition, certain of our customers are currently facing significant financial challenges. General Motors and Chrysler have recently filed for bankruptcy protection and others may do so in the future. The bankruptcy filings could result in adverse changes in these customers' production levels, pricing, and payment terms and could limit our ability to collect receivables, which could harm our business or results of operations.

*Our customers' cost cutting efforts and purchasing practices may adversely impact our business.*

Our customers are continually seeking to lower their costs of manufacturing, particularly in light of their current financial challenges. These cost reductions may reduce the amount we receive for sales of our products and may include relocation of our customers' operations to countries with lower production costs. Customers might find it less costly to manufacture themselves at relocated facilities or to rely on foreign suppliers with lower production costs, whether or not the customers' production is relocated, either of which may have a significant negative impact on our business. Changes in our customers' purchasing policies or payment practices could also have an adverse effect on our business.

***We operate in the highly competitive automotive supply industry.***

The automotive supply industry is highly competitive, both domestically and internationally, with a large number of suppliers competing to provide products to a relatively small number of OEMs. Competition is based primarily on price, quality, timely delivery, and overall customer service. Many of our competitors are larger and have greater financial and other resources than we do. Further consolidation in the industry may result in fewer, larger suppliers who benefit from purchasing and distribution economies of scale. We may not be able to compete successfully with these or other companies. In addition, there is a trend toward OEMs expanding their business relationships with a smaller number of "preferred" suppliers. If we are not designated as a preferred supplier, we could lose sales to competitors that are preferred suppliers.

Furthermore, the rapidly evolving nature of the automotive industry may attract new entrants, particularly in low cost countries such as China. We may not be able to offer our products at prices competitive with those of competitors in low-cost countries and pricing pressure created by such competitors could reduce our sales and margins. These factors have led to a re-sourcing of certain future business to foreign competitors in the past and may continue to do so in the future. In addition, any of our competitors may develop superior products, produce similar products at a lower cost than we do, or adapt more quickly to new technologies or evolving customer requirements. As a result, our products may not be able to compete successfully.

A number of our competitors have been forced to seek bankruptcy protection partially as a result of highly competitive market conditions in our industry. In addition, our filing for protection under Chapter 11 of the Bankruptcy Code and the associated risks and uncertainties of the Chapter 11 proceedings may be used by our competitors to attract our existing customers or may discourage our customers from purchasing products under long-term arrangements or designating us a "preferred" supplier.

***We may be unable to maintain trade credit with our suppliers.***

We currently maintain trade credit with certain of our key suppliers and utilize such credit to purchase significant amounts of raw material and other supplies with payment terms. As conditions in the automotive supply industry have become less favorable, credit insurance, which is used by suppliers to manage their payment risk in connection with providing payment terms, has become significantly more expensive or unavailable. As a result, key suppliers have been seeking to shorten trade credit terms, reduce credit limits or require cash in advance for payment. Because we have filed for protection under Chapter 11 of the Bankruptcy Code, our key suppliers may seek to further restrict or eliminate our ability to obtain trade credit, or they may require payment on more restricted terms. If a significant number of our key suppliers were to shorten or eliminate our trade credit, our inability to finance large purchases of key supplies and raw materials would increase our costs and negatively impact our liquidity and cash flow, which could have a material adverse effect on our business, results of operations, or financial condition and on our ability to emerge from the Chapter 11 proceedings.

***Increased cost of supplies and raw materials could affect our financial health.***

Our business is subject to the risk of price increases and periodic delays in the delivery of raw materials and supplies. The availability and price of these commodities are subject to market forces largely beyond our control. Fluctuations in prices or availability of these raw materials or supplies will affect our profitability and could have a material adverse effect on our business, results of operations, or financial condition. In addition, if any of our suppliers seek bankruptcy relief or otherwise cannot continue their business as anticipated, the availability or price of raw materials could be adversely affected.

In recent periods there has been significant volatility in the global prices of steel, aluminum, and natural gas, which have had an impact on our business. Continued volatility in the price of steel, aluminum, natural gas, or other key materials and supplies may have a material adverse effect on our business, results of operations, or financial condition. Although we have been able to pass some of the supply and raw material cost increases onto our customers in the past, current competitive and marketing pressures may prevent us from doing so in the future. In addition, our customers are not contractually obligated to accept certain of these price increases, and in light of current market conditions, they may be less likely to accept the increases than they have been in the past. Moreover, we sometimes use fixed-forward contracts to hedge against fluctuation in the prices of certain commodities, which could result in our paying greater than market prices for these commodities. Where we pass through the costs of raw materials to our customers, customer pricing will decrease as raw material market prices decrease, regardless of the cost of our fixed forward contracts. For example, we generally enter into fixed-forward contracts for aluminum based on volume projections from our customers that coincide with the applicable pass through pricing adjustment periods. In recent periods, customer volumes have decreased significantly relative to their projections while at the same time market prices for aluminum have fallen sharply. As a result, we have fixed-forward

37

contracts for aluminum based on projected volumes at prices that are well above current market levels, while the amount of the cost we can pass through to the customer has decreased to reflect the lower market cost. This potential inability to pass on price increases to our customers could adversely affect our operating margins and cash flow, and result in lower operating income and profitability.

***The financial distress of our suppliers could harm our results of operations.***

The conditions in the automotive industry have adversely affected our supplier base. Several large suppliers have filed for bankruptcy protection or ceased operations. Continued financial distress among our supply base could lead to commercial disputes, write offs and possibly supply chain interruptions. The continuation or worsening of conditions in the supply base could have a material adverse effect on our business, financial condition or results of operations.

***We have significant international operations that subject us to risks not faced by domestic competitors.***

Approximately 82% of our consolidated net sales in fiscal 2008 were from operations outside the United States. We expect sales from our international operations to continue to represent a substantial and growing portion of our business. Risks inherent in international operations include the following:

- agreements may be difficult to enforce and receivables difficult to collect through a foreign country's legal system;

- foreign customers may have longer payment cycles;

- foreign countries may impose additional withholding taxes or otherwise tax our foreign income, impose tariffs or adopt other restrictions on foreign trade or investment, including foreign exchange controls;

- foreign laws or regulations may restrict our ability to repatriate cash from foreign operations;

- necessary export licenses or customs clearances may be difficult to obtain;

- intellectual property rights may be more difficult to enforce in foreign countries;

- political or economic conditions or exposure to local social unrest, including any resultant acts of war, terrorism or similar events in the countries in which we operate could have an adverse effect on our earnings from operations in those countries;

- unexpected adverse changes in foreign laws or regulatory requirements may occur;

- compliance with a variety of foreign laws and regulations may be difficult;

- in certain countries we are subject to nationwide collective labor agreements that we did not negotiate;

- labor laws in certain countries may make it more difficult or expensive to reduce our labor force in response to reduced demand;

- differing foreign tax structures may subject us to additional taxes or affect our ability to repatriate cash from our foreign subsidiaries;

- fluctuations in exchange rates between the operating currencies of our international operations relative to the US dollar may adversely affect the value of our international assets and results of operations as reported in US dollars, as well as the comparability of period-to-period results of operations; and

- an inability to use the financing provided by the DIP Credit Agreement to fund our foreign operations could result in local insolvency proceedings in certain foreign jurisdictions.

Any of these factors could have a material adverse effect on our business, cash flows, financial condition, and results of operations.

***Unexpected equipment failures, delays in deliveries, or catastrophic loss at any of our manufacturing facilities could lead to production curtailments or shutdowns.***

Equipment failure, interruption of supply, labor disputes, or other causes could significantly reduce production of our products, which would reduce our sales and earnings for the affected period. In addition, we generally produce our products on a "just in time" basis and do not hold large inventories. If production is interrupted at any of our manufacturing facilities, even if only temporarily or as a result of events that are beyond our control, delivery times could be severely affected. Any significant delay in deliveries to our customers could lead to returns or cancellations and cause us to lose future sales, as well as expose us to claims for damages. Our manufacturing facilities are also subject to the risk of catastrophic loss due to unanticipated events such as fires, explosions, or violent weather conditions. We have in the past and may in the future experience plant shutdowns or periods of reduced production as a result of equipment failure, power outages, and delays in deliveries, or catastrophic loss, which could have a material adverse effect on our results of operations or financial condition.

### *We may not be able to successfully implement our planned operational improvements or realize the benefits of those plans already implemented.*

As part of our ongoing focus on being a low-cost provider of high quality products, we continually analyze our business to further improve our operations and identify cost-cutting measures. If we do not identify and implement operational improvements or if implemented improvements do not generate the expected benefits, we may be unable to offer products at a competitive price and generate sufficient operating funds to service our debt or make necessary capital expenditures. If that were to happen, alternative sources of financing may not be available to us on commercially reasonable terms or at all, and our ability to emerge from the Chapter 11 proceedings could be materially and adversely affected.

### *We may not be able to timely or successfully launch new products.*

In order to effectively compete in the automotive supply industry, we must be able to launch new products to meet our customers' demand. As a result of our current liquidity condition and covenants limiting the amount of our capital expenditures, we may not be able to make the investments needed to launch production of new products. We may not be able to install and obtain customer approval of the equipment needed to produce products for new programs in time for the start of production. In addition, transitioning our manufacturing facilities and resources to full production under new product programs may impact production rates or other operational efficiency measures. Moreover, our customers may delay or cancel the launch of new product programs or actual production may be below planned quantities. Our failure to successfully launch new products, or a failure by our customers to successfully launch new programs in the quantities anticipated, could adversely affect our results.

### *Our success will depend on our ability to attract and retain qualified employees.*

Our success will depend in part on our ability to attract, hire, train, and retain qualified engineering, managerial, technical, sales, and marketing personnel. We face significant competition for these types of employees. Our current financial condition and Chapter 11 proceedings create uncertainty that may lead to an increase in unwanted attrition and may affect our ability to attract and retain qualified new employees. Additionally, as conditions in the automotive industry decline and we implement measures to improve our cost structure, employee morale may suffer. We may be unsuccessful in attracting and retaining the personnel we require and key personnel may leave and compete against us. We may be unsuccessful in replacing key managers who either resign or retire. The loss of any member of our senior management team or other experienced, senior employees could impair our ability to execute our business plan and emerge from the Chapter 11 proceedings, cause us to lose customers and reduce our sales, or lead to the loss of other key employees. In any such event, our financial condition, results of operations, and cash flows could be adversely affected.

### *We might fail to adequately protect our intellectual property or third parties might assert that our technologies infringe on their intellectual property.*

We rely on a combination of patents, trade secrets, trademarks and copyrights to protect our intellectual property, but this protection might be inadequate. For example, our pending or future patent applications might not be approved or, if allowed, they might not be of sufficient strength or scope. Conversely, third parties might assert that our technologies infringe their proprietary rights. We are currently involved in litigation in which the plaintiff has asserted that we have infringed on its patents. This litigation, and possible future litigation, could result in substantial costs and diversion of our efforts and could adversely affect our business, whether or not we are ultimately successful. For more information on this litigation, see the section entitled *Legal Proceedings* .

### *Our products may be rendered obsolete or less attractive by changes in regulatory requirements or competitive technologies.*

Changes in legislative, regulatory or industry requirements or in competitive technologies may render certain of our products obsolete or less attractive. Our ability to anticipate changes in technology and regulatory standards and to successfully develop and introduce new and enhanced products on a timely basis will be a significant factor in our ability to remain competitive. Certain of our products may become obsolete and we may not be able to achieve the technological advances necessary for us to remain competitive. We are also subject to the risks generally associated with new product introductions and applications, including lack of market acceptance, delays in product development, and failure of products to operate properly.

### *A high percentage of our customers' employees and certain of our employees are unionized or covered by collective bargaining agreements.*

Many employees of our major customers and certain of our employees are unionized. Certain of our employees in the United States are represented by the United Steel Workers Union, all of whom are employed at our facility in Akron, Ohio. Our current contract with the United Steel Workers Union expires in fiscal 2010, and, as part of our Chapter 11 proceedings, we must determine whether to accept or reject this contract. As is common in Mexico and many European jurisdictions, substantially all of our employees in Europe and Mexico are covered by country-wide collective bargaining agreements, which are subject to negotiations on an annual basis. Although we believe that our relations with our employees are good, a dispute between us and our employees could have a material adverse effect on our business. In addition, significant percentages of the workforces at certain of our major customers and their suppliers are unionized. Strikes or labor disputes at a major customer or one of their key suppliers could result in reduced production of vehicles incorporating our products. This would reduce demand for our products and could have a material adverse effect on our sales and results of operations during the affected periods.

### *We are subject to potential exposure to environmental liabilities.*

We are subject to various foreign, federal, state, and local environmental laws, ordinances, and regulations, including those governing discharges into the air and water, the storage, handling and disposal of solid and hazardous wastes, the remediation of contaminated soil and groundwater, and the health and safety of our employees. We are also required to obtain permits from governmental authorities for certain operations. We may not be in complete compliance with these permits at all times. If we fail to comply with these permits, we could be fined or otherwise sanctioned by regulators and the fine or sanction could be material. The nature of our operations and the history of industrial uses at some of our facilities expose us to the risk of environmental liabilities that could have a material adverse effect on our business. For example, we may be liable for the costs of removal or remediation of contamination that may be present on our property, even if we did not know about or cause the contamination and even if the practices that resulted in the contamination were legal when they occurred.

### *We may suffer future asset impairments and other restructuring charges, including write downs of intangible assets.*

We record asset impairment losses when we determine that our estimates of the future undiscounted cash flows from an operation will not be sufficient to recover the carrying value of that facility's building, fixed assets, and production tooling. During fiscal 2008 we recorded asset impairment losses, other restructuring charges, and facility exit costs of $22.2 million and goodwill and other intangible asset impairments of $238 million and we may incur significant similar losses and charges in the future. In connection with our emergence from Chapter 11 in 2003 and the application of fresh start accounting, we recorded significant increases in goodwill and intangible assets. At April 30, 2009 we had no goodwill and approximately $113.2 million of other intangible assets recorded on our consolidated balance sheets. We are required to evaluate annually whether our other intangible assets have been impaired or are not recoverable. Future market conditions may indicate that these assets are not recoverable based on changes in forecasts of future business performance and the estimated useful life of these assets, and this may trigger further write-downs of these assets. Any future write-off of a significant portion of our intangible assets would have an adverse effect on our financial condition and results of operations.

### *The nature of our business exposes us to product liability, recall, and warranty claims and other legal proceedings.*

We are subject to litigation in the ordinary course of our business. The risk of product liability, recall, and warranty claims are inherent in the design, manufacture, and sale of automotive products, the failure of which could result in property damage, personal injury, or death. Although we currently maintain what we believe to be suitable and adequate product liability insurance, we may not be able to maintain this insurance on acceptable terms and this insurance may not provide adequate protection against potential liabilities. In addition, we may be required to participate in a recall involving our products. Such a recall would not be covered by our insurance. Furthermore, our customers can initiate a recall of our products without our agreement and offset their costs of the recall against payments due to us for other products. A successful product liability claim in excess of available insurance coverage or a requirement to participate in a product recall could have a material adverse effect on our business. In addition, we are involved in other legal proceedings, which could adversely affect our cash flows, financial condition, or results of operations.

### *Our pension and other postretirement employee benefits expense could materially increase.*

Certain of our current and former employees participate in defined benefit pension plans. The plans are currently underfunded. Declines in interest rates or the market values of the securities held by the plans, or certain other changes, could materially increase the amount by which the plans are underfunded, affect the level and timing of required contributions, and significantly increase our pension expenses and reduce profitability. The values of the securities held by the plans has decreased significantly during the past fiscal year, significantly increasing the amount by which the plans are underfunded. We also sponsor other postretirement employee

benefit plans that cover certain current and former employees and eligible dependents. We fund these obligations on a pay-as-you-go basis. Increases in the expected cost of the benefits, particularly health care, in excess of our assumptions could increase our actuarially determined liability and related expense along with future cash outlays.

## Risks Related to Our Capital Structure

### *We have substantial levels of debt and debt service that will divert a significant amount of cash from our business operations.*

We have substantial levels of debt, including debt under our Pre-petition Credit Facilities and Senior Notes, and we are no longer in compliance with the covenants of these debt instruments. As of April 30 and January 31, 2009, we had approximately $715.4 million and $731.5 million of total indebtedness and approximately $56.7 million and $107.5 million of cash and cash equivalents, respectively. The filing of our Chapter 11 petitions constituted an event of default under our Pre-petition Credit Agreement and the Senior Notes, and those debt obligations became automatically and immediately due and payable, subject to an automatic stay of any action to collect, assert, or recover a claim against the Debtors and the application of applicable bankruptcy law. In addition to the debt under our Pre-petition Credit Agreement and under the Senior Notes, we may incur up to $200 million of additional debt under the DIP Loans, and we may incur significant additional debt in the future, including financing required to develop a plan of reorganization and successfully emerge from the Chapter 11 proceedings. The degree to which we will be leveraged could have important consequences, including:

- requiring a substantial portion of our cash flow from operations to be dedicated to debt service and therefore not available for our operations, capital expenditures, and future business opportunities;

- increasing our vulnerability to a downturn in general economic conditions or in our business;

- limiting our ability to adjust to changing market conditions, placing us at a competitive disadvantage compared to our competitors that have relatively less debt; and

- limiting our ability to obtain additional financing or access additional funds under the DIP New Credit Agreement for capital expenditures, working capital, or general corporate purposes.

We are currently operating under the DIP Credit Agreement, which provides up to $100 million of New Money DIP ALoans. The DIP Credit Agreement contains certain highly restrictive covenants that require us, among other things, to maintain our corporate existence, make certain payments, perform our obligations under existing agreements, purchase insurance, and provide financial records. The DIP Credit Agreement also limits or prohibits our ability to make capital expenditures, incur indebtedness, make prepayments on or purchase indebtedness in whole or in part, pay dividends, make investments, lease properties, create liens, consolidate or merge with another entity (or allow one of our subsidiaries to do so), sell assets, and acquire facilities or other businesses. The DIP Credit Agreement also requires us to maintain minimum net cash flow after restructuring expenses, EBITDA, interest coverage ratios, and liquidity. There can be no assurance that we will be able to comply with these and other covenants in our DIP Credit Agreement.

The proceeds of the New Money DIP Loan are deposited in depositary accounts and can be withdrawn no more than twice per week and then only to the extent needed to pay permitted expenses payable in the five business days following each withdrawal in accordance with budgets approved in the sole discretion of the DIP lenders. The DIP Credit Agreement also contains numerous events of default, many of which may be triggered by circumstances beyond our ability to control. If we were to default on the DIP Credit Agreement, all amounts due thereunder including the New Money DIP Loans and the Roll-up Loans could become immediately due and payable. In that event, if we were not able to obtain alternative financing to repay the indebtedness outstanding under the DIP Credit Agreement, we may be forced to discontinue operations and liquidate the Company.

### *We may not be able to fund required capital expenditures, and for that and other reasons we may need additional financing in the future, which we may be unable to obtain.*

Our business requires us to make significant capital expenditures to acquire equipment needed to produce products for new customer programs, maintain existing equipment, and implement technologies to reduce production costs in response to customer pricing pressure. In addition, lower sales or unanticipated expenses could give rise to additional financing requirements. We may not generate sufficient cash flow from operations to fund our capital expenditure requirements. In that event, we may need to obtain additional financing or take other steps to reduce expenses or generate cash. There can, however, be no assurance that additional financing will be available or, if it is available, that it will be offered on acceptable terms. Any additional financing would require the consent of the DIP lenders, which we may not be able to obtain. We may be unable to obtain financing on favorable terms, or at all. If adequate funds are not available on acceptable terms, we may be required to make significant reductions in expenses and capital

expenditures, which could significantly restrict our operations and limit our ability to enhance our products, fund capital investments, respond to competitive pressures, or take advantage of business opportunities. As a result of our filing for protection under Chapter 11 of the Bankruptcy Code, our access to additional financing is, and for the foreseeable future will likely continue to be, very limited. Our long-term liquidity requirements and the adequacy of our capital resources are difficult to predict at this time and ultimately cannot be determined until a plan of reorganization has been developed and is confirmed by the Bankruptcy Court.

***Our exposure to variable interest rates and foreign currency fluctuations may negatively affect our results.***

A portion of our debt, including our borrowings under our Pre-petition Credit Facilities and the DIP Credit Agreement, bears interest at variable rates. Any increase in the interest rates will increase our expenses and reduce funds available for our operations and future business opportunities. Increases in interest rates will also increase the risks resulting from our significant debt levels. Due to the increase in our operations outside the United States, we have experienced increased foreign currency exchange gains and losses in the ordinary course of our business. Fluctuations in exchange rates may have a material impact on our financial condition, since Euro-denominated debt is converted into US dollars for financial reporting, and cash flows generated in other currencies will be used, in part, to service the dollar-denominated portion of our debt. This fluctuation could result in an increase in our overall leverage and could result in less cash flow available for our operations, capital expenditures, and repayment of our obligations. In addition, fluctuations in foreign currency exchange rates may affect the value of our foreign assets as reported in US dollars and may adversely affect reported earnings and, accordingly, the comparability of period-to-period results of operations. Changes in currency exchange rates may affect the relative prices at which we and foreign competitors sell products in the same market. In addition, changes in the value of the relevant currencies may affect the cost of certain items required in our operations. Although we attempt to hedge against fluctuations in interest rates or exchange rates, such fluctuations may have a material adverse effect on our financial condition or results of operations, or cause significant fluctuations in quarterly and annual results.

***Our credit rating may be downgraded in the future.***

Our debt is rated by nationally recognized statistical rating organizations. Our debt ratings were recently downgraded and, as a result of our filing for protection under Chapter 11 of the Bankruptcy Code, such ratings may be further downgraded in the future. While these actions do not affect our current cost of borrowing, they could significantly affect our ability to obtain or maintain trade credit with suppliers, reduce our access to the debt markets and increase the cost of incurring additional debt. There can be no assurance that we will be able to maintain our current credit ratings. Should we be unable to maintain our current credit ratings, we could experience a reduction in credit terms, an increase in our borrowing costs or difficulty accessing capital markets. Such a development could adversely affect our financial condition and results of operations.

## Item 2. *Changes in Securities and Use of Proceeds*

None.

## Item 3. *Defaults upon Senior Securities*

The Company has defaulted on the Pre-petition Credit Facilities, which consist of the Term Loan with a principal balance of € 254.8 million, the Revolving Credit Facility with a principal balance of $125 million and a € 15 million synthetic letter of credit facility. The defaults resulted from our failure to comply with the financial covenants of the Pre-petition Credit Facilities for the period ending April 30, 2009 and the filing of the Chapter 11 proceedings.

The Company has also defaulted on the Senior Notes, which have a principal balance of €130 million. The defaults resulted from the filing of the Chapter 11 proceedings, and the failure to make the payment of interest due June 15, 2009.

## Item 4. *Submission of Matters to a Vote of Security Holders*

None.

## Item 5. *Other Information*

None.

**Item 6.** *Exhibits*

| | |
|---|---|
| 10.17 | Amendment No. 2, dated as of May 12, 2009, to Second Amended and Restated Credit Agreement, dated as of May 30, 2007, as amended by Amendment No. 1, dated as of January 30, 2009, by and among Hayes Lemmerz International, Inc., HLI Operating Company, Inc., Hayes Lemmerz Finance LLC—Luxembourg S.C.A., the Lenders named therein, Deutsche Bank AG, New York Branch, as DIP Administrative Agent, Deutsche Bank Securities Inc. and General Electric Capital Corporation, as Joint Book-Running Lead Managers, Joint Lead Arrangers, and Joint Syndication Agents for the DIP Facilities, and Deutsche Bank Securities Inc., as Documentation Agent for the DIP Facilities (incorporated by reference to Exhibit 10.1 to our Current Report on Form 8-K, filed on May 29, 2009). |
| 10.18 | Second Amended and Restated Credit Agreement, dated as of May 30, 2007, as amended by Amendment No. 1, dated as of January 30, 2009, as further amended by Amendment No. 2, dated as of May 12, 2009, by and among HLI Operating Company, Inc., as U.S. Borrower, Hayes Lemmerz Finance LLC—Luxembourg S.C.A., as Luxembourg Borrower, Hayes Lemmerz International, Inc. and the other Debtors, each Lender party thereto, each DIP Lender named therein, Citicorp North America, Inc., as Pre-petition Administrative Agent, Deutsche Bank Trust Company Americas, as DIP Administrative Agent, Deutsche Bank Securities Inc., as Pre-petition Syndication Agent, Citicorp North America, Inc., as Pre-petition Documentation Agent, Citigroup Global Markets Inc. and Deutsche Bank Securities Inc., as Joint Book-Running Lead Managers and Joint Lead Arrangers for the Pre-petition Facilities, and Deutsche Bank Securities Inc. and General Electric Capital Corporation, as Joint Book-Running Lead Managers, Joint Lead Arrangers, and Syndication Agents (incorporated by reference to Exhibit 10.2 to our Current Report on Form 8-K, filed on May 29, 2009). |
| 10.19 | Guaranty, dated as of May 12, 2009, by and between the Debtors named therein and Deutsche Bank AG, New York Branch, as DIP Administrative Agent (incorporated by reference to Exhibit 10.3 to our Current Report on Form 8-K, filed on May 29, 2009). |
| 10.20 | Depositary Agreement, dated as of May 12, 2009, by and among HLI Operating Company, Inc., as U.S. Borrower, Hayes Lemmerz Finance LLC—Luxembourg, S.C.A., as Luxembourg Borrower, Deutsche Bank AG, New York Branch, as DIP Administrative Agent, and Deutsche Bank Trust Company Americas, as Depositary (incorporated by reference to Exhibit 10.4 to our Current Report on Form 8-K, filed on May 29, 2009). |
| 10.21 | Amendment No. 3, dated as of May 19, 2009, to Second Amended and Restated Credit Agreement, dated as of May 30, 2007, as amended by Amendment No. 1, dated as of January 30, 2009, as further amended by Amendment No. 2, dated as of May 12, 2009, by and among Hayes Lemmerz International, Inc., HLI Operating Company, Inc., Hayes Lemmerz Finance LLC—Luxembourg S.C.A., the Lenders named therein, Deutsche Bank AG, New York Branch, as DIP Administrative Agent, Deutsche Bank Securities Inc. and General Electric Capital Corporation, as Joint Book-Running Lead Managers, Joint Lead Arrangers, and Joint Syndication Agents for the DIP Facilities, and Deutsche Bank Securities Inc., as Documentation Agent for the DIP Facilities (incorporated by reference to Exhibit 10.5 to our Current Report on Form 8-K, filed on May 29, 2009). |
| 31.1 | Certification of Curtis J. Clawson, Chairman of the Board, President, and Chief Executive Officer, pursuant to Section 302 of the Sarbanes-Oxley Act of 2002.* |
| 31.2 | Certification Mark A. Brebberman, Vice President, Chief Financial Officer, pursuant to Section 302 of the Sarbanes-Oxley Act of 2002.* |
| 32.1 | Certification of Curtis J. Clawson, Chairman of the Board, President, and Chief Executive Officer, Pursuant to 18 U.S.C. Section 1350, as Adopted Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002.* |
| 32.2 | Certification of Mark A. Brebberman, Vice President, Chief Financial Officer, Pursuant to 18 U.S.C. Section 1350, as Adopted Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002.* |

---

\*     Filed electronically herewith.

## SIGNATURES

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned thereunto duly authorized.

HAYES LEMMERZ INTERNATIONAL, INC.

/s/    MARK A. BREBBERMAN
Mark A. Brebberman
*Vice President and Chief Financial Officer*

June 19, 2009

44

**HAYES LEMMERZ INTERNATIONAL, INC.**

**10-Q EXHIBIT INDEX**

| | |
|---|---|
| 10.17 | Amendment No. 2, dated as of May 12, 2009, to Second Amended and Restated Credit Agreement, dated as of May 30, 2007, as amended by Amendment No. 1, dated as of January 30, 2009, by and among Hayes Lemmerz International, Inc., HLI Operating Company, Inc., Hayes Lemmerz Finance LLC—Luxembourg S.C.A., the Lenders named therein, Deutsche Bank AG, New York Branch, as DIP Administrative Agent, Deutsche Bank Securities Inc. and General Electric Capital Corporation, as Joint Book-Running Lead Managers, Joint Lead Arrangers, and Joint Syndication Agents for the DIP Facilities, and Deutsche Bank Securities Inc., as Documentation Agent for the DIP Facilities (incorporated by reference to Exhibit 10.1 to our Current Report on Form 8-K, filed on May 29, 2009). |
| 10.18 | Second Amended and Restated Credit Agreement, dated as of May 30, 2007, as amended by Amendment No. 1, dated as of January 30, 2009, as further amended by Amendment No. 2, dated as of May 12, 2009, by and among HLI Operating Company, Inc., as U.S. Borrower, Hayes Lemmerz Finance LLC—Luxembourg S.C.A., as Luxembourg Borrower, Hayes Lemmerz International, Inc. and the other Debtors, each Lender party thereto, each DIP Lender named therein, Citicorp North America, Inc., as Pre-petition Administrative Agent, Deutsche Bank Trust Company Americas, as DIP Administrative Agent, Deutsche Bank Securities Inc., as Pre-petition Syndication Agent, Citicorp North America, Inc., as Pre-petition Documentation Agent, Citigroup Global Markets Inc. and Deutsche Bank Securities Inc., as Joint Book-Running Lead Managers and Joint Lead Arrangers for the Pre-petition Facilities, and Deutsche Bank Securities Inc. and General Electric Capital Corporation, as Joint Book-Running Lead Managers, Joint Lead Arrangers, and Syndication Agents (incorporated by reference to Exhibit 10.2 to our Current Report on Form 8-K, filed on May 29, 2009). |
| 10.19 | Guaranty, dated as of May 12, 2009, by and between the Debtors named therein and Deutsche Bank AG, New York Branch, as DIP Administrative Agent (incorporated by reference to Exhibit 10.3 to our Current Report on Form 8-K, filed on May 29, 2009). |
| 10.20 | Depositary Agreement, dated as of May 12, 2009, by and among HLI Operating Company, Inc., as U.S. Borrower, Hayes Lemmerz Finance LLC—Luxembourg, S.C.A., as Luxembourg Borrower, Deutsche Bank AG, New York Branch, as DIP Administrative Agent, and Deutsche Bank Trust Company Americas, as Depositary (incorporated by reference to Exhibit 10.4 to our Current Report on Form 8-K, filed on May 29, 2009). |
| 10.21 | Amendment No. 3, dated as of May 19, 2009, to Second Amended and Restated Credit Agreement, dated as of May 30, 2007, as amended by Amendment No. 1, dated as of January 30, 2009, as further amended by Amendment No. 2, dated as of May 12, 2009, by and among Hayes Lemmerz International, Inc., HLI Operating Company, Inc., Hayes Lemmerz Finance LLC—Luxembourg S.C.A., the Lenders named therein, Deutsche Bank AG, New York Branch, as DIP Administrative Agent, Deutsche Bank Securities Inc. and General Electric Capital Corporation, as Joint Book-Running Lead Managers, Joint Lead Arrangers, and Joint Syndication Agents for the DIP Facilities, and Deutsche Bank Securities Inc., as Documentation Agent for the DIP Facilities (incorporated by reference to Exhibit 10.5 to our Current Report on Form 8-K, filed on May 29, 2009). |
| 31.1 | Certification of Curtis J. Clawson, Chairman of the Board, President, and Chief Executive Officer, pursuant to Section 302 of the Sarbanes-Oxley Act of 2002.* |
| 31.2 | Certification Mark A. Brebberman, Vice President, Chief Financial Officer, pursuant to Section 302 of the Sarbanes-Oxley Act of 2002.* |
| 32.1 | Certification of Curtis J. Clawson, Chairman of the Board, President, and Chief Executive Officer, Pursuant to 18 U.S.C. Section 1350, as Adopted Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002.* |
| 32.2 | Certification of Mark A. Brebberman, Vice President, Chief Financial Officer, Pursuant to 18 U.S.C. Section 1350, as Adopted Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002.* |

---

\* Filed electronically herewith.

**EXHIBIT 31.1**

## CERTIFICATIONS

I, Curtis J. Clawson, certify that:

1. I have reviewed this quarterly report on Form 10-Q of Hayes Lemmerz International, Inc;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) for the registrant and have:

    a. Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    b. Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    c. Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    d. Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    a. All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    b. Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

_/s/ CURTIS J. CLAWSON_
Curtis J. Clawson
_President and Chief Executive Officer_

June 19, 2009

**EXHIBIT 31.2**

## CERTIFICATIONS

I, Mark A. Brebberman, certify that:

1. I have reviewed this quarterly report on Form 10-Q of Hayes Lemmerz International, Inc;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) for the registrant and have:

    a. Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    b. Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    c. Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    d. Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    a. All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting that are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    b. Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

*/s/   MARK A. BREBBERMAN*
Mark A. Brebberman
*Vice President and Chief Financial Officer*

June 19, 2009

**EXHIBIT 32.1**

**CERTIFICATION PURSUANT TO 18 U.S.C. SECTION 1350, AS ADOPTED
PURSUANT TO SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002.**

In connection with the Quarterly Report of Hayes Lemmerz International, Inc. (the "Company") on Form 10-Q for the quarterly period ended April 30, 2009 as filed with the Securities and Exchange Commission on the date hereof (the "Report"), I, Curtis J. Clawson, President and Chief Executive Officer of the Company, certify, pursuant to 18 U.S.C. section 1350, as adopted pursuant to section 906 of the Sarbanes-Oxley Act of 2002, that, to the best of my knowledge:

1. The Report fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

2. The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

_____
*/s/  CURTIS J. CLAWSON*
Curtis J. Clawson
*President and Chief Executive Officer*

June 19, 2009

**EXHIBIT 32.2**

**CERTIFICATION PURSUANT TO 18 U.S.C. SECTION 1350, AS ADOPTED
PURSUANT TO SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002.**

In connection with the Quarterly Report of Hayes Lemmerz International, Inc. (the "Company") on Form 10-Q for the quarterly period ended April 30, 2009 as filed with the Securities and Exchange Commission on the date hereof (the "Report"), I, Mark A. Brebberman of the Company, certify, pursuant to 18 U.S.C. section 1350, as adopted pursuant to section 906 of the Sarbanes-Oxley Act of 2002, that, to the best of my knowledge:

1.   The Report fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

2.   The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

*/s/   MARK A. BREBBERMAN*
Mark A. Brebberman
Vice President and Chief Financial Officer

June 19, 2009

**APPENDIX D**

**PRO FORMA FINANCIAL PROJECTIONS**

# HAYES LEMMERZ INTERNATIONAL, INC.
## SIGNIFICANT BUSINESS AND ECONOMIC ASSUMPTIONS

For purposes of developing the Plan and evaluating its feasibility, the following financial Projections were prepared. These financial Projections reflect the Debtors' estimate of its expected consolidated financial position, results of operations and cash flows of the Reorganized Debtors. Accordingly, the Projections reflect management's judgment of expected future operating and business conditions, which are subject to change.

All estimates and assumptions shown within the Projections were developed by management with, in certain instances, the assistance of AP Services. The Projections have not been audited or reviewed by independent accountants. The assumptions disclosed herein are those that management believes to be significant to the Projections. Although the Debtor is of the opinion that these assumptions are reasonable under the circumstances, such assumptions are subject to significant uncertainties, such as change in automotive build rates, the demand for aluminum components, laws and regulations, foreign currency and interest rates, inflation, other economic factors including utility costs and other related factors affecting the Company's businesses. Despite efforts to foresee and plan for the effects of changes in these circumstances, the impact cannot be predicted with certainty. Consequently, actual financial results could vary significantly from projected results.

**THE PROJECTIONS, INCLUDING THE UNDERLYING ASSUMPTIONS, SHOULD BE CAREFULLY REVIEWED IN EVALUATING THE PLAN. WHILE MANAGEMENT BELIEVES THE ASSUMPTIONS UNDERLYING THE PROJECTIONS, WHEN CONSIDERED ON AN OVERALL BASIS, ARE REASONABLE IN LIGHT OF CURRENT CIRCUMSTANCES AND EXPECTATIONS, NO ASSURANCE CAN BE GIVEN THAT THE PROJECTIONS WILL BE REALIZED.**

**THE PROJECTIONS SHOULD NOT BE REGARDED AS A REPRESENTATION OR WARRANTY BY THE DEBTORS OR ANY OTHER PERSON AS TO THE ACCURACY OF THE PROJECTIONS OR THAT THE PROJECTIONS WILL BE REALIZED.**

The significant assumptions used in the preparation of the financial Projections are stated below.

The Projections assume that the Debtor will emerge from Chapter 11 on November 1, 2009 (the "Effective Date"). The Projections should be read in conjunction with the significant assumptions, qualifications and notes set forth below and with the audited consolidated financial statements for the fiscal year ended January 31, 2009 contained in the fiscal 2008 Form 10-K included in Appendix C-2.

## I.  Overview

The Projections assume that the Company's business strategy will not change as a result of its reorganization and change of ownership.  The Company will continue to strive to be the low-cost producer of aluminum and steel wheels and automotive components to Original Equipment Manufacturers and Tier I automotive suppliers, and to grow its core business within those segments by continuing to satisfy its customers.  The Projections also assume the Company does not make any acquisitions or divestitures during the projection period, beyond the plants that were closed or anticipated being closed during fiscal 2009 and 2010.

Fiscal Year 2009 reflects actual results through March 31, 2009 and expected results for April 2009 through January 2010.  Projected operating performance during fiscal years 2010 through 2013 has been estimated using 2009 forecasts as a basis and incorporating the cost management improvements made during the Chapter 11 Cases and incorporating anticipated ongoing productivity improvements.  The Projections were created on a consolidated legal entity basis using the business reporting entities, which includes the Subsidiaries and non-Debtor Affiliates.

The Projections assume certain specific economic and business conditions for 2009, with general assumptions based upon future macroeconomic indicators (including automotive build rates), historic growth and estimated directions of specific markets thereafter.

These Projections were prepared in good faith based on assumptions believed to be reasonable and applied in a manner consistent with past practices.  They should be read in conjunction with the assumptions and qualifications to the tables contained herein, the risk factors described in Section IX of the Disclosure Statement, the historical consolidated financial information for the fiscal year ended January 31, 2009.

**THE COMPANY DOES NOT, AS A MATTER OF COURSE, PUBLISH OR DISCLOSE THEIR FINANCIAL PROJECTIONS.  ACCORDINGLY, THE COMPANY DOES NOT INTEND, AND DISCLAIMS ANY OBLIGATION TO, (A) FURNISH UPDATED PROJECTIONS TO HOLDERS OF CLAIMS OR EQUITY INTERESTS AT ANY TIME IN THE FUTURE, (B) INCLUDE UPDATED INFORMATION IN ANY DOCUMENTS THAT MAY BE REQUIRED TO BE FILED WITH THE SECURITIES AND EXCHANGE COMMISSION, OR (C) OTHERWISE MAKE UPDATED INFORMATION OR PROJECTIONS PUBLICLY AVAILABLE.  THE SUMMARY FINANCIAL PROJECTIONS AND RELATED INFORMATION PROVIDED IN THE DISCLOSURE STATEMENT AND THE EXHIBITS THERETO HAVE BEEN PREPARED EXCLUSIVELY BY THE COMPANY'S MANAGEMENT WITH THE ASSISTANCE OF AP SERVICES.  THESE PROJECTIONS, WHILE PRESENTED WITH NUMERICAL SPECIFICITY, ARE NECESSARILY BASED ON A VARIETY OF ESTIMATES AND ASSUMPTIONS WHICH, THOUGH CONSIDERED REASONABLE BY MANAGEMENT, MAY NOT BE REALIZED,**

AND ARE INHERENTLY SUBJECT TO SIGNIFICANT BUSINESS, ECONOMIC AND COMPETITIVE UNCERTAINTIES AND CONTINGENCIES, MANY OF WHICH ARE BEYOND THE COMPANY'S CONTROL. THE COMPANY CAUTIONS THAT NO REPRESENTATIONS CAN BE MADE AS TO THE ACCURACY OF THESE FINANCIAL PROJECTIONS AND RELATED INFORMATION OR AS TO THE REORGANIZED COMPANY'S ABILITY TO ACHIEVE THE PROJECTED RESULTS. SOME ASSUMPTIONS INEVITABLY WILL NOT MATERIALIZE AND EVENTS AND CIRCUMSTANCES OCCURRING SUBSEQUENT TO THE DATE ON WHICH THESE PROJECTIONS WERE PREPARED MAY BE DIFFERENT FROM THOSE ASSUMED OR MAY BE UNANTICIPATED, AND THUS MAY AFFECT FINANCIAL RESULTS IN A MATERIAL AND POSSIBLY ADVERSE MANNER. THE PROJECTIONS AND RELATED INFORMATION, THEREFORE, MAY NOT BE RELIED UPON AS A GUARANTY OR OTHER ASSURANCE OF THE ACTUAL RESULTS THAT WILL OCCUR.

**Assumptions for Financial Projections**

*Sales:*
The Company is the largest Tier I supplier of automotive and commercial highway wheels in the world. The Company is also a leading supplier for lightweight aluminum products and structural components. Given the Company's dependence on the production levels of the industry's Original Equipment Manufacturers (who integrate the Company's products into their platform designs), the Company's financial performance will depend significantly on the build rate of light vehicles in North America and Europe. In developing the Projections, the Company used build rate forecasts from CSM® and JD Power® published in Q2 2009. These Projections assume North American light vehicle production of 7.9 million units in 2009, building to approximately 14.6 million units in 2013 in North America, and from 16.3 million to 19.2 million in Europe over the same period. The Projections also assume North American truck production of 145,000 units in 2009, building to approximately 304,000 units in 2013 in North America, and from 262,000 to 752,000 in Europe over the same period. Because the volume of an individual platform using Company products may not follow the overall industry build rate, management has prepared its forecasts based on projections for specific automotive platforms where appropriate. The Company's sales include revenue from products for which contracts have already been awarded, in addition to programs which management reasonably believes will be awarded in the future.

*Cost of Goods Sold:*
A substantial portion of the Company's cost of goods sold expenditures is related to direct material costs, largely composed of purchases of steel and aluminum raw material. The remainder of the Company's cost of goods sold is composed of manufacturing and conversion costs. The Company has included manufacturing cost reductions in the forecast period which it believes are consistent with increased productivity resulting from the restructuring of the business, including management changes, plant consolidations, and the implementation of lean manufacturing practices throughout the Company.

*SG&A and Engineering / Research & Development Expenses:*
SG&A and Engineering and Research & Development expenses are expected to have minimal increases each year.

*Foreign Exchange:*
The Company consolidates its financial results in U.S. dollars for reporting purposes. The exchange rate assumptions included in the Projections are substantially unchanged throughout the projection period.

*U.S. Pension & OPEB Expenses:*
The Projections exclude all U.S. pension and OPEB related expenses beginning at the Effective Date. The Projections assume contributions to the U.S. pension stopped May 11, 2009, upon the filing of the chapter 11 cases. U.S. retiree medical contributions are assumed to stop upon the Effective Date. It is anticipated some settlement for the

obligations will be required, however, the form, amount and timing of such settlement is unknown at this time and not included in the Projections.

***Interest Rates and Exit Financing:***

The Projections assume the Company will obtain exit financing in an amount sufficient to fund the Plan, and assumes a New Credit Facility as contemplated in the Plan. The New Credit Facility is assumed to be comprised of some combination of a revolving credit facility ("New Revolver") and terms loans ("New Term Loan"). For purposes of preparing the Projections, a blended interest rate of 10.0% has been assumed and applied to the entire estimated balance of the New Credit Facility. The actual amount of proceeds required could differ materially from this estimate, as could the actual blended interest rate ultimately obtained. The final terms of the New Credit Facility are subject to further negotiation with the Company's potential exit lenders and future market conditions.

**UNAUDITED PRO FORMA PROJECTED FINANCIAL INFORMATION**

The Projections of the Company for fiscal years ended January 31, 2010, 2011, 2012, 2013 and 2014 as set forth below are unaudited and should be read in conjunction with the assumptions, qualifications and footnotes set forth herein, the Disclosure Statement, the historical financial information (including the notes and schedules thereto) and other information set forth in the Company's Annual Report on Form 10-K for the fiscal year ended January 31, 2009 and in the Quarterly Report on Form 10-Q for the Fiscal Quarter ended April 30, 2009, each as previously filed with the Securities and Exchange Commission (the "SEC") and included in Appendix C-2 and C-3, respectively, to the Disclosure Statement.

The Company expects that the effective date (the "Effective Date") of a confirmed plan of reorganization (the "Plan") will occur at the end of the third quarter of fiscal 2009. For purposes of these Projections, the Effective Date is assumed to be November 1, 2009. These Projections were prepared to show the estimated consolidated financial positions, results of operations, and cash flows of the Company and take into account the estimated effects on the capitalization of the Company as defined in the Plan. As such, the Projections consider the ongoing operations of the Reorganized Debtors and its Subsidiaries and its proposed strategies for managing its operations and do not take into account the effects of the principles of "fresh start" accounting.

The Projections herein include:

1. A pro forma projected consolidated balance sheet of the Company as of October 31, 2009 adjusted to reflect (i) the effects of projected pre-confirmation activities up to the Effective Date (assumed to be November 1, 2009), (ii) the estimated effect of the discharge of pre-petition obligations pursuant to the Plan, and (iii) the estimated effect of obtaining exit financing and the payment of certain costs and obligations pursuant to or due with respect to the Plan on the Effective Date;

2. Pro forma projected consolidated balance sheets of the Company as of January 31, 2010, 2011, 2012, 2013 and 2014 reflecting the estimated effect of the Plan on the capitalization of the Company after emerging from Chapter 11;

3. Projected consolidated statements of operations of the Company for the twelve months ended January 31, 2010, 2011, 2012, 2013 and 2014 reflecting the estimated effect of the Plan on the interest costs of the Company after emerging from Chapter 11; and

4. Pro forma projected consolidated statements of cash flows of the Company for each period for which a consolidated statement of operations is presented herein reflecting the cash flow effects of the aforementioned items.

**THE PROJECTIONS WERE NOT PREPARED WITH A VIEW TOWARD COMPLIANCE WITH THE GUIDELINES ESTABLISHED BY THE AICPA, THE FINANCIAL ACCOUNTING STANDARDS BOARD (THE "FASB") OR THE RULES AND REGULATIONS OF THE SEC. FURTHERMORE, THE PROJECTIONS HAVE NOT BEEN AUDITED, REVIEWED OR SUBJECTED TO ANY PROCEDURES DESIGNED TO PROVIDE ANY LEVEL OF ASSURANCE BY THE COMPANY'S INDEPENDENT PUBLIC ACCOUNTANTS, KPMG LLP. WHILE PRESENTED WITH NUMERICAL SPECIFICITY, THE PROJECTIONS ARE BASED UPON A VARIETY OF ESTIMATES AND ASSUMPTIONS, WHICH, ALTHOUGH DEVELOPED AND CONSIDERED REASONABLE BY MANAGEMENT, MAY NOT BE REALIZED AND ARE SUBJECT TO SIGNIFICANT BUSINESS, ECONOMIC AND COMPETITIVE UNCERTANTIES AND CONTINGENCIES, MANY OF WHICH ARE BEYOND THE CONTROL OF THE COMPANY'S MANAGEMENT. THESE UNCERTAINTIES INCLUDE, AMONG OTHER THINGS, THE ULTIMATE OUTCOME AND CONTENTS OF A CONFIRMED PLAN OF REORGANIZATION AND THE TIMING OF THE CONFIRMATION OF SUCH PLAN. CONSEQUENTLY, THE PROJECTIONS SHOULD NOT BE REGARDED AS A REPRESENTATION OR WARRANTY BY THE COMPANY, OR ANY OTHER PERSON, AS TO THE ACCURACY OF THE PROJECTIONS OR THAT THE PROJECTIONS WILL BE REALIZED. ACTUAL RESULTS MAY VARY MATERIALLY FROM THOSE PRESENTED IN THESE PROJECTIONS.**

**Hayes-Lemmerz International**
**Pro-Forma Emergence Balance Sheet**

**Pro Forma as of 10/31/2009**

<u>Plan of Reorganization Adjustments</u>

| **Assets** | Projected Pre-Emergence | Discharge of Debt | | Exit Financing | | Reorganized |
|---|---|---|---|---|---|---|
| Cash and Cash Equivalents | 70 | - | - | - | - | 70 |
| Receivables | 221 | - | - | - | - | 221 |
| Inventories | 130 | - | - | - | - | 130 |
| Pre-Paid Expenses & Other | 17 | - | - | - | - | 17 |
| Total Current Assets | 438 | - | | - | | 438 |
| | | | | | | |
| Property, Plant, Equipment - net | 457 | - | - | - | - | 457 |
| Other Intangible Assets | 106 | - | - | - | - | 106 |
| Other Long-Term Assets | 27 | - | - | - | - | 27 |
| Total Assets | 1,028 | - | | - | | 1,028 |
| | | | | | | |
| **Liabilities and Stockholders' Equity** | | | | | | |
| | | | | | | |
| DIP Facility | 100 | - | - | (100) | (a, c) | - |
| DIP Roll-Up Loans | 100 | - | - | (100) | (d) | - |
| Foreign Loans | 28 | - | - | - | | 28 |
| Accounts Payable and Accrued Liabilities | 248 | - | - | - | - | 248 |
| Total Current Liabilities | 475 | - | | (200) | | 275 |
| | | | | | | |
| New Revolver | - | - | | - | (b) | - |
| New Term Loan | - | - | | 100 | (a, b) | 100 |
| Capital Lease Obligations | 0 | - | | - | | 0 |
| Other Long-Term Liabilities | 192 | - | | - | | 192 |
| Minority Interest | 45 | - | | - | | 45 |
| Preferred Stock | 12 | - | | - | | 12 |
| Liabilities Subject to Compromise | 746 | (746) | (e) | - | | - |
| | | | | | | |
| Stockholders' Equity (Deficit) | | - | | - | | - |
| New Equity | - | - | | 100 | (d) | 100 |
| Old Equity | 993 | - | | - | | 993 |
| Retained Earnings | (1,435) | 746 | (e) | - | | (689) |
| Accumulated Other Comprehensive Income | (1) | - | | - | | (1) |
| Total Liabilities and Stockholders' Equity | 1,028 | - | | - | | 1,028 |

**Hayes-Lemmerz International**
**Summary Pro-Forma Financial Statements**
**Balance Sheet**
*(in millions USD)*

| | | | | HLI Consolidated | | |
|---|---|---|---|---|---|---|
| **ASSETS** | | **2009** | **2010** | **2011** | **2012** | **2013** |
| **Current assets:** | | | | | | |
| Cash and Marketable Securities | $ | 105 | $ 78 | $ 75 | $ 106 | $ 149 |
| Total Accounts Receivable | | 187 | 180 | 211 | 228 | 241 |
| Inventories & Factory Supplies | | 121 | 121 | 139 | 149 | 156 |
| Asset Held for Sale | | 8 | - | - | - | - |
| Total Prepaid Expenses | | 5 | 5 | 5 | 5 | 5 |
| Deferred Tax Asset - Short Term | | 3 | 3 | 3 | 3 | 3 |
| Total Current Assets | | 429 | 387 | 433 | 491 | 554 |
| | | | | | | |
| Land | | 39 | 35 | 35 | 35 | 35 |
| Buildings | | 157 | 151 | 151 | 151 | 151 |
| Machinery & Equipment | | 721 | 747 | 795 | 846 | 900 |
| Gross Fixed Assets | | 917 | 932 | 980 | 1,031 | 1,086 |
| Total Accumulated Depr/Amortization | | (477) | (529) | (598) | (668) | (733) |
| Net Fixed Assets | | 441 | 404 | 383 | 363 | 353 |
| | | | | | | |
| Production Tooling | | 9 | 9 | 7 | 7 | 7 |
| Other Assets-Intangible | | 105 | 97 | 93 | 89 | 85 |
| Other Assets-Long Term | | 14 | 14 | 14 | 14 | 14 |
| Deferred Tax Asset - Long Term | | (4) | (4) | (4) | (4) | (4) |
| | | | | | | |
| **Total Assets** | **$** | **994** | **$ 907** | **$ 926** | **$ 960** | **$ 1,009** |

| | | | | | | |
|---|---|---|---|---|---|---|
| **LIABILITIES** | | **2009** | **2010** | **2011** | **2012** | **2013** |
| **Current Liabilities:** | | | | | | |
| Unsecured Short-Term Debt | $ | 22 | $ 22 | $ 22 | $ 22 | $ 22 |
| Long-Term Debt-Due Within One Year | | 1 | 1 | 1 | 1 | 1 |
| Short Term Capital Lease Obligations | | 0 | 0 | 0 | 0 | 0 |
| Accounts Payable | | 154 | 142 | 175 | 190 | 201 |
| Payrolls and Employee Benefits | | 34 | 40 | 40 | 40 | 40 |
| Taxes Other than Income | | (1) | 1 | 7 | 14 | 22 |
| Accrued Interest | | 13 | 13 | 13 | 13 | 13 |
| Other Accrued Liabilities | | 23 | 22 | 22 | 22 | 22 |
| Income and Profits Taxes | | 15 | 14 | 17 | 29 | 42 |
| Total Current Liabilities | | 261 | 254 | 297 | 331 | 362 |
| | | | | | | |
| Long-Term Debt-Due Beyond One Year | | 101 | 100 | 100 | 100 | 100 |
| Deferred Taxes Payable | | 39 | 39 | 39 | 39 | 39 |
| Liabilities-Due Beyond One Year | | 140 | 139 | 139 | 137 | 135 |
| Total Long Term Liabilities | | 279 | 278 | 278 | 276 | 274 |
| | | | | | | |
| Minority Interest | | 42 | 39 | 39 | 41 | 43 |
| Preferred Stock | | 12 | 12 | 12 | 12 | 12 |
| Total Liabilities | | 594 | 584 | 626 | 661 | 691 |
| | | | | | | |
| Total Stockholders' Equity | | 400 | 323 | 300 | 299 | 317 |
| | | | | | | |
| **Total liabilities and stockholders' equity** | **$** | **994** | **$ 907** | **$ 926** | **$ 960** | **$ 1,009** |

**Hayes-Lemmerz International**
**Summary Pro-Forma Financial Statements**
**Statement of Operations**
*(in millions USD)*

| | | **HLI Consolidated** | | | |
|---|---|---|---|---|---|
| | **2009** | **2010** | **2011** | **2012** | **2013** |
| Total Sales | $ 1,174 | $ 1,270 | $ 1,429 | $ 1,564 | $ 1,662 |
| Cost of goods sold | 1,112 | 1,152 | 1,272 | 1,377 | 1,446 |
| Gross Profit, less EBITDA addbacks | 62 | 118 | 157 | 187 | 216 |
| Marketing, general, and administrative | 105 | 113 | 115 | 118 | 120 |
| Amortization of Intangibles | 8 | 7 | 5 | 4 | 4 |
| Asset impairments and other restructuring charges | 8 | 23 | 6 | - | - |
| Other income, net | 1 | 15 | (3) | (3) | (3) |
| EBIT | (60) | (41) | 34 | 67 | 95 |
| Ch. 11 Restructuring Fees (including Exit Fees) | 52 | - | - | - | - |
| Earnings (loss) from operations | (113) | (41) | 34 | 67 | 95 |
| Interest expense, net | 41 | 14 | 16 | 16 | 15 |
| Other non-operating expense | (2) | - | - | - | - |
| Earnings (loss) from continuing operations before taxes and minority interest | (152) | (55) | 18 | 52 | 79 |
| Taxes on Income | 12 | 23 | 37 | 47 | 54 |
| Earnings (loss) from continuing operations before minority interest | (164) | (78) | (19) | 5 | 25 |
| Minority Interest | (2) | 2 | 8 | 9 | 11 |
| Extraordinary Items | (746) | - | - | - | - |
| Earnings (loss) from continuing operations | 584 | (81) | (27) | (4) | 14 |
| **Net Income/ (Loss)** | **$ 584** | **$ (81)** | **$ (27)** | **$ (4)** | **$ 14** |

**Hayes-Lemmerz International**
**Summary Pro-Forma Financial Statements**
**Statement of Cash Flows**
*(in millions USD)*

| | | HLI Consolidated | | | |
|---|---|---|---|---|---|
| | **2009** | **2010** | **2011** | **2012** | **2013** |
| **Published Net Income** | $ 584 | $ (81) | $ (27) | $ (4) | $ 14 |
| | | | | | |
| **Adjustments to Operating Activities:** | | | | | |
| Depreciation & Tooling Amortization | 80 | 72 | 74 | 76 | 70 |
| Bond Discount Amortization | 8 | - | - | - | - |
| Amortization of Intangibles | 8 | 7 | 5 | 4 | 4 |
| Impairment & Other | (0) | 8 | - | - | - |
| Minority Interest | (2) | 2 | 8 | 9 | 11 |
| LTIP Restricted Stock | 4 | 3 | 3 | 3 | 4 |
| (Gain)/Loss on Sale of Fixed Assets | 1 | 18 | - | - | - |
| Extraordinary Items | (526) | - | - | - | - |
| Increase/(decrease) in deferred income taxes | (6) | 2 | 6 | 7 | 8 |
| Receivables & other receivables | (12) | 7 | (31) | (17) | (13) |
| Inventory (Inc)/Dec | 38 | (1) | (17) | (10) | (7) |
| Prepaids | 2 | 0 | 0 | - | - |
| Net Asset Held for Sale Inc/Dec | (0) | (6) | - | - | - |
| Total AP and other | (227) | (8) | 37 | 26 | 21 |
| **Cash Flow from Operations** | **(49)** | **24** | **57** | **93** | **111** |
| | | | | | |
| Total Capital Expenditures | (15) | (55) | (52) | (55) | (59) |
| Proceeds from Sale of Assets | 1 | 9 | - | - | - |
| **Cash Flow from Investing** | **(14)** | **(46)** | **(52)** | **(56)** | **(59)** |
| | | | | | |
| Dividends paid to minority shareholders | (11) | (5) | (8) | (7) | (9) |
| Long Term Debt - External | 69 | (1) | - | - | - |
| **Cash Flow from Financing Activities** | **58** | **(6)** | **(8)** | **(7)** | **(9)** |
| | | | | | |
| Cash flow from discontinued ops | (1) | - | - | - | - |
| FX Impact on cash | 4 | - | - | - | - |
| | | | | | |
| **Net Cash Flow** | $ (2) | $ (28) | $ (2) | $ 31 | $ 43 |
| | | | | | |
| Cash and Marketable Securities - opening balance | $ 108 | $ 105 | $ 78 | $ 75 | $ 106 |
| Cash and Marketable Securities - ending balance | 105 | 78 | 75 | 106 | 149 |

**Notes to Unaudited Pro Forma Projected Consolidated Financial Statements**

a.  The following is a summary of estimated cash sources and uses to reflect the Plan: ($ in millions)

|  |  |
|---|---:|
| **Cash Sources:** | |
| 10/31 Available Cash | $ 42 |
| New Term Loan | 100 |
| Total cash sources | $ 142 |
| | |
| **Cash Uses:** | |
| Repayment of the projected DIP Credit Facility upon emergence | $ (100) |
| Payment of Professional Holdback Amount and other professional fees including success fees as required by the Plan | (12) |
| Payment of DIP financing exit fees and agent fees | (4) |
| Payment of estimated debt issuance costs | (5) |
| Remaining cash available | (20) |
| Total cash uses | $ (142) |

b.  Represents the proceeds from the New Credit Facility as contemplated in the Plan. The New Credit Facility is assumed to be comprised of some combination of a revolving credit facility ("New Revolver") and terms loans ("New Term Loan"). The Projections do not assume any draw down on the New Revolver at closing. For purposes of preparing the Projections, a blended interest rate of 10.0% has been assumed and applied to the entire estimated balance of the New Credit Facility. Actual results could differ from these estimates in several respects, including the actual amount of proceeds required, the distribution of debt between facilities and between domestic and foreign jurisdictions, and the actual blended interest rate ultimately obtained.

c.  Represents the repayment of the DIP Credit Facility. The amount of the DIP Credit Facility outstanding on the Effective Date could differ materially from this estimate.

d.  Represents the conversion of the DIP Roll-Up Loans to equity. The amount of the DIP Roll-Up Loans on the Effective Date could differ materially from this estimate.

e.  Represents the adjustment to Liabilities Subject to Compromise from discharge/settlement of prepetition claims. The balance consists of following liabilities:

|  |  |
|---|---:|
| **Liabilities Subject to Compromise:** | |
| Account Payable | $ 2 |
| Pre-Petition Revolver | 125 |
| Pre-Petition Notes | 401 |
| Retiree Benefits - LT | 131 |
| Pension Liability – LT | 74 |
| Heritage Retiree Health Care | 13 |
| Total | $ 746 |

**APPENDIX E**

**LIQUIDATION ANALYSIS**

# HAYES LEMMERZ INTERNATIONAL, INC.
## Liquidation Analysis

The Debtors believe that the Plan meets the "best interest of creditors" test as set forth in section 1129(a)(7) of the Bankruptcy Code. There are Impaired Classes with respect to each Debtor, certain of which are contemplated to receive recoveries under the Plan. The Debtors believe that the members of each Impaired Class will receive at least as much under the Plan as they would if the Debtors were liquidated under Chapter 7 of the Bankruptcy Code.

Obligations under the DIP Credit Agreement and Prepetition Credit Facility are guaranteed by, and secured by a first priority lien on substantially all of the assets of, Hayes Lemmerz International, Inc. ("HLI" and, together with its subsidiaries, the "Company"), each of its subsidiaries in the United States and Hayes Lemmerz Finance LLC – Luxembourg S.C.A. (collectively, the "Debtors"). Obligations under the Prepetition Credit Facility are also guaranteed by substantially all of HLI's wholly-owned non-Debtor subsidiaries (the "Non-Debtors"), subject to limitations with respect to local law in each jurisdiction.

Unencumbered assets ("Unencumbered Assets") of the Non-Debtors include certain equity interests in joint ventures in Turkey, Thailand and India; inventories and machinery & equipment in Spain; accounts receivable, inventories, real property and machinery & equipment in Italy; land & buildings in Brazil; and inventories, land & buildings and machinery & equipment in South Africa. The Debtors do not believe that either the Unencumbered Assets or the value thereof will be available for distribution to the Debtors' creditors because they would first be distributed on account of separate claims against the Non-Debtors. Thus, the Liquidation Analysis assumes no value is generated from the Unencumbered Assets on behalf of the Debtors. Certain creditors of the Debtors may also have claims against Non-Debtors as a result of guarantees issued by certain of the Non-Debtors. Creditors holding claims against the Debtors and the Non-Debtors may, depending in part upon the outcome of litigation commenced by the Debtors with respect to certain Non-Debtor guarantees, receive a recovery with respect to their claims against Non-Debtors, including proceeds derived from the liquidation or orderly sale of Unencumbered Assets.

The proceeds of the assets of each of the Debtors are required to be applied to the secured claims of the DIP Lenders and Prepetition Lenders. Moreover, the Prepetition Lenders and the DIP Lenders may also realize recoveries from the proceeds of any assets on which the Non-Debtors have granted liens to secure the claims of the Prepetition Lenders and the DIP Lenders. Notwithstanding the application of the proceeds from all such Debtor and Non-Debtor assets, the DIP Lenders and Prepetition Lenders would still have substantial unsecured deficiency claims in the event of liquidation. Because there are no Unencumbered Assets of the Debtors that would be available for distribution to unsecured creditors, the Liquidation Analysis is shown on a consolidated basis.

The Liquidation Analysis reflects the estimated cash proceeds, net of liquidation-related costs that would be realized if the Debtors were to be liquidated in accordance with Chapter 7 of the Bankruptcy Code and the Non-Debtors were to be liquidated pursuant to local law or, in certain cases, sold as going concerns. Underlying the Liquidation Analysis are a number of estimates and assumptions that, although developed and considered reasonable by management of the Company and by the Debtors' professionals, are inherently subject to significant business, economic and competitive uncertainties and contingencies beyond the control of the Company and management, and are also based upon assumptions with respect to certain liquidation decisions which could be subject to change. ACCORDINGLY, THERE CAN BE NO ASSURANCE THAT THE VALUES REFLECTED IN THE LIQUIDATION ANALYSIS WOULD BE REALIZED IF THE COMPANY WERE, IN FACT, TO UNDERGO SUCH A LIQUIDATION, AND ACTUAL RESULTS COULD VARY MATERIALLY FROM THOSE SHOWN HERE.

The Liquidation Analysis was prepared by management of the Debtors, with the assistance of both AP Services and other Debtor professionals. The Liquidation Analysis is based on the Company's balance sheet as of May 31, 2009, and is predicated on the assumption that the Debtors would commence Chapter 7 liquidation on October 31, 2009. The Liquidation Analysis assumes that the actual May 31, 2009 balance sheet is a proxy for the October 31, 2009 balance sheet for all assets other than cash. Cash estimates as of October 31, 2009 were based on the Debtors' Summary Proforma Financial Statements.

Management believes that the Company would not be able to maintain an orderly wind-down of the global operations. In other words, the Debtors and liquidating Non-Debtors would not be able either to convert inventory (both on hand and, in some instances, from additional purchases of raw materials) into finished goods for sale to customers or to wind-down daily operations following the completion of any remaining production in an orderly manner. Management believes that OEM customers would react to an exit by the Debtors and the liquidating Non-Debtors from the supply chain by (a) contracting with its other suppliers of like parts to supply alternative products and (b) altering production schedules to replace the products of the Debtors and the liquidating Non-Debtors with readily available alternatives. The Company would not be able to leverage customer support due to the commodity nature of its products and significant open industry capacity. Other factors which were considered in reaching this conclusion include expected challenges in maintaining control of the liquidation process in foreign jurisdictions due to local insolvency laws and limited availability of funding sources.

Accordingly, the Liquidation Analysis assumes that the liquidation of the Debtors would commence under the direction of a Court-appointed trustee and that all Non-Debtor operations, other than the steel wheel facilities in Brazil (Borlem S.A. Empreendimentos Industriais, "Borlem Steel") and the Czech Republic (Hayes Lemmerz Autokola, a.s. "Autokola"), would cease operations upon commencement of the liquidation process. The liquidation process would continue for a period of nine months, during which time all of the Company's worldwide major assets would either be sold or conveyed to the respective lien holders, and the cash proceeds, net of liquidation-related costs, would then be distributed to creditors. Although the liquidation of some assets might not require nine months, other assets would be more difficult to collect or sell, thus requiring a liquidation period substantially longer than nine months. The liquidation period would allow for the collection of receivables and the sale of inventory and fixed assets. Liquidation values were assessed for general classes of assets by estimating the percentage recoveries that a trustee might achieve through an orderly disposition.

The Liquidation Analysis assumes the liquidation and wind down of all Debtor assets within a Chapter 7 liquidation while the Non-Debtor assets located in Mexico (Industrias Fronterizas HLI, S.A. de C.V. and Hayes Lemmerz Aluminio S. de R.L. de C.V.) would be liquidated outside of a court supervised insolvency. Management believes that the Non-Debtor

steel wheel facilities located in Brazil (Borlem Steel) and the Czech Republic (Autokola) have greater value as going concerns than in a wind-down. Thus, the Liquidation Analysis assumes the liquidation of these entities as going concerns through an expedited sales process, with the proceeds of such sales realized by Hayes Lemmerz Holding GmbH, which owns approximately 95% of the outstanding equity of Borlem Steel and 80% of the outstanding equity of Autokola, and HLI Operating Company, Inc., which owns the other 20% of Autokola. There can be no assurances that the actual value realized in a sale of these facilities would yield the results as assumed in the Liquidation Analysis.

Management believes the liquidation of the remaining Non-Debtor operations in Germany, Spain, Czech Republic, Italy, Brazil, South Africa, Turkey, India and Thailand will not provide value due to the significant costs required to maintain control of the process, the relative creditor priority in foreign jurisdictions and the potential costs associated with cash repatriation of proceeds. Thus, the Liquidation Analysis assumes that the operations in these locations are placed into court supervised insolvency proceedings and are liquidated by a local trustee/administrator.

The Company's equity interests in the joint venture operations in Turkey, India and Thailand have not been pledged to secure the guaranty under the DIP Facility and Prepetition Credit Facility and are considered Unencumbered Assets. The Liquidation Analysis assumes that any value remaining from the liquidation of these assets after payment of wind-down expenses and local obligations would be distributed to Hayes Lemmerz Holding GmbH and Hayes Lemmerz s.r.l., which own the Company's equity interests in the joint ventures, and in turn will be distributed to creditors of Hayes Lemmerz Holding GmbH and Hayes Lemmerz s.r.l. and would not be available for distribution by the Debtors.

The Liquidation Analysis assumes that liquidation proceeds of the Debtors' assets would be distributed in accordance with Bankruptcy Code sections 726 and 1129(b). If a Chapter 7 liquidation were pursued for the Debtors, the amount of liquidation value available to unsecured creditors would be reduced first, by the costs of the liquidation including fees and expenses of the trustee appointed to manage the liquidation, fees and expenses of other professionals retained by the trustee to assist with the liquidation and asset disposition expenses; second, by the DIP Facility Claim and the carve-out for unpaid professional fees and disbursements from the Chapter 11 Cases

(the "Carve-Out")**;** third, by the claims of secured creditors to the extent of the value of their collateral except as described herein; and fourth, by the priority and administrative costs and expenses of the Chapter 7 estates, including unpaid operating expenses incurred during the Chapter 11 Cases and any accrued and unpaid professional fees in excess of the Carve-Out allowed in the Chapter 7 cases.

The Chapter 7 liquidation itself would trigger certain priority payments that otherwise would not be due in the ordinary course of business. These priority payments would be made in full before any distribution of proceeds to pay general unsecured claims or to make distributions in respect of equity interests. The liquidation would likely prompt certain other events to occur including the termination of the Company's pension and benefit plans, the rejection of remaining executory contracts and unexpired leases, and defaults under agreements with customers to provide products. Such events would likely create a much larger number of unsecured creditors and would subject the Chapter 7 estates to considerable additional claims for damages for breaches of those contracts or for the rejection of those contracts under the Bankruptcy Code. Such claims would also materially increase the amount of General Unsecured Claims against the Debtors and would dilute any potential recoveries to other holders of General Unsecured Claims. No attempt has been made to estimate additional General Unsecured Claims that may result from such events under a Chapter 7 liquidation scenario. Similar additional claims would also likely arise in the liquidation of the non-Debtor subsidiaries.

The Liquidation Analysis necessarily contains an estimate of the amount of Claims that will ultimately become Allowed Claims. Estimates for various classes of Claims are based solely upon the Debtors' continuing review of the Claims filed in these Chapter 11 Cases and the Company's books and records. No order or finding has been entered by the Court estimating or otherwise fixing the amount of Claims at the projected levels set forth in this Liquidation Analysis. In preparing the Liquidation Analysis, the Debtors have projected amounts of Claims that ultimately may not be consistent with the actual amount of Claims allowed under the Plan.

The Liquidation Analysis assumes that there are no recoveries from the pursuit of any potential preferences, fraudulent conveyances, or other causes of action and does not include the estimated costs of pursuing those actions.

# FOOTNOTES TO LIQUIDATION ANALYSIS

*Note A – Organization and Ownership*

HLI is the parent entity for all the Debtors and Non-Debtors and affiliates. Its primary assets are the direct and indirect ownership interests in its subsidiaries and affiliates.

*Note B – Book Values as of May 31, 2009*

Unless stated otherwise, the book values used in this Liquidation Analysis are the un-audited estimated net book values of the Debtors as of May 31, 2009, and, for all assets other than cash, are assumed to be a proxy for the assets of these entities as of October 31, 2009. The Company does not prepare a consolidating balance sheet for the Debtor entities and thus the balances used in the Liquidation Analysis do not reflect potential eliminating entries which would primarily impact intercompany and equity balances. The balances exclude the assets of any non-Debtor Subsidiaries which are valued in the *Note K – Liquidation Values of Non-Debtor Subsidiaries.*

*Note C – Cash and Cash Equivalents*

The Liquidation Analysis assumes that operations during the liquidation period would not generate additional cash available for distribution except for net proceeds from the disposition of non-cash assets. It is assumed that the projected cash and cash equivalents of $39.6 million at October 31, 2009, as provided for in the Debtors' Summary Proforma Financial Statements, are fully collectible and would be used to fund the liquidation.

*Note D - Accounts Receivable*

The analysis of accounts receivable assumes that a Chapter 7 trustee would retain certain existing staff of the Debtors to handle an aggressive collection effort for outstanding trade accounts receivable for both the Debtors and for the operations in Mexico. Collectible accounts receivable are assumed to include all third party trade accounts receivable including third party foreign receivables. The liquidation value of accounts receivable was estimated based upon a review and assessment of the probability of collection of trade receivables less the amounts of accounts payable due to customers that provide the Debtors with steel under a steel-resale program.

The Liquidation Analysis assumes that these customers would withhold payments for receivables until the Company has remitted payment to the customer for amounts owed under the steel-resale program. A range of discount factors were then applied to the book value of receivables in order to estimate their current value under the assumed hypothetical liquidation. The result is assumed to be an estimate of the proceeds that would be available in a liquidation scenario and takes into account the inevitable difficulty a liquidating company has in collecting its receivables and any concessions which might be required to facilitate the collection of certain accounts. Collections during a liquidation of the Debtors may be further compromised by the likely claims for damages for breaches of or the likely rejection of customer contracts as customers will likely attempt to set off outstanding amounts owed to the Debtors against such claims. The liquidation value of accounts receivable is estimated to be approximately 55% of the net book value of the accounts receivable as of May 31, 2009.

*Note E – Inventories and Factory Supplies*

Inventories are comprised of certain raw materials, work-in-process and finished goods, as well as factory supplies and spare parts. The Liquidation Analysis assumes no new purchases are made after October 31, 2009 except for amounts sufficient to supply customers of the Borlem Steel and Autokola steel wheel facilities until completion of the going concern sales. Proceeds from the collection of inventories were estimated based upon the assumption that finished goods would be sold to the customers for a recovery of 81% of net book value. The Liquidation Analysis assumes that customers would not be willing to pay to convert raw materials or work-in-process due to the excess supply of alternative products. Accordingly, the Liquidation Analysis assumes that all raw material and work-in-process inventory would be sold to a liquidator. Management estimates that the work-in-process remaining could be liquidated for a recovery of 10% of net book value while raw materials could be liquidated for a net recovery of 67.5% of net book value. Factory supplies and replacement/spare parts are assumed to be sold to a liquidator and are estimated to have a liquidation value of 7.5% of net book value.

*Note F – Assets Held for Sale*

Assets held for sale consist of four unoccupied properties located in Ferndale, Michigan, Huntington, Indiana, Howell, Michigan, and Gainesville, Georgia. The Liquidation Analysis assumes sale of these properties for 85% of estimated net realizable value.

*Note G – Other Current Assets*

Other current assets include prepaid taxes, prepaid insurance, deferred tax assets, and other prepaid expenses and deposits. Other current assets are estimated to have no liquidation value.

*Note H – Property, Plant & Equipment, Net*

Property, Plant & Equipment includes all land, buildings, and machinery and equipment owned by the Debtors. The recovery rate for land & buildings was assumed to be 15% of net book value. The Company's book value of land and buildings were adjusted to estimated fair market value in 2003 as part of the Company's exit from Chapter 11. With no recent appraisal available, the recovery rate was estimated based on management's business judgment, actual recoveries realized by the Company in recent transactions and estimated recoveries realized in similar Tier 1 automotive supplier liquidations. These recoveries reflect the macroeconomic factors impacting the automotive supplier industry including worldwide excess capacity and market saturation. The liquidation value for machinery and equipment is estimated at 8.5% of its net book value and was estimated by management using its business judgment after giving consideration to historical appraisal information, actual recoveries realized by the Company in similar transactions, and current market trends provided by professional liquidators. Total liquidation value for Property, Plant & Equipment is estimated at 11.8% of its net book value.

*Note I – Intercompany Receivables*

Intercompany receivables represent amounts due to the Debtors from the Non-Debtors on account of initial capital investments, certain costs and overhead charges allocated by the Company and intercompany loans provided to the Non-Debtors. The Liquidation Analysis allocates no value to the $262 million of intercompany receivables because there are no intercompany amounts due to the Debtors from the Non-Debtors assumed to be liquidated as going concerns (Borlem Steel and Autokola) and the prepetition intercompany loans are unsecured and

are assumed to be subordinate to the DIP Lenders, Prepetition Lenders and local secured indebtedness.

*Note J – Other Non-Current Assets*

Other non-current assets are comprised primarily of production tooling, capitalized financing costs and certain other intangible assets. Intangible assets arose in connection with numerous acquisitions and consist predominantly of goodwill, trade names, customer relationships and technology. The Liquidation Analysis assigns no recovery value to these assets.

*Note K – Estimated Liquidation Value of Non-Debtors*

In order to maximize total liquidation value, the Liquidation Analysis assumes the wind-down of the Non-Debtor operations in Mexico as well as the orderly liquidation on a going concern basis of the Non-Debtor steel wheel operations in Brazil (Borlem Steel) and the Czech Republic (Autokola).

The Liquidation Analysis contemplates a wind-down of the Non-Debtor operations located in Mexico, specifically Hayes Lemmerz Aluminio S. de R. L. de C.V. and Industrias Fronterizas HLI, S.A. de C.V ("Mexico"). The methodology for determining the liquidation value of the specific classes of assets in Mexico is consistent with the assumptions detailed for those respective asset classes above. These operations are not a part of the Chapter 7 estates and, therefore, the distribution of proceeds from this wind-down would not be subject to the priority order established in the Bankruptcy Code. The Liquidation Analysis assumes that the current, locally secured creditors, estimated employee obligations, operating wind-down costs, professional fees and liquidation fees would be repaid prior to any distribution of proceeds to other creditors. The liquidation of the operations located in Mexico resulted in net proceeds of approximately $2.3 million available for distribution. These proceeds would then be distributed to the DIP Lenders and Prepetition Lenders in accordance with the guarantees and asset pledges provided by Mexico under the Prepetition Credit Agreement.

The estimated sale price of the Non-Debtor operations in Brazil (Borlem Steel) and the Czech Republic (Autokola) were valued by applying a market multiple to their fiscal 2009 estimated EBITDA to arrive at an estimated Enterprise Value. The multiple selected is consistent

with the methodology used to determine the Enterprise Value of the Company as discussed in *Section XII(d) – Estimated Value of Reorganized Debtors.* A 20% discount was applied to the estimated Enterprise Value to reflect the effect of a Chapter 7 sale process for the Debtors, the likelihood of a "damaged goods" or fire sale perception by bidders, and the loss of value attributable to the Company's global market presence.

The proceeds from the expedited going concern sales have been increased by $11 million to reflect estimated excess cash held in those operations. Net proceeds from the sale ultimately available to satisfy Claims has been reduced by $4 million for the repayment of foreign debt, by approximately $50 million to account for tax and regulatory risk associated with selling assets in Brazil and Czech Republic, and by an additional 5% of the total enterprise value for estimated transaction costs. The remaining net amount available for distribution is approximately $56.9 million. Substantially all of the proceeds would then be distributed to the DIP Lenders and Prepetition Lenders in accordance with the guarantees and asset pledge provided by Borlem Steel and Autokola under the Prepetition Credit Agreement.

The Liquidation Analysis also contemplates a wind-down of the remaining Non-Debtor assets located in Germany, Spain, Italy, South Africa, Turkey, India and Thailand as well as the remaining operations in Czech Republic and Brazil (i.e., those not described above). The methodology for determining the liquidation value of the specific classes of assets for these operations is consistent with the assumptions detailed for those respective asset classes above. These operations are not a part of the Chapter 7 estates and therefore the distribution of proceeds from the wind-down of these operations would not be subject to the priority distribution scheme established in the Bankruptcy Code. The Liquidation Analysis assumes that the current secured creditors, unsecured creditors at the joint venture operations (Turkey, Thailand and India), estimated employee obligations, operating wind-down costs, professional fees and liquidation fees would be repaid first. The balance of the liquidation values remaining, if any, of these entities is returned pro-rata to the joint venture partners and the Non-Debtor entities that own the stock of the respective joint venture entities. The liquidation of these assets resulted in no remaining net proceeds for the Debtors after the repayment of the local obligations described above and the obligations of the Non-Debtor entities which hold the joint venture interests. It is further assumed

that these operations would be placed into local insolvency and wound down under the control of a local administrator/trustee.

*Note L – Costs Associated with Liquidation*

Corporate payroll and certain operating costs during the liquidation are based upon the assumption that certain plant and corporate functions would be retained to oversee the liquidation process. The remaining staff would also be needed to maintain and close the accounting records and to complete certain administrative tasks including payroll and tax forms and records. Corporate payroll/overhead costs of $3.9 million were estimated assuming (a) $.4 million per month for payroll and benefits of critical employees of the Debtors for the first two months, $.24 million per month for payroll and benefits for months three and four, and $.075 million per month for months five through nine, and (b) $2.2 million of additional administrative overhead charges for the nine month liquidation period.

Certain minimum staff would be required at the physical locations to complete the closure of the facilities, to disassemble the equipment and to oversee the sale process for equipment and real estate. Furthermore, in order to maintain control of the liquidation proceedings in foreign jurisdictions, the Liquidation Analysis assumes that the Company would be required to continue to pay full wages and benefits for the duration of the liquidation. Accordingly, the Liquidation Analysis assumes six months of payroll and benefits/severance for the liquidating facilities in the US and Mexico. The amount paid by the Debtors is approximately $11.1 million. The Liquidation Analysis also assumes $8.8 million of fixed operating costs paid over the six -month wind down of the operating facilities of the Debtors. In addition to these amounts paid by the Debtors, $4.2 million of employee payroll/benefits and operating costs are assumed to be incurred in Mexico and are accounted for in Note K – Liquidation Value of Non-Debtors. The methodology used to estimate these amounts is the same as described above.

Chapter 7 trustee fees include those fees associated with the appointment of a Chapter 7 trustee in accordance with section 326 of the Bankruptcy Code. Trustee fees are estimated based on historical experience in other similar cases and are calculated at 3% of the total liquidation value of the Debtor entities.

Chapter 7 professional fees include legal, appraisal, broker and accounting fees expected to be incurred during the nine-month liquidation period and not already deducted from liquidation values. Monthly professional fees for legal, accounting and other staff to assist the estates, the Prepetition Lenders, the DIP Lenders, the Unsecured Creditors' Committee and the Chapter 7 trustee with the process are assumed to be $1.6 million per month for the first three months and $.4 million per month for the next six months. In addition, the Liquidation Analysis assumes another $.7 million of fees paid to professionals supporting the liquidation process in Mexico and $3.8 million of fees paid to professional liquidators.

The costs of administering the Chapter 7 liquidation of the Debtors are estimated as follows:

| | |
|---|---|
| Payroll/overhead costs | $ 23.9 million |
| Trustee Fees | $ 2.0 million |
| Professional Fees | $ 10.6 million |
| Total | $ 36.6 million |

*Note M – Super-priority Administrative Claims*

Total obligations under the DIP Credit Facility, including the Roll-Up Loan and accrued PIK interest, are estimated to be $204.3 million at October 31, 2009. The Carve-Out at October 31, 2009 is estimated to be $6.3 million which includes estimated unpaid October professional fees plus holdback amounts. The DIP Facility Claim and the Carve-Out for accrued and unpaid professional fees from the Chapter 11 Estates are assumed to be paid after the liquidation costs of the Chapter 7 estates, with the Carve-Out assumed paid in its entirety first and the DIP Facility Claim paid subsequently.

*Note N – Secured Claims*

For purposes of the Liquidation Analysis, management has assumed that Secured Claims will consist of the estimated Prepetition Credit Facility Secured Claims including amounts outstanding under the Euro Synthetic Letter of Credit Facility and Swap Termination Claims. These Claims are assumed paid on a pro rata basis from the net liquidation proceeds. Total Secured Creditor Claims are estimated to be $412 million based on initial claims filed by the Prepetition Lenders. These amounts are for illustrative purposes only as the Debtors are still in the process of confirming the accuracy of these amounts.

*Note O – Administrative and Priority Claims*

Administrative and priority claims include unpaid postpetition operating expenses of the Chapter 11 Estates as estimated by the postpetition accounts payable and accrued expenses reflected in the Debtors' Summary Proforma Financial Statements as of October 31, 2009, estimated Chapter 7 administrative claims, and estimated Priority Claims. The Liquidation Analysis does not include any estimated amounts for 503 (b) (9) Priority Claims, Priority Tax Claims or Other Administrative & Priority Claims as this analysis has not yet been completed. Administrative claims are assumed paid on a pro rata basis from the net proceeds, if any, remaining after the payment of liquidation costs, DIP Facility Claims (including the Carve-Out), and Secured Claims. Other Priority Claims are assumed to be paid on a pro rata basis from the net proceeds available, if any, after the payment of liquidation costs, DIP Facility Claims (including the Carve-Out), Secured Claims and administrative claims. These Claims are assumed to have their priority as set out in the Bankruptcy Code.

*Note P – Unsecured Claims*

For purposes of the Liquidation Analysis, management has assumed that unsecured claims will consist of estimated Senior Note Claims, the estimated Secured Debt deficiency claim and General Unsecured Claims as defined in the Plan. It should be noted that the Liquidation Analysis does not attempt to estimate potential additional General Unsecured Claims that would likely arise as a result of the termination of the Debtors' pension and benefit plans, the rejection of remaining executory contracts and leases, claims arising from 1114 actions or other settlements related to the Debtors' OPEB obligations, and the failure of the Debtors to perform under existing contracts with its customers. Unsecured Claims are assumed to be paid on a pro rata basis from the net liquidation proceeds available, if any, after the payment of all other Claims.

## HAYES LEMMERZ INTERNATIONAL, INC. (Note A)
### Liquidation Analysis

The Company has prepared this liquidation analysis (the "Liquidation Analysis") in connection with the Disclosure Statement and Plan.  The Liquidation Analysis estimates the value that may be recovered by classes of Claims upon disposition of the Debtor assets in a Chapter 7 liquidation and the wind-down and sale of the Non-Debtor assets.

### STATEMENT OF ASSETS
*($ in thousands)*

| | *Notes* | Book Value as of May 31, 2009 (Note B) *(Unaudited)* | Hypothetical Percentage Recovery | Estimated Liquidation Value *(Unaudited)* |
|---|---|---|---|---|
| Debtor Entities | | | | |
| Cash and Cash Equivalents | C | $39,597 | 100.0% | $39,597 |
| Accounts Receivable, net | D | 31,191 | 55.0% | 17,155 |
| Inventories & Factory Supplies | E | 34,548 | 56.9% | 19,649 |
| Assets Held for Sale | F | 8,554 | 85.0% | 7,271 |
| Other Current Assets | G | 8,777 | 0.0% | - |
| Property, Plant and Equipment, Net | H | 60,007 | 11.8% | 7,067 |
| Intercompany Receivables | I | 262,222 | 0.0% | - |
| Other Noncurrent Assets | J | 14,057 | 0.0% | - |
| Liquidation Value of Non-Debtor Subsidiaries | K | 1,922,127 | N/A | N/A |
| Total Assets | | $2,381,080 | | $90,739 |
| | | | | |
| Costs Associated with Liquidation of Debtors: | L | | | |
| Corporate Overhead | | | | (3,973) |
| Wind-down costs | | | | (8,807) |
| Employee Severance | | | | (11,100) |
| Liquidation Costs of PP&E | | | | (3,399) |
| Chapter 7 Trustee Fees | | | | (2,083) |
| Chapter 7 Professional Fees | | | | (7,200) |
| Total | | | | ($36,562) |
| | | | | |
| **Estimated Liquidation Value of Debtor Entities** | | | | $   54,178 |

## HAYES LEMMERZ INTERNATIONAL, INC.
### Liquidation Analysis

### *DISTRIBUTION ANALYSIS SUMMARY*

*($ in thousands)*

| | Estimated Allowable Claims | | Estimated Recovery Value | | Notes |
|---|---|---|---|---|---|
| **Net Estimated Proceeds Available for Distribution following Liquidation of Debtors and Non-Debtor Assets and Going Concern Sale of certain Non-Debtors** | | | $ | 54,178 | |
| | | | | | |
| Less Estimated Superpriority Administrative Claims: | | | | | |
| New Money & Roll-Up DIP Facilities plus accrued PIK interest | | 204,300 | | 204,300 | M |
| Carve-Out for Professional Fees | | 6,300 | | 6,300 | M |
| Total Superpriority Administrative Claims | $ | 210,600 | $ | 210,600 | |
| Hypothetical recovery to Superpriority Administrative Claims | | | | 25.7% | |
| **Net Proceeds Available after Superpriority Administrative Claims** | | | $ | - | |
| | | | | | |
| Less Estimated Secured Claims: | | | | | |
| Prepetition Credit Facility - Term Debt | $ | 250,867 | | 250,867 | N |
| Prepetition Credit Facility - Revolver | | 126,164 | | 126,164 | N |
| Letters of Credit Facility - Euro Synthetic | | 20,862 | | 20,862 | N |
| Swap Termination Claims | | 14,000 | | 14,000 | |
| Total Secured Claims | $ | 411,894 | $ | 411,894 | |
| Hypothetical recovery to Secured Claims | | | | 0.0% | |
| **Proceeds Available after Secured Claims** | | | $ | - | |
| | | | | | |
| Less Estimated Administrative and Priority Claims: | | | | | |
| Chapter 11 Post-Petition Account Payable and Accrued Liabilities | $ | 40,000 | | | O |
| 503 (b)(9) Claims | | TBD | | | O |
| Priority Tax Claims | | TBD | | | O |
| Other Administrative & Priority Claims | | TBD | | | O |
| Total Administrative Claims | $ | 40,000 | $ | 40,000 | |
| Hypothetical recovery to Administrative and Priority Claims | | | | 0.0% | |
| **Proceeds Available after Administrative and Priority Claims:** | | | $ | - | |
| | | | | | |
| Less Total Esimated Unsecured Claims: | | | | | |
| Secured Debt - Deficiency Claim | $ | 411,894 | | | P |
| Senior Notes | | 182,624 | | | P |
| PBGC Claim (Pension) | | TBD | | | P |
| OPEB Claim | | TBD | | | P |
| Other Estimated General Unsecured Claims | | 40,682 | | | P |
| Total Unsecured Claims | $ | 635,200 | $ | 635,200 | |
| Hypothetical recovery to Unsecured Claims | | | | 0.0% | |

# HAYES LEMMERZ INTERNATIONAL, INC.
## Liquidation Analysis - Debtor Entities

*($ in thousands)*

| | Akron | Sedalia | Laredo | Corp/Other | Lux | Total Debtor |
|---|---|---|---|---|---|---|
| **Gross Proceeds** | | | | | | |
| Cash and Cash Equivalents | $ - | $ - | $ - | $ 21,685 | $ 17,912 | $ 39,597 |
| Accounts Receivable | 3,284 | 10,156 | 2,859 | 856 | - | 17,155 |
| Notes Receivable | - | - | - | - | - | - |
| Inventories & Factory Supplies | 6,180 | 5,742 | 1,621 | 6,107 | - | 19,649 |
| Assets Held for Sale | - | - | - | 7,271 | - | 7,271 |
| Other Current Assets | - | - | - | - | - | - |
| Property, Plant & Equipment, Net | 1,249 | 2,384 | 151 | 3,283 | - | 7,067 |
| Other NonCurrent Assets | - | - | - | - | - | - |
| Total | 10,713 | 18,282 | 4,631 | 39,202 | 17,912 | 90,739 |
| | | | | | | |
| **Wind-Down Expense** | | | | | | |
| Operating Costs | (2,752) | (4,320) | (1,735) | - | - | (8,807) |
| Employee/Severance | (2,940) | (5,820) | (2,340) | - | - | (11,100) |
| Corporate Ovehead | - | - | - | (3,973) | - | (3,973) |
| Liqudation of PP&E | (743) | (813) | (177) | (1,666) | - | (3,399) |
| Trustee Fees | - | - | - | (2,083) | - | (2,083) |
| Professional Fees | - | - | - | (7,200) | - | (7,200) |
| Total | (6,435) | (10,953) | (4,252) | (14,922) | - | (36,562) |
| | | | | | | |
| **Net Proceeds Before Taxes** | 4,278 | 7,329 | 379 | 24,280 | 17,912 | 54,178 |
| | | | | | | |
| Tax Estimate | - | - | - | - | - | - |
| | | | | | | |
| Net Proceeds After Taxes | 4,278 | 7,329 | 379 | 24,280 | 17,912 | 54,178 |
| | | | | | | |
| **Local Obligations** | | | | | | |
| Secured Foreign Debt | - | - | - | - | - | - |
| Other Foreign Liabilites | - | - | - | - | - | - |
| Total Local Obligations | - | - | - | - | - | - |
| | | | | | | |
| Net Proceeds After Local Obligations | 4,278 | 7,329 | 379 | 24,280 | 17,912 | 54,178 |
| | | | | | | |
| HLI Ownership % | 100% | 100% | 100% | 100% | 100% | 100% |
| | | | | | | |
| HLI Proceeds | $ 4,278 | $ 7,329 | $ 379 | $ 24,280 | $ 17,912 | $ 54,178 |

**Final**

**HAYES LEMMERZ INTERNATIONAL, INC. (Note A)**
**Liquidation Analysis - Toal Proceeds Available for Distribution**
**For Illustrative Purposes Only**

The Company has prepared this liquidation analysis (the "Liquidation Analysis") in connection with the Disclosure Statement and Plan. The Liquidation Analysis estimates the value that may be recovered by classes of Claims upon disposition of the Debtor assets in a Chapter 7 liquidation and the wind-down and sale of the Non-Debtor assets.

| | | |
|---|---|---:|
| **Estimated Liquidation Value of Debtor Entities** | $ | **54,178** |
| | | |
| Estimated Liquidaiton Value of Non-Debtor Entities (For Illustrative Purposes Only) | | |
| Net Liquidation Value | K | 2,313 |
| Going Concern Sale Value | K | 56,985 |
| Total Estimated Liquidation Value of Non-Debtor Entities | | 59,298 |
| | | |
| **Estimated Liquidation Proceeds Available for Distribution - Debtor & Non-Debtor Entities (For Illustrative Purposes Only)** | $ | **113,476** |

**Final**

# HAYES LEMMERZ INTERNATIONAL, INC.
## Liquidation Analysis - Non-Debtor Entities
## For Illustrative Purposes Only

*($ in thousands)*

| | Mexico | Autokola [a] | Borlem Steel [a] | Total Non-Debtor |
|---|---|---|---|---|
| **Gross Proceeds** | | | | |
| Cash and Cash Equivalents | $ - | $ - | $ - | $ - |
| Accounts Receivable | 3,504 | - | - | 3,504 |
| Notes Receivable | - | - | - | - |
| Inventories & Factory Supplies | 2,411 | - | - | 2,411 |
| Assets Held for Sale | - | - | - | - |
| Other Current Assets | - | - | - | - |
| Property, Plant & Equipment, Net | 1,665 | - | - | 1,665 |
| Other NonCurrent Assets | - | - | - | - |
| Total | 7,581 | - | - | 7,581 |
| | | | | |
| **Wind-Down Expense** | | | | |
| Operating Costs | (2,590) | - | - | (2,590) |
| Employee/Severance | (1,620) | - | - | (1,620) |
| Corporate Ovehead | - | - | - | - |
| Liqudation of PP&E | (408) | - | - | (408) |
| Trustee Fees | - | - | - | - |
| Professional Fees | (650) | - | - | (650) |
| Total | (5,268) | - | - | (5,268) |
| | | | | |
| Net Proceeds Before Taxes | 2,313 | - | - | 2,313 |
| | | | | |
| Tax Estimate | - | - | - | - |
| | | | | |
| Net Proceeds After Taxes | 2,313 | - | - | 2,313 |
| | | | | |
| **Local Obligations** | | | | |
| Secured Foreign Debt | - | - | - | - |
| Other Foreign Liabilites | - | - | - | - |
| Total Local Obligations | - | - | - | - |
| | | | | |
| Net Proceeds After Local Obligations | 2,313 | - | - | 2,313 |
| | | | | |
| HLI Ownership % | 100% | 100% | 95% | |
| | | | | |
| HLI Proceeds | $ 2,313 | $ 8,354 | $ 48,631 | $ 59,298 |

(a) Non-Debtor entities assumed to be liquidated as going-concerns; please see following page for details

**Final**

**HAYES LEMMERZ INTERNATIONAL, INC.**
**DRAFT - Liquidation Analysis - Non-Debtor Going Concern Sales**
**For Illustrative Purposes Only**
*($ in Thousands)*

|  | Czech Republic Autokola | | | Brazil Borlem Steel | | | Total | | |
|  | Low | High | Midpoint | Low | High | Midpoint | Low | High | Midpoint |
|---|---|---|---|---|---|---|---|---|---|
| Adjusted FY 2009 EBITDA | $12,349 | $12,349 | $12,349 | $31,509 | $31,509 | $31,509 | $43,858 | $43,858 | $43,858 |
| Identified Re-sourcing Risk (a) | (8,278) | (8,278) | (8,278) | (9,554) | (9,554) | (9,554) | n/a | n/a | n/a |
| **FY 2009 EBITDA - Sensitized** | **$4,071** | **$4,071** | **$4,071** | **$21,955** | **$21,955** | **$21,955** | **$26,026** | **$26,026** | **$26,026** |
| Public Comps. EBITDA Multiple (b) | 4.9x | 5.9x | 5.4x | 4.9x | 5.9x | 5.4x | 4.9x | 5.9x | 5.4x |
| Pt. Est. of Going Concern TEV | $19,948 | $24,019 | $21,984 | $107,578 | $129,532 | $118,555 | $127,526 | $153,551 | $140,539 |
| Discount to Going Concern TEV (c) | 20.0% | 20.0% | 20.0% | 20.0% | 20.0% | 20.0% | 20.0% | 20.0% | 20.0% |
| Pt. Est. of Orderly Liquidation TEV | 15,959 | 19,215 | 17,587 | 86,062 | 103,626 | 94,844 | 102,021 | 122,841 | 112,431 |
| Wind Down Costs (% of OL TEV) | 5.0% | 5.0% | 5.0% | 5.0% | 5.0% | 5.0% | 5.0% | 5.0% | 5.0% |
| Wind Down Costs (d) | (798) | (961) | (879) | (4,303) | (5,181) | (4,742) | (5,101) | (6,142) | (5,622) |
| Proceeds from Orderly Liquidation | 15,161 | 18,255 | 16,708 | 81,759 | 98,444 | 90,102 | 96,920 | 116,699 | 106,809 |
| Less: Foreign Debt Obligation (e) | 0 | 0 | 0 | (4,218) | (4,218) | (4,218) | (4,218) | (4,218) | (4,218) |
| Plus: Cash on Balance Sheet (f) | 0 | 0 | 0 | 11,380 | 11,380 | 11,380 | 11,380 | 11,380 | 11,380 |
| **Net OLV before minority interests** | **$15,161** | **$18,255** | **$16,708** | **$88,920** | **$105,606** | **$97,263** | **$104,081** | **$123,860** | **$113,970** |
| Equity Ownership % (g) | 100% | 100% | 100% | 95% | 95% | 100% | n/a | n/a | n/a |
| Repatriation Risk (h) | 50% | 50% | 50% | 50% | 50% | 50% | n/a | n/a | n/a |
| **Net Estimate of OLV** | **$7,580** | **$9,127** | **$8,354** | **$42,415** | **$50,374** | **$48,631** | **$49,995** | **$59,501** | **$56,985** |
| **Value Flow to Debtor Entities (i)** | 1,516 | 1,825 | 1,671 | - | - | - | 1,516 | 1,825 | 1,671 |
| **Value Flow to Non-Debtor Entities (i)** | 6,064 | 7,302 | 6,683 | 42,415 | 50,374 | 48,631 | 48,479 | 57,676 | 55,314 |

Notes:
(a) We have assumed that certain customers would re-source the Company prior to the completion of the expedited sale process.
(b) Median EV/EBITDA multiple of publicly-listed comparable automotive suppliers was utilized
     Market value of debt was used in calculating enterprise value for public comparables
(c) Applies a 20% discount to reflect the orderly liquidation versus a full marketing and sales process of a going concern
(d) Fees associated with orderly liquidation of entities
(e) Local bank debt facilities, including accrued interest as of May 31, 2009
(f) Represents estimated cash on balance sheet as of May 31, 2009
(g) HLI equity interest in subsidiary entities
(h) Discount applied to account for tax and regulatory risk associated with selling assets in these jurisdictions
(i) Reflects ownership percentages held by Debtor and Non-Debtor entities respectively

**APPENDIX F**

**VALUATION OF THE DEBTORS**

# VALUATION ANALYSIS

In order to provide information to parties in interest regarding the possible range of values of their distributions under the Plan, it is necessary to ascribe an estimated value, or range of values, to the New Common Stock.  The Debtors have been advised by Lazard, their financial advisor, with respect to the estimated value of the Company, including the Reorganized Debtors, on a going-concern basis.

**THE ESTIMATES OF THE ENTERPRISE VALUE AND EQUITY VALUE CONTAINED IN THIS SECTION DO NOT REFLECT VALUES THAT COULD BE ATTAINABLE IN PUBLIC OR PRIVATE MARKETS.  THE IMPUTED ESTIMATE OF THE RANGE OF THE EQUITY VALUE OF THE COMPANY, INCLUDING THE REOGRANIZED DEBTORS, ASCRIBED IN THE ANALYSIS DOES NOT PURPORT TO BE AN ESTIMATE OF THE POST-REORGANIZATION MARKET TRADING VALUE. ANY SUCH TRADING VALUE MAY BE MATERIALLY DIFFERENT FROM THE IMPUTED ESTIMATE OF EQUITY VALUE RANGE FOR THE COMPANY ASSOCIATED WITH LAZARD'S VALUATION ANALYSIS. THE VALUATION INFORMATION CONTAINED IN THIS SECTION IS NOT A PREDICTION OR GUARANTEE OF THE ACTUAL MARKET VALUE THAT MAY BE REALIZED THROUGH THE SALE OF ANY SECURITIES TO BE ISSUED PURSUANT TO THE PLAN.**

1.    Overview

Lazard has estimated the value of the Company, including the Reorganized Debtors, as of the date of this Disclosure Statement.  Lazard has undertaken this valuation analysis to determine the value available for distribution to holders of Allowed Claims pursuant to the Plan and to analyze the relative recoveries to such holders thereunder.  The estimated total value available for distribution to holders of Allowed Claims (the "Enterprise Value") consists of the estimated value of the Company's operations on a going concern basis.  The valuation analysis assumes that the Plan becomes effective on November 1, 2009 (the "Assumed Effective Date") and is based on projections provided by the Debtors' management ("Projections") for FY 2009 – FY 2013 (the "Projection Period"), which are attached to the Disclosure Statement as Appendix D.

Based on these Projections and solely for purposes of the Plan, Lazard estimates that the Enterprise Value of the Company falls within a range from approximately $230 to $295 million, with a point estimate of $262.5 million as of the Assumed Effective Date.  For purposes of this valuation, Lazard assumes that no material changes that would affect value occur between the date of the Disclosure Statement and the Assumed Effective Date.  Lazard's estimate of Enterprise Value does not constitute an opinion as to fairness from a financial point of view of the consideration to be received under the Plan or of the terms and provisions of the Plan.

THE ASSUMED ENTERPRISE VALUE RANGE, AS OF THE ASSUMED EFFECTIVE DATE OF NOVEMBER 1, 2009, REFLECTS WORK PERFORMED BY LAZARD ON THE BASIS OF INFORMATION AVAILABLE TO LAZARD CURRENTLY AS OF THE DATE OF THIS DISCLOSURE STATEMENT.  ALTHOUGH SUBSEQUENT DEVELOPMENTS MAY AFFECT LAZARD'S CONCLUSIONS, NEITHER LAZARD, NOR THE DEBTORS HAS ANY OBLIGATION TO UPDATE, REVISE OR REAFFIRM ITS ESTIMATES.

Based upon the assumed range of the Enterprise Value of the Company of between $230 million and $295 million and an assumed total debt balance of approximately $128 million projected as of the Assumed Effective Date, Lazard has employed an imputed estimate of the range of equity value for the New Common Stock of the Company (the "Equity Value") between $102 million and $167 million, with a point estimate of $134.5 million.

The Equity Value assumes that the Assumed Effective Date has occurred. The Equity Value does not give effect to any potential settlement with the Pension Benefit Guaranty Corporation or the Official Committee of Retirees, which if entered into, could impact Equity Value. Additionally, these values do not give effect to the potentially dilutive impact of any shares issued upon exercise of any warrants or any shares issued upon exercise of options that may be granted under a long-term incentive plan, which the Board of Directors of the Reorganized Debtors may authorize for management of the Company.

The foregoing estimate of the Enterprise Value of the Company is based on a number of assumptions, including a successful reorganization of the Debtors' businesses and finances in a timely manner, the continued implementation of the Company's business plan, the achievement of the forecasts reflected in the Projections, access to adequate exit financing, the continuing leadership of the existing management team, market conditions as of the date of the Disclosure Statement continuing through the Assumed Effective Date, and the Plan becoming effective in accordance with the estimates and other assumptions discussed herein.

Lazard assumed that the Projections prepared by the management of the Debtors were reasonably prepared in good faith and on a basis reflecting the Debtors' most accurate currently available estimates and judgments as to the future operating and financial performance of the Company, including the Reorganized Debtors. Lazard's estimated Enterprise Value range assumes the Company will achieve its Projections in all material respects, including revenue and EBITDA growth and improvements in EBITDA margins, earnings and cash flow as projected. Certain of the results forecast by the management of the Company are materially better than the recent historical results of operations of the Company. As a result, to the extent that the estimate of the Enterprise Value is dependent upon the Company performing at the levels set forth in the Projections, such analysis must be considered speculative. If the business performs at levels below those set forth in the Projections, such performance may have a materially negative impact on Enterprise Value. Conversely, if the business performs at levels above those set forth in the Projections, such performance may have materially positive impact on Enterprise Value.

In estimating the Enterprise Value and the value of the New Common Stock, Lazard: (a) reviewed certain historical financial information of the Debtors for recent years and interim periods; (b) reviewed certain internal financial and operating data of the Debtors, which data were prepared and provided to Lazard by the management of the Debtors and which relate to the Company's business and its prospects; (c) met with and discussed the Company's operations and future prospects with the senior management team; (d) reviewed certain publicly available financial data for, and considered the market value of, public companies that Lazard deemed generally comparable to the operating business of the Company; (f) reviewed certain publicly available information concerning public and private M&A transactions for companies Lazard deemed generally comparable to the operating business of the Company; (e) considered certain economic and industry information relevant to the operating business; (g) conducted a limited marketing process to provide an indication of what prospective buyers were willing to pay for the Company; and (f) conducted such other studies, analyses, inquiries and investigations as it deemed appropriate. Although Lazard conducted a review and analysis of the Company's business, operating assets and liabilities and the Company's business plan, it assumed and relied

on the accuracy and completeness of all financial and other information furnished to it by the Company as well as publicly available information.

In addition, Lazard did not independently verify the Projections in connection with preparing estimates of Enterprise Value, and no independent valuations or appraisals of the Company were sought or obtained in connection herewith. Such estimates were developed solely for purposes of the formulation and negotiation of the Plan and the analysis of implied relative recoveries to holders of Allowed Claims thereunder.

Lazard's estimates of the Enterprise Value and the Equity Value of the Company do not constitute a recommendation to any holder of Allowed Claims as to how such person should vote or otherwise act with respect to the Plan. Lazard has not been asked to and does not express any view as to what the trading value of the Company's securities would be when issued pursuant to the Plan or the prices at which they may trade in the future. The estimated Enterprise Value of the Company set forth herein does not constitute an opinion as to fairness from a financial point of view to any person of the consideration to be received by such person under the Plan or of the terms and provisions of the Plan.

Lazard's estimate of Enterprise Value reflects the application of standard valuation techniques and does not purport to reflect or constitute appraisals, liquidation values or estimates of the actual market value that may be realized through the sale of any securities to be issued pursuant to the Plan, which may be significantly different than the amounts set forth herein.

The value of an operating business is subject to numerous uncertainties and contingencies, which are difficult to predict and will fluctuate with changes in factors affecting the financial condition and prospects of such a business. As a result, the estimated Enterprise Value range of the Company set forth herein is not necessarily indicative of actual outcomes, which may be significantly more or less favorable than those set forth herein. Neither the Company, Reorganized Debtors, Lazard, nor any other person assumes responsibility for any differences between the Enterprise Value range and such actual outcomes. Actual market prices of such securities at issuance will depend upon, among other things, the operating performance of the Company, prevailing interest rates, conditions in the financial markets, the anticipated holding period of securities received by prepetition creditors (some of whom may prefer to liquidate their investment rather than hold it on a long-term basis), developments in the Company's industry and economic conditions generally, and other factors which generally influence the prices of securities.

2.    Valuation Methodology

The following is a brief summary of certain financial analyses performed by Lazard to arrive at its range of estimated Enterprise Values for the Company. In performing the financial analyses described below and certain other relevant procedures, Lazard reviewed all significant assumptions with the management of the Debtors. Lazard's valuation analysis must be considered as a whole. For reasons discussed in detail below, in arriving at its estimated Enterprise Value range, Lazard applied equal weight to four methodologies - comparable company analysis, discounted cash flow analysis, precedent transaction analysis and market check. Reliance on only one of the methodologies used or portions of the analysis performed could create a misleading or incomplete conclusion as to Enterprise Value.

## a. Comparable Company Analysis

The comparable company valuation analysis estimates the value of a company based on a relative comparison with other publicly traded companies with similar operating and financial characteristics. Under this methodology, the enterprise value for each selected public company was determined by examining the trading prices for the equity securities of such company in the public markets and adding the aggregate amount of outstanding net debt for such company (at book value and current market values). Those enterprise values are commonly expressed as multiples of various measures of operating statistics, most commonly sales, earnings before interest and taxes ("EBIT") and earnings before interest, taxes, depreciation and amortization ("EBITDA"). In addition, each of the selected public company's operational performance, operating margins, profitability, leverage and business trends were examined. Based on these analyses, financial multiples and ratios are calculated to apply to the Company's actual and projected operational performance. Lazard focused primarily on EBITDA multiples of the selected comparable companies to value the Company. EBITDA is generally considered a strong proxy for the cash flow provided from the operations of a company and as such, it is a good determinant of the ability of a company to service claims against the Company. Additionally, EBITDA does not reflect the effects of capital structure and other non-operating items.

A key factor to this approach is the selection of companies with relatively similar business and operational characteristics to the Company. Common criteria for selecting comparable companies for the analysis include, among other relevant characteristics, similar lines of businesses, business risks, growth prospects, maturity of businesses, location, market presence and size and scale of operations. The selection of appropriate comparable companies is often difficult, a matter of judgment, and subject to limitations due to sample size and the availability of meaningful market-based information.

Lazard selected the following publicly traded companies (the "Peer Group") on the basis of general comparability to the Company in one or more of the factors described above: Accuride, American Axle and Manufacturing, ArvinMeritor, Continental AG, Faurecia, GKN, Linamar, Magna International, Shiloh Industries, Sogefi, Superior Industries, Tenneco, TRW Automotive and Valeo.

Lazard calculated market multiples for the Peer Group based on 2009 and 2010 estimated EBITDA by dividing the enterprise value of each comparable company as of July 9, 2009, by the projected 2009 and 2010 EBITDA as estimated by equity research analysts. In determining the applicable EBITDA multiple ranges, Lazard considered a variety of factors, including both qualitative attributes and quantitative measures such as historical and projected revenue and EBITDA results, historical enterprise value/EBITDA trading multiples, EBITDA margins, financial distress impacting trading values, size, growth and similarity in business lines.

Lazard then applied the range of multiples described above to the Company's 2009E and 2010P EBITDA, as adjusted for restructuring fees, financing fees, and the portion of JV entities' EBITDA attributable to minority partners ("Adjusted EBITDA") to determine a range of Enterprise Values.

## b. Discounted Cash Flow Analysis

The discounted cash flow ("DCF") analysis is a forward-looking enterprise valuation methodology that estimates the value of an asset or business by calculating the present value of expected future cash flows to be generated by that asset or business. Under this methodology,

projected future cash flows are discounted by the business' weighted average cost of capital (the "Discount Rate"). The Discount Rate reflects the estimated blended rate of return that would be required by debt and equity investors to invest in the business based on its capital structure. The enterprise value of the firm is determined by calculating the present value of the Company's unlevered after-tax free cash flows based on the Projections plus an estimate for the value of the firm beyond the Projection Period known as the terminal value. The terminal value is derived by evaluating two (2) approaches: 1) applying a multiple to the Reorganized Debtors' projected EBITDA in the final year of the Projection Period, discounted back to the assumed date of emergence by the Discount Rate; and 2) dividing the projected unlevered free cash flow in the year following the final projected year by the Discount Rate minus a range of perpetual growth rates, discounted back to the assumed date of emergence by the Discount Rate.

To estimate the Discount Rate, Lazard used the cost of equity and the after-tax cost of debt for the Company, assuming a targeted long-term debt-to-total capitalization ratio based on an assumed range of the Company's pro forma capitalization and the average leverage ratio of the Peer Group. Lazard calculated the cost of equity based on the "Capital Asset Pricing Model," which assumes that the required equity return is a function of the risk-free cost of capital and the correlation of a publicly traded stock's performance to the return on the broader market. In calculating the cost of equity, Lazard also considered the impact of unsystematic risks specific to the Company, including risks related to operational restructuring activities, business turnaround, margin improvement and residual bankruptcy effects, among others. Lazard also calculated the cost of equity using the "Buildup Method" which yielded similar results to the Capital Asset Pricing Model. To estimate the cost of debt, Lazard estimated what would be the Company's blended cost of debt based on current capital markets conditions and the financing costs for comparable companies with leverage similar to the Company's target capital structure. The actual cost of debt for the Company will be determined by available exit financing and may differ from this estimate. In determining the terminal multiple, Lazard used the historical EBITDA multiple range derived for the Peer Group.

Although formulaic methods are used to derive the key estimates for the DCF methodology, their application and interpretation still involve complex considerations and judgments concerning potential variances in the projected financial and operating characteristics of the Company, which in turn affect its cost of capital and terminal multiples.

In applying the above methodology, Lazard utilized management's detailed Projections for the period beginning on the Assumed Effective Date of November 1, 2009 and ending January 31, 2014, to derive unlevered after-tax free cash flows. Free cash flow includes sources and uses of cash not reflected in the income statement, such as changes in working capital, capital expenditures, minority dividends, proceeds from asset sales and cash taxes. For purposes of the DCF, Lazard utilized the expected cash tax payments provided by the Company for the projection period, for each country in which it operates. These cash flows, along with the terminal value, are discounted back to the Assumed Effective Date using a range of Discount Rates calculated in the manner described above to arrive at a range of Enterprise Values.

The DCF approach relies on the Company's ability to project future cash flows with some degree of accuracy. Because the Company's projections reflect significant assumptions made by the Company's management concerning anticipated results, the assumptions and judgments used in the Projections may or may not prove correct and, therefore, no assurances can be provided that projected results are attainable or will be realized. Lazard cannot and does not make any representations or warranties as to the accuracy or completeness of the Company's projections.

The precedent transactions valuation analysis is based on the enterprise values of companies involved in public merger and acquisition transactions that have operating and financial characteristics similar to the Company.  Under this methodology, the enterprise value of such companies is determined by an analysis of the consideration paid and the debt assumed in the merger or acquisition transaction.  As in a comparable company valuation analysis, those enterprise values are commonly expressed as multiples of various measures of operating statistics, such as sales, EBITDA and EBIT.  Lazard reviewed industry-wide valuation multiples, considering prices paid as a multiple of sales and EBITDA for companies in similar lines of business to the Company.  The derived multiples are then applied to the Company's operating statistics to determine the Enterprise Value or value to a potential strategic buyer.  Similar to the comparable company analysis, Lazard focused mainly on EBITDA multiples in comparing the valuations of the Company and the selected companies involved in relevant precedent transactions.

Unlike the comparable company analysis, the enterprise valuation derived using this methodology reflects a "control" premium (i.e., a premium paid to purchase a majority or controlling position in the assets of a company).  Thus, this methodology generally produces higher valuations than the comparable public company analysis.  In addition, other factors not directly related to a company's business operations can affect a valuation based on  precedent transactions, including:  (a) circumstances surrounding a merger transaction may introduce "diffusive quantitative results" into the analysis (e.g., a buyer may pay an additional premium for reasons that are not solely related to competitive bidding); (b) the market environment is not identical for transactions occurring at different periods of time; and (c) circumstances pertaining to the financial position of the company may have an impact on the resulting purchase price (e.g., a company in financial distress may receive a lower price due to perceived weakness in its bargaining leverage). Lazard evaluated various merger and acquisition transactions that have occurred in the auto parts manufacturing industry over the last five years.  Many of the transactions that have occurred over the past five years have been executed under drastically different fundamental, credit and other market conditions from those prevailing in the current marketplace.  These considerations greatly reduce the relevance of the precedent transaction analysis.

As with the comparable company analysis, because no precedent merger or acquisition used in any analysis will be identical to the target transaction, valuation conclusions cannot be based solely on quantitative results.  The reasons for and circumstances surrounding each acquisition transaction are specific to such transaction, and there are inherent differences between the businesses, operations, and prospects of each target.  Therefore, qualitative judgments must be made concerning the differences between the characteristics of these transactions and other factors and issues that could affect the price an acquirer is willing to pay in an acquisition.  The number of completed transactions for which public data is available also limits this analysis.  Furthermore, the data available for all the precedent transactions may have discrepancies due to varying sources of information. As described above, the precedent transactions analysis explains other aspects of value besides the inherent value of a company.

In deriving a range of Enterprise Values for the Company under this methodology, Lazard calculated multiples of total transaction value ("Transaction Value") to the last twelve months ("LTM") EBITDA of the acquired companies by dividing the disclosed purchase price of the target's equity, plus any debt assumed as part of the transaction less any cash on the target's

balance sheet, by estimated LTM EBITDA. Lazard then applied these multiples to the 2009E Adjusted EBITDA for the Company.

d.      Marketing Process

Following the approval of the Interim DIP Order, Lazard conducted a marketing process as required under the DIP Credit Agreement. The marketing process provides an indication of what prospective buyers were willing to pay for the Company based on the Company's track record, financial projections of the Company and the current industry and capital markets environment,

Lazard, with the Company's assistance, identified and contacted 42 potential investors comprised of 16 financial sponsors and 26 strategic investors (other automotive suppliers), it believed might be interested in acquiring the Company during the Chapter 11 cases.

Lazard identified the potential investors based on a number of factors, including their known desire to invest in companies in the automotive sector, their desire to acquire financially distressed companies and their ability to quickly complete diligence and fund a transaction.

An initial diligence packaging containing information on the Company's operations, factors leading to the commencement of the Chapter 11 cases, and historical and projected financial information was distributed to 13 interested parties. Interested parties were invited to attend a "town hall style" management presentation on July 17, 2009, prior to which they were able to submit questions in writing for management to address at the presentation.

Most interest received for the Company was from financial sponsors. In declining to pursue a transaction, most strategic investors cited internal financial issues and/or uncertainty over the future direction of the automotive industry.

Following discussions with senior management and the initial diligence package, investors were invited to submit non-binding indications of interest by July 24, 2009. The Company received non-binding term sheets from two financial investors, each of which was subject to legal, business and financial due diligence as well as other conditions precedent. The high end of the range of bids received was at the low end of Lazard's estimate of Enterprise Value.

THE SUMMARY SET FORTH ABOVE DOES NOT PURPORT TO BE A COMPLETE DESCRIPTION OF THE ANALYSES PERFORMED BY LAZARD. THE PREPARATION OF A VALUATION ESTIMATE INVOLVES VARIOUS DETERMINATIONS AS TO THE MOST APPROPRIATE AND RELEVANT METHODS OF FINANCIAL ANALYSIS AND THE APPLICATION OF THESE METHODS IN THE PARTICULAR CIRCUMSTANCES AND, THEREFORE, SUCH AN ESTIMATE IS NOT READILY SUITABLE TO SUMMARY DESCRIPTION. IN PERFORMING THESE ANALYSES, LAZARD AND THE COMPANY MADE NUMEROUS ASSUMPTIONS WITH RESPECT TO INDUSTRY PERFORMANCE, BUSINESS AND ECONOMIC CONDITIONS AND OTHER MATTERS. THE ANALYSES PERFORMED BY LAZARD ARE NOT NECESSARILY INDICATIVE OF ACTUAL VALUES OR FUTURE RESULTS, WHICH MAY BE SIGNIFICANTLY MORE OR LESS FAVORABLE THAN SUGGESTED BY SUCH ANALYSES.

**APPENDIX G**

**<u>WARRANTS TERM SHEET</u>**

## HAYES LEMMERZ INTERNATIONAL, INC.

---

### WARRANTS

### Summary of Principal Terms and Conditions

---

Capitalized terms used but not defined herein have the meanings ascribed to such terms in the Plan Term Sheet.

*Issuer:*     The Reorganized Company.

*Warrants:*     On the Plan Effective Date, the Reorganized Company will issue to holders of the 8.25% Senior Notes due 2015 of Hayes Lemmerz Finance LLC—Luxembourg S.C.A. entitled to receive the Warrants pursuant to the terms of the Plan (the "Noteholders") and to the Pension Benefit Guaranty Corporation (together with the Noteholders and any permitted transferee of the Warrants, the "Holders"), Series A Warrants and Series B Warrants (collectively, "Warrants") that will entitle Holders to receive, in the case of of the Series A Warrants, upon the exercise of all such Series A Warrants for cash, shares of common stock of the Reorganized Company ("New Common Stock") representing in the aggregate five percent (5%) of the equity interests of the Reorganized Company (calculated on the Plan Effective Date and assuming the exercise of all Warrants, but excluding any shares of New Common Stock to be issued or reserved for issuance under any management incentive plan to be implemented by the Company (the "Management Incentive Shares")), and in the case of of the Series B Warrants, upon the exercise of all such Series B Warrants for cash, New Common Stock representing in the aggregate five percent (5%) of the equity interests of the Reorganized Company (calculated on the Plan Effective Date and assuming the exercise of all Warrants, but excluding any Management Incentive Shares) (collectively, the "Warrant Shares").

*Exercise Prices:*     The exercise price for the Series A Warrants shall be equivalent to the per share price of the New Common Stock on the Plan Effective Date assuming the Reorganized Company had on the Plan Effective Date an aggregate enterprise value of $350 million.

The exercise price for the Series B Warrants shall be equivalent to the per share price of the New Common Stock on the Plan Effective Date assuming the Reorganized Company had on the Plan Effective Date an aggregate enterprise value of $375 million.

The exercise price for the Series A Warrants and the Series B Warrants shall be referred to herein as the "Exercise Price". The respective Exercise Prices of the Series A Warrants and Series B Warrants shall be determined by (a) (i) subtracting from the above-referenced aggregate enterprise values, the Reorganized Company's term debt as of the Plan Effective Date (excluding borrowings under any revolving credit[1] or receivables financing facilities), and (ii) adding back to the above-referenced aggregate enterprise values the Reorganized Company's cash on hand as of the Plan Effective Date (provided that for purposes of determining the Exercise Price, cash on hand shall not include "trapped cash" as of the Plan Effective Date, as determined by the Reorganized Company on a basis consistent with past practice, or cash collateralizing letters of credit or guarantees outstanding at the Plan Effective Date), and (b) dividing the resulting amount by (i) the sum of the number of shares of New Common Stock outstanding on the Plan Effective Date, and (ii) in the case of the Series A Warrants, all Warrant Shares to be issued upon exercise of all Series A Warrants, and, in the case of the Series B Warrants, all Warrant Shares to be issued upon exercise of all Warrants.

**Term**

The Warrants will expire on the seventh (7th) anniversary of the Plan Effective Date (the "Expiration Date"); *provided however, that* any Warrants not exercised in connection with a Sale Transaction in which the holders of New Common Stock receive only cash consideration, shall automatically expire upon consummation of such Sale Transaction; *provided further*, for the avoidance of doubt, in connection with certain Sale Transactions pursuant to which holders of New Common Stock are entitled to receive consideration in the form of stock or other securities, the Holders shall be entitled to purchase and receive, subject to any necessary adjustments, the kind and amount of shares of stock or other securities that the Holder would have received if it had exercised its Warrants immediately prior to such event.

**Exercise; Payment of Exercise Price**

Prior to the Expiration Date, the Warrants shall be exercisable at the option of the Holder at any time and from time to time, in whole or in part, into the Warrant Shares. The issuance of the Warrant Shares shall be subject to payment in full by the Holder of the applicable Exercise Price either (i) by delivery to the Reorganized Company of a certified or official bank check or by wire transfer of immediately available funds in the amount of the aggregate Exercise Price for such

---

[1] Revolving credit facility balance is expected to be zero at the Plan Effective Date.

Warrant Shares or (ii) if exercising in connection with a Triggering Event or at anytime on or after the expiration of all lock-up periods imposed by the underwriters of a firm commitment underwritten public offering of shares of the New Common Stock of the Reorganized Company (an "IPO"), by instructing the Reorganized Company to withhold from the Warrant Shares issuable to the Holder upon such exercise, a number of Warrant Shares equal in value to the aggregate Exercise Price payable with respect to such exercise. For purposes of a such a "cashless" exercise, the value of the Warrant Shares withheld will be calculated based on the Current Market Price (as defined below) of the New Common Stock on the trading day prior to the date on which the Warrant and a notice of exercise of the Warrant are delivered to Reorganized Company by the exercising Holder.

A "Triggering Event" shall mean: (i) immediately prior to the consummation of a Sale Transaction (as defined below) pursuant to which the Holders of the Warrants have the opportunity to exchange all of their Warrant Shares for cash and/or readily marketable securities and (ii) upon receipt from the Reorganized Company of a notice regarding completion of a Company Valuation (as defined below). A "Sale Transaction" shall mean: (i) a merger, consolidation, or other similar transaction or series of transactions to which the Reorganized Company is a party and pursuant to which (a) the Reorganized Company is not the surviving person in such transaction or (b) if the Reorganized Company is the surviving person, the holders of shares of New Common Stock immediately prior to such transaction (including for this purpose the shares issuable upon exercise of the Warrants and the Management Incentive Shares) represent less than 50% of the shares of New Common Stock outstanding immediately following such transaction (including for this purpose the shares issuable upon exercise of the Warrants and the Management Incentive Shares), (ii) the sale or other disposition of all or substantially all of the assets of the Reorganized Company and its subsidiaries, taken as a whole, (iii) a sale, other disposition or issuance, in a single transaction or series of related transactions, of 35% or more of the then outstanding shares of New Common Stock, and (iv) any other transaction in which holders of New Common Stock have "drag along" rights pursuant to and to the extent provided in the Stockholders Agreement then in effect among the Reorganized Company's stockholders (as may be amended, the "Stockholders Agreement"). In the event that a Triggering Event or an IPO has not occurred prior to the 90th day prior to the Expiration Date, the Board of Directors of the Reorganized Company shall cause a qualified nationally recognized independent third party selected by the Board of Directors of the Reorganized Company and reasonably acceptable to

Holders of a majority of the Warrants to determine the aggregate enterprise value of the Reorganized Company as of the 90th day prior to the Expiration Date, together with the Current Market Price (as defined below) of the New Common Stock based thereon (a "Company Valuation"). The Reorganized Company shall notify the Holders of the result of the Company Valuation not later than the 30th day prior to the Expiration Date, together with the Current Market Price (as defined below) of the New Common Stock.

The "Current Market Price" shall equal, in the event the Warrants are exercised (a) following an IPO pursuant to which the shares of New Common Stock are listed or admitted to trading on the New York Stock Exchange or the Nasdaq Stock Market (each, a "National Exchange"), the average closing price as reported on such National Exchange of the New Common Stock for the ten (10) consecutive trading days immediately prior to the exercise of the Warrant or, if not listed or admitted to trading on a National Exchange, the volume-weighted average of the closing bid and asked prices of the Common Stock in the over-the-counter market during the ten (10) consecutive trading days immediately prior to the exercise of the Warrant; (b) in connection with a Sale Transaction, the per share fair market value of the consideration being paid by the third party in connection with such Sale Transaction or (c) in connection with a Company Valuation, the per share equity value of the New Common Stock calculated based upon the aggregate enterprise value of the Reorganized Company as of the valuation date without regard to marketability or other similar liquidity discounts, as determined by the qualified nationally recognized independent third party conducting the Company Valuation. The fair market value of the per share consideration to be paid by the third party in a Sale Transaction shall be determined by adding (i) the per share cash consideration, (ii) for consideration in the form of publicly traded securities, if the per share valuation of such securities is not otherwise set forth in the definitive agreement for such Sale Transaction, the average closing price for the ten (10) consecutive trading days immediately prior to the Sale Transaction, and (iii) the per share fair market value of consideration in the form of any other securities or assets as determined in good faith by the Board of Directors of the Reorganized Company or its advisors.

Anti-Dilution:    The Warrants will provide for customary proportional anti-dilution adjustments in the event of a combination, subdivision, or reclassification of shares of New Common Stock or any dividend payment with respect to the New Common Stock in the form of additional shares of New Common Stock, or in connection with extraordinary transactions (e.g. spin-offs and sales of material

subsidiaries), in each case, as determined to be necessary or appropriate in the reasonable discretion of the Board of Directors of the Reorganized Company.  The Company shall provide (i) at least fifteen (15) days prior notice to the Holders of any record date relating to the payment by the Reorganized Company of a cash dividend to the holders of the New Common Stock, and (ii) prior notice, not later than the time notice is given to eligible stockholders under the Stockholders Agreement, of any transaction involving the right of a holder of New Common Stock to exercise "tag along" rights under the Stockholders Agreement.

***Registration Rights:***  Following the consummation of an IPO, (i) the Holders shall have customary "piggyback" registration rights in connection with any public offering of New Common Stock for the account of the Company other than the IPO and (ii) until the earlier of such time that all Warrant Shares have been issued and the Expiration Date, and so long as the Current Market Price of the shares of New Common Stock is greater than 85% of the Exercise Price of the Warrants and the Reorganzied Company is eligible to do so pursuant to applicable securities laws, the Reorganized Company shall file and maintain a shelf registration statement on Form S-3 with respect to the issuance of such Warrant Shares.

***Transfer Restrictions:***  Prior to a Qualified Public Offering (as defined in the Stockholders Agreement), the Warrants will not be transferable, other than among the Holders, holders of the New Common Stock and the Reorganized Company; *provided that*, a Holder shall be entitled to transfer its Warrants in whole or in part (but in part only if there are sixty (60) or less Holders), if such Holder is an individual, to any any member of his immediate family or any estate or trust in which he is the settlor or otherwise by will or the laws of descent or distribution, and if such Holder is not an individual, to such Holder's partners, members or affiliates, provided that in each case, such transferee agrees in writing to be bound by the terms of the Warrant Agreement prior to such transfer.  All such transfers of Warrants will be subject to the Reorganized Company's being provided advance written notice of the proposed transfer and terms of such transfer and subject to customary restrictions to (i) preserve the value of the Company's net operating losses and (ii) avoid the need to register and file reports and other information under the Securities Exchange Act of 1934, as amended.

***No Stockholder Rights:***  Nothing contained in the Warrant shall be construed as conferring upon the Holder the right to vote or to consent or to receive notice as a stockholder in respect of any meeting of stockholders for the

election of directors of the Reorganized Company or any other matter, to receive dividends or any rights whatsoever as stockholders of the Reorganized Company. Each Holder shall be entitled to receive the same information and reports to which a holder of the New Common Stock is entitled pursuant to the Stockholders Agreement then in effect, subject to execution of an appropriate confidentiality agreement.

***Stockholders Agreement:*** Each Holder will be required, as a condition to receiving shares of New Common Stock issuable upon exercise of such Holder's Warrant (unless such holder is already a party thereto), to enter into a Stockholders Agreement substantially in the form then in effect, if any.

***Notification by Reorganized Company:*** The Reorganized Company will provide or cause to be provided to the Holders notice of (i) an IPO, (ii) any Triggering Event, and (iii) any anti-dilution adjustment. Notice of the same may be given by press release.

***Amendment*** The terms of each series of the Warrants may be amended by the Company together with the affirmative vote or consent of the Holders of a majority of the Warrants of such series.

***Governing Law:*** State of Delaware.