IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

- - - - - - - - - - - - - - - x
                          :
In re:                       :  Chapter 11
                          :
HAYES LEMMERZ INTERNATIONAL,: Case No. 09-11655 (MFW)
INC., <u>et</u> <u>al.</u>,[1]       :
                          : Jointly Administered
           Debtors.    :
                          : **Hrg Date: 10/15/09 at 2:00 p.m. (ET)**
                          : **Related to Docket No. 539**
- - - - - - - - - - - - - - - x

**NOTICE OF FILING OF EXHIBITS TO THE FIRST AMENDED JOINT PLAN
OF REORGANIZATION OF HAYES LEMMERZ INTERNATIONAL, INC. AND
ITS AFFILIATED DEBTORS AND DEBTORS-IN-POSSESSION**

PLEASE TAKE NOTICE that on September 2, 2009, the above

captioned debtors and debtors-in-possession (collectively, the

"<u>Debtors</u>") filed the **Disclosure Statement With Respect to the First**

**Amended Joint Plan of Reorganization of Hayes Lemmerz International,**

---

[1]  The following of Hayes' U.S. subsidiaries and affiliates (including the last four digits of their respective taxpayer identification numbers) have filed petitions for relief under chapter 11 concurrently with Hayes (2578) and have obtained joint administration therewith: Hayes Lemmerz Finance LLC (7731), Hayes Lemmerz International Import, Inc. (1655), Hayes Lemmerz International - California, Inc. (2337), Hayes Lemmerz International - Commercial Highway, Inc. (7674), Hayes Lemmerz International - Georgia, Inc. (6122), Hayes Lemmerz International - Howell, Inc. (9246), Hayes Lemmerz International - Huntington, Inc. (0825), Hayes Lemmerz International - Kentucky, Inc. (8246), Hayes Lemmerz International - Laredo, Inc. (8656), Hayes Lemmerz International - New York, Inc. (9278), Hayes Lemmerz International - Sedalia, Inc. (7670), Hayes Lemmerz International - Technical Center, Inc. (7519), Hayes Lemmerz International - Wabash, Inc. (0301), HLI Brakes Holding Company, Inc. (2575), HLI Commercial Highway Holding Company, Inc. (2828), HLI Netherlands Holdings, Inc. (0015), HLI Operating Company, Inc. (7742), HLI Parent Company, Inc. (7832), HLI Powertrain Holding Company, Inc. (8269), HLI Realty, Inc. (1885), HLI Services Holding Company, Inc. (7840), HLI Suspension Holding Company, Inc. (0061), and HLI Wheels Holding Company, Inc. (7882) (collectively with Hayes, the "<u>U.S. Debtors</u>").  With the exception of Hayes Lemmerz Finance LLC - Luxembourg S.C.A. (Luxembourg: 0646; USA: 7731) (the "<u>Non-U.S. Debtor</u>"), none of the foreign affiliates or subsidiaries of Hayes are Debtors in these chapter 11 cases.  The mailing address for each of the U.S. Debtors is 15300 Centennial Drive, Northville, Michigan 48168.

**Inc. and its Affiliated Debtors and Debtors-in-Possession** (the "Disclosure Statement") (Docket No. 539).  The Debtors' proposed **First Amended Joint Plan of Reorganization of Hayes Lemmerz International, Inc. and its Affiliated Debtors and Debtors-in-Possession** (the "Plan") is attached as Appendix A to the Disclosure Statement.

PLEASE TAKE FURTHER NOTICE that on September 26, 2009, the Debtors filed the below listed exhibits to the Plan:

- Exhibit B – Summary of Long Term Incentive Plan

- Exhibit D – Amended Schedule of Retained Actions

- Exhibit E – Certificate of Incorporation for the Reorganized Company

- Exhibit F – Bylaws for the Reorganized Company

- Exhibit G – Initial Directors and Officers of the Reorganized Debtors

- Exhibit H – Form of Executive Employment Agreements

- Exhibit I – Modifications to Supplemental Executive Retirement Plan

- Exhibit J – Amended Schedule of Rejected Contracts and Leases

- Exhibit K – Material Terms of Post-Plan Effective Date Secured Term Loan

- Exhibit M – Form of Stockholders' Agreement, Registration Rights Agreement and Management Stockholders' Agreement

PLEASE TAKE FURTHER NOTICE that the attached documents remain subject to further revision and negotiation among the Requisite DIP Lenders (as defined in the Plan), the Official Committee of Unsecured Creditors, and the Debtors.  Such documents, by virtue of their filing, shall not be deemed to satisfy any condition to confirmation or consummation of the Plan as set forth in Article XI of the Plan.

PLEASE TAKE FURTHER NOTICE that copies of the above documents can be obtained on the Court's website at www.deb.uscourts.gov by registered users of the Bankruptcy Court's case filing system or the Debtors' restructuring website at www.hayeslemmerzreorg.com or from counsel for the Debtors as set forth below.

Dated:  Wilmington, Delaware
        September 26, 2009

SKADDEN, ARPS, SLATE, MEAGHER
    & FLOM LLP

By:  */s/ Kimberly A. LaMaina*
     Anthony W. Clark (I.D. No. 2051)
     Kimberly A. LaMaina (I.D. No. 4568)
     One Rodney Square
     P.O. Box 636
     Wilmington, DE 19899
     (302) 651-3000
     - and -
     J. Eric Ivester
     Stephen D. Williamson
     Bennett S. Silverberg (New York Office)
     155 North Wacker Drive, Suite 2700
     Chicago, Illinois 60606
     (312) 407-0700

Counsel for Debtors and
    Debtors-in-Possession

3

687913- Server 1a - MSW

## **Exhibit B**

## **Summary of Long Term Incentive Plan**

### *Summary of Potential Terms of Anticipated Long-Term Incentive Plan*

Set forth below is a summary of certain key terms and conditions of the anticipated LTI Plan (as defined below).  The terms and conditions set forth below may be supplemented, amended, or modified prior to implementation and are in all cases subject to further negotiation and final documentation.

1.  Plan Name:  The Debtors anticipate that the Board of Directors (the "Board") of the Reorganized Debtors (the "Company") will implement a Hayes Lemmerz International, Inc. Long-Term Incentive Plan (the "LTI Plan" or "Plan") after Company's chapter 11 reorganization plan is consummated and the Company emerges from its chapter 11 reorganization proceedings.

2.  Plan Administrator:  The Compensation Committee of the Board, which shall consist solely of "non-employee directors" within the meaning of Rule 16b-3, is anticipated to be the Plan Administrator of the Plan.

3.  Effective Date:  The Board or the Compensation Committee shall determine the effective date of the LTI Plan.

4.  Participants:  It is anticipated that the LTI Plan would be available to officers, key employees and directors of the Company.  Participation will be at the discretion of the Plan Administrator.  For reference, approximately 65 of the Debtors' employees were eligible to participate in the Debtors' long term incentive plan prior to the commencement of the Debtors' chapter 11 cases.

5.  Shares Available:  The Debtors anticipate that the LTI Plan would provide awards with respect to New Common Stock.  The number of shares of New Common Stock available under the LTI Plan is to be determined.

6.  Plan Objectives:  The Debtors expect that the LTI Plan would be designed to enhance shareholder value by linking long-term incentive compensation to the financial performance of the Company and to further align employees' financial rewards with the financial rewards realized by the Company and its shareholders.  The Plan could also be a vehicle to attract and retain key personnel.

7.  Plan Structure:  It is anticipated that the LTI Plan would be an equity-based compensation plan providing for awards to eligible participants, at the discretion of the Compensation Committee, in the form of stock options, stock appreciation rights, restricted stock or stock units, in each case, subject to vesting conditions.

8.  Types of Stock Options:  It is anticipated that the LTI Plan may provide for grants of non-qualified stock options, which would not be intended to meet the requirements of Section 422 of the Internal Revenue Code.

NY2:#4851499

1

*Summary of Potential Terms of Anticipated Long-Term Incentive Plan*

9.  <u>Grants</u>:  Grants of awards would be made by the Compensation Committee of the Board. The Compensation Committee would set forth in any award agreements the terms and conditions of such grants that it deems appropriate, including but not limited to (a) exercise price, (b) vesting, including circumstances involving involuntary termination for cause and resignation for good reason, (c) duration of any stock options, (d) transferability of awards, (e) rights upon a change in control, and (f) other standard and customary provisions, including equitable adjustment to prevent dilution in the case of a recapitalization, stock split or other similar event.

10.  It is anticipated that awards under the Plan will be subject to the terms and conditions of a Management Stockholders Agreement.

## <u>Exhibit D</u>

## Amended Schedule of Retained Actions

**PLAN EXHIBIT D**

### Amended Schedule of Retained Actions

In accordance with section 1123(b)(3) of the Bankruptcy Code[1] and except as otherwise provided in the Plan, the Reorganized Debtors shall retain and may, in their sole discretion, enforce or prosecute all Retained Actions, including those set forth in the Plan and identified in this exhibit to the Plan.  The Debtors or the Reorganized Debtors, in their sole and absolute discretion, will determine whether to bring, settle, release, compromise, or enforce such rights (or decline to do any of the foregoing).  The Reorganized Debtors or any successors may prosecute (or decline to prosecute) such Retained Actions in accordance with the best interests of the Reorganized Debtors or any successors holding such rights of action.  Except as otherwise provided herein, the failure of the Debtors to specifically list any Claim, right of action, suit or proceeding does not, and will not be deemed to, constitute a waiver or release by the Debtors of such claim, right of action, suit or proceeding, and the Reorganized Debtors will retain the right to pursue such claims, rights of action, suits or proceedings in their sole discretion and, therefore, no preclusion doctrine, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise) or laches will apply to such claim, right of action, suit or proceeding upon or after the confirmation or consummation of this Plan.

For the avoidance of any confusion, the Debtors and Reorganized Debtors expressly retain:

  1. any and all claims, Causes of Action, rights of action, suits, and proceedings in favor of the Debtors arising under Chapter 5 of the Bankruptcy Code, and other similar avoidance actions available under applicable non-bankruptcy law, or any other provisions of the Bankruptcy Code; and

  2. all claims of the Debtors in the following litigation:

     (a) Hayes Lemmerz International – Georgia, Inc. v. Punch International NV and Punch Property International NV, as reported in the United States District Court for the Northern District of Georgia, Case No.: 2 09-CV-0021;

     (b) Punch International NV and Punch Property International NV v. Hayes Lemmerz International, Inc., as reported in the Commercial Court Antwerp, Belgium;

---

1    Capitalized terms used in this Exhibit and not otherwise defined have the meanings ascribed to such terms in the Plan.

D-2

D-3

  (c)  HLI Operating Company, Inc. v. Diversified Machine, Inc., as reported in the Circuit Court of Wayne County, Michigan, Case No.: 09-006683-CZ; and

  (d)  HLI Suspension Holding Company, Inc. v. Diversified Machine, Inc., as reported in the Circuit Court of Wayne County, Michigan, Case No.: 09-006683-CZ.

The Debtors reserve their right to modify this Exhibit.

D-3

## <u>Exhibit E</u>

**Certificate of Incorporation for the Reorganized Company**

**AMENDED AND RESTATED CERTIFICATE OF INCORPORATION**
**OF**
**HAYES LEMMERZ INTERNATIONAL, INC.**

Hayes Lemmerz International, Inc., a corporation organized and existing under the laws of the State of Delaware, hereby certifies as follows:

1.      The name of the corporation (hereinafter called the "***Corporation***") is Hayes Lemmerz International, Inc.  The Corporation was originally incorporated under the name HLI Holding Company, Inc.  The date of filing the original Certificate of Incorporation of the Corporation with the Secretary of State of the State of Delaware was May 6, 2003.  The name of the Corporation was changed to Hayes Lemmerz International, Inc. pursuant to an Amendment to the Certificate of Incorporation filed with the Secretary of State of the State of Delaware on June 3, 2003.  The Certificate of Incorporation was further amended pursuant to an Amendment to the Certificate of Incorporation filed with the Secretary of State of the State of Delaware on May 15, 2007.

2.      On May 11, 2009, the Corporation and certain of its subsidiaries filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "***Bankruptcy Code***") in the United States Bankruptcy Court for the District of Delaware (the "***Bankruptcy Court***").

3.      This Amended and Restated Certificate of Incorporation has been duly adopted in accordance with Section 245 and Section 303 of the General Corporation Law of the State of Delaware to put into effect and carry out the Plan of Reorganization under the Bankruptcy Code of the Corporation, et al., as confirmed on [____], 2009 by order (the "***Order***") of the Bankruptcy Court.  Provision for the making of this Amended and Restated Certificate of Incorporation is contained in the Order of the Bankruptcy Court having jurisdiction under the Bankruptcy Code for the formation of the Corporation.

4.      The text of the Certificate of Incorporation of the Corporation is hereby amended and restated to read in its entirety as set forth on Exhibit A attached hereto and incorporated herein by this reference.

IN WITNESS WHEREOF, the undersigned has executed this Amended and Restated Certificate of Incorporation of Hayes Lemmerz International, Inc. as of the ___ day of [_____], 2009.

HAYES LEMMERZ INTERNATIONAL, INC.

By: _____
    Name:
    Title:

NY1:#3515461

# AMENDED AND RESTATED CERTIFICATE OF INCORPORATION

## OF

## HAYES LEMMERZ INTERNATIONAL, INC.

### ARTICLE I.

The name of the corporation is Hayes Lemmerz International, Inc. (the "*Corporation*").

### ARTICLE II.

The period of its duration is perpetual.

### ARTICLE III.

The purpose of the Corporation is to engage in any lawful act or activity for which corporations may be organized under the General Corporation Law of the State of Delaware (the "*DGCL*").

### ARTICLE IV.

The address of the Corporation's registered office in the State of Delaware is 2711 Centerville Road, Suite 400, City of Wilmington, County of New Castle.  The name of the Corporation's registered agent at such address is Corporation Service Company.

### ARTICLE V.

Section 5.01.  Authorized Capital Stock.  The Corporation shall have the authority to issue an aggregate of 20,000,000 shares of common stock, par value $0.01 per share, of which (i) [_____] shares shall be designated "*Class A Common Stock*" (the "*Class A Common Stock*"), (ii) [_____] shares shall be designated "*Class B-1 Common Stock*" (the "*Class B-1 Common Stock*") and (iii) [_____] shares shall be designated "*Class B-2 Common Stock*" (the "*Class B-2 Common Stock*" and, together with the Class B-1 Common Stock,  the "*Class B Common Stock*").  The Class A Common Stock, together with the Class B Common Stock, shall be referred to as "*Common Stock*" (the "*Common Stock*").

Section 5.02.  Section 1123.  The Corporation shall not issue any non-voting equity securities to the extent prohibited by Section 1123 of Title 11 of the United States Code (the "*Bankruptcy Code*") as in effect on the effective date of the Plan of Reorganization of Hayes Lemmerz International, Inc., et al., as confirmed on [_____], 2009 by an order of the United States Bankruptcy Court for the District of Delaware entered on [_____], 2009 (the "*Chapter 11 Plan*"); *provided, however,* that this Section 5.02: (a) shall have no further force and effect beyond that required under Section 1123 of the Bankruptcy Code, (b) shall have such force and effect, if any, only for so long as such section of the Bankruptcy Code is in effect and applicable to the Corporation, and (c) in all events may be amended or eliminated in accordance with applicable law as from time to time may be in effect.

Section 5.03.   <u>Common Stock</u>.   The relative powers, preferences, special rights, qualifications, limitations and restrictions granted to or imposed on the respective classes of the shares of the Common Stock are as follows:

(a)      <u>Generally</u>.   Each share of Class A Common Stock, Class B-1 Common Stock and Class B-2 Common Stock shall be identical and treated equally in all respects except as set forth in Sections 5.03(b) and 5.03(c) and as otherwise provided by law.   No stock dividend, stock split, combination or other similar recapitalization may be effected as to any class of Common Stock unless such action affects the Class A Common Stock, Class B-1 Common Stock and Class B-2 Common Stock on a *pari passu* basis.   The rights and privileges of the Class B-1 Common Stock or the Class B-2 Common Stock as set forth in this Section 5.03 shall not be amended, altered or repealed (whether by amendment or restatement or by merger, consolidation, business combination or otherwise) in any manner which does not equally affect the other classes of Common Stock without the affirmative vote of holders of a majority of the outstanding shares, voting as a separate class, of such class of  Common Stock proposed to be affected.

(b)      <u>Voting</u>.

(i)      Each holder of Class A Common Stock shall be entitled to one vote in respect of each share of Class A Common Stock held of record on all matters submitted to a vote of stockholders.

(ii)      The shares of Class B-1 Common Stock and Class B-2 Common Stock shall not have voting rights except as provided by law and as provided in Section 5.03(b)(iii) below.   At any time the Class B-1 Common Stock or Class B-2 Common Stock is entitled to vote, such holders of Class B-1 Common Stock or Class B-2 Common Stock shall be entitled to one vote in respect of each share of Class B-1 Common Stock or Class B-2 Common Stock held of record.

(iii)      The Company shall not[, and, as applicable, shall not permit any of its subsidiaries to,] take any of the following actions (whether by amendment or restatement of this Certificate of Incorporation or by merger, consolidation, business combination or otherwise) without first obtaining the affirmative vote or written consent of the holders of not less than a majority of the outstanding Class A Common Stock, Class B-1 Common Stock and Class B-2 Common Stock, voting together as a single class:

(1)      any authorization of, or increase in the number of authorized shares of, any class of capital stock ranking *pari passu* with or senior to the Common Stock as to dividends or liquidation preference, including additional Common Stock;

(2)      any amendment to this Certificate of Incorporation or the Corporation's Bylaws;

(3)      any amendment to the Stockholders Agreement among the Corporation and the stockholders party thereto, dated as of [_____], 2009;

(4)     any change in the authorized number of directors of the Board to a number other than seven;

(5)     any sale, lease or other disposition of all or substantially all of the assets of the Corporation through one or more transactions (for purposes of this Section 5.03(b)(iii)(5), any sale, lease or other disposition of assets of any subsidiary of the Corporation through one or more transactions will be deemed to be a sale, lease or disposition of assets of the Corporation if such sale, lease or disposition would constitute all or substantially all of the assets of the Corporation and its subsidiaries on a consolidated basis);

(6)     any recapitalization, reorganization, consolidation or merger of the Corporation;

(7)     any issuance or entry into an agreement for the issuance of any equity securities or any securities convertible or exercisable for equity securities of the Corporation [which, in the aggregate with all other issuances permitted by this Section 5.03(b)(iii)(7), would exceed [_____] shares (on an as converted basis)], except for (i) issuance of the Series A Warrants and Series B Warrants contemplated to be issued pursuant to the Plan, and any shares issued or issuable upon exercise thereof,  or (ii) issuances of Common Stock or securities convertible or exercisable for Common Stock  reserved for grant pursuant to any employee stock option plan, stock purchase plan, employee benefit plan, employment contract or any similar benefit or incentive program or agreement covering employees, consultants and directors of the Corporation and its subsidiaries approved by the board of directors, where the primary purpose of such plan, program or agreement is not to raise capital for the Corporation;

(8)     the initiation or completion of a public offering of the securities of the Corporation or of any of its subsidiaries; and

(9)     any redemption, purchase or other acquisition by the Corporation [or any of its subsidiaries'] capital stock, except for purchases approved or ratified by the board of directors, of Common Stock or securities convertible or exercisable for Common Stock from employees, consultants and directors of the Corporation upon termination of employment or affiliation.

(c)     <u>Conversion of Class B Common Stock</u>.  The holders of Class B Common Stock have conversion rights as follows:

(i)     Each share of Class B-1 Common Stock shall be convertible, at the option of the holder thereof, at any time and from time to time after the date of issuance of such share, and without the payment of additional consideration by the holder thereof, into one share of Class A Common Stock.

(ii)     Prior to the transfer of a share of Class B-2 Common Stock to a person who is a non-affiliate of the initial holder of record of such share (a "*Qualifying Transfer*"), such share of Class B-2 Common Stock shall not be convertible.  At any time after a

Qualifying Transfer, such share shall be convertible, at the option of the holder thereof, at any time and from time to time after the date of transfer of such share, and without the payment of additional consideration by the holder thereof, into one share of Class A Common Stock.

(iii)    Shares of Class B-1 Common Stock and any share of Class B-2 Common Stock that is convertible by the holder thereof by virtue of a Qualifying Transfer of such share shall be referred to herein as shares of "*Convertible Class B Common Stock.*"  Before any holder of Convertible Class B Common Stock will be entitled to convert such holder's shares of Convertible Class B Common Stock into shares of Class A Common Stock and to receive certificates therefor, such holder shall either (A) surrender the certificate or certificates of such shares of Convertible Class B Common Stock, duly endorsed, at the office of the Corporation or of any transfer agent for the Convertible Class B Common Stock or (B) notify the Corporation or its transfer agent that such certificates have been lost, stolen or destroyed and execute an agreement satisfactory to the Corporation to indemnify the Corporation from any loss incurred by it in connection with such certificates, and shall give written notice to the Corporation that he elects to convert the same.  The Corporation shall, as soon as practicable after such delivery, or after such agreement and indemnification, issue and deliver to such holder of Convertible Class B Common Stock, a certificate or certificates for the number of shares of Class A Common Stock to which the holder shall be entitled as aforesaid.  Any declared but unpaid dividends on the Convertible Class B Common Stock to be converted shall remain payable to the holder after conversion thereof.  Such conversion shall be deemed to have been made immediately prior to the close of business on the date of such surrender of the shares of Convertible Class B Common Stock to be converted, and the person or persons entitled to receive the shares of Class A Common Stock issuable upon such conversion shall be treated for all purposes as the record holder or holders of such shares of Class A Common Stock on such date; *provided, however,* that if the conversion is in connection with an underwritten offer of securities registered pursuant to the Securities Act of 1933, as amended, or a merger, sale, financing, or liquidation of the Corporation or other event, the conversion may, at the option of any holder tendering Convertible Class B Common Stock for conversion, be conditioned upon the closing of such transaction or upon the occurrence of such event, in which case the person(s) entitled to receive the Class A Common Stock issuable upon such conversion of the Convertible Class B Common Stock shall not be deemed to have converted such Convertible Class B Common Stock until immediately prior to the closing of such transaction or the occurrence of such event.

(iv)    The Corporation shall at all times when the Class B Common Stock shall be outstanding, reserve and keep available out of its authorized but unissued capital stock, for the purpose of effecting the conversion of shares of Convertible Class B Common Stock, such number of its duly authorized shares of Class A Common Stock as shall from time to time be sufficient to effect the conversion of all outstanding Class B Common Stock.

(v)    All shares of Convertible Class B Common Stock which shall have been surrendered for conversion as provided herein shall no longer be deemed to be outstanding and all rights with respect to such shares shall immediately cease and terminate upon conversion, except only the right of the holders thereof to receive shares of Class A Common Stock in exchange therefor and to receive payment of any dividends declared but unpaid thereon.  Any

shares of Convertible Class B Common Stock so converted shall become authorized but unissued shares of Class A Common Stock.

(d)    Dividends.  The holders of Common Stock shall be entitled to receive dividends when and as declared by the board of directors out of funds legally available therefor. Holders of shares of Common Stock shall be entitled to share equally, share for share, in such dividends.

(e)    Liquidation.  In the event of any liquidation, dissolution or winding up of the affairs of the Corporation, voluntary or involuntary, the assets of the Corporation available to stockholders shall be distributed equally per share to the holders of Common Stock.

## ARTICLE VI.

The business and affairs of the Corporation shall be managed by or under the direction of the board of directors, and the directors need not be elected by ballot unless required by the Bylaws of the Corporation.  The number of directors of the Corporation shall be fixed from time to time in the manner set forth in the Corporation's Bylaws.

## ARTICLE VII.

A director shall have no liability to the Corporation or its stockholders for monetary damages for breach of fiduciary duty as a director, except for liability (i) for any breach of the director's duty of loyalty to the Corporation or its stockholder, (ii) for acts or omissions not in good faith or that involve intentional misconduct by the director, or a knowing violation of law by a director, (iii) under Section 174 of the DGCL or (iv) for any transaction from which the director derived any improper personal benefit.  If the DGCL is hereafter amended to authorize corporate action further eliminating or limiting the personal liability of directors, then the liability of a director shall be eliminated or limited to the full extent permitted under the DGCL, as so amended.  Any repeal or modification of this Article shall not adversely affect any right or protection of a director of the Corporation existing at the time of such repeal or modification for or with respect to an act or omission of such director occurring prior to such repeal or modification.

## ARTICLE VIII.

In furtherance and not in limitation of the powers conferred by the laws of the State of Delaware, the board of directors is expressly authorized to make, amend and repeal the Bylaws of the Corporation.

## ARTICLE IX.

The Corporation reserves the right to amend or repeal any provision contained in this Certificate of Incorporation in the manner from time to time prescribed by the laws of the State of Delaware.  All rights herein conferred are granted subject to this reservation.

NY1:# 3515461                                          6

## ARTICLE X.

The Corporation expressly elects not to be governed by Section 203 of the DGCL.

## ARTICLE XI.

The Corporation renounces any interest or expectancy of the Corporation in, or in being offered an opportunity to participate in, any Excluded Opportunity.  An "***Excluded Opportunity***" is any matter, transaction or interest that is presented to, or acquired, created or developed by, or which otherwise comes into the possession of, any director of the Corporation who is not an employee of the Corporation or any of its subsidiaries (a "***Covered Person***"), unless such matter, transaction or interest is presented to, or acquired, created or developed by, or otherwise comes into the possession of, a Covered Person expressly and solely in such Covered Person's capacity as a director of the Corporation.

## <u>Exhibit F</u>

## Bylaws for the Reorganized Company

**AMENDED AND RESTATED BYLAWS**

**OF**

**HAYES LEMMERZ INTERNATIONAL, INC.**

## ARTICLE I
## OFFICE AND RECORDS

1.1     The principal office of the Corporation in the State of Delaware shall be located at 2711 Centerville Road, Suite 400, City of Wilmington, County of New Castle, and the name and address of its registered agent is Corporation Service Company.

1.2     The Corporation may have such other offices, either within or without the State of Delaware, as the Board of Directors may designate or as the business of the Corporation may from time to time require.

1.3     The books and records of the Corporation may be kept at the Corporation's principal executive office in 15300 Centennial Drive, Northville, Michigan 48168 or at such other locations outside the State of Delaware as may from time to time be designated by the Board of Directors.

## ARTICLE II
## MEETINGS OF STOCKHOLDERS

2.1     All annual meetings of the stockholders for the election of directors shall be held at such date, time and place either within or without the State of Delaware as may be designated from time to time by the Board of Directors and stated in the notice of the meeting or in a duly executed waiver of notice thereof.  Special meetings of stockholders for any other purpose may be held at such time and place, within or without the State of Delaware, as may be designated by the Board of Directors and stated in the notice of the meeting or in a duly executed waiver of notice thereof.

2.2     Whenever stockholders are required or permitted to take any action at a meeting, unless notice is waived as provided in Section 4.1, written notice of the meeting stating the place, date and hour of the meeting shall be given to each stockholder entitled to vote at such meeting either personally or by mail, not fewer than ten (10) nor more than sixty (60) days before the date of the meeting.  If mailed, notice shall be deemed given when deposited in the mail, postage prepaid, directed to the stockholder at his or her address as it appears on the records of the Corporation. Any previously scheduled meeting of the stockholders may be postponed by resolution of the Board of Directors upon public notice given prior to the time previously scheduled for such meeting of stockholders.

NY1:#3515462

2.3     The officer who has charge of the stock ledger of the Corporation shall prepare and make, at least ten (10) days before every meeting of stockholders, a complete list of the stockholders entitled to vote at the meeting, arranged in alphabetical order, and showing the address of each stockholder and the number of shares registered in the name of each stockholder.  Such list shall be open to the examination of any stockholder, for any purpose germane to the meeting, during ordinary business hours, for a period of at least ten (10) days prior to the meeting, either at a place within the city where the meeting is to be held, which place shall be specified in the notice of the meeting, or, if not so specified, at the place where the meeting is to be held.  The list shall also be produced and kept at the time and place of the meeting during the whole time thereof, and may be inspected by any stockholder who is present.

2.4     A Special meeting of the stockholders, for any purpose or purposes, may be called only by the Chairman of the Board of Directors, by the President, by the Board of Directors or by one or more stockholders holding shares, in the aggregate, entitled to cast not less than ten percent (10%) of the votes at such meeting.  If any person(s) other than the Chairman of the Board or the Board of Directors calls a special meeting, the request shall:

   a.  be in writing;

   b.  specify the time of such meeting and the general nature of the business proposed to be transacted; and

   c.  be delivered personally or sent by registered mail or by facsimile transmission to the Chairman of the Board of Directors, the President or the Secretary of the Company.  The officer(s) receiving the request shall cause notice to be promptly given to the stockholders entitled to vote at such meeting, in accordance with these Bylaws, that a meeting will be held at the time requested by the person or persons calling the meeting.  No business may be transacted at such special meeting other than the business specified in such notice to stockholders.  Nothing contained in this paragraph of this Section 2.4 of these Bylaws shall be construed as limiting, fixing, or affecting the time when a meeting of stockholders called by action of the Board of Directors may be held.

2.5     The holders of a majority of the stock issued and outstanding and entitled to vote thereat, present in person or represented by proxy, shall constitute a quorum at all meetings of the stockholders for the transaction of business except as otherwise provided by the Delaware General Corporation Law ("DGCL"), the certificate of incorporation or these Bylaws.  If, however, such quorum shall not be present or represented at any meeting of the stockholders, the Chairman of the Board of Directors or other person acting as the Chairman of the meeting, or the Board of Directors, shall have the power to adjourn the meeting from time to time, without notice other than announcement at the meeting, until a quorum shall be present or represented. At such adjourned meeting at which a quorum shall be present or represented, any business may be transacted that might have been transacted at the meeting as originally notified.  If the adjournment is for more than thirty (30) days, or if after the adjournment a new record date is fixed for the adjourned meeting, a notice of the adjourned meeting shall be given to each stockholder of record entitled to vote at the meeting.  The stockholders present at a duly organized meeting may continue to transact business until adjournment, notwithstanding the withdrawal of enough stockholders to leave less than a quorum.

NY1:# 3515462                                    2

2.6     Whenever directors are to be elected at a meeting, they shall be elected by a plurality of the votes cast at the meeting by the holders of stock entitled to vote, subject to the provisions of the Stockholders Agreement among the Corporation and the stockholders party thereto, dated as of [___], 2009, as may be amended from time to time (the "Stockholders Agreement"). Whenever any corporate action, other than the election of directors, is to be taken by vote of stockholders at a meeting, the vote of the holders of a majority of the stock having voting power present in person or represented by proxy shall decide any question brought before such meeting, unless the question is one upon which by express provision of the DGCL, the certificate of incorporation, the Stockholders Agreement or these Bylaws, a different vote is required, in which case such express provision shall govern and control the decision of such question.

2.7     Unless otherwise provided in the certificate of incorporation, each stockholder shall at every meeting of the stockholders be entitled to one vote in person or by proxy for each share of the capital stock having voting power held by such stockholder, but no proxy shall be voted on after three years from its date, unless the proxy provides for a longer period.  Every proxy shall be signed by the stockholder or by his duly authorized attorney.  Such proxy must be filed with the Secretary of the Corporation or his or her representative at or before the time of the meeting.

2.8     Unless otherwise provided in the certificate of incorporation, any action required to be taken at any annual or special meeting of stockholders of the Corporation, or any action which may be taken at any annual or special meeting of such stockholders, may be taken without a meeting, without prior notice and without a vote, if a consent in writing, setting forth the action so taken, shall be signed by the holders of outstanding stock having not less than the minimum number of votes that would be necessary to authorize or take such action at a meeting at which all shares entitled to vote thereon were present and voted.  Prompt notice of the taking of the corporate action without a meeting by less than unanimous written consent shall be given to those stockholders who have not consented in writing.

2.9     Upon demand of any stockholder entitled to vote at a meeting, the vote for directors or for any other matter at such meeting shall be by written ballot, but otherwise the method of voting and the manner in which votes are counted shall be discretionary with the presiding officer at the meeting.

### ARTICLE III
### DIRECTORS

3.1     The business, property and affairs of the Corporation shall be managed by or under the direction of the Board of Directors of the Corporation. The number of directors constituting the entire Board of Directors shall initially be seven (7) and may be increased or decreased from time to time by vote of a majority of the entire Board of Directors, subject to the certificate of incorporation and Section 2.4(a)(iv) of the Stockholders Agreement, except as provided in Section 3.2 of this Article; provided, however, that no decrease in the number of directors may shorten the term of any incumbent director.  Directors need not be stockholders.  The directors shall be elected to hold office for a term expiring at the annual meeting of stockholders held in the year following the year of their election, and until their successors are elected and qualified.

The provisions of this Article III shall be subject to the terms and conditions of the Stockholders Agreement.

3.2     Except as otherwise provided in the Stockholders Agreement, vacancies and newly created directorships resulting from any increase in the authorized number of directors may be filled by a majority of the directors then in office, though less than a quorum, or by a sole remaining director, and the directors so chosen shall hold office until the next annual election and until their successors are duly elected and shall qualify, unless sooner displaced.  If there are no directors in office, then an election of directors may be held in the manner provided by the DGCL.  Except as otherwise provided in the Stockholders Agreement, if, at the time of filling any vacancy or any newly created directorship, the directors then in office shall constitute less than a majority of the whole Board of Directors (as constituted immediately prior to any such increase), the Court of Chancery of the State of Delaware may, upon application of any stockholder or stockholders holding at least ten percent (10%) of the total number of the shares at the time outstanding having the right to vote for such directors, summarily order an election to be held to fill any such vacancies or newly created directorships, or to replace the directors chosen by the directors then in office.

3.3     The business of the Corporation shall be managed by or under the direction of its Board of Directors, which may exercise all such powers of the Corporation and do all such lawful acts and things as are not by law or by the certificate of incorporation or by these Bylaws directed or required to be exercised or done by the stockholders.

### MEETINGS OF THE BOARD OF DIRECTORS

3.4     The Board of Directors of the Corporation may hold meetings, both regular and special, either within or without the State of Delaware.

3.5     The first meeting of each newly elected Board of Directors shall be held at the same place and immediately following each annual meeting of stockholders, and no further notice thereof need be given other than this Bylaw.

3.6     Regular meetings of the Board of Directors may be held without notice at such time and at such place as shall from time to time be determined by the Board of Directors.

3.7     Special meetings of the Board of Directors may be called by the Chairman of the Board of Directors or by any two directors, at such time and place as shall be specified in the notice or waiver thereof.  The person or persons authorized to call special meetings of the Board of Directors may fix the place and time of the meetings.  Notice of any special meeting shall be given to each director at his or her business or residence.  If mailed, such notice shall be deemed adequately delivered: (a) when personally delivered to the director to be notified; (b) when sent by confirmed facsimile to the director to be notified at a number previously identified by the director and currently on record with the Corporation; (c) when sent by email to the director to be notified at an email address previously identified by the director and currently on record with the Corporation; (d) three (3) business days after deposit in the United States mail postage prepaid by certified or registered mail return receipt requested and addressed to the director to be notified at an address previously identified by the director and currently on record with the

NY1:# 3515462                                                  4

Corporation; or (e) one (1) business day after deposit with a national overnight delivery service, postage prepaid, addressed to the director to be notified at an address previously identified by the director and currently on record with the Corporation.  Neither the business to be transacted at, nor the purpose of, any regular or special meeting of the Board of Directors need be specified in the notice of such meeting, except for amendments to these Bylaws provided under Section 8.1 of these Bylaws.

3.8     At all meetings of the Board of Directors a majority of the directors shall constitute a quorum for the transaction of business and the act of a majority of the directors present at any meeting at which there is a quorum shall be the act of the Board of Directors, except as may be otherwise specifically provided by law, the certificate of incorporation of these Bylaws.  If a quorum shall not be present at any meeting of the Board of Directors, the directors present thereat may adjourn the meeting from time to time, without notice other than announcement at the meeting, until a quorum shall be present.

3.9     Unless otherwise restricted by the certificate of incorporation or these Bylaws, any action required or permitted to be taken at any meeting of the Board of Directors or of any committee thereof may be taken without a meeting, if all members of the Board of Directors or committee, as the case may be, consent thereto in writing, and the writing or writings are filed with the minutes of proceedings of the Board of Directors or committee.

3.10    Unless otherwise restricted by the certificate of incorporation or these Bylaws, members of the Board of Directors, or any committee designated by the Board of Directors, may participate in a meeting of the Board of Directors, or any committee, by means of conference telephone or similar communications equipment by means of which all persons participating in the meeting can hear each other, and such participation in a meeting shall constitute presence in person at the meeting.

## COMMITTEES OF THE BOARD OF DIRECTORS

3.11    The Board of Directors may designate one or more committees, each committee to consist of one or more of the directors of the Corporation.  The Board of Directors may designate one or more directors as alternate members of any committee, who may replace any absent or disqualified member at any meeting of the committee.

3.12    In the absence or disqualification of a member of a committee, the member or members thereof present at any meeting and not disqualified from voting, whether or not he or they constitute a quorum, may unanimously appoint another member of the Board of Directors to act at the meeting in the place of any such absent or disqualified member.

3.13    Any such committee, to the extent provided in the resolution of the Board of Directors, shall have and may exercise all the powers and authority of the Board of Directors in the management of the business and affairs of the Corporation, and may authorize the seal of the Corporation to be affixed to all papers which may require it, except as otherwise may be provided by law.  Unless the resolution of the Board of Directors expressly so provides, no such committee shall have the power or authority to declare a dividend or authorize the issuance of stock.

3.14    Each committee shall keep regular minutes of its meetings and report the same to the Board of Directors when required.

3.15    Any such committee may adopt rules governing the method of calling and time and place of holding its meetings.  Unless otherwise  provided by the Board of Directors, a majority of any such committee (or the member thereof, if only one) shall constitute a quorum for the transaction of business, and the vote of a majority of the members of such committee present at a meeting at which a quorum is present shall be the act of such committee.  Any or all members of any such committee may be removed, with or without cause, by resolution of the Board of Directors.

## COMPENSATION OF DIRECTORS

3.16    Unless otherwise restricted by the certificate of incorporation or these Bylaws, the Board of Directors shall have the authority to fix the compensation of directors.  The directors may be paid their expenses, if any, of attendance at each meeting of the Board of Directors and may be paid a fixed sum for attendance at each meeting of the Board of Directors or a stated salary as director.  No such payment shall preclude any director from serving the Corporation in any other capacity and receiving compensation therefor.  Members of special or standing committees may be allowed like compensation for attending committee meetings.

## RESIGNATION AND REMOVAL OF DIRECTORS

3.17    Any director may resign at any time upon written notice to the Corporation.  Any such resignation shall take effect at the time specified therein or, if the time not be specified, upon receipt thereof, and the acceptance of such resignation, unless required by the terms thereof, shall not be necessary to make such resignation effective.

3.18    Unless otherwise restricted by the certificate of incorporation, these Bylaws or the Stockholders Agreement, any director or the entire Board of Directors may be removed, with or without cause, by the holders of a majority of shares entitled to vote at an election of directors.

## ARTICLE IV
## WAIVER OF NOTICE

4.1    Whenever any notice is required to be given to any stockholder or director of the Corporation under any provision of the DGCL or the certificate of incorporation or these Bylaws, a waiver thereof in writing, signed by the person or persons entitled to said notice, whether before or after the time stated therein, shall be deemed equivalent thereto.  In the case of a stockholder, such waiver of notice may be signed by such stockholder's attorney or proxy duly appointed in writing.  Attendance of a person at a meeting shall constitute a waiver of notice of such meeting, except when the person attends a meeting for the express purpose of objecting at the beginning of the meeting to the transaction of any business because the meeting is not lawfully called or convened.  Neither the business to be transacted at, nor the purpose of, any regular or special meeting of the stockholders, directors or members of a committee of directors needs to be specified in any written waiver of notice.

**ARTICLE V**
**OFFICERS**

5.1     The officers of the Corporation shall be chosen by the Board of Directors and shall include a Chairman of the Board, a Chief Executive Officer, a President, a Treasurer and a Secretary.  The Board of Directors may also choose one or more Vice Presidents, one or more Assistant Secretaries and one or more Assistant Treasurers.  Any number of offices may be held by the same person, unless the certificate of incorporation or these Bylaws otherwise provide. All officers chosen by the Board of Directors shall each have such powers and duties as generally pertain to their respective offices subject to the specific provisions of this Article V together with such other powers and duties as from time to time may be conferred by the Board of Directors and Committee thereof.

5.2     The Board of Directors at its first meeting after each annual meeting of stockholders shall choose a President, a Treasurer, and a Secretary and may choose Vice Presidents.

5.3     The Board of Directors may appoint such other officers and agents as it shall deem necessary who shall hold their offices for such terms and shall exercise such powers and perform such duties as shall be determined from time to time by the Board of Directors.

5.4     The salaries of all officers and agents of the Corporation shall be subject to the approval of the Board of Directors.

5.5     The officers of the Corporation shall hold office until their successors are chosen and qualify or until his or her death or resignation.  Any officer elected or appointed by the Board of Directors may be removed at any time by the affirmative vote of a majority of the Board of Directors.  Any vacancy occurring in any office of the Corporation shall be filled by the Board of Directors.

**THE CHAIRMAN OF THE BOARD**

5.6     The Chairman of the Board shall preside at all meetings of the Board of Directors and of the stockholders at which he or she shall be present.  He or she shall have and may exercise such powers as are, from time to time, assigned to him or her by the Board of Directors and as may be provided by law.  The Chairman of the Board shall be responsible for the general management of the affairs of the Corporation, shall make reports to the Board of Directors and the stockholders and shall perform all duties incidental to such office which may be required by law and all such other duties as are properly required by the Board of Directors.  Unless another person is chosen by the Board of Directors, so long as the President and Chief Executive Officer of the Company is a member of the Board of Directors, he or she shall serve as the Chairman of the Board. Except where by law the signature of the President is required, the Chairman of the Board shall possess the same power as the President to sign all certificates, contracts and other instruments of the Corporation which may be authorized by the Board of Directors.  The Chairman of the Board shall see that all orders and resolutions of the Board of Directors and of any committee thereof are carried into effect.

**THE PRESIDENT AND VICE-PRESIDENTS**

5.7      The President shall be the Chief Executive Officer of the Corporation and, if not serving as the Chairman of the Board, in the absence or inability to act of the Chairman of the Board he or she shall preside at all meetings of the stockholders and the Board of Directors and perform all duties of the Chairman of the Board.  He or she shall act in a general executive capacity in the administration and operation of the Corporation's business and general supervision of its policies and affairs.

5.8      The President may sign, alone or with the Secretary or any other proper officer of the Corporation authorized by the Board of Directors, certificates, contracts and other instruments of the Corporation as authorized by the Board of Directors.

5.9      In the absence of the President or in the event of his or her inability or refusal to act, the Vice President, if any, (or in the event there be more than one Vice President, the Vice Presidents in the order designated by the directors, or in the absence of any designation, then in the order of their election) shall perform the duties of the President, and when so acting, shall have all the powers of and be subject to all the restrictions upon the President.  The Vice Presidents shall perform such other duties and have such other powers as the Board of Directors may from time to time prescribe.

**THE SECRETARY AND ASSISTANT SECRETARY**

5.10     The Secretary shall attend all meetings of the Board of Directors and all meetings of the stockholders and record all the proceedings of the meetings of the Corporation and of the Board of Directors in a book to be kept for that purpose, shall also record therein all action taken by written consent of directors in lieu of a meeting, and shall perform like duties for the standing committees when required.  He or she shall give, or cause to be given, notice of all meetings of the stockholders and special meetings of the Board of Directors, and shall perform such other duties as may be prescribed by the Board of Directors or president, under whose supervision he or she shall be.  He or she shall have custody of the corporate seal of the Corporation and he or she, or an Assistant Secretary, shall have authority to affix the same to any instrument requiring it and when so affixed, it may be attested by his or her signature or by the signature of such assistant secretary.  The Board of Directors may give general authority to any other officer to affix the seal of the Corporation and to attest the affixing by his or her signature.  He or she shall have charge of the stock ledger and such other books and papers as the Board of Directors may direct, but he or she may delegate responsibility for maintaining the stock ledger to any transfer agent appointed by the Board of Directors.  He or she may have all such further powers and duties as generally are incident to the position of Secretary or as may be assigned to him or her by the President or the Board of Directors.

5.11     The Assistant Secretary, or if there be more than one, the Assistant Secretaries in the order determined by the Board of Directors (or if there be no such determination, then in the order of their election) shall, in the absence of the Secretary or in the event of his or her inability or refusal to act, perform the duties and exercise the powers of the Secretary and shall perform such other duties and have such other powers as the Board of Directors may from time to time prescribe.

**THE TREASURER AND ASSISTANT TREASURERS**

5.12    The Treasurer shall have the custody of the corporate funds and securities and shall keep full and accurate accounts of receipts and disbursements in books belonging to the Corporation and shall deposit all moneys and other valuable effects in the name and to the credit of the Corporation in such depositories as may be designated by the Board of Directors.  He or she may endorse all commercial documents requiring endorsements for or on behalf of the Corporation and may sign all receipts and vouchers for payments made to the Corporation.

5.13    He or she shall disburse the funds of the Corporation as may be ordered by the Board of Directors, taking proper vouchers for such disbursements, and shall render to the President and the Board of Directors, at its regular meetings, or when the Board of Directors so requires, an account of all his or her transactions as treasurer and of the financial condition of the Corporation.  He or she may have all such further powers and duties as generally are incident to the position of the Treasurer or as may be assigned to him or her by the Chairman of the Board, the President or the Board of Directors.

5.14    The Assistant Treasurer, or if there shall be more than one, the Assistant Treasurers in the order determined by the Board of Directors (or if there be no such determination, then in the order of their election) shall, in the absence of the Treasurer or in the event of his or her inability or refusal to act, perform the duties and exercise the powers of the Treasurer and shall perform such other duties and have such other powers as the Board of Directors may from time to time prescribe.

5.15    In case of the absence of any officer of the Corporation, or for any other reason that the Board of Directors may deem sufficient, the Board of Directors may confer for the time being the powers or duties, or any of them, of such officer upon any other officer or upon any director.

**ARTICLE VI
CERTIFICATES OF STOCK**

6.1    Every holder of stock in the Corporation shall be entitled to have a certificate, signed by, or in the name of the Corporation by, the Chairman of the Board of Directors, the President or a Vice President, and the Treasurer or an Assistant Treasurer, or the Secretary or an Assistant Secretary of the Corporation, certifying the number of shares owned by him or her in the Corporation.

6.2    If the Corporation shall be authorized to issue more than one class of stock or more than one series of any class, the powers, designations, preferences and relative, participating, optional or other special rights of each class of stock or series thereof and the qualification, limitations or restrictions of such preferences and/or rights shall be set forth in full or summarized on the face or back of the certificate which the Corporation shall issue to represent such class or series of stock, provided that, except as otherwise provided in Section 202 of the General Corporation Law of the State of Delaware, in lieu of the foregoing requirements, there may be set forth on the face or back of the certificate which the Corporation shall issue to represent such class or series of stock, a statement that the Corporation will furnish without charge to each stockholder who so requests the powers, designations, preferences and relative, participating, optional or other

special rights of each class of stock or series thereof and the qualifications, limitations or restrictions of such preferences and/or rights.

6.3    Any of or all the signatures on the certificate may be facsimile. In case any officer, transfer agent or registrar who has signed or whose facsimile signature has been placed upon a certificate shall have ceased to be such officer, transfer agent or registrar before such certificate is issued, it may be issued by the Corporation with the same effect as if he or she were such officer, transfer agent or registrar at the date of issue.

## LOST CERTIFICATES

6.4    The Board of Directors may direct a new certificate or certificates to be issued in place of any certificate or certificates theretofore issued by the Corporation alleged to have been lost, stolen or destroyed, upon the making of an affidavit of that fact by the person claiming the certificate of stock to be lost, stolen or destroyed.  When authorizing such issue of a new certificate or certificates, the Board of Directors may, in its discretion and as a condition precedent to the issuance thereof, require the owner of such lost, stolen or destroyed certificate or certificates, or his or her legal representative, to advertise the same in such manner as it shall require and/or to give the Corporation a bond in such sum as it may direct as indemnity against any claim that may be made against the Corporation with respect to the certificate alleged to have been lost, stolen or destroyed.

## TRANSFER OF STOCK

6.5    Upon surrender to the Corporation or the transfer agent of the Corporation of a certificate or certificates for shares with an assignment and power of transfer endorsed thereon or attached thereto, duly executed, with such proof of the authenticity of the signature as the Corporation or its agents may reasonably require, the Corporation shall issue a new certificate to the person entitled thereto, cancel the old certificate and record the transaction upon its books.  The Board of Directors shall have the power to make all such rules and regulations, not inconsistent with the certificate of incorporation, these Bylaws, the Stockholders' Agreement and the DGCL, as the Board of Directors may deem appropriate concerning the issue, transfer and registration of certificates for stock of the Corporation.  The Board of Directors may appoint one or more transfer agents or registrars of transfers, or both, and may require all stock certificates to bear the signature of either or both.

## STOCKHOLDER RECORD DATE

6.6    In order that the Corporation may determine the stockholders entitled to notice of or to vote at any meeting of stockholder or any adjournment thereof, or to express consent to corporate action in writing without a meeting, or entitled to receive payment of any dividend or other distribution or allotment of any rights, or entitled to exercise any rights in respect of any change, conversion or exchange of stock or for the purpose of any other lawful action, the Board of Directors may fix, in advance, a record date, which shall not be more than sixty (60) nor less than ten (10) days before the date of such meeting, nor more than sixty (60) days prior to any other action.  If no record date is fixed by the Board of Directors, (l) the record date for determining stockholders entitled to notice of or to vote at a meeting of stockholders shall be at

the close of business on the day next preceding the date on which notice is given, or, if notice is waived, at the close of business on the day next preceding the day on which the meeting is held, and (2) the record date for determining stockholders for any other purpose shall be at the close of business on the day on which the Board of Directors adopts the resolution relating thereto.  A determination of stockholders of record entitled to notice of or to vote at a meeting of stockholders shall apply to any adjournment of the meeting; provided, however, that the Board of Directors may fix a new record date for the adjourned meeting.

6.7     Only such stockholders as shall be stockholders of record on the date so fixed shall be entitled to notice of, and to vote at, such meeting and any adjournment thereof, or to receive payment of such dividend or other distribution, or to exercise such rights in respect of any such change, conversion or exchange of stock, or to participate in such action, as the case may be, notwithstanding any transfer of any stock on the books of the Corporation after any record date so fixed.

<div align="center">

**ARTICLE VII**
**GENERAL PROVISIONS**

**CHECKS**

</div>

7.1     All checks or demands for money and notes of the Corporation shall be signed by such officer or officers or such other person or persons as the Board of Directors may from time to time designate.

<div align="center">

**FISCAL YEAR**

</div>

7.2     The fiscal year of the Corporation shall be fixed by resolution of the Board of Directors.

<div align="center">

**SEAL**

</div>

7.3     The Board of Directors may adopt a corporate seal having inscribed thereon the name of the Corporation, the year of its organization and the words "Corporate Seal, Delaware." The seal may be used by causing it or a facsimile thereof to be impressed or affixed or reproduced or otherwise.

<div align="center">

**INDEMNIFICATION**

</div>

7.4     Each person who was or is made a party or is threatened to be made a party to or is otherwise involved in any action, suit or proceeding, whether civil, criminal, administrative or investigative ("Proceeding"), by reason of the fact that he or she or a person of whom he or she is the legal representative is or was a director or an officer of the Corporation or, while an officer of director of the Corporation is or was serving at the request of the Corporation as a director, officer, employee or agent of any other corporation or of a partnership, joint venture, trust or other enterprise, including service with respect to any employee benefit plan ("Indemnitee"), whether the basis of such Proceeding is alleged action in an official capacity as a director, officer, employee or agent or in any other capacity while serving as a director, officer, employee or agent, shall be indemnified and held harmless by the Corporation to the fullest extent authorized by the DGCL, as the same exists or may hereafter be amended (but, in the case of any

NY1:# 3515462                                      11

such amendment, only to the extent that such amendment permits the Corporation to provide broader indemnification rights than said law permitted the Corporation to provide prior to such amendment), against all expense, liability and loss (including, without limitation, attorneys' fees, judgments, fines, excise taxes or penalties under the Employee Retirement Income Security Act of 1974, as amended, and amounts paid or to be paid in settlement) reasonably incurred by such Indemnitee in connection therewith; provided, however, that except as provided in Section 7.6 with respect to Proceedings seeking to enforce rights to indemnification, the Corporation shall indemnify any such Indemnitee seeking indemnification in connection with a Proceeding (or part thereof) initiated by such Indemnitee only if such Proceeding (or part thereof) was authorized by the Board of Directors.  The Board of Directors may also provide the foregoing indemnification rights to employees and other agents of the Corporation, to the extent it deems appropriate and desirable, in its sole discretion.

7.5     The right to indemnification conferred in Section 7.4 shall include the right to be paid by the Corporation the expenses (including attorneys' fees) incurred in defending any such Proceeding in advance of its final disposition ("Advancement of Expenses"); provided, however, that, if the DGCL requires, an Advancement of Expenses incurred by an Indemnitee in his or her capacity as a director or officer (and not in any other capacity in which service was or is rendered by such Indemnitee, including, without limitation, service to an employee benefit plan) shall be made only upon delivery to the Corporation of an undertaking ("Undertaking"), by or on behalf of such Indemnitee, to repay all amounts so advanced if it shall ultimately be determined by final judicial decision from which there is no further right to appeal ("Final Adjudication") that such Indemnitee is not entitled to be indemnified for such expenses under this Section 7.5 or otherwise.  No director or officer shall be required to post any bond or provide any other security for any such repayment Undertaking.

7.6     If a claim under Section 7.4 or Section 7.5 is not paid in full by the Corporation within thirty (30) days after a written claim has been received by the Corporation, except in the case of a claim for an Advancement of Expenses, in which case the applicable period shall be twenty (20) days, the Indemnitee may at any time thereafter bring suit against the Corporation to recover the unpaid amount of the claim.  If successful in whole or in part in any such suit, or in a suit brought by the Corporation to recover an Advancement of Expenses pursuant to the terms of an Undertaking, the Indemnitee shall be entitled to be paid also the expense of prosecuting or defending such suit.  In (i) any suit brought by the Indemnitee to enforce a right to indemnification hereunder (but not in a suit brought by the Indemnitee to enforce a right of an Advancement of Expenses) it shall be a defense that, and (ii) in any suit brought by the Corporation to recover an Advancement of Expenses pursuant to the terms of an Undertaking, the Corporation shall be entitled to recover such expenses upon a Final Adjudication that, the Indemnitee has not met any applicable standard for indemnification set forth in the DGCL.  Neither the failure of the Corporation (including its Board of Directors, independent legal counsel or stockholders) to have made a determination prior to the commencement of such action that indemnification of the Indemnitee is proper in the circumstances because the Indemnitee has met the applicable standard of conduct set forth in the DGCL, nor an actual determination by the Corporation (including its Board of Directors, independent legal counsel or stockholders) that the Indemnitee has not met such applicable standard of conduct, shall create a presumption that the Indemnitee has not met the applicable standard of conduct or, in the case of such a suit brought by the Indemnitee, be a defense to such suit.  In any suit brought by the Indemnitee to enforce a

right to indemnification or to an Advancement of Expenses hereunder, or brought by the Corporation to recover an Advancement of Expenses pursuant to the terms of an Undertaking, the burden of proving that the Indemnitee is not entitled to be indemnified, or to such Advancement of Expenses, under this Article VII or otherwise shall be on the Corporation.

7.7    The right to indemnification and the Advancement of Expenses conferred in this Article VII shall not be exclusive of any other right which any person may have or hereafter acquire under any statute, provision of the Certificate of Incorporation, provision of these Bylaws, agreement, vote of stockholders or disinterested directors or otherwise.

7.8    The Corporation may maintain insurance, at its expense, to protect itself and any director, officer, employee or agent of the Corporation or another corporation, partnership, joint venture, trust or other enterprise against any expense, liability or loss, whether or not the Corporation would have the power to indemnify such person against such expense, liability or loss under the DGCL.

7.9    The Corporation may, to the extent authorized from time to time by the Board of Directors, grant rights to indemnification, and rights to the Advancement of Expenses, to any employee or agent of the Corporation to the fullest extent of the provisions of this Article VII with respect to the indemnification and Advancement of Expenses of directors and officers of the Corporation.

7.10    The rights to indemnification and to the Advancement of Expenses conferred in Section 7.4 and Section 7.5 shall be contract rights and such rights shall continue as to an Indemnitee who has ceased to be a director, officer, employee or agent and shall inure to the benefit of the Indemnitee's heirs, executors and administrators.

7.11    The Corporation acknowledges that (i) certain persons employed by, otherwise affiliated with, or appointed by, a stockholder of the Corporation or any of its affiliates or any funds managed or advised by such stockholder or its affiliates may serve on the Board of Directors, or, at the request of the Corporation, on the board of directors or other governing body of another entity, and (ii) such directors may be entitled to, or may be provided, indemnification by such stockholder or its affiliates for certain expenses and liabilities for which such directors may also be entitled to seek indemnification from the Corporation pursuant to these Bylaws, pursuant to Section 145 of the DGCL or pursuant to indemnification agreements or other agreements between the Corporation and such directors (the "Company Indemnified Expenses").    The Corporation acknowledges and agrees that, as between the Corporation and its subsidiaries, on the one hand, and such stockholder and its affiliates (other than the Corporation and its subsidiaries), on the other hand, the Corporation shall be primarily liable to such directors with respect to any Company Indemnified Expenses and any liability of such stockholder or its affiliates to such directors shall be secondary liability. In recognition of the primary liability of the Corporation, the Corporation agrees that, in the event that such stockholder or any of its affiliates pays any Company Indemnified Expenses to or on behalf of any such director, reimburses any such director for any Company Indemnified Expenses paid by such director or advances amounts to any such director  (including by way of any loan) for the payment of Company Indemnified Expenses, then (i) the Corporation shall pay to such stockholder any amounts so paid, reimbursed or advanced, to the extent that any such director would have been

entitled to indemnification of such Company Indemnified Expenses and (ii) such stockholder shall be subrogated to all of the rights of such director with respect to any claim that the such director could have brought against the Corporation or any subsidiary with respect to any Company Indemnified Expenses that have been paid, reimbursed or advanced to or on behalf of such director. All such payments to such stockholder shall be made within five (5) business days of the receipt by the Corporation of written notice from such stockholder of such payment, reimbursement or advance, accompanied by documentation showing, in reasonable detail, the Company Indemnified Expenses so paid, reimbursed or advanced by such stockholder or any of its affiliates. The Company shall also reimburse such stockholder and its affiliates for all expenses, including legal expenses, incurred in enforcing this Section 7.11.

**ARTICLE VIII**
**AMENDMENTS**

8.1     These Bylaws may be altered, amended or repealed or new Bylaws may be adopted by the stockholders or by the Board of Directors, when such power is conferred upon the Board of Directors by the certificate of incorporation, at any regular meeting of the stockholders or of the Board of Directors or at any special meeting of the stockholders or of the Board of Directors if notice of such alteration, amendment, repeal or adoption of new Bylaws be contained in the notice of such special meeting. If the power to adopt, amend or repeal Bylaws is conferred upon the Board of Directors by the certificate or incorporation it shall not divest or limit the power of the stockholders to adopt, amend or repeal Bylaws.

NY1:# 3515462                                    14

## **Exhibit G**

## **Initial Directors and Officers of the Reorganized Debtors**

<div align="right">**PLAN EXHIBIT G**</div>

### Initial Directors and Officers of the Reorganized Debtors

Board of Directors

In accordance with Bankruptcy Code[1] section 1129(a)(5) and Section 6.6 of the Plan, on the Plan Effective Date the terms of the current members of Hayes' board of directors will expire. Pursuant to the Plan, Reorganized Hayes' CEO will serve on the initial board of directors of Reorganized Hayes and serve as its Chairman and the remaining directors will be designated by the Requisite DIP Lenders, in their sole discretion. The existing directors of each Subsidiary Debtor shall remain in their capacities as director of the applicable Reorganized Subsidiary Debtor.

While no final determination has yet been made, the Requisite DIP Lenders are actively interviewing a number of candidates to serve on the initial board of directors of Reorganized Hayes following the Plan Effective Date. These candidates generally are independent business people with significant experience as executives, directors, and/or consultants of publicly or privately-held businesses, including businesses in the automotive industry. In these positions, many of the candidates developed significant knowledge and experience in matters relating to corporate governance, insolvency and restructuring. Additionally, multiple candidates have experience as investment professionals specializing in distressed and high-yield investments in a variety of industries. Simultaneously with this interview process, the Requisite DIP Lenders are also in discussions with certain existing directors of Hayes to determine if the Requisite DIP Lenders will include one or more of such existing directors on the board of directors of Reorganized Hayes following the consummation of the Plan.

The Requisite DIP Lenders intend to conclude the director search process shortly and, in any event, prior to the Confirmation Hearing. Once the directors are selected, an amended exhibit or notice identifying the selected directors will be filed with the Bankruptcy Court. Prior to the Confirmation Hearing, in accordance with Bankruptcy Code section 1129(a)(5), the post-Plan Effective Date compensation for the directors will be disclosed.

Officers

The existing Officers or managing members of the Debtors shall remain in their current capacities as officers or managing members of the Debtors, subject to the ordinary rights and powers of the board of directors or equityholders, as the case may be, to replace them. Prior to the Confirmation Hearing, in accordance with Bankruptcy Code section 1129(a)(5), the post-Plan Effective Date compensation for the officers will be disclosed.

---

[1] Capitalized terms used in this exhibit and not otherwise defined have the meanings ascribed to such terms in the Plan.

<div align="center">G-2</div>

## **Exhibit H**

## **Form of Executive Employment Agreements**

**PLAN EXHIBIT H**

## Executive Employment Agreements

Section 6.7 of the Plan provides that the Debtors shall assume the existing employment agreements and/or implement new employment agreements with respect to certain members of Hayes' executive management team.  The Debtors' assumption of the existing employment agreements or entering into new employment agreements is subject to the consent of the Requisite DIP Lenders' in their sole discretion.

Conformed composite versions of the existing employment agreements (as of the Petition Date) are annexed hereto as Annex 1 (the "Existing Employment Agreements").  The executives subject to the Existing Employment Agreements and the Requisite DIP Lenders are also in the process of negotiating amendments to the Existing Employment Agreements.  The Debtors will amend this Exhibit or provide notice of any material revisions to the Existing Employment Agreements prior to the Confirmation Hearing.

H-2

**Annex 1**

AMENDED AND RESTATED EMPLOYMENT AGREEMENT, AS
<u>AMENDED BY AMENDMENT No. 1 TO EMPLOYMENT AGREEMENT</u>


THIS AMENDED AND RESTATED AGREEMENT (the
"Agreement") is made as of the 26th day of September, 2001 (the "Agreement
Date"), by and between Hayes Lemmerz International, Inc. (the "Company") and
Curtis J. Clawson (the "Executive"), as amended by that certain Amendment No. 1
to Amended and Restated Employment Agreement dated as of December 30, 2008.

WHEREAS, the Executive and the Company entered into an
Employment Agreement dated August 1, 2001 (the "Original Agreement"); and

WHEREAS, the Executive and the Company each desire to amend
and restate the Original Agreement in its entirety as set forth herein.

NOW, THEREFORE, in consideration of the premises and the re-
spective covenants and agreements of the parties herein contained, the parties agree
as follows:

1.      <u>Employment</u>.  The Company agrees to employ the Executive
and the Executive agrees to be employed on a full-time basis by the Company for the
period and upon the terms and conditions hereinafter set forth.

2.      <u>Term; Employment Period</u>.  The term of this Agreement (the
"Term") shall be two years, commencing on August 1, 2001 (the "Effective Date");
provided, however, that commencing on the second day of the Term and each day
thereafter, the Term shall automatically be extended for one additional day.  The
period during which the Executive is employed by the Company pursuant to this
Agreement is referred to herein as the "Employment Period."  The date on which the
termination of the Executive's employment hereunder shall become effective is
referred to herein as the "Termination Date."  Press releases related to the
Executive's commencement of employment hereunder shall be subject to reasonable
review and approval by the Executive.

3.      <u>Position and Duties</u>.  During the Employment Period, the
Executive shall serve as President and Chief Executive Officer of the Company and
shall have such responsibilities, duties and authority as are customarily and ordi-
narily exercised by executives in similar positions in similar businesses in the United

1

States and shall exercise such responsibilities, duties and authority consistent with the foregoing as the Company's Board of Directors (the "Board") shall determine from time to time.  During the Employment Period, the Executive shall report to the Board.  It is the intention of the parties that, during the Term, Executive shall be nominated, and following his election or appointment, shall serve, as a director of the Company; provided, however, that the Executive shall resign as a director of the Company immediately if his employment hereunder is terminated for any reason.  The Executive shall devote substantially all his working time and efforts to the business and affairs of the Company and shall use his best efforts to carry out his responsibilities faithfully and efficiently in a professional manner.  Notwithstanding the foregoing, it is understood that (i) during the first year of the Employment Period, the Executive shall not serve as a director of any for-profit business enterprise other than Clawson Associates and (ii) subject to any conflict of interest policies of the Company and Section 8, following the first year of the Employment Period, the Executive may with the prior consent of the Board, which shall not be unreasonably withheld, serve on the board of directors of up to two additional for-profit business enterprises.  It is further understood that during the Employment Period, subject to any conflict of interest policies of the Company and Section 8, the Executive may (x) serve in any capacity with any civic, charitable, educational or professional organization provided that such service does not materially interfere with his duties and responsibilities hereunder and (y) make and manage personal investments of his choice.

4.      Place of Performance.  During the Employment Period, the Executive's place of performance of his services shall be at the Company's Northville, Michigan headquarters, except for required travel by the Executive on the Company's business or as may be reasonably required by the Company.

5.      Compensation and Benefits.

(a)      Salary.  During the Employment Period, the Company shall pay to the Executive an initial annual base salary of Seven Hundred Fifty-Five Thousand Dollars ($755,000) (the "Base Salary"), such salary to be paid in periodic installments in accordance with the Company's payroll practices as in effect from time to time.  The Base Salary shall be reviewed annually by the compensation committee of the Board and may be increased from time to time in accordance with normal business practices of the Company and, if so increased, shall not thereafter be reduced.

2

(b)    <u>Cash-Based Incentives</u>.  During the Employment Period, the Executive shall be eligible to earn an annual bonus under the Company's Short-Term Incentive Plan, or a successor plan thereto, as in effect from time to time (the "Incentive Plan"), up to a maximum of two hundred percent (200%) of his Base Salary, subject to achievement of performance goals determined  after consultation with the Executive in accordance with the terms of the Incentive Plan (such annual bonus, the "Annual Bonus").  With respect to that portion of the Employment Period commencing on the Effective Date and ending January 31, 2002, the Executive shall receive in respect of his Annual Bonus an amount not less than One Hundred and Ninety Thousand Dollars ($190,000).  The Annual Bonus shall be payable in a cash lump sum at such time as bonuses are ordinarily paid in accordance with the terms of the Incentive Plan, but in no event later than 120 days after the end of each fiscal year of the Company.

(c)    <u>Sign-On/Retention Bonus</u>. Within [two] business days after the Agreement Date, the Company shall pay the Executive a one-time sign-on/retention bonus of  One Million Two Hundred Thousand Dollars ($1,200,000) (the "Sign-on/Retention Bonus"), which will result in an after-tax payment to the Executive of $669,000.00 (the "After-Tax Retention Bonus Payment Amount").  The Sign-on/Retention Bonus is being paid on the condition that the Executive remains in the employ of the Company for a period of not less than three (3) years and, accordingly, the after-tax portion of the Sign-on/Retention Bonus shall be subject to the set-off and repayment provisions set forth in Section 6(f).

(d)    <u>Equity-Based Incentives</u>.

(i)    <u>Option Grants</u>.  The Company shall, (i) effective as of the Effective Date, grant to the Executive an option (the "Initial Option") pursuant to the Company's 1996 Stock Option Plan or otherwise (the "Option Plan") to purchase up to one million (1,000,000) shares of the Company's common stock, par value $0.01 per share ("Common Stock") and (ii) effective as of September 26th, 2001, grant to the Executive an option (the "Additional Option" and, together and with the Initial Option, the "Options") pursuant to the Option Plan to purchase up to four hundred thousand (400,000) shares of Common Stock.  The Initial Option and the Additional Option shall each be evidenced by an agreement containing such terms and conditions as the Board shall determine are necessary and desirable, consistent with the terms of the Option Plan; provided, however, that the Options shall (i) have a per share exercise price

3

equal to the closing price of the Common Stock on the New York Stock Exchange ("NYSE") as of the Effective Date, with respect to the Initial Option and, as of September 26, 2001, with respect to the Additional Option; (ii) become cumulatively vested and exercisable with respect to twenty percent (20%) of the shares covered thereby on each of the first five anniversaries of the Effective Date; (iii) become fully vested and exercisable with respect to one-hundred percent (100%) of the shares covered thereby upon the occurrence of a Change in Control (as defined below); (iv) upon a termination of employment hereunder either (x) by the Company without Cause or (y) by the Executive for Good Reason (each as defined in Section 6(g)), become vested with respect to that number of shares that would have become vested in the normal course during the 36-month period following the Termination Date, absent such termination of employment (and without taking into account any subsequent Change in Control); and (v) notwithstanding the vesting and exercise period stated in such Options or the Option Plan, the Executive shall have not less than a period expiring seven months following the Termination Date to exercise such Options.

For purposes of this Agreement, a Change in Control shall be deemed to have occurred upon the first of the following to occur:

(A)     any Person (within the meaning of Section 3(a)(9) of the Securities and Exchange Act of 1934, as amended (the "Exchange Act"), as modified and used in Sections 13(d) and 14(d) thereof), other than Joseph Littlejohn & Levy Fund II, L.P. (or any affiliate (within the meaning of Regulation D Rule 501(b) under the Securities Act of 1933, as amended (the "Securities Act")) thereof), TSG Capital Fund II, L.P. (or any affiliate thereof), or Canadian Imperial Bank of Commerce (or affiliate thereof) (such entitles, collectively, the "JLL Group"), is or becomes the "Beneficial Owner" (within the meaning of Rule 13d-3 under the Exchange Act) of fifty percent (50%) or more of either (1) the then-outstanding Common Stock or (2) the combined voting power of the then-outstanding voting securities of the Company entitled to vote generally in the election of directors;

(B)     the following individuals cease for any reason to constitute a majority of the number of directors then serving:  individuals

4

who, as of the Effective Date, constitute the Board and any new director (other than a director whose initial assumption of office is in connection with an actual or threatened election contest, including but not limited to a consent solicitation, relating to the election of directors of the Company) whose appointment or election by the Board or nomination for election by the Company's stockholders was approved or recommended by a vote of at least a majority of the directors then still in office who either were directors on the date hereof or whose appointment, election or nomination for election was previously so approved or recommended;

(C)   there is consummated a merger or consolidation of the Company or any direct or indirect subsidiary of the Company with any other corporation, other than a merger or consolidation which would result in the voting securities of the Company outstanding immediately prior to such merger or consolidation continuing to represent (either by remaining outstanding or by being converted into voting securities of the surviving entity or any parent thereof) at least fifty percent (50%) of the combined voting power of the securities of the Company or such surviving entity or any parent thereof outstanding immediately after such merger or consolidation, provided, however, that it shall not be a Change in Control under this clause (C) if (i) directors appointed or nominated by the JLL Group or any constituent member thereof continue immediately following such transaction to constitute a majority of the Board and (ii) the JLL Group or any constituent member thereof continues immediately following such transaction to own securities representing at least thirty-five percent (35%) of the combined voting power of the securities of the Company or such surviving entity or any parent thereof outstanding immediately after such merger or consolidation; or

(D)   the stockholders of the Company approve a plan of complete liquidation or dissolution of the Company or there is consummated an agreement for the sale or disposition by the Company of all or substantially all of its assets.

5

(ii)    Additional Option Grants.  Based upon the Executive's performance and annual review, the Executive shall be eligible during the Employment Period to receive additional stock option grants in such amounts and subject to such terms and conditions as the compensation committee of the Board shall determine in its sole discretion are necessary and desirable.

(iii)    Antidilution.  In addition to the antidilution provision contained in the Option Plan, in the event that during the employment period the Company shall issue shares of Common Stock in one transaction or a series of similar transaction in an amount exceeding five percent (5%) of the then outstanding shares of Common Stock, other than (A) as a result of stock split, stock dividend or similar transaction, (B) upon the conversion of shares of Non-Voting Common Stock, par value $.01 per share, of the Company that are outstanding as of the Agreement Date, (C) upon the exercise of warrants to purchase shares of Common Stock that are outstanding as of the Agreement Date or (D) upon the exercise of employee stock options (each, an "Additional Issuance"), the Company shall grant to the Executive an option (the "Antidilution Option") pursuant to the Option Plan to purchase the number of shares of Common Stock necessary to cause the percentage of the outstanding shares of Common Stock subject to the Options and the Antidilution Option to be equal to the percentage of the outstanding shares of Common Stock subject to the Options immediately prior to such additional issuance of shares of Common Stock.  The Antidilution Option shall be granted contemporaneously with the Additional Issuance, and the per share exercise price of the Additional Option shall be equal to the per share consideration received by the Company in such Additional Issuance, as determined by the Board.

(e)    Expenses.  During the Employment Period, the Company shall promptly reimburse the Executive for all reasonable out-of-pocket expenses incurred by the Executive in connection with the business of the Company and the performance of his duties under this Agreement in accordance with the terms of the Company's policies as in effect from time to time.

(f)    Benefit Plans.  During the Employment Period, the Executive shall be entitled to participate in all of the employee benefit plans, programs, agreements and arrangements provided to senior executives of the

6

Company, as such are in effect from time to time, on a basis no less favorable than that provided to such senior executives.

(g)     Perquisites.  During the Employment Period, the Executive shall be entitled to a Company car, and an annual executive physical examination, each such perquisite to be paid or provided commensurate with his position and in accordance with the Company's policies as in effect on the Amendment Date.  In addition, the Company shall pay Executive an annual flexible benefits allowance (the "Flexible Benefits Allowance") of Forty Thousand Dollars ($40,000), such allowance to be paid in periodic installments in accordance with the Company's payroll practices as in effect from time to time. The Flexible Benefits Allowance shall be reviewed annually by the Compensation Committee of the Board and may be increased from time to time and, if so increased, shall not thereafter be reduced.

(h)     Vacations.  During the Employment Period, the Executive shall be entitled to vacation time, paid holidays and personal days, determined in accordance with the Company's policy with respect to its senior executives as in effect from time to time, it being understood that the Executive shall be entitled to not less than four weeks' vacation in any 12-month period during the Employment Period.

(i)     Relocation.  For a period of 12 months immediately following the Effective Date, the Company shall pay or reimburse the Executive for (i) his reasonable temporary housing expenses, (ii) automobile rental expenses and (iii) his and his spouse's reasonable travel expenses between Chicago, Illinois and Northville, Michigan that are incurred in connection with or prior to the relocation of his primary residence to the Northville, Michigan area.  In addition, the Company shall pay or reimburse the Executive for his actual moving expenses related to the relocation of his primary residence to the Northville, Michigan area and for all taxes payable by the Executive because of relocation-related payments by the Company, including tax reimbursement payments.  In no event shall payments and reimbursements to or on behalf of the Executive pursuant to this Section 5(h) exceed an aggregate of One Hundred Thousand Dollars ($100,000).

6.     Termination of Employment.

(a)     Accrued Benefits.  In the event of the termination of the Executive's employment hereunder for any reason, the Executive (or his estate or

7

representative, as applicable) shall be entitled to receive any Base Salary, Annual Bonus, vacation time and expenses that have in each case accrued but are unpaid as of the Termination Date, vested options as well as any post-termination benefits to which he may be entitled pursuant to the Company's retirement, insurance and other benefit plans, programs and arrangements as in effect immediately prior to the Termination Date (the "Accrued Benefits").

(b)     Death.  The Executive's employment hereunder shall terminate as of the date of his death.  Upon the termination of the Executive's employment hereunder because of his death, the Executive's estate or representative, as the case may be, shall be entitled to receive the Accrued Benefits and a lump sum payment in cash equal to (i) one year's Base Salary as in effect on the Termination Date and (ii) the product of (x) sixty percent (60%) of the Base Salary as in effect on the Termination Date, multiplied by a fraction (y) the numerator of which shall be the number of months (including fractions thereof) worked by the Executive during the Company's fiscal year in which the Termination Date occurs and (z) the denomi-nator of which shall be the number 12 (such amount under this clause (ii), the "Pro Rata Annual Bonus").  Such amounts shall be paid as soon as administratively feasible following the Executive's death but in no event later than April 15 of the calendar year following the Executive's death.  In addition, those immediate family members who were participating in the Company's medical benefit plan as of the date of the Executive's death shall continue to participate in the Company's medical benefit plan at active employee contribution rates for the one-year period immediately following the date of the Executive's death.

(c)     Disability.   The Executive's employment hereunder may be terminated during the Employment Period if the Executive is incapable of performing his principal duties hereunder because of physical or mental incapacity for a period of 45 consecutive working days or for more than 90 working days in any 12-month period ("Disability").  In the event that the Executive's employment is to be terminated pursuant to this Section 6(c), (i) this Agreement shall terminate on the date specified in the notice of termination delivered to the Executive (subject to Section 8(g) and Section 18); (ii) the Executive shall as of such date resign from all of his positions, duties and authorities hereunder; (iii) the Executive shall be placed on a medical leave of absence until the earlier of (A) expiration of the six-month period commencing on the date his medical leave of absence began, unless there is no reasonable expectation that the Executive will return to employment with the Company, in which case the date the Executive ceases performing services for the

8

Company, (B) the date he qualifies for benefits under the Company's long-term disability plan or (C) the date he is able to return to work; and (iv) the Executive shall continue to be paid his Base Salary until such medical leave of absence ends. In the case of a termination of the Executive's employment pursuant to this Section 6(c), for purposes of calculating benefits pursuant to clauses (B) and (C) below the Termination Date shall be the date upon which the Executive's medical leave of absence commences, and for all other purposes, the Termination Date shall be the date upon which the Executive's medical leave of absence ends. In the event the Executive's employment is terminated pursuant to this Section 6(c), the Executive (or his representative, as applicable) shall be entitled to: (A) the Accrued Benefits; (B) payments in cash equal to one year's Base Salary and Flexible Benefits Allowance as in effect on the Termination Date; (C) the Pro Rata Annual Bonus; and (D) the continuation of health and welfare benefits at the levels in effect as of the Termination Date at no additional cost to the Executive than that which was in effect as of the Termination Date for the one-year period immediately following the Termination Date; provided, however, that such benefits shall be reduced to the extent comparable benefits are made available to the Executive from a successor employer, and the Executive shall be obligated to report such benefits to the Company. The amounts payable pursuant to clauses (B) and (C) of the preceding sentence shall be paid, subject to Section 22, in twelve equal monthly payments commencing on the first day of the month following the Executive's Termination Date. It is acknowledged and agreed by the Executive that he shall be precluded from terminating his employment hereunder for Good Reason in the event that his employment hereunder is terminated pursuant to this Section 6(c).

(d)     For Cause; Without Good Reason. The Executive's employment hereunder may be terminated during the Employment Period (i) by the Company for Cause (as defined below) or (ii) by the Executive without Good Reason (as defined below). In the event that the Company terminates the Executive's employment hereunder for Cause, the Termination Date shall be the date specified in the notice of termination for Cause delivered by the Company to the Executive. In the event that the Executive terminates his employment hereunder without Good Reason, the Termination Date shall be no earlier than 30 days following the date on which a notice of termination is delivered by the Executive to the Company. In the event that the Executive's employment hereunder is terminated pursuant to this Section 6(d), the Executive shall be entitled to the Accrued Benefits.

(e)    <u>Without Cause; For Good Reason; Change in Control</u>. The Executive's employment hereunder may be terminated during the Employment Period (i) by the Company without Cause, (ii) by the Executive for Good Reason or (iii) by the Executive for any reason during the three-month period immediately following a Change in Control.  In the event that the Executive's employment is terminated pursuant to this Section 6(e) (whether by the Company or by the Executive), the Termination Date shall be no earlier than 30 days following the date on which a notice of termination is delivered by one party to the other.  In the event that the Executive's employment is terminated pursuant to this Section 6(e), the Executive (or his estate or representative, as the case may be) shall be entitled to receive the Accrued Benefits.  The Executive (or his estate or representative, as the case may be) shall be entitled to payments in cash equal to two times the sum of the Flexible Benefits Allowance and one hundred sixty percent (160%) of the Base Salary as in effect on the Termination Date.  The benefits described in the preceding sentence shall be paid, subject to Section 22, in twenty four equal monthly payments commencing on the first day of the month following the Executive's Termination Date.  The Executive shall be entitled for the duration of the Term to executive level career outplacement services by a firm selected by the Executive and paid for as incurred by the Company.  In addition, for the first eighteen months following the Termination Date, the Executive shall receive continuation of health and welfare benefits at the levels in effect as of the Termination Date at no additional cost to the Executive than that which was in effect as of the Termination Date; provided, that such benefits shall be reduced to the extent comparable benefits are made available to the Executive from a successor employer, and the Executive shall be obligated to report such benefits to the Company.  If the Executive is not receiving accident and health insurance coverage from another employer at the end of such eighteen month period at the levels in effect as of the Termination Date, the Company shall pay the Executive a lump sum amount equal to six times the monthly COBRA health benefit continuation premium for the Executive's coverage under the Company's accident and health insurance coverage.

(f)    <u>Set-Off and Reimbursement of Sign-On/Retention Bonus</u>.  Notwithstanding anything to the contrary contained herein, in the event that prior to August 1, 2004, the Executive's employment hereunder is terminated (i) by the Company For Cause pursuant to Section 6(d) or (ii) by the Executive without Good Reason pursuant to Section 6(d), then and only then, the Company shall have the right to set-off the Repayment Amount (as defined below) against any payments due to the Executive hereunder and the Executive shall immediately repay to the

10

Company the balance, if any, of the Repayment Amount that is not set-off by the Company pursuant to this Section 6(f).  For purposes of this Agreement, the "Repayment Amount" shall equal the product of (i) the After-Tax Retention Payment Amount multiplied by (ii) a fraction (A) the numerator of which is the difference between 1,095 less the number of days the Executive was employed by the Company prior to the Termination Date and (B) the denominator of which is 1,095 (Repayment Amount = $669,000.00 x (1,095 - numbers of day employed) / 1,095).

<div align="center">(g)      Definition of "Cause" and "Good Reason".</div>

For purposes of this Agreement, "Cause" means:  (i) the willful failure of the Executive to perform his material duties with the Company which have been duly assigned to the Executive and which duties are commensurate with those of the position for which Executive is then employed, and which failure is not cured (if capable of cure) within 15 days after receipt of written notice of such failure, which notice identifies the manner in which the Executive has willfully failed to perform, (ii) the engaging by the Executive in willful conduct which is demonstrably injurious to the Company, monetarily or otherwise, (iii) the conviction of the Executive of any crime or offense constituting a felony, or (iv) a failure by the Executive to comply with any material provision of this Agreement, which failure is not cured (if capable of cure) within 15 days after receipt of written notice of such non-compliance by the Executive.  Termination of the Executive for Cause shall mean termination by action of at least a majority of the Company's Board of Directors, at a meeting duly called and held upon at least 15 days' written notice to the Executive specifying the particulars of the action or inaction alleged to constitute Cause and at which meeting the Executive and his counsel were entitled to be present and given adequate opportunity to be heard.  For purposes of clauses (i) and (ii) of this definition, action or inaction by the Executive shall not be considered "willful" unless done or omitted by him (A) intentionally or not in good faith and (B) without reasonable belief that his action or inaction was in the best interest of the Company, and shall not include failure to act by reason of total or partial incapacity due to physical or mental illness.

For purposes of this Agreement, "Good Reason" means:  (i) a material adverse alteration in the nature or status of the Executive's position, duties, responsibilities or authority from those in effect as of the Effective Date; (ii) a material reduction in the Executive's Base Salary or level of employee benefits (other than across-the-board reductions applied similarly to all of the Company's senior executives); (iii) failure to pay or provide any of the compensation set forth in

<div align="center">11</div>

this Agreement (except for an across-the-board deferral of compensation applied similarly to all of the Company's senior executives) which is not cured within 15 days after receipt by the Company of written notice thereof; (iv) the relocation of the Executive's principal place of employment more than 30 miles from its location as of the Effective Date except for required travel on the Company's business; (v) assignment of duties or responsibilities to the Executive which are materially inconsistent with the provisions of this Agreement; (vi) failure to continue the Executive on the Board following his initial election or appointment to the Board or (vii) a failure by the Company to comply with any material provision of this Agreement, which failure is not cured (if capable of cure) within 15 days after receipt of written notice of such non-compliance by the Company.

(h)     Additional Payment.

(i)     If any of the payments or benefits received or to be received by the Executive in connection with a Change in Control or the Executive's termination of employment (whether pursuant to the terms of this Agreement or any other plan, arrangement or agreement with the Company, any Person whose actions result in a Change in Control or any Person affiliated with the Company or such Person) (all such payments and benefits, excluding the Gross-Up Payment, being hereinafter referred to as the "Total Payments") will be subject to the excise tax imposed under Section 4999 of the Internal Revenue Code of 1986, as amended (the "Code" and such excise tax, the "Excise Tax"), the Company shall pay to the Executive an additional amount (the "Gross-Up Payment") such that the net amount retained by the Executive, after deduction of any Excise Tax on the Total Payments and any federal, state and local income and employment taxes incurred by the Executive in connection with payment of the Gross-Up Payment, shall be equal to the Total Payments.

(ii)     For purposes of determining whether any of the Total Payments will be subject to the Excise Tax and the amount of such Excise Tax, (A) all of the Total Payments shall be treated as "parachute payments" (within the meaning of section 280G(b)(2) of the Code) unless, in the opinion of tax counsel ("Tax Counsel") reasonably acceptable to the Executive and selected by the accounting firm which was, immediately prior to the Change in Control, the Company's independent auditor (the "Auditor"), such payments or benefits (in whole or in part) do not constitute parachute payments, including by reason of section 280G(b)(4)(A) of the

12

Code, (B) all "excess parachute payments" within the meaning of section 280G(b)(l) of the Code shall be treated as subject to the Excise Tax unless, in the opinion of Tax Counsel, such excess parachute payments (in whole or in part) represent reasonable compensation for services actually rendered (within the meaning of section 280G(b)(4)(B) of the Code) in excess of the Base Amount allocable to such reasonable compensation, or are otherwise not subject to the Excise Tax, and (C) the value of any noncash benefits or any deferred payment or benefit shall be determined by the Auditor in accordance with the principles of sections 280G(d)(3) and (4) of the Code. For purposes of determining the amount of the Gross-Up Payment, the Executive shall be deemed to pay federal income tax at the highest marginal rate of federal income taxation in the calendar year in which the Gross-Up Payment is to be made and state and local income taxes at the highest marginal rate of taxation in the state and locality of the Executive's residence or the Executive's place of business, whichever is higher, on the Termination Date (or if there is not yet a Termination Date, then the date on which the Gross-Up Payment is calculated for purposes of this Section 6(h)), net of the maximum reduction in federal income taxes which could be obtained from deduction of such state and local taxes.

(iii)   In the event that the Excise Tax is finally determined to be less than the amount taken into account hereunder in calculating the Gross-Up Payment, the Executive shall repay to the Company, within five business days following the time that the amount of such reduction in the Excise Tax is finally determined, the portion of the Gross-Up Payment attributable to such reduction (including that portion of the Gross-Up Payment attributable to the Excise Tax and federal, state and local income and employment taxes imposed on the Gross-Up Payment being repaid by the Executive), to the extent that such repayment results in a reduction in the Excise Tax and a dollar-for-dollar reduction in the Executive's taxable income and wages for purposes of federal, state and local income and employment taxes, plus interest on the amount of such repayment at 120% of the rate provided in section 1274(b)(2)(B) of the Code. Notwithstanding the foregoing, in the event any portion of the amount to be repaid to the Company has been paid to any tax authority, repayment thereof shall not be required until actual refund or credit of such portion has been made to Executive, and interest payable to the Company shall not exceed the interest received or credited to Executive by such tax authority. In the event

13

that the Excise Tax is determined to exceed the amount taken into account hereunder in calculating the Gross-Up Payment (including by reason of any payment the existence or amount of which cannot be determined at the time of the Gross-Up Payment), the Company shall make an additional Gross-Up Payment in respect of such excess (including any interest, penalties or additions payable by the Executive with respect to such excess and the Gross-Up Payment attributable to the Excise Tax and federal, state, and local income and employment taxes imposed on the Gross-Up Payment being made to the Executive) within five business days following the time that the amount of such excess is finally determined.  The Executive and the Company shall each reasonably cooperate with the other in connection with any administrative or judicial proceedings concerning the existence or amount of liability for Excise Tax with respect to the Total Payments.

(iv)    The payments provided in this Section 6(h) hereof shall be made not later than the thirtieth day following the Date of Termination (or if there is no Date of Termination, then the date on which the Gross-Up Payment is calculated for purposes of this Section 6(h)) (but in no event after the last day of the calendar year following the calendar year in which the expense is incurred).

(v)    No Mitigation.  Upon termination of the Executive's employment with the Company, subject to the Executive's affirmative obligations pursuant to Section 6(c) and 6(e), the Executive shall be under no obligation to seek other employment or otherwise mitigate the obligations of the Company under this Agreement.

7.    Directors' and Officers' Insurance; Indemnification.  In addition to any rights to indemnification to which the Executive is entitled under the Company's Restated Certificate of Incorporation and Bylaws, the Company shall indemnify the Executive at all times during and after the Employment Period to the maximum extent permitted under the Delaware Business Corporation Act or any successor provision thereof, and any and all applicable state law, and shall pay the Executive's expenses (including reasonable attorneys' fees and expenses, which shall be paid in advance by the Company as incurred, subject to recoupment in accordance with applicable law) in defending any civil action, suit or proceeding in advance of the final disposition of such action, suit or proceeding to the maximum extent permitted under such applicable state laws for the Executive's action or inaction on behalf of the Company under the terms of this Agreement including but

14

not limited to any acts or alleged acts arising out of events prior to the Executive's employment by the Company which obligation shall survive the termination of the Executive's employment or the termination of the other provisions of this Agreement.

8.      Confidential Information; Removal of Documents; Non-Competition; etc.  For purposes of this Section 8, "Company" shall mean the Company, its subsidiaries and affiliates.

(a)      Confidentiality.  Except as otherwise provided in this Agreement, at all times during and after the Employment Term, the Executive shall keep secret and retain in strictest confidence, any and all Confidential Information (as defined below) relating to the Company, and shall use such Confidential Information only in furtherance of the performance by the Executive of the Executive's duties to the Company and not for personal benefit or the benefit of any interest adverse to the Company's interests.  For purposes of this Agreement, "Confidential Information" shall mean any information including without limitation plans, specifications, models, samples, data, customer lists and customer information, computer programs and documentation, and other technical and/or business information, in whatever form, tangible or intangible, that can be communicated by whatever means available at such time, that relates to the Company's current Business or future business contemplated during the Employment Period, products, services and development, or information received from others that the Company is obligated to treat as confidential or proprietary; provided, however, that such Confidential Information shall not include any information that (i) has become generally available to the public other than as a result of a disclosure by the Executive, or (ii) was available to or became known to the Executive prior to the disclosure of such information on a non-confidential basis without breach of any duty of confidentiality from any party to the Company, and the Executive shall not disclose such Confidential Information to any person or entity other than the Company, except as may be required by law or court or administrative order (in which event the Executive shall so notify the Company as promptly as practicable). Upon termination of the Executive's employment hereunder for any reason, the Executive shall return to the Company all copies, reproductions and summaries of Confidential Information in the Executive's possession and erase the same from all media in the Executive's possession, and, if the Company so requests, shall certify in writing that the Executive has done so.  All Confidential Information is and shall remain the property of the Company (or, in the case of information that the Company

15

receives from a third party which it is obligated to treat as confidential, then the property of such third party).

        (b)    <u>Non-Competition</u>.

        (i)    During the Employment Period, the Executive shall not engage in Competition (as defined below) with the Company.  For purposes of this Agreement, "Competition" by the Executive shall mean the Executive's engaging in, or otherwise directly or indirectly being employed by or acting as a consultant or lender to, or being a director, officer, employee, principal, agent, stockholder, member, owner or partner of, or permitting the Executive's name to be used in connection with the activities of any other business or organization anywhere which competes, directly or indirectly, with the Business of the Company as the same shall be constituted at the Termination Date or which, during the six-month period prior to the Executive's termination, the Company had made substantial plans with the intention of establishing operations.

        (ii)    Following termination of the Executive's employment hereunder, for the remainder of the Term as in effect immediately prior to the Termination Date, Executive shall not engage in Competition with the Company in any locality or region in which the Company had operations at the time of, or within six months prior to, the Executive's termination, or in which, during the six-month period prior to the Executive's termination, the Company had made substantial plans with the intention of establishing operations in such locality or region; provided, however, that it shall not be a violation of this sub-paragraph for the Executive to become the registered or beneficial owner of up to three percent (3%) of any class of the capital stock of a competing corporation registered under the Exchange Act, provided that the Executive does not actively participate in the business of such corporation until such time as this covenant expires.

        (c)    <u>Non-Solicitation</u>.  Following termination of the Executive's employment hereunder, for the remainder of the Term as in effect immediately prior to the Termination Date, the Executive agrees that the Executive shall not, directly or indirectly, for the Executive's benefit or for the benefit of any other person, firm or entity, engage any of the following conduct:

<div align="center">16</div>

(i)　　solicit from any customer doing business with the Company as of the Termination Date, business of the same or of a similar nature to the business of the Company with such customer;

(ii)　　solicit from any known potential customer of the Company business of the same or of a similar nature to that which has been the subject of a known written or oral bid, offer or proposal by the Company, or of substantial preparation with a view to making such a bid, proposal or offer, within six months prior to the Executive's termination;

(iii)　　solicit the employment or services of, or hire, any person who was known to be employed by or was a known consultant to the Company upon the termination of the Executive's employment, or within six months prior thereto; or

(iv)　　otherwise interfere with the business or accounts of the Company.

(d)　　Intellectual Property.  All Intellectual Property (as defined below) and Technology (as defined below) created, developed, obtained or conceived of by the Executive during the Employment Period, and all business opportunities presented to the Executive during the Employment Period, shall be owned by and belong exclusively to the Company, provided that they reasonably relate to the Business, and the Executive shall (i) promptly disclose any such Intellectual Property, Technology or business opportunity to the Company, and (ii) execute and deliver to the Company, without additional compensation, such instruments as the Company may require from time to time to evidence its ownership of any such Intellectual Property, Technology or business opportunity.  For purposes of this Agreement, (A) the term "Intellectual Property" means and includes any and all trademarks, trade names, service marks, service names, patents, copyrights, and applications therefor, and (B) the term "Technology" means and includes any and all trade secrets, proprietary information, invention, discoveries, know-how, formulae, processes and procedures.

(e)　　The Executive acknowledges that the services to be rendered by the Executive to the Company are of a special and unique character, which gives this Agreement a peculiar value to the Company, the loss of which may not be reasonably or adequately compensated for by damages in an action at law, and that a material breach or threatened breach by the Executive of any of the provisions

17

contained in this Section 8 shall cause the Company irreparable injury.  The Executive therefore agrees that the Company shall be entitled, in addition to any other right or remedy, to a temporary, preliminary and permanent injunction, without the necessity of proving the inadequacy of monetary damages or the posting of any bond or security, enjoining or restraining the Executive from any such violation or threatened violations.

(f)      The Executive further acknowledges and agrees that due to the uniqueness of the Executive's services and confidential nature of the information the Executive shall possess, the covenants set forth herein are reasonable and necessary for the protection of the business and goodwill of the Company.

(g)      <u>Continuing Operation</u>.  Any termination of the Executive's employment or of this Agreement shall have no effect on the continuing operation of this Section 8.

9.      <u>Severability</u>.  It is the desire and intent of the parties that the provisions of this Agreement shall be enforced to the fullest extent permissible under the laws and public policies applied in each jurisdiction in which enforcement is sought.  Accordingly, if any particular provision or portion of this Agreement shall be adjudicated to be invalid or unenforceable, this Agreement shall be deemed amended to delete therefrom the portion thus adjudicated to be invalid or unenforceable, such deletion to apply only with respect to the operation of such provision in the particular jurisdiction in which such adjudication is made.

10.      <u>Notices</u>.  All communications, requests, consents and other notices provided for in this Agreement shall be in writing and shall be deemed give if delivered by hand or mailed by first class mail, postage prepaid, to the last known address of the recipient.

11.      <u>Governing Law</u>.  This Agreement shall be governed by and construed and enforced in accordance with the laws of the State of Delaware, without regard to its conflicts of laws provisions.

12.      <u>Assignment</u>.  Neither this Agreement nor any rights or duties hereunder may be assigned by the Executive without the prior written consent of the Company.  The Company shall have the right at any time to assign this Agreement to its successors and assigns; provided, however, that the assignee or transferee is the successor to all or substantially all of the business and assets of the Company and

18

such assignee or transferee expressly assumes all of the obligations, duties and liabilities of the Company set forth in this Agreement.

13.      Amendments.  No provisions of this Agreement shall be altered, amended, revoked or waived except by an instrument in writing, signed by each party to this Agreement.

14.      Binding Effect.  Except as otherwise provided herein, this Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective legal representatives, heirs, successors and assigns.

15.      Execution in Counterparts.  This Agreement may be executed in any number of counterparts, each of which shall be deemed an original, but all of which together shall constituted one and the same instrument.

16.      Arbitration.  Any dispute, controversy or question arising under, out of, or relating to this Agreement (or the breach thereof), or, the Executive's employment with the Company or termination thereof, shall be referred for arbitration in the State of Michigan to a neutral arbitrator selected by the Executive and the Company and this shall be the exclusive and sole means for resolving such dispute.  Such arbitration shall be conducted in accordance with the National Rules for Resolution of Employment Disputes of the American Arbitration Association. The arbitrator shall have the discretion to award reasonable attorneys' fees, costs and expenses to the prevailing party.  Judgment upon the award rendered by the arbitrator may be entered in any court having jurisdiction thereof.

17.      Entire Agreement.  This Agreement sets forth the entire agreement and understanding of the parties and supersedes all prior understandings, agreements (including the Original Agreement) or representations by or between the parties, whether written or oral, which relate in any way to the subject matter hereof.

18.      Survivorship.  The provisions of this Agreement necessary to carry out the intention of the parties as expressed herein shall survive the termination or expiration of this Agreement.

19.      Waiver.  Except as provided herein, the waiver by either party of the other party's prompt and complete performance, or breach or violation, of any provision of this Agreement shall not operate nor be construed as a waiver of any subsequent breach or violation, and the failure by any party hereto to exercise any

19

right or remedy which it may possess hereunder shall not operate nor be construed as a bar to the exercise of such right or remedy by such party upon the occurrence of any subsequent breach or violation.

20.     Captions.  The captions of this Agreement are for convenience and reference only and in no way define, describe, extend or limit the scope or intent of this Agreement or the intent of any provision hereof.

21.     Construction.  The parties acknowledge that this Agreement is the result of arm's-length negotiations between sophisticated parties each afforded representation by legal counsel.  Each and every provision of this Agreement shall be construed as though both parties participated equally in the drafting of same, and any rule of construction that a document shall be construed against the drafting party shall not be applicable to this Agreement.

22.     Code Section 409A Payment Delay.  Notwithstanding any provision in this Agreement to the contrary, any payment triggered by a termination of employment to the extent and up to the amount necessary to ensure that such payments are not subject to penalties and interest under Code Section 409A (including but not limited to payments under Sections 6(c), (e) and (h)) shall not commence until at least six months after the Executive's termination of employment. To the extent payments under this Agreement are not exempt from Code Section 409A, and absent this provision, would be paid during the first six month period following the Executive's termination of employment, those payments shall be withheld and the amount of the payments withheld will be paid in a lump sum, without interest, during the seventh month after termination; provided that, if the Executive dies during such six-month period, any such delayed payments shall be immediately payable to the Executive's estate or representative.

20

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first above written.

By:_____
    Curtis J. Clawson

HAYES LEMMERZ INTERNATIONAL, INC.

By:_____
Name:
Title:

21

EMPLOYMENT AGREEMENT, AS AMENDED BY AMENDMENT No. 1,
AMENDMENT No. 2, AND AMENDMENT No. 3 TO EMPLOYMENT AGREEMENT

THIS AGREEMENT (the "Agreement") is made as of the ___ day of September, 2001 (the "Agreement Date"), by and between Hayes Lemmerz International, Inc. (the "Company") and Fred Bentley (the "Executive"), as amended by those certain Amendment No. 1, Amendment No. 2 dated December 30, 2008, and Amendment No. 3 dated January 7, 2009, to Employment Agreement.

WHEREAS, the Company desires to provide for the employment of the Executive on the terms and conditions set forth herein, in the best interest of the Company and its constituencies; and

WHEREAS, the Executive desires to be employed by the Company as provided herein; and

NOW, THEREFORE, in consideration of the premises and the respective covenants and agreements of the parties herein contained, the parties agree as follows:

1.      Employment.  The Company agrees to employ the Executive and the Executive agrees to be employed on a full-time basis by the Company for the period and upon the terms and conditions hereinafter set forth.

2.      Term; Employment Period.  The term of this Agreement (the "Term") shall be two years, commencing on October 22, 2001 (the "Effective Date"); provided, however, that commencing on the second day of the Term and each day thereafter, the Term shall automatically be extended for one additional day.  The period during which the Executive is employed by the Company pursuant to this Agreement is referred to herein as the "Employment Period."  The date on which the termination of the Executive's employment hereunder shall become effective is referred to herein as the "Termination Date."  Press releases related to the Executive's commencement of employment hereunder shall be subject to reasonable review and approval by the Executive.

3.      Position and Duties.  From and after January 1, 2006, the Executive shall serve as Chief Operating Officer and President, Global Wheel Group and shall have such responsibilities, duties and authority as are customarily and ordinarily exercised by executives in similar positions in similar businesses in the United States and shall exercise such responsibilities, duties and authority consistent with the foregoing as the Company's Chief Executive Officer or the Company's Board of Directors (the "Board") shall determine from time to time.  During the Employment Period, the Executive shall report to the Company's Chief Executive Officer.  The Executive shall devote substantially all his working time and efforts to the business and affairs of the Company and shall use his best efforts to carry out his responsibilities faithfully and efficiently in a professional manner.  Notwithstanding the foregoing, it is understood that during the

A-1

Employment Period, subject to any conflict of interest policies of the Company and Section 8, the Executive may (x) serve in any capacity with any civic, charitable, educational or professional organization provided that such service does not materially interfere with his duties and responsibilities hereunder and (y) make and manage personal investments of his choice, and with the prior consent of the Company's Chief Executive Officer, which shall not be unreasonably withheld, serve on the board of directors of one (1) for-profit business enterprise.

4.      Place of Performance.  During the Employment Period, the Executive's place of performance of his services shall be at the Company's Ferndale, Michigan Technical Center, except for required travel by the Executive on the Company's business or as may be reasonably required by the Company.

5.      Compensation and Benefits.

(a)      Salary.  From and after March 15, 2006, the Company shall pay to the Executive an annual base salary of Three Hundred Eighty Thousand Dollars ($380,000) (as the same may be increased from time to time, the "Base Salary"), such salary to be paid in periodic installments in accordance with the Company's payroll practices as in effect from time to time.  The Base Salary shall be reviewed annually by the compensation committee of the Board and may be increased from time to time in accordance with normal business practices of the Company and, if so increased, shall not thereafter be reduced.

(b)      Cash-Based Incentives.  During the Employment Period, the Executive shall be eligible to earn an annual bonus under the Company's Short-Term Incentive Plan, or a successor plan thereto, as in effect from time to time (the "Incentive Plan"), subject to achievement of performance goals determined in accordance with the terms of the Incentive Plan (such annual bonus, the "Annual Bonus").  Such performance goals shall include (i) a threshold level below which no Annual Bonus shall be paid, (ii) a normative level that is tied to the budget, which if obtained, would result in an Annual Bonus of one hundred percent (100%) of the Base Salary and (iii) an upside level, which if obtained, would increase the Annual Bonus to a maximum of two hundred percent (200%) of the Base Salary.  Any Annual Bonus payable to the Executive for the Company's fiscal year ending January 31, 2002 will be on a pro rata basis based upon the number of months the Executive worked for the Company during such fiscal year.  The Annual Bonus shall be payable in a cash lump sum at such time as bonuses are ordinarily paid in accordance with the terms of the Incentive Plan, but in no event later than 120 days after the end of each fiscal year of the Company.  Except as otherwise specifically provided in this Agreement, the Executive shall only be eligible to receive the Annual Bonus if the Executive is employed by the Company through the last day of February in the year in which the Annual Bonus is to be paid.

(c)      Sign-On/Retention Bonus. Within one (1) day after the Agreement Date, the Company shall pay the Executive a one-time sign-on/retention bonus of six hundred thousand dollars ($600,000) (the "Sign-on/Retention Bonus"), which will result in an after-tax payment to the Executive of $393,115 (the "After-Tax Retention Bonus Payment Amount").  The Sign-on/Retention Bonus is being paid on the condition that the Executive remains in the employ

A-2

of the Company for a period of not less than three (3) years and, accordingly, the after-tax portion of the Sign-on/Retention Bonus shall be subject to the set-off and repayment provisions set forth in Section 6(f).

          (d)      <u>Equity-Based Incentives</u>.

          (i)      <u>Initial Option Grant</u>.  The Company shall, effective as of the Effective Date, grant to the Executive an option (the "Initial Option") pursuant to the Company's 1996 Stock Option Plan or otherwise (the "Option Plan") to purchase up to ninety thousand (90,000) shares of the Company's common stock, par value $0.01 per share ("Common Stock").  The Initial Option shall consist of the maximum number of incentive stock options as permitted by the Internal Revenue Code of 1986, as amended. The Initial Option shall be evidenced by an agreement containing such terms and conditions as the Board shall determine are necessary and desirable, consistent with the terms of the Option Plan; provided, however, that the Initial Option shall:

          (1)      have a per share exercise price equal to the closing price of the Common Stock on the New York Stock Exchange ("NYSE") as of the Effective Date;

          (2)      become cumulatively vested and exercisable with respect to twenty percent (20%) of the shares covered thereby on each of the first five anniversaries of the Effective Date;

          (3)      become fully vested and exercisable with respect to one-hundred percent (100%) of the shares covered thereby upon the occurrence of a Change in Control (as defined below);

          (4)      upon a termination of employment hereunder either by (w) death, pursuant to Section 6(b), (x) Disability, pursuant to Section 6(c), (y) the Company without Cause, pursuant to Section 6(e) or (z) the Executive for Good Reason, pursuant to Section 6(e), become vested with respect to:

- sixty percent (60%) of the shares covered thereby if such termination occurs during the one year period commencing on the first anniversary of the Effective Date,

- eighty percent (80%) of the shares covered thereby if such termination occurs during the one year period commencing on the second anniversary of the Effective Date and

- one hundred percent (100%) of the shares covered thereby if such termination occurs any time on or after the third anniversary of the Effective Date; and

A-3

(5)     notwithstanding the vesting and exercise period stated in such Initial Option or the Option Plan, the Executive shall have not less than a period expiring seven months following the Termination Date to exercise such Initial Option.

For purposes of this Agreement, a Change in Control shall be deemed to have occurred upon the first of the following to occur:

(1)     any Person (within the meaning of Section 3(a)(9) of the Securities and Exchange Act of 1934, as amended (the "Exchange Act"), as modified and used in Sections 13(d) and 14(d) thereof), other than Joseph Littlejohn & Levy Fund II, L.P. (or any affiliate (within the meaning of Regulation D Rule 501(b) under the Securities Act of 1933, as amended (the "Securities Act")) thereof), TSG Capital Fund II, L.P. (or any affiliate thereof), or Canadian Imperial Bank of Commerce (or affiliate thereof) (such entitles, collectively, the "JLL Group"), is or becomes the "Beneficial Owner" (within the meaning of Rule 13d-3 under the Exchange Act) of fifty percent (50%) or more of either (1) the then-outstanding Common Stock or (2) the combined voting power of the then-outstanding voting securities of the Company entitled to vote generally in the election of directors;

(2)     the following individuals cease for any reason to constitute a majority of the number of directors then serving:  individuals who, as of the Effective Date, constitute the Board and any new director (other than a director whose initial assumption of office is in connection with an actual or threatened election contest, including but not limited to a consent solicitation, relating to the election of directors of the Company) whose appointment or election by the Board or nomination for election by the Company's stockholders was approved or recommended by a vote of at least a majority of the directors then still in office who either were directors on the date hereof or whose appointment, election or nomination for election was previously so approved or recommended;

(3)     there is consummated a merger or consolidation of the Company or any direct or indirect subsidiary of the Company with any other corporation, other than a merger or consolidation which would result in the voting securities of the Company outstanding immediately prior to such merger or consolidation continuing to represent (either by remaining outstanding or by being converted into voting securities of the surviving entity or any parent thereof) at least fifty percent (50%) of the combined voting power of the securities of the Company or such surviving entity or any parent thereof outstanding immediately after such merger or consolidation, provided, however, that it shall not be a Change in Control under this clause (C) if (i) directors appointed or nominated by the JLL Group or any constituent member thereof continue immediately following such transaction to constitute a majority of the Board and (ii) the JLL Group or

A-4

any constituent member thereof continues immediately following such transaction to own securities representing at least thirty-five percent (35%) of the combined voting power of the securities of the Company or such surviving entity or any parent thereof outstanding immediately after such merger or consolidation; or

(4)    the stockholders of the Company approve a plan of complete liquidation or dissolution of the Company or there is consummated an agreement for the sale or disposition by the Company of all or substantially all of its assets.

(ii)    <u>Additional Option Grants</u>.  Based upon the Executive's performance and annual review, the Executive shall be eligible during the Employment Period to receive additional stock option grants in such amounts and subject to such terms and conditions as the compensation committee of the Board shall determine in its sole discretion are necessary and desirable.

(iii)    <u>Antidilution</u>.  In addition to the antidilution provision contained in the Option Plan, in the event that during the employment period the Company shall issue shares of Common Stock in one transaction or a series of similar transaction in an amount exceeding five percent (5%) of the then outstanding shares of Common Stock, other than (i) as a result of stock split, stock dividend or similar transaction, (ii) upon the conversion of shares of Non-Voting Common Stock, par value $.01 per share, of the Company that are outstanding as of the Agreement Date, (iii) upon the exercise of warrants to purchase shares of Common Stock that are outstanding as of the Agreement Date or (iv) upon the exercise of employee stock options (each, an "Additional Issuance"), the Company shall grant to the Executive an option (the "Antidilution Option") pursuant to the Option Plan to purchase the number of shares of Common Stock necessary to cause the percentage of the outstanding shares of Common Stock subject to the Initial Option and the Antidilution Option to be equal to the percentage of the outstanding shares of Common Stock subject to the Initial Option immediately prior to such additional issuance of shares of Common Stock.  The Antidilution Option shall be granted contemporaneously with the Additional Issuance, and the per share exercise price of the Additional Option shall be equal to the per share consideration received by the Company in such Additional Issuance, as determined by the Board.

(e)    <u>Expenses</u>.  During the Employment Period, the Company shall promptly reimburse the Executive for all reasonable out-of-pocket expenses incurred by the Executive in connection with the business of the Company and the performance of his duties under this Agreement in accordance with the terms of the Company's policies as in effect from time to time.

(f)    <u>Benefit Plans</u>.  During the Employment Period, the Executive shall be entitled to participate in all of the employee benefit plans, programs, agreements and arrangements provided to senior executives of the Company, as such are in effect from time to time, on a basis no less favorable than that provided to such senior executives; <u>provided</u>, <u>however</u>,

that health care insurance coverage shall commence the first day of the month following thirty (30) days after the Effective Date and the Company shall reimburse the Executive for all COBRA premiums paid by the Executive or medical costs actually incurred by the Executive or the Executive's dependents during the period commencing on the Effective Date and ending on the date health care coverage is made available to the Executive. In addition, for any welfare benefit provided by the Company such as short term disability benefits which depends upon the Executive's years of service in order to provide the maximum level of benefits coverage, the Executive shall be deemed to have the requisite years of service in order to receive the maximum level of benefits coverage.

(g)        Perquisites. During the Employment Period, the Executive shall be entitled to a Company car, and an annual executive physical examination, each such perquisite to be paid or provided commensurate with his position and in accordance with the Company's policies as in effect on the Amendment Date. In addition, the Company shall pay Executive an annual flexible benefits allowance (the "Flexible Benefits Allowance") of Thirty Five Thousand Dollars ($35,000), such allowance to be paid in periodic installments in accordance with the Company's payroll practices as in effect from time to time. The Flexible Benefits Allowance shall be reviewed annually by the Compensation Committee of the Board and may be increased from time to time and, if so increased, shall not thereafter be reduced.

(h)        Vacations. During the Employment Period, the Executive shall be entitled to vacation time, paid holidays and personal days, determined in accordance with the Company's policy with respect to its senior executives as in effect from time to time, it being understood that the Executive shall be entitled to two (2) weeks vacation in 2001 and not less than four weeks' vacation in any 12-month period during the Employment Period thereafter.

(i)        Relocation. The Executive shall be entitled to the relocation benefits described on Attachment A hereto (and any subsequent enhancements thereto).

6.        Termination of Employment.

(a)        Accrued Benefits. In the event of the termination of the Executive's employment hereunder for any reason, the Executive (or his estate or representative, as applicable) shall be entitled to receive any Base Salary, Annual Bonus, vacation time and expenses that have in each case accrued but are unpaid as of the Termination Date, vested options as well as any post-termination benefits to which he may be entitled pursuant to the Company's retirement, insurance and other benefit plans, programs and arrangements as in effect immediately prior to the Termination Date (the "Accrued Benefits").

(b)        Death. The Executive's employment hereunder shall terminate as of the date of his death. Upon the termination of the Executive's employment hereunder because of his death, the Executive's estate or representative, as the case may be, shall be entitled to receive the Accrued Benefits and a lump sum payment in cash equal to (i) one year's Base Salary as in effect on the Termination Date and (ii) the product of (x) one hundred percent (100%) of the Base Salary as in effect on the Termination Date, multiplied by a fraction (y) the numerator of

A-6

which shall be the number of months (including fractions thereof) worked by the Executive during the Company's fiscal year in which the Termination Date occurs and (z) the denominator of which shall be the number 12 (such amount under this clause (ii), the "Pro Rata Annual Bonus").  Such amounts shall be paid as soon as administratively feasible following the Executive's death but in no event later than April 15 of the calendar year following the Executive's death.  In addition, those immediate family members who were participating in the Company's medical benefit plan as of the date of the Executive's death shall continue to participate in the Company's medical benefit plan at active employee contribution rates for the one-year period immediately following the date of the Executive's death.

(c)    Disability.  The Executive's employment hereunder may be terminated during the Employment Period if the Executive is incapable of performing his principal duties hereunder because of physical or mental incapacity for a period of 45 consecutive working days or for more than 90 working days in any 12-month period ("Disability").  In the event that the Executive's employment is to be terminated pursuant to this Section 6(c), (i) this Agreement shall terminate on the date specified in the notice of termination delivered to the Executive (subject to Section 8(g) and Section 18); (ii) the Executive shall as of such date resign from all of his positions, duties and authorities hereunder; (iii) the Executive shall be placed on a medical leave of absence until the earlier of (A) expiration of the six-month period commencing on the date his medical leave of absence began, unless there is no reasonable expectation that the Executive will return to employment with the Company, in which case the date the Executive ceases performing services for the Company, (B) the date he qualifies for benefits under the Company's long-term disability plan or (C) the date he is able to return to work; and (iv) the Executive shall continue to be paid his Base Salary until such medical leave of absence ends.  In the case of a termination of the Executive's employment pursuant to this Section 6(c), for purposes of calculating benefits pursuant to clauses (B) and (C) below the Termination Date shall be the date upon which the Executive's medical leave of absence commences, and for all other purposes, the Termination Date shall be the date upon which the Executive's medical leave of absence ends.  In the event the Executive's employment is terminated pursuant to this Section 6(c), the Executive (or his representative, as applicable) shall be entitled to:  (A) the Accrued Benefits; (B) a lump sum payment in cash equal to one year's Base Salary and Flexible Benefits Allowance as in effect on the Termination Date; (C) the Pro Rata Annual Bonus; and (D) the continuation of health and welfare benefits at the levels in effect as of the Termination Date at no additional cost to the Executive than that which was in effect as of the Termination Date for the one-year period immediately following the Termination Date;  provided, however, that such benefits shall be reduced to the extent comparable benefits are made available to the Executive from a successor employer, and the Executive shall be obligated to report such benefits to the Company.  The amounts payable pursuant to clauses (B) and (C) of the preceding sentence shall be paid in the month following the Executive's Termination Date.  It is acknowledged and agreed by the Executive that he shall be precluded from terminating his employment hereunder for Good Reason in the event that his employment hereunder is terminated pursuant to this Section 6(c).

(d)    For Cause; Without Good Reason.  The Executive's employment hereunder may be terminated during the Employment Period (i) by the Company for Cause (as defined below) or (ii) by the Executive without Good Reason (as defined below).  In the event

that the Company terminates the Executive's employment hereunder for Cause, the Termination Date shall be the date specified in the notice of termination for Cause delivered by the Company to the Executive.  In the event that the Executive terminates his employment hereunder without Good Reason, the Termination Date shall be no earlier than 30 days following the date on which a notice of termination is delivered by the Executive to the Company.  In the event that the Executive's employment hereunder is terminated pursuant to this Section 6(d), the Executive shall be entitled to the Accrued Benefits.

(e)      Without Cause; For Good Reason. The Executive's employment hereunder may be terminated during the Employment Period (i) by the Company without Cause or (ii) by the Executive for Good Reason.  In the event that the Executive's employment is terminated pursuant to this Section 6(e) (whether by the Company or by the Executive), the Termination Date shall be no earlier than 30 days following the date on which a notice of termination is delivered by one party to the other.  In the event that the Executive's employment is terminated pursuant to this Section 6(e), the Executive (or his estate or representative, as the case may be) shall be entitled to receive the Accrued Benefits.   The Executive (or his estate or representative, as the case may be) shall be entitled to the following severance benefits (A) a lump sum payment in cash equal to one year's Base Salary and Flexible Benefits Allowance as in effect on the Termination Date; (B) the Pro Rata Annual Bonus; and (C) the title to the Executive's Company vehicle.  The benefits described in the preceding sentence shall be paid in the month following the Executive's Termination Date.  Severance benefits provided to the Executive under this paragraph shall also include:  (x) continuation of health and welfare benefits for one year at the levels in effect as of the Termination Date at no additional cost to the Executive than that which was in effect as of the Termination Date; provided, that such benefits shall be reduced to the extent comparable benefits are made available to the Executive from a successor employer, and the Executive shall be obligated to report such benefits to the Company; and (y) executive level career outplacement services for the period beginning on the Termination Date and ending December 31 of second calendar year following termination by a mutually agreeable outplacement firm and paid for as incurred by the Company.

(f)      Set-Off and Reimbursement of Sign-On/Retention Bonus. Notwithstanding anything to the contrary contained herein, if the Executive does not commence employment with the Company on or before the Effective Date, (i) the full amount of the Sign-On/Retention Bonus shall be repaid by the Executive to the Company no later than three days after the Effective Date, and (ii) the Executive shall pay the Company's expenses (including reasonable attorney's fees and expenses) incurred in recovering the Sign-On/Retention Bonus from the Executive.  In addition, notwithstanding anything to the Contrary contained herein, in the event that, during the initial three-year period of the Term, without taking into account any extensions thereof, the Executive's employment hereunder is terminated by (i) by the Company For Cause pursuant to Section 6(d) or by the Executive without Good Reason pursuant to Section 6(d), then and only then, the Company shall have the right to set-off the Repayment Amount (as defined below) against any payments due to the Executive hereunder and the Executive shall immediately repay to the Company the balance, if any, of the Repayment Amount that is not set-off by the Company pursuant to this Section 6(f).  For purposes of this Agreement, the "Repayment Amount" shall equal the product of (i) the After-Tax Retention Payment Amount

A-8

multiplied by (ii) a fraction (A) the numerator of which is the difference between 1,095 less the number of days the Executive has been employed by the Company and (B) the denominator of which is 1,095 (Repayment Amount = $393,115 x (1,095 - numbers of day employed) / 1,095).

<div align="center">(g)    <u>Definition of "Cause" and "Good Reason"</u>.</div>

For purposes of this Agreement, "Cause" means:  (i) the willful failure of the Executive to perform his material duties with the Company which have been duly assigned to the Executive and which duties are commensurate with those of the position for which Executive is then employed, and which failure is not cured (if capable of cure) within 15 days after receipt of written notice of such failure, which notice identifies the manner in which the Executive has willfully failed to perform, (ii) the engaging by the Executive in willful conduct which is demonstrably injurious to the Company, monetarily or otherwise, (iii) the conviction of the Executive of any crime or offense constituting a felony, or (iv) a failure by the Executive to comply with any material provision of this Agreement, which failure is not cured (if capable of cure) within 15 days after receipt of written notice of such non-compliance by the Executive. Termination of the Executive for Cause shall mean termination by action of at least a majority of the Company's Board of Directors, at a meeting duly called and held upon at least 15 days' written notice to the Executive specifying the particulars of the action or inaction alleged to constitute Cause and at which meeting the Executive and his counsel were entitled to be present and given adequate opportunity to be heard.  For purposes of clauses (i) and (ii) of this definition, action or inaction by the Executive shall not be considered "willful" unless done or omitted by him (A) intentionally or not in good faith and (B) without reasonable belief that his action or inaction was in the best interest of the Company, and shall not include failure to act by reason of total or partial incapacity due to physical or mental illness.

For purposes of this Agreement, "Good Reason" means:  (i) a material adverse alteration in the nature or status of the Executive's position, duties, responsibilities or authority from those in effect as of the Effective Date; (ii) a material reduction in the Executive's Base Salary or level of employee benefits (other than across-the-board reductions applied similarly to all of the Company's senior executives occurring after the second anniversary of the Effective Date); (iii) failure to pay or provide any of the compensation set forth in this Agreement (except for an across-the-board deferral of compensation applied similarly to all of the Company's senior executives occurring after the second anniversary of the Effective Date) which is not cured within 15 days after receipt by the Company of written notice thereof; (iv) the relocation of the Executive's principal place of employment more than 30 miles from its location as of the Effective Date except for required travel on the Company's business; (v) assignment of duties or responsibilities to the Executive which are materially inconsistent with the provisions of this Agreement; or (vi) a failure by the Company to comply with any material provision of this Agreement, which failure is not cured (if capable of cure) within 15 days after receipt of written notice of such non-compliance by the Company; (vii) if Curtis J. Clawson is no longer serving as President and Chief Executive Officer of the Company and the Executive is not offered the position of President and Chief Executive Officer; or (viii) if a Substantial Asset Sale shall occur with respect to the Global Wheel Group, but only if the Executive is not offered additional responsibilities reasonably commensurate with his responsibilities related to the operations

<div align="center">A-9</div>

involved in such Substantial Asset Sale. For purposes of the foregoing clause (viii), a "Substantial Asset Sale" shall mean the sale or other disposition to any entity that is not an Affiliate of the Company of the assets, stock or other ownership interests, either as the result of a single transaction or a series of transactions, of either all of the steel wheel operations of the Global Wheel Group or all of the aluminum wheel operations of the Global Wheel Group. For purposes of this definition, "Affiliate" shall mean any entity controlling, controlled by or under common control with the Company.

(h)    Change in Control Severance Provisions. The provisions set forth in Attachment B hereto are hereby incorporated into this Agreement. The Executive hereby acknowledges that in the event he becomes entitled to the payment set forth in Section 6.1(A) of Attachment B hereto, that such payment will be in lieu of any other payments to be made pursuant to the terms of this Agreement.

(i)    Release Agreement. Notwithstanding anything to the contrary contained in this Section 6, the Executive shall be required to execute the Company's then current standard release agreement as a condition to receiving any of the payments and benefits provided for in this Section 6 or Attachment B. It is acknowledged and agreed that the then current standard release agreement shall be a mutual release and shall not diminish or terminate Executive's rights under this Agreement including, but not limited to, those delineated in Sections 6(j), 7 and 16 herein. The time period for executing such release (and the period available to revoke it) shall be in accordance with the Company's then current standard practice but in no event shall the execution and revocation periods extend beyond the six month anniversary of the Executive's Termination Date.

(j)    No Mitigation. Upon termination of the Executive's employment with the Company, subject to the Executive's affirmative obligations pursuant to Section 6(c) and 6(e), the Executive shall be under no obligation to seek other employment or otherwise mitigate the obligations of the Company under this Agreement.

7.    Directors' and Officers' Insurance; Indemnification. In addition to any rights to indemnification to which the Executive is entitled under the Company's Restated Certificate of Incorporation and Bylaws, the Company shall indemnify the Executive at all times during and after the Employment Period to the maximum extent permitted under the Delaware Business Corporation Act or any successor provision thereof, and any and all applicable state law, and shall pay the Executive's expenses (including reasonable attorneys' fees and expenses, which shall be paid in advance by the Company as incurred, subject to recoupment in accordance with applicable law) in defending any civil action, suit or proceeding in advance of the final disposition of such action, suit or proceeding to the maximum extent permitted under such applicable state laws for the Executive's action or inaction on behalf of the Company under the terms of this Agreement including but not limited to any acts or alleged acts arising out of events prior to the Executive's employment by the Company which obligation shall survive the termination of the Executive's employment or the termination of the other provisions of this Agreement.

A-10

8.    Confidential Information; Removal of Documents; Non-Competition; etc. For purposes of this Section 8, "Company" shall mean the Company, its subsidiaries and affiliates.

(a)    Confidentiality.  Except as otherwise provided in this Agreement, at all times during and after the Employment Term, the Executive shall keep secret and retain in strictest confidence, any and all Confidential Information (as defined below) relating to the Company, and shall use such Confidential Information only in furtherance of the performance by the Executive of the Executive's duties to the Company and not for personal benefit or the benefit of any interest adverse to the Company's interests.  For purposes of this Agreement, "Confidential Information" shall mean any information including without limitation plans, specifications, models, samples, data, customer lists and customer information, computer programs and documentation, and other technical and/or business information, in whatever form, tangible or intangible, that can be communicated by whatever means available at such time, that relates to the Company's current Business or future business contemplated during the Employment Period, products, services and development, or information received from others that the Company is obligated to treat as confidential or proprietary; provided, however, that such Confidential Information shall not include any information that (i) has become generally available to the public other than as a result of a disclosure by the Executive, or (ii) was available to or became known to the Executive prior to the disclosure of such information on a non-confidential basis without breach of any duty of confidentiality from any party to the Company, and the Executive shall not disclose such Confidential Information to any person or entity other than the Company, except as may be required by law or court or administrative order (in which event the Executive shall so notify the Company as promptly as practicable).  Upon termination of the Executive's employment hereunder for any reason, the Executive shall return to the Company all copies, reproductions and summaries of Confidential Information in the Executive's possession and erase the same from all media in the Executive's possession, and, if the Company so requests, shall certify in writing that the Executive has done so.  All Confidential Information is and shall remain the property of the Company (or, in the case of information that the Company receives from a third party which it is obligated to treat as confidential, then the property of such third party).

(b)    Non-Competition.

(i)    During the Employment Period, the Executive shall not engage in Competition (as defined below) with the Company.  For purposes of this Agreement, "Competition" by the Executive shall mean the Executive's engaging in, or otherwise directly or indirectly being employed by or acting as a consultant or lender to, or being a director, officer, employee, principal, agent, stockholder, member, owner or partner of, or permitting the Executive's name to be used in connection with the activities of any other business or organization anywhere which competes, directly or indirectly, with the Business of the Company as the same shall be constituted at the Termination Date or which, during the six-month period prior to the Executive's termination, the Company had made substantial plans with the intention of establishing operations.

(ii)    For the one year period commencing on the Termination Date, the Executive shall not engage in Competition with the Company in any locality or

A-11

region in which the Company had operations at the time of, or within six months prior to, the Executive's termination, or in which, during the six-month period prior to the Executive's termination, the Company had made substantial plans with the intention of establishing operations in such locality or region; provided, however, that it shall not be a violation of this sub-paragraph or the sub-paragraph hereinabove for the Executive to be or become the registered or beneficial owner of up to three percent (3%) of any class of the capital stock of a competing corporation registered under the Exchange Act, provided that the Executive does not actively participate in the business of such corporation until such time as this covenant expires.

(c)    Non-Solicitation.  For the one year period commencing on the Termination Date, the Executive agrees that the Executive shall not, directly or indirectly, for the Executive's benefit or for the benefit of any other person, firm or entity, engage any of the following conduct:

(i)    solicit from any customer doing business with the Company as of the Termination Date, business of the same or of a similar nature to the business of the Company with such customer;

(ii)    solicit from any known potential customer of the Company business of the same or of a similar nature to that which has been the subject of a known written or oral bid, offer or proposal by the Company, or of substantial preparation with a view to making such a bid, proposal or offer, within six months prior to the Executive's termination;

(iii)    solicit the employment or services of, or hire, any person who was known to be employed by or was a known consultant to the Company upon the termination of the Executive's employment, or within six months prior thereto; or

(iv)    otherwise interfere with the business or accounts of the Company.

(d)    Intellectual Property.  All Intellectual Property (as defined below) and Technology (as defined below) created, developed, obtained or conceived of by the Executive during the Employment Period, and all business opportunities presented to the Executive during the Employment Period, shall be owned by and belong exclusively to the Company, provided that they reasonably relate to the Business, and the Executive shall (i) promptly disclose any such Intellectual Property, Technology or business opportunity to the Company, and (ii) execute and deliver to the Company, without additional compensation, such instruments as the Company may require from time to time to evidence its ownership of any such Intellectual Property, Technology or business opportunity.  For purposes of this Agreement, (A) the term "Intellectual Property" means and includes any and all trademarks, trade names, service marks, service names, patents, copyrights, and applications therefor, and (B) the term "Technology" means and includes any and all trade secrets, proprietary information, invention, discoveries, know-how, formulae, processes and procedures.

(e)     The Executive acknowledges that the services to be rendered by the Executive to the Company are of a special and unique character, which gives this Agreement a peculiar value to the Company, the loss of which may not be reasonably or adequately compensated for by damages in an action at law, and that a material breach or threatened breach by the Executive of any of the provisions contained in this Section 8 shall cause the Company irreparable injury.  The Executive therefore agrees that the Company shall be entitled, in addition to any other right or remedy, to a temporary, preliminary and permanent injunction, without the necessity of proving the inadequacy of monetary damages or the posting of any bond or security, enjoining or restraining the Executive from any such violation or threatened violations.

(f)     The Executive further acknowledges and agrees that due to the uniqueness of the Executive's services and confidential nature of the information the Executive shall possess, the covenants set forth herein are reasonable and necessary for the protection of the business and goodwill of the Company.

(g)     Continuing Operation.  Any termination of the Executive's employment or of this Agreement shall have no effect on the continuing operation of this Section 8.

9.     Severability.  It is the desire and intent of the parties that the provisions of this Agreement shall be enforced to the fullest extent permissible under the laws and public policies applied in each jurisdiction in which enforcement is sought.  Accordingly, if any particular provision or portion of this Agreement shall be adjudicated to be invalid or unenforceable, this Agreement shall be deemed amended to delete therefrom the portion thus adjudicated to be invalid or unenforceable, such deletion to apply only with respect to the operation of such provision in the particular jurisdiction in which such adjudication is made.

10.     Notices.  All communications, requests, consents and other notices provided for in this Agreement shall be in writing and shall be deemed give if delivered by hand or mailed by first class mail, postage prepaid, to the last known address of the recipient.

11.     Governing Law.  This Agreement shall be governed by and construed and enforced in accordance with the laws of the State of Delaware, without regard to its conflicts of laws provisions.

12.     Assignment.  Neither this Agreement nor any rights or duties hereunder may be assigned by the Executive without the prior written consent of the Company.  The Company shall have the right at any time to assign this Agreement to its successors and assigns; provided, however, that the assignee or transferee is the successor to all or substantially all of the business and assets of the Company and such assignee or transferee expressly assumes all of the obligations, duties and liabilities of the Company set forth in this Agreement.

13.     Amendments.  No provisions of this Agreement shall be altered, amended, revoked or waived except by an instrument in writing, signed by each party to this Agreement.

A-13

14.    Binding Effect.  Except as otherwise provided herein, this Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective legal representatives, heirs, successors and assigns.

15.    Execution in Counterparts.  This Agreement may be executed in any number of counterparts, each of which shall be deemed an original, but all of which together shall constituted one and the same instrument.

16.    Arbitration.  Any dispute, controversy or question arising under, out of, or relating to this Agreement (or the breach thereof), or, the Executive's employment with the Company or termination thereof, shall be referred for arbitration in the State of Michigan to a neutral arbitrator selected by the Executive and the Company and this shall be the exclusive and sole means for resolving such dispute.  Such arbitration shall be conducted in accordance with the National Rules for Resolution of Employment Disputes of the American Arbitration Association.  The arbitrator shall have the discretion to award reasonable attorneys' fees, costs and expenses to the prevailing party.  Judgment upon the award rendered by the arbitrator may be entered in any court having jurisdiction thereof.

17.    Entire Agreement.  This Agreement sets forth the entire agreement and understanding of the parties and supersedes all prior understandings, agreements or representations by or between the parties, whether written or oral, which relate in any way to the subject matter hereof.

18.    Survivorship.  The provisions of this Agreement necessary to carry out the intention of the parties as expressed herein shall survive the termination or expiration of this Agreement.

19.    Waiver.  Except as provided herein, the waiver by either party of the other party's prompt and complete performance, or breach or violation, of any provision of this Agreement shall not operate nor be construed as a waiver of any subsequent breach or violation, and the failure by any party hereto to exercise any right or remedy which it may possess hereunder shall not operate nor be construed as a bar to the exercise of such right or remedy by such party upon the occurrence of any subsequent breach or violation.

20.    Captions.  The captions of this Agreement are for convenience and reference only and in no way define, describe, extend or limit the scope or intent of this Agreement or the intent of any provision hereof.

21.    Construction.  The parties acknowledge that this Agreement is the result of arm's-length negotiations between sophisticated parties each afforded representation by legal counsel.  Each and every provision of this Agreement shall be construed as though both parties participated equally in the drafting of same, and any rule of construction that a document shall be construed against the drafting party shall not be applicable to this Agreement.

A-14

A-15

22.    <u>Code Section 409A Payment Delay</u>.  Notwithstanding any provision in this Agreement (or the attached Severance Agreement) to the contrary, any payment triggered by a termination of employment to the extent and up to the amount necessary to ensure that such payments are not subject to penalties and interest under Code Section 409A (including but not limited to payments under Sections 6(c) and (e), and Severance Agreement Sections 6.1(A), 6.1(D) and 6.3) shall not commence until at least six months after the Executive's termination of employment.  To the extent such payments, absent this provision, would be paid during the first six month period following the Executive's termination of employment, those payments shall be withheld and the amount of the payments withheld will be paid in a lump sum, without interest, during the seventh month after termination; provided that, if the Executive dies during such six-month period, any such delayed payments shall be immediately payable to the Executive's estate or representative.

A-15

A-16

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first above written.

By:_____
    Fred Bentley


HAYES LEMMERZ INTERNATIONAL,  INC.


By:_____
Name:  Curtis J. Clawson
Title:   President and Chief Executive Officer

A-16

*Attachment* **A**

## SUMMARY OF RELOCATION PROVISIONS

In principle, the Company will arrange and/or reimburse the cost of the following items arising from your relocation area to the Northville/Detroit area.

1.      The Company will arrange transportation of personal and household effects to include packing, unpacking, transportation, insurance, storage, etc. Excluded from this provision would be unusual personal items such as boats, travel trailers, etc. **Contact Jim Mullins in Northville, MI at (734) 737-5195 to arrange your move.**

2.      The Company will reimburse expenses in the event of having to be in temporary accommodations for a period of up to ninety (90) days, if necessary.

3.      One (1) round trip extended three (3) day weekend to your place of residence every third week during the above described temporary living period.

4.      You will be reimbursed for up to 2 three-day house hunting trips for your spouse.

5.      Providing you currently own or are buying your principle residence, in the event you sell your current residence, the Company will reimburse you for normal closing cost expenses, real estate commission, and legal fees, but excluding points. **At the time you are listing your property and prior to contacting realtors, please contact Tom Noteman (also in Northville) at 734-737-5170.** He will provide you with information regarding marketing assistance of the sale of your residence.

6.      Provided that you currently own or are buying your current principle residence, should you elect to purchase a home at your new location during your first year of employment, the Company will reimburse you for most closing cost related expenses, but excluding, in most cases, mortgage origination fees and points.

7.      Should you purchase a home in the Northville/Detroit area during your first year of employment, payment of the equivalent of one-month's base salary for incidental expenses incurred in connection with relocation will be issued by the Company.  You will not be required to submit receipts.  This allowance is paid in lump sum at the time you relocate your principle residence to the new work location.  This incidental expense allowance will be treated as ordinary income and not grossed up.

8.      Home warranties and repairs to either residence required for loan approvals are not included.

A-17

A-18

9.    The Company will "gross up" the taxable portion of your relocation costs according to the Company's formula (except as indicated in item 7 above).

10.    You will be eligible to receive the benefits under the Company's Home Purchase Program which is currently being established that will provide a buy-out after 120 days.

A-18

*Attachment* **B**

SEVERANCE AGREEMENT

1. <u>Defined Terms</u>.  Unless otherwise defined in this Attachment B, the terms that are defined in the Employment Agreement (the "Employment Agreement") shall have the same meanings when used herein as that are ascribed to such terms in the Employment Agreement.

2. <u>Term of Agreement</u>.  The Term of this Agreement shall commence on the Effective Date hereof and shall continue in effect through the third anniversary thereof; <u>provided</u>, <u>however</u>, that commencing on the first anniversary of the Effective Date and each anniversary thereafter (each such date a "Renewal Date"), the Term shall automatically be extended for one additional year unless, on or prior to such Renewal Date, the Company or the Executive shall have given notice not to extend the Term; and <u>further</u> <u>provided</u>, <u>however</u>, that if a Change in Control shall have occurred during the Term, the Term shall expire no earlier than twenty-four (24) months beyond the month in which such Change in Control occurred.

3. <u>Immediate Effect of Change in Control</u>.  Promptly following a Change in Control, but in no event later than April 15 of the calendar year following the Change in Control, the Executive shall be entitled to the immediate payment of all unpaid compensation amounts (including the pro rata bonus payment for the current fiscal year under any bonus plan for which he is eligible ("Pro-rata Bonus") and all unpaid bonuses with respect to any prior fiscal year) with respect to the Executive's employment.  For purposes of this Section 3, Pro-rata Bonus shall be an amount equal to the product of (1) the product of (x) the Executive's base salary as in effect immediately prior to the Change in Control and (y) the greater of (A) the Executive's normative bonus percentage for the fiscal year in which the Change in Control occurs and (B) the Executive's estimated bonus percentage calculated in good faith by the Company's Finance Department determined by projecting performance through the end of the fiscal year in which the Change in Control occurs and (2) a fraction, the numerator of which is the number of days in the fiscal year in which the Change in Control occurs through the date of the Change in Control, and the denominator of which is 365.  The Pro-rata Bonus paid shall be subtracted from the amount otherwise due the Executive as a bonus for the fiscal year in which the Change in Control occurs, but such Pro-rata Bonus becomes a vested benefit upon a Change in Control and in no event shall the Executive have to repay all or any portion of the Pro-rata Bonus.

4. <u>Company's Covenants Summarized</u>.  In order to induce the Executive to remain in the employ of the Company, the Company agrees, under the conditions described herein, to pay the Executive the Severance Payments and the other payments and benefits described herein.  Except as provided in Section 9.1 hereof, no Severance Payments shall be payable under this Agreement unless there shall have been (or, under the terms of the second sentence of Section 6.1 hereof, there shall be deemed to have been) a termination of the Executive's employment with the Company on or following a Change in Control and during the Term.  This Agreement shall not be construed as creating an express or implied contract of employment and, except as otherwise agreed in writing between the Executive and the Company, the Executive shall not have any right to be retained in the employ of the Company.

5. <u>Compensation Other Than Severance Payments</u>.

5.1  Following a Change in Control and during the Term, during any period that the Executive fails to perform the Executive's full-time duties with the Company as a result of incapacity due to physical or mental illness, the Company shall pay the Executive's full salary to the Executive at the rate in effect at the commencement of any such period, together with all compensation and benefits payable to the Executive under the terms of any compensation or benefit plan, program or arrangement (other than the Company's short- or long-term disability plan, as applicable, to the extent such benefits would be duplicative and their nonpayment would not prejudice Executive's future entitlement to benefits) maintained by the Company during such period, until the Executive's employment is terminated by the Company for Disability.

5.2  If the Executive's employment shall be terminated for any reason on or following a Change in Control and during the Term, the Company shall pay the Executive's full salary to the Executive through the Date of Termination at the rate in effect immediately prior to the Date of Termination or, if higher, the rate in effect immediately prior to the first occurrence of an event or circumstance constituting Good Reason, together with all compensation and benefits payable to the Executive through the Date of Termination under the terms of the Company's compensation and benefit plans, programs or arrangements as in effect immediately prior to the Date of Termination or, if more favorable to the Executive, as in effect immediately prior to the first occurrence of an event or circumstance constituting Good Reason (including all unpaid bonuses with respect to any prior fiscal year).  In addition, if the Executive's employment is terminated on or following a Change in Control and during the Term, other than (A) by the Company for Cause, (B) by reason of death or Disability, or (C) by the Executive without Good Reason, then the Company shall pay Executive an amount equal to the product of (1) the product of (x) the Executive's base salary as in effect immediately prior to the Date of Termination, or, if higher, as in effect immediately prior to the first occurrence of an event or circumstance constituting Good Reason (the greater of such amounts, the "Base Salary") and (y) the Executive's normative bonus percentage for the year in which the Date of Termination occurs, or if higher, the normative bonus percentage for the fiscal year in which the Change in Control occurs or the normative bonus percentage in effect immediately prior to the first occurrence of an event or circumstance constituting Good Reason (the greatest of such percentages, the "Bonus Percentage") and (2) a fraction, the numerator of which is the number of days in the fiscal year in which the Date of Termination occurs through the date of the Date of Termination, and the denominator of which is 365; it being understood that, if the Date of Termination is in the same fiscal year as the Change in Control, the Pro-rata Bonus calculated pursuant to Section 3 shall be subtracted from the amount payable pursuant to this sentence of Section 5.2 but shall not reduce the amount payable below zero.

5.3  If the Executive's employment shall be terminated for any reason on or following a Change in Control and during the Term, the Company shall pay to the Executive the Executive's normal post-termination compensation and benefits as such payments become due.  Such post-termination compensation and benefits shall be determined under, and paid in accordance with, the Company's retirement, insurance and other compensation or benefit plans, programs and arrangements as in effect immediately prior to the Date of Termination or, if more favorable to the

Executive, as in effect immediately prior to the occurrence of the first event or circumstance constituting Good Reason.

      6.   Severance Payments.

      6.1  If the Executive's employment is terminated on or following a Change in Control and during the Term, other than (A) by the Company for Cause, (B) by reason of death or Disability, or (C) by the Executive without Good Reason, then the Company shall pay the Executive the amounts, and provide the Executive the benefits, described in this Section 6.1 ("Severance Payments") and Section 6.2, in addition to any payments and benefits to which the Executive is entitled under Section 5 hereof or otherwise (except as provided herein).  For purposes of this Agreement, the Executive's employment shall be deemed to have been terminated following a Change in Control by the Company without Cause or by the Executive with Good Reason, if (i) the Executive's employment is terminated by the Company without Cause prior to a Change in Control (whether or not a Change in Control ever occurs) and such termination was at the request or direction of a Person who enters into an agreement with the Company the consummation of which would constitute a Change in Control, (ii) the Executive terminates his employment for Good Reason prior to a Change in Control (whether or not a Change in Control ever occurs) and the circumstance or event which constitutes Good Reason occurs at the request or direction of such Person, or (iii) the Executive's employment is terminated by the Company without Cause or by the Executive for Good Reason and such termination or the circumstance or event which constitutes Good Reason is otherwise in connection with or in anticipation of a Change in Control (whether or not a Change in Control ever occurs).

      (A)  In lieu of any further salary payments to the Executive for periods subsequent to the Date of Termination and in lieu of any severance benefit otherwise payable to the Executive (whether pursuant to any employment agreement, plan, policy or otherwise), the Company shall pay to the Executive a lump sum severance payment, in cash, equal to two times the sum of (i) the Base Salary and Flexible Benefits Allowance and (ii) the product of (x) the Base Salary and (y) the Bonus Percentage.  Such amounts shall be paid within the period described in Section 6.3.

      (B)  For the twenty-four (24) month period immediately following the Date of Termination, the Company shall arrange to provide the Executive and his dependents with life, disability, accident and health insurance benefits substantially similar to those provided to the Executive and his dependents immediately prior to the Date of Termination or, if more favorable to the Executive, those provided to the Executive and his dependents immediately prior to the first occurrence of an event or circumstance constituting Good Reason, at no greater cost to the Executive than the Executive's cost immediately prior to such date or occurrence (the "Executive's Cost").  Unless the Executive consents to a different method (after taking into account the effect of such method on the calculation of "parachute payments" pursuant to Section 6.2 hereof), the health insurance benefits described in this Section 6.1(B) shall be provided through a third-party insurer.  In the event continued accident and health insurance coverage under this Section 6.1(B) is provided through the Company's self-insured health plan such coverage shall be limited to the first eighteen months following the Date of Termination.  If the Executive is not receiving accident and health insurance coverage from another employer at the end of such eighteen month period, the Company shall pay the Executive a lump sum amount equal to six times the monthly COBRA health benefit

B-21

continuation premium for the Executive's coverage under the Company's accident and health insurance coverage.  Benefits otherwise receivable by the Executive pursuant to this Section 6.1(B) shall be reduced to the extent benefits of the same type are received by or made available to the Executive by another employer of the Executive during the twenty four (24) month period following the Executive's termination of employment (and any such benefits received by or made available to the Executive shall be reported to the Company by the Executive); provided, however, that the Company shall reimburse the Executive for the excess, if any, of the cost of such benefits to the Executive over such cost immediately prior to the Date of Termination or, if more favorable to the Executive, the first occurrence of an event or circumstance constituting Good Reason.

(C)    For purposes of COBRA health benefit continuation under section 4980B of the Code, the cessation of benefits pursuant to Section 6.1(B) shall be treated as though such cessation is the "qualifying event" under section 4980B(f)(3) of the Code for purposes of determining the period of coverage.

(D)    The Company shall pay to the Executive a lump sum amount equal to one hundred thousand dollars ($100,000).  Such amount shall be paid in the month following the Date of Termination.

(E)    The Company shall, at its sole expense as incurred, provide Executive with "key executive level" outplacement services for the period ending on December 31 of the second calendar year following the Termination Date at a cost of no more than fifteen percent (15%) of the sum of (i) Base Salary and (ii) the Bonus Percentage multiplied by Base Salary.

6.2    (A)    Whether or not the Executive becomes entitled to the Severance Payments, if any of the payments or benefits received or to be received by the Executive in connection with a Change in Control or the Executive's termination of employment (whether pursuant to the terms of this Agreement or any other plan, arrangement or agreement with the Company, any Person whose actions result in a Change in Control or any Person affiliated with the Company or such Person) (all such payments and benefits, excluding the Gross-Up Payment, being hereinafter referred to as the "Total Payments") will be subject to the Excise Tax, the Company shall pay to the Executive an additional amount (the "Gross-Up Payment") such that the net amount retained by the Executive, after deduction of any Excise Tax on the Total Payments and any federal, state and local income and employment taxes and any penalties, interest or fees incurred by the Executive as a result of any payment under Section 6.2 being made later than five business days prior to the due date of the excise tax with respect to which it is paid and any Excise Tax upon the Gross-Up Payment, shall be equal to the Total Payments.

(B)    For purposes of determining whether any of the Total Payments will be subject to the Excise Tax and the amount of such Excise Tax, (i) all of the Total Payments shall be treated as "parachute payments" (within the meaning of section 280G(b)(2) of the Code) unless, in the opinion of tax counsel ("Tax Counsel") reasonably acceptable to the Executive and selected by the accounting firm which was, immediately prior to the Change in Control, the Company's independent auditor (the "Auditor"), such payments or benefits (in whole or in part) do not constitute parachute payments, including by reason of section 280G(b)(4)(A) of the Code, (ii) all "excess

B-22

parachute payments" within the meaning of section 280G(b)(l) of the Code shall be treated as subject to the Excise Tax unless, in the opinion of Tax Counsel, such excess parachute payments (in whole or in part) represent reasonable compensation for services actually rendered (within the meaning of section 280G(b)(4)(B) of the Code) in excess of the Base Amount allocable to such reasonable compensation, or are otherwise not subject to the Excise Tax, and (iii) the value of any noncash benefits or any deferred payment or benefit shall be determined by the Auditor in accordance with the principles of sections 280G(d)(3) and (4) of the Code.  For purposes of determining the amount of the Gross-Up Payment, the Executive shall be deemed to pay federal income tax at the highest marginal rate of federal income taxation in the calendar year in which the Gross-Up Payment is to be made and state and local income taxes at the highest marginal rate of taxation in the state and locality of the Executive's residence or the Executive's place of business, whichever is higher, on the Date of Termination (or if there is not yet a Date of Termination, then the date on which the Gross-Up Payment is calculated for purposes of this Section 6.2), net of the maximum reduction in federal income taxes which could be obtained from deduction of such state and local taxes.

(C)    In the event that the Excise Tax is finally determined to be less than the amount taken into account hereunder in calculating the Gross-Up Payment, the Executive shall repay to the Company, within five (5) business days following the time that the amount of such reduction in the Excise Tax is finally determined, the portion of the Gross-Up Payment attributable to such reduction (including that portion of the Gross-Up Payment attributable to the Excise Tax and federal, state and local income and employment taxes imposed on the Gross-Up Payment being repaid by the Executive), to the extent that such repayment results in a reduction in the Excise Tax and a dollar-for-dollar reduction in the Executive's taxable income and wages for purposes of federal, state and local income and employment taxes, plus interest on the amount of such repayment at 120% of the rate provided in section 1274(b)(2)(B) of the Code.  Notwithstanding the foregoing, in the event any portion of the amount to be repaid to the Company has been paid to any tax authority, repayment thereof shall not be required until actual refund or credit of such portion has been made to Executive, and interest payable to the Company shall not exceed the interest received or credited to Executive by such tax authority.  In the event that the Excise Tax is determined to exceed the amount taken into account hereunder in calculating the Gross-Up Payment (including by reason of any payment the existence or amount of which cannot be determined at the time of the Gross-Up Payment), the Company shall make an additional Gross-Up Payment in respect of such excess (including any interest, penalties or additions payable by the Executive with respect to such excess and the Gross-Up Payment attributable to the Excise Tax and federal, state, and local income and employment taxes imposed on the Gross-Up Payment being made to the Executive) within five (5) business days following the time that the amount of such excess is finally determined.  The Executive and the Company shall each reasonably cooperate with the other in connection with any administrative or judicial proceedings concerning the existence or amount of liability for Excise Tax with respect to the Total Payments.

6.3  The payments provided in subsections (A), of Section 6.1 hereof and in Section 6.2 hereof shall be made not later than the fifth day following the Date of Termination (or if there is no Date of Termination, then the date on which the Gross-up Payment is calculated for purposes of Section 6.2 hereof); provided, however, that if the amounts of such payments cannot be finally determined on or before such day, the Company shall pay to the Executive on such day an estimate,

as determined in good faith by the Company or, in the case of payments under Section 6.2 hereof, in accordance with Section 6.2 hereof, of the minimum amount of such payments to which the Executive is clearly entitled and shall pay the remainder of such payments (together with interest on the unpaid remainder (or on all such payments to the extent the Company fails to make such payments when due) at 120% of the rate provided in section 1274(b)(2)(B) of the Code) as soon as the amount thereof can be determined but in no event later than the thirtieth (30th) day after the Date of Termination.   In the event that the amount of the estimated payments exceeds the amount subsequently determined to have been due, such excess shall constitute a loan by the Company to the Executive, payable on the fifth (5th) business day after demand by the Company (together with interest at 120% of the rate provided in section 1274(b)(2)(B) of the Code).

6.4  The Company also shall pay to the Executive all legal fees and expenses incurred by the Executive in disputing in good faith any issue hereunder relating to the termination of the Executive's employment, in seeking in good faith to obtain or enforce any benefit or right provided by this Agreement or in connection with any tax audit or proceeding to the extent attributable to the application of section 4999 of the Code to any payment or benefit provided hereunder.  Such payments shall be made within five (5) business days after delivery of the Executive's written requests for payment accompanied with such evidence of fees and expenses incurred as the Company reasonably may require (but in no event after the last day of the calendar year following the calendar year in which the expense is incurred).

7.  Termination Procedures and Compensation During Dispute.

7.1  Notice of Termination.  After a Change in Control and during the Term, any purported termination of the Executive's employment (other than by reason of death) shall be communicated by written Notice of Termination from one party hereto to the other party hereto in accordance with Section 10 of the Employment Agreement.   For purposes of this Agreement, a "Notice of Termination" shall mean a notice which shall indicate the specific termination provision in this Agreement relied upon and shall set forth in reasonable detail the facts and circumstances claimed to provide a basis for termination of the Executive's employment under the provision so indicated.  Further, a Notice of Termination for Cause is required to include a copy of a resolution duly adopted by the affirmative vote of not less than three-quarters (3/4) of the entire membership of the Board at a meeting of the Board which was called and held for the purpose of considering such termination (after reasonable notice to the Executive and an opportunity for the Executive, together with the Executive's counsel, to be heard before the Board) finding that, in the good faith opinion of the Board, the Executive was guilty of conduct set forth in clause (i) or (ii) of the definition of Cause herein, and specifying the particulars thereof in detail.

7.2  Date of Termination.  "Date of Termination," with respect to any purported termination of the Executive's employment after a Change in Control and during the Term, shall mean (i) if the Executive's employment is terminated for Disability, thirty (30) days after Notice of Termination is given (provided that the Executive shall not have returned to the full-time performance of the Executive's duties during such thirty (30) day period), and (ii) if the Executive's employment is terminated for any other reason, the date specified in the Notice of Termination (which, in the case of a termination by the Company (except in the case of a termination for Cause) and, in the case of a

B-24

termination by the Executive, shall not be less than thirty (30) days from the date such Notice of Termination is given).

7.3    Dispute Concerning Termination.  If within fifteen (15) days after any Notice of Termination is given, or, if later, prior to the Date of Termination (as determined without regard to this Section 7.3), the party receiving such Notice of Termination notifies the other party that a dispute exists concerning the termination, the Date of Termination shall be extended until the earlier of (i) the date prior to the date on which the Term ends or (ii) the date on which the dispute is finally resolved, either by mutual written agreement of the parties or by a final judgment, order or decree of an arbitrator or a court of competent jurisdiction (which is not appealable or with respect to which the time for appeal therefrom has expired and no appeal has been perfected); provided, however, that the Date of Termination shall be extended by a notice of dispute only if such notice is given in good faith and the party providing notice pursues the resolution of such dispute with reasonable diligence.

7.4  [intentionally blank]

8.    No Mitigation.  The Company agrees that, if the Executive's employment with the Company terminates during the Term, the Executive is not required to seek other employment or to attempt in any way to reduce any amounts payable to the Executive by the Company pursuant to this Agreement.  Further, the amount of any payment or benefit provided for in this Agreement (other than Section 6.1(B) hereof) shall not be reduced by any compensation earned by the Executive as the result of employment by another employer, by retirement benefits, by offset against any amount claimed to be owed by the Executive to the Company, or otherwise.

9.    Successors; Binding Agreement.

9.1  This Agreement shall inure to the benefit of and be binding upon the Company and its successors and assigns.  In addition to any obligations imposed by law upon any successor to the Company, the Company will require any successor (whether direct or indirect, by purchase, merger, consolidation or otherwise) to all or substantially all of the business and/or assets of the Company to expressly assume and agree in writing to perform this Agreement in the same manner and to the same extent that the Company would be required to perform it if no such succession had taken place.  The Company will require any ultimate parent entity, as defined in 16 C.F.R. 8801,1(a)(3), of any Person who acquires 90% of the outstanding shares of common stock of the Company or the outstanding voting securities of the Company entitled to vote generally in the election of directors (including through a merger in which the Company does not survive or as a result of which the Company becomes a subsidiary of another Person or a consolidation involving the Company and another Person) to assume and agree in writing to perform as a joint and several obligor of the Company (including any successor to the Company), this Agreement in the same manner and to the same extent as the Company. Failure of the Company to obtain such assumption and agreement in writing from a successor or its parent as described in the preceding sentences after notice and a reasonable cure period (not to exceed ten days from the date such notice is received) shall be a breach of this Agreement and shall entitle the Executive to compensation from the Company in the same amount and on the same terms as the Executive would be entitled to hereunder if the Executive were to terminate the Executive's employment for Good Reason after a Change in Control, except that, for

purposes of implementing the foregoing, the date on which any such succession becomes effective shall be deemed the Date of Termination.

9.2  This Agreement shall inure to the benefit of and be enforceable by the Executive's personal or legal representatives, executors, administrators, successors, heirs, distributees, devisees and legatees.  If the Executive shall die while any amount would still be payable to the Executive hereunder (other than amounts which, by their terms, terminate upon the death of the Executive) if the Executive had continued to live, all such amounts, unless otherwise provided herein, shall be paid in accordance with the terms of this Agreement to the executors, personal representatives or administrators of the Executive's estate.

10.  Insurance and Indemnification.  From and after a Change in Control, including after the termination of Executive's employment, the Company shall indemnify, defend and hold the Executive harmless from and against any and all expenses, liabilities, damages, costs, judgments, penalties, fines and amounts paid in settlement, incurred in good faith by Executive in connection with any proceeding involving Executive by reason of Executive's being or having been an officer, director, employee or agent of the Company (or any affiliate of the Company) to the fullest extent permitted by law, whether or not Executive is, or is threatened to be made, a party to any threatened, pending, or completed proceeding, and whether or not Executive is successful in such proceeding.  In addition, upon receipt from Executive of (i) a written request for an advancement of reasonable expenses which Executive reasonably believes will be subject to indemnification hereunder and (ii) a written undertaking by Executive to repay any such amounts if it shall ultimately be determined that the Executive is not entitled to indemnification under this Agreement or otherwise, the Company shall advance such expenses to Executive or pay such expenses for Executive, all in advance of the final disposition of any such matter.  From and after a Change in Control, including after the termination of Executive's employment hereunder, Executive shall have coverage under a director's and officer's liability insurance policy in amounts no less than, and on terms no less favorable than those, provided to senior executive officers of the Company from time to time.

11.  Definitions.  For purposes of this Agreement, the following terms shall have the meanings indicated below:

(A)  "Affiliate" shall have the meaning set forth in Rule 12b-2 promulgated under Section 12 of the Exchange Act.

(B)  "Agreement" shall mean this Attachment B to the Employment Agreement.

(B)  "Auditor" shall have the meaning set forth in Section 6.2 hereof.

(C)  "Base Amount" shall have the meaning set forth in section 280G(b)(3) of the Code.

(D)  "Code" shall mean the Internal Revenue Code of 1986, as amended from time to time.

(E)  "Company" shall mean Hayes Lemmerz International, Inc. and, except in determining under Section 15(G) hereof whether or not any Change in Control of the Company has occurred,

B-27

shall include any successor to its business and/or assets which assumes and agrees to perform this Agreement by operation of law, or otherwise.

(F)  "Excise Tax" shall mean any excise tax imposed under section 4999 of the Code or any similar state or local tax or any interest or penalties incurred by Executive with respect to such excise tax.

(G)  "Person" shall have the meaning given in Section 3(a)(9) of the Exchange Act, as modified and used in Sections 13(d) and 14(d) including a "group" within the meaning of Section 13(d)(3) thereof, except that such term shall not include (i) the Company or any of its subsidiaries, (ii) a trustee or other fiduciary holding securities under an employee benefit plan of the Company or any of its Affiliates, (iii) an underwriter temporarily holding securities pursuant to an offering of such securities, or (iv) a corporation owned, directly or indirectly, by the stockholders of the Company in substantially the same proportions as their ownership of stock of the Company.

(H)  "Retirement" shall be deemed the reason for the termination by the Executive of the Executive's employment if such employment is terminated in accordance with the Company's retirement policy, including early retirement, generally applicable to its salaried employees.

688056- Server 1a - MSW

### EXECUTIVE EMPLOYMENT AGREEMENT

THIS AGREEMENT (the "Agreement") is made the 19th day of January, 2009 (the "Agreement Date"), by and between Hayes Lemmerz International, Inc. (the "Company") and Mark A. Brebberman (the "Executive").

WHEREAS, the Company desires to provide for the continued employment of the Executive on the terms and conditions set forth herein, in the best interest of the Company and its constituencies; and

WHEREAS, the Executive desires to continue to be employed by the Company as provided herein; and

NOW, THEREFORE, in consideration of the premises and the respective covenants and agreements of the parties herein contained, the parties agree as follows:

1.      Employment.  The Company agrees to continue to employ the Executive and the Executive agrees to continue to be employed on a full-time basis by the Company for the period and upon the terms and conditions hereinafter set forth.

2.      Term; Employment Period.  The term of this Agreement (the "Term") shall commence on the Agreement Date (the "Effective Date") and continue until terminated pursuant to Section 6 of this Agreement.  The period during which the Executive is employed by the Company pursuant to this Agreement is referred to herein as the "Employment Period."  The date on which the termination of the Executive's employment hereunder shall become effective is referred to herein as the "Termination Date."

3.      Position and Duties.  During the Employment Period, the Executive shall serve as Vice President and Chief Financial Officer of the Company and shall have such responsibilities, duties and authority as are customarily and ordinarily exercised by executives in similar positions in similar businesses in the United States and shall exercise such responsibilities, duties and authority consistent with the foregoing as the Company's Chief Executive Officer or the Company's Board of Directors (the "Board") shall determine from time to time.  During the Employment Period, the Executive shall report to the Company's Chief Executive Officer or the Chief Executive Officer's designee.  The Executive shall devote substantially all his working time and efforts to the business and affairs of the Company and shall use his best efforts to carry out his responsibilities faithfully and efficiently in a professional manner.  Notwithstanding the foregoing, it is understood that during the Employment Period, subject to any conflict of interest policies of the Company and Section 8, the Executive may (x) serve in any capacity with any civic, charitable, educational or professional organization provided that such service does not materially interfere with his duties and responsibilities hereunder and (y) make and manage personal investments of his choice, and with the prior consent of the Company's Chief Executive

Officer, which shall not be unreasonably withheld, serve on the board of directors of one (1) for-profit business enterprise.

4.    Place of Performance.  During the Employment Period, the Executive's place of performance of his services shall be at the Company's Northville, Michigan Headquarters, except for required travel by the Executive on the Company's business or as may be reasonably required by the Company.

5.    Compensation and Benefits.

(a)    Salary.  During the Employment Period, the Company shall pay to the Executive an initial annual base salary of Two Hundred Sixty-Six Thousand Five Hundred Dollars ($266,500) (as the same may be increased from time to time, the "Base Salary"), such salary to be paid in periodic installments in accordance with the Company's payroll practices as in effect from time to time.  The Base Salary shall be reviewed annually by the compensation committee of the Board and may be increased from time to time in accordance with normal business practices of the Company and, if so increased, shall not thereafter be reduced.

(b)    Cash-Based Incentives.  During the Employment Period, the Executive shall be eligible to earn an annual bonus under the Company's Short-Term Incentive Plan, or a successor plan thereto, as in effect from time to time (the "Incentive Plan"), subject to achievement of performance goals determined in accordance with the terms of the Incentive Plan (such annual bonus, the "Annual Bonus").  Such performance goals shall include (i) a threshold level below which no Annual Bonus shall be paid, (ii) a normative level that is tied to the budget, which if obtained, would result in an Annual Bonus of sixty percent (60%) of the Base Salary and (iii) an upside level, which if obtained, would increase the Annual Bonus to a maximum of one hundred twenty percent (120%) of the Base Salary.  The Annual Bonus shall be payable in a cash lump sum at such time as bonuses are ordinarily paid in accordance with the terms of the Incentive Plan, but in no event later than 120 days after the end of each fiscal year of the Company.  Except as otherwise specifically provided in this Agreement, the Executive shall only be eligible to receive the Annual Bonus if the Executive is employed by the Company through the last day of February in the year in which the Annual Bonus is to be paid.

(c)    "Change in Control" Definition.  For purposes of this Agreement, a "Change in Control" shall be deemed to have occurred upon the first of the following to occur:

(1)    any Person (within the meaning of Section 3(a)(9) of the Securities and Exchange Act of 1934, as amended (the "Exchange Act"), as modified and used in Sections 13(d) and 14(d) thereof), other than Joseph Littlejohn & Levy Fund II, L.P. (or any affiliate (within the meaning of Regulation D Rule 501(b) under the Securities Act of 1933, as amended (the "Securities Act")) thereof), TSG Capital Fund II, L.P. (or any affiliate thereof), or Canadian

2

Imperial Bank of Commerce (or affiliate thereof) (such entitles, collectively, the "JLL Group"), is or becomes the "Beneficial Owner" (within the meaning of Rule 13d-3 under the Exchange Act) of fifty percent (50%) or more of either (1) the then-outstanding Common Stock or (2) the combined voting power of the then-outstanding voting securities of the Company entitled to vote generally in the election of directors;

(2)    the following individuals cease for any reason to constitute a majority of the number of directors then serving:  individuals who, as of the Effective Date, constitute the Board and any new director (other than a director whose initial assumption of office is in connection with an actual or threatened election contest, including but not limited to a consent solicitation, relating to the election of directors of the Company) whose appointment or election by the Board or nomination for election by the Company's stockholders was approved or recommended by a vote of at least a majority of the directors then still in office who either were directors on the date hereof or whose appointment, election or nomination for election was previously so approved or recommended;

(3)    there is consummated a merger or consolidation of the Company or any direct or indirect subsidiary of the Company with any other corporation, other than a merger or consolidation which would result in the voting securities of the Company outstanding immediately prior to such merger or consolidation continuing to represent (either by remaining outstanding or by being converted into voting securities of the surviving entity or any parent thereof) at least fifty percent (50%) of the combined voting power of the securities of the Company or such surviving entity or any parent thereof outstanding immediately after such merger or consolidation, provided, however, that it shall not be a Change in Control under this clause (C) if (i) directors appointed or nominated by the JLL Group or any constituent member thereof continue immediately following such transaction to constitute a majority of the Board and (ii) the JLL Group or any constituent member thereof continues immediately following such transaction to own securities representing at least thirty-five percent (35%) of the combined voting power of the securities of the Company or such surviving entity or any parent thereof outstanding immediately after such merger or consolidation; or

(4)    the stockholders of the Company approve a plan of complete liquidation or dissolution of the Company or there is consummated an agreement for the sale or disposition by the Company of all or substantially all of its assets.

(d)    Option Grants.  Based upon the Executive's performance and annual review, the Executive shall be eligible during the Employment Period to receive stock option grants in such amounts and subject to such terms and conditions as the compensation committee of the Board shall determine in its sole discretion are necessary and desirable.

3

(e)    Expenses.  During the Employment Period, the Company shall promptly reimburse the Executive for all reasonable out-of-pocket expenses incurred by the Executive in connection with the business of the Company and the performance of his duties under this Agreement in accordance with the terms of the Company's policies as in effect from time to time.

(f)    Benefit Plans.  During the Employment Period, the Executive shall be entitled to participate in all of the employee benefit plans, programs, agreements and arrangements provided to senior executives of the Company, as such are in effect from time to time, on a basis no less favorable than that provided to such senior executives.

(g)    Perquisites.  During the Employment Period, the Executive shall be entitled to participate in those perquisites provided to senior executives of the Company, as such are in effect from time to time, on a basis no less favorable than that provided to such senior executives.  In addition, the Company shall pay Executive an annual flexible benefits allowance (the "Flexible Benefits Allowance") of Thirty Five Thousand Dollars ($35,000), such allowance to be paid in periodic installments in accordance with the Company's payroll practices as in effect from time to time. The Flexible Benefits Allowance shall be reviewed annually by the Compensation Committee of the Board and may be increased from time to time and, if so increased, shall not thereafter be reduced.

(h)    Vacations.  During the Employment Period, the Executive shall be entitled to vacation time, paid holidays and personal days, determined in accordance with the Company's policy with respect to its senior executives as in effect from time to time, it being understood that the Executive shall be entitled to not less than four weeks' vacation in any 12-month period during the Employment Period thereafter.

6.    Termination of Employment.

(a)    Accrued Benefits.  In the event of the termination of the Executive's employment hereunder for any reason, the Executive (or his estate or representative, as applicable) shall be entitled to receive any Base Salary, Annual Bonus, vacation time and expenses that have in each case accrued but are unpaid as of the Termination Date, vested options as well as any post-termination benefits to which he may be entitled pursuant to the Company's retirement, insurance and other benefit plans, programs and arrangements as in effect immediately prior to the Termination Date (the "Accrued Benefits").

(b)    Death.  The Executive's employment hereunder shall terminate as of the date of his death.  Upon the termination of the Executive's employment hereunder because of his death, the Executive's estate or representative, as the case may be, shall be entitled to receive the Accrued Benefits and a lump sum payment in cash equal to (i) one year's Base Salary as in effect on the Termination Date and (ii) the product of (x) sixty percent (60%) of the Base Salary as in effect on the Termination Date, multiplied by a fraction (y) the numerator of which shall be the number of months (including fractions thereof) worked by the Executive during the

4

Company's fiscal year in which the Termination Date occurs and (z) the denominator of which shall be the number 12 (such amount under this clause (ii), the "Pro Rata Annual Bonus").  In addition, those immediate family members who were participating in the Company's medical benefit plan as of the date of the Executive's death shall continue to participate in the Company's medical benefit plan at active employee contribution rates for the one-year period immediately following the date of the Executive's death.  Such amounts shall be paid as soon as administratively feasible following the Executive's death but in no event later than April 15 of the calendar year following the Executive's death.

(c)     Disability.   The Executive's employment hereunder may be terminated during the Employment Period if the Executive is incapable of performing his principal duties hereunder because of physical or mental incapacity for a period of 45 consecutive working days or for more than 90 working days in any 12-month period ("Disability").  In the event that the Executive's employment is to be terminated pursuant to this Section 6(c), (i) this Agreement shall terminate on the date specified in the notice of termination delivered to the Executive (subject to Section 8(g) and Section 18); (ii) the Executive shall as of such date resign from all of his positions, duties and authorities hereunder; (iii) the Executive shall be placed on a medical leave of absence until the earlier of (A) expiration of the six-month period commencing on the date his medical leave of absence began, unless there is no reasonable expectation that the Executive will return to employment with the Company, in which case the date the Executive ceases performing services for the Company, (B) the date he qualifies for benefits under the Company's long-term disability plan or (C) the date he is able to return to work; and (iv) the Executive shall continue to be paid his Base Salary until such medical leave of absence ends.  In the case of a termination of the Executive's employment pursuant to this Section 6(c), for purposes of calculating benefits pursuant to clauses (B) and (C) below the Termination Date shall be the date upon which the Executive's medical leave of absence commences, and for all other purposes, the Termination Date shall be the date upon which the Executive's medical leave of absence ends.  In the event the Executive's employment is terminated pursuant to this Section 6(c), the Executive (or his representative, as applicable) shall be entitled to:  (A) the Accrued Benefits; (B) a lump sum payment in cash equal to one year's Base Salary and Flexible Benefits Allowance as in effect on the Termination Date; (C) the Pro Rata Annual Bonus; and (D) the continuation of health and welfare benefits at the levels in effect as of the Termination Date at no additional cost to the Executive than that which was in effect as of the Termination Date for the one-year period immediately following the Termination Date;  provided, however, that such benefits shall be reduced to the extent comparable benefits are made available to the Executive from a successor employer, and the Executive shall be obligated to report such benefits to the Company.  The amounts payable pursuant to clauses (B) and (C) of the preceding sentence shall be paid in the month following the Executive's Termination Date.  It is acknowledged and agreed by the Executive that he shall be precluded from terminating his employment hereunder for Good Reason in the event that his employment hereunder is terminated pursuant to this Section 6(c).

(d)     For Cause; Without Good Reason.   The Executive's employment hereunder may be terminated during the Employment Period (i) by the Company for Cause (as defined below) or (ii) by the Executive without Good Reason (as defined below).  In the event that the Company terminates the Executive's employment hereunder for Cause, the Termination

5

Date shall be the date specified in the notice of termination for Cause delivered by the Company to the Executive.  In the event that the Executive terminates his employment hereunder without Good Reason, the Termination Date shall be no earlier than 30 days following the date on which a notice of termination is delivered by the Executive to the Company.  In the event that the Executive's employment hereunder is terminated pursuant to this Section 6(d), the Executive shall be entitled to the Accrued Benefits.

(e)     Without Cause; For Good Reason. The Executive's employment hereunder may be terminated during the Employment Period (i) by the Company without Cause or (ii) by the Executive for Good Reason.  In the event that the Executive's employment is terminated pursuant to this Section 6(e) (whether by the Company or by the Executive), the Termination Date shall be no earlier than 30 days following the date on which a notice of termination is delivered by one party to the other.  In the event that the Executive's employment is terminated pursuant to this Section 6(e), the Executive (or his estate or representative, as the case may be) shall be entitled to receive the Accrued Benefits.  The Executive (or his estate or representative, as the case may be) shall be entitled to the following severance benefits (A) a lump sum payment in cash equal to one year's Base Salary and Flexible Benefits Allowance as in effect on the Termination Date; (B) the Pro Rata Annual Bonus; and (C) the title to the Executive's Company vehicle.  The benefits described in the preceding sentence shall be paid in the month following the Executive's Termination Date.  Severance benefits provided to the Executive under this paragraph shall also include:  (x) continuation of health and welfare benefits for one year at the levels in effect as of the Termination Date at no additional cost to the Executive than that which was in effect as of the Termination Date; provided, that such benefits shall be reduced to the extent comparable benefits are made available to the Executive from a successor employer, and the Executive shall be obligated to report such benefits to the Company; and (y) executive level career outplacement services for the period beginning on the Termination Date and ending December 31 of second calendar year following termination by a mutually agreeable outplacement firm and paid for as incurred by the Company.

(f)     Definition of "Cause" and "Good Reason".

For purposes of this Agreement, "Cause" means:  (i) the willful failure of the Executive to perform his material duties with the Company which have been duly assigned to the Executive and which duties are commensurate with those of the position for which Executive is then employed, and which failure is not cured (if capable of cure) within 15 days after receipt of written notice of such failure, which notice identifies the manner in which the Executive has willfully failed to perform, (ii) the engaging by the Executive in willful conduct which is demonstrably injurious to the Company, monetarily or otherwise, (iii) the conviction of the Executive of any crime or offense constituting a felony, or (iv) a failure by the Executive to comply with any material provision of this Agreement, which failure is not cured (if capable of cure) within 15 days after receipt of written notice of such non-compliance by the Executive. Termination of the Executive for Cause shall mean termination by action of at least a majority of the Company's Board of Directors, at a meeting duly called and held upon at least 15 days' written notice to the Executive specifying the particulars of the action or inaction alleged to constitute Cause and at which meeting the Executive and his counsel were entitled to be present

6

and given adequate opportunity to be heard.  For purposes of clauses (i) and (ii) of this definition, action or inaction by the Executive shall not be considered "willful" unless done or omitted by him (A) intentionally or not in good faith and (B) without reasonable belief that his action or inaction was in the best interest of the Company, and shall not include failure to act by reason of total or partial incapacity due to physical or mental illness.

For purposes of this Agreement, 'Good Reason' means the occurrence of one or more of the following events if the Executive gives notice of the event to the Company within 90 days of the event and the Company fails to remedy such event within 30 days of receiving notice from the Executive:  (i) a material adverse alteration in the nature or status of the Executive's position, duties, responsibilities or authority from those in effect as of the Effective Date; (ii) a material reduction in the Executive's Base Salary or level of employee benefits (other than across-the-board reductions applied similarly to all of the Company's senior executives occurring after the second anniversary of the Effective Date); (iii) a failure to pay or provide a material amount of the compensation set forth in this Agreement (except for an across-the-board deferral of compensation applied similarly to all of the Company's senior executives occurring after the second anniversary of the Effective Date); (iv) the relocation of the Executive's principal place of employment more than 30 miles from its location as of the Effective Date except for required travel on the Company's business; (v) assignment of duties or responsibilities to the Executive which are materially inconsistent with the provisions of this Agreement; or (vi) a failure by the Company to comply with any material provision of this Agreement.

(g)    Change in Control Severance Provisions.  The provisions set forth in Attachment A hereto are hereby incorporated into this Agreement.  The Executive hereby acknowledges that in the event he becomes entitled to the payment set forth in Section 6.1(A) of Attachment A hereto, that such payment will be in lieu of any other payments to be made pursuant to the terms of this Agreement.

(h)    Release Agreement.  Notwithstanding anything to the contrary contained in this Section 6, the Executive shall be required to execute the Company's then current standard release agreement as a condition to receiving any of the payments and benefits provided for in this Section 6 or Attachment A.  It is acknowledged and agreed that the then current standard release agreement shall be a mutual release and shall not diminish or terminate Executive's rights under this Agreement including, but not limited to, those delineated in Sections 6(i), 7 and 16 herein.

(i)    No Mitigation.  Upon termination of the Executive's employment with the Company, subject to the Executive's affirmative obligations pursuant to Section 6(c) and 6(e), the Executive shall be under no obligation to seek other employment or otherwise mitigate the obligations of the Company under this Agreement.  The time period for executing such release (and the period available to revoke it) shall be in accordance with the Company's then current standard practice but in no event shall the execution period extend beyond 60 days following the Executive's Termination Date.

<div align="center">7</div>

7.    Directors' and Officers' Insurance; Indemnification.  In addition to any rights to indemnification to which the Executive is entitled under the Company's Restated Certificate of Incorporation and Bylaws, the Company shall indemnify the Executive at all times during and after the Employment Period to the maximum extent permitted under the Delaware Business Corporation Act or any successor provision thereof, and any and all applicable state law, and shall pay the Executive's expenses (including reasonable attorneys' fees and expenses, which shall be paid in advance by the Company as incurred, subject to recoupment in accordance with applicable law) in defending any civil action, suit or proceeding in advance of the final disposition of such action, suit or proceeding to the maximum extent permitted under such applicable state laws for the Executive's action or inaction on behalf of the Company under the terms of this Agreement including but not limited to any acts or alleged acts arising out of events prior to the Executive's employment by the Company which obligation shall survive the termination of the Executive's employment or the termination of the other provisions of this Agreement.

8.    Confidential Information; Removal of Documents; Non-Competition; etc. For purposes of this Section 8, "Company" shall mean the Company, its subsidiaries and affiliates.

(a)    Confidentiality.  Except as otherwise provided in this Agreement, at all times during and after the Employment Term, the Executive shall keep secret and retain in strictest confidence, any and all Confidential Information (as defined below) relating to the Company, and shall use such Confidential Information only in furtherance of the performance by the Executive of the Executive's duties to the Company and not for personal benefit or the benefit of any interest adverse to the Company's interests.  For purposes of this Agreement, "Confidential Information" shall mean any information including without limitation plans, specifications, models, samples, data, customer lists and customer information, computer programs and documentation, and other technical and/or business information, in whatever form, tangible or intangible, that can be communicated by whatever means available at such time, that relates to the Company's current Business or future business contemplated during the Employment Period, products, services and development, or information received from others that the Company is obligated to treat as confidential or proprietary; provided, however, that such Confidential Information shall not include any information that (i) has become generally available to the public other than as a result of a disclosure by the Executive, or (ii) was available to or became known to the Executive prior to the disclosure of such information on a non-confidential basis without breach of any duty of confidentiality from any party to the Company, and the Executive shall not disclose such Confidential Information to any person or entity other than the Company, except as may be required by law or court or administrative order (in which event the Executive shall so notify the Company as promptly as practicable).  Upon termination of the Executive's employment hereunder for any reason, the Executive shall return to the Company all copies, reproductions and summaries of Confidential Information in the Executive's possession and erase the same from all media in the Executive's possession, and, if the Company so requests, shall certify in writing that the Executive has done so.  All Confidential Information is and shall remain the property of the Company (or, in the case of information that the Company receives from a third party which it is obligated to treat as confidential, then the property of such third party).

8

(b)      Non-Competition.

(i)      During the Employment Period, the Executive shall not engage in Competition (as defined below) with the Company.  For purposes of this Agreement, "Competition" by the Executive shall mean the Executive's engaging in, or otherwise directly or indirectly being employed by or acting as a consultant or lender to, or being a director, officer, employee, principal, agent, stockholder, member, owner or partner of, or permitting the Executive's name to be used in connection with the activities of any other business or organization anywhere which competes, directly or indirectly, with the Business of the Company as the same shall be constituted at the Termination Date or which, during the six-month period prior to the Executive's termination, the Company had made substantial plans with the intention of establishing operations.

(ii)      For the one year period commencing on the Termination Date, the Executive shall not engage in Competition with the Company in any locality or region in which the Company had operations at the time of, or within six months prior to, the Executive's termination, or in which, during the six-month period prior to the Executive's termination, the Company had made substantial plans with the intention of establishing operations in such locality or region; provided, however, that it shall not be a violation of this sub-paragraph or the sub-paragraph hereinabove for the Executive to be or become the registered or beneficial owner of up to three percent (3%) of any class of the capital stock of a competing corporation registered under the Exchange Act, provided that the Executive does not actively participate in the business of such corporation until such time as this covenant expires.

(c)      Non-Solicitation.  For the one year period commencing on the Termination Date, the Executive agrees that the Executive shall not, directly or indirectly, for the Executive's benefit or for the benefit of any other person, firm or entity, engage any of the following conduct:

(i)      solicit from any customer doing business with the Company as of the Termination Date, business of the same or of a similar nature to the business of the Company with such customer;

(ii)      solicit from any known potential customer of the Company business of the same or of a similar nature to that which has been the subject of a known written or oral bid, offer or proposal by the Company, or of substantial preparation with a view to making such a bid, proposal or offer, within six months prior to the Executive's termination;

(iii)      solicit the employment or services of, or hire, any person who was known to be employed by or was a known consultant to the Company upon the termination of the Executive's employment, or within six months prior thereto; or

9

(iv)     otherwise interfere with the business or accounts of the Company.

(d)     Intellectual Property.  All Intellectual Property (as defined below) and Technology (as defined below) created, developed, obtained or conceived of by the Executive during the Employment Period, and all business opportunities presented to the Executive during the Employment Period, shall be owned by and belong exclusively to the Company, provided that they reasonably relate to the Business, and the Executive shall (i) promptly disclose any such Intellectual Property, Technology or business opportunity to the Company, and (ii) execute and deliver to the Company, without additional compensation, such instruments as the Company may require from time to time to evidence its ownership of any such Intellectual Property, Technology or business opportunity.  For purposes of this Agreement, (A) the term "Intellectual Property" means and includes any and all trademarks, trade names, service marks, service names, patents, copyrights, and applications therefor, and (B) the term "Technology" means and includes any and all trade secrets, proprietary information, invention, discoveries, know-how, formulae, processes and procedures.

(e)     The Executive acknowledges that the services to be rendered by the Executive to the Company are of a special and unique character, which gives this Agreement a peculiar value to the Company, the loss of which may not be reasonably or adequately compensated for by damages in an action at law, and that a material breach or threatened breach by the Executive of any of the provisions contained in this Section 8 shall cause the Company irreparable injury.  The Executive therefore agrees that the Company shall be entitled, in addition to any other right or remedy, to a temporary, preliminary and permanent injunction, without the necessity of proving the inadequacy of monetary damages or the posting of any bond or security, enjoining or restraining the Executive from any such violation or threatened violations.

(f)     The Executive further acknowledges and agrees that due to the uniqueness of the Executive's services and confidential nature of the information the Executive shall possess, the covenants set forth herein are reasonable and necessary for the protection of the business and goodwill of the Company.

(g)     Continuing Operation.  Any termination of the Executive's employment or of this Agreement shall have no effect on the continuing operation of this Section 8.

9.     Severability.  It is the desire and intent of the parties that the provisions of this Agreement shall be enforced to the fullest extent permissible under the laws and public policies applied in each jurisdiction in which enforcement is sought.  Accordingly, if any particular provision or portion of this Agreement shall be adjudicated to be invalid or unenforceable, this Agreement shall be deemed amended to delete therefrom the portion thus adjudicated to be invalid or unenforceable, such deletion to apply only with respect to the operation of such provision in the particular jurisdiction in which such adjudication is made.

10

10.     Notices.  All communications, requests, consents and other notices provided for in this Agreement shall be in writing and shall be deemed give if delivered by hand or mailed by first class mail, postage prepaid, to the last known address of the recipient.

11.     Governing Law.  This Agreement shall be governed by and construed and enforced in accordance with the laws of the State of Delaware, without regard to its conflicts of laws provisions.

12.     Assignment.  Neither this Agreement nor any rights or duties hereunder may be assigned by the Executive without the prior written consent of the Company.  The Company shall have the right at any time to assign this Agreement to its successors and assigns; provided, however, that the assignee or transferee is the successor to all or substantially all of the business and assets of the Company and such assignee or transferee expressly assumes all of the obligations, duties and liabilities of the Company set forth in this Agreement.

13.     Amendments.  No provisions of this Agreement shall be altered, amended, revoked or waived except by an instrument in writing, signed by each party to this Agreement.

14.     Binding Effect.  Except as otherwise provided herein, this Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective legal representatives, heirs, successors and assigns.

15.     Execution in Counterparts.  This Agreement may be executed in any number of counterparts, each of which shall be deemed an original, but all of which together shall constituted one and the same instrument.

16.     Arbitration.  Any dispute, controversy or question arising under, out of, or relating to this Agreement (or the breach thereof), or, the Executive's employment with the Company or termination thereof, shall be referred for arbitration in the State of Michigan to a neutral arbitrator selected by the Executive and the Company and this shall be the exclusive and sole means for resolving such dispute.  Such arbitration shall be conducted in accordance with the National Rules for Resolution of Employment Disputes of the American Arbitration Association.  The arbitrator shall have the discretion to award reasonable attorneys' fees, costs and expenses to the prevailing party.  Judgment upon the award rendered by the arbitrator may be entered in any court having jurisdiction thereof.

17.     Entire Agreement.  This Agreement sets forth the entire agreement and understanding of the parties and supersedes all prior understandings, agreements or representations by or between the parties, whether written or oral, which relate in any way to the subject matter hereof.

18.     Survivorship.  The provisions of this Agreement necessary to carry out the intention of the parties as expressed herein shall survive the termination or expiration of this Agreement.

11

19.     Waiver.  Except as provided herein, the waiver by either party of the other party's prompt and complete performance, or breach or violation, of any provision of this Agreement shall not operate nor be construed as a waiver of any subsequent breach or violation, and the failure by any party hereto to exercise any right or remedy which it may possess hereunder shall not operate nor be construed as a bar to the exercise of such right or remedy by such party upon the occurrence of any subsequent breach or violation.

20.     Captions.  The captions of this Agreement are for convenience and reference only and in no way define, describe, extend or limit the scope or intent of this Agreement or the intent of any provision hereof.

21.     Construction.  The parties acknowledge that this Agreement is the result of arm's-length negotiations between sophisticated parties each afforded representation by legal counsel.  Each and every provision of this Agreement shall be construed as though both parties participated equally in the drafting of same, and any rule of construction that a document shall be construed against the drafting party shall not be applicable to this Agreement.

22.     Code Section 409A Payment Delay.  Notwithstanding any provision in this Agreement (or the attached Severance Agreement) to the contrary, any payment triggered by a termination of employment to the extent and up to the amount necessary to ensure that such payments are not subject to penalties and interest under Code Section 409A shall not commence until at least six months after the Executive's termination of employment.  To the extent such payments, absent this provision, would be paid during the first six month period following the Executive's termination of employment, those payments shall be withheld and the amount of the payments withheld will be paid in a lump sum, without interest, during the seventh month after termination; provided that, if the Executive dies during such six-month period, any such delayed payments shall be immediately payable to the Executive's estate or representative.

12

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first above written.

EXECUTIVE


By:_____

  Mark A. Brebberman


HAYES LEMMERZ INTERNATIONAL, INC.


By:_____

Name:  Curtis J. Clawson

Title:   President and Chief Executive Officer

13

*Attachment A*

## SEVERANCE AGREEMENT

1. <u>Defined Terms</u>.  Unless otherwise defined in this Attachment A, the terms that are defined in the Employment Agreement  (the "Employment Agreement") shall have the same meanings when used herein as that are ascribed to such terms in the Employment Agreement.

2. <u>Term of Agreement</u>.  The Term of this Agreement shall commence on the Effective Date hereof and shall continue in effect through the third anniversary thereof; <u>provided</u>, <u>however</u>, that commencing on the first anniversary of the Effective Date and each anniversary thereafter (each such date a "Renewal Date"), the Term shall automatically be extended for one additional year unless, on or prior to such Renewal Date, the Company or the Executive shall have given notice not to extend the Term; and <u>further</u> <u>provided</u>, <u>however</u>, that if a Change in Control shall have occurred during the Term, the Term shall expire no earlier than twenty-four (24) months beyond the month in which such Change in Control occurred.

3. <u>Immediate Effect of Change in Control</u>. Promptly following a Change in Control, but in no event later than April 15 of the calendar year following the Change in Control, the Executive shall be entitled to the immediate payment of all unpaid compensation amounts (including the pro rata bonus payment for the current fiscal year under any bonus plan for which he is eligible ("Pro-rata Bonus") and all unpaid bonuses with respect to any prior fiscal year) with respect to the Executive's employment.  For purposes of this Section 3, Pro-rata Bonus shall be an amount equal to the product of (1) the product of (x) the Executive's base salary as in effect immediately prior to the Change in Control and (y) the greater of (A) the Executive's normative bonus percentage for the fiscal year in which the Change in Control occurs and (B) the Executive's estimated bonus percentage calculated in good faith by the Company's Finance Department determined by projecting performance through the end of the fiscal year in which the Change in Control occurs and (2) a fraction, the numerator of which is the number of days in the fiscal year in which the Change in Control occurs through the date of the Change in Control, and the denominator of which is 365.  The Pro-rata Bonus paid shall be subtracted from the amount otherwise due the Executive as a bonus for the fiscal year in which the Change in Control occurs, but such Pro-rata Bonus becomes a vested benefit upon a Change in Control and in no event shall the Executive have to repay all or any portion of the Pro-rata Bonus.

4. <u>Company's Covenants Summarized</u>.  In order to induce the Executive to remain in the employ of the Company, the Company agrees, under the conditions described herein, to pay the Executive the Severance Payments and the other payments and benefits described herein.  Except as provided in Section 9.1 hereof, no Severance Payments shall be payable under this Agreement unless there shall have been (or, under the terms of the second sentence of Section 6.1 hereof, there shall be deemed to have been) a termination of the Executive's employment with the Company on or following a Change in Control and during the Term.  This Agreement shall not be construed as creating an express or implied contract of employment and, except as otherwise agreed in writing between the Executive and the Company, the Executive shall not have any right to be retained in the employ of the Company.

A-14

5.  <u>Compensation Other Than Severance Payments</u>.

5.1  Following a Change in Control and during the Term, during any period that the Executive fails to perform the Executive's full-time duties with the Company as a result of incapacity due to physical or mental illness, the Company shall pay the Executive's full salary to the Executive at the rate in effect at the commencement of any such period, together with all compensation and benefits payable to the Executive under the terms of any compensation or benefit plan, program or arrangement (other than the Company's short- or long-term disability plan, as applicable, to the extent such benefits would be duplicative and their nonpayment would not prejudice Executive's future entitlement to benefits) maintained by the Company during such period, until the Executive's employment is terminated by the Company for Disability.

5.2  If the Executive's employment shall be terminated for any reason on or following a Change in Control and during the Term, the Company shall pay the Executive's full salary to the Executive through the Date of Termination at the rate in effect immediately prior to the Date of Termination or, if higher, the rate in effect immediately prior to the first occurrence of an event or circumstance constituting Good Reason, together with all compensation and benefits payable to the Executive through the Date of Termination under the terms of the Company's compensation and benefit plans, programs or arrangements as in effect immediately prior to the Date of Termination or, if more favorable to the Executive, as in effect immediately prior to the first occurrence of an event or circumstance constituting Good Reason (including all unpaid bonuses with respect to any prior fiscal year).  In addition, if the Executive's employment is terminated on or following a Change in Control and during the Term, other than (A) by the Company for Cause, (B) by reason of death or Disability, or (C) by the Executive without Good Reason, then the Company shall pay Executive an amount equal to the product of (1) the product of (x) the Executive's base salary as in effect immediately prior to the Date of Termination, or, if higher, as in effect immediately prior to the first occurrence of an event or circumstance constituting Good Reason (the greater of such amounts, the "Base Salary") and (y) the Executive's normative bonus percentage for the year in which the Date of Termination occurs, or if higher, the normative bonus percentage for the fiscal year in which the Change in Control occurs or the normative bonus percentage in effect immediately prior to the first occurrence of an event or circumstance constituting Good Reason (the greatest of such percentages, the "Bonus Percentage") and (2) a fraction, the numerator of which is the number of days in the fiscal year in which the Date of Termination occurs through the date of the Date of Termination, and the denominator of which is 365; it being understood that, if the Date of Termination is in the same fiscal year as the Change in Control, the Pro-rata Bonus calculated pursuant to Section 3 shall be subtracted from the amount payable pursuant to this sentence of Section 5.2 but shall not reduce the amount payable below zero.

5.3  If the Executive's employment shall be terminated for any reason on or following a Change in Control and during the Term, the Company shall pay to the Executive the Executive's normal post-termination compensation and benefits as such payments become due.  Such post-termination compensation and benefits shall be determined under, and paid in accordance with, the Company's retirement, insurance and other compensation or benefit plans, programs and arrangements as in effect immediately prior to the Date of Termination or, if more favorable to the

A-15

Executive, as in effect immediately prior to the occurrence of the first event or circumstance constituting Good Reason.

6.  Severance Payments.

6.1  If the Executive's employment is terminated on or following a Change in Control and during the Term, other than (A) by the Company for Cause, (B) by reason of death or Disability, or (C) by the Executive without Good Reason, then the Company shall pay the Executive the amounts, and provide the Executive the benefits, described in this Section 6.1 ("Severance Payments") and Section 6.2, in addition to any payments and benefits to which the Executive is entitled under Section 5 hereof or otherwise (except as provided herein).  For purposes of this Agreement, the Executive's employment shall be deemed to have been terminated following a Change in Control by the Company without Cause or by the Executive with Good Reason, if (i) the Executive's employment is terminated by the Company without Cause prior to a Change in Control (whether or not a Change in Control ever occurs) and such termination was at the request or direction of a Person who enters into an agreement with the Company the consummation of which would constitute a Change in Control, (ii) the Executive terminates his employment for Good Reason prior to a Change in Control (whether or not a Change in Control ever occurs) and the circumstance or event which constitutes Good Reason occurs at the request or direction of such Person, or (iii) the Executive's employment is terminated by the Company without Cause or by the Executive for Good Reason and such termination or the circumstance or event which constitutes Good Reason is otherwise in connection with or in anticipation of a Change in Control (whether or not a Change in Control ever occurs).

(A)  In lieu of any further salary payments to the Executive for periods subsequent to the Date of Termination and in lieu of any severance benefit otherwise payable to the Executive (whether pursuant to any employment agreement, plan, policy or otherwise), the Company shall pay to the Executive a lump sum severance payment, in cash, equal to two times the sum of (i) the Base Salary and Flexible Benefits Allowance and (ii) the product of (x) the Base Salary and (y) the Bonus Percentage.  Such amounts shall be paid within the period described in Section 6.3.

(B)  For the twenty-four (24) month period immediately following the Date of Termination, the Company shall arrange to provide the Executive and his dependents with life, disability, accident and health insurance benefits substantially similar to those provided to the Executive and his dependents immediately prior to the Date of Termination or, if more favorable to the Executive, those provided to the Executive and his dependents immediately prior to the first occurrence of an event or circumstance constituting Good Reason, at no greater cost to the Executive than the Executive's cost immediately prior to such date or occurrence (the "Executive's Cost").  Unless the Executive consents to a different method (after taking into account the effect of such method on the calculation of "parachute payments" pursuant to Section 6.2 hereof), the health insurance benefits described in this Section 6.1(B) shall be provided through a third-party insurer.  In the event continued accident and health insurance coverage under this Section 6.1(B) is provided through the Company's self-insured health plan such coverage shall be limited to the first eighteen months following the Date of Termination.  If the Executive is not receiving accident and health insurance coverage from another employer at the end of such eighteen month period, the Company shall pay the Executive a lump sum amount equal to six times the monthly COBRA health benefit

A-16

continuation premium for the Executive's coverage under the Company's accident and health insurance coverage. Benefits otherwise receivable by the Executive pursuant to this Section 6.1(B) shall be reduced to the extent benefits of the same type are received by or made available to the Executive by another employer of the Executive during the twenty-four (24) month period following the Executive's termination of employment (and any such benefits received by or made available to the Executive shall be reported to the Company by the Executive); provided, however, that the Company shall reimburse the Executive for the excess, if any, of the cost of such benefits to the Executive over such cost immediately prior to the Date of Termination or, if more favorable to the Executive, the first occurrence of an event or circumstance constituting Good Reason.

(C)     For purposes of COBRA health benefit continuation under section 4980B of the Code, the cessation of benefits pursuant to Section 6.1(B) shall be treated as though such cessation is the "qualifying event" under section 4980B(f)(3) of the Code for purposes of determining the period of coverage.

(D)     The Company shall pay to the Executive a lump sum amount equal to one hundred thousand dollars ($100,000).   Such amount shall be paid in the month following the Date of Termination.

(E)     The Company shall, at its sole expense as incurred, provide Executive with "key executive level" outplacement services for the period ending on December 31 of the second calendar year following the Termination Date at a cost of no more than fifteen percent (15%) of the sum of (i) Base Salary and (ii) the Bonus Percentage multiplied by Base Salary.

6.2     (A)     Whether or not the Executive becomes entitled to the Severance Payments, if any of the payments or benefits received or to be received by the Executive in connection with a Change in Control or the Executive's termination of employment (whether pursuant to the terms of this Agreement or any other plan, arrangement or agreement with the Company, any Person whose actions result in a Change in Control or any Person affiliated with the Company or such Person) (all such payments and benefits, excluding the Gross-Up Payment, being hereinafter referred to as the "Total Payments") will be subject to the Excise Tax, the Company shall pay to the Executive an additional amount (the "Gross-Up Payment") such that the net amount retained by the Executive, after deduction of any Excise Tax on the Total Payments and any federal, state and local income and employment taxes and any penalties, interest or fees incurred by the Executive as a result of any payment under Section 6.2 being made later than five business days prior to the due date of the excise tax with respect to which it is paid and any Excise Tax upon the Gross-Up Payment, shall be equal to the Total Payments.

(B)     For purposes of determining whether any of the Total Payments will be subject to the Excise Tax and the amount of such Excise Tax, (i) all of the Total Payments shall be treated as "parachute payments" (within the meaning of section 280G(b)(2) of the Code) unless, in the opinion of tax counsel ("Tax Counsel") reasonably acceptable to the Executive and selected by the accounting firm which was, immediately prior to the Change in Control, the Company's independent auditor (the "Auditor"), such payments or benefits (in whole or in part) do not constitute parachute payments, including by reason of section 280G(b)(4)(A) of the Code, (ii) all "excess

A-17

parachute payments" within the meaning of section 280G(b)(l) of the Code shall be treated as subject to the Excise Tax unless, in the opinion of Tax Counsel, such excess parachute payments (in whole or in part) represent reasonable compensation for services actually rendered (within the meaning of section 280G(b)(4)(B) of the Code) in excess of the Base Amount allocable to such reasonable compensation, or are otherwise not subject to the Excise Tax, and (iii) the value of any noncash benefits or any deferred payment or benefit shall be determined by the Auditor in accordance with the principles of sections 280G(d)(3) and (4) of the Code.  For purposes of determining the amount of the Gross-Up Payment, the Executive shall be deemed to pay federal income tax at the highest marginal rate of federal income taxation in the calendar year in which the Gross-Up Payment is to be made and state and local income taxes at the highest marginal rate of taxation in the state and locality of the Executive's residence or the Executive's place of business, whichever is higher, on the Date of Termination (or if there is not yet a Date of Termination, then the date on which the Gross-Up Payment is calculated for purposes of this Section 6.2), net of the maximum reduction in federal income taxes which could be obtained from deduction of such state and local taxes.

(C)    In the event that the Excise Tax is finally determined to be less than the amount taken into account hereunder in calculating the Gross-Up Payment, the Executive shall repay to the Company, within five (5) business days following the time that the amount of such reduction in the Excise Tax is finally determined, the portion of the Gross-Up Payment attributable to such reduction (including that portion of the Gross-Up Payment attributable to the Excise Tax and federal, state and local income and employment taxes imposed on the Gross-Up Payment being repaid by the Executive), to the extent that such repayment results in a reduction in the Excise Tax and a dollar-for-dollar reduction in the Executive's taxable income and wages for purposes of federal, state and local income and employment taxes, plus interest on the amount of such repayment at 120% of the rate provided in section 1274(b)(2)(B) of the Code.  Notwithstanding the foregoing, in the event any portion of the amount to be repaid to the Company has been paid to any tax authority, repayment thereof shall not be required until actual refund or credit of such portion has been made to Executive, and interest payable to the Company shall not exceed the interest received or credited to Executive by such tax authority.  In the event that the Excise Tax is determined to exceed the amount taken into account hereunder in calculating the Gross-Up Payment (including by reason of any payment the existence or amount of which cannot be determined at the time of the Gross-Up Payment), the Company shall make an additional Gross-Up Payment in respect of such excess (including any interest, penalties or additions payable by the Executive with respect to such excess and the Gross-Up Payment attributable to the Excise Tax and federal, state, and local income and employment taxes imposed on the Gross-Up Payment being made to the Executive) within five (5) business days following the time that the amount of such excess is finally determined.  The Executive and the Company shall each reasonably cooperate with the other in connection with any administrative or judicial proceedings concerning the existence or amount of liability for Excise Tax with respect to the Total Payments.

6.3  The payments provided in subsections (A), of Section 6.1 hereof and in Section 6.2 hereof shall be made not later than the fifth day following the Date of Termination (or if there is no Date of Termination, then the date on which the Gross-up Payment is calculated for purposes of Section 6.2 hereof); provided, however, that if the amounts of such payments cannot be finally determined on or before such day, the Company shall pay to the Executive on such day an estimate,

A-18

as determined in good faith by the Company or, in the case of payments under Section 6.2 hereof, in accordance with Section 6.2 hereof, of the minimum amount of such payments to which the Executive is clearly entitled and shall pay the remainder of such payments (together with interest on the unpaid remainder (or on all such payments to the extent the Company fails to make such payments when due) at 120% of the rate provided in section 1274(b)(2)(B) of the Code) as soon as the amount thereof can be determined but in no event later than the thirtieth (30th) day after the Date of Termination.   In the event that the amount of the estimated payments exceeds the amount subsequently determined to have been due, such excess shall constitute a loan by the Company to the Executive, payable on the fifth (5th) business day after demand by the Company (together with interest at 120% of the rate provided in section 1274(b)(2)(B) of the Code).

6.4  The Company also shall pay to the Executive all legal fees and expenses incurred by the Executive in disputing in good faith any issue hereunder relating to the termination of the Executive's employment, in seeking in good faith to obtain or enforce any benefit or right provided by this Agreement or in connection with any tax audit or proceeding to the extent attributable to the application of section 4999 of the Code to any payment or benefit provided hereunder.  Such payments shall be made within five (5) business days after delivery of the Executive's written requests for payment accompanied with such evidence of fees and expenses incurred as the Company reasonably may require (but in no event after the last day of the calendar year following the calendar year in which the expense is incurred).

7.  Termination Procedures and Compensation During Dispute.

7.1  Notice of Termination.  After a Change in Control and during the Term, any purported termination of the Executive's employment (other than by reason of death) shall be communicated by written Notice of Termination from one party hereto to the other party hereto in accordance with Section 10 of the Employment Agreement.  For purposes of this Agreement, a "Notice of Termination" shall mean a notice which shall indicate the specific termination provision in this Agreement relied upon and shall set forth in reasonable detail the facts and circumstances claimed to provide a basis for termination of the Executive's employment under the provision so indicated. Further, a Notice of Termination for Cause is required to include a copy of a resolution duly adopted by the affirmative vote of not less than three-quarters (3/4) of the entire membership of the Board at a meeting of the Board which was called and held for the purpose of considering such termination (after reasonable notice to the Executive and an opportunity for the Executive, together with the Executive's counsel, to be heard before the Board) finding that, in the good faith opinion of the Board, the Executive was guilty of conduct set forth in clause (i) or (ii) of the definition of Cause herein, and specifying the particulars thereof in detail.

7.2   Date of Termination.  "Date of Termination," with respect to any purported termination of the Executive's employment after a Change in Control and during the Term, shall mean (i) if the Executive's employment is terminated for Disability, thirty (30) days after Notice of Termination is given (provided that the Executive shall not have returned to the full-time performance of the Executive's duties during such thirty (30) day period), and (ii) if the Executive's employment is terminated for any other reason, the date specified in the Notice of Termination (which, in the case of a termination by the Company (except in the case of a termination for Cause) and, in the case of a

A-19

termination by the Executive, shall not be less than thirty (30) days from the date such Notice of Termination is given).

7.3   Dispute Concerning Termination.  If within fifteen (15) days after any Notice of Termination is given, or, if later, prior to the Date of Termination (as determined without regard to this Section 7.3), the party receiving such Notice of Termination notifies the other party that a dispute exists concerning the termination, the Date of Termination shall be extended until the earlier of (i) the date prior to the date on which the Term ends or (ii) the date on which the dispute is finally resolved, either by mutual written agreement of the parties or by a final judgment, order or decree of an arbitrator or a court of competent jurisdiction (which is not appealable or with respect to which the time for appeal therefrom has expired and no appeal has been perfected); provided, however, that the Date of Termination shall be extended by a notice of dispute only if such notice is given in good faith and the party providing notice pursues the resolution of such dispute with reasonable diligence.

7.4  [Intentionally blank]

8.   No Mitigation.  The Company agrees that, if the Executive's employment with the Company terminates during the Term, the Executive is not required to seek other employment or to attempt in any way to reduce any amounts payable to the Executive by the Company pursuant to this Agreement.  Further, the amount of any payment or benefit provided for in this Agreement (other than Section 6.1(B) hereof) shall not be reduced by any compensation earned by the Executive as the result of employment by another employer, by retirement benefits, by offset against any amount claimed to be owed by the Executive to the Company, or otherwise.

9.   Successors; Binding Agreement.

9.1  This Agreement shall inure to the benefit of and be binding upon the Company and its successors and assigns.  In addition to any obligations imposed by law upon any successor to the Company, the Company will require any successor (whether direct or indirect, by purchase, merger, consolidation or otherwise) to all or substantially all of the business and/or assets of the Company to expressly assume and agree in writing to perform this Agreement in the same manner and to the same extent that the Company would be required to perform it if no such succession had taken place.  The Company will require any ultimate parent entity, as defined in 16 C.F.R. 8801,1(a)(3), of any Person who acquires 90% of the outstanding shares of common stock of the Company or the outstanding voting securities of the Company entitled to vote generally in the election of directors (including through a merger in which the Company does not survive or as a result of which the Company becomes a subsidiary of another Person or a consolidation involving the Company and another Person) to assume and agree in writing to perform as a joint and several obligor of the Company (including any successor to the Company), this Agreement in the same manner and to the same extent as the Company.  Failure of the Company to obtain such assumption and agreement in writing from a successor or its parent as described in the preceding sentences after notice and a reasonable cure period (not to exceed ten days from the date such notice is received) shall be a breach of this Agreement and shall entitle the Executive to compensation from the Company in the same amount and on the same terms as the Executive would be entitled to hereunder if the Executive were to terminate the Executive's employment for Good Reason after a Change in Control, except that, for

A-20

purposes of implementing the foregoing, the date on which any such succession becomes effective shall be deemed the Date of Termination.

9.2  This Agreement shall inure to the benefit of and be enforceable by the Executive's personal or legal representatives, executors, administrators, successors, heirs, distributees, devisees and legatees.  If the Executive shall die while any amount would still be payable to the Executive hereunder (other than amounts which, by their terms, terminate upon the death of the Executive) if the Executive had continued to live, all such amounts, unless otherwise provided herein, shall be paid in accordance with the terms of this Agreement to the executors, personal representatives or administrators of the Executive's estate.

10.  Insurance and Indemnification.  From and after a Change in Control, including after the termination of Executive's employment, the Company shall indemnify, defend and hold the Executive harmless from and against any and all expenses, liabilities, damages, costs, judgments, penalties, fines and amounts paid in settlement, incurred in good faith by Executive in connection with any proceeding involving Executive by reason of Executive's being or having been an officer, director, employee or agent of the Company (or any affiliate of the Company) to the fullest extent permitted by law, whether or not Executive is, or is threatened to be made, a party to any threatened, pending, or completed proceeding, and whether or not Executive is successful in such proceeding.  In addition, upon receipt from Executive of (i) a written request for an advancement of reasonable expenses which Executive reasonably believes will be subject to indemnification hereunder and (ii) a written undertaking by Executive to repay any such amounts if it shall ultimately be determined that the Executive is not entitled to indemnification under this Agreement or otherwise, the Company shall advance such expenses to Executive or pay such expenses for Executive, all in advance of the final disposition of any such matter.  From and after a Change in Control, including after the termination of Executive's employment hereunder, Executive shall have coverage under a director's and officer's liability insurance policy in amounts no less than, and on terms no less favorable than those, provided to senior executive officers of the Company from time to time.

11.  Definitions.  For purposes of this Agreement, the following terms shall have the meanings indicated below:

(A)  "Affiliate" shall have the meaning set forth in Rule 12b-2 promulgated under Section 12 of the Exchange Act.

(B)  "Agreement" shall mean this Attachment A to the Employment Agreement.

(B)  "Auditor" shall have the meaning set forth in Section 6.2 hereof.

(C)  "Base Amount" shall have the meaning set forth in section 280G(b)(3) of the Code.

(D)  "Code" shall mean the Internal Revenue Code of 1986, as amended from time to time.

(E)  "Company" shall mean Hayes Lemmerz International, Inc. and, except in determining under Section 15(G) hereof whether or not any Change in Control of the Company has occurred,

A-21

A-22

shall include any successor to its business and/or assets which assumes and agrees to perform this Agreement by operation of law, or otherwise.

(F) "Excise Tax" shall mean any excise tax imposed under section 4999 of the Code or any similar state or local tax or any interest or penalties incurred by Executive with respect to such excise tax.

(G) "Person" shall have the meaning given in Section 3(a)(9) of the Exchange Act, as modified and used in Sections 13(d) and 14(d) including a "group" within the meaning of Section 13(d)(3) thereof, except that such term shall not include (i) the Company or any of its subsidiaries, (ii) a trustee or other fiduciary holding securities under an employee benefit plan of the Company or any of its Affiliates, (iii) an underwriter temporarily holding securities pursuant to an offering of such securities, or (iv) a corporation owned, directly or indirectly, by the stockholders of the Company in substantially the same proportions as their ownership of stock of the Company.

(H) "Retirement" shall be deemed the reason for the termination by the Executive of the Executive's employment if such employment is terminated in accordance with the Company's retirement policy, including early retirement, generally applicable to its salaried employees.

A-22

**EXECUTIVE EMPLOYMENT AGREEMENT, AS AMENDED BY**
**AMENDMENT NO. 1 TO EMPLOYMENT AGREEMENT**

THIS AGREEMENT (the "Agreement") is made as of the 25th day of March, 2004 (the "Agreement Date"), by and between Hayes Lemmerz International, Inc. (the "Company") and Patrick C. Cauley (the "Executive"), as amended by that certain Amendment No. 1 to Employment Agreement dated as of December 30, 2008.

WHEREAS, the Company desires to provide for the continued employment of the Executive on the terms and conditions set forth herein, in the best interest of the Company and its constituencies; and

WHEREAS, the Executive desires to continue to be employed by the Company as provided herein; and

NOW, THEREFORE, in consideration of the premises and the respective covenants and agreements of the parties herein contained, the parties agree as follows:

1.    Employment.  The Company agrees to continue to employ the Executive and the Executive agrees to continue to be employed on a full-time basis by the Company for the period and upon the terms and conditions hereinafter set forth.

2.    Term; Employment Period.  The term of this Agreement (the "Term") shall commence on the Agreement Date (the "Effective Date") and continue until terminated pursuant to Section 6 of this Agreement.  The period during which the Executive is employed by the Company pursuant to this Agreement is referred to herein as the "Employment Period."  The date on which the termination of the Executive's employment hereunder shall become effective is referred to herein as the "Termination Date."

3.    Position and Duties.  During the Employment Period, the Executive shall serve as Vice President, General Counsel and Secretary of the Company and shall have such responsibilities, duties and authority as are customarily and ordinarily exercised by executives in similar positions in similar businesses in the United States and shall exercise such responsibilities, duties and authority consistent with the foregoing as the Company's Chief Executive Officer or the Company's Board of Directors (the "Board") shall determine from time to time.  During the Employment Period, the Executive shall report to the Company's Chief Executive Officer or the Chief Executive Officer's designee.  The Executive shall devote substantially all his working time and efforts to the business and affairs of the Company and shall use his best efforts to carry out his responsibilities faithfully and efficiently in a professional manner.  Notwithstanding the foregoing, it is understood that during the Employment Period, subject to any conflict of interest policies of the Company and Section 8, the Executive may (x) serve in any capacity with any civic, charitable, educational or professional organization provided that such service does not materially interfere with his duties and responsibilities hereunder and (y) make and manage

personal investments of his choice, and with the prior consent of the Company's Chief Executive Officer, which shall not be unreasonably withheld, serve on the board of directors of one (1) for-profit business enterprise.

4.      Place of Performance.  During the Employment Period, the Executive's place of performance of his services shall be at the Company's Northville, Michigan Headquarters, except for required travel by the Executive on the Company's business or as may be reasonably required by the Company.

5.      Compensation and Benefits.

(a)      Salary.  During the Employment Period, the Company shall pay to the Executive an initial annual base salary of Two Hundred Thousand Dollars ($200,000) (as the same may be increased from time to time, the "Base Salary"), such salary to be paid in periodic installments in accordance with the Company's payroll practices as in effect from time to time. The Base Salary shall be reviewed annually by the compensation committee of the Board and may be increased from time to time in accordance with normal business practices of the Company and, if so increased, shall not thereafter be reduced.

(b)      Cash-Based Incentives.  During the Employment Period, the Executive shall be eligible to earn an annual bonus under the Company's Short-Term Incentive Plan, or a successor plan thereto, as in effect from time to time (the "Incentive Plan"), subject to achievement of performance goals determined in accordance with the terms of the Incentive Plan (such annual bonus, the "Annual Bonus").  Such performance goals shall include (i) a threshold level below which no Annual Bonus shall be paid, (ii) a normative level that is tied to the budget, which if obtained, would result in an Annual Bonus of  sixty percent (60%) of the Base Salary and (iii) an upside level, which if obtained, would increase the Annual Bonus to a maximum of one hundred twenty percent (120%) of the Base Salary.  Any Annual Bonus payable to the Executive for the Company's fiscal year ending January 31, 2005 will be on a pro rata basis based upon the number of months the Executive worked for the Company during such fiscal year.  The Annual Bonus shall be payable in a cash lump sum at such time as bonuses are ordinarily paid in accordance with the terms of the Incentive Plan, but in no event later than 120 days after the end of each fiscal year of the Company.  Except as otherwise specifically provided in this Agreement, the Executive shall only be eligible to receive the Annual Bonus if the Executive is employed by the Company through the last day of February in the year in which the Annual Bonus is to be paid.

(c)      "Change in Control" Definition.  For purposes of this Agreement, a "Change in Control" shall be deemed to have occurred upon the first of the following to occur:

(1)      any Person (within the meaning of Section 3(a)(9) of the Securities and Exchange Act of 1934, as amended (the "Exchange Act"), as modified and used in Sections 13(d) and 14(d) thereof), other than Joseph Littlejohn & Levy Fund II, L.P. (or any affiliate (within the meaning of Regulation D Rule 501(b) under the Securities Act of 1933, as amended (the "Securities

2

Act")) thereof), TSG Capital Fund II, L.P. (or any affiliate thereof), or Canadian Imperial Bank of Commerce (or affiliate thereof) (such entitles, collectively, the "JLL Group"), is or becomes the "Beneficial Owner" (within the meaning of Rule 13d-3 under the Exchange Act) of fifty percent (50%) or more of either (1) the then-outstanding Common Stock or (2) the combined voting power of the then-outstanding voting securities of the Company entitled to vote generally in the election of directors;

(2)    the following individuals cease for any reason to constitute a majority of the number of directors then serving:  individuals who, as of the Effective Date, constitute the Board and any new director (other than a director whose initial assumption of office is in connection with an actual or threatened election contest, including but not limited to a consent solicitation, relating to the election of directors of the Company) whose appointment or election by the Board or nomination for election by the Company's stockholders was approved or recommended by a vote of at least a majority of the directors then still in office who either were directors on the date hereof or whose appointment, election or nomination for election was previously so approved or recommended;

(3)    there is consummated a merger or consolidation of the Company or any direct or indirect subsidiary of the Company with any other corporation, other than a merger or consolidation which would result in the voting securities of the Company outstanding immediately prior to such merger or consolidation continuing to represent (either by remaining outstanding or by being converted into voting securities of the surviving entity or any parent thereof) at least fifty percent (50%) of the combined voting power of the securities of the Company or such surviving entity or any parent thereof outstanding immediately after such merger or consolidation, provided, however, that it shall not be a Change in Control under this clause (C) if (i) directors appointed or nominated by the JLL Group or any constituent member thereof continue immediately following such transaction to constitute a majority of the Board and (ii) the JLL Group or any constituent member thereof continues immediately following such transaction to own securities representing at least thirty-five percent (35%) of the combined voting power of the securities of the Company or such surviving entity or any parent thereof outstanding immediately after such merger or consolidation; or

(4)    the stockholders of the Company approve a plan of complete liquidation or dissolution of the Company or there is consummated an agreement for the sale or disposition by the Company of all or substantially all of its assets.

(d)    Option Grants.  Based upon the Executive's performance and annual review, the Executive shall be eligible during the Employment Period to receive stock option grants in such amounts and subject to such terms and conditions as the compensation

3

committee of the Board shall determine in its sole discretion are necessary and desirable.

(e)    Expenses.  During the Employment Period, the Company shall promptly reimburse the Executive for all reasonable out-of-pocket expenses incurred by the Executive in connection with the business of the Company and the performance of his duties under this Agreement in accordance with the terms of the Company's policies as in effect from time to time.

(f)    Benefit Plans.  During the Employment Period, the Executive shall be entitled to participate in all of the employee benefit plans, programs, agreements and arrangements provided to senior executives of the Company, as such are in effect from time to time, on a basis no less favorable than that provided to such senior executives.

(g)    Perquisites.  During the Employment Period, the Executive shall be entitled to participate in those perquisites provided to senior executives of the Company, as such are in effect from time to time, on a basis no less favorable than that provided to such senior executives.  In addition, the Company shall pay Executive an annual flexible benefits allowance (the "Flexible Benefits Allowance") of Thirty Five Thousand Dollars ($35,000), such allowance to be paid in periodic installments in accordance with the Company's payroll practices as in effect from time to time. The Flexible Benefits Allowance shall be reviewed annually by the Compensation Committee of the Board and may be increased from time to time and, if so increased, shall not thereafter be reduced.

(h)    Vacations.  During the Employment Period, the Executive shall be entitled to vacation time, paid holidays and personal days, determined in accordance with the Company's policy with respect to its senior executives as in effect from time to time, it being understood that the Executive shall be entitled to not less than four weeks' vacation in any 12-month period during the Employment Period thereafter.

6.    Termination of Employment.

(a)    Accrued Benefits.  In the event of the termination of the Executive's employment hereunder for any reason, the Executive (or his estate or representative, as applicable) shall be entitled to receive any Base Salary, Annual Bonus, vacation time and expenses that have in each case accrued but are unpaid as of the Termination Date, vested options as well as any post-termination benefits to which he may be entitled pursuant to the Company's retirement, insurance and other benefit plans, programs and arrangements as in effect immediately prior to the Termination Date (the "Accrued Benefits").

(b)    Death.  The Executive's employment hereunder shall terminate as of the date of his death.  Upon the termination of the Executive's employment hereunder because of his death, the Executive's estate or representative, as the case may be, shall be entitled to receive the Accrued Benefits and a lump sum payment in cash equal to (i) one year's Base Salary as in effect on the Termination Date and (ii) the product of (x) sixty percent (60%) of the Base Salary as in effect on the Termination Date, multiplied by a fraction (y) the numerator of which

4

shall be the number of months (including fractions thereof) worked by the Executive during the Company's fiscal year in which the Termination Date occurs and (z) the denominator of which shall be the number 12 (such amount under this clause (ii), the "Pro Rata Annual Bonus").  Such amounts shall be paid as soon as administratively feasible following the Executive's death but in no event later than April 15 of the calendar year following the Executive's death.  In addition, those immediate family members who were participating in the Company's medical benefit plan as of the date of the Executive's death shall continue to participate in the Company's medical benefit plan at active employee contribution rates for the one-year period immediately following the date of the Executive's death.

(c)    Disability.  The Executive's employment hereunder may be terminated during the Employment Period if the Executive is incapable of performing his principal duties hereunder because of physical or mental incapacity for a period of 45 consecutive working days or for more than 90 working days in any 12-month period ("Disability").  In the event that the Executive's employment is to be terminated pursuant to this Section 6(c), (i) this Agreement shall terminate on the date specified in the notice of termination delivered to the Executive (subject to Section 8(g) and Section 18); (ii) the Executive shall as of such date resign from all of his positions, duties and authorities hereunder; (iii) the Executive shall be placed on a medical leave of absence until the earlier of (A) expiration of the six-month period commencing on the date his medical leave of absence began, unless there is no reasonable expectation that the Executive will return to employment with the Company, in which case the date the Executive ceases performing services for the Company, (B) the date he qualifies for benefits under the Company's long-term disability plan or (C) the date he is able to return to work; and (iv) the Executive shall continue to be paid his Base Salary until such medical leave of absence ends.  In the case of a termination of the Executive's employment pursuant to this Section 6(c), for purposes of calculating benefits pursuant to clauses (B) and (C) below the Termination Date shall be the date upon which the Executive's medical leave of absence commences, and for all other purposes, the Termination Date shall be the date upon which the Executive's medical leave of absence ends.  In the event the Executive's employment is terminated pursuant to this Section 6(c), the Executive (or his representative, as applicable) shall be entitled to:  (A) the Accrued Benefits; (B) a lump sum payment in cash equal to one year's Base Salary and Flexible Benefits Allowance as in effect on the Termination Date; (C) the Pro Rata Annual Bonus; and (D) the continuation of health and welfare benefits at the levels in effect as of the Termination Date at no additional cost to the Executive than that which was in effect as of the Termination Date for the one-year period immediately following the Termination Date;  provided, however, that such benefits shall be reduced to the extent comparable benefits are made available to the Executive from a successor employer, and the Executive shall be obligated to report such benefits to the Company.  The amounts payable pursuant to clauses (B) and (C) of the preceding sentence shall be paid in the month following the Executive's Termination Date.  It is acknowledged and agreed by the Executive that he shall be precluded from terminating his employment hereunder for Good Reason in the event that his employment hereunder is terminated pursuant to this Section 6(c).

(d)    For Cause; Without Good Reason.  The Executive's employment hereunder may be terminated during the Employment Period (i) by the Company for Cause (as defined below) or (ii) by the Executive without Good Reason (as defined below).  In the event

5

that the Company terminates the Executive's employment hereunder for Cause, the Termination Date shall be the date specified in the notice of termination for Cause delivered by the Company to the Executive. In the event that the Executive terminates his employment hereunder without Good Reason, the Termination Date shall be no earlier than 30 days following the date on which a notice of termination is delivered by the Executive to the Company. In the event that the Executive's employment hereunder is terminated pursuant to this Section 6(d), the Executive shall be entitled to the Accrued Benefits.

(e)    Without Cause; For Good Reason. The Executive's employment hereunder may be terminated during the Employment Period (i) by the Company without Cause or (ii) by the Executive for Good Reason. In the event that the Executive's employment is terminated pursuant to this Section 6(e) (whether by the Company or by the Executive), the Termination Date shall be no earlier than 30 days following the date on which a notice of termination is delivered by one party to the other. In the event that the Executive's employment is terminated pursuant to this Section 6(e), the Executive (or his estate or representative, as the case may be) shall be entitled to receive the Accrued Benefits. The Executive (or his estate or representative, as the case may be) shall be entitled to the following severance benefits (A) a lump sum payment in cash equal to one year's Base Salary and Flexible Benefits Allowance as in effect on the Termination Date; (B) the Pro Rata Annual Bonus; and (C) the title to the Executive's Company vehicle. The benefits described in the preceding sentence shall be paid in the month following the Executive's Termination Date. Severance benefits provided to the Executive under this paragraph shall also include: (x) continuation of health and welfare benefits for one year at the levels in effect as of the Termination Date at no additional cost to the Executive than that which was in effect as of the Termination Date; provided, that such benefits shall be reduced to the extent comparable benefits are made available to the Executive from a successor employer, and the Executive shall be obligated to report such benefits to the Company; and (y) executive level career outplacement services for the period beginning on the Termination Date and ending December 31 of second calendar year following termination by a mutually agreeable outplacement firm and paid for as incurred by the Company.

(f)    Definition of "Cause" and "Good Reason".

For purposes of this Agreement, "Cause" means: (i) the willful failure of the Executive to perform his material duties with the Company which have been duly assigned to the Executive and which duties are commensurate with those of the position for which Executive is then employed, and which failure is not cured (if capable of cure) within 15 days after receipt of written notice of such failure, which notice identifies the manner in which the Executive has willfully failed to perform, (ii) the engaging by the Executive in willful conduct which is demonstrably injurious to the Company, monetarily or otherwise, (iii) the conviction of the Executive of any crime or offense constituting a felony, or (iv) a failure by the Executive to comply with any material provision of this Agreement, which failure is not cured (if capable of cure) within 15 days after receipt of written notice of such non-compliance by the Executive. Termination of the Executive for Cause shall mean termination by action of at least a majority of the Company's Board of Directors, at a meeting duly called and held upon at least 15 days' written notice to the Executive specifying the particulars of the action or inaction alleged to

6

constitute Cause and at which meeting the Executive and his counsel were entitled to be present and given adequate opportunity to be heard.  For purposes of clauses (i) and (ii) of this definition, action or inaction by the Executive shall not be considered "willful" unless done or omitted by him (A) intentionally or not in good faith and (B) without reasonable belief that his action or inaction was in the best interest of the Company, and shall not include failure to act by reason of total or partial incapacity due to physical or mental illness.

For purposes of this Agreement, 'Good Reason' means the occurrence of one or more of the following events if the Executive gives notice of the event to the Company within 90 days of the event and the Company fails to remedy such event within 30 days of receiving notice from the Executive:  (i) a material adverse alteration in the nature or status of the Executive's position, duties, responsibilities or authority from those in effect as of the Effective Date; (ii) a material reduction in the Executive's Base Salary or level of employee benefits (other than across-the-board reductions applied similarly to all of the Company's senior executives occurring after the second anniversary of the Effective Date); (iii) a failure to pay or provide a material amount of the compensation set forth in this Agreement (except for an across-the-board deferral of compensation applied similarly to all of the Company's senior executives occurring after the second anniversary of the Effective Date); (iv) the relocation of the Executive's principal place of employment more than 30 miles from its location as of the Effective Date except for required travel on the Company's business; (v) assignment of duties or responsibilities to the Executive which are materially inconsistent with the provisions of this Agreement; or (vi) a failure by the Company to comply with any material provision of this Agreement.

(g)    <u>Change in Control Severance Provisions</u>.  The provisions set forth in Attachment A hereto are hereby incorporated into this Agreement.  The Executive hereby acknowledges that in the event he becomes entitled to the payment set forth in Section 6.1(A) of Attachment A hereto, that such payment will be in lieu of any other payments to be made pursuant to the terms of this Agreement.

(h)    <u>Release Agreement</u>.  Notwithstanding anything to the contrary contained in this Section 6, the Executive shall be required to execute the Company's then current standard release agreement as a condition to receiving any of the payments and benefits provided for in this Section 6 or Attachment A.  It is acknowledged and agreed that the then current standard release agreement shall be a mutual release and shall not diminish or terminate Executive's rights under this Agreement including, but not limited to, those delineated in Sections 6(i), 7 and 16 herein.

(i)    <u>No Mitigation</u>.  Upon termination of the Executive's employment with the Company, subject to the Executive's affirmative obligations pursuant to Section 6(c) and 6(e), the Executive shall be under no obligation to seek other employment or otherwise mitigate the obligations of the Company under this Agreement.  The time period for executing such release (and the period available to revoke it) shall be in accordance with the Company's then current standard practice but in no event shall the execution period extend beyond 60 days following the Executive's Termination Date.

7

7.    Directors' and Officers' Insurance; Indemnification.  In addition to any rights to indemnification to which the Executive is entitled under the Company's Restated Certificate of Incorporation and Bylaws, the Company shall indemnify the Executive at all times during and after the Employment Period to the maximum extent permitted under the Delaware Business Corporation Act or any successor provision thereof, and any and all applicable state law, and shall pay the Executive's expenses (including reasonable attorneys' fees and expenses, which shall be paid in advance by the Company as incurred, subject to recoupment in accordance with applicable law) in defending any civil action, suit or proceeding in advance of the final disposition of such action, suit or proceeding to the maximum extent permitted under such applicable state laws for the Executive's action or inaction on behalf of the Company under the terms of this Agreement including but not limited to any acts or alleged acts arising out of events prior to the Executive's employment by the Company which obligation shall survive the termination of the Executive's employment or the termination of the other provisions of this Agreement.

8.    Confidential Information; Removal of Documents; Non-Competition; etc. For purposes of this Section 8, "Company" shall mean the Company, its subsidiaries and affiliates.

(a)    Confidentiality.  Except as otherwise provided in this Agreement, at all times during and after the Employment Term, the Executive shall keep secret and retain in strictest confidence, any and all Confidential Information (as defined below) relating to the Company, and shall use such Confidential Information only in furtherance of the performance by the Executive of the Executive's duties to the Company and not for personal benefit or the benefit of any interest adverse to the Company's interests.  For purposes of this Agreement, "Confidential Information" shall mean any information including without limitation plans, specifications, models, samples, data, customer lists and customer information, computer programs and documentation, and other technical and/or business information, in whatever form, tangible or intangible, that can be communicated by whatever means available at such time, that relates to the Company's current Business or future business contemplated during the Employment Period, products, services and development, or information received from others that the Company is obligated to treat as confidential or proprietary; provided, however, that such Confidential Information shall not include any information that (i) has become generally available to the public other than as a result of a disclosure by the Executive, or (ii) was available to or became known to the Executive prior to the disclosure of such information on a non-confidential basis without breach of any duty of confidentiality from any party to the Company, and the Executive shall not disclose such Confidential Information to any person or entity other than the Company, except as may be required by law or court or administrative order (in which event the Executive shall so notify the Company as promptly as practicable).  Upon termination of the Executive's employment hereunder for any reason, the Executive shall return to the Company all copies, reproductions and summaries of Confidential Information in the Executive's possession and erase the same from all media in the Executive's possession, and, if the Company so requests, shall certify in writing that the Executive has done so.  All Confidential Information is and shall remain the property of the Company (or, in the case of information that the Company receives from a third party which it is obligated to treat as confidential, then the property of such third party).

8

(b)    Non-Competition.

(i)    During the Employment Period, the Executive shall not engage in Competition (as defined below) with the Company.  For purposes of this Agreement, "Competition" by the Executive shall mean the Executive's engaging in, or otherwise directly or indirectly being employed by or acting as a consultant or lender to, or being a director, officer, employee, principal, agent, stockholder, member, owner or partner of, or permitting the Executive's name to be used in connection with the activities of any other business or organization anywhere which competes, directly or indirectly, with the Business of the Company as the same shall be constituted at the Termination Date or which, during the six-month period prior to the Executive's termination, the Company had made substantial plans with the intention of establishing operations.

(ii)    For the one year period commencing on the Termination Date, the Executive shall not engage in Competition with the Company in any locality or region in which the Company had operations at the time of, or within six months prior to, the Executive's termination, or in which, during the six-month period prior to the Executive's termination, the Company had made substantial plans with the intention of establishing operations in such locality or region; provided, however, that it shall not be a violation of this sub-paragraph or the sub-paragraph hereinabove for the Executive to be or become the registered or beneficial owner of up to three percent (3%) of any class of the capital stock of a competing corporation registered under the Exchange Act, provided that the Executive does not actively participate in the business of such corporation until such time as this covenant expires.

(c)    Non-Solicitation.  For the one year period commencing on the Termination Date, the Executive agrees that the Executive shall not, directly or indirectly, for the Executive's benefit or for the benefit of any other person, firm or entity, engage any of the following conduct:

(i)    solicit from any customer doing business with the Company as of the Termination Date, business of the same or of a similar nature to the business of the Company with such customer;

(ii)    solicit from any known potential customer of the Company business of the same or of a similar nature to that which has been the subject of a known written or oral bid, offer or proposal by the Company, or of substantial preparation with a view to making such a bid, proposal or offer, within six months prior to the Executive's termination;

(iii)    solicit the employment or services of, or hire, any person who was known to be employed by or was a known consultant to the Company upon the termination of the Executive's employment, or within six months prior thereto; or

9

(iv)    otherwise interfere with the business or accounts of the Company.

(d)    <u>Intellectual Property</u>.  All Intellectual Property (as defined below) and Technology (as defined below) created, developed, obtained or conceived of by the Executive during the Employment Period, and all business opportunities presented to the Executive during the Employment Period, shall be owned by and belong exclusively to the Company, provided that they reasonably relate to the Business, and the Executive shall (i) promptly disclose any such Intellectual Property, Technology or business opportunity to the Company, and (ii) execute and deliver to the Company, without additional compensation, such instruments as the Company may require from time to time to evidence its ownership of any such Intellectual Property, Technology or business opportunity.  For purposes of this Agreement, (A) the term "Intellectual Property" means and includes any and all trademarks, trade names, service marks, service names, patents, copyrights, and applications therefor, and (B) the term "Technology" means and includes any and all trade secrets, proprietary information, invention, discoveries, know-how, formulae, processes and procedures.

(e)    The Executive acknowledges that the services to be rendered by the Executive to the Company are of a special and unique character, which gives this Agreement a peculiar value to the Company, the loss of which may not be reasonably or adequately compensated for by damages in an action at law, and that a material breach or threatened breach by the Executive of any of the provisions contained in this Section 8 shall cause the Company irreparable injury.  The Executive therefore agrees that the Company shall be entitled, in addition to any other right or remedy, to a temporary, preliminary and permanent injunction, without the necessity of proving the inadequacy of monetary damages or the posting of any bond or security, enjoining or restraining the Executive from any such violation or threatened violations.

(f)    The Executive further acknowledges and agrees that due to the uniqueness of the Executive's services and confidential nature of the information the Executive shall possess, the covenants set forth herein are reasonable and necessary for the protection of the business and goodwill of the Company.

(g)    <u>Continuing Operation</u>.  Any termination of the Executive's employment or of this Agreement shall have no effect on the continuing operation of this Section 8.

9.    <u>Severability</u>.  It is the desire and intent of the parties that the provisions of this Agreement shall be enforced to the fullest extent permissible under the laws and public policies applied in each jurisdiction in which enforcement is sought.  Accordingly, if any particular provision or portion of this Agreement shall be adjudicated to be invalid or unenforceable, this Agreement shall be deemed amended to delete therefrom the portion thus adjudicated to be invalid or unenforceable, such deletion to apply only with respect to the operation of such provision in the particular jurisdiction in which such adjudication is made.

10

10.     Notices.  All communications, requests, consents and other notices provided for in this Agreement shall be in writing and shall be deemed give if delivered by hand or mailed by first class mail, postage prepaid, to the last known address of the recipient.

11.     Governing Law.  This Agreement shall be governed by and construed and enforced in accordance with the laws of the State of Delaware, without regard to its conflicts of laws provisions.

12.     Assignment.  Neither this Agreement nor any rights or duties hereunder may be assigned by the Executive without the prior written consent of the Company.  The Company shall have the right at any time to assign this Agreement to its successors and assigns; provided, however, that the assignee or transferee is the successor to all or substantially all of the business and assets of the Company and such assignee or transferee expressly assumes all of the obligations, duties and liabilities of the Company set forth in this Agreement.

13.     Amendments.  No provisions of this Agreement shall be altered, amended, revoked or waived except by an instrument in writing, signed by each party to this Agreement.

14.     Binding Effect.  Except as otherwise provided herein, this Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective legal representatives, heirs, successors and assigns.

15.     Execution in Counterparts.  This Agreement may be executed in any number of counterparts, each of which shall be deemed an original, but all of which together shall constituted one and the same instrument.

16.     Arbitration.  Any dispute, controversy or question arising under, out of, or relating to this Agreement (or the breach thereof), or, the Executive's employment with the Company or termination thereof, shall be referred for arbitration in the State of Michigan to a neutral arbitrator selected by the Executive and the Company and this shall be the exclusive and sole means for resolving such dispute.  Such arbitration shall be conducted in accordance with the National Rules for Resolution of Employment Disputes of the American Arbitration Association.  The arbitrator shall have the discretion to award reasonable attorneys' fees, costs and expenses to the prevailing party.  Judgment upon the award rendered by the arbitrator may be entered in any court having jurisdiction thereof.

17.     Entire Agreement.  This Agreement sets forth the entire agreement and understanding of the parties and supersedes all prior understandings, agreements or representations by or between the parties, whether written or oral, which relate in any way to the subject matter hereof.

18.     Survivorship.  The provisions of this Agreement necessary to carry out the intention of the parties as expressed herein shall survive the termination or expiration of this Agreement.

11

19.     Waiver.  Except as provided herein, the waiver by either party of the other party's prompt and complete performance, or breach or violation, of any provision of this Agreement shall not operate nor be construed as a waiver of any subsequent breach or violation, and the failure by any party hereto to exercise any right or remedy which it may possess hereunder shall not operate nor be construed as a bar to the exercise of such right or remedy by such party upon the occurrence of any subsequent breach or violation.

20.     Captions.  The captions of this Agreement are for convenience and reference only and in no way define, describe, extend or limit the scope or intent of this Agreement or the intent of any provision hereof.

21.     Construction.  The parties acknowledge that this Agreement is the result of arm's-length negotiations between sophisticated parties each afforded representation by legal counsel.  Each and every provision of this Agreement shall be construed as though both parties participated equally in the drafting of same, and any rule of construction that a document shall be construed against the drafting party shall not be applicable to this Agreement.

22.     Code Section 409A Payment Delay.  Notwithstanding any provision in this Agreement (or the attached Severance Agreement) to the contrary, any payment triggered by a termination of employment to the extent and up to the amount necessary to ensure that such payments are not subject to penalties and interest under Code Section 409A shall not commence until at least six months after the Executive's termination of  employment.  To the extent such payments, absent this provision, would be paid during the first six month period following the Executive's termination of employment, those payments shall be withheld and the amount of the payments withheld will be paid in a lump sum, without interest, during the seventh month after termination; provided that, if the Executive dies during such six-month period, any such delayed payments shall be immediately payable to the Executive's estate or representative.

12

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first above written.

EXECUTIVE


By:_____
　　Patrick C. Cauley


HAYES LEMMERZ INTERNATIONAL,  INC.


By:_____
Name:  Curtis J. Clawson
Title:   President and Chief Executive Officer

10301891.2

13

*Attachment A*

## SEVERANCE AGREEMENT

1.  Defined Terms.  Unless otherwise defined in this Attachment A, the terms that are defined in the Employment Agreement (the "Employment Agreement") shall have the same meanings when used herein as that are ascribed to such terms in the Employment Agreement.

2.  Term of Agreement.  The Term of this Agreement shall commence on the Effective Date hereof and shall continue in effect through the third anniversary thereof; provided, however, that commencing on the first anniversary of the Effective Date and each anniversary thereafter (each such date a "Renewal Date"), the Term shall automatically be extended for one additional year unless, on or prior to such Renewal Date, the Company or the Executive shall have given notice not to extend the Term; and further provided, however, that if a Change in Control shall have occurred during the Term, the Term shall expire no earlier than twenty-four (24) months beyond the month in which such Change in Control occurred.

3.  Immediate Effect of Change in Control.  Promptly following a Change in Control, but in no event later than April 15 of the calendar year following the Change in Control, the Executive shall be entitled to the immediate payment of all unpaid compensation amounts (including the pro rata bonus payment for the current fiscal year under any bonus plan for which he is eligible ("Pro-rata Bonus") and all unpaid bonuses with respect to any prior fiscal year) with respect to the Executive's employment.  For purposes of this Section 3, Pro-rata Bonus shall be an amount equal to the product of (1) the product of (x) the Executive's base salary as in effect immediately prior to the Change in Control and (y) the greater of (A) the Executive's normative bonus percentage for the fiscal year in which the Change in Control occurs and (B) the Executive's estimated bonus percentage calculated in good faith by the Company's Finance Department determined by projecting performance through the end of the fiscal year in which the Change in Control occurs and (2) a fraction, the numerator of which is the number of days in the fiscal year in which the Change in Control occurs through the date of the Change in Control, and the denominator of which is 365.  The Pro-rata Bonus paid shall be subtracted from the amount otherwise due the Executive as a bonus for the fiscal year in which the Change in Control occurs, but such Pro-rata Bonus becomes a vested benefit upon a Change in Control and in no event shall the Executive have to repay all or any portion of the Pro-rata Bonus.

4.  Company's Covenants Summarized.  In order to induce the Executive to remain in the employ of the Company, the Company agrees, under the conditions described herein, to pay the Executive the Severance Payments and the other payments and benefits described herein.  Except as provided in Section 9.1 hereof, no Severance Payments shall be payable under this Agreement unless there shall have been (or, under the terms of the second sentence of Section 6.1 hereof, there shall be deemed to have been) a termination of the Executive's employment with the Company on or following a Change in Control and during the Term.  This Agreement shall not be construed as creating an express or implied contract of employment and, except as otherwise agreed in writing between the Executive and the Company, the Executive shall not have any right to be retained in the employ of the Company.

A-14

5. <u>Compensation Other Than Severance Payments</u>.

5.1 Following a Change in Control and during the Term, during any period that the Executive fails to perform the Executive's full-time duties with the Company as a result of incapacity due to physical or mental illness, the Company shall pay the Executive's full salary to the Executive at the rate in effect at the commencement of any such period, together with all compensation and benefits payable to the Executive under the terms of any compensation or benefit plan, program or arrangement (other than the Company's short- or long-term disability plan, as applicable, to the extent such benefits would be duplicative and their nonpayment would not prejudice Executive's future entitlement to benefits) maintained by the Company during such period, until the Executive's employment is terminated by the Company for Disability.

5.2 If the Executive's employment shall be terminated for any reason on or following a Change in Control and during the Term, the Company shall pay the Executive's full salary to the Executive through the Date of Termination at the rate in effect immediately prior to the Date of Termination or, if higher, the rate in effect immediately prior to the first occurrence of an event or circumstance constituting Good Reason, together with all compensation and benefits payable to the Executive through the Date of Termination under the terms of the Company's compensation and benefit plans, programs or arrangements as in effect immediately prior to the Date of Termination or, if more favorable to the Executive, as in effect immediately prior to the first occurrence of an event or circumstance constituting Good Reason (including all unpaid bonuses with respect to any prior fiscal year). In addition, if the Executive's employment is terminated on or following a Change in Control and during the Term, other than (A) by the Company for Cause, (B) by reason of death or Disability, or (C) by the Executive without Good Reason, then the Company shall pay Executive an amount equal to the product of (1) the product of (x) the Executive's base salary as in effect immediately prior to the Date of Termination, or, if higher, as in effect immediately prior to the first occurrence of an event or circumstance constituting Good Reason (the greater of such amounts, the "Base Salary") and (y) the Executive's normative bonus percentage for the year in which the Date of Termination occurs, or if higher, the normative bonus percentage for the fiscal year in which the Change in Control occurs or the normative bonus percentage in effect immediately prior to the first occurrence of an event or circumstance constituting Good Reason (the greatest of such percentages, the "Bonus Percentage") and (2) a fraction, the numerator of which is the number of days in the fiscal year in which the Date of Termination occurs through the date of the Date of Termination, and the denominator of which is 365; it being understood that, if the Date of Termination is in the same fiscal year as the Change in Control, the Pro-rata Bonus calculated pursuant to Section 3 shall be subtracted from the amount payable pursuant to this sentence of Section 5.2 but shall not reduce the amount payable below zero.

5.3 If the Executive's employment shall be terminated for any reason on or following a Change in Control and during the Term, the Company shall pay to the Executive the Executive's normal post-termination compensation and benefits as such payments become due. Such post-termination compensation and benefits shall be determined under, and paid in accordance with, the Company's retirement, insurance and other compensation or benefit plans, programs and arrangements as in effect immediately prior to the Date of Termination or, if more favorable to the

Executive, as in effect immediately prior to the occurrence of the first event or circumstance constituting Good Reason.

6.   Severance Payments.

6.1  If the Executive's employment is terminated on or following a Change in Control and during the Term, other than (A) by the Company for Cause, (B) by reason of death or Disability, or (C) by the Executive without Good Reason, then the Company shall pay the Executive the amounts, and provide the Executive the benefits, described in this Section 6.1 ("Severance Payments") and Section 6.2, in addition to any payments and benefits to which the Executive is entitled under Section 5 hereof or otherwise (except as provided herein).  For purposes of this Agreement, the Executive's employment shall be deemed to have been terminated following a Change in Control by the Company without Cause or by the Executive with Good Reason, if (i) the Executive's employment is terminated by the Company without Cause prior to a Change in Control (whether or not a Change in Control ever occurs) and such termination was at the request or direction of a Person who enters into an agreement with the Company the consummation of which would constitute a Change in Control, (ii) the Executive terminates his employment for Good Reason prior to a Change in Control (whether or not a Change in Control ever occurs) and the circumstance or event which constitutes Good Reason occurs at the request or direction of such Person, or (iii) the Executive's employment is terminated by the Company without Cause or by the Executive for Good Reason and such termination or the circumstance or event which constitutes Good Reason is otherwise in connection with or in anticipation of a Change in Control (whether or not a Change in Control ever occurs).

(A)  In lieu of any further salary payments to the Executive for periods subsequent to the Date of Termination and in lieu of any severance benefit otherwise payable to the Executive (whether pursuant to any employment agreement, plan, policy or otherwise), the Company shall pay to the Executive a lump sum severance payment, in cash, equal to two times the sum of (i) the Base Salary and Flexible Benefits Allowance and (ii) the product of (x) the Base Salary and (y) the Bonus Percentage.  Such amounts shall be paid within the period described in Section 6.3.

(B)   For the twenty-four (24) month period immediately following the Date of Termination, the Company shall arrange to provide the Executive and his dependents with life, disability, accident and health insurance benefits substantially similar to those provided to the Executive and his dependents immediately prior to the Date of Termination or, if more favorable to the Executive, those provided to the Executive and his dependents immediately prior to the first occurrence of an event or circumstance constituting Good Reason, at no greater cost to the Executive than the Executive's cost immediately prior to such date or occurrence (the "Executive's Cost").  Unless the Executive consents to a different method (after taking into account the effect of such method on the calculation of "parachute payments" pursuant to Section 6.2 hereof), the health insurance benefits described in this Section 6.1(B) shall be provided through a third-party insurer.  In the event continued accident and health insurance coverage under this Section 6.1(B) is provided through the Company's self-insured health plan such coverage shall be limited to the first eighteen months following the Date of Termination.  If the Executive is not receiving accident and health insurance coverage from another employer at the end of such eighteen month period, the Company shall pay the Executive a lump sum amount equal to six times the monthly COBRA health benefit

A-16

continuation premium for the Executive's coverage under the Company's accident and health insurance coverage. Benefits otherwise receivable by the Executive pursuant to this Section 6.1(B) shall be reduced to the extent benefits of the same type are received by or made available to the Executive by another employer of the Executive during the twenty four (24) month period following the Executive's termination of employment (and any such benefits received by or made available to the Executive shall be reported to the Company by the Executive); provided, however, that the Company shall reimburse the Executive for the excess, if any, of the cost of such benefits to the Executive over such cost immediately prior to the Date of Termination or, if more favorable to the Executive, the first occurrence of an event or circumstance constituting Good Reason.

(C)     For purposes of COBRA health benefit continuation under section 4980B of the Code, the cessation of benefits pursuant to Section 6.1(B) shall be treated as though such cessation is the "qualifying event" under section 4980B(f)(3) of the Code for purposes of determining the period of coverage.

(D)     The Company shall pay to the Executive a lump sum amount equal to one hundred thousand dollars ($100,000).  Such amount shall be paid in the month following the Date of Termination.

(E)     The Company shall, at its sole expense as incurred, provide Executive with "key executive level" outplacement services for the period ending on December 31 of the second calendar year following the Termination Date at a cost of no more than fifteen percent (15%) of the sum of (i) Base Salary and (ii) the Bonus Percentage multiplied by Base Salary.

6.2     (A)     Whether or not the Executive becomes entitled to the Severance Payments, if any of the payments or benefits received or to be received by the Executive in connection with a Change in Control or the Executive's termination of employment (whether pursuant to the terms of this Agreement or any other plan, arrangement or agreement with the Company, any Person whose actions result in a Change in Control or any Person affiliated with the Company or such Person) (all such payments and benefits, excluding the Gross-Up Payment, being hereinafter referred to as the "Total Payments") will be subject to the Excise Tax, the Company shall pay to the Executive an additional amount (the "Gross-Up Payment") such that the net amount retained by the Executive, after deduction of any Excise Tax on the Total Payments and any federal, state and local income and employment taxes and any penalties, interest or fees incurred by the Executive as a result of any payment under Section 6.2 being made later than five business days prior to the due date of the excise tax with respect to which it is paid and any Excise Tax upon the Gross-Up Payment, shall be equal to the Total Payments.

(B)     For purposes of determining whether any of the Total Payments will be subject to the Excise Tax and the amount of such Excise Tax, (i) all of the Total Payments shall be treated as "parachute payments" (within the meaning of section 280G(b)(2) of the Code) unless, in the opinion of tax counsel ("Tax Counsel") reasonably acceptable to the Executive and selected by the accounting firm which was, immediately prior to the Change in Control, the Company's independent auditor (the "Auditor"), such payments or benefits (in whole or in part) do not constitute parachute payments, including by reason of section 280G(b)(4)(A) of the Code, (ii) all "excess

A-17

parachute payments" within the meaning of section 280G(b)(l) of the Code shall be treated as subject to the Excise Tax unless, in the opinion of Tax Counsel, such excess parachute payments (in whole or in part) represent reasonable compensation for services actually rendered (within the meaning of section 280G(b)(4)(B) of the Code) in excess of the Base Amount allocable to such reasonable compensation, or are otherwise not subject to the Excise Tax, and (iii) the value of any noncash benefits or any deferred payment or benefit shall be determined by the Auditor in accordance with the principles of sections 280G(d)(3) and (4) of the Code.  For purposes of determining the amount of the Gross-Up Payment, the Executive shall be deemed to pay federal income tax at the highest marginal rate of federal income taxation in the calendar year in which the Gross-Up Payment is to be made and state and local income taxes at the highest marginal rate of taxation in the state and locality of the Executive's residence or the Executive's place of business, whichever is higher, on the Date of Termination (or if there is not yet a Date of Termination, then the date on which the Gross-Up Payment is calculated for purposes of this Section 6.2), net of the maximum reduction in federal income taxes which could be obtained from deduction of such state and local taxes.

(C)    In the event that the Excise Tax is finally determined to be less than the amount taken into account hereunder in calculating the Gross-Up Payment, the Executive shall repay to the Company, within five (5) business days following the time that the amount of such reduction in the Excise Tax is finally determined, the portion of the Gross-Up Payment attributable to such reduction (including that portion of the Gross-Up Payment attributable to the Excise Tax and federal, state and local income and employment taxes imposed on the Gross-Up Payment being repaid by the Executive), to the extent that such repayment results in a reduction in the Excise Tax and a dollar-for-dollar reduction in the Executive's taxable income and wages for purposes of federal, state and local income and employment taxes, plus interest on the amount of such repayment at 120% of the rate provided in section 1274(b)(2)(B) of the Code.  Notwithstanding the foregoing, in the event any portion of the amount to be repaid to the Company has been paid to any tax authority, repayment thereof shall not be required until actual refund or credit of such portion has been made to Executive, and interest payable to the Company shall not exceed the interest received or credited to Executive by such tax authority.  In the event that the Excise Tax is determined to exceed the amount taken into account hereunder in calculating the Gross-Up Payment (including by reason of any payment the existence or amount of which cannot be determined at the time of the Gross-Up Payment), the Company shall make an additional Gross-Up Payment in respect of such excess (including any interest, penalties or additions payable by the Executive with respect to such excess and the Gross-Up Payment attributable to the Excise Tax and federal, state, and local income and employment taxes imposed on the Gross-Up Payment being made to the Executive) within five (5) business days following the time that the amount of such excess is finally determined.  The Executive and the Company shall each reasonably cooperate with the other in connection with any administrative or judicial proceedings concerning the existence or amount of liability for Excise Tax with respect to the Total Payments.

6.3  The payments provided in subsections (A), of Section 6.1 hereof and in Section 6.2 hereof shall be made not later than the fifth day following the Date of Termination (or if there is no Date of Termination, then the date on which the Gross-up Payment is calculated for purposes of Section 6.2 hereof); provided, however, that if the amounts of such payments cannot be finally determined on or before such day, the Company shall pay to the Executive on such day an estimate,

A-18

as determined in good faith by the Company or, in the case of payments under Section 6.2 hereof, in accordance with Section 6.2 hereof, of the minimum amount of such payments to which the Executive is clearly entitled and shall pay the remainder of such payments (together with interest on the unpaid remainder (or on all such payments to the extent the Company fails to make such payments when due) at 120% of the rate provided in section 1274(b)(2)(B) of the Code) as soon as the amount thereof can be determined but in no event later than the thirtieth (30th) day after the Date of Termination.   In the event that the amount of the estimated payments exceeds the amount subsequently determined to have been due, such excess shall constitute a loan by the Company to the Executive, payable on the fifth (5th) business day after demand by the Company (together with interest at 120% of the rate provided in section 1274(b)(2)(B) of the Code).

6.4  The Company also shall pay to the Executive all legal fees and expenses incurred by the Executive in disputing in good faith any issue hereunder relating to the termination of the Executive's employment, in seeking in good faith to obtain or enforce any benefit or right provided by this Agreement or in connection with any tax audit or proceeding to the extent attributable to the application of section 4999 of the Code to any payment or benefit provided hereunder.   Such payments shall be made within five (5) business days after delivery of the Executive's written requests for payment accompanied with such evidence of fees and expenses incurred as the Company reasonably may require (but in no event after the last day of the calendar year following the calendar year in which the expense is incurred).

7.  Termination Procedures and Compensation During Dispute.

7.1  Notice of Termination.  After a Change in Control and during the Term, any purported termination of the Executive's employment (other than by reason of death) shall be communicated by written Notice of Termination from one party hereto to the other party hereto in accordance with Section 10 of the Employment Agreement.   For purposes of this Agreement, a "Notice of Termination" shall mean a notice which shall indicate the specific termination provision in this Agreement relied upon and shall set forth in reasonable detail the facts and circumstances claimed to provide a basis for termination of the Executive's employment under the provision so indicated. Further, a Notice of Termination for Cause is required to include a copy of a resolution duly adopted by the affirmative vote of not less than three-quarters (3/4) of the entire membership of the Board at a meeting of the Board which was called and held for the purpose of considering such termination (after reasonable notice to the Executive and an opportunity for the Executive, together with the Executive's counsel, to be heard before the Board) finding that, in the good faith opinion of the Board, the Executive was guilty of conduct set forth in clause (i) or (ii) of the definition of Cause herein, and specifying the particulars thereof in detail.

7.2  Date of Termination.  "Date of Termination," with respect to any purported termination of the Executive's employment after a Change in Control and during the Term, shall mean (i) if the Executive's employment is terminated for Disability, thirty (30) days after Notice of Termination is given (provided that the Executive shall not have returned to the full-time performance of the Executive's duties during such thirty (30) day period), and (ii) if the Executive's employment is terminated for any other reason, the date specified in the Notice of Termination (which, in the case of a termination by the Company (except in the case of a termination for Cause) and, in the case of a

A-19

termination by the Executive, shall not be less than thirty (30) days from the date such Notice of Termination is given).

7.3    Dispute Concerning Termination.  If within fifteen (15) days after any Notice of Termination is given, or, if later, prior to the Date of Termination (as determined without regard to this Section 7.3), the party receiving such Notice of Termination notifies the other party that a dispute exists concerning the termination, the Date of Termination shall be extended until the earlier of (i) the date prior to the date on which the Term ends or (ii) the date on which the dispute is finally resolved, either by mutual written agreement of the parties or by a final judgment, order or decree of an arbitrator or a court of competent jurisdiction (which is not appealable or with respect to which the time for appeal therefrom has expired and no appeal has been perfected); provided, however, that the Date of Termination shall be extended by a notice of dispute only if such notice is given in good faith and the party providing notice pursues the resolution of such dispute with reasonable diligence.

7.4  [intentionally blank]

8.    No Mitigation.  The Company agrees that, if the Executive's employment with the Company terminates during the Term, the Executive is not required to seek other employment or to attempt in any way to reduce any amounts payable to the Executive by the Company pursuant to this Agreement.  Further, the amount of any payment or benefit provided for in this Agreement (other than Section 6.1(B) hereof) shall not be reduced by any compensation earned by the Executive as the result of employment by another employer, by retirement benefits, by offset against any amount claimed to be owed by the Executive to the Company, or otherwise.

9.    Successors; Binding Agreement.

9.1  This Agreement shall inure to the benefit of and be binding upon the Company and its successors and assigns.  In addition to any obligations imposed by law upon any successor to the Company, the Company will require any successor (whether direct or indirect, by purchase, merger, consolidation or otherwise) to all or substantially all of the business and/or assets of the Company to expressly assume and agree in writing to perform this Agreement in the same manner and to the same extent that the Company would be required to perform it if no such succession had taken place.  The Company will require any ultimate parent entity, as defined in 16 C.F.R. 8801,1(a)(3), of any Person who acquires 90% of the outstanding shares of common stock of the Company or the outstanding voting securities of the Company entitled to vote generally in the election of directors (including through a merger in which the Company does not survive or as a result of which the Company becomes a subsidiary of another Person or a consolidation involving the Company and another Person) to assume and agree in writing to perform as a joint and several obligor of the Company (including any successor to the Company), this Agreement in the same manner and to the same extent as the Company.  Failure of the Company to obtain such assumption and agreement in writing from a successor or its parent as described in the preceding sentences after notice and a reasonable cure period (not to exceed ten days from the date such notice is received) shall be a breach of this Agreement and shall entitle the Executive to compensation from the Company in the same amount and on the same terms as the Executive would be entitled to hereunder if the Executive were to terminate the Executive's employment for Good Reason after a Change in Control, except that, for

A-20

purposes of implementing the foregoing, the date on which any such succession becomes effective shall be deemed the Date of Termination.

9.2  This Agreement shall inure to the benefit of and be enforceable by the Executive's personal or legal representatives, executors, administrators, successors, heirs, distributees, devisees and legatees.  If the Executive shall die while any amount would still be payable to the Executive hereunder (other than amounts which, by their terms, terminate upon the death of the Executive) if the Executive had continued to live, all such amounts, unless otherwise provided herein, shall be paid in accordance with the terms of this Agreement to the executors, personal representatives or administrators of the Executive's estate.

10.  Insurance and Indemnification.  From and after a Change in Control, including after the termination of Executive's employment, the Company shall indemnify, defend and hold the Executive harmless from and against any and all expenses, liabilities, damages, costs, judgments, penalties, fines and amounts paid in settlement, incurred in good faith by Executive in connection with any proceeding involving Executive by reason of Executive's being or having been an officer, director, employee or agent of the Company (or any affiliate of the Company) to the fullest extent permitted by law, whether or not Executive is, or is threatened to be made, a party to any threatened, pending, or completed proceeding, and whether or not Executive is successful in such proceeding.  In addition, upon receipt from Executive of (i) a written request for an advancement of reasonable expenses which Executive reasonably believes will be subject to indemnification hereunder and (ii) a written undertaking by Executive to repay any such amounts if it shall ultimately be determined that the Executive is not entitled to indemnification under this Agreement or otherwise, the Company shall advance such expenses to Executive or pay such expenses for Executive, all in advance of the final disposition of any such matter.  From and after a Change in Control, including after the termination of Executive's employment hereunder, Executive shall have coverage under a director's and officer's liability insurance policy in amounts no less than, and on terms no less favorable than those, provided to senior executive officers of the Company from time to time.

11.  Definitions.  For purposes of this Agreement, the following terms shall have the meanings indicated below:

(A)  "Affiliate" shall have the meaning set forth in Rule 12b-2 promulgated under Section 12 of the Exchange Act.

(B)  "Agreement" shall mean this Attachment A to the Employment Agreement.

(B)  "Auditor" shall have the meaning set forth in Section 6.2 hereof.

(C)  "Base Amount" shall have the meaning set forth in section 280G(b)(3) of the Code.

(D)  "Code" shall mean the Internal Revenue Code of 1986, as amended from time to time.

(E)  "Company" shall mean Hayes Lemmerz International, Inc. and, except in determining under Section 15(G) hereof whether or not any Change in Control of the Company has occurred,

A-21

A-22

shall include any successor to its business and/or assets which assumes and agrees to perform this Agreement by operation of law, or otherwise.

(F)  "Excise Tax" shall mean any excise tax imposed under section 4999 of the Code or any similar state or local tax or any interest or penalties incurred by Executive with respect to such excise tax.

(G)  "Person" shall have the meaning given in Section 3(a)(9) of the Exchange Act, as modified and used in Sections 13(d) and 14(d) including a "group" within the meaning of Section 13(d)(3) thereof, except that such term shall not include (i) the Company or any of its subsidiaries, (ii) a trustee or other fiduciary holding securities under an employee benefit plan of the Company or any of its Affiliates, (iii) an underwriter temporarily holding securities pursuant to an offering of such securities, or (iv) a corporation owned, directly or indirectly, by the stockholders of the Company in substantially the same proportions as their ownership of stock of the Company.

(H)  "Retirement" shall be deemed the reason for the termination by the Executive of the Executive's employment if such employment is terminated in accordance with the Company's retirement policy, including early retirement, generally applicable to its salaried employees.

A-22

**EXECUTIVE EMPLOYMENT AGREEMENT, AS AMENDED BY
AMENDMENT NO. 1 TO EMPLOYMENT AGREEMENT**

THIS AGREEMENT (the "Agreement") is made as of the 23rd day of September, 2003 (the "Agreement Date"), by and between Hayes Lemmerz International, Inc. (the "Company") and John A. Salvette (the "Executive"), as amended by that certain Amendment No. 1 to Employment Agreement dated as of December 30, 2008.

WHEREAS, the Company desires to provide for the continued employment of the Executive on the terms and conditions set forth herein, in the best interest of the Company and its constituencies; and

WHEREAS, the Executive desires to continue to be employed by the Company as provided herein; and

NOW, THEREFORE, in consideration of the premises and the respective covenants and agreements of the parties herein contained, the parties agree as follows:

1.      Employment.  The Company agrees to continue to employ the Executive and the Executive agrees to continue to be employed on a full-time basis by the Company for the period and upon the terms and conditions hereinafter set forth.

2.      Term; Employment Period.  The term of this Agreement (the "Term") shall commence on the Agreement Date (the "Effective Date") and continue until terminated pursuant to Section 6 of this Agreement.  The period during which the Executive is employed by the Company pursuant to this Agreement is referred to herein as the "Employment Period."  The date on which the termination of the Executive's employment hereunder shall become effective is referred to herein as the "Termination Date."

3.      Position and Duties.  During the Employment Period, the Executive shall serve as Vice President, Business Development of the Company and shall have such responsibilities, duties and authority as are customarily and ordinarily exercised by executives in similar positions in similar businesses in the United States and shall exercise such responsibilities, duties and authority consistent with the foregoing as the Company's Chief Executive Officer or the Company's Board of Directors (the "Board") shall determine from time to time.  During the Employment Period, the Executive shall report to the Company's Chief Executive Officer or the Chief Executive Officer's designee.  The Executive shall devote substantially all his working time and efforts to the business and affairs of the Company and shall use his best efforts to carry out his responsibilities faithfully and efficiently in a professional manner.  Notwithstanding the foregoing, it is understood that during the Employment Period, subject to any conflict of interest policies of the Company and Section 8, the Executive may (x) serve in any capacity with any civic, charitable, educational or professional organization provided that such service does not materially interfere with his duties and responsibilities hereunder and (y) make and manage

personal investments of his choice, and with the prior consent of the Company's Chief Executive Officer, which shall not be unreasonably withheld, serve on the board of directors of one (1) for-profit business enterprise.

4.      Place of Performance.  During the Employment Period, the Executive's place of performance of his services shall be at the Company's Northville, Michigan Headquarters, except for required travel by the Executive on the Company's business or as may be reasonably required by the Company.

5.      Compensation and Benefits.

(a)      Salary.  During the Employment Period, the Company shall pay to the Executive an initial annual base salary of Two Hundred Sixty-Seven Thousand Three Hundred Dollars ($267,300) (as the same may be increased from time to time, the "Base Salary"), such salary to be paid in periodic installments in accordance with the Company's payroll practices as in effect from time to time.  The Base Salary shall be reviewed annually by the compensation committee of the Board and may be increased from time to time in accordance with normal business practices of the Company and, if so increased, shall not thereafter be reduced.

(b)      Cash-Based Incentives.  During the Employment Period, the Executive shall be eligible to earn an annual bonus under the Company's Short-Term Incentive Plan, or a successor plan thereto, as in effect from time to time (the "Incentive Plan"), subject to achievement of performance goals determined in accordance with the terms of the Incentive Plan (such annual bonus, the "Annual Bonus").  Such performance goals shall include (i) a threshold level below which no Annual Bonus shall be paid, (ii) a normative level that is tied to the budget, which if obtained, would result in an Annual Bonus of  sixty percent (60%) of the Base Salary and (iii) an upside level, which if obtained, would increase the Annual Bonus to a maximum of one hundred twenty percent (120%) of the Base Salary.  Any Annual Bonus payable to the Executive for the Company's fiscal year ending January 31, 2004 will be on a pro rata basis based upon the number of months the Executive worked for the Company during such fiscal year.  The Annual Bonus shall be payable in a cash lump sum at such time as bonuses are ordinarily paid in accordance with the terms of the Incentive Plan, but in no event later than 120 days after the end of each fiscal year of the Company.  Except as otherwise specifically provided in this Agreement, the Executive shall only be eligible to receive the Annual Bonus if the Executive is employed by the Company through the last day of February in the year in which the Annual Bonus is to be paid.

(c)      "Change in Control" Definition.  For purposes of this Agreement, a "Change in Control" shall be deemed to have occurred upon the first of the following to occur:

(1)      any Person (within the meaning of Section 3(a)(9) of the Securities and Exchange Act of 1934, as amended (the "Exchange Act"), as modified and used in Sections 13(d) and 14(d) thereof), other than Joseph Littlejohn & Levy Fund II, L.P. (or any affiliate (within the meaning of Regulation D Rule 501(b) under the Securities Act of 1933, as amended (the "Securities

2

Act")) thereof), TSG Capital Fund II, L.P. (or any affiliate thereof), or Canadian Imperial Bank of Commerce (or affiliate thereof) (such entities, collectively, the "JLL Group"), is or becomes the "Beneficial Owner" (within the meaning of Rule 13d-3 under the Exchange Act) of fifty percent (50%) or more of either (1) the then-outstanding Common Stock or (2) the combined voting power of the then-outstanding voting securities of the Company entitled to vote generally in the election of directors;

(2)     the following individuals cease for any reason to constitute a majority of the number of directors then serving:  individuals who, as of the Effective Date, constitute the Board and any new director (other than a director whose initial assumption of office is in connection with an actual or threatened election contest, including but not limited to a consent solicitation, relating to the election of directors of the Company) whose appointment or election by the Board or nomination for election by the Company's stockholders was approved or recommended by a vote of at least a majority of the directors then still in office who either were directors on the date hereof or whose appointment, election or nomination for election was previously so approved or recommended;

(3)     there is consummated a merger or consolidation of the Company or any direct or indirect subsidiary of the Company with any other corporation, other than a merger or consolidation which would result in the voting securities of the Company outstanding immediately prior to such merger or consolidation continuing to represent (either by remaining outstanding or by being converted into voting securities of the surviving entity or any parent thereof) at least fifty percent (50%) of the combined voting power of the securities of the Company or such surviving entity or any parent thereof outstanding immediately after such merger or consolidation, provided, however, that it shall not be a Change in Control under this clause (C) if (i) directors appointed or nominated by the JLL Group or any constituent member thereof continue immediately following such transaction to constitute a majority of the Board and (ii) the JLL Group or any constituent member thereof continues immediately following such transaction to own securities representing at least thirty-five percent (35%) of the combined voting power of the securities of the Company or such surviving entity or any parent thereof outstanding immediately after such merger or consolidation; or

(4)     the stockholders of the Company approve a plan of complete liquidation or dissolution of the Company or there is consummated an agreement for the sale or disposition by the Company of all or substantially all of its assets.

(d)     Option Grants. Based upon the Executive's performance and annual review, the Executive shall be eligible during the Employment Period to receive stock option grants in such amounts and subject to such terms and conditions as the compensation

3

committee of the Board shall determine in its sole discretion are necessary and desirable.

(e)     Expenses.  During the Employment Period, the Company shall promptly reimburse the Executive for all reasonable out-of-pocket expenses incurred by the Executive in connection with the business of the Company and the performance of his duties under this Agreement in accordance with the terms of the Company's policies as in effect from time to time.

(f)     Benefit Plans.  During the Employment Period, the Executive shall be entitled to participate in all of the employee benefit plans, programs, agreements and arrangements provided to senior executives of the Company, as such are in effect from time to time, on a basis no less favorable than that provided to such senior executives.

(g)     Perquisites.  During the Employment Period, the Executive shall be entitled to participate in those perquisites provided to senior executives of the Company, as such are in effect from time to time, on a basis no less favorable than that provided to such senior executives.  In addition, the Company shall pay Executive an annual flexible benefits allowance (the "Flexible Benefits Allowance") of Thirty Five Thousand Dollars ($35,000), such allowance to be paid in periodic installments in accordance with the Company's payroll practices as in effect from time to time. The Flexible Benefits Allowance shall be reviewed annually by the Compensation Committee of the Board and may be increased from time to time and, if so increased, shall not thereafter be reduced.

(h)     Vacations.  During the Employment Period, the Executive shall be entitled to vacation time, paid holidays and personal days, determined in accordance with the Company's policy with respect to its senior executives as in effect from time to time, it being understood that the Executive shall be entitled to not less than four weeks' vacation in any 12-month period during the Employment Period thereafter.

6.     Termination of Employment.

(a)     Accrued Benefits.  In the event of the termination of the Executive's employment hereunder for any reason, the Executive (or his estate or representative, as applicable) shall be entitled to receive any Base Salary, Annual Bonus, vacation time and expenses that have in each case accrued but are unpaid as of the Termination Date, vested options as well as any post-termination benefits to which he may be entitled pursuant to the Company's retirement, insurance and other benefit plans, programs and arrangements as in effect immediately prior to the Termination Date (the "Accrued Benefits").

(b)     Death.  The Executive's employment hereunder shall terminate as of the date of his death.  Upon the termination of the Executive's employment hereunder because of his death, the Executive's estate or representative, as the case may be, shall be entitled to receive the Accrued Benefits and a lump sum payment in cash equal to (i) one year's Base Salary as in effect on the Termination Date and (ii) the product of (x) sixty percent (60%) of the Base Salary as in effect on the Termination Date, multiplied by a fraction (y) the numerator of which

4

shall be the number of months (including fractions thereof) worked by the Executive during the Company's fiscal year in which the Termination Date occurs and (z) the denominator of which shall be the number 12 (such amount under this clause (ii), the "Pro Rata Annual Bonus"). Such amounts shall be paid as soon as administratively feasible following the Executive's death but in no event later than April 15 of the calendar year following the Executive's death. In addition, those immediate family members who were participating in the Company's medical benefit plan as of the date of the Executive's death shall continue to participate in the Company's medical benefit plan at active employee contribution rates for the one-year period immediately following the date of the Executive's death.

(c)    Disability.    The Executive's employment hereunder may be terminated during the Employment Period if the Executive is incapable of performing his principal duties hereunder because of physical or mental incapacity for a period of 45 consecutive working days or for more than 90 working days in any 12-month period ("Disability"). In the event that the Executive's employment is to be terminated pursuant to this Section 6(c), (i) this Agreement shall terminate on the date specified in the notice of termination delivered to the Executive (subject to Section 8(g) and Section 18); (ii) the Executive shall as of such date resign from all of his positions, duties and authorities hereunder; (iii) the Executive shall be placed on a medical leave of absence until the earlier of (A) expiration of the six-month period commencing on the date his medical leave of absence began, unless there is no reasonable expectation that the Executive will return to employment with the Company, in which case the date the Executive ceases performing services for the Company, (B) the date he qualifies for benefits under the Company's long-term disability plan or (C) the date he is able to return to work; and (iv) the Executive shall continue to be paid his Base Salary until such medical leave of absence ends. In the case of a termination of the Executive's employment pursuant to this Section 6(c), for purposes of calculating benefits pursuant to clauses (B) and (C) below the Termination Date shall be the date upon which the Executive's medical leave of absence commences, and for all other purposes, the Termination Date shall be the date upon which the Executive's medical leave of absence ends. In the event the Executive's employment is terminated pursuant to this Section 6(c), the Executive (or his representative, as applicable) shall be entitled to: (A) the Accrued Benefits; (B) a lump sum payment in cash equal to one year's Base Salary and Flexible Benefits Allowance as in effect on the Termination Date; (C) the Pro Rata Annual Bonus; and (D) the continuation of health and welfare benefits at the levels in effect as of the Termination Date at no additional cost to the Executive than that which was in effect as of the Termination Date for the one-year period immediately following the Termination Date; provided, however, that such benefits shall be reduced to the extent comparable benefits are made available to the Executive from a successor employer, and the Executive shall be obligated to report such benefits to the Company. The amounts payable pursuant to clauses (B) and (C) of the preceding sentence shall be paid in the month following the Executive's Termination Date. It is acknowledged and agreed by the Executive that he shall be precluded from terminating his employment hereunder for Good Reason in the event that his employment hereunder is terminated pursuant to this Section 6(c).

(d)    For Cause; Without Good Reason.    The Executive's employment hereunder may be terminated during the Employment Period (i) by the Company for Cause (as defined below) or (ii) by the Executive without Good Reason (as defined below). In the event

5

that the Company terminates the Executive's employment hereunder for Cause, the Termination Date shall be the date specified in the notice of termination for Cause delivered by the Company to the Executive.  In the event that the Executive terminates his employment hereunder without Good Reason, the Termination Date shall be no earlier than 30 days following the date on which a notice of termination is delivered by the Executive to the Company.  In the event that the Executive's employment hereunder is terminated pursuant to this Section 6(d), the Executive shall be entitled to the Accrued Benefits.

(e)    Without Cause; For Good Reason. The Executive's employment hereunder may be terminated during the Employment Period (i) by the Company without Cause or (ii) by the Executive for Good Reason.  In the event that the Executive's employment is terminated pursuant to this Section 6(e) (whether by the Company or by the Executive), the Termination Date shall be no earlier than 30 days following the date on which a notice of termination is delivered by one party to the other.  In the event that the Executive's employment is terminated pursuant to this Section 6(e), the Executive (or his estate or representative, as the case may be) shall be entitled to receive the Accrued Benefits.  The Executive (or his estate or representative, as the case may be) shall be entitled to the following severance benefits (A) a lump sum payment in cash equal to one year's Base Salary and Flexible Benefits Allowance as in effect on the Termination Date; (B) the Pro Rata Annual Bonus; and (C) the title to the Executive's Company vehicle.  The benefits described in the preceding sentence shall be paid in the month following the Executive's Termination Date.  Severance benefits provided to the Executive under this paragraph shall also include:  (x) continuation of health and welfare benefits for one year at the levels in effect as of the Termination Date at no additional cost to the Executive than that which was in effect as of the Termination Date; provided, that such benefits shall be reduced to the extent comparable benefits are made available to the Executive from a successor employer, and the Executive shall be obligated to report such benefits to the Company; and (y) executive level career outplacement services for the period beginning on the Termination Date and ending December 31 of second calendar year following termination by a mutually agreeable outplacement firm and paid for as incurred by the Company.

(f)    Definition of "Cause" and "Good Reason".

For purposes of this Agreement, "Cause" means:  (i) the willful failure of the Executive to perform his material duties with the Company which have been duly assigned to the Executive and which duties are commensurate with those of the position for which Executive is then employed, and which failure is not cured (if capable of cure) within 15 days after receipt of written notice of such failure, which notice identifies the manner in which the Executive has willfully failed to perform, (ii) the engaging by the Executive in willful conduct which is demonstrably injurious to the Company, monetarily or otherwise, (iii) the conviction of the Executive of any crime or offense constituting a felony, or (iv) a failure by the Executive to comply with any material provision of this Agreement, which failure is not cured (if capable of cure) within 15 days after receipt of written notice of such non-compliance by the Executive. Termination of the Executive for Cause shall mean termination by action of at least a majority of the Company's Board of Directors, at a meeting duly called and held upon at least 15 days' written notice to the Executive specifying the particulars of the action or inaction alleged to

6

constitute Cause and at which meeting the Executive and his counsel were entitled to be present and given adequate opportunity to be heard.  For purposes of clauses (i) and (ii) of this definition, action or inaction by the Executive shall not be considered "willful" unless done or omitted by him (A) intentionally or not in good faith and (B) without reasonable belief that his action or inaction was in the best interest of the Company, and shall not include failure to act by reason of total or partial incapacity due to physical or mental illness.

For purposes of this Agreement, 'Good Reason' means the occurrence of one or more of the following events if the Executive gives notice of the event to the Company within 90 days of the event and the Company fails to remedy such event within 30 days of receiving notice from the Executive:  (i) a material adverse alteration in the nature or status of the Executive's position, duties, responsibilities or authority from those in effect as of the Effective Date; (ii) a material reduction in the Executive's Base Salary or level of employee benefits (other than across-the-board reductions applied similarly to all of the Company's senior executives occurring after the second anniversary of the Effective Date); (iii) a failure to pay or provide a material amount of the compensation set forth in this Agreement (except for an across-the-board deferral of compensation applied similarly to all of the Company's senior executives occurring after the second anniversary of the Effective Date); (iv) the relocation of the Executive's principal place of employment more than 30 miles from its location as of the Effective Date except for required travel on the Company's business; (v) assignment of duties or responsibilities to the Executive which are materially inconsistent with the provisions of this Agreement; or (vi) a failure by the Company to comply with any material provision of this Agreement.

(g)    <u>Change in Control Severance Provisions</u>.  The provisions set forth in Attachment A hereto are hereby incorporated into this Agreement.  The Executive hereby acknowledges that in the event he becomes entitled to the payment set forth in Section 6.1(A) of Attachment A hereto, that such payment will be in lieu of any other payments to be made pursuant to the terms of this Agreement.

(h)    <u>Release Agreement</u>.  Notwithstanding anything to the contrary contained in this Section 6, the Executive shall be required to execute the Company's then current standard release agreement as a condition to receiving any of the payments and benefits provided for in this Section 6 or Attachment A.  It is acknowledged and agreed that the then current standard release agreement shall be a mutual release and shall not diminish or terminate Executive's rights under this Agreement including, but not limited to, those delineated in Sections 6(i), 7 and 16 herein.

(i)    <u>No Mitigation</u>.  Upon termination of the Executive's employment with the Company, subject to the Executive's affirmative obligations pursuant to Section 6(c) and 6(e), the Executive shall be under no obligation to seek other employment or otherwise mitigate the obligations of the Company under this Agreement.  The time period for executing such release (and the period available to revoke it) shall be in accordance with the Company's then current standard practice but in no event shall the execution period extend beyond 60 days following the Executive's Termination Date.

7

7.    <u>Directors' and Officers' Insurance; Indemnification</u>.  In addition to any rights to indemnification to which the Executive is entitled under the Company's Restated Certificate of Incorporation and Bylaws, the Company shall indemnify the Executive at all times during and after the Employment Period to the maximum extent permitted under the Delaware Business Corporation Act or any successor provision thereof, and any and all applicable state law, and shall pay the Executive's expenses (including reasonable attorneys' fees and expenses, which shall be paid in advance by the Company as incurred, subject to recoupment in accordance with applicable law) in defending any civil action, suit or proceeding in advance of the final disposition of such action, suit or proceeding to the maximum extent permitted under such applicable state laws for the Executive's action or inaction on behalf of the Company under the terms of this Agreement including but not limited to any acts or alleged acts arising out of events prior to the Executive's employment by the Company which obligation shall survive the termination of the Executive's employment or the termination of the other provisions of this Agreement.

8.    <u>Confidential Information; Removal of Documents; Non-Competition; etc</u>.  For purposes of this Section 8, "Company" shall mean the Company, its subsidiaries and affiliates.

(a)    <u>Confidentiality</u>.  Except as otherwise provided in this Agreement, at all times during and after the Employment Term, the Executive shall keep secret and retain in strictest confidence, any and all Confidential Information (as defined below) relating to the Company, and shall use such Confidential Information only in furtherance of the performance by the Executive of the Executive's duties to the Company and not for personal benefit or the benefit of any interest adverse to the Company's interests.  For purposes of this Agreement, "Confidential Information" shall mean any information including without limitation plans, specifications, models, samples, data, customer lists and customer information, computer programs and documentation, and other technical and/or business information, in whatever form, tangible or intangible, that can be communicated by whatever means available at such time, that relates to the Company's current Business or future business contemplated during the Employment Period, products, services and development, or information received from others that the Company is obligated to treat as confidential or proprietary; <u>provided</u>, <u>however</u>, that such Confidential Information shall not include any information that (i) has become generally available to the public other than as a result of a disclosure by the Executive, or (ii) was available to or became known to the Executive prior to the disclosure of such information on a non-confidential basis without breach of any duty of confidentiality from any party to the Company, and the Executive shall not disclose such Confidential Information to any person or entity other than the Company, except as may be required by law or court or administrative order (in which event the Executive shall so notify the Company as promptly as practicable).  Upon termination of the Executive's employment hereunder for any reason, the Executive shall return to the Company all copies, reproductions and summaries of Confidential Information in the Executive's possession and erase the same from all media in the Executive's possession, and, if the Company so requests, shall certify in writing that the Executive has done so.  All Confidential Information is and shall remain the property of the Company (or, in the case of information that the Company receives from a third party which it is obligated to treat as confidential, then the property of such third party).

8

     (b)       <u>Non-Competition</u>.

     (i)       During the Employment Period, the Executive shall not engage in Competition (as defined below) with the Company.  For purposes of this Agreement, "Competition" by the Executive shall mean the Executive's engaging in, or otherwise directly or indirectly being employed by or acting as a consultant or lender to, or being a director, officer, employee, principal, agent, stockholder, member, owner or partner of, or permitting the Executive's name to be used in connection with the activities of any other business or organization anywhere which competes, directly or indirectly, with the Business of the Company as the same shall be constituted at the Termination Date or which, during the six-month period prior to the Executive's termination, the Company had made substantial plans with the intention of establishing operations.

     (ii)       For the one year period commencing on the Termination Date, the Executive shall not engage in Competition with the Company in any locality or region in which the Company had operations at the time of, or within six months prior to, the Executive's termination, or in which, during the six-month period prior to the Executive's termination, the Company had made substantial plans with the intention of establishing operations in such locality or region; provided, however, that it shall not be a violation of this sub-paragraph or the sub-paragraph hereinabove for the Executive to be or become the registered or beneficial owner of up to three percent (3%) of any class of the capital stock of a competing corporation registered under the Exchange Act, provided that the Executive does not actively participate in the business of such corporation until such time as this covenant expires.

     (c)       <u>Non-Solicitation</u>.  For the one year period commencing on the Termination Date, the Executive agrees that the Executive shall not, directly or indirectly, for the Executive's benefit or for the benefit of any other person, firm or entity, engage any of the following conduct:

     (i)       solicit from any customer doing business with the Company as of the Termination Date, business of the same or of a similar nature to the business of the Company with such customer;

     (ii)       solicit from any known potential customer of the Company business of the same or of a similar nature to that which has been the subject of a known written or oral bid, offer or proposal by the Company, or of substantial preparation with a view to making such a bid, proposal or offer, within six months prior to the Executive's termination;

     (iii)       solicit the employment or services of, or hire, any person who was known to be employed by or was a known consultant to the Company upon the termination of the Executive's employment, or within six months prior thereto; or

<div align="center">9</div>

(iv) otherwise interfere with the business or accounts of the Company.

(d) <u>Intellectual Property</u>.  All Intellectual Property (as defined below) and Technology (as defined below) created, developed, obtained or conceived of by the Executive during the Employment Period, and all business opportunities presented to the Executive during the Employment Period, shall be owned by and belong exclusively to the Company, provided that they reasonably relate to the Business, and the Executive shall (i) promptly disclose any such Intellectual Property, Technology or business opportunity to the Company, and (ii) execute and deliver to the Company, without additional compensation, such instruments as the Company may require from time to time to evidence its ownership of any such Intellectual Property, Technology or business opportunity.  For purposes of this Agreement, (A) the term "Intellectual Property" means and includes any and all trademarks, trade names, service marks, service names, patents, copyrights, and applications therefor, and (B) the term "Technology" means and includes any and all trade secrets, proprietary information, invention, discoveries, know-how, formulae, processes and procedures.

(e) The Executive acknowledges that the services to be rendered by the Executive to the Company are of a special and unique character, which gives this Agreement a peculiar value to the Company, the loss of which may not be reasonably or adequately compensated for by damages in an action at law, and that a material breach or threatened breach by the Executive of any of the provisions contained in this Section 8 shall cause the Company irreparable injury.  The Executive therefore agrees that the Company shall be entitled, in addition to any other right or remedy, to a temporary, preliminary and permanent injunction, without the necessity of proving the inadequacy of monetary damages or the posting of any bond or security, enjoining or restraining the Executive from any such violation or threatened violations.

(f) The Executive further acknowledges and agrees that due to the uniqueness of the Executive's services and confidential nature of the information the Executive shall possess, the covenants set forth herein are reasonable and necessary for the protection of the business and goodwill of the Company.

(g) <u>Continuing Operation</u>.  Any termination of the Executive's employment or of this Agreement shall have no effect on the continuing operation of this Section 8.

9. <u>Severability</u>.  It is the desire and intent of the parties that the provisions of this Agreement shall be enforced to the fullest extent permissible under the laws and public policies applied in each jurisdiction in which enforcement is sought.  Accordingly, if any particular provision or portion of this Agreement shall be adjudicated to be invalid or unenforceable, this Agreement shall be deemed amended to delete therefrom the portion thus adjudicated to be invalid or unenforceable, such deletion to apply only with respect to the operation of such provision in the particular jurisdiction in which such adjudication is made.

10

10.    Notices.  All communications, requests, consents and other notices provided for in this Agreement shall be in writing and shall be deemed give if delivered by hand or mailed by first class mail, postage prepaid, to the last known address of the recipient.

11.    Governing Law.  This Agreement shall be governed by and construed and enforced in accordance with the laws of the State of Delaware, without regard to its conflicts of laws provisions.

12.    Assignment.  Neither this Agreement nor any rights or duties hereunder may be assigned by the Executive without the prior written consent of the Company.  The Company shall have the right at any time to assign this Agreement to its successors and assigns; provided, however, that the assignee or transferee is the successor to all or substantially all of the business and assets of the Company and such assignee or transferee expressly assumes all of the obligations, duties and liabilities of the Company set forth in this Agreement.

13.    Amendments.  No provisions of this Agreement shall be altered, amended, revoked or waived except by an instrument in writing, signed by each party to this Agreement.

14.    Binding Effect.  Except as otherwise provided herein, this Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective legal representatives, heirs, successors and assigns.

15.    Execution in Counterparts.  This Agreement may be executed in any number of counterparts, each of which shall be deemed an original, but all of which together shall constituted one and the same instrument.

16.    Arbitration.  Any dispute, controversy or question arising under, out of, or relating to this Agreement (or the breach thereof), or, the Executive's employment with the Company or termination thereof, shall be referred for arbitration in the State of Michigan to a neutral arbitrator selected by the Executive and the Company and this shall be the exclusive and sole means for resolving such dispute.  Such arbitration shall be conducted in accordance with the National Rules for Resolution of Employment Disputes of the American Arbitration Association.  The arbitrator shall have the discretion to award reasonable attorneys' fees, costs and expenses to the prevailing party.  Judgment upon the award rendered by the arbitrator may be entered in any court having jurisdiction thereof.

17.    Entire Agreement.  This Agreement sets forth the entire agreement and understanding of the parties and supersedes all prior understandings, agreements or representations by or between the parties, whether written or oral, which relate in any way to the subject matter hereof.

18.    Survivorship.  The provisions of this Agreement necessary to carry out the intention of the parties as expressed herein shall survive the termination or expiration of this Agreement.

11

19.    Waiver.  Except as provided herein, the waiver by either party of the other party's prompt and complete performance, or breach or violation, of any provision of this Agreement shall not operate nor be construed as a waiver of any subsequent breach or violation, and the failure by any party hereto to exercise any right or remedy which it may possess hereunder shall not operate nor be construed as a bar to the exercise of such right or remedy by such party upon the occurrence of any subsequent breach or violation.

20.    Captions.  The captions of this Agreement are for convenience and reference only and in no way define, describe, extend or limit the scope or intent of this Agreement or the intent of any provision hereof.

21.    Construction.  The parties acknowledge that this Agreement is the result of arm's-length negotiations between sophisticated parties each afforded representation by legal counsel.  Each and every provision of this Agreement shall be construed as though both parties participated equally in the drafting of same, and any rule of construction that a document shall be construed against the drafting party shall not be applicable to this Agreement.

22.    Code Section 409A Payment Delay.  Notwithstanding any provision in this Agreement (or the attached Severance Agreement) to the contrary, any payment triggered by a termination of employment to the extent and up to the amount necessary to ensure that such payments are not subject to penalties and interest under Code Section 409A shall not commence until at least six months after the Executive's termination of  employment.  To the extent such payments, absent this provision, would be paid during the first six month period following the Executive's termination of employment, those payments shall be withheld and the amount of the payments withheld will be paid in a lump sum, without interest, during the seventh month after termination; provided that, if the Executive dies during such six-month period, any such delayed payments shall be immediately payable to the Executive's estate or representative.

12

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first above written.

EXECUTIVE


By:_____
    John A. Salvette


HAYES LEMMERZ INTERNATIONAL, INC.


By:_____
Name:  Curtis J. Clawson
Title:   President and Chief Executive Officer


10301891.2

13

*Attachment A*

## SEVERANCE AGREEMENT

1. <u>Defined Terms</u>. Unless otherwise defined in this Attachment A, the terms that are defined in the Employment Agreement (the "Employment Agreement") shall have the same meanings when used herein as that are ascribed to such terms in the Employment Agreement.

2. <u>Term of Agreement</u>. The Term of this Agreement shall commence on the Effective Date hereof and shall continue in effect through the third anniversary thereof; <u>provided</u>, <u>however</u>, that commencing on the first anniversary of the Effective Date and each anniversary thereafter (each such date a "Renewal Date"), the Term shall automatically be extended for one additional year unless, on or prior to such Renewal Date, the Company or the Executive shall have given notice not to extend the Term; and <u>further</u> <u>provided</u>, <u>however</u>, that if a Change in Control shall have occurred during the Term, the Term shall expire no earlier than twenty-four (24) months beyond the month in which such Change in Control occurred.

3. <u>Immediate Effect of Change in Control</u>. Promptly following a Change in Control, but in no event later than April 15 of the calendar year following the Change in Control, the Executive shall be entitled to the immediate payment of all unpaid compensation amounts (including the pro rata bonus payment for the current fiscal year under any bonus plan for which he is eligible ("Pro-rata Bonus") and all unpaid bonuses with respect to any prior fiscal year) with respect to the Executive's employment. For purposes of this Section 3, Pro-rata Bonus shall be an amount equal to the product of (1) the product of (x) the Executive's base salary as in effect immediately prior to the Change in Control and (y) the greater of (A) the Executive's normative bonus percentage for the fiscal year in which the Change in Control occurs and (B) the Executive's estimated bonus percentage calculated in good faith by the Company's Finance Department determined by projecting performance through the end of the fiscal year in which the Change in Control occurs and (2) a fraction, the numerator of which is the number of days in the fiscal year in which the Change in Control occurs through the date of the Change in Control, and the denominator of which is 365. The Pro-rata Bonus paid shall be subtracted from the amount otherwise due the Executive as a bonus for the fiscal year in which the Change in Control occurs, but such Pro-rata Bonus becomes a vested benefit upon a Change in Control and in no event shall the Executive have to repay all or any portion of the Pro-rata Bonus.

4. <u>Company's Covenants Summarized</u>. In order to induce the Executive to remain in the employ of the Company, the Company agrees, under the conditions described herein, to pay the Executive the Severance Payments and the other payments and benefits described herein. Except as provided in Section 9.1 hereof, no Severance Payments shall be payable under this Agreement unless there shall have been (or, under the terms of the second sentence of Section 6.1 hereof, there shall be deemed to have been) a termination of the Executive's employment with the Company on or following a Change in Control and during the Term. This Agreement shall not be construed as creating an express or implied contract of employment and, except as otherwise agreed in writing between the Executive and the Company, the Executive shall not have any right to be retained in the employ of the Company.

A-14

5.  Compensation Other Than Severance Payments.

5.1  Following a Change in Control and during the Term, during any period that the Executive fails to perform the Executive's full-time duties with the Company as a result of incapacity due to physical or mental illness, the Company shall pay the Executive's full salary to the Executive at the rate in effect at the commencement of any such period, together with all compensation and benefits payable to the Executive under the terms of any compensation or benefit plan, program or arrangement (other than the Company's short- or long-term disability plan, as applicable, to the extent such benefits would be duplicative and their nonpayment would not prejudice Executive's future entitlement to benefits) maintained by the Company during such period, until the Executive's employment is terminated by the Company for Disability.

5.2  If the Executive's employment shall be terminated for any reason on or following a Change in Control and during the Term, the Company shall pay the Executive's full salary to the Executive through the Date of Termination at the rate in effect immediately prior to the Date of Termination or, if higher, the rate in effect immediately prior to the first occurrence of an event or circumstance constituting Good Reason, together with all compensation and benefits payable to the Executive through the Date of Termination under the terms of the Company's compensation and benefit plans, programs or arrangements as in effect immediately prior to the Date of Termination or, if more favorable to the Executive, as in effect immediately prior to the first occurrence of an event or circumstance constituting Good Reason (including all unpaid bonuses with respect to any prior fiscal year).  In addition, if the Executive's employment is terminated on or following a Change in Control and during the Term, other than (A) by the Company for Cause, (B) by reason of death or Disability, or (C) by the Executive without Good Reason, then the Company shall pay Executive an amount equal to the product of (1) the product of (x) the Executive's base salary as in effect immediately prior to the Date of Termination, or, if higher, as in effect immediately prior to the first occurrence of an event or circumstance constituting Good Reason (the greater of such amounts, the "Base Salary") and (y) the Executive's normative bonus percentage for the year in which the Date of Termination occurs, or if higher, the normative bonus percentage for the fiscal year in which the Change in Control occurs or the normative bonus percentage in effect immediately prior to the first occurrence of an event or circumstance constituting Good Reason (the greatest of such percentages, the "Bonus Percentage") and (2) a fraction, the numerator of which is the number of days in the fiscal year in which the Date of Termination occurs through the date of the Date of Termination, and the denominator of which is 365; it being understood that, if the Date of Termination is in the same fiscal year as the Change in Control, the Pro-rata Bonus calculated pursuant to Section 3 shall be subtracted from the amount payable pursuant to this sentence of Section 5.2 but shall not reduce the amount payable below zero.

5.3  If the Executive's employment shall be terminated for any reason on or following a Change in Control and during the Term, the Company shall pay to the Executive the Executive's normal post-termination compensation and benefits as such payments become due.  Such post-termination compensation and benefits shall be determined under, and paid in accordance with, the Company's retirement, insurance and other compensation or benefit plans, programs and arrangements as in effect immediately prior to the Date of Termination or, if more favorable to the

A-15

Executive, as in effect immediately prior to the occurrence of the first event or circumstance constituting Good Reason.

6. Severance Payments.

6.1  If the Executive's employment is terminated on or following a Change in Control and during the Term, other than (A) by the Company for Cause, (B) by reason of death or Disability, or (C) by the Executive without Good Reason, then the Company shall pay the Executive the amounts, and provide the Executive the benefits, described in this Section 6.1 ("Severance Payments") and Section 6.2, in addition to any payments and benefits to which the Executive is entitled under Section 5 hereof or otherwise (except as provided herein).  For purposes of this Agreement, the Executive's employment shall be deemed to have been terminated following a Change in Control by the Company without Cause or by the Executive with Good Reason, if (i) the Executive's employment is terminated by the Company without Cause prior to a Change in Control (whether or not a Change in Control ever occurs) and such termination was at the request or direction of a Person who enters into an agreement with the Company the consummation of which would constitute a Change in Control, (ii) the Executive terminates his employment for Good Reason prior to a Change in Control (whether or not a Change in Control ever occurs) and the circumstance or event which constitutes Good Reason occurs at the request or direction of such Person, or (iii) the Executive's employment is terminated by the Company without Cause or by the Executive for Good Reason and such termination or the circumstance or event which constitutes Good Reason is otherwise in connection with or in anticipation of a Change in Control (whether or not a Change in Control ever occurs).

(A)  In lieu of any further salary payments to the Executive for periods subsequent to the Date of Termination and in lieu of any severance benefit otherwise payable to the Executive (whether pursuant to any employment agreement, plan, policy or otherwise), the Company shall pay to the Executive a lump sum severance payment, in cash, equal to two times the sum of (i) the Base Salary and Flexible Benefits Allowance and (ii) the product of (x) the Base Salary and (y) the Bonus Percentage.  Such amounts shall be paid within the period described in Section 6.3.

(B)  For the twenty-four (24) month period immediately following the Date of Termination, the Company shall arrange to provide the Executive and his dependents with life, disability, accident and health insurance benefits substantially similar to those provided to the Executive and his dependents immediately prior to the Date of Termination or, if more favorable to the Executive, those provided to the Executive and his dependents immediately prior to the first occurrence of an event or circumstance constituting Good Reason, at no greater cost to the Executive than the Executive's cost immediately prior to such date or occurrence (the "Executive's Cost").  Unless the Executive consents to a different method (after taking into account the effect of such method on the calculation of "parachute payments" pursuant to Section 6.2 hereof), the health insurance benefits described in this Section 6.1(B) shall be provided through a third-party insurer.  In the event continued accident and health insurance coverage under this Section 6.1(B) is provided through the Company's self-insured health plan such coverage shall be limited to the first eighteen months following the Date of Termination.  If the Executive is not receiving accident and health insurance coverage from another employer at the end of such eighteen month period, the Company shall pay the Executive a lump sum amount equal to six times the monthly COBRA health benefit

A-16

continuation premium for the Executive's coverage under the Company's accident and health insurance coverage. Benefits otherwise receivable by the Executive pursuant to this Section 6.1(B) shall be reduced to the extent benefits of the same type are received by or made available to the Executive by another employer of the Executive during the twenty four (24) month period following the Executive's termination of employment (and any such benefits received by or made available to the Executive shall be reported to the Company by the Executive); provided, however, that the Company shall reimburse the Executive for the excess, if any, of the cost of such benefits to the Executive over such cost immediately prior to the Date of Termination or, if more favorable to the Executive, the first occurrence of an event or circumstance constituting Good Reason.

(C)    For purposes of COBRA health benefit continuation under section 4980B of the Code, the cessation of benefits pursuant to Section 6.1(B) shall be treated as though such cessation is the "qualifying event" under section 4980B(f)(3) of the Code for purposes of determining the period of coverage.

(D)    The Company shall pay to the Executive a lump sum amount equal to one hundred thousand dollars ($100,000).  Such amount shall be paid in the month following the Date of Termination.

(E)    The Company shall, at its sole expense as incurred, provide Executive with "key executive level" outplacement services for the period ending on December 31 of the second calendar year following the Termination Date at a cost of no more than fifteen percent (15%) of the sum of (i) Base Salary and (ii) the Bonus Percentage multiplied by Base Salary.

6.2    (A)    Whether or not the Executive becomes entitled to the Severance Payments, if any of the payments or benefits received or to be received by the Executive in connection with a Change in Control or the Executive's termination of employment (whether pursuant to the terms of this Agreement or any other plan, arrangement or agreement with the Company, any Person whose actions result in a Change in Control or any Person affiliated with the Company or such Person) (all such payments and benefits, excluding the Gross-Up Payment, being hereinafter referred to as the "Total Payments") will be subject to the Excise Tax, the Company shall pay to the Executive an additional amount (the "Gross-Up Payment") such that the net amount retained by the Executive, after deduction of any Excise Tax on the Total Payments and any federal, state and local income and employment taxes and any penalties, interest or fees incurred by the Executive as a result of any payment under Section 6.2 being made later than five business days prior to the due date of the excise tax with respect to which it is paid and any Excise Tax upon the Gross-Up Payment, shall be equal to the Total Payments.

(B)    For purposes of determining whether any of the Total Payments will be subject to the Excise Tax and the amount of such Excise Tax, (i) all of the Total Payments shall be treated as "parachute payments" (within the meaning of section 280G(b)(2) of the Code) unless, in the opinion of tax counsel ("Tax Counsel") reasonably acceptable to the Executive and selected by the accounting firm which was, immediately prior to the Change in Control, the Company's independent auditor (the "Auditor"), such payments or benefits (in whole or in part) do not constitute parachute payments, including by reason of section 280G(b)(4)(A) of the Code, (ii) all "excess

A-17

parachute payments" within the meaning of section 280G(b)(l) of the Code shall be treated as subject to the Excise Tax unless, in the opinion of Tax Counsel, such excess parachute payments (in whole or in part) represent reasonable compensation for services actually rendered (within the meaning of section 280G(b)(4)(B) of the Code) in excess of the Base Amount allocable to such reasonable compensation, or are otherwise not subject to the Excise Tax, and (iii) the value of any noncash benefits or any deferred payment or benefit shall be determined by the Auditor in accordance with the principles of sections 280G(d)(3) and (4) of the Code.  For purposes of determining the amount of the Gross-Up Payment, the Executive shall be deemed to pay federal income tax at the highest marginal rate of federal income taxation in the calendar year in which the Gross-Up Payment is to be made and state and local income taxes at the highest marginal rate of taxation in the state and locality of the Executive's residence or the Executive's place of business, whichever is higher, on the Date of Termination (or if there is not yet a Date of Termination, then the date on which the Gross-Up Payment is calculated for purposes of this Section 6.2), net of the maximum reduction in federal income taxes which could be obtained from deduction of such state and local taxes.

(C)    In the event that the Excise Tax is finally determined to be less than the amount taken into account hereunder in calculating the Gross-Up Payment, the Executive shall repay to the Company, within five (5) business days following the time that the amount of such reduction in the Excise Tax is finally determined, the portion of the Gross-Up Payment attributable to such reduction (including that portion of the Gross-Up Payment attributable to the Excise Tax and federal, state and local income and employment taxes imposed on the Gross-Up Payment being repaid by the Executive), to the extent that such repayment results in a reduction in the Excise Tax and a dollar-for-dollar reduction in the Executive's taxable income and wages for purposes of federal, state and local income and employment taxes, plus interest on the amount of such repayment at 120% of the rate provided in section 1274(b)(2)(B) of the Code.  Notwithstanding the foregoing, in the event any portion of the amount to be repaid to the Company has been paid to any tax authority, repayment thereof shall not be required until actual refund or credit of such portion has been made to Executive, and interest payable to the Company shall not exceed the interest received or credited to Executive by such tax authority.  In the event that the Excise Tax is determined to exceed the amount taken into account hereunder in calculating the Gross-Up Payment (including by reason of any payment the existence or amount of which cannot be determined at the time of the Gross-Up Payment), the Company shall make an additional Gross-Up Payment in respect of such excess (including any interest, penalties or additions payable by the Executive with respect to such excess and the Gross-Up Payment attributable to the Excise Tax and federal, state, and local income and employment taxes imposed on the Gross-Up Payment being made to the Executive) within five (5) business days following the time that the amount of such excess is finally determined.  The Executive and the Company shall each reasonably cooperate with the other in connection with any administrative or judicial proceedings concerning the existence or amount of liability for Excise Tax with respect to the Total Payments.

6.3  The payments provided in subsections (A), of Section 6.1 hereof and in Section 6.2 hereof shall be made not later than the fifth day following the Date of Termination (or if there is no Date of Termination, then the date on which the Gross-up Payment is calculated for purposes of Section 6.2 hereof); provided, however, that if the amounts of such payments cannot be finally determined on or before such day, the Company shall pay to the Executive on such day an estimate,

A-18

as determined in good faith by the Company or, in the case of payments under Section 6.2 hereof, in accordance with Section 6.2 hereof, of the minimum amount of such payments to which the Executive is clearly entitled and shall pay the remainder of such payments (together with interest on the unpaid remainder (or on all such payments to the extent the Company fails to make such payments when due) at 120% of the rate provided in section 1274(b)(2)(B) of the Code) as soon as the amount thereof can be determined but in no event later than the thirtieth (30th) day after the Date of Termination.   In the event that the amount of the estimated payments exceeds the amount subsequently determined to have been due, such excess shall constitute a loan by the Company to the Executive, payable on the fifth (5th) business day after demand by the Company (together with interest at 120% of the rate provided in section 1274(b)(2)(B) of the Code).

6.4   The Company also shall pay to the Executive all legal fees and expenses incurred by the Executive in disputing in good faith any issue hereunder relating to the termination of the Executive's employment, in seeking in good faith to obtain or enforce any benefit or right provided by this Agreement or in connection with any tax audit or proceeding to the extent attributable to the application of section 4999 of the Code to any payment or benefit provided hereunder.   Such payments shall be made within five (5) business days after delivery of the Executive's written requests for payment accompanied with such evidence of fees and expenses incurred as the Company reasonably may require (but in no event after the last day of the calendar year following the calendar year in which the expense is incurred).

7.   Termination Procedures and Compensation During Dispute.

7.1   Notice of Termination.   After a Change in Control and during the Term, any purported termination of the Executive's employment (other than by reason of death) shall be communicated by written Notice of Termination from one party hereto to the other party hereto in accordance with Section 10 of the Employment Agreement.   For purposes of this Agreement, a "Notice of Termination" shall mean a notice which shall indicate the specific termination provision in this Agreement relied upon and shall set forth in reasonable detail the facts and circumstances claimed to provide a basis for termination of the Executive's employment under the provision so indicated. Further, a Notice of Termination for Cause is required to include a copy of a resolution duly adopted by the affirmative vote of not less than three-quarters (3/4) of the entire membership of the Board at a meeting of the Board which was called and held for the purpose of considering such termination (after reasonable notice to the Executive and an opportunity for the Executive, together with the Executive's counsel, to be heard before the Board) finding that, in the good faith opinion of the Board, the Executive was guilty of conduct set forth in clause (i) or (ii) of the definition of Cause herein, and specifying the particulars thereof in detail.

7.2   Date of Termination.   "Date of Termination," with respect to any purported termination of the Executive's employment after a Change in Control and during the Term, shall mean (i) if the Executive's employment is terminated for Disability, thirty (30) days after Notice of Termination is given (provided that the Executive shall not have returned to the full-time performance of the Executive's duties during such thirty (30) day period), and (ii) if the Executive's employment is terminated for any other reason, the date specified in the Notice of Termination (which, in the case of a termination by the Company (except in the case of a termination for Cause) and, in the case of a

termination by the Executive, shall not be less than thirty (30) days from the date such Notice of Termination is given).

7.3   Dispute Concerning Termination.   If within fifteen (15) days after any Notice of Termination is given, or, if later, prior to the Date of Termination (as determined without regard to this Section 7.3), the party receiving such Notice of Termination notifies the other party that a dispute exists concerning the termination, the Date of Termination shall be extended until the earlier of (i) the date prior to the date on which the Term ends or (ii) the date on which the dispute is finally resolved, either by mutual written agreement of the parties or by a final judgment, order or decree of an arbitrator or a court of competent jurisdiction (which is not appealable or with respect to which the time for appeal therefrom has expired and no appeal has been perfected); provided, however, that the Date of Termination shall be extended by a notice of dispute only if such notice is given in good faith and the party providing notice pursues the resolution of such dispute with reasonable diligence.

7.4   [intentionally blank]

8.   No Mitigation.   The Company agrees that, if the Executive's employment with the Company terminates during the Term, the Executive is not required to seek other employment or to attempt in any way to reduce any amounts payable to the Executive by the Company pursuant to this Agreement.   Further, the amount of any payment or benefit provided for in this Agreement (other than Section 6.1(B) hereof) shall not be reduced by any compensation earned by the Executive as the result of employment by another employer, by retirement benefits, by offset against any amount claimed to be owed by the Executive to the Company, or otherwise.

9.   Successors; Binding Agreement.

9.1   This Agreement shall inure to the benefit of and be binding upon the Company and its successors and assigns.   In addition to any obligations imposed by law upon any successor to the Company, the Company will require any successor (whether direct or indirect, by purchase, merger, consolidation or otherwise) to all or substantially all of the business and/or assets of the Company to expressly assume and agree in writing to perform this Agreement in the same manner and to the same extent that the Company would be required to perform it if no such succession had taken place.   The Company will require any ultimate parent entity, as defined in 16 C.F.R. 8801,1(a)(3), of any Person who acquires 90% of the outstanding shares of common stock of the Company or the outstanding voting securities of the Company entitled to vote generally in the election of directors (including through a merger in which the Company does not survive or as a result of which the Company becomes a subsidiary of another Person or a consolidation involving the Company and another Person) to assume and agree in writing to perform as a joint and several obligor of the Company (including any successor to the Company), this Agreement in the same manner and to the same extent as the Company.   Failure of the Company to obtain such assumption and agreement in writing from a successor or its parent as described in the preceding sentences after notice and a reasonable cure period (not to exceed ten days from the date such notice is received) shall be a breach of this Agreement and shall entitle the Executive to compensation from the Company in the same amount and on the same terms as the Executive would be entitled to hereunder if the Executive were to terminate the Executive's employment for Good Reason after a Change in Control, except that, for

A-20

purposes of implementing the foregoing, the date on which any such succession becomes effective shall be deemed the Date of Termination.

9.2   This Agreement shall inure to the benefit of and be enforceable by the Executive's personal or legal representatives, executors, administrators, successors, heirs, distributees, devisees and legatees.   If the Executive shall die while any amount would still be payable to the Executive hereunder (other than amounts which, by their terms, terminate upon the death of the Executive) if the Executive had continued to live, all such amounts, unless otherwise provided herein, shall be paid in accordance with the terms of this Agreement to the executors, personal representatives or administrators of the Executive's estate.

10.   Insurance and Indemnification.   From and after a Change in Control, including after the termination of Executive's employment, the Company shall indemnify, defend and hold the Executive harmless from and against any and all expenses, liabilities, damages, costs, judgments, penalties, fines and amounts paid in settlement, incurred in good faith by Executive in connection with any proceeding involving Executive by reason of Executive's being or having been an officer, director, employee or agent of the Company (or any affiliate of the Company) to the fullest extent permitted by law, whether or not Executive is, or is threatened to be made, a party to any threatened, pending, or completed proceeding, and whether or not Executive is successful in such proceeding.   In addition, upon receipt from Executive of (i) a written request for an advancement of reasonable expenses which Executive reasonably believes will be subject to indemnification hereunder and (ii) a written undertaking by Executive to repay any such amounts if it shall ultimately be determined that the Executive is not entitled to indemnification under this Agreement or otherwise, the Company shall advance such expenses to Executive or pay such expenses for Executive, all in advance of the final disposition of any such matter.   From and after a Change in Control, including after the termination of Executive's employment hereunder, Executive shall have coverage under a director's and officer's liability insurance policy in amounts no less than, and on terms no less favorable than those, provided to senior executive officers of the Company from time to time.

11.   Definitions.   For purposes of this Agreement, the following terms shall have the meanings indicated below:

(A)   "Affiliate" shall have the meaning set forth in Rule 12b-2 promulgated under Section 12 of the Exchange Act.

(B)   "Agreement" shall mean this Attachment A to the Employment Agreement.

(B)   "Auditor" shall have the meaning set forth in Section 6.2 hereof.

(C)   "Base Amount" shall have the meaning set forth in section 280G(b)(3) of the Code.

(D)   "Code" shall mean the Internal Revenue Code of 1986, as amended from time to time.

(E)   "Company" shall mean Hayes Lemmerz International, Inc. and, except in determining under Section 15(G) hereof whether or not any Change in Control of the Company has occurred,

A-21

A-22

shall include any successor to its business and/or assets which assumes and agrees to perform this Agreement by operation of law, or otherwise.

(F) "Excise Tax" shall mean any excise tax imposed under section 4999 of the Code or any similar state or local tax or any interest or penalties incurred by Executive with respect to such excise tax.

(G) "Person" shall have the meaning given in Section 3(a)(9) of the Exchange Act, as modified and used in Sections 13(d) and 14(d) including a "group" within the meaning of Section 13(d)(3) thereof, except that such term shall not include (i) the Company or any of its subsidiaries, (ii) a trustee or other fiduciary holding securities under an employee benefit plan of the Company or any of its Affiliates, (iii) an underwriter temporarily holding securities pursuant to an offering of such securities, or (iv) a corporation owned, directly or indirectly, by the stockholders of the Company in substantially the same proportions as their ownership of stock of the Company.

(H) "Retirement" shall be deemed the reason for the termination by the Executive of the Executive's employment if such employment is terminated in accordance with the Company's retirement policy, including early retirement, generally applicable to its salaried employees.

688060- Server 1a - MSW

## <u>Exhibit I</u>

## Modifications to Supplemental Executive Retirement Plan

G-2

**PLAN EXHIBIT I**

**<u>Modifications to the Supplemental Executive Retirement Plan</u>**

Section 6.7 of the Plan provides that the Debtors shall assume any remaining obligations under the Supplemental Executive Retirement Plan (the "<u>SERP</u>"), subject to any modifications required by the Requisite DIP Lenders.  The participants under the SERP and the Requisite DIP Lenders continue to negotiate any proposed modifications to the SERP.  The Debtors will amend this Exhibit or provide notice of any material revisions to the SERP prior to the Confirmation Hearing.

G-2

## Exhibit J

## Amended Schedule of Rejected Contracts and Leases

**PLAN EXHIBIT J**

**Hayes-Lemmerz International, Inc. et al**
**Amended Schedule of Rejected Contracts and Leases**
(additions to the exhibit are noted in bold)

| Counterparty | Description of Contract |
|---|---|
| AT&T | Dedicated Circuits & Voice |
| AT&T Wireless | Wireless Service |
| Brembo North America, Inc | Stock Purchase Agreement dated 11/9/07 |
| Constellation New Energy | MarketGuard Master Agreement |
| Corporate Fleet Services | Automobile and Truck Leasing Agreement |
| Daniel D. Minor and Todd G. Carlson | Stock Purchase Agreement dated 6/30/05 |
| Diversified Machine, Inc. | Stock Purchase Agreement dated 2/14/07 |
| EpiUse | SAP Payroll - Application Support |
| **Fitch, Inc.** | **Ratings Agreement** |
| Harvey Industries LLC | Asset Purchase Agreement dated 7/3/07 |
| Harvey Industries LLC | Lease Agreement - Equipment |
| Hess Engineering | Gas supply agreement for Akron, OH facility |
| Integrity Interactive, Inc. | Service Agreement - Ethics/Training Courses |
| Minor Investments, LLC | Stock Purchase Agreement dated 12/5/05 |
| **Moody's** | **Ratings Agreement** |
| Precision Partners Holding Company | Stock Purchase Agreement dated 10/14/05 |
| Rudeveca | Asset Purchase Agreement-dallas warehouse |
| Shareholder.com | Subscriber Agreement |
| **Standard & Poor's** | **Ratings Agreement** |
| Syncro | Asset Purchase Agreement dated 10/17/05- brake controller |
| TDS (Germany) | Remote Service Management (SAP) |
| Tetra Financial Group | Sale/leaseback of buildings and equipment, Sedalia, MO facility - 1/21/2009 |
| Tetra Financial Group | Sale/leaseback of buildings and equipment, Sedalia, MO facility - 2/9/2009 |
| Thomson Financial, LLC | Client Agreement |

775231-Chicago Server 2A - MSW

<div align="center">

K-1

## <u>Exhibit K</u>

## Material Terms of Post-Plan Effective Date Secured Term Loan

</div>

This illustrative term sheet (the "Term Sheet") has been provided to the Debtors from their existing lenders for informational purposes only and solely to illustrate a potential exit financing scenario.  The Debtors are seeking exit financing (exclusive of roll-over term loans) consisting of two facilities of up to $100,000,000 in the aggregate, although the final aggregate amount could be substantially less.  The Debtors have received no commitment or assurances that they will receive financing from their existing lenders or otherwise, or in the amounts and on the terms described in the Term Sheet, which have not been negotiated or agreed upon and which are subject to change.  The Debtors anticipate receiving a commitment for exit financing and will file additional information regarding the same prior to or at the hearing to consider confirmation of the First Amended Joint Plan of Reorganization of Hayes Lemmerz International, Inc. and its Affiliated Debtors and Debtors-in-Possession.

<div align="center">

**Hayes International, Inc.**
**HLI Operating Company, Inc.**
**Hayes Lemmerz Finance LLC - Luxembourg S.C.A.**
**Summary of Illustrative Terms & Conditions**
**Exit Facility**
**[$30,000,000 - $50,000,000] ABL Revolving Credit Facility**
**[$50,000,000 - $70,000,000] New Money Term Loan**
**$100,000,000 Roll-Over Term Loan**

</div>

*Not a Commitment:  This draft Term Sheet is provided for discussion only and does not constitute a financing commitment.  Except as expressly provided in any binding written agreement the parties may enter into in the future, no past, present or future action, course of conduct, or failure to act relating to the transactions or proposals referred to in this draft term sheet or relating to the negotiation of the terms of such transactions or proposals shall give rise to or serve as the basis for any obligation or other liability on the part of such persons or any of their affiliates.*

Reference is made to that Second Amended and Restated Credit Agreement, dated as of May 30, 2007 (as heretofore amended, modified and supplemented, the "Amended DIP Credit Agreement") among the HLI Operating Company, Inc., a Delaware corporation ("Hayes" or the "U.S. Borrower") and Hayes Lemmerz Finance LLC - Luxembourg S.C.A., a société en commandite par actions organized under the laws of the Grand Duchy of Luxembourg ("Hayes Luxembourg" or "Luxembourg Borrower", together with the U.S. Borrower, the "Borrowers"), Hayes Lemmerz Finance LLC - Luxembourg S.C.A., a société en commandite par actions organized under the laws of the Grand Duchy of Luxembourg, Hayes Lemmerz International, Inc., a Delaware corporation ("Holdings"), the Lenders and Issuers (in each case as defined therein) party thereto, Citicorp North America, Inc. ("CNAI"), as administrative agent ("Prepetition Administrative Agent"), Deutsche Bank Securities Inc., as Syndication Agent, CNAI, as Documentation Agent, and Citigroup Global Markets Inc. and Deutsche Bank Securities Inc., as Joint Book-Running Lead Managers and Joint Lead Arrangers, as amended by

Amendment No. 1, dated as of January 30, 2009, among the Borrowers, Holdings and the Prepetition Administrative Agent on behalf of each Lender executing a Lender Consent (as defined therein), as further amended by Amendment No. 2, dated as of May 12, 2009, among the Borrowers, Holdings, each DIP Lender (as defined therein) party thereto, the DIP Administrative Agent, the DIP Lead Arrangers and the DIP Documentation Agent (in each case as defined therein), as further amended by Amendment No. 3, dated as of May 19, 2009, among the Borrowers, Holdings, each DIP Lender party thereto, the DIP Administrative Agent and the DIP Depositary, as further amended by Amendment No. 4, dated as of August 7, 2009, among the Borrowers, Holdings, each DIP Lender party thereto, the DIP Administrative Agent and the DIP Depositary; as further amended by Amendment No. 5, dated as of August 31, 2009, among the Borrowers, Holdings, each DIP Lender and Senior Roll-Up Lender (as defined therein) party thereto, the DIP Administrative Agent and the DIP Depositary, and as further amended by Amendment No. 6, dated as of September 17, 2009, among the Borrowers, Holdings, each DIP Lender party thereto, the DIP Administrative Agent and the DIP Depositary.  Capitalized terms used but not otherwise defined herein shall have the meaning ascribed to such terms in the Amended DIP Credit Agreement.

| ABL Revolving Credit Facility (the "ABL Facility") | |
|---|---|
| **Borrower:** | U.S. Borrower |
| **ABL Guarantors:** | All obligations under the ABL Facility portion of the Exit Facility will be unconditionally guaranteed (the "ABL Guarantee") by each existing and future direct and indirect domestic subsidiary of the U.S. Borrower  with the exception of certain subsidiaries to be agreed upon. |
| **Purpose:** | The proceeds of the ABL Revolving Credit Facility will be used to provide working capital and to fund other general corporate purposes of U.S. Borrower. |
| **Facility:** | An asset backed revolving credit facility subject to a Borrowing not to exceed an aggregate principal amount of up to [$30,000,000 - $50,000,000] subject to a letter of credit sub-limit (the "LC Sub-Limit") in an amount to be determined, to be used in accordance with the "Purpose" described above and subject to the terms and conditions below. |
| **Currency:** | US Dollars |
| **Maturity/Tenor:** | [TBD] years |
| **Pricing:** | Undrawn Pricing: [TBD] bps<br><br>Drawn Pricing: L+ [TBD] bps with a LIBOR floor of [TBD] bps (corresponding Base Rate and Base Rate floor to be determined) |
| **Upfront Fees:** | In an amount to be determined. |
| **Letter of Credit Facility Fee** | In an amount to be determined. |
| **Letter of Credit Fees** | In an amount to be determined. |

| | |
|---|---|
| **Security:** | The ABL Facility will be secured by a [(i)] first-priority lien on all Accounts Receivable, eligible inventory, and Cash of U.S. Borrower and the ABL Guarantors [, (ii) [first][second] lien of all of the assets of the U.S Borrower and the ABL Guarantors and (iii) pledge of 65% stock in foreign subsidiaries][1]. |
| **Borrower Base:** | The borrowing base shall initially include:<br>• [85]% of eligible accounts receivable; and<br>• the lesser of (a) [65]% of eligible inventory or (b) [85]% of the NOLV of eligible inventory;<br>less<br>• usual and customary reserves. |
| **Key Financial Covenants:** | Financial covenants will include provisions establishing, *inter alia*, the maximum leverage, maximum CapEx, and minimum fixed charge coverage ratio. |
| **Affirmative Covenants:** | Customary and standard for transactions of this type. |
| **Negative Covenants:** | Customary and standard for transactions of this type. |
| **Events of Default:** | Customary and standard for transactions of this type. |
| **Conditions to Effectiveness:** | To be determined. |

### New Money Term Loan ("New Money Term Loan")

| | |
|---|---|
| **Borrower:** | Luxembourg Borrower |
| **Term Guarantors:** | All obligations under the New Money Term Loan portion of the Exit Facility will be unconditionally guaranteed (the "New Money Guarantee") by each (i) existing and future direct and indirect subsidiary of the Luxembourg Borrower and (ii) each U.S. subsidiaries, with the exception of certain joint ventures and those certain subsidiaries to be agreed upon. |
| **Purpose:** | The proceeds of the New Money Term Loan will be used to provide working capital and to fund other general corporate purposes of the Luxembourg Borrower. |
| **Facility:** | A term loan facility in an aggregate principal amount of up to [$50,000,000 - $70,000,000] (or Euro equivalent) to be used in accordance with the "Purpose" described above and subject to the terms and conditions below. |
| **Currency:** | U.S. Dollars or Euros |
| **Maturity/Tenor:** | [TBD] years |
| **Pricing:** | LIBOR or EURIBOR+ [TBD] bps with a LIBOR or EURIBOR floor of [TBD] bps |
| **Upfront Fees:** | In an amount to be determined. |
| **Amortization:** | To be determined. |
| **Security:** | The New Money Term Loan will be secured on a pari passu basis |

---

[1] Level of ancillary collateral required for ABL Facility to be determined.

| | |
|---|---|
| | with the Roll-Over Term Loan by a first-priority lien on all assets of the Luxembourg Borrower and the Term Guarantors. |
| **Key Financial Covenants[2]:** | Financial covenants will include provisions establishing, *inter alia*, the maximum leverage, maximum CapEx, and minimum fixed charge coverage ratio. |
| **Affirmative Covenants[3]:** | Customary and standard for transactions of this type. |
| **Negative Covenants[4]:** | Customary and standard for transactions of this type. |
| **Events of Default:** | Customary and standard for transactions of this type. |
| **Mandatory Prepayments:** | To be determined |
| **Conditions to Effectiveness:** | To be determined. |

## Roll-Over Term Loan ("Roll-Over Term Loan")

| | |
|---|---|
| **Borrower:** | Luxembourg Borrower |
| **Term Guarantors:** | All obligations under the Roll-Over Term Loan portion of the Exit Facility will be unconditionally guaranteed (the "Roll-Over Guarantee") by each (i) existing and future direct and indirect subsidiary of the Luxembourg Borrower and (ii) each U.S. subsidiaries, with the exception of those certain subsidiaries to be agreed upon. |
| **Purpose:** | The proceeds of the Roll-Over Term Loan will be used to refinance the DIP Facilities. |
| **Facility:** | A term loan facility in an aggregate principal amount of $[100,000,000] (or Euro equivalent) to be used in accordance with the "Purpose" described above and subject to the terms and conditions below. |
| **Currency:** | U.S. Dollars or Euros |
| **Maturity/Tenor:** | [TBD] years |
| **Pricing:** | LIBOR or EURIBOR + [TBD] bps with a LIBOR or EURIBOR floor of [TBD] bps |
| **Upfront Fees:** | In an amount to be determined. |
| **Amortization:** | To be determined. |
| **Security:** | The Roll-Over Term Loan will be secured on a pari passu basis with the New Money Term Loan by a first priority lien on substantially all assets of the Luxembourg Borrower and the Term Guarantors. |
| **Key Financial Covenants[5]:** | Financial covenants will include provisions establishing, *inter alia*, the maximum leverage, maximum CapEx, and minimum fixed charge coverage ratio. |

---

[2] To be determined if covenants will apply to US assets.
[3] To be determined if covenants will apply to US assets.
[4] To be determined if covenants will apply to US assets.
[5] To be determined if covenants will apply to US assets.

| | |
|---|---|
| **Affirmative Covenants[6]:** | Customary and standard for transactions of this type. |
| **Negative Covenants[7]:** | Customary and standard for transactions of this type. |
| **Events of Default:** | Customary and standard for transactions of this type. |
| **Mandatory Prepayments:** | To be determined. |
| **Conditions to Effectiveness:** | To be determined. |
| <div align="center">**INTERCREDITOR ARRANGEMENTS**</div> | |
| Each of the facilities described above will be subject intercreditor arrangements in one or more agreements subject to customary terms to agreed upon. | |

---

[6] To be determined if covenants will apply to US assets.

[7] To be determined if covenants will apply to US assets.

777485-Chicago Server 2A - MSW

## Exhibit M

**Form of Stockholders' Agreement, Registration Rights Agreement and
Management Stockholders' Agreement**

**PLAN EXHIBIT M**


## Registration Rights Agreement and Stockholders' Agreement

The forms of Registration Rights Agreement and Stockholders' Agreement are attached hereto.

## Management Stockholders Agreement

The Plan provides that any party that receives the New Common Stock or similar equity based incentives through or on account of any management incentive plan or the like shall be required to execute a separate management stockholders agreement prior to receipt of such New Common Stock or incentive.  The First Amended Joint Plan of Reorganization of Hayes Lemmerz International, Inc. and its Affiliated Debtors and Debtors-in-Possession (the "Plan") does not provide for any member of the Debtors' or Reorganized Hayes' management to receive New Common Stock or similar equity based incentives, or implement any management incentive plan or the like, on the effective date of the Plan.  Accordingly, the Debtors and the Requisite DIP Lenders have agreed that such a management stockholders agreement will either be (a) negotiated with the Requisite DIP Lenders prior to the hearing to consider confirmation of the Plan or (b) negotiated by the Board of Directors (the "Board") of Reorganized Hayes after the effective date of the Plan and implemented in connection with any long-term incentive plan or other management incentive or similar plan implemented by the Board of Reorganized Hayes.

777483.04-Chicago Server 2A - MSW

STOCKHOLDERS AGREEMENT

among

HAYES LEMMERZ INTERNATIONAL, INC.

and

EACH OF THE STOCKHOLDERS

of

HAYES LEMMERZ INTERNATIONAL, INC.
NAMED ON THE SIGNATURE PAGES HERETO

Dated as of _____, 2009

NY1:#3515464

TABLE OF CONTENTS

Page

ARTICLE I DEFINITIONS ....................................................................................1

ARTICLE II BOARD OF DIRECTORS AND GOVERNANCE ..................................................6

    SECTION 2.1    Election of Directors; Number and Composition of the Board. ...................6

    SECTION 2.2    Action by the Board ................................................................7

    SECTION 2.3    D&O Indemnification Agreement; Expenses ....................................7

    SECTION 2.4    Actions Requiring Stockholder Approval; Director Approval. ...................7

ARTICLE III ACCESS TO INFORMATION ...............................................................9

    SECTION 3.1    General Information to be Provided by the Company ...........................9

    SECTION 3.2    Right to Access .................................................................10

    SECTION 3.3    Notice of Certain Events .........................................................10

ARTICLE IV CERTIFICATE OF INCORPORATION AND BYLAWS ..............................11

ARTICLE V TRANSFERS OF SHARES ...................................................................11

    SECTION 5.1    Restrictions on Transfers; Permitted Transferees. ...............................11

    SECTION 5.2    Drag-Along Right. ...............................................................13

    SECTION 5.3    Tag-Along Rights. ...............................................................15

    SECTION 5.4    Legend on Certificates ...........................................................16

    SECTION 5.5    No Circumvention of Stock Transfer Restrictions ..............................16

ARTICLE VI ADDITIONAL AGREEMENTS ...........................................................17

    SECTION 6.1    Preemptive Rights. ...............................................................17

    SECTION 6.2    Confidentiality ...................................................................18

    SECTION 6.3    Environmental, Health and Safety Covenants ...................................19

ARTICLE VII MISCELLANEOUS ..........................................................................19

    SECTION 7.1    Term ..............................................................................19

    SECTION 7.2    Modifications ....................................................................19

    SECTION 7.3    Action by Stockholders ..........................................................20

    SECTION 7.4    Applicability ....................................................................20

    SECTION 7.5    Notices ..........................................................................20

    SECTION 7.6    Binding Effect ...................................................................21

    SECTION 7.7    Entire Agreement ................................................................21

NY1:#3515464

SECTION 7.8    Counterparts ................................................................................21

SECTION 7.9    Headings ......................................................................................22

SECTION 7.10   Bylaws .........................................................................................22

SECTION 7.11   Further Acts and Assurances ......................................................22

SECTION 7.12   Governing Law; Consent to Jurisdiction and Service of Process ...............22

SECTION 7.13   Injunctive Relief .........................................................................22

SECTION 7.14   Severability .................................................................................22

SECTION 7.15   Recapitalization, Etc. ..................................................................23

Exhibit A          Certificate of Incorporation
Exhibit B          Bylaws

NY1:#3515464

STOCKHOLDERS AGREEMENT

This STOCKHOLDERS AGREEMENT, dated as of [_____], 2009 (this "Agreement"), is entered into among HAYES LEMMERZ INTERNATIONAL, INC., a Delaware corporation (the "Company") and the Stockholders.  Capitalized terms not otherwise defined herein have the meanings set forth in Article I.

WITNESSETH:

WHEREAS, on May 11, 2009, the Company and certain of the Company's direct and indirect subsidiaries each filed a voluntary petition in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") initiating cases under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") §§ 101-1330 and continued in the possession of their assets and in the management of their businesses pursuant to sections 1107 and 1108 of the Bankruptcy Code;

WHEREAS, the [First] Amended Joint Plan of Reorganization of Hayes Lemmerz International, Inc., et al., as confirmed on [_____], 2009 by an order of the Bankruptcy Court entered on [_____], 2009 (the "Plan"), provides that the Company shall issue to the Stockholders shares of Class A Common Stock and/or shares of Class B Common Stock; and

WHEREAS, in connection with the consummation of the transactions contemplated by the Plan, and as required pursuant to the Plan as a condition to the receipt of such shares, the Company and the Stockholders are entering into this Agreement to provide certain rights and obligations among them.

NOW, THEREFORE, in consideration of the premises set forth herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties, intending to be legally bound hereby, agree as follows:

ARTICLE I

DEFINITIONS

The following terms shall have the definitions set forth below:

"Acceptance Notice" has the meaning set forth in Section 6.1(c).

"Affiliate" means, with respect to any specified Person, any other Person directly or indirectly controlling or controlled by or under direct or indirect common control with such specified Person.  For the purposes of this definition, "control" when used with respect to any specified Person means the power to direct the management and policies of such Person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise; and the terms "controlling" and "controlled" have meanings correlative to the foregoing.

"Agreement" has the meaning set forth in the preamble of this Agreement.

"Bankruptcy Code" has the meaning set forth in the preamble of this Agreement.

"Bankruptcy Court" has the meaning set forth in the preamble of this Agreement.

"Breaching Drag-Along Stockholder" has the meaning set forth in Section 5.2(e) of this Agreement.

"Beneficial Ownership" or "Beneficially Own" shall have the meaning given such term in Rule 13d-3 under the Exchange Act and a Person's Beneficial Ownership of securities shall be calculated in accordance with the provisions of such Rule; provided, however, that for purposes of determining any Person's Beneficial Ownership, such Person shall be deemed to be the Beneficial Owner of any Common Stock which may be acquired by such Person (disregarding any legal impediments to such Beneficial Ownership), whether within sixty (60) days or thereafter, upon the conversion, exchange, redemption or exercise of any warrants, options, rights, or other securities issued by the Company or any subsidiary thereof. Notwithstanding anything to the contrary set forth herein, prior to the pledgee commencing action to foreclose upon any shares of Common Stock pledged in any Qualified Pledge, any such pledged shares of Common Stock will be deemed Beneficially Owned by the pledging party.

"Board" means the Board of Directors of the Company.

"Business Day" means any day other than a Saturday, a Sunday or a day on which banks in New York, New York are authorized or obligated by law or executive order to close.

"Bylaws" means the Amended and Restated Bylaws of the Company, as amended from time to time.

"Certificate of Incorporation" means the Amended and Restated Certificate of Incorporation of the Company, as amended from time to time.

"Class A Common Stock" means the Company's Class A common stock, par value of $0.01 per share.

"Class B Common Stock" means the Company's Class B common stock, par value of $0.01 per share.

"Common Stock" means the Company's Class A Common Stock and Class B Common Stock.

"Common Stock Equivalents" means securities (including, without limitation, options or warrants) exercisable, exchangeable or convertible into Common Stock, whether immediately, upon the happening of any event or the passage of time, or otherwise.

"Company" has the meaning set forth in the preamble of this Agreement.

"Confidential Information" means any information, including all financial information provided pursuant to Article III, concerning the organization, business, technology, trade secrets, know-how, finance, transactions or affairs of a Person (whether conveyed in written, oral or in

2

any other form and whether such information has been furnished before, on or after the date of this Agreement) that is not known to the public or otherwise publicly available.

"DGCL"  means the Delaware General Corporation Law.

"Dilutive Securities" has the meaning set forth in Section 6.1.

"Drag-Along Buyer" has the meaning set forth in Section 5.2(a).

"Drag-Along Proxy Holder" has the meaning set forth in Section 5.2(e).

"Drag-Along Right" has the meaning set forth in Section 5.2(a).

"EHS" has the meaning set forth in Section 6.3.

"Eligible Stockholder" has the meaning set forth in Section 3.1.

"Equity Incentive Plan" means any employee stock option plan, stock purchase plan, employee benefit plan, employment contract or any similar benefit or incentive program or agreement covering management, directors, employees or consultants of the Company and its subsidiaries approved by the Board, where the primary purpose of such plan, program or agreement is not to raise capital for the Company.

"Exchange Act" means the Securities Exchange Act of 1934, as amended, and the rules and regulations of the SEC promulgated thereunder.

"Initial Holders" means the Stockholders designated as such on the signature pages hereto.

"Majority Sale" has the meaning set forth in Section 5.2(a).

"Majority Sale Closing Date" has the meaning set forth in Section 5.2(b).

"Majority Sale Notice" has the meaning set forth in Section 5.2(b).

"Non-Initiating Stockholders" has the meaning set forth in Section 5.2(a).

"Notice of Preemptive Rights" has the meaning set forth in Section 6.1(b).

"Other Purchasers" has the meaning set forth in Section 6.1(d).

"Parties" means collectively the Company and any Person who becomes a party to this Agreement.  Each of the Parties are referred to as a "Party."

"Permitted Transferee" has the meaning set forth in Section 5.1(e).

"Person" means an individual, corporation, partnership, limited liability company, joint venture, association, joint stock company, trust or unincorporated organization, or government or any agency or political subdivision thereof.

3

"Plan" has the meaning set forth in the preamble of this Agreement.

"Preemptive Offer" has the meaning set forth in Section 6.1(b).

"Pro Rata Portion" means:

(a) For purposes of Section 5.2 (with respect to each class of Shares to be Transferred pursuant to the Drag-Along Rights), a number of such class of Shares determined by multiplying (i) the aggregate number of such class of Shares Beneficially Owned by the Non-Initiating Stockholder by (ii) a fraction, the numerator of which is the aggregate number of such class of Shares proposed to be Transferred by the Proposing Stockholders to the Drag-Along Buyer and the denominator of which is the aggregate number of such class of Shares Beneficially Owned by the Proposing Stockholders.

(b) For purposes of Section 5.3 (with respect to each class of Shares to be transferred pursuant to the tag-along rights), (x) with respect to each Tagging Stockholder, a number of such class of Shares determined by multiplying (i) the total number of such class of Shares proposed to be Transferred by the Proposing Stockholder to the Proposed Transferee, by (ii) a fraction, the numerator of which is the number of such class of Shares Beneficially Owned by the Tagging Stockholder and the denominator of which is the aggregate number of such class of Shares Beneficially Owned by all Stockholders.

(c) For purposes of Section 6.1 (with respect to preemptive rights), a number of Dilutive Securities determined by multiplying (i) the aggregate number of Dilutive Securities the Company proposes to issue on the relevant issuance date by (ii) a fraction, the numerator of which is the number of Shares Beneficially Owned by the relevant Stockholder immediately prior to such date and the denominator of which is the aggregate number of Shares Beneficially Owned by all Stockholders.

"Proposed Transferee" has the meaning set forth in Section 5.3(a).

"Proposing Stockholders" has the meaning set forth in Section 5.2(a).

"Qualified Pledge" means a bona fide pledge of Common Stock in connection with a secured borrowing transaction, the pledgee with respect to which is a financial institution in the business of engaging in secured lending and similar transactions which has entered into such transaction in the ordinary course of such business.

"Qualified Public Offering" means a bona fide underwritten public offering of Shares by a nationally recognized investment banking firm that is registered under the Securities Act and (i) that results in net proceeds to the Company of not less than $75 million; and (ii) following which the Shares are listed on a United States national securities exchange.

"Registration Rights Agreement" means the Registration Rights Agreement, dated as of the date hereof, among the Parties hereto, as amended from time to time in accordance with its terms.

4

"Representative" means a Person's employees, directors, officers, advisors and other representatives (including attorneys, accountants and consultants).

"SEC" means the United States Securities and Exchange Commission, or any other Federal agency at the time administering the Securities Act or the Exchange Act.

"Securities Act" means the Securities Act of 1933, as amended, and the rules and regulations of the SEC promulgated thereunder.

"Series A Warrants" means the Series A Warrants contemplated to be issued to certain noteholders and the Pension Benefit Guaranty Corporation under the Plan.

"Series B Warrants" means the Series B Warrants contemplated to be issued to certain noteholders and the Pension Benefit Guaranty Corporation under the Plan.

"Shares" means shares of Common Stock, including any subdivisions, combinations, splits or reclassifications thereof.

"Stockholder Excess Election" has the meaning set forth in Section 6.1(c).

"Stockholders" means each Party (other than the Company) named on the signature pages to this Agreement, any Person who is a Transferee or a Permitted Transferee of Shares, whether from another Stockholder or from the Company, who is required by this Agreement to agree to be bound by the terms and conditions of this Agreement, and any other Person who otherwise becomes a party to this Agreement pursuant to the terms of this Agreement.  The term "Stockholder" means any one of the Stockholders and, in the case of a Stockholder who is a natural person, the term "Stockholder" also includes such Stockholder's legal representatives, executors or administrators when the context so requires.

"Tag-Along Notice" has the meaning set forth in Section 5.3(b).

"Tagging Stockholder" has the meaning set forth in Section 5.3(a).

"Tag-Along Transfer"  has the meaning set forth in Section 5.3(a).

"Transfer" means any sale, transfer, assignment, conveyance or other disposition, including without limitation by merger, operation of law, bequest or pursuant to any domestic relations order, whether voluntarily or involuntarily, provided, that (i) any sale, transfer, assignment, conveyance or other disposition to the Company or any subsidiary of the Company shall not be a Transfer and (ii) no Transfer of shares of Common Stock shall be deemed to have occurred as a result of the entry into, modification of or existence of any Qualified Pledge until such time as the pledgee commences any action to foreclose upon such shares of Common Stock or any shares of  Common Stock are delivered upon settlement or termination of such Qualified Pledge (whichever occurs first).

"Transferee" means any Person acquiring Shares from the Company, regardless of the method of transfer.

<div align="center">5</div>

"Warrants" means the Series A Warrants and the Series B Warrants.

"Warrant Shares" means Shares issued pursuant to the exercise of the Warrants.

"Unallocated Share" has the meaning set forth in Section 6.1(c).

## ARTICLE II

## BOARD OF DIRECTORS AND GOVERNANCE

SECTION 2.1          Election of Directors; Number and Composition of the Board.

(a)       Each Stockholder agrees to vote (or shall cause to be voted) all Shares beneficially owned by such Stockholder, to the extent such Shares are entitled to so vote pursuant to the Certificate of Incorporation, to ensure that the number of directors constituting the entire Board shall be seven (7).  The initial Board shall consist of [_____] and the Chief Executive Officer.  The Chief Executive Officer shall be employed under an employment agreement which provides that, upon any termination of such Person's employment (whether by the Company or the executive, and regardless of whether or not for "cause"), such executive shall, upon any request by the Board, immediately resign as a director of the Company, any subsidiary of the Company and any other Person for which such executive is serving, at the request of the Company, as a director, member, manager, trustee or other similar capacity.  Each such director shall serve for a term expiring at the annual meeting of Stockholders held in the year following the year of their election, and until their successors are elected and qualified, subject to any earlier resignation or termination in accordance with the terms of this Agreement and the Certificate of Incorporation and Bylaws of the Company.

(b)       Prior to each annual meeting of Stockholders, a nominating committee of the Board, consisting of all non-employee directors, shall nominate a slate of six (6) directors who shall stand for election at such meeting.

(c)       Any director or the entire Board may be removed, with or without cause, by vote of the holders of a majority of the outstanding stock entitled to so vote.  Any vacancies and newly created directorships resulting from any increase in the authorized number of directors may initially be filled by a majority vote of the remaining directors, and shall thereafter be filled, at the next meeting of the Stockholders, by the affirmative vote of [a majority of] the Stockholders entitled to so vote.

(d)       For so long as a Stockholder holds at least one million (1,000,000) Shares, the Company shall invite and permit a representative of such Stockholder to attend all meetings of the Board and any committee thereof (whether in person, telephonically or otherwise) solely in a nonvoting observer capacity (each, a "Board Observer") and, in this respect, shall give such Board Observer copies of all notices, minutes, consents, and other materials that the Company provides to its directors; provided, however, that the Company reserves the right to withhold any information and to exclude such Board Observer from any meeting or portion thereof if (i) access to such information or attendance at such meeting could adversely affect the attorney-client privilege between the Company and its counsel; (ii)

6

access to such information or attendance at such meeting could result in disclosure of trade secrets to such Stockholder or its Board Observer; or (iii) access to such information or attendance at such meeting could result in a conflict of interest between such Stockholder or its Board Observer and the Company or its counsel; provided further that such Board Observer shall enter into an agreement with the Company providing that such Board Observer shall hold in confidence and trust and act in a fiduciary manner with respect to all information provided to them or learned by them in connection with the observer rights described herein, except to the extent otherwise required by law and any other regulatory process to which such Stockholder is subject.

SECTION 2.2        Action by the Board.    Except as otherwise set forth in this Agreement or in the Company's Bylaws, all actions taken by the Board shall be taken by a majority vote of the directors present at any meeting at which a quorum is present, provided, however, that any transaction between the Company or any of its subsidiaries on one hand, and a director, officer or Stockholder or an Affiliate thereof on the other hand, shall be approved by a majority vote of the disinterested directors.

SECTION 2.3        D&O Indemnification Agreement; Expenses.

(a)        The Company shall enter into an Indemnification Agreement with each director upon his or her appointment in such form as is adopted by the Board.

(b)        The Company shall reimburse the directors for all reasonable, documented out-of-pocket expenses incurred in connection with performing their duties and the directors and any Board Observers for all reasonable, documented out-of-pocket expenses incurred in connection with attending meetings of the Board.

SECTION 2.4        Actions Requiring Stockholder Approval; Director Approval.

(a)        The Company shall not[, and, as applicable, shall not permit any of its subsidiaries to,] take any of the following actions, through mergers, consolidations or otherwise, without first obtaining the affirmative vote or written consent of the holders of not less than a majority of the outstanding shares of Common Stock, voting together as a single class:

(i)        any authorization of, or increase in the number of authorized shares of, any class of capital stock ranking *pari passu* with or senior to the Common Stock as to dividends or liquidation preference, including additional Common Stock;

(ii)        any amendment to the Company's Certificate of Incorporation or Bylaws;

(iii)        any amendment to this Agreement;

(iv)        any change in the authorized number of directors of the Board to a number other than seven (7);

7

(v)  any sale, lease or other disposition of all or substantially all of the assets of the Company through one or more transactions (for purposes of this Section 2.4(a)(v), any sale, lease or other disposition of assets of any subsidiary of the Company through one or more transactions will be deemed to be a sale, lease or disposition of assets of the Company if such sale, lease or disposition would constitute all or substantially all of the assets of the Company and its subsidiaries on a consolidated basis);

(vi)  any recapitalization, reorganization, consolidation or merger of the Company;

(vii)  any issuance or entry into an agreement for the issuance of any equity securities or any securities convertible or exercisable for equity securities of the Company [which, in the aggregate with all other issuances permitted by this Section 2.4(a)(vii), would exceed [_____] shares (on an as converted basis)], except for (a) issuance of the Warrants and any Warrant Shares or (b) issuances of Common Stock or securities convertible or exercisable for Common Stock reserved for grant pursuant to any Equity Incentive Plan;

(viii)  the initiation or completion of a public offering of the securities of the Company or of any of its subsidiaries; and

(ix)  any redemption, purchase or other acquisition by the Company [or any of its subsidiaries] of any of its [or its subsidiaries'] capital stock, except for purchases approved or ratified by the Board of Common Stock or securities convertible or exercisable for Common Stock from employees, directors and consultants of the Company upon termination of employment or affiliation.

(b)  The Board shall not take any of the following actions with respect to the Company or any of its subsidiaries without first obtaining the affirmative vote or written consent of not less than [a supermajority] of the directors elected by the Stockholders under Section 2.1 hereof:

(i)  any authorization, declaration or payment of any dividend (other than dividends payable solely in Shares) on any share of the capital stock of the Company or any subsidiary, other than the authorization and payment of dividends on the Common Stock;

(ii)  any issuance of any debt that is (a) convertible into capital stock of the Company or of any of its subsidiaries, or (b) other than indebtedness between the Company and any of its wholly owned subsidiaries or between any of the Company's wholly owned subsidiaries for an amount (1) greater than $[___] million or (2) which would cause the Company's or any of its subsidiaries' aggregate indebtedness to exceed $[___] million;

(iii)  the appointment or termination of the Chief Executive Officer or any person with substantially equivalent responsibilities;

(iv)  the creation of a committee of the Board of Directors or changing of the scope of authority of a committee of the Board of Directors;

8

(v)     any acquisition of all or substantially all of the properties or assets of any other Person;

(vi)    any acquisition of or any investment in (whether by merger, consolidation or otherwise) any other Person including consideration paid by the Company or its subsidiaries (including by way of assumption of liabilities) in excess of $[___];

(vii)   any fundamental change in the Company's or any of its material subsidiaries' existing lines of business or entry by the Company or any of its subsidiaries into a new significant line of business or material alteration of the Company's or any of its subsidiaries' business plan;

(viii)  any adoption of and any substantial alterations to the Company's annual budget;

(ix)    any increase in the number of Shares reserved for grant pursuant to any Equity Incentive Plans to an amount greater than [_____];

(x)     any creation or acquisition of equity interests in any subsidiaries other than a subsidiary in which the Company is, directly or indirectly, the sole record or beneficial holder of all the equity interests;

(xi)    the appointment or change of the independent auditor for the Company or any of its material subsidiaries;

(xii)   the settling of any litigation, arbitration or administration proceeding for an amount in excess of $[___] or that provides for any material limitation on the conduct of the business by the Company or any of its subsidiaries;  and

(xiii)  any single or series of related capital expenditures in excess of $[__].

## ARTICLE III

### ACCESS TO INFORMATION

SECTION 3.1         General Information to be Provided by the Company.

(a)     The Company shall provide to each Stockholder the following information:

(i)     within forty-five (45) days after the end of each of the first three fiscal quarters for the Company each fiscal year, unaudited quarterly financial statements for the quarterly period then ended and the comparable period in the prior year (including a narrative comparing the results of operations and financial position of the Company in the most recent period to the corresponding period in the prior fiscal year (which narrative need not

9

contain all of the information that would be required in a "Management's Discussion and Analysis" pursuant to Regulation S-K under the Exchange Act); and

(ii)    within one hundred twenty (120) days after the end of each fiscal year, audited financial statements for the Company and its consolidated subsidiaries for such year (including a narrative comparing the results of operations and financial position of the Company in the most recent period to the corresponding period in the prior fiscal year (which narrative need not contain all of the information that would be required in a "Management's Discussion and Analysis" pursuant to Regulation S-K under the Exchange Act), together with a copy of the audit report of the Company's independent public accountants.

(b)    The Company shall provide to each Stockholder holding at least one million (1,000,000) Shares (an "Eligible Stockholder") the following information:

(i)    as soon as practicable after the end of each month, but in any event within thirty (30) days thereafter, an unaudited consolidated balance sheet of the Company and its subsidiaries, as of the end of each such monthly period, and unaudited statements of income, retained earnings and cash flows of the Company and its subsidiaries for such period and for the current fiscal year to date, setting forth in each case in comparative form the figures for the corresponding periods for the previous fiscal year, all in reasonable detail and prepared in accordance with the Company's normal financial reporting practices; and

(ii)    as soon as practicable prior to the end of each fiscal year, a budget for the next fiscal year and, as soon as prepared, any other budgets or revised budgets prepared by the Company.

Notwithstanding anything in this Agreement to the contrary, the Company shall not be required to provide any of the foregoing to any Stockholder whom the Company reasonably determines to be a direct competitor of the Company or to any Stockholder who owns a controlling interest in a Person whom the Company reasonably determines to be a direct competitor of the Company.

SECTION 3.2    Right to Access.

(a)    Each Eligible Stockholder shall have the right, upon reasonable notice and at reasonable times, to meet with the management of the Company and any of its subsidiaries and to have access to the auditors and other Representatives of the Company and any of its subsidiaries, provided however, that the Company or subsidiary shall have a right to limit such access if the Company or subsidiary determines that it is necessary or desirable to do so in order for the Company to preserve any privilege that the Company or subsidiary is entitled to claim.

(b)    The Company shall hold quarterly conference calls with the Stockholders to discuss the results of the Company's operations and the financial performance of the Company and to answer questions related thereto.

SECTION 3.3    Notice of Certain Events. The Company shall, within a reasonable time after the occurrence of an event described below, provide notice to the Stockholders of (i) any litigation or administrative proceeding commenced against the Company or any of its

10

subsidiaries which, were the Company subject to the Exchange Act, would be required to be reported in a Current Report on Form 8-K or in an Annual Report on Form 10-K and (ii) any default or event of default under an agreement which, if the Company were subject to the reporting requirements under the Exchange Act, would be required to be included in a Current Report on Form 8-K pursuant to Item 2.04 of such Form.  Such notice must contain all material facts and circumstances surrounding such event but shall not be required to contain all of the information that would be required under the applicable Item in a Current Report on Form 8-K.

## ARTICLE IV

## CERTIFICATE OF INCORPORATION AND BYLAWS

The Stockholders acknowledge and agree that in connection with the execution of this Agreement, the Certificate of Incorporation and the Bylaws of the Company shall be as set forth in Exhibits A and B hereto, respectively.  The Certificate of Incorporation shall, at all times during the term of this Agreement and, with respect to clause (b) below, for so long as any person designated by any Stockholder serves on the Board, provide (a) that the Company elects not to be governed by Section 203 of the DGCL and (b) for a renunciation of corporate opportunities presented to any Stockholder (and their respective Affiliates and nominees for election as a director) to the extent permitted by Section 122(17) of the DGCL and substantially on the terms and conditions set forth in Exhibit A.

## ARTICLE V

## TRANSFERS OF SHARES

SECTION 5.1          Restrictions on Transfers; Permitted Transferees.

(a)      Each Stockholder, severally and not jointly, agrees and acknowledges that such Stockholder will not Transfer any Shares unless (i) such Transfer complies with the provisions of this Agreement, and (ii) (x) such Transfer is pursuant to an effective registration statement under the Securities Act and has been registered under all applicable state securities or "blue sky" laws or (y) unless waived by the Company in writing, such Stockholder shall have furnished the Company with an opinion of counsel, which opinion of counsel shall be reasonably satisfactory to the Company, to the effect that no such registration is required because of the availability of an exemption from registration under the Securities Act and all applicable state securities or "blue sky" laws.  A Stockholder will not be required to obtain an opinion of counsel for (i) any transaction made pursuant to SEC Rule 144 except in cases where the Company, based on the opinion of counsel, has reasonable basis to believe that an issue of law exists with respect to such transaction or (ii) any transaction in which such Stockholder Transfers Shares to an Affiliate of such Stockholder for no consideration.

(b)      Without the prior written consent of the Board, no Stockholder may Transfer any Shares if, as a result of such Transfer, any class of equity securities of the Company would be held of record by more than two hundred and twenty-five (225) Persons (which calculation shall, for purposes of this Section 5.1(b), include the number of holders of

11

any securities exercisable, convertible or exchangeable into equity securities of such class) or otherwise in circumstances that the Board determines could require the Company to file reports under the Exchange Act, if it is not otherwise then subject to such requirements.

(c)        A Transferee of Shares pursuant to this Article V who is a Permitted Transferee must (i) satisfy the requirements of this Article V, (ii) execute a joinder in form and substance satisfactory to the Company agreeing to be bound by the terms and provisions of this Agreement and assuming all of the Transferring Stockholder's then existing and future liabilities arising under or relating to this Agreement, and (iii) represent that the Transfer was made in accordance with this Agreement, the Certificate of Incorporation and all applicable securities laws and regulations.  Written notice of joinder of a Person to this Agreement as a Stockholder shall be sent promptly by the Transferring Stockholder to the Company.  Any attempted or purported Transfer of all or a portion of the Shares held by such Stockholder in violation of this Article V shall be null and void *ab initio* and of no force or effect whatsoever, such Stockholder will not be treated as an owner of Shares for purposes of this Agreement or otherwise, and the Company will not register such Transfer of Shares.  If all or any portion of a Stockholder's Shares are Transferred in violation of the other provisions of this Article V, involuntarily, by operation of law or otherwise, then without limiting any other rights and remedies available to the other Parties under this Agreement or otherwise, the Transferee of such Shares (or portion thereof) shall not be permitted to become a Party to this Agreement or be entitled to any rights as a Stockholder hereunder, and the Stockholder whose Shares have been Transferred in violation of the provisions of this Article V shall, together with its Affiliates, lose all rights it may have pursuant to Sections 2.1, 3.2, 5.2, 5.3, and 6.1, but will continue to be bound by all obligations hereunder, unless each other Stockholder consents in writing to such Transferee becoming an Stockholder, which consent shall be granted or withheld in each Stockholder's sole discretion.

(d)        Except as specifically contemplated hereby, or in connection with a Qualified Pledge, no Stockholder shall grant any proxy or enter into or agree to be bound by any voting trust with respect to any Shares, nor enter into any stockholder agreements or arrangements of any kind with any person with respect to any Shares inconsistent with the provisions of this Agreement (whether or not such agreements and arrangements are with other Stockholders or holders of Shares who are not Parties to this Agreement), including but not limited to, agreements or arrangements with respect to the acquisition, disposition or voting of Shares, nor shall any Stockholder act, for any reason, as a member of a group or in concert with any other Persons in connection with the acquisition, disposition or voting of Shares in any manner which is inconsistent with the provisions of this Agreement.

(e)        None of the restrictions contained in this Article V (other than Sections 5.1(a), 5.1(b), 5.1(c) and 5.5) shall apply:  (i) to any Transfer or assignment for consideration or as a gift (including by will or the laws of descent) by any Stockholder to any spouse, child, parent, sibling or grandchild of a Stockholder, or by any of such relatives to such Stockholder or to any one or more of such relatives, or by any Stockholder or any such relatives to a trust of which there are no principal beneficiaries other than such Stockholder and/or one or more of such relatives; (ii) to any Transfer to a legal representative of a Stockholder in the event any Stockholder becomes mentally incompetent; and (iii) with respect to a Stockholder which is

12

not an individual, to any Transfer by such Stockholder to any Affiliate thereof (in each of cases (i) through (iii) a "Permitted Transferee").

SECTION 5.2    Drag-Along Right.

(a)    In the event that any Stockholder or any group of Stockholders acting together or pursuant to a common plan or arrangement (the "Proposing Stockholders"), proposes to sell, or otherwise dispose of, in one transaction or a series of related transactions, to a Person or a group of Persons, other than an Affiliate of one or more of the transferring Stockholders (a "Drag-Along Buyer"), Shares representing more than fifty percent (50%) of the then outstanding Shares (a "Majority Sale"), such Proposing Stockholder(s) shall have the right (the "Drag-Along Right") to require each of the other Stockholders (the "Non-Initiating Stockholders") to Transfer to the Drag-Along Buyer its Pro Rata Portion of Shares in such Majority Sale, upon the same terms and subject to the same conditions as are applicable to the Proposing Stockholders.

(b)    The Proposing Stockholders shall provide written notice of such Majority Sale to the Non-Initiating Stockholders (a "Majority Sale Notice") specifying the number of Shares proposed to be Transferred by the Proposing Stockholders and the other material terms and conditions of the proposed Transfer, including the purchase price payable for the Shares, the identity of the Drag-Along Buyer and the date of closing of the purchase and sale contemplated by the Majority Sale Notice (the "Majority Sale Closing Date"), which Majority Sale Closing Date shall be not less than fifteen (15) Business Days following the delivery of the Majority Sale Notice to the Non-Initiating Stockholders.  In determining the proposed purchase price per Share referred to in the immediately preceding sentence, there shall be taken into account (and the Non-Initiating Stockholders shall receive their Pro Rata Portion of) any other consideration or value to be received from the Drag-Along Buyer, directly or indirectly, by the Proposing Stockholders in connection with or relating to the Majority Sale, including without limitation, by way of any "non-compete," consulting, management or other payments, any value provided under other agreements entered into in connection with the transaction or otherwise. The Majority Sale Notice shall also specify each Non-Initiating Stockholder's Pro Rata Portion of the Shares to be Transferred and the estimated amount of the proceeds to be distributed to such Non-Initiating Stockholder upon completion of the Majority Sale.  Notwithstanding the foregoing, no Non-Initiating Stockholder shall be required to make any representation or warranty, or provide any indemnity to any person, in connection with any Majority Sale other than with respect to the unencumbered title to its Shares and its power, authority and legal right to Transfer such Shares, and the aggregate liability or loss as a result of such representations, warranties, indemnities or other agreements shall not exceed the proceeds such Non-Initiating Stockholder received in connection with such Transfer.

(c)    At the closing of the Majority Sale, the Proposing Stockholders and the Non-Initiating Stockholders shall deliver to the Drag-Along Buyer certificates representing their Shares, duly endorsed in blank for Transfer or accompanied by stock powers duly endorsed in blank.  Upon receipt by the Drag-Along Buyer of such certificates representing the Shares, the Drag-Along Buyer shall pay to each such Proposing Stockholder and Non-Initiating Stockholder the consideration payable at the closing pursuant to such transaction.

13

The Drag-Along Buyer shall provide written notice to the Company of any failure of any Non-Initiating Stockholder to deliver any share certificates.  Upon receipt of such notice, the Company shall refrain from recording the Transfer of such Non-Initiating Stockholder's Shares on the books and records of the Company and shall promptly direct the Company's transfer agent, if any, that the transfer agent shall refrain from recording the Transfer of such Shares on the books and records of the Company.

(d)    If any Majority Sale is structured as a merger, consolidation, amalgamation, or similar transaction each Non-Initiating Stockholder agrees, as applicable, to (i) vote such Shares in favor of, or consent to, such transactions; (ii) waive or refrain from exercising any appraisal, dissenters' or similar rights with respect to such transaction; and (iii) take such other action, consistent with Section 5.2(b), as may reasonably be required to complete the transaction.

(e)    Solely for purposes of Section 5.2(d) and in order to secure the performance of each Stockholder's obligations under Section 5.2(d), each Stockholder hereby irrevocably appoints each other Stockholder that qualifies as a Drag-Along Proxy Holder (as defined below) the attorney-in-fact and proxy of such first Stockholder (with full power of substitution) to vote or provide a written consent with respect to its Shares as described in this paragraph if, and only in the event that, such Stockholder fails to vote or provide a written consent with respect to its Shares in accordance with the terms of Section 5.2(d) (each such Stockholder, a "Breaching Drag-Along Stockholder") within three (3) Business Days of a request for such vote or written consent.  Upon such failure, each Proposing Stockholder shall have and are hereby irrevocably granted a proxy to vote or provide a written consent with respect to each such Breaching Drag-Along Stockholder's Shares solely for the purpose of taking the actions required by Section 5.2(d) (such Proposing Stockholder, a "Drag-Along Proxy Holder").  Each Stockholder intends this proxy to be, and it shall be, irrevocable and coupled with an interest, and each Stockholder will take such further action and execute such other instruments as may be necessary to effectuate the intent of this proxy and hereby revoke any proxy previously granted by it with respect to the matters set forth in Section 5.2(d) with respect to the Shares owned by such Stockholder. Notwithstanding the foregoing, the conditional proxy granted by this Section 5.2(e) shall be deemed to be revoked upon the termination of this Article V in accordance with its terms.

(f)    If the Majority Sale shall not have been consummated within ninety (90) days of the date the Majority Notice was provided (which ninety (90) day period may be extended by notice from the Proposing Stockholders to the Non-Initiating Stockholders for up to two hundred and seventy (270) days in the event any required approval of such sales from any governmental entity, including termination or expiration of the applicable waiting period under the applicable antitrust and competition laws has not then been obtained), the Proposing Stockholders shall return to the Non-Initiating Stockholders all applicable instruments representing Shares that the Non-Initiating Stockholders delivered for Transfer, together with any other documents in the possession of the Proposing Stockholders executed by the Non-Initiating Stockholders in connection with such proposed Majority Sale, if any, and all the restrictions on Transfer contained in this Agreement or otherwise applicable at such time with respect to any Shares shall again be in effect.

14

SECTION 5.3          Tag-Along Rights.

(a)      If a Proposing Stockholder proposes to Transfer, in one transaction or a series of related transactions, to a third party that is not an Affiliate of such Stockholder (the "Proposed Transferee") Shares representing more than [ten percent (10%)] of the outstanding Shares or in the event of a Majority Sale, if Drag-Along Rights are not exercised pursuant to Section 5.2 (each such proposed Transfer, a "Tag-Along Transfer"), each Non-Initiating Stockholder shall have the right to participate in the Tag-Along Transfer by Transferring up to its Pro Rata Portion to the Proposed Transferee on the same terms and conditions as those proposed by the Proposing Stockholder (each such participating Stockholder, other than the Proposing Stockholder, the "Tagging Stockholder").

(b)      The Proposing Stockholder shall give written notice (a "Tag-Along Notice") to each other Stockholder of a Tag-Along Transfer, setting forth the number and class(es) of Shares proposed to be so Transferred, the name and address of the Proposed Transferee, the proposed amount and form of consideration and other terms and conditions of payment offered by the Proposed Transferee. The Proposing Stockholder shall deliver or cause to be delivered to each other Stockholder copies of all transaction documents relating to the Tag-Along Transfer as the same become available. The tag-along rights provided by this Section 5.3 must be exercised by a Stockholder by delivery of an irrevocable written notice to the Proposing Stockholder, within a period of fifteen (15) Business Days from the Tag-Along Notice, specifying the portion of its Pro Rata Portion of the Shares (of each class proposed to be Transferred) which it wishes to include in the Tag-Along Transfer. With respect to each class of Shares proposed to be Transferred, if the Proposed Transferee fails to purchase all the Shares of such class proposed to be Transferred by the Proposing Stockholder and the Tagging Stockholders, then the number of Shares of such class that each such Stockholder is permitted to sell in such Tag-Along Transfer shall be reduced pro rata based on the number of Shares of such class proposed to be Transferred by such Stockholder relative to the aggregate number of Shares of such class proposed to be Transferred by all Stockholders participating in such Tag-Along Transfer. The Proposing Stockholder shall have a period of ninety (90) days following the expiration of the fifteen (15) Business Day notice period mentioned above to sell all the Shares agreed to be purchased by the Proposed Transferee on the terms specified in the notice required by the first sentence of this Section 5.3(b). With respect to each class of Shares proposed to be Transferred, if the Proposed Transferee agrees to purchase more Shares of such class than specified in the Tag-Along Notice in the proposed Transfer, the Stockholders shall also have the same right to participate in the Transfer of such Shares of such class that are in excess of the amount set forth on the Tag-Along Notice on a pro rata basis based on the number of Shares of such class proposed to be Transferred by such Stockholder relative to the aggregate number of Shares of such class proposed to be Transferred by all Stockholders participating in such Tag-Along Transfer.

(c)      Any Transfer of Shares by a Tagging Stockholder to a Proposed Transferee pursuant to this Section 5.3 shall be on the same terms and conditions (including, without limitation, price, time of payment and form of consideration) as to be paid to the Proposing Stockholder.  In determining the proposed purchase price per Share referred to in the immediately preceding sentence, there shall be taken into account (and the Tagging Stockholders shall receive their Pro Rata Portion of) any other consideration or value to be

15

received from the Proposed Transferee or its Affiliates, directly or indirectly, by the Proposing Stockholders in connection with or relating to the Tag-Along Transfer, including without limitation, by way of any "non-compete," consulting, management or other payments, any value provided under other agreements entered into in connection with the transaction or otherwise.  Notwithstanding the foregoing, no Tagging Stockholder shall be required to make any representation or warranty, agree to any "non-compete" clause, or provide any indemnity to any person, in connection with any Tag-Along Transfer other than with respect to the unencumbered title to its Shares and its power, authority and legal right to Transfer such Shares, and the aggregate liability or loss as a result of such representations, warranties, indemnities or other agreements shall not exceed the proceeds such Tagging Stockholder received in connection with such Tag-Along Transfer.  Each Tagging Stockholder shall be responsible for its proportionate share of the costs of the proposed Transfer to the extent not paid or reimbursed by the Proposed Transferee or the Company.

SECTION 5.4     Legend on Certificates.  Each outstanding certificate representing Shares that are subject to this Agreement shall bear an endorsement reading substantially as follows:

THE SECURITIES REPRESENTED BY THIS CERTIFICATE (THE "SECURITIES") WERE ORIGINALLY ISSUED IN RELIANCE UPON AN EXEMPTION FROM THE REGISTRATION REQUIREMENT OF SECTION 5 OF THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), PROVIDED BY SECTION 1145 OF THE BANKRUPTCY CODE, 11 U.S.C. 1145.  THE SECURITIES HAVE NOT BEEN REGISTERED UNDER THE ACT OR ANY STATE SECURITIES LAW, AND TO THE EXTENT THE HOLDER OF THE SECURITIES IS AN "UNDERWRITER," AS DEFINED IN SECTION 1145(B)(1) OF THE BANKRUPTCY CODE, THE SECURITIES MAY NOT BE SOLD OR TRANSFERRED IN THE ABSENCE OF AN EFFECTIVE REGISTRATION STATEMENT UNDER THE ACT OR AN EXEMPTION FROM REGISTRATION THEREUNDER.

THE SALE, ASSIGNMENT, PLEDGE, ENCUMBRANCE OR OTHER TRANSFER OF THE SECURITIES REPRESENTED BY THIS CERTIFICATE IS RESTRICTED BY THE TERMS OF, AND THE HOLDER HEREOF IS SUBJECT TO CERTAIN OTHER OBLIGATIONS PURSUANT TO, THE PROVISIONS OF A STOCKHOLDERS AGREEMENT, DATED AS OF [____], 2009, AMONG THE COMPANY AND CERTAIN HOLDERS OF ITS SECURITIES, AS MAY BE AMENDED FROM TIME TO TIME IN ACCORDANCE WITH ITS TERMS.  A COPY OF SUCH STOCKHOLDERS AGREEMENT IS ON FILE AT THE PRINCIPAL EXECUTIVE OFFICE OF THE COMPANY.

SECTION 5.5     No Circumvention of Stock Transfer Restrictions.  Each Party agrees that the Transfer restrictions in this Agreement may not be avoided by the holding of Shares directly or indirectly through a Person that can itself be sold in order to dispose of an interest in Shares free of such restrictions.  Any Transfer of any Shares (or other interest) resulting in any change in the control, directly or indirectly, of a Stockholder or of any other

16

Person having control, directly or indirectly, over that Stockholder shall be treated as being a Transfer of the Shares held by that Stockholder, and the provisions of this Agreement that apply in respect of the Transfer of Shares shall thereupon apply in respect of the Shares so held; provided that this Section 5.5 shall not apply in respect of (i) a bona fide Transfer of equity securities of a Person having a direct or indirect interest in any Shares, where that interest does not represent more than ten percent (10%) of the assets of that Person, or (ii) any Transfer to a Permitted Transferee.

ARTICLE VI

ADDITIONAL AGREEMENTS

SECTION 6.1    Preemptive Rights.  In the event that the Company proposes to sell or otherwise issue Common Stock Equivalents or any other equity securities, or any options, rights or warrants to purchase equity securities of the Company (collectively, "Dilutive Securities"), each Stockholder shall have the right to acquire Dilutive Securities, in accordance with the provisions of this Section 6.1.

(b)    Not later than twenty (20) Business Days prior to the anticipated issuance date of Dilutive Securities, the Company shall give written notice (the "Notice of Preemptive Rights") to each Stockholder which shall state the Company's intention to issue Dilutive Securities, the type and amount of Dilutive Securities to be issued, the purchase price therefor, a summary of the other material terms of the proposed issuance and the Pro Rata Portion of such Dilutive Securities which the Stockholder to which the notice is directed may purchase in connection with such issuance.

(c)    Each Stockholder that is an "accredited investor" as defined in Rule 501 promulgated under the Securities Act of 1933, as amended, shall have the right to purchase up to its Pro Rata Portion of such Dilutive Securities at the price and on the terms and conditions specified in the Notice of Preemptive Rights by delivering an irrevocable written notice (the "Acceptance Notice") to the Company no later than fifteen (15) Business Days from the date the Notice of Preemptive Rights is delivered to such Stockholder, at the price and upon the terms specified in the Notice of Preemptive Rights, setting out the number of Dilutive Securities with respect to which such right is being exercised. Such Acceptance Notice shall also include the maximum number of Dilutive Securities the Stockholder would be willing to purchase in the event any other Stockholder elects to purchase less than its Pro Rata Portion of such Dilutive Securities.  If any Stockholder fails to elect to purchase its full Pro Rata Portion of such Dilutive Securities, the Company shall allocate any remaining amount among those Stockholders (pro rata in accordance with the Shares then held by each such Stockholder relative to the aggregate number of Shares held by all Stockholders participating in issuance of Dilutive Securities) who have indicated in their Acceptance Notice a desire to purchase Dilutive Securities in excess of their respective Pro Rata Portions (it being understood that if Stockholders elect to purchase more Dilutive Securities than remain available for sale, such allocation shall be made pro rata in accordance with the Shares then held by each such Stockholder relative to the aggregate number of Shares held by all Stockholders participating in issuance of Dilutive Securities); provided that no Stockholder shall be required to purchase

17

more Dilutive Securities than the maximum number set forth in such Stockholder's Acceptance Notice.

(d)    The Company may sell or issue any Dilutive Securities not covered by a Notice of Acceptance to any other Person or Persons, but only upon terms and conditions that are in all respects no more favorable to such other Person or Persons, than those set forth in the Notice of Preemptive Rights.  If the Company does not consummate the sale or issuance of all or part of such remaining Dilutive Securities to such other Person or Persons within sixty (60) days after the end of the twenty (20) Business Day period specified in Section 6.1(b), the right provided hereunder shall be deemed to be revived and such Dilutive Securities shall not be issued unless first reoffered to the Stockholders in accordance with this Section 6.1. Concurrently with the closing of the sale or issuance to such other Person or Persons (the "Other Purchasers") of all or part of such Dilutive Securities, each Stockholder shall purchase from the Company, and the Company shall sell or issue to such Stockholder, the securities covered by the Acceptance Notice delivered to the Company by such Stockholder on the terms specified in the Notice of Preemptive Rights.  The purchase by a Stockholder of any such securities is subject in all cases to the execution and delivery by the Company and the Stockholder of (a) a purchase agreement or subscription agreement relating to such securities and (b) all other documents in form and substance similar in all material respects, to the extent applicable, to those executed and delivered by the Company and the Other Purchasers.

(e)    If any Stockholder does not deliver an Acceptance Notice within such fifteen (15) day period, such Stockholder shall be deemed to have irrevocably waived any and all rights under this Section 6.1 with respect to the purchase of such Dilutive Securities (but not with respect to future issuances in accordance with this Section 6.1). Any sale of Dilutive Securities by the Company without first giving the Stockholders the rights described in this Section 6.1 shall be void and of no force and effect.

(f)    This Section 6.1 shall not apply to (i)  the sale or issuance of Dilutive Securities pursuant to any Equity Incentive Plan approved by the Board; (ii) the issuance of the Warrant Shares; (iii) the issuance of equity securities pursuant to any merger or business combination transaction involving the Company or any of its subsidiaries or as consideration for the acquisition by the Company or any of its subsidiaries of assets or another business entity in each case, approved as required under Section 2.4; or (iv) any public offering of equity securities registered under the Securities Act.

SECTION 6.2    Confidentiality.  Each Stockholder who has received Confidential Information from the Company or its Representatives agrees that it shall not, and shall cause its Affiliates and Representatives not to, reveal to any Person other than such Stockholder's Affiliates and Representatives any such Confidential Information without the prior written consent of the Company; provided that such undertaking shall not apply to:

(a)    disclosure of Confidential Information that is or has become generally available to the public other than as a result of disclosure by or at the direction of a Party or a Party's Representatives or the Representatives of any Affiliate of any Party in violation of this Agreement;

18

(b)    disclosures of Confidential Information to the extent necessary or required under any (i) applicable Law, (ii) accounting standard, or (iii) in connection with any judicial process regarding any legal action, suit or proceeding arising out of or relating to this Agreement, in each case after giving prior written notice to the other Parties to the extent practicable under the circumstances, and subject to having undertaken any reasonably available arrangements to protect confidentiality (for example, seeking a protective order in relation to such Confidential Information); or

(c)    disclosures of Confidential Information with respect to the Company by any Stockholder to a third party who is not a competitor to the Company and who has executed a confidentiality agreement whereby such party is bound by the confidentiality provisions of this Agreement.

SECTION 6.3        Environmental, Health and Safety Covenants.

(a)    Notice of EHS Events.  The Company shall provide prompt written notice to each of the Eligible Stockholders of any environmental, health or safety ("EHS") event or matter reasonably likely to adversely impact the Company's operations, including, but not limited to notices of violations; fines or assessments; citations; suits; written complaints or administrative actions alleging violations of EHS laws; serious personal injury or property damage; unauthorized releases, spills or discharges of any significant quantities of hazardous substances into the environment or conditions which may cause the Company to operate in non-compliance with its EHS policies or applicable EHS laws.

(b)    Compliance with Labor and Environmental Law.  The Company shall comply with all applicable statutes, laws, ordinances, rules, orders and regulations concerning labor, industrial hygiene and EHS laws.

(c)    EHS Report-Out and Assessment.  The Company shall, at regular intervals, but no less frequently than every three months, provide to the Board a written report describing the compliance of the Company with its EHS policies and applicable EHS laws, and implement such improvements and corrections as may be necessary or appropriate to maintain conformance with such policies and laws.

ARTICLE VII

MISCELLANEOUS

SECTION 7.1        Term.  This Agreement shall terminate on the completion of a Qualified Public Offering; provided that the provisions of Section 6.2 shall survive the termination of this Agreement.

SECTION 7.2        Modifications.  This Agreement may be modified or amended only by a writing signed by the Company and Stockholders holding a majority of the Shares; provided that (a) any modification or amendment that would adversely affect one or more Stockholders in

19

a way that is disproportionate to its effect on the other Stockholders shall require the consent of such disproportionately affected Stockholders holding a majority of the Shares held by all such disproportionately affected Stockholders; (b) any modification or amendment that would make the transfer restrictions set forth in Article V or the confidentiality obligations set forth in Section 6.2 more burdensome on one or more Stockholders, or remove or otherwise adversely amend the preemptive rights set forth in Section 6.1 or the drag-along or tag-along rights set forth in Sections 5.2 and 5.3, respectively, held by one or more Stockholders, shall require the consent of such affected Stockholders holding a majority of the Shares held by all such affected Stockholders; and (c) any specific director designation or board observer rights provided to a Stockholder may only be amended by the Stockholders entitled to such rights.  For the avoidance of doubt, the addition of Parties to this Agreement pursuant to the terms hereof shall not be deemed a modification or amendment of this Agreement.

SECTION 7.3       Action by Stockholders.  Any action required or contemplated by this Agreement to be taken by the Stockholders may be taken by delivery of a written consent executed on behalf of one or more of such holders holding the requisite number of Shares, and the Company shall be entitled to rely upon any such written consent without prior notice to or consultation with any Person.

SECTION 7.4       Applicability.   This Agreement shall apply to all Shares beneficially owned by a Stockholder at all times, whether such Shares are acquired prior to or after the date hereof.

SECTION 7.5       Notices.  All notices, requests, waivers and other communications made pursuant to this Agreement shall be in writing and shall be deemed to have been effectively given (a) when personally delivered to the Party to be notified; (b) when sent by confirmed facsimile to the Party to be notified at the number set forth below; (c) when sent by email to the Party to be notified at the email address set forth below; (d) three (3) Business Days after deposit in the United States mail postage prepaid by certified or registered mail return receipt requested and addressed to the Party to be notified as set forth below; or (e) one (1) Business Day after deposit with a national overnight delivery service, postage prepaid, addressed to the Party to be notified as set forth below with next-business-day delivery guaranteed, in each case as follows:

In the case of the Company, to:

Hayes Lemmerz International, Inc.
[ADDRESS]
Attention: [_____]
Telephone: [_____]
Facsimile: [_____]
Email: [_____]

20

With a copy (which shall not constitute notice) to:

[NAME]
[ADDRESS]
Attention: [_____]
Telephone: [_____]
Facsimile: [_____]
Email: [_____]

In the case of the Initial Holders:

To the names and addresses set forth on the signature pages hereto.

With a copy (which copy shall not constitute notice) to:

Milbank, Tweed, Hadley & McCloy LLP
1 Chase Manhattan Plaza
New York, New York  10005
Attention:  Thomas C. Janson
Telephone:  (212) 530-5000
Facsimile:  (212) 530-5219
Email:  tjanson@milbank.com

In the case of any other Stockholder, to such Stockholder at its address set forth in the stock ledger of the Company.

A Party may change its address for purposes of notice hereunder by giving ten (10) days' notice of such change to all other Parties in the manner provided in this Section 7.5.

SECTION 7.6        Binding Effect.  This Agreement shall be binding upon and inure to the benefit of the respective successors and assigns of the Parties hereto.

SECTION 7.7        Entire Agreement.  This Agreement (together with the documents attached as exhibits hereto and any documents or agreements specifically contemplated hereby) supersedes all prior discussions and agreements among any of the Parties hereto (and their Affiliates) with respect to the subject matter hereof and contains the entire understanding of the Parties with respect to the subject matter hereof.

SECTION 7.8        Counterparts.  This Agreement may be executed in counterparts, each of which shall be signed by the Company and one or more Stockholders, and all of which are deemed to be one and the same agreement binding upon the Company and each of the Stockholders.

21

SECTION 7.9    Headings.  The headings of the various sections of this Agreement have been inserted for convenience of reference only and shall not be deemed to be a part of this Agreement.

SECTION 7.10    Bylaws.  If and to the extent that any provision of this Agreement conflicts with or is inconsistent with any provision of the Bylaws of the Company, such provision of this Agreement shall be controlling and, to the extent practicable, the conflicting or inconsistent provision of the Bylaws shall be construed in a manner consistent with such provision of this Agreement.  It is hereby agreed that the Bylaws shall not be amended to be inconsistent with this Agreement.

SECTION 7.11    Further Acts and Assurances.  Each Party shall give such further assurance, provide such further information, take such further actions and execute and deliver such further documents and instruments as are, in each case, within its power to give, provide and take so as to give full force and effect to the provisions of this Agreement.

SECTION 7.12    Governing Law; Consent to Jurisdiction and Service of Process.  This Agreement shall be governed by and construed in accordance with the laws of the State of Delaware, without regard to its conflicts of law doctrine.  Each Party hereby submits to the exclusive jurisdiction of the Chancery Court of the State of Delaware or the United States District Court for the District of Delaware and any judicial proceeding brought against any of the Parties on any dispute arising out of this Agreement or any matter related hereto shall be brought in such courts.  Each Party hereby irrevocably waives, to the fullest extent permitted by law, any objection it may have or hereafter have to the laying of the venue of any such proceeding brought in such a court and any claim that any such proceeding brought in such a court has been brought in an inconvenient forum.  Each Party hereby consents to process being served in any such proceeding by the mailing of a copy thereof by registered or certified mail, postage prepaid, to the address specified in Section 7.5, or in any other manner permitted by law.  EACH PARTY HERETO HEREBY KNOWINGLY, VOLUNTARILY, AND INTENTIONALLY WAIVES ANY RIGHTS IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY SUCH ACTION OR PROCEEDING.

SECTION 7.13    Injunctive Relief.  It is hereby agreed and acknowledged that it will be impossible to measure in money the damages that would be suffered if the Parties fail to comply with any of the obligations imposed on them by this Agreement and that in the event of any such failure, an aggrieved person will be irreparably damaged and will not have an adequate remedy at law.  Any such person shall, therefore, be entitled to seek injunctive relief, including specific performance, to enforce such obligations, and if any action should be brought in equity to enforce any of the provisions of this Agreement, none of the Parties shall raise the defense that there is an adequate remedy at law.

SECTION 7.14    Severability.  The invalidity or unenforceability of any provisions of this Agreement in any jurisdiction shall not affect the validity, legality or enforceability of the remainder of this Agreement in such jurisdiction or the validity, legality or enforceability of any provision of this Agreement in any other jurisdiction, it being intended that all rights and obligations of the Parties shall be enforceable to the fullest extent permitted by law.

22

23

SECTION 7.15      <u>Recapitalization, Etc.</u>  In the event that any capital stock or other securities are issued in respect of, in exchange for, or in substitution of, shares of capital stock of the Company by reason of any reorganization, recapitalization, reclassification, merger, consolidation, spin-off, partial or complete liquidation, stock dividend, split-up, sale of assets, distribution to stockholders or combination of shares or any other change in the Company's capital structure, appropriate adjustments shall be made to the provisions of this Agreement so as to fairly and equitably preserve, as far as practicable, the original rights and obligations of the Parties hereto under this Agreement.

<div align="center">[<em>Signature Page Follows</em>]</div>

IN WITNESS WHEREOF, each of the Parties has caused this Agreement to be executed and delivered by its duly authorized officer as of the date first above written.

HAYES LEMMERZ INTERNATIONAL, INC.

By: _____

Name:

Title:

NY1:#3515464

STOCKHOLDER


By: _____

Name: _____

Title: _____

NY1:#3515464

REGISTRATION RIGHTS AGREEMENT

among

HAYES LEMMERZ INTERNATIONAL, INC.

and

EACH OF THE STOCKHOLDERS

of

HAYES LEMMERZ INTERNATIONAL, INC.
PARTY HERETO

Dated as of _____, 2009

#4819-7660-3396

## TABLE OF CONTENTS

<u>Page</u>

1.    Definitions ............................................................................................1

2.    Demand Registration. ............................................................................4

3.    Piggyback Registration. .........................................................................7

4.    Holdback Agreement .............................................................................8

5.    Registration Procedures .........................................................................8

6.    Registration Expenses ..........................................................................12

7.    Underwriting Requirements ..................................................................12

8.    Indemnification ...................................................................................13

9.    Rule 144 Information............................................................................16

10.   Miscellaneous.....................................................................................16

REGISTRATION RIGHTS AGREEMENT

This REGISTRATION RIGHTS AGREEMENT, dated as of **[_____]** (this "Agreement"), is entered into among HAYES LEMMERZ INTERNATIONAL, INC., a Delaware corporation (the "Company"), and the Holders.  Capitalized terms not otherwise defined herein have the meanings set forth in Section 1.


W I T N E S S E T H :

WHEREAS, on May 11, 2009, the Company and certain of the Company's direct and indirect subsidiaries each filed a voluntary petition in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") initiating cases under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") §§ 101-1330 and continued in the possession of their assets and in the management of their businesses pursuant to sections 1107 and 1108 of the Bankruptcy Code;

WHEREAS, the [First] Amended Joint Plan of Reorganization of Hayes Lemmerz International, Inc., et al., as confirmed on [_____], 2009 by an order of the Bankruptcy Court entered on [_____], 2009 (the "Plan"), provides that the Company shall issue to the Holders shares  of Class A Common Stock and/or shares of Class B Common Stock (the "Shares");

WHEREAS, the Shares to be issued to the Holders pursuant to the Plan are being issued in reliance upon Section 1145 of the Bankruptcy Code ("Section 1145") without registration under the Securities Act or any state securities laws;

WHEREAS, notwithstanding the provisions of Section 1145, resales of the Shares may be required to be registered under the Securities Act and applicable state securities laws, depending upon the status of a Holder or the intended method of distribution of the Shares; and

WHEREAS, in order to induce the Holders to complete the transactions contemplated by the Plan, on the effective date of the Plan, the Company is granting to the Holders certain rights to cause the Company to register the Shares and certain other Registrable Securities, on the terms and subject to the conditions set forth herein.

NOW, THEREFORE, in consideration of the premises set forth herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, intending to be legally bound hereby, agree as follows:

1.    Definitions.  As used in this Agreement, the following terms shall have the following meanings:

"Advice" shall have the meaning set forth in Section 5(k).

"Affiliate" means, with respect to any specified Person, any other Person directly or indirectly controlling or controlled by or under direct or indirect common control with such specified Person.  For the purposes of this definition, "control" when used with respect to any

1

specified Person means the power to direct the management and policies of such Person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise; and the terms "controlling" and "controlled" have meanings correlative to the foregoing.

"Bankruptcy Code" has the meaning set forth in the preamble.

"Bankruptcy Court" has the meaning set forth in the preamble.

"Business Day" means any day (other than a day which is a Saturday, Sunday or legal holiday in the States of New York) on which banks are open for business in the States of New York.

"Capital Stock" means, with respect to any Person, any and all shares, interests, participations or other equivalents (however designated) of corporate stock issued by such person, including each class of common stock and preferred stock of such person.

"Class A Common Stock" means the Company's Class A common stock, par value $0.01 per share.

"Class B Common Stock" means the Company's Class B common stock, par value $0.01 per share.

"Common Stock" means the Company's (a) Class A Common Stock and (b) Class B Common Stock, and any other shares of Capital Stock into which such Class A Common Stock or Class B Common Stock shall have been changed or any other shares of Capital Stock resulting from any reclassification of such Class A Common Stock or Class B Common Stock.

"Company" shall have the meaning set forth in the introductory clauses hereof.

"Delay Period" shall have the meaning set forth in Section 2(d).

"Demand Notice" shall have the meaning set forth in Section 2(a).

"Demand Registration" shall have the meaning set forth in Section 2(b).

"Effectiveness Period" shall have the meaning set forth in Section 2(c).

"Exchange Act" means the Securities Exchange Act of 1934, as amended, and the rules and regulations of the SEC promulgated thereunder.

"free writing prospectus" shall have the meaning set forth in Rule 405 under the Securities Act.

"Hold Back Period" shall have the meaning set forth in Section 4.

"Holder" means each person identified as a Holder on the signature pages hereto who is the record or beneficial owner of Registrable Securities, together with its successors and permitted assigns who becomes a party to this Agreement.

"Indemnified Party" shall have the meaning set forth in Section 8(c).

"Indemnifying Party" shall have the meaning set forth in Section 8(c).

"Initial Holder" means the Holders designated as such on the signature pages hereto.

"Initial Outstanding Amount" shall have the meaning set forth in Section 2(a)(ii).

"Inspectors" shall have the meaning set forth in Section 5(j).

"Interruption Period" shall have the meaning set forth in Section 5(k).

"IPO" means the initial public offering of Common Stock of the Company.

"Losses" shall have the meaning set forth in Section 8(a).

"Marketing Materials" shall have the meaning set forth in Section 8(a).

"Person" means any individual, corporation, limited liability company, partnership, joint venture, association, joint-stock company, trust, unincorporated organization or government or any agency or political subdivision thereof.

"Piggyback Registration" shall have the meaning set forth in Section 3(a).

"Plan" shall have the meaning ascribed to it in the preamble.

"Prospectus" means the prospectus included in any Registration Statement (including a prospectus that discloses information previously omitted from a prospectus filed as part of an effective registration statement in reliance upon Rule 430A), as amended or supplemented by any prospectus supplement, with respect to the terms of the offering of any portion of the Registrable Securities covered by such Registration Statement and all other amendments and supplements to such prospectus, including post-effective amendments, and all material incorporated by reference or deemed to be incorporated by reference in such prospectus, including any free writing prospectus.

"Records" shall have the meaning set forth in Section 5(j).

"Registrable Securities" means (i) the Shares and (ii) any additional shares of Common Stock acquired by any Holder after the date hereof, including any shares of Common Stock issued or distributed by way of a dividend, stock split or other distribution in respect of the Shares or acquired by way of any rights offering or similar offering made in respect of the Shares, in each case, if the shares of Common Stock would, in the hands of such Holder, not be freely transferable in accordance with the intended method of disposition (x) in accordance with Section 1145 or (y) under Rule 144 under the Securities Act, without regard to any volume or holding period restriction under Rule 144 under the Securities Act  As to any particular Registrable Securities, once issued, such securities shall cease to be Registrable Securities when (i) a registration statement with respect to the sale of such Registrable Securities shall have become effective under the Securities Act and such securities shall have been disposed of in

3

accordance with such registration statement, (ii) they shall have been distributed to the public pursuant to Rule 144 under the Securities Act, or (iii) they shall have ceased to be outstanding.

"Registration" means registration under the Securities Act of an offering of Registrable Securities pursuant to a Demand Registration or a Piggyback Registration.

"Registration Statement" means any registration statement of the Company filed under the Securities Act that covers any of the Registrable Securities pursuant to the provisions of this Agreement, including the related Prospectus, all amendments and supplements to such registration statement, including pre- and post-effective amendments, all exhibits thereto and all material incorporated by reference or deemed to be incorporated by reference in such registration statement.  The term "Registration Statement" shall also include any registration statement filed pursuant to Rule 462(b) to register additional securities in connection with any offering.

"road show" means any "road show" as defined in Rule 433 under the Securities Act, including an electronic road show.

"SEC" means the Securities and Exchange Commission or any other governmental agency at the time administering the Securities Act.

"Securities Act" means the Securities Act of 1933, as amended, and the rules and regulations of the SEC promulgated thereunder.

"Shares" shall have the meaning ascribed to it in the preamble.

"Shelf Registration" shall have the meaning set forth in Section 2(b).

"underwritten registration" or "underwritten offering" means a registration under the Securities Act in which securities of the Company are sold to an underwriter for reoffering to the public.

"Warrant Agreements" shall have the meaning set forth in Section 10(a).

2.    Demand Registration.

(a)    (i)    The Holders of a majority of the Registrable Securities shall have the right, commencing on the 2nd anniversary of the date of this Agreement, by written notice (the "Demand Notice") given to the Company, to request the Company to register under and in accordance with the provisions of the Securities Act all or any portion of the Registrable Securities designated by such Holders.  For the avoidance of doubt, the foregoing right shall persist if a Demand Registration pursuant to the provisions of this Section 2(a)(i) does not become effective.

(ii)    At any time after the date that the Company becomes subject to the periodic reporting requirements under Section 13 or 15(d) of the Exchange Act, any Holder or group of Holders holding, in the aggregate, [ten percent (10%)] or more of the Registrable Securities issued and outstanding immediately following the effective date of the Plan (the "Initial Outstanding Amount"), shall have the right to request the Company to register under and

4

in accordance with the provisions of the Securities Act all or any portion of the Registrable Securities designated by such Holder(s); provided, however, that (i) the Registrable Securities requested to be registered constitute at least [ten percent (10%)] of the Initial Outstanding Amount, and (ii) prior to the time the Company is eligible to use Form S-3 for the registration of Registrable Securities for resale, such Holder(s), in the aggregate, shall only be entitled to [four (4)] Demand Registrations pursuant to the provisions of this Section 2(a)(ii) unless any Demand Registration does not become effective or is not maintained in effect for the respective periods set forth in Section 2(c), in which case the relevant Holder(s) will be entitled to an additional Demand Registration pursuant hereto.  Following the time that the Company becomes eligible for use of Form S-3, such Holder or group of Holders holding, in the aggregate, [ten percent (10%)] or more of the Initial Outstanding Amount, shall have the right to request the Company to register under and in accordance with the provisions of the Securities Act all or any portion of the Registrable Securities designated by such Holder(s); provided, however, that such Registrable Securities represent at least [ten percent (10%)] of the Initial Outstanding Amount.

(iii)    Upon receipt of a Demand Notice, the Company shall promptly (and in any event within ten (10) Business Days from the date of receipt of such Demand Notice), notify all other Holders of the receipt of such Demand Notice and allow them the opportunity to include Registrable Securities held by them in the proposed registration by submitting their own Demand Notice.  In connection with any Demand Registration in which more than one Holder participates, in the event that such Demand Registration involves an underwritten offering and the managing underwriter or underwriters participating in such offering advise in writing the Holders of Registrable Securities to be included in such offering that the total number of Registrable Securities to be included in such offering exceeds the amount that can be sold in (or during the time of) such offering without delaying or jeopardizing the success of such offering (including the price per share of the Registrable Securities to be sold), then the Registrable Securities to be offered shall be distributed amongst the participating Holders *pro rata* according to each Holder's overall percentage of  ownership in the Company.  In the event of such a pro-rata distribution, to the extent that any Holder (or Holders) has not submitted a Demand Notice, or withdraws from the underwriting, then those Shares that would have been allocated *pro-rata* to the non-participating Holder if they had participated shall be distributed amongst the participating Holders, *pro rata* according to each participating Holder's overall percentage of ownership in the Company.

(b)    The Company, within 45 days of the date on which the Company receives a Demand Notice given by Holders in accordance with Section 2(a), shall file with the SEC, and the Company shall thereafter use its best efforts to cause to be declared effective as promptly as practicable, a Registration Statement on the appropriate form for the registration and sale, in accordance with the intended method or methods of distribution, of the total number of Registrable Securities specified by the Holders in such Demand Notice (a "Demand Registration").  Any Demand Registration may, at the request of the Holders submitting the Demand Notice, be a "shelf" registration (a "Shelf Registration") pursuant to Rule 415 under the Securities Act**[**, provided, however, in the case of a Demand Notice requesting a Shelf Registration on behalf of a Holder or a group of Holders holding less than fifty percent (50%) of the Registrable Securities, that the Company is at the time eligible to use Form S-3 for the registration of such Registrable Securities for resale.**]**

5

(c)     The Company shall use commercially reasonable efforts to keep each Registration Statement filed pursuant to this Section 2 continuously effective and usable for the resale of the Registrable Securities covered thereby (i) in the case of a Registration that is not a Shelf Registration, for a period of one hundred twenty (120) days from the date on which the SEC declares such Registration Statement effective and (ii) in the case of a Shelf Registration, for a period of two (2) years from the date on which the SEC declares such Registration Statement effective, in either case (x) until such earlier date as all of the Registrable Securities covered by such Registration Statement have been sold pursuant to such Registration Statement, and (y) as such period may be extended pursuant to this Section 2.  The time period for which the Company is required to maintain the effectiveness of any Registration Statement shall be extended by the aggregate number of days of all Delay Periods, the Hold Back Period (if applicable) and all Interruption Periods occurring with respect to such Registration and such period and any extension thereof is hereinafter referred to as the "Effectiveness Period."

(d)     The Company shall be entitled to postpone the filing of any Registration Statement otherwise required to be prepared and filed by the Company pursuant to this Section 2, or suspend the use of any effective Registration Statement under this Section 2, for a reasonable period of time (a "Delay Period"), if the Board of Directors of the Company determines in the Board of Directors' reasonable judgment and in good faith that the registration and distribution of the Registrable Securities covered or to be covered by such Registration Statement would materially interfere with any pending material financing, acquisition or corporate reorganization or other material corporate development involving the Company or any of its subsidiaries or would require premature disclosure thereof and promptly gives the Holders written notice of such determination, containing a general statement of the reasons for such postponement and an approximation of the period of the anticipated delay; provided, however, that (i) the aggregate number of days included in all Delay Periods during any consecutive twelve (12) months shall not exceed the aggregate of (x) forty-five (45) days minus (y) the number of days occurring during the Hold Back Period (if applicable) and all Interruption Periods during such consecutive twelve (12) months and (ii) a period of at least forty-five (45) days shall elapse between the termination of any Delay Period, Hold Back Period (if applicable) or Interruption Period and the commencement of the immediately succeeding Delay Period.  If the Company shall so postpone the filing of a Registration Statement, the Holders of Registrable Securities to be registered shall have the right to withdraw the request for registration by giving written notice from the Holders of a majority of the Registrable Securities that were to be registered to the Company within forty-five (45) days after receipt of the notice of postponement or, if earlier, the termination of such Delay Period (and, in the event of such withdrawal, such request shall not be counted for purposes of determining the number of requests for registration to which the Holders of Registrable Securities are entitled pursuant to this Section 2).  The Company shall not be entitled to initiate or continue a Delay Period unless it shall (A) concurrently prohibit sales by all other security holders under registration statements covering securities held by such other security holders and (B) in accordance with the Company's policies from time to time in effect, forbid purchases and sales in the open market by directors and executive officers of the Company.

(e)     The Company shall not include any securities (whether for its own account or otherwise) that are not Registrable Securities in any Registration Statement filed pursuant to this Section 2 without the prior written consent of the Holders of a majority in number of the

6

Registrable Securities covered by such Registration Statement.  Any such securities so included shall be subject to the cut-back provisions of Section 2(a)(iii).

(f)    Holders of a majority in number of the Registrable Securities to be included in a Registration Statement pursuant to this Section 2 may, at any time prior to the effective date of the Registration Statement relating to such Registration, revoke such request by providing a written notice to the Company revoking such request.  Any such Demand Request so withdrawn shall not be counted for purposes of determining the number of requests for registration to which the Holders of Registrable Securities are entitled pursuant to this Section 2 if the Holders of Registrable Securities who revoked such request reimburse the Company for all its out-of-pocket expenses incurred in the preparation, filing and processing of the Registration Statement; provided, however, that, if such revocation was based on (i) the Company's failure to comply in any material respect with its obligations hereunder or (ii) the institution by the Company of a Delay Period or the occurrence of the Hold Back Period (if applicable) or any Interruption Period, such reimbursement shall not be required.

3.    Piggyback Registration.

(a)    Right to Piggyback.  If at any time the Company proposes to file a registration statement under the Securities Act with respect to a public offering by the Company for its own account of securities of the same type as the Registrable Securities (other than a registration statement (i) in connection with the IPO, or (ii) on Form S-8 or Form S-4 or any successor forms thereto, or (iii) filed solely in connection with a dividend reinvestment plan or an employee benefit plan covering only officers or directors of the Company or its Affiliates), then the Company shall give written notice of such proposed filing to the Holders at least fifteen (15) days before the anticipated filing date.  Such notice shall offer the Holders the opportunity to register such amount of Registrable Securities as they may request (a "Piggyback Registration").  Subject to Section 3(b), the Company shall include in each such Piggyback Registration all Registrable Securities with respect to which the Company has received written requests for inclusion therein within ten (10) days after notice has been given to the Holders.  Each Holder shall be permitted to withdraw all or any portion of the Registrable Securities of such Holder from a Piggyback Registration at any time prior to the effective date of such Piggyback Registration.

(b)    Priority on Piggyback Registrations.  The Company shall permit the Holders to include all such Registrable Securities on the same terms and conditions as any similar securities, if any, of the Company or any other persons included therein.  Notwithstanding the foregoing, if the Company or the managing underwriter or underwriters participating in such offering advise the Holders in writing that the total amount of securities requested to be included in such Piggyback Registration exceeds the amount which can be sold in (or during the time of) such offering without delaying or jeopardizing the success of the offering (including the price per share of the securities to be sold), then the amount of securities to be offered for the account of the Holders and other holders of securities who have piggyback registration rights with respect thereto shall be reduced (to zero if necessary) pro rata on the basis of the number of Common Stock equivalents requested to be registered by each such Holder or other holder participating in such offering.

7

(c)      Right To Abandon.  Nothing in this Section 3 shall create any liability on the part of the Company to the Holders if the Company in its sole discretion should decide not to file a registration statement proposed to be filed pursuant to Section 3(a) or to withdraw such registration statement subsequent to its filing, regardless of any action whatsoever that a Holder may have taken, whether as a result of the issuance by the Company of any notice hereunder or otherwise.  Any such determination not to file or to withdraw a registration statement shall not affect the obligations of the Company to pay or to reimburse all Registration Expenses pursuant to Section 6.

4.      Holdback Agreement.  If the Company shall file a registration statement (other than in connection with the registration of securities issuable pursuant to an employee stock option, stock purchase or similar plan or pursuant to a merger, exchange offer or a transaction of the type specified in Rule 145(a) under the Securities Act) with respect to the IPO, and (i) with reasonable prior notice, the managing underwriter or underwriters, if any, advises the Company in writing (in which case the Company shall notify the Holders) that a public sale or distribution of Registrable Securities would materially adversely impact such offering and (ii) the underwriter or underwriters have obtained written holdback agreements from the Company, each executive officer of the Company and each other person who has been granted registration rights by the Company, then each Holder shall, to the extent not inconsistent with applicable law, refrain from effecting any public sale or distribution of Registrable Securities during the ten (10) days prior to the effective date of such registration statement and until the earlier of (A) the abandonment of such offering and (B) ninety (90) days from the effective date of such registration statement (the "Hold Back Period").  Notwithstanding the foregoing, any obligations of the Holders under this Section 4 shall terminate in the event that the Company or any underwriter terminates, releases or waives, in whole of in part, the holdback agreements with respect to the Company, any executive officer of the Company or any such other person who has been granted registration rights by the Company.

5.      Registration Procedures.  In connection with the registration obligations of the Company pursuant to and in accordance with Sections 2 and 3 (and subject to Sections 2 and 3), the Company shall use commercially reasonable efforts to effect such registration to permit the sale of such Registrable Securities in accordance with the intended method or methods of disposition thereof, and pursuant thereto the Company shall as expeditiously as possible:

(a)      prepare and file with the SEC a Registration Statement for the sale of the Registrable Securities on any form for which the Company then qualifies or which counsel for the Company shall deem appropriate in accordance with such Holders' intended method or methods of distribution thereof, and, subject to the Company's right to terminate or abandon a registration pursuant to Section 3(c), use commercially reasonable efforts to cause such Registration Statement to become effective and remain effective as provided herein;

(b)      prepare and file with the SEC such amendments (including post-effective amendments) to such Registration Statement, and such supplements to the related Prospectus, as may be required by the rules, regulations or instructions applicable to the Securities Act during the applicable period in accordance with the intended methods of disposition specified by the

8

Holders of the Registrable Securities covered by such Registration Statement, make generally available earnings statements satisfying the provisions of Section 11(a) of the Securities Act (provided that the Company shall be deemed to have complied with this Section if it has complied with Rule 158 under the Securities Act), and cause the related Prospectus as so supplemented to be filed pursuant to Rule 424 under the Securities Act; provided, however, that before filing a Registration Statement or Prospectus, or any amendments or supplements thereto (other than reports required to be filed by it under the Exchange Act that are incorporated or deemed to be incorporated by reference into the Registration Statement and the Prospectus except to the extent that such reports related primarily to the offering), the Company shall furnish to the Holders of Registrable Securities covered by such Registration Statement and their counsel for review and comment, copies of all documents required to be filed;

(c)     notify the Holders of any Registrable Securities covered by such Registration Statement promptly and (if requested) confirm such notice in writing, (i) when a Prospectus or any Prospectus supplement or post-effective amendment has been filed, and, with respect to such Registration Statement or any post-effective amendment, when the same has become effective, (ii) of any request by the SEC for amendments or supplements to such Registration Statement or the related Prospectus or for additional information regarding the Company or the Holders, (iii) of the issuance by the SEC of any stop order suspending the effectiveness of such Registration Statement or the initiation of any proceedings for that purpose, (iv) of the receipt by the Company of any notification with respect to the suspension of the qualification or exemption from qualification of any of the Registrable Securities for sale in any jurisdiction or the initiation or threatening of any proceeding for such purpose, and (v) of the happening of any event that requires the making of any changes in such Registration Statement, Prospectus or documents incorporated or deemed to be incorporated therein by reference so that they will not contain any untrue statement of a material fact or omit to state any material fact required to be stated therein or necessary to make the statements therein not misleading;

(d)     use commercially reasonable efforts to prevent the issuance of any order suspending the effectiveness of such Registration Statement or the qualification or exemption from qualification of any Registrable Securities for sale in any jurisdiction in the United States, and to obtain the lifting or withdrawal of any such order at the earliest practicable time;

(e)     furnish to the Holder of any Registrable Securities covered by such Registration Statement, each counsel for such Holders and each managing underwriter, if any, without charge, one conformed copy of such Registration Statement, as declared effective by the SEC, and of each post-effective amendment thereto, in each case including financial statements and schedules and all exhibits and reports incorporated or deemed to be incorporated therein by reference; and deliver, without charge, such number of copies of the preliminary prospectus, any amended preliminary prospectus, any free writing prospectus, each final Prospectus and any post-effective amendment or supplement thereto, as such Holder may reasonably request in order to facilitate the disposition of the Registrable Securities of such Holder covered by such Registration Statement in conformity with the requirements of the Securities Act;

(f)     prior to any public offering of Registrable Securities covered by such Registration Statement, use commercially reasonable efforts to register or qualify such Registrable Securities for offer and sale under the securities or "Blue Sky" laws of such jurisdictions as the Holders of

9

such Registrable Securities shall reasonably request in writing; provided, however, that the Company shall in no event be required to qualify generally to do business as a foreign corporation or as a dealer in any jurisdiction where it is not at the time required to be so qualified or to execute or file a general consent to service of process in any such jurisdiction where it has not theretofore done so or to take any action that would subject it to general service of process or taxation in any such jurisdiction where it is not then subject;

(g)     upon the occurrence of any event contemplated by Section 5(c)(v), prepare a supplement or post-effective amendment to such Registration Statement or the related Prospectus or any document incorporated or deemed to be incorporated therein by reference and file any other required document so that, as thereafter delivered to the purchasers of the Registrable Securities being sold thereunder (including upon the termination of any Delay Period), such Prospectus will not contain an untrue statement of a material fact or omit to state any material fact required to be stated therein or necessary to make the statements therein, in light of the circumstances under which they were made, not misleading;

(h)     use commercially reasonable efforts to cause all Registrable Securities covered by such Registration Statement to be listed on each securities exchange or automated interdealer quotation system, if any, on which similar securities issued by the Company are then listed or quoted, or, if none, on such securities exchange or automated interdealer quotation system reasonably selected by the Company;

(i)     on or before the effective date of such Registration Statement, provide the transfer agent of the Company for the Registrable Securities with printed certificates for the Registrable Securities covered by such Registration Statement, which are in a form eligible for deposit with The Depository Trust Company;

(j)     if such offering is an underwritten offering, make available for inspection by any Holder of Registrable Securities included in such Registration Statement, any underwriter participating in any offering pursuant to such Registration Statement, and any attorney, accountant or other agent retained by any such Holder or underwriter (collectively, the "Inspectors"), all financial and other records and other information, pertinent corporate documents and properties of any of the Company and its subsidiaries and affiliates (collectively, the "Records"), as shall be reasonably necessary to enable them to exercise their due diligence responsibilities; provided, however, that the Records that the Company determines, in good faith, to be confidential and which it notifies the Inspectors in writing are confidential shall not be disclosed to any Inspector unless such Inspector signs a confidentiality agreement reasonably satisfactory to the Company, which shall permit the disclosure of such Records in such Registration Statement or the related Prospectus if (i) necessary to avoid or correct a material misstatement in or material omission from such Registration Statement or Prospectus or (ii) the release of such Records is ordered pursuant to a subpoena or other order from a court of competent jurisdiction; provided further, however, that (A) any decision regarding the disclosure of information pursuant to subsection (i) shall be made only after consultation with counsel for the applicable Inspectors and the Company and (B) with respect to any release of Records pursuant to subsection (ii), each Holder of Registrable Securities agrees that it shall, promptly after learning that disclosure of such Records is sought in a court having jurisdiction, give notice

10

to the Company so that the Company, at the Company's expense, may undertake appropriate action to prevent disclosure of such Records;

(k)    not later than the effective date of a registration statement, the Company shall provide to the Holders the CUSIP number for all Registrable Securities; and

(l)    if such offering is an underwritten offering, enter into such agreements (including an underwriting agreement in form, scope and substance as is customary in underwritten offerings) and take all such other appropriate and reasonable actions requested by the Holders of a majority of the Registrable Securities being sold in connection therewith (including those reasonably requested by the managing underwriters) in order to expedite or facilitate the disposition of such Registrable Securities, and in such connection, (i) use commercially reasonable efforts to obtain opinions of counsel to the Company and updates thereof (which counsel and opinions (in form, scope and substance) shall be reasonably satisfactory to the managing underwriters and counsel to the Holders of the Registrable Securities being sold), addressed to each selling Holder of Registrable Securities covered by such Registration Statement and each of the underwriters as to the matters customarily covered in opinions requested in underwritten offerings and such other matters as may be reasonably requested by such counsel and underwriters, (ii) use commercially reasonable efforts to obtain "cold comfort" letters and updates thereof from the independent certified public accountants of the Company (and, if necessary, any other independent certified public accountants of any subsidiary of the Company or of any business acquired by the Company for which financial statements and financial data are, or are required to be, included in the Registration Statement), addressed to each selling holder of Registrable Securities covered by the Registration Statement (unless such accountants shall be prohibited from so addressing such letters by applicable standards of the accounting profession) and each of the underwriters, such letters to be in customary form and covering matters of the type customarily covered in "cold comfort" letters in connection with underwritten offerings, (iii) if requested and if an underwriting agreement is entered into, provide indemnification provisions and procedures customary for underwritten public offerings, but in any event no less favorable to the indemnified parties than the provisions set forth in Section 8. The above shall be done at each closing under such underwriting or similar agreement, or as and to the extent required thereunder.

The Company may require each Holder of Registrable Securities covered by a Registration Statement to furnish such information regarding such Holder and such Holder's intended method of disposition of such Registrable Securities as it may from time to time reasonably request in writing.  If any such information is not furnished within a reasonable period of time after receipt of such request, the Company may exclude such Holder's Registrable Securities from such Registration Statement.

Each Holder of Registrable Securities covered by a Registration Statement agrees that, upon receipt of any notice from the Company of the happening of any event of the kind described in Section 5(c)(ii), 5(c)(iii), 5(c)(iv) or 5(c)(v), that such Holder shall discontinue disposition of any Registrable Securities covered by such Registration Statement or the related Prospectus until receipt of the copies of the supplemented or amended Prospectus contemplated by Section 5(g), or until such Holder is advised in writing (the "Advice") by the Company that the use of the applicable Prospectus may be resumed, and has received copies of any amended or

11

supplemented Prospectus or any additional or supplemental filings which are incorporated, or deemed to be incorporated, by reference in such Prospectus (such period during which disposition is discontinued being an "Interruption Period") and, if requested by the Company, the Holder shall deliver to the Company (at the expense of the Company) all copies then in its possession, other than permanent file copies then in such holder's possession, of the Prospectus covering such Registrable Securities at the time of receipt of such request.

Each Holder of Registrable Securities covered by a Registration Statement further agrees not to utilize any material other than the applicable current preliminary prospectus, free writing prospectus, road show or Prospectus in connection with the offering of such Registrable Securities.

6.      Registration Expenses.  Whether or not any Registration Statement is filed or becomes effective, the Company shall pay all costs, fees and expenses incident to the Company's performance of or compliance with this Agreement, including (i) all registration and filing fees, including NASD filing fees, (ii) all fees and expenses of compliance with securities or "Blue Sky" laws, including reasonable fees and disbursements of counsel in connection therewith, (iii) printing expenses (including expenses of printing certificates for Registrable Securities and of printing prospectuses if the printing of prospectuses is requested by the Holders or the managing underwriter, if any) and expenses associated with a road show, (iv) messenger, telephone and delivery expenses, (v) fees and disbursements of counsel for the Company, (vi) fees and disbursements of all independent certified public accountants of the Company (including expenses of any "cold comfort" letters required in connection with this Agreement) and all other persons retained by the Company in connection with such Registration Statement, (vii) fees and disbursements of one counsel, other than the Company's counsel, selected by Holders of a majority of the Registrable Securities being registered, to represent all such Holders, (viii) fees and disbursements of underwriters customarily paid by the issuers or sellers of securities and (ix) all other costs, fees and expenses incident to the Company's performance or compliance with this Agreement.  Notwithstanding the foregoing, the fees and expenses of any persons retained by any Holder, other than one counsel for all such Holders, and any discounts, commissions or brokers' fees or fees of similar securities industry professionals and any transfer taxes relating to the disposition of the Registrable Securities by a Holder, will be payable by such Holder and the Company will have no obligation to pay any such amounts.

7.      Underwriting Requirements.

(a)      Subject to Section 7(c), any Holder shall have the right, by written notice, to request that any Demand Registration provide for an underwritten offering.

(b)      In the case of any underwritten offering pursuant to a Demand Registration, the Holders of a majority of the Registrable Securities to be disposed of in connection therewith shall select the institution or institutions that shall manage or lead such offering, which institution or institutions shall be reasonably satisfactory to the Company.  In the case of any underwritten offering pursuant to a Piggyback Registration, the Company shall select the institution or institutions that shall manage or lead such offering.

12

(c)    In the case of any Piggyback Registration that is an underwritten offering, no Holder shall be entitled to participate in an underwritten offering unless and until such Holder has entered into an underwriting or other agreement with such institution or institutions for such offering in such form as the Company and such institution or institutions shall reasonably determine; provided, that no holder of Registrable Securities included in any underwritten registration shall be required to make any representation or warranties to the Company or the underwriters (other than representations and warranties regarding such holder and such holder's ownership of the shares to be sold pursuant to such underwriting) or to undertake any indemnification or contribution obligations to the Company or any underwriter with respect thereto, other than as specifically provided in Section 8.

8.    Indemnification.

(a)    Indemnification by the Company.  The Company shall, without limitation as to time, indemnify and hold harmless, to the fullest extent permitted by law, each Holder of Registrable Securities whose Registrable Securities are covered by a Registration Statement or Prospectus, the officers, directors and agents and employees of each of them, each Person who controls each such Holder (within the meaning of Section 15 of the Securities Act or Section 20 of the Exchange Act) and the officers, directors, agents and employees of each such controlling person, to the fullest extent lawful, from and against any and all losses, claims, damages, liabilities, judgment, costs (including costs of investigation or preparation and reasonable attorneys' fees) and expenses (collectively, "Losses"), as incurred, arising out of or based upon (w) any untrue or alleged untrue statement of a material fact contained in such Registration Statement or Prospectus or in any amendment or supplement thereto in any preliminary prospectus, any free writing prospectus, any information the Company has filed or is required to file pursuant to Rule 433(d) under the Securities Act, or any other material or information provided to or made available to investors by, or with the approval of, the Company in connection with the offering, including any road show for the offering (collectively, "Marketing Materials"), (x) any omission or alleged omission of a material fact required to be stated therein or necessary to make the statements therein not misleading, except insofar as the same are based upon information furnished in writing to the Company by or on behalf of such Holder expressly for use in the Marketing Materials, (y) any untrue statement or alleged untrue statement of a material fact in the information conveyed to any purchaser at the time of the sale to such purchaser, or the omission or alleged omission to state therein a material fact required to be stated therein, or (z) any violation by the Company of any federal, state or common law rule or regulation applicable to the Company and relating to action required of or inaction by the Company in connection with any such registration; provided, however, that the Company shall not be liable to any such Holder to the extent that any such Losses arise out of or are based upon an untrue statement or alleged untrue statement or omission or alleged omission made in any preliminary prospectus if (i) having previously been furnished by or on behalf of the Company with copies of the Prospectus, such Holder failed to send or deliver a copy of the Prospectus with or prior to the delivery of written confirmation of the sale of Registrable Securities by such Holder to the person asserting the claim from which such Losses arise and (ii) the Prospectus would have corrected in all material respects such untrue statement or alleged untrue statement or such omission or alleged omission; and provided further, however, that the Company shall not be liable in any such case to the extent that any such Losses arise out of or are based upon an

13

untrue statement or alleged untrue statement or omission or alleged omission in the Prospectus, if (A) such untrue statement or alleged untrue statement, omission or alleged omission is corrected in all material respects in an amendment or supplement to the Prospectus and (B) having previously been furnished by or on behalf of the Company with copies of the Prospectus as so amended or supplemented, such Holder thereafter fails to deliver such Prospectus as so amended or supplemented, prior to or concurrently with the sale of Registrable Securities.

(b)    Indemnification by Holder of Registrable Securities.  In connection with any Registration Statement in which a Holder is participating, such Holder shall furnish to the Company in writing such information as the Company reasonably requests for use in connection with the Marketing Materials and agrees to indemnify, severally and not jointly with the other Holders and to the full extent permitted by law, the Company, its directors, officers, agents or employees, each Person who controls the Company (within the meaning of Section 15 of the Securities Act and Section 20 of the Exchange Act) and the directors, officers, agents or employees of such controlling Persons, from and against all Losses arising out of or based upon (x) any untrue or alleged untrue statement of a material fact contained in the Marketing Materials or (y) any omission or alleged omission of a material fact required to be stated therein or necessary to make the statements therein not misleading, to the extent, but only to the extent, that such untrue or alleged untrue statement or omission or alleged omission is based upon and is consistent with information so furnished in writing by or on behalf of such Holder to the Company expressly for use in such Marketing Materials.  No Holder shall be held liable for any damages in excess of the total amount of proceeds received by such Holder from the sale of the Registrable Securities sold by such Holder (net of all underwriting discounts and commissions) under that particular Registration Statement.

(c)    Conduct of Indemnification Proceedings.  If any Person shall be entitled to indemnity hereunder (an "Indemnified Party"), such Indemnified Party shall give prompt notice to the party from which such indemnity is sought (the "Indemnifying Party") of any claim or of the commencement of any proceeding with respect to which such Indemnified Party seeks indemnification or contribution pursuant hereto; provided, however, that the delay or failure to so notify the Indemnifying Party shall not relieve the Indemnifying Party from any obligation or liability except to the extent that the Indemnifying Party has been materially prejudiced by such delay or failure.  The Indemnifying Party shall have the right, exercisable by giving written notice to an Indemnified Party promptly after the receipt of written notice from such Indemnified Party of such claim or proceeding, to assume, at the Indemnifying Party's expense, the defense of any such claim or proceeding, with counsel reasonably satisfactory to such Indemnified Party; provided, however, that (i) an Indemnified Party shall have the right to employ separate counsel in any such claim or proceeding and to participate in the defense thereof, but the fees and expenses of such counsel shall be at the expense of such Indemnified Party unless: (1) the Indemnifying Party agrees to pay such fees and expenses; (2) the Indemnifying Party fails promptly to assume the defense of such claim or proceeding or fails to employ counsel reasonably satisfactory to such Indemnified Party; or (3) the named parties to any proceeding (including impleaded parties) include both such Indemnified Party and the Indemnifying Party, and such Indemnified Party shall have been advised by counsel that there may be one or more legal defenses available to it that are in addition to or are inconsistent with those available to the Indemnifying Party or that a conflict of interest is likely to exist among such Indemnified Party and any other indemnified parties (in which case the Indemnifying Party shall not have the right

14

to assume the defense of such action on behalf of such Indemnified Party); and (ii) subject to subsection (3) above, the Indemnifying Party shall not, in connection with any one such claim or proceeding or separate but substantially similar or related claims or proceedings in the same jurisdiction, arising out of the same general allegations or circumstances, be liable for the fees and expenses of more than one firm of attorneys (together with appropriate local counsel) at any time for all of the indemnified parties.   Whether or not such defense is assumed by the Indemnifying Party, such Indemnified Party shall not be subject to any liability for any settlement made without its consent, which consent shall not be unreasonably withheld, conditioned or delayed.   The Indemnifying Party shall not consent to entry of any judgment or enter into any settlement that does not include as an unconditional term thereof the giving by the claimant or plaintiff to such Indemnified Party of a release, in form and substance reasonably satisfactory to the Indemnified Party, from all liability in respect of such claim or litigation for which such Indemnified Party would be entitled to indemnification hereunder.

(d)    Contribution.  If the indemnification provided for in this Section 8 is applicable in accordance with its terms but is legally unavailable to an Indemnified Party in respect of any Losses, then each applicable Indemnifying Party, in lieu of indemnifying such Indemnified Party, shall contribute to the amount paid or payable by such Indemnified Party as a result of such Losses, in such proportion as is appropriate to reflect the relative fault of the Indemnifying Party, on the one hand, and such Indemnified Party, on the other hand, in connection with the actions, statements or omissions that resulted in such Losses as well as any other relevant equitable considerations.  The relative fault of such Indemnifying Party, on the one hand, and Indemnified Party, on the other hand, shall be determined by reference to, among other things, whether any action in question, including any untrue statement of a material fact or omission or alleged omission to state a material fact, has been taken by, or relates to information supplied by, such Indemnifying Party or Indemnified Party, and the parties' relative intent, knowledge, access to information and opportunity to correct or prevent any such action, statement or omission.  The amount paid or payable by a party as a result of any Losses shall be deemed to include any legal or other fees or expenses incurred by such party in connection with any investigation or proceeding.  The parties hereto agree that it would not be just and equitable if contribution pursuant to this Section 8(d) were determined by pro rata allocation or by any other method of allocation that does not take account of the equitable considerations referred to in the immediately preceding paragraph.  Notwithstanding the provision of this Section 8(d), an Indemnifying Party that is a Holder shall not be required to contribute any amount which is in excess of the amount by which the total proceeds received by such Holder from the sale of the Registrable Securities sold by such Holder (net of all underwriting discounts and commissions) exceeds the amount of any damages that such Indemnifying Party has otherwise been required to pay by reason of such untrue or alleged untrue statement or omission or alleged omission.  No person guilty of fraudulent misrepresentation (within the meaning of Section 11(f) of the Securities Act) shall be entitled to contribution from any Person who was not guilty of such fraudulent misrepresentation.

9.    Rule 144 Information.  With a view to making available the benefits of certain rules and regulations of the Commission which may at any time permit the sale of the Registrable Securities to the public without registration, after such time as a registration statement relating to the Common Stock of the Company has been declared effective under either the Securities Act or the Exchange Act, the Company agrees to use its best efforts to:

(a)    Make and keep public information available, as those terms are understood and defined in Rule 144 under the Securities Act, at all times after the earlier of (a) such time as a registration statement relating to the Common Stock of the Company has been declared effective under either the Securities Act or the Exchange Act or (b) the date that the Company becomes subject to the periodic reporting requirements under Section 13 or 15(d) of the Exchange Act, for so long as the Company remains subject to the periodic reporting requirements under Section 13 or 15(d) of the Exchange Act.

(b)    Use its best efforts to file with the Commission in a timely manner all reports and other documents required of the Company under the Securities Act and the Exchange Act (at any time after it has become subject to such reporting requirements).

(c)    Furnish to any Holder forthwith upon request a written statement by the Company as to its compliance with the reporting requirements of Rule 144 under the Securities Act (at any time after 90 days after the effective date of the first registration statement filed by the Company for an offering of its securities to the general public), and of the Securities Act and the Securities Exchange Act of 1934 (at any time after it has become subject to such reporting requirements), a copy of the most recent annual or quarterly report of the Company, and such other reports and documents of the Company and other information in as such Holder may reasonably request in availing itself of any rule or regulation of the Commission allowing such Holder to sell any such securities without registration.

10.    Miscellaneous.

(a)    Limitations on Subsequent Registration Rights.    After the date of this Agreement and prior to the IPO, and except as set forth in each of the Warrant Agreements between the Company and [BNY Mellon Shareowner Services] dated as of even date herewith (the "Warrant Agreements"), the Company shall not grant registration rights to any third party other than pursuant to the terms of this Agreement unless the Company has obtained the written consent of Holders of at least a majority in number of the Registrable Securities then outstanding; provided that after the IPO, the Company shall not grant registration rights to any third party which are senior to or *pari passu* with the registration rights granted to Holders hereunder unless the Company has obtained the written consent of Holders of at least a majority in number of the Registrable Securities then outstanding.

(b)    Termination.  This Agreement and the obligations of the Company and the Holders hereunder (other than with respect to Section 8) shall terminate on the first date on which no Registrable Securities remain outstanding.

(c)    Notices.  All notices, requests, waivers and other communications made pursuant to this Agreement shall be in writing and shall be deemed to have been effectively given (i) when

personally delivered to the party to be notified; (ii) when sent by confirmed facsimile to the party to be notified at the number set forth below; (iii) when sent by email to the party to be notified at the email address set forth below; (iv) three (3) Business Days after deposit in the United States mail postage prepaid by certified or registered mail return receipt requested and addressed to the party to be notified as set forth below; or (v) one (1) Business Day after deposit with a national overnight delivery service, postage prepaid, addressed to the party to be notified as set forth below with next-business-day delivery guaranteed, in each case as follows:

In the case of the Company, to:

> Hayes Lemmerz International, Inc.
> [ADDRESS]
> Attention:  [_____]
> Telephone:  [_____]
> Facsimile:  [_____]
> Email:  [_____]

> With a copy (which shall not constitute notice) to:

> [NAME]
> [ADDRESS]
> Attention:  [_____]
> Telephone:  [_____]
> Facsimile:  [_____]
> Email:  [_____]

In the case of the Initial Holders:

> To the names and addresses set forth on the signature pages hereto.

> With a copy (which copy shall not constitute notice) to:

> Milbank, Tweed, Hadley & McCloy LLP
> 1 Chase Manhattan Plaza
> New York, New York  10005
> Attention:  Thomas C. Janson
> Telephone:  (212) 530-5000
> Facsimile:  (212) 530-5219
> Email:  tjanson@milbank.com

17

In the case of any other Holder, to such Holder at its address set forth in the stock ledger of the Company.

(d)    Separability. If any provision of this Agreement shall be declared to be invalid or unenforceable, in whole or in part, such invalidity or unenforceability shall not affect the remaining provisions hereof which shall remain in full force and effect.

(e)    Assignment. This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective heirs, devisees, legatees, legal representatives, successors and assigns. The rights to cause the Company to register Registrable Securities pursuant to Sections 2 and 3 may be assigned in connection with any transfer or assignment by a Holder of Registrable Securities, provided that: (i) such transfer may otherwise be effected in accordance with applicable securities laws; (ii) such transfer is effected in compliance with the restrictions on transfer contained in this Agreement and in any other agreement between the Company and the Holder; and (iii) such assignee or transferee is (A) an affiliate of the Holder (B) a partner or member of the Holder or an affiliate of the Holder or (C) holds (after giving effect to such transfer) (I) at least 2% of the issued and outstanding shares or (II) all shares of Registrable Securities held by a Holder if transferred to a single entity. No transfer or assignment will divest a Holder or any subsequent owner of such rights and powers unless all Registrable Securities are transferred or assigned.

(f)    Entire Agreement. This Agreement represents the entire agreement of the parties and shall supersede any and all previous contracts, arrangements or understandings between the parties hereto with respect to the subject matter hereof.

(g)    Amendments and Waivers. Except as otherwise provided herein, the provisions of this Agreement may not be amended, modified or supplemented, and waivers or consents to departures from the provisions hereof may not be given, unless the Company has obtained the written consent of Holders of at least a majority in number of the Registrable Securities then outstanding.

(h)    Publicity. No public release or announcement concerning the transactions contemplated hereby shall be issued by any party without the prior consent of the other parties, except to the extent that such party is advised by counsel that such release or announcement is necessary or advisable under applicable law or the rules or regulations of any securities exchange, in which case the party required to make the release or announcement shall to the extent practicable provide the other party with an opportunity to review and comment on such release or announcement in advance of its issuance.

(i)    Expenses. Whether or not the transactions contemplated hereby are consummated, except as otherwise provided herein, all costs and expenses incurred in connection with the execution of this Agreement shall be paid by the party incurring such costs or expenses, except as otherwise set forth herein.

(j)    Interpretation.

(i)    The headings contained in this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement.

18

(ii)     The meaning assigned to each term defined herein shall be equally applicable to both the singular and the plural forms of such term and vice versa, and words denoting either gender shall include both genders as the context requires.  Where a word or phrase is defined herein, each of its other grammatical forms shall have a corresponding meaning.

(iii)    The terms "hereof", "herein" and "herewith" and words of similar import shall, unless otherwise stated, be construed to refer to this Agreement as a whole and not to any particular provision of this Agreement.

(iv)    When a reference is made in this Agreement to a Section, paragraph, Exhibit or Schedule, such reference is to a Section, paragraph, Exhibit or Schedule to this Agreement unless otherwise specified.

(v)     The word "include", "includes", and "including" when used in this Agreement shall be deemed to include the words "without limitation", unless otherwise specified.

(vi)    A reference to any party to this Agreement or any other agreement or document shall include such party's predecessors, successors and permitted assigns.

(k)     Counterparts.  This Agreement may be executed in two or more counterparts, all of which shall be one and the same agreement, and shall become effective when counterparts have been signed by each of the parties and delivered to each other party.

(l)     Governing Law.  This Agreement shall be construed, interpreted, and governed in accordance with the internal laws of New York.

(m)     Calculation of Time Periods.  Except as otherwise indicated, all periods of time referred to herein shall include all Saturdays, Sundays and holidays; provided, however, that if the date to perform the act or give any notice with respect to this Agreement shall fall on a day other than a Business Day, such act or notice may be timely performed or given if performed or given on the next succeeding Business Day.

[*Signature Page Follows*]

19

IN WITNESS WHEREOF, each of the Parties has caused this Agreement to be executed and delivered by its duly authorized officer as of the date first above written.

HAYES LEMMERZ INTERNATIONAL, INC.

By: _____

Name:

Title:

*[signature page to Registration Rights Agreement]*

#4819-7660-3396

INITIAL HOLDER

By: _____

Name: _____

Title: _____

Address: _____

_____

_____

[*signature page to Registration Rights Agreement*]

#4819-7660-3396