| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| HAYES LEMMERZ INTERNATIONAL, | ) | Case No. 09-11655 (MFW) |
| INC., *et al.* | ) | |
| | ) | (Jointly Administered) |
| Debtors. | ) | |
| | ) | **Related to Docket No. 539** |

## OBJECTION OF MERCATOR CLO III LIMITED TO FIRST AMENDED JOINT PLAN OF REORGANIZATION OF HAYES LEMMERZ INTERNATIONAL, INC. AND ITS AFFILIATED DEBTORS AND DEBTORS-IN-POSSESSION

Mercator CLO III Limited ("Mercator") hereby files its objection (the "Objection") to the First Amended Joint Plan of Reorganization of Hayes Lemmerz International, Inc. and its Affiliated Debtors and Debtors-in-Possession (the "Plan") and respectfully represents as follows:

### Preliminary Statement

The Plan as currently constructed cannot be confirmed. The above referenced debtors and debtors-in-possession (the "Debtors") and a select group of "DIP Lenders"[1] have designed and re-designed a chapter 11 plan which may succeed in enticing the major creditor constituencies to support the Plan. However, such "enticement" does not absolve the supporters of the Plan from several fundamental inconsistencies with the Bankruptcy Code which preclude this Plan from being confirmed. The infirmities include: a Plan not proposed in good faith with a flawed valuation; unfair discrimination; invalid third party releases; a failed fair and equitable test and/or inconsistencies with other provisions of title 11; a failed best interest test; questionable feasibility. Moreover, there were underlying infirmities with the process for obtaining the DIP Financing which cleared the path for this Plan. Further, Mercator believes that even if Class 6 voted in favor of the Plan as a class, many votes in favor were procured or

---

[1] Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Plan.

solicited in bad faith and such votes should be disregarded. Fundamentally for these reasons, this Court must not approve the Plan.

## Background

1. The Debtors summarize the prepetition history of their prepetition secured borrowing in paragraphs nine through eleven of the Debtors' Motion for Interim and Final Orders (I) Authorizing Debtors to (A) Obtain Priming Post-petition Secured Financing and (B) Use Cash Collateral, (II) Granting Adequate Protection to Prepetition Secured Lenders, and (III) Scheduling Final Hearing Pursuant to Bankruptcy Rule 4001 (the "DIP Motion") (Docket No 23). As set forth therein, on May 30, 2007, the Debtors refinanced their initial credit facility by entering into the Second Amended and Restated Credit Agreement (hereafter, as amended prepetition, the "Prepetition Credit Agreement", attached hereto as Exhibit A) "to establish three new senior credit facilities in the aggregate amount of approximately $495 million." As of the Petition Date, the total amount due and owing under the Prepetition Credit Agreement was approximately $495 million.

2. Prior to the bankruptcy, another component of the Debtors' capital structure was their unsecured indebtedness arising under the Indenture dated as of May 30, 2007 (the "Indenture"). The Debtor Hayes Lemmerz Finance LLC – Luxembourg S C A ("Hayes Luxembourg") issued 8.25% senior notes due 2015 in the face amount of € 130,000,000 via U.S. Bank National Association, as Trustee (the "Notes"; and hereafter the holders thereof are sometimes referred to as the "Noteholders"). U.S. Bank filed a proof of claim asserting an unsecured claim as of the Petition Date of $182,460,005.00 in total unpaid principal and interest due and owing.

WM1A 937012v1 10/06/09

3. In the DIP Motion, the Debtors describe in paragraphs eighteen though twenty-eight their own narrative of negotiations between the Debtors on the one hand and the "Prepetition Lenders" (who they state retained their own advisors), on the other hand. The Debtors describe how beginning in February 2009 their investment bank, Lazard, identified potential "financial investors it believed might be interested in lending to, investing in or acquiring the Company during Chapter 11 cases."[2] The Debtors also described how they "also continued working with the Prepetition Lender group, which is comprised of approximately 40 commercial banks and hedge funds, in a potential DIP facility."

4. In their DIP Motion, the Debtors go on to describe how in the second half of April 2009, "a majority of the Prepetition Lenders" advised the Debtors that they were opposed to a transaction proposed by a potential bidder, "were finalizing their own DIP loan proposal" and "requested the Company refrain from executing the definitive documentation."

5. In paragraphs twenty-five though twenty-eight of the DIP Motion, the Debtors describe "around the clock" negotiations and finalization of DIP Financing. In late April, proposed term sheets were delivered to the Debtors.[3] The Debtors describe how once the DIP Facility was close to final: "all Prepetition Lenders were offered the opportunity to participate in and/or consent to the proposed DIP Financing." They add: "Prior to Prepetition Date, the Prepetition Agent obtained the consent from more than one-half of the Prepetition Lenders [representing more than two-thirds in outstanding amount]."

---

[2] The Debtors added that they and Lazard decided it was not in the Debtors' best interest to approach other automotive suppliers prior to a bankruptcy filing.

[3] Mercator respectfully requests that this Court take judicial notice of the fact that this was a period of great uncertainty in the automotive sector. On April 30, 2009, Chrysler filed for bankruptcy. A little over a moth later, General Motors filed.

3

6.	Upon information and belief, Mercator was the only Lender under the Prepetition Credit Facility without a U.S. based office. Moreover, upon information and belief, it is significantly smaller than many of the institutions who are Lenders under the facility. As a consequence of its location, and perhaps for other reasons unknown to Mercator, the direct information flow to it related to the negotiations regarding the DIP Financing were significantly delayed and inconsistent at best. Specifically, Mercator was not informed of the full extent and materiality of the Debtor's financial distress or of the DIP negotiations until mid-April 2009 when the discussions were well-advanced. It is Mercator's understanding that these discussions had been taking place with other Lenders since February and that all or substantially all of the Lenders had been informed of these negotiations prior to notification to Mercator. In fact, a meeting was held between the Debtor, the proposed DIP Lenders and European-based Lenders in April to which Mercator was not invited to participate. In addition, this meeting, the Debtor's financial situation, the DIP discussions and the work done by Houlihan Lokey were only disclosed to Mercator by that firm, not through the Prepetition Agent (as required in the Prepetition Credit Agreement). This lack of communication was even more of a hindrance to a smaller investment fund like Mercator, as it must raise capital in order to make any additional loan commitments or investments in connection with its loan portfolio.

7.	On May 11, 2009, the Debtors commenced these Chapter 11 cases. At no time before or after the filing did Mercator consent to the DIP Financing. In fact, while it experienced difficulty in communicating with Houlihan Lokey (Mercator was directed by the Prepetition Agent, Citibank, to communicate directly with Houlihan Lokey), if anything Mercator expressed its lack of support for the financing and did so in writing (to Houlihan Lokey and left voicemail messages to the same effect which were never returned). At no time did Mercator advise the

Debtors, any of the Prepetition Lenders, or their respective advisors that they consented to the "priming" feature of the DIP Facility.

8.     The official committee of unsecured creditors (the "Committee") appointed in the cases is composed of a) U.S. Bank, as indenture trustee; b) one of the Noteholders; and c) Pension Benefit Guaranty Corporation.  Mercator understands that after its appointment, the Committee was active in the cases.  On July 2, 2009, the Debtors filed a chapter 11 plan.  On August 11, 2009, the Committee filed an objection to the Disclosure Statement which included various objections to the underlying plan.  Additionally, on that same date the Committee filed a motion for the appointment of an examiner.

9.     After reaching a "settlement" with the Committee on the treatment of the Noteholders, on September 2, 2009 the Debtors filed an amended plan (the "Plan").

### Objection

10.     The Plan in many respects cannot be confirmed as currently designed.  At the outset of this restructuring process the Debtors and the other Plan proponents skirted around the consent requirements for waivers and amendments under the Prepetition Credit Agreement in order to put the DIP Lenders in a quick position to "own" the company via the DIP Financing. Such new financing was quite modest, consisting of less than half "new money", with the remainder being a "roll-up" of a portion of their prepetition secured debt.  In order to "grease the skids" for obtaining approval of the DIP Financing, certain non-participating Lenders were "incentivized" to consent through a fee which was much larger than the amount they were being paid for their prepetition claim.  Yet, a critical step was not taken when the Debtors came before this Court with a "priming" request: the Plan proponents did not obtain the consent of Mercator and upon information and belief certain other Lenders.  Aside from this inherent flaw in the

WM1A 937012v1 10/06/09

approval process for DIP Financing, the Plan is violative of a number of Bankruptcy Court provisions which make it patently unconformable.

### A. The Debtors Failed to Obtain the Necessary Consent Required Under the Prepetition Creditor Agreement Before Entering into the DIP Financing.

11.     Mercator is one of the Lenders under the Prepetition Credit Agreement. As is common in secured credit facilities, the Prepetition Agent is authorized to act upon behalf of the Lenders if a requisite share (more than 50%) of such Lenders provide their written consent to certain actions, including certain types of amendments and waivers under the agreement. Prepetition Credit Agreement, Section 11.1(a). Critically, however, Section 11.1(a) specifically requires the written consent of <u>all</u> Lenders prior to the Prepetition Agent taking specific actions, including without limitation:

> (iv)     reduce the principal amount of any Loan or Reimbursement Obligation owing to such Lender (other than by the payment or prepayment thereof);
>
> (viii)   release all or substantially all of the Collateral except as provided in *Section 10.8(b) (Concerning the Collateral and the Collateral Documents)* or release the Borrowers from its payment obligation to such Lender under this Agreement or the Revolving Credit Notes owing to such Lender (if any) or release any Guarantor from its obligations under the Guaranty except in connection with the sale or other disposition of a Subsidiary Guarantor (or all or substantially all of the assets thereof) permitted by this Agreement (or permitted pursuant to a waiver or consent of a transaction otherwise prohibited by this Agreement);
>
> (ix)     expressly subordinate any of the Secured Obligations or any Liens securing any of the Secured Obligations, except in accordance with this Agreement.

12.     Here, the Debtors and some but not all Lenders entered into an agreement immediately prior to the bankruptcy which led to each of these proscribed actions being pursued in the bankruptcy without full consent. First, the DIP Financing – the ultimate "currency" for

owning the reorganized company under a chapter 11 plan – obtained at the outset of these cases provided that the liens and claims of the Lenders under the Prepetition Credit Facility would be "primed." DIP Motion at pp. 29-30. Then, the Plan which followed seeks to reduce (in fact eliminate) the principal amount as well as release the Collateral of some of the Lenders including Mercator. This Plan treatment was predicated on first obtaining the DIP Financing, particularly its "priming" feature.

13.     Actually, the Term Sheet (attached hereto as Exhibit B) preceding the bankruptcy filing did not mention such priming taking place under the DIP Financing, or really anything regarding the legal effect of such financing on prepetition secured debt (or other details including the proposed "adequate protection"). Nor did communications to the Lenders in the form of memoranda dated May 15 and 19 from the "DIP Agent" reference those details. The DIP Lenders did solicit the consent of other Lenders not participating in the DIP Facility. In fact, they were "incentivized" to consent – by being offered a pro rata share of 8.5% of new equity under a plan. The offering of an incentive – and of that magnitude – suggests an implicit recognition of the consent requirements under the Prepetition Credit Agreement. Yet, that consent was not obtained from all Lenders, including Mercator.

14.     Unfortunately, absent from the "first day" motion filed by the Debtors requesting emergency approval of the DIP Financing on an interim basis and on the record at the hearing is an affirmative statement or evidence that all Lenders consented to such financing, including the proposed "priming" of the obligations under the Prepetition Credit Facility pursuant to Section 364(d) of the Bankruptcy Code. Had the Court been aware of the fact that there were actually non-consenting Lenders opposed to the DIP Financing, whose written consent was required under the Prepetition Credit Agreement, at a bare minimum the Debtors would have been

7

required to create a much more fulsome record in order to attempt to meet their burden. Additionally, the record is unclear whether notice was given to all non-consenting Lenders.

15. After securing the DIP Lenders' priority status by getting approval of the DIP Financing, the Plan proponents were poised to file and prosecute a chapter 11 plan which would enable the newly minted DIP Lenders to capitalize on this status. The Plan would include treatment to which Mercator had consent rights under the Prepetition Credit Agreement: a) the reduction (in fact the elimination) in principal; and b) a full release of Collateral, as well as of the guarantees by non-Debtors. See Plan at pp. 25-26. And, tragically, the Plan even breaches the contractual subordination of the Notes. Id. at p. 26.

16. Now what the supporters of the Plan will argue is it does not really matter whether a Lender like Mercator withholds its consent if enough "incentivized" Class 6 members accept the Plan. They will ask the Court to ignore the necessary predicate to their strategy - getting approval of the DIP Financing. Mercator respectfully submits that this strategy should not be sanctioned under the Plan. Mercator has been placed in a class in which most if not all other members receive via other provisions of the Plan different and better treatment either as a DIP Lender or as an incentivized holder of "consent" rights. A debtor, in concert with a select group of secured creditors, cannot be permitted to orchestrate such an abrogation of a secured creditor's rights. These circumstances present a threshold reason for not confirming the Plan.

**B.     The Debtors Bear the Burden to Demonstrate
that the Plan Meets the Confirmation Requirements.**

17. The proponents of a plan bear the burden of establishing by a preponderance of the evidence that each and every requirement of sections 1129(a) and (b) has been satisfied in connection with the attempt to confirm the Chapter 11 Plan. See. e.g., In re Armstrong World Indus., Inc., 348 B.R. 111, 120 (D. Del. 2006); In re Genesis Health Ventures, Inc., 266 B.R.

8

591, 598-599 (Bankr. D. Del. 2001), appeal dismissed by 280 B.R. 339 (D. Del. 2002). Since the plan proponent bears the burden, an objecting party may successfully rebut a plan proponent's evidence without introducing any new evidence of its own. See generally In re Global Ocean Carriers Ltd., 251 B.R. 31 (Bankr. D. Del. 2000). Indeed, even in the absence of opposition, the court has an independent duty to find that each and every element of section 1129 is met. See Genesis Health Ventures, 266 B.R. at 599; In re Lernout & Hauspie Speech Prod., N.V., 301 B.R. 651, 656 (Bankr. Del. 2003).

**C.  The Debtors' Valuation is Fundamentally Flawed
and Indicative of a Plan Not Proposed in Good Faith.**

18.     The Plan is not proposed in good faith and therefore fails to comply with section 1129(a)(3). Besides the "plan strategy" described above regarding the securing of priority status under the DIP Financing as a path to owning the company, the Debtors' valuation in support of this Plan is grossly understated. These are clear indications the Plan was not proposed in good faith. As such, the Plan cannot be confirmed.

19.     The Debtors' valuation attached to their Disclosure Statement is deficient in many respects by undervaluing a company at historic low points in the macroeconomy and the automotive industry. In greater detail immediately below, Mercator will describe the specific flaws in the valuation. The low value ranges that the Debtors place on both the enterprise - $230 million to $295 million and the equity - $102 million to $167 million - are critical pieces of a Plan strategy designed to enable a favored group of secured creditors to own the reorganized debtor. Those favored creditors contributed under the DIP Financing in the aggregate: (i) up to $100 million in new financing; and (ii) $100 million in their prepetition secured debt being "rolled up" into post-petition debt, each piece of which "primed" the Prepetition Secured Obligations. Under the Plan, the DIP Lenders will receive for this "investment" in a relatively

short bankruptcy an 84.5 percent interest in the Company's equity which, under their extremely conservative valuation, is worth $85 million to $139 million. Looking simply at the amount of current actual new funding ($15.4 million)[4] from a relatively short stay in chapter 11, the economics of Plan treatment are disproportionately favorable to the DIP Lenders versus other Lenders.

20.    Using more reasonable and conventional assumptions and methodology, the "distributable value" to creditors under a chapter 11 Plan is materially greater.[5] The following represent some but not all areas in which the valuation is not representative of the current Enterprise Value, hence, the Equity Value.

a.    In the analytical valuation methodologies, the projections for 2010-2013 are all driven off of the data for 2009. However: i) the 2009 data only incorporates actual data for two months (February and March of 2009), the balance of the 2009 data represents projections that were developed as far back as April 2009, and ii) the key value-driving conditions in the general economy and the auto industry sector have changed significantly since April 2009. For this reason, the foundation on which the 2010-2013 projections were built is suspect.

b.    Similarly, the values produced by the "marketing process" are also not likely to be representative of the current fair market value of the Company since: i) the actual canvassing of potential buyers appears to have been conducted primarily between February and

---

[4]  The amount of DIP Financing projected to be drawn by management in the August report to the Lenders was $53 million with free cash of $37.6 million for a net financing requirement of $15.4 million. This amount is 68% less than the Plan projected net financing requirement of $48.2 million to be provided by DIP Lenders.

[5]  Mercator is in the process of having a valuation expert retained for purposes of contesting valuation and possibly scrutinizing the liquidation analysis at confirmation.

10

April, and ii) the financial performance information provided to potential buyers and investors was based on the same now-dated FYTD March data.[6]

      c.     With the passage of time, even the values produced by the marketing process are no longer reliable. Specifically, in addition to economic conditions having changed since earlier in the year, M & A and financing conditions have also changed as we have moved away from the precipitous declines in the market brought on by the events of September 2008. As a result, potential buyers have more ready access to capital and, with the resulting higher level of corporate transaction activity, higher valuation multiples typically result.

      d.     The valuation itself (attachment to the Disclosure Statement, entitled "Valuation of the Debtors") repeatedly mentions the importance of EBITDA as a valuation indicator. However, this report does not provide any actual EBITDA data used in deriving the results of the four respective methodologies. Hence, the analyses used to derive the above valuation ranges are not provided. Therefore, it was not clear whether the valuation was driven off EBITDA and other financial data on an "As Reported" or "Continuing Operations" basis. The Disclosure Statement itself goes back and forth.

      e.     It appeared that the financial projections provided were very conservative, since the cumulative amount of the "Net Cash Flow" for 2009-2013 appears very low for a company of this size. The projections suggest very little cushion in the event of a negative variance from the projections

      21.     Unfortunately, what appears to be happening here is a select group of senior creditors are attempting to buy the Debtors "on the cheap" – and do it fast. Discussions regarding a restructuring of the Debtors' capital structure began during a period of nearly

---

[6] Although the Disclosure Statement indicates that marketing took place in July, the "real" marketing process took place from February to April.

unprecedented turmoil in the financial markets and in the midst of a severe and protracted economic downturn in the national and global economies. As explained in the Debtors' Disclosure Statement, as a consequence of this economic crisis the automotive sector suddenly suffered from a severe and rapid downturn in consumer demand. The Debtors estimate that 2009 EBITDA will be down 66% percent from 2008. Earlier this year both Chrysler and General Motors filed for bankruptcy – immediately before and after these cases filed.

22.     So, this is a company which filed for bankruptcy in the midst of unprecedented financial and economic turmoil to pursue a quick debt restructuring – not an operational restructuring – which will result in a turn over of ownership of the company to a select group of Lenders. Under the circumstances, not only should the underlying impetus for the Plan be under scrutiny, the sequence of events surrounding the Term Sheet and subsequent DIP Financing casts doubt on whether the Plan was proposed in good faith.[7]

23.     Bankruptcy Code section 1129(a)(3) requires that a plan be "proposed in good faith and not by any means forbidden by law." Judge Walrath has described good faith as follows:

> The good faith standard requires that the plan be proposed with honesty, good intention and a basis for expecting that a reorganization can be effected with results consistent with the objectives and purposes of the Bankruptcy Code . . . . In evaluating the totality of circumstances surrounding a plan a court has considerable judicial discretion in finding good faith, with the most important feature being an inquiry into the fundamental fairness of the plan.

---

[7]  As explained further below, it did not help matters that during the Plan formulation process the DIP Lenders held out the prospect of the Debtors' management receiving incentive compensation.

In re Coram Healthcare Corp., 271 B.R. 228, 234 (Bankr. D. Del. 2001) (citations and footnote omitted); see also In re ACandS, Inc., 311 B.R. 36, 42-43 (Bankr. D. Del. 2004); Kane v. Johns-Manville Corp. (In re Johns-Manville Corp.), 843 F.2d 636, 649 (2d. Cir. 1988). The issue of "good faith" arises in the context of a contested valuation. See In re Zenith Elecs. Corp., 241 B.R. 92, 108-10 (Bankr. D. Del. 1999) (discussion of "entire fairness" doctrine); In re Oneida Ltd., 351 B.R. 79, 84-88 (Bankr. S.D.N.Y. 2006).

24.    Here we have a debtor which appears not to be undertaking a meaningful restructuring in a bankruptcy, notwithstanding the monumental challenges facing the automotive industry. The Debtor had been in bankruptcy previously with a plan being approved in 2003. Since that time, the Debtor had been massively restructured with considerable cash invested and a shift away from North America to international markets to become the global market leader and a profitable business. During a period of unprecedented distress in this sector – when two of the "Big Three" automakers in the U.S. have filed for bankruptcy – certain senior creditors are seizing on an opportunity to buy this previously reorganized business through use of a low valuation. They are attempting to exchange a portion of their debt for new equity quickly – before the credit markets and macroeconomy recover enough to defeat a strategy which was being implemented at a low point in the industry (at the time of the Chrysler filing and as exacerbated by the global financial crisis). They enticed similarly situated secured creditors to consent by offering them a smaller piece of the action. Indeed, a careful review and analysis of the obvious weaknesses of the valuation attached to the Disclosure Statement reveals that the new owners would be getting a significant bargain – and at the expense of other creditors.

25.    As set forth above, and will be further developed at the confirmation hearing, the scheme underlying the Plan was not proposed with "honesty" and "good intentions." And given

the Debtors' various shortcomings described in this Objection in meeting the requirements for confirming a plan, this restructuring cannot be "effected with results consistent with the objectives and purposes of the Bankruptcy Code." In re Coram Healthcare Corp., 271 B.R. at 234.

26.     Sadly, whatever "counter balancing" to the DIP Lenders' substantial leverage which might have been expected from the Debtors' senior management in negotiating a better plan for creditors was neutralized by the fact that their future compensation was hanging in the balance. The Term Sheet contemplated a subsequent agreement on: a "Long Term Incentive Plan", the assumption of certain executive employment agreements, and the terms to be assumed or proposed under the Debtors' 2009 annual incentive plan or key employee incentive plan Eventually, as the pieces were seemingly in place for this "(DIP) loan to own" strategy, senior management was rewarded.[8]

27.     Under these circumstances, the Plan proponents cannot meet their burden that the Plan was proposed in good faith and therefore it cannot be confirmed.

### D.     The Plan's Releases Are Not Warranted Under Third Circuit Precedent and Are Not Proposed in Good Faith.

28.     The Plan includes broad releases which should not be approved. Also troubling is the proposed expensive "exculpation" of the Debtors and non-Debtor "Released Parties" for acts in connection with, or arising out of, the Plan. Moreover, the Plan proposes to release non-Debtor guarantors of the Prepetition Credit Facility. Such an attempt at "cleansing" events surrounding this Plan is further evidence that the Plan is not proposed in good faith.

---

[8]  On September 25, 2009, the Debtors filed various Plan documents, including employee compensation – related documents.

14

29.     Section 524(e) of the Bankruptcy Code states: "Except as provided in subsection (a)(3) of this section, discharge of a debt of the debtor does not affect the liability of any other entity on, or the property of any other entity for, such debt." 11 U.S.C. § 524(e).

30.     The inclusion of non-consensual third party releases in a chapter 11 plan violates section 524(e) of the Bankruptcy Code. See In re Continental Airlines, 203 F.3d 203, 214 (3d Cir. 2000). In applying section 524(e), courts in the Third Circuit have unanimously held, except in extraordinary circumstances plainly not present in this case, that a bankruptcy court has no authority to release an obligation owing from one non-debtor to another without the individual consent of the party prejudiced by the release. See, e.g., In re Zenith Elecs. Corp., 241 B.R. 92, 111 (Bankr. D. Del. 1999) (release of non-derivative third-party claims against non-debtor "cannot be accomplished without the affirmative agreement of the creditor affected"). Consensual "third party" releases may only be approved in circumstances where (a) substantial value is provided by the released parties, (b) substantial distributions are made to all creditors, (c) a substantial majority of creditors impacted by the release support the plan and (d) without the release there is little likelihood of success of confirming a plan. See In re Continental Airlines, 203 F.3d at 213. Zenith Elecs. Corp., 241 B.R. at 10-12; In re Master Mortgage Investment Fund, Inc., 168 B.R. 930, 937 (Bankr. W.D. Mo. 1994) (applying five factor test); See also In re Global Ocean Carriers, Ltd., 251 B.R. 31, 42-43 (Bankr. D. Del. 2000).

31.     Here, plainly there are not "exceptional" or "rare" circumstances which allow non-consensual releases. Again, among the Released Parties are the non-Debtor guarantors of the Prepetition Credit Facility, a critical contractual right bargained for in connection with the facility. What makes this release even more egregious is that non-consenting Lenders such as Mercator are releasing such important security for nothing, but the recent resolution of the

15

Noteholders purportedly gives value to those junior creditors based upon a similar release of rights.[9] So, not only do we have a Plan which does not respect contractual subordination; we also have a Plan which confers value on a junior creditor but not a senior creditor for essentially the same right vis-à-vis the debtor. Not only is such treatment violative of other provisions in title 11 (including section 510(a)), it is also arbitrary, unfair and inequitable.

32.     Clearly, the non-consensual releases and exculpation of other parties are incompatible with section 524(e) and precedent in this Circuit. The sequence of events prior to and after the bankruptcy filing raise questions which deserve greater scrutiny. For all of these reasons, the releases under the Plan must not be approved.

### E.     The Plan Unfairly Discriminates Within Class 6.

33.     Section 1123(a)(4) is clear: a plan must "provide the same treatment for each claim or interest of a particular class, unless the holder of a particular claim or interest agrees to a less favorable treatment of such particular claim or interest." 11 U.S.C. § 1123(a)(4). Otherwise, a plan "unfairly discriminates" against the non-consenting class member. Here, it is patently clear that the Plan unfairly discriminates against Mercator by treating it less favorably than most other prepetition secured lenders.

34.     Section 3.2(b) of the Plan sets forth the treatment of Class 6, "Prepetition Secured Obligations." All claims shall be allowed in an amount net of "the anticipated Senior Roll-up Loans in the amount of $100 million." The Plan provides that members of Class 6 receive their pro rata share of the "Prepetition Secured Lender Distribution Property" in full satisfaction of their claims – provided the Class votes as a class in favor of the Plan. The Prepetition Secured Lender Distribution Property is defined as: 400,000 shares of New Common Stock equal to 4% of the New Common Stock that is to be issued hereunder (prior to dilution from the Long Term

---

[9]    Apparently this is the justification for making a distribution to a junior creditor.

Incentive Plan, Tranche A Warrants, and Tranche B Warrants). Section 1.116 of Plan. But, that is not the end of the story. Other language in Section 3.2(b), together with provisions in other sections of the Plan, act to discriminate between DIP Lenders and non-DIP Lenders, and consenting non-DIP Lenders versus non-consenting non-DIP Lenders.

35.     Specifically, Section 3.2(b) of the Plan adds that "Holders of Prepetition Secured Obligations who are DIP Lenders" waive the above treatment under Class 6, with such distributions going on a pro rata basis to "Holders" who are not DIP Lenders.[10] Turning to Section 2.5(a) and (b) of the Plan, "DIP Financing Claims" – defined as all Claims and other obligations of the DIP Agents and DIP Lenders under the DIP Financing Facility (again, such Claims are held by a subset of the Prepetition Lenders) – are allowed. Allowed DIP Financing Claims are to receive: (i) a pro rata share of "The DIP Lenders New Money Distribution Property", defined as a secured term loan in the principal amount outstanding under the "New Money DIP Term Loans" plus "Incremental New Money DIP Term Loans"; (ii) a pro rata share of the "DIP Lenders Roll-Up Distribution Property," defined as 8,450,000 shares of New Common Stock representing 84.50% of the total amount of New Common Stock; plus (iii) all DIP Agent and DIP Lender fees and expenses; (iv) all accrued and unpaid costs and charges of the DIP Financing Facility; and (v) all unpaid interest under the DIP Financing Facility.

36.     In other words, identically situated prepetition creditors are cleverly but improperly given disparate treatment – particularly 84.5% of the equity in the reorganized enterprise – from their participation in DIP Financing providing only modest new "skin in the game" for an enterprise the Debtors' valued at $230 to $295 million. The Plan also preserves $100 million of this preferred group's prepetition debt via the "roll up" under the DIP Financing.

---

[10]   Any adequate protection claims of the "Holders of the Prepetition Secured Obligations" pursuant to the DIP Financing are deemed satisfied.

The Disclosure Statement does not provide an estimate of the percentage recovery of this preferred group, but even under conservative estimates it greatly exceeds the estimated recovery percentage of non-DIP Lenders in Class 6: 1.1%.

37.     Yet, the Plan further discriminates within Class 6 between "Consenting" versus "non-consenting" non-DIP Lenders. Specifically, the Plan rewards Consenting non-DIP Lenders with a pro rata share of an additional 8.5 percent of new equity. There is no legitimate basis for this "kicker," especially of this magnitude (materially more than the recovery for just their claim). Once again, these "Consenting" Lenders are similarly situated prepetition secured creditors. They provide <u>nothing</u> in the way of additional consideration under the Plan. Like the DIP Lenders, they are being improperly rewarded in connection with post-petition financing. But, there is even less justification for their special treatment, as all they did was "consent" to the earlier-apprised DIP Financing. As described above, their consent was insufficient under the Prepetition Credit Agreement, as Section 11.1(a) required the consent of <u>all</u> Lenders with respect to certain waivers or amendments, including subordination. Moreover, upon information and belief, many of such consents were provided <u>prior</u> to the bankruptcy filing – calling into further question why such consents would warrant special, discriminatory treatment under the Plan.

38.     Treating holders of claims within Class 6 differently violates section 1123(a)(4) of the Bankruptcy Code, which expressly requires the same treatment for claims of the same type. As a result, the Plan unfairly discriminates against Mercator. Section 1123(a)(4) of the Bankruptcy Code requires the plan to "provide the same treatment for each claim or interest of a particular class, unless the holder of a particular claim or interest agrees to a less favorable treatment of such particular claim or interest." 11 U.S.C. § 1123(a)(4); <u>see</u> Collier citation LAWRENCE P. KING, COLLIER ON BANKRUPTCY P 1123.01[4], 7-1123 (15th ed. Rev.

18

1996). See also Schroeder v. New Century Liquidating Trust (In re New Century TRS Holdings, Inc.), 407 B.R. 576, 586 (D. Del. 2009). Courts are to enforce this provision according to its plain language. See Hartford Underwriters Ins. Co. v. Union Planters, 530 U.S. 1, 6 (2000). As a result, if claims within the same class are not receiving the same treatment, and the holders of those claims being treated less favorably have not consented to the discrimination, the plan is not confirmable.

39. Accordingly, "[a]bsent consent to accept less favorable treatment, all members of the class must receive equal value." In re Quigley Co., 377 B.R. 110, 117 (Bankr. S.D.N.Y. 2007) (noting that "[i]n addition, each member of the class must pay the same consideration for its distribution"). When a creditor objects to the classification of a particular class of claims, "[t]he burden is on the debtor to show that unequal treatment between classes having the same priority does not constitute unfair discrimination." In re El Comandante Mgmt. Co., LLC, No. 04-10938 2006 Bankr. LEXIS 3820, #14 (Bankr. D.P.R., Mar. 3, 2006); see also In re Barney & Carey Co., 170 B.R. 17, 25 (Bankr. D. Mass. 1994). Here, the Debtors have not met that requirement. Therefore, the Plan cannot be confirmed.

### F. Mercator Requests Section 1126(e) Designation of Votes Not Solicited or Procured in Good Faith or in Accordance with Title 11.

40. Mercator did not know as of the filing of this Objection whether the Plan proponents obtained the requisite vote in terms of amount and number within Class 6. If they did, Mercator believes there is evidence that votes solicited or procured in favor of the Plan by the "Consenting" DIP Lenders (and perhaps others) were not solicited or procured in good faith or in accordance with the provisions of this title. And consequently, their votes were not cast in good faith. Mercator respectfully requests that the Court designate such accepting votes accordingly, so that the voting for Class 6 is retabulated. This may result in a different outcome.

WM1A 937012v1 10/06/09

41.     Subsection (c) of section 1126 of the Bankruptcy Code provides:

> (c) A class of claims has accepted a plan if such plan has been accepted by creditors, other than any entity designated under subsection (c) of this section, that hold at least two-thirds in amount and more than one-half in number of the allowed claims of such class held by creditors, **other than any entity designated under subsection (e) of this section**, that have accepted or rejected such plan.

11 U.S.C. § 1126(c) (emphasis added).

Subsection (e) provides: "On request of a party in interest, and after notice and a hearing, the court may designate any entity whose acceptance or rejection of such plan was not in good faith, or was not solicited or procured in good faith or in accordance with the provision of this title."

42.     Section 1126(e) allows a bankruptcy court to hold invalid any vote that is not made or solicited in good faith or accordance with title 11. See Century Glove, Inv. v. First Am. Bank of NY., 860 F.2d 94, 97 (3d Cir. 1988). It grants the bankruptcy court discretion to sanction any conduct that taints the voting process, whether it violates a specific provision or is in bad faith. See id. Section 1126(e) is often used to "monitor the conduct of creditor's who seek to gain an untoward advantage over others in the bankruptcy process." In re Combustion Eng'g, Inc., 391 F.3d 190, 248 (3d Cir. 2004).

43.     In connection with the DIP Financing negotiated and executed prior to the Petition Date, non-DIP Lenders were coerced into supporting the DIP Financing and subsequently the Plan by the offer of a "Consent Fee." This coercive fee was indeed a generous one – an additional 8.5% of the new equity in the reorganized Debtors. But surely the intent of those offering the fee – the DIP Lenders – was to gain "untoward advantage" over others in the bankruptcy. That activity alone should be deemed in each instance as causing a vote in bad faith and designated accordingly.

20

44. Additionally, in the weeks leading up to the voting deadline, the Prepetition Agent received from the DIP Lenders warnings to not encourage any lenders to oppose the Plan or discourage any lenders from accepting the Plan. These communications included stern warnings regarding fees and expenses of the Prepetition Agent and its advisors. This conduct is emblematic of a broad effort to solicit support to the Plan which is lacking in good faith. It calls into question the reliability of the overall outcome of the voting in Class 6.

45. For these reasons, Mercator respectfully requests that the Court apply Section 1126(e) of the Bankruptcy Code and designate any such votes not accepting in good faith or not solicited or procured in good faith or in accordance with title 11, and direct that they be disregarded for purposes of tabulating votes for Class 6.

## G. If Class A-6 Is a Non-accepting Class, Then the Plan Fails the Fair and Equitable Test.

46. If Class A-6 does not vote as a class in favor of the Plan (with or without the application of section 1126(e)), since such class is impaired then paragraph (8) of section 1129(a) is not met. The Debtors then must resort to a "cram down" under section 1129(b). They must prove that the Plan does not discriminate unfairly and is fair and equitable with respect to Class A-6 as a non-accepting, impaired class. 11 U.S.C. § 1129(b)(1).

47. As set forth above in Section E, the Plan does discriminate unfairly within Class 6 notwithstanding that the class members are similarly situated prepetition secured creditors. Treatment differs among class members after factoring in other features of the Plan relating to DIP Financing. Specifically, the subclass of Lenders who are DIP Lenders receive the most favorable overall Plan treatment, and those Lenders who gave "consent" to the DIP Financing receive materially better treatment than those who did not, including Mercator.

21

48.     With respect to the cram down requirement that the Plan be "fair and equitable",

paragraph (2) of section 1129(b) provides:

> (2)  For the purpose of this subsection, the condition that a plan be fair and
> equitable with respect to a class includes the following requirements.
>
> (A) With respect to a class of secured claims the plan provides –
>
>     (i)  (I) that the holders of such claims retain the liens securing such
> claims, whether the property subject to such liens is retained by the debtor or
> transferred to another entity, to the extent of the allowed amount of such claims;
> and
>
>     (II) that each holder of a claim of such class receive on account
> of such claim deferred cash payments totaling at least the allowed amount of such
> claim, of a value, as of the effective date of the plan, of at least the value of such
> holder's interest in the estate's interest in such property;
>
>     (ii)   for the sale, subject to section 363(k) of this title, of any
> property that is subject to the liens securing such claims, free and clear of such
> liens, with such liens to attach to the proceeds of such sale, and the treatment of
> such liens on proceeds under clause (i) or (iii) of this subparagraph; or
>
>     (iii)    for the realization by such holders of the indubitable
> equivalent of such claims.

11 U.S.C. § 1129(b)(2)(A).

49.     Here, the Plan does not provide that Lenders such as Mercator within Class 6

retain their liens or alternatively provide for the sale of their collateral.  Thus, (i) and (ii) do not

apply.  That means the Plan proponents are left with demonstrating whether the Plan provides

Lenders like Mercator with the "indubitable equivalent" of their claims.  See Sandy Ridge Dev.

Corp. v. La. Nat'l. Bank (In re Sandy Ridge Dev. Corp.), 881 F.2d 1346, 1350 (5th Cir. 1989)

(abandonment or other unqualified collateral transfer constitutes "indubitable equivalent").

50.     The Debtors' Plan does not offer the indubitable equivalent as required in a "cram

down" - far from it.  Here, Lenders who did not participate in or consent to the DIP Financing

are penalized and discriminated against for not doing so.  They receive only a pro rata share of 4

22

percent of the new equity, estimated to equate to a 1.1% recovery, which is materially less than even those Lenders who merely "consented" to the DIP Financing at the beginning of the bankruptcy. This is not the "indubitable equivalent" of their claims. As such, the Debtors cannot meet their burden that the Plan is fair and equitable. The Plan therefore cannot be confirmed if Class 6 is a non-accepting class.

> **H.  Even if Class 6 Accepts, the Plan Improperly Makes Distributions to Creditors Junior to an Impaired Class in Contravention of Section 510(a).**

51.     Even if Class 6 is an accepting class, the Plan does not comply with other provisions of title 11 and cannot be confirmed. 11 U.S.C. § 1129(a)(1). Specifically, junior creditors – the Noteholders – receive a recovery under a deal struck with the Debtors and DIP Lenders even though Lenders, as contractually senior creditors, are not paid in full. This feature of the Plan is in violation of section 510(a) of the Bankruptcy Code.

52.     Section 1129(a)(1) provides that "a plan must comply with the "applicable provisions of this title." 11 U.S.C. § 1129(a)(1); see In re PWS Holding Corp., 228 F.3d 224, 228 (3d Cir. 2000). This requires that the plan conform to the applicable provisions of title 11. Id.; Collier citation LAWRENCE P. KING, COLLIER ON BANKRUPTCY P 1129.03[1], 1129-25 (15th ed. Rev. 1996).

53.     11 U.S.C. § 510(a) is a provision within title 11. Therefore, section 1129(a)(1) requires a plan's compliance with the statute. See Id. (considering section 510(a) in the context of section 1129(a)(1)). Section 510(a) states: "A subordination agreement is enforceable in a case under this title to the same extent that such agreement is enforceable under applicable nonbankruptcy law."

23

54.     Here, there is no question that the Noteholders are contractually subordinated to all of the Lenders, including Mercator. The Indenture together with the Notes incorporated therein are clear. The Notes are expressly subordinated to all obligations of the Company that are secured by senior liens. In order for a lien to be senior, it must be a Permitted Lien arising from Permitted Debt (as those terms are defined in the Indenture). It is indisputable that the obligations under the Prepetition Credit Agreement are Permitted Debt. Hence, the Notes are subordinated to the Lenders' claims and liens. Bankruptcy courts apply section 510(a) within different contexts involving prepetition agreements which establish the relative priorities of creditors. See In re Enron Creditors Recovery Corp. f/k/a Enron Corp., et al., 380 B.R. 307, 312, 314 (Bankr. S.D.N.Y. 2008); In re Walnut Equip. Leasing Co., Inc., No. 97-19699 DWS 1999 Bankr. LEXIS 1460, at *15-17 (Bankr. E.D. Pa., Nov. 23, 1999). By granting the Noteholders a recovery before all Lenders, including Mercator, recover the full amount of their claims is inconsistent with section 510(a). For that reason, section 1129(a)(1) is violated, and the Plan cannot be confirmed.

55.     What the Plan proponents may argue is the Noteholders are receiving a recovery solely on account of the non-Debtors' guarantees, which are being released under the Plan. The flaws with the argument are multi-fold. First, the non-Debtor guaranteeing the Notes also guaranteed the Prepetition Credit Obligations. Secondly, the Lenders' collateral includes pledged interests in the non-Debtors. Thirdly, it is difficult to discern from the Plan, Disclosure Statement or Schedules what the value of the non-Debtors and their assets may be. The Schedules of the Debtors who directly or indirectly own such non-Debtors state the value of their equity interests cannot be determined. Thus, the Plan proponents cannot even show the value of

the consideration "waived" in exchange for the Noteholders' treatment under the Plan. The Court should reject this argument.

56. For all of these reasons, the Plan proponents cannot overcome the Plan's section 1129(a)(1) shortcomings. Accordingly, the Plan cannot be confirmed.

## I.     The Plan Fails to Satisfy the Best Interest Test.

57. The Debtors' Liquidation Analysis attached to their Disclosure Statement fails to prove that all of the Lenders, most particularly Mercator, will receive more under the Plan than they would receive under a chapter 7 liquidation. In trying to defend their analysis, the Debtors once again must resort to relying upon the non-consensual DIP Financing "priming" and "consent rights." The Debtors cannot meet their burden under the best interests tests as to all members of Class 6.

58. Section 1129(a)(7)(A) of the Bankruptcy Code, also known as the "best interests" test, requires in relevant part that:

> With respect to each impaired class of claims or interests
>
> (A) each holder of a claim or interest of such class (i) has accepted the plan; or
>
> (ii) will receive or retain under the plan on account of such claim or interest property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under chapter 7 of this title on such date.

See 11 U.S.C. 1129(a)(7)(A); See Bank of Am. Nat'l Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship., 526 U.S. 434, 442 n.13 (1999); In re Resorts Int'l, Inc., 145 B.R. 412, 476-77 (D.N.J. 1990). "The 'best interests' test applies to individual creditors holding impaired claims, even if the class as a whole votes to accept the plan." LaSalle, 526 U.S. at 422 n. 13.

25

59.     Applying the best interests test requires the hypothetical application of chapter 7 to a chapter 11 plan. In re Stone and Webster, Inc., 286 B.R. 532, 544-45 (Bankr. D. Del. 2002). In determining whether the "best interests" standard is met, courts must "measure what is to be received by rejecting creditors in the impaired classes under the plan against what would be received by them in the event of liquidation under chapter 7." Id. ("In doing so, the court must take into consideration the applicable rules of distribution of the estate under chapter 7, as well as the probable costs incident to such liquidation."); see also In re Johns-Manville Corp., 843 F.2d 636, 649 (2d Cir. 1988) (the debtor must show that a dissenting creditor will receive no less under the plan than it would have received in a chapter 7 liquidation).

60.     A plan proponent has the burden of establishing by a preponderance of the evidence that its plan meets the "best interests" test. See id.; see also ACC Bondholder Group v. Adelphia Commc'n. (In re Adelphia Communications), 361 B.R. 337, 365 (S.D.N.Y. 2007) ("That burden is met by showing that creditors will receive at least as much under the [p]lan as they would receive in a liquidation of the [d]ebtor's assets under chapter 7"); Lisanti v. Lubetkin (In re Lisanti Foods, Inc.), 329 B.R. 491, 500 (D.N.J. 2005) (citing In re MCorp Fin., Inc., 137 B.R. 219, 228 (S.D. Tex. 1992)). To carry their burden, the Debtors must present evidence and assign recovery values to any potential causes of action, including actions to avoid preferences or fraudulent transfers. See In re Zaleha, 162 B.R. 309, 316 (Bankr. D. Idaho 1993) (declining to confirm the debtor's plan of reorganization, which did not value potential causes of action); In re Future Energy Corp., 83 B.R. 470, 489 n.33 (Bankr. S.D. Ohio 1988) ("In ascertaining what creditors would receive in a hypothetical Chapter 7 liquidation, the Court is required to assign a value to possible recoveries in actions to avoid preferential or fraudulent transfers.") (citation omitted).

WM1A 937012v1 10/06/09

61.     Fundamental to passage of the "best interests" test is a liquidation analysis. See In re Crowthers McCall Pattern, Inc., 120 B.R. 279, 301 (Bankr. S.D.N.Y. 1990). A liquidation analysis must show "that a payment under a plan is equal to the value that the creditor would receive if the debtor were liquidated." Adelphia Communications, 361 B.R. at 367. Further, a liquidation analysis must be based on evidence and not mere assumptions or assertions." Id. (noting, however, that "the valuation of a hypothetical chapter 7 liquidation is, by nature, 'inherently speculative' and 'is often replete with assumptions and judgments'"). Otherwise, the "best interests" test cannot be met. The test is designed to "protect individual creditors even in the face of majority support for a plan." Id.

62.     Here, the Liquidation Analysis appears to have potential flaws such as understated recoveries from assets, possible exclusion of estate causes of action and overstated liquidation costs. Mercator may use its expert, as necessary, at the confirmation hearing to test the validity of the Liquidation Analysis.

For all of these reasons, the Debtors' cannot meet the "best interests test" under section 1129 (a)(7)(A) the Plan cannot be confirmed.

### J.     The Debtors Have Not Demonstrated That the Plan is Feasible.

63.     This is the Debtors' second chapter 11 filing. See Case No. 01-11490 (MFW). The Debtors' characterize the first filing, where the Plan confirmed in 2003, as an "operational" restructuring. On the other hand, the Debtors have referred in their papers to this "chapter 22" filing as a financial restructuring. Yet, the net effect of the Plan is on the one hand to reduce existing secured debt by approximately $395 million, but then on the other hand make "permanent" their "new money" DIP Financing in the amount of $100 million and add up to $120 million in new secured debt for "exit financing." Moreover, the fact that the Plan is

27

conditioned upon exit financing still to be obtained is a large hole to be filled: even if they can obtain it, by when and on what terms? The Court cannot confirm the Plan under these circumstances unless the Debtors provide more support that the Plan is feasible.

64.     Section 1129(a)(11) requires: "Confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed under the Plan." See 11 U.S.C. § 1129(a)(11). This confirmation requirement is referred to as the "feasibility" requirement. See Fin. Sec. Assurance Ins. v. T-H New Orleans Ltd. P'ship (In re T-H New Orleans Ltd. P'ship), 116 F.3d 790, 801 (5th Cir. 1997). A plan of reorganization is feasible if it offers "a reasonable assurance of success." In re Johns-Manville Corp., 843 F.2d at 649 see In re T-H New Orleans Ltd. P'ship, 116 F.3d at 801 (providing that the feasibility requirement is satisfied if the plan offers a reasonable assurance of commercial viability). "Success need not be guaranteed." 843 F.2d at 649. "The standard of proof required by the debtor to prove a Chapter 11 plan's feasibility is by a preponderance of the evidence." 116 F.3d at 801.

65.     Here, material terms of the Plan are unknown at the time of voting and when Plan objections are due. At this juncture, parties in interest do not know if the Debtors will secure exit financing, when and on what terms. See generally In re Whispering Pines Estate, Inc., NO. 05-56003-MNV 2008 WL 5156429; at * (Bankr. D. N.H.) (denying confirmation based on lack of feasibility, including speculative financing). What we do know is the Debtors propose to reduce existing prepetition secured indebtedness – which was priced in the market in May 2007 before the credit markets began to deteriorate – of approximately $395 million in exchange for (i) $100 million in permanent secured debt from the "new money" DIP Financing priced in the Spring of

28

2009 and (ii) up to $120 million in exit financing priced in the current credit markets. It is the Debtors' burden to show a feasible "financial" restructuring.

66. Finally, the Debtors bear the burden of convincing this Court that the absence of an "operational" restructuring in a "quick" bankruptcy constitutes a feasible restructuring plan, particularly where there is only a modest deleveraging.

67. In short, the Debtors need a greater showing to meet their burden that their Plan is feasible from both an operational and financial restructuring standpoint.

## Conclusion

WHEREFORE, for the foregoing reasons, Mercator respectfully requests that the Court deny confirmation of the Plan.

Dated: October 6, 2009

FOX ROTHSCHILD LLP

By: _____
Jeffrey M. Schlerf (No. 3047)
Citizens Bank Center
919 North Market Street, Suite 1600
Wilmington, Delaware 19801
Telephone: (302) 654-7444

Counsel to Mercator CLO III Limited

WM1A 937012v1 10/06/09