**EXHIBIT A**

**<u>ASSET PURCHASE AGREEMENT</u>**

# ASSET PURCHASE AGREEMENT

## BY AND AMONG

## HARVEY HOLDINGS LLC

## HARVEY INDUSTRIES, LLC

## HAYES LEMMERZ INTERNATIONAL – LAREDO, INC.

## AND

## HLI OPERATING COMPANY, INC.

## DATED AS OF

## OCTOBER [---], 2009

# TABLE OF CONTENTS

## [To be updated]

ARTICLE  I DEFINITIONS AND TERMS ................................................................ 2
    1.1    Certain Definitions .............................................................................. 2
    1.2    Other Terms. ....................................................................................... 6
    1.3    Other Definitional Provisions. ............................................................ 6
ARTICLE  II PURCHASE AND SALE OF THE ACQUIRED ASSETS .................... 7
    2.1    Purchase and Sale of the Acquired Assets. ......................................... 7
    2.2    Excluded Assets. .................................................................................. 8
    2.3    Assumed Liabilities. ............................................................................ 9
    2.4    Conveyance. ......................................................................................... 9
    2.5    Consideration.. ..................................................................................... 9
    2.6    Retained Liabilities ............................................................................. 9
    2.7    Payment of Accounts Payable; Collection of Accounts Receivable ........... 10
ARTICLE  III CLOSING ............................................................................................ 11
    3.1    Closing ................................................................................................. 11
    3.2    Deliveries by Seller ............................................................................. 11
    3.3    Deliveries by Holdings ........................................................................ 12
    3.4    Simultaneous Transactions .................................................................. 13
    3.5    Allocation of Purchase Price. .............................................................. 13
ARTICLE  IV REPRESENTATIONS AND WARRANTIES OF SELLER ............... 13
    4.1    Organization and Qualification ........................................................... 13
    4.2    Authority; Binding Effect. ................................................................... 13
    4.3    Title to Acquired Assets; Capitalization of Industrias. ....................... 14
    4.4    Consents and Approvals; No Violation. .............................................. 14
    4.5    Absence of Litigation. ......................................................................... 15
    4.6    U.S. Benefit Plans. .............................................................................. 15
    4.7    Disclaimer of Warranties .................................................................... 15
ARTICLE  V REPRESENTATIONS AND WARRANTIES OF PURCHASERS ...... 16
    5.1    Organization ........................................................................................ 16
    5.2    Authority; Binding Effect .................................................................... 16
    5.3    Consents and Approvals; No Violation. .............................................. 16
    5.4    Absence of Litigation. ......................................................................... 17
    5.5    No Knowledge of Seller's Breach ....................................................... 17
    5.6    Investigation. ....................................................................................... 17
    5.7    Financing. ............................................................................................ 17
ARTICLE  VI COVENANTS ...................................................................................... 17
    6.1    Commercially Reasonable Efforts ...................................................... 17
    6.2    Consents .............................................................................................. 18
    6.3    Further Assurances. ............................................................................. 18
    6.4    Conduct of Business ............................................................................ 18
    6.5    Access to Information; Confidentiality. ............................................... 19
    6.6    Inter-Company Obligations ................................................................. 20
    6.7    Access to Books and Records Following the Closing ......................... 20

BH01\1049357.12
ID\GMC - 019956/0999

| 6.8 | Transition Services Agreement. | 20 |
|---|---|---|
| 6.9 | Public Announcements | 20 |
| 6.10 | Use of Names | 21 |
| 6.11 | Employees. | 21 |
| 6.12 | Assumed Contracts and Cure Costs. | 23 |
| 6.13 | Insurance. | 23 |
| 6.14 | Covenant Not To Compete. | 24 |
| 6.15 | Non-Solicitation | 25 |
| 6.16 | Payments on Certain Business. | 25 |
| 6.17 | Bankruptcy Notice Procedures | 27 |
| 6.18 | Reimbursements. | 27 |
| 6.19 | Seller' Internet Website. | 27 |

**ARTICLE VII CLOSING CONDITIONS** ... 27

| 7.1 | Conditions to Obligations of Purchasers and Seller | 27 |
|---|---|---|
| 7.2 | Condition to Obligations of Purchasers | 28 |
| 7.3 | Conditions to Obligations of Seller | 29 |
| 7.4 | Waiver of Condition. | 29 |

**ARTICLE VIII SURVIVAL** ... 30

| 8.1 | Survival of Representations | 30 |
|---|---|---|

**ARTICLE IX MISCELLANEOUS** ... 30

| 9.1 | Notices | 30 |
|---|---|---|
| 9.2 | Amendment; Waiver | 31 |
| 9.3 | Assignment. | 31 |
| 9.4 | Entire Agreement | 31 |
| 9.5 | Fulfillment of Obligations. | 31 |
| 9.6 | Parties in Interest | 31 |
| 9.7 | Expenses | 31 |
| 9.8 | Brokers | 31 |
| 9.9 | Governing Law; Jurisdiction | 32 |
| 9.10 | Counterparts | 32 |
| 9.11 | Headings. | 32 |
| 9.12 | Further Assurances. | 32 |
| 9.13 | Specific Performance | 32 |
| 9.14 | Knowledge | 32 |
| 9.15 | Severability | 32 |
| 9.16 | No Strict Construction | 33 |

BH01\1049357.12
ID\GMC - 019956/0999

# LIST OF EXHIBITS AND SCHEDULES

EXHIBITS

| | |
|---|---|
| Exhibit A | Form of Bill of Sale |
| Exhibit B | Form of Transition Services Agreement |
| Exhibit C | Form of Patent Assignment |
| Exhibit D | Form of Assignment and Assumption Agreement |
| Exhibit E | Form of Escrow Agreement |
| Exhibit F | Form of Release of Industrias |
| Exhibit G | Form of Release of Seller |
| Exhibit H | Form of Sale Order |

SCHEDULES

| | |
|---|---|
| 2.1(a) | Assets of Affiliates |
| 2.1(c)(1) | Personal Property |
| 2.1(c)(4)(C) | Leases and Subleases |
| 2.1(c)(4)(D) | Assumed Contracts |
| 2.5 | Personal Property Tax Proration |
| 2.7A | Accounts Payable At Closing |
| 2.7B | Retained Receivables |
| 2.9 | Telephone and Fax Numbers |
| 3.2(h) | Officers and Directors of Industrias |
| 3.5 | Allocation of Purchase Price |
| 4.3(a) | Title to Acquired Assets |
| 4.3(c) | Industrias Capital Stock |
| 4.4(a) | Consents and Approvals |
| 4.4(b) | No Violation |
| 4.5 | Absence of Litigation: Seller |
| 4.6 | U.S. Benefit Plans |
| 6.4 | Conduct of Business |
| 6.11(a) | U.S. Continuing Employees |
| 6.11(g) | U.S. Continuing Employees on Short-term Disability |

BH01\1049357.12
ID\GMC - 019956/0999

This ASSET PURCHASE AGREEMENT (this "Agreement"), dated as of October [___], 2009, is entered into by and among Harvey Holdings LLC, a Michigan limited liability company ("Holdings"), Harvey Industries, LLC, a Michigan limited liability company ("Industries", and collectively with Holdings, the "Purchasers"), Hayes Lemmerz International – Laredo, Inc., a Texas corporation ("HLI Laredo or Seller") and HLI Operating Company, Inc., a Delaware Corporation ("HLI Opco"). Each of HLI Laredo, Holdings and Industries are referred to herein as the "Parties." HLI Opco is a party to this Agreement with respect to Section 6.16 of this Agreement only.

## W I T N E S S E T H :

WHEREAS, Industrias Fronterizas HLI, S.A. de C.V. ("Industrias") is engaged in the business of manufacturing and selling cast aluminum intake manifolds, cast aluminum engine covers and housings, cast aluminum water crossovers and cast aluminum tubes used in large truck engines; polymer intake manifolds; and machined iron exhaust manifolds for the automotive industry in the North American market (the "Business") and, in connection therewith, operates that certain manufacturing facility located in Nuevo Laredo, Mexico (the "Plant");

WHEREAS, HLI Laredo is the direct record and beneficial owner of 49,999 of the issued and outstanding Series A shares and 6,441,057 of the issued and outstanding Series B shares of Industrias, and HLI Powertrain Holding Company, Inc. ("HLI Powertrain") is the direct record and beneficial owner of one issued and outstanding Series A share of Industrias, which together constitute all of the issued and outstanding shares of capital stock of Industrias (the "Industrias Shares");

WHEREAS, HLI Laredo and certain of its Affilates each own of certain assets used in the Business described below;

WHEREAS, Holdings desires to acquire from Seller (or its Affiliates), and Seller (or its Affiliates) desires to sell to Holdings, the Industrias Shares (except that Industries desires to acquire from HLI Powertrain, and HLI Powertrain desires to sell to Industries, the one share of Industrias stock held by HLI Powertrain) and certain assets used in the Business (collectively, the "Asset Purchase"), all upon the terms and subject to the conditions contained herein and subject to the approval of the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"), in which Seller and certain other subsidiaries of Hayes Lemmerz International, Inc., have filed for protection under the laws of chapter 11 of the U.S. Bankruptcy Code (the "Chapter 11 Filing"); and

WHEREAS, the respective Boards of Directors of Purchasers and Seller have approved this Agreement and the transactions contemplated hereby.

NOW, THEREFORE, in consideration of the mutual covenants and undertakings contained herein, and subject to and on the terms and conditions herein set forth, the parties hereto agree as follows:

# ARTICLE I
## DEFINITIONS AND TERMS

1.1    Certain Definitions.  As used in this Agreement, the following terms shall have the meanings set forth or as referenced below:

"Accounts Payable At Closing" shall have the meaning set forth in Section 2.7A hereof.

"Acquired Assets" shall have the meaning set forth in Section 2.1 hereof.

"Affiliate" shall mean, as to any Person (as hereinafter defined), any other Person which, directly or indirectly, is in control of, is controlled by, or is under common control with, such Person. The term "control" (including, with correlative meanings, the terms "controlled by" and "under common control with"), as applied to any Person, means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities or other ownership interest, by contract or otherwise.

"Agreement" shall mean this Agreement, as the same may be amended or supplemented from time to time in accordance with the terms hereof.

"Ancillary Agreements" shall mean the Bill of Sale, Transition Services Agreement, Assignment and Assumption Agreement and Escrow Agreement.

"Assignment and Assumption Agreement" shall have the meaning set forth in Section 3.2 hereof.

"Asset Purchase" shall have the meaning set forth in the recitals hereto.

"Assumed Contracts" shall have the meaning set forth in Section 2.1(c)(4) hereof.

"Assumed Liabilities" shall have the meaning set forth in Section 2.3 hereof.

"Audit Report" shall have the meaning set forth in Section 6.16(b) hereof.

"Audit Response" shall have the meaning set forth in Section 6.16(b) hereof.

"Bankruptcy Court" shall have the meaning set forth in the recitals hereto.

"Bidding Procedures Order" means that certain Order (A) Establishing Bidding and Auction Procedures Related To the Sale of Substantially all of the Assets of Hayes Lemmerz International – Laredo, Inc.; (B) Approving Expense Reimbursement Claim; (C) Scheduling an Auction and Sale Hearing; (D) Permitting Credit Bidding Pursuant to Bankruptcy Code Section 363(k); (E) Establishing Certain Notice Procedures for Assumption and Assignment of Executory Contracts and Unexpired Leases; (F) Approving Form and Manner of Notice of All Procedures, Protections, Schedules and Agreements; and (G) Granting Certain Related Relief, entered by the Bankruptcy Court on September 22, 2009.

BH01\1049357.12
ID\GMC - 019956/0999

"Bill of Sale" shall have the meaning set forth in Section 2.4 hereof.

"Books and Records" shall have the meaning set forth in Section 2.1(c)(5) hereof.

"Business" shall have the meaning set forth in the recitals hereto.

"Business Day" shall mean any day other than a Saturday, a Sunday or a day on which banks in the City of Detroit are authorized or obligated by law or executive order to close.

"Chapter 11 Filing" shall have the meaning set forth in the recitals hereto.

"Claim" means a right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured or a right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured, in each case, whether known or unknown, accrued, absolute or contingent, liquidated or unliquidated, choate or inchoate, matured or unmatured, or otherwise.

"Closing" shall mean the closing of the transactions contemplated by this Agreement, as provided for in Section 3.1 hereof.

"Closing Date" shall have the meaning set forth in Section 3.1 hereof.

"Code" shall mean the Internal Revenue Code of 1986, as amended.

"Confidentiality Agreement" shall mean the Confidentiality Agreement, dated October 17, 2007, between Harvey Industries, LLC and HLI Operating Company, Inc.

"Consents" shall have the meaning set forth in Section 4.4(a) hereof.

"Continuing Employees" shall have the meaning set forth in Section 6.11(a) hereof.

"Credit Agreement" shall mean the Second Amended and Restated Credit Agreement, dated as of May 30, 2007, originally entered into by and among HLI Operating Company, Inc., Hayes Lemmerz Finance LLC – Luxembourg S.C.A., Hayes Lemmerz International, Inc., the Lenders and Issuers party thereto, Citicorp North America, Inc., as administrative agent, Deutsche Bank Securities Inc., as syndication agent, and Citicorp North America, Inc., as documentation agent, as amended by Amendment No.1 to Credit Agreement dated January 29, 2009, Amendment No.2 to Second Amended and Restated Credit Agreement dated May 12, 2009, Amendment No. 3 to Credit Agreement dated May 19, 2009, Amendment No. 4 to Credit Agreement dated August 7, 2009, Amendment No. 5 to Credit Agreement dated August 31, 2009, and Amendment No. 6 to Credit Agreement dated September 17, 2009, including any related Mortgages, Deeds of Trust, Guaranties, Pledge and Security Agreements, or other documents executed in connection therewith, all as amended through the date hereof.

BH01\1049357.12
ID\GMC - 019956/0999

"Cure Costs" means any and all pre- or post-petition date costs and expenses required by the Sale Order or any other order of the Bankruptcy Court to be paid to cure monetary defaults under all Assumed Contracts.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended, and the rules and regulations promulgated thereunder.

"ERISA Affiliate" shall mean each trade or business (whether or not incorporated) that together with one or more of the Companies would be deemed to be a "single employer" within the meaning of Section 4001(b) of ERISA.

"Escrow Agreement" shall have the meaning set forth in Section 3.2(f) hereof.

"Escrow Receivables" shall have the meaning set forth in Section 2.7 hereof.

"Excluded Assets" shall have the meaning set forth in Section 2.2 hereof.

"Final Revenue Report" shall have the meaning set forth in Section 6.16(c) hereof.

"Governmental Authority" shall have the meaning set forth in Section 4.4(a) hereof.

"Indebtedness" of any Person at any date shall include (a) all indebtedness of such Person for borrowed money or for the deferred purchase price of property or services (other than current trade liabilities incurred in the ordinary course of business and payable in accordance with customary practices), (b) any other indebtedness of such Person that is evidenced by a note, bond, debenture or similar instrument, (c) all obligations of such Person in respect of acceptances issued or created for the account of such Person, (d) all liabilities secured by any Lien (as hereinafter defined) on any property owned by such Person even though such Person has not assumed or otherwise become liable for the payment thereof and (e) all direct or indirect guarantees of any of the foregoing for the benefit of another Person.

"Indenture" shall mean the Indenture dated as of May 30, 2007 with respect to the 8.25% Senior Notes Due 2015 issued by Hayes Lemmerz Finance LLC – Luxembourg S.C.A., as amended or supplemented from time to time.

"Industrias Shares" shall have the meaning set forth in the recitals hereto.

"Intellectual Property Rights" means all (a) inventions, whether or not patentable, (b) those patents and patent applications set forth in the Patent Assignment, (c) copyrights and related rights, whether or not registered, (d) trade secrets, know-how and technical information, including product design and proprietary technology, processes and formulae, and (e) all rights to sue or recover and retain damages for past, present and future infringement or misappropriation of any of the foregoing, including all associated goodwill.

"Inventory" shall have the meaning set forth in Section 2.1(c)(2) hereof.

"Knowledge of Purchasers" shall have the meaning set forth in Section 9.14 hereof.

BH01\1049357.12
ID\GMC - 019956/0999

"Knowledge of Seller" shall have the meaning set forth in Section 9.14 hereof.

"Laws" shall mean any United States federal, state or local law, statute, ordinance, rule, regulation, order, judgment or decree, administrative order or decree, administrative or judicial decision, and any other executive or legislative proclamation.

"Liens" shall mean any Claim or any charge against or interest in property to secure payment of a debt or performance of an obligation including but not limited to any lien (statutory or otherwise), hypothecation, security interests, mortgages, pledges or liens for Taxes, in each case, whether secured or unsecured, choate or inchoate, filed or unfiled, scheduled or unscheduled, noticed or unnoticed, recorded or unrecorded, contingent or non-contingent, material or non-material, known or un-known.

"Litigation" shall have the meaning set forth in Section 4.5 hereof.

"Material Adverse Effect" shall mean a material adverse effect on the business, results of operations or financial condition of Seller or the Business or the Acquired Assets, except any such effect resulting primarily from (a) this Agreement, the transactions contemplated by this Agreement or the announcement thereof, (b) Purchaser's announcement or other disclosure of its plans or intentions with respect to the conduct of the Business (or any portion thereof), or (c) changes or conditions (including changes in economic, financial market, regulatory or political conditions, whether resulting from acts of terrorism or war or otherwise) affecting the United States economy or the industry in which Seller operates generally, to the extent such changes or conditions do not disproportionately affect Seller.

"Mexican Continuing Employees" shall have the meaning set forth in Section 6.11(a) hereof.

"Patent Assignment" means an assignment of Patents and Patent applications in the form of Exhibit C hereto.

"Permits" shall have the meaning set forth in Section 2.1(c)(7) hereof.

"Person" shall mean an individual, a corporation, a partnership, a limited liability company, an association, a trust or other entity or organization.

"Personal Property" shall have the meaning set forth in Section 2.1 hereof.

"Plant" shall have the meaning set forth in the recitals.

"Prepaid Expenses" shall have the meaning set forth in Section 2.1(c)(6) hereof.

"Purchasers" shall have the meaning set forth in the preamble.

"Purchaser Plans" shall have the meaning set forth in Section 6.11(b) hereof.

"Retained Liabilities" shall have the meaning set forth in Section 2.6 hereof.

BH01\1049357.12
ID\GMC - 019956/0999

"Retained Receivables" shall have the meaning set forth in Section 2.7B hereof.

"Revenue Report" shall have the meaning set forth in Section 6.16(a) hereof.

"Reviewing Accountant" shall have the meaning set forth in Section 6.16(c) hereof.

"Sale Order" means a final, non-appealable order entered by the Bankruptcy Court approving the transactions contemplated by this Agreement and authorizing Seller to perform all acts necessary or appropriate to consummate the transactions contemplated by this Agreement.

"Schedule" shall mean any of the disclosure schedules being delivered by Seller concurrently with the execution of this Agreement, as the same may be amended from time to time by the delivery of amended or supplemental disclosure schedules.

"Seller" shall have the meaning set forth in the recitals hereto.

"Seller's Savings Plan" shall have the meaning set forth in Section 6.11(d) hereof.

"Taxes" shall mean all taxes, charges, fees, duties, levies, penalties or other assessments imposed by any United States federal, state, local or non-United States Governmental Authority, including, but not limited to, income, gross receipts, excise, property, sales, gain, use, license, capital stock, transfer, franchise, payroll, withholding, social security, value-added or other taxes, including any interest, penalties or additions attributable thereto.

"Transition Services Agreement" shall have the meaning set forth in Section 6.8 hereof.

"UCC" shall have the meaning set forth in Section 2.1(c)(1) hereof.

"U.S. Benefit Plan" shall mean any bonus, deferred compensation, incentive compensation, stock purchase, stock option, executive compensation, severance or termination pay, hospitalization, health, welfare, dental, prescription drug or other medical, life or other insurance, supplemental unemployment benefits, profit-sharing, pension or retirement plan, fringe benefit, cafeteria, flexible spending, dependent care program or agreement, and each other employee benefit plan, program or agreement, sponsored, maintained or contributed to or required to be contributed to by (i) HLI Laredo, (ii) by any ERISA Affiliate or (iii) by an Affiliate of HLI Laredo if such plan or arrangement is or was maintained for employees or former employees, directors or officers of HLI Laredo, or any U.S. Continuing Employees thereunder.

"U.S. Continuing Employees" shall have the meaning set forth in Section 6.11(a) hereof.

1.2     Other Terms. Other terms may be defined elsewhere in the text of this Agreement and, unless otherwise indicated, shall have such meaning throughout this Agreement.

1.3     Other Definitional Provisions.

6

(a)     The words "hereof", "herein", "hereto", "hereunder" and "hereinafter" and words of similar import, when used in this Agreement, shall refer to this Agreement as a whole and not to any particular provision of this Agreement.

(b)     The terms defined in the singular shall have a comparable meaning when used in the plural, and vice versa.

(c)     The term "dollars" and character "$" shall mean United States dollars.

(d)     The word "including" shall mean including, without limitation, and the words "include" and "includes" shall have corresponding meanings.

### ARTICLE II
### PURCHASE AND SALE OF THE ACQUIRED ASSETS

2.1     Purchase and Sale of the Acquired Assets. Upon the terms and subject to the conditions of this Agreement and the approval of the Bankruptcy Court, as of the Closing Date (defined below), Seller shall sell, convey, assign, transfer and deliver to the applicable Purchaser, and the applicable Purchaser shall purchase, acquire and accept from Seller, free and clear of any and all Liens, all right, title and interest in and to the Industrias Shares, all assets of Seller used in the Business, and certain assets of Affiliates of Seller used in the Business, whether tangible or intangible, wherever located, other than the Excluded Assets (the "Acquired Assets"). The Acquired Assets include, without limitation, the following assets of the Seller used in the Business:

(a)     certain assets of Affiliates of Seller used in the Business and located in Northville, Michigan, listed on Schedule 2.1(a);

(b)     the Industrias Shares; and

(c)     all of the assets of HLI Laredo used in the Business, except for the Excluded Assets, including but not limited to the following:

(1)     Personal Property. All equipment (as defined in the Uniform Commercial Code of the State of Michigan (the "UCC")), and all other items of tangible personal property, in each case whether or not capitalized on the books of HLI Laredo (collectively, the "Personal Property"). Schedule 2.1(c)(1) is a list of Personal Property dated as of October 20, 2009.

(2)     Inventory. All inventory (as defined in the UCC), except that Holdings shall only acquire the right to possess any inventory consigned by any third party to HLI Laredo (the "Inventory").

(3)     Accounts Receivable. All accounts receivable, or portions thereof, other than the Retained Receivables, but including all non-trade receivables.

(4)     Assumed Contracts. Subject to Section 6.12, (A) any and all purchase orders placed with and accepted by HLI Laredo in the ordinary course of business on or before the Closing Date that have not been completely performed or filled before the Closing Date,

7

covering the purchase from HLI Laredo of products to be supplied by Seller, or covering the rendition by Seller of services, and including all deposits, progress payments, and credits; (B) any and all purchase orders placed by Seller prior to the Closing Date that have not been completely performed before the Closing Date, covering Seller' purchase of inventory, supplies, or materials in the ordinary course of business; (C) the leases or subleases of Seller and the rights thereunder listed on Schedule 2.1(c)(4)(C), which list shall be updated prior to the Closing Date as set forth in Section 6.12; and (D) the agreements and contracts listed on Schedule 2.1(c)(4)(D), which list shall be updated prior to the Closing Date as set forth in Section 6.12 (the "Assumed Contracts").

(5)     Books and Records.    All books, records, lists, files, documents, architectural plans, drawings and specifications, creative materials, advertising and promotional materials, customer lists, including those relating to sales, services, delivery, internal organization, employees, and/or operations, but not including the tax returns, general ledger, or corporate minute books and capital stock books of HLI Laredo (together, the "Books and Records").

(6)     Security Deposits and Prepaid Expenses.  All security deposits, prepaid expenses, and similar items  (together, the "Prepaid Expenses").

(7)     Permits.  All local, state, and federal franchises, licenses, bonds, permits, and similar items pertaining to the Business and/or the Acquired Assets to the extent assignable by HLI Laredo (the "Permits").

(8)     Tooling Rights. All rights that HLI Laredo has to tooling located at its or Industrias's facilities which is owned by General Motors Corporation or any other customer or supplier to manufacture certain parts or components.

(9)     Intellectual Property and Intangibles. All (A) Intellectual Property Rights including Seller's right to use the names "Industrias Fronterizas", and all related names and derivations thereof, but in any event not including the names "Hayes" or "Lemmerz" or "hayes" or "lemmerz" or HL or HLI or the domain name "hayes-lemmerz", and (B) any and all telephone and FAX numbers, as listed on Schedule 2.1(c)(9) and yellow-page advertisements.

2.2     Excluded Assets.  Seller shall not sell, convey, transfer, assign or deliver, or cause to be sold, conveyed, transferred, assigned or delivered to Purchasers, and Purchasers shall not purchase or acquire from Seller the following assets (collectively, the "Excluded Assets"):

(a)     the Retained Receivables;

(b)     all assets owned or held by, and any Seller or its Affiliates' rights in connection with, any U.S. Benefit Plans; and

(c)     the names "Hayes" or "Lemmerz" or "hayes" or "lemmerz" or HL or HLI or the domain name "hayes-lemmerz."

8

2.3     Assumed Liabilities. Upon the terms and subject to the conditions of this Agreement, Holdings shall assume only the liabilities of Seller as specifically set forth on Schedule 2.3 (the "Assumed Liabilities"). Other than the Assumed Liabilities, Holdings is not assuming any liabilities of any kind of Seller. Industries is not assuming any liabilities of any kind of Seller.

2.4     Conveyance. The sale, conveyance, assignment, transfer and delivery of the Acquired Assets shall be effected by: (a) delivery by Seller to Purchasers of: (1) a bill of sale, substantially in the form attached hereto as Exhibit A, executed by Seller and certain of its Affiliates (the "Bill of Sale"); (2) stock certificates representing the Industrias Shares, duly endorsed by Seller and HLI Powertrain with appropriate transfer stamps, if any, affixed, and/or any other documents that are necessary to transfer title to the Industrias Shares to the applicable Purchaser (or to any designee of Purchasers) and a copy certified by the secretary of the board of Industrias of the notation in the share registry of Industrias of the transfer of the Industrias Shares; and (3) such other documents as are necessary to transfer title to the Acquired Assets to the applicable Purchaser, including approval of the Sale Order by the Bankruptcy Court.

2.5     Consideration. Upon the terms and subject to the conditions of this Agreement, in consideration of such sale, conveyance, assignment, transfer and delivery of the Acquired Assets by Seller, Holdings shall: (a) pay or cause to be paid to Seller (x) One Dollar ($1.00), and (y) a sum equal to the amount of cash, calculated in dollars using the exchange rate as published in The Wall Street Journal on the last Business Day prior to the Closing Date, in the accounts held by Industrias at Banco Santander Serfin, S.A. on the Closing Date, which amount shall be adjusted 10 days after the Closing Date to account for debits or reductions as a result of checks written by or on behalf of Seller but not cashed prior to the Closing Date, with the amount of such debits or reductions promptly paid to Holdings (collectively, the "Purchase Price"); and (b) assume the Assumed Liabilities. U.S. Personal Property Taxes shall be prorated as of the Closing Date in the manner set forth in Schedule 2.5; provided, however, that upon receipt of the final Personal Property Tax invoices, the Parties shall agree upon a correct allocation of the Personal Property Tax proration and to the extent that the proration as of the Closing Date was incorrect, either Holdings shall reimburse Seller or Seller shall reimburse Holdings for any under or overpayment of Holdings credits with respect to U.S. Personal Property Taxes, as the case may be.

2.6     Retained Liabilities. Except for the Assumed Liabilities, all liabilities of Seller or any Affiliate of Seller (other than Industrias), in each case whether arising or accruing prior to or after the Closing Date, unless otherwise specifically set forth in this Section 2.6, shall remain the sole responsibility of, and shall be retained, paid, performed and discharged solely by Seller or the applicable Affiliate of Seller as and when due (collectively, the "Retained Liabilities"), which shall include, but are not limited to, the following: (a) any liability of Seller for any Taxes arising as a result of ownership prior to the Closing Date of the Acquired Assets, which Taxes shall be pro-rated as of the Closing Date, (b) any liability of Seller for income, transfer, sales, use, and other Taxes arising in connection with the consummation of the transactions contemplated hereby (including any income Taxes arising because Seller is transferring the Acquired Assets), (c) any liability of Seller for the unpaid Taxes of any Person under Reg. §1.1502-6 (or any similar provision of state, local, or foreign law), as a transferee or successor, by contract, or otherwise, (d) any obligation of Seller to indemnify any Person by reason of the

9

fact that such Person was a director, officer, employee, or agent of Seller or was serving at the request of any such entity as a partner, trustee, director, officer, employee, or agent of another entity (whether such indemnification is for judgments, damages, penalties, fines, costs, amounts paid in settlement, losses, expenses, or otherwise and whether such indemnification is pursuant to any statute, charter document, bylaw, agreement, or otherwise), (e) any liability of Seller for costs and expenses incurred by Seller in connection with the negotiation and execution of this Agreement and the transactions contemplated hereby, except those costs and expenses for which a Purchaser is responsible pursuant to the terms of this Agreement, (f) any brokerage or finder's fees or commissions or similar payments based upon any agreement or understanding made, or alleged to have been made, by any Person with Seller in connection with any of transactions contemplated by this Agreement; (g) accounts payable owed by Seller as of the Closing Date as set forth in Section 2.7; (h) any liabilities arising out of a breach by Seller prior to the Closing of any Assumed Contract; (i) any liabilities with respect to retention agreements between Seller, Industrias or any their respective Affiliates and any employee of Seller or Industrias entered into prior to the Closing Date; (j) any liability or obligation of Seller or any Affiliate of Seller arising under or relating to any U.S. Benefit Plan; and (k) all liabilities of Seller to any present or past employees, agents or independent contractors of Seller that are not U.S. Continuing Employees including any workers' compensation claims and employee severance claims; (l) all liabilities of Seller to U.S. Continuing Employees accrued prior to the Closing Date, including for unpaid wages, bonuses, commissions, tuition or other benefits reimbursements, expense reimbursements, or other employment related liabilities; (m) all liabilities of Seller for product liability or similar claims for injury to person or property which arises out of or is based upon any express or implied representation or warranty, agreement or guaranty of Seller or an Affiliate of Seller (other than Industrias) or by reason of Seller's or an Affiliate of Seller's (other than Industrias) improper performance or manufacturing of a product, Seller's or an Affiliate of Seller's (other than Industrias) improper design or manufacture of a product, Seller's or an Affiliate of Seller's (other than Industrias) failure to adequately package, label or warn or hazards or other related product defects related to or arising out of products manufactured by Seller or an Affiliate of Seller (other than Industrias) prior the Closing Date; (n) all liabilities arising out of, resulting from or related to any obligation of Seller or an Affiliate of Seller (other than Industrias) to implement any replacement, field fix, retrofit, modification or recall campaign relating to products manufactured by Seller or an Affiliate of Seller (other than Industrias) prior to the Closing Date; and (o) all liabilities of Seller or an Affiliate of Seller (other than Industrias) arising out of, resulting from or relating to product warranty or product return relating to products manufactured by Seller or an Affiliate of Seller (other than Industrias) prior to the Closing Date. Except as expressly provided in 2.6(i) above, neither Seller nor any of its Affiliates is assuming any liabilities of any kind of Industrias.

2.7     <u>Payment of Accounts Payable; Collection of Accounts Receivable</u>. The total amount of the known accounts payable owed by HLI Laredo as of the Closing Date (the "<u>Accounts Payable At Closing</u>") shall be calculated and set forth on <u>Schedule 2.7A</u> to be delivered by HLI Laredo at the Closing; for the avoidance of doubt, the Accounts Payable At Closing shall not include Cure Costs. The Excluded Assets shall include certain accounts receivable to be identified by HLI Laredo in an aggregate amount not to exceed an amount sufficient to pay the Accounts Payable At Closing and set forth on <u>Schedule 2.7B</u> to be delivered by HLI Laredo to Holdings at Closing (the "<u>Retained Receivables</u>"). Holdings hereby authorizes

BH01\1049357.12
ID\GMC - 019956/0999

Seller to collect payment on all accounts receivable of Seller at the Closing, regardless of whether or not they are Retained Receivables, until Seller pays, settles or otherwise discharges all Accounts Payable At Closing. Seller may not agree with a customer to discount or reduce any accounts receivable that are not Retained Receivables without Holdings' prior written consent; provided that Seller's acceptance of a payment from a customer with respect to any accounts receivable which is less than full face amount of a receivable shall not be deemed an agreement to discount or reduce such receivable so long as Seller does not agree with such customer that such payment constitutes payment in full with respect to the applicable account receivable. In addition, the amount collected from accounts receivable to be identified by Seller in an aggregate amount not to exceed 10% of the Retained Receivables (the "Escrow Receivables"), shall be placed into escrow pursuant to the Escrow Agreement until such time as Seller has paid, settled or discharged all the Accounts Payable At Closing. As set forth in the Escrow Agreement, amounts in escrow may be withdrawn by Seller to the extent of any documented payment default, reduction or set-off with respect to any of the Retained Receivables or to cover the payment of any documented accounts payable owed by Seller at Closing but not identified on Schedule 2.7A, including any Cure Costs actually paid with respect to any Assumed Contracts. Seller shall forward at least weekly to Holdings all collections from accounts receivable other than Escrow Receivables that are included in the Acquired Assets and shall forward to the escrow agent pursuant to the Escrow Agreement all collections from Escrow Receivables (and shall hold such proceeds in trust for the benefit of Holdings or the escrow agent until forwarded). At the same time, Seller shall deliver a report broken down by Retained Receivables, Escrow Receivables and other receivables setting forth the following information: (i) invoice number, (ii) invoice amount, (iii) payment due date (iv) actual payment date, and (v) amount of the payment actually received. In no event shall amounts retained by Seller with respect to the Retained Receivables together with any withdrawals from the escrow exceed the aggregate amount of the Accounts Payable At Closing. When the Accounts Payable At Closing are paid in full from collections of Retained Receivables and/or Escrow Receivables and the Escrow Agreement has been terminated in accordance with its terms, then Seller shall forward at least weekly to Holdings all collections from all accounts receivable of Seller, whether relating to Retained Receivables, Escrow Receivables or accounts receivable that are Acquired Assets.

## ARTICLE III
## CLOSING

3.1     Closing. The closing of the Asset Purchase (the "Closing") shall take place at the offices of HLI Laredo, 15300 Centennial Drive, Northville, Michigan, at 10:00 a.m. (local time), on the last Business Day of the month following the the satisfaction or waiver of the conditions to Closing set forth in Article VII, or such other date as the Parties may mutually agree. The date on which the Closing occurs is referred to herein as the "Closing Date."

3.2     Deliveries by Seller. At the Closing, Seller shall deliver or cause to be delivered to Purchasers (unless delivered previously) the following:

(a)     the Bill of Sale, duly executed by Seller and any of its Affiliates with title to any Acquired Assets;

11

(b)     certificates representing the Industrias Shares, duly endorsed with appropriate transfer stamps, if any, affixed together with a copy of the notation in the share registry of Industrias of the transfer of the Industrias Shares to the applicable Purchaser (or the Purchasers' designee) certified by the secretary of the board of Industrias and any other documents that are reasonably necessary to transfer title to the Industrias Shares;

(c)     the Transition Services Agreement, substantially in the form attached as <u>Exhibit B</u>, duly executed by Seller and/or one or more of its Affiliates;

(d)     the Patent Assignment, substantially in the form attached as <u>Exhibit C</u>, duly executed by Seller and/or one or more of its Affiliates;

(e)     the Assignment and Assumption Agreement, substantially in the form attached as <u>Exhibit D</u> (the "<u>Assignment and Assumption Agreement</u>"), with respect to the Assumed Contracts, duly executed by Seller and/or one or more of its Affiliates;

(f)     the Escrow Agreement, substantially in the form attached as <u>Exhibit E</u>, duly executed by HLI Laredo (the "<u>Escrow Agreement</u>");

(g)     a release, duly executed by Seller of any and all claims that Seller or their Affiliates may have against Industrias, except as otherwise provided in Section 6.16 of this Agreement, in substantially in the form attached as <u>Exhibit F</u>;

(h)     a resolution, in form and substance reasonably acceptable to Seller and Holdings, duly adopted by the stockholders of Industrias pursuant to which Industrias accepts the resignations of its officers and directors listed on <u>Schedule 3.2(h)</u> and each of the officers and directors of Industrias appointed by Seller are released from any and all liabilities which they may have incurred as a result of their service to Industrias, other than those resulting from gross negligence or willful misconduct;

(i)     copies of the written resignations (effective as of the Closing) of the officers and members of the Board of Directors of Industrias set forth on <u>Schedule 3.2(h)</u>;

(j)     the Books and Records; and

(k)     all other documents, certificates, instruments or writings reasonably required to be delivered by Seller at or prior to the Closing pursuant to this Agreement or otherwise reasonably required in connection herewith.

3.3     <u>Deliveries by Holdings</u>. At the Closing, Holdings shall deliver or cause to be delivered to Seller (unless delivered previously) the following:

(a)     the Purchase Price;

(b)     the Transition Services Agreement, duly executed by one or more Purchaser;

(c)     the Assignment and Assumption Agreement with respect to the Assumed Contracts, duly executed by Holdings;

12

(d)     the Escrow Agreement, duly executed by Holdings;

(e)     a release, duly executed by Industrias and Holdings, of any and all claims that Industrias may have against Seller and its Affiliates, except as otherwise provided in Section 6.16 of this Agreement, in substantially in the form attached as Exhibit G; and

(f)     all other documents, certificates, instruments or writings reasonably required to be delivered by Holdings at or prior to the Closing pursuant to this Agreement or otherwise reasonably required in connection herewith.

3.4     Simultaneous Transactions.     All of the transactions contemplated by this Agreement shall be deemed to occur simultaneously, and no such transaction shall be deemed to have been consummated until all such transactions have been consummated.

3.5     Allocation of Purchase Price.     The parties hereto agree to allocate the Purchase Price among the Acquired Assets in the manner set forth on Schedule 3.5, which allocation shall comply with applicable Laws, including the Code. Seller and Purchasers each hereby agree that such allocation shall be conclusive and binding and each of them for purposes of all United States and Mexican federal, state and local tax returns and that they will not voluntarily take any position inconsistent therewith. Seller and Purchasers each hereby agree to prepare and timely file (taking into consideration any extensions of any filing deadline granted by the IRS) all tax returns required pursuant to applicable Laws, including the Code, and any other forms required by any Governmental Authority, to cooperate with each other in the preparation of such forms, and to furnish each other with a copy of such forms prepared in draft, within a reasonable period prior to the filing due date thereof.

## ARTICLE IV
## REPRESENTATIONS AND WARRANTIES OF SELLER

At the Closing, Seller shall sell and convey the Acquired Assets to Purchasers "AS IS, WHERE IS" without any representations and warranties, other than the following:

4.1     Organization and Qualification.     Seller is duly organized, validly existing, and in good standing under the laws of the state of its organization, and has all requisite power and authority, corporate or otherwise, to own, lease and operate all of its properties and assets and to conduct its business as it is now being conducted.

4.2     Authority; Binding Effect.     Seller and any applicable Affiliate of Seller each has all requisite power and authority to execute and deliver this Agreement and each of the Ancillary Agreements, to perform its obligations hereunder and to consummate the transactions contemplated hereby. The execution, delivery and performance of this Agreement, and the consummation of the transactions contemplated hereby, have been duly authorized by all necessary corporate action on the part of Seller and, to the extent required, any applicable Affiliate of Seller, and, except for the required approval of the Bankruptcy Court, no other action, corporate or otherwise, on the part of Seller, any Affiliates of Seller or their stockholders or otherwise is required to authorize the execution, delivery and performance hereof, and the consummation of the transactions contemplated hereby.

13

4.3    Title to Acquired Assets; Capitalization of Industrias.

(a)    Except as set forth in Schedule 4.3(a), Seller, or the applicable Affiliate of Seller for those Acquired Assets set forth on Schedule 2.1(a), is the sole owner and has good and valid title to the Acquired Assets that Seller or such Affiliate owns, free and clear of all Liens and on the Closing Date, Seller will deliver to Purchasers good and valid title to all of the Acquired Assets, free and clear of all Liens.

(b)    The authorized, issued and outstanding capital stock of Industrias consists of 50,000 Series A shares, no par value per share, all of which are issued and outstanding and 6,441,057 Series B shares, no par value per share, all of which are issued and outstanding. No shares of capital stock of Industrias are reserved for issuance upon exercise of outstanding stock options. No shares of capital stock of Industrias are held as treasury stock or the Mexican equivalent thereof. Each issued and outstanding share of capital stock of Industrias has been duly authorized and validly issued, and is fully paid and nonassessable. None of the issued and outstanding shares of capital stock of Industrias has been issued in violation of, or is subject to, any preemptive or subscription rights. 49,999 of the issued and outstanding Series A shares of Industrias and all of the issued and outstanding Series B shares of Industrias are owned, beneficially and of record, by HLI Laredo and the remaining issued and outstanding Series A share of Industrias is owned, beneficially and of record, by HLI Powertrain.

(c)    Except as set forth in Schedule 4.3(c), (1) there is no option, warrant or other right, agreement, arrangement, or commitment of any kind whatsoever to which Industrias is a party relating to its issued or unissued capital stock or obligating it to grant, issue or sell any share of its capital stock by sale, lease, license or otherwise; (2) there is no obligation, contingent or otherwise, of Industrias to (A) repurchase, redeem or otherwise acquire any share of its capital stock, or (B) provide funds to, or make any investment in (in the form of a loan, capital contribution or otherwise), or provide any guarantee with respect to the obligations of any other Person, nor is any such obligation or guarantee outstanding; (3) Industrias does not, directly or indirectly, own, nor has agreed it to purchase or otherwise acquire, the capital stock or other equity interests of, or any interest convertible into or exchangeable or exercisable for such capital stock or such equity interests, of any corporation, partnership, joint venture or other entity; (4) there is no voting trust, proxy or other agreement, arrangement, contract or other commitment of any kind whatsoever to which Seller or Industrias is a party, or by which Seller or Industrias is bound with respect to the voting of any share of capital stock of Industrias; and (5) there is no obligation, contingent or otherwise, of Industrias to pay dividends or make distributions or other similar payments to Seller or to any Affiliate of Seller.

4.4    Consents and Approvals; No Violation.

(a)    Other than the approval of the Bankruptcy Court, the execution and delivery of this Agreement and each Ancillary Agreement by Seller and its Affiliates do not, and the performance by the Seller of this Agreement and the consummation of the transactions contemplated hereby and by the Ancillary Agreements will not, require Seller or its Affiliates to obtain (i) any consent, approval, waiver, authorization or permit of, or to make any filing or registration with or notification to ("Consents"), any court, agency or commission, or other governmental entity, authority or instrumentality, whether domestic or foreign ("Governmental

14

Authority"), or (ii) to the Knowledge of Seller, any Consent of any third party, except for the Consents set forth in <u>Schedule 4.4(a)</u> and except where the failure to obtain such Consent would not, individually or in the aggregate, have had or would not reasonably be expected to have a Material Adverse Effect on the Business or on Seller's ability to perform its obligations under this Agreement or the Ancillary Agreements.

(b)     Provided Seller has obtained the approval of the Bankruptcy Court and has received the Consents set forth in <u>Schedule 4.4(a)</u>, the execution and delivery of this Agreement Seller does not, and the performance of this Agreement and each Ancillary Agreement by Seller and its Affiliates and the consummation of the transactions contemplated hereby will not, except as set forth in <u>Schedule 4.4(b)</u>, (i) conflict with or violate the articles of incorporation or by-laws, in each case as currently in effect, of Seller or any Affiliate, (ii) conflict with or violate any Laws applicable to Seller or any Affiliate or by which the Acquired Assets are bound or subject, or (iii) result in any breach of, or constitute a default (or an event that with notice or lapse of time or both would constitute a default) under, or give to others any right of termination, amendment, acceleration or cancellation of, or require payment under, or result in the creation of a Lien, on any of the Acquired Assets, any note, bond, indenture, material contract, permit, franchise or other instrument or obligation to which Seller or any Affiliate is a party or by which the Acquired Assets are bound or subject, except for such of the foregoing which, individually or in the aggregate, have not had or would not reasonably be expected to have a Material Adverse Effect on the Business.

4.5     <u>Absence of Litigation</u>. Except for the Chapter 11 Filing and except as set forth in <u>Schedule 4.5</u> there is no claim, action, suit, proceeding or investigation at law or in equity (including actions or proceedings seeking injunctive relief), by or before any Governmental Authority ("<u>Litigation</u>") pending or, to the Knowledge of Seller, threatened against Seller.

4.6     <u>U.S. Benefit Plans</u>.

(a)     <u>Schedule 4.6</u> lists all material U.S. Benefit Plans. Seller has delivered or made available to Holdings true and complete copies of all material U.S. Benefit Plans.

(b)     No U.S. Benefit Plan applicable to the U.S. Continuing Employees is a "defined benefit plan," as defined in Section 3(35) of ERISA, or a "multiemployer plan," as defined in Section 3(37) of ERISA nor has Seller maintained, established, sponsored, participated in or contributed to a "defined benefit plan" or "multiemployer plan at any time within the last five years preceding the Closing Date.

(c)     Seller has not maintained or entered into any U.S. Benefit Plan or other document, plan or agreement that contains any change in control provisions which would cause an increase or acceleration of benefits or vesting or contains any benefit entitlements (including severance pay, unemployment compensation, or any other type of payment), which would cause an increase in liability to Holdings with respect to the U.S. Continuing Employees as a result of the transactions contemplated by this Agreement.

4.7     <u>Disclaimer of Warranties</u>. EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES OF SELLER THAT ARE EXPRESSLY SET FORTH IN THIS ARTICLE IV,

15

THE UNDERLYING BUSINESS OPERATIONS AND ASSETS OF SELLER ARE BEING TRANSFERRED, ASSIGNED AND CONVEYED "AS IS, WHERE IS", AND SELLER HAS NOT MADE, AND DOES NOT HEREBY MAKE, ANY EXPRESS OR IMPLIED REPRESENTATIONS OR WARRANTIES, STATUTORY OR OTHERWISE, OF ANY NATURE, WITH RESPECT TO SELLER OR THE BUSINESS, INCLUDING ANY EXPRESS OR IMPLIED REPRESENTATION OR WARRANTY AS TO THE MERCHANTABILITY, QUALITY, QUANTITY, SUITABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE OF THE ASSETS AND PROPERTIES OF THE SELLER, AND ALL SUCH REPRESENTATIONS AND WARRANTIES ARE HEREBY DISCLAIMED BY SELLER.

## ARTICLE V
## REPRESENTATIONS AND WARRANTIES OF PURCHASERS

Purchasers hereby represent and warrant to Seller as follows:

5.1     Organization.  Each Purchaser is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Michigan and has all requisite power and authority, corporate or otherwise, to own, lease and operate all of its properties and assets and to conduct its business as it is now being conducted.

5.2     Authority; Binding Effect.  Each Purchaser has all requisite power and authority to execute and deliver this Agreement, to perform its obligations hereunder and to consummate the transactions contemplated hereby. The execution, delivery and performance of this Agreement, and the consummation of the transactions contemplated hereby, have been duly authorized by all necessary corporate action on the part of each Purchaser, and no other action, corporate or otherwise, on the part of any Purchaser or its stockholders is required to authorize the execution, delivery and performance hereof, and the consummation of the transactions contemplated hereby. This Agreement has been duly executed and delivered by each Purchaser and constitutes the valid and binding obligation of such Purchaser, enforceable against such Purchaser in accordance with its terms, except that such enforcement may be subject to any bankruptcy, insolvency, reorganization, moratorium or other laws now or hereafter in effect relating to or limiting creditors' rights generally and the remedy of specific performance and injunctive and other forms of equitable relief may be subject to equitable defenses and to the discretion of the court before which any proceedings therefore may be brought.

5.3     Consents and Approvals; No Violation.

(a)     The execution and delivery of this Agreement by either Purchaser does not, and the performance of this Agreement by Purchasers and the consummation of the transactions contemplated hereby will not, (i) conflict with or violate the articles of organization or operating agreement, in each case as currently in effect, of either Purchaser, (ii) conflict with or violate in any material respect any Laws applicable to either Purchaser or to which any of its properties or assets is bound or subject, or (iii) result in any material breach of, or constitute a material default (or an event that with notice or lapse of time or both would constitute a material default) under, or give to others any right of termination, amendment, acceleration or cancellation of, or require payment under, or result in the creation of a Lien on any of the properties or assets of either

16

Purchaser under, any material note, bond, indenture, material contract, permit, franchise or other instrument or obligation to which any Purchaser is a party or by or to which Purchaser or any of its properties or assets is bound or subject.

(b)  The execution and delivery of this Agreement and each Ancillary Agreement by Purchasers and their Affiliates do not, and the performance by the Purchasers of this Agreement and the consummation of the transactions contemplated hereby and by the Ancillary Agreements will not, require Purchasers or their Affiliates to obtain (i) any Consent of, or to make any filing or registration with or notification to, any Governmental Authority, or (ii) to the Knowledge of Purchasers, any Consent of any third party, except where the failure to obtain such Consent would not, individually or in the aggregate, have had or would not reasonably be expected to have a Material Adverse Effect on Purchasers' ability to perform their obligations under this Agreement or the Ancillary Agreements.

5.4  <u>Absence of Litigation</u>.  There is no Litigation pending or, to the Knowledge of Purchasers, threatened against either Purchaser, if adversely determined, nor any judgment, order or decree of any Governmental Authority to which either Purchaser is a party or subject, that would reasonably be expected to impair, in any material respect, either Purchaser's ability to perform its obligations hereunder or to consummate the transactions contemplated hereby.

5.5  <u>No Knowledge of Seller's Breach</u>.  To the knowledge of Purchasers, there is no breach of any representation or warranty of Seller set forth in Article IV hereof, and Purchasers are not aware of any fact, event, condition or circumstance that could result in liability to Seller or any of its directors, officers, employees, stockholders or Affiliates, agents, advisors or representatives under this Agreement or excuse Purchasers from the timely performance of its obligations under this Agreement.

5.6  <u>Investigation</u>.  Purchasers have conducted their own independent investigation, review and analysis of the business, operations, assets, liabilities, results of operations, financial condition, software and technology of Seller, which investigation, review and analysis was performed by Purchasers.  Purchasers acknowledge that it and its representatives and advisors have been provided adequate access to the personnel, properties, premises and records of Seller for such purpose. Except for the representations and warranties of Seller set forth in this Agreement, Purchasers acknowledge that the Acquired Assets are being transferred, assigned and conveyed "AS IS, WHERE IS," in accordance with Section 4.6.

5.7  <u>Financing</u>.  Holdings has cash available, commitments from financial institutions or availability on its committed credit facility to enable it to consummate the transactions contemplated hereby.

## ARTICLE VI
## COVENANTS

6.1  <u>Commercially Reasonable Efforts</u>.  Upon the terms and subject to the conditions of this Agreement, Purchasers and Seller agree to use commercially reasonable efforts to take, or cause to be taken, all actions, and to do, or cause to be done, all things necessary, proper or

17

advisable under applicable Laws to consummate and make effective the transactions contemplated by this Agreement as promptly as practicable.

6.2    Consents.  Without limiting the generality of Section 6.1 hereof, each of the parties hereto shall use commercially reasonable efforts to obtain all required Consents of all Governmental Authorities. Notwithstanding the foregoing, and excluding Cure Costs which shall be paid by Seller as set forth in Section 6.12, neither Purchasers nor Seller shall have any obligation to pay any fee to any third party (which does not include filing or other fees payable to Governmental Authorities) for the purpose of obtaining any Consent or any costs and expenses of any third party resulting from the process of obtaining such Consents. Each of the parties hereto shall make or cause to be made all filings and submissions under Laws applicable to it as may be required for the consummation of the transactions contemplated by this Agreement.

6.3    Further Assurances. From and after the Closing Date, Seller and Purchasers shall take all such action as may be necessary or appropriate in order to carry out the purposes of this Agreement and to vest Purchasers with full title to all of the Acquired Assets.

6.4    Conduct of Business.  Except as set forth on Schedule 6.4 or as expressly permitted by this Agreement or with the prior written consent of Holdings, during the period from the date of this Agreement to the Closing Date, Seller shall cause Industrias to conduct its business only in the ordinary course, and Seller shall cause Industrias to preserve intact its present business organization, and to use its commercially reasonable efforts to preserve its current relationships with customers, suppliers, creditors and business partners. Without limiting the generality of the foregoing, except in the ordinary course of business, or as otherwise expressly set forth in Schedule 6.4, during the period from the date of this Agreement through the Closing Date, Seller shall not, and shall cause Industrias not to, without the prior written consent of Holdings:

(a)    issue, reissue, sell, deliver, transfer, repurchase, redeem, acquire or pledge or authorize or propose the issuance, reissuance, sale, delivery, transfer, repurchase, redemption, acquisition or pledge of Industrias capital stock of any class or series, or any securities convertible into Industrias capital stock of any class or series, or grant or enter into any rights, warrants, options, agreements or commitments with respect to the issuance of such capital stock or convertible securities or amend any terms of any such right, warrant, option, agreement or commitment, other than the pledges of the Industrias Shares pursuant to the Credit Agreement, which pledges shall be terminated on or before the Closing Date;

(b)    adjust, split, combine, subdivide or reclassify any Industrias capital stock of any class or series, as the case may be, or any option, warrant or right relating thereto;

(c)    (i) sell, lease, transfer or otherwise dispose of any of its properties, assets or rights, other than sales of inventory in the ordinary course of business or (ii) permit, allow or suffer any of its properties or assets to be subjected to any Lien, restriction or charge, other than Liens which are to be released at or before the Closing;

(d)    create, incur, assume or guarantee any Indebtedness, other than (i) with respect to the guaranty by Industrias of borrowings under the Credit Agreement; (ii) with respect to the any

18

guaranty made under the Credit Agreement and Indenture; (iii) accounts payable incurred in the ordinary course of business between Industrias and any Affiliate of Industrias; and (iv) subject to the requirements of Section 6.6, intercompany loans between Industrias and any Affiliate of Industrias;

(e)     change any of the accounting or tax principles, practices or methods used by Industrias, or fail to maintain the accounts, books and records of Industrias in the usual, regular and ordinary manner on a basis consistently applied;

(f)     enter into, or materially amend or supplement any employment, severance, termination or other agreement or employee benefit plan or materially increase the compensation, severance or termination benefits payable, or to become payable, to any of its officers, directors, employees, agents or consultants (other than in the ordinary course of business);

(g)     enter into any transaction, agreement or arrangement with, any of their Affiliates, officers, directors, partners, employees, agents, consultants, stockholders or their Affiliates, associates or family members, in each case, except in the ordinary course of business or pursuant to Contracts existing on the date of this Agreement;

(h)     acquire by merging or consolidating with, or by purchasing a substantial portion of the assets or securities of, or by any other manner, any corporation, partnership, joint venture or other entity;

(i)     except to the extent contemplated by the capital expenditures budget of Industrias, based on the 7 + 5 projections, or a capital expenditure request that has been approved as of October 1, 2009, make or authorize any material capital expenditures or commitment for material capital expenditures other than in the ordinary course of business and, in any event, in an amount not to exceed $30,000;

(j)     suffer or permit any transfer, termination or expiration of any licenses;

(k)     accelerate the collection of receivables or extend the payment terms of accounts payable;

(l)     fail to continue its cash management practices in the ordinary course of business;

(m)     fail to replenish inventory or supplies in a normal and customary manner consistent with Seller's and Industrias' past practice or make any purchase commitment other than in the ordinary course of business; or

(n)     enter into any agreement, commitment or transaction with respect to taking any of the foregoing actions.

6.5     Access to Information; Confidentiality.

(a)     Prior to the Closing Date, Seller shall permit Holdings and its advisors, accountants, attorneys and representatives to have access, during regular business hours and

19

upon reasonable notice, to the offices, facilities, assets, properties, employees, books and records of Seller, and shall furnish, or caused to be furnished, to Holdings, such financial, tax and operating data and other information with respect to such entities and their respective offices, facilities, assets, properties, employees, contracts, businesses and operations as Holdings from time to time reasonably requests. Holdings shall hold, and shall cause its Affiliates, advisors, accountants, attorneys and representatives to hold, any non-public information so provided to Holdings by or on behalf of Seller in connection with the transactions contemplated by this Agreement in confidence and shall comply with all terms and conditions of the Confidentiality Agreement to the same extent as Harvey Industries LLC.

(b) From and after the Closing Date, Seller shall hold, and shall cause its Affiliates, advisors, accountants, attorneys and representatives to hold, any material non-public information concerning or relating to Seller in confidence and except for such disclosures as may be (i) consented to by Holdings in writing or (ii) required by Law.

6.6 <u>Inter-Company Obligations</u>. Prior to the Closing Date, and at no cost to Purchasers, Industrias shall sell, settle or transfer to Seller and/or any Affiliates of Seller all intercompany receivables and payables between Industrias and Seller or any Affiliate of Seller so that there are no such intercompany receivables and payables which remain unpaid on the Closing Date (other than any payables accrued under the Assignment Agreement dated October 7, 2008 by and among Industrias, Hayes Lemmerz Holding GmbH and MGG Group B.V. and the Participation Agreement referenced therein in connection with the Detroit Diesel Heavy Duty Engine Project), provided that Seller shall provide to Purchasers a written accounting of such settlements or payments.

6.7 <u>Access to Books and Records Following the Closing</u>. After the Closing Date, Holdings shall permit Seller and its authorized representatives, during normal business hours and upon reasonable notice, to have reasonable access to, and examine and make copies of, all Books and Records existing on the Closing Date.

6.8 <u>Transition Services Agreement</u>. HLI Laredo acknowledges and agrees that Holdings will require certain services from HLI Laredo and its Affiliates on an interim basis following the Closing Date in order to operate the Business. In furtherance of the foregoing, at the Closing, Holdings, or an Affiliate of Holdings, and HLI Laredo or an Affiliate of HLI Laredo, shall enter into a transition services agreement on substantially the terms set forth in <u>Exhibit B</u> attached hereto (the "<u>Transition Services Agreement</u>").

6.9 <u>Public Announcements</u>. Seller and Purchasers shall not, and Seller and Purchasers shall cause their Affiliates not to, issue any public report, statement or press release or otherwise make any public statement regarding this Agreement or the transactions contemplated hereby, other than in connection with filings with the Bankruptcy Court, without the prior written consent of the other party hereto, unless otherwise required by applicable Law or to obtain any necessary Consents (including Consents of the Lenders pursuant to the Credit Agreement and the Trustee pursuant to the Indenture), in which case the party required to make such disclosure shall advise the other party hereto and discuss the contents before issuing any such report, statement or press release.

BH01\1049357.12
ID\GMC - 019956/0999

6.10    Use of Names.  After the Closing, Purchasers shall not use or permit any of its Affiliates to use the name "HLI" or "Hayes Lemmerz" or "Lemmerz" or "Hayes" or any variation or derivative thereof; provided, however, that Holdings shall be permitted to use such names for a reasonable transition period following the Closing Date, which transition period shall in no event exceed sixty (60) days.

6.11    Employees.

(a)    Effective as of the Closing, Holdings shall, and shall cause its Affiliates to (i) continue the employment of each employee of Industrias (the "Mexican Continuing Employees"), and (ii) hire each of the employees employed by Seller or its Affiliates immediately prior to the Closing that are listed on Schedule 6.11(a) (the "U.S. Continuing Employees") (the Mexican Continuing Employees and the U.S. Continuing Employees are referred to collectively as the "Continuing Employees") on terms and conditions with respect to salary and wages that are substantially similar to those terms and conditions in effect immediately prior to the Closing unless a Continuing Employee agrees otherwise.  Holdings shall not be required to continue the employment of, or to hire, any other individuals.  Subject to the specific terms provided herein with respect to certain benefits, for a period of no less than one month immediately following the Closing Date, Holdings shall, and shall cause its Affiliates to, provide the U.S. Continuing Employees with material employee benefits that are substantially similar in the aggregate to the employee benefits provided by Purchaser to its similarly situated employees.  Purchaser shall not assume any of Seller's U.S. Benefit Plans nor any liability associated with the  U.S. Benefit Plans.  None of the Continuing Employee shall be third party beneficiaries of Holdings' obligations pursuant to this subsection.

(b)    Holdings shall, and shall cause its Affiliates to, cause those employee benefit plans, programs, agreements and arrangements of Holdings and its Affiliates (the "Purchaser Plans") to credit each Continuing Employee's service with Industrias, Seller or an Affiliate of Seller, or any predecessor employers to Industrias, Seller or an Affiliate of Seller, to the extent credited under the analogous benefit plan provided on behalf of Seller or Industrias, as service with Purchaser and its Affiliates for purposes of vesting and eligibility under the Purchaser Plans in which a Continuing Employee becomes eligible to participate after the Closing Date and for purposes of determining the amount of benefits under any Purchaser Plan that provides for severance, disability, vacation and paid time off; provided, however, that in no event shall the Continuing Employees be entitled to any credit to the extent that it would result in duplication of benefits with respect to the same period of service.  Purchaser shall, and shall cause its Affiliates to, from and after the Closing Date, to cause any and all pre-existing condition limitations (unless such condition was not covered under a comparable plan of Seller in which such Continuing Employee participated prior to the Closing Date), eligibility waiting periods, active employment requirements and requirements to show evidence of good health under the Purchaser Plans for eligibility purposes, to the extent that such conditions, exclusions and waiting periods would have been waived or satisfied under the analogous benefit plan of Seller or Industrias in which any such Continuing Employee participated immediately prior to the Closing Date, to be waived with respect to Continuing Employees (and their spouses and eligible dependents) who become participants in such Purchaser Plans.  Holdings shall, and shall cause its Affiliates to, from and after the Closing Date, to give credit for or otherwise take into account under the Purchaser Plans the out-of-pocket expenses and annual expense limitation amounts

21

paid by each Continuing Employee under the analogous plan for the year in which the Closing Date occurs. On the Closing Date and each month thereafter for the remainder of the respective plan year, Seller shall provide Holdings with information regarding the out-of-pocket expenses and annual expense limitation amounts paid by each Continuing Employee under the analogous plan for the portion of the plan year preceding such date. Notwithstanding the foregoing (but only to the extent that Holdings sponsors or maintains a flexible spending arrangement), Holdings shall credit each Continuing Employee with their balances in any flexible spending account only if the cash balances under such accounts are transferred to Holdings, which transfer shall occur as soon as administratively feasible after the Closing Date (subject to the Transition Services Agreement). Holdings shall cause each Continuing Employee whose accounts are being transferred to Holdings to be immediately covered under Holdings' flexible spending account, and such participation shall be subject to the Continuing Employees' salary reduction elections that they made under the Seller flexible spending account. Seller shall provide Holdings with sufficient information in sufficiently usable form to enable Holdings to determine the Continuing Employees' 2009 plan year elections, the amount of each Continuing Employee's transferred account balance, and any credits for salary deferral contributions and debits for reimbursement of eligible expenses for the portion of the 2009 plan year preceding the Closing Date.

(c) Notwithstanding anything to the contrary contained herein, Holdings' obligations to comply with Section 6.11(b) shall be subject to the consent of the insurer to the extent of any insured arrangement, which Holdings shall use their reasonable efforts to obtain, and shall be contingent on Seller furnishing sufficient information in sufficiently usable form to enable Holdings to reasonably administer such service credit or waivers under the Purchaser Plans.

(d) For a period of no less than one month immediately following the Closing Date, Holdings shall, and shall cause its Affiliates to, provide severance benefits to the Continuing Employees that are no less favorable than (i) those provided to such Continuing Employees immediately prior to the Closing Date or (ii) those provided to similarly situated employees of Holdings and their Affiliates from time to time, whichever provides the greater benefit to the Continuing Employees.

(e) Seller shall be responsible for all medical, dental, and similar health claims incurred by U.S. Continuing Employees (and their dependents) prior to the Closing. For purposes of this Section 6.11(d), a claim shall be deemed to have been incurred on the date on which the treatment or service was rendered. Seller shall bear the responsibilities for providing health care continuation coverage pursuant to Section 4980B of the Code (i.e., COBRA health care continuation coverage) for any employee of Seller or its Affiliates (including corresponding qualified beneficiaries) who did not become a U.S. Continuing Employee.

(f) Effective as of the Closing Date, Continuing Employees shall no longer actively participate in the Hayes Lemmerz International, Inc. Retirement Savings Plan (the "Seller's Savings Plan"). The Seller shall cause all Continuing Employees to be fully vested in their accounts under the Seller's Savings Plan as of the Closing, and the Seller shall cause the plan to make distributions available to the Continuing Employees after the Closing to the extent permitted by applicable law.

BH01\1049357.12
ID\GMC - 019956/0999

(g)     Seller shall be responsible for maintaining long-term disability insurance benefits with respect to any Continuing Employee or any former employee who did not become a Continuing Employee who is receiving such benefits as of the Closing or becomes eligible to receive such benefits as a result of any qualifying event or disability that occurs prior to the Closing Date. Seller shall be responsible for short-term disability claims for the U.S. Continuing Employees up to the Closing Date, after which time Holdings shall take over responsibility. A list of U.S. Continuing Employees currently receiving short-term disability benefits from Seller or from a plan sponsored by Sellers is set forth on Schedule 6.11(g). After the date of this Agreement, Seller shall promptly notify Holdings in writing if any U.S. Continuing Employee begins to receive short-term disability benefits from Seller or from a plan sponsored by Seller.

(h)     Nothing in this Agreement, including but not limited to this Section 6.11, shall be construed as prohibiting or otherwise restricting Holdings or its Affiliates from terminating the employment of any Continuing Employee for any reason (or for no reason) following the Closing Date.

(i)     It is understood and agreed between the parties that all provisions contained in this Agreement with respect to employee benefit plans or employee compensation are included for the sole benefit of the respective parties hereto and do not and shall not create any right in any other Person, including, but not limited to, any Continuing Employees, any participant in any benefit or compensation plan or any beneficiary thereof.

6.12     Assumed Contracts and Cure Costs.

(a)     Assumption and Assignment of Assumed Contracts. HLI Laredo and Holdings shall use commercially reasonable efforts to obtain an order of the Bankruptcy Court authorizing HLI Laredo to assume the Assumed Contracts and assign to Holdings all Assumed Contracts. Upon the later of (i) October 22, 2009 or (ii) on the date that the Sale Order is entered, Holdings shall finalize the list of contracts identified on Schedule 2.1(c)(4)(C) or on Schedule 2.1(c)(4)(D). Holdings shall be exclusively responsible for any and all obligations under all such Assumed Contracts arising after Closing. Cure. HLI Laredo shall, at or prior to the Closing, cure any defaults under the Assumed Contracts, which defaults are required to be cured under the Bankruptcy Code, so that such Assumed Contracts may be assumed by HLI Laredo and assigned to Holdings in accordance with the provisions of section 365 of the Bankruptcy Code. HLI Laredo shall be responsible for all Cure Costs required to be paid in connection with the assignment to Holdings of all Assumed Contracts. To the extent necessary to obtain authorization therefore or otherwise as required by the Bankruptcy Court, Holdings shall promptly upon request provide evidence to the non-debtor party to the Assumed Contracts of Holdings' financial condition in order to satisfy the requirement under section 365 of the Bankruptcy Code to provide adequate assurance of future performance of each of the Assumed Contracts.

6.13     Insurance. For a period of two (2) years following the Closing Date, Holdings shall maintain general and product liability insurance coverage for the Business with limits in an amount not less than $5,000,000.00 and with a waiver of subrogation in favor of HLI Laredo for Holdings' obligations under this Agreement. At the Closing, and on HLI Laredo's request during

BH01\1049357.12
ID\GMC - 019956/0999

the two-year period after Closing, Holdings shall give HLI Laredo a Certificate of Insurance evidencing such coverage.

6.14 Covenant Not To Compete.

(a)    To secure the interests of Purchasers hereunder, Seller and its Affiliates hereby covenant and agree that, except as otherwise provided herein, from and after the Closing and until the second (2nd) anniversary of the Closing Date, each such party shall not, and shall cause its Affiliates (but only as long as they remain Affiliates of Seller) not to, directly or indirectly, participate in the management, operation or control of, or have any financial ownership interest greater than five percent (5%) in, or aid or knowingly assist anyone else in the conduct of, any business or entity that (i) engages in the Business, or (ii) is, to the Knowledge of Seller, making preparations for engaging in the Business, including, without limitation, (A) soliciting any customer of Seller or Industrias to purchase any products which are competitive with the products currently sold by the Business from anyone other than Industrias; and (B) assisting any Person in any way to do, or attempt to do, anything prohibited by the foregoing, whether by ownership, control, management, operation or financing of such Person; provided, however, that Seller may acquire a company that engages in the Business among other activities of such company provided that such company's net sales from the conduct of the Business do not exceed 12% of its total net sales for the completed portion of its then current fiscal year or either of the two full fiscal years prior to such acquisition.

(b)    To secure the interests of Seller hereunder, Purchasers and their Affiliates (but only so long as they remain Affiliates of a Purchaser) hereby covenant and agree that, except as otherwise provided herein, from and after the Closing Date and until the second (2nd) anniversary of the Closing Date, Purchasers shall not, and shall cause their Affiliates (but only so long as they remain Affiliates) not to, directly or indirectly, participate in the management, operation or control of, or have any financial or ownership interest greater than five percent (5%) in, or aid or knowingly assist anyone else in the conduct of, any business or entity that (i) engages in the business of designing, fabricating, procuring, marketing, selling or distributing light vehicle steel and aluminum wheels and commercial truck wheels ("Seller's Business"), (ii) is, to Purchasers' Knowledge, making preparations for engaging in Seller's Business, including, without limitation, (A) soliciting any customer of Seller or any of its Affiliates to purchase any vehicle wheels from anyone other than Seller or its Affiliates; and (B) assisting any Person in any way to do, or attempt to do, anything prohibited by the foregoing, whether by ownership, control, management, operation or financing of such Person; provided, however, that Purchasers may acquire a company that engages in Seller's Business among other activities of such company provided that such company's net sales from the conduct of Seller's Business do not exceed 12% of its total net sales for the completed portion of its then current fiscal year or either of the two full fiscal years prior to such acquisition.

(c)    Seller and Purchasers each hereby acknowledge and agree that if any of Seller or any one or more of its Affiliates breaches any provision of Section 6.14(a) or Purchasers or any one or more of its Affiliates breaches any provision of Section 6.14(b), any remedy at law would be inadequate and that the Companies and Purchasers or Seller, as applicable, in addition to seeking monetary damages in connection with any such breach, shall be entitled to specific

24

performance, and injunctive and other equitable relief to prevent or restrain a breach of this Section 6.14 or to enforce the provisions hereof.

(d)     Seller and Purchasers intend that the provisions of this Section 6.14 be enforced to the fullest extent permissible under the Laws applied in each jurisdiction in which enforcement is sought. If any provision of this Section 6.14, or any part hereof, shall be held by a court of competent jurisdiction to be invalid or unenforceable, this Section 6.14 shall be amended to revise the scope of such provision, to make it enforceable to the fullest extent permitted by applicable Law, if possible, or to delete such provision or such part, such revision or deletion to apply only with respect to the operation of this Section 6.14 in the jurisdiction of such court.

6.15     Non-Solicitation. For a period of two (2) years from and after the date of this Agreement, neither Purchasers nor Seller nor any of their respective Affiliates shall, directly or indirectly, without the prior written consent of the other party, hire, solicit or direct any other Person to hire, solicit any officer or other employee of such other party or such other party's Affiliates to: (a) terminate such officer's or employee's employment with such other party or such other party's Affiliates; or (b) seek or accept employment or other affiliation with any other Person (other than, in each case, any solicitation directed to the public in general in publications of general distribution).

6.16     Payments on Certain Business.

The Parties agree that, in the event that Holdings, Industrias or any other Affiliate of Holdings makes any sales after January 1, 2011, of the parts and assemblies under the General Motors High Feature V6 SIDI program (the "GM SIDI Program") having (i) an engine platform designation of "High Feature V6", (ii) an engine program designation of "LLT", (iii) an engine model designation of "3.6L 24v dohc V6" and (iv) the part name of "3.6L Lambda SIDI LLT Intake Manifold Assembly" (such designations comprising the "GM SIDI Parts"), Holdings shall pay to HLI Opco two and a half percent (2.5%) of the revenue actually collected by Holdings (net of warranty claims, rebates, returns, credits, bad debts, or discounts) attributable to the sales of GM SIDI Parts (each a "Revenue Payment"). If there is any change to the engine platform designation, the engine program designation, the engine model designation or the part name set forth in the defined term "GM SIDI Parts", then the parts subject to the changed designation shall not be considered GM SIDI Parts and no Revenue Payments shall be due pursuant to this Section 6.16 with respect to such parts. The Revenue Payments shall be paid by Holdings to HLI Opco on a quarterly basis (with quarters ending January 31, April 30, July 31 and October 31), by wire transfer to the bank or other financial institution specified by HLI Opco, within thirty (30) days of the end of each quarter during which any Revenue Payment is to be made to HLI Opco hereunder. At the time of such Revenue Payment, Holdings shall send by facsimile or email to the contacts designated by HLI Opco a report in a mutually-agreed format setting forth an itemization of all shipments and payments received for the GM SIDI Parts during the respective quarterly period, and the calculation of Holdings' revenue based thereon (each a "Revenue Report"). Holdings shall make all Revenue Payments to HLI Opco under this Section 6.16 without deduction or withholding for taxes, except to the extent that such deduction or withholding is required by applicable law. In addition, Holdings shall cause Industrias to continue to make payments pursuant to, and otherwise comply with, the terms and conditions of the Assignment Agreement dated October 7, 2008 by and among Industrias, Hayes Lemmerz

25

Holding GmbH and MGG Group B.V. and the Participation Agreement referenced therein in connection with the Detroit Diesel Heavy Duty Engine Project.

(a)     Upon no less than 10 Business Days prior notice, Holdings shall provide HLI Opco and/or its auditors with complete access, during normal business hours, to all of Holdings' books and records which relate to the GM SIDI Program showing shipments and receipts for the GM SIDI Parts, in order to allow HLI Opco and/or its auditors to verify the information set forth in the Revenue Report including quantity of units shipped, the selling price, receipts received and the amounts due and to otherwise facilitate the monitoring of Holdings' compliance hereunder. The audit shall be conducted in good faith and the findings shall be set forth in a report (an "Audit Report"). The Audit Report shall be delivered to Holdings promptly upon completion. Upon Holdings' request, HLI Opco shall timely provide Holdings with any documentation related to the Audit Report to allow Holdings to evaluate such Audit Report. The Audit Report shall be shall be final, binding, conclusive and non-appealable on and by the Parties unless Holdings delivers to HLI Opco its written disagreement with the Audit Report (setting forth in reasonable detail the basis for such dispute) (an "Audit Response") on or before the thirtieth day after the date that Holdings receives the Audit Report. In the event of a dispute, Holdings and HLI Opco shall attempt to reconcile their differences and any written resolution by them as to any disputed amount shall be final, binding, conclusive and non-appealable on and by the Parties. HLI Laredo and Holdings agree that any audit by HLI Opco or its Affiliates must be commenced no later than 6 months following the expiration the GM SIDI Program (the "Audit Deadline"). If HLI Opco does not begin an audit by the Audit Deadline, then HLI Opco and its Affiliates shall no longer have the right to audit under this Section 6.16.

(b)     In the event of a dispute pursuant to this Section 6.16 HLI Opco, Holdings and each of their representatives shall be afforded reasonable access to each other's books and records and the work papers of each other's representative subject to execution of customary non-reliance agreements. If Holdings and HLI Opco do not reach a resolution on or before the thirtieth day after the date of receipt of an Audit Response (or such later date as may be mutually agreed), then Holdings and HLI Opco shall submit the items remaining in dispute to an independent accounting firm agreed upon by the Parties in writing (the "Reviewing Accountant"). Holdings and HLI Opco shall direct the Reviewing Accountant to determine and report to Holdings and HLI Opco upon such remaining disputed items within twenty days of submission to the Reviewing Accountant of the remaining disputed items or as soon thereafter as practicable (the "Accountant Report"). The Accountant Report shall be final, binding, conclusive, and non-appealable on and by the Parties. For each Audit Report, an Audit Report that is undisputed, a revision to an Audit Report as agreed to by the Parties, or the Audit Report as revised by the Accountant Report, as the case may be, shall be the "Final Revenue Report" for the audited period. Any information set forth in any Revenue Report that relates to a period for which an Audit Report has been delivered to Holdings, and for which there is a Final Revenue Report, shall not be subject to a subsequent audit. The Final Revenue Report with respect to any period that has been audited shall be final, binding, conclusive and non-appealable on and by the Parties with respect to such period.

(c)     If the Final Revenue Report determines that a payment in excess of the Revenue Payment(s) made is owing to HLI Opco, then Holdings shall promptly pay to HLI Opco the difference between the amounts determined to be owing in the Final Revenue Report and the

26

Revenue Payment(s) actually made, together with interest thereon at the rate of four percent (4%) per annum from the date of the Revenue Report to which such Revenue Payment relates through the date of payment pursuant to this subsection (d); provided, however, that no interest shall be payable if the amount of any underpayment is less than $10,000 for any fiscal year. If the Final Revenue Report determines that a payment less than the Revenue Payment(s) actually made is owing, Holdings shall receive a credit against the next Revenue Payment(s) to become due (or a refund if there will be no more sales of GM SIDI Parts) equal to the difference between the amount determined to be owing in the Final Revenue Report and the Revenue Payments actually made.

(d)     The fees and expenses of the Reviewing Accountants incurred in rendering any Final Revenue Report pursuant to this Section 6.16 shall be borne one-half by HLI Opco (or its Affiliate) and one-half by Holdings and the fees and expenses of each Party incurred in connection with this Section 6.16, shall be borne by such Party.

6.17     Bankruptcy Notice Procedures. Promptly upon entry of the Sale Order, Seller and its Affiliates shall serve the entire Sale Order on all parties that may have an interest in the Acquired Assets including but not limited to lienholders, counterparties to Assumed Contracts and taxing authorities.

6.18     Reimbursements.

(a)     Seller agrees that after the Closing Date, to the extent not already received or reimbursed as of the Closing Date, it shall reimburse Holdings for any receivables, refunds, rebates, price adjustments or other payments collected by Seller to which a Purchaser is entitled pursuant to this Agreement within a reasonable time after receipt of payment.

(b)     Holdings agrees that after the Closing Date, to the extent not already received or reimbursed as of the Closing Date, it shall reimburse Seller for any receivables, refunds (including Tax refunds of Seller with respect to any period prior to the Closing Date), rebates or retroactive price adjustments or other payments collected by a Purchaser to which Seller is entitled pursuant to this Agreement within a reasonable time after receipt of payment.

6.19     Seller' Internet Website. During the period beginning on the Closing Date and ending 60 days after the Closing Date, Seller shall take all commercially reasonable steps to automatically redirect all visitors to the "Powertrain" section of the website www.hayes-lemmerz.com to a website to be established by Holdings. Holdings shall notify Seller of such website's domain name prior to the Closing Date.

## ARTICLE VII
## CLOSING CONDITIONS

7.1     Conditions to Obligations of Purchasers and Seller. The respective obligations of the Parties hereto to consummate the transactions contemplated by this Agreement are subject to the satisfaction or, where permissible under applicable Law, waiver, on or prior to the Closing Date, of the following conditions, provided, however, that the conditions set forth in

subparagraph 7.1(d) may not be waived without prior written consent of the Official Committee of Unsecured Creditors:

(a)  No statute, ordinance, rule, regulation or executive order shall have been enacted or promulgated by any Governmental Authority which prohibits the consummation of the transactions contemplated hereunder or which would make such consummation illegal.

(b)  On the Closing Date:

(1)  there shall be no Order of any nature issued by any court of competent jurisdiction that directs that this Agreement or any transaction contemplated by this Agreement shall not be consummated as herein provided;

(2)  there shall be no suit, action or other proceeding by any Person pending before any court or Governmental Agency, or threatened to be filed or initiated, which, in the reasonable judgment of any Party, may result in the restraint or prohibition of the consummation of any transaction contemplated hereby or the obtaining of a material amount of damages from or other relief against any of the Parties or their Affiliates in connection with the consummation of any transaction contemplated hereby;

(c)  The Sale Order, in substantially the form attached to this Agreement as <u>Exhibit H</u> or in such other form that is satisfactory to Purchasers in their sole discretion shall have been entered by the Bankruptcy Court; and

(d)  Either (1) the effective date of the debtors' plan of reorganization in connection with the Chapter 11 Filing shall have occurred; (2) the official committee of unsecured creditors shall have given its consent to the Closing or (3) the Bankruptcy Court shall have entered an order approving the Closing prior to the effective date of the debtors' plan of reorganization in connection with the Chapter 11 Filing.

7.2  <u>Condition to Obligations of Purchasers</u>. The obligation of Purchasers to consummate the transactions contemplated herein are subject to the satisfaction or, where permissible under applicable Law, waiver, on or prior to the Closing Date, of the following conditions:

(a)  The Assumed Contracts shall have been assumed and assigned to Holdings;

(b)  Seller shall have performed in all material respects all of its obligations hereunder required to be performed by it before the Closing Date;

(c)  the representations and warranties of Seller contained in this Agreement, shall be true and correct in all material respects (except with respect to representations and warranties of Seller qualified as to materiality which shall be true and correct in all respects) at and as of the Closing Date as if made at and as of such date, and Purchasers shall have received a certificate signed by the Chief Financial Officer of HLI Laredo to the foregoing effect;

28

(d)     the Sale Order shall have been served on all parties who may have an interest in the Acquired Assets or the Business including but not limited to lienholders, counterparties to the Assumed Contracts and taxing authorities;

(e)     the debtors' plan of reorganization in connection the Chapter 11 Filing shall have been confirmed by the Bankruptcy Court and the related [Plan Confirmation Order/Sale Order] shall provide, to the satisfaction of Purchasers, for (1) the release or other termination of all guaranties given by Industrias of any indebtedness or other obligation of Seller or any Affiliate, including under the Credit Agreement and the Indenture, (2) the release or other termination of any security given in respect of such guaranties, and (3) the releases or other termination of all Liens on the Acquired Assets;

(f)     all Cure Costs shall have been paid to allow the assignment and assumption of the Assumed Contracts;

(g)     Purchasers shall have received counterparts of all documents and instruments pursuant to Section 3.2; and

(h)     no Material Adverse Effect shall have occurred.

7.3     <u>Conditions to Obligations of Seller</u>. The obligation of Seller to consummate the transactions contemplated herein are subject to the satisfaction or, where permissible under applicable Law, waiver, on or prior to the Closing Date, of the following conditions:

(a)     Seller shall have received the Purchase Price in immediately available funds; and

(b)     Purchaser shall have performed in all material respects all of its obligations hereunder required to be performed by it before the Closing Date;

(c)     the representations and warranties of Purchasers contained in this Agreement, shall be true and correct in all material respects (except with respect to representations and warranties of Purchaser qualified as to materiality which shall be true and correct in all respects) at and as of the Closing Date as if made at and as of such date, and Seller shall have received a certificate signed by the Chief Financial Officer of Holdings to the foregoing effect;

(d)     Seller shall have received counterparts to all documents and instruments pursuant to Section 3.3.

7.4     <u>Waiver of Condition</u>.  If a Party waives any condition to Closing, then such waiver shall be deemed to be a waiver and release by such Party of any other Party of any claim that the Party waiving such condition may have against any other Party for a breach of any representation, warranty, covenant or other provision of this Agreement, which waiver and release shall be effective as of the Closing Date.

7.5     <u>Termination</u>. This Agreement may be terminated at any time prior to the Closing by Purchaser if: (i) the conditions to Closing set forth in this Article VII have not been satisfied or waived by the 90th day after the date that Sale Order is entered, provided that Purchaser is not

BH01\1049357.12
ID\GMC - 019956/0999

in breach of its representations and warranties or covenants under this Agreement, or (ii) a Material Adverse Effect has occurred.

## ARTICLE VIII
## SURVIVAL

8.1    <u>Survival of Representations</u>.    The representations and warranties in this Agreement shall terminate at the Closing.

## ARTICLE IX
## MISCELLANEOUS

9.1    <u>Notices</u>. All notices or other communications hereunder shall be deemed to have been duly given and made if in writing and if served by personal delivery upon the party for whom it is intended, if delivered by registered or certified mail, return receipt requested, or by a national courier service, or if sent by telecopier, provided that the telecopy is promptly confirmed by telephone confirmation thereof, to the person at the address set forth below, or such other address as may be designated in writing hereafter, in the same manner, by such person:

To Seller:

Hayes Lemmerz International – Laredo, Inc.
c/o 15300 Centennial Drive
Northville, MI 48168
Attention: Vice President, Business Development
Fax: (734) 737-2143

With a required copy to:

Hayes Lemmerz International, Inc.
15300 Centennial Drive
Northville, MI 48168
Attention: General Counsel
Fax: (734) 737-2069

To Purchasers:

Harvey Holdings LLC
1021 Manufactures Drive
Westland, MI 49186
Attention: Jerome Harvey
Facsimile: (734) 405-2434

With a copy to:

Dykema Gossett PLLC
39577 Woodward Ave., Ste. 300

30

Bloomfield Hills, MI 48034
Attention: Brendan J. Cahill
Facsimile: (248) 203-0763

Any such notification shall be deemed delivered (i) upon receipt, if delivered personally, (ii) on the next business day, if sent by national courier service for next business day delivery or (iii) the business day received, if sent by telecopier.

9.2     Amendment; Waiver.  Any provision of this Agreement may be amended or waived if, and only if, such amendment or waiver is in writing and signed, in the case of an amendment, by Purchasers and Seller, or in the case of a waiver, by the party against whom the waiver is to be effective. No failure or delay by any party in exercising any right, power or privilege hereunder shall operate as a waiver thereof nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right, power or privilege.

9.3     Assignment.  No party to this Agreement may assign any of its rights or obligations under this Agreement without the prior written consent of the other party hereto, except that Purchasers may without such consent assign its rights, duties and obligations hereunder, in whole or in part, to any Affiliate of Purchasers designated by Purchasers in a writing delivered to the Representatives at or prior to the Closing; provided, however, that no assignment by Purchasers shall relieve Purchasers of any of its obligations hereunder.

9.4     Entire Agreement.  This Agreement (including all Schedules and Exhibits hereto) contains the entire agreement among the parties hereto with respect to the subject matter hereof and supersedes all prior agreements and understandings, oral or written, with respect to such matters, except for the Confidentiality Agreement which will remain in full force and effect for the term provided for therein.

9.5     Fulfillment of Obligations.  Any obligation of any party to any other party under this Agreement, which obligation is performed, satisfied or fulfilled by an Affiliate of such party, shall be deemed to have been performed, satisfied or fulfilled by such party.

9.6     Parties in Interest.  This Agreement shall inure to the benefit of and be binding upon the parties hereto and their respective successors and permitted assigns. Nothing in this Agreement, express or implied, is intended to confer upon any Person other than Purchasers, Seller or their successors or permitted assigns, any rights or remedies under or by reason of this Agreement.

9.7     Expenses.  Except as otherwise expressly provided in this Agreement, whether or not the transactions contemplated by this Agreement are consummated, all costs and expenses incurred in connection with this Agreement and the transactions contemplated hereby shall be borne by the party incurring such expenses.

9.8     Brokers.  The fees of any broker, finder, investment banker or financial advisor hired by Seller shall be borne by Seller. The fees of any broker, finder, investment banker or

31

financial advisor hired by Purchasers (including without limitation fees of Doeren Mayhew) shall be borne solely by Purchasers.

9.9 <u>Governing Law; Jurisdiction</u>. This Agreement shall be governed by the Laws of the State of Michigan, its rules of conflict of laws notwithstanding. Seller and Purchasers each hereby agree and consent to be subject to the exclusive jurisdiction of the Wayne County Circuit Court of the State of Michigan and the United States District Court for the Eastern District of Michigan in any suit, action or proceeding seeking to enforce any provision of, or based on any matter arising out of or in connection with, this Agreement or the transactions contemplated hereby. Each party hereby irrevocably consents to the service of any and all process in any such suit, action or proceeding by the delivery of such process to such party at the address and in the manner provided in Section 9.1.

9.10 <u>Counterparts</u>. This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, and all of which shall constitute one and the same agreement.

9.11 <u>Headings</u>. The heading references herein and in the table of contents hereto are for convenience purposes only, do not constitute a part of this Agreement and shall not be deemed to limit or affect any of the provisions hereof.

9.12 <u>Further Assurances</u>. From time to time after the Closing Date, at the request of the other party hereto and at the expense of the party so requesting, Seller and Purchasers shall execute and deliver to such requesting party such documents and take such other action as such requesting party may reasonably request in order to consummate the transactions contemplated hereby.

9.13 <u>Specific Performance</u>. Each party hereto acknowledges that money damages would be both incalculable and an insufficient remedy for any breach of this Agreement by such party and that any such breach would cause the other party hereto irreparable harm. Accordingly, each party hereto also agrees that, in the event of any breach or threatened breach of the provisions of this Agreement by such party, the other party hereto shall be entitled to equitable relief without the requirement of posting a bond or other security, including in the form of injunctions and orders for specific performance.

9.14 <u>Knowledge</u>. For purposes of this Agreement, (i) "Knowledge of Seller" means the actual knowledge of John A. Salvette, and (ii) "Knowledge of Purchasers" means the actual knowledge of Jerome Harvey.

9.15 <u>Severability</u>. If any term or other provision of this Agreement, or any portion thereof, is invalid, illegal or incapable of being enforced by any rule of Law or public policy, all other terms and provisions of this Agreement, or remaining portion thereof, shall nevertheless remain in full force and effect so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any party. Upon such determination that any such term or other provision, or any portion thereof, is invalid, illegal or incapable of being enforced, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in an acceptable

32

manner to the end that the transactions contemplated hereby are consummated to the fullest extent possible.

9.16    <u>No Strict Construction</u>.  The language used in this Agreement shall be deemed to be the language chosen by the parties hereto to express their mutual intent, and no rule of strict construction shall be applied against any Person.

[SIGNATURE PAGE FOLLOWS]

BH01\1049357.12
ID\GMC - 019956/0999

IN WITNESS WHEREOF, the parties have executed or caused this Agreement to be executed as of the date first written above.

**"Purchasers"**                                    **"Seller"**

HARVEY HOLDINGS LLC                    HAYES LEMMERZ INTERNATIONAL –
                                                            LAREDO, INC.

By: _____                    By: _____
    Name: Jerome Harvey                        Name
    Title: President                                  Title:

HARVEY INDUSTRIES, LLC

By: _____
    Name: Jerome Harvey
    Title: President

**With respect to Section 6.16 only:**

HLI OPERATING COMPANY, INC.

By:_____
    Name:
    Title:

34