IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

- - - - - - - - - - - - - - - x
                              :
In re:                        :   Chapter 11
                              :
HAYES LEMMERZ INTERNATIONAL,  :   Case No. 09-11655 (MFW)
INC., <u>et</u> <u>al.</u>,[1]              :
                              :   Jointly Administered
                              :
          Debtors.            :   **Hrg Date: 11/3/09 at 10:00 a.m. (ET)**
                              :   **Related to Docket Nos. 539, 654 & 807**
- - - - - - - - - - - - - - - x

**NOTICE OF FILING OF MODIFIED AND NEW EXHIBITS TO
THE FIRST AMENDED JOINT PLAN OF REORGANIZATION OF HAYES
LEMMERZ INTERNATIONAL, INC. AND ITS AFFILIATED
DEBTORS AND DEBTORS-IN-POSSESSION**

PLEASE TAKE NOTICE that on September 2, 2009, the above

captioned debtors and debtors-in-possession (collectively, the

"Debtors") filed the **Disclosure Statement With Respect to the First**

---

[1]  The following of Hayes' U.S. subsidiaries and affiliates (including the last four digits of their respective taxpayer identification numbers) have filed petitions for relief under chapter 11 concurrently with Hayes (2578) and have obtained joint administration therewith: Hayes Lemmerz Finance LLC (7731), Hayes Lemmerz International Import, Inc. (1655), Hayes Lemmerz International - California, Inc. (2337), Hayes Lemmerz International - Commercial Highway, Inc. (7674), Hayes Lemmerz International - Georgia, Inc. (6122), Hayes Lemmerz International - Howell, Inc. (9246), Hayes Lemmerz International - Huntington, Inc. (0825), Hayes Lemmerz International - Kentucky, Inc. (8246), Hayes Lemmerz International - Laredo, Inc. (8656), Hayes Lemmerz International - New York, Inc. (9278), Hayes Lemmerz International - Sedalia, Inc. (7670), Hayes Lemmerz International - Technical Center, Inc. (7519), Hayes Lemmerz International - Wabash, Inc. (0301), HLI Brakes Holding Company, Inc. (2575), HLI Commercial Highway Holding Company, Inc. (2828), HLI Netherlands Holdings, Inc. (0015), HLI Operating Company, Inc. (7742), HLI Parent Company, Inc. (7832), HLI Powertrain Holding Company, Inc. (8269), HLI Realty, Inc. (1885), HLI Services Holding Company, Inc. (7840), HLI Suspension Holding Company, Inc. (0061), and HLI Wheels Holding Company, Inc. (7882) (collectively with Hayes, the "U.S. Debtors").  With the exception of Hayes Lemmerz Finance LLC - Luxembourg S.C.A. (Luxembourg: 0646; USA: 7731) (the "Non-U.S. Debtor"), none of the foreign affiliates or subsidiaries of Hayes are Debtors in these chapter 11 cases.  The mailing address for each of the U.S. Debtors is 15300 Centennial Drive, Northville, Michigan 48168.

**Amended Joint Plan of Reorganization of Hayes Lemmerz International, Inc. and its Affiliated Debtors and Debtors-in-Possession** (the "Disclosure Statement") (Docket No. 539).  The Debtors' proposed **First Amended Joint Plan of Reorganization of Hayes Lemmerz International, Inc. and its Affiliated Debtors and Debtors-in-Possession** (the "Plan") is attached as Appendix A to the Disclosure Statement.[2]

PLEASE TAKE FURTHER NOTICE that on September 26, 2009, the Debtors filed the **Notice of Filing of Exhibits to the First Amended Joint Plan of Reorganization of Hayes Lemmerz International, Inc. and its Affiliated Debtors and Debtors-in-Possession** (Docket No. 654) (the "Initial Exhibit Notice").

PLEASE TAKE FURTHER NOTICE that since the Initial Exhibit Notice was filed with the Court, certain of the Plan Exhibits attached to the Initial Exhibit Notice (the "Initial Plan Exhibits") have been modified (the "Modified Plan Exhibits") and certain other new Plan Exhibits (the "New Plan Exhibits") have been added to the modified version of the Plan to be filed with the Court in advance of the Confirmation Hearing.

PLEASE TAKE FURTHER NOTICE that on October 29, 2009, the Debtors filed the Modified Plan Exhibits set forth below, copies of

---

[2]   Capitalized terms not defined herein have the meanings set forth in the Plan.

which are attached hereto as Exhibit A and are marked to show the modifications made to the Initial Plan Exhibits:

- Exhibit D – Amended Schedule of Retained Actions

- Exhibit E – Certificate of Incorporation for the Reorganized Company

- Exhibit H – Form of Executive Employment Agreements

- Exhibit I – Modifications to Supplemental Executive Retirement Plan

- Exhibit J – Amended Schedule of Rejected Contracts and Leases

- Exhibit L(1) – Form of Series A & B Warrants Agreement

- Exhibit M – Form of Stockholders' Agreement, Registration Rights Agreement and Management Stockholders' Agreement

PLEASE TAKE FURTHER NOTICE that on October 29, 2009, the Debtors filed the New Plan Exhibits set forth below, copies of which are attached hereto as Exhibit B:

- Exhibit N – Director Indemnification Agreement

- Exhibit G – Initial Directors and Officers of the Reorganized Debtors

- Exhibit K – Material Terms of Post-Plan Effective Date Secured Term Loan

- Exhibit L(2) – Form of Series C & D Warrants Agreement

- Exhibit L(3) – Form of Series E & F Warrants Agreement

The Director Indemnification Agreement was inadvertently not listed as a Plan Exhibit or included the Initial Exhibit Notice.  The Series C & D Warrants have been added to the modified Plan to

3

provide anti-dilution protection to the Prepetition Secured Lenders entitled to receive the Consent Fee against potential dilution of the New Common Stock that might be caused by the exercise of the Series A & B Warrants.  The Series E & F Warrants have been added to the modified Plan to provide anti-dilution protection to the Noteholders and the PBGC against potential dilution of the New Common Stock that might be caused by exercise of the Series C & D Warrants.

PLEASE TAKE FURTHER NOTICE that, other than the Modified Plan Exhibits filed under and attached to this notice, the other Initial Plan Exhibits have not changed or, if they have been modified, will be included in a subsequent notice(s) filed with the Court.

PLEASE TAKE FURTHER NOTICE that the attached documents remain subject to further revision and negotiation among the Requisite DIP Lenders (as defined in the Plan), the Official Committee of Unsecured Creditors, and the Debtors.  Such documents, by virtue of their filing, shall not be deemed to satisfy any condition to confirmation or consummation of the Plan as set forth in Article XI of the Plan.

PLEASE TAKE FURTHER NOTICE that copies of the Initial Plan Exhibits, Modified Plan Exhibits, New Plan Exhibits, and other pleadings filed in the above-captioned cases, can be obtained on the Court's website at www.deb.uscourts.gov by registered users of the Bankruptcy Court's case filing system or the Debtors' restructuring website at www.hayeslemmerzreorg.com or from counsel for the Debtors as set forth below.

Dated: Wilmington, Delaware
       October 29, 2009

SKADDEN, ARPS, SLATE, MEAGHER
  & FLOM LLP

By: /s/ *Kimberly A. LaMaina*
    Anthony W. Clark (I.D. No. 2051)
    Kimberly A. LaMaina (I.D. No. 4568)
    One Rodney Square
    P.O. Box 636
    Wilmington, DE 19899
    (302) 651-3000

    - and -

    J. Eric Ivester
    Stephen D. Williamson
    Bennett S. Silverberg (New York Office)
    155 North Wacker Drive, Suite 2700
    Chicago, Illinois 60606
    (312) 407-0700

Counsel for Debtors and
    Debtors-in-Possession

5

692145- Server 1a - MSW

# EXHIBIT A

## BLACKLINES – MODIFIED PLAN EXHIBITS

# Exhibit D

## Blackline - Amended Schedule of Retained Actions

**PLAN EXHIBIT D**

**Amended Schedule of Retained Actions**

In accordance with section 1123(b)(3) of the Bankruptcy Code[1] and except as otherwise provided in the Plan, the Reorganized Debtors shall retain and may, in their sole discretion, enforce or prosecute all Retained Actions, including those set forth in the Plan and identified in this exhibit to the Plan. The Debtors or the Reorganized Debtors, in their sole and absolute discretion, will determine whether to bring, settle, release, compromise, or enforce such rights (or decline to do any of the foregoing). The Reorganized Debtors or any successors may prosecute (or decline to prosecute) such Retained Actions in accordance with the best interests of the Reorganized Debtors or any successors holding such rights of action. Except as otherwise provided herein, the failure of the Debtors to specifically list any Claim, right of action, suit or proceeding does not, and will not be deemed to, constitute a waiver or release by the Debtors of such claim, right of action, suit or proceeding, and the Reorganized Debtors will retain the right to pursue such claims, rights of action, suits or proceedings in their sole discretion and, therefore, no preclusion doctrine, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise) or laches will apply to such claim, right of action, suit or proceeding upon or after the confirmation or consummation of this Plan.

For the avoidance of any confusion, the Debtors and Reorganized Debtors expressly retain:

1.      any and all eClaims, Causes of Action, rights of action, suits, and proceedings in favor of the Debtors arising under Chapter 5 of the Bankruptcy Code, and other similar avoidance actions available under applicable non-bankruptcy law, or any other provisions of the Bankruptcy Code; and

2.      all claims of the Debtors in the following litigation:

   (a)     Hayes Lemmerz International – Georgia, Inc. v. Punch International NV and Punch Property International NV, as reported in the United States District Court for the Northern District of Georgia, Case No.: 2 09-CV-0021;

   (b)     Punch International NV and Punch Property International NV v. Hayes Lemmerz International, Inc., as reported in the Commercial Court Antwerp, Belgium;

---

[1]      Capitalized terms used in this Exhibit and not otherwise defined have the meanings ascribed to such terms in the Plan.

2      DeltaView comparison of pcdocs://chisr02a/772206/4 and pcdocs://chisr02a/772206/6. Performed on 10/27/2009.

     (c)        HLI Operating Company, Inc. v. Diversified Machine, Inc., as reported in the Circuit Court of Wayne County, Michigan, Case No.: 09-006683-CZ; ~~and~~

     (d)        HLI Suspension Holding Company, Inc. v. Diversified Machine, Inc., as reported in the Circuit Court of Wayne County, Michigan, Case No.: 09-006683-CZ~~.~~;

     (e)        Hayes Lemmerz International Inc. v. Charter Township of Northville, as reported in the Michigan Tax Tribunal, MTT Docket No. 0337525;

     (f)        Hayes Lemmerz International – Georgia, Inc. v. Hall County Board of Tax Assessors, as reported in the Superior Court Hall County, Georgia, Case No. (Parcel No.) 2051721;

     (g)        Hayes Lemmerz International, Inc. v. ACE American Insurance Company, as reported in the United States District Court of the Northern District of Indiana, Case No. 3:08-CV-288; and

     (h)        Barnes & Thornburg LLP v. Hayes Lemmerz International, Inc. et al, as reported in the Allen Superior Court of Allen County, Indiana, Cause No. 02D01-0801-PL-8.

The Debtors reserve their right to modify this Exhibit.

---

3     DeltaView comparison of pcdocs://chisr02a/772206/4 and pcdocs://chisr02a/772206/6. Performed on 10/27/2009.

Document comparison done by DeltaView on Tuesday, October 27, 2009 6:46:08 PM

| Input: | |
|---|---|
| Document 1 | pcdocs://chisr02a/772206/4 |
| Document 2 | pcdocs://chisr02a/772206/6 |
| Rendering set | Option 3a strikethrough double score no moves |

| Legend: | |
|---|---|
| Insertion | |
| Deletion | |
| <Moved from > | |
| >Moved to < | |
| Style change | |
| Format change | |
| Moved deletion | |
| Inserted cell | |
| Deleted cell | |
| Moved cell | |
| Split/Merged cell | |
| Padding cell | |

| Statistics: | |
|---|---|
| | Count |
| Insertions | 10 |
| Deletions | 3 |
| Moved from | 0 |
| Moved to | 0 |
| Style change | 0 |
| Format changed | 0 |
| Total changes | 13 |

4 DeltaView comparison of pcdocs://chisr02a/772206/4 and pcdocs://chisr02a/772206/6. Performed on 10/27/2009.

**<u>Exhibit E</u>**

**Blackline - Certificate of Incorporation for the Reorganized Company**

**AMENDED AND RESTATED CERTIFICATE OF INCORPORATION**
**OF**
**HAYES LEMMERZ INTERNATIONAL, INC.**

Hayes Lemmerz International, Inc., a corporation organized and existing under the laws of the State of Delaware, hereby certifies as follows:

1.      The name of the corporation (hereinafter called the "*Corporation*") is Hayes Lemmerz International, Inc.  The Corporation was originally incorporated under the name HLI Holding Company, Inc.  The date of filing the original Certificate of Incorporation of the Corporation with the Secretary of State of the State of Delaware was May 6, 2003.  The name of the Corporation was changed to Hayes Lemmerz International, Inc. pursuant to an Amendment to the Certificate of Incorporation filed with the Secretary of State of the State of Delaware on June 3, 2003.  The Certificate of Incorporation was further amended pursuant to an Amendment to the Certificate of Incorporation filed with the Secretary of State of the State of Delaware on May 15, 2007.

2.      On May 11, 2009, the Corporation and certain of its subsidiaries filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "*Bankruptcy Code*") in the United States Bankruptcy Court for the District of Delaware (the "*Bankruptcy Court*").

3.      This Amended and Restated Certificate of Incorporation has been duly adopted in accordance with Section 245 and Section 303 of the General Corporation Law of the State of Delaware to put into effect and carry out the Plan of Reorganization under the Bankruptcy Code of the Corporation, et al., as confirmed on [____], 2009 by order (the "*Order*") of the Bankruptcy Court.  Provision for the making of this Amended and Restated Certificate of Incorporation is contained in the Order of the Bankruptcy Court having jurisdiction under the Bankruptcy Code for the formation of the Corporation.

4.      The text of the Certificate of Incorporation of the Corporation is hereby amended and restated to read in its entirety as set forth on <u>Exhibit A</u> attached hereto and incorporated herein by this reference.

IN WITNESS WHEREOF, the undersigned has executed this Amended and Restated Certificate of Incorporation of Hayes Lemmerz International, Inc. as of the ___ day of [_____], 2009.

HAYES LEMMERZ INTERNATIONAL, INC.

By: _____
    Name:
    Title:

**AMENDED AND RESTATED CERTIFICATE OF INCORPORATION**

**OF**

**HAYES LEMMERZ INTERNATIONAL, INC.**

ARTICLE I.

The name of the corporation is Hayes Lemmerz International, Inc. (the "***Corporation***").

ARTICLE II.

The period of its duration is perpetual.

ARTICLE III.

The purpose of the Corporation is to engage in any lawful act or activity for which corporations may be organized under the General Corporation Law of the State of Delaware (the "***DGCL***").

ARTICLE IV.

The address of the Corporation's registered office in the State of Delaware is 2711 Centerville Road, Suite 400, City of Wilmington, County of New Castle.  The name of the Corporation's registered agent at such address is Corporation Service Company.

ARTICLE V.

Section 5.01.   Authorized Capital Stock.  The Corporation shall have the authority to issue an aggregate of 20,000,000 shares of common stock, par value $0.01 per share, of which (i) [_____] shares shall be designated "***Class A Common Stock***" (the "***Class A Common Stock***"), (ii) [_____] shares shall be designated "***Class B-1 Common Stock***" (the "***Class B-1 Common Stock***") and (iii) [_____] shares shall be designated "***Class B-2 Common Stock***" (the "***Class B-2 Common Stock***" and, together with the Class B-1 Common Stock,  the "***Class B Common Stock***").  The Class A Common Stock, together with the Class B Common Stock, shall be referred to as "***Common Stock***" (the "***Common Stock***").

Section 5.02.   Section 1123.  The Corporation shall not issue any non-voting equity securities to the extent prohibited by Section 1123 of Title 11 of the United States Code (the "***Bankruptcy Code***") as in effect on the effective date of the Plan of Reorganization of Hayes Lemmerz International, Inc., et al., as confirmed on [_____], 2009 by an order of the United States Bankruptcy Court for the District of Delaware entered on [_____], 2009 (the "***Chapter 11 Plan***"); *provided, however,* that this Section 5.02: (a) shall have no further force and effect beyond that required under Section 1123 of the Bankruptcy Code, (b) shall have such force and effect, if any, only for so long as such section of the Bankruptcy Code is in effect and applicable to the Corporation, and (c) in all events may be amended or eliminated in accordance with applicable law as from time to time may be in effect.

---

2_____DeltaView comparison of pcdocs://chisr01a/688254/1 and pcdocs://chisr01a/688254/2. Performed on 10/27/2009.

3

Section 5.03.  <u>Common Stock</u>.  The relative powers, preferences, special rights, qualifications, limitations and restrictions granted to or imposed on the respective classes of the shares of the Common Stock are as follows:

(a)  <u>Generally</u>.  Each share of Class A Common Stock, Class B-1 Common Stock and Class B-2 Common Stock shall be identical and treated equally in all respects except as set forth in Sections 5.03(b) and 5.03(c) and as otherwise provided by law.  No stock dividend, stock split, combination or other similar recapitalization may be effected as to any class of Common Stock unless such action affects the Class A Common Stock, Class B-1 Common Stock and Class B-2 Common Stock on a *pari passu* basis.  The rights and privileges of the Class B-1 Common Stock or the Class B-2 Common Stock as set forth in this Section 5.03 shall not be amended, altered or repealed (whether by amendment or restatement or by merger, consolidation, business combination or otherwise) in any manner which does not equally affect the other classes of Common Stock without the affirmative vote of holders of a majority of the outstanding shares, voting as a separate class, of such class of  Common Stock proposed to be affected.

(b)  <u>Voting</u>.

(i)  Each holder of Class A Common Stock shall be entitled to one vote in respect of each share of Class A Common Stock held of record on all matters submitted to a vote of stockholders.

(ii)  The shares of Class B-1 Common Stock and Class B-2 Common Stock shall not have voting rights except as provided by law and as provided in Section 5.03(b)(iii) below.  At any time the Class B-1 Common Stock or Class B-2 Common Stock is entitled to vote, such holders of Class B-1 Common Stock or Class B-2 Common Stock shall be entitled to one vote in respect of each share of Class B-1 Common Stock or Class B-2 Common Stock held of record.

(iii)  The ~~Company~~Corporation shall not~~[~~, and, as ~~applicable~~specified, shall not permit any of its subsidiaries to,~~]~~ take any of the following actions (whether by amendment or restatement of this Certificate of Incorporation or by merger, consolidation, business combination or otherwise) without first obtaining the affirmative vote or written consent of the holders of not less than a majority of the outstanding Class A Common Stock, Class B-1 Common Stock and Class B-2 Common Stock, voting together as a single class:

(1)  any authorization of, or increase in the number of authorized shares of, any class of capital stock ranking *pari passu* with or senior to the Common Stock as to dividends or liquidation preference, including additional Common Stock;

(2)  any amendment to this Certificate of Incorporation or the Corporation's Bylaws;

(3)  any amendment to the Stockholders Agreement among the Corporation and the stockholders party thereto, dated as of [_____], 2009;

---

3    DeltaView comparison of pcdocs://chisr01a/688254/1 and pcdocs://chisr01a/688254/2. Performed on 10/27/2009.

4

(4)     any change in the authorized number of directors of the Board to a number other than seven;

(5)     any sale, lease or other disposition of all or substantially all of the assets of the Corporation through one or more transactions (for purposes of this Section 5.03(b)(iii)(5), any sale, lease or other disposition of assets of any subsidiary of the Corporation through one or more transactions will be deemed to be a sale, lease or disposition of assets of the Corporation if such sale, lease or disposition would constitute all or substantially all of the assets of the Corporation and its subsidiaries on a consolidated basis);

(6)     any recapitalization, reorganization, consolidation or merger of the Corporation or any of its subsidiaries, other than recapitalizations, reorganizations, consolidations or mergers between the Corporation and any of its wholly owned subsidiaries or between any of the Corporation's wholly owned subsidiaries;

(7)     any issuance or entry into an agreement for the issuance of any equity securities or any securities convertible or exercisable for equity securities (A) of the Corporation, [which, in the aggregate with all other issuances permitted by this Section 5.03(b)(iii)(7), would exceed [————]750,000 shares (on an as converted basis)] or (B) of any of its subsidiaries, except for (i) in the case of clause (A), the issuance of the Series A Warrants, Series B Warrants, Series C Warrants, Series D Warrants, Series E Warrants and Series BF Warrants contemplated to be issued pursuant to the Plan, and any shares issued or issuable upon exercise thereof, or (ii) in the case of clause (A), issuances of Common Stock or securities convertible or exercisable for Common Stock  reserved for grant pursuant to any employee stock option plan, stock purchase plan, employee benefit plan, employment contract or any similar benefit or incentive program or agreement covering employees, consultants and directors of the Corporation and its subsidiaries approved by the board of directors, where the primary purpose of such plan, program or agreement is not to raise capital for the Corporation, and (iii) in the case of clause (B), any issuances between the Corporation and any of its wholly owned subsidiaries or between any of the Corporation's wholly owned subsidiaries;

(8)     the initiation or completion of a public offering of the securities of the Corporation or of any of its subsidiaries; and

(9)     any redemption, purchase or other acquisition by the Corporation [or any of its subsidiaries'] capital stock, except for (A) purchases approved or ratified by the board of directors, of Common Stock or securities convertible or exercisable for Common Stock from employees, consultants and directors of the Corporation upon termination of employment or affiliation and (B) purchases between the Corporation and any of its wholly owned subsidiaries or between any of the Corporation's wholly owned subsidiaries.

---

4_____DeltaView comparison of pcdocs://chisr01a/688254/1 and pcdocs://chisr01a/688254/2. Performed on 10/27/2009.

(c)    Conversion of Class B Common Stock.  The holders of Class B Common Stock have conversion rights as follows:

(i)    Each share of Class B-1 Common Stock shall be convertible, at the option of the holder thereof, at any time and from time to time after the date of issuance of such share, and without the payment of additional consideration by the holder thereof, into one share of Class A Common Stock.

(ii)    Prior to the transfer of a share of Class B-2 Common Stock to a person who is a non-affiliate of the initial holder of record of such share (a "*Qualifying Transfer*"), such share of Class B-2 Common Stock shall not be convertible.  At any time after a Qualifying Transfer, such share shall be convertible, at the option of the holder thereof, at any time and from time to time after the date of transfer of such share, and without the payment of additional consideration by the holder thereof, into one share of Class A Common Stock.

(iii)    Shares of Class B-1 Common Stock and any share of Class B-2 Common Stock that is convertible by the holder thereof by virtue of a Qualifying Transfer of such share shall be referred to herein as shares of "*Convertible Class B Common Stock.*" Before any holder of Convertible Class B Common Stock will be entitled to convert such holder's shares of Convertible Class B Common Stock into shares of Class A Common Stock and to receive certificates therefor, such holder shall either (A) surrender the certificate or certificates of such shares of Convertible Class B Common Stock, duly endorsed, at the office of the Corporation or of any transfer agent for the Convertible Class B Common Stock or (B) notify the Corporation or its transfer agent that such certificates have been lost, stolen or destroyed and execute an agreement satisfactory to the Corporation to indemnify the Corporation from any loss incurred by it in connection with such certificates, and shall give written notice to the Corporation that he elects to convert the same.  The Corporation shall, as soon as practicable after such delivery, or after such agreement and indemnification, issue and deliver to such holder of Convertible Class B Common Stock, a certificate or certificates for the number of shares of Class A Common Stock to which the holder shall be entitled as aforesaid.  Any declared but unpaid dividends on the Convertible Class B Common Stock to be converted shall remain payable to the holder after conversion thereof.  Such conversion shall be deemed to have been made immediately prior to the close of business on the date of such surrender of the shares of Convertible Class B Common Stock to be converted, and the person or persons entitled to receive the shares of Class A Common Stock issuable upon such conversion shall be treated for all purposes as the record holder or holders of such shares of Class A Common Stock on such date; *provided, however,* that if the conversion is in connection with an underwritten offer of securities registered pursuant to the Securities Act of 1933, as amended, or a merger, sale, financing, or liquidation of the Corporation or other event, the conversion may, at the option of any holder tendering Convertible Class B Common Stock for conversion, be conditioned upon the closing of such transaction or upon the occurrence of such event, in which case the person(s) entitled to receive the Class A Common Stock issuable upon such conversion of the Convertible Class B Common Stock shall not be deemed to have converted such Convertible Class B Common Stock until immediately prior to the closing of such transaction or the occurrence of such event.

---

5    DeltaView comparison of pcdocs://chisr01a/688254/1 and pcdocs://chisr01a/688254/2. Performed on 10/27/2009.

(iv)    The Corporation shall at all times when the Class B Common Stock shall be outstanding, reserve and keep available out of its authorized but unissued capital stock, for the purpose of effecting the conversion of shares of Convertible Class B Common Stock, such number of its duly authorized shares of Class A Common Stock as shall from time to time be sufficient to effect the conversion of all outstanding Class B Common Stock.

(v)    All shares of Convertible Class B Common Stock which shall have been surrendered for conversion as provided herein shall no longer be deemed to be outstanding and all rights with respect to such shares shall immediately cease and terminate upon conversion, except only the right of the holders thereof to receive shares of Class A Common Stock in exchange therefor and to receive payment of any dividends declared but unpaid thereon.  Any shares of Convertible Class B Common Stock so converted shall become authorized but unissued shares of Class A Common Stock.

(d)    Dividends.  The holders of Common Stock shall be entitled to receive dividends when and as declared by the board of directors out of funds legally available therefor.  Holders of shares of Common Stock shall be entitled to share equally, share for share, in such dividends.

(e)    Liquidation.  In the event of any liquidation, dissolution or winding up of the affairs of the Corporation, voluntary or involuntary, the assets of the Corporation available to stockholders shall be distributed equally per share to the holders of Common Stock.

## ARTICLE VI.

The business and affairs of the Corporation shall be managed by or under the direction of the board of directors, and the directors need not be elected by ballot unless required by the Bylaws of the Corporation.  The number of directors of the Corporation shall be fixed from time to time in the manner set forth in the Corporation's Bylaws.

## ARTICLE VII.

A director shall have no liability to the Corporation or its stockholders for monetary damages for breach of fiduciary duty as a director, except for liability (i) for any breach of the director's duty of loyalty to the Corporation or its stockholder, (ii) for acts or omissions not in good faith or that involve intentional misconduct by the director, or a knowing violation of law by a director, (iii) under Section 174 of the DGCL or (iv) for any transaction from which the director derived any improper personal benefit.  If the DGCL is hereafter amended to authorize corporate action further eliminating or limiting the personal liability of directors, then the liability of a director shall be eliminated or limited to the full extent permitted under the DGCL, as so amended.  Any repeal or modification of this Article shall not adversely affect any right or protection of a director of the Corporation existing at the time of such repeal or modification for or with respect to an act or omission of such director occurring prior to such repeal or modification.

6    DeltaView comparison of pcdocs://chisr01a/688254/1 and pcdocs://chisr01a/688254/2. Performed on 10/27/2009.

## ARTICLE VIII.

In furtherance and not in limitation of the powers conferred by the laws of the State of Delaware, the board of directors is expressly authorized to make, amend and repeal the Bylaws of the Corporation.

## ARTICLE IX.

The Corporation reserves the right to amend or repeal any provision contained in this Certificate of Incorporation in the manner from time to time prescribed by the laws of the State of Delaware.  All rights herein conferred are granted subject to this reservation.

## ARTICLE X.

The Corporation expressly elects not to be governed by Section 203 of the DGCL.

## ARTICLE XI.

The Corporation renounces any interest or expectancy of the Corporation in, or in being offered an opportunity to participate in, any Excluded Opportunity.  An "***Excluded Opportunity***" is any matter, transaction or interest that is presented to, or acquired, created or developed by, or which otherwise comes into the possession of, any director of the Corporation who is not an employee of the Corporation or any of its subsidiaries (a "***Covered Person***"), unless such matter, transaction or interest is presented to, or acquired, created or developed by, or otherwise comes into the possession of, a Covered Person expressly and solely in such Covered Person's capacity as a director of the Corporation.

---

7       DeltaView comparison of pcdocs://chisr01a/688254/1 and pcdocs://chisr01a/688254/2. Performed on 10/27/2009.

Document comparison done by DeltaView on Tuesday, October 27, 2009 6:46:55 PM

| Input: | |
|---|---|
| Document 1 | pcdocs://chisr01a/688254/1 |
| Document 2 | pcdocs://chisr01a/688254/2 |
| Rendering set | Option 3a strikethrough double score no moves |

| Legend: | |
|---|---|
| Insertion | |
| Deletion | |
| <Moved from > | |
| >Moved to < | |
| Style change | |
| Format change | |
| Moved deletion | |
| Inserted cell | |
| Deleted cell | |
| Moved cell | |
| Split/Merged cell | |
| Padding cell | |

| Statistics: | |
|---|---|
| | Count |
| Insertions | 14 |
| Deletions | 11 |
| Moved from | 0 |
| Moved to | 0 |
| Style change | 0 |
| Format changed | 0 |
| Total changes | 25 |

8_____DeltaView comparison of pcdocs://chisr01a/688254/1 and pcdocs://chisr01a/688254/2.
Performed on 10/27/2009.

## Exhibit H

## Blackline - Form of Executive Employment Agreements

**H-1 Curtis J. Clawson, President and Chief Executive Officer**

~~AMENDED AND RESTATED~~ EMPLOYMENT AGREEMENT~~, AS~~

~~AMENDED BY AMENDMENT No. 1 TO EMPLOYMENT AGREEMENT~~

THIS ~~AMENDED AND RESTATED~~EMPLOYMENT AGREEMENT (the "Agreement") is made as of the ~~26th~~[___] day of ~~September, 2001 (the "Agreement Date"),~~[_____], 2009, by and between Hayes Lemmerz International, Inc. (the "Company") and Curtis J. Clawson (the "Executive")~~, as amended by that certain Amendment No. 1 to Amended and Restated Employment Agreement dated as of December 30, 2008.~~.

~~WHEREAS, the Executive and the Company entered into an Employment Agreement dated August 1, 2001 (the "Original Agreement"); and~~

~~WHEREAS, the Executive and the Company each desire to amend and restate the Original Agreement in its entirety as set forth herein.~~

~~NOW, THEREFORE, in consideration of the premises and the respective covenants and agreements of the parties herein contained, the parties agree as follows:~~

**PRELIMINARY STATEMENTS**

A.    The Executive currently serves as the Company's Chief Executive Officer, pursuant to an employment agreement dated September 26, 2001, as amended thereafter (the "Original Agreement").

B.    The Company desires to continue to employ Executive as Chief Executive Officer, and the Executive desires to continue to be employed by the Company in said capacity; and

C.    Each party desires to set forth in writing the terms and conditions of their understandings and agreements.

**NOW, THEREFORE**, in consideration of the mutual covenants and obligations contained herein, the Company hereby agrees to employ the Executive and the Executive hereby accepts such employment upon the terms and conditions set forth in this Agreement, which shall take effect on the plan effective date (the "Effective Date") of the Joint Plan of Reorganization of Hayes Lemmerz International, Inc. and its Affiliated Debtors and Debtors-In Possession, dated as of September 2, 2009 (as the same may be amended or modified, the "Plan of Reorganization"). In the event the Plan of Reorganization does not become effective, this Agreement shall be of no force and effect.

**STATEMENT OF AGREEMENT**

1.    Employment.  The Company agrees to employ the Executive and the Executive agrees to be employed on a full-time basis by the Company for the period and upon the terms and conditions hereinafter set forth.

2.     Term; Employment Period.  The term of this Agreement (the "Term") shall be two years, commencing on ~~August 1, 2001 (~~the "Effective Date~~")~~; provided, however, that commencing on the second day of the Term and each day thereafter, the Term shall automatically be extended for one additional day.  The period during which the Executive is employed by the Company pursuant to this Agreement is referred to herein as the "Employment Period."  The date on which the termination of the Executive's employment hereunder shall become effective is referred to herein as the "Termination Date." ~~Press releases related to the Executive's commencement of employment hereunder shall be subject to reasonable review and approval by the Executive.~~

3.     Position and Duties.  During the Employment Period, the Executive shall serve as the President and Chief Executive Officer of the Company and shall have such responsibilities, duties and authority as are customarily ~~and ordinarily exercised by executives in similar positions in similar businesses in the United States~~associated with such position and shall exercise such responsibilities, duties and authority consistent with the foregoing as the Company's Board of Directors (the "Board") shall determine from time to time.  During the Employment Period, the Executive shall report to the Board.  It is the intention of the parties that, during the Term, Executive shall be nominated, and following his election or appointment, shall serve, as ~~a director~~the chairman of the ~~Company~~Board; provided, however, that the Executive shall resign as ~~a director~~the chairman of the ~~Company~~Board immediately if his employment hereunder is terminated for any reason.  The Executive shall devote substantially all his working time and efforts to the business and affairs of the Company and shall use his best efforts to carry out his responsibilities faithfully and efficiently in a professional manner.  Notwithstanding the foregoing, it is understood that ~~(i) during the first year of the Employment Period, the Executive shall not serve as a director of any for-profit business enterprise other than Clawson Associates and (ii) subject to any conflict of interest policies of the Company and Section 8, following the first year of the Employment Period,~~ the Executive may with the prior consent of the Board, which shall not be unreasonably withheld, serve on the board of directors of up to ~~two additional~~three for-profit business enterprises.  It is further understood that during the Employment Period, subject to any conflict of interest policies of the Company and Section 8, the Executive may (x) serve in any capacity with any civic, charitable, educational or professional organization provided that such service does not materially interfere with his duties and responsibilities hereunder and (y) make and manage personal investments of his choice.

4.     Place of Performance.  During the Employment Period, the Executive's place of performance of his services shall be at the Company's Northville, Michigan headquarters, except for required travel by the Executive on the Company's business or as may be reasonably required by the Company.

5.     Compensation and Benefits.

(a)     Salary.  During the Employment Period, the Company shall pay to the Executive an initial annual base salary of ~~Seven~~Eight Hundred ~~Fifty-Five~~Twenty-Four Thousand Dollars ($~~755,000~~824,000) (the "Base Salary"), such salary to be paid in periodic installments in accordance with the Company's payroll practices as in effect from time to time.  The Base Salary shall be reviewed annually by the compensation committee of the Board and

may be increased from time to time in accordance with normal business practices of the Company and, if so increased, shall not thereafter be reduced.

(b)  Cash-Based Incentives.  ~~During~~Following the expiration of the KEIP (as defined below) and during the Employment Period, the Executive shall be eligible to earn an annual bonus under the Company's Short-Term Incentive Plan, or a successor plan thereto, as in effect from time to time (the "Incentive Plan"), up to a maximum of two hundred percent (200%) of his Base Salary, subject to achievement of performance goals determined by the Board after consultation with the Executive in accordance with the terms of the Incentive Plan (such annual bonus, the "Annual Bonus").  ~~With respect to that portion of the Employment Period commencing on the Effective Date and ending January 31, 2002, the Executive shall receive in respect of his Annual Bonus an amount not less than One Hundred and Ninety Thousand Dollars ($190,000).  The Annual Bonus shall be payable in a cash lump sum at such time as bonuses are ordinarily paid in accordance with the terms of the Incentive Plan, but in no event later than 120 days after the end of each fiscal year of the Company.~~

~~(c)  Sign-On/Retention Bonus. Within [two] business days after the Agreement Date, the Company shall pay the Executive a one-time sign-on/retention bonus of One Million Two Hundred Thousand Dollars ($1,200,000) (the "Sign-on/Retention Bonus"), which will result in an after-tax payment to the Executive of $669,000.00 (the "After-Tax Retention Bonus Payment Amount").  The Sign-on/Retention Bonus is being paid on the condition that the Executive remains in the employ of the Company for a period of not less than three (3) years and, accordingly, the after-tax portion of the Sign-on/Retention Bonus shall be subject to the set-off and repayment provisions set forth in Section 6(f).~~

(c)  ~~(d) Equity-Based Incentives.~~ Equity Based Incentives.  In accordance with the Plan of Reorganization, the Board shall establish a long term equity incentive program ( the "LTIP").  The Executive shall be entitled to participate in the LTIP and shall receive awards under the LTIP which are no less than commensurate in value with awards received by other executives participating in the LTIP.

~~(i)  Option Grants.  The Company shall, (i) effective as of the Effective Date, grant to the Executive an option (the "Initial Option") pursuant to the Company's 1996 Stock Option Plan or otherwise (the "Option Plan") to purchase up to one million (1,000,000) shares of the Company's common stock, par value $0.01 per share ("Common Stock") and (ii) effective as of September 26th, 2001, grant to the Executive an option (the "Additional Option" and, together and with the Initial Option, the "Options") pursuant to the Option Plan to purchase up to four hundred thousand (400,000) shares of Common Stock.  The Initial Option and the Additional Option shall each be evidenced by an agreement containing such terms and conditions as the Board shall determine are necessary and desirable, consistent with the terms of the Option Plan; provided, however, that the Options shall (i) have a per share exercise price equal to the closing price of the Common Stock on the New York Stock Exchange ("NYSE") as of the Effective Date, with respect to the Initial Option and, as of September 26, 2001, with respect to the Additional Option; (ii) become cumulatively vested and exercisable with respect to twenty percent (20%) of the shares covered thereby on each of the first five anniversaries of the Effective Date; (iii) become fully vested and exercisable with respect~~

---

3____DeltaView comparison of pcdocs://chisr02a/773958/2 and pcdocs://chisr01a/681983/9. Performed on 10/29/2009.

to one-hundred percent (100%) of the shares covered thereby upon the occurrence of a Change in Control (as defined below); (iv) upon a termination of employment hereunder either (x) by the Company without Cause or (y) by the Executive for Good Reason (each as defined in Section 6(g)), become vested with respect to that number of shares that would have become vested in the normal course during the 36-month period following the Termination Date, absent such termination of employment (and without taking into account any subsequent Change in Control); and (v) notwithstanding the vesting and exercise period stated in such Options or the Option Plan, the Executive shall have not less than a period expiring seven months following the Termination Date to exercise such Options.

For purposes of this Agreement, a Change in Control shall be deemed to have occurred upon the first of the following to occur:

(A)     any Person (within the meaning of Section 3(a)(9) of the Securities and Exchange Act of 1934, as amended (the "Exchange Act"), as modified and used in Sections 13(d) and 14(d) thereof), other than Joseph Littlejohn & Levy Fund II, L.P. (or any affiliate (within the meaning of Regulation D Rule 501(b) under the Securities Act of 1933, as amended (the "Securities Act")) thereof), TSG Capital Fund II, L.P. (or any affiliate thereof), or Canadian Imperial Bank of Commerce (or affiliate thereof) (such entitles, collectively, the "JLL Group"), is or becomes the "Beneficial Owner" (within the meaning of Rule 13d-3 under the Exchange Act) of fifty percent (50%) or more of either (1) the then-outstanding Common Stock or (2) the combined voting power of the then-outstanding voting securities of the Company entitled to vote generally in the election of directors;

(B)     the following individuals cease for any reason to constitute a majority of the number of directors then serving:  individuals who, as of the Effective Date, constitute the Board and any new director (other than a director whose initial assumption of office is in connection with an actual or threatened election contest, including but not limited to a consent solicitation, relating to the election of directors of the Company) whose appointment or election by the Board or nomination for election by the Company's stockholders was approved or recommended by a vote of at least a majority of the directors then still in office who either were directors on the date hereof or whose appointment, election or nomination for election was previously so approved or recommended;

(C)     there is consummated a merger or consolidation of the Company or any direct or indirect subsidiary of the Company with any other corporation, other than a merger or consolidation which would result in the voting securities of the Company outstanding immediately prior to such merger or consolidation continuing to represent (either by remaining outstanding or by being converted into voting securities of the surviving entity or any parent thereof) at least fifty percent (50%) of the combined voting power of the securities of the Company or such surviving entity or any parent

4     DeltaView comparison of pcdocs://chisr02a/773958/2 and pcdocs://chisr01a/681983/9. Performed on 10/29/2009.

thereof outstanding immediately after such merger or consolidation, provided, however, that it shall not be a Change in Control under this clause (C) if (i) directors appointed or nominated by the JLL Group or any constituent member thereof continue immediately following such transaction to constitute a majority of the Board and (ii) the JLL Group or any constituent member thereof continues immediately following such transaction to own securities representing at least thirty-five percent (35%) of the combined voting power of the securities of the Company or such surviving entity or any parent thereof outstanding immediately after such merger or consolidation; or

(D)    the stockholders of the Company approve a plan of complete liquidation or dissolution of the Company or there is consummated an agreement for the sale or disposition by the Company of all or substantially all of its assets.

(ii)    Additional Option Grants.  Based upon the Executive's performance and annual review, the Executive shall be eligible during the Employment Period to receive additional stock option grants in such amounts and subject to such terms and conditions as the compensation committee of the Board shall determine in its sole discretion are necessary and desirable.

(iii)    Antidilution.  In addition to the antidilution provision contained in the Option Plan, in the event that during the employment period the Company shall issue shares of Common Stock in one transaction or a series of similar transaction in an amount exceeding five percent (5%) of the then outstanding shares of Common Stock, other than (A) as a result of stock split, stock dividend or similar transaction, (B) upon the conversion of shares of Non-Voting Common Stock, par value $.01 per share, of the Company that are outstanding as of the Agreement Date, (C) upon the exercise of warrants to purchase shares of Common Stock that are outstanding as of the Agreement Date or (D) upon the exercise of employee stock options (each, an "Additional Issuance"), the Company shall grant to the Executive an option (the "Antidilution Option") pursuant to the Option Plan to purchase the number of shares of Common Stock necessary to cause the percentage of the outstanding shares of Common Stock subject to the Options and the Antidilution Option to be equal to the percentage of the outstanding shares of Common Stock subject to the Options immediately prior to such additional issuance of shares of Common Stock.  The Antidilution Option shall be granted contemporaneously with the Additional Issuance, and the per share exercise price of the Additional Option shall be equal to the per share consideration received by the Company in such Additional Issuance, as determined by the Board.

(d)    Key Employee Incentive Plan.  The Executive shall participate in the Company's Key Employee Incentive Plan (the "KEIP"), in accordance with its terms, and as approved by the "Bankruptcy Court" in connection with the "Restructuring" (as each such term is defined in the KEIP).  If the KEIP is not approved by the Bankruptcy Court prior to the Effective Date, the Executive shall be entitled to payments under this Agreement in the amounts and under the terms and conditions set forth in the Company's Motion for Order Approving the

5    DeltaView comparison of pcdocs://chisr02a/773958/2 and pcdocs://chisr01a/681983/9. Performed on 10/29/2009.

Implementation of Key Employee Incentive Plan and Short Term Incentive Plan filed with the Bankruptcy Court on July 29, 2009.

(e)        Expenses.  During the Employment Period, the Company shall promptly reimburse the Executive for all reasonable out-of-pocket expenses incurred by the Executive in connection with the business of the Company and the performance of his duties under this Agreement in accordance with the terms of the Company's policies as in effect from time to time.

(f)        Benefit Plans.  During the Employment Period, the Executive shall be entitled to participate in all of the employee benefit plans, programs, agreements and arrangements (including without limitation the supplemental executive retirement plan) generally provided to senior executives of the Company, as such are in effect from time to time, on a basis no less favorable than that provided to such senior executives.

(g)        Perquisites.  During the Employment Period, the Executive shall be entitled to a Company car, and an annual executive physical examination, each such perquisite to be paid or provided commensurate with his position and in accordance with the Company's policies as in effect on the AmendmentEffective Date.  In addition, the Company shall pay Executive an annual flexible benefits allowance (the "Flexible Benefits Allowance") of Forty Thousand Dollars ($40,000), such allowance to be paid in periodic installments in accordance with the Company's payroll practices as in effect from time to time.  The Flexible Benefits Allowance shall be reviewed annually by the Compensation Committee of the Board and may be increased from time to time and, if so increased, shall not thereafter be reduced.

(h)        Vacations.  During the Employment Period, the Executive shall be entitled to vacation time, paid holidays and personal days, determined in accordance with the Company's policy with respect to its senior executives as in effect from time to time, it being understood that the Executive shall be entitled to not less than four weeks' vacation in any 12-month period during the Employment Period.

(i)        Relocation.  For a period of 12 months immediately following the Effective Date, the Company shall pay or reimburse the Executive for (i) his reasonable temporary housing expenses, (ii) automobile rental expenses and (iii) his and his spouse's reasonable travel expenses between Chicago, Illinois and Northville, Michigan that are incurred in connection with or prior to the relocation of his primary residence to the Northville, Michigan area.  In addition, the Company shall pay or reimburse the Executive for his actual moving expenses related to the relocation of his primary residence to the Northville, Michigan area and for all taxes payable by the Executive because of relocation-related payments by the Company, including tax reimbursement payments.  In no event shall payments and reimbursements to or on behalf of the Executive pursuant to this Section 5(h) exceed an aggregate of One Hundred Thousand Dollars ($100,000).

6.        Termination of Employment.

(a)        Accrued Benefits.  In the event of the termination of the Executive's employment hereunder for any reason during the Term, the Executive (or his estate

---

6   DeltaView comparison of pcdocs://chisr02a/773958/2 and pcdocs://chisr01a/681983/9. Performed on 10/29/2009.

or representative, as applicable) shall be entitled to receive any Base Salary, Annual Bonus, vacation time and expenses that have in each case accrued but are unpaid as of the Termination Date, ~~vested options~~ as well as any post--termination benefits (including but not limited to vested awards under the LTIP) to which he may be entitled pursuant to the Company's retirement, insurance and other benefit plans, programs and arrangements as in effect immediately prior to the Termination Date (the "Accrued Benefits").

(b)     Death.  The Executive's employment hereunder shall terminate as of the date of his death.  Upon the termination of the Executive's employment hereunder because of his death and during the Term, the Executive's estate or representative, as the case may be, shall be entitled to receive the Accrued Benefits and a lump sum payment in cash equal to (i) one year's Base Salary as in effect on the Termination Date and (ii) the product of (x) sixty percent (60%) of the Base Salary as in effect on the Termination Date, multiplied by a fraction (y) the numerator of which shall be the number of months (including fractions thereof) worked by the Executive during the Company's fiscal year in which the Termination Date occurs and (z) the denominator of which shall be the number 12 (such amount under this clause (ii), the "Pro Rata Annual Bonus").  Such amounts shall be paid as soon as administratively feasible following the Executive's death but in no event later than April 15 of the calendar year following the Executive's death.  In addition, those immediate family members who were participating in the Company's medical benefit plan as of the date of the Executive's death shall continue to participate in the Company's medical benefit plan at active employee contribution rates for the one-year period immediately following the date of the Executive's death.

(c)     Disability.   The Executive's employment hereunder may be terminated during the ~~Employment Period~~Term if the Executive is incapable of performing his principal duties hereunder because of physical or mental incapacity for a period of 45 consecutive working days or for more than 90 working days in any 12-month period ("Disability").  In the event that the Executive's employment is to be terminated pursuant to this Section 6(c), (i) this Agreement shall terminate on the date specified in the notice of termination delivered to the Executive (subject to Section 8(g) and Section 18); (ii) the Executive shall as of such date resign from all of his positions, duties and authorities hereunder; (iii) the Executive shall be placed on a medical leave of absence until the earlier of (A) expiration of the six-month period commencing on the date his medical leave of absence began, unless there is no reasonable expectation that the Executive will return to employment with the Company, in which case the date the Executive ceases performing services for the Company, (B) the date he qualifies for benefits under the Company's long-term disability plan or (C) the date he is able to return to work; and (iv) the Executive shall continue to be paid his Base Salary until such medical leave of absence ends.  In the case of a termination of the Executive's employment pursuant to this Section 6(c), for purposes of calculating benefits pursuant to clauses (B) and (C) below, the Termination Date shall be the date upon which the Executive's medical leave of absence commences, and for all other purposes, the Termination Date shall be the date upon which the Executive's medical leave of absence ends.  In the event the Executive's employment is terminated pursuant to this Section 6(c), the Executive (or his representative, as applicable) shall be entitled to:  (A) the Accrued Benefits; (B) payments in cash equal to one year's Base Salary and Flexible Benefits Allowance as in effect on the Termination Date; (C) the Pro Rata Annual Bonus; and (D) the continuation of health and welfare benefits at the levels in effect as of the Termination Date at no additional cost to the Executive than that which was in effect as of the

7____DeltaView comparison of pcdocs://chisr02a/773958/2 and pcdocs://chisr01a/681983/9. Performed on 10/29/2009.

Termination Date for the one-year period immediately following the Termination Date; provided, however, that such benefits shall be reduced to the extent comparable benefits are made available to the Executive from a successor employer, and the Executive shall be obligated to report such benefits to the Company.  The amounts payable pursuant to clauses (B) and (C) of the preceding sentence shall be paid, subject to Section 22,22 hereof, in twelve equal monthly payments commencing on the first day of the month following the Executive's Termination Date.  It is acknowledged and agreed by the Executive that he shall be precluded from terminating his employment hereunder for Good Reason in the event that his employment hereunder is terminated pursuant to this Section 6(c).

(d)      For Cause; Without Good Reason.  The Executive's employment hereunder may be terminated during the Employment PeriodTerm (i) by the Company for Cause (as defined below) or (ii) by the Executive without Good Reason (as defined below).  In the event that the Company terminates the Executive's employment hereunder for Cause, the Termination Date shall be the date specified in the notice of termination for Cause delivered by the Company to the Executive.  In the event that the Executive terminates his employment hereunder without Good Reason, the Termination Date shall be no earlier than 30 days following the date on which a notice of termination is delivered by the Executive to the Company.  In the event that the Executive's employment hereunder is terminated pursuant to this Section 6(d), the Executive shall be entitled to the Accrued Benefits.

(e)      Without Cause; For Good Reason; Change in Control.  The Executive's employment hereunder may be terminated during the Employment PeriodTerm (i) by the Company without Cause, (ii) by the Executive for Good Reason or (iii) by the Executive for any reason during the three-month period immediately following a Change in Control.  In the event that the Executive's employment is terminated pursuant to this Section 6(e) (whether by the Company or by the Executive), the Termination Date shall be no earlier than 30 days following the date on which a notice of termination is delivered by one party to the other.  In the event that the Executive's employment is terminated pursuant to this Section 6(e), the Executive (or his estate or representative, as the case may be) shall be entitled to receive the Accrued Benefits, and the other payments and benefits set forth in this Section 6(e).  The Executive (or his estate or representative, as the case may be) shall be entitled to payments in cash equal to two times the sum of the Flexible Benefits Allowance and one hundred and sixty percent (160%) of the Base Salary as in effect on the Termination Date.  The benefits described in the preceding sentence shall be paid, subject to Section 22,22 hereof, in twenty four equal monthly payments commencing on the first day of the month following the Executive's Termination Date.  The Executive shall be entitled for the duration of the Termtwo years following the Termination Date to executive level career outplacement services by a firm selected by the Executive and paid for as incurred by the Company.  In addition, for the first eighteen months following the Termination Date, the Executive shall receive continuation of health and welfare benefits at the levels in effect as of the Termination Date at no additional cost to the Executive than that which was in effect as of the Termination Date; provided, that such benefits shall be reduced to the extent comparable benefits are made available to the Executive from a successor employer, and the Executive shall be obligated to report such benefits to the Company.  If the Executive is not receiving accident and health insurance coverage from another employer at the end of such eighteen month period at the levels in effect as of the Termination Date, the Company shall pay the Executive a lump sum amount equal to six times the monthly COBRA health benefit

8      DeltaView comparison of pcdocs://chisr02a/773958/2 and pcdocs://chisr01a/681983/9. Performed on 10/29/2009.

continuation premium for the Executive's coverage under the Company's accident and health insurance coverage.

(f)     ~~Set-Off and Reimbursement of Sign-On/Retention Bonus.~~ ~~Notwithstanding anything to the contrary contained herein, in the event that  prior to August 1, 2004, the Executive's employment hereunder is terminated (i) by the Company For Cause pursuant to Section 6(d) or (ii) by the Executive without Good Reason pursuant to Section 6(d), then and only then, the Company shall have the right to set-off the Repayment Amount (as defined below) against any payments due to the Executive hereunder and the Executive shall immediately repay to the Company the balance, if any, of the Repayment Amount that is not set-off by the Company pursuant to this Section 6(f).  For purposes of this Agreement, the "Repayment Amount" shall equal the product of (i) the After-Tax Retention Payment Amount multiplied by (ii) a fraction (A) the numerator of which is the difference between 1,095 less the number of days the Executive was employed by the Company prior to the Termination Date and (B) the denominator of which is 1,095 (Repayment Amount = $669,000.00 x (1,095 - numbers of day employed) / 1,095).~~

(f)     ~~(g)~~ Definition of "Cause" ~~and~~, "Good Reason" ~~.~~ and "Change in Control."

For purposes of this Agreement, "Cause" means:  (i) the willful failure of the Executive to perform his material duties with the Company which have been duly assigned to the Executive and which duties are commensurate with those of the position for which Executive is then employed, and which failure is not cured (if capable of cure) within 15 days after receipt of written notice of such failure, which notice identifies the manner in which the Executive has willfully failed to perform, (ii) the engaging by the Executive in willful conduct which is demonstrably injurious to the Company, monetarily or otherwise, (iii) the conviction of the Executive of any crime or offense constituting a felony, ~~or~~ (iv) the conviction of the Executive for a violation of criminal law involving the Company and its business or (v) a failure by the Executive to comply with any material provision of this Agreement, which failure is not cured (if capable of cure) within 15 days after receipt of written notice of such non--compliance by the Executive.  Termination of the Executive for Cause shall mean termination by action of at least a majority of the Company's Board of Directors, at a meeting duly called and held upon at least 15 days' written notice to the Executive specifying the particulars of the action or inaction, alleged to constitute Cause and at which meeting the Executive and his counsel were entitled to be present and given adequate opportunity to be heard.  For purposes of clauses (i) and (ii) of this definition, action or inaction by the Executive shall not be considered "willful" unless done or omitted by him (A) intentionally or not in good faith and (B) without reasonable belief that his action or inaction was in the best interest of the Company, and shall not include failure to act by reason of total or partial incapacity due to physical or mental illness.

For purposes of this Agreement, "Good Reason" means the occurrence of one or more of the following events:  (i) a material adverse alteration in the nature or status of the Executive's position, duties, responsibilities or authority from those in effect as of the Effective Date; (ii) a material reduction in the Executive's Base Salary or level of employee benefits (other than across-the-board reductions applied similarly to all of the Company's senior executives); (iii) failure to pay or provide any of the compensation set forth in this Agreement

 9    DeltaView comparison of pcdocs://chisr02a/773958/2 and pcdocs://chisr01a/681983/9. Performed on 10/29/2009.

(except for an across-the-board deferral of compensation applied similarly to all of the Company's senior executives) which is not cured within fifteen (15) days after receipt by the Company of written notice thereof; (iv) the relocation of the Executive's principal place of employment more than 30 miles from its location as of the Effective Date except for required travel on the Company's business; (v) assignment of duties or responsibilities to the Executive which are materially inconsistent with the provisions of this Agreement; (vi) failure to continue the Executive on the Board following his initial election or appointment to the Board; or (vii) a failure by the Company to comply with any material provision of this Agreement, which failure is not cured (if capable of cure) within 15 days after receipt of written notice of such non-compliance by the Company..

For purposes of this Agreement, a Change in Control shall be deemed to have occurred upon the first of the following to occur after the Effective Date:

(i)    any Person (within the meaning of Section 3(a)(9) of the Securities and Exchange Act of 1934, as amended (the "Exchange Act"), as modified and used in Sections 13(d) and 14(d) thereof) becomes the "Beneficial Owner" (within the meaning of Rule 13d-3 under the Exchange Act) of fifty percent (50%) or more of either (1) the then-outstanding Common Stock or (2) the combined voting power of the then-outstanding voting securities of the Company entitled to vote generally in the election of directors;

(ii)    the following individuals cease for any reason to constitute a majority of the number of directors then serving: individuals who, as of the Effective Date, constitute the Board and any new director (other than a director whose initial assumption of office is in connection with an actual or threatened election contest, including but not limited to a consent solicitation, relating to the election of directors of the Company) whose appointment or election by the Board or nomination for election by the Company's stockholders was approved or recommended by a vote of at least a majority of the directors then still in office who either were directors on the date hereof or whose appointment, election or nomination for election was previously so approved or recommended;

(iii)    there is consummated a merger or consolidation of the Company or any direct or indirect subsidiary of the Company with any other corporation, other than a merger or consolidation which would result in the voting securities of the Company outstanding immediately prior to such merger or consolidation continuing to represent (either by remaining outstanding or by being converted into voting securities of the surviving entity or any parent thereof) at least fifty percent (50%) of the combined voting power of the securities of the Company or such surviving entity or any parent thereof outstanding immediately after such merger or consolidation; or

(iv)    the stockholders of the Company approve a plan of complete liquidation or dissolution of the Company or there is consummated an agreement for the sale or disposition by the Company of all or substantially all of its assets.

10    DeltaView comparison of pcdocs://chisr02a/773958/2 and pcdocs://chisr01a/681983/9. Performed on 10/29/2009.

Notwithstanding anything contained in this Agreement to the contrary (including, without limitation, this Section 6(f)), no transaction entered into, or other event occurring, pursuant to, as a result of, or in any way in connection with, the Restructuring shall constitute a "Change in Control" under this Agreement.

      (g)      INTENTIONALLY LEFT BLANK

      (h)      Additional Payments.:

      (i)      If any of the payments or benefits received or to be received by the Executive in connection with a Change in Control or the Executive's termination of employment (whether pursuant to the terms of this Agreement or any other plan, arrangement or agreement with the Company, any Person whose actions result in a Change in Control or any Person affiliated with the Company or such Person) (all such payments and benefits, excluding the Gross-Up Payment, being hereinafter referred to as the "Total Payments") will be subject to the excise tax imposed under Section 4999 of the Internal Revenue Code of 1986, as amended (the "Code" and such excise tax, the "Excise Tax"), the Company shall pay to the Executive an additional amount (the "Gross-Up Payment") such that the net amount retained by the Executive, after deduction of any Excise Tax on the Total Payments and any federal, state and local income and employment taxes incurred by the Executive in connection with payment of the Gross-Up Payment, shall be equal to the Total Payments.

      (ii)      For purposes of determining whether any of the Total Payments will be subject to the Excise Tax and the amount of such Excise Tax, (A) all of the Total Payments shall be treated as "parachute payments" (within the meaning of section 280G(b)(2) of the Code) unless, in the opinion of tax counsel ("Tax Counsel") reasonably acceptable to the Executive and selected by the accounting firm which was, immediately prior to the Change in Control, the Company's independent auditor (the "Auditor"), such payments or benefits (in whole or in part) do not constitute parachute payments, including by reason of section 280G(b)(4)(A) of the Code, (B) all "excess parachute payments" within the meaning of section 280G(b)(l) of the Code shall be treated as subject to the Excise Tax unless, in the opinion of Tax Counsel, such excess parachute payments (in whole or in part) represent reasonable compensation for services actually rendered (within the meaning of section 280G(b)(4)(B) of the Code) in excess of the Base Amount allocable to such reasonable compensation, or are otherwise not subject to the Excise Tax, and (C) the value of any noncash benefits or any deferred payment or benefit shall be determined by the Auditor in accordance with the principles of sections 280G(d)(3) and (4) of the Code.  For purposes of determining the amount of the Gross-Up Payment, the Executive shall be deemed to pay federal income tax at the highest marginal rate of federal income taxation in the calendar year in which the Gross- Up Payment is to be made and state and local income taxes at the highest marginal rate of taxation in the state and locality of the Executive's residence or the Executive's place of business, whichever is higher, on the Termination Date (or if there is not yet a Termination Date, then the date on which the Gross-Up Payment is calculated for

DeltaView comparison of pcdocs://chisr02a/773958/2 and pcdocs://chisr01a/681983/9. Performed on 10/29/2009.

purposes of this Section 6(h)), net of the maximum reduction in federal income taxes which could be obtained from deduction of such state and local taxes.

(iii)    In the event that the Excise Tax is finally determined to be less than the amount taken into account hereunder in calculating the Gross-Up Payment, the Executive shall repay to the Company, within five business days following the time that the amount of such reduction in the Excise Tax is finally determined, the portion of the Gross-Up Payment attributable to such reduction (including that portion of the Gross-Up Payment attributable to the Excise Tax and federal, state and local income and employment taxes imposed on the Gross-Up Payment being repaid by the Executive), to the extent that such repayment results in a reduction in the Excise Tax and a dollar-for-dollar reduction in the Executive's taxable income and wages for purposes of federal, state and local income and employment taxes, plus interest on the amount of such repayment at 120% of the rate provided in section 1274(b)(2)(B) of the Code. Notwithstanding the foregoing, in the event any portion of the amount to be repaid to the Company has been paid to any tax authority, repayment thereof shall not be required until actual refund or credit of such portion has been made to Executive, and interest payable to the Company shall not exceed the interest received or credited to Executive by such tax authority.  In the event that the Excise Tax is determined to exceed the amount taken into account hereunder in calculating the Gross-Up Payment (including by reason of any payment the existence or amount of which cannot be determined at the time of the Gross-Up Payment), the Company shall make an additional Gross-Up Payment in respect of such excess (including any interest, penalties or additions payable by the Executive with respect to such excess and the Gross-Up Payment attributable to the Excise Tax and federal, state, and local income and employment taxes imposed on the Gross-Up Payment being made to the Executive) within five business days following the time that the amount of such excess is finally determined.  The Executive and the Company shall each reasonably cooperate with the other in connection with any administrative or judicial proceedings concerning the existence or amount of liability for Excise Tax with respect to the Total Payments.

(iv)    The payments provided in this Section 6(h) hereof shall be made not later than the thirtieth day following the Date of Termination (or if there is no Date of Termination, then the date on which the Gross-Up Payment is calculated for purposes of this Section 6(h)) (but in no event after the last day of the calendar year following the calendar year in which the expense is incurred).

(i)    (v) No Mitigation.  Upon termination of the Executive's employment with the Company, subject to the Executive's affirmative obligations pursuant to Section 6(c) and 6(e), the Executive shall be under no obligation to seek other employment or otherwise mitigate the obligations of the Company under this Agreement.

7.    Directors' and Officers' Insurance; Indemnification.  In addition to any rights to indemnification to which the Executive is entitled under the Company's Restated Certificate of Incorporation and Bylaws, the Company shall indemnify the Executive at all times during and after the Employment Period to the maximum extent permitted under the Delaware Business Corporation Act or any successor provision thereof, and any and all applicable state

12    DeltaView comparison of pcdocs://chisr02a/773958/2 and pcdocs://chisr01a/681983/9. Performed on 10/29/2009.

law, and shall pay the Executive's expenses (including reasonable attorneys' fees and expenses, which shall be paid in advance by the Company as incurred, subject to recoupment in accordance with applicable law) in defending any civil action, suit or proceeding in advance of the final disposition of such action, suit or proceeding to the maximum extent permitted under such applicable state laws for the Executive's action or inaction on behalf of the Company under the terms of this Agreement including but not limited to any acts or alleged acts arising out of events prior to the Executive's employment by the Company which obligation shall survive the termination of the Executive's employment or the termination of the other provisions of this Agreement.

8.      Confidential Information; Removal of Documents; ~~Non-Competition~~Noncompetition; etc.  For purposes of this Section 8, "Company" shall mean the Company, its subsidiaries and affiliates.

(a)      Confidentiality.  Except as otherwise provided in this Agreement, at all times during and after the Employment ~~Term~~Period, the Executive shall keep secret and retain in strictest confidence, any and all Confidential Information (as defined below) relating to the Company, and shall use such Confidential Information only in furtherance of the performance by the Executive of the Executive's duties to the Company and not for personal benefit or the benefit of any interest adverse to the Company's interests.  For purposes of this Agreement, "Confidential Information" shall mean any information including without limitation plans, specifications, models, samples, data, customer lists and customer information, computer programs and documentation, and other technical and/or business information, in whatever form, tangible or intangible, that can be communicated by whatever means available at such time, that relates to the Company's current Business or future business contemplated during the Employment Period, products, services and development, or information received from others that the Company is obligated to treat as confidential or proprietary; provided, however, that such Confidential Information shall not include any information that (i) has become generally available to the public other than as a result of a disclosure by the Executive, or (ii) was available to or became known to the Executive prior to the disclosure of such information on a non-confidential basis without breach of any duty of confidentiality from any party to the Company, and the Executive shall not disclose such Confidential Information to any person or entity other than the Company, except as may be required by law or court or administrative order (in which event the Executive shall so notify the Company as promptly as practicable).  Upon termination of the Executive's employment hereunder for any reason, the Executive shall return to the Company all copies, reproductions and summaries of Confidential Information in the Executive's possession and erase the same from all media in the Executive's possession, and, if the Company so requests, shall certify in writing that the Executive has done so.  All Confidential Information is and shall remain the property of the Company (or, in the case of information that the Company receives from a third party which it is obligated to treat as confidential, then the property of such third party).

(b)      Non-~~ ~~Competition.

(i)      During the Employment Period, the Executive shall not engage in Competition ~~(as defined below)~~ with the Company.  For purposes of this Agreement, "Competition" by the Executive shall mean the Executive's engaging in, or

13     DeltaView comparison of pcdocs://chisr02a/773958/2 and pcdocs://chisr01a/681983/9. Performed on 10/29/2009.

otherwise directly or indirectly being employed by or acting as a consultant or lender to, or being a director, officer, employee, principal, agent, stockholder, member, owner or partner of, or permitting the Executive's name to be used in connection with the activities of any other business or organization anywhere which competes, directly or indirectly, with the Business of the Company as the same shall be constituted at the Termination Date or which, during the six-month period prior to the Executive's termination, the Company had made substantial plans with the intention of establishing operations.

(ii)     ~~Following termination of the Executive's employment hereunder, for the remainder of the Term as in effect immediately prior to~~For twenty-four months following the Termination Date, Executive shall not engage in Competition with the Company in any locality or region in which the Company had operations at the time of, or within six months prior to, the Executive's termination, or in which, during the six-month period prior to the Executive's termination, the Company had made substantial plans with the intention of establishing operations in such locality or region; provided, however, that it shall not be a violation of this sub-paragraph for the Executive to become the registered or beneficial owner of up to three percent (3%) of any class of the capital stock of a competing corporation registered under the Exchange Act, provided that the Executive does not actively participate in the business of such corporation until such time as this covenant expires.

(c)     Non-~~Solicitation.  Following termination of the Executive's employment hereunder, for the remainder of the Term as in effect immediately prior to~~ Solicitation.  During the Employment Period and for twenty-four months following the Termination Date, the Executive agrees that the Executive shall not, directly or indirectly, for the Executive's benefit or for the benefit of any other person, firm or entity, engage any of the following conduct:

(i)     solicit from any customer doing business with the Company as of the Termination Date, business of the same or of a similar nature to the business of the Company with such customer;

(ii)     solicit from any known potential customer of the Company business of the same or of a similar nature to that which has been the subject of a known written or oral bid, offer or proposal by the Company, or of substantial preparation with a view to making such a bid, proposal or offer, within six months prior to the Executive's termination;

(iii)     solicit the employment or services of, or hire, any person who was known to be employed by or was a known consultant to the Company upon the termination of the Executive's employment, or within six months prior thereto; or

(iv)     otherwise interfere with the business or accounts of the Company.

(d)     Intellectual Property.  All Intellectual Property (as defined below) and Technology (as defined below) created, developed, obtained or conceived of by the

14     DeltaView comparison of pcdocs://chisr02a/773958/2 and pcdocs://chisr01a/681983/9. Performed on 10/29/2009.

Executive during the Employment Period, and all business opportunities presented to the Executive during the Employment Period, shall be owned by and belong exclusively to the Company, provided that they reasonably relate to the Business, and the Executive shall (i) promptly disclose any such Intellectual Property, Technology or business opportunity to the Company, and (ii) execute and deliver to the Company, without additional compensation, such instruments as the Company may require from time to time to evidence its ownership of any such Intellectual Property, Technology or business opportunity.  For purposes of this Agreement, (A) the term "Intellectual Property" means and includes any and all trademarks, trade names, service marks, service names, patents, copyrights, and applications therefor, and (B) the term "Technology" means and includes any and all trade secrets, proprietary information, invention, discoveries, know-how, formulae, processes and procedures.

(e)    The Executive acknowledges that the services to be rendered by the Executive to the Company are of a special and unique character, which gives this Agreement a peculiar value to the Company, the loss of which may not be reasonably or adequately compensated for by damages in an action at law, and that a material breach or threatened breach by the Executive of any of the provisions contained in this Section 8 shall cause the Company irreparable injury.  The Executive therefore agrees that the Company shall be entitled, in addition to any other right or remedy, to a temporary, preliminary and permanent injunction, without the necessity of proving the inadequacy of monetary damages or the posting of any bond or security, enjoining or restraining the Executive from any such violation or threatened violations.

(f)    The Executive further acknowledges and agrees that due to the uniqueness of the Executive's services and confidential nature of the information the Executive shall possess, the covenants set forth herein are reasonable and necessary for the protection of the business and goodwill of the Company.

(g)    Continuing Operation.  Any termination of the Executive's employment or of this Agreement shall have no effect on the continuing operation of this Section 8.

9.    Stockholder Agreement.  As a precondition to receiving any award under the LTIP, Executive shall execute a management stockholders agreement that is acceptable to Executive and to the Company.

10.    9. Severability.  It is the desire and intent of the parties that the provisions of this Agreement shall be enforced to the fullest extent permissible under the laws and public policies applied in each jurisdiction in which enforcement is sought.  Accordingly, if any particular provision or portion of this Agreement shall be adjudicated to be invalid or unenforceable, this Agreement shall be deemed amended to delete therefrom the portion thus adjudicated to be invalid or unenforceable, such deletion to apply only with respect to the operation of such provision in the particular jurisdiction in which such adjudication is made.

15    DeltaView comparison of pcdocs://chisr02a/773958/2 and pcdocs://chisr01a/681983/9.  Performed on 10/29/2009.

11.    ~~10.~~ Notices.  All communications, requests, consents and other notices provided for in this Agreement shall be in writing and shall be deemed given if delivered by hand or mailed by first class mail, postage prepaid, to the last known address of the recipient.

12.    ~~11.~~ Governing Law.  This Agreement shall be governed by and construed and enforced in accordance with the laws of the State of Delaware, without regard to its conflicts of laws provisions.

13.    ~~12.~~ Assignment.  Neither this Agreement nor any rights or duties hereunder may be assigned by the Executive without the prior written consent of the Company. The Company shall have the right at any time to assign this Agreement to its successors and assigns; provided, however, that the assignee or transferee is the successor to all or substantially all of the business and assets of the Company and such assignee or transferee expressly assumes all of the obligations, duties and liabilities of the Company set forth in this Agreement.

14.    ~~13.~~ Amendments.  No provisions of this Agreement shall be altered, amended, revoked or waived except by an instrument in writing, signed by each party to this Agreement.

15.    ~~14.~~ Binding Effect.  Except as otherwise provided herein, this Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective legal representatives, heirs, successors and assigns.

16.    ~~15.~~ Execution in Counterparts.  This Agreement may be executed in any number of counterparts, each of which shall be deemed an original, but all of which together shall constituted one and the same instrument.

17.    ~~16.~~ Arbitration.  Any dispute, controversy or question arising under, out of, or relating to this Agreement (or the breach thereof), or, the Executive's employment with the Company or termination thereof, shall be referred for arbitration in the State of Michigan to a neutral arbitrator selected by the Executive and the Company and this shall be the exclusive and sole means for resolving such dispute.  Such arbitration shall be conducted in accordance with the National Rules for Resolution of Employment Disputes of the American Arbitration Association.  The arbitrator shall have the discretion to award reasonable attorneys' fees, costs and expenses to the prevailing party.  Judgment upon the award rendered by the arbitrator may be entered in any court having jurisdiction thereof.

18.    ~~17.~~ Entire Agreement.  This Agreement sets forth the entire agreement and understanding of the parties and supersedes all prior understandings, agreements (including, without limitation, the Original Agreement) or representations by or between the parties, whether written or oral, which relate in any way to the subject matter hereof.

19.    ~~18.~~ Survivorship.  The provisions of this Agreement necessary to carry out the intention of the parties as expressed herein shall survive the termination or expiration of this Agreement.

20.    ~~19.~~ Waiver.  Except as provided herein, the waiver by either party of the other party's prompt and complete performance, or breach or violation, of any provision of this

Agreement shall not operate nor be construed as a waiver of any subsequent breach or violation, and the failure by any party hereto to exercise any right or remedy which it may possess hereunder shall not operate nor be construed as a bar to the exercise of such right or remedy by such party upon the occurrence of any subsequent breach or violation.

21.    20. Captions.  The captions of this Agreement are for convenience and reference only and in no way define, describe, extend or limit the scope or intent of this Agreement or the intent of any provision hereof.

22.    21. Construction.  The parties acknowledge that this Agreement is the result of arm's-length negotiations between sophisticated parties each afforded representation by legal counsel.  Each and every provision of this Agreement shall be construed as though both parties participated equally in the drafting of same, and any rule of construction that a document shall be construed against the drafting party shall not be applicable to this Agreement.

23.    22. Code Section 409A Payment Delay.  Notwithstanding any provision in this Agreement to the contrary, any payment triggered by a termination of employment, to the extent and up to the amount necessary to ensure that such payments are not subject to penalties and interest under Code Section 409A (including but not limited to payments under Sections 6(c), (e) and (h)), shall not commence until at least six months after the Executive's termination of employment.  To the extent payments under this Agreement are not exempt from Code Section 409A, and absent this provision, would be paid during the first six month period following the Executive's termination of employment, those payments shall be withheld and the amount of the payments withheld will be paid in a lump sum, without interest, during the seventh month after termination; provided that, if the Executive dies during such six-month period, any such delayed payments shall be immediately payable to the Executive's estate or representative.

17    DeltaView comparison of pcdocs://chisr02a/773958/2 and pcdocs://chisr01a/681983/9. Performed on 10/29/2009.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first above written.  If and to the extent that any payment or benefit under this Agreement is determined by the Company to constitute "non-qualified deferred compensation" subject to Code Section 409A and is payable to the Executive by reason of the Executive's termination of employment, then such payment or benefit shall be made or provided to the Executive only upon a "separation from service" as defined for purposes of Code Section 409A.  The Company shall not have any liability or be responsible for any claim related to the incurrence by the Executive or any other person of any tax, interest expense, loss of tax benefit, or any other obligation or liability, in each case, arising under or related to Code Section 409A.

24.    Tax Withholding.  All compensation payable pursuant to this Agreement shall be subject to reduction by all applicable withholding, social security and other federal, state and local taxes and deductions.

*[signatures on following page]*

18___DeltaView comparison of pcdocs://chisr02a/773958/2 and pcdocs://chisr01a/681983/9. Performed on 10/29/2009.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first above written.

By:_____
       Curtis J. Clawson


HAYES LEMMERZ INTERNATIONAL, INC.


By:_____
Name:
Title:

Document comparison done by DeltaView on Thursday, October 29, 2009 9:35:56 PM

| Input: | |
|---|---|
| Document 1 | pcdocs://chisr02a/773958/2 |
| Document 2 | pcdocs://chisr01a/681983/9 |
| Rendering set | Option 3a strikethrough double score no moves |

| Legend: | |
|---|---|
| Insertion | |
| Deletion | |
| <Moved from > | |
| >Moved to < | |
| Style change | |
| Format change | |
| Moved deletion | |
| Inserted cell | |
| Deleted cell | |
| Moved cell | |
| Split/Merged cell | |
| Padding cell | |

| Statistics: | |
|---|---|
| | Count |
| Insertions | 88 |
| Deletions | 84 |
| Moved from | 0 |
| Moved to | 0 |
| Style change | 0 |
| Format changed | 40 |
| Total changes | 212 |

2    DeltaView comparison of pcdocs://chisr02a/773958/2 and pcdocs://chisr01a/681983/9. Performed on 10/29/2009.

**H-2 Fred Bentley, Chief Operation Officer and President, Global Wheel Group**

~~EMPLOYMENT AGREEMENT, AS AMENDED BY AMENDMENT No. 1, AMENDMENT No. 2, AND AMENDMENT No. 3 TO~~ EXECUTIVE EMPLOYMENT AGREEMENT

THIS AGREEMENT (the "Agreement") is made as of the ____th day of ~~September, 2001~~_____, 2009 (the "Agreement Date"), by and between Hayes Lemmerz International, Inc. (the "Company") and Fred Bentley (the "Executive")~~, as amended by those certain Amendment No. 1, Amendment No. 2 dated December 30, 2008, and Amendment No. 3 dated January 7, 2009, to Employment Agreement.~~.

~~WHEREAS, the Company desires to provide for the employment of the Executive on the terms and conditions set forth herein, in the best interest of the Company and its constituencies; and~~

~~WHEREAS, the Executive desires to be employed by the Company as provided herein; and~~

~~NOW, THEREFORE, in consideration of the premises and the respective covenants and agreements of the parties herein contained, the parties agree as follows:~~

## PRELIMINARY STATEMENTS

1. The Executive currently serves as the Company's Chief Operating Officer and President, Global Wheel Group, pursuant to an employment agreement dated September 21, 2001, as amended thereafter (the "Original Agreement").

2. The Company desires to continue to employ Executive as its Chief Operating Officer and President, Global Wheel Group, and the Executive desires to continue to be employed by the company in said capacity; and

3. Each party desires to set forth in writing the terms and conditions of their understandings and agreements.

**NOW, THEREFORE**, in consideration of the mutual covenants and obligations contained herein, the Company hereby agrees to employ the Executive and the Executive hereby accepts such employment upon the terms and conditions set forth in this Agreement, which shall take effect on the plan effective date (the "Effective Date") of the Joint Plan of Reorganization of Hayes Lemmerz International, Inc. and its Affiliated Debtors and Debtors-In Possession, dated as of September 2, 2009 (as the same may be amended or modified, the "Plan of Reorganization"). In the event the Plan of Reorganization does not become effective, this Agreement shall be of no force and effect

## STATEMENT OF AGREEMENT

1.     Employment.  The Company agrees to employ the Executive and the Executive agrees to be employed on a full-time basis by the Company for the period and upon the terms and conditions hereinafter set forth.

2.     Term; Employment Period.  The term of this Agreement (the "Term") shall be two years, commencing on ~~October 22, 2001 (~~the "Effective Date~~")~~; provided, however, that commencing on the second day of the Term and each day thereafter, the Term shall automatically be extended for one additional day.  The period during which the Executive is employed by the Company pursuant to this Agreement is referred to herein as the "Employment Period."  The date on which the termination of the Executive's employment hereunder shall become effective is referred to herein as the "Termination Date." ~~Press releases related to the Executive's commencement of employment hereunder shall be subject to reasonable review and approval by the Executive.~~

3.     Position and Duties.  ~~From and after January 1, 2006,~~During the Employment Period, the Executive shall serve as Chief Operating Officer and President, Global Wheel Group and shall have such responsibilities, duties and authority as are customarily ~~and ordinarily exercised by executives in similar positions in similar businesses in the United States~~associated with such position and shall exercise such responsibilities, duties and authority consistent with the foregoing as the Company's Chief Executive Officer or the Company's Board of Directors (the "Board") shall determine from time to time.  During the Employment Period, the Executive shall report to the Company's Chief Executive Officer.  The Executive shall devote substantially all his working time and efforts to the business and affairs of the Company and shall use his best efforts to carry out his responsibilities faithfully and efficiently in a professional manner.  Notwithstanding the foregoing, it is understood that during the Employment Period, subject to any conflict of interest policies of the Company and Section 8, the Executive may (x) serve in any capacity with any civic, charitable, educational or professional organization provided that such service does not materially interfere with his duties and responsibilities hereunder and (y) make and manage personal investments of his choice, and with the prior consent of the Company's Chief Executive Officer, which shall not be unreasonably withheld, serve on the board of directors of one (1) for-profit business enterprise.

4.     Place of Performance.  During the Employment Period, the Executive's place of performance of his services shall be at the Company's ~~Ferndale~~Northville, Michigan ~~Technical Center~~Headquarters, except for required travel by the Executive on the Company's business or as may be reasonably required by the Company.

5.     Compensation and Benefits.

(a)     Salary.  ~~From and after March 15, 2006,~~During the Employment Period, the Company shall pay to the Executive an initial annual base salary of ~~Three~~Four Hundred ~~Eighty~~and Twenty-Two Thousand Dollars ($~~380,000~~422,000) (as the same may be increased from time to time, the "Base Salary"), such salary to be paid in periodic installments in accordance with the Company's payroll practices as in effect from time to time.  The Base Salary

2____DeltaView comparison of pcdocs://chisr01a/688056/5 and pcdocs://wilsr01a/596789/6. Performed on 10/29/2009.

shall be reviewed annually by the compensation committee of the Board and may be increased from time to time in accordance with normal business practices of the Company and, if so increased, shall not thereafter be reduced.

(b)    Cash-Based Incentives.  ~~During~~Following the expiration of the KEIP (as defined below) and during the Employment Period, the Executive shall be eligible to earn an annual bonus under the Company~~'~~'s Short-Term Incentive Plan, or a successor plan thereto, as in effect from time to time (the ~~"~~"Incentive Plan~~"~~"), subject to achievement of performance goals determined by the Board in accordance with the terms of the Incentive Plan (such annual bonus, the ~~"~~"Annual Bonus~~"~~").  Such performance goals shall include (i) a threshold level below which no Annual Bonus shall be paid, (ii) a normative level that is tied to the budget, which if obtained, would result in an Annual Bonus of one hundred percent (100%) of the Base Salary and (iii) an upside level, which if obtained, would increase the Annual Bonus to a maximum of two hundred percent (200%) of the Base Salary.  ~~Any Annual Bonus payable to the Executive for the Company's fiscal year ending January 31, 2002 will be on a pro rata basis based upon the number of months the Executive worked for the Company during such fiscal year.~~  The Annual Bonus shall be payable in a cash lump sum at such time as bonuses are ordinarily paid in accordance with the terms of the Incentive Plan, but in no event later than 120 days after the end of each fiscal year of the Company.  Except as otherwise specifically provided in this Agreement, the Executive shall only be eligible to receive the Annual Bonus if the Executive is employed by the Company through the last day of February in the year in which the Annual Bonus is to be paid.

~~(c)    Sign-On/Retention Bonus. Within one (1) day after the Agreement Date, the Company shall pay the Executive a one-time sign-on/retention bonus of six hundred thousand dollars ($600,000) (the "Sign-on/Retention Bonus"), which will result in an after-tax payment to the Executive of $393,115 (the "After-Tax Retention Bonus Payment Amount").  The Sign-on/Retention Bonus is being paid on the condition that the Executive remains in the employ of the Company for a period of not less than three (3) years and, accordingly, the after-tax portion of the Sign-on/Retention Bonus shall be subject to the set-off and repayment provisions set forth in Section 6(f).~~
(c)    Equity Based Incentives.  In accordance with the Plan of Reorganization, the Board shall establish a long term equity incentive program ( the "LTIP").  The Executive shall be entitled to participate in the LTIP.  Prior to making any grants to the Executive, the Board shall consult with the CEO on such grants.

(d)    ~~Equity-Based Incentives.~~ Key Employee Incentive Plan.  The Executive shall participate in the Company's Key Employee Incentive Plan (the "KEIP"), in accordance with its terms, and as approved by the "Bankruptcy Court" in connection with the "Restructuring" (as each such term is defined in the KEIP).  If the KEIP is not approved by the Bankruptcy Court prior to the Effective Date, the Executive shall be entitled to payments under this Agreement in the amounts and under the terms and conditions set forth in the Company's Motion for Order Approving the Implementation of Key Employee Incentive Plan and Short Term Incentive Plan filed with the Bankruptcy Court on July 29, 2009.

 3    DeltaView comparison of pcdocs://chisr01a/688056/5 and pcdocs://wilsr01a/596789/6.  Performed on 10/29/2009.

(i)      Initial Option Grant.  The Company shall, effective as of the Effective Date, grant to the Executive an option (the "Initial Option") pursuant to the Company's 1996 Stock Option Plan or otherwise (the "Option Plan") to purchase up to ninety thousand (90,000) shares of the Company's common stock, par value $0.01 per share ("Common Stock").  The Initial Option shall consist of the maximum number of incentive stock options as permitted by the Internal Revenue Code of 1986, as amended.  The Initial Option shall be evidenced by an agreement containing such terms and conditions as the Board shall determine are necessary and desirable, consistent with the terms of the Option Plan; provided, however, that the Initial Option shall:

(1)      have a per share exercise price equal to the closing price of the Common Stock on the New York Stock Exchange ("NYSE") as of the Effective Date;

(2)      become cumulatively vested and exercisable with respect to twenty percent (20%) of the shares covered thereby on each of the first five anniversaries of the Effective Date;

(3)      become fully vested and exercisable with respect to one hundred percent (100%) of the shares covered thereby upon the occurrence of a Change in Control (as defined below);

(4)      upon a termination of employment hereunder either by (w) death, pursuant to Section 6(b), (x) Disability, pursuant to Section 6(c), (y) the Company without Cause, pursuant to Section 6(e) or (z) the Executive for Good Reason, pursuant to Section 6(e), become vested with respect to:

- sixty percent (60%) of the shares covered thereby if such termination occurs during the one year period commencing on the first anniversary of the Effective Date,

- eighty percent (80%) of the shares covered thereby if such termination occurs during the one year period commencing on the second anniversary of the Effective Date and

- one hundred percent (100%) of the shares covered thereby if such termination occurs any time on or after the third anniversary of the Effective Date; and

(5)      notwithstanding the vesting and exercise period stated in such Initial Option or the Option Plan, the Executive shall have not less than a period expiring seven months following the Termination Date to exercise such Initial Option.

For purposes of this Agreement, a Change in Control shall be deemed to have occurred upon the first of the following to occur:

(1) any Person (within the meaning of Section 3(a)(9) of the Securities and Exchange Act of 1934, as amended (the "Exchange Act"), as modified and used in Sections 13(d) and 14(d) thereof), other than Joseph Littlejohn & Levy Fund II, L.P. (or any affiliate (within the meaning of Regulation D Rule 501(b) under the Securities Act of 1933, as amended (the "Securities Act")) thereof), TSG Capital Fund II, L.P. (or any affiliate thereof), or Canadian Imperial Bank of Commerce (or affiliate thereof) (such entitles, collectively, the "JLL Group"), is or becomes the "Beneficial Owner" (within the meaning of Rule 13d-3 under the Exchange Act) of fifty percent (50%) or more of either (1) the then-outstanding Common Stock or (2) the combined voting power of the then-outstanding voting securities of the Company entitled to vote generally in the election of directors;

(2) the following individuals cease for any reason to constitute a majority of the number of directors then serving:  individuals who, as of the Effective Date, constitute the Board and any new director (other than a director whose initial assumption of office is in connection with an actual or threatened election contest, including but not limited to a consent solicitation, relating to the election of directors of the Company) whose appointment or election by the Board or nomination for election by the Company's stockholders was approved or recommended by a vote of at least a majority of the directors then still in office who either were directors on the date hereof or whose appointment, election or nomination for election was previously so approved or recommended;

(3) there is consummated a merger or consolidation of the Company or any direct or indirect subsidiary of the Company with any other corporation, other than a merger or consolidation which would result in the voting securities of the Company outstanding immediately prior to such merger or consolidation continuing to represent (either by remaining outstanding or by being converted into voting securities of the surviving entity or any parent thereof) at least fifty percent (50%) of the combined voting power of the securities of the Company or such surviving entity or any parent thereof outstanding immediately after such merger or consolidation, provided, however, that it shall not be a Change in Control under this clause (C) if (i) directors appointed or nominated by the JLL Group or any constituent member thereof continue immediately following such transaction to constitute a majority of the Board and (ii) the JLL Group or any constituent member thereof continues immediately following such transaction to own securities representing at least thirty-five percent (35%) of the combined voting power of the securities of the Company or such surviving entity or any parent thereof outstanding immediately after such merger or consolidation; or

(4) the stockholders of the Company approve a plan of complete liquidation or dissolution of the Company or there is consummated an

~~agreement for the sale or disposition by the Company of all or substantially all of its assets.~~

~~(ii)    Additional Option Grants.  Based upon the Executive's performance and annual review, the Executive shall be eligible during the Employment Period to receive additional stock option grants in such amounts and subject to such terms and conditions as the compensation committee of the Board shall determine in its sole discretion are necessary and desirable.~~

~~(iii)    Antidilution.  In addition to the antidilution provision contained in the Option Plan, in the event that during the employment period the Company shall issue shares of Common Stock in one transaction or a series of similar transaction in an amount exceeding five percent (5%) of the then outstanding shares of Common Stock, other than (i) as a result of stock split, stock dividend or similar transaction, (ii) upon the conversion of shares of Non-Voting Common Stock, par value $.01 per share, of the Company that are outstanding as of the Agreement Date, (iii) upon the exercise of warrants to purchase shares of Common Stock that are outstanding as of the Agreement Date or (iv) upon the exercise of employee stock options (each, an "Additional Issuance"), the Company shall grant to the Executive an option (the "Antidilution Option") pursuant to the Option Plan to purchase the number of shares of Common Stock necessary to cause the percentage of the outstanding shares of Common Stock subject to the Initial Option and the Antidilution Option to be equal to the percentage of the outstanding shares of Common Stock subject to the Initial Option immediately prior to such additional issuance of shares of Common Stock.  The Antidilution Option shall be granted contemporaneously with the Additional Issuance, and the per share exercise price of the Additional Option shall be equal to the per share consideration received by the Company in such Additional Issuance, as determined by the Board.~~

(e)    <u>Expenses</u>.  During the Employment Period, the Company shall promptly reimburse the Executive for all reasonable out-of-pocket expenses incurred by the Executive in connection with the business of the Company and the performance of his duties under this Agreement in accordance with the terms of the Company's policies as in effect from time to time.

(f)    <u>Benefit Plans</u>.  During the Employment Period, the Executive shall be entitled to participate in all of the employee benefit plans, programs, agreements and arrangements <u>(including without limitation the supplemental executive retirement plan) generally</u> provided to senior executives of the Company, as such are in effect from time to time, on a basis no less favorable than that provided to such senior executives~~; provided, however, that health care insurance coverage shall commence the first day of the month following thirty (30) days after the Effective Date and the Company shall reimburse the Executive for all COBRA premiums paid by the Executive or medical costs actually incurred by the Executive or the Executive's dependents during the period commencing on the Effective Date and ending on the date health care coverage is made available to the Executive~~.  In addition, for any welfare benefit provided by the Company such as short term disability benefits which depends upon the

6    DeltaView comparison of pcdocs://chisr01a/688056/5 and pcdocs://wilsr01a/596789/6. Performed on 10/29/2009.

Executive's years of service in order to provide the maximum level of benefits coverage, the Executive shall be deemed to have the requisite years of service in order to receive the maximum level of benefits coverage.

(g)  <u>Perquisites</u>.  During the Employment Period, the Executive shall be entitled to a Company car, and an annual executive physical examination, each such perquisite to be paid or provided commensurate with his position and in accordance with the Company's policies as in effect ~~on~~from time to time after the ~~Amendment~~Effective Date.  In addition, the Company shall pay Executive an annual flexible benefits allowance (the "Flexible Benefits Allowance") of Thirty Five Thousand Dollars ($35,000), such allowance to be paid in periodic installments in accordance with the Company's payroll practices as in effect from time to time.  The Flexible Benefits Allowance shall be reviewed annually by the Compensation Committee of the Board and may be increased from time to time and, if so increased, shall not thereafter be reduced.

(h)  <u>Vacations</u>.  During the Employment Period, the Executive shall be entitled to vacation time, paid holidays and personal days, determined in accordance with the Company's policy with respect to its senior executives as in effect from time to time, it being understood that the Executive shall be entitled to ~~two (2) weeks vacation in 2001 and~~ not less than four weeks' vacation in any 12-month period during the Employment Period thereafter~~.~~

~~(i)  Relocation.  The Executive shall be entitled to the relocation benefits described on Attachment A hereto (and any subsequent enhancements thereto)~~.

6.  <u>Termination of Employment</u>.

(a)  <u>Accrued Benefits</u>.  In the event of the termination of the Executive's employment hereunder for any reason <u>during the Term</u>, the Executive (or his estate or representative, as applicable) shall be entitled to receive any Base Salary, Annual Bonus, vacation time and expenses that have in each case accrued but are unpaid as of the Termination Date, ~~vested options~~ as well as any post-termination benefits <u>(including but not limited to vested awards under the LTIP)</u> to which he may be entitled pursuant to the Company's retirement, insurance and other benefit plans, programs and arrangements as in effect immediately prior to the Termination Date (the "Accrued Benefits").

(b)  <u>Death</u>.  The Executive's employment hereunder shall terminate as of the date of his death.  Upon the termination of the Executive's employment hereunder because of his death <u>during the Term</u>, the Executive's estate or representative, as the case may be, shall be entitled to receive the Accrued Benefits and a lump sum payment in cash equal to (i) one year's Base Salary as in effect on the Termination Date and (ii) the product of (x) one hundred percent (100%) of the Base Salary as in effect on the Termination Date, multiplied by a fraction (y) the numerator of which shall be the number of months (including fractions thereof) worked by the Executive during the Company's fiscal year in which the Termination Date occurs and (z) the denominator of which shall be the number 12 (such amount under this clause (ii), the "Pro Rata Annual Bonus").  Such amounts shall be paid as soon as administratively feasible following the Executive's death but in no event later than April 15 of the calendar year following the Executive's death.  In addition, those immediate family members who were participating in the

7  DeltaView comparison of pcdocs://chisr01a/688056/5 and pcdocs://wilsr01a/596789/6. Performed on 10/29/2009.

Company's medical benefit plan as of the date of the Executive's death shall continue to participate in the Company's medical benefit plan at active employee contribution rates for the one-year period immediately following the date of the Executive's death.

(c)      Disability.   The Executive's employment hereunder may be terminated during the ~~Employment Period~~Term if the Executive is incapable of performing his principal duties hereunder because of physical or mental incapacity for a period of 45 consecutive working days or for more than 90 working days in any 12-month period ("Disability").  In the event that the Executive's employment is to be terminated pursuant to this Section 6(c), (i) this Agreement shall terminate on the date specified in the notice of termination delivered to the Executive (subject to Section 8(g) and Section 18); (ii) the Executive shall as of such date resign from all of his positions, duties and authorities hereunder; (iii) the Executive shall be placed on a medical leave of absence until the earlier of (A) expiration of the six-month period commencing on the date his medical leave of absence began, unless there is no reasonable expectation that the Executive will return to employment with the Company, in which case the date the Executive ceases performing services for the Company, (B) the date he qualifies for benefits under the Company's long-term disability plan or (C) the date he is able to return to work; and (iv) the Executive shall continue to be paid his Base Salary until such medical leave of absence ends.  In the case of a termination of the Executive's employment pursuant to this Section 6(c), for purposes of calculating benefits pursuant to clauses (B) and (C) below the Termination Date shall be the date upon which the Executive's medical leave of absence commences, and for all other purposes, the Termination Date shall be the date upon which the Executive's medical leave of absence ends.  In the event the Executive's employment is terminated pursuant to this Section 6(c), the Executive (or his representative, as applicable) shall be entitled to:  (A) the Accrued Benefits; (B) a lump sum payment in cash equal to one year's Base Salary and Flexible Benefits Allowance as in effect on the Termination Date; (C) the Pro Rata Annual Bonus; and (D) the continuation of health and welfare benefits at the levels in effect as of the Termination Date at no additional cost to the Executive than that which was in effect as of the Termination Date for the one-year period immediately following the Termination Date; provided, however, that such benefits shall be reduced to the extent comparable benefits are made available to the Executive from a successor employer, and the Executive shall be obligated to report such benefits to the Company.  The amounts payable pursuant to clauses (B) and (C) of the preceding sentence shall be paid in the month following the Executive's Termination Date. It is acknowledged and agreed by the Executive that he shall be precluded from terminating his employment hereunder for Good Reason in the event that his employment hereunder is terminated pursuant to this Section 6(c).

(d)      For Cause; Without Good Reason.  The Executive's employment hereunder may be terminated during the ~~Employment Period~~Term (i) by the Company for Cause (as defined below) or (ii) by the Executive without Good Reason (as defined below).  In the event that the Company terminates the Executive's employment hereunder for Cause, the Termination Date shall be the date specified in the notice of termination for Cause delivered by the Company to the Executive.  In the event that the Executive terminates his employment hereunder without Good Reason, the Termination Date shall be no earlier than 30 days following the date on which a notice of termination is delivered by the Executive to the Company.  In the

8     DeltaView comparison of pcdocs://chisr01a/688056/5 and pcdocs://wilsr01a/596789/6. Performed on 10/29/2009.

event that the Executive's employment hereunder is terminated pursuant to this Section 6(d), the Executive shall be entitled to the Accrued Benefits.

(e)    Without Cause; For Good Reason. The Executive's employment hereunder may be terminated during the ~~Employment Period~~Term (i) by the Company without Cause or (ii) by the Executive for Good Reason.  In the event that the Executive's employment is terminated pursuant to this Section 6(e) (whether by the Company or by the Executive), the Termination Date shall be no earlier than 30 days following the date on which a notice of termination is delivered by one party to the other.  In the event that the Executive's employment is terminated pursuant to this Section 6(e), the Executive (or his estate or representative, as the case may be) shall be entitled to receive the Accrued Benefits and the other payments and benefits set forth in this Section 6(e).   The Executive (or his estate or representative, as the case may be) shall be entitled to the following severance benefits (A) a lump sum payment in cash equal to one year's Base Salary and Flexible Benefits Allowance as in effect on the Termination Date; (B) the Pro Rata Annual Bonus; and (C) the title to the Executive's Company vehicle.  The benefits described in the preceding sentence shall be paid in the month following the Executive's Termination Date.  Severance benefits provided to the Executive under this paragraph shall also include:  (x) continuation of health and welfare benefits for one year at the levels in effect as of the Termination Date at no additional cost to the Executive than that which was in effect as of the Termination Date; provided, that such benefits shall be reduced to the extent comparable benefits are made available to the Executive from a successor employer, and the Executive shall be obligated to report such benefits to the Company; and (y) executive level career outplacement services for the period beginning on the Termination Date and ending December 31 of second calendar year following termination by a mutually agreeable outplacement firm and paid for as incurred by the Company.

(f)    ~~Set-Off and Reimbursement of Sign-On/Retention Bonus.  Notwithstanding anything to the contrary contained herein, if the Executive does not commence employment with the Company on or before the Effective Date, (i) the full amount of the Sign-On/Retention Bonus shall be repaid by the Executive to the Company no later than three days after the Effective Date, and (ii) the Executive shall pay the Company's expenses (including reasonable attorney's fees and expenses) incurred in recovering the Sign-On/Retention Bonus from the Executive.  In addition, notwithstanding anything to the Contrary contained herein, in the event that, during the initial three-year period of the Term, without taking into account any extensions thereof, the Executive's employment hereunder is terminated by (i) by the Company For Cause pursuant to Section 6(d) or by the Executive without Good Reason pursuant to Section 6(d), then and only then, the Company shall have the right to set-off the Repayment Amount (as defined below) against any payments due to the Executive hereunder and the Executive shall immediately repay to the Company the balance, if any, of the Repayment Amount that is not set-off by the Company pursuant to this Section 6(f).  For purposes of this Agreement, the "Repayment Amount" shall equal the product of (i) the After-Tax Retention Payment Amount multiplied by (ii) a fraction (A) the numerator of which is the difference between 1,095 less the number of days the Executive has been employed by the Company and (B) the denominator of which is 1,095 (Repayment Amount = $393,115 x (1,095 - numbers of day employed) / 1,095).~~          ~~(g)~~    Definition of "Cause" and "Good Reason".

---

⁹ ........ DeltaView comparison of pcdocs://chisr01a/688056/5 and pcdocs://wilsr01a/596789/6. Performed on 10/29/2009.

For purposes of this Agreement, "Cause" means:  (i) the willful failure of the Executive to perform his material duties with the Company which have been duly assigned to the Executive and which duties are commensurate with those of the position for which Executive is then employed, and which failure is not cured (if capable of cure) within 15 days after receipt of written notice of such failure, which notice identifies the manner in which the Executive has willfully failed to perform, (ii) the engaging by the Executive in willful conduct which is demonstrably injurious to the Company, monetarily or otherwise, (iii) the conviction of the Executive of any crime or offense constituting a felony, or (iv(iv) the conviction of the Executive for a violation of criminal laws involving the Company and its business, or (v) a failure by the Executive to comply with any material provision of this Agreement, which failure is not cured (if capable of cure) within 15 days after receipt of written notice of such non-compliance by the Executive.  Termination of the Executive for Cause shall mean termination by action of at least a majority of the Company's Board of Directors, at a meeting duly called and held upon at least 15 days' written notice to the Executive specifying the particulars of the action or inaction alleged to constitute Cause and at which meeting the Executive and his counsel were entitled to be present and given adequate opportunity to be heard.  For purposes of clauses (i) and (ii) of this definition, action or inaction by the Executive shall not be considered "willful" unless done or omitted by him (A) intentionally or not in good faith and (B) without reasonable belief that his action or inaction was in the best interest of the Company, and shall not include failure to act by reason of total or partial incapacity due to physical or mental illness.

For purposes of this Agreement, "Good Reason" means:  (i) a material adverse alteration in the nature or status of the Executive's position, duties, responsibilities or authority from those in effect as of the Effective Date; (ii) a material reduction in the Executive's Base Salary or level of employee benefits (other than across-the-board reductions applied similarly to all of the Company's senior executives occurring after the second anniversary of the Effective Date); (iii) failure to pay or provide any of the compensation set forth in this Agreement (except for an across-the-board deferral of compensation applied similarly to all of the Company's senior executives occurring after the second anniversary of the Effective Date) which is not cured within 15 days after receipt by the Company of written notice thereof; (iv) the relocation of the Executive's principal place of employment more than 30 miles from its location as of the Effective Date except for required travel on the Company's business; (v) assignment of duties or responsibilities to the Executive which are materially inconsistent with the provisions of this Agreement; or (vi) a failure by the Company to comply with any material provision of this Agreement, which failure is not cured (if capable of cure) within 15 days after receipt of written notice of such non-compliance by the Company; (vii) if Curtis J. Clawson is no longer serving as President and Chief Executive Officer of the Company and the Executive is not offered the position of President and Chief Executive Officer; or (viii) if a Substantial Asset Sale shall occur with respect to the Global Wheel Group, but only if the Executive is not offered additional responsibilities reasonably commensurate with his responsibilities related to the operations involved in such Substantial Asset Sale.  For purposes of the foregoing clause (viii), a "Substantial Asset Sale" shall mean the sale or other disposition to any entity that is not an Affiliate of the Company of the assets, stock or other ownership interests, either as the result of a single transaction or a series of transactions, of either all of the steel wheel operations of the Global Wheel Group or all of the aluminum wheel operations of the Global Wheel Group.  For

10_____DeltaView comparison of pcdocs://chisr01a/688056/5 and pcdocs://wilsr01a/596789/6. Performed on 10/29/2009.

purposes of this definition, "Affiliate" shall mean any entity controlling, controlled by or under common control with the Company.

(~~h~~g)   <u>Change in Control Severance Provisions</u>.  The provisions set forth in Attachment B hereto are hereby incorporated into this Agreement.  The Executive hereby acknowledges that in the event he becomes entitled to the payment set forth in Section 6.1(A) of Attachment B hereto, that such payment will be in lieu of any other payments to be made pursuant to the terms of this Agreement.

<u>For purposes of this Agreement, a Change in Control shall be deemed to have occurred upon the first of the following to occur after the Effective Date:</u>

<u>(i)   any Person (within the meaning of Section 3(a)(9) of the Securities and Exchange Act of 1934, as amended (the "Exchange Act"), as modified and used in Sections 13(d) and 14(d) thereof) becomes the "Beneficial Owner" (within the meaning of Rule 13d-3 under the Exchange Act) of fifty percent (50%) or more of either (1) the then-outstanding Common Stock or (2) the combined voting power of the then-outstanding voting securities of the Company entitled to vote generally in the election of directors;</u>

<u>(ii)   the following individuals cease for any reason to constitute a majority of the number of directors then serving: individuals who, as of the Effective Date, constitute the Board and any new director (other than a director whose initial assumption of office is in connection with an actual or threatened election contest, including but not limited to a consent solicitation, relating to the election of directors of the Company) whose appointment or election by the Board or nomination for election by the Company's stockholders was approved or recommended by a vote of at least a majority of the directors then still in office who either were directors on the date hereof or whose appointment, election or nomination for election was previously so approved or recommended;</u>

<u>(iii)   there is consummated a merger or consolidation of the Company or any direct or indirect subsidiary of the Company with any other corporation, other than a merger or consolidation which would result in the voting securities of the Company outstanding immediately prior to such merger or consolidation continuing to represent (either by remaining outstanding or by being converted into voting securities of the surviving entity or any parent thereof) at least fifty percent (50%) of the combined voting power of the securities of the Company or such surviving entity or any parent thereof outstanding immediately after such merger or consolidation; or</u>

<u>(iv)   the stockholders of the Company approve a plan of complete liquidation or dissolution of the Company or there is consummated an agreement for the sale or disposition by the Company of all or substantially all of its assets.</u>

<u>(~~i~~Notwithstanding anything contained in this Agreement to the contrary (including, without limitation, this Section 6(g)), no transaction entered into, or other event</u>

---

11_____DeltaView comparison of pcdocs://chisr01a/688056/5 and pcdocs://wilsr01a/596789/6. Performed on 10/29/2009.

occurring, pursuant to, as a result of, or in any way in connection with, the Restructuring shall constitute a "Change in Control" under this Agreement.

(h)    Release Agreement.  Notwithstanding anything to the contrary contained in this Section 6, the Executive shall be required to execute the Company's then current standard release agreement as a condition to receiving any of the payments and benefits provided for in this Section 6 or Attachment B.  It is acknowledged and agreed that the then current standard release agreement shall be a mutual release and shall not diminish or terminate Executive's rights under this Agreement including, but not limited to, those delineated in Sections 6(ji), 7 and 16 herein.  The time period for executing such release (and the period available to revoke it) shall be in accordance with the Company's then current standard practice but in no event shall the execution and revocation periods extend beyond the six month anniversary of the Executive's Termination Date.

(ji)    No Mitigation.  Upon termination of the Executive's employment with the Company, subject to the Executive's affirmative obligations pursuant to Section 6(c) and 6(e), the Executive shall be under no obligation to seek other employment or otherwise mitigate the obligations of the Company under this Agreement.

7.    Directors' and Officers' Insurance; Indemnification.  In addition to any rights to indemnification to which the Executive is entitled under the Company's Restated Certificate of Incorporation and Bylaws, the Company shall indemnify the Executive at all times during and after the Employment Period to the maximum extent permitted under the Delaware Business Corporation Act or any successor provision thereof, and any and all applicable state law, and shall pay the Executive's expenses (including reasonable attorneys' fees and expenses, which shall be paid in advance by the Company as incurred, subject to recoupment in accordance with applicable law) in defending any civil action, suit or proceeding in advance of the final disposition of such action, suit or proceeding to the maximum extent permitted under such applicable state laws for the Executive's action or inaction on behalf of the Company under the terms of this Agreement including but not limited to any acts or alleged acts arising out of events prior to the Executive's employment by the Company which obligation shall survive the termination of the Executive's employment or the termination of the other provisions of this Agreement.

8.    Confidential Information; Removal of Documents; Non-Competition; etc.  For purposes of this Section 8, "Company" shall mean the Company, its subsidiaries and affiliates.

(a)    Confidentiality.  Except as otherwise provided in this Agreement, at all times during and after the Employment TermPeriod, the Executive shall keep secret and retain in strictest confidence, any and all Confidential Information (as defined below) relating to the Company, and shall use such Confidential Information only in furtherance of the performance by the Executive of the Executive's duties to the Company and not for personal benefit or the benefit of any interest adverse to the Company's interests.  For purposes of this Agreement, "Confidential Information" shall mean any information including without limitation plans, specifications, models, samples, data, customer lists and customer information, computer

12    DeltaView comparison of pcdocs://chisr01a/688056/5 and pcdocs://wilsr01a/596789/6. Performed on 10/29/2009.

programs and documentation, and other technical and/or business information, in whatever form, tangible or intangible, that can be communicated by whatever means available at such time, that relates to the Company's current Business or future business contemplated during the Employment Period, products, services and development, or information received from others that the Company is obligated to treat as confidential or proprietary; provided, however, that such Confidential Information shall not include any information that (i) has become generally available to the public other than as a result of a disclosure by the Executive, or (ii) was available to or became known to the Executive prior to the disclosure of such information on a non-confidential basis without breach of any duty of confidentiality from any party to the Company, and the Executive shall not disclose such Confidential Information to any person or entity other than the Company, except as may be required by law or court or administrative order (in which event the Executive shall so notify the Company as promptly as practicable).  Upon termination of the Executive's employment hereunder for any reason, the Executive shall return to the Company all copies, reproductions and summaries of Confidential Information in the Executive's possession and erase the same from all media in the Executive's possession, and, if the Company so requests, shall certify in writing that the Executive has done so.  All Confidential Information is and shall remain the property of the Company (or, in the case of information that the Company receives from a third party which it is obligated to treat as confidential, then the property of such third party).

(b)     Non-Competition.

(i)     During the Employment Period, the Executive shall not engage in Competition (as defined below) with the Company.  For purposes of this Agreement, "Competition" by the Executive shall mean the Executive's engaging in, or otherwise directly or indirectly being employed by or acting as a consultant or lender to, or being a director, officer, employee, principal, agent, stockholder, member, owner or partner of, or permitting the Executive's name to be used in connection with the activities of any other business or organization anywhere which competes, directly or indirectly, with the Business of the Company as the same shall be constituted at the Termination Date or which, during the six-month period prior to the Executive's termination, the Company had made substantial plans with the intention of establishing operations.

(ii)     For the one year period commencing on the Termination Date, the Executive shall not engage in Competition with the Company in any locality or region in which the Company had operations at the time of, or within six months prior to, the Executive's termination, or in which, during the six-month period prior to the Executive's termination, the Company had made substantial plans with the intention of establishing operations in such locality or region; provided, however, that it shall not be a violation of this sub-paragraph or the sub-paragraph hereinabove for the Executive to be or become the registered or beneficial owner of up to three percent (3%) of any class of the capital stock of a competing corporation registered under the Exchange Act, provided that the Executive does not actively participate in the business of such corporation until such time as this covenant expires.

13     DeltaView comparison of pcdocs://chisr01a/688056/5 and pcdocs://wilsr01a/596789/6. Performed on 10/29/2009.

(c)    Non-Solicitation.  ~~For~~During the Employment Period and for the one year period commencing on the Termination Date, the Executive agrees that the Executive shall not, directly or indirectly, for the Executive's benefit or for the benefit of any other person, firm or entity, engage any of the following conduct:

(i)    solicit from any customer doing business with the Company as of the Termination Date, business of the same or of a similar nature to the business of the Company with such customer;

(ii)    solicit from any known potential customer of the Company business of the same or of a similar nature to that which has been the subject of a known written or oral bid, offer or proposal by the Company, or of substantial preparation with a view to making such a bid, proposal or offer, within six months prior to the Executive's termination;

(iii)    solicit the employment or services of, or hire, any person who was known to be employed by or was a known consultant to the Company upon the termination of the Executive's employment, or within six months prior thereto; or

(iv)    otherwise interfere with the business or accounts of the Company.

(d)    Intellectual Property.  All Intellectual Property (as defined below) and Technology (as defined below) created, developed, obtained or conceived of by the Executive during the Employment Period, and all business opportunities presented to the Executive during the Employment Period, shall be owned by and belong exclusively to the Company, provided that they reasonably relate to the Business, and the Executive shall (i) promptly disclose any such Intellectual Property, Technology or business opportunity to the Company, and (ii) execute and deliver to the Company, without additional compensation, such instruments as the Company may require from time to time to evidence its ownership of any such Intellectual Property, Technology or business opportunity.  For purposes of this Agreement, (A) the term "Intellectual Property" means and includes any and all trademarks, trade names, service marks, service names, patents, copyrights, and applications therefor, and (B) the term "Technology" means and includes any and all trade secrets, proprietary information, invention, discoveries, know-how, formulae, processes and procedures.

(e)    The Executive acknowledges that the services to be rendered by the Executive to the Company are of a special and unique character, which gives this Agreement a peculiar value to the Company, the loss of which may not be reasonably or adequately compensated for by damages in an action at law, and that a material breach or threatened breach by the Executive of any of the provisions contained in this Section 8 shall cause the Company irreparable injury.  The Executive therefore agrees that the Company shall be entitled, in addition to any other right or remedy, to a temporary, preliminary and permanent injunction, without the necessity of proving the inadequacy of monetary damages or the posting of any bond or security, enjoining or restraining the Executive from any such violation or threatened violations.

14⸺DeltaView comparison of pcdocs://chisr01a/688056/5 and pcdocs://wilsr01a/596789/6. Performed on 10/29/2009.

(f)    The Executive further acknowledges and agrees that due to the uniqueness of the Executive's services and confidential nature of the information the Executive shall possess, the covenants set forth herein are reasonable and necessary for the protection of the business and goodwill of the Company.

(g)    <u>Continuing Operation</u>.  Any termination of the Executive's employment or of this Agreement shall have no effect on the continuing operation of this Section 8.

1.    Stockholder Agreement.  As a precondition to receiving any award under the LTIP, Executive shall execute a management stockholders agreement that is acceptable to Executive and the Company.

2.    9. <u>Severability</u>.  It is the desire and intent of the parties that the provisions of this Agreement shall be enforced to the fullest extent permissible under the laws and public policies applied in each jurisdiction in which enforcement is sought.  Accordingly, if any particular provision or portion of this Agreement shall be adjudicated to be invalid or unenforceable, this Agreement shall be deemed amended to delete therefrom the portion thus adjudicated to be invalid or unenforceable, such deletion to apply only with respect to the operation of such provision in the particular jurisdiction in which such adjudication is made.

3.    10. <u>Notices</u>.  All communications, requests, consents and other notices provided for in this Agreement shall be in writing and shall be deemed give if delivered by hand or mailed by first class mail, postage prepaid, to the last known address of the recipient.

4.    11. <u>Governing Law</u>.  This Agreement shall be governed by and construed and enforced in accordance with the laws of the State of Delaware, without regard to its conflicts of laws provisions.

5.    12. <u>Assignment</u>.  Neither this Agreement nor any rights or duties hereunder may be assigned by the Executive without the prior written consent of the Company. The Company shall have the right at any time to assign this Agreement to its successors and assigns; <u>provided</u>, <u>however</u>, that the assignee or transferee is the successor to all or substantially all of the business and assets of the Company and such assignee or transferee expressly assumes all of the obligations, duties and liabilities of the Company set forth in this Agreement.

6.    13. <u>Amendments</u>.  No provisions of this Agreement shall be altered, amended, revoked or waived except by an instrument in writing, signed by each party to this Agreement.

7.    14. <u>Binding Effect</u>.  Except as otherwise provided herein, this Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective legal representatives, heirs, successors and assigns.

15 DeltaView comparison of pcdocs://chisr01a/688056/5 and pcdocs://wilsr01a/596789/6. Performed on 10/29/2009.

8.    ~~15.~~ Execution in Counterparts.  This Agreement may be executed in any number of counterparts, each of which shall be deemed an original, but all of which together shall constituted one and the same instrument.

9.    ~~16.~~ Arbitration.  Any dispute, controversy or question arising under, out of, or relating to this Agreement (or the breach thereof), or, the Executive's employment with the Company or termination thereof, shall be referred for arbitration in the State of Michigan to a neutral arbitrator selected by the Executive and the Company and this shall be the exclusive and sole means for resolving such dispute.  Such arbitration shall be conducted in accordance with the National Rules for Resolution of Employment Disputes of the American Arbitration Association.  The arbitrator shall have the discretion to award reasonable attorneys' fees, costs and expenses to the prevailing party.  Judgment upon the award rendered by the arbitrator may be entered in any court having jurisdiction thereof.

10.    ~~17.~~ Entire Agreement.  This Agreement sets forth the entire agreement and understanding of the parties and supersedes all prior understandings, agreements (including, without limitation, the Original Agreement) or representations by or between the parties, whether written or oral, which relate in any way to the subject matter hereof.

11.    ~~18.~~ Survivorship.  The provisions of this Agreement necessary to carry out the intention of the parties as expressed herein shall survive the termination or expiration of this Agreement.

12.    ~~19.~~ Waiver.  Except as provided herein, the waiver by either party of the other party's prompt and complete performance, or breach or violation, of any provision of this Agreement shall not operate nor be construed as a waiver of any subsequent breach or violation, and the failure by any party hereto to exercise any right or remedy which it may possess hereunder shall not operate nor be construed as a bar to the exercise of such right or remedy by such party upon the occurrence of any subsequent breach or violation.

13.    ~~20.~~ Captions.  The captions of this Agreement are for convenience and reference only and in no way define, describe, extend or limit the scope or intent of this Agreement or the intent of any provision hereof.

14.    ~~21.~~ Construction.  The parties acknowledge that this Agreement is the result of arm's-length negotiations between sophisticated parties each afforded representation by legal counsel.  Each and every provision of this Agreement shall be construed as though both parties participated equally in the drafting of same, and any rule of construction that a document shall be construed against the drafting party shall not be applicable to this Agreement.

15.    ~~22.~~ Code Section 409A Payment Delay.  Notwithstanding any provision in this Agreement (or the attached Severance Agreement) to the contrary, any payment triggered by a termination of employment to the extent and up to the amount necessary to ensure that such payments are not subject to penalties and interest under Code Section 409A (including but not limited to payments under Sections 6(c) and (e), and Severance Agreement Sections 6.1(A), 6.1(D) and 6.3) shall not commence until at least six months after the Executive's termination of

16    DeltaView comparison of pcdocs://chisr01a/688056/5 and pcdocs://wilsr01a/596789/6.  Performed on 10/29/2009.

employment.  To the extent such payments, absent this provision, would be paid during the first six month period following the Executive's termination of employment, those payments shall be withheld and the amount of the payments withheld will be paid in a lump sum, without interest, during the seventh month after termination; provided that, if the Executive dies during such six-month period, any such delayed payments shall be immediately payable to the Executive's estate or representative.

If and to the extent that any payment or benefit under this Agreement is determined by the Company to constitute "non-qualified deferred compensation" subject to Code Section 409A and is payable to the Executive by reason of the Executive's termination of employment, then such payment or benefit shall be made or provided to the Executive only upon a "separation from service" as defined for purposes of Code Section 409A.  The Company shall not have any liability or be responsible for any claim related to the incurrence by the Executive or any other person of any tax, interest expense, loss of tax benefit, or any other obligation or liability, in each case, arising under or related to Code Section 409A

16.   Tax Withholding.  All compensation payable pursuant to this Agreement shall be subject to reduction by all applicable withholding, social security and other federal, state and local taxes and deductions.

17   DeltaView comparison of pcdocs://chisr01a/688056/5 and pcdocs://wilsr01a/596789/6. Performed on 10/29/2009.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first above written.

By:_____

Fred Bentley

HAYES LEMMERZ INTERNATIONAL,  INC.

By:_____

Name: Curtis J. Clawson

Title:   President and Chief Executive Officer

18     DeltaView comparison of pcdocs://chisr01a/688056/5 and pcdocs://wilsr01a/596789/6. Performed on 10/29/2009.

19    DeltaView comparison of pcdocs://chisr01a/688056/5 and pcdocs://wilsr01a/596789/6. Performed on 10/29/2009.

*Attachment* **A**

### ~~SUMMARY OF RELOCATION PROVISIONS~~

~~In principle, the Company will arrange and/or reimburse the cost of the following items arising from your relocation area to the Northville/Detroit area.~~

~~1.       The Company will arrange transportation of personal and household effects to include packing, unpacking, transportation, insurance, storage, etc. Excluded from this provision would be unusual personal items such as boats, travel trailers, etc. **Contact Jim Mullins in Northville, MI at (734) 737-5195 to arrange your move.**~~

~~2.       The Company will reimburse expenses in the event of having to be in temporary accommodations for a period of up to ninety (90) days, if necessary.~~

~~3.       One (1) round trip extended three (3) day weekend to your place of residence every third week during the above described temporary living period.~~

~~4.       You will be reimbursed for up to 2 three-day house hunting trips for your spouse.~~

~~5.       Providing you currently own or are buying your principle residence, in the event you sell your current residence, the Company will reimburse you for normal closing cost expenses, real estate commission, and legal fees, but excluding points.  **At the time you are listing your property and prior to contacting realtors, please contact Tom Noteman (also in Northville) at 734-737-5170.**  He will provide you with information regarding marketing assistance of the sale of your residence.~~

~~6.       Provided that you currently own or are buying your current principle residence, should you elect to purchase a home at your new location during your first year of employment, the Company will reimburse you for most closing cost related expenses, but excluding, in most cases, mortgage origination fees and points.~~

~~7.       Should you purchase a home in the Northville/Detroit area during your first year of employment, payment of the equivalent of one month's base salary for incidental expenses incurred in connection with relocation will be issued by the Company.  You will not be required to submit receipts.  This allowance is paid in lump sum at the time you relocate your principle residence to the new work location.  This incidental expense allowance will be treated as ordinary income and not grossed up.~~

~~8.       Home warranties and repairs to either residence required for loan approvals are not included.~~

~~9.       The Company will "gross up" the taxable portion of your relocation costs according to the Company's formula (except as indicated in item 7 above).~~

---

1       DeltaView comparison of pcdocs://chisr01a/688056/5 and pcdocs://wilsr01a/596789/6. Performed on 10/29/2009.

~~10.    You will be eligible to receive the benefits under the Company's Home Purchase Program which is currently being established that will provide a buy-out after 120 days.~~
                                                                    *Attachment* **B**

## SEVERANCE AGREEMENT

1.    Defined Terms.  Unless otherwise defined in this Attachment ~~B~~A, the terms that are defined in the Employment Agreement  (the "Employment Agreement") shall have the same meanings when used herein as that are ascribed to such terms in the Employment Agreement.

2.    Term of Agreement.  The Term of this Agreement shall commence on the Effective Date hereof and shall continue in effect through the third anniversary thereof; provided, however, that commencing on the first anniversary of the Effective Date and each anniversary thereafter (each such date a "Renewal Date"), the Term shall automatically be extended for one additional year unless, on or prior to such Renewal Date, the Company or the Executive shall have given notice not to extend the Term; and further provided, however, that if a Change in Control shall have occurred during the Term, the Term shall expire no earlier than twenty-four (24) months beyond the month in which such Change in Control occurred.

3.    Immediate Effect of Change in Control.  Promptly following a Change in Control, but in no event later than April 15 of the calendar year following the Change in Control, the Executive shall be entitled to the immediate payment of all unpaid compensation amounts (including the pro rata bonus payment for the current fiscal year under any bonus plan for which he is eligible ("Pro-rata Bonus") and all unpaid bonuses with respect to any prior fiscal year) with respect to the Executive's employment.  For purposes of this Section 3, Pro-rata Bonus shall be an amount equal to the product of (1) the product of (x) the Executive's base salary as in effect immediately prior to the Change in Control and (y) the greater of (A) the Executive's normative bonus percentage for the fiscal year in which the Change in Control occurs and (B) the Executive's estimated bonus percentage calculated in good faith by the Company's Finance Department determined by projecting performance through the end of the fiscal year in which the Change in Control occurs and (2) a fraction, the numerator of which is the number of days in the fiscal year in which the Change in Control occurs through the date of the Change in Control, and the denominator of which is 365.  The Pro-rata Bonus paid shall be subtracted from the amount otherwise due the Executive as a bonus for the fiscal year in which the Change in Control occurs, but such Pro-rata Bonus becomes a vested benefit upon a Change in Control and in no event shall the Executive have to repay all or any portion of the Pro-rata Bonus.

4.    Company's Covenants Summarized.  In order to induce the Executive to remain in the employ of the Company, the Company agrees, under the conditions described herein, to pay the Executive the Severance Payments and the other payments and benefits described herein. Except as provided in Section 9.1 hereof, no Severance Payments shall be payable under this Agreement unless there shall have been (or, under the terms of the second sentence of Section 6.1 hereof, there shall be deemed to have been) a termination of the Executive's employment with the Company on or following a Change in Control and during the Term.  This Agreement

2_____DeltaView comparison of pcdocs://chisr01a/688056/5 and pcdocs://wilsr01a/596789/6. Performed on 10/29/2009.

shall not be construed as creating an express or implied contract of employment and, except as otherwise agreed in writing between the Executive and the Company, the Executive shall not have any right to be retained in the employ of the Company.

5.  Compensation Other Than Severance Payments.

5.1  Following a Change in Control and during the Term, during any period that the Executive fails to perform the Executive's full-time duties with the Company as a result of incapacity due to physical or mental illness, the Company shall pay the Executive's full salary to the Executive at the rate in effect at the commencement of any such period, together with all compensation and benefits payable to the Executive under the terms of any compensation or benefit plan, program or arrangement (other than the Company's short- or long-term disability plan, as applicable, to the extent such benefits would be duplicative and their nonpayment would not prejudice Executive's future entitlement to benefits) maintained by the Company during such period, until the Executive's employment is terminated by the Company for Disability.

5.2  If the Executive's employment shall be terminated for any reason on or following a Change in Control and during the Term, the Company shall pay the Executive's full salary to the Executive through the Date of Termination at the rate in effect immediately prior to the Date of Termination or, if higher, the rate in effect immediately prior to the first occurrence of an event or circumstance constituting Good Reason, together with all compensation and benefits payable to the Executive through the Date of Termination under the terms of the Company's compensation and benefit plans, programs or arrangements as in effect immediately prior to the Date of Termination or, if more favorable to the Executive, as in effect immediately prior to the first occurrence of an event or circumstance constituting Good Reason (including all unpaid bonuses with respect to any prior fiscal year).  In addition, if the Executive's employment is terminated on or following a Change in Control and during the Term, other than (A) by the Company for Cause, (B) by reason of death or Disability, or (C) by the Executive without Good Reason, then the Company shall pay Executive an amount equal to the product of (1) the product of (x) the Executive's base salary as in effect immediately prior to the Date of Termination, or, if higher, as in effect immediately prior to the first occurrence of an event or circumstance constituting Good Reason (the greater of such amounts, the "Base Salary") and (y) the Executive's normative bonus percentage for the year in which the Date of Termination occurs, or if higher, the normative bonus percentage for the fiscal year in which the Change in Control occurs or the normative bonus percentage in effect immediately prior to the first occurrence of an event or circumstance constituting Good Reason (the greatest of such percentages, the "Bonus Percentage") and (2) a fraction, the numerator of which is the number of days in the fiscal year in which the Date of Termination occurs through the date of the Date of Termination, and the denominator of which is 365; it being understood that, if the Date of Termination is in the same fiscal year as the Change in Control, the Pro-rata Bonus calculated pursuant to Section 3 shall be subtracted from the amount payable pursuant to this sentence of Section 5.2 but shall not reduce the amount payable below zero.

5.3  If the Executive's employment shall be terminated for any reason on or following a Change in Control and during the Term, the Company shall pay to the Executive the Executive's normal post-termination compensation and benefits as such payments become due.

---

3      DeltaView comparison of pcdocs://chisr01a/688056/5 and pcdocs://wilsr01a/596789/6. Performed on 10/29/2009.

Such post-termination compensation and benefits shall be determined under, and paid in accordance with, the Company's retirement, insurance and other compensation or benefit plans, programs and arrangements as in effect immediately prior to the Date of Termination or, if more favorable to the Executive, as in effect immediately prior to the occurrence of the first event or circumstance constituting Good Reason.

6.  Severance Payments.

6.1  If the Executive's employment is terminated on or following a Change in Control and during the Term, other than (A) by the Company for Cause, (B) by reason of death or Disability, or (C) by the Executive without Good Reason, then the Company shall pay the Executive the amounts, and provide the Executive the benefits, described in this Section 6.1 ("Severance Payments") and Section 6.2, in addition to any payments and benefits to which the Executive is entitled under Section 5 hereof or otherwise (except as provided herein).  For purposes of this Agreement, the Executive's employment shall be deemed to have been terminated following a Change in Control by the Company without Cause or by the Executive with Good Reason, if (i) the Executive's employment is terminated by the Company without Cause prior to a Change in Control (whether or not a Change in Control ever occurs) and such termination was at the request or direction of a Person who enters into an agreement with the Company the consummation of which would constitute a Change in Control, (ii) the Executive terminates his employment for Good Reason prior to a Change in Control (whether or not a Change in Control ever occurs) and the circumstance or event which constitutes Good Reason occurs at the request or direction of such Person, or (iii) the Executive's employment is terminated by the Company without Cause or by the Executive for Good Reason and such termination or the circumstance or event which constitutes Good Reason is otherwise in connection with or in anticipation of a Change in Control (whether or not a Change in Control ever occurs).

(A)  In lieu of any further salary payments to the Executive for periods subsequent to the Date of Termination and in lieu of any severance benefit otherwise payable to the Executive (whether pursuant to any employment agreement, plan, policy or otherwise), the Company shall pay to the Executive a lump sum severance payment, in cash, equal to two times the sum of (i) the Base Salary and Flexible Benefits Allowance and (ii) the product of (x) the Base Salary and (y) the Bonus Percentage.  Such amounts shall be paid within the period described in Section 6.3.

(B)  For the twenty-four (24) month period immediately following the Date of Termination, the Company shall arrange to provide the Executive and his dependents with life, disability, accident and health insurance benefits substantially similar to those provided to the Executive and his dependents immediately prior to the Date of Termination or, if more favorable to the Executive, those provided to the Executive and his dependents immediately prior to the first occurrence of an event or circumstance constituting Good Reason, at no greater cost to the Executive than the Executive's cost immediately prior to such date or occurrence (the "Executive's Cost").  Unless the Executive consents to a different method (after taking into account the effect of such method on the calculation of "parachute payments" pursuant to Section 6.2 hereof), the health insurance benefits described in this Section 6.1(B) shall be

----

provided through a third-party insurer.  In the event continued accident and health insurance coverage under this Section 6.1(B) is provided through the Company's self-insured health plan such coverage shall be limited to the first eighteen months following the Date of Termination.  If the Executive is not receiving accident and health insurance coverage from another employer at the end of such eighteen month period, the Company shall pay the Executive a lump sum amount equal to six times the monthly COBRA health benefit continuation premium for the Executive's coverage under the Company's accident and health insurance coverage.  Benefits otherwise receivable by the Executive pursuant to this Section 6.1(B) shall be reduced to the extent benefits of the same type are received by or made available to the Executive by another employer of the Executive during the twenty four (24) month period following the Executive's termination of employment (and any such benefits received by or made available to the Executive shall be reported to the Company by the Executive); provided, however, that the Company shall reimburse the Executive for the excess, if any, of the cost of such benefits to the Executive over such cost immediately prior to the Date of Termination or, if more favorable to the Executive, the first occurrence of an event or circumstance constituting Good Reason.

(C)     For purposes of COBRA health benefit continuation under section 4980B of the Code, the cessation of benefits pursuant to Section 6.1(B) shall be treated as though such cessation is the "qualifying event" under section 4980B(f)(3) of the Code for purposes of determining the period of coverage.

(D)     The Company shall pay to the Executive a lump sum amount equal to one hundred thousand dollars ($100,000).  Such amount shall be paid in the month following the Date of Termination.

(E)     The Company shall, at its sole expense as incurred, provide Executive with "key executive level" outplacement services for the period ending on December 31 of the second calendar year following the Termination Date at a cost of no more than fifteen percent (15%) of the sum of (i) Base Salary and (ii) the Bonus Percentage multiplied by Base Salary.

6.2     (A)     Whether or not the Executive becomes entitled to the Severance Payments, if any of the payments or benefits received or to be received by the Executive in connection with a Change in Control or the Executive's termination of employment (whether pursuant to the terms of this Agreement or any other plan, arrangement or agreement with the Company, any Person whose actions result in a Change in Control or any Person affiliated with the Company or such Person) (all such payments and benefits, excluding the Gross-Up Payment, being hereinafter referred to as the "Total Payments") will be subject to the Excise Tax, the Company shall pay to the Executive an additional amount (the "Gross-Up Payment") such that the net amount retained by the Executive, after deduction of any Excise Tax on the Total Payments and any federal, state and local income and employment taxes and any penalties, interest or fees incurred by the Executive as a result of any payment under Section 6.2 being made later than five business days prior to the due date of the excise tax with respect to which it is paid and any Excise Tax upon the Gross-Up Payment, shall be equal to the Total Payments.

(B)     For purposes of determining whether any of the Total Payments will be subject to the Excise Tax and the amount of such Excise Tax, (i) all of the Total Payments shall

be treated as "parachute payments" (within the meaning of section 280G(b)(2) of the Code) unless, in the opinion of tax counsel ("Tax Counsel") reasonably acceptable to the Executive and selected by the accounting firm which was, immediately prior to the Change in Control, the Company's independent auditor (the "Auditor"), such payments or benefits (in whole or in part) do not constitute parachute payments, including by reason of section 280G(b)(4)(A) of the Code, (ii) all "excess parachute payments" within the meaning of section 280G(b)(l) of the Code shall be treated as subject to the Excise Tax unless, in the opinion of Tax Counsel, such excess parachute payments (in whole or in part) represent reasonable compensation for services actually rendered (within the meaning of section 280G(b)(4)(B) of the Code) in excess of the Base Amount allocable to such reasonable compensation, or are otherwise not subject to the Excise Tax, and (iii) the value of any noncash benefits or any deferred payment or benefit shall be determined by the Auditor in accordance with the principles of sections 280G(d)(3) and (4) of the Code.  For purposes of determining the amount of the Gross-Up Payment, the Executive shall be deemed to pay federal income tax at the highest marginal rate of federal income taxation in the calendar year in which the Gross-Up Payment is to be made and state and local income taxes at the highest marginal rate of taxation in the state and locality of the Executive's residence or the Executive's place of business, whichever is higher, on the Date of Termination (or if there is not yet a Date of Termination, then the date on which the Gross-Up Payment is calculated for purposes of this Section 6.2), net of the maximum reduction in federal income taxes which could be obtained from deduction of such state and local taxes.

(C)    In the event that the Excise Tax is finally determined to be less than the amount taken into account hereunder in calculating the Gross-Up Payment, the Executive shall repay to the Company, within five (5) business days following the time that the amount of such reduction in the Excise Tax is finally determined, the portion of the Gross-Up Payment attributable to such reduction (including that portion of the Gross-Up Payment attributable to the Excise Tax and federal, state and local income and employment taxes imposed on the Gross-Up Payment being repaid by the Executive), to the extent that such repayment results in a reduction in the Excise Tax and a dollar-for-dollar reduction in the Executive's taxable income and wages for purposes of federal, state and local income and employment taxes, plus interest on the amount of such repayment at 120% of the rate provided in section 1274(b)(2)(B) of the Code. Notwithstanding the foregoing, in the event any portion of the amount to be repaid to the Company has been paid to any tax authority, repayment thereof shall not be required until actual refund or credit of such portion has been made to Executive, and interest payable to the Company shall not exceed the interest received or credited to Executive by such tax authority. In the event that the Excise Tax is determined to exceed the amount taken into account hereunder in calculating the Gross-Up Payment (including by reason of any payment the existence or amount of which cannot be determined at the time of the Gross-Up Payment), the Company shall make an additional Gross-Up Payment in respect of such excess (including any interest, penalties or additions payable by the Executive with respect to such excess and the Gross-Up Payment attributable to the Excise Tax and federal, state, and local income and employment taxes imposed on the Gross-Up Payment being made to the Executive) within five (5) business days following the time that the amount of such excess is finally determined.  The Executive and the Company shall each reasonably cooperate with the other in connection with any administrative or judicial proceedings concerning the existence or amount of liability for Excise Tax with respect to the Total Payments.

---

6 ........DeltaView comparison of pcdocs://chisr01a/688056/5 and pcdocs://wilsr01a/596789/6. Performed on 10/29/2009.

6.3  The payments provided in subsections (A), of Section 6.1 hereof and in Section 6.2 hereof shall be made not later than the fifth day following the Date of Termination (or if there is no Date of Termination, then the date on which the Gross-up Payment is calculated for purposes of Section 6.2 hereof); provided, however, that if the amounts of such payments cannot be finally determined on or before such day, the Company shall pay to the Executive on such day an estimate, as determined in good faith by the Company or, in the case of payments under Section 6.2 hereof, in accordance with Section 6.2 hereof, of the minimum amount of such payments to which the Executive is clearly entitled and shall pay the remainder of such payments (together with interest on the unpaid remainder (or on all such payments to the extent the Company fails to make such payments when due) at 120% of the rate provided in section 1274(b)(2)(B) of the Code) as soon as the amount thereof can be determined but in no event later than the thirtieth (30th) day after the Date of Termination.  In the event that the amount of the estimated payments exceeds the amount subsequently determined to have been due, such excess shall constitute a loan by the Company to the Executive, payable on the fifth (5th) business day after demand by the Company (together with interest at 120% of the rate provided in section 1274(b)(2)(B) of the Code).

6.4  The Company also shall pay to the Executive all legal fees and expenses incurred by the Executive in disputing in good faith any issue hereunder relating to the termination of the Executive's employment, in seeking in good faith to obtain or enforce any benefit or right provided by this Agreement or in connection with any tax audit or proceeding to the extent attributable to the application of section 4999 of the Code to any payment or benefit provided hereunder.  Such payments shall be made within five (5) business days after delivery of the Executive's written requests for payment accompanied with such evidence of fees and expenses incurred as the Company reasonably may require (but in no event after the last day of the calendar year following the calendar year in which the expense is incurred).

7.  Termination Procedures and Compensation During Dispute.

7.1  Notice of Termination.  After a Change in Control and during the Term, any purported termination of the Executive's employment (other than by reason of death) shall be communicated by written Notice of Termination from one party hereto to the other party hereto in accordance with Section 10 of the Employment Agreement.  For purposes of this Agreement, a "Notice of Termination" shall mean a notice which shall indicate the specific termination provision in this Agreement relied upon and shall set forth in reasonable detail the facts and circumstances claimed to provide a basis for termination of the Executive's employment under the provision so indicated.  Further, a Notice of Termination for Cause is required to include a copy of a resolution duly adopted by the affirmative vote of not less than three-quarters (3/4) of the entire membership of the Board at a meeting of the Board which was called and held for the purpose of considering such termination (after reasonable notice to the Executive and an opportunity for the Executive, together with the Executive's counsel, to be heard before the Board) finding that, in the good faith opinion of the Board, the Executive was guilty of conduct set forth in clause (i) or (ii) of the definition of Cause herein, and specifying the particulars thereof in detail.

7 DeltaView comparison of pcdocs://chisr01a/688056/5 and pcdocs://wilsr01a/596789/6. Performed on 10/29/2009.

7.2    Date of Termination.  "Date of Termination," with respect to any purported termination of the Executive's employment after a Change in Control and during the Term, shall mean (i) if the Executive's employment is terminated for Disability, thirty (30) days after Notice of Termination is given (provided that the Executive shall not have returned to the full-time performance of the Executive's duties during such thirty (30) day period), and (ii) if the Executive's employment is terminated for any other reason, the date specified in the Notice of Termination (which, in the case of a termination by the Company (except in the case of a termination for Cause) and, in the case of a termination by the Executive, shall not be less than thirty (30) days from the date such Notice of Termination is given).

7.3    Dispute Concerning Termination.  If within fifteen (15) days after any Notice of Termination is given, or, if later, prior to the Date of Termination (as determined without regard to this Section 7.3), the party receiving such Notice of Termination notifies the other party that a dispute exists concerning the termination, the Date of Termination shall be extended until the earlier of (i) the date prior to the date on which the Term ends or (ii) the date on which the dispute is finally resolved, either by mutual written agreement of the parties or by a final judgment, order or decree of an arbitrator or a court of competent jurisdiction (which is not appealable or with respect to which the time for appeal therefrom has expired and no appeal has been perfected); provided, however, that the Date of Termination shall be extended by a notice of dispute only if such notice is given in good faith and the party providing notice pursues the resolution of such dispute with reasonable diligence.

7.4  [intentionally blank]

8.  No Mitigation.  The Company agrees that, if the Executive's employment with the Company terminates during the Term, the Executive is not required to seek other employment or to attempt in any way to reduce any amounts payable to the Executive by the Company pursuant to this Agreement.  Further, the amount of any payment or benefit provided for in this Agreement (other than Section 6.1(B) hereof) shall not be reduced by any compensation earned by the Executive as the result of employment by another employer, by retirement benefits, by offset against any amount claimed to be owed by the Executive to the Company, or otherwise.

9.  Successors; Binding Agreement.

9.1  This Agreement shall inure to the benefit of and be binding upon the Company and its successors and assigns.  In addition to any obligations imposed by law upon any successor to the Company, the Company will require any successor (whether direct or indirect, by purchase, merger, consolidation or otherwise) to all or substantially all of the business and/or assets of the Company to expressly assume and agree in writing to perform this Agreement in the same manner and to the same extent that the Company would be required to perform it if no such succession had taken place.  The Company will require any ultimate parent entity, as defined in 16 C.F.R. 8801,1(a)(3), of any Person who acquires 90% of the outstanding shares of common stock of the Company or the outstanding voting securities of the Company entitled to vote generally in the election of directors (including through a merger in which the Company does not survive or as a result of which the Company becomes a subsidiary of another Person or a consolidation involving the Company and another Person) to assume and agree in writing to

---

8    DeltaView comparison of pcdocs://chisr01a/688056/5 and pcdocs://wilsr01a/596789/6.  Performed on 10/29/2009.

perform as a joint and several obligor of the Company (including any successor to the Company), this Agreement in the same manner and to the same extent as the Company.  Failure of the Company to obtain such assumption and agreement in writing from a successor or its parent as described in the preceding sentences after notice and a reasonable cure period (not to exceed ten days from the date such notice is received) shall be a breach of this Agreement and shall entitle the Executive to compensation from the Company in the same amount and on the same terms as the Executive would be entitled to hereunder if the Executive were to terminate the Executive's employment for Good Reason after a Change in Control, except that, for purposes of implementing the foregoing, the date on which any such succession becomes effective shall be deemed the Date of Termination.

9.2    This Agreement shall inure to the benefit of and be enforceable by the Executive's personal or legal representatives, executors, administrators, successors, heirs, distributees, devisees and legatees.  If the Executive shall die while any amount would still be payable to the Executive hereunder (other than amounts which, by their terms, terminate upon the death of the Executive) if the Executive had continued to live, all such amounts, unless otherwise provided herein, shall be paid in accordance with the terms of this Agreement to the executors, personal representatives or administrators of the Executive's estate.

10.    Insurance and Indemnification.  From and after a Change in Control, including after the termination of Executive's employment, the Company shall indemnify, defend and hold the Executive harmless from and against any and all expenses, liabilities, damages, costs, judgments, penalties, fines and amounts paid in settlement, incurred in good faith by Executive in connection with any proceeding involving Executive by reason of Executive's being or having been an officer, director, employee or agent of the Company (or any affiliate of the Company) to the fullest extent permitted by law, whether or not Executive is, or is threatened to be made, a party to any threatened, pending, or completed proceeding, and whether or not Executive is successful in such proceeding.  In addition, upon receipt from Executive of (i) a written request for an advancement of reasonable expenses which Executive reasonably believes will be subject to indemnification hereunder and (ii) a written undertaking by Executive to repay any such amounts if it shall ultimately be determined that the Executive is not entitled to indemnification under this Agreement or otherwise, the Company shall advance such expenses to Executive or pay such expenses for Executive, all in advance of the final disposition of any such matter.  From and after a Change in Control, including after the termination of Executive's employment hereunder, Executive shall have coverage under a director's and officer's liability insurance policy in amounts no less than, and on terms no less favorable than those, provided to senior executive officers of the Company from time to time.

11.    Definitions.  For purposes of this Agreement, the following terms shall have the meanings indicated below:

(A)    "Affiliate" shall have the meaning set forth in Rule 12b-2 promulgated under Section 12 of the Exchange Act.

(B)    "Agreement" shall mean this Attachment B to the Employment Agreement.

---

9    DeltaView comparison of pcdocs://chisr01a/688056/5 and pcdocs://wilsr01a/596789/6.  Performed on 10/29/2009.

(B)  "Auditor" shall have the meaning set forth in Section 6.2 hereof.

(C)  "Base Amount" shall have the meaning set forth in section 280G(b)(3) of the Code.

(D)  "Code" shall mean the Internal Revenue Code of 1986, as amended from time to time.

(E)  "Company" shall mean Hayes Lemmerz International, Inc. and, except in determining under Section 15(G) hereof whether or not any Change in Control of the Company has occurred, shall include any successor to its business and/or assets which assumes and agrees to perform this Agreement by operation of law, or otherwise.

(F)  "Excise Tax" shall mean any excise tax imposed under section 4999 of the Code or any similar state or local tax or any interest or penalties incurred by Executive with respect to such excise tax.

(G)  "Person" shall have the meaning given in Section 3(a)(9) of the Exchange Act, as modified and used in Sections 13(d) and 14(d) including a "group" within the meaning of Section 13(d)(3) thereof, except that such term shall not include (i) the Company or any of its subsidiaries, (ii) a trustee or other fiduciary holding securities under an employee benefit plan of the Company or any of its Affiliates, (iii) an underwriter temporarily holding securities pursuant to an offering of such securities, or (iv) a corporation owned, directly or indirectly, by the stockholders of the Company in substantially the same proportions as their ownership of stock of the Company.

(H)  "Retirement" shall be deemed the reason for the termination by the Executive of the Executive's employment if such employment is terminated in accordance with the Company's retirement policy, including early retirement, generally applicable to its salaried employees.

---

10    DeltaView comparison of pcdocs://chisr01a/688056/5 and pcdocs://wilsr01a/596789/6. Performed on 10/29/2009.

Document comparison done by DeltaView on Thursday, October 29, 2009 9:40:59 PM

| Input: | |
|---|---|
| Document 1 | pcdocs://chisr01a/688056/5 |
| Document 2 | pcdocs://wilsr01a/596789/6 |
| Rendering set | Option 3a strikethrough double score no moves |

| Legend: | |
|---|---|
| Insertion | |
| Deletion | |
| <Moved from > | |
| >Moved to < | |
| Style change | |
| Format change | |
| Moved deletion | |
| Inserted cell | |
| Deleted cell | |
| Moved cell | |
| Split/Merged cell | |
| Padding cell | |

| Statistics: | |
|---|---|
| | Count |
| Insertions | 65 |
| Deletions | 94 |
| Moved from | 0 |
| Moved to | 0 |
| Style change | 0 |
| Format changed | 0 |
| Total changes | 159 |

11 ⸺ DeltaView comparison of pcdocs://chisr01a/688056/5 and pcdocs://wilsr01a/596789/6. Performed on 10/29/2009.

**H-3 Mark A. Brebberman, Chief Financial Officer**

<u>**EXECUTIVE EMPLOYMENT AGREEMENT**</u>

THIS AGREEMENT (the "Agreement") is made <u>as of </u>the ~~19~~__th day of ~~January~~[_____], 2009 (the "Agreement Date"), by and between Hayes Lemmerz International, Inc. (the "Company") and Mark A. Brebberman (the "Executive").

**<u>PRELIMINARY STATEMENTS</u>**

<u>1.      The Executive currently serves as the Company's Chief Financial Officer, pursuant to an employment agreement dated January 19, 2009, as amended thereafter (the "Original Agreement").</u>

~~WHEREAS, the~~          <u>2.      The</u> Company desires to ~~provide for the continued employment of the~~<u>continue to employ</u> Executive ~~on the terms and conditions set forth herein, in the best interest of the Company and its constituencies; and~~<u>WHEREAS,</u><u>as Chief Financial Officer, and</u> the Executive desires to continue to be employed by the Company ~~as provided herein; and~~ <u>in said capacity; and</u>

~~NOW, THEREFORE, in consideration of the premises and the respective covenants and agreements of the parties herein contained, the parties agree as follows:~~
<u>3.      Each party desires to set forth in writing the terms and conditions of their understandings and agreements.</u>

<u>**NOW, THEREFORE**, in consideration of the mutual covenants and obligations contained herein, the Company hereby agrees to employ the Executive and the Executive hereby accepts such employment upon the terms and conditions set forth in this Agreement, which shall take effect on the plan effective date (the "Effective Date") of the Joint Plan of Reorganization of Hayes Lemmerz International, Inc. and its Affiliated Debtors and Debtors-In Possession, dated as of September 2, 2009 (as the same may be amended or modified, the "Plan of Reorganization"). In the event the Plan of Reorganization does not become effective, this Agreement shall be of no force and effect.</u>

**<u>STATEMENT OF AGREEMENT</u>**

1.      <u>Employment</u>. The Company agrees to continue to employ the Executive and the Executive agrees to continue to be employed on a full-time basis by the Company for the period and upon the terms and conditions hereinafter set forth.

2.      <u>Term; Employment Period</u>. The term of this Agreement (the "Term") shall commence on the Agreement Date (the "Effective Date") and continue until terminated pursuant to Section 6 of this Agreement. The period during which the Executive is employed by the Company pursuant to this Agreement is referred to herein as the "Employment Period." The date on which the termination of the Executive's employment hereunder shall become effective is referred to herein as the "Termination Date."

3.    Position and Duties.  During the Employment Period, the Executive shall serve as Vice President and Chief Financial Officer of the Company and shall have such responsibilities, duties and authority as are customarily ~~and ordinarily exercised by executives in similar positions in similar businesses in the United States~~associated with such position and shall exercise such responsibilities, duties and authority consistent with the foregoing as the Company's Chief Executive Officer or the Company's Board of Directors (the "Board") shall determine from time to time.  During the Employment Period, the Executive shall report to the Company's Chief Executive Officer or the Chief Executive Officer's designee.  The Executive shall devote substantially all his working time and efforts to the business and affairs of the Company and shall use his best efforts to carry out his responsibilities faithfully and efficiently in a professional manner.  Notwithstanding the foregoing, it is understood that during the Employment Period, subject to any conflict of interest policies of the Company and Section 8, the Executive may (x) serve in any capacity with any civic, charitable, educational or professional organization provided that such service does not materially interfere with his duties and responsibilities hereunder and (y) make and manage personal investments of his choice, and with the prior consent of the Company's Chief Executive Officer, which shall not be unreasonably withheld, serve on the board of directors of one (1) for-profit business enterprise.

4.    Place of Performance.  During the Employment Period, the Executive's place of performance of his services shall be at the Company's Northville, Michigan Headquarters, except for required travel by the Executive on the Company's business or as may be reasonably required by the Company.

5.    Compensation and Benefits.

(a)    Salary.  During the Employment Period, the Company shall pay to the Executive an initial annual base salary of Two Hundred Sixty-Six Thousand Five Hundred Dollars ($266,500) (as the same may be increased from time to time, the "Base Salary"), such salary to be paid in periodic installments in accordance with the Company's payroll practices as in effect from time to time.  The Base Salary shall be reviewed annually by the compensation committee of the Board and may be increased from time to time in accordance with normal business practices of the Company and, if so increased, shall not thereafter be reduced.

(b)    Cash-Based Incentives.  ~~During~~Following the expiration of the KEIP (as defined below) and during the Employment Period, the Executive shall be eligible to earn an annual bonus under the Company's Short-Term Incentive Plan, or a successor plan thereto, as in effect from time to time (the "Incentive Plan"), subject to achievement of performance goals determined by the Board in accordance with the terms of the Incentive Plan (such annual bonus, the "Annual Bonus").  Such performance goals shall include (i) a threshold level below which no Annual Bonus shall be paid, (ii) a normative level that is tied to the budget, which if obtained, would result in an Annual Bonus of sixty percent (60%) of the Base Salary and (iii) an upside level, which if obtained, would increase the Annual Bonus to a maximum of one hundred twenty percent (120%) of the Base Salary.  The Annual Bonus shall be payable in a cash lump sum at such time as bonuses are ordinarily paid in accordance with the terms of the Incentive Plan, but in no event later than 120 days after the end of each fiscal year of the

2    DeltaView comparison of pcdocs://chisr01a/688085/2 and pcdocs://chisr01a/688085/6. Performed on 10/29/2009.

Company.  Except as otherwise specifically provided in this Agreement, the Executive shall only be eligible to receive the Annual Bonus if the Executive is employed by the Company through the last day of February in the year in which the Annual Bonus is to be paid.

(c)     "Change in Control" Definition.  For purposes of this Agreement, a "Change in Control" shall be deemed to have occurred upon the first of the following to occur:

(1)     any Person (within the meaning of Section 3(a)(9) of the Securities and Exchange Act of 1934, as amended (the "Exchange Act"), as modified and used in Sections 13(d) and 14(d) thereof), other than Joseph Littlejohn & Levy Fund II, L.P. (or any affiliate (within the meaning of Regulation D Rule 501(b) under the Securities Act of 1933, as amended (the "Securities Act")) thereof), TSG Capital Fund II, L.P. (or any affiliate thereof), or Canadian

Imperial Bank of Commerce (or affiliate thereof) (such entitles, collectively, the "JLL Group"), is or becomes the "Beneficial Owner" (within the meaning of Rule 13d-3 under the Exchange Act) of fifty percent (50%) or more of either (1) the then outstanding Common Stock or (2) the combined voting power of the then outstanding voting securities of the Company entitled to vote generally in the election of directors;

(2)    the following individuals cease for any reason to constitute a majority of the number of directors then serving:  individuals who, as of the Effective Date, constitute the Board and any new director (other than a director whose initial assumption of office is in connection with an actual or threatened election contest, including but not limited to a consent solicitation, relating to the election of directors of the Company) whose appointment or election by the Board or nomination for election by the Company's stockholders was approved or recommended by a vote of at least a majority of the directors then still in office who either were directors on the date hereof or whose appointment, election or nomination for election was previously so approved or recommended;

(3)    there is consummated a merger or consolidation of the Company or any direct or indirect subsidiary of the Company with any other corporation, other than a merger or consolidation which would result in the voting securities of the Company outstanding immediately prior to such merger or consolidation continuing to represent (either by remaining outstanding or by being converted into voting securities of the surviving entity or any parent thereof) at least fifty percent (50%) of the combined voting power of the securities of the Company or such surviving entity or any parent thereof outstanding immediately after such merger or consolidation, provided, however, that it shall not be a Change in Control under this clause (C) if (i) directors appointed or nominated by the JLL Group or any constituent member thereof continue immediately following such transaction to constitute a majority of the Board and (ii) the JLL Group or any constituent member thereof continues immediately following such transaction to own securities representing at least thirty-five percent (35%) of the combined voting power of the securities of the Company or such surviving entity or any parent thereof outstanding immediately after such merger or consolidation; or

(4)    the stockholders of the Company approve a plan of complete liquidation or dissolution of the Company or there is consummated an agreement for the sale or disposition by the Company of all or substantially all of its assets.

(c)    Equity Based Incentives.  In accordance with the Plan of reorganization, the Board shall establish a long term equity incentive program ( the "LTIP").  The Executive shall be entitled to participate in the LTIP.  Prior to making any grants to Executive, the Board shall consult with the CEO on such grants.

4    DeltaView comparison of pcdocs://chisr01a/688085/2 and pcdocs://chisr01a/688085/6. Performed on 10/29/2009.

(d) ~~Option Grants.  Based upon the Executive's performance and annual review, the Executive shall be eligible during the Employment Period to receive stock option grants in such amounts and subject to such terms and conditions as the compensation committee of the Board shall determine in its sole discretion are necessary and desirable.~~

(d) Key Employee Incentive Plan.  The Executive shall participate in the Company's Key Employee Incentive Plan (the "KEIP"), in accordance with its terms, and as approved by the "Bankruptcy Court" in connection with the "Restructuring" (as each such term is defined in the KEIP).  If the KEIP is not approved by the Bankruptcy Court prior to the Effective Date, the Executive shall be entitled to payments under this Agreement in the amounts and under the terms and conditions set forth in the Company's Motion for Order Approving the Implementation of Key Employee Incentive Plan and Short Term Incentive Plan filed with the Bankruptcy Court on July 29, 2009.

(e) Expenses.  During the Employment Period, the Company shall promptly reimburse the Executive for all reasonable out-of-pocket expenses incurred by the Executive in connection with the business of the Company and the performance of his duties under this Agreement in accordance with the terms of the Company's policies as in effect from time to time.

(f) Benefit Plans.  During the Employment Period, the Executive shall be entitled to participate in all of the employee benefit plans, programs, agreements and arrangements (including without limitation the supplemental executive retirement plan) generally provided to senior executives of the Company, as such are in effect from time to time, on a basis no less favorable than that provided to such senior executives.

(g) Perquisites.  During the Employment Period, the Executive shall be entitled to participate in those perquisites provided to senior executives of the Company, as such are in effect from time to time after the Effective Date, on a basis no less favorable than that provided to such senior executives.  In addition, the Company shall pay Executive an annual flexible benefits allowance (the "Flexible Benefits Allowance") of Thirty Five Thousand Dollars ($35,000), such allowance to be paid in periodic installments in accordance with the Company's payroll practices as in effect from time to time. The Flexible Benefits Allowance shall be reviewed annually by the Compensation Committee of the Board and may be increased from time to time and, if so increased, shall not thereafter be reduced.

(h) Vacations.  During the Employment Period, the Executive shall be entitled to vacation time, paid holidays and personal days, determined in accordance with the Company's policy with respect to its senior executives as in effect from time to time, it being understood that the Executive shall be entitled to not less than four weeks' vacation in any 12-month period during the Employment Period thereafter.

6. Termination of Employment.

(a) Accrued Benefits.  In the event of the termination of the Executive's employment hereunder for any reason during the Term, the Executive (or his estate or representative, as applicable) shall be entitled to receive any Base Salary, Annual Bonus,

5 DeltaView comparison of pcdocs://chisr01a/688085/2 and pcdocs://chisr01a/688085/6. Performed on 10/29/2009.

vacation time and expenses that have in each case accrued but are unpaid as of the Termination Date, ~~vested options~~ as well as any post-termination benefits <u>(including but not limited to vested awards under the LTIP)</u> to which he may be entitled pursuant to the Company's retirement, insurance and other benefit plans, programs and arrangements as in effect immediately prior to the Termination Date (the "Accrued Benefits").

(b)     <u>Death</u>.  The Executive's employment hereunder shall terminate as of the date of his death.  Upon the termination of the Executive's employment hereunder because of his death <u>and during the Term</u>, the Executive's estate or representative, as the case may be, shall be entitled to receive the Accrued Benefits and a lump sum payment in cash equal to (i) one year's Base Salary as in effect on the Termination Date and (ii) the product of (x) sixty percent (60%) of the Base Salary as in effect on the Termination Date, multiplied by a fraction (y) the numerator of which shall be the number of months (including fractions thereof) worked by the Executive during the Company's fiscal year in which the Termination Date occurs and (z) the denominator of which shall be the number 12 (such amount under this clause (ii), the "Pro Rata Annual Bonus").  In addition, those immediate family members who were participating in the Company's medical benefit plan as of the date of the Executive's death shall continue to participate in the Company's medical benefit plan at active employee contribution rates for the one-year period immediately following the date of the Executive's death.  Such amounts shall be paid as soon as administratively feasible following the Executive's death but in no event later than April 15 of the calendar year following the Executive's death.

(c)     <u>Disability</u>.   The Executive's employment hereunder may be terminated during the ~~Employment Period~~<u>Term</u> if the Executive is incapable of performing his principal duties hereunder because of physical or mental incapacity for a period of 45 consecutive working days or for more than 90 working days in any 12-month period ("Disability").  In the event that the Executive's employment is to be terminated pursuant to this Section 6(c), (i) this Agreement shall terminate on the date specified in the notice of termination delivered to the Executive (subject to Section 8(g) and Section 18); (ii) the Executive shall as of such date resign from all of his positions, duties and authorities hereunder; (iii) the Executive shall be placed on a medical leave of absence until the earlier of (A) expiration of the six-month period commencing on the date his medical leave of absence began, unless there is no reasonable expectation that the Executive will return to employment with the Company, in which case the date the Executive ceases performing services for the Company, (B) the date he qualifies for benefits under the Company's long-term disability plan or (C) the date he is able to return to work; and (iv) the Executive shall continue to be paid his Base Salary until such medical leave of absence ends.  In the case of a termination of the Executive's employment pursuant to this Section 6(c), for purposes of calculating benefits pursuant to clauses (B) and (C) below the Termination Date shall be the date upon which the Executive's medical leave of absence commences, and for all other purposes, the Termination Date shall be the date upon which the Executive's medical leave of absence ends.  In the event the Executive's employment is terminated pursuant to this Section 6(c), the Executive (or his representative, as applicable) shall be entitled to:  (A) the Accrued Benefits; (B) a lump sum payment in cash equal to one year's Base Salary and Flexible Benefits Allowance as in effect on the Termination Date; (C) the Pro Rata Annual Bonus; and (D) the continuation of health and welfare benefits at the levels in effect as of the Termination Date at no additional cost to the Executive than that which was in effect as

---

6     DeltaView comparison of pcdocs://chisr01a/688085/2 and pcdocs://chisr01a/688085/6. Performed on 10/29/2009.

of the Termination Date for the one-year period immediately following the Termination Date; provided, however, that such benefits shall be reduced to the extent comparable benefits are made available to the Executive from a successor employer, and the Executive shall be obligated to report such benefits to the Company.  The amounts payable pursuant to clauses (B) and (C) of the preceding sentence shall be paid in the month following the Executive's Termination Date. It is acknowledged and agreed by the Executive that he shall be precluded from terminating his employment hereunder for Good Reason in the event that his employment hereunder is terminated pursuant to this Section 6(c).

(d)    For Cause; Without Good Reason.  The Executive's employment hereunder may be terminated during the Employment PeriodTerm (i) by the Company for Cause (as defined below) or (ii) by the Executive without Good Reason (as defined below).  In the event that the Company terminates the Executive's employment hereunder for Cause, the Termination Date shall be the date specified in the notice of termination for Cause delivered by the Company to the Executive.  In the event that the Executive terminates his employment hereunder without Good Reason, the Termination Date shall be no earlier than 30 days following the date on which a notice of termination is delivered by the Executive to the Company.  In the event that the Executive's employment hereunder is terminated pursuant to this Section 6(d), the Executive shall be entitled to the Accrued Benefits.

(e)    Without Cause; For Good Reason. The Executive's employment hereunder may be terminated during the Employment PeriodTerm (i) by the Company without Cause or (ii) by the Executive for Good Reason.  In the event that the Executive's employment is terminated pursuant to this Section 6(e) (whether by the Company or by the Executive), the Termination Date shall be no earlier than 30 days following the date on which a notice of termination is delivered by one party to the other.  In the event that the Executive's employment is terminated pursuant to this Section 6(e), the Executive (or his estate or representative, as the case may be) shall be entitled to receive the Accrued Benefits and the other payments and benefits set forth in this Section 6(e).  The Executive (or his estate or representative, as the case may be) shall be entitled to the following severance benefits (A) a lump sum payment in cash equal to one year's Base Salary and Flexible Benefits Allowance as in effect on the Termination Date; (B) the Pro Rata Annual Bonus; and (C) the title to the Executive's Company vehicle.  The benefits described in the preceding sentence shall be paid in the month following the Executive's Termination Date.  Severance benefits provided to the Executive under this paragraph shall also include:  (x) continuation of health and welfare benefits for one year at the levels in effect as of the Termination Date at no additional cost to the Executive than that which was in effect as of the Termination Date; provided, that such benefits shall be reduced to the extent comparable benefits are made available to the Executive from a successor employer, and the Executive shall be obligated to report such benefits to the Company; and (y) executive level career outplacement services for the period beginning on the Termination Date and ending December 31 of second calendar year following termination by a mutually agreeable outplacement firm and paid for as incurred by the Company.

(f)    Definition of "Cause" and "Good Reason".

---

7    DeltaView comparison of pcdocs://chisr01a/688085/2 and pcdocs://chisr01a/688085/6. Performed on 10/29/2009.

For purposes of this Agreement, "Cause" means:  (i) the willful failure of the Executive to perform his material duties with the Company which have been duly assigned to the Executive and which duties are commensurate with those of the position for which Executive is then employed, and which failure is not cured (if capable of cure) within 15 days after receipt of written notice of such failure, which notice identifies the manner in which the Executive has willfully failed to perform, (ii) the engaging by the Executive in willful conduct which is demonstrably injurious to the Company, monetarily or otherwise, (iii) the conviction of the Executive of any crime or offense constituting a felony, or (iv) the conviction of the Executive for a violation of criminal law involving the Company and its business, or (v) a failure by the Executive to comply with any material provision of this Agreement, which failure is not cured (if capable of cure) within 15 days after receipt of written notice of such non-compliance by the Executive.  Termination of the Executive for Cause shall mean termination by action of at least a majority of the Company's Board of Directors, at a meeting duly called and held upon at least 15 days' written notice to the Executive specifying the particulars of the action or inaction alleged to constitute Cause and at which meeting the Executive and his counsel were entitled to be present and given adequate opportunity to be heard.  For purposes of clauses (i) and (ii) of this definition, action or inaction by the Executive shall not be considered "willful" unless done or omitted by him (A) intentionally or not in good faith and (B) without reasonable belief that his action or inaction was in the best interest of the Company, and shall not include failure to act by reason of total or partial incapacity due to physical or mental illness.

For purposes of this Agreement, 'Good Reason' means the occurrence of one or more of the following events if the Executive gives notice of the event to the Company within 90 days of the event and the Company fails to remedy such event within 30 days of receiving notice from the Executive:  (i) a material adverse alteration in the nature or status of the Executive's position, duties, responsibilities or authority from those in effect as of the Effective Date; (ii) a material reduction in the Executive's Base Salary or level of employee benefits (other than across-the-board reductions applied similarly to all of the Company's senior executives occurring after the second anniversary of the Effective Date); (iii) a failure to pay or provide a material amount of the compensation set forth in this Agreement (except for an across-the-board deferral of compensation applied similarly to all of the Company's senior executives occurring after the second anniversary of the Effective Date); (iv) the relocation of the Executive's principal place of employment more than 30 miles from its location as of the Effective Date except for required travel on the Company's business; (v) assignment of duties or responsibilities to the Executive which are materially inconsistent with the provisions of this Agreement; or (vi) a failure by the Company to comply with any material provision of this Agreement.

(g)    Change in Control Severance Provisions.  The provisions set forth in Attachment A hereto are hereby incorporated into this Agreement.  The Executive hereby acknowledges that in the event he becomes entitled to the payment set forth in Section 6.1(A) of Attachment A hereto, that such payment will be in lieu of any other payments to be made pursuant to the terms of this Agreement.

For purposes of this Agreement, a Change in Control shall be deemed to have occurred upon the first of the following to occur after the Effective Date:

8    DeltaView comparison of pcdocs://chisr01a/688085/2 and pcdocs://chisr01a/688085/6. Performed on 10/29/2009.

(i)	any Person (within the meaning of Section 3(a)(9) of the Securities and Exchange Act of 1934, as amended (the "Exchange Act"), as modified and used in Sections 13(d) and 14(d) thereof) becomes the "Beneficial Owner" (within the meaning of Rule 13d-3 under the Exchange Act) of fifty percent (50%) or more of either (1) the then-outstanding Common Stock or (2) the combined voting power of the then-outstanding voting securities of the Company entitled to vote generally in the election of directors;

(ii)	the following individuals cease for any reason to constitute a majority of the number of directors then serving: individuals who, as of the Effective Date, constitute the Board and any new director (other than a director whose initial assumption of office is in connection with an actual or threatened election contest, including but not limited to a consent solicitation, relating to the election of directors of the Company) whose appointment or election by the Board or nomination for election by the Company's stockholders was approved or recommended by a vote of at least a majority of the directors then still in office who either were directors on the date hereof or whose appointment, election or nomination for election was previously so approved or recommended;

(iii)	there is consummated a merger or consolidation of the Company or any direct or indirect subsidiary of the Company with any other corporation, other than a merger or consolidation which would result in the voting securities of the Company outstanding immediately prior to such merger or consolidation continuing to represent (either by remaining outstanding or by being converted into voting securities of the surviving entity or any parent thereof) at least fifty percent (50%) of the combined voting power of the securities of the Company or such surviving entity or any parent thereof outstanding immediately after such merger or consolidation; or

(iv)	the stockholders of the Company approve a plan of complete liquidation or dissolution of the Company or there is consummated an agreement for the sale or disposition by the Company of all or substantially all of its assets.

Notwithstanding anything contained in this Agreement to the contrary (including, without limitation, this Section 6(g)), no transaction entered into, or other event occurring, pursuant to, as a result of, or in any way in connection with, the Restructuring shall constitute a "Change in Control" under this Agreement.

(h)	Release Agreement.  Notwithstanding anything to the contrary contained in this Section 6, the Executive shall be required to execute the Company's then current standard release agreement as a condition to receiving any of the payments and benefits provided for in this Section 6 or Attachment A.  It is acknowledged and agreed that the then current standard release agreement shall be a mutual release and shall not diminish or terminate Executive's rights under this Agreement including, but not limited to, those delineated in Sections 6(i), 7 and 16 herein.  The time period for executing such release (and the period available to revoke it) shall be in accordance with the Company's then current standard practice

---

9	DeltaView comparison of pcdocs://chisr01a/688085/2 and pcdocs://chisr01a/688085/6. Performed on 10/29/2009.

but in no event shall the execution period extend beyond 60 days following the Executive's Termination Date.

(i)    No Mitigation.  Upon termination of the Executive's employment with the Company, subject to the Executive's affirmative obligations pursuant to Section 6(c) and 6(e), the Executive shall be under no obligation to seek other employment or otherwise mitigate the obligations of the Company under this Agreement.  The time period for executing such release (and the period available to revoke it) shall be in accordance with the Company's then current standard practice but in no event shall the execution period extend beyond 60 days following the Executive's Termination Date.

7.    Directors' and Officers' Insurance; Indemnification.  In addition to any rights to indemnification to which the Executive is entitled under the Company's Restated Certificate of Incorporation and Bylaws, the Company shall indemnify the Executive at all times during and after the Employment Period to the maximum extent permitted under the Delaware Business Corporation Act or any successor provision thereof, and any and all applicable state law, and shall pay the Executive's expenses (including reasonable attorneys' fees and expenses, which shall be paid in advance by the Company as incurred, subject to recoupment in accordance with applicable law) in defending any civil action, suit or proceeding in advance of the final disposition of such action, suit or proceeding to the maximum extent permitted under such applicable state laws for the Executive's action or inaction on behalf of the Company under the terms of this Agreement including but not limited to any acts or alleged acts arising out of events prior to the Executive's employment by the Company which obligation shall survive the termination of the Executive's employment or the termination of the other provisions of this Agreement.

8.    Confidential Information; Removal of Documents; Non-Competition; etc.  For purposes of this Section 8, "Company" shall mean the Company, its subsidiaries and affiliates.

(a)    Confidentiality.  Except as otherwise provided in this Agreement, at all times during and after the Employment TermPeriod, the Executive shall keep secret and retain in strictest confidence, any and all Confidential Information (as defined below) relating to the Company, and shall use such Confidential Information only in furtherance of the performance by the Executive of the Executive's duties to the Company and not for personal benefit or the benefit of any interest adverse to the Company's interests.  For purposes of this Agreement, "Confidential Information" shall mean any information including without limitation plans, specifications, models, samples, data, customer lists and customer information, computer programs and documentation, and other technical and/or business information, in whatever form, tangible or intangible, that can be communicated by whatever means available at such time, that relates to the Company's current Business or future business contemplated during the Employment Period, products, services and development, or information received from others that the Company is obligated to treat as confidential or proprietary; provided, however, that such Confidential Information shall not include any information that (i) has become generally available to the public other than as a result of a disclosure by the Executive, or (ii) was available to or became known to the Executive prior to the disclosure of such information on a non-

10____DeltaView comparison of pcdocs://chisr01a/688085/2 and pcdocs://chisr01a/688085/6. Performed on 10/29/2009.

confidential basis without breach of any duty of confidentiality from any party to the Company, and the Executive shall not disclose such Confidential Information to any person or entity other than the Company, except as may be required by law or court or administrative order (in which event the Executive shall so notify the Company as promptly as practicable).  Upon termination of the Executive's employment hereunder for any reason, the Executive shall return to the Company all copies, reproductions and summaries of Confidential Information in the Executive's possession and erase the same from all media in the Executive's possession, and, if the Company so requests, shall certify in writing that the Executive has done so.  All Confidential Information is and shall remain the property of the Company (or, in the case of information that the Company receives from a third party which it is obligated to treat as confidential, then the property of such third party).

> (b)　　Non-Competition.

> (i)　　During the Employment Period, the Executive shall not engage in Competition (as defined below) with the Company.  For purposes of this Agreement, "Competition" by the Executive shall mean the Executive's engaging in, or otherwise directly or indirectly being employed by or acting as a consultant or lender to, or being a director, officer, employee, principal, agent, stockholder, member, owner or partner of, or permitting the Executive's name to be used in connection with the activities of any other business or organization anywhere which competes, directly or indirectly, with the Business of the Company as the same shall be constituted at the Termination Date or which, during the six-month period prior to the Executive's termination, the Company had made substantial plans with the intention of establishing operations.

> (ii)　　For the one year period commencing on the Termination Date, the Executive shall not engage in Competition with the Company in any locality or region in which the Company had operations at the time of, or within six months prior to, the Executive's termination, or in which, during the six-month period prior to the Executive's termination, the Company had made substantial plans with the intention of establishing operations in such locality or region; provided, however, that it shall not be a violation of this sub-paragraph or the sub-paragraph hereinabove for the Executive to be or become the registered or beneficial owner of up to three percent (3%) of any class of the capital stock of a competing corporation registered under the Exchange Act, provided that the Executive does not actively participate in the business of such corporation until such time as this covenant expires.

> (c)　　Non-Solicitation.  ForDuring the Employment Period and for the one year period commencing on the Termination Date, the Executive agrees that the Executive shall not, directly or indirectly, for the Executive's benefit or for the benefit of any other person, firm or entity, engage any of the following conduct:

> (i)　　solicit from any customer doing business with the Company as of the Termination Date, business of the same or of a similar nature to the business of the Company with such customer;

11　　DeltaView comparison of pcdocs://chisr01a/688085/2 and pcdocs://chisr01a/688085/6. Performed on 10/29/2009.

(ii)     solicit from any known potential customer of the Company business of the same or of a similar nature to that which has been the subject of a known written or oral bid, offer or proposal by the Company, or of substantial preparation with a view to making such a bid, proposal or offer, within six months prior to the Executive's termination;

(iii)     solicit the employment or services of, or hire, any person who was known to be employed by or was a known consultant to the Company upon the termination of the Executive's employment, or within six months prior thereto; or

(iv)     otherwise interfere with the business or accounts of the Company.

(d)     Intellectual Property.  All Intellectual Property (as defined below) and Technology (as defined below) created, developed, obtained or conceived of by the Executive during the Employment Period, and all business opportunities presented to the Executive during the Employment Period, shall be owned by and belong exclusively to the Company, provided that they reasonably relate to the Business, and the Executive shall (i) promptly disclose any such Intellectual Property, Technology or business opportunity to the Company, and (ii) execute and deliver to the Company, without additional compensation, such instruments as the Company may require from time to time to evidence its ownership of any such Intellectual Property, Technology or business opportunity.  For purposes of this Agreement, (A) the term "Intellectual Property" means and includes any and all trademarks, trade names, service marks, service names, patents, copyrights, and applications therefor, and (B) the term "Technology" means and includes any and all trade secrets, proprietary information, invention, discoveries, know-how, formulae, processes and procedures.

(e)     The Executive acknowledges that the services to be rendered by the Executive to the Company are of a special and unique character, which gives this Agreement a peculiar value to the Company, the loss of which may not be reasonably or adequately compensated for by damages in an action at law, and that a material breach or threatened breach by the Executive of any of the provisions contained in this Section 8 shall cause the Company irreparable injury.  The Executive therefore agrees that the Company shall be entitled, in addition to any other right or remedy, to a temporary, preliminary and permanent injunction, without the necessity of proving the inadequacy of monetary damages or the posting of any bond or security, enjoining or restraining the Executive from any such violation or threatened violations.

(f)     The Executive further acknowledges and agrees that due to the uniqueness of the Executive's services and confidential nature of the information the Executive shall possess, the covenants set forth herein are reasonable and necessary for the protection of the business and goodwill of the Company.

(g)     Continuing Operation.  Any termination of the Executive's employment or of this Agreement shall have no effect on the continuing operation of this Section 8.

12_____DeltaView comparison of pcdocs://chisr01a/688085/2 and pcdocs://chisr01a/688085/6. Performed on 10/29/2009.

1. <u>Stockholder Agreement.  As a precondition to receiving any award under the LTIP, Executive shall execute a management stockholders agreement that is acceptable to Executive and the Company.</u>

2. ~~9.~~ Severability.  It is the desire and intent of the parties that the provisions of this Agreement shall be enforced to the fullest extent permissible under the laws and public policies applied in each jurisdiction in which enforcement is sought.  Accordingly, if any particular provision or portion of this Agreement shall be adjudicated to be invalid or unenforceable, this Agreement shall be deemed amended to delete therefrom the portion thus adjudicated to be invalid or unenforceable, such deletion to apply only with respect to the operation of such provision in the particular jurisdiction in which such adjudication is made.

3. ~~10.~~ Notices.  All communications, requests, consents and other notices provided for in this Agreement shall be in writing and shall be deemed give if delivered by hand or mailed by first class mail, postage prepaid, to the last known address of the recipient.

4. ~~11.~~ Governing Law.  This Agreement shall be governed by and construed and enforced in accordance with the laws of the State of Delaware, without regard to its conflicts of laws provisions.

5. ~~12.~~ Assignment.  Neither this Agreement nor any rights or duties hereunder may be assigned by the Executive without the prior written consent of the Company.  The Company shall have the right at any time to assign this Agreement to its successors and assigns; <u>provided</u>, <u>however</u>, that the assignee or transferee is the successor to all or substantially all of the business and assets of the Company and such assignee or transferee expressly assumes all of the obligations, duties and liabilities of the Company set forth in this Agreement.

6. ~~13.~~ Amendments.  No provisions of this Agreement shall be altered, amended, revoked or waived except by an instrument in writing, signed by each party to this Agreement.

7. ~~14.~~ Binding Effect.  Except as otherwise provided herein, this Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective legal representatives, heirs, successors and assigns.

8. ~~15.~~ Execution in Counterparts.  This Agreement may be executed in any number of counterparts, each of which shall be deemed an original, but all of which together shall constituted one and the same instrument.

9. ~~16.~~ Arbitration.  Any dispute, controversy or question arising under, out of, or relating to this Agreement (or the breach thereof), or, the Executive's employment with the Company or termination thereof, shall be referred for arbitration in the State of Michigan to a neutral arbitrator selected by the Executive and the Company and this shall be the exclusive and sole means for resolving such dispute.  Such arbitration shall be conducted in accordance with the National Rules for Resolution of Employment Disputes of the American Arbitration

Association.  The arbitrator shall have the discretion to award reasonable attorneys' fees, costs and expenses to the prevailing party.  Judgment upon the award rendered by the arbitrator may be entered in any court having jurisdiction thereof.

10.        17. Entire Agreement.  This Agreement sets forth the entire agreement and understanding of the parties and supersedes all prior understandings, agreements (including, without limitation, the Original Agreement) or representations by or between the parties, whether written or oral, which relate in any way to the subject matter hereof.

11.        18. Survivorship.  The provisions of this Agreement necessary to carry out the intention of the parties as expressed herein shall survive the termination or expiration of this Agreement.

12.        19. Waiver.  Except as provided herein, the waiver by either party of the other party's prompt and complete performance, or breach or violation, of any provision of this Agreement shall not operate nor be construed as a waiver of any subsequent breach or violation, and the failure by any party hereto to exercise any right or remedy which it may possess hereunder shall not operate nor be construed as a bar to the exercise of such right or remedy by such party upon the occurrence of any subsequent breach or violation.

13.        20. Captions.  The captions of this Agreement are for convenience and reference only and in no way define, describe, extend or limit the scope or intent of this Agreement or the intent of any provision hereof.

14.        21. Construction.  The parties acknowledge that this Agreement is the result of arm's-length negotiations between sophisticated parties each afforded representation by legal counsel.  Each and every provision of this Agreement shall be construed as though both parties participated equally in the drafting of same, and any rule of construction that a document shall be construed against the drafting party shall not be applicable to this Agreement.

15.        22. Code Section 409A Payment Delay.  Notwithstanding any provision in this Agreement (or the attached Severance Agreement) to the contrary, any payment triggered by a termination of employment to the extent and up to the amount necessary to ensure that such payments are not subject to penalties and interest under Code Section 409A shall not commence until at least six months after the Executive's termination of employment.  To the extent such payments, absent this provision, would be paid during the first six month period following the Executive's termination of employment, those payments shall be withheld and the amount of the payments withheld will be paid in a lump sum, without interest, during the seventh month after termination; provided that, if the Executive dies during such six-month period, any such delayed payments shall be immediately payable to the Executive's estate or representative.

---

14      DeltaView comparison of pcdocs://chisr01a/688085/2 and pcdocs://chisr01a/688085/6. Performed on 10/29/2009.

~~IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first above written.~~

<u>If and to the extent that any payment or benefit under this Agreement is determined by the Company to constitute "non-qualified deferred compensation" subject to Code Section 409A and is payable to the Executive by reason of the Executive's termination of employment, then such payment or benefit shall be made or provided to the Executive only upon a "separation from service" as defined for purposes of Code Section 409A.  The Company shall not have any liability or be responsible for any claim related to the incurrence by the Executive or any other person of any tax, interest expense, loss of tax benefit, or any other obligation or liability, in each case, arising under or related to Code Section 409A.</u>

<u>16.     Tax Withholding.  All compensation payable pursuant to this Agreement shall be subject to reduction by all applicable withholding, social security and other federal, state and local taxes and deductions.</u>

<u>IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first above written.</u>

EXECUTIVE


By:_____
      Mark A. Brebberman



HAYES LEMMERZ INTERNATIONAL, INC.


By:_____
Name: Curtis J. Clawson
Title:   President and Chief Executive Officer

---

15_____DeltaView comparison of pcdocs://chisr01a/688085/2 and pcdocs://chisr01a/688085/6. Performed on 10/29/2009.

*Attachment A*

## SEVERANCE AGREEMENT

       1.  Defined Terms.  Unless otherwise defined in this Attachment A, the terms that are defined in the Employment Agreement  (the "Employment Agreement") shall have the same meanings when used herein as that are ascribed to such terms in the Employment Agreement.

       2.  Term of Agreement.  The Term of this Agreement shall commence on the Effective Date hereof and shall continue in effect through the third anniversary thereof; provided, however, that commencing on the first anniversary of the Effective Date and each anniversary thereafter (each such date a "Renewal Date"), the Term shall automatically be extended for one additional year unless, on or prior to such Renewal Date, the Company or the Executive shall have given notice not to extend the Term; and further provided, however, that if a Change in Control shall have occurred during the Term, the Term shall expire no earlier than twenty-four (24) months beyond the month in which such Change in Control occurred.

       3.  Immediate Effect of Change in Control. Promptly following a Change in Control, but in no event later than April 15 of the calendar year following the Change in Control, the Executive shall be entitled to the immediate payment of all unpaid compensation amounts (including the pro rata bonus payment for the current fiscal year under any bonus plan for which he is eligible ("Pro-rata Bonus") and all unpaid bonuses with respect to any prior fiscal year) with respect to the Executive's employment.  For purposes of this Section 3, Pro-rata Bonus shall be an amount equal to the product of (1) the product of (x) the Executive's base salary as in effect immediately prior to the Change in Control and (y) the greater of (A) the Executive's normative bonus percentage for the fiscal year in which the Change in Control occurs and (B) the Executive's estimated bonus percentage calculated in good faith by the Company's Finance Department determined by projecting performance through the end of the fiscal year in which the Change in Control occurs and (2) a fraction, the numerator of which is the number of days in the fiscal year in which the Change in Control occurs through the date of the Change in Control, and the denominator of which is 365.  The Pro-rata Bonus paid shall be subtracted from the amount otherwise due the Executive as a bonus for the fiscal year in which the Change in Control occurs, but such Pro-rata Bonus becomes a vested benefit upon a Change in Control and in no event shall the Executive have to repay all or any portion of the Pro-rata Bonus.

       4.  Company's Covenants Summarized.  In order to induce the Executive to remain in the employ of the Company, the Company agrees, under the conditions described herein, to pay the Executive the Severance Payments and the other payments and benefits described herein. Except as provided in Section 9.1 hereof, no Severance Payments shall be payable under this Agreement unless there shall have been (or, under the terms of the second sentence of Section 6.1 hereof, there shall be deemed to have been) a termination of the Executive's employment with the Company on or following a Change in Control and during the Term.  This Agreement shall not be construed as creating an express or implied contract of employment and, except as otherwise agreed in writing between the Executive and the Company, the Executive shall not have any right to be retained in the employ of the Company.

5.  <u>Compensation Other Than Severance Payments</u>.

5.1  Following a Change in Control and during the Term, during any period that the Executive fails to perform the Executive's full-time duties with the Company as a result of incapacity due to physical or mental illness, the Company shall pay the Executive's full salary to the Executive at the rate in effect at the commencement of any such period, together with all compensation and benefits payable to the Executive under the terms of any compensation or benefit plan, program or arrangement (other than the Company's short- or long-term disability plan, as applicable, to the extent such benefits would be duplicative and their nonpayment would not prejudice Executive's future entitlement to benefits) maintained by the Company during such period, until the Executive's employment is terminated by the Company for Disability.

5.2  If the Executive's employment shall be terminated for any reason on or following a Change in Control and during the Term, the Company shall pay the Executive's full salary to the Executive through the Date of Termination at the rate in effect immediately prior to the Date of Termination or, if higher, the rate in effect immediately prior to the first occurrence of an event or circumstance constituting Good Reason, together with all compensation and benefits payable to the Executive through the Date of Termination under the terms of the Company's compensation and benefit plans, programs or arrangements as in effect immediately prior to the Date of Termination or, if more favorable to the Executive, as in effect immediately prior to the first occurrence of an event or circumstance constituting Good Reason (including all unpaid bonuses with respect to any prior fiscal year).  In addition, if the Executive's employment is terminated on or following a Change in Control and during the Term, other than (A) by the Company for Cause, (B) by reason of death or Disability, or (C) by the Executive without Good Reason, then the Company shall pay Executive an amount equal to the product of (1) the product of (x) the Executive's base salary as in effect immediately prior to the Date of Termination, or, if higher, as in effect immediately prior to the first occurrence of an event or circumstance constituting Good Reason (the greater of such amounts, the "Base Salary") and (y) the Executive's normative bonus percentage for the year in which the Date of Termination occurs, or if higher, the normative bonus percentage for the fiscal year in which the Change in Control occurs or the normative bonus percentage in effect immediately prior to the first occurrence of an event or circumstance constituting Good Reason (the greatest of such percentages, the "Bonus Percentage") and (2) a fraction, the numerator of which is the number of days in the fiscal year in which the Date of Termination occurs through the date of the Date of Termination, and the denominator of which is 365; it being understood that, if the Date of Termination is in the same fiscal year as the Change in Control, the Pro-rata Bonus calculated pursuant to Section 3 shall be subtracted from the amount payable pursuant to this sentence of Section 5.2 but shall not reduce the amount payable below zero.

5.3  If the Executive's employment shall be terminated for any reason on or following a Change in Control and during the Term, the Company shall pay to the Executive the Executive's normal post-termination compensation and benefits as such payments become due. Such post-termination compensation and benefits shall be determined under, and paid in accordance with, the Company's retirement, insurance and other compensation or benefit plans, programs and arrangements as in effect immediately prior to the Date of Termination or, if more

---

17⎯⎯DeltaView comparison of pcdocs://chisr01a/688085/2 and pcdocs://chisr01a/688085/6. Performed on 10/29/2009.

favorable to the Executive, as in effect immediately prior to the occurrence of the first event or circumstance constituting Good Reason.

6. <u>Severance Payments</u>.

6.1  If the Executive's employment is terminated on or following a Change in Control and during the Term, other than (A) by the Company for Cause, (B) by reason of death or Disability, or (C) by the Executive without Good Reason, then the Company shall pay the Executive the amounts, and provide the Executive the benefits, described in this Section 6.1 ("Severance Payments") and Section 6.2, in addition to any payments and benefits to which the Executive is entitled under Section 5 hereof or otherwise (except as provided herein).  For purposes of this Agreement, the Executive's employment shall be deemed to have been terminated following a Change in Control by the Company without Cause or by the Executive with Good Reason, if (i) the Executive's employment is terminated by the Company without Cause prior to a Change in Control (whether or not a Change in Control ever occurs) and such termination was at the request or direction of a Person who enters into an agreement with the Company the consummation of which would constitute a Change in Control, (ii) the Executive terminates his employment for Good Reason prior to a Change in Control (whether or not a Change in Control ever occurs) and the circumstance or event which constitutes Good Reason occurs at the request or direction of such Person, or (iii) the Executive's employment is terminated by the Company without Cause or by the Executive for Good Reason and such termination or the circumstance or event which constitutes Good Reason is otherwise in connection with or in anticipation of a Change in Control (whether or not a Change in Control ever occurs).

(A)  In lieu of any further salary payments to the Executive for periods subsequent to the Date of Termination and in lieu of any severance benefit otherwise payable to the Executive (whether pursuant to any employment agreement, plan, policy or otherwise), the Company shall pay to the Executive a lump sum severance payment, in cash, equal to two times the sum of (i) the Base Salary and Flexible Benefits Allowance and (ii) the product of (x) the Base Salary and (y) the Bonus Percentage.  Such amounts shall be paid within the period described in Section 6.3.

(B)  For the twenty-four (24) month period immediately following the Date of Termination, the Company shall arrange to provide the Executive and his dependents with life, disability, accident and health insurance benefits substantially similar to those provided to the Executive and his dependents immediately prior to the Date of Termination or, if more favorable to the Executive, those provided to the Executive and his dependents immediately prior to the first occurrence of an event or circumstance constituting Good Reason, at no greater cost to the Executive than the Executive's cost immediately prior to such date or occurrence (the "Executive's Cost").  Unless the Executive consents to a different method (after taking into account the effect of such method on the calculation of "parachute payments" pursuant to Section 6.2 hereof), the health insurance benefits described in this Section 6.1(B) shall be provided through a third-party insurer.  In the event continued accident and health insurance coverage under this Section 6.1(B) is provided through the Company's self-insured health plan such coverage shall be limited to the first eighteen months following the Date of Termination.  If

18 ____ DeltaView comparison of pcdocs://chisr01a/688085/2 and pcdocs://chisr01a/688085/6. Performed on 10/29/2009.

the Executive is not receiving accident and health insurance coverage from another employer at the end of such eighteen month period, the Company shall pay the Executive a lump sum amount equal to six times the monthly COBRA health benefit continuation premium for the Executive's coverage under the Company's accident and health insurance coverage. Benefits otherwise receivable by the Executive pursuant to this Section 6.1(B) shall be reduced to the extent benefits of the same type are received by or made available to the Executive by another employer of the Executive during the twenty-four (24) month period following the Executive's termination of employment (and any such benefits received by or made available to the Executive shall be reported to the Company by the Executive); provided, however, that the Company shall reimburse the Executive for the excess, if any, of the cost of such benefits to the Executive over such cost immediately prior to the Date of Termination or, if more favorable to the Executive, the first occurrence of an event or circumstance constituting Good Reason.

(C)     For purposes of COBRA health benefit continuation under section 4980B of the Code, the cessation of benefits pursuant to Section 6.1(B) shall be treated as though such cessation is the "qualifying event" under section 4980B(f)(3) of the Code for purposes of determining the period of coverage.

(D)     The Company shall pay to the Executive a lump sum amount equal to one hundred thousand dollars ($100,000).  Such amount shall be paid in the month following the Date of Termination.

(E)     The Company shall, at its sole expense as incurred, provide Executive with "key executive level" outplacement services for the period ending on December 31 of the second calendar year following the Termination Date at a cost of no more than fifteen percent (15%) of the sum of (i) Base Salary and (ii) the Bonus Percentage multiplied by Base Salary.

6.2     (A)     Whether or not the Executive becomes entitled to the Severance Payments, if any of the payments or benefits received or to be received by the Executive in connection with a Change in Control or the Executive's termination of employment (whether pursuant to the terms of this Agreement or any other plan, arrangement or agreement with the Company, any Person whose actions result in a Change in Control or any Person affiliated with the Company or such Person) (all such payments and benefits, excluding the Gross-Up Payment, being hereinafter referred to as the "Total Payments") will be subject to the Excise Tax, the Company shall pay to the Executive an additional amount (the "Gross-Up Payment") such that the net amount retained by the Executive, after deduction of any Excise Tax on the Total Payments and any federal, state and local income and employment taxes and any penalties, interest or fees incurred by the Executive as a result of any payment under Section 6.2 being made later than five business days prior to the due date of the excise tax with respect to which it is paid and any Excise Tax upon the Gross-Up Payment, shall be equal to the Total Payments.

(B)     For purposes of determining whether any of the Total Payments will be subject to the Excise Tax and the amount of such Excise Tax, (i) all of the Total Payments shall be treated as "parachute payments" (within the meaning of section 280G(b)(2) of the Code) unless, in the opinion of tax counsel ("Tax Counsel") reasonably acceptable to the Executive and selected by the accounting firm which was, immediately prior to the Change in Control, the

19____DeltaView comparison of pcdocs://chisr01a/688085/2 and pcdocs://chisr01a/688085/6. Performed on 10/29/2009.

Company's independent auditor (the "Auditor"), such payments or benefits (in whole or in part) do not constitute parachute payments, including by reason of section 280G(b)(4)(A) of the Code, (ii) all "excess parachute payments" within the meaning of section 280G(b)(l) of the Code shall be treated as subject to the Excise Tax unless, in the opinion of Tax Counsel, such excess parachute payments (in whole or in part) represent reasonable compensation for services actually rendered (within the meaning of section 280G(b)(4)(B) of the Code) in excess of the Base Amount allocable to such reasonable compensation, or are otherwise not subject to the Excise Tax, and (iii) the value of any noncash benefits or any deferred payment or benefit shall be determined by the Auditor in accordance with the principles of sections 280G(d)(3) and (4) of the Code.  For purposes of determining the amount of the Gross-Up Payment, the Executive shall be deemed to pay federal income tax at the highest marginal rate of federal income taxation in the calendar year in which the Gross-Up Payment is to be made and state and local income taxes at the highest marginal rate of taxation in the state and locality of the Executive's residence or the Executive's place of business, whichever is higher, on the Date of Termination (or if there is not yet a Date of Termination, then the date on which the Gross-Up Payment is calculated for purposes of this Section 6.2), net of the maximum reduction in federal income taxes which could be obtained from deduction of such state and local taxes.

(C)     In the event that the Excise Tax is finally determined to be less than the amount taken into account hereunder in calculating the Gross-Up Payment, the Executive shall repay to the Company, within five (5) business days following the time that the amount of such reduction in the Excise Tax is finally determined, the portion of the Gross-Up Payment attributable to such reduction (including that portion of the Gross-Up Payment attributable to the Excise Tax and federal, state and local income and employment taxes imposed on the Gross-Up Payment being repaid by the Executive), to the extent that such repayment results in a reduction in the Excise Tax and a dollar-for-dollar reduction in the Executive's taxable income and wages for purposes of federal, state and local income and employment taxes, plus interest on the amount of such repayment at 120% of the rate provided in section 1274(b)(2)(B) of the Code. Notwithstanding the foregoing, in the event any portion of the amount to be repaid to the Company has been paid to any tax authority, repayment thereof shall not be required until actual refund or credit of such portion has been made to Executive, and interest payable to the Company shall not exceed the interest received or credited to Executive by such tax authority. In the event that the Excise Tax is determined to exceed the amount taken into account hereunder in calculating the Gross-Up Payment (including by reason of any payment the existence or amount of which cannot be determined at the time of the Gross-Up Payment), the Company shall make an additional Gross-Up Payment in respect of such excess (including any interest, penalties or additions payable by the Executive with respect to such excess and the Gross-Up Payment attributable to the Excise Tax and federal, state, and local income and employment taxes imposed on the Gross-Up Payment being made to the Executive) within five (5) business days following the time that the amount of such excess is finally determined.  The Executive and the Company shall each reasonably cooperate with the other in connection with any administrative or judicial proceedings concerning the existence or amount of liability for Excise Tax with respect to the Total Payments.

6.3  The payments provided in subsections (A), of Section 6.1 hereof and in Section 6.2 hereof shall be made not later than the fifth day following the Date of Termination (or if

20____DeltaView comparison of pcdocs://chisr01a/688085/2 and pcdocs://chisr01a/688085/6. Performed on 10/29/2009.

there is no Date of Termination, then the date on which the Gross-up Payment is calculated for purposes of Section 6.2 hereof); provided, however, that if the amounts of such payments cannot be finally determined on or before such day, the Company shall pay to the Executive on such day an estimate, as determined in good faith by the Company or, in the case of payments under Section 6.2 hereof, in accordance with Section 6.2 hereof, of the minimum amount of such payments to which the Executive is clearly entitled and shall pay the remainder of such payments (together with interest on the unpaid remainder (or on all such payments to the extent the Company fails to make such payments when due) at 120% of the rate provided in section 1274(b)(2)(B) of the Code) as soon as the amount thereof can be determined but in no event later than the thirtieth (30th) day after the Date of Termination.  In the event that the amount of the estimated payments exceeds the amount subsequently determined to have been due, such excess shall constitute a loan by the Company to the Executive, payable on the fifth (5th) business day after demand by the Company (together with interest at 120% of the rate provided in section 1274(b)(2)(B) of the Code).

6.4  The Company also shall pay to the Executive all legal fees and expenses incurred by the Executive in disputing in good faith any issue hereunder relating to the termination of the Executive's employment, in seeking in good faith to obtain or enforce any benefit or right provided by this Agreement or in connection with any tax audit or proceeding to the extent attributable to the application of section 4999 of the Code to any payment or benefit provided hereunder.  Such payments shall be made within five (5) business days after delivery of the Executive's written requests for payment accompanied with such evidence of fees and expenses incurred as the Company reasonably may require (but in no event after the last day of the calendar year following the calendar year in which the expense is incurred).

7.  Termination Procedures and Compensation During Dispute.

7.1  Notice of Termination.  After a Change in Control and during the Term, any purported termination of the Executive's employment (other than by reason of death) shall be communicated by written Notice of Termination from one party hereto to the other party hereto in accordance with Section 10 of the Employment Agreement.  For purposes of this Agreement, a "Notice of Termination" shall mean a notice which shall indicate the specific termination provision in this Agreement relied upon and shall set forth in reasonable detail the facts and circumstances claimed to provide a basis for termination of the Executive's employment under the provision so indicated.  Further, a Notice of Termination for Cause is required to include a copy of a resolution duly adopted by the affirmative vote of not less than three-quarters (3/4) of the entire membership of the Board at a meeting of the Board which was called and held for the purpose of considering such termination (after reasonable notice to the Executive and an opportunity for the Executive, together with the Executive's counsel, to be heard before the Board) finding that, in the good faith opinion of the Board, the Executive was guilty of conduct set forth in clause (i) or (ii) of the definition of Cause herein, and specifying the particulars thereof in detail.

7.2  Date of Termination.  "Date of Termination," with respect to any purported termination of the Executive's employment after a Change in Control and during the Term, shall mean (i) if the Executive's employment is terminated for Disability, thirty (30) days after Notice

21_____DeltaView comparison of pcdocs://chisr01a/688085/2 and pcdocs://chisr01a/688085/6. Performed on 10/29/2009.

of Termination is given (provided that the Executive shall not have returned to the full-time performance of the Executive's duties during such thirty (30) day period), and (ii) if the Executive's employment is terminated for any other reason, the date specified in the Notice of Termination (which, in the case of a termination by the Company (except in the case of a termination for Cause) and, in the case of a termination by the Executive, shall not be less than thirty (30) days from the date such Notice of Termination is given).

7.3    Dispute Concerning Termination.  If within fifteen (15) days after any Notice of Termination is given, or, if later, prior to the Date of Termination (as determined without regard to this Section 7.3), the party receiving such Notice of Termination notifies the other party that a dispute exists concerning the termination, the Date of Termination shall be extended until the earlier of (i) the date prior to the date on which the Term ends or (ii) the date on which the dispute is finally resolved, either by mutual written agreement of the parties or by a final judgment, order or decree of an arbitrator or a court of competent jurisdiction (which is not appealable or with respect to which the time for appeal therefrom has expired and no appeal has been perfected); provided, however, that the Date of Termination shall be extended by a notice of dispute only if such notice is given in good faith and the party providing notice pursues the resolution of such dispute with reasonable diligence.

7.4  [Intentionally blank]

8.  No Mitigation.  The Company agrees that, if the Executive's employment with the Company terminates during the Term, the Executive is not required to seek other employment or to attempt in any way to reduce any amounts payable to the Executive by the Company pursuant to this Agreement.  Further, the amount of any payment or benefit provided for in this Agreement (other than Section 6.1(B) hereof) shall not be reduced by any compensation earned by the Executive as the result of employment by another employer, by retirement benefits, by offset against any amount claimed to be owed by the Executive to the Company, or otherwise.

9.  Successors; Binding Agreement.

9.1  This Agreement shall inure to the benefit of and be binding upon the Company and its successors and assigns.  In addition to any obligations imposed by law upon any successor to the Company, the Company will require any successor (whether direct or indirect, by purchase, merger, consolidation or otherwise) to all or substantially all of the business and/or assets of the Company to expressly assume and agree in writing to perform this Agreement in the same manner and to the same extent that the Company would be required to perform it if no such succession had taken place.  The Company will require any ultimate parent entity, as defined in 16 C.F.R. 8801,1(a)(3), of any Person who acquires 90% of the outstanding shares of common stock of the Company or the outstanding voting securities of the Company entitled to vote generally in the election of directors (including through a merger in which the Company does not survive or as a result of which the Company becomes a subsidiary of another Person or a consolidation involving the Company and another Person) to assume and agree in writing to perform as a joint and several obligor of the Company (including any successor to the Company), this Agreement in the same manner and to the same extent as the Company.  Failure of the Company to obtain such assumption and agreement in writing from a successor or its

22⸺DeltaView comparison of pcdocs://chisr01a/688085/2 and pcdocs://chisr01a/688085/6. Performed on 10/29/2009.

parent as described in the preceding sentences after notice and a reasonable cure period (not to exceed ten days from the date such notice is received) shall be a breach of this Agreement and shall entitle the Executive to compensation from the Company in the same amount and on the same terms as the Executive would be entitled to hereunder if the Executive were to terminate the Executive's employment for Good Reason after a Change in Control, except that, for purposes of implementing the foregoing, the date on which any such succession becomes effective shall be deemed the Date of Termination.

9.2    This Agreement shall inure to the benefit of and be enforceable by the Executive's personal or legal representatives, executors, administrators, successors, heirs, distributees, devisees and legatees.  If the Executive shall die while any amount would still be payable to the Executive hereunder (other than amounts which, by their terms, terminate upon the death of the Executive) if the Executive had continued to live, all such amounts, unless otherwise provided herein, shall be paid in accordance with the terms of this Agreement to the executors, personal representatives or administrators of the Executive's estate.

10.    Insurance and Indemnification.  From and after a Change in Control, including after the termination of Executive's employment, the Company shall indemnify, defend and hold the Executive harmless from and against any and all expenses, liabilities, damages, costs, judgments, penalties, fines and amounts paid in settlement, incurred in good faith by Executive in connection with any proceeding involving Executive by reason of Executive's being or having been an officer, director, employee or agent of the Company (or any affiliate of the Company) to the fullest extent permitted by law, whether or not Executive is, or is threatened to be made, a party to any threatened, pending, or completed proceeding, and whether or not Executive is successful in such proceeding.  In addition, upon receipt from Executive of (i) a written request for an advancement of reasonable expenses which Executive reasonably believes will be subject to indemnification hereunder and (ii) a written undertaking by Executive to repay any such amounts if it shall ultimately be determined that the Executive is not entitled to indemnification under this Agreement or otherwise, the Company shall advance such expenses to Executive or pay such expenses for Executive, all in advance of the final disposition of any such matter.  From and after a Change in Control, including after the termination of Executive's employment hereunder, Executive shall have coverage under a director's and officer's liability insurance policy in amounts no less than, and on terms no less favorable than those, provided to senior executive officers of the Company from time to time.

11.    Definitions.  For purposes of this Agreement, the following terms shall have the meanings indicated below:

(A)    "Affiliate" shall have the meaning set forth in Rule 12b-2 promulgated under Section 12 of the Exchange Act.

(B)    "Agreement" shall mean this Attachment A to the Employment Agreement.

(B)    "Auditor" shall have the meaning set forth in Section 6.2 hereof.

23____DeltaView comparison of pcdocs://chisr01a/688085/2 and pcdocs://chisr01a/688085/6. Performed on 10/29/2009.

(C)  "Base Amount" shall have the meaning set forth in section 280G(b)(3) of the Code.

(D)  "Code" shall mean the Internal Revenue Code of 1986, as amended from time to time.

(E)  "Company" shall mean Hayes Lemmerz International, Inc. and, except in determining under Section 15(G) hereof whether or not any Change in Control of the Company has occurred, shall include any successor to its business and/or assets which assumes and agrees to perform this Agreement by operation of law, or otherwise.

(F)  "Excise Tax" shall mean any excise tax imposed under section 4999 of the Code or any similar state or local tax or any interest or penalties incurred by Executive with respect to such excise tax.

(G)  "Person" shall have the meaning given in Section 3(a)(9) of the Exchange Act, as modified and used in Sections 13(d) and 14(d) including a "group" within the meaning of Section 13(d)(3) thereof, except that such term shall not include (i) the Company or any of its subsidiaries, (ii) a trustee or other fiduciary holding securities under an employee benefit plan of the Company or any of its Affiliates, (iii) an underwriter temporarily holding securities pursuant to an offering of such securities, or (iv) a corporation owned, directly or indirectly, by the stockholders of the Company in substantially the same proportions as their ownership of stock of the Company.

(H)  "Retirement" shall be deemed the reason for the termination by the Executive of the Executive's employment if such employment is terminated in accordance with the Company's retirement policy, including early retirement, generally applicable to its salaried employees.

---

24 DeltaView comparison of pcdocs://chisr01a/688085/2 and pcdocs://chisr01a/688085/6. Performed on 10/29/2009.

Document comparison done by DeltaView on Thursday, October 29, 2009 9:42:02 PM

| Input: | |
|---|---|
| Document 1 | pcdocs://chisr01a/688085/2 |
| Document 2 | pcdocs://chisr01a/688085/6 |
| Rendering set | Option 3a strikethrough double score no moves |

| Legend: | |
|---|---|
| Insertion | |
| Deletion | |
| <Moved from > | |
| >Moved to < | |
| Style change | |
| Format change | |
| Moved deletion | |
| Inserted cell | |
| Deleted cell | |
| Moved cell | |
| Split/Merged cell | |
| Padding cell | |

| Statistics: | |
|---|---|
| | Count |
| Insertions | 48 |
| Deletions | 42 |
| Moved from | 0 |
| Moved to | 0 |
| Style change | 0 |
| Format changed | 1 |
| Total changes | 91 |

25 ____ DeltaView comparison of pcdocs://chisr01a/688085/2 and pcdocs://chisr01a/688085/6. Performed on 10/29/2009.

**H-4 John A. Salvette, Vice President, Business Development**

## EXECUTIVE EMPLOYMENT AGREEMENT, AS AMENDED BY

## AMENDMENT NO. 1 TO EMPLOYMENT AGREEMENT

THIS AGREEMENT (the "Agreement") is made as of the 23rd ___th day of September, 2003 _____, 2009 (the "Agreement Date"), by and between Hayes Lemmerz International, Inc. (the "Company") and John A. Salvette (the "Executive"), as amended by that certain Amendment No. 1 to Employment Agreement dated as of December 30, 2008.").

WHEREAS, the Company desires to provide for the continued employment of the Executive on the terms and conditions set forth herein, in the best interest of the Company and its constituencies; and

## PRELIMINARY STATEMENTS

1.     The Executive currently serves as the Company's Vice President, Business Development, pursuant to an employment agreement dated September 23, 2001, as amended thereafter (the "Original Agreement").

2.     WHEREAS, The Company desires to continue to employ Executive as its Vice President, Business Development, and the Executive desires to continue to be employed by the Company as provided herein; and company in said capacity; and

NOW, THEREFORE, in consideration of the premises and the respective covenants and agreements of the parties herein contained, the parties agree as follows:

3.     Each party desires to set forth in writing the terms and conditions of their understandings and agreements.

**NOW, THEREFORE**, in consideration of the mutual covenants and obligations contained herein, the Company hereby agrees to employ the Executive and the Executive hereby accepts such employment upon the terms and conditions set forth in this Agreement, which shall take effect on the plan effective date (the "Effective Date") of the Joint Plan of Reorganization of Hayes Lemmerz International, Inc. and its Affiliated Debtors and Debtors-In Possession, dated as of September 2, 2009 (as the same may be amended or modified, the "Plan of Reorganization").  In the event the Plan of Reorganization does not become effective, this Agreement shall be of no force and effect

## STATEMENT OF AGREEMENT

1.    Employment.  The Company agrees to continue to employ the Executive and the Executive agrees to continue to be employed on a full-time basis by the Company for the period and upon the terms and conditions hereinafter set forth.

2.    Term; Employment Period.  The term of this Agreement (the "Term") shall commence on the Agreement Date (the "Effective Date") and continue until terminated pursuant to Section 6 of this Agreement.  The period during which the Executive is employed by the Company pursuant to this Agreement is referred to herein as the "Employment Period." The date on which the termination of the Executive's employment hereunder shall become effective is referred to herein as the "Termination Date."

3.    Position and Duties.  During the Employment Period, the Executive shall serve as Vice President, Business Development of the Company and shall have such responsibilities, duties and authority as are customarily and ordinarily exercised by executives in similar positions in similar businesses in the United Statesassociated with such position and shall exercise such responsibilities, duties and authority consistent with the foregoing as the Company's Chief Executive Officer or the Company's Board of Directors (the "Board") shall determine from time to time.  During the Employment Period, the Executive shall report to the Company's Chief Executive Officer or the Chief Executive Officer's designee.  The Executive shall devote substantially all his working time and efforts to the business and affairs of the Company and shall use his best efforts to carry out his responsibilities faithfully and efficiently in a professional manner.  Notwithstanding the foregoing, it is understood that during the Employment Period, subject to any conflict of interest policies of the Company and Section 8, the Executive may (x) serve in any capacity with any civic, charitable, educational or professional organization provided that such service does not materially interfere with his duties and responsibilities hereunder and (y) make and manage personal investments of his choice, and with the prior consent of the Company's Chief Executive Officer, which shall not be unreasonably withheld, serve on the board of directors of one (1) for-profit business enterprise.

4.    Place of Performance.  During the Employment Period, the Executive's place of performance of his services shall be at the Company's Northville, Michigan Headquarters, except for required travel by the Executive on the Company's business or as may be reasonably required by the Company.

5.    Compensation and Benefits.

(a)                              (a)    Salary.  During the Employment Period, the Company shall pay to the Executive an initial annual base salary of Two Hundred Sixty-Sevenand Eighty-One Thousand Three Hundred Dollars ($267,300281,000) (as the same

2    DeltaView comparison of pcdocs://chisr01a/688060/3 and pcdocs://wilsr01a/596715/4. Performed on 10/29/2009.

may be increased from time to time, the "Base Salary"), such salary to be paid in periodic installments in accordance with the Company's payroll practices as in effect from time to time. The Base Salary shall be reviewed annually by the compensation committee of the Board and may be increased from time to time in accordance with normal business practices of the Company and, if so increased, shall not thereafter be reduced.

(b)          (b)          Cash-Based Incentives. DuringFollowing the expiration of the KEIP (as defined below) and during the Employment Period, the Executive shall be eligible to earn an annual bonus under the Company''s Short-Term Incentive Plan, or a successor plan thereto, as in effect from time to time (the ""Incentive Plan""), subject to achievement of performance goals determined by the Board in accordance with the terms of the Incentive Plan (such annual bonus, the ""Annual Bonus""). Such performance goals shall include (i) a threshold level below which no Annual Bonus shall be paid, (ii) a normative level that is tied to the budget, which if obtained, would result in an Annual Bonus of sixty percent (60%) of the Base Salary and (iii) an upside level, which if obtained, would increase the Annual Bonus to a maximum of one hundred twenty percent (120%) of the Base Salary. Any Annual Bonus payable to the Executive for the Company's fiscal year ending January 31, 2004 will be on a pro rata basis based upon the number of months the Executive worked for the Company during such fiscal year. The Annual Bonus shall be payable in a cash lump sum at such time as bonuses are ordinarily paid in accordance with the terms of the Incentive Plan, but in no event later than 120 days after the end of each fiscal year of the Company. Except as otherwise specifically provided in this Agreement, the Executive shall only be eligible to receive the Annual Bonus if the Executive is employed by the Company through the last day of February in the year in which the Annual Bonus is to be paid.

(c)          "Change in Control" Definition. For purposes of this Agreement, a "Change in Control" shall be deemed to have occurred upon the first of the following to occur:

(1)          any Person (within the meaning of Section 3(a)(9) of the Securities and Exchange Act of 1934, as amended (the "Exchange Act"), as modified and used in Sections 13(d) and 14(d) thereof), other than Joseph Littlejohn & Levy Fund II, L.P. (or any affiliate (within the meaning of Regulation D Rule 501(b) under the Securities Act of 1933, as amended (the "Securities Act")) thereof), TSG Capital Fund II, L.P. (or any affiliate thereof), or Canadian Imperial Bank of Commerce (or affiliate thereof) (such entitles, collectively, the "JLL Group"), is or becomes the "Beneficial Owner" (within the meaning of Rule 13d-3 under the Exchange Act) of fifty percent (50%) or more of either (1) the then-outstanding Common Stock or (2) the combined voting power of the then-outstanding voting securities of the Company entitled to vote generally in the election of directors;

(2)          the following individuals cease for any reason to constitute a majority of the number of directors then serving: individuals who, as of the Effective Date, constitute the Board and any new director (other than a director whose initial assumption of office is in connection with an actual or

3      DeltaView comparison of pcdocs://chisr01a/688060/3 and pcdocs://wilsr01a/596715/4. Performed on 10/29/2009.

threatened election contest, including but not limited to a consent solicitation, relating to the election of directors of the Company) whose appointment or election by the Board or nomination for election by the Company's stockholders was approved or recommended by a vote of at least a majority of the directors then still in office who either were directors on the date hereof or whose appointment, election or nomination for election was previously so approved or recommended;

(3)     there is consummated a merger or consolidation of the Company or any direct or indirect subsidiary of the Company with any other corporation, other than a merger or consolidation which would result in the voting securities of the Company outstanding immediately prior to such merger or consolidation continuing to represent (either by remaining outstanding or by being converted into voting securities of the surviving entity or any parent thereof) at least fifty percent (50%) of the combined voting power of the securities of the Company or such surviving entity or any parent thereof outstanding immediately after such merger or consolidation, provided, however, that it shall not be a Change in Control under this clause (C) if (i) directors appointed or nominated by the JLL Group or any constituent member thereof continue immediately following such transaction to constitute a majority of the Board and (ii) the JLL Group or any constituent member thereof continues immediately following such transaction to own securities representing at least thirty-five percent (35%) of the combined voting power of the securities of the Company or such surviving entity or any parent thereof outstanding immediately after such merger or consolidation; or

(4)     the stockholders of the Company approve a plan of complete liquidation or dissolution of the Company or there is consummated an agreement for the sale or disposition by the Company of all or substantially all of its assets.

(d)     Option Grants.  Based upon the Executive's performance and annual review, the Executive shall be eligible during the Employment Period to receive stock option grants in such amounts and subject to such terms and conditions as the compensation committee of the Board shall determine in its sole discretion are necessary and desirable.

(c)     Equity Based Incentives.  In accordance with the Plan of Reorganization, the Board shall establish a long term equity incentive program ( the "LTIP").  The Executive shall be entitled to participate in the LTIP.  Prior to making any grants to Executive, the Board shall consult with the CEO on such grants.

(d)     Key Employee Incentive Plan.  The Executive shall participate in the Company's Key Employee Incentive Plan (the "KEIP"), in accordance with its terms, and as approved by the "Bankruptcy Court" in connection with the "Restructuring" (as each such term is defined in the KEIP).  If the KEIP is not approved by the Bankruptcy Court prior to the Effective Date, the Executive shall be entitled to payments under this Agreement in the amounts

 4     DeltaView comparison of pcdocs://chisr01a/688060/3 and pcdocs://wilsr01a/596715/4. Performed on 10/29/2009.

and under the terms and conditions set forth in the Company's Motion for Order Approving the Implementation of Key Employee Incentive Plan and Short Term Incentive Plan filed with the Bankruptcy Court on July 29, 2009.

(e)        (e)        Expenses.  During the Employment Period, the Company shall promptly reimburse the Executive for all reasonable out-of-pocket expenses incurred by the Executive in connection with the business of the Company and the performance of his duties under this Agreement in accordance with the terms of the Company's policies as in effect from time to time.

(f)        (f)        Benefit Plans.  During the Employment Period, the Executive shall be entitled to participate in all of the employee benefit plans, programs, agreements and arrangements (including without limitation the supplemental executive retirement plan) generally provided to senior executives of the Company, as such are in effect from time to time, on a basis no less favorable than that provided to such senior executives.

(g)        (g)        Perquisites.  During the Employment Period, the Executive shall be entitled to participate in those perquisites provided to senior executives of the Company, as such are in effect from time to time after the Effective Date, on a basis no less favorable than that provided to such senior executives.  In addition, the Company shall pay Executive an annual flexible benefits allowance (the "Flexible Benefits Allowance") of Thirty Five Thousand Dollars ($35,000), such allowance to be paid in periodic installments in accordance with the Company's payroll practices as in effect from time to time. The Flexible Benefits Allowance shall be reviewed annually by the Compensation Committee of the Board and may be increased from time to time and, if so increased, shall not thereafter be reduced.

(h)        (h)        Vacations.  During the Employment Period, the Executive shall be entitled to vacation time, paid holidays and personal days, determined in accordance with the Company's policy with respect to its senior executives as in effect from time to time, it being understood that the Executive shall be entitled to not less than four weeks' vacation in any 12-month period during the Employment Period thereafter.

6.        Termination of Employment.

(a)        (a)        Accrued Benefits.  In the event of the termination of the Executive's employment hereunder for any reason during the Term, the Executive (or his estate or representative, as applicable) shall be entitled to receive any Base Salary, Annual Bonus, vacation time and expenses that have in each case accrued but are unpaid as of the Termination Date, vested options as well as any post-termination benefits (including but not limited to vested awards under the LTIP) to which he may be entitled pursuant to the

5        DeltaView comparison of pcdocs://chisr01a/688060/3 and pcdocs://wilsr01a/596715/4. Performed on 10/29/2009.

Company's retirement, insurance and other benefit plans, programs and arrangements as in effect immediately prior to the Termination Date (the "Accrued Benefits").

(b) Death.  The Executive's employment hereunder shall terminate as of the date of his death.  Upon the termination of the Executive's employment hereunder because of his death during the Term, the Executive's estate or representative, as the case may be, shall be entitled to receive the Accrued Benefits and a lump sum payment in cash equal to (i) one year's Base Salary as in effect on the Termination Date and (ii) the product of (x) sixty percent (60%) of the Base Salary as in effect on the Termination Date, multiplied by a fraction (y) the numerator of which shall be the number of months (including fractions thereof) worked by the Executive during the Company's fiscal year in which the Termination Date occurs and (z) the denominator of which shall be the number 12 (such amount under this clause (ii), the "Pro Rata Annual Bonus").  Such amounts shall be paid as soon as administratively feasible following the Executive's death but in no event later than April 15 of the calendar year following the Executive's death.  In addition, those immediate family members who were participating in the Company's medical benefit plan as of the date of the Executive's death shall continue to participate in the Company's medical benefit plan at active employee contribution rates for the one-year period immediately following the date of the Executive's death.

(c) Disability.  The Executive's employment hereunder may be terminated during the Term if the Executive is incapable of performing his principal duties hereunder because of physical or mental incapacity for a period of 45 consecutive working days or for more than 90 working days in any 12-month period ("Disability").  In the event that the Executive's employment is to be terminated pursuant to this Section 6(c), (i) this Agreement shall terminate on the date specified in the notice of termination delivered to the Executive (subject to Section 8(g) and Section 18); (ii) the Executive shall as of such date resign from all of his positions, duties and authorities hereunder; (iii) the Executive shall be placed on a medical leave of absence until the earlier of (A) expiration of the six-month period commencing on the date his medical leave of absence began, unless there is no reasonable expectation that the Executive will return to employment with the Company, in which case the date the Executive ceases performing services for the Company, (B) the date he qualifies for benefits under the Company's long-term disability plan or (C) the date he is able to return to work; and (iv) the Executive shall continue to be paid his Base Salary until such medical leave of absence ends.  In the case of a termination of the Executive's employment pursuant to this Section 6(c), for purposes of calculating benefits pursuant to clauses (B) and (C) below the Termination Date shall be the date upon which the Executive's medical leave of absence commences, and for all other purposes, the Termination Date shall be the date upon which the Executive's medical leave of absence ends.  In the event the Executive's employment is terminated pursuant to this Section 6(c), the Executive (or his representative, as applicable) shall be entitled to:  (A) the Accrued Benefits; (B) a lump sum payment in cash equal to one year's Base Salary and Flexible Benefits Allowance as in effect on the Termination Date; (C) the Pro Rata Annual Bonus; and (D) the continuation of health and welfare benefits at the levels in effect as of the Termination Date at no additional cost to the Executive than that which was in effect as of the Termination Date for the one-year period

6       DeltaView comparison of pcdocs://chisr01a/688060/3 and pcdocs://wilsr01a/596715/4. Performed on 10/29/2009.

immediately following the Termination Date;  provided, however, that such benefits shall be reduced to the extent comparable benefits are made available to the Executive from a successor employer, and the Executive shall be obligated to report such benefits to the Company.  The amounts payable pursuant to clauses (B) and (C) of the preceding sentence shall be paid in the month following the Executive's Termination Date.  It is acknowledged and agreed by the Executive that he shall be precluded from terminating his employment hereunder for Good Reason in the event that his employment hereunder is terminated pursuant to this Section 6(c).

(d)                    (d)        For Cause; Without Good Reason. The Executive's employment hereunder may be terminated during the Employment PeriodTerm (i) by the Company for Cause (as defined below) or (ii) by the Executive without Good Reason (as defined below).  In the event that the Company terminates the Executive's employment hereunder for Cause, the Termination Date shall be the date specified in the notice of termination for Cause delivered by the Company to the Executive.  In the event that the Executive terminates his employment hereunder without Good Reason, the Termination Date shall be no earlier than 30 days following the date on which a notice of termination is delivered by the Executive to the Company.  In the event that the Executive's employment hereunder is terminated pursuant to this Section 6(d), the Executive shall be entitled to the Accrued Benefits.

(e)                    (e)        Without Cause; For Good Reason. The Executive's employment hereunder may be terminated during the Employment PeriodTerm (i) by the Company without Cause or (ii) by the Executive for Good Reason.  In the event that the Executive's employment is terminated pursuant to this Section 6(e) (whether by the Company or by the Executive), the Termination Date shall be no earlier than 30 days following the date on which a notice of termination is delivered by one party to the other.  In the event that the Executive's employment is terminated pursuant to this Section 6(e), the Executive (or his estate or representative, as the case may be) shall be entitled to receive the Accrued Benefits and the other payments and benefits set forth in this Section 6(e).  The Executive (or his estate or representative, as the case may be) shall be entitled to the following severance benefits (A) a lump sum payment in cash equal to one year's Base Salary and Flexible Benefits Allowance as in effect on the Termination Date; (B) the Pro Rata Annual Bonus; and (C) the title to the Executive's Company vehicle.  The benefits described in the preceding sentence shall be paid in the month following the Executive's Termination Date.  Severance benefits provided to the Executive under this paragraph shall also include:  (x) continuation of health and welfare benefits for one year at the levels in effect as of the Termination Date at no additional cost to the Executive than that which was in effect as of the Termination Date; provided, that such benefits shall be reduced to the extent comparable benefits are made available to the Executive from a successor employer, and the Executive shall be obligated to report such benefits to the Company; and (y) executive level career outplacement services for the period beginning on the Termination Date and ending December 31 of second calendar year following termination by a mutually agreeable outplacement firm and paid for as incurred by the Company.

(f)        (f)        Definition of "Cause" and "Good Reason."  For purposes of this Agreement, "Cause" means:  (i) the willful failure of the Executive to perform

7    DeltaView comparison of pcdocs://chisr01a/688060/3 and pcdocs://wilsr01a/596715/4. Performed on 10/29/2009.

his material duties with the Company which have been duly assigned to the Executive and which duties are commensurate with those of the position for which Executive is then employed, and which failure is not cured (if capable of cure) within 15 days after receipt of written notice of such failure, which notice identifies the manner in which the Executive has willfully failed to perform, (ii) the engaging by the Executive in willful conduct which is demonstrably injurious to the Company, monetarily or otherwise, (iii) the conviction of the Executive of any crime or offense constituting a felony, or (iv(iv) the conviction of the Executive for a violation of criminal law involving the Company and its business, or (v) a failure by the Executive to comply with any material provision of this Agreement, which failure is not cured (if capable of cure) within 15 days after receipt of written notice of such non-compliance by the Executive.  Termination of the Executive for Cause shall mean termination by action of at least a majority of the Company's Board of Directors, at a meeting duly called and held upon at least 15 days' written notice to the Executive specifying the particulars of the action or inaction alleged to constitute Cause and at which meeting the Executive and his counsel were entitled to be present and given adequate opportunity to be heard.  For purposes of clauses (i) and (ii) of this definition, action or inaction by the Executive shall not be considered "willful" unless done or omitted by him (A) intentionally or not in good faith and (B) without reasonable belief that his action or inaction was in the best interest of the Company, and shall not include failure to act by reason of total or partial incapacity due to physical or mental illness.

For purposes of this Agreement, "Good Reason" means the occurrence of one or more of the following events if the Executive gives notice of the event to the Company within 90 days of the event and the Company fails to remedy such event within 30 days of receiving notice from the Executive:  (i) a material adverse alteration in the nature or status of the Executive's position, duties, responsibilities or authority from those in effect as of the Effective Date; (ii) a material reduction in the Executive's Base Salary or level of employee benefits (other than across-the-board reductions applied similarly to all of the Company's senior executives occurring after the second anniversary of the Effective Date); (iii) a failure to pay or provide a material amount of the compensation set forth in this Agreement (except for an across-the-board deferral of compensation applied similarly to all of the Company's senior executives occurring after the second anniversary of the Effective Date); (iv) the relocation of the Executive's principal place of employment more than 30 miles from its location as of the Effective Date except for required travel on the Company's business; (v) assignment of duties or responsibilities to the Executive which are materially inconsistent with the provisions of this Agreement; or (vi) a failure by the Company to comply with any material provision of this Agreement.

(g)                                                      (g)        Change in Control Severance Provisions.  The provisions set forth in Attachment A hereto are hereby incorporated into this Agreement.  The Executive hereby acknowledges that in the event he becomes entitled to the payment set forth in Section 6.1(A) of Attachment A hereto, that such payment will be in lieu of any other payments to be made pursuant to the terms of this Agreement.

For purposes of this Agreement, a Change in Control shall be deemed to have occurred upon the first of the following to occur after the Effective Date:

8    DeltaView comparison of pcdocs://chisr01a/688060/3 and pcdocs://wilsr01a/596715/4. Performed on 10/29/2009.

(i)       any Person (within the meaning of Section 3(a)(9) of the Securities and Exchange Act of 1934, as amended (the "Exchange Act"), as modified and used in Sections 13(d) and 14(d) thereof) becomes the "Beneficial Owner" (within the meaning of Rule 13d-3 under the Exchange Act) of fifty percent (50%) or more of either (1) the then-outstanding Common Stock or (2) the combined voting power of the then-outstanding voting securities of the Company entitled to vote generally in the election of directors;

(ii)      the following individuals cease for any reason to constitute a majority of the number of directors then serving: individuals who, as of the Effective Date, constitute the Board and any new director (other than a director whose initial assumption of office is in connection with an actual or threatened election contest, including but not limited to a consent solicitation, relating to the election of directors of the Company) whose appointment or election by the Board or nomination for election by the Company's stockholders was approved or recommended by a vote of at least a majority of the directors then still in office who either were directors on the date hereof or whose appointment, election or nomination for election was previously so approved or recommended;

(iii)     there is consummated a merger or consolidation of the Company or any direct or indirect subsidiary of the Company with any other corporation, other than a merger or consolidation which would result in the voting securities of the Company outstanding immediately prior to such merger or consolidation continuing to represent (either by remaining outstanding or by being converted into voting securities of the surviving entity or any parent thereof) at least fifty percent (50%) of the combined voting power of the securities of the Company or such surviving entity or any parent thereof outstanding immediately after such merger or consolidation; or

(iv)     the stockholders of the Company approve a plan of complete liquidation or dissolution of the Company or there is consummated an agreement for the sale or disposition by the Company of all or substantially all of its assets.

Notwithstanding anything contained in this Agreement to the contrary (including, without limitation, this Section 6(g)), no transaction entered into, or other event occurring, pursuant to, as a result of, or in any way in connection with, the Restructuring shall constitute a "Change in Control" under this Agreement.

(h)                              (h)     Release Agreement. Notwithstanding anything to the contrary contained in this Section 6, the Executive shall be required to execute the Company's then current standard release agreement as a condition to receiving any of the payments and benefits provided for in this Section 6 or Attachment A.  It is acknowledged and agreed that the then current standard release agreement shall be a mutual

release and shall not diminish or terminate Executive's rights under this Agreement including, but not limited to, those delineated in Sections 6(i), 7 and 16 herein.  The time period for executing such release (and the period available to revoke it) shall be in accordance with the Company's then current standard practice but in no event shall the execution period extend beyond 60 days following the Executive's Termination Date.

(i)                              (i)        No Mitigation.  Upon termination of the Executive's employment with the Company, subject to the Executive's affirmative obligations pursuant to Section 6(c) and 6(e), the Executive shall be under no obligation to seek other employment or otherwise mitigate the obligations of the Company under this Agreement. The time period for executing such release (and the period available to revoke it) shall be in accordance with the Company's then current standard practice but in no event shall the execution period extend beyond 60 days following the Executive's Termination Date.

7.        Directors' and Officers' Insurance; Indemnification.  In addition to any rights to indemnification to which the Executive is entitled under the Company's Restated Certificate of Incorporation and Bylaws, the Company shall indemnify the Executive at all times during and after the Employment Period to the maximum extent permitted under the Delaware Business Corporation Act or any successor provision thereof, and any and all applicable state law, and shall pay the Executive's expenses (including reasonable attorneys' fees and expenses, which shall be paid in advance by the Company as incurred, subject to recoupment in accordance with applicable law) in defending any civil action, suit or proceeding in advance of the final disposition of such action, suit or proceeding to the maximum extent permitted under such applicable state laws for the Executive's action or inaction on behalf of the Company under the terms of this Agreement including but not limited to any acts or alleged acts arising out of events prior to the Executive's employment by the Company which obligation shall survive the termination of the Executive's employment or the termination of the other provisions of this Agreement.

8.        Confidential Information; Removal of Documents; Non-Competition; etc. For purposes of this Section 8, "Company" shall mean the Company, its subsidiaries and affiliates.

(a)                              (a)        Confidentiality.  Except as otherwise provided in this Agreement, at all times during and after the Employment TermPeriod, the Executive shall keep secret and retain in strictest confidence, any and all Confidential Information (as defined below) relating to the Company, and shall use such Confidential Information only in furtherance of the performance by the Executive of the Executive's duties to the Company and not for personal benefit or the benefit of any interest adverse to the Company's interests.  For purposes of this Agreement, "Confidential Information" shall mean any information including without limitation plans, specifications, models, samples, data, customer lists and customer information, computer programs and documentation, and other technical and/or business information, in whatever form, tangible or intangible, that can be communicated by whatever means available at such time, that relates to the Company's current

10        DeltaView comparison of pcdocs://chisr01a/688060/3 and pcdocs://wilsr01a/596715/4. Performed on 10/29/2009.

Business or future business contemplated during the Employment Period, products, services and development, or information received from others that the Company is obligated to treat as confidential or proprietary; provided, however, that such Confidential Information shall not include any information that (i) has become generally available to the public other than as a result of a disclosure by the Executive, or (ii) was available to or became known to the Executive prior to the disclosure of such information on a non-confidential basis without breach of any duty of confidentiality from any party to the Company, and the Executive shall not disclose such Confidential Information to any person or entity other than the Company, except as may be required by law or court or administrative order (in which event the Executive shall so notify the Company as promptly as practicable).  Upon termination of the Executive's employment hereunder for any reason, the Executive shall return to the Company all copies, reproductions and summaries of Confidential Information in the Executive's possession and erase the same from all media in the Executive's possession, and, if the Company so requests, shall certify in writing that the Executive has done so.  All Confidential Information is and shall remain the property of the Company (or, in the case of information that the Company receives from a third party which it is obligated to treat as confidential, then the property of such third party).

(b)                                    (b)        Non-Competition.

(i)                                    (i)        During the Employment Period, the Executive shall not engage in Competition (as defined below) with the Company.  For purposes of this Agreement, "Competition" by the Executive shall mean the Executive's engaging in, or otherwise directly or indirectly being employed by or acting as a consultant or lender to, or being a director, officer, employee, principal, agent, stockholder, member, owner or partner of, or permitting the Executive's name to be used in connection with the activities of any other business or organization anywhere which competes, directly or indirectly, with the Business of the Company as the same shall be constituted at the Termination Date or which, during the six-month period prior to the Executive's termination, the Company had made substantial plans with the intention of establishing operations.

(ii)                                    (ii)        For the one year period commencing on the Termination Date, the Executive shall not engage in Competition with the Company in any locality or region in which the Company had operations at the time of, or within six months prior to, the Executive's termination, or in which, during the six-month period prior to the Executive's termination, the Company had made substantial plans with the intention of establishing operations in such locality or region; provided, however, that it shall not be a violation of this sub-paragraph or the sub-paragraph hereinabove for the Executive to be or become the registered or beneficial owner of up to three percent (3%) of any class of the capital stock of a competing corporation registered under the Exchange Act, provided that the Executive does not actively participate in the business of such corporation until such time as this covenant expires.

11    DeltaView comparison of pcdocs://chisr01a/688060/3 and pcdocs://wilsr01a/596715/4. Performed on 10/29/2009.

(c) ~~(c)~~    Non-~~-~~Solicitation. ~~For~~During the Employment Period and for the one year period commencing on the Termination Date, the Executive agrees that the Executive shall not, directly or indirectly, for the Executive~~'~~'s benefit or for the benefit of any other person, firm or entity, engage any of the following conduct:

(i) ~~(i)~~    solicit from any customer doing business with the Company as of the Termination Date, business of the same or of a similar nature to the business of the Company with such customer;

(ii) ~~(ii)~~    solicit from any known potential customer of the Company business of the same or of a similar nature to that which has been the subject of a known written or oral bid, offer or proposal by the Company, or of substantial preparation with a view to making such a bid, proposal or offer, within six months prior to the Executive~~'~~'s termination;

(iii) ~~(iii)~~    solicit the employment or services of, or hire, any person who was known to be employed by or was a known consultant to the Company upon the termination of the Executive~~'~~'s employment, or within six months prior thereto; or

(iv) ~~(iv)~~    otherwise interfere with the business or accounts of the Company.

(d) ~~(d)~~    Intellectual Property.  All Intellectual Property (as defined below) and Technology (as defined below) created, developed, obtained or conceived of by the Executive during the Employment Period, and all business opportunities presented to the Executive during the Employment Period, shall be owned by and belong exclusively to the Company, provided that they reasonably relate to the Business, and the Executive shall (i) promptly disclose any such Intellectual Property, Technology or business opportunity to the Company, and (ii) execute and deliver to the Company, without additional compensation, such instruments as the Company may require from time to time to evidence its ownership of any such Intellectual Property, Technology or business opportunity.  For purposes of this Agreement, (A) the term "Intellectual Property" means and includes any and all trademarks, trade names, service marks, service names, patents, copyrights, and applications therefor, and (B) the term "Technology" means and includes any and all trade secrets, proprietary information, invention, discoveries, know-how, formulae, processes and procedures.

(e) ~~(e)~~    The Executive acknowledges that the services to be rendered by the Executive to the Company are of a special and unique character, which gives this Agreement a peculiar value to the Company, the loss of which may not be reasonably or adequately compensated for by damages in an action at law, and that a material

breach or threatened breach by the Executive of any of the provisions contained in this Section 8 shall cause the Company irreparable injury.  The Executive therefore agrees that the Company shall be entitled, in addition to any other right or remedy, to a temporary, preliminary and permanent injunction, without the necessity of proving the inadequacy of monetary damages or the posting of any bond or security, enjoining or restraining the Executive from any such violation or threatened violations.

(f)        (f)        The Executive further acknowledges and agrees that due to the uniqueness of the Executive's services and confidential nature of the information the Executive shall possess, the covenants set forth herein are reasonable and necessary for the protection of the business and goodwill of the Company.

(g)        (g)        Continuing Operation.  Any termination of the Executive's employment or of this Agreement shall have no effect on the continuing operation of this Section 8.

9.        Stockholder Agreement.  As a precondition to receiving any award under the LTIP, Executive shall execute a management stockholders agreement that is acceptable to Executive and the Company.

10.        9. Severability.  It is the desire and intent of the parties that the provisions of this Agreement shall be enforced to the fullest extent permissible under the laws and public policies applied in each jurisdiction in which enforcement is sought.  Accordingly, if any particular provision or portion of this Agreement shall be adjudicated to be invalid or unenforceable, this Agreement shall be deemed amended to delete therefrom the portion thus adjudicated to be invalid or unenforceable, such deletion to apply only with respect to the operation of such provision in the particular jurisdiction in which such adjudication is made.

11.        10. Notices.  All communications, requests, consents and other notices provided for in this Agreement shall be in writing and shall be deemed give if delivered by hand or mailed by first class mail, postage prepaid, to the last known address of the recipient.

12.        11. Governing Law.  This Agreement shall be governed by and construed and enforced in accordance with the laws of the State of Delaware, without regard to its conflicts of laws provisions.

13.        12. Assignment.  Neither this Agreement nor any rights or duties hereunder may be assigned by the Executive without the prior written consent of the Company. The Company shall have the right at any time to assign this Agreement to its successors and assigns; provided, however, that the assignee or transferee is the successor to all or substantially

13_____DeltaView comparison of pcdocs://chisr01a/688060/3 and pcdocs://wilsr01a/596715/4. Performed on 10/29/2009.

all of the business and assets of the Company and such assignee or transferee expressly assumes all of the obligations, duties and liabilities of the Company set forth in this Agreement.

14.    13. Amendments.  No provisions of this Agreement shall be altered, amended, revoked or waived except by an instrument in writing, signed by each party to this Agreement.

15.    14. Binding Effect.  Except as otherwise provided herein, this Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective legal representatives, heirs, successors and assigns.

16.    15. Execution in Counterparts.  This Agreement may be executed in any number of counterparts, each of which shall be deemed an original, but all of which together shall constituted one and the same instrument.

17.    16. Arbitration.  Any dispute, controversy or question arising under, out of, or relating to this Agreement (or the breach thereof), or, the Executive's employment with the Company or termination thereof, shall be referred for arbitration in the State of Michigan to a neutral arbitrator selected by the Executive and the Company and this shall be the exclusive and sole means for resolving such dispute.  Such arbitration shall be conducted in accordance with the National Rules for Resolution of Employment Disputes of the American Arbitration Association.  The arbitrator shall have the discretion to award reasonable attorneys' fees, costs and expenses to the prevailing party.  Judgment upon the award rendered by the arbitrator may be entered in any court having jurisdiction thereof.

18.    17. Entire Agreement.  This Agreement sets forth the entire agreement and understanding of the parties and supersedes all prior understandings, agreements (including, without limitation, the Original Agreement) or representations by or between the parties, whether written or oral, which relate in any way to the subject matter hereof.

19.    18. Survivorship.  The provisions of this Agreement necessary to carry out the intention of the parties as expressed herein shall survive the termination or expiration of this Agreement.

20.    19. Waiver.  Except as provided herein, the waiver by either party of the other party's prompt and complete performance, or breach or violation, of any provision of this Agreement shall not operate nor be construed as a waiver of any subsequent breach or violation, and the failure by any party hereto to exercise any right or remedy which it may possess hereunder shall not operate nor be construed as a bar to the exercise of such right or remedy by such party upon the occurrence of any subsequent breach or violation.

14    DeltaView comparison of pcdocs://chisr01a/688060/3 and pcdocs://wilsr01a/596715/4. Performed on 10/29/2009.

21.    20. Captions.  The captions of this Agreement are for convenience and reference only and in no way define, describe, extend or limit the scope or intent of this Agreement or the intent of any provision hereof.

22.    21. Construction.  The parties acknowledge that this Agreement is the result of arm's-length negotiations between sophisticated parties each afforded representation by legal counsel.  Each and every provision of this Agreement shall be construed as though both parties participated equally in the drafting of same, and any rule of construction that a document shall be construed against the drafting party shall not be applicable to this Agreement.

23.    22. Code Section 409A Payment Delay.  Notwithstanding any provision in this Agreement (or the attached Severance Agreement) to the contrary, any payment triggered by a termination of employment to the extent and up to the amount necessary to ensure that such payments are not subject to penalties and interest under Code Section 409A shall not commence until at least six months after the Executive's termination of  employment.  To the extent such payments, absent this provision, would be paid during the first six month period following the Executive's termination of employment, those payments shall be withheld and the amount of the payments withheld will be paid in a lump sum, without interest, during the seventh month after termination; provided that, if the Executive dies during such six-month period, any such delayed payments shall be immediately payable to the Executive's estate or representative.

If and to the extent that any payment or benefit under this Agreement is determined by the Company to constitute "non-qualified deferred compensation" subject to Code Section 409A and is payable to the Executive by reason of the Executive's termination of employment, then such payment or benefit shall be made or provided to the Executive only upon a "separation from service" as defined for purposes of Code Section 409A.  The Company shall not have any liability or be responsible for any claim related to the incurrence by the Executive or any other person of any tax, interest expense, loss of tax benefit, or any other obligation or liability, in each case, arising under or related to Code Section 409A

24.    Tax Withholding.  All compensation payable pursuant to this Agreement shall be subject to reduction by all applicable withholding, social security and other federal, state and local taxes and deductions.

**IN WITNESS WHEREOF,** the parties have executed this Agreement as of the date first above written.

EXECUTIVE

By:_____

John A. Salvette

HAYES LEMMERZ
INTERNATIONAL, INC.

By:_____

By:

_____Name:   Curtis J. Clawson

Title:   President and Chief Executive        Officer

10301891.2

---

16____DeltaView comparison of pcdocs://chisr01a/688060/3 and pcdocs://wilsr01a/596715/4. Performed on 10/29/2009.

*Attachment A*

SEVERANCE AGREEMENT

1.      1.  Defined Terms.  Unless otherwise defined in this Attachment A, the terms that are defined in the Employment Agreement  (the "Employment Agreement") shall have the same meanings when used herein as that are ascribed to such terms in the Employment Agreement.

2.      2.  Term of Agreement.  The Term of this Agreement shall commence on the Effective Date hereof and shall continue in effect through the third anniversary thereof; provided, however, that commencing on the first anniversary of the Effective Date and each anniversary thereafter (each such date a "Renewal Date"), the Term shall automatically be extended for one additional year unless, on or prior to such Renewal Date, the Company or the Executive shall have given notice not to extend the Term; and further provided, however, that if a Change in Control shall have occurred during the Term, the Term shall expire no earlier than twenty-four (24) months beyond the month in which such Change in Control occurred.

3.      3.  Immediate Effect of Change in Control.  Promptly following a Change in Control, but in no event later than April 15 of the calendar year following the Change in Control, the Executive shall be entitled to the immediate payment of all unpaid compensation amounts (including the pro rata bonus payment for the current fiscal year under any bonus plan for which he is eligible ("Pro-rata Bonus") and all unpaid bonuses with respect to any prior fiscal year) with respect to the Executive's employment.  For purposes of this Section 3, Pro-rata Bonus shall be an amount equal to the product of (1) the product of (x) the Executive's base salary as in effect immediately prior to the Change in Control and (y) the greater of (A) the Executive's normative bonus percentage for the fiscal year in which the Change in Control occurs and (B) the Executive's estimated bonus percentage calculated in good faith by the Company's Finance Department determined by projecting performance through the end of the fiscal year in which the Change in Control occurs and (2) a fraction, the numerator of which is the number of days in the fiscal year in which the Change in Control occurs through the date of the Change in Control, and the denominator of which is 365.  The Pro-rata Bonus paid shall be subtracted from the amount otherwise due the Executive as a bonus for the fiscal year in which the Change in Control occurs, but such Pro-rata Bonus becomes a vested benefit upon a Change in Control and in no event shall the Executive have to repay all or any portion of the Pro-rata Bonus.

4.      4.  Company's Covenants Summarized.  In order to induce the Executive to remain in the employ of the Company, the Company agrees, under the conditions described herein, to pay the Executive the Severance Payments and the other payments and benefits described herein.  Except as provided in Section 9.1 hereof, no Severance Payments shall be payable under this Agreement unless there shall have been (or, under the terms of the second sentence of Section 6.1 hereof, there shall be deemed to have been) a termination of the Executive's employment with the Company on or following a Change in Control and during the

1_____DeltaView comparison of pcdocs://chisr01a/688060/3 and pcdocs://wilsr01a/596715/4. Performed on 10/29/2009.

Term.  This Agreement shall not be construed as creating an express or implied contract of employment and, except as otherwise agreed in writing between the Executive and the Company, the Executive shall not have any right to be retained in the employ of the Company.

5.        5. Compensation Other Than Severance Payments.

5.1        5.1 Following a Change in Control and during the Term, during any period that the Executive fails to perform the Executive's full-time duties with the Company as a result of incapacity due to physical or mental illness, the Company shall pay the Executive's full salary to the Executive at the rate in effect at the commencement of any such period, together with all compensation and benefits payable to the Executive under the terms of any compensation or benefit plan, program or arrangement (other than the Company's short- or long-term disability plan, as applicable, to the extent such benefits would be duplicative and their nonpayment would not prejudice Executive's future entitlement to benefits) maintained by the Company during such period, until the Executive's employment is terminated by the Company for Disability.

5.2        5.2 If the Executive's employment shall be terminated for any reason on or following a Change in Control and during the Term, the Company shall pay the Executive's full salary to the Executive through the Date of Termination at the rate in effect immediately prior to the Date of Termination or, if higher, the rate in effect immediately prior to the first occurrence of an event or circumstance constituting Good Reason, together with all compensation and benefits payable to the Executive through the Date of Termination under the terms of the Company's compensation and benefit plans, programs or arrangements as in effect immediately prior to the Date of Termination or, if more favorable to the Executive, as in effect immediately prior to the first occurrence of an event or circumstance constituting Good Reason (including all unpaid bonuses with respect to any prior fiscal year).  In addition, if the Executive's employment is terminated on or following a Change in Control and during the Term, other than (A) by the Company for Cause, (B) by reason of death or Disability, or (C) by the Executive without Good Reason, then the Company shall pay Executive an amount equal to the product of (1) the product of (x) the Executive's base salary as in effect immediately prior to the Date of Termination, or, if higher, as in effect immediately prior to the first occurrence of an event or circumstance constituting Good Reason (the greater of such amounts, the "Base Salary") and (y) the Executive's normative bonus percentage for the year in which the Date of Termination occurs, or if higher, the normative bonus percentage for the fiscal year in which the Change in Control occurs or the normative bonus percentage in effect immediately prior to the first occurrence of an event or circumstance constituting Good Reason (the greatest of such percentages, the "Bonus Percentage") and (2) a fraction, the numerator of which is the number of days in the fiscal year in which the Date of Termination occurs through the date of the Date of Termination, and the denominator of which is 365; it being understood that, if the Date of Termination is in the same fiscal year as the Change in Control, the Pro-rata Bonus calculated pursuant to Section 3 shall be subtracted from the amount payable pursuant to this sentence of Section 5.2 but shall not reduce the amount payable below zero.

2      DeltaView comparison of pcdocs://chisr01a/688060/3 and pcdocs://wilsr01a/596715/4. Performed on 10/29/2009.

5.3   5.3 If the Executive's employment shall be terminated for any reason on or following a Change in Control and during the Term, the Company shall pay to the Executive the Executive's normal post-termination compensation and benefits as such payments become due.  Such post-termination compensation and benefits shall be determined under, and paid in accordance with, the Company's retirement, insurance and other compensation or benefit plans, programs and arrangements as in effect immediately prior to the Date of Termination or, if more favorable to the Executive, as in effect immediately prior to the occurrence of the first event or circumstance constituting Good Reason.

6.   6. Severance Payments.

6.1   6.1 If the Executive's employment is terminated on or following a Change in Control and during the Term, other than (A) by the Company for Cause, (B) by reason of death or Disability, or (C) by the Executive without Good Reason, then the Company shall pay the Executive the amounts, and provide the Executive the benefits, described in this Section 6.1 ("Severance Payments") and Section 6.2, in addition to any payments and benefits to which the Executive is entitled under Section 5 hereof or otherwise (except as provided herein). For purposes of this Agreement, the Executive's employment shall be deemed to have been terminated following a Change in Control by the Company without Cause or by the Executive with Good Reason, if (i) the Executive's employment is terminated by the Company without Cause prior to a Change in Control (whether or not a Change in Control ever occurs) and such termination was at the request or direction of a Person who enters into an agreement with the Company the consummation of which would constitute a Change in Control, (ii) the Executive terminates his employment for Good Reason prior to a Change in Control (whether or not a Change in Control ever occurs) and the circumstance or event which constitutes Good Reason occurs at the request or direction of such Person, or (iii) the Executive's employment is terminated by the Company without Cause or by the Executive for Good Reason and such termination or the circumstance or event which constitutes Good Reason is otherwise in connection with or in anticipation of a Change in Control (whether or not a Change in Control ever occurs).

(A)   (A) In lieu of any further salary payments to the Executive for periods subsequent to the Date of Termination and in lieu of any severance benefit otherwise payable to the Executive (whether pursuant to any employment agreement, plan, policy or otherwise), the Company shall pay to the Executive a lump sum severance payment, in cash, equal to two times the sum of (i) the Base Salary and Flexible Benefits Allowance and (ii) the product of (x) the Base Salary and (y) the Bonus Percentage.  Such amounts shall be paid within the period described in Section 6.3.

(B)   (B) For the twenty-four (24) month period immediately following the Date of Termination, the Company shall arrange to provide the Executive and his dependents with life, disability, accident and health insurance benefits substantially similar to those provided to the Executive and his dependents immediately prior to the Date of Termination or, if more

favorable to the Executive, those provided to the Executive and his dependents immediately prior to the first occurrence of an event or circumstance constituting Good Reason, at no greater cost to the Executive than the Executive's cost immediately prior to such date or occurrence (the "Executive's Cost").  Unless the Executive consents to a different method (after taking into account the effect of such method on the calculation of "parachute payments" pursuant to Section 6.2 hereof), the health insurance benefits described in this Section 6.1(B) shall be provided through a third-party insurer.  In the event continued accident and health insurance coverage under this Section 6.1(B) is provided through the Company's self-insured health plan such coverage shall be limited to the first eighteen months following the Date of Termination.  If the Executive is not receiving accident and health insurance coverage from another employer at the end of such eighteen month period, the Company shall pay the Executive a lump sum amount equal to six times the monthly COBRA health benefit continuation premium for the Executive's coverage under the Company's accident and health insurance coverage. Benefits otherwise receivable by the Executive pursuant to this Section 6.1(B) shall be reduced to the extent benefits of the same type are received by or made available to the Executive by another employer of the Executive during the twenty four (24) month period following the Executive's termination of employment (and any such benefits received by or made available to the Executive shall be reported to the Company by the Executive); provided, however, that the Company shall reimburse the Executive for the excess, if any, of the cost of such benefits to the Executive over such cost immediately prior to the Date of Termination or, if more favorable to the Executive, the first occurrence of an event or circumstance constituting Good Reason.

(C)    For purposes of COBRA health benefit continuation under section 4980B of the Code, the cessation of benefits pursuant to Section 6.1(B) shall be treated as though such cessation is the "qualifying event" under section 4980B(f)(3) of the Code for purposes of determining the period of coverage.

(D)    The Company shall pay to the Executive a lump sum amount equal to one hundred thousand dollars ($100,000).  Such amount shall be paid in the month following the Date of Termination.

(E)    The Company shall, at its sole expense as incurred, provide Executive with "key executive level" outplacement services for the period ending on December 31 of the second calendar year following the Termination Date at a cost of no more than fifteen percent (15%) of the sum of (i) Base Salary and (ii) the Bonus Percentage multiplied by Base Salary.

6.2    (A) Whether or not the Executive becomes entitled to the Severance Payments, if any of the payments or benefits received or to be received by the Executive in connection with a Change in Control or the Executive's termination of employment (whether pursuant to the terms of this Agreement or any other plan, arrangement or agreement with the Company, any Person whose actions result in a Change in Control or any Person affiliated with the Company or such Person) (all such payments and benefits, excluding the Gross-Up Payment, being hereinafter referred to as the "Total Payments") will be subject to

4    DeltaView comparison of pcdocs://chisr01a/688060/3 and pcdocs://wilsr01a/596715/4. Performed on 10/29/2009.

the Excise Tax, the Company shall pay to the Executive an additional amount (the ""Gross-Up Payment"") such that the net amount retained by the Executive, after deduction of any Excise Tax on the Total Payments and any federal, state and local income and employment taxes and any penalties, interest or fees incurred by the Executive as a result of any payment under Section 6.2 being made later than five business days prior to the due date of the excise tax with respect to which it is paid and any Excise Tax upon the Gross-Up Payment, shall be equal to the Total Payments.

(B)   (B)   For purposes of determining whether any of the Total Payments will be subject to the Excise Tax and the amount of such Excise Tax, (i) all of the Total Payments shall be treated as ""parachute payments"" (within the meaning of section 280G(b)(2) of the Code) unless, in the opinion of tax counsel (""Tax Counsel"") reasonably acceptable to the Executive and selected by the accounting firm which was, immediately prior to the Change in Control, the Company's independent auditor (the ""Auditor""), such payments or benefits (in whole or in part) do not constitute parachute payments, including by reason of section 280G(b)(4)(A) of the Code, (ii) all ""excess parachute payments"" within the meaning of section 280G(b)(l) of the Code shall be treated as subject to the Excise Tax unless, in the opinion of Tax Counsel, such excess parachute payments (in whole or in part) represent reasonable compensation for services actually rendered (within the meaning of section 280G(b)(4)(B) of the Code) in excess of the Base Amount allocable to such reasonable compensation, or are otherwise not subject to the Excise Tax, and (iii) the value of any noncash benefits or any deferred payment or benefit shall be determined by the Auditor in accordance with the principles of sections 280G(d)(3) and (4) of the Code.  For purposes of determining the amount of the Gross-Up Payment, the Executive shall be deemed to pay federal income tax at the highest marginal rate of federal income taxation in the calendar year in which the Gross-Up Payment is to be made and state and local income taxes at the highest marginal rate of taxation in the state and locality of the Executive's residence or the Executive's place of business, whichever is higher, on the Date of Termination (or if there is not yet a Date of Termination, then the date on which the Gross-Up Payment is calculated for purposes of this Section 6.2), net of the maximum reduction in federal income taxes which could be obtained from deduction of such state and local taxes.

(C)   (C)   In the event that the Excise Tax is finally determined to be less than the amount taken into account hereunder in calculating the Gross-Up Payment, the Executive shall repay to the Company, within five (5) business days following the time that the amount of such reduction in the Excise Tax is finally determined, the portion of the Gross-Up Payment attributable to such reduction (including that portion of the Gross-Up Payment attributable to the Excise Tax and federal, state and local income and employment taxes imposed on the Gross-Up Payment being repaid by the Executive), to the extent that such repayment results in a reduction in the Excise Tax and a dollar-for-dollar reduction in the Executive's taxable income and wages for purposes of federal, state and local income and employment taxes, plus interest on the amount of such repayment at 120% of the rate provided in section 1274(b)(2)(B) of the Code.  Notwithstanding the foregoing, in the event any portion of the amount to be repaid to the Company has been paid to any tax authority, repayment thereof shall not be required until actual refund or credit of such portion has been made to Executive, and interest payable to the Company shall not exceed the interest received or credited to Executive

5____DeltaView comparison of pcdocs://chisr01a/688060/3 and pcdocs://wilsr01a/596715/4. Performed on 10/29/2009.

by such tax authority. In the event that the Excise Tax is determined to exceed the amount taken into account hereunder in calculating the Gross-Up Payment (including by reason of any payment the existence or amount of which cannot be determined at the time of the Gross-Up Payment), the Company shall make an additional Gross-Up Payment in respect of such excess (including any interest, penalties or additions payable by the Executive with respect to such excess and the Gross-Up Payment attributable to the Excise Tax and federal, state, and local income and employment taxes imposed on the Gross-Up Payment being made to the Executive) within five (5) business days following the time that the amount of such excess is finally determined. The Executive and the Company shall each reasonably cooperate with the other in connection with any administrative or judicial proceedings concerning the existence or amount of liability for Excise Tax with respect to the Total Payments.

6.3 6.3 The payments provided in subsections (A), of Section 6.1 hereof and in Section 6.2 hereof shall be made not later than the fifth day following the Date of Termination (or if there is no Date of Termination, then the date on which the Gross-up Payment is calculated for purposes of Section 6.2 hereof); provided, however, that if the amounts of such payments cannot be finally determined on or before such day, the Company shall pay to the Executive on such day an estimate, as determined in good faith by the Company or, in the case of payments under Section 6.2 hereof, in accordance with Section 6.2 hereof, of the minimum amount of such payments to which the Executive is clearly entitled and shall pay the remainder of such payments (together with interest on the unpaid remainder (or on all such payments to the extent the Company fails to make such payments when due) at 120% of the rate provided in section 1274(b)(2)(B) of the Code) as soon as the amount thereof can be determined but in no event later than the thirtieth (30th) day after the Date of Termination. In the event that the amount of the estimated payments exceeds the amount subsequently determined to have been due, such excess shall constitute a loan by the Company to the Executive, payable on the fifth (5th) business day after demand by the Company (together with interest at 120% of the rate provided in section 1274(b)(2)(B) of the Code).

6.4 6.4 The Company also shall pay to the Executive all legal fees and expenses incurred by the Executive in disputing in good faith any issue hereunder relating to the termination of the Executive's employment, in seeking in good faith to obtain or enforce any benefit or right provided by this Agreement or in connection with any tax audit or proceeding to the extent attributable to the application of section 4999 of the Code to any payment or benefit provided hereunder. Such payments shall be made within five (5) business days after delivery of the Executive's written requests for payment accompanied with such evidence of fees and expenses incurred as the Company reasonably may require (but in no event after the last day of the calendar year following the calendar year in which the expense is incurred).

7. 7. Termination Procedures and Compensation During Dispute.

7.1 7.1 Notice of Termination. After a Change in Control and during the Term, any purported termination of the Executive's employment (other than by reason of death) shall be communicated by written Notice of Termination from one party hereto to the other party

6 DeltaView comparison of pcdocs://chisr01a/688060/3 and pcdocs://wilsr01a/596715/4. Performed on 10/29/2009.

hereto in accordance with Section 10 of the Employment Agreement.  For purposes of this Agreement, a ""Notice of Termination"" shall mean a notice which shall indicate the specific termination provision in this Agreement relied upon and shall set forth in reasonable detail the facts and circumstances claimed to provide a basis for termination of the Executive's employment under the provision so indicated.  Further, a Notice of Termination for Cause is required to include a copy of a resolution duly adopted by the affirmative vote of not less than three-quarters (3/4) of the entire membership of the Board at a meeting of the Board which was called and held for the purpose of considering such termination (after reasonable notice to the Executive and an opportunity for the Executive, together with the Executive's counsel, to be heard before the Board) finding that, in the good faith opinion of the Board, the Executive was guilty of conduct set forth in clause (i) or (ii) of the definition of Cause herein, and specifying the particulars thereof in detail.

7.2       7.2  Date of Termination.  ""Date of Termination,"" with respect to any purported termination of the Executive's employment after a Change in Control and during the Term, shall mean (i) if the Executive's employment is terminated for Disability, thirty (30) days after Notice of Termination is given (provided that the Executive shall not have returned to the full-time performance of the Executive's duties during such thirty (30) day period), and (ii) if the Executive's employment is terminated for any other reason, the date specified in the Notice of Termination (which, in the case of a termination by the Company (except in the case of a termination for Cause) and, in the case of a termination by the Executive, shall not be less than thirty (30) days from the date such Notice of Termination is given).

7.3       7.3  Dispute Concerning Termination.  If within fifteen (15) days after any Notice of Termination is given, or, if later, prior to the Date of Termination (as determined without regard to this Section 7.3), the party receiving such Notice of Termination notifies the other party that a dispute exists concerning the termination, the Date of Termination shall be extended until the earlier of (i) the date prior to the date on which the Term ends or (ii) the date on which the dispute is finally resolved, either by mutual written agreement of the parties or by a final judgment, order or decree of an arbitrator or a court of competent jurisdiction (which is not appealable or with respect to which the time for appeal therefrom has expired and no appeal has been perfected); provided, however, that the Date of Termination shall be extended by a notice of dispute only if such notice is given in good faith and the party providing notice pursues the resolution of such dispute with reasonable diligence.

7.4       7.4  [intentionally blank]

8.       8.  No Mitigation.  The Company agrees that, if the Executive's employment with the Company terminates during the Term, the Executive is not required to seek other employment or to attempt in any way to reduce any amounts payable to the Executive by the Company pursuant to this Agreement.  Further, the amount of any payment or benefit provided for in this Agreement (other than Section 6.1(B) hereof) shall not be reduced by any compensation earned by the Executive as the result of employment by another employer, by

7_____DeltaView comparison of pcdocs://chisr01a/688060/3 and pcdocs://wilsr01a/596715/4.
Performed on 10/29/2009.

retirement benefits, by offset against any amount claimed to be owed by the Executive to the Company, or otherwise.

9.   9. Successors; Binding Agreement.

9.1   9.1 This Agreement shall inure to the benefit of and be binding upon the Company and its successors and assigns.  In addition to any obligations imposed by law upon any successor to the Company, the Company will require any successor (whether direct or indirect, by purchase, merger, consolidation or otherwise) to all or substantially all of the business and/or assets of the Company to expressly assume and agree in writing to perform this Agreement in the same manner and to the same extent that the Company would be required to perform it if no such succession had taken place.  The Company will require any ultimate parent entity, as defined in 16 C.F.R. 8801,1(a)(3), of any Person who acquires 90% of the outstanding shares of common stock of the Company or the outstanding voting securities of the Company entitled to vote generally in the election of directors (including through a merger in which the Company does not survive or as a result of which the Company becomes a subsidiary of another Person or a consolidation involving the Company and another Person) to assume and agree in writing to perform as a joint and several obligor of the Company (including any successor to the Company), this Agreement in the same manner and to the same extent as the Company.  Failure of the Company to obtain such assumption and agreement in writing from a successor or its parent as described in the preceding sentences after notice and a reasonable cure period (not to exceed ten days from the date such notice is received) shall be a breach of this Agreement and shall entitle the Executive to compensation from the Company in the same amount and on the same terms as the Executive would be entitled to hereunder if the Executive were to terminate the Executive's employment for Good Reason after a Change in Control, except that, for purposes of implementing the foregoing, the date on which any such succession becomes effective shall be deemed the Date of Termination.

9.2   9.2 This Agreement shall inure to the benefit of and be enforceable by the Executive's personal or legal representatives, executors, administrators, successors, heirs, distributees, devisees and legatees.  If the Executive shall die while any amount would still be payable to the Executive hereunder (other than amounts which, by their terms, terminate upon the death of the Executive) if the Executive had continued to live, all such amounts, unless otherwise provided herein, shall be paid in accordance with the terms of this Agreement to the executors, personal representatives or administrators of the Executive's estate.

10.   10. Insurance and Indemnification.  From and after a Change in Control, including after the termination of Executive's employment, the Company shall indemnify, defend and hold the Executive harmless from and against any and all expenses, liabilities, damages, costs, judgments, penalties, fines and amounts paid in settlement, incurred in good faith by Executive in connection with any proceeding involving Executive by reason of Executive's being or having been an officer, director, employee or agent of the Company (or any affiliate of the Company) to the fullest extent permitted by law, whether or not Executive is, or is threatened to be made, a party to any threatened, pending, or completed proceeding, and

8........DeltaView comparison of pcdocs://chisr01a/688060/3 and pcdocs://wilsr01a/596715/4. Performed on 10/29/2009.

whether or not Executive is successful in such proceeding.  In addition, upon receipt from Executive of (i) a written request for an advancement of reasonable expenses which Executive reasonably believes will be subject to indemnification hereunder and (ii) a written undertaking by Executive to repay any such amounts if it shall ultimately be determined that the Executive is not entitled to indemnification under this Agreement or otherwise, the Company shall advance such expenses to Executive or pay such expenses for Executive, all in advance of the final disposition of any such matter.  From and after a Change in Control, including after the termination of Executive's employment hereunder, Executive shall have coverage under a director's and officer's liability insurance policy in amounts no less than, and on terms no less favorable than those, provided to senior executive officers of the Company from time to time.

11.   11. Definitions.  For purposes of this Agreement, the following terms shall have the meanings indicated below:

(A)   (A) "Affiliate" shall have the meaning set forth in Rule 12b-2 promulgated under Section 12 of the Exchange Act.

(B)   (B) "Agreement" shall mean this Attachment A to the Employment Agreement.

(C)   (B) "Auditor" shall have the meaning set forth in Section 6.2 hereof.

(D)   (C) "Base Amount" shall have the meaning set forth in section 280G(b)(3) of the Code.

(E)   (D) "Code" shall mean the Internal Revenue Code of 1986, as amended from time to time.

(F)   (E) "Company" shall mean Hayes Lemmerz International, Inc. and, except in determining under Section 15(G) hereof whether or not any Change in Control of the Company has occurred, shall include any successor to its business and/or assets which assumes and agrees to perform this Agreement by operation of law, or otherwise.

(G)   (F) "Excise Tax" shall mean any excise tax imposed under section 4999 of the Code or any similar state or local tax or any interest or penalties incurred by Executive with respect to such excise tax.

(H)   (G) "Person" shall have the meaning given in Section 3(a)(9) of the Exchange Act, as modified and used in Sections 13(d) and 14(d) including a "group"

9   DeltaView comparison of pcdocs://chisr01a/688060/3 and pcdocs://wilsr01a/596715/4. Performed on 10/29/2009.

within the meaning of Section 13(d)(3) thereof, except that such term shall not include (i) the Company or any of its subsidiaries, (ii) a trustee or other fiduciary holding securities under an employee benefit plan of the Company or any of its Affiliates, (iii) an underwriter temporarily holding securities pursuant to an offering of such securities, or (iv) a corporation owned, directly or indirectly, by the stockholders of the Company in substantially the same proportions as their ownership of stock of the Company.

(I)   (H)  "Retirement" shall be deemed the reason for the termination by the Executive of the Executive's employment if such employment is terminated in accordance with the Company's retirement policy, including early retirement, generally applicable to its salaried employees.

10   DeltaView comparison of pcdocs://chisr01a/688060/3 and pcdocs://wilsr01a/596715/4. Performed on 10/29/2009.

Document comparison done by DeltaView on Thursday, October 29, 2009 9:59:00 PM

| Input: | |
|---|---|
| Document 1 | pcdocs://chisr01a/688060/3 |
| Document 2 | pcdocs://wilsr01a/596715/4 |
| Rendering set | Option 3a strikethrough double score no moves |

| Legend: | |
|---|---|
| Insertion | |
| Deletion | |
| <Moved from> | |
| >Moved to< | |
| Style change | |
| Format change | |
| Moved deletion | |
| Inserted cell | |
| Deleted cell | |
| Moved cell | |
| Split/Merged cell | |
| Padding cell | |

| Statistics: | |
|---|---|
| | Count |
| Insertions | 325 |
| Deletions | 379 |
| Moved from | 0 |
| Moved to | 0 |
| Style change | 0 |
| Format changed | 11 |
| Total changes | 715 |

11⸺DeltaView comparison of pcdocs://chisr01a/688060/3 and pcdocs://wilsr01a/596715/4. Performed on 10/29/2009.

**H-5 Patrick C. Cauley, General Counsel**

**EXECUTIVE EMPLOYMENT AGREEMENT~~, AS AMENDED BY~~**

**~~AMENDMENT NO. 1 TO EMPLOYMENT AGREEMENT~~**

THIS AGREEMENT (the "Agreement") is made as of the ~~25~~ __th day of ~~March, 2004~~[_____], 2009 (the "Agreement Date"), by and between Hayes Lemmerz International, Inc. (the "Company") and Patrick C. Cauley (the "Executive")~~, as amended by that certain Amendment No. 1 to Employment Agreement dated as of December 30, 2008.~~..

**PRELIMINARY STATEMENTS**

1. The Executive currently serves as the Company's General Counsel, pursuant to an employment agreement dated March 25, 2004, as amended thereafter (the "Original Agreement").

~~WHEREAS, the~~ 2. The Company desires to ~~provide for the continued employment of the~~continue to employ Executive ~~on the terms and conditions set forth herein, in the best interest of the Company and its constituencies; and WHEREAS,~~as General Counsel, and the Executive desires to continue to be employed by the Company ~~as provided herein; and~~ in said capacity; and

3. Each party desires to set forth in writing the terms and conditions of their understandings and agreements.

~~NOW, THEREFORE, in consideration of the premises and the respective covenants and agreements of the parties herein contained, the parties agree as follows:~~

**NOW, THEREFORE**, in consideration of the mutual covenants and obligations contained herein, the Company hereby agrees to employ the Executive and the Executive hereby accepts such employment upon the terms and conditions set forth in this Agreement, which shall take effect on the plan effective date (the "Effective Date") of the Joint Plan of Reorganization of Hayes Lemmerz International, Inc. and its Affiliated Debtors and Debtors-In Possession, dated as of September 2, 2009 (as the same may be amended or modified, the "Plan of Reorganization").  In the event the Plan of Reorganization does not become effective, this Agreement shall be of no force and effect.

1.    Employment.  The Company agrees to continue to employ the Executive and the Executive agrees to continue to be employed on a full-time basis by the Company for the period and upon the terms and conditions hereinafter set forth.

2.    Term; Employment Period.  The term of this Agreement (the "Term") shall commence on the Agreement Date (the "Effective Date") and continue until terminated pursuant to Section 6 of this Agreement.  The period during which the Executive is employed by the Company pursuant to this Agreement is referred to herein as the "Employment Period."  The

date on which the termination of the Executive's employment hereunder shall become effective is referred to herein as the "Termination Date."

3.    Position and Duties.  During the Employment Period, the Executive shall serve as Vice President, General Counsel and Secretary of the Company and shall have such responsibilities, duties and authority as are customarily and ~~ordinarily exercised by executives in similar~~associated with such positions ~~in similar businesses in the United States~~ and shall exercise such responsibilities, duties and authority consistent with the foregoing as the Company's Chief Executive Officer or the Company's Board of Directors (the "Board") shall determine from time to time.  During the Employment Period, the Executive shall report to the Company's Chief Executive Officer or the Chief Executive Officer's designee.  The Executive shall devote substantially all his working time and efforts to the business and affairs of the Company and shall use his best efforts to carry out his responsibilities faithfully and efficiently in a professional manner.  Notwithstanding the foregoing, it is understood that during the Employment Period, subject to any conflict of interest policies of the Company and Section 8, the Executive may (x) serve in any capacity with any civic, charitable, educational or professional organization provided that such service does not materially interfere with his duties and responsibilities hereunder and (y) make and manage personal investments of his choice, and with the prior consent of the Company's Chief Executive Officer, which shall not be unreasonably withheld, serve on the board of directors of one (1) for-profit business enterprise.

4.    Place of Performance.  During the Employment Period, the Executive's place of performance of his services shall be at the Company's Northville, Michigan Headquarters, except for required travel by the Executive on the Company's business or as may be reasonably required by the Company.

5.    Compensation and Benefits.

(a)    Salary.  During the Employment Period, the Company shall pay to the Executive an initial annual base salary of ~~Two~~Three Hundred and Fifteen Thousand Dollars ($~~200,000~~315,000) (as the same may be increased from time to time, the "Base Salary"), such salary to be paid in periodic installments in accordance with the Company's payroll practices as in effect from time to time.  The Base Salary shall be reviewed annually by the compensation committee of the Board and may be increased from time to time in accordance with normal business practices of the Company and, if so increased, shall not thereafter be reduced.

(b)    Cash-Based Incentives.  ~~During~~Following the expiration of the KEIP (as defined below) during the Employment Period, the Executive shall be eligible to earn an annual bonus under the Company's Short-Term Incentive Plan, or a successor plan thereto, as in effect from time to time (the "Incentive Plan"), subject to achievement of performance goals determined by the Board in accordance with the terms of the Incentive Plan (such annual bonus, the "Annual Bonus").  Such performance goals shall include (i) a threshold level below which no Annual Bonus shall be paid, (ii) a normative level that is tied to the budget, which if obtained, would result in an Annual Bonus of  sixty percent (60%) of the Base Salary and (iii) an upside level, which if obtained, would increase the Annual Bonus to a maximum of one hundred twenty percent (120%) of the Base Salary.  ~~Any Annual Bonus payable to the Executive for the~~

2    DeltaView comparison of pcdocs://chisr01a/688058/3 and pcdocs://chisr01a/688058/7. Performed on 10/29/2009.

Company's fiscal year ending January 31, 2005 will be on a pro rata basis based upon the number of months the Executive worked for the Company during such fiscal year.  The Annual Bonus shall be payable in a cash lump sum at such time as bonuses are ordinarily paid in accordance with the terms of the Incentive Plan, but in no event later than 120 days after the end of each fiscal year of the Company.  Except as otherwise specifically provided in this Agreement, the Executive shall only be eligible to receive the Annual Bonus if the Executive is employed by the Company through the last day of February in the year in which the Annual Bonus is to be paid.

(c)    "Change in Control" Definition.  For purposes of this Agreement, a "Change in Control" shall be deemed to have occurred upon the first of the following to occur:

(1)    any Person (within the meaning of Section 3(a)(9) of the Securities and Exchange Act of 1934, as amended (the "Exchange Act"), as modified and used in Sections 13(d) and 14(d) thereof), other than Joseph Littlejohn & Levy Fund II, L.P. (or any affiliate (within the meaning of Regulation D Rule 501(b) under the Securities Act of 1933, as amended (the "Securities Act")) thereof), TSG Capital Fund II, L.P. (or any affiliate thereof), or Canadian Imperial Bank of Commerce (or affiliate thereof) (such entitles, collectively, the "JLL Group"), is or becomes the "Beneficial Owner" (within the meaning of Rule 13d-3 under the Exchange Act) of fifty percent (50%) or more of either (1) the then-outstanding Common Stock or (2) the combined voting power of the then-outstanding voting securities of the Company entitled to vote generally in the election of directors;

(2)    the following individuals cease for any reason to constitute a majority of the number of directors then serving:  individuals who, as of the Effective Date, constitute the Board and any new director (other than a director whose initial assumption of office is in connection with an actual or threatened election contest, including but not limited to a consent solicitation, relating to the election of directors of the Company) whose appointment or election by the Board or nomination for election by the Company's stockholders was approved or recommended by a vote of at least a majority of the directors then still in office who either were directors on the date hereof or whose appointment, election or nomination for election was previously so approved or recommended;

(3)    there is consummated a merger or consolidation of the Company or any direct or indirect subsidiary of the Company with any other corporation, other than a merger or consolidation which would result in the voting securities of the Company outstanding immediately prior to such merger or consolidation continuing to represent (either by remaining outstanding or by being converted into voting securities of the surviving entity or any parent thereof) at least fifty percent (50%) of the combined voting power of the securities of the Company or such surviving entity or any parent thereof outstanding immediately after such merger or consolidation, provided, however,

that it shall not be a Change in Control under this clause (C) if (i) directors appointed or nominated by the JLL Group or any constituent member thereof continue immediately following such transaction to constitute a majority of the Board and (ii) the JLL Group or any constituent member thereof continues immediately following such transaction to own securities representing at least thirty-five percent (35%) of the combined voting power of the securities of the Company or such surviving entity or any parent thereof outstanding immediately after such merger or consolidation; or

(4)    the stockholders of the Company approve a plan of complete liquidation or dissolution of the Company or there is consummated an agreement for the sale or disposition by the Company of all or substantially all of its assets.

(d)    Option Grants.  Based upon the Executive's performance and annual review, the Executive shall be eligible during the Employment Period to receive stock option grants in such amounts and subject to such terms and conditions as the compensation committee of the Board shall determine in its sole discretion are necessary and desirable.

(c)    Equity Based Incentives.  In accordance with the Plan of Reorganization, the Board shall establish a long term equity incentive program ( the "LTIP").  The Executive shall be entitled to participate in the LTIP.  Prior to making any grants to Executive, the Board shall consult with the CEO on such grants.

(d)    Key Employee Incentive Plan.  The Executive shall participate in the Company's Key Employee Incentive Plan (the "KEIP"), in accordance with its terms, and as approved by the "Bankruptcy Court" in connection with the "Restructuring" (as each such term is defined in the KEIP).  If the KEIP is not approved by the Bankruptcy Court prior to the Effective Date, the Executive shall be entitled to payments under this Agreement in the amounts and under the terms and conditions set forth in the Company's Motion for Order Approving the Implementation of Key Employee Incentive Plan and Short Term Incentive Plan filed with the Bankruptcy Court on July 29, 2009.

(e)    Expenses.  During the Employment Period, the Company shall promptly reimburse the Executive for all reasonable out-of-pocket expenses incurred by the Executive in connection with the business of the Company and the performance of his duties under this Agreement in accordance with the terms of the Company's policies as in effect from time to time.

(f)    Benefit Plans.  During the Employment Period, the Executive shall be entitled to participate in all of the employee benefit plans, programs, agreements and arrangements(including without limitation the supplemental executive retirement plan) generally provided to senior executives of the Company, as such are in effect from time to time, on a basis no less favorable than that provided to such senior executives.

(g)    Perquisites.  During the Employment Period, the Executive shall be entitled to participate in those perquisites provided to senior executives of the Company, as such

---

4    DeltaView comparison of pcdocs://chisr01a/688058/3 and pcdocs://chisr01a/688058/7. Performed on 10/29/2009.

are in effect from time to time after the Effective Date, on a basis no less favorable than that provided to such senior executives.  In addition, the Company shall pay Executive an annual flexible benefits allowance (the "Flexible Benefits Allowance") of Thirty Five Thousand Dollars ($35,000), such allowance to be paid in periodic installments in accordance with the Company's payroll practices as in effect from time to time. The Flexible Benefits Allowance shall be reviewed annually by the Compensation Committee of the Board and may be increased from time to time and, if so increased, shall not thereafter be reduced.

(h)     Vacations.  During the Employment Period, the Executive shall be entitled to vacation time, paid holidays and personal days, determined in accordance with the Company's policy with respect to its senior executives as in effect from time to time, it being understood that the Executive shall be entitled to not less than four weeks' vacation in any 12-month period during the Employment Period thereafter.

6.     Termination of Employment.

(a)     Accrued Benefits.  In the event of the termination of the Executive's employment hereunder for any reason during the Term, the Executive (or his estate or representative, as applicable) shall be entitled to receive any Base Salary, Annual Bonus, vacation time and expenses that have in each case accrued but are unpaid as of the Termination Date, vested options as well as any post-termination benefits(including but not limited to vested awards under the LTIP) to which he may be entitled pursuant to the Company's retirement, insurance and other benefit plans, programs and arrangements as in effect immediately prior to the Termination Date (the "Accrued Benefits").

(b)     Death.  The Executive's employment hereunder shall terminate as of the date of his death.  Upon the termination of the Executive's employment hereunder because of his death during the Term, the Executive's estate or representative, as the case may be, shall be entitled to receive the Accrued Benefits and a lump sum payment in cash equal to (i) one year's Base Salary as in effect on the Termination Date and (ii) the product of (x) sixty percent (60%) of the Base Salary as in effect on the Termination Date, multiplied by a fraction (y) the numerator of which shall be the number of months (including fractions thereof) worked by the Executive during the Company's fiscal year in which the Termination Date occurs and (z) the denominator of which shall be the number 12 (such amount under this clause (ii), the "Pro Rata Annual Bonus").  Such amounts shall be paid as soon as administratively feasible following the Executive's death but in no event later than April 15 of the calendar year following the Executive's death.  In addition, those immediate family members who were participating in the Company's medical benefit plan as of the date of the Executive's death shall continue to participate in the Company's medical benefit plan at active employee contribution rates for the one-year period immediately following the date of the Executive's death.

(c)     Disability.  The Executive's employment hereunder may be terminated during the Employment PeriodTerm if the Executive is incapable of performing his principal duties hereunder because of physical or mental incapacity for a period of 45 consecutive working days or for more than 90 working days in any 12-month period ("Disability").  In the event that the Executive's employment is to be terminated pursuant to this

---

5     DeltaView comparison of pcdocs://chisr01a/688058/3 and pcdocs://chisr01a/688058/7. Performed on 10/29/2009.

Section 6(c), (i) this Agreement shall terminate on the date specified in the notice of termination delivered to the Executive (subject to Section 8(g) and Section 18); (ii) the Executive shall as of such date resign from all of his positions, duties and authorities hereunder; (iii) the Executive shall be placed on a medical leave of absence until the earlier of (A) expiration of the six-month period commencing on the date his medical leave of absence began, unless there is no reasonable expectation that the Executive will return to employment with the Company, in which case the date the Executive ceases performing services for the Company, (B) the date he qualifies for benefits under the Company's long-term disability plan or (C) the date he is able to return to work; and (iv) the Executive shall continue to be paid his Base Salary until such medical leave of absence ends.  In the case of a termination of the Executive's employment pursuant to this Section 6(c), for purposes of calculating benefits pursuant to clauses (B) and (C) below the Termination Date shall be the date upon which the Executive's medical leave of absence commences, and for all other purposes, the Termination Date shall be the date upon which the Executive's medical leave of absence ends.  In the event the Executive's employment is terminated pursuant to this Section 6(c), the Executive (or his representative, as applicable) shall be entitled to:  (A) the Accrued Benefits; (B) a lump sum payment in cash equal to one year's Base Salary and Flexible Benefits Allowance as in effect on the Termination Date; (C) the Pro Rata Annual Bonus; and (D) the continuation of health and welfare benefits at the levels in effect as of the Termination Date at no additional cost to the Executive than that which was in effect as of the Termination Date for the one-year period immediately following the Termination Date; provided, however, that such benefits shall be reduced to the extent comparable benefits are made available to the Executive from a successor employer, and the Executive shall be obligated to report such benefits to the Company.  The amounts payable pursuant to clauses (B) and (C) of the preceding sentence shall be paid in the month following the Executive's Termination Date.  It is acknowledged and agreed by the Executive that he shall be precluded from terminating his employment hereunder for Good Reason in the event that his employment hereunder is terminated pursuant to this Section 6(c).

(d)      For Cause; Without Good Reason.  The Executive's employment hereunder may be terminated during the ~~Employment Period~~Term (i) by the Company for Cause (as defined below) or (ii) by the Executive without Good Reason (as defined below).  In the event that the Company terminates the Executive's employment hereunder for Cause, the Termination Date shall be the date specified in the notice of termination for Cause delivered by the Company to the Executive.  In the event that the Executive terminates his employment hereunder without Good Reason, the Termination Date shall be no earlier than 30 days following the date on which a notice of termination is delivered by the Executive to the Company.  In the event that the Executive's employment hereunder is terminated pursuant to this Section 6(d), the Executive shall be entitled to the Accrued Benefits.

(e)      Without Cause; For Good Reason.  The Executive's employment hereunder may be terminated during the Employment Period (i) by the Company without Cause or (ii) by the Executive for Good Reason.  In the event that the Executive's employment is terminated pursuant to this Section 6(e) (whether by the Company or by the Executive), the Termination Date shall be no earlier than 30 days following the date on which a notice of termination is delivered by one party to the other.  In the event that the Executive's employment is terminated pursuant to this Section 6(e), the Executive (or his estate or representative, as the

case may be) shall be entitled to receive the Accrued Benefits and the other payments and benefits set forth in this Section 6(e).  The Executive (or his estate or representative, as the case may be) shall be entitled to the following severance benefits (A) a lump sum payment in cash equal to one year's Base Salary and Flexible Benefits Allowance as in effect on the Termination Date; (B) the Pro Rata Annual Bonus; and (C) the title to the Executive's Company vehicle.  The benefits described in the preceding sentence shall be paid in the month following the Executive's Termination Date.  Severance benefits provided to the Executive under this paragraph shall also include:  (x) continuation of health and welfare benefits for one year at the levels in effect as of the Termination Date at no additional cost to the Executive than that which was in effect as of the Termination Date; provided, that such benefits shall be reduced to the extent comparable benefits are made available to the Executive from a successor employer, and the Executive shall be obligated to report such benefits to the Company; and (y) executive level career outplacement services for the period beginning on the Termination Date and ending December 31 of second calendar year following termination by a mutually agreeable outplacement firm and paid for as incurred by the Company.

(f)      <u>Definition of "Cause" and "Good Reason"</u>.

For purposes of this Agreement, "Cause" means:  (i) the willful failure of the Executive to perform his material duties with the Company which have been duly assigned to the Executive and which duties are commensurate with those of the position for which Executive is then employed, and which failure is not cured (if capable of cure) within 15 days after receipt of written notice of such failure, which notice identifies the manner in which the Executive has willfully failed to perform, (ii) the engaging by the Executive in willful conduct which is demonstrably injurious to the Company, monetarily or otherwise, (iii) the conviction of the Executive of any crime or offense constituting a felony, or (iv) the conviction of the Executive for a violation of criminal law involving the Company and its business, or (v) a failure by the Executive to comply with any material provision of this Agreement, which failure is not cured (if capable of cure) within 15 days after receipt of written notice of such non-compliance by the Executive.  Termination of the Executive for Cause shall mean termination by action of at least a majority of the Company's Board of Directors, at a meeting duly called and held upon at least 15 days' written notice to the Executive specifying the particulars of the action or inaction alleged to constitute Cause and at which meeting the Executive and his counsel were entitled to be present and given adequate opportunity to be heard.  For purposes of clauses (i) and (ii) of this definition, action or inaction by the Executive shall not be considered "willful" unless done or omitted by him (A) intentionally or not in good faith and (B) without reasonable belief that his action or inaction was in the best interest of the Company, and shall not include failure to act by reason of total or partial incapacity due to physical or mental illness.

For purposes of this Agreement, 'Good Reason' means the occurrence of one or more of the following events if the Executive gives notice of the event to the Company within 90 days of the event and the Company fails to remedy such event within 30 days of receiving notice from the Executive:  (i) a material adverse alteration in the nature or status of the Executive's position, duties, responsibilities or authority from those in effect as of the Effective Date; (ii) a material reduction in the Executive's Base Salary or level of employee benefits (other than across-the-board reductions applied similarly to all of the Company's senior

---

7   DeltaView comparison of pcdocs://chisr01a/688058/3 and pcdocs://chisr01a/688058/7. Performed on 10/29/2009.

executives occurring after the second anniversary of the Effective Date); (iii) a failure to pay or provide a material amount of the compensation set forth in this Agreement (except for an across-the-board deferral of compensation applied similarly to all of the Company's senior executives occurring after the second anniversary of the Effective Date); (iv) the relocation of the Executive's principal place of employment more than 30 miles from its location as of the Effective Date except for required travel on the Company's business; (v) assignment of duties or responsibilities to the Executive which are materially inconsistent with the provisions of this Agreement; or (vi) a failure by the Company to comply with any material provision of this Agreement.

(g)    Change in Control Severance Provisions. The provisions set forth in Attachment A hereto are hereby incorporated into this Agreement. The Executive hereby acknowledges that in the event he becomes entitled to the payment set forth in Section 6.1(A) of Attachment A hereto, that such payment will be in lieu of any other payments to be made pursuant to the terms of this Agreement.

For purposes of this Agreement, a Change in Control shall be deemed to have occurred upon the first of the following to occur after the Effective Date:

(i)    any Person (within the meaning of Section 3(a)(9) of the Securities and Exchange Act of 1934, as amended (the "Exchange Act"), as modified and used in Sections 13(d) and 14(d) thereof) becomes the "Beneficial Owner" (within the meaning of Rule 13d-3 under the Exchange Act) of fifty percent (50%) or more of either (1) the then-outstanding Common Stock or (2) the combined voting power of the then-outstanding voting securities of the Company entitled to vote generally in the election of directors;

(ii)    the following individuals cease for any reason to constitute a majority of the number of directors then serving: individuals who, as of the Effective Date, constitute the Board and any new director (other than a director whose initial assumption of office is in connection with an actual or threatened election contest, including but not limited to a consent solicitation, relating to the election of directors of the Company) whose appointment or election by the Board or nomination for election by the Company's stockholders was approved or recommended by a vote of at least a majority of the directors then still in office who either were directors on the date hereof or whose appointment, election or nomination for election was previously so approved or recommended;

(iii)    there is consummated a merger or consolidation of the Company or any direct or indirect subsidiary of the Company with any other corporation, other than a merger or consolidation which would result in the voting securities of the Company outstanding immediately prior to such merger or consolidation continuing to represent (either by remaining outstanding or by being converted into voting securities of the surviving entity or any parent thereof) at least fifty percent (50%) of the combined voting power of the securities of the Company or such surviving entity or any parent thereof outstanding immediately after such merger or consolidation; or

8    DeltaView comparison of pcdocs://chisr01a/688058/3 and pcdocs://chisr01a/688058/7. Performed on 10/29/2009.

(iv)      the stockholders of the Company approve a plan of complete liquidation or dissolution of the Company or there is consummated an agreement for the sale or disposition by the Company of all or substantially all of its assets.

Notwithstanding anything contained in this Agreement to the contrary (including, without limitation, this Section 6(g)), no transaction entered into, or other event occurring, pursuant to, as a result of, or in any way in connection with, the Restructuring shall constitute a "Change in Control" under this Agreement.

(h)      Release Agreement.  Notwithstanding anything to the contrary contained in this Section 6, the Executive shall be required to execute the Company's then current standard release agreement as a condition to receiving any of the payments and benefits provided for in this Section 6 or Attachment A.  It is acknowledged and agreed that the then current standard release agreement shall be a mutual release and shall not diminish or terminate Executive's rights under this Agreement including, but not limited to, those delineated in Sections 6(i), 7 and 16 herein. The time period for executing such release (and the period available to revoke it) shall be in accordance with the Company's then current standard practice but in no event shall the execution period extend beyond 60 days following the Executive's Termination Date.

(i)      No Mitigation.  Upon termination of the Executive's employment with the Company, subject to the Executive's affirmative obligations pursuant to Section 6(c) and 6(e), the Executive shall be under no obligation to seek other employment or otherwise mitigate the obligations of the Company under this Agreement.  ~~The time period for executing such release (and the period available to revoke it) shall be in accordance with the Company's then current standard practice but in no event shall the execution period extend beyond 60 days following the Executive's Termination Date.~~

7.      Directors' and Officers' Insurance; Indemnification.  In addition to any rights to indemnification to which the Executive is entitled under the Company's Restated Certificate of Incorporation and Bylaws, the Company shall indemnify the Executive at all times during and after the Employment Period to the maximum extent permitted under the Delaware Business Corporation Act or any successor provision thereof, and any and all applicable state law, and shall pay the Executive's expenses (including reasonable attorneys' fees and expenses, which shall be paid in advance by the Company as incurred, subject to recoupment in accordance with applicable law) in defending any civil action, suit or proceeding in advance of the final disposition of such action, suit or proceeding to the maximum extent permitted under such applicable state laws for the Executive's action or inaction on behalf of the Company under the terms of this Agreement including but not limited to any acts or alleged acts arising out of events prior to the Executive's employment by the Company which obligation shall survive the termination of the Executive's employment or the termination of the other provisions of this Agreement.

---

9      DeltaView comparison of pcdocs://chisr01a/688058/3 and pcdocs://chisr01a/688058/7. Performed on 10/29/2009.

8.      Confidential Information; Removal of Documents; Non-Competition; etc. For purposes of this Section 8, "Company" shall mean the Company, its subsidiaries and affiliates.

(a)      Confidentiality.  Except as otherwise provided in this Agreement, at all times during and after the Employment ~~Term~~Period, the Executive shall keep secret and retain in strictest confidence, any and all Confidential Information (as defined below) relating to the Company, and shall use such Confidential Information only in furtherance of the performance by the Executive of the Executive's duties to the Company and not for personal benefit or the benefit of any interest adverse to the Company's interests.  For purposes of this Agreement, "Confidential Information" shall mean any information including without limitation plans, specifications, models, samples, data, customer lists and customer information, computer programs and documentation, and other technical and/or business information, in whatever form, tangible or intangible, that can be communicated by whatever means available at such time, that relates to the Company's current Business or future business contemplated during the Employment Period, products, services and development, or information received from others that the Company is obligated to treat as confidential or proprietary; provided, however, that such Confidential Information shall not include any information that (i) has become generally available to the public other than as a result of a disclosure by the Executive, or (ii) was available to or became known to the Executive prior to the disclosure of such information on a non-confidential basis without breach of any duty of confidentiality from any party to the Company, and the Executive shall not disclose such Confidential Information to any person or entity other than the Company, except as may be required by law or court or administrative order (in which event the Executive shall so notify the Company as promptly as practicable).  Upon termination of the Executive's employment hereunder for any reason, the Executive shall return to the Company all copies, reproductions and summaries of Confidential Information in the Executive's possession and erase the same from all media in the Executive's possession, and, if the Company so requests, shall certify in writing that the Executive has done so.  All Confidential Information is and shall remain the property of the Company (or, in the case of information that the Company receives from a third party which it is obligated to treat as confidential, then the property of such third party).

(b)      Non-Competition.

(i)      During the Employment Period, the Executive shall not engage in Competition ~~(as defined below)~~ with the Company.  For purposes of this Agreement, "Competition" by the Executive shall mean the Executive's engaging in, or otherwise directly or indirectly being employed by or acting as a consultant or lender to, or being a director, officer, employee, principal, agent, stockholder, member, owner or partner of, or permitting the Executive's name to be used in connection with the activities of any other business or organization anywhere which competes, directly or indirectly, with the Business of the Company as the same shall be constituted at the Termination Date or which, during the six-month period prior to the Executive's termination, the Company had made substantial plans with the intention of establishing operations.

(ii)    For the one year period commencing on the Termination Date, the Executive shall not engage in Competition with the Company in any locality or region in which the Company had operations at the time of, or within six months prior to, the Executive's termination, or in which, during the six-month period prior to the Executive's termination, the Company had made substantial plans with the intention of establishing operations in such locality or region; provided, however, that it shall not be a violation of this sub-paragraph or the sub-paragraph hereinabove for the Executive to be or become the registered or beneficial owner of up to three percent (3%) of any class of the capital stock of a competing corporation registered under the Exchange Act, provided that the Executive does not actively participate in the business of such corporation until such time as this covenant expires.

(c)    Non-Solicitation.  ForDuring the Employment Period and for the one year period commencing on the Termination Date, the Executive agrees that the Executive shall not, directly or indirectly, for the Executive's benefit or for the benefit of any other person, firm or entity, engage any of the following conduct:

(i)    solicit from any customer doing business with the Company as of the Termination Date, business of the same or of a similar nature to the business of the Company with such customer;

(ii)    solicit from any known potential customer of the Company business of the same or of a similar nature to that which has been the subject of a known written or oral bid, offer or proposal by the Company, or of substantial preparation with a view to making such a bid, proposal or offer, within six months prior to the Executive's termination;

(iii)    solicit the employment or services of, or hire, any person who was known to be employed by or was a known consultant to the Company upon the termination of the Executive's employment, or within six months prior thereto; or

(iv)    otherwise interfere with the business or accounts of the Company.

(d)    Intellectual Property.  All Intellectual Property (as defined below) and Technology (as defined below) created, developed, obtained or conceived of by the Executive during the Employment Period, and all business opportunities presented to the Executive during the Employment Period, shall be owned by and belong exclusively to the Company, provided that they reasonably relate to the Business, and the Executive shall (i) promptly disclose any such Intellectual Property, Technology or business opportunity to the Company, and (ii) execute and deliver to the Company, without additional compensation, such instruments as the Company may require from time to time to evidence its ownership of any such Intellectual Property, Technology or business opportunity.  For purposes of this Agreement, (A) the term "Intellectual Property" means and includes any and all trademarks, trade names, service marks, service names, patents, copyrights, and applications therefor, and (B) the term

11____DeltaView comparison of pcdocs://chisr01a/688058/3 and pcdocs://chisr01a/688058/7. Performed on 10/29/2009.

"Technology" means and includes any and all trade secrets, proprietary information, invention, discoveries, know-how, formulae, processes and procedures.

(e)     The Executive acknowledges that the services to be rendered by the Executive to the Company are of a special and unique character, which gives this Agreement a peculiar value to the Company, the loss of which may not be reasonably or adequately compensated for by damages in an action at law, and that a material breach or threatened breach by the Executive of any of the provisions contained in this Section 8 shall cause the Company irreparable injury.  The Executive therefore agrees that the Company shall be entitled, in addition to any other right or remedy, to a temporary, preliminary and permanent injunction, without the necessity of proving the inadequacy of monetary damages or the posting of any bond or security, enjoining or restraining the Executive from any such violation or threatened violations.

(f)     The Executive further acknowledges and agrees that due to the uniqueness of the Executive's services and confidential nature of the information the Executive shall possess, the covenants set forth herein are reasonable and necessary for the protection of the business and goodwill of the Company.

(g)     Continuing Operation.  Any termination of the Executive's employment or of this Agreement shall have no effect on the continuing operation of this Section 8.

9.     Stockholder Agreement.  As a precondition to receiving any award under the LTIP, Executive shall execute a management stockholders agreement that is acceptable to Executive and the Company.

9.  10. Severability.  It is the desire and intent of the parties that the provisions of this Agreement shall be enforced to the fullest extent permissible under the laws and public policies applied in each jurisdiction in which enforcement is sought.  Accordingly, if any particular provision or portion of this Agreement shall be adjudicated to be invalid or unenforceable, this Agreement shall be deemed amended to delete therefrom the portion thus adjudicated to be invalid or unenforceable, such deletion to apply only with respect to the operation of such provision in the particular jurisdiction in which such adjudication is made.

10.  11.  Notices.  All communications, requests, consents and other notices provided for in this Agreement shall be in writing and shall be deemed give if delivered by hand or mailed by first class mail, postage prepaid, to the last known address of the recipient.

11.  12. Governing Law.  This Agreement shall be governed by and construed and enforced in accordance with the laws of the State of Delaware, without regard to its conflicts of laws provisions.

12.  13. Assignment.  Neither this Agreement nor any rights or duties hereunder may be assigned by the Executive without the prior written consent of the Company.  The Company shall have the right at any time to assign this Agreement to its successors and assigns; provided, however, that the assignee or transferee is the successor to all or substantially all of the business

12____DeltaView comparison of pcdocs://chisr01a/688058/3 and pcdocs://chisr01a/688058/7. Performed on 10/29/2009.

and assets of the Company and such assignee or transferee expressly assumes all of the obligations, duties and liabilities of the Company set forth in this Agreement.

~~13.~~  14. Amendments.  No provisions of this Agreement shall be altered, amended, revoked or waived except by an instrument in writing, signed by each party to this Agreement.

~~14.~~  15. Binding Effect.  Except as otherwise provided herein, this Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective legal representatives, heirs, successors and assigns.

~~15.~~  16. Execution in Counterparts.  This Agreement may be executed in any number of counterparts, each of which shall be deemed an original, but all of which together shall constituted one and the same instrument.

~~16.~~  17. Arbitration.  Any dispute, controversy or question arising under, out of, or relating to this Agreement (or the breach thereof), or, the Executive's employment with the Company or termination thereof, shall be referred for arbitration in the State of Michigan to a neutral arbitrator selected by the Executive and the Company and this shall be the exclusive and sole means for resolving such dispute.  Such arbitration shall be conducted in accordance with the National Rules for Resolution of Employment Disputes of the American Arbitration Association. The arbitrator shall have the discretion to award reasonable attorneys' fees, costs and expenses to the prevailing party.  Judgment upon the award rendered by the arbitrator may be entered in any court having jurisdiction thereof.

~~17.~~  18. Entire Agreement.  This Agreement sets forth the entire agreement and understanding of the parties and supersedes all prior understandings, agreements (including, without limitation, the Original Agreement) or representations by or between the parties, whether written or oral, which relate in any way to the subject matter hereof.

~~18.~~  19. Survivorship.  The provisions of this Agreement necessary to carry out the intention of the parties as expressed herein shall survive the termination or expiration of this Agreement.

~~19.~~  20. Waiver.  Except as provided herein, the waiver by either party of the other party's prompt and complete performance, or breach or violation, of any provision of this Agreement shall not operate nor be construed as a waiver of any subsequent breach or violation, and the failure by any party hereto to exercise any right or remedy which it may possess hereunder shall not operate nor be construed as a bar to the exercise of such right or remedy by such party upon the occurrence of any subsequent breach or violation.

~~20.~~  21. Captions.  The captions of this Agreement are for convenience and reference only and in no way define, describe, extend or limit the scope or intent of this Agreement or the intent of any provision hereof.

~~21.~~  22. Construction.  The parties acknowledge that this Agreement is the result of arm's-length negotiations between sophisticated parties each afforded representation by legal counsel.  Each and every provision of this Agreement shall be construed as though both parties participated

---

13    DeltaView comparison of pcdocs://chisr01a/688058/3 and pcdocs://chisr01a/688058/7. Performed on 10/29/2009.

equally in the drafting of same, and any rule of construction that a document shall be construed against the drafting party shall not be applicable to this Agreement.

22.  23. Code Section 409A Payment Delay.  Notwithstanding any provision in this Agreement (or the attached Severance Agreement) to the contrary, any payment triggered by a termination of employment to the extent and up to the amount necessary to ensure that such payments are not subject to penalties and interest under Code Section 409A shall not commence until at least six months after the Executive's termination of  employment.  To the extent such payments, absent this provision, would be paid during the first six month period following the Executive's termination of employment, those payments shall be withheld and the amount of the payments withheld will be paid in a lump sum, without interest, during the seventh month after termination; provided that, if the Executive dies during such six-month period, any such delayed payments shall be immediately payable to the Executive's estate or representative.

If and to the extent that any payment or benefit under this Agreement is determined by the Company to constitute "non-qualified deferred compensation" subject to Code Section 409A and is payable to the Executive by reason of the Executive's termination of employment, then such payment or benefit shall be made or provided to the Executive only upon a "separation from service" as defined for purposes of Code Section 409A.  The Company shall not have any liability or be responsible for any claim related to the incurrence by the Executive or any other person of any tax, interest expense, loss of tax benefit, or any other obligation or liability, in each case, arising under or related to Code Section 409A.

24.     Tax Withholding.  All compensation payable pursuant to this Agreement shall be subject to reduction by all applicable withholding, social security and other federal, state and local taxes and deductions.

14_____DeltaView comparison of pcdocs://chisr01a/688058/3 and pcdocs://chisr01a/688058/7. Performed on 10/29/2009.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first above written.

EXECUTIVE


By:_____
    Patrick C. Cauley


HAYES LEMMERZ INTERNATIONAL,  INC.


By:_____
Name: Curtis J. Clawson
Title:   President and Chief Executive Officer

10301891.2

15      DeltaView comparison of pcdocs://chisr01a/688058/3 and pcdocs://chisr01a/688058/7. Performed on 10/29/2009.

*Attachment A*

### SEVERANCE AGREEMENT

1. <u>Defined Terms</u>.  Unless otherwise defined in this Attachment A, the terms that are defined in the Employment Agreement  (the "Employment Agreement") shall have the same meanings when used herein as that are ascribed to such terms in the Employment Agreement.

2. <u>Term of Agreement</u>.  The Term of this Agreement shall commence on the Effective Date hereof and shall continue in effect through the third anniversary thereof; <u>provided</u>, <u>however</u>, that commencing on the first anniversary of the Effective Date and each anniversary thereafter (each such date a "Renewal Date"), the Term shall automatically be extended for one additional year unless, on or prior to such Renewal Date, the Company or the Executive shall have given notice not to extend the Term; and <u>further</u> <u>provided</u>, <u>however</u>, that if a Change in Control shall have occurred during the Term, the Term shall expire no earlier than twenty-four (24) months beyond the month in which such Change in Control occurred.

3. <u>Immediate Effect of Change in Control</u>.  Promptly following a Change in Control, but in no event later than April 15 of the calendar year following the Change in Control, the Executive shall be entitled to the immediate payment of all unpaid compensation amounts (including the pro rata bonus payment for the current fiscal year under any bonus plan for which he is eligible ("Pro-rata Bonus") and all unpaid bonuses with respect to any prior fiscal year) with respect to the Executive's employment.  For purposes of this Section 3, Pro-rata Bonus shall be an amount equal to the product of (1) the product of (x) the Executive's base salary as in effect immediately prior to the Change in Control and (y) the greater of (A) the Executive's normative bonus percentage for the fiscal year in which the Change in Control occurs and (B) the Executive's estimated bonus percentage calculated in good faith by the Company's Finance Department determined by projecting performance through the end of the fiscal year in which the Change in Control occurs and (2) a fraction, the numerator of which is the number of days in the fiscal year in which the Change in Control occurs through the date of the Change in Control, and the denominator of which is 365.  The Pro-rata Bonus paid shall be subtracted from the amount otherwise due the Executive as a bonus for the fiscal year in which the Change in Control occurs, but such Pro-rata Bonus becomes a vested benefit upon a Change in Control and in no event shall the Executive have to repay all or any portion of the Pro-rata Bonus.

4. <u>Company's Covenants Summarized</u>.  In order to induce the Executive to remain in the employ of the Company, the Company agrees, under the conditions described herein, to pay the Executive the Severance Payments and the other payments and benefits described herein. Except as provided in Section 9.1 hereof, no Severance Payments shall be payable under this Agreement unless there shall have been (or, under the terms of the second sentence of Section 6.1 hereof, there shall be deemed to have been) a termination of the Executive's employment with the Company on or following a Change in Control and during the Term.  This Agreement shall not be construed as creating an express or implied contract of employment and, except as otherwise agreed in writing between the Executive and the Company, the Executive shall not have any right to be retained in the employ of the Company.

5.  <u>Compensation Other Than Severance Payments</u>.

5.1  Following a Change in Control and during the Term, during any period that the Executive fails to perform the Executive's full-time duties with the Company as a result of incapacity due to physical or mental illness, the Company shall pay the Executive's full salary to the Executive at the rate in effect at the commencement of any such period, together with all compensation and benefits payable to the Executive under the terms of any compensation or benefit plan, program or arrangement (other than the Company's short- or long-term disability plan, as applicable, to the extent such benefits would be duplicative and their nonpayment would not prejudice Executive's future entitlement to benefits) maintained by the Company during such period, until the Executive's employment is terminated by the Company for Disability.

5.2  If the Executive's employment shall be terminated for any reason on or following a Change in Control and during the Term, the Company shall pay the Executive's full salary to the Executive through the Date of Termination at the rate in effect immediately prior to the Date of Termination or, if higher, the rate in effect immediately prior to the first occurrence of an event or circumstance constituting Good Reason, together with all compensation and benefits payable to the Executive through the Date of Termination under the terms of the Company's compensation and benefit plans, programs or arrangements as in effect immediately prior to the Date of Termination or, if more favorable to the Executive, as in effect immediately prior to the first occurrence of an event or circumstance constituting Good Reason (including all unpaid bonuses with respect to any prior fiscal year).  In addition, if the Executive's employment is terminated on or following a Change in Control and during the Term, other than (A) by the Company for Cause, (B) by reason of death or Disability, or (C) by the Executive without Good Reason, then the Company shall pay Executive an amount equal to the product of (1) the product of (x) the Executive's base salary as in effect immediately prior to the Date of Termination, or, if higher, as in effect immediately prior to the first occurrence of an event or circumstance constituting Good Reason (the greater of such amounts, the "Base Salary") and (y) the Executive's normative bonus percentage for the year in which the Date of Termination occurs, or if higher, the normative bonus percentage for the fiscal year in which the Change in Control occurs or the normative bonus percentage in effect immediately prior to the first occurrence of an event or circumstance constituting Good Reason (the greatest of such percentages, the "Bonus Percentage") and (2) a fraction, the numerator of which is the number of days in the fiscal year in which the Date of Termination occurs through the date of the Date of Termination, and the denominator of which is 365; it being understood that, if the Date of Termination is in the same fiscal year as the Change in Control, the Pro-rata Bonus calculated pursuant to Section 3 shall be subtracted from the amount payable pursuant to this sentence of Section 5.2 but shall not reduce the amount payable below zero.

5.3  If the Executive's employment shall be terminated for any reason on or following a Change in Control and during the Term, the Company shall pay to the Executive the Executive's normal post-termination compensation and benefits as such payments become due. Such post-termination compensation and benefits shall be determined under, and paid in accordance with, the Company's retirement, insurance and other compensation or benefit plans, programs and arrangements as in effect immediately prior to the Date of Termination or, if more

---

17␣␣␣␣DeltaView comparison of pcdocs://chisr01a/688058/3 and pcdocs://chisr01a/688058/7. Performed on 10/29/2009.

favorable to the Executive, as in effect immediately prior to the occurrence of the first event or circumstance constituting Good Reason.

6.  Severance Payments.

6.1  If the Executive's employment is terminated on or following a Change in Control and during the Term, other than (A) by the Company for Cause, (B) by reason of death or Disability, or (C) by the Executive without Good Reason, then the Company shall pay the Executive the amounts, and provide the Executive the benefits, described in this Section 6.1 ("Severance Payments") and Section 6.2, in addition to any payments and benefits to which the Executive is entitled under Section 5 hereof or otherwise (except as provided herein).  For purposes of this Agreement, the Executive's employment shall be deemed to have been terminated following a Change in Control by the Company without Cause or by the Executive with Good Reason, if (i) the Executive's employment is terminated by the Company without Cause prior to a Change in Control (whether or not a Change in Control ever occurs) and such termination was at the request or direction of a Person who enters into an agreement with the Company the consummation of which would constitute a Change in Control, (ii) the Executive terminates his employment for Good Reason prior to a Change in Control (whether or not a Change in Control ever occurs) and the circumstance or event which constitutes Good Reason occurs at the request or direction of such Person, or (iii) the Executive's employment is terminated by the Company without Cause or by the Executive for Good Reason and such termination or the circumstance or event which constitutes Good Reason is otherwise in connection with or in anticipation of a Change in Control (whether or not a Change in Control ever occurs).

(A)  In lieu of any further salary payments to the Executive for periods subsequent to the Date of Termination and in lieu of any severance benefit otherwise payable to the Executive (whether pursuant to any employment agreement, plan, policy or otherwise), the Company shall pay to the Executive a lump sum severance payment, in cash, equal to two times the sum of (i) the Base Salary and Flexible Benefits Allowance and (ii) the product of (x) the Base Salary and (y) the Bonus Percentage.  Such amounts shall be paid within the period described in Section 6.3.

(B)  For the twenty-four (24) month period immediately following the Date of Termination, the Company shall arrange to provide the Executive and his dependents with life, disability, accident and health insurance benefits substantially similar to those provided to the Executive and his dependents immediately prior to the Date of Termination or, if more favorable to the Executive, those provided to the Executive and his dependents immediately prior to the first occurrence of an event or circumstance constituting Good Reason, at no greater cost to the Executive than the Executive's cost immediately prior to such date or occurrence (the "Executive's Cost").  Unless the Executive consents to a different method (after taking into account the effect of such method on the calculation of "parachute payments" pursuant to Section 6.2 hereof), the health insurance benefits described in this Section 6.1(B) shall be provided through a third-party insurer.  In the event continued accident and health insurance coverage under this Section 6.1(B) is provided through the Company's self-insured health plan such coverage shall be limited to the first eighteen months following the Date of Termination.  If

18_____DeltaView comparison of pcdocs://chisr01a/688058/3 and pcdocs://chisr01a/688058/7. Performed on 10/29/2009.

the Executive is not receiving accident and health insurance coverage from another employer at the end of such eighteen month period, the Company shall pay the Executive a lump sum amount equal to six times the monthly COBRA health benefit continuation premium for the Executive's coverage under the Company's accident and health insurance coverage. Benefits otherwise receivable by the Executive pursuant to this Section 6.1(B) shall be reduced to the extent benefits of the same type are received by or made available to the Executive by another employer of the Executive during the twenty four (24) month period following the Executive's termination of employment (and any such benefits received by or made available to the Executive shall be reported to the Company by the Executive); provided, however, that the Company shall reimburse the Executive for the excess, if any, of the cost of such benefits to the Executive over such cost immediately prior to the Date of Termination or, if more favorable to the Executive, the first occurrence of an event or circumstance constituting Good Reason.

(C)      For purposes of COBRA health benefit continuation under section 4980B of the Code, the cessation of benefits pursuant to Section 6.1(B) shall be treated as though such cessation is the "qualifying event" under section 4980B(f)(3) of the Code for purposes of determining the period of coverage.

(D)      The Company shall pay to the Executive a lump sum amount equal to one hundred thousand dollars ($100,000).  Such amount shall be paid in the month following the Date of Termination.

(E)      The Company shall, at its sole expense as incurred, provide Executive with "key executive level" outplacement services for the period ending on December 31 of the second calendar year following the Termination Date at a cost of no more than fifteen percent (15%) of the sum of (i) Base Salary and (ii) the Bonus Percentage multiplied by Base Salary.

6.2      (A)      Whether or not the Executive becomes entitled to the Severance Payments, if any of the payments or benefits received or to be received by the Executive in connection with a Change in Control or the Executive's termination of employment (whether pursuant to the terms of this Agreement or any other plan, arrangement or agreement with the Company, any Person whose actions result in a Change in Control or any Person affiliated with the Company or such Person) (all such payments and benefits, excluding the Gross-Up Payment, being hereinafter referred to as the "Total Payments") will be subject to the Excise Tax, the Company shall pay to the Executive an additional amount (the "Gross-Up Payment") such that the net amount retained by the Executive, after deduction of any Excise Tax on the Total Payments and any federal, state and local income and employment taxes and any penalties, interest or fees incurred by the Executive as a result of any payment under Section 6.2 being made later than five business days prior to the due date of the excise tax with respect to which it is paid and any Excise Tax upon the Gross-Up Payment, shall be equal to the Total Payments.

(B)      For purposes of determining whether any of the Total Payments will be subject to the Excise Tax and the amount of such Excise Tax, (i) all of the Total Payments shall be treated as "parachute payments" (within the meaning of section 280G(b)(2) of the Code) unless, in the opinion of tax counsel ("Tax Counsel") reasonably acceptable to the Executive and selected by the accounting firm which was, immediately prior to the Change in Control, the

19____DeltaView comparison of pcdocs://chisr01a/688058/3 and pcdocs://chisr01a/688058/7. Performed on 10/29/2009.

Company's independent auditor (the "Auditor"), such payments or benefits (in whole or in part) do not constitute parachute payments, including by reason of section 280G(b)(4)(A) of the Code, (ii) all "excess parachute payments" within the meaning of section 280G(b)(l) of the Code shall be treated as subject to the Excise Tax unless, in the opinion of Tax Counsel, such excess parachute payments (in whole or in part) represent reasonable compensation for services actually rendered (within the meaning of section 280G(b)(4)(B) of the Code) in excess of the Base Amount allocable to such reasonable compensation, or are otherwise not subject to the Excise Tax, and (iii) the value of any noncash benefits or any deferred payment or benefit shall be determined by the Auditor in accordance with the principles of sections 280G(d)(3) and (4) of the Code.  For purposes of determining the amount of the Gross-Up Payment, the Executive shall be deemed to pay federal income tax at the highest marginal rate of federal income taxation in the calendar year in which the Gross-Up Payment is to be made and state and local income taxes at the highest marginal rate of taxation in the state and locality of the Executive's residence or the Executive's place of business, whichever is higher, on the Date of Termination (or if there is not yet a Date of Termination, then the date on which the Gross-Up Payment is calculated for purposes of this Section 6.2), net of the maximum reduction in federal income taxes which could be obtained from deduction of such state and local taxes.

(C)     In the event that the Excise Tax is finally determined to be less than the amount taken into account hereunder in calculating the Gross-Up Payment, the Executive shall repay to the Company, within five (5) business days following the time that the amount of such reduction in the Excise Tax is finally determined, the portion of the Gross-Up Payment attributable to such reduction (including that portion of the Gross-Up Payment attributable to the Excise Tax and federal, state and local income and employment taxes imposed on the Gross-Up Payment being repaid by the Executive), to the extent that such repayment results in a reduction in the Excise Tax and a dollar-for-dollar reduction in the Executive's taxable income and wages for purposes of federal, state and local income and employment taxes, plus interest on the amount of such repayment at 120% of the rate provided in section 1274(b)(2)(B) of the Code. Notwithstanding the foregoing, in the event any portion of the amount to be repaid to the Company has been paid to any tax authority, repayment thereof shall not be required until actual refund or credit of such portion has been made to Executive, and interest payable to the Company shall not exceed the interest received or credited to Executive by such tax authority. In the event that the Excise Tax is determined to exceed the amount taken into account hereunder in calculating the Gross-Up Payment (including by reason of any payment the existence or amount of which cannot be determined at the time of the Gross-Up Payment), the Company shall make an additional Gross-Up Payment in respect of such excess (including any interest, penalties or additions payable by the Executive with respect to such excess and the Gross-Up Payment attributable to the Excise Tax and federal, state, and local income and employment taxes imposed on the Gross-Up Payment being made to the Executive) within five (5) business days following the time that the amount of such excess is finally determined.  The Executive and the Company shall each reasonably cooperate with the other in connection with any administrative or judicial proceedings concerning the existence or amount of liability for Excise Tax with respect to the Total Payments.

6.3  The payments provided in subsections (A), of Section 6.1 hereof and in Section 6.2 hereof shall be made not later than the fifth day following the Date of Termination (or if

20⸺DeltaView comparison of pcdocs://chisr01a/688058/3 and pcdocs://chisr01a/688058/7. Performed on 10/29/2009.

there is no Date of Termination, then the date on which the Gross-up Payment is calculated for purposes of Section 6.2 hereof); provided, however, that if the amounts of such payments cannot be finally determined on or before such day, the Company shall pay to the Executive on such day an estimate, as determined in good faith by the Company or, in the case of payments under Section 6.2 hereof, in accordance with Section 6.2 hereof, of the minimum amount of such payments to which the Executive is clearly entitled and shall pay the remainder of such payments (together with interest on the unpaid remainder (or on all such payments to the extent the Company fails to make such payments when due) at 120% of the rate provided in section 1274(b)(2)(B) of the Code) as soon as the amount thereof can be determined but in no event later than the thirtieth (30th) day after the Date of Termination.  In the event that the amount of the estimated payments exceeds the amount subsequently determined to have been due, such excess shall constitute a loan by the Company to the Executive, payable on the fifth (5th) business day after demand by the Company (together with interest at 120% of the rate provided in section 1274(b)(2)(B) of the Code).

6.4  The Company also shall pay to the Executive all legal fees and expenses incurred by the Executive in disputing in good faith any issue hereunder relating to the termination of the Executive's employment, in seeking in good faith to obtain or enforce any benefit or right provided by this Agreement or in connection with any tax audit or proceeding to the extent attributable to the application of section 4999 of the Code to any payment or benefit provided hereunder.  Such payments shall be made within five (5) business days after delivery of the Executive's written requests for payment accompanied with such evidence of fees and expenses incurred as the Company reasonably may require (but in no event after the last day of the calendar year following the calendar year in which the expense is incurred).

7.  Termination Procedures and Compensation During Dispute.

7.1  Notice of Termination.  After a Change in Control and during the Term, any purported termination of the Executive's employment (other than by reason of death) shall be communicated by written Notice of Termination from one party hereto to the other party hereto in accordance with Section 10 of the Employment Agreement.  For purposes of this Agreement, a "Notice of Termination" shall mean a notice which shall indicate the specific termination provision in this Agreement relied upon and shall set forth in reasonable detail the facts and circumstances claimed to provide a basis for termination of the Executive's employment under the provision so indicated.  Further, a Notice of Termination for Cause is required to include a copy of a resolution duly adopted by the affirmative vote of not less than three-quarters (3/4) of the entire membership of the Board at a meeting of the Board which was called and held for the purpose of considering such termination (after reasonable notice to the Executive and an opportunity for the Executive, together with the Executive's counsel, to be heard before the Board) finding that, in the good faith opinion of the Board, the Executive was guilty of conduct set forth in clause (i) or (ii) of the definition of Cause herein, and specifying the particulars thereof in detail.

7.2  Date of Termination.  "Date of Termination," with respect to any purported termination of the Executive's employment after a Change in Control and during the Term, shall mean (i) if the Executive's employment is terminated for Disability, thirty (30) days after Notice

21_____DeltaView comparison of pcdocs://chisr01a/688058/3 and pcdocs://chisr01a/688058/7. Performed on 10/29/2009.

of Termination is given (provided that the Executive shall not have returned to the full-time performance of the Executive's duties during such thirty (30) day period), and (ii) if the Executive's employment is terminated for any other reason, the date specified in the Notice of Termination (which, in the case of a termination by the Company (except in the case of a termination for Cause) and, in the case of a termination by the Executive, shall not be less than thirty (30) days from the date such Notice of Termination is given).

7.3    Dispute Concerning Termination.    If within fifteen (15) days after any Notice of Termination is given, or, if later, prior to the Date of Termination (as determined without regard to this Section 7.3), the party receiving such Notice of Termination notifies the other party that a dispute exists concerning the termination, the Date of Termination shall be extended until the earlier of (i) the date prior to the date on which the Term ends or (ii) the date on which the dispute is finally resolved, either by mutual written agreement of the parties or by a final judgment, order or decree of an arbitrator or a court of competent jurisdiction (which is not appealable or with respect to which the time for appeal therefrom has expired and no appeal has been perfected); provided, however, that the Date of Termination shall be extended by a notice of dispute only if such notice is given in good faith and the party providing notice pursues the resolution of such dispute with reasonable diligence.

7.4    [intentionally blank]

8.    No Mitigation.    The Company agrees that, if the Executive's employment with the Company terminates during the Term, the Executive is not required to seek other employment or to attempt in any way to reduce any amounts payable to the Executive by the Company pursuant to this Agreement.    Further, the amount of any payment or benefit provided for in this Agreement (other than Section 6.1(B) hereof) shall not be reduced by any compensation earned by the Executive as the result of employment by another employer, by retirement benefits, by offset against any amount claimed to be owed by the Executive to the Company, or otherwise.

9.    Successors; Binding Agreement.

9.1    This Agreement shall inure to the benefit of and be binding upon the Company and its successors and assigns.    In addition to any obligations imposed by law upon any successor to the Company, the Company will require any successor (whether direct or indirect, by purchase, merger, consolidation or otherwise) to all or substantially all of the business and/or assets of the Company to expressly assume and agree in writing to perform this Agreement in the same manner and to the same extent that the Company would be required to perform it if no such succession had taken place.    The Company will require any ultimate parent entity, as defined in 16 C.F.R. 8801,1(a)(3), of any Person who acquires 90% of the outstanding shares of common stock of the Company or the outstanding voting securities of the Company entitled to vote generally in the election of directors (including through a merger in which the Company does not survive or as a result of which the Company becomes a subsidiary of another Person or a consolidation involving the Company and another Person) to assume and agree in writing to perform as a joint and several obligor of the Company (including any successor to the Company), this Agreement in the same manner and to the same extent as the Company.    Failure of the Company to obtain such assumption and agreement in writing from a successor or its

22____DeltaView comparison of pcdocs://chisr01a/688058/3 and pcdocs://chisr01a/688058/7. Performed on 10/29/2009.

parent as described in the preceding sentences after notice and a reasonable cure period (not to exceed ten days from the date such notice is received) shall be a breach of this Agreement and shall entitle the Executive to compensation from the Company in the same amount and on the same terms as the Executive would be entitled to hereunder if the Executive were to terminate the Executive's employment for Good Reason after a Change in Control, except that, for purposes of implementing the foregoing, the date on which any such succession becomes effective shall be deemed the Date of Termination.

9.2    This Agreement shall inure to the benefit of and be enforceable by the Executive's personal or legal representatives, executors, administrators, successors, heirs, distributees, devisees and legatees.  If the Executive shall die while any amount would still be payable to the Executive hereunder (other than amounts which, by their terms, terminate upon the death of the Executive) if the Executive had continued to live, all such amounts, unless otherwise provided herein, shall be paid in accordance with the terms of this Agreement to the executors, personal representatives or administrators of the Executive's estate.

10.    Insurance and Indemnification.  From and after a Change in Control, including after the termination of Executive's employment, the Company shall indemnify, defend and hold the Executive harmless from and against any and all expenses, liabilities, damages, costs, judgments, penalties, fines and amounts paid in settlement, incurred in good faith by Executive in connection with any proceeding involving Executive by reason of Executive's being or having been an officer, director, employee or agent of the Company (or any affiliate of the Company) to the fullest extent permitted by law, whether or not Executive is, or is threatened to be made, a party to any threatened, pending, or completed proceeding, and whether or not Executive is successful in such proceeding.  In addition, upon receipt from Executive of (i) a written request for an advancement of reasonable expenses which Executive reasonably believes will be subject to indemnification hereunder and (ii) a written undertaking by Executive to repay any such amounts if it shall ultimately be determined that the Executive is not entitled to indemnification under this Agreement or otherwise, the Company shall advance such expenses to Executive or pay such expenses for Executive, all in advance of the final disposition of any such matter.  From and after a Change in Control, including after the termination of Executive's employment hereunder, Executive shall have coverage under a director's and officer's liability insurance policy in amounts no less than, and on terms no less favorable than those, provided to senior executive officers of the Company from time to time.

11.    Definitions.  For purposes of this Agreement, the following terms shall have the meanings indicated below:

(A)    "Affiliate" shall have the meaning set forth in Rule 12b-2 promulgated under Section 12 of the Exchange Act.

(B)    "Agreement" shall mean this Attachment A to the Employment Agreement.

(B)    "Auditor" shall have the meaning set forth in Section 6.2 hereof.

23    DeltaView comparison of pcdocs://chisr01a/688058/3 and pcdocs://chisr01a/688058/7. Performed on 10/29/2009.

(C)  "Base Amount" shall have the meaning set forth in section 280G(b)(3) of the Code.

(D)  "Code" shall mean the Internal Revenue Code of 1986, as amended from time to time.

(E)  "Company" shall mean Hayes Lemmerz International, Inc. and, except in determining under Section 15(G) hereof whether or not any Change in Control of the Company has occurred, shall include any successor to its business and/or assets which assumes and agrees to perform this Agreement by operation of law, or otherwise.

(F)  "Excise Tax" shall mean any excise tax imposed under section 4999 of the Code or any similar state or local tax or any interest or penalties incurred by Executive with respect to such excise tax.

(G)  "Person" shall have the meaning given in Section 3(a)(9) of the Exchange Act, as modified and used in Sections 13(d) and 14(d) including a "group" within the meaning of Section 13(d)(3) thereof, except that such term shall not include (i) the Company or any of its subsidiaries, (ii) a trustee or other fiduciary holding securities under an employee benefit plan of the Company or any of its Affiliates, (iii) an underwriter temporarily holding securities pursuant to an offering of such securities, or (iv) a corporation owned, directly or indirectly, by the stockholders of the Company in substantially the same proportions as their ownership of stock of the Company.

(H)  "Retirement" shall be deemed the reason for the termination by the Executive of the Executive's employment if such employment is terminated in accordance with the Company's retirement policy, including early retirement, generally applicable to its salaried employees.

24_____DeltaView comparison of pcdocs://chisr01a/688058/3 and pcdocs://chisr01a/688058/7. Performed on 10/29/2009.

Document comparison done by DeltaView on Thursday, October 29, 2009 9:42:51 PM

| Input: | |
|---|---|
| Document 1 | pcdocs://chisr01a/688058/3 |
| Document 2 | pcdocs://chisr01a/688058/7 |
| Rendering set | Option 3a strikethrough double score no moves |

| Legend: | |
|---|---|
| Insertion | |
| Deletion | |
| <Moved from > | |
| >Moved to < | |
| Style change | |
| Format change | |
| Moved deletion | |
| Inserted cell | |
| Deleted cell | |
| Moved cell | |
| Split/Merged cell | |
| Padding cell | |

| Statistics: | |
|---|---|
| | Count |
| Insertions | 62 |
| Deletions | 48 |
| Moved from | 0 |
| Moved to | 0 |
| Style change | 0 |
| Format changed | 1 |
| Total changes | 111 |

25 ___ DeltaView comparison of pcdocs://chisr01a/688058/3 and pcdocs://chisr01a/688058/7. Performed on 10/29/2009.

**<u>Exhibit I</u>**

**Blackline - Modifications to Supplemental Executive Retirement Plan**

**PLAN EXHIBIT I**

## Modifications to the Supplemental Executive Retirement Plan

Section 6.7 of the Plan provides that the Debtors shall assume any remaining obligations under the ~~Supplemental~~Hayes Lemmerz International, Inc. Executive Retirement Plan, restated as of January 1, 2005 (the "SERP"), subject to any modifications required by the Requisite DIP Lenders~~.  The participants under the SERP and the Requisite DIP Lenders continue to negotiate any proposed modifications to the SERP.  The Debtors will amend this Exhibit or provide notice of any material revisions to the SERP prior to the Confirmation Hearing~~ and as identified on this Plan Exhibit I.  The following proposed modification of the SERP shall be effective immediately upon entry of the Confirmation Order without any further action by the Debtors or any other party, subject only to the occurrence of the Plan Effective Date:

> Notwithstanding anything contained in the SERP to the contrary (including, without limitation, Section 11.13 thereof), no transaction entered into, or other event occurring, pursuant to, as a result of, or in any way in connection with, the confirmation of the Plan shall constitute a "Change of Control" under and as defined in the SERP.

2    DeltaView comparison of pcdocs://nycsr01a/856548/1 and pcdocs://nycsr01a/856548/2. Performed on 10/29/2009.

Document comparison done by DeltaView on Thursday, October 29, 2009 9:12:31 AM

| Input: | |
|---|---|
| Document 1 | pcdocs://nycsr01a/856548/1 |
| Document 2 | pcdocs://nycsr01a/856548/2 |
| Rendering set | Option 3a strikethrough double score no moves |

| Legend: | |
|---|---|
| Insertion | |
| Deletion | |
| <Moved from > | |
| >Moved to < | |
| Style change | |
| Format change | |
| Moved deletion | |
| Inserted cell | |
| Deleted cell | |
| Moved cell | |
| Split/Merged cell | |
| Padding cell | |

| Statistics: | |
|---|---|
| | Count |
| Insertions | 4 |
| Deletions | 2 |
| Moved from | 0 |
| Moved to | 0 |
| Style change | 0 |
| Format changed | 0 |
| Total changes | 6 |

3      DeltaView comparison of pcdocs://nycsr01a/856548/1 and pcdocs://nycsr01a/856548/2. Performed on 10/29/2009.

# Exhibit J

## Blackline - Amended Schedule of Rejected Contracts and Leases

PLAN EXHIBIT J

**Hayes- Lemmerz International, Inc. et al**
**Amended Schedule of Rejected Contracts and Leases**
(additions to the exhibit are noted in bold)

| Counterparty | Description of Contract |
|---|---|
| AT&T | Dedicated Circuits & Voice |
| AT&T Wireless | Wireless Service |

| Brembo North America, IncCounterparty(ies) | Stock Purchase Agreement dated 11/9/07 Description of Contract(s) |
|---|---|
| Constellation New EnergyCorporate Fleet ServicesBrembo North America, Inc., Hayes Lemmerz International – Homer, Inc. Hayes Lemmerz International – Frenos S.A. de C.V. Brembo S.p.A.[1] | MarketGuard MasterStock Purchase Agreement by and among Brembo North America, Inc. and HLI Brakes Holding Company, Inc., dated as of November 9, 2007. |
| | Automobile and Truck LeasingTransition Services Agreement dated November 9, 2007, by and among Brembo North America, Inc. and its subsidiaries Hayes Lemmerz International – Homer, Inc. and Hayes Lemmerz International – Frenos S.A. de C.V. and HLI Operating Company, Inc. |
| Daniel D. Minor and Todd G. Carlson Hayes Lemmerz International – Equipment and Engineering, Inc. | Stock Purchase Agreement dated 6/30/05June 30, 2005, by and among Daniel D. Minor, Todd G. Carlson, Hayes Lemmerz International – Equipment and Engineering, Inc. and HLI Services Holding Company, Inc. |
| Diversified Machine, Inc.EpiUse, Hayes Lemmerz International – Bristol, Inc. Hayes Lemmerz International – Montague, Inc.[2] | Stock Purchase Agreement dated 2/14/07as of February 1, 2007, by and among Diversified Machine, Inc., HLI Operating Company, Inc. and HLI Suspension Holding Company. |
| | SAP Payroll - Application SupportTransition Services Agreement by and among Hayes Lemmerz International – Bristol, Inc., Hayes Lemmerz International – Montague, Inc., HLI Operating Company, Inc. and HLI Suspension Holding Company, Inc. |
| FitchHarvey Industries LLC Harvey Property Management LLC Spacer Industries, Inc. | RatingsAsset Purchase Agreement dated as of July 3, 2007 by and among Harvey Industries LLC, Harvey Property Management LLC, Spacer Industries, LLC, Hayes Lemmerz International – Wabash, Inc. and HLI Operating Company, Inc. |
| | Transition Services Agreement dated July 3, 2007 by and among |

[1]    The Debtors do not reject, and in accordance with section 7.1 of the Plan of Reorganization, intend to assume (i) Lease Agreement dated November 9, 2007 by and between HLI Operating Company, Inc. and Brembo North America, Inc. and (ii) First Addendum to Lease Agreement dated July 31, 2008 and any and all subsequent addenda thereto.

[2]    The Debtors do not reject, and in accordance with section 7.1 of the Plan of Reorganization, intend to assume Escrow Agreement by and among Diversified Machine, Inc., HLI Operating Company, Inc. and HLI Suspension Holding Company, Inc.

1        DeltaView comparison of pcdocs://chisr02a/775231/2 and pcdocs://chisr02a/775231/7. Performed on 10/29/2009.

| | |
|---|---|
| | Harvey Industries LLC and HLI Operating Company, Inc. |
| Harvey Industries LLC | Asset PurchaseEquipment Lease Agreement dated 7/3/072008 between Hayes Lemmerz International – Laredo, Inc. and Harvey Industries LLC |
| Harvey Industries LLC Hess Engineering | Lease Agreement – Equipment Gas supply agreement for Akron, OH facility |
| Integrity Interactive, Inc. | Service Agreement – Ethics/Training Coursesdated February 7, 2005 and all Renewal Agreements thereto between Integrity Interactive Corporation and Hayes Lemmerz International, Inc. |
| Minor Investments, LLCMoody's TRA Investments, LLC AWB Investments, LLC Whitebox Hedged High Yield/ Cadillac Cashing Acquisitions, LTD Hayes Lemmerz International – Cadillac, Inc.[3] | Stock Purchase Agreement dated 12/5/05December 5, 2005, between Minor Investments, LLC, TRA Investments, LLC, AWB Investments, LLC, Whitebox Hedged High Yield/Cadillac Casting Acquisition, Ltd., Hayes Lemmerz International – Cadillac, Inc. and HLI Suspension Holding Company, Inc. |
| | RatingsTransition Services Agreement dated December 5, 2005 by and among Hayes Lemmerz International – Cadillac, Inc. and HLI Operating Company, Inc. |
| OCE Imagistics, Inc. | Printer/plotter lease |
| Precision Partners Holding Company Hayes Lemmerz International – Mexico, Inc. Hayes Lemmerz International – Hub and Drum, Inc. Hayes Lemmerz Mexico, S.A. de C.V. | Stock Purchase Agreement dated 10/14/05 October 14, 2005, by and among Precision Partners Holding Company, HLI Operating Company, Inc., HLI Commercial Highway Holding Company, Inc. and Hayes Lemmerz International – Commercial Highway, Inc. |
| | Transition Services Agreement by and among Hayes Lemmerz International – Mexico, Inc., Hayes Lemmerz International – Hub and Drum, Inc., Hayes Lemmerz Mexico, S.A. de C.V and HLI Operating Company, Inc. |
| Rudeveca | Asset Purchase Agreement dallas warehouse |
| Shareholder.com | Subscriber Agreement dated November 29, 2008. |
| Standard & Poor's | Ratings Agreement |
| Hayes Brake Controller Company, LLC Syncro Corporation | Asset Purchase Agreement dated 10/17/05 brake controllerOctober 17, 2005 by and among Hayes Brake Controller Company, LLC and Hayes Lemmerz International – Commercial Highway, Inc. |
| TDS (Germany) | Remote Service Management (SAP) |
| Tetra Financial Group | Sale/Letter of intent for sale and leaseback of buildings and equipment, Sedalia, MO facility  1/21/2009dated January 21, 2009. |

[3]    The Debtors do not reject, and in accordance with section 7.1 of the Plan of Reorganization, intend to assume the Supply and Purchase Agreement dated December 5, 2005 by and between Hayes Lemmerz International – Southfield,  Inc., Hayes Lemmerz International – Montague, Inc., Hayes Lemmerz International – Wabash, Inc., Hayes Lemmerz International – Laredo, Inc. and Hayes Lemmerz International – Cadillac, Inc.

2       DeltaView comparison of pcdocs://chisr02a/775231/2 and pcdocs://chisr02a/775231/7. Performed on 10/29/2009.

| Tetra Financial Group | ~~Sale/~~Letter of intent for sale and leaseback of buildings and equipment, Sedalia, MO facility ~~2/9/2009~~dated February 9, 2009. |
|---|---|
| Thomson Financial, LLC | Client Agreement Number 00003963.0 and all addenda thereto. |

3    DeltaView comparison of pcdocs://chisr02a/775231/2 and pcdocs://chisr02a/775231/7. Performed on 10/29/2009.

Document comparison done by DeltaView on Thursday, October 29, 2009 5:05:27 PM

| Input: | |
|---|---|
| Document 1 | pcdocs://chisr02a/775231/2 |
| Document 2 | pcdocs://chisr02a/775231/7 |
| Rendering set | Option 3a strikethrough double score no moves |

| Legend: | |
|---|---|
| Insertion | |
| Deletion | |
| <Moved from > | |
| >Moved to < | |
| Style change | |
| Format change | |
| Moved deletion | |
| Inserted cell | |
| Deleted cell | |
| Moved cell | |
| Split/Merged cell | |
| Padding cell | |

| Statistics: | |
|---|---|
| | Count |
| Insertions | 52 |
| Deletions | 40 |
| Moved from | 0 |
| Moved to | 0 |
| Style change | 0 |
| Format changed | 4 |
| Total changes | 96 |

4　　　　DeltaView comparison of pcdocs://chisr02a/775231/2 and pcdocs://chisr02a/775231/7. Performed on 10/29/2009.

## <u>Exhibit L</u>

## Blackline - Amended Form of Warrants Agreement

**Blackline - Form of Series A & B Warrants Agreement**

HAYES LEMMERZ INTERNATIONAL, INC.

and

[BNY MELLON SHAREOWNERINVESTOR SERVICES] LLC,

as Warrant Agent

_____

WARRANT AGREEMENT

Dated as of _____, 2009

_____

Warrants to Purchase Common Stock, par value $[.01] per share

_____

**TABLE OF CONTENTS**

**Page**

ARTICLE I ISSUANCE OF WARRANTS AND EXECUTION AND DELIVERY OF
    WARRANT CERTIFICATES...........................................................................2

    Section 1.01        Issuance of Warrants..................................................................2
    Section 1.02        Execution and Delivery of Warrant Certificates. ..........................2
    Section 1.03        Issuance of Warrant Certificates..................................................3

ARTICLE II WARRANT PRICE, DURATION AND EXERCISE OF WARRANTS .............34

    Section 2.01        Exercise Price. ........................................................................34

    Section 2.02        Duration of Warrants. ................................................................4
    Section 2.03        Exercise of Warrants...................................................................4
    Section 2.04        Reservation of Warrant Shares ...................................................9

ARTICLE III OTHER PROVISIONS RELATING TO RIGHTS OF HOLDERS OF
    WARRANT ...........................................................................................910

    Section 3.01        No Rights as Stockholder Conferred by Warrants or  ....................
                        Warrant Certificates................................................................9 10
    Section 3.02        Lost, Mutilated, Stolen or Destroyed Warrant Certificates........9 10
    Section 3.03        General Information to be Provided by the Company. ................10
    Section 3.04        Notice of Certain Events .......................................................1011

ARTICLE IV EXCHANGE AND TRANSFER ..................................................1011

    Section 4.01        Exchange and Transfer.........................................................10 11
    Section 4.02        Restrictions on Transfer; Restrictive Legend ..........................1112
    Section 4.03        Treatment of Holders of Warrant Certificates..........................1314
    Section 4.04        Cancellation of Warrant Certificates......................................1314

ARTICLE V ADJUSTMENT OF WARRANT PRICE AND NUMBER OF WARRANT
    SECURITIES ........................................................................................1314

    Section 5.01        Adjustments Generally.........................................................13 14
    Section 5.02        Stock Dividends; Split-Ups...................................................14
    Section 5.03        Aggregation of Shares..........................................................14
    Section 5.04        Adjustments in Exercise Price................................................14 15
    Section 5.05        Replacement of Securities upon Reorganization...................14 15
    Section 5.06        Notices of Changes in Warrant..............................................15
    Section 5.07        No Fractional Shares.............................................................15 16

Section 5.08      Form of Warrant ........................................... ~~15~~ 16
Section 5.09      Extraordinary Transactions .......................... ~~15~~ 16
Section 5.10      De Minimis Adjustments .............................. ~~15~~ 16

ARTICLE VI CONCERNING THE WARRANT AGENT ........................................ 16

Section 6.01      Warrant Agent ................................................ 16
Section 6.02      Conditions of Warrant Agent's Obligations ..................... ~~16~~ 17
Section 6.03      Resignation and Appointment of Successor ................... ~~18~~19

ARTICLE VII REGISTRATION RIGHTS ............................................... ~~19~~21

Section 7.01      S-3 Registration ............................................ ~~19~~ 21
Section 7.02      Piggyback Registration ................................... ~~19~~ 21
Section 7.03      Registration Procedures ................................. ~~20~~ 22
Section 7.04      Holder Obligations ....................................... ~~23~~ 25
Section 7.05      Registration Expenses .................................. ~~24~~ 26
Section 7.06      Limitations on Subsequent Registration Rights ............ 27

ARTICLE VIII MISCELLANEOUS ................................................... ~~25~~27

Section 8.01      Amendment .............................................. ~~25~~ 27
Section 8.02      Notices and Demands to the Company and Warrant Agent ..... ~~25~~ 27
Section 8.03      Addresses ............................................... ~~25~~ 27
Section 8.04      Applicable Law ......................................... ~~25~~ 28
Section 8.05      Obtaining of Governmental Approval ..................... ~~25~~ 28
Section 8.06      Persons Having Rights Under Warrant Agreement .......... ~~26~~ 28
Section 8.07      Headings ................................................ ~~26~~ 28
Section 8.08      Counterparts ............................................ ~~26~~ 28
Section 8.09      Inspection of Agreement ................................ ~~26~~ 28
Section 8.10      Notices to Holders of Warrants ......................... ~~26~~ 28

Section 8.11      Binding Effects ......................................... 28
Section 8.12      Severability ............................................ 29

WARRANT AGREEMENT

THIS AGREEMENT dated as of _____, 2009 (the "Effective Date") between HAYES LEMMERZ INTERNATIONAL, INC., a Delaware corporation (the "Company"), and [BNY MELLON SHAREOWNER SERVICES], a [_____] duly incorporated and existing under the laws of [_____]INVESTOR SERVICES LLC, a New Jersey limited liability company, as Warrant Agent (the "Warrant Agent").

W I T N E S S E T H :

WHEREAS, on May 11, 2009, the Company and certain of the Company's direct and indirect subsidiaries each filed a voluntary petition in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") initiating cases under chapter 11 of title 11 of the United States Code §§ 101-1330 and continued in the possession of their assets and in the management of their businesses pursuant to sections 1107 and 1108 of the Bankruptcy Code; and

WHEREAS, the [Plan of Reorganization of [Hayes Lemmerz International, Inc., et al.], as confirmed on [_____], 2009 by an order of the Bankruptcy Court entered on [_____], 2009 (the "Plan"), provides that the Company shall issue to certain holders of the 8.25 % Senior Notes due 2015 of Hayes Lemmerz Finance LLC – Luxembourg S.C.A. (the "Noteholders") and to the Pension Benefit Guaranty Corporation (together with the Noteholders, the "Holders") Series A Warrants of the Company (the "Series A Warrants" or the "Warrants"), entitling the Holders to purchase shares (the "Warrant Shares") of the Company's Class A Common Stock, par value $[0.01] per share (the "Common Stock"); and

WHEREAS, the Plan provides that the Company shall also issue to the Holders Series B Warrants of the Company (the "Series B Warrants"), entitling the Holders to purchase shares of the Common Stock; and

WHEREAS, the Company desires the Warrant Agent to act on behalf of the Company in connection with the issuance, transfer, exchange, exercise and replacement of the certificates representing the Warrant Shares (the "Warrant Certificates"), and in this Agreement wishes to set forth, among other things, the form and provisions of the Warrant Certificates and the terms and conditions on which they may be issued, transferred, exchanged, exercised and replaced;

NOW, THEREFORE, in consideration of the premises and of the mutual agreements herein contained, the parties hereto agree as follows:

## ARTICLE I
## ISSUANCE OF WARRANTS AND EXECUTION AND DELIVERY OF WARRANT CERTIFICATES

Section 1.01   Issuance of Warrants.  The Warrants shall be evidenced by one or more Warrant Certificates.  Each Warrant evidenced thereby shall represent the right, subject to the provisions contained herein and therein, to purchase one share of the Warrant Shares.  The Company, on the date hereof shall deliver to each Holder duly executed Warrant Certificates registered in the name of each Holder for the number of Warrant Shares required pursuant to the Plan.  Upon exercise for cash, the Warrants shall initially entitle the Holders of such Warrants to 555,555 shares of Common Stock, as such amount may be adjusted from time to time pursuant to this Agreement.

Section 1.02   Execution and Delivery of Warrant Certificates.

(a)   Each Warrant, shall be evidenced by a Warrant Certificate in registered form substantially in the form set forth in Exhibit A hereto, shall be dated and may have such letters, numbers or other marks of identification or designation and such legends or endorsements printed, lithographed or engraved thereon as the officers of the Company executing the same may approve (execution thereof to be conclusive evidence of such approval) and as are not inconsistent with the provisions of this Agreement, or as may be required to comply with any law or with any rule or regulation made pursuant thereto.  The Warrant Certificates shall be signed on behalf of the Company by its chairman or vice chairman of the Board of Directors of the Company (the "Board of Directors"), the chief financial officer, the president, any vice president, any assistant vice president, the treasurer or any assistant treasurer of the Company, which may but need not be attested by its secretary or one of its assistant secretaries.  Such signatures may be manual or facsimile signatures of such authorized officers and may be imprinted or otherwise reproduced on the Warrant Certificates.  The Warrant Certificates shall be subject to all of the terms and conditions of the Warrant Agreement, which terms and conditions shall be incorporated therein by reference and made a part thereof.  Notwithstanding anything contained herein to the contrary, if any terms or conditions of the Warrant Certificates shall be found to conflict with any terms or conditions of the Warrant Agreement, the Warrant Agreement shall control.

(b)   No Warrant Certificate shall be valid for any purpose, and no Warrant evidenced thereby shall be exercisable, until such Warrant Certificate has been countersigned by the Warrant Agent by manual or facsimile signature.  Such signature by the Warrant Agent upon any Warrant Certificate executed by the Company shall be conclusive evidence, and the only evidence, that the Warrant Certificate so countersigned has been duly issued hereunder.

(c)   In case any officer of the Company who shall have signed any of the Warrant Certificates either manually or by facsimile signature shall cease to be such officer before the Warrant Certificates so signed shall have been countersigned and delivered by the Warrant Agent as provided herein, such Warrant Certificates may be countersigned and delivered notwithstanding that the person who signed such Warrant Certificates ceased to be such officer of the Company; and any Warrant Certificate may be signed on behalf of the Company by such persons as, at the actual date of the execution of such Warrant Certificate, shall be the proper

officers of the Company, although at the date of the execution of this Agreement any such person was not such officer.

(d)     The term "Holder," when used with respect to any Warrant Certificate, shall mean any person in whose name at the time such Warrant Certificate shall be registered upon the books to be maintained by the Warrant Agent for that purpose.

Section 1.03   Issuance of Warrant Certificates.

(a)     Warrant Certificates evidencing the right to purchase the Warrant Shares (except as provided in Sections 2.03, 3.02 and 4.01) may be executed by the Company and delivered to the Warrant Agent upon the execution of this Warrant Agreement.  The Warrant Agent shall, upon receipt of a written order of the Company, Warrant Certificates duly executed on behalf of the Company and all other information reasonably requested by the Warrant Agent, countersign Warrant Certificates evidencing Warrants representing the right to purchase Warrant Shares and shall deliver such Warrant Certificates to or upon the order of the Company.  Subsequent to such original issuance of the Warrant Certificates, the Warrant Agent shall countersign a Warrant Certificate only if the Warrant Certificate is issued in exchange or substitution for one or more previously countersigned Warrant Certificates or in connection with their transfer as hereinafter provided.

(b)     Pending the preparation of definitive Warrant Certificates evidencing Warrants, the Company may execute and the Warrant Agent, upon receipt of a written order of the Company and all other information reasonably requested by the Warrant Agent, shall countersign and deliver temporary Warrant Certificates evidencing such Warrants (printed, lithographed, typewritten or otherwise produced, in each case in form satisfactory to the Warrant Agent).  Such temporary Warrant Certificates shall be issuable substantially in the form of the definitive Warrant Certificates but with such omissions, insertions and variations as may be appropriate for temporary Warrant Certificates, all as may be determined by the Company with the concurrence of the Warrant Agent.  Such temporary Warrant Certificates may contain such reference to any provisions of this Warrant Agreement as may be appropriate.  Every such temporary Warrant Certificate shall be executed by the Company and shall be countersigned by the Warrant Agent upon the same conditions and in substantially the same manner, and with like effect, as the definitive Warrant Certificates.  Without unreasonable delay, the Company shall execute and shall furnish definitive Warrant Certificates and thereupon such temporary Warrant Certificates may be surrendered in exchange therefor without charge pursuant to and subject to the provisions of Section 4.01, and the Warrant Agent shall countersign and deliver in exchange for such temporary Warrant Certificates definitive Warrant Certificates of authorized denominations evidencing a like aggregate number of Warrants evidenced by such temporary Warrant Certificates.  Until so exchanged, such temporary Warrant Certificates shall be entitled to the same benefits under this Warrant Agreement as definitive Warrant Certificates.

3       DeltaView comparison of pcdocs://wilsr01a/592246/9 and pcdocs://wilsr01a/592246/18. Performed on 10/27/2009.

## ARTICLE II
## WARRANT PRICE, DURATION AND EXERCISE OF WARRANTS

Section 2.01    Exercise Price.  The initial exercise price for each Warrant shall be $[   ] (the "Exercise Price"), subject to adjustment as provided herein.[1]

Section 2.02    Duration of Warrants.  Subject to the provisions of this Agreement, each Warrant may be exercised in whole or in part at any time prior to the Expiration Date, as specifieddefined herein, on any day other than a Saturday, Sunday or a day on which banking institutions in the State of New York and New Jersey are authorized or obligated by law or executive order to close (a "Business Day") prior to 5:00 p.m. New York City time, at the offices of the Warrant Agent at _____designated for such purpose (the "Warrant Agent Office") on _____, 2016; *provided however, that* any Warrants not exercised in connection with a Sale Transaction (as defined below) in which the holders of Common Stock receive only cash consideration, shall automatically expire upon consummation of such Sale Transaction (in either case, such date and such time, the "Expiration Date"); *provided further, that* for the avoidance of doubt, the foregoing provision shall not affect a Holder's entitlement to replacement securities pursuant to Section 5.05 hereof.  Each Warrant not exercised at or before the Expiration Date shall become void, and all rights of the Holder and any beneficial owners of the Warrant Certificate evidencing such Warrant under this Agreement shall cease.  The Company shall promptly notify the Warrant Agent in writing upon the occurrence of the Expiration Date and, if such notification is given orally, the Company shall confirm same in writing on or prior to the Business Day next following.  Until such notice is received by the Warrant Agent, the Warrant Agent may presume conclusively for all purposes that the Expiration Date has not occurred.

Section 2.03    Exercise of Warrants.

(a)    Warrants may be exercised, at the option of the Holder, in whole or in part, at any time or from time to time, by presentation of the Warrant Certificate duly executed and properly completed and simultaneous payment of the Exercise Price to the Company.  Payment of the Exercise Price shall be made, (i) by certified or official bank check payable to the Company, or

---

[1]  The respective Exercise Prices of the Series A Warrants and Series B Warrants shall be determined by (a) (i) subtracting from the below-referenced aggregate enterprise values, the Company's term debt as of the Plan Effective Date (excluding borrowings under any revolving credit or receivables financing facilities) and (ii) adding back to the below-referenced aggregate enterprise values the Company's cash on hand as of the Plan Effective Date (provided that for purposes of determining the Exercise Price, cash on hand shall not include "trapped cash" as of the Plan Effective Date, as determined by the Company on a basis consistent with past practice, or cash collateralizing letters of credit or guarantees outstanding as of the Plan Effective Date), and (b) dividing the resulting amount by (i) the sum of the number of shares of Common Stock outstanding on the Plan Effective Date, and (ii) in the case of the Series A Warrants, all Warrant Shares to be issued upon exercise of all Series A Warrants, and, in the case of the Series B Warrants, all Warrant Shares to be issued upon exercise of all Warrants.  The Exercise Price for the Series A Warrants shall be equivalent to the per share price of the Common Stock on the Plan Effective Date, assuming the Company had on the Plan Effective Date an aggregate enterprise value of $350 million and the Exercise Price for the Series B Warrants shall be equivalent to the per share price of the Common Stock on the Plan Effective Date, assuming the Company had on the Plan Effective Date an aggregate enterprise value of $375 million.

4        DeltaView comparison of pcdocs://wilsr01a/592246/9 and pcdocs://wilsr01a/592246/18. Performed on 10/27/2009.

by wire transfer in immediately available funds, in the amount of the aggregate Exercise Price for such Warrant Shares or (ii) if exercising in connection with a Triggering Event (as defined below) or at anytime on or after the expiration of all lock-up periods imposed by the underwriters of a firm commitment underwritten public offering of shares of the Common Stock of the Company (an "IPO"), by Cashless Exercise (as defined and in the manner described below in Section 2.03(c)). The Company shall give or cause to be given written notice to the Warrant Agent, in the manner set forth in Section 8.03, and to each Holder, by press release or at the last address set forth for such Holder in the register books of the Warrant Agent, of an IPO or any Triggering Event; provided that such notice of any Triggering Event shall be given to the Holders not less than thirty (30) days prior to any such Triggering Event.  Failure to give such notice, or any defect therein, shall not affect the legality or validity of such event.  As used herein, a "Triggering Event" shall mean: (i) immediately prior to the consummation of a Sale Transaction pursuant to which the Holders of the Warrants have the opportunity to exchange all of their Warrant Shares for cash and/or readily marketable securities and (ii) upon receipt from the Company of a notice regarding completion of a Company Valuation (as defined below) and a "Sale Transaction" shall mean: (i) a merger, consolidation, or other similar transaction or series of transactions to which the Company is a party and pursuant to which (a) the Company is not the surviving person in such transaction or (b) if the Company is the surviving person, the holders of shares of Common Stock immediately prior to such transaction (including for this purpose the shares issuable upon exercise of the Warrants and shares of Common Stock to be issued or reserved for issuance under any management incentive plan of the Company (the "Management Incentive Shares")) represent less than 50% of the shares of Common Stock outstanding immediately following such transaction (including for this purpose the shares issuable upon exercise of the Series A Warrants and Series B Warrants and the Management Incentive Shares), (ii) the sale or other disposition of all or substantially all of the assets of the Company and its subsidiaries, taken as a whole, (iii) a sale, other disposition or issuance, in a single transaction or series of related transactions, of 35% or more of the then outstanding shares of Common Stock, and (iv) any other transaction in which holders of Common Stock have "drag along" rights pursuant to and to the extent provided in that certain Stockholders Agreement entered into on the date hereof among the Company and its stockholders (as may be amended, the "Stockholders Agreement").

(b)     In the event that a Triggering Event or an IPO has not occurred prior to the 90th day prior to the Expiration Date (the "Valuation Date"), the Board of Directors shall as promptly as practicable thereafter select, and provide notice to the holders of the Series A Warrants and Series B Warrants of such selection (the "Appraisal Notice"), of a qualified nationally recognized independent investment banking firm that has not provided any material services to the Company within the twenty four (24) month period prior to the Valuation Date (as selected pursuant to this Section 2.03(b), an "Independent Appraiser") to determine the aggregate enterprise value of the Company as of the Valuation Date, together with the per share value of the Common Stock calculated based upon the aggregate enterprise value of the Company as of the Valuation Date without regard to marketability or other similar liquidity discounts (a "Company Valuation").  The Company's selection of an Independent Appraiser set forth in the Appraisal Notice shall be deemed to be acceptable to the holders of the Series A Warrants and Series B Warrants, if the Company has not, within ten (10) days from the date the Company delivered the Appraisal Notice to the holders of the Series A Warrants and Series B Warrants, received written notice from holders of not less than a majority of the Series A Warrants and Series B Warrants taken together (the "Requisite Holders"), indicating the Requisite Holders' reasonable opposition

5      DeltaView comparison of pcdocs://wilsr01a/592246/9 and pcdocs://wilsr01a/592246/18. Performed on 10/27/2009.

to the Company's choice of Independent Appraiser and the basis of such opposition, together with the names of three (3) alternate Independent Appraisers (each, an "Alternate Appraiser") which are acceptable to the Requisite Holders (an "Opposition Notice").  If the Company timely receives from the Requisite Holders an Opposition Notice, it shall be entitled, in its sole discretion, to choose any of the Alternate Appraisers to perform the Company Valuation; provided, that if none of the Alternate Appraisers are reasonably acceptable to the Company, the Company shall so notify the Requisite Holders and the Company and the Requisite Holders shall each choose one Independent Appraiser, which shall, within five (5) days of their selection, jointly select a third Independent Appraiser not previously selected by the Company or the Requisite Holders to perform the Company Valuation.  The selection of the Independent Appraiser pursuant to the provisions of this Section 2.03(b) shall be binding on the Company and the Requisite Holders.  The Company shall notify the Holders of the result of the Company Valuation not later than the 30th day prior to the Expiration Date, together with the Current Market Price (as defined below) of the Common Stock, which shall be final and binding on the Company and the Requisite Holders.

(c)     In lieu of paying the aggregate Exercise Price under the conditions specified in Section 2.03(a), each Warrant shall entitle the Holder, at the election of such Holder, to exercise the Warrant by authorizing the Company to withhold from issuance a number of Warrant Shares issuable upon exercise of the Warrant which when multiplied by the Current Market Price of the Common Stock is equal to the aggregate Exercise Price of all Warrants being exercised, and such withheld Warrant Shares shall no longer be issuable under the Warrant (a "Cashless Exercise").  The formula for determining the number of Warrant Shares to be issued in a Cashless Exercise is as follows:

$$X = \frac{(A-B) \times C}{A}$$

where:

$X$ = the number of Warrant Shares issuable upon exercise of the Warrant pursuant to this subsection (c).

$A$ = the Current Market Price of the Common Stock on the Business Day immediately preceding the date on which the Holder delivers the Warrant and pursuant to subsection (e) below.

$B$ = the Exercise Price.

$C$ = the number of Warrant Shares as to which a Warrant is then being exercised including the withheld Warrant Shares.

If the foregoing calculation results in a negative number, then no Warrant Shares shall be issuable via a Cashless Exercise.

6     DeltaView comparison of pcdocs://wilsr01a/592246/9 and pcdocs://wilsr01a/592246/18. Performed on 10/27/2009.

(d)    For purposes of this Section 2.03, the "Current Market Price" shall equal, in the event the Warrants are exercised (a) following an IPO pursuant to which the shares of Common Stock are listed or admitted to trading on the New York Stock Exchange or the Nasdaq Stock Market (each, a "National Exchange"), the average closing price as reported on such National Exchange of the Common Stock for the ten (10) consecutive trading days immediately prior to the exercise of the Warrant or, if not listed or admitted to trading on a National Exchange, the volume-weighted average of the closing bid and asked prices of the Common Stock in the over-the-counter market during the ten (10) consecutive trading days immediately prior to the exercise of the Warrant; (b) in connection with a Sale Transaction, the per share fair market value of the consideration being paid by the third party in connection with such Sale Transaction or (c) in connection with a Company Valuation, the per share equity value of the Common Stock, as determined by the Independent Appraiser pursuant to Section 2.03(b).  The fair market value of the per share consideration to be paid by the third party in a Sale Transaction shall be determined by adding (i) the per share cash consideration, (ii) for consideration in the form of publicly traded securities, if the per share valuation of such securities is not otherwise set forth in the definitive agreement entered into in connection with such Sale Transaction, the average closing price for the ten (10) consecutive trading days ending on the second (2nd) Business Day prior to the Sale Transaction, and (iii) the per share fair market value of consideration in the form of any other securities or assets as determined in good faith by the Board of Directors of the Company.

(e)    The date on which payment in full of the Exercise Price is received by the Warrant Agent or deemed to be received in the case of a Cashless Exercise shall, subject to receipt of the Warrant Certificate as aforesaid, be deemed to be the date on which the Warrant is exercised.  The Warrant Agent shall promptly deposit all funds received by it in payment for the exercise of Warrants in an account of the Company maintained with it (or in such other account as may be designated by the Company) and shall promptly advise the Company, by telephone or by facsimile transmission or other form of electronic communication available to both parties, at the end of each day on which when a payment for the exercise of Warrants is received ofand the amount so deposited to its account.  The Warrant Agent shall promptly confirm such advice to the Company in writing.  Notwithstanding anything in this Agreement to the contrary, the Warrant Agent shall have no duty or obligation to determine, investigate or confirm the sufficiency of any payment received by it or the determination by the Company as to the Exercise Price or the number of Warrant Shares to be issued upon an exercise of such Warrants.

(f)    Upon such surrender of a Warrant Certificate and, payment of the Exercise Price, or the deemed payment of the Exercise Price in connection with a Cashless Exercise, and a written order of the Company, the Warrant Agent shall requisition from the transfer agent for the Common Stock (the "Transfer Agent") for issuance and delivery to or upon the written order of the Holder of such Warrant Certificate and in such name or names as the Holder may designate, a certificate or certificates for the Warrant Shares issuable upon the exercise of the Warrant or Warrants evidenced by such Warrant Certificate, less any Warrant Shares withheld in connection with a Cashless Exercise.  Upon receipt thereof, the Company shall, as promptly as practicable, and in any event within three (3) Business Days thereafter, cause to be issued to the Holder the aggregate number of whole Warrant Shares issuable upon such exercise and deliver to the Holder written confirmation that such Warrant Shares have been duly issued and recorded on the books of the Company as hereinafter provided.  The Warrant Shares so issued shall be registered in the name of the Holder or such other name as shall be designated in the order

delivered by the Holder.  Such certificate or certificates shall be deemed to have been issued and any person so designated to be named therein shall be deemed to have become the holder of record of such Warrant Shares as of the date of surrender of such Warrant Certificate at the Warrant Agent Office duly executed by the Holder thereof and upon payment of the Exercise Price or the deemed payment of the Exercise Price in connection with a Cashless Exercise.  Notwithstanding any provision herein to the contrary, the Company shall not be required to register Warrant Shares in the name of any person who acquired any Warrant or any Warrant Shares otherwise than in accordance with this Agreement.

(g)    In case an exercise of Warrants is in part only, a new Warrant or Warrants of like tenor, calling in the aggregate on the face or faces of the Warrant Certificate or Warrant Certificates for the number of shares of Common Stock equal (without giving effect to any adjustment thereof) to the number of such shares called for on the face of the Warrant Certificate minus the number of such shares designated by the Holder upon such exercise together with any Warrant Shares withheld in connection with a Cashless Exercise, shall be issued and delivered to the Holder or its registered assigns.

(h)    The Neither the Warrant Agent nor the Company shall not be required to pay any stamp or other tax or other governmental charge required to be paid in connection with any transfer involved in the issuance of the Warrant Shares, and in the event that any such transfer is involved, neither the Warrant Agent nor the Company shall not be required to issue or deliver any Warrant Share until such tax or other charge shall have been paid or it has been established to the Company's and the Warrant Agent's satisfaction that *such tax or other charge* has been paid or that no such tax or other charge is due.

(i)    Any exercise of a Warrant pursuant to the terms of this Agreement shall be irrevocable and shall constitute a binding agreement between the Holder and the Company, enforceable in accordance with its terms; *provided however, that* if a Holder validly exercises its Warrants by way of a Cashless Exercise in connection with the occurrence of a Triggering Event, and such Triggering Event is not subsequently consummated, then such exercise shall be automatically revoked and such Warrant shall continue in full force and effect.

(j)    The Warrant Agent shall:

(i)    examine all exercised Warrants and all other documents delivered to it by or on behalf of Holders as contemplated hereunder to ascertain whether or not, on their face, such exercised Warrants and any such other documents have been executed and completed in accordance with their terms and the terms hereof;

(ii)    where an exercised Warrant or other document appears on its face to have been improperly completed or executed or some other irregularity in connection with the exercise of the Warrants exists, the Warrant Agent shall endeavor to inform the appropriate parties (including the person submitting such instrument) of the need for fulfillment of all requirements, specifying those requirements which appear to be unfulfilled;

8      DeltaView comparison of pcdocs://wilsr01a/592246/9 and pcdocs://wilsr01a/592246/18. Performed on 10/27/2009.

(iii)    inform the Company of and cooperate with and assist the Company in resolving any reconciliation problems between exercised Warrants received and delivery of Warrants to the Warrant Agent's account; and

(iv)    advise the Company no later than ~~three~~five (5) Business Days after receipt of an exercised Warrant, of (i) the receipt of such exercised Warrant and the number of Warrants exercised in accordance with the terms and conditions of this Agreement ~~and (ii~~, (ii) the percentage of the then outstanding Series A Warrants represented by such exercise and (iii) such other information as the Company shall reasonably require~~; and~~.

(k)    All questions as to the validity, form and sufficiency (including time of receipt) of an exercised Warrant will be determined by the Company in its sole discretion, which determination shall be final and binding.  The Company reserves the right to reject any and all exercised Warrants not in proper form or for which any corresponding agreement by the Company to exchange would, in the opinion of the Company, be unlawful.  Such determination by the Company shall be final and binding on the Holders, absent manifest error.  Moreover, the Company reserves the absolute right to waive any of the conditions to the exercise of Warrants or defects in the exercise thereof with regard to any particular exercise of Warrants.  Neither the Company nor the Warrant Agent shall be under any duty to give notice to the Holders of the Warrants of any irregularities in any exercise of Warrants, nor shall it incur any liability for the failure to give such notice.

(l)    Prior to a Qualified Public Offering (as defined in the Stockholders Agreement), as a condition to the issuance of Warrant Shares pursuant to the exercise of the Warrant, each Holder shall be required to execute and become a party to (unless such Holder is already a party thereto) any Stockholders Agreement in effect at the time of exercise of such Holder's Warrant.

Section 2.04    Reservation of Warrant Shares

(a)    For the purpose of enabling it to satisfy any obligation to issue Warrant Shares upon exercise of Warrants, the Company will at all times through the Expiration Date, reserve and keep available out of its aggregate authorized but unissued or treasury shares of Common Stock, the number of Warrant Shares deliverable upon the exercise of all outstanding Warrants, and the Company's Transfer Agent is hereby irrevocably authorized and directed at all times to reserve such number of authorized and unissued or treasury shares of Common Stock as shall be required for such purpose.  The Company will keep a copy of this Agreement on file with the Transfer Agent.  The Warrant Agent is hereby irrevocably authorized to requisition from time to time from such Transfer Agent stock certificates issuable upon exercise of outstanding Warrants, and the Company will supply such Transfer Agent with duly executed stock certificates for such purpose.

(b)    The Company covenants that all shares of Common Stock issued upon exercise of the Warrants will, upon issuance in accordance with the terms of this Agreement,

9        DeltaView comparison of pcdocs://wilsr01a/592246/9 and pcdocs://wilsr01a/592246/18.
Performed on 10/27/2009.

be fully paid and nonassessable and free from all taxes, liens, charges and security interests created by or imposed upon the Company with respect to the issuance and holding thereof.

## ARTICLE III
## OTHER PROVISIONS RELATING TO RIGHTS OF HOLDERS OF WARRANT

Section 3.01    No Rights as Stockholder Conferred by Warrants or Warrant Certificates.    No Warrant Certificate or Warrant evidenced thereby shall, and nothing contained in this Agreement or in the Warrant Certificate shall be construed to, entitle the Holder or any beneficial owner thereof to any of the rights of a holder or beneficial owner of Warrant Shares, including, without limitation, the right to vote or to consent or to receive notice as a stockholder in respect of any meeting of stockholders for the election of directors of the Company or any other matter, to receive dividends on Warrant Shares or any rights whatsoever as stockholders of the Company.

Section 3.02    Lost, Mutilated, Stolen or Destroyed Warrant Certificates.    Upon receipt by the Warrant Agent of evidence reasonably satisfactory to it and the Company of the ownership of and the loss, mutilation, theft or destruction of any Warrant Certificate and of such security or indemnity as may be required by the Company and the Warrant Agent to hold each of them and any agent of them harmless and, in the case of mutilation of a Warrant Certificate, upon surrender thereof to the Warrant Agent for cancellation, then, in the absence of notice to the Company or the Warrant Agent that such Warrant Certificate has been acquired by a bona fide purchaser, the Company shall execute, and an authorized officer of the Warrant Agent shall manually countersign or countersign by facsimile and deliver, in exchange for or in lieu of the lost, mutilated, stolen or destroyed Warrant Certificate, a new Warrant Certificate of the same tenor and evidencing a like number of Warrants.  Upon the issuance of any new Warrant Certificate under this Section 3.02, the Company may require the payment of a sum sufficient to cover any stamp or other tax or other governmental charge that may be imposed in relation thereto and any other expenses (including the fees and expenses of the Warrant Agent) in connection therewith.  Every substitute Warrant Certificate executed and delivered pursuant to this Section 3.02 in lieu of any lost, mutilated, stolen or destroyed Warrant Certificate shall represent an additional contractual obligation of the Company, whether or not the lost, stolen or destroyed Warrant Certificate shall be at any time enforceable by anyone, and shall be entitled to the benefits of this Agreement equally and proportionately with any and all other Warrant Certificates duly executed and delivered hereunder.  The provisions of this Section 3.02 are exclusive and shall preclude (to the extent lawful) all other rights and remedies with respect to the replacement of lost, mutilated, stolen or destroyed Warrant Certificates.  Notwithstanding anything in this Agreement to the contrary, the Warrant Agent shall have no obligation to take any action whatsoever with respect to such an exchange unless and until such payments required under this section have been made.

Section 3.03    General Information to be Provided by the Company.  The Company shall provide to each Holder the same information and reports to which a holder of the Common Stock is entitled pursuant to Section [3.1]3.01 and 3.03 of the Stockholders Agreement, subject to execution of an appropriate confidentiality agreement by each such Holder.

10     DeltaView comparison of pcdocs://wilsr01a/592246/9 and pcdocs://wilsr01a/592246/18. Performed on 10/27/2009.

Section 3.04    Notice of Certain Events.  The Company shall (i) provide at least fifteen (15) days prior written notice to each Holder, at the last address set forth for such Holder in the register books of the Warrant Agent, of any record date relating to the payment by the Company of a cash dividend on the Common Stock and (ii) provide prior notice, not later than the time notice is given to eligible stockholders under the Stockholders Agreement, at the last address set forth for such Holder in the register books of the Warrant Agent, of any transaction involving the right of a holder of New Common Stock to exercise "tag along" rights under the Stockholders Agreement.

## ARTICLE IV
## EXCHANGE AND TRANSFER

Section 4.01    Exchange and Transfer.

(a)    Upon surrender at the Warrant Agent Office, Warrant Certificates evidencing Warrants may be exchanged for Warrant Certificates in other authorized denominations evidencing such Warrants or the transfer thereof may be registered in whole or in part; provided, however, that such other Warrant Certificates shall evidence the same aggregate number of Warrants as the Warrant Certificates so surrendered.

(b)    The Warrant Agent shall keep, at the Warrant Agent Office, books in which, subject to such reasonable regulations as it may prescribe, it shall register Warrant Certificates and exchanges and transfers of outstanding Warrant Certificates upon surrender of such Warrant Certificates to the Warrant Agent at the Warrant Agent Office for exchange or registration of transfer, properly endorsed.

(c)    No service charge shall be made for any exchange or registration of transfer of Warrant Certificates, buthowever, the Warrant Agent and/or the Company may require payment of a sum sufficient to cover any stamp or other tax or other governmental charge that may be imposed in connection with any such exchange or registration of transfer. Neither the Warrant Agent nor the Company shall be required to pay any stamp or other tax or other charge required to be paid in connection with such transfer, and neither the Warrant Agent nor the Company shall be required to issue or deliver any Warrant Share until it has been established to the Company's and the Warrant Agent's satisfaction that such tax or other charge has been paid or that no such tax or other charge is due.

(d)    Whenever any Warrant Certificates, are so surrendered for exchange or registration of transfer, an authorized officer of the Warrant Agent, upon the request of the Company, shall manually countersign or countersign by facsimile and deliver to the person or persons entitled thereto a Warrant Certificate or Warrant Certificates, duly authorized and executed by the Company, as so requested.  The Warrant Agent shall not effect any exchange or registration of transfer which will result in the issuance of a Warrant Certificate, evidencing a fraction of a Warrant or a number of full Warrants and a fraction of a Warrant.

(e)    All Warrant Certificates, issued upon any exchange or registration of transfer of Warrant Certificates shall be the valid obligations of the Company, evidencing the same

11    DeltaView comparison of pcdocs://wilsr01a/592246/9 and pcdocs://wilsr01a/592246/18.  Performed on 10/27/2009.

obligations, and entitled to the same benefits under this Agreement, as the Warrant Certificates surrendered for such exchange or registration or transfer.

Section 4.02    <u>Restrictions on Transfer; Restrictive Legend</u>

(a)    Prior to a Qualified Public Offering (as defined in the Stockholders Agreement), the Warrants shall not be transferable, other than transfers to (i) other Holders, (ii) holders of the Common Stock and (iii) the Company; *provided, however that*, a Holder shall be entitled to transfer its Warrants in whole or in part (but in part only if there are sixty (60) or fewer holders of the Series A Warrants and the Series B Warrants, taken together), if such Holder is an individual, to any member of his immediate family or any estate or trust in which he is the settlor or otherwise by will or the laws of descent or distribution, and if such Holder is not an individual, to such Holder's partners, members or Affiliates, provided that in each case, such transferee agrees in writing to be bound by the terms of the Warrant Agreement prior to such transfer.  As used herein, "Affiliates" shall mean, with respect to any specified person, any other person directly or indirectly controlling or controlled by or under direct or indirect common control with such specified person. For the purposes of this definition, "control" when used with respect to any specified person means the power to direct the management and policies of such person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise; and the terms "controlling" and "controlled" have meanings correlative to the foregoing.

(b)    Notwithstanding Section 4.02(a), each Holder shall not transfer any Warrants unless (i) such transfer complies with the provisions of this Agreement, and (ii) (x) such transfer is pursuant to an effective registration statement under the Securities Act of 1933, as amended, and the rules and regulations promulgated thereunder (the "Securities Act") and has been registered under all applicable state securities or "blue sky" laws or (y) if reasonably requested by the Company, such Holder shall have furnished the Company with an opinion of counsel, which opinion of counsel shall be reasonably satisfactory to the Company, to the effect that no such registration is required because of the availability of an exemption from registration under the Securities Act and all applicable state securities or "blue sky" laws.

(c)    Prior to a Qualified Public Offering (as defined in the Stockholders Agreement, without the prior written consent of the Board of Directors, a Holder shall not transfer any Warrants if, as a result of such transfer, any class of equity securities of the Company would be held of record by more than ~~five~~<u>two</u> hundred (~~500~~<u>twenty-five (225)</u>) persons or otherwise in circumstances that the Board of Directors determines could require the Company to file reports under the Securities Exchange Act of 1934, as amended, and the rules and regulations promulgated thereunder (the "Exchange Act"), if it is not otherwise then subject to such requirements.

(d)    All such transfers of Warrants will be subject to the Company's being provided advance written notice of the proposed transfer and terms of such transfer.

(e)    Notwithstanding anything herein to the contrary, the Warrants shall be subject to restrictions on transfer intended to preserve the value of tax attributes (including net operating losses) if (i) the Board of Directors determines that such restrictions on transfer are

12    DeltaView comparison of pcdocs://wilsr01a/592246/9 and pcdocs://wilsr01a/592246/18. Performed on 10/27/2009.

reasonably necessary to preserve the value of such tax attributes and (ii) substantially similar restrictions apply to or will also be imposed on the holders of Common Stock.

(f)     Any attempted or purported transfer of all or a portion of the Warrants held by a Holder in violation of this Section 4.02 shall be null and void and of no force or effect whatsoever, such purported transferee will not be treated as an owner of the Warrants for purposes of this Agreement or otherwise, and the Company will not register such transfer.

(g)     Each Warrant Certificate and certificate representing Warrant Shares issued upon the exercise of a Warrant shall be stamped or otherwise imprinted with a legend in the following or a comparable form:

THE SECURITIES REPRESENTED BY THIS CERTIFICATE (THE "SECURITIES") WERE ORIGINALLY ISSUED IN RELIANCE UPON AN EXEMPTION FROM THE REGISTRATION REQUIREMENT OF SECTION 5 OF THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), PROVIDED BY SECTION 1145 OF THE BANKRUPTCY CODE, 11 U.S.C. 1145.  THE SECURITIES HAVE NOT BEEN REGISTERED UNDER THE ACT OR ANY STATE SECURITIES LAW, AND TO THE EXTENT THE HOLDER OF THE SECURITIES IS AN "UNDERWRITER," AS DEFINED IN SECTION 1145(B)(1) OF THE BANKRUPTCY CODE, THE SECURITIES MAY NOT BE SOLD OR TRANSFERRED IN THE ABSENCE OF AN EFFECTIVE REGISTRATION STATEMENT UNDER THE ACT OR AN EXEMPTION FROM REGISTRATION THEREUNDER.

If at the time of issuance of Warrant Shares the Stockholders Agreement is still in effect, each certificate representing Warrant Shares issued upon the exercise of a Warrant shall also be stamped or otherwise imprinted with a legend in the following or a comparable form:

THE SALE, ASSIGNMENT, PLEDGE, ENCUMBRANCE OR OTHER TRANSFER OF THE SECURITIES REPRESENTED BY THIS CERTIFICATE IS RESTRICTED BY THE TERMS OF, AND THE HOLDER HEREOF IS SUBJECT TO CERTAIN OTHER OBLIGATIONS PURSUANT TO, THE PROVISIONS OF A STOCKHOLDERS AGREEMENT, DATED AS OF [____], 2009, AMONG THE COMPANY AND CERTAIN HOLDERS OF ITS SECURITIES, A COPY OF WHICH IS ON FILE AT THE PRINCIPAL EXECUTIVE OFFICE OF THE COMPANY.

(h)     A holder (or its transferee, as applicable) shall be entitled to receive from the Company, without expense, new securities of like tenor not bearing the legends set forth above when (i) such Warrant Certificates or restricted shares of Common Stock shall have been (A) effectively registered under the Securities Act and disposed of in accordance with a registration statement covering such securities, (B) disposed of pursuant to the provisions of Rule 144 or any comparable rule under the Securities Act, or (C) when, in the written reasonable opinion of independent counsel for the holder thereof experienced in Securities Act matters, which counsel and opinion shall be reasonably satisfactory to the Company, such restrictions are no longer required in order to insure compliance with the Securities Act (including when the provisions of

13     DeltaView comparison of pcdocs://wilsr01a/592246/9 and pcdocs://wilsr01a/592246/18. Performed on 10/27/2009.

Rule 144(k) or any comparable rule under the Securities Act have been satisfied) and (ii) in the case of the restricted shares of Common Stock only, such restricted shares of Common Stock are no longer subject to the Stockholders Agreement.

Section 4.03    Treatment of Holders of Warrant Certificates.  Each Holder of a Warrant Certificate, by accepting the same, consents and agrees with the Company, the Warrant Agent and every subsequent Holder of such Warrant Certificate that until the transfer of such Warrant Certificate is registered on the books of such Warrant Agent, the Company and the Warrant Agent may treat the registered Holder of such Warrant Certificate as the absolute owner thereof for any purpose and as the person entitled to exercise the rights represented by the Warrants evidenced thereby, any notice to the contrary notwithstanding.

Section 4.04    Cancellation of Warrant Certificates.  Any Warrant Certificate surrendered for exchange or registration of transfer or exercise of the Warrants evidenced thereby shall, if surrendered to the Company, be delivered to the Warrant Agent, and all Warrant Certificates surrendered or so delivered to the Warrant Agent shall be promptly cancelled by the Warrant Agent and shall not be reissued and, except as expressly permitted by this Agreement, no Warrant Certificate shall be issued hereunder in exchange therefor or in lieu thereof.  The Warrant Agent shall cause all cancelled Warrant Certificates to be destroyed and shall deliver a certificate of such destruction to the Company.

## ARTICLE V
## ADJUSTMENT OF WARRANT PRICE AND NUMBER OF WARRANT SECURITIES

Section 5.01    Adjustments Generally.  The Exercise Price, the number of Warrant Shares issuable upon exercise of Warrants and the number of Warrants outstanding are subject to adjustment from time to time upon the occurrence of the events enumerated in this Article V, as determined to be necessary or appropriate in the reasonable discretion of the Board of Directors of the Company.

Section 5.02    Stock Dividends; Split-Ups.  If after the date hereof, and subject to the provisions of Section 5.07, the number of outstanding shares of Common Stock is increased by a stock dividend payable in shares of Common Stock, or by a split-up of shares of Common Stock, or other similar event, then, on the effective date of such stock dividend, split-up or similar event, the number of shares of Common Stock issuable on exercise of each Warrant shall be increased in proportion to such increase in outstanding shares of Common Stock.

Section 5.03    Aggregation of Shares.  If after the date hereof, and subject to the provisions of Section 5.07, the number of outstanding shares of Common Stock is decreased by a consolidation, combination, reverse stock split or reclassification of shares of Common Stock or other similar event, then, on the effective date of such consolidation, combination, reverse stock split, reclassification or similar event, the number of shares of Common Stock issuable on exercise of each Warrant shall be decreased in proportion to such decrease in outstanding shares of Common Stock.

Section 5.04    Adjustments in Exercise Price.  Whenever the number of shares of Common Stock purchasable upon the exercise of the Warrants is adjusted, as provided in Sections

14    DeltaView comparison of pcdocs://wilsr01a/592246/9 and pcdocs://wilsr01a/592246/18. Performed on 10/27/2009.

5.02 and 5.03, the Exercise Price shall be adjusted (to the nearest cent) by multiplying such Exercise Price immediately prior to such adjustment by a fraction (x) the numerator of which shall be the number of shares of Common Stock purchasable upon the exercise of the Warrants immediately prior to such adjustment, and (y) the denominator of which shall be the number of shares of Common Stock so purchasable immediately thereafter.

Section 5.05    Replacement of Securities upon Reorganization.  In case of any reclassification or reorganization of the outstanding shares of Common Stock (other than a change covered by Section 5.02 or 5.03 or that solely affects the par value of such shares of Common Stock), or in the case of any merger or consolidation of the Company with or into another corporation (other than a consolidation or merger in which the Company is the continuing corporation and that does not result in any reclassification or reorganization of the outstanding shares of Common Stock), or in the case of any sale or conveyance to another corporation or entity of the assets or other property of the Company as an entirety or substantially as an entirety in connection with which the Company is dissolved, except in each case, with respect to any such transaction pursuant to which holders of the outstanding Common Stock are entitled to receive cash consideration for such shares, the Holders shall thereafter have the right to purchase and receive, upon the basis and upon the terms and conditions specified in the Warrants and in lieu of the shares of the Warrant Shares immediately theretofore purchasable and receivable upon the exercise of the rights represented thereby, the kind and amount of shares of stock or other securities or property (including cash) receivable upon such reclassification, reorganization, merger or consolidation, or upon a dissolution following any such sale or transfer, that the Holder would have received if such Holder had exercised his, her or its Warrant(s) immediately prior to such event; and if any reclassification also results in a change in shares of Common Stock covered by Section 5.02 or 5.03, then such adjustment shall be made pursuant to Sections 5.02, 5.03, 5.04 and this Section 5.05.  The provisions of this Section 5.05 shall similarly apply to successive reclassifications, reorganizations, mergers or consolidations, sales or other transfers.

Section 5.06    Notices of Changes in Warrant.  Upon every adjustment of the Exercise Price or the number of shares issuable upon exercise of a Warrant, the Company shall give written notice thereof to the Warrant Agent, which notice shall state the Exercise Price resulting from such adjustment and the increase or decrease, if any, in the number of shares of Common Stock purchasable at such price upon the exercise of a Warrant, setting forth in reasonable detail the method of calculation and the facts upon which such calculation is based. Upon the occurrence of any event specified in Section 5.02, 5.03, 5.04 5.04, 5.05 or 5.05, 5.09, then, in any such event, the Company shall give or cause to be given written notice to each Holder, by press release or at the last address set forth for such Holder in the register books of the Warrant Agent, of the record date or the effective date of the event.  Failure to give such notice, or any defect therein, shall not affect the legality or validity of such event. The Warrant Agent shall be fully protected in relying upon such a certificate and shall have no duty to investigate or inquire as to whether such adjustment is accurate, and shall not be deemed to have knowledge of, and shall not be required to take any action with respect to any adjustments, unless and until the Warrant Agent shall have received such a certificate.

Section 5.07    No Fractional Shares.  Notwithstanding any provision contained in this Agreement to the contrary, the Company shall not issue fractional shares upon exercise of Warrants.  If, by reason of any adjustment made pursuant to this Article V, any Holder would be

15    DeltaView comparison of pcdocs://wilsr01a/592246/9 and pcdocs://wilsr01a/592246/18. Performed on 10/27/2009.

entitled, upon the exercise of such Warrant, to receive a fractional interest in a share of Common Stock, the Company shall, upon such exercise, round down to the nearest whole number the number of the shares of Common Stock to be issued to the Holder. The Warrant Agent shall not be required to effect any registration of transfer or exchange that will result in the issuance of a Warrant Certificate for a fraction of a share of Common Stock.

Section 5.08    Form of Warrant.  The form of Warrant or Warrant Certificate need not be changed because of any adjustment pursuant to this Article V, and Warrants Certificates issued after such adjustment may state the same Exercise Price and the same number of shares as is stated in the Warrant Certificates initially issued pursuant to this Agreement.  However, the Company may at any time in its sole discretion make any change in the form of Warrant or Warrant Certificate that the Company may deem appropriate and that does not affect the substance thereof, and any Warrant Certificates thereafter issued or countersigned, whether in exchange or substitution for an outstanding Warrant Certificate or otherwise, may be in the form as so changed.

Section 5.09    Extraordinary Transactions.  If the Company, shall distribute property (other than cash or shares of Common Stock) to the holders of Common Stock, other than as described in Section 5.02, 5.03 or 5.05, in connection with a spin-off, sale of a material subsidiary or similar extraordinary transaction (an "Extraordinary Transaction"), then in connection with such Extraordinary Transaction, the number of shares of Common Stock issuable upon exercise of the Warrants and/or the Warrant Price, as appropriate, shall be equitably and proportionately adjusted to reflect such Extraordinary Transaction, as determined in good faith by the Company's Board of Directors.

Section 5.10    De Minimis Adjustments.  No adjustment in the number of Warrant Shares purchasable hereunder shall be required unless such adjustment would require an increase or decrease of at least one percent (1%) in the number of Warrant Shares purchasable upon the exercise of each Warrant; provided, however, that any adjustments which by reason of this paragraph (c) are not required to be made shall be carried forward and taken into account in any subsequent adjustment.  All calculations shall be made to the nearest cent and to the nearest one-hundredth of a Warrant Share, as the case may be.

## ARTICLE VI
## CONCERNING THE WARRANT AGENT

Section 6.01    Warrant Agent.

The Company hereby appoints [BNY Mellon Shareowner Services] asthe Warrant Agent to act as agent of the Company in respect of the Warrants and the Warrant Certificates upon the express terms and subject to the conditions herein and in the Warrant Certificates; and [BNY Mellon Shareowner Services] (and no implied terms); and the Warrant Agent hereby accepts such appointment. The Warrant Agent shall have the powers and authority granted to and conferred upon it in the Warrant Certificates and herein and such further powers and authority to act on behalf of the Company as the Company may hereafter grant to or confer upon it.  All of the terms and provisions with respect to such powers and authority contained in the Warrant Certificates are subject to and governed by the terms and provisions hereof.

16    DeltaView comparison of pcdocs://wilsr01a/592246/9 and pcdocs://wilsr01a/592246/18. Performed on 10/27/2009.

Section 6.02    Conditions of Warrant Agent's Obligations.

(a)    The Warrant Agent accepts its obligations herein set forth upon the express terms and conditions hereof (and no implied terms), including the following, to all of which the Company agrees and to all of which the rights hereunder of the Holders from time to time of the Warrant Certificates shall be subject:

(i)    *Compensation and Indemnification.*  The Company agrees promptly to pay the Warrant Agent the compensation to be agreed upon with the Company for all services rendered by the Warrant Agent and to reimburse the Warrant Agent for reasonable out-of-pocket expenses (including the reasonable fees and expenses of its counsel) incurred by the Warrant Agent without gross negligence, bad faith or willful misconduct or breach of this Agreement(each as determined by a final, non-appealable judgment of a court of competent jurisdiction) on its part in connection with the services rendered hereunder by the Warrant Agentpreparation, delivery, acceptance, administration, execution and amendment of this Agreement and the exercise and performance of its duties hereunder.  The Company also agrees to indemnify the Warrant Agent for, and to hold it harmless against, any loss, liability or expense, suit, action, proceeding, judgment, claim, settlement, cost or expense (including the reasonable fees and expenses of its counsel) incurred without gross negligence, bad faith or willful misconduct on the part of the Warrant Agent, arising out of or in connection with its acting as Warrant Agent hereunder, as well as the reasonable (each as determined by a final, non-appealable judgment of a court of competent jurisdiction), for any action taken, suffered or omitted to be taken by the Warrant Agent in connection with the preparation, delivery, acceptance, administration, execution and amendment of this Agreement and the exercise and performance of its duties hereunder, including the costs and expenses of defending against any claim of such liability arising therefrom, directly or indirectly.  The provisions of this Section 6.02(a)(i) shall survive the termination of this Agreement and the replacement, removal or resignation of the Warrant Agent.

(ii)    *Agent for the Company.*  In acting under this Agreement and in connection with the Warrants and the Warrant Certificates, the Warrant Agent is acting solely as agent of the Company and does not assume any obligation or relationship of agency or trust for or with any of the Holders of Warrant Certificates or beneficial owners of Warrants.

(iii)    *Counsel.*  The Warrant Agent may consult with counsel satisfactory to it in its reasonable judgment (who may be counsel for the Company or in-house counsel of the Warrant Agent), and the advice of such counsel shall be full and complete authorization and protection in respect of any action taken, suffered or omitted to be taken by it hereunder in good faith, in the absence of gross negligence, bad faith or willful misconduct, and in accordance with the advice of such counsel.

(iv)    *Documents*.  Subject to Section 2.03(j), the Warrant Agent shall be protected and shall incur no liability for or in respect of any action taken ~~or thing~~, suffered <u>or omitted to be taken</u> by it in reliance upon any Warrant Certificate, notice, direction, consent, certificate, affidavit, statement or other paper or document reasonably believed by it to be genuine and to have been presented or signed by the proper parties.

(v)    *Certain Transactions*.  The Warrant Agent, and its officers, directors ~~and~~, employees<u>, agents and affiliates</u>, may become the owner of, or acquire any interest in, Warrants, with the same rights that it or they would have if it were not the Warrant Agent hereunder, and, to the extent permitted by applicable law, it or they may engage or be interested in any financial or other transaction with the Company and may act on, or as depositary, trustee or agent for, any committee or body of holders of Warrant Shares or other obligations of the Company as freely as if it were not the Warrant Agent hereunder.

(vi)    *No Liability for Interest*.  The Warrant Agent shall have no liability for interest on any monies at any time received by it pursuant to any of the provisions of this Agreement or of the Warrant Certificates.

(vii)    *No Liability for Invalidity*.  The Warrant Agent shall not be under any responsibility with respect to the validity or sufficiency of this Agreement or the execution and delivery hereof (except the due authorization to execute this Agreement and the due execution and delivery hereof by the Warrant Agent) or subject to Section 2.03(j), with respect to the validity or execution of any Warrant Certificates (except its countersignature thereof).

(viii)    *No Liability for Recitals*.  The recitals contained herein shall be taken as the statements of the Company and the Warrant Agent assumes no liability for the correctness of the same.

(ix)    *No Implied Obligations*.  The Warrant Agent shall be obligated to perform only such duties as are herein and in the Warrant Certificates specifically set forth and no implied duties or obligations shall be read into this Agreement or the Warrant Certificates against the Warrant Agent.  The Warrant Agent shall not be under any obligation to <u>expend or risk its own funds or </u>take any action hereunder <u>or at the request of any Warrant Holder or other Person </u>which may tend to involve it in any expense or liability, <u>unless it has received indemnity reasonably satisfactory to it or </u>the payment of which within a reasonable time is not, in its ~~reasonable~~ opinion, assured to it.  The Warrant Agent shall not be accountable or under any duty or responsibility for the use by the Company of any of the Warrant Certificates countersigned by the Warrant Agent and delivered by it to the Company pursuant to this Agreement or for the application by the Company of the proceeds of the Warrant Certificates.  The Warrant Agent shall have no duty or responsibility in case of any default by the Company in the performance of its covenants or agreements contained herein or in the Warrant Certificates or in the case of the receipt of any written demand from a Holder of a Warrant Certificate

18    DeltaView comparison of pcdocs://wilsr01a/592246/9 and pcdocs://wilsr01a/592246/18. Performed on 10/27/2009.

with respect to such default, including, without limiting the generality of the foregoing, any duty or responsibility to initiate or attempt to initiate any proceedings at law or otherwise or, except as provided in Section 8.02, to make any demand upon the Company.

(x)      *Agents*.  The Warrant Agent may execute any of the trusts or powers hereunder or perform any duties hereunder either directly or by or through agents or attorneys-in-fact, provided reasonable care has been exercised in the selection and continued employment of such agent or attorney-in-fact.

(xi)     *Liability*.  Notwithstanding anything in this Agreement to the contrary, in no event shall the Warrant Agent be liable for special, indirect, punitive, incidental or consequential loss or damage of any kind whatsoever (including but not limited to lost profits), even if the Warrant Agent has been advised of the likelihood of the loss or damage and regardless of the form of the action.  Any liability of the Warrant Agent under this Agreement shall be limited to the amount of annual fees paid by the Company to the Warrant Agent.  The provisions of this Section 6.02(a)(xi) shall survive the termination of this Agreement and the replacement, removal or resignation of the Warrant Agent.

(xii)    *Force Majeure.*  In no event shall the Warrant Agent be responsible or liable for any failure or delay in the performance of its obligations under this Agreement arising out of or caused by, directly or indirectly, forces beyond its reasonable control, including without limitation strikes, work stoppages, accidents, acts of war or terrorism, civil or military disturbances, nuclear or natural catastrophes or acts of God, and interruptions, loss or malfunctions of utilities, communications or computer (software or hardware) services ("Force Majeure").  In the event of any such excused delay, the time for performance shall be extended for a period equal to the time lost by reason of the delay; *provided*, *however*, that the Warrant Agent shall use all commercially reasonable efforts to avoid and to remove such causes of non-performance and shall continue performance hereunder promptly following the removal of such causes.

Section 6.03    Resignation and Appointment of Successor.

(a)      The Company agrees, for the benefit of the Holders from time to time of the Warrant Certificates, that there shall at all times be a Warrant Agent hereunder until all the Warrants have been exercised or are no longer exercisable.

(b)      The Warrant Agent may at any time resign as such by giving written notice of its resignation to the Company, specifying the desired date on which its resignation shall become effective; provided, however, that such date shall be not less than 9030 days after the date on which such notice is given unless the Company agrees to accept shorter notice.  Upon receiving such notice of resignation, the Company shall promptly appoint a successor Warrant Agent (which shall be a bank or trust company in good standing, authorized under the laws of the jurisdiction of its organization to exercise corporate trust powers) by written instrument in duplicate signed on

19      DeltaView comparison of pcdocs://wilsr01a/592246/9 and pcdocs://wilsr01a/592246/18. Performed on 10/27/2009.

behalf of the Company, one copy of which shall be delivered to the resigning Warrant Agent and one copy to the successor Warrant Agent.  The Company may, at any time and for any reason, remove the Warrant Agent and appoint a successor Warrant Agent (qualified as aforesaid) by written instrument in duplicate signed on behalf of the Company and specifying such removal and the date when it is intended to become effective, one copy of which shall be delivered to the Warrant Agent being removed and one copy to the successor Warrant Agent.  Any resignation or removal of the Warrant Agent and any appointment of a successor Warrant Agent shall become effective upon acceptance of appointment by the successor Warrant Agent as provided in this subsection (b).  In the event a successor Warrant Agent has not been appointed and accepted its duties within ~~90~~30 days of the Warrant Agent's notice of resignation, the Warrant Agent may apply to any court of competent jurisdiction for the designation of a successor Warrant Agent.  Upon its resignation, replacement or removal, the Warrant Agent shall be entitled to the payment by the Company of the compensation and to the reimbursement of all reasonable out-of-pocket expenses incurred by it hereunder as agreed to in Section 6.02(a).

(c)     The Company shall remove the Warrant Agent and appoint a successor Warrant Agent if the Warrant Agent (i) shall become incapable of acting, (ii) shall be adjudged bankrupt or insolvent, (iii) shall commence a voluntary case or other proceeding seeking liquidation, reorganization or other relief with respect to it or its debts under any bankruptcy, insolvency or other similar law now or hereafter in effect or seeking the appointment of a trustee, receiver, liquidator, custodian or other similar official of it or any substantial part of its property, (iv) shall consent to, or shall have had entered against it a court order for, any such relief or to the appointment of or taking possession by any such official in any involuntary case or other proceedings commenced against it, (v) shall make a general assignment for the benefit of creditors or (vi) shall fail generally to pay its debts as they become due.  Upon the appointment as aforesaid of a successor Warrant Agent and acceptance by it of such appointment, the predecessor Warrant Agent shall, if not previously disqualified by operation of law, cease to be Warrant Agent hereunder.

(d)     Any successor Warrant Agent appointed hereunder shall execute, acknowledge and deliver to its predecessor and the Company an instrument accepting such appointment hereunder, and thereupon such successor Warrant Agent, without any further act, deed or conveyance, shall become vested with all the authority, rights, powers, immunities, duties and obligations of such predecessor with like effect as if originally named as Warrant Agent hereunder, and such predecessor shall thereupon become obligated to transfer, deliver and pay over, and such successor Warrant Agent shall be entitled to receive, all monies, securities and other property on deposit with or held by such predecessor as Warrant Agent hereunder.

(e)     Any ~~corporation~~person into which the Warrant Agent hereunder may be merged or converted or any ~~corporation~~person with which the Warrant Agent may be consolidated, or any ~~corporation~~person resulting from any merger, conversion or consolidation to which the Warrant Agent shall be a party, or any ~~corporation~~person to which the Warrant Agent shall sell or otherwise transfer all or substantially all the assets and business of the Warrant Agent, provided that it shall be qualified as aforesaid, shall be the successor Warrant Agent under this Agreement without the execution or filing of any paper or any further act on the part of any of the parties hereto.

20      DeltaView comparison of pcdocs://wilsr01a/592246/9 and pcdocs://wilsr01a/592246/18.
Performed on 10/27/2009.

## ARTICLE VII
## REGISTRATION RIGHTS

Section 7.01    S-3 Registration.  Until the earlier of such time that all Warrant Shares have been issued and the Expiration Date, and so long as the Current Market Price of the shares of Common Stock is greater than 85% of the Exercise Price of the Warrants and the Company is eligible to use Form S-3 or any successor thereto, the Company shall use its commercially reasonable efforts to register and maintain under the Act on Form S-3 or any successor thereto (an "S-3 Registration"), for sale upon the exercise of the Warrants, the Warrant Shares.  Whenever the Company is required by this Section 7.01 to use its commercially reasonable efforts to effect the registration of Warrant Shares, each of the applicable procedures and requirements of Sections 7.03(b), 7.03(c) and 7.03(i) shall apply to such registration.  As used herein, "Registration Statement" shall mean any registration statement of the Company filed under the Securities Act that covers any of the Warrant Shares pursuant to the provisions of this Article VII, including the related Prospectus, all amendments and supplements to such registration statement, including pre- and post-effective amendments, all exhibits thereto and all material incorporated by reference or deemed to be incorporated by reference in such registration statement.  The term "Registration Statement" shall also include any registration statement filed pursuant to Rule 462(b) to register additional securities in connection with any offering.  As used herein, "Prospectus" shall mean the prospectus included in any Registration Statement (including a prospectus that discloses information previously omitted from a prospectus filed as part of an effective registration statement in reliance upon Rule 430A), as amended or supplemented by any prospectus supplement, with respect to the terms of the offering of any portion of the Warrant Shares covered by such Registration Statement and all other amendments and supplements to such prospectus, including post-effective amendments, and all material incorporated by reference or deemed to be incorporated by reference in such prospectus, including any free writing prospectus.

Section 7.02    Piggyback Registration.

(a)    Right to Piggyback.  If there shall not be currently effective an S-3 Registration and the Exercise Price of the Warrants is greater than the Current Market Price of the Common Stock, then at any time the Company proposes to file a registration statement under the Securities Act with respect to a public offering by the Company for its own account of securities of the same type as the Warrant Shares (other than a registration statement (i) in connection with the IPO, or (ii) on Form S-8 or Form S-4 or any successor forms thereto, or (iii) filed solely in connection with a dividend reinvestment plan or an employee benefit plan covering only officers or directors of the Company or its Affiliates), the Company shall give written notice of such proposed filing to the Holders and holders of Warrant Shares at least fifteen (15) days before the anticipated filing date.  Such notice shall offer such holders the opportunity to register such amount of Warrant Shares as they may request (a "Piggyback Registration").  Subject to 7.02(b), the Company shall include in each such Piggyback Registration all Warrant Shares with respect to which the Company has received written requests for inclusion therein within ten (10) days after notice has been given to the Holders and holders of Warrant Shares.  Each such holder shall be permitted to withdraw all or any portion of the Warrant Shares of such holder from a Piggyback Registration at any time prior to the effective date of such Piggyback Registration.

21    DeltaView comparison of pcdocs://wilsr01a/592246/9 and pcdocs://wilsr01a/592246/18.  Performed on 10/27/2009.

(b)    Priority on Piggyback Registrations.  The Company shall permit the Holders and holders of Warrant Shares to include all such Warrant Shares on the same terms and conditions as any similar securities, if any, of the Company or any other persons included therein. Notwithstanding the foregoing, if the Company or the managing underwriter or underwriters participating in such offering advise the Holders and holders of Warrant Shares in writing that the total amount of securities requested to be included in such Piggyback Registration exceeds the amount which can be sold in (or during the time of) such offering without delaying or jeopardizing the success of the offering (including the price per share of the securities to be sold), then the amount of securities to be offered for the account of the such holders and other holders of securities who have piggyback registration rights with respect thereto shall be reduced (to zero if necessary) pro rata on the basis of the number of Common Stock or Common Stock equivalents requested to be registered by each such holder or other holder participating in such offering.

(c)    Right to Abandon.  Nothing in this Section 7.02 shall create any liability on the part of the Company to the Holders or holders of any Warrant Shares if the Company in its sole discretion should decide not to file a registration statement proposed to be filed pursuant to Section 7.02(a) or to withdraw such registration statement subsequent to its filing, regardless of any action whatsoever that a holder may have taken, whether as a result of the issuance by the Company of any notice hereunder or otherwise.  Any such determination not to file or to withdraw a registration statement shall not affect the obligations of the Company to pay or to reimburse all Registration Expenses pursuant to Section 7.05.

Section 7.03    Registration Procedures.  In connection with the registration obligations of the Company pursuant to and in accordance with Sections 7.01 and 7.02 (and subject to Sections 7.01 and 7.02), the Company shall use commercially reasonable efforts to effect such registration to permit the sale of such Warrant Shares in accordance with the intended method or methods of disposition thereof, and pursuant thereto the Company shall as expeditiously as possible:

(a)    prepare and file with the Securities and Exchange Commission ("SEC") a Registration Statement for the sale of the Warrant Shares on any form for which the Company then qualifies or which counsel for the Company shall deem appropriate in accordance with such Holders' or Warrant Shares holders' intended method or methods of distribution thereof, and, subject to the Company's right to terminate or abandon a registration pursuant to Section 7.02(c), use commercially reasonable efforts to cause such Registration Statement to become effective and remain effective as provided herein;

(b)    prepare and file with the SEC such amendments (including post-effective amendments) to such Registration Statement, and such supplements to the related Prospectus, as may be required by the rules, regulations or instructions applicable to the Securities Act during the applicable period in accordance with the intended methods of disposition specified by the holders whose Warrant Shares are covered by such Registration Statement, make generally available earnings statements satisfying the provisions of Section 11(a) of the Securities Act (provided that the Company shall be deemed to have complied with this Section 7.03 if it has complied with Rule 158 under the Securities Act), and cause the related Prospectus as so supplemented to be filed pursuant to Rule 424 under the Securities Act; provided, however, that before filing a Registration Statement or Prospectus, or any amendments or supplements thereto

22    DeltaView comparison of pcdocs://wilsr01a/592246/9 and pcdocs://wilsr01a/592246/18. Performed on 10/27/2009.

(other than reports required to be filed by it under the Exchange Act that are incorporated or deemed to be incorporated by reference into the Registration Statement and the Prospectus except to the extent that such reports related primarily to the offering), the Company shall furnish to the holders whose Warrant Shares are covered by such Registration Statement and their counsel for review and comment, copies of all documents required to be filed;

(c)    notify the holders whose Warrant Shares are covered by such Registration Statement promptly and (if requested) confirm such notice in writing, (i) when a Prospectus or any Prospectus supplement or post-effective amendment has been filed, and, with respect to such Registration Statement or any post-effective amendment, when the same has become effective, (ii) of any request by the SEC for amendments or supplements to such Registration Statement or the related Prospectus or for additional information regarding the Company or the Holders, (iii) of the issuance by the SEC of any stop order suspending the effectiveness of such Registration Statement or the initiation of any proceedings for that purpose, (iv) of the receipt by the Company of any notification with respect to the suspension of the qualification or exemption from qualification of any of the Warrant Shares for sale in any jurisdiction or the initiation or threatening of any proceeding for such purpose, and (v) of the happening of any event that requires the making of any changes in such Registration Statement, Prospectus or documents incorporated or deemed to be incorporated therein by reference so that they will not contain any untrue statement of a material fact or omit to state any material fact required to be stated therein or necessary to make the statements therein not misleading;

(d)    use commercially reasonable efforts to prevent the issuance of any order suspending the effectiveness of such Registration Statement or the qualification or exemption from qualification of any Warrant Shares for sale in any jurisdiction in the United States, and to obtain the lifting or withdrawal of any such order at the earliest practicable time;

(e)    furnish to the holder whose Warrant Shares are covered by such Registration Statement and who so requests in writing, each counsel for such holders and each managing underwriter, if any, without charge, one conformed copy of such Registration Statement, as declared effective by the SEC, and of each post-effective amendment thereto, in each case including financial statements and schedules and all exhibits and reports incorporated or deemed to be incorporated therein by reference; and deliver, without charge, such number of copies of the preliminary prospectus, any amended preliminary prospectus, any free writing prospectus, each final Prospectus and any post-effective amendment or supplement thereto, as such holder may reasonably request in order to facilitate the disposition of the Warrant Shares of such holder covered by such Registration Statement in conformity with the requirements of the Securities Act;

(f)    prior to any public offering of Warrant Shares covered by such Registration Statement, use commercially reasonable efforts to register or qualify such Warrant Shares for offer and sale under the securities or "Blue Sky" laws of such jurisdictions as the holders of such Warrant Shares shall reasonably request in writing; provided, however, that the Company shall in no event be required to qualify generally to do business as a foreign corporation or as a dealer in any jurisdiction where it is not at the time required to be so qualified or to execute or file a general consent to service of process in any such jurisdiction where it has not theretofore done so or to take any action that would subject it to general service of process or taxation in any such jurisdiction where it is not then subject;

23    DeltaView comparison of pcdocs://wilsr01a/592246/9 and pcdocs://wilsr01a/592246/18. Performed on 10/27/2009.

(g)    upon the occurrence of any event contemplated by Section 7.03(c)(v), prepare a supplement or post-effective amendment to such Registration Statement or the related Prospectus or any document incorporated or deemed to be incorporated therein by reference and file any other required document so that, as thereafter delivered to the purchasers of the Warrant Shares being sold thereunder, such Prospectus will not contain an untrue statement of a material fact or omit to state any material fact required to be stated therein or necessary to make the statements therein, in light of the circumstances under which they were made, not misleading;

(h)    use commercially reasonable efforts to cause all Warrant Shares covered by such Registration Statement to be listed on each securities exchange or automated interdealer quotation system, if any, on which similar securities issued by the Company are then listed or quoted, or, if none, on such securities exchange or automated interdealer quotation system reasonably selected by the Company;

(i)    on or before the effective date of such Registration Statement, provide the transfer agent of the Company for the Warrant Shares with printed certificates for the Warrant Shares covered by such Registration Statement, which are in a form eligible for deposit with The Depository Trust Company;

(j)    if such offering is an underwritten offering, make available for inspection by any holder whose Warrant Shares are included in such Registration Statement, any underwriter participating in any offering pursuant to such Registration Statement, and any attorney, accountant or other agent retained by any such holder or underwriter (collectively, the "Inspectors"), all financial and other records and other information, pertinent corporate documents and properties of any of the Company and its subsidiaries and affiliates (collectively, the "Records"), as shall be reasonably necessary to enable them to exercise their due diligence responsibilities; provided, however, that the Records that the Company determines, in good faith, to be confidential and which it notifies the Inspectors in writing are confidential shall not be disclosed to any Inspector unless such Inspector signs a confidentiality agreement reasonably satisfactory to the Company, which shall permit the disclosure of such Records in such Registration Statement or the related Prospectus if (i) necessary to avoid or correct a material misstatement in or material omission from such Registration Statement or Prospectus or (ii) the release of such Records is ordered pursuant to a subpoena or other order from a court of competent jurisdiction; provided further, however, that (A) any decision regarding the disclosure of information pursuant to subsection (i) shall be made only after consultation with counsel for the applicable Inspectors and the Company and (B) with respect to any release of Records pursuant to subsection (ii), each holder of Warrant Shares shall, promptly after learning that disclosure of such Records is sought in a court having jurisdiction, give notice to the Company so that the Company, at the Company's expense, may undertake appropriate action to prevent disclosure of such Records;

(k)    if such offering is an underwritten offering, enter into such agreements (including an underwriting agreement in form, scope and substance as is customary in underwritten offerings) and take all such other appropriate and reasonable actions requested by the holders of a majority of the Warrant Shares being sold in connection therewith (including those reasonably requested by the managing underwriters) in order to expedite or facilitate the disposition of such Warrant Shares, and in such connection, (i) use commercially reasonable

24    DeltaView comparison of pcdocs://wilsr01a/592246/9 and pcdocs://wilsr01a/592246/18. Performed on 10/27/2009.

efforts to obtain opinions of counsel to the Company and updates thereof (which counsel and opinions (in form, scope and substance) shall be reasonably satisfactory to the managing underwriters and counsel to the holders of the Warrant Shares being sold), addressed to each selling holder of Warrant Shares covered by such Registration Statement and each of the underwriters as to the matters customarily covered in opinions requested in underwritten offerings and such other matters as may be reasonably requested by such counsel and underwriters, (ii) use commercially reasonable efforts to obtain "cold comfort" letters and updates thereof from the independent certified public accountants of the Company (and, if necessary, any other independent certified public accountants of any subsidiary of the Company or of any business acquired by the Company for which financial statements and financial data are, or are required to be, included in the Registration Statement), addressed to each selling holder of Warrant Shares covered by the Registration Statement (unless such accountants shall be prohibited from so addressing such letters by applicable standards of the accounting profession) and each of the underwriters, such letters to be in customary form and covering matters of the type customarily covered in "cold comfort" letters in connection with underwritten offerings, (iii) if requested and if an underwriting agreement is entered into, provide indemnification provisions and procedures customary for underwritten public offerings.  The above shall be done at each closing under such underwriting or similar agreement, or as and to the extent required thereunder.

Section 7.04    Holder Obligations.The Company may require each holder of Warrant Shares covered by a Registration Statement to furnish such information regarding such holder and such holder's intended method of disposition of such Warrant Shares as it may from time to time reasonably request in writing.  If any such information is not furnished within a reasonable period of time after receipt of such request, the Company may exclude such holder's Warrant Shares from such Registration Statement.  In addition if such offering is an underwritten offering, the Company may require the holders of Warrants and Warrant Shares to enter into such agreements (including an underwriting agreement in form, scope and substance as is customary in underwritten offerings) and take all such other appropriate and reasonable actions requested by the Company (including that such holders exercise their Warrants and any other actions reasonably requested by the managing underwriters) in order to expedite or facilitate the disposition of such Warrant Shares;

(b)    Upon receipt of any notice from the Company of the happening of any event of the kind described in Section 7.03(c)(ii), 7.03(c)(iii), 7.03(c)(iv) or 7.03(c)(v), each holder of Warrant Shares covered by a Registration Statement shall discontinue disposition of any Warrant Shares covered by such Registration Statement or the related Prospectus until receipt of the copies of the supplemented or amended Prospectus contemplated by Section 7.03(g), or until such holder is advised in writing by the Company that the use of the applicable Prospectus may be resumed, and has received copies of any amended or supplemented Prospectus or any additional or supplemental filings which are incorporated, or deemed to be incorporated, by reference in such Prospectus and, if requested by the Company, the Holder shall deliver to the Company (at the expense of the Company) all copies then in its possession, other than permanent file copies then in such holder's possession, of the Prospectus covering such Warrant Shares at the time of receipt of such request;

(c)    Each holder of Warrant Shares covered by a Registration Statement shall not to utilize any material other than the applicable current preliminary prospectus, free

25    DeltaView comparison of pcdocs://wilsr01a/592246/9 and pcdocs://wilsr01a/592246/18. Performed on 10/27/2009.

writing prospectus, road show or Prospectus in connection with the offering of such Warrant Shares; and

(d)     If (i) the Company shall file a registration statement (other than in connection with the registration of securities issuable pursuant to an employee stock option, stock purchase or similar plan or pursuant to a merger, exchange offer or a transaction of the type specified in Rule 145(a) under the Securities Act) with respect to an underwritten public offering of Common Stock or securities convertible into, or exchangeable or exercisable for, such securities, (ii) with reasonable prior notice, the managing underwriter or underwriters of a public offering advises the Company in writing (in which case the Company shall notify the Holders) that a public sale or distribution of Warrant Shares would materially adversely impact such offering and (iii) the underwriter or underwriters have obtained written lock-up agreements from the Company, each executive officer of the Company and the stockholders party to the Stockholders Agreement ("Lock-up Agreements"), then each Holder shall, to the extent not inconsistent with applicable law, refrain from effecting any public sale or distribution of Warrant Shares during the ten (10) days prior to the effective date of such registration statement and until the earlier of the abandonment of such offering and the expiration of all lock-up periods imposed in connection with the Lock-Up Agreements. Notwithstanding the foregoing, any obligations of the Holders under this Section 7.04(d) shall terminate in the event that the Company or any underwriter terminates, releases or waives, in whole of in part, the Lock-up Agreements with respect to the Company, any executive officer of the Company or any such other person who has been granted registration rights by the Company.

Section 7.05   Registration Expenses.  Whether or not any Registration Statement is filed or becomes effective, the Company shall pay all costs, fees and expenses incident to the Company's performance of or compliance with this Article VII, including (i) all registration and filing fees, including NASD filing fees, (ii) all fees and expenses of compliance with securities or "Blue Sky" laws, including reasonable fees and disbursements of counsel in connection therewith, (iii) printing expenses (including expenses of printing certificates for Warrant Shares and of printing prospectuses if the printing of prospectuses is requested by the Holders or holders of Warrant Shares or the managing underwriter, if any) and expenses associated with a road show, (iv) messenger, telephone and delivery expenses, (v) fees and disbursements of counsel for the Company, (vi) fees and disbursements of all independent certified public accountants of the Company (including expenses of any "cold comfort" letters required in connection with this Agreement) and all other persons retained by the Company in connection with such Registration Statement, (vii) fees and disbursements of one counsel, other than the Company's counsel, selected by holders of a majority of the Warrant Shares being registered, to represent all such holders, (viii) fees and disbursements of underwriters customarily paid by the issuers or sellers of securities and (ix) all other costs, fees and expenses incident to the Company's performance or compliance with this Article VII.  Notwithstanding the foregoing, the fees and expenses of any persons retained by any holder, other than one counsel for all such holders, and any discounts, commissions or brokers' fees or fees of similar securities industry professionals and any transfer taxes relating to the disposition of the Warrant Shares by a holder, will be payable by such holder and the Company will have no obligation to pay any such amounts.

Section 7.06   Limitations on Subsequent Registration Rights.     After the date of the IPO and before the Expiration Date, the Company shall not grant registration rights to any

26      DeltaView comparison of pcdocs://wilsr01a/592246/9 and pcdocs://wilsr01a/592246/18. Performed on 10/27/2009.

third party which are senior to or *pari passu* with the registration rights granted pursuant to this Article VII, unless the Company has obtained the written consent of holders of Warrants representing at least a majority in number of the Warrant Shares then issuable upon the exercise of outstanding Warrants.

## ARTICLE VIII
## MISCELLANEOUS

Section 8.01   Amendment.  The terms of the Warrants may be amended by the Company together with the affirmative vote or consent of the Holders of a majority of the Warrants.  The Company and the Warrant Agent may from time to time supplement or amend this Agreement without the approval of any Holders in order to cure any ambiguity, manifest error or other mistake in this Agreement, or to correct or supplement any provision contained herein that may be defective or inconsistent with any other provision herein, or to make any other provisions in regard to matters or questions arising hereunder that the Company and the Warrant Agent may deem necessary or desirable and that shall not adversely affect, alter or change the interests of any Holder.  Notwithstanding anything to the contrary herein, upon the delivery of a certificate from an appropriate officer of the Company, which states that the proposed supplement or amendment is in compliance with the terms of this Section 8.01 and, provided such supplement or amendment does not change the Warrant Agent's own rights, duties, liabilities, immunities or obligations hereunder, the Warrant Agent shall execute such supplement or amendment.  Any amendment, modification or waiver effected pursuant to and in accordance with the provisions of this Section 8.01 will be binding upon all Holders and upon each future Holder, the Company and the Warrant Agent.  In the event of any amendment, modification or waiver, the Company will give prompt notice thereof to all Holders.

Section 8.02   Notices and Demands to the Company and Warrant Agent.  If the Warrant Agent shall receive any notice or demand addressed to the Company by the Holder of a Warrant Certificate pursuant to the provisions of the Warrant Certificates, the Warrant Agent shall promptly forward such notice or demand to the Company.

Section 8.03   Addresses.  Any communication from the Company to the Warrant Agent with respect to this Agreement shall be addressed to [          ],Mellon Investor Services LLC, 200 W. Monroe Street, Suite 1590, Chicago, IL 60606, Attention: [          ] Georg Drake, with a copy to Mellon Investor Services LLC, 480 Washington Boulevard, Jersey City, NJ 07310, Attention:  Legal Department, and any communication from the Warrant Agent to the Company with respect to this Agreement shall be addressed to Hayes Lemmerz International, Inc., 15300 Centennial Drive, Northville, MI 48167, Attention: General Counsel (or such other address as shall be specified in writing by the Warrant Agent or by the Company).  For the avoidance of doubt, the Company may satisfy its obligation to provide the Warrant Agent with a written order or direction pursuant to this Agreement through the use of electronic mail delivered to the Warrant Agent.

Section 8.04   Applicable Law.  The validity, interpretation and performance of this Agreement and each Warrant Certificate issued hereunder and of the respective terms and

27     DeltaView comparison of pcdocs://wilsr01a/592246/9 and pcdocs://wilsr01a/592246/18. Performed on 10/27/2009.

provisions hereof and thereof shall be governed by, and construed in accordance with, the laws of the State of Delaware.

Section 8.05    Obtaining of Governmental Approval.  The Company from time to time will use its best efforts to obtain and keep effective any and all permits, consents and approvals of governmental agencies and authorities and to make any necessary filings under federal or state securities laws, which may become requisite in connection with the issuance, sale, transfer and delivery of the Warrant Certificates, the exercise or conversion of the Warrants, the issuance, sale, transfer and delivery of the Warrant Shares.

Section 8.06    Persons Having Rights Under Warrant Agreement.  Nothing contained in the Warrant shall be construed as conferring upon the Holder the right to vote or to consent or to receive notice as a stockholder in respect of any meeting of stockholders for the election of directors of the Company or any other matter, to receive dividends or any rights whatsoever as stockholders of the Company.  Each Holder shall be entitled to receive the same information and reports to which a holder of the Common Stock is entitled pursuant to the Stockholders Agreement then in effect, subject to execution of an appropriate confidentiality agreement.

Section 8.07    Headings.  The descriptive headings of the several Articles and Sections of this Agreement are inserted for convenience only and shall not control or affect the meaning or construction of any of the provisions hereof.

Section 8.08    Counterparts.  This Agreement may be executed in any number of counterparts, each of which as so executed shall be deemed to be an original, but such counterparts shall together constitute but one and the same instrument.

Section 8.09    Inspection of Agreement.  A copy of this Agreement shall be available at all reasonable times at the principal corporate trust office of the Warrant Agent for inspection by the Holder of any Warrant Certificate.  The Warrant Agent may require such Holder to submit his Warrant Certificate for inspection by it.

Section 8.10    Notices to Holders of Warrants.  Any notice to Holders of Warrants evidenced by Warrant Certificates which by any provisions of this Warrant Agreement is required or permitted to be given shall be given by first class mail prepaid at such Holder's address as it appears on the books of the Warrant Agent.

Section 8.11    Binding Effects.  This Agreement shall inure to the benefit and shall be binding upon the Company, the Warrant Agent and the Holders and their respective heirs, legal representatives, successors and assigns.  Nothing in this Agreement, express or implied, is intended to or shall confer on any Person other than the Company, the Warrant Agent and the Holders, or their respective heirs, legal representatives, successors or assigns, any rights, remedies, obligations or liabilities under or by reason of this Agreement.

Section 8.12    Severability.  In the event that any one or more of the provisions contained herein, or the application thereof in any circumstances, is held invalid, illegal or

28    DeltaView comparison of pcdocs://wilsr01a/592246/9 and pcdocs://wilsr01a/592246/18. Performed on 10/27/2009.

unenforceable, the validity, legality and enforceability of any such provisions in every other respect and of the remaining provisions contained herein and therein shall not be affected or impaired thereby; provided, that if any such excluded term, provision, covenant or restriction shall materially adversely affect the rights, immunities, duties or obligations of the Warrant Agent, the Warrant Agent shall be entitled to resign by giving not less than ten (10) days prior written notice to the Company.  In the event a successor Warrant Agent has not been appointed and accepted its duties within ten (10) days of the Warrant Agent's notice of resignation, the Warrant Agent may apply to any court of competent jurisdiction for the designation of a successor Warrant Agent.

[SIGNATURE PAGE FOLLOWS]

29      DeltaView comparison of pcdocs://wilsr01a/592246/9 and pcdocs://wilsr01a/592246/18. Performed on 10/27/2009.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed.

HAYES LEMMERZ INTERNATIONAL, INC.

By: _____

     Name:

     Title:


[BNY MELLON SHAREOWNERINVESTOR SERVICES] LLC

By: _____

     Name:

     Title:

EXHIBIT A

[FORM OF WARRANT CERTIFICATE]

[Face]

EXERCISABLE ONLY IF AUTHENTICATED BY THE WARRANT
AGENT AS PROVIDED HEREIN

VOID AFTER THE CLOSE OF BUSINESS ON _____, 2016
HAYES LEMMERZ INTERNATIONAL, INC.

Warrant Certificate representing
Series A[2] Warrants to purchase
Class A Common Stock, par value $.[01]0.01 per share
as described herein

_____

Warrants

This certifies that [_____] or registered assigns is the registered owner of the above indicated number of  Series A Warrants[3] (each, a "Warrant"), each Warrant entitling such registered owner to purchase, one share of the Class A Common Stock, par value $.[01]0.01 per share (the "Warrant Shares") of Hayes Lemmerz International, Inc. (the "Company") on the following basis.

The Warrant may be exercised in whole or in part at any time on or before the close of business on _____, 2016; *provided that*, any Warrants not exercised in connection with a Sale Transaction in which the holders of Common Stock receive only cash consideration, shall automatically expire upon consummation of such Sale Transaction (in either case, such date and such time, the "Expiration Date"); *provided further, that* for the avoidance of doubt, the foregoing proviso shall not affect a Holder's entitlement to replacement securities pursuant to Section 5.05 of the Warrant Agreement.  Each Warrant not exercised at or before the Expiration Date shall become void, and all rights of the Holder and any beneficial owners of the Warrant Certificate evidencing such Warrant under the Warrant Agreement shall cease.

Prior to the Expiration Date, each Warrant shall entitle the Holder thereof, subject to the provisions of this Agreement, to purchase from the Company one Warrant Share at the Exercise

---

[2] Series B Warrant Certificate will state "Series B"

[3] Series B Warrant Certificate will state "Series B"

Price of [$____ ] (the "Exercise Price").  The Holder of this Warrant Certificate may exercise the Warrants evidenced hereby, in whole or in part, by surrendering this Warrant Certificate, with the purchase form set forth hereon duly completed, accompanied by payment in full, in lawful money of the United States of America, in immediately available funds, or deemed payment in full in connection with a "cashless" exercise, the Exercise Price for each Warrant exercised, to the Warrant Agent (as hereinafter defined), ~~at the corporate trust office of [                ],~~ or its successor as warrant agent (the "Warrant Agent") at the addresses specified on the reverse hereof and upon compliance with and subject to the conditions set forth herein and in the Warrant Agreement dated as of _____, 2009 (the "Warrant Agreement").  Capitalized terms used, but not otherwise defined, herein, shall have the meaning ascribed to such terms in the Warrant Agreement.

The term "Holder" as used herein shall mean the person in whose name at the time this Warrant Certificate shall be registered upon the books to be maintained by the Warrant Agent for that purpose pursuant to Section 4.01 of the Warrant Agreement.

Any whole number of Warrants evidenced by this Warrant Certificate may be exercised to purchase Warrant Shares in registered form.  Upon any exercise of fewer than all of the Warrants evidenced by this Warrant Certificate, a new Warrant or Warrants of like tenor, calling in the aggregate on the face or faces of this Warrant Certificate or Warrant Certificates for the number of shares of Common Stock equal (without giving effect to any adjustment thereof) to the number of such shares called for on the face of the Warrant Certificate minus the number of such shares designated by the Holder upon such exercise together with any Warrant Shares withheld in connection with a Cashless Exercise, shall be issued and delivered to the Holder or its registered assigns.

This Warrant Certificate is issued under and in accordance with the Warrant Agreement, between the Company and the Warrant Agent and is subject to the terms and provisions contained in the Warrant Agreement, to all of which terms and provisions the Holder of this Warrant Certificate consents by acceptance hereof.  Copies of the Warrant Agreement are on file at the above-mentioned office of the Warrant Agent.

After authentication by the Warrant Agent and prior to the expiration of this Warrant Certificate, this Warrant Certificate may be exchanged at the corporate trust office of the Warrant Agent for Warrant Certificates representing the same aggregate number of Warrants.

Neither this Warrant Certificate nor the Warrant evidenced hereby, shall, and nothing contained in the Warrant Agreement shall be construed to entitle the registered owner hereof, or any beneficial owner, to any of the rights of a registered holder or beneficial owner of the Warrant Shares, including, without limitation, the right to vote or to consent or to receive notice as a stockholder in respect of any meetings of stockholders for the election of directors of the Company or any other matter, to receive dividends on Warrant Shares or any rights whatsoever as stockholders of the Company.

Reference is hereby made to the further provisions of this Warrant Certificate set forth on the reverse hereof, which further provisions shall for all purposes have the same effect as if set

2    DeltaView comparison of pcdocs://wilsr01a/592246/9 and pcdocs://wilsr01a/592246/18. Performed on 10/27/2009.

forth at this place.

This Warrant Certificate shall not be valid or obligatory for any purpose until authenticated by the Warrant Agent.

---

3      DeltaView comparison of pcdocs://wilsr01a/592246/9 and pcdocs://wilsr01a/592246/18. Performed on 10/27/2009.

IN WITNESS WHEREOF, the Company has caused this Warrant Certificate to be duly executed.

Dated:_____

HAYES LEMMERZ INTERNATIONAL, INC

By:_____

Attest:

_____

Certificate of Authentication

This is one of the Warrant Certificates referred to in the within-mentioned Warrant Agreement.

_____
MELLON INVESTOR SERVICES LLC,
                As Warrant Agent

By:_____
        Authorized Signature

<hr>

4        DeltaView comparison of pcdocs://wilsr01a/592246/9 and pcdocs://wilsr01a/592246/18. Performed on 10/27/2009.

[REVERSE] [FORM OF WARRANT CERTIFICATE]
(Instructions for Exercise of Warrants)

To exercise any Warrants evidenced hereby, the Holder of this Warrant Certificate must pay by certified check or official bank check or by bank wire transfer, in each case, in immediately available funds, unless such exercise is a Cashless Exercise, then by tendering Warrants equal to, the aggregate Exercise Price in full for each of the Warrants exercised, to _____, ~~Corporate Trust Department~~, _____, Attn: _____, which payment should specify the name of the Holder of this Warrant Certificate and the number of Warrants exercised by such Holder.  A Cashless Exercise shall only be permitted in connection with an IPO or a Triggering Event, as provided in the Warrant Agreement.  In addition, the Holder of this Warrant Certificate should complete the information required below and present in person or mail by registered mail this Warrant Certificate to the Warrant Agent at the addresses set forth below.

[FORM OF EXERCISE]
(To be executed upon exercise of Warrants.)

The undersigned hereby irrevocably elects to exercise _____ Warrants, represented by this Warrant Certificate, to purchase _____ shares of Class A Common Stock, par value $.~~[01]~~0.01 per share (the "Warrant Shares") of Hayes Lemmerz International, Inc. and represents that he has tendered payment for such Warrant Shares by (check one):

☐   certified check or official bank check or by bank wire transfer, in each case, in immediately available funds, to the order of Hayes Lemmerz International, Inc., c/o [        ] in the amount of $_____ ,

or

☐   tendering _____ Warrants, in connection with a Cashless Exercise, as set forth in Section 2.03(c) of the Warrant Agreement, equal to the aggregate Exercise Price,

in accordance with the terms of the Warrant Agreement.  The undersigned requests the Warrant Shares to which the Holder is entitled be in fully registered form, in the authorized denominations, registered in such names and delivered, all as specified in accordance with the instructions set forth below.

If said amount of Warrant Shares is less than all of the Warrant Shares purchasable hereunder, the undersigned requests that a new Warrant Certificate or Warrants of like tenor representing the remaining balance of the Warrants evidenced hereby be issued and delivered to the undersigned unless otherwise specified in the instructions below.

Dated:_____

Name_____
        (Please Print)

5       DeltaView comparison of pcdocs://wilsr01a/592246/9 and pcdocs://wilsr01a/592246/18. Performed on 10/27/2009.

_____
(Insert Social Security or Other
Identifying Number of Holder)

Address _____
_____

Signature_____
    (Signed exactly as name appears
    on the other side of this Warrant
    Certificate)

      This Warrant may be exercised at the following addresses:
    By hand at   _____
           _____
           _____
           _____

    By mail at   _____
           _____
           _____
           _____

(Instructions as to form and delivery of Warrant Shares and/or Warrant Certificates):

**(NOTE:  The signature(s) must be medallion guaranteed by a commercial bank or trust company in the United States or by a member firm of the New York Stock Exchange)**

---

6  DeltaView comparison of pcdocs://wilsr01a/592246/9 and pcdocs://wilsr01a/592246/18. Performed on 10/27/2009.

[FORM OF ASSIGNMENT]

(TO BE EXECUTED TO TRANSFER THE WARRANT CERTIFICATE)

FOR VALUE RECEIVED _____ hereby sells, assigns and transfers unto
                                                Please insert social
                                                security or other
                                                identifying number)

_____

_____
(Please print name and address
including zip code)

_____
__ the right represented by the within Warrant Certificate and does hereby irrevocably constitute
and appoint _____, Attorney, to transfer said Warrant Certificate on the books of
the Warrant Agent with full power of substitution.

Dated: _____

                        _____
                                Signature
                        (Signed exactly as name appears on the
                        other side of this Warrant Certificate)

Signature Guarantee:

_____
Participant in a recognized Signature
Guarantee Medallion Program (or other
signature guarantor program reasonably
acceptable to the Warrant Agent)

**(NOTE:  The signature(s) must be medallion guaranteed by a commercial bank or trust company in the United States or by a member firm of the New York Stock Exchange)**

7       DeltaView comparison of pcdocs://wilsr01a/592246/9 and pcdocs://wilsr01a/592246/18. Performed on 10/27/2009.

Document comparison done by DeltaView on Tuesday, October 27, 2009 10:18:16 PM

| Input: | |
|---|---|
| Document 1 | pcdocs://wilsr01a/592246/9 |
| Document 2 | pcdocs://wilsr01a/592246/18 |
| Rendering set | Option 3a strikethrough double score no moves |

| Legend: | |
|---|---|
| Insertion | |
| Deletion | |
| <Moved from > | |
| >Moved to < | |
| Style change | |
| Format change | |
| Moved deletion | |
| Inserted cell | |
| Deleted cell | |
| Moved cell | |
| Split/Merged cell | |
| Padding cell | |

| Statistics: | |
|---|---|
| | Count |
| Insertions | 142 |
| Deletions | 105 |
| Moved from | 0 |
| Moved to | 0 |
| Style change | 0 |
| Format changed | 0 |
| Total changes | 247 |

8       DeltaView comparison of pcdocs://wilsr01a/592246/9 and pcdocs://wilsr01a/592246/18. Performed on 10/27/2009.

## <u>Exhibit M</u>

**Blackline - Form of Stockholders' Agreement, Registration Rights Agreement
and Management Stockholders' Agreement**

**PLAN EXHIBIT M**

**Registration Rights Agreement ~~and~~ ,
Stockholders' Agreement, and
Management Stockholders Agreement**

The forms of Registration Rights Agreement and Stockholders' Agreement are attached hereto.

~~Management Stockholders Agreement~~  The Plan provides that any party that receives the New Common Stock or similar equity based incentives through or on account of any management incentive plan or the like shall be required to execute a separate management stockholders agreement acceptable to the executive and Reorganized Hayes prior to receipt of such New Common Stock or incentive.  ~~The First Amended Joint Plan of Reorganization of Hayes Lemmerz International, Inc. and its Affiliated Debtors and Debtors-in-Possession (the "Plan") does not provide for any member of the Debtors' or Reorganized Hayes' management to receive~~ Specific awards of New Common Stock or similar equity based incentives~~, or implement~~ to Reorganized Hayes' management, or the implementation of any management incentive plan or the like, ~~on the effective date of~~ will not occur until after the Plan Effective Date.  Accordingly, the Debtors and the Requisite DIP Lenders have agreed that such a management stockholders agreement will ~~either be (a) negotiated with the Requisite DIP Lenders prior to the hearing to consider confirmation of the Plan or (b)~~ negotiated by the Board of Directors (the "Board") of Reorganized Hayes after the ~~effective date of the~~ Plan Effective Date and be implemented in connection with any long-term incentive plan or other management incentive or similar plan implemented by the Board of Reorganized Hayes.

---

2 _____ DeltaView comparison of pcdocs://chisr02a/777483/4 and pcdocs://chisr02a/777483/5. Performed on 10/29/2009.

Document comparison done by DeltaView on Thursday, October 29, 2009 2:53:46 PM

| Input: | |
|---|---|
| Document 1 | pcdocs://chisr02a/777483/4 |
| Document 2 | pcdocs://chisr02a/777483/5 |
| Rendering set | Option 3a strikethrough double score no moves |

| Legend: | |
|---|---|
| Insertion | |
| Deletion | |
| <Moved from > | |
| >Moved to < | |
| Style change | |
| Format change | |
| Moved deletion | |
| Inserted cell | |
| Deleted cell | |
| Moved cell | |
| Split/Merged cell | |
| Padding cell | |

| Statistics: | |
|---|---|
| | Count |
| Insertions | 10 |
| Deletions | 7 |
| Moved from | 0 |
| Moved to | 0 |
| Style change | 0 |
| Format changed | 2 |
| Total changes | 19 |

3_____DeltaView comparison of pcdocs://chisr02a/777483/4 and pcdocs://chisr02a/777483/5.
Performed on 10/29/2009.

Execution Version

STOCKHOLDERS AGREEMENT

among

HAYES LEMMERZ INTERNATIONAL, INC.

and

EACH OF THE STOCKHOLDERS

of

HAYES LEMMERZ INTERNATIONAL, INC.
NAMED ON THE SIGNATURE PAGES HERETO

Dated as of _____, 2009

———————————

2     DeltaView comparison of pcdocs://chisr01a/688255/1 and pcdocs://chisr01a/688255/2. Performed on 10/28/2009.

TABLE OF CONTENTS

Page

ARTICLE I DEFINITIONS .................................................................................... 1

ARTICLE II BOARD OF DIRECTORS AND GOVERNANCE ............................ 6

SECTION 2.1     Election of Directors; Number and Composition of the Board. ............ 6

SECTION 2.2     Action by the Board ............................................................................ 7

SECTION 2.3     D&O Indemnification Agreement; Expenses ....................................... 7

SECTION 2.4     Actions Requiring Stockholder Approval; Director Approval. ............. 7

ARTICLE III ACCESS TO INFORMATION ........................................................ 910

SECTION 3.1     General Information to be Provided by the Company ......................... 910

SECTION 3.2     Right to Access .................................................................................. 1011

SECTION 3.3     Notice of Certain Events .................................................................... 1011

ARTICLE IV CERTIFICATE OF INCORPORATION AND BYLAWS ................ 11

ARTICLE V TRANSFERS OF SHARES .............................................................. 1112

SECTION 5.1     Restrictions on Transfers; Permitted Transferees. ............................. 1112

SECTION 5.2     Drag-Along Right. ............................................................................. 13

SECTION 5.3     Tag-Along Rights. .............................................................................. 15

SECTION 5.4     Legend on Certificates ....................................................................... 16

SECTION 5.5     No Circumvention of Stock Transfer Restrictions .............................. 1617

ARTICLE VI ADDITIONAL AGREEMENTS ...................................................... 17

SECTION 6.1     Preemptive Rights. ............................................................................. 17

SECTION 6.2     Confidentiality ................................................................................... 1819

SECTION 6.3     Environmental, Health and Safety Covenants ..................................... 19

ARTICLE VII MISCELLANEOUS ....................................................................... 1920

SECTION 7.1     Term .................................................................................................. 1920

SECTION 7.2     Modifications ..................................................................................... 1920

SECTION 7.3     Action by Stockholders ...................................................................... 20

SECTION 7.4     Applicability ...................................................................................... 20

SECTION 7.5     Notices .............................................................................................. 2021

SECTION 7.6     Binding Effect .................................................................................... 2122

SECTION 7.7     Entire Agreement ............................................................................... 2122

SECTION 7.8    Counterparts ........................................................................... 2122

SECTION 7.9    Headings ................................................................................ 22

SECTION 7.10   Bylaws .................................................................................. 22

SECTION 7.11   Further Acts and Assurances ................................................. 22

SECTION 7.12   Governing Law; Consent to Jurisdiction and Service of Process ................ 22

SECTION 7.13   Injunctive Relief ................................................................... 2223

SECTION 7.14   Severability ........................................................................... 2223

SECTION 7.15   Recapitalization, Etc. ............................................................ 23

Exhibit A          Certificate of Incorporation

Exhibit B          Bylaws

STOCKHOLDERS AGREEMENT

This STOCKHOLDERS AGREEMENT, dated as of [_____], 2009 (this "Agreement"), is entered into among HAYES LEMMERZ INTERNATIONAL, INC., a Delaware corporation (the "Company") and the Stockholders.  Capitalized terms not otherwise defined herein have the meanings set forth in Article I.

W I T N E S S E T H :

WHEREAS, on May 11, 2009, the Company and certain of the Company's direct and indirect subsidiaries each filed a voluntary petition in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") initiating cases under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") §§ 101-1330 and continued in the possession of their assets and in the management of their businesses pursuant to sections 1107 and 1108 of the Bankruptcy Code;

WHEREAS, the [First] Amended Joint Plan of Reorganization of Hayes Lemmerz International, Inc., et al., as confirmed on [_____], 2009 by an order of the Bankruptcy Court entered on [_____], 2009 (the "Plan"), provides that the Company shall issue to the Stockholders shares of Class A Common Stock and/or shares of Class B Common Stock; and

WHEREAS, in connection with the consummation of the transactions contemplated by the Plan, and as required pursuant to the Plan as a condition to the receipt of such shares, the Company and the Stockholders are entering into this Agreement to provide certain rights and obligations among them.

NOW, THEREFORE, in consideration of the premises set forth herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties, intending to be legally bound hereby, agree as follows:

ARTICLE I

DEFINITIONS

The following terms shall have the definitions set forth below:

"Acceptance Notice" has the meaning set forth in Section 6.1(c).

"Affiliate" means, with respect to any specified Person, any other Person directly or indirectly controlling or controlled by or under direct or indirect common control with such specified Person.  For the purposes of this definition, "control" when used with respect to any specified Person means the power to direct the management and policies of such Person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise; and the terms "controlling" and "controlled" have meanings correlative to the foregoing.

"Agreement" has the meaning set forth in the preamble of this Agreement.

"Bankruptcy Code" has the meaning set forth in the preamble of this Agreement.

"Bankruptcy Court" has the meaning set forth in the preamble of this Agreement.

"Breaching Drag-Along Stockholder" has the meaning set forth in Section 5.2(e) of this Agreement.

"Beneficial Ownership" or "Beneficially Own" shall have the meaning given such term in Rule 13d-3 under the Exchange Act and a Person's Beneficial Ownership of securities shall be calculated in accordance with the provisions of such Rule; provided, however, that for purposes of determining any Person's Beneficial Ownership, such Person shall be deemed to be the Beneficial Owner of any Common Stock which may be acquired by such Person (disregarding any legal impediments to such Beneficial Ownership), whether within sixty (60) days or thereafter, upon the conversion, exchange, redemption or exercise of any warrants, options, rights, or other securities issued by the Company or any subsidiary thereof.  Notwithstanding anything to the contrary set forth herein, prior to the pledgee commencing action to foreclose upon any shares of Common Stock pledged in any Qualified Pledge, any such pledged shares of Common Stock will be deemed Beneficially Owned by the pledging party.

"Board" means the Board of Directors of the Company.

"Business Day" means any day other than a Saturday, a Sunday or a day on which banks in New York, New York are authorized or obligated by law or executive order to close.

"Bylaws"  means the Amended and Restated Bylaws of the Company, as amended from time to time.

"Certificate of Incorporation"  means the Amended and Restated Certificate of Incorporation of the Company, as amended from time to time.

"Class A Common Stock" means the Company's Class A common stock, par value of $0.01 per share.

"Class B Common Stock" means the Company's Class B common stock, par value of $0.01 per share.

"Common Stock" means the Company's Class A Common Stock and Class B Common Stock.

"Common Stock Equivalents" means securities (including, without limitation, options or warrants) exercisable, exchangeable or convertible into Common Stock, whether immediately, upon the happening of any event or the passage of time, or otherwise.

"Company" has the meaning set forth in the preamble of this Agreement.

---

2    DeltaView comparison of pcdocs://chisr01a/688255/1 and pcdocs://chisr01a/688255/2. Performed on 10/28/2009.

"Confidential Information" means any information, including all financial information provided pursuant to Article III, concerning the organization, business, technology, trade secrets, know-how, finance, transactions or affairs of a Person (whether conveyed in written, oral or in any other form and whether such information has been furnished before, on or after the date of this Agreement) that is not known to the public or otherwise publicly available.

"DGCL"  means the Delaware General Corporation Law.

"Dilutive Securities" has the meaning set forth in Section 6.1.

"Drag-Along Buyer" has the meaning set forth in Section 5.2(a).

"Drag-Along Proxy Holder" has the meaning set forth in Section 5.2(e).

"Drag-Along Right" has the meaning set forth in Section 5.2(a).

 "EHS" has the meaning set forth in Section 6.3.

"Eligible Stockholder" has the meaning set forth in Section 3.1.

"Equity Incentive Plan" means any employee stock option plan, stock purchase plan, employee benefit plan, employment contract or any similar benefit or incentive program or agreement covering management, directors, employees or consultants of the Company and its subsidiaries approved by the Board, where the primary purpose of such plan, program or agreement is not to raise capital for the Company.

"Exchange Act" means the Securities Exchange Act of 1934, as amended, and the rules and regulations of the SEC promulgated thereunder.

 "Initial Holders" means the Stockholders designated as such on the signature pages hereto.

 "Majority Sale" has the meaning set forth in Section 5.2(a).

"Majority Sale Closing Date" has the meaning set forth in Section 5.2(b).

"Majority Sale Notice" has the meaning set forth in Section 5.2(b).

"Non-Initiating Stockholders" has the meaning set forth in Section 5.2(a).

 "Notice of Preemptive Rights" has the meaning set forth in Section 6.1(b).

"Other Purchasers" has the meaning set forth in Section 6.1(d).

"Parties" means collectively the Company and any Person who becomes a party to this Agreement.  Each of the Parties are referred to as a "Party."

"Permitted Transferee" has the meaning set forth in Section 5.1(e).

---

3_____DeltaView comparison of pcdocs://chisr01a/688255/1 and pcdocs://chisr01a/688255/2. Performed on 10/28/2009.

"Person" means an individual, corporation, partnership, limited liability company, joint venture, association, joint stock company, trust or unincorporated organization, or government or any agency or political subdivision thereof.

"Plan" has the meaning set forth in the preamble of this Agreement.

"Preemptive Offer" has the meaning set forth in Section 6.1(b).

"Pro Rata Portion" means:

(a) For purposes of Section 5.2 (with respect to each class of Shares to be Transferred pursuant to the Drag-Along Rights), a number of such class of Shares determined by multiplying (i) the aggregate number of such class of Shares Beneficially Owned by the Non-Initiating Stockholder by (ii) a fraction, the numerator of which is the aggregate number of such class of Shares proposed to be Transferred by the Proposing Stockholders to the Drag-Along Buyer and the denominator of which is the aggregate number of such class of Shares Beneficially Owned by the Proposing Stockholders.

(b) For purposes of Section 5.3 (with respect to each class of Shares to be transferred pursuant to the tag-along rights), (x) with respect to each Tagging Stockholder, a number of such class of Shares determined by multiplying (i) the total number of such class of Shares proposed to be Transferred by the Proposing Stockholder to the Proposed Transferee, by (ii) a fraction, the numerator of which is the number of such class of Shares Beneficially Owned by the Tagging Stockholder and the denominator of which is the aggregate number of such class of Shares Beneficially Owned by all Stockholders.

(c) For purposes of Section 6.1 (with respect to preemptive rights), a number of Dilutive Securities determined by multiplying (i) the aggregate number of Dilutive Securities the Company proposes to issue on the relevant issuance date by (ii) a fraction, the numerator of which is the number of Shares Beneficially Owned by the relevant Stockholder immediately prior to such date and the denominator of which is the aggregate number of Shares Beneficially Owned by all Stockholders.

"Proposed Transferee" has the meaning set forth in Section 5.3(a).

"Proposing Stockholders" has the meaning set forth in Section 5.2(a).

"Qualified Pledge" means a bona fide pledge of Common Stock in connection with a secured borrowing transaction, the pledgee with respect to which is a financial institution in the business of engaging in secured lending and similar transactions which has entered into such transaction in the ordinary course of such business.

"Qualified Public Offering" means a bona fide underwritten public offering of Shares by a nationally recognized investment banking firm that is registered under the Securities Act and (i) that results in net proceeds to the Company of not less than $75 million; and (ii) following which the Shares are listed on a United States national securities exchange.

4    DeltaView comparison of pcdocs://chisr01a/688255/1 and pcdocs://chisr01a/688255/2. Performed on 10/28/2009.

"Registration Rights Agreement" means the Registration Rights Agreement, dated as of the date hereof, among the Parties hereto, as amended from time to time in accordance with its terms.

"Representative" means a Person's employees, directors, officers, advisors and other representatives (including attorneys, accountants and consultants).

"SEC" means the United States Securities and Exchange Commission, or any other Federal agency at the time administering the Securities Act or the Exchange Act.

"Securities Act" means the Securities Act of 1933, as amended, and the rules and regulations of the SEC promulgated thereunder.

"Series A Warrants" means the Series A Warrants contemplated to be issued to certain noteholders and the Pension Benefit Guaranty Corporation under the Plan.

"Series B Warrants" means the Series B Warrants contemplated to be issued to certain noteholders and the Pension Benefit Guaranty Corporation under the Plan.

"Series C Warrants" means the Series C Warrants contemplated to be issued to certain prepetition lenders under the Plan.

"Series D Warrants" means the Series D Warrants contemplated to be issued to certain prepetition lenders under the Plan.

"Series E Warrants" means the Series E Warrants contemplated to be issued to certain noteholders and the Pension Benefit Guaranty Corporation under the Plan.

"Series F Warrants" means the Series F Warrants contemplated to be issued to certain noteholders and the Pension Benefit Guaranty Corporation under the Plan.

"Shares" means shares of Common Stock, including any subdivisions, combinations, splits or reclassifications thereof.

"Stockholder Excess Election" has the meaning set forth in Section 6.1(c).

"Stockholders" means each Party (other than the Company) named on the signature pages to this Agreement, any Person who is a Transferee or a Permitted Transferee of Shares, whether from another Stockholder or from the Company, who is required by this Agreement to agree to be bound by the terms and conditions of this Agreement, and any other Person who otherwise becomes a party to this Agreement pursuant to the terms of this Agreement.  The term "Stockholder" means any one of the Stockholders and, in the case of a Stockholder who is a natural person, the term "Stockholder" also includes such Stockholder's legal representatives, executors or administrators when the context so requires.

"Tag-Along Notice" has the meaning set forth in Section 5.3(b).

5       DeltaView comparison of pcdocs://chisr01a/688255/1 and pcdocs://chisr01a/688255/2. Performed on 10/28/2009.

"Tagging Stockholder" has the meaning set forth in Section 5.3(a).

"Tag-Along Transfer" has the meaning set forth in Section 5.3(a).

"Transfer" means any sale, transfer, assignment, conveyance or other disposition, including without limitation by merger, operation of law, bequest or pursuant to any domestic relations order, whether voluntarily or involuntarily, provided, that (i) any sale, transfer, assignment, conveyance or other disposition to the Company or any subsidiary of the Company shall not be a Transfer and (ii) no Transfer of shares of Common Stock shall be deemed to have occurred as a result of the entry into, modification of or existence of any Qualified Pledge until such time as the pledgee commences any action to foreclose upon such shares of Common Stock or any shares of Common Stock are delivered upon settlement or termination of such Qualified Pledge (whichever occurs first).

"Transferee" means any Person acquiring Shares from the Company, regardless of the method of transfer.

"Warrants" means the Series A Warrants and the, Series B Warrants, Series C Warrants, Series D Warrants, Series E Warrants and Series F Warrants.

"Warrant Shares" means Shares issued pursuant to the exercise of the Warrants.

"Unallocated Share" has the meaning set forth in Section 6.1(c).

## ARTICLE II

## BOARD OF DIRECTORS AND GOVERNANCE

SECTION 2.1          Election of Directors; Number and Composition of the Board.

(a)      Each Stockholder agrees to vote (or shall cause to be voted) all Shares beneficially owned by such Stockholder, to the extent such Shares are entitled to so vote pursuant to the Certificate of Incorporation, to ensure that the number of directors constituting the entire Board shall be seven (7).  The initial Board shall consist of [_____] and the Chief Executive Officer.  The Chief Executive Officer shall be employed under an employment agreement which provides that, upon any termination of such Person's employment (whether by the Company or the executive, and regardless of whether or not for "cause"), such executive shall, upon any request by the Board, immediately resign as a director of the Company, any subsidiary of the Company and any other Person for which such executive is serving, at the request of the Company, as a director, member, manager, trustee or other similar capacity.  Each such director shall serve for a term expiring at the annual meeting of Stockholders held in the year following the year of their election, and until their successors are elected and qualified, subject to any earlier resignation or termination in accordance with the terms of this Agreement and the Certificate of Incorporation and Bylaws of the Company.

(b)      Prior to each annual meeting of Stockholders, a nominating committee of the Board, consisting of all non-employee directors, shall nominate a slate of six (6) directors who shall stand for election at such meeting.

(c)      Any director or the entire Board may be removed, with or without cause, by vote of the holders of a majority of the outstanding stock entitled to so vote.  Any vacancies and newly created directorships resulting from any increase in the authorized number of directors may initially be filled by a majority vote of the remaining directors, and shall thereafter be filled, at the next meeting of the Stockholders, by the affirmative vote of [a majority of] the Stockholders entitled to so vote.

(d)      For so long as a Stockholder holds at least one million (1,000,000) Shares, the Company shall invite and permit a representative of such Stockholder to attend all meetings of the Board and any committee thereof (whether in person, telephonically or otherwise) solely in a nonvoting observer capacity (each, a "Board Observer") and, in this respect, shall give such Board Observer copies of all notices, minutes, consents, and other materials that the Company provides to its directors; provided, however,. The Company shall not be required to invite and permit a Board Observer to attend meetings of any committee of the Board, provided that the Company shall give such Board Observer copies of all notices, minutes, consents, and other materials related to such Board committee meetings that the Company provides to the entire Board.  Notwithstanding the foregoing, (i) the Company reserves the right to withhold any information and to exclude such Board Observer from any meeting or portion thereof if (iA) access to such information or attendance at such meeting could adversely affect the attorney-client privilege between the Company and its counsel; (iiB) access to such information or attendance at such meeting could result in disclosure of trade secrets to such Stockholder or its Board Observer; or (iiiC) access to such information or attendance at such meeting could result in a conflict of interest between such Stockholder or its Board Observer and the Company or its counsel; provided further that suchand (ii) each Board Observer shall, prior to being given any information or being permitted to attend any meetings, enter into an agreement with the Company providing that such Board Observer shall hold in confidence and trust and act in a fiduciary manner with respect to all information provided to them or learned by them in connection with the observer rights described herein, except to the extent otherwise required by law and any other regulatory process to which such Stockholder is subject.

SECTION 2.2      Action by the Board.  Except as otherwise set forth in this Agreement or in the Company's Bylaws, all actions taken by the Board shall be taken by a majority vote of the directors present at any meeting at which a quorum is present, provided, however, that any transaction between the Company or any of its subsidiaries on one hand, and a director, officer or Stockholder or an Affiliate thereof on the other hand, shall be approved by a majority vote of the disinterested directors.

SECTION 2.3      D&O Indemnification Agreement; Expenses.

(a)      The Company shall enter into an Indemnification Agreement with each director upon his or her appointment in such form as is adopted by the Board.

---

7      DeltaView comparison of pcdocs://chisr01a/688255/1 and pcdocs://chisr01a/688255/2. Performed on 10/28/2009.

(b)    The Company shall reimburse the directors for all reasonable, documented out-of-pocket expenses incurred in connection with performing their duties and the directors and any Board Observers for all reasonable, documented out-of-pocket expenses incurred in connection with attending meetings of the Board.

SECTION 2.4    Actions Requiring Stockholder Approval; Director Approval.

(a)    The Company shall not[, and, as ~~applicable~~specified, shall not permit any of its subsidiaries to,] take any of the following actions, through mergers, consolidations or otherwise, without first obtaining the affirmative vote or written consent of the holders of not less than a majority of the outstanding shares of Common Stock, voting together as a single class:

(i)    any authorization of, or increase in the number of authorized shares of, any class of capital stock ranking *pari passu* with or senior to the Common Stock as to dividends or liquidation preference, including additional Common Stock;

(ii)    any amendment to the Company's Certificate of Incorporation or Bylaws;

(iii)    any amendment to this Agreement;

(iv)    any change in the authorized number of directors of the Board to a number other than seven (7);

(v)    any sale, lease or other disposition of all or substantially all of the assets of the Company through one or more transactions (for purposes of this Section 2.4(a)(v), any sale, lease or other disposition of assets of any subsidiary of the Company through one or more transactions will be deemed to be a sale, lease or disposition of assets of the Company if such sale, lease or disposition would constitute all or substantially all of the assets of the Company and its subsidiaries on a consolidated basis);

(vi)    any recapitalization, reorganization, consolidation or merger of the Company or any of its subsidiaries, other than recapitalizations, reorganizations, consolidations or mergers between the Company and any of its wholly owned subsidiaries or between any of the Company's wholly owned subsidiaries;

(vii)    any issuance or entry into an agreement for the issuance of any equity securities or any securities convertible or exercisable for equity securities (A) of the Company, [which, in the aggregate with all other issuances permitted by this Section 2.4(a)(vii), would exceed [_____]seven hundred fifty thousand (750,000) shares (on an as converted basis)] or (B) of any of its subsidiaries, except for (a) in the case of clause (A), the issuance of the Warrants and any Warrant Shares ~~or~~, (b) in the case of clause (A), issuances of Common Stock or securities convertible or exercisable for Common Stock reserved for grant pursuant to any Equity Incentive Plan and (c) in the case of clause (B), any issuances between the Company and any of its wholly owned subsidiaries or between any of the Company's wholly owned subsidiaries;

(viii)    the initiation or completion of a public offering of the securities of the Company or of any of its subsidiaries; and

(ix)    any redemption, purchase or other acquisition by the Company [or any of its subsidiaries] of any of its [or its subsidiaries'] capital stock, except for (a) purchases approved or ratified by the Board of Common Stock or securities convertible or exercisable for Common Stock from employees, directors and consultants of the Company upon termination of employment or affiliation and (b) purchases between the Company and any of its wholly owned subsidiaries or between any of the Company's wholly owned subsidiaries.

(b)    The Board shall not take any of the following actions with respect to the Company or any of its subsidiaries without first obtaining the affirmative vote or written consent of not less than [a supermajority] of not less than five of the directors elected by the Stockholders under Section 2.1 hereof:

(i)    any authorization, declaration or payment of any dividend (other than dividends payable solely in Shares) on any share of the capital stock of the Company or any subsidiary, other than the authorization and payment of dividends on the Common Stock;

(ii)    anythe issncuarrence of any debt that is (a) convertible into capital stock of the Company or of any of its subsidiaries, or (b) other than indebtedness between the Company and any of its wholly owned subsidiaries or between any of the Company's wholly owned subsidiaries forin an amount (1) greater than $[___] million5 million (other than borrowings under a revolving credit or similar agreement, which agreement has been previously approved pursuant to these provisions) or (2) which would cause the Company's or any of its subsidiaries' aggregate indebtedness to exceed $[___] million;220 million, excluding, in all cases, the incurrence of indebtedness between the Company and any of its wholly owned subsidiaries or between or among any of the Company's wholly owned subsidiaries;

(iii)    the appointment or termination of the Chief Executive Officer or any person with substantially equivalent responsibilities;

(iv)    the creation of a committee of the Board of Directors or changing of the scope of authority of a committee of the Board of Directors;

(v)    any acquisition of all or substantially all of the properties or assets of any other Person;

(vi)    any acquisition of or any investment in (whether by merger, consolidation or otherwise) any other Person including consideration paid by the Company or its subsidiaries (including by way of assumption of liabilities) in excess of $[___]2.5 million;

(vii)    any fundamental change in the Company's or any of its material subsidiaries' existing lines of business or entry by the Company or any of its subsidiaries into a new significant line of business or material alteration of the Company's or any of its subsidiaries' business plan;

9    DeltaView comparison of pcdocs://chisr01a/688255/1 and pcdocs://chisr01a/688255/2. Performed on 10/28/2009.

(viii)   any adoption of and any substantial alterations to the Company's annual budget;

(ix)   any increase in the number of Shares reserved for grant pursuant to any Equity Incentive Plans ~~to~~in an amount greater than [_____]seventy-five thousand (75,000) shares;

(x)   any creation or acquisition of equity interests in any subsidiaries other than a subsidiary in which the Company is, directly or indirectly, the sole record or beneficial holder of all the equity interests;

(xi)   the appointment or change of the independent auditor for the Company or any of its material subsidiaries;

(xii)   the settling of any litigation, arbitration or administration proceeding for an amount in excess of $[____]1 million or that provides for any material limitation on the conduct of the business by the Company or any of its subsidiaries;  and

(xiii)   any single or series of related capital expenditures in excess of $[__]4 million.

ARTICLE III

ACCESS TO INFORMATION

SECTION 3.1        <u>General Information to be Provided by the Company</u>.

(a)   The Company shall provide to each Stockholder the following information:

(i)   within forty-five (45) days after the end of each of the first three fiscal quarters for the Company each fiscal year, unaudited quarterly financial statements for the quarterly period then ended and the comparable period in the prior year (including a narrative comparing the results of operations and financial position of the Company in the most recent period to the corresponding period in the prior fiscal year (which narrative need not contain all of the information that would be required in a "Management's Discussion and Analysis" pursuant to Regulation S-K under the Exchange Act); and

(ii)   within one hundred twenty (120) days after the end of each fiscal year, audited financial statements for the Company and its consolidated subsidiaries for such year (including a narrative comparing the results of operations and financial position of the Company in the most recent period to the corresponding period in the prior fiscal year (which narrative need not contain all of the information that would be required in a "Management's Discussion and Analysis" pursuant to Regulation S-K under the Exchange Act), together with a copy of the audit report of the Company's independent public accountants.

10___DeltaView comparison of pcdocs://chisr01a/688255/1 and pcdocs://chisr01a/688255/2. Performed on 10/28/2009.

(b)     The Company shall provide to each Stockholder holding at least one million (1,000,000) Shares (an "Eligible Stockholder") the following information:

(i)     as soon as practicable after the end of each month, but in any event within thirty (30) days thereafter, an unaudited consolidated balance sheet of the Company and its subsidiaries, as of the end of each such monthly period, and unaudited statements of income, retained earnings and cash flows of the Company and its subsidiaries for such period and for the current fiscal year to date, setting forth in each case in comparative form the figures for the corresponding periods for the previous fiscal year, all in reasonable detail and prepared in accordance with the Company's normal financial reporting practices; and

(ii)     as soon as practicable prior to the end of each fiscal year, a budget for the next fiscal year and, as soon as prepared, any other budgets or revised budgets prepared by the Company.

Notwithstanding anything in this Agreement to the contrary, the Company shall not be required to provide any of the foregoing to any Stockholder whom the Company reasonably determines to be a direct competitor of the Company or to any Stockholder who owns a controlling interest in a Person whom the Company reasonably determines to be a direct competitor of the Company.

SECTION 3.2     Right to Access.

(a)     Each Eligible Stockholder shall have the right, upon reasonable notice and at reasonable times, to meet with the management of the Company and any of its subsidiaries and to have access to the auditors and other Representatives of the Company and any of its subsidiaries, provided however, that the Company or subsidiary shall have a right to limit such access if the Company or subsidiary determines that it is necessary or desirable to do so in order for the Company to preserve any privilege that the Company or subsidiary is entitled to claim.

(b)     The Company shall hold quarterly conference calls with the Stockholders to discuss the results of the Company's operations and the financial performance of the Company and to answer questions related thereto.

SECTION 3.3     Notice of Certain Events.  The Company shall, within a reasonable time after the occurrence of an event described below, provide notice to the Stockholders of (i) any litigation or administrative proceeding commenced against the Company or any of its subsidiaries which, were the Company subject to the Exchange Act, would be required to be reported in a Current Report on Form 8-K or in an Annual Report on Form 10-K and (ii) any default or event of default under an agreement which, if the Company were subject to the reporting requirements under the Exchange Act, would be required to be included in a Current Report on Form 8-K pursuant to Item 2.04 of such Form.  Such notice must contain all material facts and circumstances surrounding such event but shall not be required to contain all of the information that would be required under the applicable Item in a Current Report on Form 8-K.

11____DeltaView comparison of pcdocs://chisr01a/688255/1 and pcdocs://chisr01a/688255/2. Performed on 10/28/2009.

## ARTICLE IV

## CERTIFICATE OF INCORPORATION AND BYLAWS

The Stockholders acknowledge and agree that in connection with the execution of this Agreement, the Certificate of Incorporation and the Bylaws of the Company shall be as set forth in Exhibits A and B hereto, respectively.  The Certificate of Incorporation shall, at all times during the term of this Agreement and, with respect to clause (b) below, for so long as any person designated by any Stockholder serves on the Board, provide (a) that the Company elects not to be governed by Section 203 of the DGCL and (b) for a renunciation of corporate opportunities presented to any Stockholder (and their respective Affiliates and nominees for election as a director) to the extent permitted by Section 122(17) of the DGCL and substantially on the terms and conditions set forth in Exhibit A.

## ARTICLE V

## TRANSFERS OF SHARES

SECTION 5.1          Restrictions on Transfers; Permitted Transferees.

(a)      Each Stockholder, severally and not jointly, agrees and acknowledges that such Stockholder will not Transfer any Shares unless (i) such Transfer complies with the provisions of this Agreement, and (ii) (x) such Transfer is pursuant to an effective registration statement under the Securities Act and has been registered under all applicable state securities or "blue sky" laws or (y) unless waived by the Company in writing, such Stockholder shall have furnished the Company with an opinion of counsel, which opinion of counsel shall be reasonably satisfactory to the Company, to the effect that no such registration is required because of the availability of an exemption from registration under the Securities Act and all applicable state securities or "blue sky" laws.  A Stockholder will not be required to obtain an opinion of counsel for (i) any transaction made pursuant to SEC Rule 144 except in cases where the Company, based on the opinion of counsel, has reasonable basis to believe that an issue of law exists with respect to such transaction or (ii) any transaction in which such Stockholder Transfers Shares to an Affiliate of such Stockholder for no consideration.

(b)      Without the prior written consent of the Board, no Stockholder may Transfer any Shares if, as a result of such Transfer, any class of equity securities of the Company would be held of record by more than two hundred and twenty-five (225) Persons (which calculation shall, for purposes of this Section 5.1(b), include the number of holders of any securities exercisable, convertible or exchangeable into equity securities of such class) or otherwise in circumstances that the Board determines could require the Company to file reports under the Exchange Act, if it is not otherwise then subject to such requirements.

(c)      A Transferee of Shares pursuant to this Article V who is a Permitted Transferee must (i) satisfy the requirements of this Article V, (ii) execute a joinder in form and substance satisfactory to the Company agreeing to be bound by the terms and provisions of this Agreement and assuming all of the Transferring Stockholder's then existing

12_____DeltaView comparison of pcdocs://chisr01a/688255/1 and pcdocs://chisr01a/688255/2. Performed on 10/28/2009.

and future liabilities arising under or relating to this Agreement, and (iii) represent that the Transfer was made in accordance with this Agreement, the Certificate of Incorporation and all applicable securities laws and regulations.  Written notice of joinder of a Person to this Agreement as a Stockholder shall be sent promptly by the Transferring Stockholder to the Company.  Any attempted or purported Transfer of all or a portion of the Shares held by such Stockholder in violation of this Article V shall be null and void *ab initio* and of no force or effect whatsoever, such Stockholder will not be treated as an owner of Shares for purposes of this Agreement or otherwise, and the Company will not register such Transfer of Shares.  If all or any portion of a Stockholder's Shares are Transferred in violation of the other provisions of this Article V, involuntarily, by operation of law or otherwise, then without limiting any other rights and remedies available to the other Parties under this Agreement or otherwise, the Transferee of such Shares (or portion thereof) shall not be permitted to become a Party to this Agreement or be entitled to any rights as a Stockholder hereunder, and the Stockholder whose Shares have been Transferred in violation of the provisions of this Article V shall, together with its Affiliates, lose all rights it may have pursuant to Sections 2.1, 3.2, 5.2, 5.3, and 6.1, but will continue to be bound by all obligations hereunder, unless each other Stockholder consents in writing to such Transferee becoming ~~an~~a Stockholder, which consent shall be granted or withheld in each Stockholder's sole discretion.

(d)     Except as specifically contemplated hereby, or in connection with a Qualified Pledge, no Stockholder shall grant any proxy or enter into or agree to be bound by any voting trust with respect to any Shares, nor enter into any stockholder agreements or arrangements of any kind with any person with respect to any Shares inconsistent with the provisions of this Agreement (whether or not such agreements and arrangements are with other Stockholders or holders of Shares who are not Parties to this Agreement), including but not limited to, agreements or arrangements with respect to the acquisition, disposition or voting of Shares, nor shall any Stockholder act, for any reason, as a member of a group or in concert with any other Persons in connection with the acquisition, disposition or voting of Shares in any manner which is inconsistent with the provisions of this Agreement.

(e)     None of the restrictions contained in this Article V (other than Sections 5.1(a), 5.1(b), 5.1(c) and 5.5) shall apply:  (i) to any Transfer or assignment for consideration or as a gift (including by will or the laws of descent) by any Stockholder to any spouse, child, parent, sibling or grandchild of a Stockholder, or by any of such relatives to such Stockholder or to any one or more of such relatives, or by any Stockholder or any such relatives to a trust of which there are no principal beneficiaries other than such Stockholder and/or one or more of such relatives; (ii) to any Transfer to a legal representative of a Stockholder in the event any Stockholder becomes mentally incompetent; and (iii) with respect to a Stockholder which is not an individual, to any Transfer by such Stockholder to any Affiliate thereof (in each of cases (i) through (iii) a "Permitted Transferee").

SECTION 5.2     Drag-Along Right.

(a)     In the event that any Stockholder or any group of Stockholders acting together or pursuant to a common plan or arrangement (the "Proposing Stockholders"), proposes to sell, or otherwise dispose of, in one transaction or a series of related transactions, to a Person or a group of Persons, other than an Affiliate of one or more of the transferring

13     DeltaView comparison of pcdocs://chisr01a/688255/1 and pcdocs://chisr01a/688255/2. Performed on 10/28/2009.

Stockholders (a "Drag-Along Buyer"), Shares representing more than fifty percent (50%) of the then outstanding Shares (a "Majority Sale"), such Proposing Stockholder(s) shall have the right (the "Drag-Along Right") to require each of the other Stockholders (the "Non-Initiating Stockholders") to Transfer to the Drag-Along Buyer its Pro Rata Portion of Shares in such Majority Sale, upon the same terms and subject to the same conditions as are applicable to the Proposing Stockholders.

(b)     The Proposing Stockholders shall provide written notice of such Majority Sale to the Non-Initiating Stockholders (a "Majority Sale Notice") specifying the number of Shares proposed to be Transferred by the Proposing Stockholders and the other material terms and conditions of the proposed Transfer, including the purchase price payable for the Shares, the identity of the Drag-Along Buyer and the date of closing of the purchase and sale contemplated by the Majority Sale Notice (the "Majority Sale Closing Date"), which Majority Sale Closing Date shall be not less than fifteen (15) Business Days following the delivery of the Majority Sale Notice to the Non-Initiating Stockholders.  In determining the proposed purchase price per Share referred to in the immediately preceding sentence, there shall be taken into account (and the Non-Initiating Stockholders shall receive their Pro Rata Portion of) any other consideration or value to be received from the Drag-Along Buyer, directly or indirectly, by the Proposing Stockholders in connection with or relating to the Majority Sale, including without limitation, by way of any "non-compete," consulting, management or other payments, any value provided under other agreements entered into in connection with the transaction or otherwise. The Majority Sale Notice shall also specify each Non-Initiating Stockholder's Pro Rata Portion of the Shares to be Transferred and the estimated amount of the proceeds to be distributed to such Non-Initiating Stockholder upon completion of the Majority Sale.  Notwithstanding the foregoing, no Non-Initiating Stockholder shall be required to make any representation or warranty, or provide any indemnity to any person, in connection with any Majority Sale other than with respect to the unencumbered title to its Shares and its power, authority and legal right to Transfer such Shares, and the aggregate liability or loss as a result of such representations, warranties, indemnities or other agreements shall not exceed the proceeds such Non-Initiating Stockholder received in connection with such Transfer.

(c)     At the closing of the Majority Sale, the Proposing Stockholders and the Non-Initiating Stockholders shall deliver to the Drag-Along Buyer certificates representing their Shares, duly endorsed in blank for Transfer or accompanied by stock powers duly endorsed in blank.  Upon receipt by the Drag-Along Buyer of such certificates representing the Shares, the Drag-Along Buyer shall pay to each such Proposing Stockholder and Non-Initiating Stockholder the consideration payable at the closing pursuant to such transaction. The Drag-Along Buyer shall provide written notice to the Company of any failure of any Non-Initiating Stockholder to deliver any share certificates.  Upon receipt of such notice, the Company shall refrain from recording the Transfer of such Non-Initiating Stockholder's Shares on the books and records of the Company and shall promptly direct the Company's transfer agent, if any, that the transfer agent shall refrain from recording the Transfer of such Shares on the books and records of the Company.

(d)     If any Majority Sale is structured as a merger, consolidation, amalgamation, or similar transaction each Non-Initiating Stockholder agrees, as applicable, to

14____DeltaView comparison of pcdocs://chisr01a/688255/1 and pcdocs://chisr01a/688255/2. Performed on 10/28/2009.

(i) vote such Shares in favor of, or consent to, such transactions; (ii) waive or refrain from exercising any appraisal, dissenters' or similar rights with respect to such transaction; and (iii) take such other action, consistent with Section 5.2(b), as may reasonably be required to complete the transaction.

(e)　　Solely for purposes of Section 5.2(d) and in order to secure the performance of each Stockholder's obligations under Section 5.2(d), each Stockholder hereby irrevocably appoints each other Stockholder that qualifies as a Drag-Along Proxy Holder (as defined below) the attorney-in-fact and proxy of such first Stockholder (with full power of substitution) to vote or provide a written consent with respect to its Shares as described in this paragraph if, and only in the event that, such Stockholder fails to vote or provide a written consent with respect to its Shares in accordance with the terms of Section 5.2(d) (each such Stockholder, a "Breaching Drag-Along Stockholder") within three (3) Business Days of a request for such vote or written consent.  Upon such failure, each Proposing Stockholder shall have and are hereby irrevocably granted a proxy to vote or provide a written consent with respect to each such Breaching Drag-Along Stockholder's Shares solely for the purpose of taking the actions required by Section 5.2(d) (such Proposing Stockholder, a "Drag-Along Proxy Holder").  Each Stockholder intends this proxy to be, and it shall be, irrevocable and coupled with an interest, and each Stockholder will take such further action and execute such other instruments as may be necessary to effectuate the intent of this proxy and hereby revoke any proxy previously granted by it with respect to the matters set forth in Section 5.2(d) with respect to the Shares owned by such Stockholder. Notwithstanding the foregoing, the conditional proxy granted by this Section 5.2(e) shall be deemed to be revoked upon the termination of this Article V in accordance with its terms.

(f)　　If the Majority Sale shall not have been consummated within ninety (90) days of the date the Majority Notice was provided (which ninety (90) day period may be extended by notice from the Proposing Stockholders to the Non-Initiating Stockholders for up to two hundred and seventy (270) days in the event any required approval of such sales from any governmental entity, including termination or expiration of the applicable waiting period under the applicable antitrust and competition laws has not then been obtained), the Proposing Stockholders shall return to the Non-Initiating Stockholders all applicable instruments representing Shares that the Non-Initiating Stockholders delivered for Transfer, together with any other documents in the possession of the Proposing Stockholders executed by the Non-Initiating Stockholders in connection with such proposed Majority Sale, if any, and all the restrictions on Transfer contained in this Agreement or otherwise applicable at such time with respect to any Shares shall again be in effect.

SECTION 5.3　　Tag-Along Rights.

(a)　　If a Proposing Stockholder proposes to Transfer, in one transaction or a series of related transactions, to a third party that is not an Affiliate of such Stockholder (the "Proposed Transferee") Shares representing more than [ten percent (10%)] of the outstanding Shares or in the event of a Majority Sale, if Drag-Along Rights are not exercised pursuant to Section 5.2 (each such proposed Transfer, a "Tag-Along Transfer"), each Non-Initiating Stockholder shall have the right to participate in the Tag-Along Transfer by Transferring up to its Pro Rata Portion to the Proposed Transferee on the same terms and conditions as those

15........DeltaView comparison of pcdocs://chisr01a/688255/1 and pcdocs://chisr01a/688255/2. Performed on 10/28/2009.

proposed by the Proposing Stockholder (each such participating Stockholder, other than the Proposing Stockholder, the "Tagging Stockholder").

(b)    The Proposing Stockholder shall give written notice (a "Tag-Along Notice") to each other Stockholder of a Tag-Along Transfer, setting forth the number and class(es) of Shares proposed to be so Transferred, the name and address of the Proposed Transferee, the proposed amount and form of consideration and other terms and conditions of payment offered by the Proposed Transferee. The Proposing Stockholder shall deliver or cause to be delivered to each other Stockholder copies of all transaction documents relating to the Tag-Along Transfer as the same become available. The tag-along rights provided by this Section 5.3 must be exercised by a Stockholder by delivery of an irrevocable written notice to the Proposing Stockholder, within a period of fifteen (15) Business Days from the Tag-Along Notice, specifying the portion of its Pro Rata Portion of the Shares (of each class proposed to be Transferred) which it wishes to include in the Tag-Along Transfer. With respect to each class of Shares proposed to be Transferred, if the Proposed Transferee fails to purchase all the Shares of such class proposed to be Transferred by the Proposing Stockholder and the Tagging Stockholders, then the number of Shares of such class that each such Stockholder is permitted to sell in such Tag-Along Transfer shall be reduced pro rata based on the number of Shares of such class proposed to be Transferred by such Stockholder relative to the aggregate number of Shares of such class proposed to be Transferred by all Stockholders participating in such Tag-Along Transfer. The Proposing Stockholder shall have a period of ninety (90) days following the expiration of the fifteen (15) Business Day notice period mentioned above to sell all the Shares agreed to be purchased by the Proposed Transferee on the terms specified in the notice required by the first sentence of this Section 5.3(b). With respect to each class of Shares proposed to be Transferred, if the Proposed Transferee agrees to purchase more Shares of such class than specified in the Tag-Along Notice in the proposed Transfer, the Stockholders shall also have the same right to participate in the Transfer of such Shares of such class that are in excess of the amount set forth on the Tag-Along Notice on a pro rata basis based on the number of Shares of such class proposed to be Transferred by such Stockholder relative to the aggregate number of Shares of such class proposed to be Transferred by all Stockholders participating in such Tag-Along Transfer.

(c)    Any Transfer of Shares by a Tagging Stockholder to a Proposed Transferee pursuant to this Section 5.3 shall be on the same terms and conditions (including, without limitation, price, time of payment and form of consideration) as to be paid to the Proposing Stockholder.  In determining the proposed purchase price per Share referred to in the immediately preceding sentence, there shall be taken into account (and the Tagging Stockholders shall receive their Pro Rata Portion of) any other consideration or value to be received from the Proposed Transferee or its Affiliates, directly or indirectly, by the Proposing Stockholders in connection with or relating to the Tag-Along Transfer, including without limitation, by way of any "non-compete," consulting, management or other payments, any value provided under other agreements entered into in connection with the transaction or otherwise.  Notwithstanding the foregoing, no Tagging Stockholder shall be required to make any representation or warranty, agree to any "non-compete" clause, or provide any indemnity to any person, in connection with any Tag-Along Transfer other than with respect to the unencumbered title to its Shares and its power, authority and legal right to Transfer such Shares, and the aggregate liability or loss as a result of such representations, warranties,

16   DeltaView comparison of pcdocs://chisr01a/688255/1 and pcdocs://chisr01a/688255/2. Performed on 10/28/2009.

indemnities or other agreements shall not exceed the proceeds such Tagging Stockholder received in connection with such Tag-Along Transfer.  Each Tagging Stockholder shall be responsible for its proportionate share of the costs of the proposed Transfer to the extent not paid or reimbursed by the Proposed Transferee or the Company.

SECTION 5.4        Legend on Certificates.  Each outstanding certificate representing Shares that are subject to this Agreement shall bear an endorsement reading substantially as follows:

THE SECURITIES REPRESENTED BY THIS CERTIFICATE (THE "SECURITIES") WERE ORIGINALLY ISSUED IN RELIANCE UPON AN EXEMPTION FROM THE REGISTRATION REQUIREMENT OF SECTION 5 OF THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), PROVIDED BY SECTION 1145 OF THE BANKRUPTCY CODE, 11 U.S.C. 1145.  THE SECURITIES HAVE NOT BEEN REGISTERED UNDER THE ACT OR ANY STATE SECURITIES LAW, AND TO THE EXTENT THE HOLDER OF THE SECURITIES IS AN "UNDERWRITER," AS DEFINED IN SECTION 1145(B)(1) OF THE BANKRUPTCY CODE, THE SECURITIES MAY NOT BE SOLD OR TRANSFERRED IN THE ABSENCE OF AN EFFECTIVE REGISTRATION STATEMENT UNDER THE ACT OR AN EXEMPTION FROM REGISTRATION THEREUNDER.

THE SALE, ASSIGNMENT, PLEDGE, ENCUMBRANCE OR OTHER TRANSFER OF THE SECURITIES REPRESENTED BY THIS CERTIFICATE IS RESTRICTED BY THE TERMS OF, AND THE HOLDER HEREOF IS SUBJECT TO CERTAIN OTHER OBLIGATIONS PURSUANT TO, THE PROVISIONS OF A STOCKHOLDERS AGREEMENT, DATED AS OF [____], 2009, AMONG THE COMPANY AND CERTAIN HOLDERS OF ITS SECURITIES, AS MAY BE AMENDED FROM TIME TO TIME IN ACCORDANCE WITH ITS TERMS.  A COPY OF SUCH STOCKHOLDERS AGREEMENT IS ON FILE AT THE PRINCIPAL EXECUTIVE OFFICE OF THE COMPANY.

SECTION 5.6        No Circumvention of Stock Transfer Restrictions.  Each Party agrees that the Transfer restrictions in this Agreement may not be avoided by the holding of Shares directly or indirectly through a Person that can itself be sold in order to dispose of an interest in Shares free of such restrictions.  Any Transfer of any Shares (or other interest) resulting in any change in the control, directly or indirectly, of a Stockholder or of any other Person having control, directly or indirectly, over that Stockholder shall be treated as being a Transfer of the Shares held by that Stockholder, and the provisions of this Agreement that apply in respect of the Transfer of Shares shall thereupon apply in respect of the Shares so held; provided that this Section 5.5 shall not apply in respect of (i) a bona fide Transfer of equity securities of a Person having a direct or indirect interest in any Shares, where that interest does not represent more than ten percent (10%) of the assets of that Person, or (ii) any Transfer to a Permitted Transferee.

---

17____DeltaView comparison of pcdocs://chisr01a/688255/1 and pcdocs://chisr01a/688255/2. Performed on 10/28/2009.

ARTICLE VI

ADDITIONAL AGREEMENTS

SECTION 6.1        Preemptive Rights.  In the event that the Company proposes to sell or otherwise issue Common Stock Equivalents or any other equity securities, or any options, rights or warrants to purchase equity securities of the Company (collectively, "Dilutive Securities"), each Stockholder shall have the right to acquire Dilutive Securities, in accordance with the provisions of this Section 6.1.

(a)        Not later than twenty (20) Business Days prior to the anticipated issuance date of Dilutive Securities, the Company shall give written notice (the "Notice of Preemptive Rights") to each Stockholder which shall state the Company's intention to issue Dilutive Securities, the type and amount of Dilutive Securities to be issued, the purchase price therefor, a summary of the other material terms of the proposed issuance and the Pro Rata Portion of such Dilutive Securities which the Stockholder to which the notice is directed may purchase in connection with such issuance.

(b)        Each Stockholder that is an "accredited investor" as defined in Rule 501 promulgated under the Securities Act of 1933, as amended, shall have the right to purchase up to its Pro Rata Portion of such Dilutive Securities at the price and on the terms and conditions specified in the Notice of Preemptive Rights by delivering an irrevocable written notice (the "Acceptance Notice") to the Company no later than fifteen (15) Business Days from the date the Notice of Preemptive Rights is delivered to such Stockholder, at the price and upon the terms specified in the Notice of Preemptive Rights, setting out the number of Dilutive Securities with respect to which such right is being exercised. Such Acceptance Notice shall also include the maximum number of Dilutive Securities the Stockholder would be willing to purchase in the event any other Stockholder elects to purchase less than its Pro Rata Portion of such Dilutive Securities.  If any Stockholder fails to elect to purchase its full Pro Rata Portion of such Dilutive Securities, the Company shall allocate any remaining amount among those Stockholders (pro rata in accordance with the Shares then held by each such Stockholder relative to the aggregate number of Shares held by all Stockholders participating in issuance of Dilutive Securities) who have indicated in their Acceptance Notice a desire to purchase Dilutive Securities in excess of their respective Pro Rata Portions (it being understood that if Stockholders elect to purchase more Dilutive Securities than remain available for sale, such allocation shall be made pro rata in accordance with the Shares then held by each such Stockholder relative to the aggregate number of Shares held by all Stockholders participating in issuance of Dilutive Securities); provided that no Stockholder shall be required to purchase more Dilutive Securities than the maximum number set forth in such Stockholder's Acceptance Notice.

(c)        The Company may sell or issue any Dilutive Securities not covered by a Notice of Acceptance to any other Person or Persons, but only upon terms and conditions that are in all respects no more favorable to such other Person or Persons, than those set forth in the Notice of Preemptive Rights.  If the Company does not consummate the sale or issuance of all or part of such remaining Dilutive Securities to such other Person or Persons within sixty

18_____DeltaView comparison of pcdocs://chisr01a/688255/1 and pcdocs://chisr01a/688255/2. Performed on 10/28/2009.

(60) days after the end of the twenty (20) Business Day period specified in Section 6.1(b), the right provided hereunder shall be deemed to be revived and such Dilutive Securities shall not be issued unless first reoffered to the Stockholders in accordance with this Section 6.1. Concurrently with the closing of the sale or issuance to such other Person or Persons (the "Other Purchasers") of all or part of such Dilutive Securities, each Stockholder shall purchase from the Company, and the Company shall sell or issue to such Stockholder, the securities covered by the Acceptance Notice delivered to the Company by such Stockholder on the terms specified in the Notice of Preemptive Rights.  The purchase by a Stockholder of any such securities is subject in all cases to the execution and delivery by the Company and the Stockholder of (a) a purchase agreement or subscription agreement relating to such securities and (b) all other documents in form and substance similar in all material respects, to the extent applicable, to those executed and delivered by the Company and the Other Purchasers.

(d)    If any Stockholder does not deliver an Acceptance Notice within such fifteen (15) day period, such Stockholder shall be deemed to have irrevocably waived any and all rights under this Section 6.1 with respect to the purchase of such Dilutive Securities (but not with respect to future issuances in accordance with this Section 6.1). Any sale of Dilutive Securities by the Company without first giving the Stockholders the rights described in this Section 6.1 shall be void and of no force and effect.

(e)    This Section 6.1 shall not apply to (i)  the sale or issuance of Dilutive Securities pursuant to any Equity Incentive Plan approved by the Board; (ii) the issuance of the Warrant Shares; (iii) the issuance of equity securities pursuant to any merger or business combination transaction involving the Company or any of its subsidiaries or as consideration for the acquisition by the Company or any of its subsidiaries of assets or another business entity in each case, approved as required under Section 2.4; or (iv) any public offering of equity securities registered under the Securities Act.

SECTION 6.3    Confidentiality.  Each Stockholder who has received Confidential Information from the Company or its Representatives agrees that it shall not, and shall cause its Affiliates and Representatives not to, reveal to any Person other than such Stockholder's Affiliates and Representatives any such Confidential Information without the prior written consent of the Company; provided that such undertaking shall not apply to:

(a)    disclosure of Confidential Information that is or has become generally available to the public other than as a result of disclosure by or at the direction of a Party or a Party's Representatives or the Representatives of any Affiliate of any Party in violation of this Agreement;

(b)    disclosures of Confidential Information to the extent necessary or required under any (i) applicable Law, (ii) accounting standard, or (iii) in connection with any judicial process regarding any legal action, suit or proceeding arising out of or relating to this Agreement, in each case after giving prior written notice to the other Parties to the extent practicable under the circumstances, and subject to having undertaken any reasonably

19____DeltaView comparison of pcdocs://chisr01a/688255/1 and pcdocs://chisr01a/688255/2. Performed on 10/28/2009.

available arrangements to protect confidentiality (for example, seeking a protective order in relation to such Confidential Information); or

(c)    disclosures of Confidential Information with respect to the Company by any Stockholder to a third party who is not a competitor to the Company and who has executed a confidentiality agreement whereby such party is bound by the confidentiality provisions of this Agreement.

SECTION 6.5    Environmental, Health and Safety Covenants.

(a)    Notice of EHS Events.  The Company shall provide prompt written notice to each of the Eligible Stockholders of any environmental, health or safety ("EHS") event or matter reasonably likely to adversely impact the Company's operations, including, but not limited to notices of violations; fines or assessments; citations; suits; written complaints or administrative actions alleging violations of EHS laws; serious personal injury or property damage; unauthorized releases, spills or discharges of any significant quantities of hazardous substances into the environment or conditions which may cause the Company to operate in non-compliance with its EHS policies or applicable EHS laws.

(b)    Compliance with Labor and Environmental Law.  The Company shall comply with all applicable statutes, laws, ordinances, rules, orders and regulations concerning labor, industrial hygiene and EHS laws.

(c)    EHS Report-Out and Assessment.  The Company shall, at regular intervals, but no less frequently than every three months, provide to the Board a written report describing the compliance of the Company with its EHS policies and applicable EHS laws, and implement such improvements and corrections as may be necessary or appropriate to maintain conformance with such policies and laws.

ARTICLE VII

MISCELLANEOUS

SECTION 7.1    Term.  This Agreement shall terminate on the completion of a Qualified Public Offering; provided that the provisions of Section 6.2 shall survive the termination of this Agreement.

SECTION 7.2    Modifications.  This Agreement may be modified or amended only by a writing signed by the Company and Stockholders holding a majority of the Shares; provided that (a) any modification or amendment that would adversely affect one or more Stockholders in a way that is disproportionate to its effect on the other Stockholders shall require the consent of such disproportionately affected Stockholders holding a majority of the Shares held by all such disproportionately affected Stockholders; (b) any modification or amendment that would make the transfer restrictions set forth in Article V or the confidentiality obligations set forth in

20 ⸺ DeltaView comparison of pcdocs://chisr01a/688255/1 and pcdocs://chisr01a/688255/2. Performed on 10/28/2009.

Section 6.2 more burdensome on one or more Stockholders, or remove or otherwise adversely amend the preemptive rights set forth in Section 6.1 or the drag-along or tag-along rights set forth in Sections 5.2 and 5.3, respectively, held by one or more Stockholders, shall require the consent of such affected Stockholders holding a majority of the Shares held by all such affected Stockholders; and (c) any specific director designation or board observer rights provided to a Stockholder may only be amended by the Stockholders entitled to such rights.  For the avoidance of doubt, the addition of Parties to this Agreement pursuant to the terms hereof shall not be deemed a modification or amendment of this Agreement.

SECTION 7.3    Action by Stockholders.  Any action required or contemplated by this Agreement to be taken by the Stockholders may be taken by delivery of a written consent executed on behalf of one or more of such holders holding the requisite number of Shares, and the Company shall be entitled to rely upon any such written consent without prior notice to or consultation with any Person.

SECTION 7.4    Applicability.  This Agreement shall apply to all Shares beneficially owned by a Stockholder at all times, whether such Shares are acquired prior to or after the date hereof.

SECTION 7.5    Notices.  All notices, requests, waivers and other communications made pursuant to this Agreement shall be in writing and shall be deemed to have been effectively given (a) when personally delivered to the Party to be notified; (b) when sent by confirmed facsimile to the Party to be notified at the number set forth below; (c) when sent by email to the Party to be notified at the email address set forth below; (d) three (3) Business Days after deposit in the United States mail postage prepaid by certified or registered mail return receipt requested and addressed to the Party to be notified as set forth below; or (e) one (1) Business Day after deposit with a national overnight delivery service, postage prepaid, addressed to the Party to be notified as set forth below with next-business-day delivery guaranteed, in each case as follows:

In the case of the Company, to:

> Hayes Lemmerz International, Inc.
> [ADDRESS]
> Attention:  [_____]
> Telephone:  [_____]
> Facsimile:  [_____]
> Email:  [_____]

> With a copy (which shall not constitute notice) to:

> [NAME]
> [ADDRESS]
> Attention:  [_____]
> Telephone:  [_____]
> Facsimile:  [_____]

---

21    DeltaView comparison of pcdocs://chisr01a/688255/1 and pcdocs://chisr01a/688255/2. Performed on 10/28/2009.

Email:  [＿＿＿＿＿＿]

In the case of the Initial Holders:

To the names and addresses set forth on the signature pages hereto.

With a copy (which copy shall not constitute notice) to:

Milbank, Tweed, Hadley & McCloy LLP
1 Chase Manhattan Plaza
New York, New York  10005
Attention:  Thomas C. Janson
Telephone:  (212) 530-5000
Facsimile:  (212) 530-5219
Email:  tjanson@milbank.com

In the case of any other Stockholder, to such Stockholder at its address set forth in the stock ledger of the Company.

A Party may change its address for purposes of notice hereunder by giving ten (10) days' notice of such change to all other Parties in the manner provided in this Section 7.5.

SECTION 7.6        Binding Effect.  This Agreement shall be binding upon and inure to the benefit of the respective successors and assigns of the Parties hereto.

SECTION 7.7        Entire Agreement.  This Agreement (together with the documents attached as exhibits hereto and any documents or agreements specifically contemplated hereby) supersedes all prior discussions and agreements among any of the Parties hereto (and their Affiliates) with respect to the subject matter hereof and contains the entire understanding of the Parties with respect to the subject matter hereof.

SECTION 7.8        Counterparts.  This Agreement may be executed in counterparts, each of which shall be signed by the Company and one or more Stockholders, and all of which are deemed to be one and the same agreement binding upon the Company and each of the Stockholders.

SECTION 7.9        Headings.  The headings of the various sections of this Agreement have been inserted for convenience of reference only and shall not be deemed to be a part of this Agreement.

SECTION 7.10        Bylaws.  If and to the extent that any provision of this Agreement conflicts with or is inconsistent with any provision of the Bylaws of the Company, such provision of this Agreement shall be controlling and, to the extent practicable, the conflicting or inconsistent provision of the Bylaws shall be construed in a manner consistent with such

---

22̲̲̲̲̲̲̲DeltaView comparison of pcdocs://chisr01a/688255/1 and pcdocs://chisr01a/688255/2. Performed on 10/28/2009.

provision of this Agreement.  It is hereby agreed that the Bylaws shall not be amended to be inconsistent with this Agreement.

SECTION 7.11    Further Acts and Assurances.  Each Party shall give such further assurance, provide such further information, take such further actions and execute and deliver such further documents and instruments as are, in each case, within its power to give, provide and take so as to give full force and effect to the provisions of this Agreement.

SECTION 7.12    Governing Law; Consent to Jurisdiction and Service of Process. This Agreement shall be governed by and construed in accordance with the laws of the State of Delaware, without regard to its conflicts of law doctrine.  Each Party hereby submits to the exclusive jurisdiction of the Chancery Court of the State of Delaware or the United States District Court for the District of Delaware and any judicial proceeding brought against any of the Parties on any dispute arising out of this Agreement or any matter related hereto shall be brought in such courts.  Each Party hereby irrevocably waives, to the fullest extent permitted by law, any objection it may have or hereafter have to the laying of the venue of any such proceeding brought in such a court and any claim that any such proceeding brought in such a court has been brought in an inconvenient forum.  Each Party hereby consents to process being served in any such proceeding by the mailing of a copy thereof by registered or certified mail, postage prepaid, to the address specified in Section 7.5, or in any other manner permitted by law.  EACH PARTY HERETO HEREBY KNOWINGLY, VOLUNTARILY, AND INTENTIONALLY WAIVES ANY RIGHTS IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY SUCH ACTION OR PROCEEDING.

SECTION 7.13    Injunctive Relief.  It is hereby agreed and acknowledged that it will be impossible to measure in money the damages that would be suffered if the Parties fail to comply with any of the obligations imposed on them by this Agreement and that in the event of any such failure, an aggrieved person will be irreparably damaged and will not have an adequate remedy at law.  Any such person shall, therefore, be entitled to seek injunctive relief, including specific performance, to enforce such obligations, and if any action should be brought in equity to enforce any of the provisions of this Agreement, none of the Parties shall raise the defense that there is an adequate remedy at law.

SECTION 7.14    Severability.  The invalidity or unenforceability of any provisions of this Agreement in any jurisdiction shall not affect the validity, legality or enforceability of the remainder of this Agreement in such jurisdiction or the validity, legality or enforceability of any provision of this Agreement in any other jurisdiction, it being intended that all rights and obligations of the Parties shall be enforceable to the fullest extent permitted by law.

SECTION 7.15    Recapitalization, Etc.  In the event that any capital stock or other securities are issued in respect of, in exchange for, or in substitution of, shares of capital stock of the Company by reason of any reorganization, recapitalization, reclassification, merger, consolidation, spin-off, partial or complete liquidation, stock dividend, split-up, sale of assets, distribution to stockholders or combination of shares or any other change in the Company's capital structure, appropriate adjustments shall be made to the provisions of this Agreement so as

23 DeltaView comparison of pcdocs://chisr01a/688255/1 and pcdocs://chisr01a/688255/2. Performed on 10/28/2009.

to fairly and equitably preserve, as far as practicable, the original rights and obligations of the Parties hereto under this Agreement.

[*Signature Page Follows*]

___

24 DeltaView comparison of pcdocs://chisr01a/688255/1 and pcdocs://chisr01a/688255/2. Performed on 10/28/2009.

IN WITNESS WHEREOF, each of the Parties has caused this Agreement to be executed and delivered by its duly authorized officer as of the date first above written.

HAYES LEMMERZ INTERNATIONAL, INC.

By: _____

_____

Name:
Title:

---

25 ........DeltaView comparison of pcdocs://chisr01a/688255/1 and pcdocs://chisr01a/688255/2. Performed on 10/28/2009.

STOCKHOLDER


By:

_____

Name:

_____

Title:

_____

Document comparison done by DeltaView on Wednesday, October 28, 2009 1:24:06 PM

| Input: | |
|---|---|
| Document 1 | pcdocs://chisr01a/688255/1 |
| Document 2 | pcdocs://chisr01a/688255/2 |
| Rendering set | Option 3a strikethrough double score no moves |

| Legend: | |
|---|---|
| Insertion | |
| Deletion | |
| <Moved from> | |
| >Moved to< | |
| Style change | |
| Format change | |
| Moved deletion | |
| Inserted cell | |
| Deleted cell | |
| Moved cell | |
| Split/Merged cell | |
| Padding cell | |

| Statistics: | |
|---|---|
| | Count |
| Insertions | 56 |
| Deletions | 54 |
| Moved from | 0 |
| Moved to | 0 |
| Style change | 0 |
| Format changed | 0 |
| Total changes | 110 |

27    DeltaView comparison of pcdocs://chisr01a/688255/1 and pcdocs://chisr01a/688255/2. Performed on 10/28/2009.

Execution Version

REGISTRATION RIGHTS AGREEMENT

among

HAYES LEMMERZ INTERNATIONAL, INC.

and

EACH OF THE STOCKHOLDERS

of

HAYES LEMMERZ INTERNATIONAL, INC.
PARTY HERETO

Dated as of _____, 2009

2⸻DeltaView comparison of pcdocs://chisr01a/688256/1 and pcdocs://chisr01a/692374/2. Performed on 10/27/2009.

TABLE OF CONTENTS

Page

1.    Definitions......................................................................................................1

2.    Demand Registration.......................................................................................4

3.    Piggyback Registration...................................................................................7

4.    Holdback Agreement.......................................................................................8

5.    Registration Procedures..................................................................................8

6.    Registration Expenses....................................................................................12

7.    Underwriting Requirements...........................................................................12

8.    Indemnification..............................................................................................13

9.    Rule 144 Information......................................................................................15

10.    Miscellaneous...............................................................................................16

i    DeltaView comparison of pcdocs://chisr01a/688256/1 and pcdocs://chisr01a/692374/2. Performed on 10/27/2009.

REGISTRATION RIGHTS AGREEMENT

This REGISTRATION RIGHTS AGREEMENT, dated as of **[_____]** (this "Agreement"), is entered into among HAYES LEMMERZ INTERNATIONAL, INC., a Delaware corporation (the "Company"), and the Holders.  Capitalized terms not otherwise defined herein have the meanings set forth in Section 1.

W I T N E S S E T H :

WHEREAS, on May 11, 2009, the Company and certain of the Company's direct and indirect subsidiaries each filed a voluntary petition in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") initiating cases under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") §§ 101-1330 and continued in the possession of their assets and in the management of their businesses pursuant to sections 1107 and 1108 of the Bankruptcy Code;

WHEREAS, the [First] Amended Joint Plan of Reorganization of Hayes Lemmerz International, Inc., et al., as confirmed on [_____], 2009 by an order of the Bankruptcy Court entered on [_____], 2009 (the "Plan"), provides that the Company shall issue to the Holders shares  of Class A Common Stock and/or shares of Class B Common Stock (the "Shares");

WHEREAS, the Shares to be issued to the Holders pursuant to the Plan are being issued in reliance upon Section 1145 of the Bankruptcy Code ("Section 1145") without registration under the Securities Act or any state securities laws;

WHEREAS, notwithstanding the provisions of Section 1145, resales of the Shares may be required to be registered under the Securities Act and applicable state securities laws, depending upon the status of a Holder or the intended method of distribution of the Shares; and

WHEREAS, in order to induce the Holders to complete the transactions contemplated by the Plan, on the effective date of the Plan, the Company is granting to the Holders certain rights to cause the Company to register the Shares and certain other Registrable Securities, on the terms and subject to the conditions set forth herein.

NOW, THEREFORE, in consideration of the premises set forth herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, intending to be legally bound hereby, agree as follows:

1.      Definitions.  As used in this Agreement, the following terms shall have the following meanings:

"Advice" shall have the meaning set forth in Section 5(k).

"Affiliate" means, with respect to any specified Person, any other Person directly or indirectly controlling or controlled by or under direct or indirect common control with such specified Person.  For the purposes of this definition, "control" when used with respect to any

---

1     DeltaView comparison of pcdocs://chisr01a/688256/1 and pcdocs://chisr01a/692374/2. Performed on 10/27/2009.

specified Person means the power to direct the management and policies of such Person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise; and the terms "controlling" and "controlled" have meanings correlative to the foregoing.

"Bankruptcy Code" has the meaning set forth in the preamble.

"Bankruptcy Court" has the meaning set forth in the preamble.

"Business Day" means any day (other than a day which is a Saturday, Sunday or legal holiday in the States of New York) on which banks are open for business in the States of New York.

"Capital Stock" means, with respect to any Person, any and all shares, interests, participations or other equivalents (however designated) of corporate stock issued by such person, including each class of common stock and preferred stock of such person.

"Class A Common Stock" means the Company's Class A common stock, par value $0.01 per share.

"Class B Common Stock" means the Company's Class B common stock, par value $0.01 per share.

"Common Stock" means the Company's (a) Class A Common Stock and (b) Class B Common Stock, and any other shares of Capital Stock into which such Class A Common Stock or Class B Common Stock shall have been changed or any other shares of Capital Stock resulting from any reclassification of such Class A Common Stock or Class B Common Stock.

"Company" shall have the meaning set forth in the introductory clauses hereof.

"Delay Period" shall have the meaning set forth in Section 2(d).

"Demand Notice" shall have the meaning set forth in Section 2(a).

"Demand Registration" shall have the meaning set forth in Section 2(b).

"Effectiveness Period" shall have the meaning set forth in Section 2(c).

"Exchange Act" means the Securities Exchange Act of 1934, as amended, and the rules and regulations of the SEC promulgated thereunder.

"free writing prospectus" shall have the meaning set forth in Rule 405 under the Securities Act.

"Hold Back Period" shall have the meaning set forth in Section 4.

"Holder" means each person identified as a Holder on the signature pages hereto who is the record or beneficial owner of Registrable Securities, together with its successors and permitted assigns who becomes a party to this Agreement.

---

2    DeltaView comparison of pcdocs://chisr01a/688256/1 and pcdocs://chisr01a/692374/2. Performed on 10/27/2009.

"Indemnified Party" shall have the meaning set forth in Section 8(c).

"Indemnifying Party" shall have the meaning set forth in Section 8(c).

"Initial Holder" means the Holders designated as such on the signature pages hereto.

"Initial Outstanding Amount" shall have the meaning set forth in Section 2(a)(ii).

"Inspectors" shall have the meaning set forth in Section 5(j).

"Interruption Period" shall have the meaning set forth in Section 5(k).

"IPO" means the initial public offering of Common Stock of the Company.

"Losses" shall have the meaning set forth in Section 8(a).

"Marketing Materials" shall have the meaning set forth in Section 8(a).

"Person" means any individual, corporation, limited liability company, partnership, joint venture, association, joint-stock company, trust, unincorporated organization or government or any agency or political subdivision thereof.

"Piggyback Registration" shall have the meaning set forth in Section 3(a).

"Plan" shall have the meaning ascribed to it in the preamble.

"Prospectus" means the prospectus included in any Registration Statement (including a prospectus that discloses information previously omitted from a prospectus filed as part of an effective registration statement in reliance upon Rule 430A), as amended or supplemented by any prospectus supplement, with respect to the terms of the offering of any portion of the Registrable Securities covered by such Registration Statement and all other amendments and supplements to such prospectus, including post-effective amendments, and all material incorporated by reference or deemed to be incorporated by reference in such prospectus, including any free writing prospectus.

"Records" shall have the meaning set forth in Section 5(j).

"Registrable Securities" means (i) the Shares and (ii) any additional shares of Common Stock acquired by any Holder after the date hereof, including any shares of Common Stock issued or distributed by way of a dividend, stock split or other distribution in respect of the Shares or acquired by way of any rights offering or similar offering made in respect of the Shares, in each case, if the shares of Common Stock would, in the hands of such Holder, not be freely transferable in accordance with the intended method of disposition (x) in accordance with Section 1145 or (y) under Rule 144 under the Securities Act, without regard to any volume or holding period restriction under Rule 144 under the Securities Act  As to any particular Registrable Securities, once issued, such securities shall cease to be Registrable Securities when (i) a registration statement with respect to the sale of such Registrable Securities shall have become effective under the Securities Act and such securities shall have been disposed of in

3_____DeltaView comparison of pcdocs://chisr01a/688256/1 and pcdocs://chisr01a/692374/2. Performed on 10/27/2009.

accordance with such registration statement, (ii) they shall have been distributed to the public pursuant to Rule 144 under the Securities Act, or (iii) they shall have ceased to be outstanding.

"Registration" means registration under the Securities Act of an offering of Registrable Securities pursuant to a Demand Registration or a Piggyback Registration.

"Registration Statement" means any registration statement of the Company filed under the Securities Act that covers any of the Registrable Securities pursuant to the provisions of this Agreement, including the related Prospectus, all amendments and supplements to such registration statement, including pre- and post-effective amendments, all exhibits thereto and all material incorporated by reference or deemed to be incorporated by reference in such registration statement.  The term "Registration Statement" shall also include any registration statement filed pursuant to Rule 462(b) to register additional securities in connection with any offering.

"road show" means any "road show" as defined in Rule 433 under the Securities Act, including an electronic road show.

"SEC" means the Securities and Exchange Commission or any other governmental agency at the time administering the Securities Act.

"Securities Act" means the Securities Act of 1933, as amended, and the rules and regulations of the SEC promulgated thereunder.

"Shares" shall have the meaning ascribed to it in the preamble.

"Shelf Registration" shall have the meaning set forth in Section 2(b).

"underwritten registration" or "underwritten offering" means a registration under the Securities Act in which securities of the Company are sold to an underwriter for reoffering to the public.

"Warrant Agreements" shall have the meaning set forth in Section 10(a).

2.    Demand Registration.

(a) (i)    The Holders of a majority of the Registrable Securities shall have the right, commencing on the 2nd anniversary of the date of this Agreement, by written notice (the "Demand Notice") given to the Company, to request the Company to register under and in accordance with the provisions of the Securities Act all or any portion of the Registrable Securities designated by such Holders.  For the avoidance of doubt, the foregoing right shall persist if a Demand Registration pursuant to the provisions of this Section 2(a)(i) does not become effective.

(ii)    At any time after the date that the Company becomes subject to the periodic reporting requirements under Section 13 or 15(d) of the Exchange Act, any Holder or group of Holders holding, in the aggregate, [ten percent (10%)] or more of the Registrable Securities issued and outstanding immediately following the effective date of the Plan (the "Initial Outstanding Amount"), shall have the right to request the Company to register under and

4    DeltaView comparison of pcdocs://chisr01a/688256/1 and pcdocs://chisr01a/692374/2. Performed on 10/27/2009.

in accordance with the provisions of the Securities Act all or any portion of the Registrable Securities designated by such Holder(s); provided, however, that (i) the Registrable Securities requested to be registered constitute at least [ten percent (10%)] of the Initial Outstanding Amount, and (ii) prior to the time the Company is eligible to use Form S-3 for the registration of Registrable Securities for resale, such Holder(s), in the aggregate, shall only be entitled to [four (4)] Demand Registrations pursuant to the provisions of this Section 2(a)(ii) unless any Demand Registration does not become effective or is not maintained in effect for the respective periods set forth in Section 2(c), in which case the relevant Holder(s) will be entitled to an additional Demand Registration pursuant hereto.  Following the time that the Company becomes eligible for use of Form S-3, such Holder or group of Holders holding, in the aggregate, [ten percent (10%)] or more of the Initial Outstanding Amount, shall have the right to request the Company to register under and in accordance with the provisions of the Securities Act all or any portion of the Registrable Securities designated by such Holder(s); provided, however, that such Registrable Securities represent at least [ten percent (10%)] of the Initial Outstanding Amount.

(iii)    Upon receipt of a Demand Notice, the Company shall promptly (and in any event within ten (10) Business Days from the date of receipt of such Demand Notice), notify all other Holders of the receipt of such Demand Notice and allow them the opportunity to include Registrable Securities held by them in the proposed registration by submitting their own Demand Notice.  In connection with any Demand Registration in which more than one Holder participates, in the event that such Demand Registration involves an underwritten offering and the managing underwriter or underwriters participating in such offering advise in writing the Holders of Registrable Securities to be included in such offering that the total number of Registrable Securities to be included in such offering exceeds the amount that can be sold in (or during the time of) such offering without delaying or jeopardizing the success of such offering (including the price per share of the Registrable Securities to be sold), then the Registrable Securities to be offered shall be distributed amongst the participating Holders *pro rata* according to each Holder's overall percentage of ownership in the Company.  In the event of such a pro-rata distribution, to the extent that any Holder (or Holders) has not submitted a Demand Notice, or withdraws from the underwriting, then those Shares that would have been allocated *pro-rata* to the non-participating Holder if they had participated shall be distributed amongst the participating Holders, *pro rata* according to each participating Holder's overall percentage of ownership in the Company.

(a) The Company, within 45 days of the date on which the Company receives a Demand Notice given by Holders in accordance with Section 2(a), shall file with the SEC, and the Company shall thereafter use its best efforts to cause to be declared effective as promptly as practicable, a Registration Statement on the appropriate form for the registration and sale, in accordance with the intended method or methods of distribution, of the total number of Registrable Securities specified by the Holders in such Demand Notice (a "Demand Registration").  Any Demand Registration may, at the request of the Holders submitting the Demand Notice, be a "shelf" registration (a "Shelf Registration") pursuant to Rule 415 under the Securities Act[, provided, however, in the case of a Demand Notice requesting a Shelf Registration on behalf of a Holder or a group of Holders holding less than fifty percent (50%) of the Registrable Securities, that the Company is at the time eligible to use Form S-3 for the registration of such Registrable Securities for resale.]

5____DeltaView comparison of pcdocs://chisr01a/688256/1 and pcdocs://chisr01a/692374/2. Performed on 10/27/2009.

(b) The Company shall use commercially reasonable efforts to keep each Registration Statement filed pursuant to this Section 2 continuously effective and usable for the resale of the Registrable Securities covered thereby (i) in the case of a Registration that is not a Shelf Registration, for a period of one hundred twenty (120) days from the date on which the SEC declares such Registration Statement effective and (ii) in the case of a Shelf Registration, for a period of two (2) years from the date on which the SEC declares such Registration Statement effective, in either case (x) until such earlier date as all of the Registrable Securities covered by such Registration Statement have been sold pursuant to such Registration Statement, and (y) as such period may be extended pursuant to this Section 2. The time period for which the Company is required to maintain the effectiveness of any Registration Statement shall be extended by the aggregate number of days of all Delay Periods, the Hold Back Period (if applicable) and all Interruption Periods occurring with respect to such Registration and such period and any extension thereof is hereinafter referred to as the "Effectiveness Period."

(c) The Company shall be entitled to postpone the filing of any Registration Statement otherwise required to be prepared and filed by the Company pursuant to this Section 2, or suspend the use of any effective Registration Statement under this Section 2, for a reasonable period of time (a "Delay Period"), if the Board of Directors of the Company determines in the Board of Directors' reasonable judgment and in good faith that the registration and distribution of the Registrable Securities covered or to be covered by such Registration Statement would materially interfere with any pending material financing, acquisition or corporate reorganization or other material corporate development involving the Company or any of its subsidiaries or would require premature disclosure thereof and promptly gives the Holders written notice of such determination, containing a general statement of the reasons for such postponement and an approximation of the period of the anticipated delay; provided, however, that (i) the aggregate number of days included in all Delay Periods during any consecutive twelve (12) months shall not exceed the aggregate of (x) forty-five (45) days minus (y) the number of days occurring during the Hold Back Period (if applicable) and all Interruption Periods during such consecutive twelve (12) months and (ii) a period of at least forty-five (45) days shall elapse between the termination of any Delay Period, Hold Back Period (if applicable) or Interruption Period and the commencement of the immediately succeeding Delay Period. If the Company shall so postpone the filing of a Registration Statement, the Holders of Registrable Securities to be registered shall have the right to withdraw the request for registration by giving written notice from the Holders of a majority of the Registrable Securities that were to be registered to the Company within forty-five (45) days after receipt of the notice of postponement or, if earlier, the termination of such Delay Period (and, in the event of such withdrawal, such request shall not be counted for purposes of determining the number of requests for registration to which the Holders of Registrable Securities are entitled pursuant to this Section 2). The Company shall not be entitled to initiate or continue a Delay Period unless it shall (A) concurrently prohibit sales by all other security holders under registration statements covering securities held by such other security holders and (B) in accordance with the Company's policies from time to time in effect, forbid purchases and sales in the open market by directors and executive officers of the Company.

(d) The Company shall not include any securities (whether for its own account or otherwise) that are not Registrable Securities in any Registration Statement filed pursuant to this Section 2 without the prior written consent of the Holders of a majority in number of the

6  DeltaView comparison of pcdocs://chisr01a/688256/1 and pcdocs://chisr01a/692374/2. Performed on 10/27/2009.

Registrable Securities covered by such Registration Statement.  Any such securities so included shall be subject to the cut-back provisions of Section 2(a)(iii).

(e) Holders of a majority in number of the Registrable Securities to be included in a Registration Statement pursuant to this Section 2 may, at any time prior to the effective date of the Registration Statement relating to such Registration, revoke such request by providing a written notice to the Company revoking such request.  Any such Demand Request so withdrawn shall not be counted for purposes of determining the number of requests for registration to which the Holders of Registrable Securities are entitled pursuant to this Section 2 if the Holders of Registrable Securities who revoked such request reimburse the Company for all its out-of-pocket expenses incurred in the preparation, filing and processing of the Registration Statement; provided, however, that, if such revocation was based on (i) the Company's failure to comply in any material respect with its obligations hereunder or (ii) the institution by the Company of a Delay Period or the occurrence of the Hold Back Period (if applicable) or any Interruption Period, such reimbursement shall not be required.

2.    Piggyback Registration.

(a) Right to Piggyback.  If at any time the Company proposes to file a registration statement under the Securities Act with respect to a public offering by the Company for its own account of securities of the same type as the Registrable Securities (other than a registration statement (i) in connection with the IPO, or (ii) on Form S-8 or Form S-4 or any successor forms thereto, or (iii) filed solely in connection with a dividend reinvestment plan or an employee benefit plan covering only officers or directors of the Company or its Affiliates), then the Company shall give written notice of such proposed filing to the Holders at least fifteen (15) days before the anticipated filing date.  Such notice shall offer the Holders the opportunity to register such amount of Registrable Securities as they may request (a "Piggyback Registration").  Subject to Section 3(b), the Company shall include in each such Piggyback Registration all Registrable Securities with respect to which the Company has received written requests for inclusion therein within ten (10) days after notice has been given to the Holders.  Each Holder shall be permitted to withdraw all or any portion of the Registrable Securities of such Holder from a Piggyback Registration at any time prior to the effective date of such Piggyback Registration.

(b) Priority on Piggyback Registrations.  The Company shall permit the Holders to include all such Registrable Securities on the same terms and conditions as any similar securities, if any, of the Company or any other persons included therein.  Notwithstanding the foregoing, if the Company or the managing underwriter or underwriters participating in such offering advise the Holders in writing that the total amount of securities requested to be included in such Piggyback Registration exceeds the amount which can be sold in (or during the time of) such offering without delaying or jeopardizing the success of the offering (including the price per share of the securities to be sold), then the amount of securities to be offered for the account of the Holders and other holders of securities who have piggyback registration rights with respect thereto shall be reduced (to zero if necessary) pro rata on the basis of the number of

7_____DeltaView comparison of pcdocs://chisr01a/688256/1 and pcdocs://chisr01a/692374/2. Performed on 10/27/2009.

Common Stock equivalents requested to be registered by each such Holder or other holder participating in such offering.

(c) <u>Right To Abandon</u>.  Nothing in this <u>Section 3</u> shall create any liability on the part of the Company to the Holders if the Company in its sole discretion should decide not to file a registration statement proposed to be filed pursuant to <u>Section 3(a)</u> or to withdraw such registration statement subsequent to its filing, regardless of any action whatsoever that a Holder may have taken, whether as a result of the issuance by the Company of any notice hereunder or otherwise.  Any such determination not to file or to withdraw a registration statement shall not affect the obligations of the Company to pay or to reimburse all Registration Expenses pursuant to <u>Section 6</u>.

3.     <u>Holdback Agreement</u>.  If the Company shall file a registration statement (other than in connection with the registration of securities issuable pursuant to an employee stock option, stock purchase or similar plan or pursuant to a merger, exchange offer or a transaction of the type specified in Rule 145(a) under the Securities Act) with respect to the IPO, and (i) with reasonable prior notice, the managing underwriter or underwriters, if any, advises the Company in writing (in which case the Company shall notify the Holders) that a public sale or distribution of Registrable Securities would materially adversely impact such offering and (ii) the underwriter or underwriters have obtained written holdback agreements from the Company, each executive officer of the Company and each other person who has been granted registration rights by the Company, then each Holder shall, to the extent not inconsistent with applicable law, refrain from effecting any public sale or distribution of Registrable Securities during the ten (10) days prior to the effective date of such registration statement and until the earlier of (A) the abandonment of such offering and (B) ninety (90) days from the effective date of such registration statement (the "<u>Hold Back Period</u>").  Notwithstanding the foregoing, any obligations of the Holders under this <u>Section 4</u> shall terminate in the event that the Company or any underwriter terminates, releases or waives, in whole of in part, the holdback agreements with respect to the Company, any executive officer of the Company or any such other person who has been granted registration rights by the Company.

4.     <u>Registration Procedures</u>.  In connection with the registration obligations of the Company pursuant to and in accordance with <u>Sections 2</u> and <u>3</u> (and subject to <u>Sections 2</u> and <u>3</u>), the Company shall use commercially reasonable efforts to effect such registration to permit the sale of such Registrable Securities in accordance with the intended method or methods of disposition thereof, and pursuant thereto the Company shall as expeditiously as possible:

(a) prepare and file with the SEC a Registration Statement for the sale of the Registrable Securities on any form for which the Company then qualifies or which counsel for the Company shall deem appropriate in accordance with such Holders' intended method or methods of distribution thereof, and, subject to the Company's right to terminate or abandon a registration pursuant to <u>Section 3(c)</u>, use commercially reasonable efforts to cause such Registration Statement to become effective and remain effective as provided herein;

(b) prepare and file with the SEC such amendments (including post-effective amendments) to such Registration Statement, and such supplements to the related Prospectus, as may be required by the rules, regulations or instructions applicable to the Securities Act during the applicable period in accordance with the intended methods of disposition specified by the

 8____DeltaView comparison of pcdocs://chisr01a/688256/1 and pcdocs://chisr01a/692374/2.  Performed on 10/27/2009.

Holders of the Registrable Securities covered by such Registration Statement, make generally available earnings statements satisfying the provisions of Section 11(a) of the Securities Act (provided that the Company shall be deemed to have complied with this Section if it has complied with Rule 158 under the Securities Act), and cause the related Prospectus as so supplemented to be filed pursuant to Rule 424 under the Securities Act; provided, however, that before filing a Registration Statement or Prospectus, or any amendments or supplements thereto (other than reports required to be filed by it under the Exchange Act that are incorporated or deemed to be incorporated by reference into the Registration Statement and the Prospectus except to the extent that such reports related primarily to the offering), the Company shall furnish to the Holders of Registrable Securities covered by such Registration Statement and their counsel for review and comment, copies of all documents required to be filed;

(c) notify the Holders of any Registrable Securities covered by such Registration Statement promptly and (if requested) confirm such notice in writing, (i) when a Prospectus or any Prospectus supplement or post-effective amendment has been filed, and, with respect to such Registration Statement or any post-effective amendment, when the same has become effective, (ii) of any request by the SEC for amendments or supplements to such Registration Statement or the related Prospectus or for additional information regarding the Company or the Holders, (iii) of the issuance by the SEC of any stop order suspending the effectiveness of such Registration Statement or the initiation of any proceedings for that purpose, (iv) of the receipt by the Company of any notification with respect to the suspension of the qualification or exemption from qualification of any of the Registrable Securities for sale in any jurisdiction or the initiation or threatening of any proceeding for such purpose, and (v) of the happening of any event that requires the making of any changes in such Registration Statement, Prospectus or documents incorporated or deemed to be incorporated therein by reference so that they will not contain any untrue statement of a material fact or omit to state any material fact required to be stated therein or necessary to make the statements therein not misleading;

(d) use commercially reasonable efforts to prevent the issuance of any order suspending the effectiveness of such Registration Statement or the qualification or exemption from qualification of any Registrable Securities for sale in any jurisdiction in the United States, and to obtain the lifting or withdrawal of any such order at the earliest practicable time;

(e) furnish to the Holder of any Registrable Securities covered by such Registration Statement, each counsel for such Holders and each managing underwriter, if any, without charge, one conformed copy of such Registration Statement, as declared effective by the SEC, and of each post-effective amendment thereto, in each case including financial statements and schedules and all exhibits and reports incorporated or deemed to be incorporated therein by reference; and deliver, without charge, such number of copies of the preliminary prospectus, any amended preliminary prospectus, any free writing prospectus, each final Prospectus and any post-effective amendment or supplement thereto, as such Holder may reasonably request in order to facilitate the disposition of the Registrable Securities of such Holder covered by such Registration Statement in conformity with the requirements of the Securities Act;

(f) prior to any public offering of Registrable Securities covered by such Registration Statement, use commercially reasonable efforts to register or qualify such Registrable Securities for offer and sale under the securities or "Blue Sky" laws of such jurisdictions as the Holders of

9    DeltaView comparison of pcdocs://chisr01a/688256/1 and pcdocs://chisr01a/692374/2. Performed on 10/27/2009.

such Registrable Securities shall reasonably request in writing; provided, however, that the Company shall in no event be required to qualify generally to do business as a foreign corporation or as a dealer in any jurisdiction where it is not at the time required to be so qualified or to execute or file a general consent to service of process in any such jurisdiction where it has not theretofore done so or to take any action that would subject it to general service of process or taxation in any such jurisdiction where it is not then subject;

(g) upon the occurrence of any event contemplated by Section 5(c)(v), prepare a supplement or post-effective amendment to such Registration Statement or the related Prospectus or any document incorporated or deemed to be incorporated therein by reference and file any other required document so that, as thereafter delivered to the purchasers of the Registrable Securities being sold thereunder (including upon the termination of any Delay Period), such Prospectus will not contain an untrue statement of a material fact or omit to state any material fact required to be stated therein or necessary to make the statements therein, in light of the circumstances under which they were made, not misleading;

(h) use commercially reasonable efforts to cause all Registrable Securities covered by such Registration Statement to be listed on each securities exchange or automated interdealer quotation system, if any, on which similar securities issued by the Company are then listed or quoted, or, if none, on such securities exchange or automated interdealer quotation system reasonably selected by the Company;

(i) on or before the effective date of such Registration Statement, provide the transfer agent of the Company for the Registrable Securities with printed certificates for the Registrable Securities covered by such Registration Statement, which are in a form eligible for deposit with The Depository Trust Company;

(j) if such offering is an underwritten offering, make available for inspection by any Holder of Registrable Securities included in such Registration Statement, any underwriter participating in any offering pursuant to such Registration Statement, and any attorney, accountant or other agent retained by any such Holder or underwriter (collectively, the "Inspectors"), all financial and other records and other information, pertinent corporate documents and properties of any of the Company and its subsidiaries and affiliates (collectively, the "Records"), as shall be reasonably necessary to enable them to exercise their due diligence responsibilities; provided, however, that the Records that the Company determines, in good faith, to be confidential and which it notifies the Inspectors in writing are confidential shall not be disclosed to any Inspector unless such Inspector signs a confidentiality agreement reasonably satisfactory to the Company, which shall permit the disclosure of such Records in such Registration Statement or the related Prospectus if (i) necessary to avoid or correct a material misstatement in or material omission from such Registration Statement or Prospectus or (ii) the release of such Records is ordered pursuant to a subpoena or other order from a court of competent jurisdiction; provided further, however, that (A) any decision regarding the disclosure of information pursuant to subsection (i) shall be made only after consultation with counsel for the applicable Inspectors and the Company and (B) with respect to any release of Records pursuant to subsection (ii), each Holder of Registrable Securities agrees that it shall, promptly after learning that disclosure of such Records is sought in a court having jurisdiction, give notice

---

10 DeltaView comparison of pcdocs://chisr01a/688256/1 and pcdocs://chisr01a/692374/2. Performed on 10/27/2009.

to the Company so that the Company, at the Company's expense, may undertake appropriate action to prevent disclosure of such Records;

(k) not later than the effective date of a registration statement, the Company shall provide to the Holders the CUSIP number for all Registrable Securities; and

(l)  if such offering is an underwritten offering, enter into such agreements (including an underwriting agreement in form, scope and substance as is customary in underwritten offerings) and take all such other appropriate and reasonable actions requested by the Holders of a majority of the Registrable Securities being sold in connection therewith (including those reasonably requested by the managing underwriters) in order to expedite or facilitate the disposition of such Registrable Securities, and in such connection, (i) use commercially reasonable efforts to obtain opinions of counsel to the Company and updates thereof (which counsel and opinions (in form, scope and substance) shall be reasonably satisfactory to the managing underwriters and counsel to the Holders of the Registrable Securities being sold), addressed to each selling Holder of Registrable Securities covered by such Registration Statement and each of the underwriters as to the matters customarily covered in opinions requested in underwritten offerings and such other matters as may be reasonably requested by such counsel and underwriters, (ii) use commercially reasonable efforts to obtain "cold comfort" letters and updates thereof from the independent certified public accountants of the Company (and, if necessary, any other independent certified public accountants of any subsidiary of the Company or of any business acquired by the Company for which financial statements and financial data are, or are required to be, included in the Registration Statement), addressed to each selling holder of Registrable Securities covered by the Registration Statement (unless such accountants shall be prohibited from so addressing such letters by applicable standards of the accounting profession) and each of the underwriters, such letters to be in customary form and covering matters of the type customarily covered in "cold comfort" letters in connection with underwritten offerings, (iii) if requested and if an underwriting agreement is entered into, provide indemnification provisions and procedures customary for underwritten public offerings, but in any event no less favorable to the indemnified parties than the provisions set forth in <u>Section 8</u>.  The above shall be done at each closing under such underwriting or similar agreement, or as and to the extent required thereunder.

The Company may require each Holder of Registrable Securities covered by a Registration Statement to furnish such information regarding such Holder and such Holder's intended method of disposition of such Registrable Securities as it may from time to time reasonably request in writing.  If any such information is not furnished within a reasonable period of time after receipt of such request, the Company may exclude such Holder's Registrable Securities from such Registration Statement.

Each Holder of Registrable Securities covered by a Registration Statement agrees that, upon receipt of any notice from the Company of the happening of any event of the kind described in <u>Section 5(c)(ii)</u>, <u>5(c)(iii)</u>, <u>5(c)(iv)</u> or <u>5(c)(v)</u>, that such Holder shall discontinue disposition of any Registrable Securities covered by such Registration Statement or the related Prospectus until receipt of the copies of the supplemented or amended Prospectus contemplated by <u>Section 5(g)</u>, or until such Holder is advised in writing (the "<u>Advice</u>") by the Company that the use of the applicable Prospectus may be resumed, and has received copies of any amended or

supplemented Prospectus or any additional or supplemental filings which are incorporated, or deemed to be incorporated, by reference in such Prospectus (such period during which disposition is discontinued being an "Interruption Period") and, if requested by the Company, the Holder shall deliver to the Company (at the expense of the Company) all copies then in its possession, other than permanent file copies then in such holder's possession, of the Prospectus covering such Registrable Securities at the time of receipt of such request.

Each Holder of Registrable Securities covered by a Registration Statement further agrees not to utilize any material other than the applicable current preliminary prospectus, free writing prospectus, road show or Prospectus in connection with the offering of such Registrable Securities.

5.     Registration Expenses.  Whether or not any Registration Statement is filed or becomes effective, the Company shall pay all costs, fees and expenses incident to the Company's performance of or compliance with this Agreement, including (i) all registration and filing fees, including NASD filing fees, (ii) all fees and expenses of compliance with securities or "Blue Sky" laws, including reasonable fees and disbursements of counsel in connection therewith, (iii) printing expenses (including expenses of printing certificates for Registrable Securities and of printing prospectuses if the printing of prospectuses is requested by the Holders or the managing underwriter, if any) and expenses associated with a road show, (iv) messenger, telephone and delivery expenses, (v) fees and disbursements of counsel for the Company, (vi) fees and disbursements of all independent certified public accountants of the Company (including expenses of any "cold comfort" letters required in connection with this Agreement) and all other persons retained by the Company in connection with such Registration Statement, (vii) fees and disbursements of one counsel, other than the Company's counsel, selected by Holders of a majority of the Registrable Securities being registered, to represent all such Holders, (viii) fees and disbursements of underwriters customarily paid by the issuers or sellers of securities and (ix) all other costs, fees and expenses incident to the Company's performance or compliance with this Agreement.  Notwithstanding the foregoing, the fees and expenses of any persons retained by any Holder, other than one counsel for all such Holders, and any discounts, commissions or brokers' fees or fees of similar securities industry professionals and any transfer taxes relating to the disposition of the Registrable Securities by a Holder, will be payable by such Holder and the Company will have no obligation to pay any such amounts.

6.     Underwriting Requirements.

(a) Subject to Section 7(c), any Holder shall have the right, by written notice, to request that any Demand Registration provide for an underwritten offering.

(b) In the case of any underwritten offering pursuant to a Demand Registration, the Holders of a majority of the Registrable Securities to be disposed of in connection therewith shall select the institution or institutions that shall manage or lead such offering, which institution or institutions shall be reasonably satisfactory to the Company.  In the case of any underwritten offering pursuant to a Piggyback Registration, the Company shall select the institution or institutions that shall manage or lead such offering.

(c) In the case of any Piggyback Registration that is an underwritten offering, no Holder shall be entitled to participate in an underwritten offering unless and until such Holder has

entered into an underwriting or other agreement with such institution or institutions for such offering in such form as the Company and such institution or institutions shall reasonably determine; provided, that no holder of Registrable Securities included in any underwritten registration shall be required to make any representation or warranties to the Company or the underwriters (other than representations and warranties regarding such holder and such holder's ownership of the shares to be sold pursuant to such underwriting) or to undertake any indemnification or contribution obligations to the Company or any underwriter with respect thereto, other than as specifically provided in Section 8.

7.    Indemnification.

(a) Indemnification by the Company.  The Company shall, without limitation as to time, indemnify and hold harmless, to the fullest extent permitted by law, each Holder of Registrable Securities whose Registrable Securities are covered by a Registration Statement or Prospectus, the officers, directors and agents and employees of each of them, each Person who controls each such Holder (within the meaning of Section 15 of the Securities Act or Section 20 of the Exchange Act) and the officers, directors, agents and employees of each such controlling person, to the fullest extent lawful, from and against any and all losses, claims, damages, liabilities, judgment, costs (including costs of investigation or preparation and reasonable attorneys' fees) and expenses (collectively, "Losses"), as incurred, arising out of or based upon (w) any untrue or alleged untrue statement of a material fact contained in such Registration Statement or Prospectus or in any amendment or supplement thereto in any preliminary prospectus, any free writing prospectus, any information the Company has filed or is required to file pursuant to Rule 433(d) under the Securities Act, or any other material or information provided to or made available to investors by, or with the approval of, the Company in connection with the offering, including any road show for the offering (collectively, "Marketing Materials"), (x) any omission or alleged omission of a material fact required to be stated therein or necessary to make the statements therein not misleading, except insofar as the same are based upon information furnished in writing to the Company by or on behalf of such Holder expressly for use in the Marketing Materials, (y) any untrue statement or alleged untrue statement of a material fact in the information conveyed to any purchaser at the time of the sale to such purchaser, or the omission or alleged omission to state therein a material fact required to be stated therein, or (z) any violation by the Company of any federal, state or common law rule or regulation applicable to the Company and relating to action required of or inaction by the Company in connection with any such registration; provided, however, that the Company shall not be liable to any such Holder to the extent that any such Losses arise out of or are based upon an untrue statement or alleged untrue statement or omission or alleged omission made in any preliminary prospectus if (i) having previously been furnished by or on behalf of the Company with copies of the Prospectus, such Holder failed to send or deliver a copy of the Prospectus with or prior to the delivery of written confirmation of the sale of Registrable Securities by such Holder to the person asserting the claim from which such Losses arise and (ii) the Prospectus would have corrected in all material respects such untrue statement or alleged untrue statement or such omission or alleged omission; and provided further, however, that the Company shall not be liable in any such case to the extent that any such Losses arise out of or are based upon an untrue statement or alleged untrue statement or omission or alleged omission in the Prospectus, if (A) such untrue statement or alleged untrue statement, omission or alleged omission is corrected in

13    DeltaView comparison of pcdocs://chisr01a/688256/1 and pcdocs://chisr01a/692374/2. Performed on 10/27/2009.

all material respects in an amendment or supplement to the Prospectus and (B) having previously been furnished by or on behalf of the Company with copies of the Prospectus as so amended or supplemented, such Holder thereafter fails to deliver such Prospectus as so amended or supplemented, prior to or concurrently with the sale of Registrable Securities.

(b) <u>Indemnification by Holder of Registrable Securities</u>.  In connection with any Registration Statement in which a Holder is participating, such Holder shall furnish to the Company in writing such information as the Company reasonably requests for use in connection with the Marketing Materials and agrees to indemnify, severally and not jointly with the other Holders and to the full extent permitted by law, the Company, its directors, officers, agents or employees, each Person who controls the Company (within the meaning of Section 15 of the Securities Act and Section 20 of the Exchange Act) and the directors, officers, agents or employees of such controlling Persons, from and against all Losses arising out of or based upon (x) any untrue or alleged untrue statement of a material fact contained in the Marketing Materials or (y) any omission or alleged omission of a material fact required to be stated therein or necessary to make the statements therein not misleading, to the extent, but only to the extent, that such untrue or alleged untrue statement or omission or alleged omission is based upon and is consistent with information so furnished in writing by or on behalf of such Holder to the Company expressly for use in such Marketing Materials.  No Holder shall be held liable for any damages in excess of the total amount of proceeds received by such Holder from the sale of the Registrable Securities sold by such Holder (net of all underwriting discounts and commissions) under that particular Registration Statement.

(c) <u>Conduct of Indemnification Proceedings</u>.  If any Person shall be entitled to indemnity hereunder (an "<u>Indemnified Party</u>"), such Indemnified Party shall give prompt notice to the party from which such indemnity is sought (the "<u>Indemnifying Party</u>") of any claim or of the commencement of any proceeding with respect to which such Indemnified Party seeks indemnification or contribution pursuant hereto; <u>provided</u>, <u>however</u>, that the delay or failure to so notify the Indemnifying Party shall not relieve the Indemnifying Party from any obligation or liability except to the extent that the Indemnifying Party has been materially prejudiced by such delay or failure.  The Indemnifying Party shall have the right, exercisable by giving written notice to an Indemnified Party promptly after the receipt of written notice from such Indemnified Party of such claim or proceeding, to assume, at the Indemnifying Party's expense, the defense of any such claim or proceeding, with counsel reasonably satisfactory to such Indemnified Party; <u>provided</u>, <u>however</u>, that (i) an Indemnified Party shall have the right to employ separate counsel in any such claim or proceeding and to participate in the defense thereof, but the fees and expenses of such counsel shall be at the expense of such Indemnified Party unless: (1) the Indemnifying Party agrees to pay such fees and expenses; (2) the Indemnifying Party fails promptly to assume the defense of such claim or proceeding or fails to employ counsel reasonably satisfactory to such Indemnified Party; or (3) the named parties to any proceeding (including impleaded parties) include both such Indemnified Party and the Indemnifying Party, and such Indemnified Party shall have been advised by counsel that there may be one or more legal defenses available to it that are in addition to or are inconsistent with those available to the Indemnifying Party or that a conflict of interest is likely to exist among such Indemnified Party and any other indemnified parties (in which case the Indemnifying Party shall not have the right to assume the defense of such action on behalf of such Indemnified Party); and (ii) subject to subsection (3) above, the Indemnifying Party shall not, in connection with any one such claim or

14_____DeltaView comparison of pcdocs://chisr01a/688256/1 and pcdocs://chisr01a/692374/2. Performed on 10/27/2009.

proceeding or separate but substantially similar or related claims or proceedings in the same jurisdiction, arising out of the same general allegations or circumstances, be liable for the fees and expenses of more than one firm of attorneys (together with appropriate local counsel) at any time for all of the indemnified parties.  Whether or not such defense is assumed by the Indemnifying Party, such Indemnified Party shall not be subject to any liability for any settlement made without its consent, which consent shall not be unreasonably withheld, conditioned or delayed.  The Indemnifying Party shall not consent to entry of any judgment or enter into any settlement that does not include as an unconditional term thereof the giving by the claimant or plaintiff to such Indemnified Party of a release, in form and substance reasonably satisfactory to the Indemnified Party, from all liability in respect of such claim or litigation for which such Indemnified Party would be entitled to indemnification hereunder.

(d) Contribution.  If the indemnification provided for in this Section 8 is applicable in accordance with its terms but is legally unavailable to an Indemnified Party in respect of any Losses, then each applicable Indemnifying Party, in lieu of indemnifying such Indemnified Party, shall contribute to the amount paid or payable by such Indemnified Party as a result of such Losses, in such proportion as is appropriate to reflect the relative fault of the Indemnifying Party, on the one hand, and such Indemnified Party, on the other hand, in connection with the actions, statements or omissions that resulted in such Losses as well as any other relevant equitable considerations.  The relative fault of such Indemnifying Party, on the one hand, and Indemnified Party, on the other hand, shall be determined by reference to, among other things, whether any action in question, including any untrue statement of a material fact or omission or alleged omission to state a material fact, has been taken by, or relates to information supplied by, such Indemnifying Party or Indemnified Party, and the parties' relative intent, knowledge, access to information and opportunity to correct or prevent any such action, statement or omission.  The amount paid or payable by a party as a result of any Losses shall be deemed to include any legal or other fees or expenses incurred by such party in connection with any investigation or proceeding.  The parties hereto agree that it would not be just and equitable if contribution pursuant to this Section 8(d) were determined by pro rata allocation or by any other method of allocation that does not take account of the equitable considerations referred to in the immediately preceding paragraph.  Notwithstanding the provision of this Section 8(d), an Indemnifying Party that is a Holder shall not be required to contribute any amount which is in excess of the amount by which the total proceeds received by such Holder from the sale of the Registrable Securities sold by such Holder (net of all underwriting discounts and commissions) exceeds the amount of any damages that such Indemnifying Party has otherwise been required to pay by reason of such untrue or alleged untrue statement or omission or alleged omission.  No person guilty of fraudulent misrepresentation (within the meaning of Section 11(f) of the Securities Act) shall be entitled to contribution from any Person who was not guilty of such fraudulent misrepresentation.

15____DeltaView comparison of pcdocs://chisr01a/688256/1 and pcdocs://chisr01a/692374/2. Performed on 10/27/2009.

8.      Rule 144 Information.  With a view to making available the benefits of certain rules and regulations of the Commission which may at any time permit the sale of the Registrable Securities to the public without registration, after such time as a registration statement relating to the Common Stock of the Company has been declared effective under either the Securities Act or the Exchange Act, the Company agrees to use its best efforts to:

(a) Make and keep public information available, as those terms are understood and defined in Rule 144 under the Securities Act, at all times after the earlier of (a) such time as a registration statement relating to the Common Stock of the Company has been declared effective under either the Securities Act or the Exchange Act or (b) the date that the Company becomes subject to the periodic reporting requirements under Section 13 or 15(d) of the Exchange Act, for so long as the Company remains subject to the periodic reporting requirements under Section 13 or 15(d) of the Exchange Act.

(b) Use its best efforts to file with the Commission in a timely manner all reports and other documents required of the Company under the Securities Act and the Exchange Act (at any time after it has become subject to such reporting requirements).

(c) Furnish to any Holder forthwith upon request a written statement by the Company as to its compliance with the reporting requirements of Rule 144 under the Securities Act (at any time after 90 days after the effective date of the first registration statement filed by the Company for an offering of its securities to the general public), and of the Securities Act and the Securities Exchange Act of 1934 (at any time after it has become subject to such reporting requirements), a copy of the most recent annual or quarterly report of the Company, and such other reports and documents of the Company and other information in as such Holder may reasonably request in availing itself of any rule or regulation of the Commission allowing such Holder to sell any such securities without registration.

9.      Miscellaneous.

(a) Limitations on Subsequent Registration Rights.      After the date of this Agreement and prior to the IPO, and except as set forth in each of the Warrant Agreements between the Company and [BNY Mellon ShareownerInvestor Services], LLC dated as of even date herewith (the "Warrant Agreements"), the Company shall not grant registration rights to any third party other than pursuant to the terms of this Agreement unless the Company has obtained the written consent of Holders of at least a majority in number of the Registrable Securities then outstanding; provided that after the IPO, the Company shall not grant registration rights to any third party which are senior to or *pari passu* with the registration rights granted to Holders hereunder unless the Company has obtained the written consent of Holders of at least a majority in number of the Registrable Securities then outstanding.

(b) Termination.  This Agreement and the obligations of the Company and the Holders hereunder (other than with respect to Section 8) shall terminate on the first date on which no Registrable Securities remain outstanding.

16_____DeltaView comparison of pcdocs://chisr01a/688256/1 and pcdocs://chisr01a/692374/2. Performed on 10/27/2009.

(c) <u>Notices</u>.  All notices, requests, waivers and other communications made pursuant to this Agreement shall be in writing and shall be deemed to have been effectively given (i) when personally delivered to the party to be notified; (ii) when sent by confirmed facsimile to the party to be notified at the number set forth below; (iii) when sent by email to the party to be notified at the email address set forth below; (iv) three (3) Business Days after deposit in the United States mail postage prepaid by certified or registered mail return receipt requested and addressed to the party to be notified as set forth below; or (v) one (1) Business Day after deposit with a national overnight delivery service, postage prepaid, addressed to the party to be notified as set forth below with next-business-day delivery guaranteed, in each case as follows:

In the case of the Company, to:

> Hayes Lemmerz International, Inc.
> [ADDRESS]
> Attention:  [_____]
> Telephone:  [_____]
> Facsimile:  [_____]
> Email:  [_____]

> With a copy (which shall not constitute notice) to:

> [NAME]
> [ADDRESS]
> Attention:  [_____]
> Telephone:  [_____]
> Facsimile:  [_____]
> Email:  [_____]

In the case of the Initial Holders:

> To the names and addresses set forth on the signature pages hereto.

> With a copy (which copy shall not constitute notice) to:

> Milbank, Tweed, Hadley & McCloy LLP
> 1 Chase Manhattan Plaza
> New York, New York  10005
> Attention:  Thomas C. Janson
> Telephone:  (212) 530-5000
> Facsimile:  (212) 530-5219
> Email:  tjanson@milbank.com

In the case of any other Holder, to such Holder at its address set forth in the stock ledger of the Company.

---

17 _____DeltaView comparison of pcdocs://chisr01a/688256/1 and pcdocs://chisr01a/692374/2. Performed on 10/27/2009.

(d) <u>Separability</u>.  If any provision of this Agreement shall be declared to be invalid or unenforceable, in whole or in part, such invalidity or unenforceability shall not affect the remaining provisions hereof which shall remain in full force and effect.

(e) <u>Assignment</u>.  This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective heirs, devisees, legatees, legal representatives, successors and assigns.  The rights to cause the Company to register Registrable Securities pursuant to <u>Sections 2</u> and <u>3</u> may be assigned in connection with any transfer or assignment by a Holder of Registrable Securities, <u>provided</u> that: (i) such transfer may otherwise be effected in accordance with applicable securities laws; (ii) such transfer is effected in compliance with the restrictions on transfer contained in this Agreement and in any other agreement between the Company and the Holder; and (iii) such assignee or transferee is (A) an affiliate of the Holder (B) a partner or member of the Holder or an affiliate of the Holder or (C) holds (after giving effect to such transfer) (I) at least 2% of the issued and outstanding shares or (II) all shares of Registrable Securities held by a Holder if transferred to a single entity. No transfer or assignment will divest a Holder or any subsequent owner of such rights and powers unless all Registrable Securities are transferred or assigned.

(f) <u>Entire Agreement</u>.  This Agreement represents the entire agreement of the parties and shall supersede any and all previous contracts, arrangements or understandings between the parties hereto with respect to the subject matter hereof.

(g) <u>Amendments and Waivers</u>.  Except as otherwise provided herein, the provisions of this Agreement may not be amended, modified or supplemented, and waivers or consents to departures from the provisions hereof may not be given, unless the Company has obtained the written consent of Holders of at least a majority in number of the Registrable Securities then outstanding.

(h) <u>Publicity</u>.   No public release or announcement concerning the transactions contemplated hereby shall be issued by any party without the prior consent of the other parties, except to the extent that such party is advised by counsel that such release or announcement is necessary or advisable under applicable law or the rules or regulations of any securities exchange, in which case the party required to make the release or announcement shall to the extent practicable provide the other party with an opportunity to review and comment on such release or announcement in advance of its issuance.

(i) <u>Expenses</u>.  Whether or not the transactions contemplated hereby are consummated, except as otherwise provided herein, all costs and expenses incurred in connection with the execution of this Agreement shall be paid by the party incurring such costs or expenses, except as otherwise set forth herein.

(j) <u>Interpretation</u>.

(ii)     The headings contained in this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement.

(iii)     The meaning assigned to each term defined herein shall be equally applicable to both the singular and the plural forms of such term and vice versa, and words

18........DeltaView comparison of pcdocs://chisr01a/688256/1 and pcdocs://chisr01a/692374/2. Performed on 10/27/2009.

denoting either gender shall include both genders as the context requires.  Where a word or phrase is defined herein, each of its other grammatical forms shall have a corresponding meaning.

(iv)    The terms "hereof", "herein" and "herewith" and words of similar import shall, unless otherwise stated, be construed to refer to this Agreement as a whole and not to any particular provision of this Agreement.

(v) When a reference is made in this Agreement to a Section, paragraph, Exhibit or Schedule, such reference is to a Section, paragraph, Exhibit or Schedule to this Agreement unless otherwise specified.

(vi)The word "include", "includes", and "including" when used in this Agreement shall be deemed to include the words "without limitation", unless otherwise specified.

(vii)    A reference to any party to this Agreement or any other agreement or document shall include such party's predecessors, successors and permitted assigns.

(k) Counterparts.  This Agreement may be executed in two or more counterparts, all of which shall be one and the same agreement, and shall become effective when counterparts have been signed by each of the parties and delivered to each other party.

(l) Governing Law.  This Agreement shall be construed, interpreted, and governed in accordance with the internal laws of New York.

(m)Calculation of Time Periods.  Except as otherwise indicated, all periods of time referred to herein shall include all Saturdays, Sundays and holidays; provided, however, that if the date to perform the act or give any notice with respect to this Agreement shall fall on a day other than a Business Day, such act or notice may be timely performed or given if performed or given on the next succeeding Business Day.

[*Signature Page Follows*]

---

19____DeltaView comparison of pcdocs://chisr01a/688256/1 and pcdocs://chisr01a/692374/2. Performed on 10/27/2009.

IN WITNESS WHEREOF, each of the Parties has caused this Agreement to be executed and delivered by its duly authorized officer as of the date first above written.

HAYES LEMMERZ INTERNATIONAL, INC.

By: _____

Name:

Title:

---

20    DeltaView comparison of pcdocs://chisr01a/688256/1 and pcdocs://chisr01a/692374/2. Performed on 10/27/2009.

INITIAL HOLDER


By:  _____

Name:  _____

Title:  _____

Address:  _____

                _____

                _____

Document comparison done by DeltaView on Tuesday, October 27, 2009 6:49:03 PM

| Input: | |
|---|---|
| Document 1 | pcdocs://chisr01a/688256/1 |
| Document 2 | pcdocs://chisr01a/692374/2 |
| Rendering set | Option 3a strikethrough double score no moves |

| Legend: | |
|---|---|
| Insertion | |
| Deletion | |
| <Moved from> | |
| >Moved to< | |
| Style change | |
| Format change | |
| Moved deletion | |
| Inserted cell | |
| Deleted cell | |
| Moved cell | |
| Split/Merged cell | |
| Padding cell | |

| Statistics: | |
|---|---|
| | Count |
| Insertions | 3 |
| Deletions | 15 |
| Moved from | 0 |
| Moved to | 0 |
| Style change | 0 |
| Format changed | 0 |
| Total changes | 18 |

22___DeltaView comparison of pcdocs://chisr01a/688256/1 and pcdocs://chisr01a/692374/2. Performed on 10/27/2009.

# EXHIBIT B

## NEW PLAN EXHIBITS

## Exhibit N

## Director Indemnification Agreement

Execution Version

**HAYES LEMMERZ INTERNATIONAL, INC.**

**DIRECTOR INDEMNIFICATION AGREEMENT**

**[NAME OF DIRECTOR/INDEMNITEE]**

**[       ], 2009**

**HAYES-LEMMERZ INTERNATIONAL, INC.**

**DIRECTOR INDEMNIFICATION AGREEMENT**

This Director Indemnification Agreement (this "*Agreement*") has been made and executed this [___] day of [_____], 2009, by and between Hayes-Lemmerz International, Inc., a Delaware corporation (the "*Company*"), and [_____], an individual resident of [_____] (the "*Indemnitee*").

WHEREAS**,** it is essential for the Company to retain and attract as directors the most capable persons available;

WHEREAS, Indemnitee [is currently serving][has agreed to serve] as a director of the Company;

WHEREAS, both the Company and Indemnitee recognize the increased risk of litigation and other claims being asserted against directors of public companies in today's environment;

WHEREAS, basic protection against undue risk of personal liability of directors heretofore has been provided through insurance coverage providing reasonable protection at reasonable cost, and Indemnitee has relied on the availability of such coverage; but it has become increasingly more difficult to obtain such insurance on terms providing reasonable protection at reasonable cost;

WHEREAS, Article 7.4 of the Bylaws of the Company (the "*By-Laws*"), as currently in effect, requires the Company to indemnify and advance expenses to its directors to the full extent permitted by law and the Indemnitee [has been serving and continues to serve][has agreed to serve] as a director of the Company in part in reliance on such provisions;

WHEREAS, in recognition of the Indemnitee's need for substantial protection against personal liability in order to enhance the Indemnitee's continued service to the Company in an effective manner, the Indemnitee's reliance on the aforesaid By-Law provisions, and, in part, to provide the Indemnitee with specific contractual assurance that the protection provided by the By-Laws will be available to the Indemnitee (regardless of, among other things, any amendment to or revocation of such By-Laws or any change in the composition of the Company's Board of Directors or any Change of Control the Company), the Company wishes to provide in this Agreement for the indemnification of and the advancing of expenses to the Indemnitee to the fullest extent (whether partial or complete) permitted by law, and, to the extent insurance is maintained, for the continued coverage of the Indemnitee under the Company's directors' and officers' liability insurance policies; and

WHEREAS, the Board of Directors of the Company has determined that (i) it is essential to the best interests of the Company's stockholders that the Company act to assure such

2

persons that there will be increased certainty of such protection in the future, and that (ii) it is reasonable, prudent and necessary for the Company contractually to obligate itself to indemnify such persons to the fullest extent permitted by applicable law as provided in this Agreement so that they will continue to act in their capacity as directors of  the Company free from undue concern that they will not be so indemnified.

NOW THEREFORE, in consideration of the premises and the mutual promises and covenants contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Company and the Indemnitee, intending to be legally bound hereby, agree as follows:

### Section 1.     *Indemnification.*

The Company hereby irrevocably agrees to indemnify the Indemnitee to the fullest extent permitted by applicable Delaware law, as in effect from time to time.  Without diminishing the scope of the indemnification provided by this Section, the rights of indemnification of the Indemnitee provided hereunder shall include, but shall not be limited to, those rights hereinafter set forth in this Agreement, except that no indemnification shall be available to the Indemnitee:

A.   on account of any suit in which judgment is rendered against the Indemnitee for disgorgement of profits made from the purchase or sale by the Indemnitee of securities of the Company pursuant to the provisions of Section 16(b) of the Securities Exchange Act of 1934, as amended (the "*Exchange Act*"), or similar provisions of any federal, state or local statutory law;

B.   on account of conduct of the Indemnitee which is finally adjudged by a court of competent jurisdiction to have been knowingly fraudulent or to constitute willful misconduct;

C.   in any circumstance where such indemnification is expressly prohibited by applicable law; or

D.   in connection with any Proceeding (or part thereof) initiated by the Indemnitee, or any Proceeding by the Indemnitee against the Company or its directors, officers, employees or other Indemnitees, (i) unless (x) such indemnification is expressly required to be made by law, (y) the Proceeding was authorized by the Board of Directors of the Company, or (z) such indemnification is provided by the Company in its sole discretion, pursuant to the powers vested in the Company under applicable law, or (ii) except as provided in Sections 9 and 13 hereof.

### Section 2.     *Actions Other Than by or in the Right of the Company.*

The Indemnitee shall be entitled to the indemnification rights provided in this Section 2 if he was or is a party or is threatened to be made a party to any Proceeding, other than an action by or in the right of the Company, arising out of or relating to any Indemnifiable Claim.  Pursuant to this Section 2, the Indemnitee shall be indemnified against all Expenses, judgments, penalties, fines and amounts paid in settlement which were actually and reasonably

3

incurred by him in connection with such Proceeding unless it is finally determined by a court of competent jurisdiction that he did not act in good faith and in a manner he reasonably believed to be in or not opposed to the best interests of the Company, and, with respect to any criminal action or Proceeding, if he had no reasonable cause to believe his conduct was unlawful.

For purposes of this Agreement, the following terms have the meanings ascribed to them below:

"*Affiliate*" means, with respect to any specified Person, any other Person directly or indirectly controlling or controlled by or under direct or indirect common control with such specified Person.  For the purposes of this definition, "control" when used with respect to any specified Person means the Power to direct the management and policies of such Person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise; and the terms "controlling" and "controlled" have meanings correlative to the foregoing.

"*Certificate*" means the Amended and Restated Certificate of Incorporation of Hayes Lemmerz International, Inc., as in effect on the date hereof, and as subsequently amended.

"*Expenses*" means all expenses and other costs incurred by or on behalf of an Indemnitee, including, without limitation, all attorneys' fees and other costs, expenses and obligations paid or incurred in connection with investigating, defending, being a witness in, participating in (including on appeal), or preparing to defend, be a witness in or participate in, any Proceeding relating to any Indemnifiable Claim.

"*Indemnifiable Claim*" means any event or occurrence related to or arising out of the fact that the Indemnitee is or was a director, officer, employee or agent of the Company, or is or was serving at the request of the Company as a director, officer, employee or agent or fiduciary of any other entity, including, but not limited to, another corporation, partnership, joint venture or trust, or by reason of any act or omission by him in any such capacity.

"*Person*" means an individual, corporation, partnership, limited liability company, joint venture, association, joint stock company, trust or unincorporated organization, or government or any agency or political subdivision thereof.

"*Proceeding*" shall mean any threatened, pending or completed action, suit or proceeding, or any inquiry or investigation, whether instituted by the Company or any other party, that the Indemnitee in good faith believes might lead to the institution of any such action, suit or proceeding, whether civil, criminal, administrative or investigative in nature.

**Section 3.**      *Actions by or in the Right of the Company.*

The Indemnitee shall be entitled to the indemnification rights provided in this Section 3 if he is was or is a party or is threatened to be made a party to any Proceeding brought by or in the right of the Company to procure a judgment in its favor arising out of or relating to any Indemnifiable Claim.  Pursuant to this Section 3, the Indemnitee shall be indemnified against all Expenses and amounts paid in settlement actually incurred by him in connection with such Proceeding, unless it is finally judicially determined that he did not act in good faith and in a manner he reasonably believed to be in or not opposed to be the best interests of the Company;

4

*provided, however*, that no such indemnification shall be made in respect of any claim, issue, or matter as to which applicable law expressly prohibits such indemnification by reason of any adjudication of liability of the Indemnitee to the Company, unless and only to the extent that the Court of Chancery of the State of Delaware or the court in which such action or suit was brought shall determine upon application that, despite the adjudication of liability but in view of all the circumstances of the case, the Indemnitee is fairly and reasonably entitled to indemnify for such expenses and costs which such court shall deem proper.

**Section 4.    *Additional Indemnity*.**

In addition to, and without regard to any limitations on, the indemnification provided in Sections 1, 2 and 3 of this Agreement, the Company shall, and hereby does, irrevocably agree to indemnify and hold harmless the Indemnitee against all Expenses, judgments, penalties, fines and amounts paid in settlement actually incurred by him on his behalf if, in connection with any Proceeding arising out of or related to an Indemnifiable Claim, including, without limitation, all liability arising out of negligence or active or passive wrongdoing of the Indemnitee unless it is finally judicially determined by a court of competent jurisdiction that such indemnification is unlawful.

**Section 5.    *Indemnification for Expenses and Costs of Successful Party*.**

Notwithstanding the other provisions of this Agreement, to the extent that the Indemnitee has served on behalf of the Company as a witness or other participant in any claim, action or Proceeding, or has been successful, on the merits or otherwise, in defense of any action, suit or Proceeding referred to in Sections 1 through 4 hereof, or in defense of any claim, issue or matter therein, including, but not limited to, the dismissal of any action without prejudice, he shall be indemnified against all Expenses incurred by him in connection therewith.

**Section 6.    *Partial Indemnification*.**

If the Indemnitee is entitled under any provision of this Agreement to indemnification by the Company for some or a portion of the Expenses, costs, judgments, fines and amounts paid in settlement actually incurred by him in connection with any Proceeding, but is not entitled to indemnification for the total amount thereof, the Company shall nevertheless indemnify the Indemnitee for the portion of such Expenses, costs, judgments, penalties, fines and amounts paid in settlement actually incurred by him to which the Indemnitee is entitled. Without limiting the generality of the foregoing, if any Proceeding is brought against the Indemnitee in his capacity as a director, officer, or employee and as a shareholder or as a director officer, employee or agent of any shareholder or other person, the presumption shall be that recovery is sought by reason of the Indemnitee's status as a director, officer or employee of the Company.

**Section 7.    *Determination of Entitlement to Indemnification*.**

It is the intention of the parties that this Agreement provide the Indemnitee with rights to indemnification that are as favorable as may be permitted by Delaware law and the public policy of the State of Delaware. Accordingly, the parties agree that the following procedures and presumptions shall apply in the event that there is any question as to whether the

5

Indemnitee is entitled to indemnification under this Agreement.

(a)  To obtain indemnification under this Agreement, the Indemnitee shall submit to the Company a written request for indemnification, including an identification of the action, Proceeding or claim giving rise to such request.  In addition, at the request of the Company, the Indemnitee shall also provide such other documentation and information as is reasonably requested by the Company and which is reasonably available to the Indemnitee and reasonably necessary to determine whether and to what extent the Indemnitee is entitled to indemnification. The Secretary of the Company shall, promptly upon receipt of such a request for indemnification, advise the Board of Directors in writing that the Indemnitee has requested indemnification.  Any Expenses incurred by the Indemnitee in connection with his request for indemnification hereunder shall be borne by the Company.

(b)  Upon written request by the Indemnitee for indemnification under Section 7(a), the entitlement of the Indemnitee to indemnification pursuant to the terms of this Agreement shall be determined by the following person or persons, who shall be empowered to make such determination: (a) in the event that no Change of Control has occurred, by (i) the Board of Directors of the Company, by a majority vote of a quorum consisting of Disinterested Directors; or (ii) if such a quorum is not obtainable or, even if obtainable, if either the Board of Directors, by the majority vote of Disinterested Directors, or the Indemnitee, by notice to the Company, so elects, by Independent Counsel in a written opinion to the Board of Directors, a copy of which shall be delivered to the Indemnitee and (b) in the event that a Change of Control has occurred, by Independent Counsel in a written opinion to the Board of Directors, a copy of which shall be delivered to the Indemnitee.  The term "*Disinterested Director*" means a Director of the Company who is not or was not a party to the Proceeding in respect of which indemnification is being sought by the Indemnitee.  The term "*Independent Counsel*" means a law firm or a member of a law firm that neither is presently nor in the past five years has been retained to represent: (i) the Company or the Indemnitee in any matter material to either such party, or (ii) any other party to the Proceeding giving rise to a claim for indemnification hereunder.  Notwithstanding the foregoing, the term "*Independent Counsel*" shall not include any person who, under the applicable standards of professional conduct then prevailing, would have a conflict of interest in representing either the Company or the Indemnitee in an action to determine the Indemnitee's right to indemnification under this Agreement.

(c)  If the determination of entitlement to indemnification is to be made by Independent Counsel pursuant to Section 7(b) hereof, the Independent Counsel shall be selected by the Indemnitee.  The Indemnitee shall notify the Company in writing of the identity of the Independent Counsel so selected.  The Company may, within 10 days after such written notice of selection shall have been given, deliver to the Indemnitee a written objection to such selection; *provided, however*, that such objection may be asserted only on the ground that the Independent Counsel so selected does not meet the requirements for serving as Independent Counsel as set forth in Section 7(b), and the objection shall set forth with particularity the factual basis of such assertion.  Absent a proper and timely objection, the person so selected shall act as Independent Counsel.  If a written objection is made and substantiated, the Independent Counsel selected may not serve as Independent Counsel unless and until such objection is withdrawn or a court has determined that such objection is without merit.  If, within 20 days after submission by Indemnitee of a written request for indemnification pursuant to Section 7(a) hereof, no

6

Independent Counsel shall have been selected and not objected to, either the Company or Indemnitee may petition the Court of Chancery of the State of Delaware or other court of competent jurisdiction for resolution of any objection which shall have been made to the Indemnitee's selection of Independent Counsel and/or for the appointment as Independent Counsel of a person selected by the court or by such other person as the court shall designate, and the person with respect to whom all objections are so resolved or the person so appointed shall act as Independent Counsel under this Agreement hereof.  The Company shall pay any and all reasonable fees and expenses of Independent Counsel incurred by such Independent Counsel in connection with acting pursuant to this Agreement, and the Company shall pay all reasonable fees and expenses incident to the procedures of this Section 7(c), regardless of the manner in which such Independent Counsel was selected or appointed.

(d)     In making a determination with respect to entitlement to indemnification hereunder, the person or persons or entity making such determination shall presume that the Indemnitee is entitled to indemnification under this Agreement.  Anyone seeking to overcome this presumption shall have the burden of proof and the burden of persuasion by clear and convincing evidence.

(e)     The Indemnitee shall be deemed to have acted in good faith if the Indemnitee's action is based on the records or books of account of the Company, including financial statements, or on information supplied to the Indemnitee by the officers of the Company in the course of their duties, or on the advice of legal counsel for the Company or on information or records given or reports made to the Company by an independent certified public accountant or by an appraiser or other expert selected with reasonable care by the Company.  In addition, the knowledge and/or actions, or failure to act, of any other director, or of any officer, agent or employee of the Company shall not be imputed to the Indemnitee for purposes of determining the right to indemnification under this Agreement.  Whether or not the foregoing provisions of this Section 7(e) are satisfied, it shall in any event be presumed that the Indemnitee has at all times acted in good faith and in a manner he reasonably believed to be in or not opposed to the best interests of the Company.  Anyone seeking to overcome this presumption shall have the burden of proof and the burden of persuasion by clear and convincing evidence.

(f)     If the person, persons or entity empowered or selected under Section 7 to determine whether the Indemnitee is entitled to indemnification shall not have made a determination within 45 days after receipt by the Company of the written request therefore, the requisite determination of entitlement to indemnification shall be deemed to have been made and the Indemnitee shall be entitled to such indemnification absent a misstatement by the Indemnitee of a material fact, or an omission of a material fact necessary to make the Indemnitee's statement not materially misleading, in connection with the request for indemnification, or a prohibition of such indemnification under applicable law; provided, however, that such 45-day period may be extended for a reasonable time, not to exceed an additional 30 days, if the person, persons or entity making such determination with respect to entitlement to indemnification in good faith requires such additional time to obtain or evaluate documentation and/or information relating thereto.  Pending any such determination, the Company shall advance Expenses as provided in Section 8, subject to the undertaking set forth in Section 8 to repay such amounts if it is ultimately determined that the Indemnitee is not entitled to indemnification hereunder.

7

(g)   The Company acknowledges that a settlement or other disposition short of final judgment may be successful if it permits a party to avoid expense, delay, distraction, disruption and uncertainty.  In the event that any Proceeding to which the Indemnitee is a party is resolved in any manner other than by adverse judgment against the Indemnitee (including, without limitation, settlement of such Proceeding with or without payment of money or other consideration) it shall be presumed that the Indemnitee has been successful on the merits or otherwise in such Proceeding.  Anyone seeking to overcome this presumption shall have the burden of proof and the burden of persuasion by clear and convincing evidence.  In addition, the termination of any Proceeding by judgment, order, or conviction, or upon a plea of *nolo contendere* or its equivalent, shall not, of itself: (a) create a presumption that the Indemnitee did not act in good faith and in a manner which he reasonably believed to be in or not opposed to the best interests of the Company, and, with respect to any criminal action or Proceeding, that the Indemnitee had reasonable cause to believe that his conduct was unlawful; or (b) otherwise adversely affect the rights of the Indemnitee to indemnification, except as may be provided herein.

**Section 8.**   *Advancement of Expenses and Costs***.**

All Expenses actually incurred by the Indemnitee shall be paid by the Company in advance of the final disposition of such action, suit or Proceeding, if so requested by the Indemnitee, within 20 days after the receipt by the Company of a statement or statements from the Indemnitee requesting such advance or advances.  The Indemnitee may submit such statements from time to time.  The Indemnitee's entitlement to such expenses shall include those incurred in connection with any Proceeding by the Indemnitee seeking an adjudication or award in arbitration pursuant to this Agreement.  Such statement or statements shall reasonably evidence the expenses and costs incurred by him in connection therewith and shall include or be accompanied by an undertaking by or on behalf of the Indemnitee to repay such amount if it is ultimately determined that the Indemnitee is not entitled to be indemnified against such expenses and costs by the Company pursuant to this Agreement or otherwise.  Any such repayment obligation shall be unsecured and shall be interest free.  In addition, in the event that a Change of Control has occurred, the Company shall, upon the request of the Indemnitee, deposit in an escrow account with a financial institution reasonably satisfactory to the Indemnitee an amount equal to the Expenses reasonably projected by counsel to the Indemnitee to be incurred over the next six months in connection with defending, or investigating or preparing to defend, any Proceeding with respect to which the Indemnitee is entitled to indemnification or advancement of Expenses, and shall, from time to time upon request of the Indemnitee replenish the amount of such escrow deposit so that, after the date of such additional deposit, the amount of such escrow account is at least equal to such reasonably projected Expenses over the ensuing six month period.

**Section 9.**   *Remedies of the Indemnitee in Cases of Determination not to Indemnify or to Advance Expenses***.**

In the event that a determination is made that the Indemnitee is not entitled to indemnification hereunder or if payment has not been timely made or if Expenses are not timely advanced pursuant to Section 8, the Indemnitee shall be entitled to a final adjudication following a determination of entitlement to indemnification pursuant to Sections 7 in an appropriate court

8

of the State of Delaware or any other court of competent jurisdiction of his entitlement to such indemnification or advance.  Alternatively, the Indemnitee may, at his option, seek an award in arbitration to be conducted by a single arbitrator pursuant to the rules of the American Arbitration Association, such award to be made within 60 days following the filing of the demand for arbitration.  The Company shall not oppose the Indemnitee's right to seek any such adjudication or award in arbitration or any other claim.  Such judicial Proceeding or arbitration shall be made *de novo* and the Indemnitee shall not be prejudiced by reason of a determination (if so made) that he is not entitled to indemnification.  If a determination is made or deemed to have been made pursuant to the terms of Section 7 hereof that the Indemnitee is entitled to indemnification, the Company shall be bound by such determination and shall be precluded from asserting that such determination has not been made or that the procedure by which such determination was made is not valid, binding and enforceable.  The Company further agrees to stipulate in any such court or before any such arbitrator that the Company is bound by all the provisions of this Agreement and is precluded from making any assertions to the contrary.  If the court or arbitrator shall determine that the Indemnitee is entitled to any indemnification hereunder, the Company shall pay all reasonable expenses (including attorneys' fees) and costs actually incurred by the Indemnitee in connection with such adjudication or award in arbitration (including, but not limited to, any appellate Proceedings).

### Section 10.    *Change of Control*.

(a)    A "*Change of Control*" shall be deemed to have occurred if (i) any "person" (as such term is used in Sections 13(d) and 14(d) of the Exchange Act, other than a trustee or other fiduciary holding securities under an employee benefit plan of the Company or a corporation owned directly or indirectly by the stockholders of the Company in substantially the same proportions as their ownership of stock of the Company, is or becomes the "beneficial owner" (as defined in Rule 13d-3 under the Exchange Act), directly or indirectly, of securities of the Company representing [20]% or more of the total voting power represented by the Company's then outstanding Voting Securities (as defined below), or (ii) during any period of two consecutive years, individuals who at the beginning of such period constitute the Board of Directors of the Company and any new director whose election by the Board of Directors or nomination for election by the Company's stockholders was approved by a vote of at least two-thirds (2/3) of the directors then still in office who either were directors at the beginning of the period or whose election or nomination for election was previously so approved, cease for any reason to constitute a majority thereof, or (iii) the stockholders of the Company approve a merger or consolidation of the Company with any other corporation, other than a merger or consolidation which would result in the Voting Securities of the Company outstanding immediately prior thereto continuing to represent (either by remaining outstanding or by being converted into Voting Securities of the surviving entity) at least [80]% of the total voting power represented by the Voting Securities of the Company or such surviving entity outstanding immediately after such merger or consolidation, or the stockholders of the Company approve a plan of complete liquidation of the Company or an agreement for the sale or disposition by the Company of (in one transaction or a series of transactions) all or substantially all the Company's assets.  The term "*Voting Securities*" means any securities of the Company that vote generally in the election of directors.

(b)    The Company agrees that if there is a Change in Control of the Company

9

(other than a Change in Control which has been approved by a majority of the Company's Board of Directors who were directors immediately prior to such Change in Control) then with respect to all matters thereafter arising concerning the rights of the Indemnitee to indemnity payments and Expense advances under this Agreement or any other agreement, Company By-law or provision in the Certificate now or hereafter in effect relating to claims for Indemnifiable Events, the Company shall seek legal advice only from Independent Legal Counsel selected by the Indemnitee.  The Company agrees to pay the reasonable fees of the Independent Legal Counsel referred to above and to indemnify fully such counsel against any and all expenses (including attorneys' fees), claims, liabilities and damages arising out of or relating to this Agreement or its engagement pursuant hereto.

### Section 11.    *Non-Exclusivity; Insurance.*

(a)    The indemnification and advancement of Expenses provided by this Agreement shall not be deemed exclusive of any other rights to which the Indemnitee may now or in the future be entitled under any provision of the Certificate or By-laws of the Company, any vote of stockholders or Disinterested Directors, any provision of law or otherwise.  No amendment, or alteration of this Agreement or of any provision hereof shall limit or restrict any right of the Indemnitee under this Agreement in respect of any action taken or omitted by such Indemnitee prior to such amendment or alteration.  To the extent that a change in the Delaware General Corporation Law, whether by statute or judicial decision, permits greater indemnification than would be afforded currently under  the Certificate, Bylaws and this Agreement, it is the intent of the parties hereto that the Indemnitee shall enjoy by this Agreement the greater benefits so afforded by such change.  No right or remedy herein conferred is intended to be exclusive of any other right or remedy, and every other right and remedy shall be cumulative and in addition to every other right and remedy given hereunder or now or hereafter existing at law or in equity or otherwise.  The assertion or employment of any right or remedy hereunder, or otherwise, shall not prevent the concurrent assertion or employment of any other right or remedy.

(b)    To the extent that the Company maintains an insurance policy or policies providing liability insurance for directors, officers, employees, or agents or fiduciaries of the Company or of any other corporation, partnership, joint venture, trust, employee benefit plan or other enterprise that such person serves at the request of the Company, the Indemnitee shall be covered by such policy or policies in accordance with its or their terms to the maximum extent of the coverage available for any director, agent or fiduciary under such policy or policies.  If, at the time of the receipt of a notice of a Proceeding pursuant to the terms hereof, the Company has director and officer liability insurance in effect, the Company shall give prompt notice of the commencement of such Proceeding to the insurers in accordance with the procedures set forth in the respective policies.  The Company shall thereafter take all necessary or desirable action to cause such insurers to pay, on behalf of the Indemnitee, all amounts payable as a result of such Proceeding in accordance with the terms of such policies.

### Section 12.    *Additional Provisions Regarding Third Party Indemnification of the Indemnitee.*

10

The Company acknowledges that the Indemnitee may be entitled to, or may be provided, indemnification by another Person (a "*Third Party Indemnitor*") in respect of the Indemnitee's service as a director for Expenses, judgments, penalties, fines and amounts paid in settlements with respect to an Indemnifiable Claim for which the Indemnitee is also entitled to seek indemnification hereunder (the "*Company Indemnified Expenses*").  The Company acknowledges and agrees that, as between the Company and its subsidiaries, on the one hand, and the Third Party Indemnitor and its Affiliates (other than the Company and its subsidiaries), on the other hand, the Company shall be primarily liable to the Indemnitee with respect to any Company Indemnified Expenses and any liability of the Third Party Indemnitor or its Affiliates to the Indemnitee shall be secondary liability.  In recognition of the primary liability of the Company, the Company agrees that, in the event that the Third Party Indemnitor or any of its Affiliates pays any Company Indemnified Expenses to or on behalf of the Indemnitee, reimburses the Indemnitee for any Company Indemnified Expenses paid by the Indemnitee or advances amounts to the Indemnitee (including by way of any loan) for the payment of Company Indemnified Expenses, then (i) the Company shall pay to the Third Party Indemnitor any amounts so paid, reimbursed or advanced, to the extent that the Indemnitee would have been entitled to indemnification of such Company Indemnified Expenses and (ii) the Third Party Indemnitor shall be subrogated to all of the rights of the Indemnitee with respect to any claim that the Indemnitee could have brought against the Company or any subsidiary with respect to any Company Indemnified Expenses that have been paid, reimbursed or advanced to or on behalf of the Indemnitee.  All such payments to the Third Party Indemnitor shall be made within 5 business days of the receipt by the Company of written notice from the Third Party Indemnitor of such payment, reimbursement or advance, accompanied by documentation showing, in reasonable detail, the Company Indemnified Expenses so paid, reimbursed or advanced by the Third Party Indemnitor or any of its Affiliates.  The Third party Indemnitor shall be an express third party beneficiary of this Agreement and the Company agrees, upon request of the Indemnitee or the Third Party Indemnitor, to enter into an agreement with the Third Party Indemnitor evidencing this agreement.  The Company shall also reimburse the Third Party Indemnitor and its Affiliates for all expenses, including legal expenses, incurred in enforcing this Section 12.

### Section 13.    *Attorneys' Fees and Other Expenses to Enforce Agreement.*

In the event that the Indemnitee is subject to or intervenes in any Proceeding in which the validity or enforceability of this Agreement is at issue or seeks an adjudication or award in arbitration to enforce his rights under, or to recover damages for breach of, this Agreement, the Indemnitee, if he prevails in whole or in part in such action, shall be entitled to recover from the Company and shall be indemnified by the Company against any actual Expenses  reasonably incurred by him in connection therewith.

### Section 14.    *Duration of Agreement.*

This Agreement shall continue until and terminate upon the later of: (a) 10 years after the Indemnitee has ceased to serve as a director, officer, employee, agent or fiduciary of the Company or to serve at the request of the Company as a director, officer, employee, agent or fiduciary of any other entity, including, but not limited to, another corporation, partnership, joint venture or trust, and (b) the final termination of all pending or threatened Proceedings to which

the Indemnitee may be subject by reason of the fact that he is or was a director, officer, employee, agent or fiduciary of the Company or is or was serving at the request of the Company as a director, officer, employee, agent or fiduciary of any other entity, including, but not limited to, another corporation, partnership, joint venture or trust, or by reason of any act or omission by him in any such capacity.  The indemnification provided under this Agreement shall continue as to the Indemnitee even though he may have ceased to be a director or officer of the Company. This Agreement shall be binding upon the Company and its successors and assigns and shall inure to the benefit of the Indemnitee and his spouse, successors, assigns, heirs, devisees, executors, administrators or other legal representatives.

### Section 15.    *Severability*.

If any provision or provisions of this Agreement shall be held invalid, illegal or unenforceable for any reason whatsoever, (a) the validity, legality and enforceability of the remaining provisions of this Agreement (including, but not limited to, all portions of any Sections of this Agreement containing any such provision held to be invalid, illegal, or unenforceable) shall not in any way be affected or impaired thereby, and (b) to the fullest extent possible, the provisions of this Agreement (including, but not limited to, all portions of any paragraph of this Agreement containing any such provision held to be invalid, illegal or unenforceable, that are not themselves invalid, illegal or unenforceable) shall be construed so as to give effect to the intent manifest by the provision held invalid, illegal or unenforceable.

### Section 16.    *Counterparts*.

This Agreement may be executed in one or more counterparts, each of which shall for all purposes be deemed to be an original but all of which together shall constitute one and the same Agreement.  Only one such counterpart signed by the party against whom enforceability is sought shall be required to be produced to evidence the existence of this Agreement.

### Section 17.    *Captions.*

The captions and headings used in this Agreement are inserted for convenience only and shall not be deemed to constitute part of this Agreement or to affect the construction thereof.

### Section 18.    *Modification and Waiver*.

No supplement, modification or amendment of this Agreement shall be binding unless executed in writing by both parties hereto. No waiver of any of the provisions of this Agreement shall be deemed or shall constitute a waiver of any other provisions hereof (whether or not similar) nor shall such waiver constitute a continuing waiver.

### Section 19.    *Notices*.

All notices, requests, demands or other communications hereunder shall be in writing and shall be deemed to have been duly given if (i) delivered by hand with receipt acknowledged by the party to whom said notice or other communication shall have been directed or if (ii) mailed by certified or registered mail, return receipt requested, with postage prepaid, on

12

the date shown on the return receipt:

If to the Indemnitee, at the address set forth on the signature page hereof.

If to the Company, to:

Hayes Lemmerz International, Inc.

Attention:
Facsimile:

or to such other address as may be furnished to the Indemnitee by the Company or to the Company by the Indemnitee, as the case may be.

**Section 20.**    *Governing Law*.

The parties hereto agree that this Agreement shall be governed by, and construed and enforced in accordance with, the laws of the State of Delaware, applied without giving effect to any conflicts-of-law principles.

[*Signature Pages Follow*]

13

IN WITNESS WHEREOF, the parties hereto have executed this Agreement on the day and year first above written.

**HAYES LEMMERZ INTERNATIONAL, INC.**

By: _____
     Name:
     Title:

**INDEMNITEE:**

_____

Name:

Address for Notices:

_____
_____
_____
_____
Facsimile:    _____

With a copy (which shall not constitute notice) to:

_____
_____
_____
_____
Facsimile:    _____

NY1:#3515587

## **Exhibit G**

## **Initial Directors and Officers of the Reorganized Debtors**

**PLAN EXHIBIT G**

## Initial Directors and Officers of the Reorganized Debtors

Initial Directors of the Reorganized Debtors

Pursuant to Section 6.6 of the Plan, the initial board of directors of Reorganized Hayes will consist of seven (7) directors.  The initial board of directors of Reorganized Hayes will include Curtis Clawson, the Debtors' current Chief Executive Officer (or in the event of his death, incapacity, resignation or dismissal, the chief executive officer of Reorganized Hayes).  The remaining six (6) members of the initial board of directors of Reorganized Hayes will be selected by the Requisite DIP Lenders, in their sole discretion.

In accordance with Section 6.6 of the Plan the Requisite DIP Lenders have designated the directors set forth in the table below to serve on the initial board of directors of Reorganized Hayes.  The existing directors of each Subsidiary Debtor shall remain in their capacities as director of the applicable Reorganized Subsidiary Debtor.

| Name | Background | Appointed by |
|---|---|---|
| Curtis Clawson | Mr. Clawson has held the positions of President, Chief Executive Officer and Chairman of the Board of Directors of Hayes Lemmerz International, Inc. prior and during its reorganization. He has held such positions since August 2001 (President and Chief Executive Officer) and September 2001 (Chairman).  Most recently, from 1999 to July 2000, Mr. Clawson was President and Chief Operating Officer of American National Can, a $2.5 billion NYSE traded manufacturing company.  Mr. Clawson has over 17 years of experience in the automotive industry.  He began his career in automotive-related businesses at Arvin Industries where he spent 9 years, from 1986 to 1995, including (I) a position as General Manager of the business unit that supplied Arvin exhaust products, (ii) tenures in sales and marketing, and (iii) tenures in production and plant management.  From 1995 until the time that he joined American National Can, Mr. Clawson worked for Allied Signal, Inc. as President of Alien's Filters (Farm) and Spark Plugs (Autoclave) Group, a $500 million automotive components business, and then President of Alien's Laminate Systems Group. Mr. Clawson earned his Bachelor of Science and Bachelor of Arts degrees from Purdue University and  Master's of Science degree in Business Administration from Harvard University Business School.  He is fluent in Spanish and French. | N/A |

| Name | Background | Appointed by |
|---|---|---|
| Timothy J. Bernlohr | Mr. Bernlohr is a Managing Director with TJB Management Consulting, LLC which specializes in providing project specific consulting services to businesses in transformation, strategic planning, and interim executive management. Prior to 2006, Mr. Bernlohr was President and CEO of RBX Industries, Inc. Mr. Bernlohr presently serves as Chairman of the Board of Directors of The Manischewitz Company and Cuisine Innovations, as Director of Cadence Innovation, LLC, Zemex Minerals Inc., General Insulation Co., Inc., Bally Total Fitness, Atlas Air World Wide Holdings, Inc., Trident Resources Corporation, Inc., Nybron Flooring International Corp, and BEIM Technologies, Inc. | Requisite DIP Lenders |
| James N. Chapman | Mr. Chapman is non-executive Vice Chairman of SkyWorks Leasing, LLC, which is an aircraft management services company. Prior to joining SkyWorks Leasing, LLC, he was associated with Regiment Capital Advisors, LP, an investment advisor specializing in high yield investments. Mr. Chapman has over 24 years of investment banking experience in a wide range of industries including aviation/airlines, metals, mining, automotive/general manufacturing, financial services, real estate and healthcare. Mr. Chapman received an MBA degree with distinction from Dartmouth College and was elected an Edward Tuck Scholar. He received his BA degree, with distinction, *magna cum laude*, at Dartmouth College and was elected Phi Beta Kappa, in addition to being a Rufus Choate Scholar. | Requisite DIP Lenders |
| Gladino Claro | Mr. Claro is Executive Vice President of Aleris International, Inc. and Chief Executive Officer of Aleris Americas. Prior to joining Aleris International, Inc., he was President and Chief Executive Officer of Heico Metals Processing Group of Heico Companies, LLC. Mr. Claro receive a degree in Mechanical Engineering from University of Taubate, Sao Paulo, Brazil in 1982. | Requisite DIP Lenders |
| Bob Dover | Mr. Dover is a consultant and advisor to many national and international businesses. Mr. Dover is Chairman of Inter City Group and a Board Member of Jaguar Daimler Heritage Trust, SinterCast AB, and Zeroshift Ltd. Mr. Dover's prior experience includes being Chairman and Chief Executive Officer of Jaguar Land Rover, Land Rover, and Aston Martin Lagonda, Ltd. He received an Honorary Doctor of Science from Warwick and an Honorary Doctor of Technology from Coventry. | Requisite DIP Lenders |

| Name | Background | Appointed by |
|---|---|---|
| George T. Haymaker, Jr. | Mr. Haymaker has served as a Director of Hayes Lemmerz International, Inc. since 2003 and serves as the Lead Director. Mr. Haymaker served as non-executive Chairman of the Board of Kaiser Aluminum Corporation from October 2001 through June 2006.  Mr. Haymaker served as Chairman of the Board and Chief Executive Officer of Kaiser Aluminum Corporation from January 1994 until January 2000, and as non-executive Chairman of the Board of Kaiser Aluminum Corporation from January 2000 through May 2001.  From May 1993 to December 1993, Mr. Haymaker served as President and Chief Operating Officer of Kaiser Aluminum Corporation.  Mr. Haymaker is also a director of Pool Corporation, a distributor of swimming pool products. Mr. Haymaker received a MBA from the University of Southern California.  He received his MS degree in Industrial Management and his BS degree in metallurgy from the Massachusetts Institute of Technology. | Requisite DIP Lenders |
| Henry D.G. Wallace | Mr. Wallace has served as a Director of Hayes Lemmerz International, Inc. since 2003.  Mr. Wallace was previously employed by Ford Motor Company from 1971 –2001.  Mr. Wallace's last position with Ford was as the Group Vice President, Mazada & Asia Pacific Operations.  Before serving Ford in this capacity Mr. Wallace occupied a number of different positions, many of which were financial in nature, including but not limited to: Group Vice President and Chief Financial Officer (2000); Vice President, European Strategic Planning and Chief Financial Officer, Ford of Europe, Inc. (1997); Treasurer, Ford of Europe, Inc. (1989); and various financial management positions within Ford of Europe, Inc.  Mr. Wallace received a BA in Economics from the University of Leicester. | Requisite DIP Lenders |

## Initial Officers of the Reorganized Debtors

The existing Officers or managing members of the Debtors shall remain in their current capacities as officers or managing members of the Debtors, subject to the ordinary rights and powers of the board of directors or equityholders, as the case may be, to replace them.  The existing Officers or managing members of the Debtors are: Curtis J. Clawson as President and Chief Executive Officer; Fred Bentley as Chief Operating Officer and President, Global Wheel Group; Mark Brebberman as Vice President and Chief Financial Officer; Patrick C. Cauley as Vice President, General Counsel and Secretary; and John A. Salvette as Vice President, Business Development.

690291- Server 1a - MSW

K-1

## Exhibit K

## Material Terms of Post-Plan Effective Date Secured Term Loan

**Hayes International, Inc.**
**HLI Operating Company, Inc.**
**Hayes Lemmerz Finance LLC - Luxembourg S.C.A.**
**Summary of Proposed Terms & Conditions**
**Exit Facility**
**$85,000,000 to $125,000,000 New Money Term Loan**
**$100,000,000 Roll-Over Term Loan**

*<u>Not a Commitment</u>: This draft term sheet (this "<u>Term Sheet</u>") is provided for discussion only and does not constitute a financing commitment. Except as expressly provided in any binding written agreement the parties may enter into in the future, no past, present or future action, course of conduct, or failure to act relating to the transactions or proposals referred to in this Term Sheet or relating to the negotiation of the terms of such transactions or proposals shall give rise to or serve as the basis for any obligation or other liability on the part of such persons or any of their affiliates. All terms and conditions of the facilities described herein are (i) subject to definitive documentation to be agreed to among the Borrowers, Deutsche Bank Securities Inc. ("<u>DB</u>"), in its capacity as prospective lead arranger and agent under the Exit Facilities, the DIP Lenders and prospective lenders under the Exit Facility and (ii) subject to change pursuant to agreement by the Borrowers, DB and prospective lenders, in each case, without consent or further order of the Bankruptcy Court.*

*This Term Sheet (i) does not constitute a commitment on the part of, or engagement of, DB, the DIP Lenders, any prospective lenders or any of their respective affiliates to provide, arrange, place, underwrite and/or participate in any or all of the facilities described herein and that neither DB, the DIP Lenders, any prospective lenders or any of their respective affiliates is under any obligation, as a result of this Term Sheet, to provide or offer to provide any such commitment or engagement, (ii) DB cannot make any commitments on behalf of any of its affiliates, the DIP Lenders , prospective lenders or any of their respective affiliates under the Exit Facilities and (iii) any commitment or engagement by DB, the DIP Lenders, any prospective lenders or any of their respective affiliates in respect of the facilities described herein would be evidenced by a separate writing and be subject to, among other things, (w) DB's, the DIP Lenders' and the prospective lenders' satisfaction with the capital structure to finance the facilities described herein, (x) DB's, the DIP Lenders' and the prospective lenders' satisfactory completion of its business, legal, tax, financial and accounting due diligence with respect to the Borrowers, their subsidiaries and the facilities described herein, (y) DB's, the DIP Lenders' and the prospective lenders' receipt of all credit and other internal approvals and our verification of all assumptions we have made and (z) the satisfaction of all conditions DB, the DIP Lenders and any prospective lenders would require to be fulfilled with respect thereto.*

Reference is made to that certain Second Amended and Restated Credit Agreement, dated as of May 30, 2007 (as heretofore amended, modified and supplemented, the "<u>Amended</u>

DIP Credit Agreement") among the HLI Operating Company, Inc., a Delaware corporation ("Hayes" or the "U.S. Borrower") and Hayes Lemmerz Finance LLC - Luxembourg S.C.A., a société en commandite par actions organized under the laws of the Grand Duchy of Luxembourg ("Hayes Luxembourg" or "Luxembourg Borrower", together with the U.S. Borrower, the "Borrowers"), Hayes Lemmerz Finance LLC - Luxembourg S.C.A., a société en commandite par actions organized under the laws of the Grand Duchy of Luxembourg, Hayes Lemmerz International, Inc., a Delaware corporation ("Holdings"), the Lenders and the other parties thereto, as amended by Amendment No. 1, dated as of January 30, 2009, among the Borrowers, Holdings and the Prepetition Administrative Agent, as further amended by Amendment No. 2, dated as of May 12, 2009, among the Borrowers, Holdings, each DIP Lender (as defined therein) party thereto, the DIP Administrative Agent, the DIP Lead Arrangers and the DIP Documentation Agent (in each case as defined therein) and as further amended from time to time.  Capitalized terms used but not otherwise defined herein shall have the meaning ascribed to such terms in the Amended DIP Credit Agreement.

| New Money Term Loan ("New Money Term Loan") | |
|---|---|
| **Facility:** | A term loan facility in an aggregate principal amount of $85,000,000 to $125,000,000 (or Euro equivalent) (subject to a sublimit of New Money Term Loans available in Euros to be agreed and a sublimit for New Money Term Loans to be borrowed by Hayes to be agreed) to be used in accordance with the "Purpose" described below and subject to the terms and conditions below. |
| **Borrowers:** | Hayes and Hayes Luxembourg |
| **Term Guarantors:** | All obligations of the Borrowers under the New Money Term Loan portion of the Exit Facility will be unconditionally guaranteed by each of its U.S. subsidiaries, with the exception of certain subsidiaries to be agreed upon ("US Guarantors").<br><br>All obligations of the Luxembourg Borrower under the New Money Term Loan portion of the Exit Facility will be unconditionally guaranteed by each (i) existing and future direct and indirect subsidiary of the Luxembourg Borrower ("Foreign Guarantors") and (ii) Hayes and each of its U.S. subsidiaries, with the exception of certain joint ventures and certain subsidiaries to be agreed upon. |
| **Purpose:** | (a) Up to an amount to be agreed will be used to fund a cash collateral account for the issuance of trade and standby letters of credit for the benefit of the Borrowers and their subsidiaries pursuant to a revolving letter of credit facility with an issuing bank to be determined ("LC Facility") and (b) the remainder of the proceeds of the New Money Term Loan will be used to provide working capital and to fund other general corporate purposes of the Borrowers (including fees and expenses in connection with the Exit |

| | |
|---|---|
| | Facilities and the consummation of the Plan); <u>provided</u>, that, the amount of proceeds received by the U.S. Borrower and the U.S. subsidiaries will not exceed an amount to be agreed. |
| **Currency:** | U.S. Dollars and Euros |
| **Maturity/Tenor:** | 48 months |
| **Pricing:** | For New Money Term Loans in U.S. Dollars: LIBOR+ 700 to 1000 bps with a LIBOR floor of 200 to 300 bps.<br><br>For New Money Term Loans in Euros: EURIBOR+ 700 to 1000 bps with a EURIBOR floor of 200 to 300 bps. |
| **Upfront Fees; Arranger Fee; Agency Fee** | Upfront Fees:  200 to 500 bps to each New Money Term Loan lender or Incremental Term Loan lender on the total New Money Term Loan or Incremental Term Loan (as defined below) funded by such lender, payable in cash upon funding.<br><br>Arranger Fee:  $3.0 million to DB, as lead arranger and bookrunner (in such capacity, the "<u>Lead Arranger</u>"), payable in cash upon closing of the New Money Term Loan.<br><br>Agency Fee:  $125,000 per annum payable in advance to the administrative agent for the New Money Term Loan and the Roll-Over Term Loan. |
| **Amortization:** | 1% per annum payable on a quarterly basis. |
| **Security:** | The New Money Term Loan will secured on a pari passu basis with the Roll-Over Term Loan; <u>provided,</u> that, the Roll-Over Loan may be subordinated in priority to the New Money Term Loan, at the discretion of Lead Arranger, prior to closing.<br><br>The portion of the New Money Term Loan borrowed by the Luxembourg Borrower will be secured by a first-priority lien on all assets of the Luxembourg Borrower, the Foreign Guarantors and the US Guarantors.<br><br>The portion of the New Money Term Loan borrowed by the U.S. Borrower will be secured by a first-priority lien on all assets of the U.S. subsidiaries; <u>provided</u>, however, that a pledge of no more than a 65% pledge of the equity interests in the first tier foreign subsidiaries of Hayes shall be provided[1].<br><br>The New Money Term Loan borrowed by the U.S. Borrower and the New Money Term Loan borrowed by the Luxembourg Borrower will be subject to a pari passu collateral sharing agreement. |

---

[1] The limited credit support for the debt of Hayes is based on an assumption that Luxembourg Borrower is treated as a corporation for U.S. tax purposes and, if such an election is not made, such limitation shall not apply.

| | |
|---|---|
| **Key Financial Covenants:** | Financial covenants will include, but not limited to, provisions establishing, *inter alia*, the maximum leverage, maximum CapEx, and minimum fixed charge coverage ratio. |
| **Affirmative Covenants:** | Substantially similar to the Amended DIP Agreement with agreed upon modifications. |
| **Negative Covenants:** | Substantially similar to the Amended DIP Agreement with agreed upon modifications. |
| **Events of Default:** | Substantially similar to the Amended DIP Agreement with agreed upon modifications. |
| **Mandatory Prepayments:** | Mandatory Prepayments under the New Money Term Loan will include, but are not limited to:<br>• 100% of net cash proceeds from any incurrence of indebtedness, equity issuance, or asset sales after the closing date, subject to exceptions to be agreed<br>• an excess cash flow sweep to agreed |
| **Conditions to Effectiveness:** | • Borrowers have entered into an LC Facility in form and substance satisfactory to the DIP Lenders and, contemporaneously with the borrowing the New Money Term Loan, funded the associated LC Facility cash collateral account in amount not less than an amount to be agreed<br>• Borrowers shall have initiated processes with Moody's Investor Services and Standard and Poor's to obtain ratings of the New Money Term Loan within a reasonable time period after closing<br>• Customary conditions precedent for transaction of this type<br>• Satisfaction of all conditions set forth in Sections 11.1 and 11.2 of the Plan of Reorganization (or waiver on one of more conditions in accordance with Section 11.3 of the Plan of Reorganization)<br>• Other conditions as requested by the Requisite DIP Lenders |
| **Other:** | A standby uncommitted term loan facility (the "<u>Incremental Term Loan</u>", which shall be considered part of the New Money Term Loan), in one or more series, in an aggregate amount not exceeding $50,000,000 (or Euro equivalent) to be used in accordance with the "Purpose" described above and subject to the terms and conditions below.  Following a request by the Borrowers, Incremental Term Loans may be made available by any of the New Money Term Loan lenders, in their sole discretion, with the consent of a majority of Exit Facility lenders.  The New Money Term Loan will include a "most favored nation" provision with respect to any of the terms and conditions offered with respect to such Incremental Term Loan that are more favorable than the terms and conditions of the New Money Term Loan. |

| Roll-Over Term Loan ("Roll-Over Term Loan") | |
|---|---|
| **Facility:** | A term loan facility in an aggregate principal amount of $100,000,000 (or Euro equivalent) (subject to a limitation of Roll-Over Loan denominated in Euros to be agreed) to be agreed to be used in accordance with the "Purpose" described below and subject to the terms and conditions below. |
| **Borrower:** | Hayes and Hayes Luxembourg, in amounts to each Borrower to be agreed. |
| **Term Guarantors:** | All obligations of the Borrowers under the Roll-Over Term Loan portion of the Exit Facility will be unconditionally guaranteed by the US Guarantors.<br><br>All obligations of the Luxembourg Borrower under the Roll-Over Term Loan portion of the Exit Facility will be unconditionally guaranteed by each (i) the Foreign Guarantors and (ii) Hayes and each of its U.S. subsidiaries, with the exception of certain joint ventures and certain subsidiaries to be agreed upon. |
| **Purpose:** | Roll-Over Term Loan will be used to amend, restate and continue the DIP Facilities without any incremental new proceeds being provided to the Borrowers.<br><br>Subject to Requisite DIP Lender consent, amounts in the Collateral Account pursuant to the Amended DIP Agreement shall be made fully available to the Borrowers concurrently with the closing of the Exit Facilities. |
| **Currency:** | US Dollars and Euros |
| **Maturity/Tenor:** | 60 months |
| **Pricing:** | For Roll-Over Term Loans in U.S. Dollars: LIBOR + 900 to 1200 bps with a LIBOR floor of 200 to 300 bps.<br><br>For Roll-Over Term Loans in Euros: EURIBOR+ 900 to 1200 bps with a EURIBOR floor of 200 to 300 bps. |
| **Amortization:** | 1% per annum payable on a quarterly basis. |
| **Security:** | The Roll-Over Term Loan will be secured on a pari passu basis with the New Money Term Loan; provided, that, the Roll-Over Loan may be subordinated in priority to the New Money Term Loan, at the discretion of Lead Arranger, prior to closing.<br><br>The portion of the Roll-Over Term Loan borrowed by the Luxembourg Borrower will be secured by a first-priority lien on all assets of the Luxembourg Borrower, the Foreign Guarantors and the US Guarantors.<br><br>The portion of the Roll-Over Term Loan borrowed by the U.S. |

|  | Borrower will be secured by a first-priority lien on all assets of Hayes, the US Guarantor; <u>provided</u>, however, that a pledge of no more than a 65% pledge of the equity interests in the first tier foreign subsidiaries of Hayes shall be provided[2].<br><br>The Roll-Over Term Loan borrowed by the U.S. Borrower and the Roll-Over Term Loan borrowed by the Luxembourg Borrower will be subject to a pari passu collateral sharing agreement. |
|---|---|
| **Key Financial Covenants:** | Financial covenants will include, but not limited to, provisions establishing, *inter alia*, the maximum leverage, maximum CapEx, and minimum fixed charge coverage ratio. |
| **Affirmative Covenants:** | Substantially similar to the Amended DIP Agreement with agreed upon modifications. |
| **Negative Covenants:** | Substantially similar to the Amended DIP Agreement with agreed upon modifications. |
| **Events of Default:** | Substantially similar to the Amended DIP Agreement with agreed upon modifications. |
| **Mandatory Prepayments:** | Mandatory Prepayments under the Roll-Over Term Loan will include, but are not limited to:<br><ul><li>100% of net cash proceeds from any incurrence of indebtedness, equity issuance, or asset sales after the closing date, subject to exceptions to be agreed</li><li>an excess cash flow sweep to agreed</li></ul> |
| **Conditions to Effectiveness:** | <ul><li>Customary conditions precedent for transaction of this type</li><li>Borrowers shall have initiated processes with Moody's Investor Services and Standard and Poor's to obtain ratings of the Roll-Over Term Loan within a reasonable time period after closing</li><li>Satisfaction of all conditions set forth in Sections 11.1 and 11.2 of the Plan of Reorganization (or waiver on one of more conditions in accordance with Section 11.3 of the Plan of Reorganization)</li><li>Other conditions as requested by the Requisite DIP Lenders</li></ul> |

## AMENDMENTS

This term sheet and the terms and conditions of the loan facilities contemplated herein shall be subject to amendment by the Requisite DIP Lenders.

## INTERCREDITOR ARRANGEMENTS

Each of the facilities described above will be subject intercreditor arrangements in one or more agreements subject to terms to be agreed upon.

## STRUCTURE AND TERMS FLEX

---

[2] The limited credit support for the debt of Hayes is based on an assumption that Luxembourg Borrower is treated as a corporation for U.S. tax purposes and, if such an election is not made, such limitation shall not apply.

The Lead Arranger shall be entitled to change the interest rate margins, LIBOR Floor or other pricing terms (notwithstanding the indicative pricing above), Up-Front Fees, terms and structure of the New Money Term Loan and the Roll-Over Term Loan (collectively, the "Exit Facilities") (including, without limitation, the call protection in respect of the Exit Facilities, requiring an original issue discount, requiring additional collateral security for either Exit Facility, changing the collateral security priority with respect to either Exit Facility, creating additional senior or senior subordinated facilities and/or one or more subordinated and/or junior subordinated facilities, and/or substituting portions of the Exit Facilities with other financings of the Borrowers and/or its Subsidiaries or Affiliates including debt securities (including senior or subordinated, with interest payable thereon in cash and/or "in-kind"), asset based financings and/or securitizations), if the Lead Arranger determines that such changes are advisable for 100% of the Exit Facilities to be placed.

## <u>Exhibit L</u>

**Amended Form of Warrants Agreement**

**Form of Series C & D Warrants Agreement**

Execution Version

HAYES LEMMERZ INTERNATIONAL, INC.

and

MELLON INVESTOR SERVICES LLC,

as Warrant Agent

———————————————

WARRANT AGREEMENT

Dated as of _____, 2009

———————————————

Warrants to Receive Common Stock, par value $.01 per share

———————————————

**TABLE OF CONTENTS**

**Page**

ARTICLE I ISSUANCE OF WARRANTS AND EXECUTION AND DELIVERY OF WARRANT CERTIFICATES...................................................................................2

Section 1.01        Issuance of Warrants..............................................................2

Section 1.02        Execution and Delivery of Warrant Certificates. ...........2

Section 1.03        Issuance of Warrant Certificates..........................................3

ARTICLE II WARRANT PRICE, DURATION AND EXERCISE OF WARRANTS ...............4

Section 2.01        Reserved. .............................................................................4

Section 2.02        Duration of Warrants ...........................................................4

Section 2.03        Exercise of Warrants............................................................4

Section 2.04        Reservation of Warrant Shares ...........................................7

ARTICLE III OTHER PROVISIONS RELATING TO RIGHTS OF HOLDERS OF WARRANT ......................................................................................................8

Section 3.01        No Rights as Stockholder Conferred by Warrants or Warrant Certificates. .........................................................8

Section 3.02        Lost, Mutilated, Stolen or Destroyed Warrant Certificates............8

ARTICLE IV EXCHANGE AND TRANSFER ........................................................................8

Section 4.01        Exchange and Transfer.........................................................8

Section 4.02        Restrictions on Transfer; Restrictive Legend ...................9

Section 4.03        Treatment of Holders of Warrant Certificates...................10

Section 4.04        Cancellation of Warrant Certificates...................................11

ARTICLE V ADJUSTMENT OF WARRANT PRICE AND NUMBER OF WARRANT SECURITIES ...................................................................................................11

Section 5.01        Adjustments Generally........................................................11

Section 5.02        Stock Dividends; Split-Ups. ...............................................11

Section 5.03        Aggregation of Shares.........................................................11

Section 5.04        Replacement of Securities upon Reorganization. ...........11

Section 5.05        Notices of Changes in Warrant...........................................12

Section 5.06        No Fractional Shares............................................................12

i

Section 5.07        Form of Warrant. ................................................................12

Section 5.08        Extraordinary Transactions. ...............................................12

Section 5.09        De Minimis Adjustments. ....................................................13

ARTICLE VI CONCERNING THE WARRANT AGENT ..........................................13

Section 6.01        Warrant Agent. ...................................................................13

Section 6.02        Conditions of Warrant Agent's Obligations. .....................13

Section 6.03        Resignation and Appointment of Successor................................16

ARTICLE VII MISCELLANEOUS ...........................................................................17

Section 7.01        Amendment. ........................................................................17

Section 7.02        Notices and Demands to the Company and Warrant Agent..........18

Section 7.03        Addresses.............................................................................18

Section 7.04        Applicable Law.....................................................................18

Section 7.05        Obtaining of Governmental Approval. ..................................18

Section 7.06        Persons Having Rights Under Warrant Agreement.....................18

Section 7.07        Headings. ..............................................................................18

Section 7.08        Counterparts. ........................................................................18

Section 7.09        Inspection of Agreement. .....................................................19

Section 7.10        Notices to Holders of Warrants. ...........................................19

Section 7.11        Binding Effects .....................................................................19

Section 7.12        Severability...........................................................................19

SCHEDULE

Schedule 1              Pro Forma Capitalization Table

EXHIBIT

Exhibit A               Form of Warrant Certificate

WARRANT AGREEMENT

THIS AGREEMENT dated as of _____, 2009 (the "Effective Date") between HAYES LEMMERZ INTERNATIONAL, INC., a Delaware corporation (the "Company"), and MELLON INVESTOR SERVICES LLC, a New Jersey limited liability company, as Warrant Agent (the "Warrant Agent").

W I T N E S S E T H :

WHEREAS, on May 11, 2009, the Company and certain of the Company's direct and indirect subsidiaries each filed a voluntary petition in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") initiating cases under chapter 11 of title 11 of the United States Code §§ 101-1330 and continued in the possession of their assets and in the management of their businesses pursuant to sections 1107 and 1108 of the Bankruptcy Code; and

WHEREAS, the [Plan of Reorganization of [Hayes Lemmerz International, Inc., et al.], as confirmed on [_____], 2009 by an order of the Bankruptcy Court entered on [_____], 2009 (the "Plan") provides that the Company shall issue to certain holders of prepetition secured obligations entitled to receive a Consent Fee (as defined in the Plan) pursuant to the Plan (the "Holders"), an aggregate of 1,198,677 shares (the "Consenting Prepetition Secured Lenders Shares") of the Company's Class A Common Stock, par value $0.01 per share (the "Class A Common Stock") and/or Class B Common Stock, par value $0.01 per share (the "Class B Common Stock" and, together with the Class A Common Stock, the "Common Stock") representing 11.99% of the 10,000,000 shares of Common Stock to be issued on the effective date of the Plan as contemplated therein; and

WHEREAS, the Plan provides that the Company shall also issue to certain holders of the 8.25% Senior Notes due 2015 of Hayes Lemmerz Finance LLC – Luxembourg S.C.A. (the "Noteholders") and to the Pension Benefit Guaranty Corporation (together with the Noteholders, the "GUCs") Series A Warrants of the Company (the "Series A Warrants") and Series B Warrants of the Company (the "Series B Warrants"), entitling the GUCs to purchase shares of Common Stock;

WHEREAS, the Plan provides that the Company shall also issue to the Holders Series C Warrants of the Company (the "Series C Warrants" or the "Warrants"), entitling the Holders to receive shares (the "Warrant Shares") of Common Stock, by surrendering the certificates representing the Series C Warrants (the "Warrant Certificates") and without the need to pay any additional consideration therefor, in order to offset dilution of the Consenting Prepetition Secured Lenders Shares, if any, as a result of the exercise of the Series A Warrants and Series E Warrants;

WHEREAS, the Plan provides that the Company shall also issue to the Holders Series D Warrants of the Company (the "Series D Warrants"), entitling the Holders to receive shares of Common Stock in order to offset dilution of the Consenting Prepetition Secured Lenders Shares, if any, as a result of the exercise of the Series B Warrants and Series F Warrants;

WHEREAS, the Plan provides that the Company shall also issue to the GUCs Series E Warrants of the Company (the "Series E Warrants"), entitling the GUCs to receive shares of Common Stock, without the need to pay any additional consideration, in order to offset dilution of the GUCs, if any, as a result of the exercise of the Series C Warrants;

WHEREAS, the Plan provides that the Company shall also issue to the GUCs Series F Warrants of the Company (the "Series F Warrants"), entitling the GUCs to receive shares of Common Stock, without the need to pay any additional consideration, in order to offset dilution of the GUCs, if any, as a result of the exercise of the Series D Warrants; and

WHEREAS, the Company desires the Warrant Agent to act on behalf of the Company in connection with the issuance, transfer, exchange, exercise and replacement of the Warrant Certificates, and in this Agreement wishes to set forth, among other things, the form and provisions of the Warrant Certificates and the terms and conditions on which they may be issued, transferred, exchanged, exercised and replaced;

NOW, THEREFORE, in consideration of the premises and of the mutual agreements herein contained, the parties hereto agree as follows:

## ARTICLE I
## ISSUANCE OF WARRANTS AND EXECUTION AND DELIVERY OF WARRANT CERTIFICATES

Section 1.01    Issuance of Warrants.  The Warrants shall be evidenced by one or more Warrant Certificates.  Each Warrant evidenced thereby shall represent the right, subject to the provisions contained herein and therein, to receive one share of the Warrant Shares.  The Company, on the date hereof shall deliver to each Holder duly executed Warrant Certificates registered in the name of each Holder for the number of Warrant Shares required pursuant to the Plan (for each such Holder, the "Base Warrant Shares").  Upon exercise pursuant to the terms herein, the Warrants shall initially entitle the Holders of such Warrants to receive up to a maximum of 76,583 shares of Common Stock, as such amount may be adjusted from time to time pursuant to this Agreement (the "Aggregate Maximum Series C Warrant Shares").

Section 1.02    Execution and Delivery of Warrant Certificates.

(a)    Each Warrant shall be evidenced by a Warrant Certificate in registered form substantially in the form set forth in Exhibit A hereto, shall be dated and may have such letters, numbers or other marks of identification or designation and such legends or endorsements printed, lithographed or engraved thereon as the officers of the Company executing the same may approve (execution thereof to be conclusive evidence of such approval) and as are not inconsistent with the provisions of this Agreement, or as may be required to comply with any law or with any rule or regulation made pursuant thereto.  The Warrant Certificates shall be signed on behalf of the Company by its chairman or vice chairman of the Board of Directors of the Company (the "Board of Directors"), the chief financial officer, the president, any vice president, any assistant vice president, the treasurer or any assistant treasurer of the Company, which may but need not be attested by its secretary or one of its assistant secretaries.  Such signatures may be manual or facsimile signatures of such authorized officers

2

and may be imprinted or otherwise reproduced on the Warrant Certificates.  The Warrant Certificates shall be subject to all of the terms and conditions of the Warrant Agreement, which terms and conditions shall be incorporated therein by reference and made a part thereof. Notwithstanding anything contained herein to the contrary, if any terms or conditions of the Warrant Certificates shall be found to conflict with any terms or conditions of the Warrant Agreement, the Warrant Agreement shall control.

(b)    No Warrant Certificate shall be valid for any purpose, and no Warrant evidenced thereby shall be exercisable, until such Warrant Certificate has been countersigned by the Warrant Agent by manual or facsimile signature.  Such signature by the Warrant Agent upon any Warrant Certificate executed by the Company shall be conclusive evidence, and the only evidence, that the Warrant Certificate so countersigned has been duly issued hereunder.

(c)    In case any officer of the Company who shall have signed any of the Warrant Certificates either manually or by facsimile signature shall cease to be such officer before the Warrant Certificates so signed shall have been countersigned and delivered by the Warrant Agent as provided herein, such Warrant Certificates may be countersigned and delivered notwithstanding that the person who signed such Warrant Certificates ceased to be such officer of the Company; and any Warrant Certificate may be signed on behalf of the Company by such persons as, at the actual date of the execution of such Warrant Certificate, shall be the proper officers of the Company, although at the date of the execution of this Agreement any such person was not such officer.

(d)    The term "Holder," when used with respect to any Warrant Certificate, shall mean any person in whose name at the time such Warrant Certificate shall be registered upon the books to be maintained by the Warrant Agent for that purpose.

Section 1.03    Issuance of Warrant Certificates.

(a)    Warrant Certificates evidencing the right to receive the Warrant Shares (except as provided in Sections 2.03, 3.02 and 4.01) may be executed by the Company and delivered to the Warrant Agent upon the execution of this Warrant Agreement.  The Warrant Agent shall, upon receipt of a written order of the Company, Warrant Certificates duly executed on behalf of the Company and all other information reasonably requested by the Warrant Agent, countersign Warrant Certificates evidencing Warrants representing the right to receive Warrant Shares and shall deliver such Warrant Certificates to or upon the order of the Company. Subsequent to such original issuance of the Warrant Certificates, the Warrant Agent shall countersign a Warrant Certificate only if the Warrant Certificate is issued in exchange or substitution for one or more previously countersigned Warrant Certificates or in connection with their transfer as hereinafter provided.

(b)    Pending the preparation of definitive Warrant Certificates evidencing Warrants, the Company may execute and the Warrant Agent, upon receipt of a written order of the Company and all other information reasonably requested by the Warrant Agent, shall countersign and deliver temporary Warrant Certificates evidencing such Warrants

3

(printed, lithographed, typewritten or otherwise produced, in each case in form satisfactory to the Warrant Agent). Such temporary Warrant Certificates shall be issuable substantially in the form of the definitive Warrant Certificates but with such omissions, insertions and variations as may be appropriate for temporary Warrant Certificates, all as may be determined by the Company with the concurrence of the Warrant Agent. Such temporary Warrant Certificates may contain such reference to any provisions of this Warrant Agreement as may be appropriate. Every such temporary Warrant Certificate shall be executed by the Company and shall be countersigned by the Warrant Agent upon the same conditions and in substantially the same manner, and with like effect, as the definitive Warrant Certificates. Without unreasonable delay, the Company shall execute and shall furnish definitive Warrant Certificates and thereupon such temporary Warrant Certificates may be surrendered in exchange therefor without charge pursuant to and subject to the provisions of Section 4.01, and the Warrant Agent shall countersign and deliver in exchange for such temporary Warrant Certificates definitive Warrant Certificates of authorized denominations evidencing a like aggregate number of Warrants evidenced by such temporary Warrant Certificates. Until so exchanged, such temporary Warrant Certificates shall be entitled to the same benefits under this Warrant Agreement as definitive Warrant Certificates.

## ARTICLE II
## WARRANT PRICE, DURATION AND EXERCISE OF WARRANTS

Section 2.01   Reserved.

Section 2.02   Duration of Warrants. Subject to the provisions of this Agreement, each Warrant may be exercised as provided herein in whole or in part prior to 5:00 p.m. New York City time on _____, 2016, or such earlier date and time at which the Series A Warrants are no longer exercisable (in either case, such date and such time, the "Expiration Date"); *provided further, that* for the avoidance of doubt, the foregoing proviso shall not affect a Holder's entitlement to replacement securities pursuant to Section 5.04 hereof. Each Warrant not exercised at or before the Expiration Date shall become void, and all rights of the Holder and any beneficial owners of the Warrant Certificate evidencing such Warrant under this Agreement shall cease. The Company shall promptly notify the Warrant Agent in writing upon the occurrence of the Expiration Date and, if such notification is given orally, the Company shall confirm same in writing on or prior to the Business Day (as defined below) next following. Until such notice is received by the Warrant Agent, the Warrant Agent may presume conclusively for all purposes that the Expiration Date has not occurred. "Business Day" shall mean prior to 5:00 p.m. New York City time on any day other than a Saturday, Sunday or a day on which banking institutions in the state of New York or New Jersey are authorized or obligated by law or executive order to close.

Section 2.03   Exercise of Warrants.

4

(a)    The Warrants shall be automatically exercised at each time, and only to the extent, at least 5% of the then outstanding Series A Warrants[1] not previously exercised (the "Minimum Exercise Threshold") have been exercised (any such time a Series A Warrant[2] is exercised, an "Exercise Time"); provided that the Minimum Exercise Threshold shall not apply with respect to any exercise of a Warrant (i) in connection with an IPO (as defined in the Series A Warrant Agreement) or any Triggering Event or (ii) within sixty (60) days of the Expiration Date.  The number of shares of Common Stock to which an individual Holder shall be entitled under the Warrant at a given Exercise Time (the "Vested Warrant Shares") shall be based upon the number of Series A Warrants exercised at that particular Exercise Time (the "Aggregate Exercised Series A Share Amount"), in accordance with the following formula:

$$\text{Vested Warrant Shares} = 76{,}583 * (x/555{,}555) * (y/76{,}583)$$

where:

76,583 = the Aggregate Maximum Series C Warrant Shares.[3]

x = the Aggregate Exercised Series A Share Amount.

555,555 = the "Aggregate Exercisable Series A Warrant Shares."

y = the Base Warrant Shares

For illustration purposes, a pro forma capitalization table is set forth on Schedule 1 hereto showing the share ownership of the Company in the event of exercise of (i) all Series A Warrants, Series C Warrants and Series E Warrants and (ii) all Series A Warrants, Series B Warrants, Series C Warrants, Series D Warrants, Series E Warrants and Series F Warrants.  The Warrants may not be exercised in any manner other than as provided herein.

(b)    Pursuant to and in accordance with section 2.03(j)(iv) of the Series A Warrant Agreement (as defined below), the Warrant Agent shall notify the Company upon the exercise of any Series A Warrant, and provide the percentage of the then outstanding Series A Warrants represented by such exercise and such other information as may be reasonably requested by the Company.  Following receipt of such notice, the Company shall confirm to the Warrant Agent in writing, based on such information, if such exercise of Series A Warrants equals or exceeds the Minimum Exercise Threshold.  Until such confirmation is received by the Warrant Agent, the Warrant Agent may presume conclusively for all purposes that the Minimum Exercise Threshold has not been achieved.  If this Warrant is automatically exercised pursuant to this Section 2.03, the Company (provided that if the company provides such notice to the Holder, it will also provide prompt written notice thereof to the Warrant Agent), or if requested and provided with all necessary information, the Warrant Agent, shall notify the Holder of the

---

[1] Series D Warrant Agreement will refer to "Series B"

[2] Series D Warrant will refer to "Series B"

[3] Aggregate Maximum Series D Warrant Shares will be 77,801

5

automatic exercise as soon as reasonably practicable, and the Holder shall surrender the Warrant Certificate to the Warrant Agent.  For purposes of providing such notice, the Warrant Agent shall maintain a record of the number of outstanding Series A Warrants that have been exercised.  The Company shall cause to be issued to each Holder the aggregate number of whole Warrant Shares issuable upon such exercise and deliver to the Holder written confirmation that such Warrant Shares have been duly issued and recorded on the books of the Company as hereinafter provided; provided that certificates for the Warrant Shares shall not be issued to the Holder unless and until such Holder surrenders the Warrant Certificate for cancellation.  The Warrant Shares so issued shall be registered in the name of the Holder.

(c)    The Warrant Agent shall promptly advise the Company, by telephone or by facsimile transmission or other form of electronic communication available to both parties when Warrant Certificates have been received.  The Warrant Agent shall promptly confirm such advice to the Company in writing.  Upon surrender of a Warrant Certificate, the Warrant Agent shall requisition from the transfer agent for the Common Stock (the "Transfer Agent") for issuance and delivery to each Holder of such Warrant Certificate, a certificate or certificates for the Vested Warrant Shares issuable upon the exercise of the Warrant or Warrants evidenced by such Warrant Certificate (together with any other Warrant Shares to which the Holder may be entitled for which the Holder has not yet been issued certificates).  Such certificate or certificates shall be deemed to have been issued as of the date of surrender of such Warrant Certificate at the offices of the Warrant Agent designated for such purpose (the "Warrant Agent Office") duly executed by the Holder thereof.  Notwithstanding any provision herein to the contrary, the Company shall not be required to register Warrant Shares in the name of any person who acquired any Warrant or any Warrant Shares otherwise than in accordance with this Agreement.

(d)    In case an exercise of Warrants is in part only, a new Warrant or Warrants of like tenor, calling in the aggregate on the face or faces of the Warrant Certificate or Warrant Certificates for the number of shares of Common Stock equal (without giving effect to any adjustment thereof) to the number of such shares called for on the face of the Warrant Certificate minus the number of such shares so exercised, shall be issued and delivered to the Holder or its registered assigns.

(e)    Neither the Warrant Agent nor the Company shall be required to pay any stamp or other tax or other charge required to be paid in connection with any transfer involved in the issuance of the Warrant Shares, and in the event that any such transfer is involved, neither the Warrant Agent nor the Company shall be required to issue or deliver any Warrant Share until it has been established to the Company's and the Warrant Agent's satisfaction that *such tax or other charge* has been paid or that no such tax or other charge is due.

(f)    An exercise of a Warrant pursuant to the terms of this Agreement shall be irrevocable; *provided however,* that if an exercise is effected as a result of an exercise of Series A Warrants in connection with the occurrence of a "Triggering Event" (as defined in the Warrant Agreement dated [_____] governing the Series A Warrants (the "Series A Warrant Agreement")), such exercise of a Warrant shall be effective only upon the consummation of such Triggering Event.

6

(g)    The Warrant Agent shall:

(i)    examine all documents delivered to it by or on behalf of Holders as contemplated hereunder to ascertain whether or not, on their face, such documents have been executed and completed in accordance with their terms and the terms hereof;

(ii)    where an exercised Warrant or other document appears on its face to have been improperly completed or executed or some other irregularity in connection with the exercise of the Warrants exists, the Warrant Agent shall endeavor to inform the appropriate parties (including the person submitting such instrument) of the need for fulfillment of all requirements, specifying those requirements which appear to be unfulfilled;

(iii)    inform the Company of and cooperate with and assist the Company in resolving any reconciliation problems between exercised Warrants and delivery of Warrant Certificates to the Warrant Agent's account; and

(iv)    advise the Company of such other information as the Company shall reasonably require.

(h)    All questions as to the validity, form and sufficiency (including time of receipt) of an exercised Warrant will be determined by the Company in its sole discretion, which determination shall be final and binding.  Such determination by the Company shall be final and binding on the Holders, absent manifest error.  Except as provided for in section 2.03(g), neither the Company nor the Warrant Agent shall be under any duty to give notice to any Person of any irregularities in any document delivered to it by or on behalf of Holders, nor shall it incur any liability for the failure to give such notice.

Section 2.04    Reservation of Warrant Shares

(a)    For the purpose of enabling it to satisfy any obligation to issue Warrant Shares upon exercise of Warrants, the Company will at all times through the Expiration Date, reserve and keep available out of its aggregate authorized but unissued or treasury shares of Common Stock, the number of Warrant Shares deliverable upon the exercise of all outstanding Warrants, and the Company's Transfer Agent is hereby irrevocably authorized and directed at all times to reserve such number of authorized and unissued or treasury shares of Common Stock as shall be required for such purpose.  The Company will keep a copy of this Agreement on file with the Transfer Agent.  The Warrant Agent is hereby irrevocably authorized to requisition from time to time from such Transfer Agent stock certificates issuable upon exercise of outstanding Warrants, and the Company will supply such Transfer Agent with duly executed stock certificates for such purpose.

(b)    The Company covenants that all shares of Common Stock issued upon exercise of the Warrants will, upon issuance in accordance with the terms of this Agreement, be fully paid and nonassessable and free from all taxes, liens, charges and security interests created by or imposed upon the Company with respect to the issuance and holding thereof.

7

## ARTICLE III
## OTHER PROVISIONS RELATING TO RIGHTS OF HOLDERS OF WARRANT

Section 3.01    No Rights as Stockholder Conferred by Warrants or Warrant Certificates.    No Warrant Certificate or Warrant evidenced thereby shall, and nothing contained in this Agreement or in the Warrant Certificate shall be construed to, entitle the Holder or any beneficial owner thereof to any of the rights of a holder or beneficial owner of Warrant Shares, including, without limitation, the right to vote or to consent or to receive notice as a stockholder in respect of any meeting of stockholders for the election of directors of the Company or any other matter, to receive dividends on Warrant Shares or any rights whatsoever as stockholders of the Company.

Section 3.02    Lost, Mutilated, Stolen or Destroyed Warrant Certificates.    Upon receipt by the Warrant Agent of evidence reasonably satisfactory to it and the Company of the ownership of and the loss, mutilation, theft or destruction of any Warrant Certificate and of such security or indemnity as may be required by the Company and the Warrant Agent to hold each of them and any agent of them harmless and, in the case of mutilation of a Warrant Certificate, upon surrender thereof to the Warrant Agent for cancellation, then, in the absence of notice to the Company or the Warrant Agent that such Warrant Certificate has been acquired by a bona fide purchaser, the Company shall execute, and an authorized officer of the Warrant Agent shall manually countersign or countersign by facsimile and deliver, in exchange for or in lieu of the lost, mutilated, stolen or destroyed Warrant Certificate, a new Warrant Certificate of the same tenor and evidencing a like number of Warrants.  Upon the issuance of any new Warrant Certificate under this Section 3.02, the Company may require the payment of a sum sufficient to cover any stamp or other tax or other charge that may be imposed in relation thereto and any other expenses (including the fees and expenses of the Warrant Agent) in connection therewith. Every substitute Warrant Certificate executed and delivered pursuant to this Section 3.02 in lieu of any lost, mutilated, stolen or destroyed Warrant Certificate shall represent an additional contractual obligation of the Company, whether or not the lost, stolen or destroyed Warrant Certificate shall be at any time enforceable by anyone, and shall be entitled to the benefits of this Agreement equally and proportionately with any and all other Warrant Certificates duly executed and delivered hereunder.  The provisions of this Section 3.02 are exclusive and shall preclude (to the extent lawful) all other rights and remedies with respect to the replacement of lost, mutilated, stolen or destroyed Warrant Certificates.  Notwithstanding anything in this Agreement to the contrary, the Warrant Agent shall have no obligation to take any action whatsoever with respect to such an exchange unless and until such payments required under this section have been made.

## ARTICLE IV
## EXCHANGE AND TRANSFER

Section 4.01    Exchange and Transfer.

(a)    Upon surrender at the Warrant Agent Office, Warrant Certificates evidencing Warrants may be exchanged for Warrant Certificates in other authorized denominations evidencing such Warrants or the transfer thereof may be registered in whole or in

8

part; *provided, however,* that such other Warrant Certificates shall evidence the same aggregate number of Warrants as the Warrant Certificates so surrendered.

(b)     The Warrant Agent shall keep, at the Warrant Agent Office, books in which, subject to such reasonable regulations as it may prescribe, it shall register Warrant Certificates and exchanges and transfers of outstanding Warrant Certificates upon surrender of such Warrant Certificates to the Warrant Agent at the Warrant Agent Office for exchange or registration of transfer, properly endorsed.

(c)     No service charge shall be made for any exchange or registration of transfer of Warrant Certificates, however, the Warrant Agent and/or the Company may require payment of a sum sufficient to cover any stamp or other tax or other charge that may be imposed in connection with any such exchange or registration of transfer.  Neither the Warrant Agent nor the Company shall be required to pay any stamp or other tax or other charge required to be paid in connection with such transfer, and neither the Warrant Agent nor the Company shall be required to issue or deliver any Warrant Share until it has been established to the Company's and the Warrant Agent's reasonable satisfaction that such tax or other charge has been paid or that no such tax or other charge is due.

(d)     Whenever any Warrant Certificates are so surrendered for exchange or registration of transfer, an authorized officer of the Warrant Agent, upon the request of the Company, shall manually countersign or countersign by facsimile and deliver to the person or persons entitled thereto a Warrant Certificate or Warrant Certificates, duly authorized and executed by the Company, as so requested.  The Warrant Agent shall not effect any exchange or registration of transfer which will result in the issuance of a Warrant Certificate, evidencing a fraction of a Warrant or a number of full Warrants and a fraction of a Warrant.

(e)     All Warrant Certificates, issued upon any exchange or registration of transfer of Warrant Certificates shall be the valid obligations of the Company, evidencing the same obligations, and entitled to the same benefits under this Agreement, as the Warrant Certificates surrendered for such exchange or registration or transfer.

Section 4.02     <u>Restrictions on Transfer; Restrictive Legend</u>

(a)     A Holder shall not transfer Warrants except in connection with the Holder's transfer of shares of the Consenting Prepetition Secured Lenders Shares held by such Holder (the "Transferred Shares"), which transfer shall comply with the provisions of the Stockholders Agreement (a "Share Transfer").  In the event of a valid Share Transfer, a Holder shall concurrently transfer such proportion of the Holder's Warrants equal to the proportion that the number of Transferred Shares bears to the total number of Consenting Prepetition Secured Lenders Shares held by such Holder prior to such transfer.

(b)     Any attempted or purported transfer of all or a portion of the Warrants held by a Holder in violation of this Section 4.02 shall be null and void and of no force or effect whatsoever, such purported transferee will not be treated as an owner of the Warrants for purposes of this Agreement or otherwise, and the Company will not register such transfer.

9

(c)    Each Warrant Certificate and certificate representing Warrant Shares issued upon the exercise of a Warrant shall be stamped or otherwise imprinted with a legend in the following or a comparable form:

THE SECURITIES REPRESENTED BY THIS CERTIFICATE (THE "SECURITIES") WERE ORIGINALLY ISSUED IN RELIANCE UPON AN EXEMPTION FROM THE REGISTRATION REQUIREMENT OF SECTION 5 OF THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), PROVIDED BY SECTION 1145 OF THE BANKRUPTCY CODE, 11 U.S.C. 1145.  THE SECURITIES HAVE NOT BEEN REGISTERED UNDER THE ACT OR ANY STATE SECURITIES LAW, AND TO THE EXTENT THE HOLDER OF THE SECURITIES IS AN "UNDERWRITER," AS DEFINED IN SECTION 1145(B)(1) OF THE BANKRUPTCY CODE, THE SECURITIES MAY NOT BE SOLD OR TRANSFERRED IN THE ABSENCE OF AN EFFECTIVE REGISTRATION STATEMENT UNDER THE ACT OR AN EXEMPTION FROM REGISTRATION THEREUNDER.

If at the time of issuance of Warrant Shares the Stockholders Agreement is still in effect, each certificate representing Warrant Shares issued upon the exercise of a Warrant shall also be stamped or otherwise imprinted with a legend in the following or a comparable form:

THE SALE, ASSIGNMENT, PLEDGE, ENCUMBRANCE OR OTHER TRANSFER OF THE SECURITIES REPRESENTED BY THIS CERTIFICATE IS RESTRICTED BY THE TERMS OF, AND THE HOLDER HEREOF IS SUBJECT TO CERTAIN OTHER OBLIGATIONS PURSUANT TO, THE PROVISIONS OF A STOCKHOLDERS AGREEMENT, DATED AS OF [____], 2009, AMONG THE COMPANY AND CERTAIN HOLDERS OF ITS SECURITIES, A COPY OF WHICH IS ON FILE AT THE PRINCIPAL EXECUTIVE OFFICE OF THE COMPANY.

(d)    A Holder (or its transferee, as applicable) shall be entitled to receive from the Company, without expense, new securities of like tenor not bearing the legends set forth above when (i) such Warrant Shares shall have been (A) effectively registered under the Securities Act and disposed of in accordance with a registration statement covering such securities, (B) disposed of pursuant to the provisions of Rule 144 or any comparable rule under the Securities Act, or (C) when, in the written reasonable opinion of independent counsel for the holder thereof experienced in Securities Act matters, which counsel and opinion shall be reasonably satisfactory to the Company, such restrictions are no longer required in order to insure compliance with the Securities Act (including when the provisions of Rule 144(k) or any comparable rule under the Securities Act have been satisfied) and (ii)such Warrant Shares are no longer subject to the Stockholders Agreement.

Section 4.03    Treatment of Holders of Warrant Certificates.  Each Holder of a Warrant Certificate, by accepting the same, consents and agrees with the Company, the Warrant Agent and every subsequent Holder of such Warrant Certificate that until the transfer of such Warrant Certificate is registered on the books of such Warrant Agent, the Company and the Warrant Agent may treat the registered Holder of such Warrant Certificate as the absolute owner

10

thereof for any purpose and as the person entitled to exercise the rights represented by the Warrants evidenced thereby, any notice to the contrary notwithstanding.

Section 4.04 <u>Cancellation of Warrant Certificates</u>. Any Warrant Certificate surrendered for exchange or registration of transfer or exercise of the Warrants evidenced thereby shall, if surrendered to the Company, be delivered to the Warrant Agent, and all Warrant Certificates surrendered or so delivered to the Warrant Agent shall be promptly cancelled by the Warrant Agent and shall not be reissued and, except as expressly permitted by this Agreement, no Warrant Certificate shall be issued hereunder in exchange therefor or in lieu thereof. The Warrant Agent shall cause all cancelled Warrant Certificates to be destroyed and shall deliver a certificate of such destruction to the Company.

**ARTICLE V**
**<u>ADJUSTMENT OF WARRANT PRICE AND NUMBER OF WARRANT SECURITIES</u>**

Section 5.01 <u>Adjustments Generally</u>. The number of Warrant Shares issuable upon exercise of Warrants and the number of Warrants outstanding are subject to adjustment from time to time upon the occurrence of the events enumerated in this Article V, as determined to be necessary or appropriate in the reasonable discretion of the Board of Directors of the Company.

Section 5.02 <u>Stock Dividends; Split-Ups</u>. If after the date hereof, and subject to the provisions of Section 5.06, the number of outstanding shares of Common Stock is increased by a stock dividend payable in shares of Common Stock, or by a split-up of shares of Common Stock, or other similar event, then, on the effective date of such stock dividend, split-up or similar event, the number of shares of Common Stock issuable on exercise of each Warrant shall be increased in proportion to such increase in outstanding shares of Common Stock.

Section 5.03 <u>Aggregation of Shares</u>. If after the date hereof, and subject to the provisions of Section 5.06, the number of outstanding shares of Common Stock is decreased by a consolidation, combination, reverse stock split or reclassification of shares of Common Stock or other similar event, then, on the effective date of such consolidation, combination, reverse stock split, reclassification or similar event, the number of shares of Common Stock issuable on exercise of each Warrant shall be decreased in proportion to such decrease in outstanding shares of Common Stock.

Section 5.04 <u>Replacement of Securities upon Reorganization</u>. In case of any reclassification or reorganization of the outstanding shares of Common Stock (other than a change covered by Section 5.02 or 5.03 or that solely affects the par value of such shares of Common Stock), or in the case of any merger or consolidation of the Company with or into another corporation (other than a consolidation or merger in which the Company is the continuing corporation and that does not result in any reclassification or reorganization of the outstanding shares of Common Stock), or in the case of any sale or conveyance to another corporation or entity of the assets or other property of the Company as an entirety or substantially as an entirety in connection with which the Company is dissolved, except in each case, with respect to any such transaction pursuant to which holders of the outstanding Common

11

Stock are entitled to receive cash consideration for such shares, the Holders shall thereafter have the right to receive, upon the basis and upon the terms and conditions specified in the Warrants and in lieu of the shares of the Warrant Shares immediately theretofore receivable upon the exercise of the rights represented thereby, the kind and amount of shares of stock or other securities or property (including cash) receivable upon such reclassification, reorganization, merger or consolidation, or upon a dissolution following any such sale or transfer, that the Holder would have received if such Holder had exercised his, her or its Warrant(s) immediately prior to such event; and if any reclassification also results in a change in shares of Common Stock covered by Section 5.02 or 5.03, then such adjustment shall be made pursuant to Sections 5.02, 5.03 and this Section 5.04.  The provisions of this Section 5.04 shall similarly apply to successive reclassifications, reorganizations, mergers or consolidations, sales or other transfers.

Section 5.05    Notices of Changes in Warrant.  Upon every adjustment of the number of shares issuable upon exercise of a Warrant, the Company shall give written notice thereof to the Warrant Agent, which notice shall state the increase or decrease, if any, in the number of shares of Common Stock issuable upon the exercise of a Warrant, setting forth in reasonable detail the method of calculation and the facts upon which such calculation is based. Upon the occurrence of any event specified in Section 5.02, 5.03, 5.04 or 5.08, then, in any such event, the Company shall give or cause to be given written notice to each Holder, by press release or at the last address set forth for such Holder in the register books of the Warrant Agent, of the record date or the effective date of the event.  Failure to give such notice, or any defect therein, shall not affect the legality or validity of such event.  The Warrant Agent shall be fully protected in relying upon such a certificate and shall have no duty to investigate or inquire as to whether such adjustment is accurate, and shall not be deemed to have knowledge of, and shall not be required to take any action with respect to any adjustments, unless and until the Warrant Agent shall have received such a certificate.

Section 5.06    No Fractional Shares.  Notwithstanding any provision contained in this Agreement to the contrary, the Company shall not issue fractional shares upon exercise of Warrants.  If, by reason of any adjustment made pursuant to this Article V, any Holder would be entitled, upon the exercise of such Warrant, to receive a fractional interest in a share of Common Stock, the Company shall, upon such exercise, round down to the nearest whole number the number of the shares of Common Stock to be issued to the Holder.  The Warrant Agent shall not be required to effect any registration of transfer or exchange that will result in the issuance of a Warrant Certificate for a fraction of a share of Common Stock.

Section 5.07    Form of Warrant.  The form of Warrant or Warrant Certificate need not be changed because of any adjustment pursuant to this Article V, and Warrant Certificates issued after such adjustment may state the same number of shares as is stated in the Warrant Certificates initially issued pursuant to this Agreement.  However, the Company may at any time in its sole discretion make any change in the form of Warrant or Warrant Certificate that the Company may deem appropriate and that does not affect the substance thereof, and any Warrant Certificates thereafter issued or countersigned, whether in exchange or substitution for an outstanding Warrant Certificate or otherwise, may be in the form as so changed.

Section 5.08    Extraordinary Transactions.  If the Company's Board of Directors, in connection with an "Extraordinary Transaction" (as defined in the Series A Warrant

12

Agreement), determines to adjust the warrant price or the number of shares of Common Stock issuable upon exercise of the Series A Warrants to reflect such Extraordinary Transaction, the number of shares issuable upon exercise of a Warrant shall also be appropriately adjusted as determined in good faith by the Company's Board of Directors.

Section 5.09    De Minimis Adjustments.  No adjustment in the number of Warrant Shares issuable hereunder shall be required unless such adjustment would require an increase or decrease of at least one percent (1%) in the number of Warrant Shares issuable upon the exercise of each Warrant; *provided, however,* that any adjustments which by reason of this paragraph (c) are not required to be made shall be carried forward and taken into account in any subsequent adjustment.  All calculations shall be made to the nearest cent and to the nearest one-hundredth of a Warrant Share, as the case may be.

## ARTICLE VI
## CONCERNING THE WARRANT AGENT

Section 6.01    Warrant Agent.

The Company hereby appoints the Warrant Agent to act as agent of the Company in respect of the Warrants and the Warrant Certificates upon the express terms and subject to the conditions herein and in the Warrant Certificates (and no implied terms); and the Warrant Agent hereby accepts such appointment.  The Warrant Agent shall have the powers and authority granted to and conferred upon it in the Warrant Certificates and herein and such further powers and authority to act on behalf of the Company as the Company may hereafter grant to or confer upon it.  All of the terms and provisions with respect to such powers and authority contained in the Warrant Certificates are subject to and governed by the terms and provisions hereof.

Section 6.02    Conditions of Warrant Agent's Obligations.

(a)    The Warrant Agent accepts its obligations herein set forth upon the express terms and conditions hereof (and no implied terms), including the following, to all of which the Company agrees and to all of which the rights hereunder of the Holders from time to time of the Warrant Certificates shall be subject:

(i)    *Compensation and Indemnification.*  The Company agrees promptly to pay the Warrant Agent the compensation to be agreed upon with the Company for all services rendered by the Warrant Agent and to reimburse the Warrant Agent for reasonable out-of-pocket expenses (including the reasonable fees and expenses of its counsel) incurred by the Warrant Agent without gross negligence, bad faith or willful misconduct (each as determined by a final, non-appealable judgment of a court of competent jurisdiction) on its part in connection with the preparation, delivery, acceptance, administration, execution and amendment of this Agreement and the exercise and performance of its duties hereunder.  The Company also agrees to indemnify the Warrant Agent for, and to hold it harmless against, any loss, liability, suit, action, proceeding, judgment, claim, settlement, cost or expense (including the reasonable fees and

13

expenses of its counsel) incurred without gross negligence, bad faith or willful misconduct on the part of the Warrant Agent, (each as determined by a final, non-appealable judgment of a court of competent jurisdiction), for any action taken, suffered or omitted to be taken by the Warrant Agent in connection with the preparation, delivery, acceptance, administration, execution and amendment of the Agreement and the exercise and performance of its duties hereunder, including the costs and expenses of defending against any claim of liability arising therefrom, directly or indirectly.  The provisions of this Section 6.02(a)(i) shall survive the termination of this Agreement and the replacement, removal or resignation of the Warrant Agent.

(ii)    *Agent for the Company*.  In acting under this Agreement and in connection with the Warrants and the Warrant Certificates, the Warrant Agent is acting solely as agent of the Company and does not assume any obligation or relationship of agency or trust for or with any of the Holders of Warrant Certificates or beneficial owners of Warrants.

(iii)    *Counsel*.  The Warrant Agent may consult with counsel satisfactory to it in its reasonable judgment (who may be counsel for the Company or in-house counsel of the Warrant Agent), and the advice of such counsel shall be full and complete authorization and protection in respect of any action taken, suffered or omitted to be taken by it hereunder, in the absence of gross negligence, bad faith or willful misconduct, and in accordance with the advice of such counsel.

(iv)    *Documents*.  Subject to Section 2.03(g), the Warrant Agent shall be protected and shall incur no liability for or in respect of any action taken, suffered or omitted to be taken by it in reliance upon any Warrant Certificate, notice, direction, consent, certificate, affidavit, statement or other paper or document reasonably believed by it to be genuine and to have been presented or signed by the proper parties.

(v)    *Certain Transactions*.  The Warrant Agent, and its officers, directors, employees, agents and affiliates, may become the owner of, or acquire any interest in, Warrants, with the same rights that it or they would have if it were not the Warrant Agent hereunder, and, to the extent permitted by applicable law, it or they may engage or be interested in any financial or other transaction with the Company and may act on, or as depositary, trustee or agent for, any committee or body of holders of Warrant Shares or other obligations of the Company as freely as if it were not the Warrant Agent hereunder.

(vi)    *No Liability for Interest*.  The Warrant Agent shall have no liability for interest on any monies at any time received by it pursuant to any of the provisions of this Agreement or of the Warrant Certificates.

(vii)    *No Liability for Invalidity*.  The Warrant Agent shall not be under any responsibility with respect to the validity or sufficiency of this

14

Agreement or the execution and delivery hereof (except the due authorization to execute this Agreement and the due execution and delivery hereof by the Warrant Agent) or subject to Section 2.03(g), with respect to the validity or execution of any Warrant Certificates (except its countersignature thereof).

(viii)    *No Liability for Recitals*.  The recitals contained herein shall be taken as the statements of the Company and the Warrant Agent assumes no liability for the correctness of the same.

(ix)    *No Implied Obligations*.  The Warrant Agent shall be obligated to perform only such duties as are herein and in the Warrant Certificates specifically set forth and no implied duties or obligations shall be read into this Agreement or the Warrant Certificates against the Warrant Agent.  The Warrant Agent shall not be under any obligation to expend or risk its own funds or take any action hereunder or at the request of any Warrant Holder or other Person which may tend to involve it in any expense or liability unless it has received indemnity reasonably satisfactory to it or, the payment of which within a reasonable time is not, in its opinion, assured to it.  The Warrant Agent shall not be accountable or under any duty or responsibility for the use by the Company of any of the Warrant Certificates countersigned by the Warrant Agent and delivered by it to the Company pursuant to this Agreement or for the application by the Company of the proceeds of the Warrant Certificates.  The Warrant Agent shall have no duty or responsibility in case of any default by the Company in the performance of its covenants or agreements contained herein or in the Warrant Certificates or in the case of the receipt of any written demand from a Holder of a Warrant Certificate with respect to such default, including, without limiting the generality of the foregoing, any duty or responsibility to initiate or attempt to initiate any proceedings at law or otherwise or, except as provided in Section 7.02, to make any demand upon the Company.

(x)    <u>Agents</u>.  The Warrant Agent may execute any of the trusts or powers hereunder or perform any duties hereunder either directly or by or through agents or attorneys-in-fact, provided reasonable care has been exercised in the selection and continued employment of such agent or attorney-in-fact.

(xi)    <u>Liability</u>.  Notwithstanding anything in this Agreement to the contrary, in no event shall the Warrant Agent be liable for special, indirect, punitive, incidental or consequential loss or damage of any kind whatsoever (including but not limited to lost profits), even if the Warrant Agent has been advised of the likelihood of the loss or damage and regardless of the form of the action.  Any liability of the Warrant Agent under this Agreement shall be limited to the amount of annual fees paid by the Company to the Warrant Agent.  The provisions of this Section 6.02(a)(xi) shall survive the termination of this Agreement and the replacement, removal or resignation of the Warrant Agent.

15

(xii)    *Force Majeure.*  In no event shall the Warrant Agent be responsible or liable for any failure or delay in the performance of its obligations under this Agreement arising out of or caused by, directly or indirectly, forces beyond its reasonable control, including without limitation strikes, work stoppages, accidents, acts of war or terrorism, civil or military disturbances, nuclear or natural catastrophes or acts of God, and interruptions, loss or malfunctions of utilities, communications or computer (software or hardware) services ("Force Majeure").  In the event of any such excused delay, the time for performance shall be extended for a period equal to the time lost by reason of the delay; *provided*, *however*, that the Warrant Agent shall use all commercially reasonable efforts to avoid and to remove such causes of non-performance and shall continue performance hereunder promptly following the removal of such causes.

Section 6.03    Resignation and Appointment of Successor.

(a)    The Company agrees, for the benefit of the Holders from time to time of the Warrant Certificates, that there shall at all times be a Warrant Agent hereunder until all the Warrants have been exercised or are no longer exercisable.

(b)    The Warrant Agent may at any time resign as such by giving written notice of its resignation to the Company, specifying the desired date on which its resignation shall become effective; *provided, however,* that such date shall be not less than 30 days after the date on which such notice is given unless the Company agrees to accept shorter notice.  Upon receiving such notice of resignation, the Company shall promptly appoint a successor Warrant Agent (which shall be a bank or trust company in good standing, authorized under the laws of the jurisdiction of its organization to exercise corporate trust powers) by written instrument in duplicate signed on behalf of the Company, one copy of which shall be delivered to the resigning Warrant Agent and one copy to the successor Warrant Agent.  The Company may, at any time and for any reason, remove the Warrant Agent and appoint a successor Warrant Agent (qualified as aforesaid) by written instrument in duplicate signed on behalf of the Company and specifying such removal and the date when it is intended to become effective, one copy of which shall be delivered to the Warrant Agent being removed and one copy to the successor Warrant Agent.  Any resignation or removal of the Warrant Agent and any appointment of a successor Warrant Agent shall become effective upon acceptance of appointment by the successor Warrant Agent as provided in this subsection (b).  In the event a successor Warrant Agent has not been appointed and accepted its duties within 30 days of the Warrant Agent's notice of resignation, the Warrant Agent may apply to any court of competent jurisdiction for the designation of a successor Warrant Agent.  Upon its resignation, replacement or removal, the Warrant Agent shall be entitled to the payment by the Company of the compensation and to the reimbursement of all reasonable out-of-pocket expenses incurred by it hereunder as agreed to in Section 6.02(a).

(c)    The Company shall remove the Warrant Agent and appoint a successor Warrant Agent if the Warrant Agent (i) shall become incapable of acting, (ii) shall be adjudged bankrupt or insolvent, (iii) shall commence a voluntary case or other proceeding seeking liquidation, reorganization or other relief with respect to it or its debts under any bankruptcy, insolvency or other similar law now or hereafter in effect or seeking the appointment

16

of a trustee, receiver, liquidator, custodian or other similar official of it or any substantial part of its property, (iv) shall consent to, or shall have had entered against it a court order for, any such relief or to the appointment of or taking possession by any such official in any involuntary case or other proceedings commenced against it, (v) shall make a general assignment for the benefit of creditors or (vi) shall fail generally to pay its debts as they become due.  Upon the appointment as aforesaid of a successor Warrant Agent and acceptance by it of such appointment, the predecessor Warrant Agent shall, if not previously disqualified by operation of law, cease to be Warrant Agent hereunder.

(d)    Any successor Warrant Agent appointed hereunder shall execute, acknowledge and deliver to its predecessor and the Company an instrument accepting such appointment hereunder, and thereupon such successor Warrant Agent, without any further act, deed or conveyance, shall become vested with all the authority, rights, powers, immunities, duties and obligations of such predecessor with like effect as if originally named as Warrant Agent hereunder, and such predecessor shall thereupon become obligated to transfer, deliver and pay over, and such successor Warrant Agent shall be entitled to receive, all monies, securities and other property on deposit with or held by such predecessor as Warrant Agent hereunder.

(e)    Any person into which the Warrant Agent hereunder may be merged or converted or any person with which the Warrant Agent may be consolidated, or any person resulting from any merger, conversion or consolidation to which the Warrant Agent shall be a party, or any person to which the Warrant Agent shall sell or otherwise transfer all or substantially all the assets and business of the Warrant Agent, *provided* that it shall be qualified as aforesaid, shall be the successor Warrant Agent under this Agreement without the execution or filing of any paper or any further act on the part of any of the parties hereto.

### ARTICLE VII
### MISCELLANEOUS

Section 7.01    Amendment.  The terms of the Warrants may be amended by the Company together with the affirmative vote or consent of the Holders of a majority of the Warrants.  The Company and the Warrant Agent may from time to time supplement or amend this Agreement without the approval of any Holders in order to cure any ambiguity, manifest error or other mistake in this Agreement, or to correct or supplement any provision contained herein that may be defective or inconsistent with any other provision herein, or to make any other provisions in regard to matters or questions arising hereunder that the Company and the Warrant Agent may deem necessary or desirable and that shall not adversely affect, alter or change the interests of any Holder.  Notwithstanding anything to the contrary herein, upon the delivery of a certificate from an appropriate officer of the Company, which states that the proposed supplement or amendment is in compliance with the terms of this Section 8.01 and, provided such supplement or amendment does not change the Warrant Agent's own rights, duties, liabilities, immunities or obligations hereunder, the Warrant Agent shall execute such supplement or amendment.  Any amendment, modification or waiver effected pursuant to and in accordance with the provisions of this Section 8.01 will be binding upon all Holders and upon each future Holder, the Company and the Warrant Agent.  In the event of any amendment, modification or waiver, the Company will give prompt notice thereof to all Holders.

17

Section 7.02    <u>Notices and Demands to the Company and Warrant Agent</u>.  If the Warrant Agent shall receive any notice or demand addressed to the Company by the Holder of a Warrant Certificate pursuant to the provisions of the Warrant Certificates, the Warrant Agent shall promptly forward such notice or demand to the Company.

Section 7.03    <u>Addresses</u>.  Any communication from the Company to the Warrant Agent with respect to this Agreement shall be addressed to Mellon Investor Services LLC, 200 W. Monroe Street, Suite 1590, Chicago, IL 60606, Attention: Georg Drake, with a copy to Mellon Investor Services LLC, 480 Washington Boulevard, Jersey City, NJ 07310, Attention: Legal Department, and any communication from the Warrant Agent to the Company with respect to this Agreement shall be addressed to Hayes Lemmerz International, Inc., 15300 Centennial Drive, Northville, MI 48167, Attention: General Counsel (or such other address as shall be specified in writing by the Warrant Agent or by the Company).  For the avoidance of doubt, the Company may satisfy its obligation to provide the Warrant Agent with a written order or direction pursuant to this Agreement through the use of electronic mail delivered to the Warrant Agent.

Section 7.04    <u>Applicable Law</u>.  The validity, interpretation and performance of this Agreement and each Warrant Certificate issued hereunder and of the respective terms and provisions hereof and thereof shall be governed by, and construed in accordance with, the laws of the State of Delaware.

Section 7.05    <u>Obtaining of Governmental Approval</u>.  The Company from time to time will use its best efforts to obtain and keep effective any and all permits, consents and approvals of governmental agencies and authorities and to make any necessary filings under federal or state securities laws, which may become requisite in connection with the issuance, sale, transfer and delivery of the Warrant Certificates, the exercise or conversion of the Warrants, the issuance, sale, transfer and delivery of the Warrant Shares.

Section 7.06    <u>Persons Having Rights Under Warrant Agreement</u>.  Nothing contained in the Warrant shall be construed as conferring upon the Holder the right to vote or to consent or to receive notice as a stockholder in respect of any meeting of stockholders for the election of directors of the Company or any other matter, to receive dividends or any rights whatsoever as stockholders of the Company.  Each Holder shall be entitled to receive the same information and reports to which a holder of the Common Stock is entitled pursuant to the Stockholders Agreement then in effect, subject to execution of an appropriate confidentiality agreement.

Section 7.07    <u>Headings</u>.  The descriptive headings of the several Articles and Sections of this Agreement are inserted for convenience only and shall not control or affect the meaning or construction of any of the provisions hereof.

Section 7.08    <u>Counterparts</u>.  This Agreement may be executed in any number of counterparts, each of which as so executed shall be deemed to be an original, but such counterparts shall together constitute but one and the same instrument.

18

Section 7.09   <u>Inspection of Agreement</u>.  A copy of this Agreement shall be available at all reasonable times at the principal corporate trust office of the Warrant Agent for inspection by the Holder of any Warrant Certificate.  The Warrant Agent may require such Holder to submit his Warrant Certificate for inspection by it.

Section 7.10   <u>Notices to Holders of Warrants</u>.  Any notice to Holders of Warrants evidenced by Warrant Certificates which by any provisions of this Warrant Agreement is required or permitted to be given shall be given by first class mail prepaid at such Holder's address as it appears on the books of the Warrant Agent.

Section 7.11   <u>Binding Effects</u>.  This Agreement shall inure to the benefit and shall be binding upon the Company, the Warrant Agent and the Holders and their respective heirs, legal representatives, successors and assigns.  Nothing in this Agreement, express or implied, is intended to or shall confer on any Person other than the Company, the Warrant Agent and the Holders, or their respective heirs, legal representatives, successors or assigns, any rights, remedies, obligations or liabilities under or by reason of this Agreement.

Section 7.12   <u>Severability</u>.  In the event that any one or more of the provisions contained herein, or the application thereof in any circumstances, is held invalid, illegal or unenforceable, the validity, legality and enforceability of any such provisions in every other respect and of the remaining provisions contained herein and therein shall not be affected or impaired thereby; provided, that if any such excluded term, provision, covenant or restriction shall materially adversely affect the rights, immunities, duties or obligations of the Warrant Agent, the Warrant Agent shall be entitled to resign by giving not less than ten (10) days prior written notice to the Company.  In the event a successor Warrant Agent has not been appointed and accepted its duties within ten (10) days of the Warrant Agent's notice of resignation, the Warrant Agent may apply to any court of competent jurisdiction for the designation of a successor to the Warrant Agent.

[SIGNATURE PAGE FOLLOWS]

19

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed.

HAYES LEMMERZ INTERNATIONAL, INC.

By: _____

    Name:

    Title:

MELLON INVESTOR SERVICES LLC

By: _____

    Name:

    Title:

SCHEDULE 1

**HLI - Share Count Analysis**

*Scenarios Assume Cash Settlement of Exercised Warrants*

| | |
|---|---|
| **Shares Outstanding at Emergence** | **10,000,000** |
| **Shares Authorized** | **20,000,000** |

| | |
|---|---|
| **Tranche A Warrants** | **555,555** |
| **Tranche B Warrants** | **555,555** |

| | |
|---|---|
| Pre-petition debt held by DIP Lenders | $  285,584,531 |
| Pre-petition Consenting Lenders | 192,432,416 |
| Pre-petition Non-Consenting Lenders | 28,324,933 |
| **Total Pre-Petition Debt** | **$ 506,341,880** |
| **Equity to Pre-petition Lenders Under Plan** | **4%** |

| | | | | | | Exercise of Tranche A Only | | | Exercise of Tranche A/B Warrants | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Emergence | | Pre Anti-Dilution | | Post Anti-Dilution | | Pre Anti-Dilution | | Post Anti-Dilution | | |
| DIP Lenders | 8,450,000 | 84.50% | 8,450,000 | 80.05% | 8,450,000 | 79.43% | 8,450,000 | 76.05% | 8,450,000 | 74.86% |
| | | | | | | | | | | |
| **Pre-Petition Lenders** | | | | | | | | | | |
| Pre-Petition Lender Consent Fee | 850,000 | 8.50% | 850,000 | 8.05% | 850,000 | 7.99% | 850,000 | 7.65% | 850,000 | 7.53% |
| Pre-Petition Consenting Lender Equity | 348,677 | 3.49% | 348,677 | 3.30% | 348,677 | 3.28% | 348,677 | 3.14% | 348,677 | 3.09% |
| Tranche C/D Anti-Dilution Warrants | 0 | 0.00% | 0 | 0.00% | 76,583 | 0.72% | 0 | 0.00% | 154,384 | 1.37% |
| Total Consenting Pre-Petition Lenders | 1,198,677 | 11.99% | 1,198,677 | 11.36% | 1,275,260 | 11.99% | 1,198,677 | 10.79% | 1,353,061 | 11.99% |
| Non-consenting Pre-Petition Lender Equity | 51,323 | 0.51% | 51,323 | 0.49% | 51,323 | 0.48% | 51,323 | 0.46% | 51,323 | 0.45% |
| Total Pre-Petition Lenders | 1,250,000 | 12.50% | 1,250,000 | 11.84% | 1,326,583 | 12.47% | 1,250,000 | 11.25% | 1,404,384 | 12.44% |
| | | | | | | | | | | |
| **Foreign Creditor Distribution** | | | | | | | | | | |
| PBGC/Noteholders | 300,000 | 3.00% | 300,000 | 2.84% | 300,000 | 2.82% | 300,000 | 2.70% | 300,000 | 2.66% |
| Tranche A/B Warrants Exercised | 0 | 0.00% | 555,555 | 5.26% | 555,555 | 5.22% | 1,111,110 | 10.00% | 1,111,110 | 9.84% |
| Tranche E/F Anti-Dilution Warrants | 0 | 0.00% | 0 | 0.00% | 6,755 | 0.06% | 0 | 0.00% | 22,459 | 0.20% |
| Total Foreign Creditor Distribution | 300,000 | 3.00% | 855,555 | 8.11% | 862,310 | 8.11% | 1,411,110 | 12.70% | 1,433,569 | 12.70% |
| | | | | | | | | | | |
| **Total Shares** | **10,000,000** | **100.00%** | **10,555,555** | **100.00%** | **10,638,893** | **100.00%** | **11,111,110** | **100.00%** | **11,287,953** | **100.00%** |

EXHIBIT A

[FORM OF WARRANT CERTIFICATE]

[Face]

EXERCISABLE ONLY AUTOMATICALLY FROM TIME TO TIME AS PROVIDED
HEREIN

VOID AFTER THE CLOSE OF BUSINESS ON _____, 2016
HAYES LEMMERZ INTERNATIONAL, INC.

Warrant Certificate representing
Series C[4] Warrants to receive
Common Stock, par value $0.01 per share
as described herein

_____ Warrants

This certifies that [_____] or registered assigns is the registered owner of the above indicated number of  Series C Warrants[5] (each, a "Warrant"), each Warrant entitling such registered owner to receive, one share of the Common Stock, par value $0.01 per share (the "Warrant Shares") of Hayes Lemmerz International, Inc. (the "Company") on the following basis.

The Warrant may be exercised in whole or in part at any time on or before 5:00 p.m. New York City time on _____, 2016, or such earlier date and time at which the Series A Warrants[6] of the Company (the "Series A Warrants") are no longer exercisable (in either case, such date and such time, the "Expiration Date"); *provided further, that* for the avoidance of doubt, the foregoing proviso shall not affect a Holder's entitlement to replacement securities pursuant to Section 5.04 of the Warrant Agreement.  Each Warrant not exercised at or before the Expiration Date shall become void, and all rights of the Holder and any beneficial owners of the Warrant Certificate evidencing such Warrant under the Warrant Agreement shall cease.

Prior to the Expiration Date, each Warrant shall entitle the Holder thereof, subject to the provisions of this Agreement, to receive from the Company one Warrant Share.  The Warrants shall be automatically exercised at each time, and only to the extent, at least 5% of the then

---

[4] Series D Warrant Certificate will state "Series D"

[5] Series D Warrant Certificate will state "Series D"

[6] Series D Warrant Certificate will state "Series B"

outstanding Series A Warrants[7] not previously exercised (the "Minimum Exercise Threshold") have been exercised (any such time a Series A Warrant[8] is exercised, an "Exercise Time"); provided that the Minimum Exercise Threshold shall not apply with respect to any exercise of a Warrant (i) in connection with an IPO (as defined in the Series A Warrant Agreement) or any Triggering Event or (ii) within sixty (60) days of the Expiration Date.  The number of shares of common stock to which an individual Holder shall be entitled under the Warrant at a given Exercise Time (the "Vested Warrant Shares") shall be based upon the number of Series A Warrants exercised at that particular Exercise Time (the "Aggregate Exercised Series A Share Amount"), in accordance with the following formula:

$$\text{Vested Warrant Shares} = 76{,}583 * (x/555{,}555) * (y/76{,}583)$$

where:

76,583 = the Aggregate Maximum Series C Warrant Shares. [9]

$x$ = the Aggregate Exercised Series A Share Amount.

555,555 = the "Aggregate Exercisable Series A Warrant Shares."

$y$ = the Base Warrant Shares

For illustration purposes, a pro forma capitalization table is set forth on Schedule 1 hereto showing the share ownership of the Company in the event of exercise of (i) all Series A Warrants, Series C Warrants and Series E Warrants and (ii) all Series A Warrants, Series B Warrants, Series C Warrants, Series D Warrants, Series E Warrants and Series F Warrants.  The Warrants may not be exercised in any manner other than as provided herein.

If this Warrant is automatically exercised, the Company or the Warrant Agent shall notify the Holder of the automatic exercise as soon as reasonably practicable, and the Holder shall surrender this Warrant Certificate to the Warrant Agent (as hereinafter defined), at the office of Mellon Investor Services LLC, or its successor as warrant agent (the "Warrant Agent") at the addresses specified on the reverse hereof and upon compliance with and subject to the conditions set forth herein and in the Warrant Agreement dated as of _____, 2009 (the "Warrant Agreement").  Capitalized terms used, but not otherwise defined, herein shall have the meaning ascribed to such terms in the Warrant Agreement.

The term "Holder" as used herein shall mean the person in whose name at the time this Warrant Certificate shall be registered upon the books to be maintained by the Warrant Agent for that purpose pursuant to Section 4.01 of the Warrant Agreement.

---

[7] Series D Warrant Certificate will refer to "Series B"

[8] Series D Warrant Certificate will refer to "Series B"

[9] Aggregate Maximum Series D Warrant Shares will be 77,801

A-2

In case an exercise of Warrants is for a number of shares fewer than the number of Warrants evidenced by this Warrant Certificate, a new Warrant or Warrants of like tenor, calling in the aggregate on the face or faces of this Warrant Certificate or Warrant Certificates for the number of shares of Common Stock equal (without giving effect to any adjustment thereof) to the number of such shares called for on the face of the Warrant Certificate minus the number of such shares so exercised, shall be issued and delivered to the Holder or its registered assigns.

This Warrant Certificate is issued under and in accordance with the Warrant Agreement, between the Company and the Warrant Agent and is subject to the terms and provisions contained in the Warrant Agreement, to all of which terms and provisions the Holder of this Warrant Certificate consents by acceptance hereof.  Copies of the Warrant Agreement are on file at the above-mentioned office of the Warrant Agent.

After authentication by the Warrant Agent and prior to the expiration of this Warrant Certificate, this Warrant Certificate may be exchanged at the corporate trust office of the Warrant Agent for Warrant Certificates representing the same aggregate number of Warrants.

Neither this Warrant Certificate nor the Warrant evidenced hereby, shall, and nothing contained in the Warrant Agreement shall be construed to entitle the registered owner hereof, or any beneficial owner, to any of the rights of a registered holder or beneficial owner of the Warrant Shares, including, without limitation, the right to vote or to consent or to receive notice as a stockholder in respect of any meetings of stockholders for the election of directors of the Company or any other matter, to receive dividends on Warrant Shares or any rights whatsoever as stockholders of the Company.

Reference is hereby made to the further provisions of this Warrant Certificate set forth on the reverse hereof, which further provisions shall for all purposes have the same effect as if set forth at this place.

This Warrant Certificate shall not be valid or obligatory for any purpose until authenticated by the Warrant Agent.

A-3

IN WITNESS WHEREOF, the Company has caused this Warrant Certificate to be duly executed.

Dated:_____

HAYES LEMMERZ INTERNATIONAL, INC

By:_____

Attest:

_____

Certificate of Authentication

This is one of the Warrant Certificates referred to in the within-mentioned Warrant Agreement.

_____
MELLON INVESTOR SERVICES LLC,
          As Warrant Agent

By:_____
          Authorized Signature

A-4

[REVERSE] [FORM OF WARRANT CERTIFICATE]
(Instructions for Exercise of Warrants)

To receive a certificate for Warrant Shares representing any exercised Warrants evidenced hereby, the Holder of this Warrant Certificate must complete the information required below and present in person or mail by registered mail this Warrant Certificate to the Warrant Agent at the addresses set forth below.

[FORM OF EXERCISE]
(To be executed upon exercise of Warrants.)

The undersigned hereby submits _____ Warrants, represented by this Warrant Certificate, in order to receive _____ shares of Class A Common Stock, par value $0.01 per share (the "Warrant Shares") of Hayes Lemmerz International, Inc.

The undersigned requests the shares of common stock, par value $0.01 per share (the "Warrant Shares") of Hayes Lemmerz International, Inc. to which the Holder is entitled (the "Vested Warrant Shares") be in fully registered form, in the authorized denominations, registered in such names and delivered, all as specified in accordance with the instructions set forth below.

If the Vested Warrant Shares is less than the maximum number of Warrant Shares subject to this Warrant Certificate, the undersigned requests that a new Warrant Certificate or Warrants of like tenor representing the remaining balance of the Warrants evidenced hereby be issued and delivered to the undersigned unless otherwise specified in the instructions below.

Dated:_____

Name_____
          (Please Print)


_____
(Insert Social Security or Other
Identifying Number of Holder)

Address _____
_____

Signature_____
          (Signed exactly as name appears
          on the other side of this Warrant
          Certificate)

This Warrant may be exercised at the following addresses:
          By hand at          _____
                              _____
                              _____

A-5

_____

By mail at        _____

_____

_____

_____

(Instructions as to form and delivery of Warrant Shares and/or Warrant Certificates):

**(NOTE:  The signature(s) must be medallion guaranteed by a commercial bank or trust company in the United States or by a member firm of the New York Stock Exchange)**

A-6

[FORM OF ASSIGNMENT]

(TO BE EXECUTED TO TRANSFER THE WARRANT CERTIFICATE)

FOR VALUE RECEIVED _____ hereby sells, assigns and transfers unto
Please insert social
security or other
identifying number)

_____

_____
(Please print name and address
including zip code)

_____
\_\_ the right represented by the within Warrant Certificate and does hereby irrevocably constitute and appoint _____, Attorney, to transfer said Warrant Certificate on the books of the Warrant Agent with full power of substitution.

Dated: _____

_____
Signature
(Signed exactly as name appears on the
other side of this Warrant Certificate)

Signature Guarantee:

_____
Participant in a recognized Signature
Guarantee Medallion Program (or other
signature guarantor program reasonably
acceptable to the Warrant Agent)

**(NOTE:  The signature(s) must be medallion guaranteed by a commercial bank or trust company in the United States or by a member firm of the New York Stock Exchange)**

A-7

SCHEDULE 1

**HLI - Share Count Analysis**

*Scenarios Assume Cash Settlement of Exercised Warrants*

| | |
|---|---|
| **Shares Outstanding at Emergence** | **10,000,000** |
| **Shares Authorized** | **20,000,000** |

| | |
|---|---|
| **Tranche A Warrants** | **555,555** |
| **Tranche B Warrants** | **555,555** |

| | |
|---|---|
| Pre-petition debt held by DIP Lenders | $  285,584,531 |
| Pre-petition Consenting Lenders | 192,432,416 |
| Pre-petition Non-Consenting Lenders | 28,324,933 |
| **Total Pre-Petition Debt** | **$ 506,341,880** |
| **Equity to Pre-petition Lenders Under Plan** | **4%** |

| | | | | | | Exercise of Tranche A Only | | | | Exercise of Tranche A/B Warrants | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Emergence | | Pre Anti-Dilution | | Post Anti-Dilution | | | Pre Anti-Dilution | | Post Anti-Dilution | | | | |
| DIP Lenders | 8,450,000 | 84.50% | 8,450,000 | 80.05% | 8,450,000 | 79.43% | | 8,450,000 | 76.05% | 8,450,000 | 74.86% | | |
| | | | | | | | | | | | | | |
| Pre-Petition Lenders | | | | | | | | | | | | | |
| Pre-Petition Lender Consent Fee | 850,000 | 8.50% | 850,000 | 8.05% | 850,000 | 7.99% | | 850,000 | 7.65% | 850,000 | 7.53% | | |
| Pre-Petition Consenting Lender Equity | 348,677 | 3.49% | 348,677 | 3.30% | 348,677 | 3.28% | | 348,677 | 3.14% | 348,677 | 3.09% | | |
| Tranche C/D Anti-Dilution Warrants | 0 | 0.00% | 0 | 0.00% | 76,583 | 0.72% | | 0 | 0.00% | 154,384 | 1.37% | | |
| Total Consenting Pre-Petition Lenders | 1,198,677 | 11.99% | 1,198,677 | 11.36% | 1,275,260 | 11.99% | | 1,198,677 | 10.79% | 1,353,061 | 11.99% | | |
| Non-consenting Pre-Petition Lender Equity | 51,323 | 0.51% | 51,323 | 0.49% | 51,323 | 0.48% | | 51,323 | 0.46% | 51,323 | 0.45% | | |
| Total Pre-Petition Lenders | 1,250,000 | 12.50% | 1,250,000 | 11.84% | 1,326,583 | 12.47% | | 1,250,000 | 11.25% | 1,404,384 | 12.44% | | |
| | | | | | | | | | | | | | |
| Foreign Creditor Distribution | | | | | | | | | | | | | |
| PBGC/Noteholders | 300,000 | 3.00% | 300,000 | 2.84% | 300,000 | 2.82% | | 300,000 | 2.70% | 300,000 | 2.66% | | |
| Tranche A/B Warrants Exercised | 0 | 0.00% | 555,555 | 5.26% | 555,555 | 5.22% | | 1,111,110 | 10.00% | 1,111,110 | 9.84% | | |
| Tranche E/F Anti-Dilution Warrants | 0 | 0.00% | 0 | 0.00% | 6,755 | 0.06% | | 0 | 0.00% | 22,459 | 0.20% | | |
| Total Foreign Creditor Distribution | 300,000 | 3.00% | 855,555 | 8.11% | 862,310 | 8.11% | | 1,411,110 | 12.70% | 1,433,569 | 12.70% | | |
| | | | | | | | | | | | | | |
| **Total Shares** | **10,000,000** | **100.00%** | **10,555,555** | **100.00%** | **10,638,893** | **100.00%** | | **11,111,110** | **100.00%** | **11,287,953** | **100.00%** | | |

**Form of Series E & F Warrants Agreement**

Execution Version

HAYES LEMMERZ INTERNATIONAL, INC.

and

MELLON INVESTOR SERVICES LLC,

as Warrant Agent

_____

WARRANT AGREEMENT

Dated as of _____, 2009

_____

Warrants to Receive Common Stock, par value $.01 per share

_____

**TABLE OF CONTENTS**

**Page**

ARTICLE I ISSUANCE OF WARRANTS AND EXECUTION AND DELIVERY OF
WARRANT CERTIFICATES..................................................................................2

Section 1.01        Issuance of Warrants..................................................2

Section 1.02        Execution and Delivery of Warrant Certificates. ...........2

Section 1.03        Issuance of Warrant Certificates..................................3

ARTICLE II WARRANT PRICE, DURATION AND EXERCISE OF WARRANTS ...............4

Section 2.01        Reserved. ................................................................4

Section 2.02        Duration of Warrants ................................................4

Section 2.03        Exercise of Warrants. ...............................................5

Section 2.04        Reservation of Warrant Shares ...................................7

ARTICLE III OTHER PROVISIONS RELATING TO RIGHTS OF HOLDERS OF
WARRANT .......................................................................................................8

Section 3.01        No Rights as Stockholder Conferred by Warrants or
Warrant Certificates..................................................8

Section 3.02        Lost, Mutilated, Stolen or Destroyed Warrant Certificates............8

ARTICLE IV EXCHANGE AND TRANSFER ..........................................................9

Section 4.01        Exchange and Transfer...............................................9

Section 4.02        Restrictions on Transfer; Restrictive Legend .............10

Section 4.03        Treatment of Holders of Warrant Certificates.............11

Section 4.04        Cancellation of Warrant Certificates...........................11

ARTICLE V ADJUSTMENT OF WARRANT PRICE AND NUMBER OF WARRANT
SECURITIES ....................................................................................................11

Section 5.01        Adjustments Generally................................................11

Section 5.02        Stock Dividends; Split-Ups. ......................................11

Section 5.03        Aggregation of Shares................................................11

Section 5.04        Replacement of Securities upon Reorganization.........12

Section 5.05        Notices of Changes in Warrant...................................12

Section 5.06        No Fractional Shares.................................................12

i

Section 5.07        Form of Warrant. ...................................................................13

Section 5.08        Extraordinary Transactions. ...............................................13

Section 5.09        De Minimis Adjustments. ...................................................13

ARTICLE VI CONCERNING THE WARRANT AGENT ........................................13

Section 6.01        Warrant Agent. .....................................................................13

Section 6.02        Conditions of Warrant Agent's Obligations. ........................13

Section 6.03        Resignation and Appointment of Successor...........................16

ARTICLE VII MISCELLANEOUS .........................................................................17

Section 7.01        Amendment. ..........................................................................17

Section 7.02        Notices and Demands to the Company and Warrant Agent..........18

Section 7.03        Addresses..............................................................................18

Section 7.04        Applicable Law. ....................................................................18

Section 7.05        Obtaining of Governmental Approval. .................................18

Section 7.06        Persons Having Rights Under Warrant Agreement.....................18

Section 7.07        Headings. ..............................................................................19

Section 7.08        Counterparts. ........................................................................19

Section 7.09        Inspection of Agreement. .....................................................19

Section 7.10        Notices to Holders of Warrants. ...........................................19

Section 7.11        Binding Effects .....................................................................19

Section 7.12        Severability...........................................................................19

SCHEDULE

Schedule 1        Pro Forma Capitalization Table

EXHIBIT

Exhibit A        Form of Warrant Certificate

WARRANT AGREEMENT

THIS AGREEMENT dated as of _____, 2009 (the "Effective Date") between HAYES LEMMERZ INTERNATIONAL, INC., a Delaware corporation (the "Company"), and MELLON INVESTOR SERVICES LLC, a New Jersey limited liability company, as Warrant Agent (the "Warrant Agent").

W I T N E S S E T H :

WHEREAS, on May 11, 2009, the Company and certain of the Company's direct and indirect subsidiaries each filed a voluntary petition in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") initiating cases under chapter 11 of title 11 of the United States Code §§ 101-1330 and continued in the possession of their assets and in the management of their businesses pursuant to sections 1107 and 1108 of the Bankruptcy Code; and

WHEREAS, the [Plan of Reorganization of [Hayes Lemmerz International, Inc., et al.], as confirmed on [_____], 2009 by an order of the Bankruptcy Court entered on [_____], 2009 (the "Plan") provides that the Company shall issue to certain holders of prepetition secured obligations (the "Prepetition Secured Lenders") an aggregate of 1,198,677 shares (the "Prepetition Secured Lenders Shares") of the Company's Class A Common Stock, par value $0.01 per share (the "Class A Common Stock") and/or Class B Common Stock, par value $0.01 per share (the "Class B Common Stock" and, together with the Class A Common Stock, the "Common Stock") representing 11.99% of the 10,000,000 shares of Common Stock to be issued on the effective date of the Plan as contemplated therein (the "New Common Stock"); and

WHEREAS, the Plan provides that the Company shall also issue to certain holders of the 8.25% Senior Notes due 2015 of Hayes Lemmerz Finance LLC – Luxembourg S.C.A. (the "Noteholders") and to the Pension Benefit Guaranty Corporation (together with the Noteholders, the "Holders") (i) an aggregate of 300,000 shares (the "Holders Shares") of Common Stock, representing 3% of the New Common Stock; (ii) Series A Warrants of the Company (the "Series A Warrants") entitling the Holders to purchase up to 555,555 shares of Common Stock (the "Series A Warrant Shares") representing in aggregate up to 5% (on a fully diluted basis) of the number of shares of New Common Stock, Series A Warrant Shares and Series B Warrant Shares; and (iii) Series B Warrants of the Company (the "Series B Warrants") entitling the Holders to purchase up to 555,555 shares of Common Stock (the "Series B Warrant Shares") representing, together with the Series A Warrant Shares, up to 10% (on a fully diluted basis) of the number of shares of New Common Stock, Series A Warrant Shares and Series B Warrant Shares (the Holders Shares, together with the Series A Warrant Shares and Series B Warrant Shares actually issued as a result of the exercise of Series A Warrants and Series B Warrants, are referred to as the "Issued Holders Shares" and the aggregate percentage of the New Common Stock, issued Series A Warrant Shares and issued Series B Warrant Shares that such Issued Holders Shares represents, the "Issued Holders Shares Percentage");

WHEREAS, the Plan provides that the Company shall also issue, to those Prepetition Secured Lenders entitled to receive a Consent Fee (as defined in the Plan), pursuant to the Plan, Series C Warrants of the Company (the "Series C Warrants") and Series D Warrants

(the "Series D Warrants") of the Company, entitling the Prepetition Secured Lenders to receive shares of Common Stock in order to offset dilution of the Prepetition Secured Lenders Shares, if any, as a result of the exercise of the warrants described in these recitals; and

WHEREAS, the Plan provides that the Company shall also issue, to the Holders, Series E Warrants of the Company (the "Warrants"), entitling the Holders to receive, by surrendering the certificates representing the Warrants (the "Warrant Certificates") and without the need to pay any additional consideration therefor, shares of Common Stock (the "Warrant Shares") in order to offset dilution of the Issued Holders Shares, if any, as a result of the exercise of the Series C Warrants; and

WHEREAS, the Plan provides that the Company shall also issue to the Holders Series F Warrants of the Company (the "Series F Warrants"), entitling the Holders to receive shares of Common Stock in order to offset dilution of the Issued Holders Shares, if any, as a result of the exercise of the Series D Warrants; and

WHEREAS, the Company desires the Warrant Agent to act on behalf of the Company in connection with the issuance, transfer, exchange, exercise and replacement of the Warrant Certificates, and in this Agreement wishes to set forth, among other things, the form and provisions of the Warrant Certificates and the terms and conditions on which they may be issued, transferred, exchanged, exercised and replaced;

NOW, THEREFORE, in consideration of the premises and of the mutual agreements herein contained, the parties hereto agree as follows:

## ARTICLE I
## ISSUANCE OF WARRANTS AND EXECUTION AND DELIVERY OF WARRANT CERTIFICATES

Section 1.01    Issuance of Warrants.  The Warrants shall be evidenced by one or more Warrant Certificates.  Each Warrant evidenced thereby shall represent the right, subject to the provisions contained herein and therein, to receive one share of the Warrant Shares.  The Company, on the date hereof shall deliver to each Holder duly executed Warrant Certificates registered in the name of each Holder for the number of Warrant Shares required pursuant to the Plan (for each such Holder, the "Base Warrant Shares").  Upon exercise pursuant to the terms herein, the Warrants shall initially entitle the Holders of such Warrants to receive up to a maximum of 6,755 shares of Common Stock, as such amount may be adjusted from time to time pursuant to this Agreement (the "Aggregate Maximum Series E Warrant Shares").

Section 1.02    Execution and Delivery of Warrant Certificates.

(a)    Each Warrant shall be evidenced by a Warrant Certificate in registered form substantially in the form set forth in Exhibit A hereto, shall be dated and may have such letters, numbers or other marks of identification or designation and such legends or endorsements printed, lithographed or engraved thereon as the officers of the Company executing the same may approve (execution thereof to be conclusive evidence of such approval)

2

and as are not inconsistent with the provisions of this Agreement, or as may be required to comply with any law or with any rule or regulation made pursuant thereto.  The Warrant Certificates shall be signed on behalf of the Company by its chairman or vice chairman of the Board of Directors of the Company (the "Board of Directors"), the chief financial officer, the president, any vice president, any assistant vice president, the treasurer or any assistant treasurer of the Company, which may but need not be attested by its secretary or one of its assistant secretaries.  Such signatures may be manual or facsimile signatures of such authorized officers and may be imprinted or otherwise reproduced on the Warrant Certificates.  The Warrant Certificates shall be subject to all of the terms and conditions of the Warrant Agreement, which terms and conditions shall be incorporated therein by reference and made a part thereof.  Notwithstanding anything contained herein to the contrary, if any terms or conditions of the Warrant Certificates shall be found to conflict with any terms or conditions of the Warrant Agreement, the Warrant Agreement shall control.

(b)     No Warrant Certificate shall be valid for any purpose, and no Warrant evidenced thereby shall be exercisable, until such Warrant Certificate has been countersigned by the Warrant Agent by manual or facsimile signature.  Such signature by the Warrant Agent upon any Warrant Certificate executed by the Company shall be conclusive evidence, and the only evidence, that the Warrant Certificate so countersigned has been duly issued hereunder.

(c)     In case any officer of the Company who shall have signed any of the Warrant Certificates either manually or by facsimile signature shall cease to be such officer before the Warrant Certificates so signed shall have been countersigned and delivered by the Warrant Agent as provided herein, such Warrant Certificates may be countersigned and delivered notwithstanding that the person who signed such Warrant Certificates ceased to be such officer of the Company; and any Warrant Certificate may be signed on behalf of the Company by such persons as, at the actual date of the execution of such Warrant Certificate, shall be the proper officers of the Company, although at the date of the execution of this Agreement any such person was not such officer.

(d)     The term "Holder," when used with respect to any Warrant Certificate, shall mean any person in whose name at the time such Warrant Certificate shall be registered upon the books to be maintained by the Warrant Agent for that purpose.

Section 1.03   Issuance of Warrant Certificates.

(a)     Warrant Certificates evidencing the right to receive the Warrant Shares (except as provided in Sections 2.03, 3.02 and 4.01) may be executed by the Company and delivered to the Warrant Agent upon the execution of this Warrant Agreement.  The Warrant Agent shall, upon receipt of a written order of the Company, Warrant Certificates duly executed on behalf of the Company and all other information reasonably requested by the Warrant Agent, countersign Warrant Certificates evidencing Warrants representing the right to receive Warrant Shares and shall deliver such Warrant Certificates to or upon the order of the Company.  Subsequent to such original issuance of the Warrant Certificates, the Warrant Agent shall countersign a Warrant Certificate only if the Warrant Certificate is issued in exchange or

3

substitution for one or more previously countersigned Warrant Certificates or in connection with their transfer as hereinafter provided.

(b)    Pending the preparation of definitive Warrant Certificates evidencing Warrants, the Company may execute and the Warrant Agent upon receipt of a written order of the Company and all other information reasonably requested by the Warrant Agent, shall countersign and deliver temporary Warrant Certificates evidencing such Warrants (printed, lithographed, typewritten or otherwise produced, in each case in form satisfactory to the Warrant Agent).  Such temporary Warrant Certificates shall be issuable substantially in the form of the definitive Warrant Certificates but with such omissions, insertions and variations as may be appropriate for temporary Warrant Certificates, all as may be determined by the Company with the concurrence of the Warrant Agent.  Such temporary Warrant Certificates may contain such reference to any provisions of this Warrant Agreement as may be appropriate.  Every such temporary Warrant Certificate shall be executed by the Company and shall be countersigned by the Warrant Agent upon the same conditions and in substantially the same manner, and with like effect, as the definitive Warrant Certificates.  Without unreasonable delay, the Company shall execute and shall furnish definitive Warrant Certificates and thereupon such temporary Warrant Certificates may be surrendered in exchange therefor without charge pursuant to and subject to the provisions of Section 4.01, and the Warrant Agent shall countersign and deliver in exchange for such temporary Warrant Certificates definitive Warrant Certificates of authorized denominations evidencing a like aggregate number of Warrants evidenced by such temporary Warrant Certificates.  Until so exchanged, such temporary Warrant Certificates shall be entitled to the same benefits under this Warrant Agreement as definitive Warrant Certificates.

## ARTICLE II
## WARRANT PRICE, DURATION AND EXERCISE OF WARRANTS

Section 2.01    Reserved.

Section 2.02    <u>Duration of Warrants</u>.  Subject to the provisions of this Agreement, each Warrant may be exercised as provided herein in whole or in part  prior to 5:00 p.m. New York City time on _____, 2016, or such earlier date and time at which the Series C Warrants are no longer exercisable (in either case, such date and such time, the "Expiration Date"); *provided further, that* for the avoidance of doubt, the foregoing proviso shall not affect a Holder's entitlement to replacement securities pursuant to Section 5.04 hereof.  Each Warrant not exercised at or before the Expiration Date shall become void, and all rights of the Holder and any beneficial owners of the Warrant Certificate evidencing such Warrant under this Agreement shall cease. The Company shall promptly notify the Warrant Agent in writing upon the occurrence of the Expiration Date and, if such notification is given orally, the Company shall confirm same in writing on or prior to the Business Day (as defined below) next following.  Until such notice is received by the Warrant Agent, the Warrant Agent may presume conclusively for all purposes that the Expiration Date has not occurred.  "Business Day" shall mean prior to 5:00 p.m. New York City time on any day other than a Saturday, Sunday or a day on which banking

4

institutions in the state of New York or New Jersey are authorized or obligated by law or executive order to close.

Section 2.03    Exercise of Warrants.

(a)    The Warrants shall be automatically exercised at each time, and only to the extent, at least 5% of the then outstanding Series C Warrants not previously exercised (the "Minimum Exercise Threshold") have been exercised in conjunction with the exercise of Series A Warrants[1] (any such time a Series C Warrant[2] is exercised, an "Exercise Time"); provided that the Minimum Exercise Threshold shall not apply with respect to any exercise of a Warrant (i) in connection with an IPO (as defined in the Series A Warrant Agreement) or any Triggering Event or (ii) within sixty (60) days of the Expiration Date.  The number of shares of Common Stock to which an individual Holder shall be entitled under the Warrant at a given Exercise Time (the "Vested Warrant Shares") shall be based upon the number of Series A Warrants exercised at that particular Exercise Time (the "Aggregate Exercised Series A Share Amount"), in accordance with the following formula:

$$\text{Vested Warrant Shares} = 6{,}755 * (x/555{,}555) * (y/6{,}755)$$

where:

6,755 = the Aggregate Maximum Series E Warrant Shares.[3]

x = the Aggregate Exercised Series A Share Amount.

555,555 = the "Aggregate Exercisable Series A Warrant Shares."

y = the Base Warrant Shares.

For illustration purposes, a pro forma capitalization table is set forth on Schedule 1 hereto showing the share ownership of the Company in the event of exercise of (i) all Series A Warrants, Series C Warrants and Series E Warrants and (ii) all Series A Warrants, Series B Warrants, Series C Warrants, Series D Warrants, Series E Warrants and Series F Warrants.  The Warrants may not be exercised in any manner other than as provided herein.

(b)    Pursuant to and in accordance with section 2.03(j)(iv) of the Series A Warrant Agreement (as defined below), the Warrant Agent shall notify the Company upon the exercise of any Series A Warrant,[4] and provide the percentage of the then outstanding Series A Warrants represented by such exercise and such other information as may be reasonably requested by the Company.  Following receipt of such notice, the Company shall confirm to the

---

[1] Series F Warrant Agreement will state "Series D Warrants in conjunction with the exercise of Series B Warrants"

[2] Series F Warrant Agreement will refer to "Series D"

[3] The Aggregate Maximum Series F Warrant Shares will be 15,704

[4] Series F will refer to 'Series B"

Warrant Agent in writing, based on such information, if such exercise of Series A Warrants[5] has caused an exercise of the Series C Warrants that equals or exceeds the Minimum Exercise Threshold.  Until such confirmation is received by the Warrant Agent, the Warrant Agent may presume conclusively for all purposes that the Minimum Exercise Threshold has not been achieved.  If this Warrant is automatically exercised pursuant to this Section 2.03, the Company (provided that if the Company provides such notice to the Holder, it will also provide prompt written notice thereof to the Warrant Agent), or if requested and provided with all necessary information, the Warrant Agent, shall notify the Holder of the automatic exercise as soon as reasonably practicable, and the Holder shall surrender the Warrant Certificate to the Warrant Agent.  For purposes of providing such notice, the Warrant Agent shall maintain a record of the number of outstanding Series C Warrants that have been exercised.  The Company shall cause to be issued to each Holder the aggregate number of whole Warrant Shares issuable upon such exercise and deliver to the Holder written confirmation that such Warrant Shares have been duly issued and recorded on the books of the Company as hereinafter provided; provided that certificates for the Warrant Shares shall not be issued to the Holder unless and until such Holder surrenders the Warrant Certificate for cancellation.  The Warrant Shares so issued shall be registered in the name of the Holder.

(c)    The Warrant Agent shall promptly advise the Company, by telephone or by facsimile transmission or other form of electronic communication available to both parties when Warrant Certificates have been received.  The Warrant Agent shall promptly confirm such advice to the Company in writing.  Upon surrender of a Warrant Certificate, the Warrant Agent shall requisition from the transfer agent for the Common Stock (the "Transfer Agent") for issuance and delivery to each Holder of such Warrant Certificate , a certificate or certificates for the Vested Warrant Shares issuable upon the exercise of the Warrant or Warrants evidenced by such Warrant Certificate (together with any other Warrant Shares to which the Holder may be entitled for which the Holder has not yet been issued certificates).  Such certificate or certificates shall be deemed to have been issued as of the date of surrender of such Warrant Certificate at the offices of the Warrant Agent designated for such purpose (the "Warrant Agent Office") duly executed by the Holder thereof.  Notwithstanding any provision herein to the contrary, the Company shall not be required to register Warrant Shares in the name of any person who acquired any Warrant or any Warrant Shares otherwise than in accordance with this Agreement.

(d)    In case an exercise of Warrants is in part only, a new Warrant or Warrants of like tenor, calling in the aggregate on the face or faces of the Warrant Certificate or Warrant Certificates for the number of shares of Common Stock equal (without giving effect to any adjustment thereof) to the number of such shares called for on the face of the Warrant Certificate minus the number of such shares so exercised, shall be issued and delivered to the Holder or its registered assigns.

(e)    Neither the Warrant Agent nor the Company shall be required to pay any stamp or other tax or other charge required to be paid in connection with any transfer

---

[5] Series F will refer to 'Series B"

involved in the issuance of the Warrant Shares, and in the event that any such transfer is involved, neither the Warrant Agent nor the Company shall be required to issue or deliver any Warrant Share until it has been established to the Company's and the Warrant Agent's satisfaction that *such tax or other charge* has been paid or that no such tax or other charge is due.

(f)    An exercise of a Warrant pursuant to the terms of this Agreement shall be irrevocable; *provided however,* that if an exercise is effected as a result of an exercise of Series A Warrants in connection with the occurrence of a "Triggering Event" (as defined in the Warrant Agreement dated [_____] governing the Series A Warrants (the "Series A Warrant Agreement")), exercise of a Warrant shall be effective only upon consummation of such Triggering Event.

(g)    The Warrant Agent shall:

(i)    examine all documents delivered to it by or on behalf of Holders as contemplated hereunder to ascertain whether or not, on their face, such documents have been executed and completed in accordance with their terms and the terms hereof;

(ii)    where an exercised Warrant or other document appears on its face to have been improperly completed or executed or some other irregularity in connection with the exercise of the Warrants exists, the Warrant Agent shall endeavor to inform the appropriate parties (including the person submitting such instrument) of the need for fulfillment of all requirements, specifying those requirements which appear to be unfulfilled;

(iii)    inform the Company of and cooperate with and assist the Company in resolving any reconciliation problems between exercised Warrants and delivery of Warrant Certificates to the Warrant Agent's account; and

(iv)    advise the Company of  such other information as the Company shall reasonably require.

(h)    All questions as to the validity, form and sufficiency (including time of receipt) of an exercised Warrant will be determined by the Company in its sole discretion, which determination shall be final and binding.  Such determination by the Company shall be final and binding on the Holders, absent manifest error.  Except as provided for in section 2.03(g), neither the Company nor the Warrant Agent shall be under any duty to give notice to any Person of any irregularities in any document delivered to it by or on behalf of Holders, nor shall it incur any liability for the failure to give such notice.

Section 2.04    Reservation of Warrant Shares

(a)    For the purpose of enabling it to satisfy any obligation to issue Warrant Shares upon exercise of Warrants, the Company will at all times through the Expiration Date, reserve and keep available out of its aggregate authorized but unissued or treasury shares of Common Stock, the number of Warrant Shares deliverable upon the exercise of all outstanding Warrants, and the Company's Transfer Agent is hereby irrevocably authorized and

7

directed at all times to reserve such number of authorized and unissued or treasury shares of Common Stock as shall be required for such purpose.  The Company will keep a copy of this Agreement on file with the Transfer Agent.  The Warrant Agent is hereby irrevocably authorized to requisition from time to time from such Transfer Agent stock certificates issuable upon exercise of outstanding Warrants, and the Company will supply such Transfer Agent with duly executed stock certificates for such purpose.

(b)    The Company covenants that all shares of Common Stock issued upon exercise of the Warrants will, upon issuance in accordance with the terms of this Agreement, be fully paid and nonassessable and free from all taxes, liens, charges and security interests created by or imposed upon the Company with respect to the issuance and holding thereof.

## ARTICLE III
## OTHER PROVISIONS RELATING TO RIGHTS OF HOLDERS OF WARRANT

Section 3.01    <u>No Rights as Stockholder Conferred by Warrants or Warrant Certificates</u>.  No Warrant Certificate or Warrant evidenced thereby shall, and nothing contained in this Agreement or in the Warrant Certificate shall be construed to, entitle the Holder or any beneficial owner thereof to any of the rights of a holder or beneficial owner of Warrant Shares, including, without limitation, the right to vote or to consent or to receive notice as a stockholder in respect of any meeting of stockholders for the election of directors of the Company or any other matter, to receive dividends on Warrant Shares or any rights whatsoever as stockholders of the Company.

Section 3.02    <u>Lost, Mutilated, Stolen or Destroyed Warrant Certificates</u>.  Upon receipt by the Warrant Agent of evidence reasonably satisfactory to it and the Company of the ownership of and the loss, mutilation, theft or destruction of any Warrant Certificate and of such security or indemnity as may be required by the Company and the Warrant Agent to hold each of them and any agent of them harmless and, in the case of mutilation of a Warrant Certificate, upon surrender thereof to the Warrant Agent for cancellation, then, in the absence of notice to the Company or the Warrant Agent that such Warrant Certificate has been acquired by a bona fide purchaser, the Company shall execute, and an authorized officer of the Warrant Agent shall manually countersign or countersign by facsimile and deliver, in exchange for or in lieu of the lost, mutilated, stolen or destroyed Warrant Certificate, a new Warrant Certificate of the same tenor and evidencing a like number of Warrants.  Upon the issuance of any new Warrant Certificate under this Section 3.02, the Company may require the payment of a sum sufficient to cover any stamp or other tax or other charge that may be imposed in relation thereto and any other expenses (including the fees and expenses of the Warrant Agent) in connection therewith.  Every substitute Warrant Certificate executed and delivered pursuant to this Section 3.02 in lieu of any lost, mutilated, stolen or destroyed Warrant Certificate shall represent an additional contractual obligation of the Company, whether or not the lost, stolen or destroyed Warrant Certificate shall be at any time enforceable by anyone, and shall be entitled to the benefits of this Agreement equally and proportionately with any and all other Warrant Certificates duly executed and delivered hereunder.  The provisions of this Section 3.02 are exclusive and shall preclude (to the extent lawful) all other rights and remedies with respect to the replacement of lost, mutilated, stolen or destroyed Warrant Certificates.  Notwithstanding anything in this Agreement to the

8

contrary, the Warrant Agent shall have no obligation to take any action whatsoever with respect to such an exchange unless and until such payments required under this section have been made.

## ARTICLE IV
## EXCHANGE AND TRANSFER

Section 4.01    Exchange and Transfer.

(a)    Upon surrender at the Warrant Agent Office, Warrant Certificates evidencing Warrants may be exchanged for Warrant Certificates in other authorized denominations evidencing such Warrants or the transfer thereof may be registered in whole or in part; *provided, however,* that such other Warrant Certificates shall evidence the same aggregate number of Warrants as the Warrant Certificates so surrendered.

(b)    The Warrant Agent shall keep, at the Warrant Agent Office, books in which, subject to such reasonable regulations as it may prescribe, it shall register Warrant Certificates and exchanges and transfers of outstanding Warrant Certificates upon surrender of such Warrant Certificates to the Warrant Agent at the Warrant Agent Office for exchange or registration of transfer, properly endorsed.

(c)    No service charge shall be made for any exchange or registration of transfer of Warrant Certificates, however, the Warrant Agent and/or the Company may require payment of a sum sufficient to cover any stamp or other tax or other charge that may be imposed in connection with any such exchange or registration of transfer.  Neither the Warrant Agent nor the Company shall be required to pay any stamp or other tax or other charge required to be paid in connection with such transfer, and neither the Warrant Agent nor the Company shall be required to issue or deliver any Warrant Share until it has been established to the Company's and the Warrant Agent's reasonable satisfaction that such tax or other charge has been paid or that no such tax or other charge is due.

(d)    Whenever any Warrant Certificates are so surrendered for exchange or registration of transfer, an authorized officer of the Warrant Agent, upon the request of the Company,  shall manually countersign or countersign by facsimile and deliver to the person or persons entitled thereto a Warrant Certificate or Warrant Certificates, duly authorized and executed by the Company, as so requested.  The Warrant Agent shall not effect any exchange or registration of transfer which will result in the issuance of a Warrant Certificate, evidencing a fraction of a Warrant or a number of full Warrants and a fraction of a Warrant.

(e)    All Warrant Certificates, issued upon any exchange or registration of transfer of Warrant Certificates shall be the valid obligations of the Company, evidencing the same obligations, and entitled to the same benefits under this Agreement, as the Warrant Certificates surrendered for such exchange or registration or transfer.

9

Section 4.02    <u>Restrictions on Transfer; Restrictive Legend</u>

(a)    A Holder shall not transfer Warrants except in connection with the Holder's transfer of shares of the Issued Holders Shares held by such Holder (the "Transferred Shares"), which transfer shall comply with the provisions of the Stockholders Agreement (a "Share Transfer").  In the event of a valid Share Transfer, a Holder shall concurrently transfer such proportion of the Holder's Warrants equal to the proportion that the number of Transferred Shares bears to the total number of Issued Holders Shares held by such Holder prior to such transfer.

(b)    Any attempted or purported transfer of all or a portion of the Warrants held by a Holder in violation of this Section 4.02 shall be null and void and of no force or effect whatsoever, such purported transferee will not be treated as an owner of the Warrants for purposes of this Agreement or otherwise, and the Company will not register such transfer.

(c)    Each Warrant Certificate and certificate representing Warrant Shares issued upon the exercise of a Warrant shall be stamped or otherwise imprinted with a legend in the following or a comparable form:

THE SECURITIES REPRESENTED BY THIS CERTIFICATE (THE "SECURITIES") WERE ORIGINALLY ISSUED IN RELIANCE UPON AN EXEMPTION FROM THE REGISTRATION REQUIREMENT OF SECTION 5 OF THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), PROVIDED BY SECTION 1145 OF THE BANKRUPTCY CODE, 11 U.S.C. 1145.  THE SECURITIES HAVE NOT BEEN REGISTERED UNDER THE ACT OR ANY STATE SECURITIES LAW, AND TO THE EXTENT THE HOLDER OF THE SECURITIES IS AN "UNDERWRITER," AS DEFINED IN SECTION 1145(B)(1) OF THE BANKRUPTCY CODE, THE SECURITIES MAY NOT BE SOLD OR TRANSFERRED IN THE ABSENCE OF AN EFFECTIVE REGISTRATION STATEMENT UNDER THE ACT OR AN EXEMPTION FROM REGISTRATION THEREUNDER.

If at the time of issuance of Warrant Shares the Stockholders Agreement is still in effect, each certificate representing Warrant Shares issued upon the exercise of a Warrant shall also be stamped or otherwise imprinted with a legend in the following or a comparable form:

THE SALE, ASSIGNMENT, PLEDGE, ENCUMBRANCE OR OTHER TRANSFER OF THE SECURITIES REPRESENTED BY THIS CERTIFICATE IS RESTRICTED BY THE TERMS OF, AND THE HOLDER HEREOF IS SUBJECT TO CERTAIN OTHER OBLIGATIONS PURSUANT TO, THE PROVISIONS OF A STOCKHOLDERS AGREEMENT, DATED AS OF [____], 2009, AMONG THE COMPANY AND CERTAIN HOLDERS OF ITS SECURITIES, A COPY OF WHICH IS ON FILE AT THE PRINCIPAL EXECUTIVE OFFICE OF THE COMPANY.

(d)    A Holder (or its transferee, as applicable) shall be entitled to receive from the Company, without expense, new securities of like tenor not bearing the legends

10

set forth above when (i) such Warrant Shares shall have been (A) effectively registered under the Securities Act and disposed of in accordance with a registration statement covering such securities, (B) disposed of pursuant to the provisions of Rule 144 or any comparable rule under the Securities Act, or (C) when, in the written reasonable opinion of independent counsel for the holder thereof experienced in Securities Act matters, which counsel and opinion shall be reasonably satisfactory to the Company, such restrictions are no longer required in order to insure compliance with the Securities Act (including when the provisions of Rule 144(k) or any comparable rule under the Securities Act have been satisfied) and (ii)such Warrant Shares are no longer subject to the Stockholders Agreement.

Section 4.03    Treatment of Holders of Warrant Certificates. Each Holder of a Warrant Certificate, by accepting the same, consents and agrees with the Company, the Warrant Agent and every subsequent Holder of such Warrant Certificate that until the transfer of such Warrant Certificate is registered on the books of such Warrant Agent, the Company and the Warrant Agent may treat the registered Holder of such Warrant Certificate as the absolute owner thereof for any purpose and as the person entitled to exercise the rights represented by the Warrants evidenced thereby, any notice to the contrary notwithstanding.

Section 4.04    Cancellation of Warrant Certificates. Any Warrant Certificate surrendered for exchange or registration of transfer or exercise of the Warrants evidenced thereby shall, if surrendered to the Company, be delivered to the Warrant Agent, and all Warrant Certificates surrendered or so delivered to the Warrant Agent shall be promptly cancelled by the Warrant Agent and shall not be reissued and, except as expressly permitted by this Agreement, no Warrant Certificate shall be issued hereunder in exchange therefor or in lieu thereof. The Warrant Agent shall cause all cancelled Warrant Certificates to be destroyed and shall deliver a certificate of such destruction to the Company.

## ARTICLE V
## ADJUSTMENT OF WARRANT PRICE AND NUMBER OF WARRANT SECURITIES

Section 5.01    Adjustments Generally. The number of Warrant Shares issuable upon exercise of Warrants and the number of Warrants outstanding are subject to adjustment from time to time upon the occurrence of the events enumerated in this Article V, as determined to be necessary or appropriate in the reasonable discretion of the Board of Directors of the Company.

Section 5.02    Stock Dividends; Split-Ups. If after the date hereof, and subject to the provisions of Section 5.06, the number of outstanding shares of Common Stock is increased by a stock dividend payable in shares of Common Stock, or by a split-up of shares of Common Stock, or other similar event, then, on the effective date of such stock dividend, split-up or similar event, the number of shares of Common Stock issuable on exercise of each Warrant shall be increased in proportion to such increase in outstanding shares of Common Stock.

Section 5.03    Aggregation of Shares. If after the date hereof, and subject to the provisions of Section 5.06, the number of outstanding shares of Common Stock is decreased by a consolidation, combination, reverse stock split or reclassification of shares of Common Stock or

11

other similar event, then, on the effective date of such consolidation, combination, reverse stock split, reclassification or similar event, the number of shares of Common Stock issuable on exercise of each Warrant shall be decreased in proportion to such decrease in outstanding shares of Common Stock.

Section 5.04    Replacement of Securities upon Reorganization.  In case of any reclassification or reorganization of the outstanding shares of Common Stock (other than a change covered by Section 5.02 or 5.03 or that solely affects the par value of such shares of Common Stock), or in the case of any merger or consolidation of the Company with or into another corporation (other than a consolidation or merger in which the Company is the continuing corporation and that does not result in any reclassification or reorganization of the outstanding shares of Common Stock), or in the case of any sale or conveyance to another corporation or entity of the assets or other property of the Company as an entirety or substantially as an entirety in connection with which the Company is dissolved, except in each case, with respect to any such transaction pursuant to which holders of the outstanding Common Stock are entitled to receive cash consideration for such shares, the Holders shall thereafter have the right to receive, upon the basis and upon the terms and conditions specified in the Warrants and in lieu of the shares of the Warrant Shares immediately theretofore receivable upon the exercise of the rights represented thereby, the kind and amount of shares of stock or other securities or property (including cash) receivable upon such reclassification, reorganization, merger or consolidation, or upon a dissolution following any such sale or transfer, that the Holder would have received if such Holder had exercised his, her or its Warrant(s) immediately prior to such event; and if any reclassification also results in a change in shares of Common Stock covered by Section 5.02 or 5.03, then such adjustment shall be made pursuant to Sections 5.02, 5.03 and this Section 5.04.  The provisions of this Section 5.04 shall similarly apply to successive reclassifications, reorganizations, mergers or consolidations, sales or other transfers.

Section 5.05    Notices of Changes in Warrant.  Upon every adjustment of the number of shares issuable upon exercise of a Warrant, the Company shall give written notice thereof to the Warrant Agent, which notice shall state the increase or decrease, if any, in the number of shares of Common Stock issuable upon the exercise of a Warrant, setting forth in reasonable detail the method of calculation and the facts upon which such calculation is based. Upon the occurrence of any event specified in Section 5.02, 5.03, 5.04 or 5.08, then, in any such event, the Company shall give or cause to be given written notice to each Holder, by press release or at the last address set forth for such Holder in the register books of the Warrant Agent, of the record date or the effective date of the event.  Failure to give such notice, or any defect therein, shall not affect the legality or validity of such event.  The Warrant Agent shall be fully protected in relying upon such a certificate and shall have no duty to investigate or inquire as to whether such adjustment is accurate, and shall not be deemed to have knowledge of and shall not be required to take any action with respect to any adjustments, unless and until the Warrant Agent shall have received such a certificate.

Section 5.06    No Fractional Shares.  Notwithstanding any provision contained in this Agreement to the contrary, the Company shall not issue fractional shares upon exercise of Warrants.  If, by reason of any adjustment made pursuant to this Article V, any Holder would be entitled, upon the exercise of such Warrant, to receive a fractional interest in a share of Common Stock, the Company shall, upon such exercise, round down to the nearest whole number the

12

number of the shares of Common Stock to be issued to the Holder.  The Warrant Agent shall not be required to effect any registration of transfer or exchange that will result in the issuance of a Warrant Certificate for a fraction of a share of Common Stock.

Section 5.07    <u>Form of Warrant</u>.  The form of Warrant or Warrant Certificate need not be changed because of any adjustment pursuant to this Article V, and Warrant Certificates issued after such adjustment may state the same number of shares as is stated in the Warrant Certificates initially issued pursuant to this Agreement.  However, the Company may at any time in its sole discretion make any change in the form of Warrant or Warrant Certificate that the Company may deem appropriate and that does not affect the substance thereof, and any Warrant Certificates thereafter issued or countersigned, whether in exchange or substitution for an outstanding Warrant Certificate or otherwise, may be in the form as so changed.

Section 5.08    <u>Extraordinary Transactions</u>.  If the Company's Board of Directors, in connection with an "Extraordinary Transaction" (as defined in the Series A Warrant Agreement), determines to adjust the warrant price or the number of shares of Common Stock issuable upon exercise of the Series A Warrants to reflect such Extraordinary Transaction, the number of shares issuable upon exercise of a Warrant shall also be appropriately adjusted as determined in good faith by the Company's Board of Directors.

Section 5.09    <u>De Minimis Adjustments</u>.  No adjustment in the number of Warrant Shares issuable hereunder shall be required unless such adjustment would require an increase or decrease of at least one percent (1%) in the number of Warrant Shares issuable upon the exercise of each Warrant; *provided, however,* that any adjustments which by reason of this paragraph (c) are not required to be made shall be carried forward and taken into account in any subsequent adjustment.  All calculations shall be made to the nearest cent and to the nearest one-hundredth of a Warrant Share, as the case may be.

**ARTICLE VI**
**<u>CONCERNING THE WARRANT AGENT</u>**

Section 6.01    <u>Warrant Agent</u>.

The Company hereby appoints the Warrant Agent to act as agent of the Company in respect of the Warrants and the Warrant Certificates upon the express terms and subject to the conditions herein and in the Warrant Certificates (and no implied terms); and the Warrant Agent hereby accepts such appointment. The Warrant Agent shall have the powers and authority granted to and conferred upon it in the Warrant Certificates and herein and such further powers and authority to act on behalf of the Company as the Company may hereafter grant to or confer upon it.  All of the terms and provisions with respect to such powers and authority contained in the Warrant Certificates are subject to and governed by the terms and provisions hereof.

Section 6.02    <u>Conditions of Warrant Agent's Obligations</u>.

(a)    The Warrant Agent accepts its obligations herein set forth upon the express terms and conditions hereof (and no implied terms), including the following, to all of

13

which the Company agrees and to all of which the rights hereunder of the Holders from time to time of the Warrant Certificates shall be subject:

(i)      *Compensation and Indemnification*.  The Company agrees promptly to pay the Warrant Agent the compensation to be agreed upon with the Company for all services rendered by the Warrant Agent and to reimburse the Warrant Agent for reasonable out-of-pocket expenses (including the reasonable fees and expenses of its counsel) incurred by the Warrant Agent without gross negligence, bad faith or willful misconduct (each as determined by a final, non-appealable judgment of a court of competent jurisdiction) on its part in connection with the preparation, delivery, acceptance, administration, execution and amendment of this Agreement and the exercise and performance of its duties hereunder.  The Company also agrees to indemnify the Warrant Agent for, and to hold it harmless against, any loss, liability, suit, action, proceeding, judgment, claim, settlement, cost or expense (including the reasonable fees and expenses of its counsel) incurred without gross negligence, bad faith or willful misconduct on the part of the Warrant Agent, (each as determined by a final, non-appealable judgment of a court of competent jurisdiction), for any action taken, suffered or omitted to be taken by the Warrant Agent in connection with the preparation, delivery, acceptance, administration, execution and amendment of the Agreement and the exercise and performance of its duties hereunder, including the costs and expenses of defending against any claim of liability arising therefrom, directly or indirectly.  The provisions of this Section 6.02(a)(i) shall survive the termination of this Agreement and the replacement, removal or resignation of the Warrant Agent.

(ii)      *Agent for the Company*.  In acting under this Agreement and in connection with the Warrants and the Warrant Certificates, the Warrant Agent is acting solely as agent of the Company and does not assume any obligation or relationship of agency or trust for or with any of the Holders of Warrant Certificates or beneficial owners of Warrants.

(iii)      *Counsel*.  The Warrant Agent may consult with counsel satisfactory to it in its reasonable judgment (who may be counsel for the Company or in-house counsel of the Warrant Agent), and the advice of such counsel shall be full and complete authorization and protection in respect of any action taken, suffered or omitted to be taken by it hereunder, in the absence of gross negligence, bad faith or willful misconduct, and in accordance with the advice of such counsel.

(iv)      *Documents*.  Subject to Section 2.03(g), the Warrant Agent shall be protected and shall incur no liability for or in respect of any action taken, suffered or omitted to be taken by it in reliance upon any Warrant Certificate, notice, direction, consent, certificate, affidavit, statement or other paper or document reasonably believed by it to be genuine and to have been presented or signed by the proper parties.

14

(v)    *Certain Transactions*.  The Warrant Agent, and its officers, directors, employees, agents and affiliates, may become the owner of, or acquire any interest in, Warrants, with the same rights that it or they would have if it were not the Warrant Agent hereunder, and, to the extent permitted by applicable law, it or they may engage or be interested in any financial or other transaction with the Company and may act on, or as depositary, trustee or agent for, any committee or body of holders of Warrant Shares or other obligations of the Company as freely as if it were not the Warrant Agent hereunder.

(vi)    *No Liability for Interest*.  The Warrant Agent shall have no liability for interest on any monies at any time received by it pursuant to any of the provisions of this Agreement or of the Warrant Certificates.

(vii)    *No Liability for Invalidity*.  The Warrant Agent shall not be under any responsibility with respect to the validity or sufficiency of this Agreement or the execution and delivery hereof (except the due authorization to execute this Agreement and the due execution and delivery hereof by the Warrant Agent) or subject to Section 2.03(g), with respect to the validity or execution of any Warrant Certificates (except its countersignature thereof).

(viii)    *No Liability for Recitals*.  The recitals contained herein shall be taken as the statements of the Company and the Warrant Agent assumes no liability for the correctness of the same.

(ix)    *No Implied Obligations*.  The Warrant Agent shall be obligated to perform only such duties as are herein and in the Warrant Certificates specifically set forth and no implied duties or obligations shall be read into this Agreement or the Warrant Certificates against the Warrant Agent.  The Warrant Agent shall not be under any obligation to expend or risk its own funds or take any action hereunder or at the request of any Warrant Holder or other Person which may tend to involve it in any expense or liability unless it has received indemnity reasonably satisfactory to it or, the payment of which within a reasonable time is not, in its opinion, assured to it.  The Warrant Agent shall not be accountable or under any duty or responsibility for the use by the Company of any of the Warrant Certificates countersigned by the Warrant Agent and delivered by it to the Company pursuant to this Agreement or for the application by the Company of the proceeds of the Warrant Certificates.  The Warrant Agent shall have no duty or responsibility in case of any default by the Company in the performance of its covenants or agreements contained herein or in the Warrant Certificates or in the case of the receipt of any written demand from a Holder of a Warrant Certificate with respect to such default, including, without limiting the generality of the foregoing, any duty or responsibility to initiate or attempt to initiate any proceedings at law or otherwise or, except as provided in Section 7.02, to make any demand upon the Company.

(x)    *Agents*.  The Warrant Agent may execute any of the trusts or powers hereunder or perform any duties hereunder either directly or by

15

or through agents or attorneys-in-fact, provided reasonable care has been exercised in the selection and continued employment of such agent or attorney-in-fact.

(xi)    *Liability*.  Notwithstanding anything in this Agreement to the contrary, in no event shall the Warrant Agent be liable for special, indirect, punitive, incidental or consequential loss or damage of any kind whatsoever (including but not limited to lost profits), even if the Warrant Agent has been advised of the likelihood of the loss or damage and regardless of the form of the action.  Any liability of the Warrant Agent under this Agreement shall be limited to the amount of annual fees paid by the Company to the Warrant Agent.  The provisions of this Section 6.02(a)(xi) shall survive the termination of this Agreement and the replacement, removal or resignation of the Warrant Agent.

(xii)    *Force Majeure*.  In no event shall the Warrant Agent be responsible or liable for any failure or delay in the performance of its obligations under this Agreement arising out of or caused by, directly or indirectly, forces beyond its reasonable control, including without limitation strikes, work stoppages, accidents, acts of war or terrorism, civil or military disturbances, nuclear or natural catastrophes or acts of God, and interruptions, loss or malfunctions of utilities, communications or computer (software or hardware) services ("Force Majeure").  In the event of any such excused delay, the time for performance shall be extended for a period equal to the time lost by reason of the delay; *provided*, *however*, that the Warrant Agent shall use all commercially reasonable efforts to avoid and to remove such causes of non-performance and shall continue performance hereunder promptly following the removal of such causes.

Section 6.03    Resignation and Appointment of Successor.

(a)    The Company agrees, for the benefit of the Holders from time to time of the Warrant Certificates, that there shall at all times be a Warrant Agent hereunder until all the Warrants have been exercised or are no longer exercisable.

(b)    The Warrant Agent may at any time resign as such by giving written notice of its resignation to the Company, specifying the desired date on which its resignation shall become effective; *provided, however,* that such date shall be not less than 30 days after the date on which such notice is given unless the Company agrees to accept shorter notice.  Upon receiving such notice of resignation, the Company shall promptly appoint a successor Warrant Agent (which shall be a bank or trust company in good standing, authorized under the laws of the jurisdiction of its organization to exercise corporate trust powers) by written instrument in duplicate signed on behalf of the Company, one copy of which shall be delivered to the resigning Warrant Agent and one copy to the successor Warrant Agent.  The Company may, at any time and for any reason, remove the Warrant Agent and appoint a successor Warrant Agent (qualified as aforesaid) by written instrument in duplicate signed on behalf of the Company and specifying such removal and the date when it is intended to become effective, one copy of which shall be delivered to the Warrant Agent being removed and one copy to the successor Warrant Agent.

16

Any resignation or removal of the Warrant Agent and any appointment of a successor Warrant Agent shall become effective upon acceptance of appointment by the successor Warrant Agent as provided in this subsection (b).  In the event a successor Warrant Agent has not been appointed and accepted its duties within 30 days of the Warrant Agent's notice of resignation, the Warrant Agent may apply to any court of competent jurisdiction for the designation of a successor Warrant Agent.  Upon its resignation, replacement or removal, the Warrant Agent shall be entitled to the payment by the Company of the compensation and to the reimbursement of all reasonable out-of-pocket expenses incurred by it hereunder as agreed to in Section 6.02(a).

(c)     The Company shall remove the Warrant Agent and appoint a successor Warrant Agent if the Warrant Agent (i) shall become incapable of acting, (ii) shall be adjudged bankrupt or insolvent, (iii) shall commence a voluntary case or other proceeding seeking liquidation, reorganization or other relief with respect to it or its debts under any bankruptcy, insolvency or other similar law now or hereafter in effect or seeking the appointment of a trustee, receiver, liquidator, custodian or other similar official of it or any substantial part of its property, (iv) shall consent to, or shall have had entered against it a court order for, any such relief or to the appointment of or taking possession by any such official in any involuntary case or other proceedings commenced against it, (v) shall make a general assignment for the benefit of creditors or (vi) shall fail generally to pay its debts as they become due.  Upon the appointment as aforesaid of a successor Warrant Agent and acceptance by it of such appointment, the predecessor Warrant Agent shall, if not previously disqualified by operation of law, cease to be Warrant Agent hereunder.

(d)     Any successor Warrant Agent appointed hereunder shall execute, acknowledge and deliver to its predecessor and the Company an instrument accepting such appointment hereunder, and thereupon such successor Warrant Agent, without any further act, deed or conveyance, shall become vested with all the authority, rights, powers, immunities, duties and obligations of such predecessor with like effect as if originally named as Warrant Agent hereunder, and such predecessor shall thereupon become obligated to transfer, deliver and pay over, and such successor Warrant Agent shall be entitled to receive, all monies, securities and other property on deposit with or held by such predecessor as Warrant Agent hereunder.

(e)     Any person into which the Warrant Agent hereunder may be merged or converted or any person with which the Warrant Agent may be consolidated, or any person resulting from any merger, conversion or consolidation to which the Warrant Agent shall be a party, or any person to which the Warrant Agent shall sell or otherwise transfer all or substantially all the assets and business of the Warrant Agent, *provided* that it shall be qualified as aforesaid, shall be the successor Warrant Agent under this Agreement without the execution or filing of any paper or any further act on the part of any of the parties hereto.

## ARTICLE VII
## MISCELLANEOUS

Section 7.01    Amendment.  The terms of the Warrants may be amended by the Company together with the affirmative vote or consent of the Holders of a majority of the Warrants.  The Company and the Warrant Agent may from time to time supplement or amend

17

this Agreement without the approval of any Holders in order to cure any ambiguity, manifest error or other mistake in this Agreement, or to correct or supplement any provision contained herein that may be defective or inconsistent with any other provision herein, or to make any other provisions in regard to matters or questions arising hereunder that the Company and the Warrant Agent may deem necessary or desirable and that shall not adversely affect, alter or change the interests of any Holder.  Notwithstanding anything to the contrary herein, upon the delivery of a certificate from an appropriate officer of the Company, which states that the proposed supplement or amendment is in compliance with the terms of this Section 8.01 and, provided such supplement or amendment does not change the Warrant Agent's own rights, duties, liabilities, immunities or obligations hereunder, the Warrant Agent shall execute such supplement or amendment.  Any amendment, modification or waiver effected pursuant to and in accordance with the provisions of this Section 8.01 will be binding upon all Holders and upon each future Holder, the Company and the Warrant Agent.  In the event of any amendment, modification or waiver, the Company will give prompt notice thereof to all Holders.

Section 7.02    Notices and Demands to the Company and Warrant Agent.  If the Warrant Agent shall receive any notice or demand addressed to the Company by the Holder of a Warrant Certificate pursuant to the provisions of the Warrant Certificates, the Warrant Agent shall promptly forward such notice or demand to the Company.

Section 7.03    Addresses.  Any communication from the Company to the Warrant Agent with respect to this Agreement shall be addressed to Mellon Investor Services LLC, 200 W. Monroe Street, Suite 1590, Chicago, IL 60606, Attention: Georg Drake, with a copy to Mellon Investor Services LLC, 480 Washington Boulevard, Jersey City, NJ 07310, Attention: Legal Department, and any communication from the Warrant Agent to the Company with respect to this Agreement shall be addressed to Hayes Lemmerz International, Inc., 15300 Centennial Drive, Northville, MI 48167, Attention: General Counsel (or such other address as shall be specified in writing by the Warrant Agent or by the Company).  For the avoidance of doubt, the Company may satisfy its obligation to provide the Warrant Agent with a written order or direction pursuant to this Agreement through the use of electronic mail delivered to the Warrant Agent.

Section 7.04    Applicable Law.  The validity, interpretation and performance of this Agreement and each Warrant Certificate issued hereunder and of the respective terms and provisions hereof and thereof shall be governed by, and construed in accordance with, the laws of the State of Delaware.

Section 7.05    Obtaining of Governmental Approval.  The Company from time to time will use its best efforts to obtain and keep effective any and all permits, consents and approvals of governmental agencies and authorities and to make any necessary filings under federal or state securities laws, which may become requisite in connection with the issuance, sale, transfer and delivery of the Warrant Certificates, the exercise or conversion of the Warrants, the issuance, sale, transfer and delivery of the Warrant Shares.

Section 7.06    Persons Having Rights Under Warrant Agreement.  Nothing contained in the Warrant shall be construed as conferring upon the Holder the right to vote or to consent or to receive notice as a stockholder in respect of any meeting of stockholders for the

18

election of directors of the Company or any other matter, to receive dividends or any rights whatsoever as stockholders of the Company.  Each Holder shall be entitled to receive the same information and reports to which a holder of the Common Stock is entitled pursuant to the Stockholders Agreement then in effect, subject to execution of an appropriate confidentiality agreement.

Section 7.07    Headings.  The descriptive headings of the several Articles and Sections of this Agreement are inserted for convenience only and shall not control or affect the meaning or construction of any of the provisions hereof.

Section 7.08    Counterparts.  This Agreement may be executed in any number of counterparts, each of which as so executed shall be deemed to be an original, but such counterparts shall together constitute but one and the same instrument.

Section 7.09    Inspection of Agreement.  A copy of this Agreement shall be available at all reasonable times at the principal corporate trust office of the Warrant Agent for inspection by the Holder of any Warrant Certificate.  The Warrant Agent may require such Holder to submit his Warrant Certificate for inspection by it.

Section 7.10    Notices to Holders of Warrants.  Any notice to Holders of Warrants evidenced by Warrant Certificates which by any provisions of this Warrant Agreement is required or permitted to be given shall be given by first class mail prepaid at such Holder's address as it appears on the books of the Warrant Agent.

Section 7.11    Binding Effects.  This Agreement shall inure to the benefit and shall be binding upon the Company, the Warrant Agent and the Holders and their respective heirs, legal representatives, successors and assigns.  Nothing in this Agreement, express or implied, is intended to or shall confer on any Person other than the Company, the Warrant Agent and the Holders, or their respective heirs, legal representatives, successors or assigns, any rights, remedies, obligations or liabilities under or by reason of this Agreement.

Section 7.12    Severability.  In the event that any one or more of the provisions contained herein, or the application thereof in any circumstances, is held invalid, illegal or unenforceable, the validity, legality and enforceability of any such provisions in every other respect and of the remaining provisions contained herein and therein shall not be affected or impaired thereby; provided, that if any such excluded term, provision, covenant or restriction shall materially adversely affect the rights, immunities, duties or obligations of the Warrant Agent, the Warrant Agent shall be entitled to resign by giving not less than ten (10) days prior written notice to the Company.  In the event a successor Warrant Agent has not been appointed and accepted its duties within ten (10) days of the Warrant Agent's notice of resignation, the Warrant Agent may apply to any court of competent jurisdiction for the designation of a successor to the Warrant Agent.

19

20

[SIGNATURE PAGE FOLLOWS]

SCHEDULE 1

**HLI - Share Count Analysis**

*Scenarios Assume Cash Settlement of Exercised Warrants*

| | |
|---|---|
| **Shares Outstanding at Emergence** | **10,000,000** |
| **Shares Authorized** | **20,000,000** |

| | |
|---|---|
| **Tranche A Warrants** | **555,555** |
| **Tranche B Warrants** | **555,555** |

| | |
|---|---|
| Pre-petition debt held by DIP Lenders | $ 285,584,531 |
| Pre-petition Consenting Lenders | 192,432,416 |
| Pre-petition Non-Consenting Lenders | 28,324,933 |
| **Total Pre-Petition Debt** | **$ 506,341,880** |
| **Equity to Pre-petition Lenders Under Plan** | **4%** |

| | Emergence | | Exercise of Tranche A Only | | | | Exercise of Tranche A/B Warrants | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Pre Anti-Dilution | | Post Anti-Dilution | | Pre Anti-Dilution | | Post Anti-Dilution | |
| DIP Lenders | 8,450,000 | 84.50% | 8,450,000 | 80.05% | 8,450,000 | 79.43% | 8,450,000 | 76.05% | 8,450,000 | 74.86% |
| **Pre-Petition Lenders** | | | | | | | | | | |
| Pre-Petition Lender Consent Fee | 850,000 | 8.50% | 850,000 | 8.05% | 850,000 | 7.99% | 850,000 | 7.65% | 850,000 | 7.53% |
| Pre-Petition Consenting Lender Equity | 348,677 | 3.49% | 348,677 | 3.30% | 348,677 | 3.28% | 348,677 | 3.14% | 348,677 | 3.09% |
| Tranche C/D Anti-Dilution Warrants | 0 | 0.00% | 0 | 0.00% | 76,583 | 0.72% | 0 | 0.00% | 154,384 | 1.37% |
| Total Consenting Pre-Petition Lenders | 1,198,677 | 11.99% | 1,198,677 | 11.36% | 1,275,260 | 11.99% | 1,198,677 | 10.79% | 1,353,061 | 11.99% |
| Non-consenting Pre-Petition Lender Equity | 51,323 | 0.51% | 51,323 | 0.49% | 51,323 | 0.48% | 51,323 | 0.46% | 51,323 | 0.45% |
| Total Pre-Petition Lenders | 1,250,000 | 12.50% | 1,250,000 | 11.84% | 1,326,583 | 12.47% | 1,250,000 | 11.25% | 1,404,384 | 12.44% |
| **Foreign Creditor Distribution** | | | | | | | | | | |
| PBGC/Noteholders | 300,000 | 3.00% | 300,000 | 2.84% | 300,000 | 2.82% | 300,000 | 2.70% | 300,000 | 2.66% |
| Tranche A/B Warrants Exercised | 0 | 0.00% | 555,555 | 5.26% | 555,555 | 5.22% | 1,111,110 | 10.00% | 1,111,110 | 9.84% |
| Tranche E/F Anti-Dilution Warrants | 0 | 0.00% | 0 | 0.00% | 6,755 | 0.06% | 0 | 0.00% | 22,459 | 0.20% |
| Total Foreign Creditor Distribution | 300,000 | 3.00% | 855,555 | 8.11% | 862,310 | 8.11% | 1,411,110 | 12.70% | 1,433,569 | 12.70% |
| **Total Shares** | **10,000,000** | **100.00%** | **10,555,555** | **100.00%** | **10,638,893** | **100.00%** | **11,111,110** | **100.00%** | **11,287,953** | **100.00%** |

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed.

HAYES LEMMERZ INTERNATIONAL, INC.

By: _____
    Name:
    Title:


MELLON INVESTOR SERVICES LLC

By: _____
    Name:
    Title:

EXHIBIT A

[FORM OF WARRANT CERTIFICATE]

[Face]

EXERCISABLE ONLY AUTOMATICALLY FROM TIME TO TIME AS PROVIDED
HEREIN

VOID AFTER THE CLOSE OF BUSINESS ON _____, 2016
HAYES LEMMERZ INTERNATIONAL, INC.

Warrant Certificate representing
Series E[6] Warrants to receive
Common Stock, par value $0.01 per share
as described herein

_____ Warrants

This certifies that [_____] or registered assigns is the registered
owner of the above indicated number of Series E Warrants[7] (each, a "Warrant"), each Warrant
entitling such registered owner to receive, one share of the Common Stock, par value $0.01 per
share (the "Warrant Shares") of Hayes Lemmerz International, Inc. (the "Company") on the
following basis.

The Warrant may be exercised in whole or in part at any time on or before 5:00 p.m. New
York City time on _____, 2016, or such earlier date and time at which the Series C
Warrants[8] of the Company (the "Series C Warrants") are no longer exercisable (in either case,
such date and such time, the "Expiration Date"); *provided further, that* for the avoidance of
doubt, the foregoing proviso shall not affect a Holder's entitlement to replacement securities
pursuant to Section 5.04 of the Warrant Agreement. Each Warrant not exercised at or before the
Expiration Date shall become void, and all rights of the Holder and any beneficial owners of the
Warrant Certificate evidencing such Warrant under the Warrant Agreement shall cease.

Prior to the Expiration Date, each Warrant shall entitle the Holder thereof, subject to the
provisions of this Agreement, to receive from the Company one Warrant Share. The Warrants
shall be automatically exercised at each time, and only to the extent, at least 5% of the then
outstanding Series C Warrants not previously exercised (the "Minimum Exercise Threshold")

---

[6] Series F Warrant Certificate will state "Series F"

[7] Series F Warrant Certificate will state "Series F"

[8] Series F Warrant Certificate will state "Series D"

have been exercised in conjunction with the exercise of Series A Warrants[9] (any such time a Series C[10] Warrant is exercised, an "Exercise Time");  provided that the Minimum Exercise Threshold shall not apply with respect to any exercise of a Warrant (i) in connection with an IPO (as defined in the Series A Warrant Agreement) or any Triggering Event or (ii) within sixty (60) days of the Expiration Date.  The number of shares of common stock to which an individual Holder shall be entitled under the Warrant at a given Exercise Time (the "Vested Warrant Shares") shall be based upon the number of Series A Warrants exercised at that particular Exercise Time (the "Aggregate Exercised Series A Share Amount"), in accordance with the following formula:

$$\text{Vested Warrant Shares} = 6{,}755 * (x/555{,}555) * (y/6{,}755)$$

where:

$6{,}755$ = the Aggregate Maximum Series E Warrant Shares. [11]

$x$ = the Aggregate Exercised Series A Share Amount.

$555{,}555$ = the "Aggregate Exercisable Series A Warrant Shares."

$y$ = the Base Warrant Shares.

For illustration purposes, a pro forma capitalization table is set forth on Schedule 1 hereto showing the share ownership of the Company in the event of exercise of (i) all Series A Warrants, Series C Warrants and Series E Warrants and (ii) all Series A Warrants, Series B Warrants, Series C Warrants, Series D Warrants, Series E Warrants and Series F Warrants.  The Warrants may not be exercised in any manner other than as provided herein.

If this Warrant is automatically exercised, the Company or the Warrant Agent shall notify the Holder of the automatic exercise as soon as reasonably practicable, and the Holder shall surrender this Warrant Certificate to the Warrant Agent (as hereinafter defined), at the office of Mellon Investor Services LLC, or its successor as warrant agent (the "Warrant Agent") at the addresses specified on the reverse hereof and upon compliance with and subject to the conditions set forth herein and in the Warrant Agreement dated as of _____, 2009 (the "Warrant Agreement").  Capitalized terms used, but not otherwise defined, herein shall have the meaning ascribed to such terms in the Warrant Agreement.

The term "Holder" as used herein shall mean the person in whose name at the time this Warrant Certificate shall be registered upon the books to be maintained by the Warrant Agent for that purpose pursuant to Section 4.01 of the Warrant Agreement.

---

[9] Series F Warrant Agreement will state "Series D Warrants in conjunction with the exercise of Series B Warrants"

[10] Series F Warrant Certificate will refer to "Series D"

[11] The Aggregate Maximum Series F Warrant Shares will be 15,704

A-2

In case an exercise of Warrants is for a number of shares fewer than the number of Warrants evidenced by this Warrant Certificate, a new Warrant or Warrants of like tenor, calling in the aggregate on the face or faces of this Warrant Certificate or Warrant Certificates for the number of shares of Common Stock equal (without giving effect to any adjustment thereof) to the number of such shares called for on the face of the Warrant Certificate minus the number of such shares so exercised, shall be issued and delivered to the Holder or its registered assigns.

This Warrant Certificate is issued under and in accordance with the Warrant Agreement, between the Company and the Warrant Agent and is subject to the terms and provisions contained in the Warrant Agreement, to all of which terms and provisions the Holder of this Warrant Certificate consents by acceptance hereof.  Copies of the Warrant Agreement are on file at the above-mentioned office of the Warrant Agent.

After authentication by the Warrant Agent and prior to the expiration of this Warrant Certificate, this Warrant Certificate may be exchanged at the corporate trust office of the Warrant Agent for Warrant Certificates representing the same aggregate number of Warrants.

Neither this Warrant Certificate nor the Warrant evidenced hereby, shall, and nothing contained in the Warrant Agreement shall be construed to entitle the registered owner hereof, or any beneficial owner, to any of the rights of a registered holder or beneficial owner of the Warrant Shares, including, without limitation, the right to vote or to consent or to receive notice as a stockholder in respect of any meetings of stockholders for the election of directors of the Company or any other matter, to receive dividends on Warrant Shares or any rights whatsoever as stockholders of the Company.

Reference is hereby made to the further provisions of this Warrant Certificate set forth on the reverse hereof, which further provisions shall for all purposes have the same effect as if set forth at this place.

This Warrant Certificate shall not be valid or obligatory for any purpose until authenticated by the Warrant Agent.

A-3

IN WITNESS WHEREOF, the Company has caused this Warrant Certificate to be duly executed.

Dated:_____

HAYES LEMMERZ INTERNATIONAL, INC

By:_____

Attest:

_____

Certificate of Authentication

This is one of the Warrant Certificates referred to in the within-mentioned Warrant Agreement.

_____
MELLON INVESTOR SERVICES LLC,
        As Warrant Agent

By:_____
        Authorized Signature

A-4

[REVERSE] [FORM OF WARRANT CERTIFICATE]
(Instructions for Exercise of Warrants)

To receive a certificate for the Warrant Shares representing any exercised Warrants evidenced hereby, the Holder of this Warrant Certificate must complete the information required below and present in person or mail by registered mail this Warrant Certificate to the Warrant Agent at the addresses set forth below.

[FORM OF EXERCISE]
(To be executed upon exercise of Warrants.)

The undersigned hereby submits _____ Warrants, represented by this Warrant Certificate, in order to receive _____ shares of Class A Common Stock, par value $0.01 per share (the "Warrant Shares") of Hayes Lemmerz International, Inc.

The undersigned requests the shares of common stock, par value $0.01 per share (the "Warrant Shares") of Hayes Lemmerz International, Inc. to which the Holder is entitled (the "Vested Warrant Shares") be in fully registered form, in the authorized denominations, registered in such names and delivered, all as specified in accordance with the instructions set forth below.

If the Vested Warrant Shares is less than the maximum number of Warrant Shares subject to this Warrant Certificate, the undersigned requests that a new Warrant Certificate or Warrants of like tenor representing the remaining balance of the Warrants evidenced hereby be issued and delivered to the undersigned unless otherwise specified in the instructions below.

Dated:_____

Name_____
        (Please Print)

_____
(Insert Social Security or Other
Identifying Number of Holder)

Address _____
_____

Signature_____
        (Signed exactly as name appears
        on the other side of this Warrant
        Certificate)

This Warrant may be exercised at the following addresses:
        By hand at       _____
                         _____
                         _____

A-5

                                         _____

By mail at       _____

                                         _____

                                         _____

                                         _____

(Instructions as to form and delivery of Warrant Shares and/or Warrant Certificates):

**(NOTE:  The signature(s) must be medallion guaranteed by a commercial bank or trust company in the United States or by a member firm of the New York Stock Exchange)**

A-6

[FORM OF ASSIGNMENT]

(TO BE EXECUTED TO TRANSFER THE WARRANT CERTIFICATE)

FOR VALUE RECEIVED _____ hereby sells, assigns and transfers unto
Please insert social
security or other
identifying number)

_____

_____
(Please print name and address
including zip code)

_____
__ the right represented by the within Warrant Certificate and does hereby irrevocably constitute and appoint _____, Attorney, to transfer said Warrant Certificate on the books of the Warrant Agent with full power of substitution.

Dated: _____

_____
Signature
(Signed exactly as name appears on the other side of this Warrant Certificate)

Signature Guarantee:

_____
Participant in a recognized Signature Guarantee Medallion Program (or other signature guarantor program reasonably acceptable to the Warrant Agent)

**(NOTE:  The signature(s) must be medallion guaranteed by a commercial bank or trust company in the United States or by a member firm of the New York Stock Exchange)**

A-7

SCHEDULE 1

**HLI - Share Count Analysis**

*Scenarios Assume Cash Settlement of Exercised Warrants*

| | |
|---|---|
| **Shares Outstanding at Emergence** | **10,000,000** |
| **Shares Authorized** | **20,000,000** |

| | |
|---|---|
| **Tranche A Warrants** | **555,555** |
| **Tranche B Warrants** | **555,555** |

| | |
|---|---|
| Pre-petition debt held by DIP Lenders | $ 285,584,531 |
| Pre-petition Consenting Lenders | 192,432,416 |
| Pre-petition Non-Consenting Lenders | 28,324,933 |
| **Total Pre-Petition Debt** | **$ 506,341,880** |
| **Equity to Pre-petition Lenders Under Plan** | **4%** |

| | Emergence | | Exercise of Tranche A Only | | | | Exercise of Tranche A/B Warrants | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Pre Anti-Dilution | | Post Anti-Dilution | | Pre Anti-Dilution | | Post Anti-Dilution | |
| DIP Lenders | 8,450,000 | 84.50% | 8,450,000 | 80.05% | 8,450,000 | 79.43% | 8,450,000 | 76.05% | 8,450,000 | 74.86% |
| **Pre-Petition Lenders** | | | | | | | | | | |
| Pre-Petition Lender Consent Fee | 850,000 | 8.50% | 850,000 | 8.05% | 850,000 | 7.99% | 850,000 | 7.65% | 850,000 | 7.53% |
| Pre-Petition Consenting Lender Equity | 348,677 | 3.49% | 348,677 | 3.30% | 348,677 | 3.28% | 348,677 | 3.14% | 348,677 | 3.09% |
| Tranche C/D Anti-Dilution Warrants | 0 | 0.00% | 0 | 0.00% | 76,583 | 0.72% | 0 | 0.00% | 154,384 | 1.37% |
| Total Consenting Pre-Petition Lenders | 1,198,677 | 11.99% | 1,198,677 | 11.36% | 1,275,260 | 11.99% | 1,198,677 | 10.79% | 1,353,061 | 11.99% |
| Non-consenting Pre-Petition Lender Equity | 51,323 | 0.51% | 51,323 | 0.49% | 51,323 | 0.48% | 51,323 | 0.46% | 51,323 | 0.45% |
| Total Pre-Petition Lenders | 1,250,000 | 12.50% | 1,250,000 | 11.84% | 1,326,583 | 12.47% | 1,250,000 | 11.25% | 1,404,384 | 12.44% |
| **Foreign Creditor Distribution** | | | | | | | | | | |
| PBGC/Noteholders | 300,000 | 3.00% | 300,000 | 2.84% | 300,000 | 2.82% | 300,000 | 2.70% | 300,000 | 2.66% |
| Tranche A/B Warrants Exercised | 0 | 0.00% | 555,555 | 5.26% | 555,555 | 5.22% | 1,111,110 | 10.00% | 1,111,110 | 9.84% |
| Tranche E/F Anti-Dilution Warrants | 0 | 0.00% | 0 | 0.00% | 6,755 | 0.06% | 0 | 0.00% | 22,459 | 0.20% |
| Total Foreign Creditor Distribution | 300,000 | 3.00% | 855,555 | 8.11% | 862,310 | 8.11% | 1,411,110 | 12.70% | 1,433,569 | 12.70% |
| **Total Shares** | **10,000,000** | **100.00%** | **10,555,555** | **100.00%** | **10,638,893** | **100.00%** | **11,111,110** | **100.00%** | **11,287,953** | **100.00%** |