## Exhibit A

## Plan Proponents

| DEBTOR (Other names, if any, used by the Debtor in the last 6 years appear in brackets) | ADDRESS | CASE NO. | EID # | State of Incorporation |
|---|---|---|---|---|
| Hayes Lemmerz International, Inc. [HLI Holding Company, Inc. of Delaware, HLI Holding Company, Inc.] | 15300 Centennial Drive Northville, MI 48168 | 09-11655 (MFW) | 32-0072578 | Delaware |
| Hayes Lemmerz Finance LLC | 15300 Centennial Drive Northville, MI 48168 | 09-11656 (MFW) | 98-0537731 | Delaware |
| Hayes Lemmerz Finance LLC – Luxembourg, S.C.A. | Centre Mercure, 5th Floor 41 avenue de la Gare, 5ème Etage, L-1611 Luxembourg | 09-11657 (MFW) | 98-0537731 (USA) 2007 2300 646 (Luxembourg) | Luxembourg |
| Hayes Lemmerz International Import, Inc. [Hayes Lemmerz Aftermarket, Inc., Hayes Wheels Aftermarket, Inc., Hayes Wheels, Hayes Wheels International] | 15300 Centennial Drive Northville, MI 48168 | 09-11659 (MFW) | 38-3311655 | Delaware |
| Hayes Lemmerz International – California, Inc. [Hayes Wheels International - California, Inc., Hayes Wheels, Hayes Wheels International, Western Wheel] | 15300 Centennial Drive Northville, MI 48168 | 09-11660 (MFW) | 33-0042337 | Delaware |
| Hayes Lemmerz International – Commercial Highway, Inc. | 15300 Centennial Drive Northville, MI 48168 | 09-11661 (MFW) | 77-0597674 | Delaware |
| Hayes Lemmerz International – Georgia, Inc. [Hayes Wheels International – Georgia, Inc., Hayes Wheels, Hayes Wheels International, Western Wheel] | 15300 Centennial Drive Northville, MI 48168 | 09-11662 (MFW) | 58-2046122 | Delaware |
| Hayes Lemmerz International – Howell, Inc. [Hayes Wheels, Western Wheel, Hayes Lemmerz International – Michigan, Inc., Hayes Wheels International – Michigan, Inc., Hayes Wheels International] | 15300 Centennial Drive Northville, MI 48168 | 09-11664 (MFW) | 38-1799246 | Michigan |
| Hayes Lemmerz International – Huntington, Inc. [Hayes Lemmerz International – Indiana, Inc., Hayes Wheels International – Indiana, Inc., Hayes Wheels, Hayes Wheels International, Western Wheel] | 15300 Centennial Drive Northville, MI 48168 | 09-11665 (MFW) | 62-1240825 | Delaware |
| Hayes Lemmerz International – Kentucky, Inc. [Alumitech] | 15300 Centennial Drive Northville, MI 48168 | 09-11666 (MFW) | 61-1148246 | Delaware |
| Hayes Lemmerz International – Laredo, Inc. [CMI – Texas, Inc.] | 15300 Centennial Drive Northville, MI 48168 | 09-11667 (MFW) | 74-2418656 | Texas |
| Hayes Lemmerz International – New York, Inc. | 15300 Centennial Drive Northville, MI 48168 | 09-11668 (MFW) | 80-0369278 | New York |
| Hayes Lemmerz International – Sedalia, Inc. | 15300 Centennial Drive Northville, MI 48168 | 09-11669 (MFW) | 77-0597670 | Delaware |

| | | | | |
|---|---|---|---|---|
| Hayes Lemmerz International – Technical Center, Inc. [CMI – Tech Center, Inc., CMI – Engineering] | 15300 Centennial Drive Northville, MI 48168 | 09-11670 (MFW) | 38-2257519 | Michigan |
| Hayes Lemmerz International – Wabash, Inc. [CMI – Wabash Cast, Inc.] | 15300 Centennial Drive Northville, MI 48168 | 09-11671 (MFW) | 38-2170301 | Indiana |
| HLI Brakes Holding Company, Inc. | 15300 Centennial Drive Northville, MI 48168 | 09-11672 (MFW) | 32-0072575 | Delaware |
| HLI Commercial Highway Holding Company, Inc. | 15300 Centennial Drive Northville, MI 48168 | 09-11673 (MFW) | 35-2202828 | Delaware |
| HLI Netherlands Holdings, Inc. [Sandman Corporation] | 15300 Centennial Drive Northville, MI 48168 | 09-11674 (MFW) | 38-3640015 | Delaware |
| HLI Operating Company, Inc. [Hayes Wheels, Hayes Wheels International, Western Wheel] | 15300 Centennial Drive Northville, MI 48168 | 09-11675 (MFW) | 30-0167742 | Delaware |
| HLI Parent Company, Inc. | 15300 Centennial Drive Northville, MI 48168 | 09-11676 (MFW) | 61-1447832 | Delaware |
| HLI Powertrain Holding Company, Inc. | 15300 Centennial Drive Northville, MI 48168 | 09-11677 (MFW) | 30-0168269 | Delaware |
| HLI Realty, Inc. [T C Realty, Inc.] | 15300 Centennial Drive Northville, MI 48168 | 09-11678 (MFW) | 38-2781885 | Michigan |
| HLI Services Holding Company, Inc. | 15300 Centennial Drive Northville, MI 48168 | 09-11679 (MFW) | 61-1447840 | Delaware |
| HLI Suspension Holding Company, Inc. [CMI - Ventures, Inc., CMI International, Inc., Hayes Lemmerz International - CMI, Inc.] | 15300 Centennial Drive Northville, MI 48168 | 09-11680 (MFW) | 38-1650061 | Michigan |
| HLI Wheels Holding Company, Inc. | 15300 Centennial Drive Northville, MI 48168 | 09-11681 (MFW) | 38-367882 | Delaware |

A-3

## Exhibit B

## Summary of Long Term Incentive Plan

## *Summary of Potential Terms of Anticipated Long-Term Incentive Plan*

Set forth below is a summary of certain key terms and conditions of the anticipated LTI Plan (as defined below). The terms and conditions set forth below may be supplemented, amended, or modified prior to implementation and are in all cases subject to further negotiation and final documentation.

1. Plan Name:  The Debtors anticipate that the Board of Directors (the "Board") of the Reorganized Debtors (the "Company") will implement a Hayes Lemmerz International, Inc. Long-Term Incentive Plan (the "LTI Plan" or "Plan") after Company's chapter 11 reorganization plan is consummated and the Company emerges from its chapter 11 reorganization proceedings.

2. Plan Administrator:  The Compensation Committee of the Board, which shall consist solely of "non-employee directors" within the meaning of Rule 16b-3, is anticipated to be the Plan Administrator of the Plan.

3. Effective Date:  The Board or the Compensation Committee shall determine the effective date of the LTI Plan.

4. Participants:  It is anticipated that the LTI Plan would be available to officers, key employees and directors of the Company. Participation will be at the discretion of the Plan Administrator. For reference, approximately 65 of the Debtors' employees were eligible to participate in the Debtors' long term incentive plan prior to the commencement of the Debtors' chapter 11 cases.

5. Shares Available:  The Debtors anticipate that the LTI Plan would provide awards with respect to New Common Stock. The number of shares of New Common Stock available under the LTI Plan is to be determined.

6. Plan Objectives:  The Debtors expect that the LTI Plan would be designed to enhance shareholder value by linking long-term incentive compensation to the financial performance of the Company and to further align employees' financial rewards with the financial rewards realized by the Company and its shareholders. The Plan could also be a vehicle to attract and retain key personnel.

7. Plan Structure:  It is anticipated that the LTI Plan would be an equity-based compensation plan providing for awards to eligible participants, at the discretion of the Compensation Committee, in the form of stock options, stock appreciation rights, restricted stock or stock units, in each case, subject to vesting conditions.

8. Types of Stock Options:  It is anticipated that the LTI Plan may provide for grants of non-qualified stock options, which would not be intended to meet the requirements of Section 422 of the Internal Revenue Code.

## *Summary of Potential Terms of Anticipated Long-Term Incentive Plan*

9.  <u>Grants</u>:  Grants of awards would be made by the Compensation Committee of the Board. The Compensation Committee would set forth in any award agreements the terms and conditions of such grants that it deems appropriate, including but not limited to (a) exercise price, (b) vesting, including circumstances involving involuntary termination for cause and resignation for good reason, (c) duration of any stock options, (d) transferability of awards, (e) rights upon a change in control, and (f) other standard and customary provisions, including equitable adjustment to prevent dilution in the case of a recapitalization, stock split or other similar event.

10. It is anticipated that awards under the Plan will be subject to the terms and conditions of a Management Stockholders Agreement.

## Exhibit C

## Summary Description of the Terms of the New Common Stock

**LIMITED VOTING NEW COMMON STOCK**

The New Common Stock shall consist of a class of full-voting common stock (the "Full Voting New Common Stock") and a separate class of limited-voting common stock (the "Limited Voting New Common Stock"). Each entity that is to receive New Common Stock pursuant to the terms of the Plan Term Sheet shall have the option to choose to take its New Common Stock in the form of Full Voting New Common Stock or Limited Voting Common Stock.

Each share of Limited Voting New Common Stock will be convertible at the option of the holder, exercisable at any time, into one share of Full Voting New Common Stock.

The economic rights of the Full Voting New Common Stock and Limited Voting New Common Stock shall be identical. The Limited Voting New Common Stock will not be entitled to general voting rights, but will be entitled to vote (to the same extent that holders of Full Voting New Common Stock have the right to vote thereon) on an "as converted" basis (together with the holders of the Full Voting New Common Stock, as a single class) on certain non-ordinary course transactions, including (i) any authorization of, or increase in the number of authorized shares of, any class of capital stock ranking *pari passu* with or senior to the New Common Stock as to dividends or liquidation preference, including additional New Common Stock, (ii) any amendment to the Reorganized Company's certificate of incorporation or by-laws, (iii) any amendment to any shareholders agreement, (iv) any sale, lease or other disposition of all or substantially all of the assets of the Reorganized Company through one or more transactions, (v) any recapitalization, reorganization, consolidation or merger of the Reorganized Company, (vi) any issuance or entry into an agreement for the issuance of capital stock (or any options or other securities convertible into capital stock) of the Reorganized Company, except as may be provided for under any management incentive plan, and (vii) any redemption, purchase or other acquisition by the Reorganized Company of any of its capital stock (except for purchases from employees upon termination of employment).

The Limited Voting New Common Stock will be entitled to a separate class vote, on a majority basis, on any amendment or modification of any rights or privileges of the Limited Voting New Common Stock that does not equally affect the Full Voting New Common Stock. In any liquidation, dissolution or winding up of the Company, all assets will be distributed to holders of the New Common Stock on a pro rata basis.

## Exhibit D

## Amended Schedule of Retained Actions

**PLAN EXHIBIT D**

### Amended Schedule of Retained Actions

In accordance with section 1123(b)(3) of the Bankruptcy Code[1] and except as otherwise provided in the Plan, the Reorganized Debtors shall retain and may, in their sole discretion, enforce or prosecute all Retained Actions, including those set forth in the Plan and identified in this exhibit to the Plan. The Debtors or the Reorganized Debtors, in their sole and absolute discretion, will determine whether to bring, settle, release, compromise, or enforce such rights (or decline to do any of the foregoing). The Reorganized Debtors or any successors may prosecute (or decline to prosecute) such Retained Actions in accordance with the best interests of the Reorganized Debtors or any successors holding such rights of action. Except as otherwise provided herein, the failure of the Debtors to specifically list any Claim, right of action, suit or proceeding does not, and will not be deemed to, constitute a waiver or release by the Debtors of such claim, right of action, suit or proceeding, and the Reorganized Debtors will retain the right to pursue such claims, rights of action, suits or proceedings in their sole discretion and, therefore, no preclusion doctrine, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise) or laches will apply to such claim, right of action, suit or proceeding upon or after the confirmation or consummation of this Plan.

For the avoidance of any confusion, the Debtors and Reorganized Debtors expressly retain:

1.  any and all Claims, Causes of Action, rights of action, suits, and proceedings in favor of the Debtors arising under Chapter 5 of the Bankruptcy Code, and other similar avoidance actions available under applicable non-bankruptcy law, or any other provisions of the Bankruptcy Code; and

2.  all claims of the Debtors in the following litigation:

    (a)  Hayes Lemmerz International – Georgia, Inc. v. Punch International NV and Punch Property International NV, as reported in the United States District Court for the Northern District of Georgia, Case No.: 2 09-CV-0021;

    (b)  Punch International NV and Punch Property International NV v. Hayes Lemmerz International, Inc., as reported in the Commercial Court Antwerp, Belgium;

---

[1]    Capitalized terms used in this Exhibit and not otherwise defined have the meanings ascribed to such terms in the Plan.

(c)     HLI Operating Company, Inc. v. Diversified Machine, Inc., as reported in the Circuit Court of Wayne County, Michigan, Case No.: 09-006683-CZ;

(d)     HLI Suspension Holding Company, Inc. v. Diversified Machine, Inc., as reported in the Circuit Court of Wayne County, Michigan, Case No.: 09-006683-CZ;

(e)     Hayes Lemmerz International Inc. v. Charter Township of Northville, as reported in the Michigan Tax Tribunal, MTT Docket No. 0337525;

(f)     Hayes Lemmerz International – Georgia, Inc. v. Hall County Board of Tax Assessors, as reported in the Superior Court Hall County, Georgia, Case No. (Parcel No.) 2051721;

(g)     Hayes Lemmerz International, Inc. v. ACE American Insurance Company, as reported in the United States District Court of the Northern District of Indiana, Case No. 3:08-CV-288; and

(h)     Barnes & Thornburg LLP v. Hayes Lemmerz International, Inc. et al, as reported in the Allen Superior Court of Allen County, Indiana, Cause No. 02D01-0801-PL-8.

The Debtors reserve their right to modify this Exhibit.

D-3

772206-Chicago Server 2A - MSW

## Exhibit E

## Certificate of Incorporation for the Reorganized Company

**AMENDED AND RESTATED CERTIFICATE OF INCORPORATION**
**OF**
**HAYES LEMMERZ INTERNATIONAL, INC.**

Hayes Lemmerz International, Inc., a corporation organized and existing under the laws of the State of Delaware, hereby certifies as follows:

1.      The name of the corporation (hereinafter called the *"Corporation"*) is Hayes Lemmerz International, Inc.  The Corporation was originally incorporated under the name HLI Holding Company, Inc.  The date of filing the original Certificate of Incorporation of the Corporation with the Secretary of State of the State of Delaware was May 6, 2003.  The name of the Corporation was changed to Hayes Lemmerz International, Inc. pursuant to an Amendment to the Certificate of Incorporation filed with the Secretary of State of the State of Delaware on June 3, 2003.  The Certificate of Incorporation was further amended pursuant to an Amendment to the Certificate of Incorporation filed with the Secretary of State of the State of Delaware on May 15, 2007.

2.      On May 11, 2009, the Corporation and certain of its subsidiaries filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the *"Bankruptcy Code"*) in the United States Bankruptcy Court for the District of Delaware (the *"Bankruptcy Court"*).

3.      This Amended and Restated Certificate of Incorporation has been duly adopted in accordance with Section 245 and Section 303 of the General Corporation Law of the State of Delaware to put into effect and carry out the Plan of Reorganization under the Bankruptcy Code of the Corporation, et al., as confirmed on [____], 2009 by order (the *"Order"*) of the Bankruptcy Court.  Provision for the making of this Amended and Restated Certificate of Incorporation is contained in the Order of the Bankruptcy Court having jurisdiction under the Bankruptcy Code for the formation of the Corporation.

4.      The text of the Certificate of Incorporation of the Corporation is hereby amended and restated to read in its entirety as set forth on Exhibit A attached hereto and incorporated herein by this reference.

IN WITNESS WHEREOF, the undersigned has executed this Amended and Restated Certificate of Incorporation of Hayes Lemmerz International, Inc. as of the ___ day of [____], 2009.

HAYES LEMMERZ INTERNATIONAL, INC.

By: _____
    Name:
    Title:

## AMENDED AND RESTATED CERTIFICATE OF INCORPORATION

### OF

## HAYES LEMMERZ INTERNATIONAL, INC.

### ARTICLE I.

The name of the corporation is Hayes Lemmerz International, Inc. (the "*Corporation*").

### ARTICLE II.

The period of its duration is perpetual.

### ARTICLE III.

The purpose of the Corporation is to engage in any lawful act or activity for which corporations may be organized under the General Corporation Law of the State of Delaware (the "*DGCL*").

### ARTICLE IV.

The address of the Corporation's registered office in the State of Delaware is 2711 Centerville Road, Suite 400, City of Wilmington, County of New Castle. The name of the Corporation's registered agent at such address is Corporation Service Company.

### ARTICLE V.

Section 5.01.  Authorized Capital Stock.  The Corporation shall have the authority to issue an aggregate of 20,000,000 shares of common stock, par value $0.01 per share, of which (i) [_____] shares shall be designated "*Class A Common Stock*" (the "*Class A Common Stock*"), (ii) [_____] shares shall be designated "*Class B-1 Common Stock*" (the "*Class B-1 Common Stock*") and (iii) [_____] shares shall be designated "*Class B-2 Common Stock*" (the "*Class B-2 Common Stock*" and, together with the Class B-1 Common Stock, the "*Class B Common Stock*"). The Class A Common Stock, together with the Class B Common Stock, shall be referred to as "*Common Stock*" (the "*Common Stock*").

Section 5.02.  Section 1123.  The Corporation shall not issue any non-voting equity securities to the extent prohibited by Section 1123 of Title 11 of the United States Code (the "*Bankruptcy Code*") as in effect on the effective date of the Plan of Reorganization of Hayes Lemmerz International, Inc., et al., as confirmed on [_____], 2009 by an order of the United States Bankruptcy Court for the District of Delaware entered on [_____], 2009 (the "*Chapter 11 Plan*"); *provided, however,* that this Section 5.02: (a) shall have no further force and effect beyond that required under Section 1123 of the Bankruptcy Code, (b) shall have such force and effect, if any, only for so long as such section of the Bankruptcy Code is in effect and applicable to the Corporation, and (c) in all events may be amended or eliminated in accordance with applicable law as from time to time may be in effect.

Section 5.03.  Common Stock.  The relative powers, preferences, special rights, qualifications, limitations and restrictions granted to or imposed on the respective classes of the shares of the Common Stock are as follows:

(a)     Generally.  Each share of Class A Common Stock, Class B-1 Common Stock and Class B-2 Common Stock shall be identical and treated equally in all respects except as set forth in Sections 5.03(b) and 5.03(c) and as otherwise provided by law.  No stock dividend, stock split, combination or other similar recapitalization may be effected as to any class of Common Stock unless such action affects the Class A Common Stock, Class B-1 Common Stock and Class B-2 Common Stock on a *pari passu* basis.  The rights and privileges of the Class B-1 Common Stock or the Class B-2 Common Stock as set forth in this Section 5.03 shall not be amended, altered or repealed (whether by amendment or restatement or by merger, consolidation, business combination or otherwise) in any manner which does not equally affect the other classes of Common Stock without the affirmative vote of holders of a majority of the outstanding shares, voting as a separate class, of such class of Common Stock proposed to be affected.

(b)     Voting.

(i)     Each holder of Class A Common Stock shall be entitled to one vote in respect of each share of Class A Common Stock held of record on all matters submitted to a vote of stockholders.

(ii)     The shares of Class B-1 Common Stock and Class B-2 Common Stock shall not have voting rights except as provided by law and as provided in Section 5.03(b)(iii) below.  At any time the Class B-1 Common Stock or Class B-2 Common Stock is entitled to vote, such holders of Class B-1 Common Stock or Class B-2 Common Stock shall be entitled to one vote in respect of each share of Class B-1 Common Stock or Class B-2 Common Stock held of record.

(iii)     The Corporation shall not, and, as specified, shall not permit any of its subsidiaries to, take any of the following actions (whether by amendment or restatement of this Certificate of Incorporation or by merger, consolidation, business combination or otherwise) without first obtaining the affirmative vote or written consent of the holders of not less than a majority of the outstanding Class A Common Stock, Class B-1 Common Stock and Class B-2 Common Stock, voting together as a single class:

(1)     any authorization of, or increase in the number of authorized shares of, any class of capital stock ranking *pari passu* with or senior to the Common Stock as to dividends or liquidation preference, including additional Common Stock;

(2)     any amendment to this Certificate of Incorporation or the Corporation's Bylaws;

(3)     any amendment to the Stockholders Agreement among the Corporation and the stockholders party thereto, dated as of [_____], 2009;

(4)　　any change in the authorized number of directors of the Board to a number other than seven;

(5)　　any sale, lease or other disposition of all or substantially all of the assets of the Corporation through one or more transactions (for purposes of this Section 5.03(b)(iii)(5), any sale, lease or other disposition of assets of any subsidiary of the Corporation through one or more transactions will be deemed to be a sale, lease or disposition of assets of the Corporation if such sale, lease or disposition would constitute all or substantially all of the assets of the Corporation and its subsidiaries on a consolidated basis);

(6)　　any recapitalization, reorganization, consolidation or merger of the Corporation or any of its subsidiaries, other than recapitalizations, reorganizations, consolidations or mergers between the Corporation and any of its wholly owned subsidiaries or between any of the Corporation's wholly owned subsidiaries;

(7)　　any issuance or entry into an agreement for the issuance of any equity securities or any securities convertible or exercisable for equity securities (A) of the Corporation, which, in the aggregate with all other issuances permitted by this Section 5.03(b)(iii)(7), would exceed 750,000 shares (on an as converted basis) or (B) of any of its subsidiaries, except for (i) in the case of clause (A), the issuance of the Series A Warrants, Series B Warrants, Series C Warrants, Series D Warrants, Series E Warrants and Series F Warrants contemplated to be issued pursuant to the Plan, and any shares issued or issuable upon exercise thereof, (ii) in the case of clause (A), issuances of Common Stock or securities convertible or exercisable for Common Stock reserved for grant pursuant to any employee stock option plan, stock purchase plan, employee benefit plan, employment contract or any similar benefit or incentive program or agreement covering employees, consultants and directors of the Corporation and its subsidiaries approved by the board of directors, where the primary purpose of such plan, program or agreement is not to raise capital for the Corporation, and (iii) in the case of clause (B), any issuances between the Corporation and any of its wholly owned subsidiaries or between any of the Corporation's wholly owned subsidiaries;

(8)　　the initiation or completion of a public offering of the securities of the Corporation or of any of its subsidiaries; and

(9)　　any redemption, purchase or other acquisition by the Corporation or any of its subsidiaries' capital stock, except for (A) purchases approved or ratified by the board of directors, of Common Stock or securities convertible or exercisable for Common Stock from employees, consultants and directors of the Corporation upon termination of employment or affiliation and (B) purchases between the Corporation and any of its wholly owned subsidiaries or between any of the Corporation's wholly owned subsidiaries.

(c)      Conversion of Class B Common Stock. The holders of Class B Common Stock have conversion rights as follows:

(i)      Each share of Class B-1 Common Stock shall be convertible, at the option of the holder thereof, at any time and from time to time after the date of issuance of such share, and without the payment of additional consideration by the holder thereof, into one share of Class A Common Stock.

(ii)      Prior to the transfer of a share of Class B-2 Common Stock to a person who is a non-affiliate of the initial holder of record of such share (a "*Qualifying Transfer*"), such share of Class B-2 Common Stock shall not be convertible. At any time after a Qualifying Transfer, such share shall be convertible, at the option of the holder thereof, at any time and from time to time after the date of transfer of such share, and without the payment of additional consideration by the holder thereof, into one share of Class A Common Stock.

(iii)      Shares of Class B-1 Common Stock and any share of Class B-2 Common Stock that is convertible by the holder thereof by virtue of a Qualifying Transfer of such share shall be referred to herein as shares of "*Convertible Class B Common Stock.*" Before any holder of Convertible Class B Common Stock will be entitled to convert such holder's shares of Convertible Class B Common Stock into shares of Class A Common Stock and to receive certificates therefor, such holder shall either (A) surrender the certificate or certificates of such shares of Convertible Class B Common Stock, duly endorsed, at the office of the Corporation or of any transfer agent for the Convertible Class B Common Stock or (B) notify the Corporation or its transfer agent that such certificates have been lost, stolen or destroyed and execute an agreement satisfactory to the Corporation to indemnify the Corporation from any loss incurred by it in connection with such certificates, and shall give written notice to the Corporation that he elects to convert the same. The Corporation shall, as soon as practicable after such delivery, or after such agreement and indemnification, issue and deliver to such holder of Convertible Class B Common Stock, a certificate or certificates for the number of shares of Class A Common Stock to which the holder shall be entitled as aforesaid. Any declared but unpaid dividends on the Convertible Class B Common Stock to be converted shall remain payable to the holder after conversion thereof. Such conversion shall be deemed to have been made immediately prior to the close of business on the date of such surrender of the shares of Convertible Class B Common Stock to be converted, and the person or persons entitled to receive the shares of Class A Common Stock issuable upon such conversion shall be treated for all purposes as the record holder or holders of such shares of Class A Common Stock on such date; *provided, however,* that if the conversion is in connection with an underwritten offer of securities registered pursuant to the Securities Act of 1933, as amended, or a merger, sale, financing, or liquidation of the Corporation or other event, the conversion may, at the option of any holder tendering Convertible Class B Common Stock for conversion, be conditioned upon the closing of such transaction or upon the occurrence of such event, in which case the person(s) entitled to receive the Class A Common Stock issuable upon such conversion of the Convertible Class B Common Stock shall not be deemed to have converted such Convertible Class B Common Stock until immediately prior to the closing of such transaction or the occurrence of such event.

(iv)    The Corporation shall at all times when the Class B Common Stock shall be outstanding, reserve and keep available out of its authorized but unissued capital stock, for the purpose of effecting the conversion of shares of Convertible Class B Common Stock, such number of its duly authorized shares of Class A Common Stock as shall from time to time be sufficient to effect the conversion of all outstanding Class B Common Stock.

(v)    All shares of Convertible Class B Common Stock which shall have been surrendered for conversion as provided herein shall no longer be deemed to be outstanding and all rights with respect to such shares shall immediately cease and terminate upon conversion, except only the right of the holders thereof to receive shares of Class A Common Stock in exchange therefor and to receive payment of any dividends declared but unpaid thereon. Any shares of Convertible Class B Common Stock so converted shall become authorized but unissued shares of Class A Common Stock.

(d)    Dividends. The holders of Common Stock shall be entitled to receive dividends when and as declared by the board of directors out of funds legally available therefor. Holders of shares of Common Stock shall be entitled to share equally, share for share, in such dividends.

(e)    Liquidation. In the event of any liquidation, dissolution or winding up of the affairs of the Corporation, voluntary or involuntary, the assets of the Corporation available to stockholders shall be distributed equally per share to the holders of Common Stock.

## ARTICLE VI.

The business and affairs of the Corporation shall be managed by or under the direction of the board of directors, and the directors need not be elected by ballot unless required by the Bylaws of the Corporation. The number of directors of the Corporation shall be fixed from time to time in the manner set forth in the Corporation's Bylaws.

## ARTICLE VII.

A director shall have no liability to the Corporation or its stockholders for monetary damages for breach of fiduciary duty as a director, except for liability (i) for any breach of the director's duty of loyalty to the Corporation or its stockholder, (ii) for acts or omissions not in good faith or that involve intentional misconduct by the director, or a knowing violation of law by a director, (iii) under Section 174 of the DGCL or (iv) for any transaction from which the director derived any improper personal benefit. If the DGCL is hereafter amended to authorize corporate action further eliminating or limiting the personal liability of directors, then the liability of a director shall be eliminated or limited to the full extent permitted under the DGCL, as so amended. Any repeal or modification of this Article shall not adversely affect any right or protection of a director of the Corporation existing at the time of such repeal or modification for or with respect to an act or omission of such director occurring prior to such repeal or modification.

## ARTICLE VIII.

In furtherance and not in limitation of the powers conferred by the laws of the State of Delaware, the board of directors is expressly authorized to make, amend and repeal the Bylaws of the Corporation.

## ARTICLE IX.

The Corporation reserves the right to amend or repeal any provision contained in this Certificate of Incorporation in the manner from time to time prescribed by the laws of the State of Delaware. All rights herein conferred are granted subject to this reservation.

## ARTICLE X.

The Corporation expressly elects not to be governed by Section 203 of the DGCL.

## ARTICLE XI.

The Corporation renounces any interest or expectancy of the Corporation in, or in being offered an opportunity to participate in, any Excluded Opportunity. An *"Excluded Opportunity"* is any matter, transaction or interest that is presented to, or acquired, created or developed by, or which otherwise comes into the possession of, any director of the Corporation who is not an employee of the Corporation or any of its subsidiaries (a *"Covered Person"*), unless such matter, transaction or interest is presented to, or acquired, created or developed by, or otherwise comes into the possession of, a Covered Person expressly and solely in such Covered Person's capacity as a director of the Corporation.

NY1:# 3515461

7

## Exhibit F

## Bylaws for the Reorganized Company

## AMENDED AND RESTATED BYLAWS

## OF

## HAYES LEMMERZ INTERNATIONAL, INC.

### ARTICLE I
### OFFICE AND RECORDS

1.1    The principal office of the Corporation in the State of Delaware shall be located at 2711 Centerville Road, Suite 400, City of Wilmington, County of New Castle, and the name and address of its registered agent is Corporation Service Company.

1.2    The Corporation may have such other offices, either within or without the State of Delaware, as the Board of Directors may designate or as the business of the Corporation may from time to time require.

1.3    The books and records of the Corporation may be kept at the Corporation's principal executive office in 15300 Centennial Drive, Northville, Michigan 48168 or at such other locations outside the State of Delaware as may from time to time be designated by the Board of Directors.

### ARTICLE II
### MEETINGS OF STOCKHOLDERS

2.1    All annual meetings of the stockholders for the election of directors shall be held at such date, time and place either within or without the State of Delaware as may be designated from time to time by the Board of Directors and stated in the notice of the meeting or in a duly executed waiver of notice thereof.  Special meetings of stockholders for any other purpose may be held at such time and place, within or without the State of Delaware, as may be designated by the Board of Directors and stated in the notice of the meeting or in a duly executed waiver of notice thereof.

2.2    Whenever stockholders are required or permitted to take any action at a meeting, unless notice is waived as provided in Section 4.1, written notice of the meeting stating the place, date and hour of the meeting shall be given to each stockholder entitled to vote at such meeting either personally or by mail, not fewer than ten (10) nor more than sixty (60) days before the date of the meeting.  If mailed, notice shall be deemed given when deposited in the mail, postage prepaid, directed to the stockholder at his or her address as it appears on the records of the Corporation. Any previously scheduled meeting of the stockholders may be postponed by resolution of the Board of Directors upon public notice given prior to the time previously scheduled for such meeting of stockholders.

2.3     The officer who has charge of the stock ledger of the Corporation shall prepare and make, at least ten (10) days before every meeting of stockholders, a complete list of the stockholders entitled to vote at the meeting, arranged in alphabetical order, and showing the address of each stockholder and the number of shares registered in the name of each stockholder.  Such list shall be open to the examination of any stockholder, for any purpose germane to the meeting, during ordinary business hours, for a period of at least ten (10) days prior to the meeting, either at a place within the city where the meeting is to be held, which place shall be specified in the notice of the meeting, or, if not so specified, at the place where the meeting is to be held.  The list shall also be produced and kept at the time and place of the meeting during the whole time thereof, and may be inspected by any stockholder who is present.

2.4     A Special meeting of the stockholders, for any purpose or purposes, may be called only by the Chairman of the Board of Directors, by the President, by the Board of Directors or by one or more stockholders holding shares, in the aggregate, entitled to cast not less than ten percent (10%) of the votes at such meeting.  If any person(s) other than the Chairman of the Board or the Board of Directors calls a special meeting, the request shall:

    a.   be in writing;

    b.   specify the time of such meeting and the general nature of the business proposed to be transacted; and

    c.   be delivered personally or sent by registered mail or by facsimile transmission to the Chairman of the Board of Directors, the President or the Secretary of the Company.  The officer(s) receiving the request shall cause notice to be promptly given to the stockholders entitled to vote at such meeting, in accordance with these Bylaws, that a meeting will be held at the time requested by the person or persons calling the meeting.  No business may be transacted at such special meeting other than the business specified in such notice to stockholders.  Nothing contained in this paragraph of this Section 2.4 of these Bylaws shall be construed as limiting, fixing, or affecting the time when a meeting of stockholders called by action of the Board of Directors may be held.

2.5     The holders of a majority of the stock issued and outstanding and entitled to vote thereat, present in person or represented by proxy, shall constitute a quorum at all meetings of the stockholders for the transaction of business except as otherwise provided by the Delaware General Corporation Law ("DGCL"), the certificate of incorporation or these Bylaws.  If, however, such quorum shall not be present or represented at any meeting of the stockholders, the Chairman of the Board of Directors or other person acting as the Chairman of the meeting, or the Board of Directors, shall have the power to adjourn the meeting from time to time, without notice other than announcement at the meeting, until a quorum shall be present or represented.  At such adjourned meeting at which a quorum shall be present or represented, any business may be transacted that might have been transacted at the meeting as originally notified.  If the adjournment is for more than thirty (30) days, or if after the adjournment a new record date is fixed for the adjourned meeting, a notice of the adjourned meeting shall be given to each stockholder of record entitled to vote at the meeting.  The stockholders present at a duly organized meeting may continue to transact business until adjournment, notwithstanding the withdrawal of enough stockholders to leave less than a quorum.

2.6     Whenever directors are to be elected at a meeting, they shall be elected by a plurality of the votes cast at the meeting by the holders of stock entitled to vote, subject to the provisions of the Stockholders Agreement among the Corporation and the stockholders party thereto, dated as of [___], 2009, as may be amended from time to time (the "Stockholders Agreement"). Whenever any corporate action, other than the election of directors, is to be taken by vote of stockholders at a meeting, the vote of the holders of a majority of the stock having voting power present in person or represented by proxy shall decide any question brought before such meeting, unless the question is one upon which by express provision of the DGCL, the certificate of incorporation, the Stockholders Agreement or these Bylaws, a different vote is required, in which case such express provision shall govern and control the decision of such question.

2.7     Unless otherwise provided in the certificate of incorporation, each stockholder shall at every meeting of the stockholders be entitled to one vote in person or by proxy for each share of the capital stock having voting power held by such stockholder, but no proxy shall be voted on after three years from its date, unless the proxy provides for a longer period.  Every proxy shall be signed by the stockholder or by his duly authorized attorney.  Such proxy must be filed with the Secretary of the Corporation or his or her representative at or before the time of the meeting.

2.8     Unless otherwise provided in the certificate of incorporation, any action required to be taken at any annual or special meeting of stockholders of the Corporation, or any action which may be taken at any annual or special meeting of such stockholders, may be taken without a meeting, without prior notice and without a vote, if a consent in writing, setting forth the action so taken, shall be signed by the holders of outstanding stock having not less than the minimum number of votes that would be necessary to authorize or take such action at a meeting at which all shares entitled to vote thereon were present and voted.  Prompt notice of the taking of the corporate action without a meeting by less than unanimous written consent shall be given to those stockholders who have not consented in writing.

2.9     Upon demand of any stockholder entitled to vote at a meeting, the vote for directors or for any other matter at such meeting shall be by written ballot, but otherwise the method of voting and the manner in which votes are counted shall be discretionary with the presiding officer at the meeting.

### ARTICLE III
### DIRECTORS

3.1     The business, property and affairs of the Corporation shall be managed by or under the direction of the Board of Directors of the Corporation. The number of directors constituting the entire Board of Directors shall initially be seven (7) and may be increased or decreased from time to time by vote of a majority of the entire Board of Directors, subject to the certificate of incorporation and Section 2.4(a)(iv) of the Stockholders Agreement, except as provided in Section 3.2 of this Article; provided, however, that no decrease in the number of directors may shorten the term of any incumbent director.  Directors need not be stockholders.  The directors shall be elected to hold office for a term expiring at the annual meeting of stockholders held in the year following the year of their election, and until their successors are elected and qualified.

The provisions of this Article III shall be subject to the terms and conditions of the Stockholders Agreement.

3.2    Except as otherwise provided in the Stockholders Agreement, vacancies and newly created directorships resulting from any increase in the authorized number of directors may be filled by a majority of the directors then in office, though less than a quorum, or by a sole remaining director, and the directors so chosen shall hold office until the next annual election and until their successors are duly elected and shall qualify, unless sooner displaced. If there are no directors in office, then an election of directors may be held in the manner provided by the DGCL. Except as otherwise provided in the Stockholders Agreement, if, at the time of filling any vacancy or any newly created directorship, the directors then in office shall constitute less than a majority of the whole Board of Directors (as constituted immediately prior to any such increase), the Court of Chancery of the State of Delaware may, upon application of any stockholder or stockholders holding at least ten percent (10%) of the total number of the shares at the time outstanding having the right to vote for such directors, summarily order an election to be held to fill any such vacancies or newly created directorships, or to replace the directors chosen by the directors then in office.

3.3    The business of the Corporation shall be managed by or under the direction of its Board of Directors, which may exercise all such powers of the Corporation and do all such lawful acts and things as are not by law or by the certificate of incorporation or by these Bylaws directed or required to be exercised or done by the stockholders.

## MEETINGS OF THE BOARD OF DIRECTORS

3.4    The Board of Directors of the Corporation may hold meetings, both regular and special, either within or without the State of Delaware.

3.5    The first meeting of each newly elected Board of Directors shall be held at the same place and immediately following each annual meeting of stockholders, and no further notice thereof need be given other than this Bylaw.

3.6    Regular meetings of the Board of Directors may be held without notice at such time and at such place as shall from time to time be determined by the Board of Directors.

3.7    Special meetings of the Board of Directors may be called by the Chairman of the Board of Directors or by any two directors, at such time and place as shall be specified in the notice or waiver thereof. The person or persons authorized to call special meetings of the Board of Directors may fix the place and time of the meetings. Notice of any special meeting shall be given to each director at his or her business or residence. If mailed, such notice shall be deemed adequately delivered: (a) when personally delivered to the director to be notified; (b) when sent by confirmed facsimile to the director to be notified at a number previously identified by the director and currently on record with the Corporation; (c) when sent by email to the director to be notified at an email address previously identified by the director and currently on record with the Corporation; (d) three (3) business days after deposit in the United States mail postage prepaid by certified or registered mail return receipt requested and addressed to the director to be notified at an address previously identified by the director and currently on record with the

Corporation; or (e) one (1) business day after deposit with a national overnight delivery service, postage prepaid, addressed to the director to be notified at an address previously identified by the director and currently on record with the Corporation. Neither the business to be transacted at, nor the purpose of, any regular or special meeting of the Board of Directors need be specified in the notice of such meeting, except for amendments to these Bylaws provided under Section 8.1 of these Bylaws.

3.8     At all meetings of the Board of Directors a majority of the directors shall constitute a quorum for the transaction of business and the act of a majority of the directors present at any meeting at which there is a quorum shall be the act of the Board of Directors, except as may be otherwise specifically provided by law, the certificate of incorporation of these Bylaws. If a quorum shall not be present at any meeting of the Board of Directors, the directors present thereat may adjourn the meeting from time to time, without notice other than announcement at the meeting, until a quorum shall be present.

3.9     Unless otherwise restricted by the certificate of incorporation or these Bylaws, any action required or permitted to be taken at any meeting of the Board of Directors or of any committee thereof may be taken without a meeting, if all members of the Board of Directors or committee, as the case may be, consent thereto in writing, and the writing or writings are filed with the minutes of proceedings of the Board of Directors or committee.

3.10    Unless otherwise restricted by the certificate of incorporation or these Bylaws, members of the Board of Directors, or any committee designated by the Board of Directors, may participate in a meeting of the Board of Directors, or any committee, by means of conference telephone or similar communications equipment by means of which all persons participating in the meeting can hear each other, and such participation in a meeting shall constitute presence in person at the meeting.

## COMMITTEES OF THE BOARD OF DIRECTORS

3.11    The Board of Directors may designate one or more committees, each committee to consist of one or more of the directors of the Corporation. The Board of Directors may designate one or more directors as alternate members of any committee, who may replace any absent or disqualified member at any meeting of the committee.

3.12    In the absence or disqualification of a member of a committee, the member or members thereof present at any meeting and not disqualified from voting, whether or not he or they constitute a quorum, may unanimously appoint another member of the Board of Directors to act at the meeting in the place of any such absent or disqualified member.

3.13    Any such committee, to the extent provided in the resolution of the Board of Directors, shall have and may exercise all the powers and authority of the Board of Directors in the management of the business and affairs of the Corporation, and may authorize the seal of the Corporation to be affixed to all papers which may require it, except as otherwise may be provided by law. Unless the resolution of the Board of Directors expressly so provides, no such committee shall have the power or authority to declare a dividend or authorize the issuance of stock.

3.14   Each committee shall keep regular minutes of its meetings and report the same to the Board of Directors when required.

3.15   Any such committee may adopt rules governing the method of calling and time and place of holding its meetings.  Unless otherwise provided by the Board of Directors, a majority of any such committee (or the member thereof, if only one) shall constitute a quorum for the transaction of business, and the vote of a majority of the members of such committee present at a meeting at which a quorum is present shall be the act of such committee.  Any or all members of any such committee may be removed, with or without cause, by resolution of the Board of Directors.

### COMPENSATION OF DIRECTORS

3.16   Unless otherwise restricted by the certificate of incorporation or these Bylaws, the Board of Directors shall have the authority to fix the compensation of directors.  The directors may be paid their expenses, if any, of attendance at each meeting of the Board of Directors and may be paid a fixed sum for attendance at each meeting of the Board of Directors or a stated salary as director.  No such payment shall preclude any director from serving the Corporation in any other capacity and receiving compensation therefor.  Members of special or standing committees may be allowed like compensation for attending committee meetings.

### RESIGNATION AND REMOVAL OF DIRECTORS

3.17   Any director may resign at any time upon written notice to the Corporation.  Any such resignation shall take effect at the time specified therein or, if the time not be specified, upon receipt thereof, and the acceptance of such resignation, unless required by the terms thereof, shall not be necessary to make such resignation effective.

3.18   Unless otherwise restricted by the certificate of incorporation, these Bylaws or the Stockholders Agreement, any director or the entire Board of Directors may be removed, with or without cause, by the holders of a majority of shares entitled to vote at an election of directors.

### ARTICLE IV
### WAIVER OF NOTICE

4.1   Whenever any notice is required to be given to any stockholder or director of the Corporation under any provision of the DGCL or the certificate of incorporation or these Bylaws, a waiver thereof in writing, signed by the person or persons entitled to said notice, whether before or after the time stated therein, shall be deemed equivalent thereto.  In the case of a stockholder, such waiver of notice may be signed by such stockholder's attorney or proxy duly appointed in writing.  Attendance of a person at a meeting shall constitute a waiver of notice of such meeting, except when the person attends a meeting for the express purpose of objecting at the beginning of the meeting to the transaction of any business because the meeting is not lawfully called or convened.  Neither the business to be transacted at, nor the purpose of, any regular or special meeting of the stockholders, directors or members of a committee of directors needs to be specified in any written waiver of notice.

## ARTICLE V
## OFFICERS

5.1    The officers of the Corporation shall be chosen by the Board of Directors and shall include a Chairman of the Board, a Chief Executive Officer, a President, a Treasurer and a Secretary. The Board of Directors may also choose one or more Vice Presidents, one or more Assistant Secretaries and one or more Assistant Treasurers. Any number of offices may be held by the same person, unless the certificate of incorporation or these Bylaws otherwise provide. All officers chosen by the Board of Directors shall each have such powers and duties as generally pertain to their respective offices subject to the specific provisions of this Article V together with such other powers and duties as from time to time may be conferred by the Board of Directors and Committee thereof.

5.2    The Board of Directors at its first meeting after each annual meeting of stockholders shall choose a President, a Treasurer, and a Secretary and may choose Vice Presidents.

5.3    The Board of Directors may appoint such other officers and agents as it shall deem necessary who shall hold their offices for such terms and shall exercise such powers and perform such duties as shall be determined from time to time by the Board of Directors.

5.4    The salaries of all officers and agents of the Corporation shall be subject to the approval of the Board of Directors.

5.5    The officers of the Corporation shall hold office until their successors are chosen and qualify or until his or her death or resignation. Any officer elected or appointed by the Board of Directors may be removed at any time by the affirmative vote of a majority of the Board of Directors. Any vacancy occurring in any office of the Corporation shall be filled by the Board of Directors.

## THE CHAIRMAN OF THE BOARD

5.6    The Chairman of the Board shall preside at all meetings of the Board of Directors and of the stockholders at which he or she shall be present. He or she shall have and may exercise such powers as are, from time to time, assigned to him or her by the Board of Directors and as may be provided by law. The Chairman of the Board shall be responsible for the general management of the affairs of the Corporation, shall make reports to the Board of Directors and the stockholders and shall perform all duties incidental to such office which may be required by law and all such other duties as are properly required by the Board of Directors. Unless another person is chosen by the Board of Directors, so long as the President and Chief Executive Officer of the Company is a member of the Board of Directors, he or she shall serve as the Chairman of the Board. Except where by law the signature of the President is required, the Chairman of the Board shall possess the same power as the President to sign all certificates, contracts and other instruments of the Corporation which may be authorized by the Board of Directors. The Chairman of the Board shall see that all orders and resolutions of the Board of Directors and of any committee thereof are carried into effect.

## THE PRESIDENT AND VICE-PRESIDENTS

5.7    The President shall be the Chief Executive Officer of the Corporation and, if not serving as the Chairman of the Board, in the absence or inability to act of the Chairman of the Board he or she shall preside at all meetings of the stockholders and the Board of Directors and perform all duties of the Chairman of the Board. He or she shall act in a general executive capacity in the administration and operation of the Corporation's business and general supervision of its policies and affairs.

5.8    The President may sign, alone or with the Secretary or any other proper officer of the Corporation authorized by the Board of Directors, certificates, contracts and other instruments of the Corporation as authorized by the Board of Directors.

5.9    In the absence of the President or in the event of his or her inability or refusal to act, the Vice President, if any, (or in the event there be more than one Vice President, the Vice Presidents in the order designated by the directors, or in the absence of any designation, then in the order of their election) shall perform the duties of the President, and when so acting, shall have all the powers of and be subject to all the restrictions upon the President. The Vice Presidents shall perform such other duties and have such other powers as the Board of Directors may from time to time prescribe.

## THE SECRETARY AND ASSISTANT SECRETARY

5.10    The Secretary shall attend all meetings of the Board of Directors and all meetings of the stockholders and record all the proceedings of the meetings of the Corporation and of the Board of Directors in a book to be kept for that purpose, shall also record therein all action taken by written consent of directors in lieu of a meeting, and shall perform like duties for the standing committees when required. He or she shall give, or cause to be given, notice of all meetings of the stockholders and special meetings of the Board of Directors, and shall perform such other duties as may be prescribed by the Board of Directors or president, under whose supervision he or she shall be. He or she shall have custody of the corporate seal of the Corporation and he or she, or an Assistant Secretary, shall have authority to affix the same to any instrument requiring it and when so affixed, it may be attested by his or her signature or by the signature of such assistant secretary. The Board of Directors may give general authority to any other officer to affix the seal of the Corporation and to attest the affixing by his or her signature. He or she shall have charge of the stock ledger and such other books and papers as the Board of Directors may direct, but he or she may delegate responsibility for maintaining the stock ledger to any transfer agent appointed by the Board of Directors. He or she may have all such further powers and duties as generally are incident to the position of Secretary or as may be assigned to him or her by the President or the Board of Directors.

5.11    The Assistant Secretary, or if there be more than one, the Assistant Secretaries in the order determined by the Board of Directors (or if there be no such determination, then in the order of their election) shall, in the absence of the Secretary or in the event of his or her inability or refusal to act, perform the duties and exercise the powers of the Secretary and shall perform such other duties and have such other powers as the Board of Directors may from time to time prescribe.

## THE TREASURER AND ASSISTANT TREASURERS

5.12    The Treasurer shall have the custody of the corporate funds and securities and shall keep full and accurate accounts of receipts and disbursements in books belonging to the Corporation and shall deposit all moneys and other valuable effects in the name and to the credit of the Corporation in such depositories as may be designated by the Board of Directors. He or she may endorse all commercial documents requiring endorsements for or on behalf of the Corporation and may sign all receipts and vouchers for payments made to the Corporation.

5.13    He or she shall disburse the funds of the Corporation as may be ordered by the Board of Directors, taking proper vouchers for such disbursements, and shall render to the President and the Board of Directors, at its regular meetings, or when the Board of Directors so requires, an account of all his or her transactions as treasurer and of the financial condition of the Corporation. He or she may have all such further powers and duties as generally are incident to the position of the Treasurer or as may be assigned to him or her by the Chairman of the Board, the President or the Board of Directors.

5.14    The Assistant Treasurer, or if there shall be more than one, the Assistant Treasurers in the order determined by the Board of Directors (or if there be no such determination, then in the order of their election) shall, in the absence of the Treasurer or in the event of his or her inability or refusal to act, perform the duties and exercise the powers of the Treasurer and shall perform such other duties and have such other powers as the Board of Directors may from time to time prescribe.

5.15    In case of the absence of any officer of the Corporation, or for any other reason that the Board of Directors may deem sufficient, the Board of Directors may confer for the time being the powers or duties, or any of them, of such officer upon any other officer or upon any director.

## ARTICLE VI
## CERTIFICATES OF STOCK

6.1    Every holder of stock in the Corporation shall be entitled to have a certificate, signed by, or in the name of the Corporation by, the Chairman of the Board of Directors, the President or a Vice President, and the Treasurer or an Assistant Treasurer, or the Secretary or an Assistant Secretary of the Corporation, certifying the number of shares owned by him or her in the Corporation.

6.2    If the Corporation shall be authorized to issue more than one class of stock or more than one series of any class, the powers, designations, preferences and relative, participating, optional or other special rights of each class of stock or series thereof and the qualification, limitations or restrictions of such preferences and/or rights shall be set forth in full or summarized on the face or back of the certificate which the Corporation shall issue to represent such class or series of stock, provided that, except as otherwise provided in Section 202 of the General Corporation Law of the State of Delaware, in lieu of the foregoing requirements, there may be set forth on the face or back of the certificate which the Corporation shall issue to represent such class or series of stock, a statement that the Corporation will furnish without charge to each stockholder who so requests the powers, designations, preferences and relative, participating, optional or other

special rights of each class of stock or series thereof and the qualifications, limitations or restrictions of such preferences and/or rights.

6.3     Any of or all the signatures on the certificate may be facsimile. In case any officer, transfer agent or registrar who has signed or whose facsimile signature has been placed upon a certificate shall have ceased to be such officer, transfer agent or registrar before such certificate is issued, it may be issued by the Corporation with the same effect as if he or she were such officer, transfer agent or registrar at the date of issue.

## LOST CERTIFICATES

6.4     The Board of Directors may direct a new certificate or certificates to be issued in place of any certificate or certificates theretofore issued by the Corporation alleged to have been lost, stolen or destroyed, upon the making of an affidavit of that fact by the person claiming the certificate of stock to be lost, stolen or destroyed.   When authorizing such issue of a new certificate or certificates, the Board of Directors may, in its discretion and as a condition precedent to the issuance thereof, require the owner of such lost, stolen or destroyed certificate or certificates, or his or her legal representative, to advertise the same in such manner as it shall require and/or to give the Corporation a bond in such sum as it may direct as indemnity against any claim that may be made against the Corporation with respect to the certificate alleged to have been lost, stolen or destroyed.

## TRANSFER OF STOCK

6.5     Upon surrender to the Corporation or the transfer agent of the Corporation of a certificate or certificates for shares with an assignment and power of transfer endorsed thereon or attached thereto, duly executed, with such proof of the authenticity of the signature as the Corporation or its agents may reasonably require, the Corporation shall issue a new certificate to the person entitled thereto, cancel the old certificate and record the transaction upon its books.  The Board of Directors shall have the power to make all such rules and regulations, not inconsistent with the certificate of incorporation, these Bylaws, the Stockholders' Agreement and the DGCL, as the Board of Directors may deem appropriate concerning the issue, transfer and registration of certificates for stock of the Corporation.  The Board of Directors may appoint one or more transfer agents or registrars of transfers, or both, and may require all stock certificates to bear the signature of either or both.

## STOCKHOLDER RECORD DATE

6.6     In order that the Corporation may determine the stockholders entitled to notice of or to vote at any meeting of stockholder or any adjournment thereof, or to express consent to corporate action in writing without a meeting, or entitled to receive payment of any dividend or other distribution or allotment of any rights, or entitled to exercise any rights in respect of any change, conversion or exchange of stock or for the purpose of any other lawful action, the Board of Directors may fix, in advance, a record date, which shall not be more than sixty (60) nor less than ten (10) days before the date of such meeting, nor more than sixty (60) days prior to any other action.  If no record date is fixed by the Board of Directors, (l) the record date for determining stockholders entitled to notice of or to vote at a meeting of stockholders shall be at

the close of business on the day next preceding the date on which notice is given, or, if notice is waived, at the close of business on the day next preceding the day on which the meeting is held, and (2) the record date for determining stockholders for any other purpose shall be at the close of business on the day on which the Board of Directors adopts the resolution relating thereto. A determination of stockholders of record entitled to notice of or to vote at a meeting of stockholders shall apply to any adjournment of the meeting; provided, however, that the Board of Directors may fix a new record date for the adjourned meeting.

6.7    Only such stockholders as shall be stockholders of record on the date so fixed shall be entitled to notice of, and to vote at, such meeting and any adjournment thereof, or to receive payment of such dividend or other distribution, or to exercise such rights in respect of any such change, conversion or exchange of stock, or to participate in such action, as the case may be, notwithstanding any transfer of any stock on the books of the Corporation after any record date so fixed.

**ARTICLE VII**
**GENERAL PROVISIONS**

**CHECKS**

7.1    All checks or demands for money and notes of the Corporation shall be signed by such officer or officers or such other person or persons as the Board of Directors may from time to time designate.

**FISCAL YEAR**

7.2    The fiscal year of the Corporation shall be fixed by resolution of the Board of Directors.

**SEAL**

7.3    The Board of Directors may adopt a corporate seal having inscribed thereon the name of the Corporation, the year of its organization and the words "Corporate Seal, Delaware." The seal may be used by causing it or a facsimile thereof to be impressed or affixed or reproduced or otherwise.

**INDEMNIFICATION**

7.4    Each person who was or is made a party or is threatened to be made a party to or is otherwise involved in any action, suit or proceeding, whether civil, criminal, administrative or investigative ("Proceeding"), by reason of the fact that he or she or a person of whom he or she is the legal representative is or was a director or an officer of the Corporation or, while an officer of director of the Corporation is or was serving at the request of the Corporation as a director, officer, employee or agent of any other corporation or of a partnership, joint venture, trust or other enterprise, including service with respect to any employee benefit plan ("Indemnitee"), whether the basis of such Proceeding is alleged action in an official capacity as a director, officer, employee or agent or in any other capacity while serving as a director, officer, employee or agent, shall be indemnified and held harmless by the Corporation to the fullest extent authorized by the DGCL, as the same exists or may hereafter be amended (but, in the case of any

such amendment, only to the extent that such amendment permits the Corporation to provide broader indemnification rights than said law permitted the Corporation to provide prior to such amendment), against all expense, liability and loss (including, without limitation, attorneys' fees, judgments, fines, excise taxes or penalties under the Employee Retirement Income Security Act of 1974, as amended, and amounts paid or to be paid in settlement) reasonably incurred by such Indemnitee in connection therewith; provided, however, that except as provided in Section 7.6 with respect to Proceedings seeking to enforce rights to indemnification, the Corporation shall indemnify any such Indemnitee seeking indemnification in connection with a Proceeding (or part thereof) initiated by such Indemnitee only if such Proceeding (or part thereof) was authorized by the Board of Directors.  The Board of Directors may also provide the foregoing indemnification rights to employees and other agents of the Corporation, to the extent it deems appropriate and desirable, in its sole discretion.

7.5     The right to indemnification conferred in Section 7.4 shall include the right to be paid by the Corporation the expenses (including attorneys' fees) incurred in defending any such Proceeding in advance of its final disposition ("Advancement of Expenses"); provided, however, that, if the DGCL requires, an Advancement of Expenses incurred by an Indemnitee in his or her capacity as a director or officer (and not in any other capacity in which service was or is rendered by such Indemnitee, including, without limitation, service to an employee benefit plan) shall be made only upon delivery to the Corporation of an undertaking ("Undertaking"), by or on behalf of such Indemnitee, to repay all amounts so advanced if it shall ultimately be determined by final judicial decision from which there is no further right to appeal ("Final Adjudication") that such Indemnitee is not entitled to be indemnified for such expenses under this Section 7.5 or otherwise.  No director or officer shall be required to post any bond or provide any other security for any such repayment Undertaking.

7.6     If a claim under Section 7.4 or Section 7.5 is not paid in full by the Corporation within thirty (30) days after a written claim has been received by the Corporation, except in the case of a claim for an Advancement of Expenses, in which case the applicable period shall be twenty (20) days, the Indemnitee may at any time thereafter bring suit against the Corporation to recover the unpaid amount of the claim.  If successful in whole or in part in any such suit, or in a suit brought by the Corporation to recover an Advancement of Expenses pursuant to the terms of an Undertaking, the Indemnitee shall be entitled to be paid also the expense of prosecuting or defending such suit.  In (i) any suit brought by the Indemnitee to enforce a right to indemnification hereunder (but not in a suit brought by the Indemnitee to enforce a right of an Advancement of Expenses) it shall be a defense that, and (ii) in any suit brought by the Corporation to recover an Advancement of Expenses pursuant to the terms of an Undertaking, the Corporation shall be entitled to recover such expenses upon a Final Adjudication that, the Indemnitee has not met any applicable standard for indemnification set forth in the DGCL. Neither the failure of the Corporation (including its Board of Directors, independent legal counsel or stockholders) to have made a determination prior to the commencement of such action that indemnification of the Indemnitee is proper in the circumstances because the Indemnitee has met the applicable standard of conduct set forth in the DGCL, nor an actual determination by the Corporation (including its Board of Directors, independent legal counsel or stockholders) that the Indemnitee has not met such applicable standard of conduct, shall create a presumption that the Indemnitee has not met the applicable standard of conduct or, in the case of such a suit brought by the Indemnitee, be a defense to such suit.  In any suit brought by the Indemnitee to enforce a

right to indemnification or to an Advancement of Expenses hereunder, or brought by the Corporation to recover an Advancement of Expenses pursuant to the terms of an Undertaking, the burden of proving that the Indemnitee is not entitled to be indemnified, or to such Advancement of Expenses, under this Article VII or otherwise shall be on the Corporation.

7.7    The right to indemnification and the Advancement of Expenses conferred in this Article VII shall not be exclusive of any other right which any person may have or hereafter acquire under any statute, provision of the Certificate of Incorporation, provision of these Bylaws, agreement, vote of stockholders or disinterested directors or otherwise.

7.8    The Corporation may maintain insurance, at its expense, to protect itself and any director, officer, employee or agent of the Corporation or another corporation, partnership, joint venture, trust or other enterprise against any expense, liability or loss, whether or not the Corporation would have the power to indemnify such person against such expense, liability or loss under the DGCL.

7.9    The Corporation may, to the extent authorized from time to time by the Board of Directors, grant rights to indemnification, and rights to the Advancement of Expenses, to any employee or agent of the Corporation to the fullest extent of the provisions of this Article VII with respect to the indemnification and Advancement of Expenses of directors and officers of the Corporation.

7.10    The rights to indemnification and to the Advancement of Expenses conferred in Section 7.4 and Section 7.5 shall be contract rights and such rights shall continue as to an Indemnitee who has ceased to be a director, officer, employee or agent and shall inure to the benefit of the Indemnitee's heirs, executors and administrators.

7.11    The Corporation acknowledges that (i) certain persons employed by, otherwise affiliated with, or appointed by, a stockholder of the Corporation or any of its affiliates or any funds managed or advised by such stockholder or its affiliates may serve on the Board of Directors, or, at the request of the Corporation, on the board of directors or other governing body of another entity, and (ii) such directors may be entitled to, or may be provided, indemnification by such stockholder or its affiliates for certain expenses and liabilities for which such directors may also be entitled to seek indemnification from the Corporation pursuant to these Bylaws, pursuant to Section 145 of the DGCL or pursuant to indemnification agreements or other agreements between the Corporation and such directors (the "Company Indemnified Expenses"). The Corporation acknowledges and agrees that, as between the Corporation and its subsidiaries, on the one hand, and such stockholder and its affiliates (other than the Corporation and its subsidiaries), on the other hand, the Corporation shall be primarily liable to such directors with respect to any Company Indemnified Expenses and any liability of such stockholder or its affiliates to such directors shall be secondary liability. In recognition of the primary liability of the Corporation, the Corporation agrees that, in the event that such stockholder or any of its affiliates pays any Company Indemnified Expenses to or on behalf of any such director, reimburses any such director for any Company Indemnified Expenses paid by such director or advances amounts to any such director  (including by way of any loan) for the payment of Company Indemnified Expenses, then (i) the Corporation shall pay to such stockholder any amounts so paid, reimbursed or advanced, to the extent that any such director would have been

entitled to indemnification of such Company Indemnified Expenses and (ii) such stockholder shall be subrogated to all of the rights of such director with respect to any claim that the such director could have brought against the Corporation or any subsidiary with respect to any Company Indemnified Expenses that have been paid, reimbursed or advanced to or on behalf of such director. All such payments to such stockholder shall be made within five (5) business days of the receipt by the Corporation of written notice from such stockholder of such payment, reimbursement or advance, accompanied by documentation showing, in reasonable detail, the Company Indemnified Expenses so paid, reimbursed or advanced by such stockholder or any of its affiliates. The Company shall also reimburse such stockholder and its affiliates for all expenses, including legal expenses, incurred in enforcing this Section 7.11.

## ARTICLE VIII
## AMENDMENTS

8.1     These Bylaws may be altered, amended or repealed or new Bylaws may be adopted by the stockholders or by the Board of Directors, when such power is conferred upon the Board of Directors by the certificate of incorporation, at any regular meeting of the stockholders or of the Board of Directors or at any special meeting of the stockholders or of the Board of Directors if notice of such alteration, amendment, repeal or adoption of new Bylaws be contained in the notice of such special meeting. If the power to adopt, amend or repeal Bylaws is conferred upon the Board of Directors by the certificate or incorporation it shall not divest or limit the power of the stockholders to adopt, amend or repeal Bylaws.

## Exhibit G

## Initial Directors and Officers of the Reorganized Debtors

PLAN EXHIBIT G

**Initial Directors and Officers of the Reorganized Debtors**

Initial Directors of the Reorganized Debtors

Pursuant to Section 6.6 of the Plan, the initial board of directors of Reorganized Hayes will consist of seven (7) directors. The initial board of directors of Reorganized Hayes will include Curtis Clawson, the Debtors' current Chief Executive Officer (or in the event of his death, incapacity, resignation or dismissal, the chief executive officer of Reorganized Hayes). The remaining six (6) members of the initial board of directors of Reorganized Hayes will be selected by the Requisite DIP Lenders, in their sole discretion.

In accordance with Section 6.6 of the Plan the Requisite DIP Lenders have designated the directors set forth in the table below to serve on the initial board of directors of Reorganized Hayes. The existing directors of each Subsidiary Debtor shall remain in their capacities as director of the applicable Reorganized Subsidiary Debtor.

| Name | Background | Appointed by |
|------|-----------|--------------|
| Curtis Clawson | Mr. Clawson has held the positions of President, Chief Executive Officer and Chairman of the Board of Directors of Hayes Lemmerz International, Inc. prior and during its reorganization. He has held such positions since August 2001 (President and Chief Executive Officer) and September 2001 (Chairman). Most recently, from 1999 to July 2000, Mr. Clawson was President and Chief Operating Officer of American National Can, a $2.5 billion NYSE traded manufacturing company. Mr. Clawson has over 17 years of experience in the automotive industry. He began his career in automotive-related businesses at Arvin Industries where he spent 9 years, from 1986 to 1995, including (I) a position as General Manager of the business unit that supplied Arvin exhaust products, (ii) tenures in sales and marketing, and (iii) tenures in production and plant management. From 1995 until the time that he joined American National Can, Mr. Clawson worked for Allied Signal, Inc. as President of Alien's Filters (Farm) and Spark Plugs (Autoclave) Group, a $500 million automotive components business, and then President of Alien's Laminate Systems Group. Mr. Clawson earned his Bachelor of Science and Bachelor of Arts degrees from Purdue University and Master's of Science degree in Business Administration from Harvard University Business School. He is fluent in Spanish and French. | N/A |

| Name | Background | Appointed by |
|---|---|---|
| Timothy J. Bernlohr | Mr. Bernlohr is a Managing Director with TJB Management Consulting, LLC which specializes in providing project specific consulting services to businesses in transformation, strategic planning, and interim executive management. Prior to 2006, Mr. Bernlohr was President and CEO of RBX Industries, Inc. Mr. Bernlohr presently serves as Chairman of the Board of Directors of The Manischewitz Company and Cuisine Innovations, as Director of Cadence Innovation, LLC, Zemex Minerals Inc., General Insulation Co., Inc., Bally Total Fitness, Atlas Air World Wide Holdings, Inc., Trident Resources Corporation, Inc., Nybron Flooring International Corp, and BEIM Technologies, Inc. | Requisite DIP Lenders |
| James N. Chapman | Mr. Chapman is non-executive Vice Chairman of SkyWorks Leasing, LLC, which is an aircraft management services company. Prior to joining SkyWorks Leasing, LLC, he was associated with Regiment Capital Advisors, LP, an investment advisor specializing in high yield investments. Mr. Chapman has over 24 years of investment banking experience in a wide range of industries including aviation/airlines, metals, mining, automotive/general manufacturing, financial services, real estate and healthcare. Mr. Chapman received an MBA degree with distinction from Dartmouth College and was elected an Edward Tuck Scholar. He received his BA degree, with distinction, *magna cum laude*, at Dartmouth College and was elected Phi Beta Kappa, in addition to being a Rufus Choate Scholar. | Requisite DIP Lenders |
| Gladino Claro | Mr. Claro is Executive Vice President of Aleris International, Inc. and Chief Executive Officer of Aleris Americas. Prior to joining Aleris International, Inc., he was President and Chief Executive Officer of Heico Metals Processing Group of Heico Companies, LLC. Mr. Claro receive a degree in Mechanical Engineering from University of Taubate, Sao Paulo, Brazil in 1982. | Requisite DIP Lenders |
| Bob Dover | Mr. Dover is a consultant and advisor to many national and international businesses. Mr. Dover is Chairman of Inter City Group and a Board Member of Jaguar Daimler Heritage Trust, SinterCast AB, and Zeroshift Ltd. Mr. Dover's prior experience includes being Chairman and Chief Executive Officer of Jaguar Land Rover, Land Rover, and Aston Martin Lagonda, Ltd. He received an Honorary Doctor of Science from Warwick and an Honorary Doctor of Technology from Coventry. | Requisite DIP Lenders |

| Name | Background | Appointed by |
|------|-----------|-------------|
| George T. Haymaker, Jr. | Mr. Haymaker has served as a Director of Hayes Lemmerz International, Inc. since 2003 and serves as the Lead Director. Mr. Haymaker served as non-executive Chairman of the Board of Kaiser Aluminum Corporation from October 2001 through June 2006. Mr. Haymaker served as Chairman of the Board and Chief Executive Officer of Kaiser Aluminum Corporation from January 1994 until January 2000, and as non-executive Chairman of the Board of Kaiser Aluminum Corporation from January 2000 through May 2001. From May 1993 to December 1993, Mr. Haymaker served as President and Chief Operating Officer of Kaiser Aluminum Corporation. Mr. Haymaker is also a director of Pool Corporation, a distributor of swimming pool products. Mr. Haymaker received a MBA from the University of Southern California. He received his MS degree in Industrial Management and his BS degree in metallurgy from the Massachusetts Institute of Technology. | Requisite DIP Lenders |
| Henry D.G. Wallace | Mr. Wallace has served as a Director of Hayes Lemmerz International, Inc. since 2003. Mr. Wallace was previously employed by Ford Motor Company from 1971–2001. Mr. Wallace's last position with Ford was as the Group Vice President, Mazada & Asia Pacific Operations. Before serving Ford in this capacity Mr. Wallace occupied a number of different positions, many of which were financial in nature, including but not limited to: Group Vice President and Chief Financial Officer (2000); Vice President, European Strategic Planning and Chief Financial Officer, Ford of Europe, Inc. (1997); Treasurer, Ford of Europe, Inc. (1989); and various financial management positions within Ford of Europe, Inc. Mr. Wallace received a BA in Economics from the University of Leicester. | Requisite DIP Lenders |

## Initial Officers of the Reorganized Debtors

The existing Officers or managing members of the Debtors shall remain in their current capacities as officers or managing members of the Debtors, subject to the ordinary rights and powers of the board of directors or equityholders, as the case may be, to replace them. The existing Officers or managing members of the Debtors are: Curtis J. Clawson as President and Chief Executive Officer; Fred Bentley as Chief Operating Officer and President, Global Wheel Group; Mark Brebberman as Vice President and Chief Financial Officer; Patrick C. Cauley as Vice President, General Counsel and Secretary; and John A. Salvette as Vice President, Business Development.

## Exhibit H

## Form of Executive Employment Agreements

**H-1 Curtis J. Clawson, President and Chief Executive Officer**

<u>EMPLOYMENT AGREEMENT</u>

THIS EMPLOYMENT AGREEMENT (the "<u>Agreement</u>") is made as of the [   ] day of [_____], 2009, by and between Hayes Lemmerz International, Inc. (the "<u>Company</u>") and Curtis J. Clawson (the "<u>Executive</u>").

**PRELIMINARY STATEMENTS**

A.   The Executive currently serves as the Company's Chief Executive Officer, pursuant to an employment agreement dated September 26, 2001, as amended thereafter (the "<u>Original Agreement</u>").

B.   The Company desires to continue to employ Executive as Chief Executive Officer, and the Executive desires to continue to be employed by the Company in said capacity; and

C.   Each party desires to set forth in writing the terms and conditions of their understandings and agreements.

**NOW, THEREFORE**, in consideration of the mutual covenants and obligations contained herein, the Company hereby agrees to employ the Executive and the Executive hereby accepts such employment upon the terms and conditions set forth in this Agreement, which shall take effect on the plan effective date (the "<u>Effective Date</u>") of the Joint Plan of Reorganization of Hayes Lemmerz International, Inc. and its Affiliated Debtors and Debtors-In Possession, dated as of September 2, 2009 (as the same may be amended or modified, the "<u>Plan of Reorganization</u>"). In the event the Plan of Reorganization does not become effective, this Agreement shall be of no force and effect.

**STATEMENT OF AGREEMENT**

1.   <u>Employment</u>. The Company agrees to employ the Executive and the Executive agrees to be employed on a full-time basis by the Company for the period and upon the terms and conditions hereinafter set forth.

2.   <u>Term; Employment Period</u>. The term of this Agreement (the "<u>Term</u>") shall be two years, commencing on the Effective Date; provided, however, that commencing on the second day of the Term and each day thereafter, the Term shall automatically be extended for one additional day. The period during which the Executive is employed by the Company pursuant to this Agreement is referred to herein as the "<u>Employment Period</u>." The date on which the termination of the Executive's employment hereunder shall become effective is referred to herein as the "<u>Termination Date</u>."

3.   <u>Position and Duties</u>. During the Employment Period, the Executive shall serve as the President and Chief Executive Officer of the Company and shall have such responsibilities, duties and authority as are customarily associated with such position and shall exercise such responsibilities, duties and authority consistent with the foregoing as the Company's Board of Directors (the "<u>Board</u>") shall determine from time to time. During the Employment Period, the Executive shall report to the Board. It is the intention of the parties that,

during the Term, Executive shall be nominated, and following his election or appointment, shall serve, as the chairman of the Board; provided, however, that the Executive shall resign as the chairman of the Board immediately if his employment hereunder is terminated for any reason. The Executive shall devote substantially all his working time and efforts to the business and affairs of the Company and shall use his best efforts to carry out his responsibilities faithfully and efficiently in a professional manner. Notwithstanding the foregoing, it is understood that the Executive may with the prior consent of the Board, which shall not be unreasonably withheld, serve on the board of directors of up to three for-profit business enterprises. It is further understood that during the Employment Period, subject to any conflict of interest policies of the Company and Section 8, the Executive may (x) serve in any capacity with any civic, charitable, educational or professional organization provided that such service does not materially interfere with his duties and responsibilities hereunder and (y) make and manage personal investments of his choice.

        4.      Place of Performance. During the Employment Period, the Executive's place of performance of his services shall be at the Company's Northville, Michigan headquarters, except for required travel by the Executive on the Company's business or as may be reasonably required by the Company.

        5.      Compensation and Benefits.

        (a)      Salary. During the Employment Period, the Company shall pay to the Executive an initial annual base salary of Eight Hundred Twenty-Four Thousand Dollars ($824,000) (the "Base Salary"), such salary to be paid in periodic installments in accordance with the Company's payroll practices as in effect from time to time. The Base Salary shall be reviewed annually by the compensation committee of the Board and may be increased from time to time in accordance with normal business practices of the Company and, if so increased, shall not thereafter be reduced.

        (b)      Cash-Based Incentives. Following the expiration of the KEIP (as defined below) and during the Employment Period, the Executive shall be eligible to earn an annual bonus under the Company's Short-Term Incentive Plan, or a successor plan thereto, as in effect from time to time (the "Incentive Plan"), up to a maximum of two hundred percent (200%) of his Base Salary, subject to achievement of performance goals determined by the Board after consultation with the Executive in accordance with the terms of the Incentive Plan (such annual bonus, the "Annual Bonus").

        (c)      Equity Based Incentives. In accordance with the Plan of Reorganization, the Board shall establish a long term equity incentive program ( the "LTIP"). The Executive shall be entitled to participate in the LTIP and shall receive awards under the LTIP which are no less than commensurate in value with awards received by other executives participating in the LTIP.

        (d)      Key Employee Incentive Plan. The Executive shall participate in the Company's Key Employee Incentive Plan (the "KEIP"), in accordance with its terms, and as approved by the "Bankruptcy Court" in connection with the "Restructuring" (as each such term is defined in the KEIP). If the KEIP is not approved by the Bankruptcy Court prior to the

2

Effective Date, the Executive shall be entitled to payments under this Agreement in the amounts and under the terms and conditions set forth in the Company's Motion for Order Approving the Implementation of Key Employee Incentive Plan and Short Term Incentive Plan filed with the Bankruptcy Court on July 29, 2009.

(e)    Expenses. During the Employment Period, the Company shall promptly reimburse the Executive for all reasonable out-of-pocket expenses incurred by the Executive in connection with the business of the Company and the performance of his duties under this Agreement in accordance with the terms of the Company's policies as in effect from time to time.

(f)    Benefit Plans. During the Employment Period, the Executive shall be entitled to participate in all of the employee benefit plans, programs, agreements and arrangements (including without limitation the supplemental executive retirement plan) generally provided to senior executives of the Company, as such are in effect from time to time, on a basis no less favorable than that provided to such senior executives.

(g)    Perquisites. During the Employment Period, the Executive shall be entitled to a Company car, and an annual executive physical examination, each such perquisite to be paid or provided commensurate with his position and in accordance with the Company's policies as in effect on the Effective Date. In addition, the Company shall pay Executive an annual flexible benefits allowance (the "Flexible Benefits Allowance") of Forty Thousand Dollars ($40,000), such allowance to be paid in periodic installments in accordance with the Company's payroll practices as in effect from time to time. The Flexible Benefits Allowance shall be reviewed annually by the Compensation Committee of the Board and may be increased from time to time and, if so increased, shall not thereafter be reduced.

(h)    Vacations. During the Employment Period, the Executive shall be entitled to vacation time, paid holidays and personal days, determined in accordance with the Company's policy with respect to its senior executives as in effect from time to time, it being understood that the Executive shall be entitled to not less than four weeks' vacation in any 12-month period during the Employment Period.

6.    Termination of Employment.

(a)    Accrued Benefits. In the event of the termination of the Executive's employment hereunder for any reason during the Term, the Executive (or his estate or representative, as applicable) shall be entitled to receive any Base Salary, Annual Bonus, vacation time and expenses that have in each case accrued but are unpaid as of the Termination Date, as well as any post-termination benefits (including but not limited to vested awards under the LTIP) to which he may be entitled pursuant to the Company's retirement, insurance and other benefit plans, programs and arrangements as in effect immediately prior to the Termination Date (the "Accrued Benefits").

(b)    Death. The Executive's employment hereunder shall terminate as of the date of his death. Upon the termination of the Executive's employment hereunder because of his death and during the Term, the Executive's estate or representative, as the case may be,

3

shall be entitled to receive the Accrued Benefits and a lump sum payment in cash equal to (i) one year's Base Salary as in effect on the Termination Date and (ii) the product of (x) sixty percent (60%) of the Base Salary as in effect on the Termination Date, multiplied by a fraction (y) the numerator of which shall be the number of months (including fractions thereof) worked by the Executive during the Company's fiscal year in which the Termination Date occurs and (z) the denominator of which shall be the number 12 (such amount under this clause (ii), the "Pro Rata Annual Bonus"). Such amounts shall be paid as soon as administratively feasible following the Executive's death but in no event later than April 15 of the calendar year following the Executive's death. In addition, those immediate family members who were participating in the Company's medical benefit plan as of the date of the Executive's death shall continue to participate in the Company's medical benefit plan at active employee contribution rates for the one-year period immediately following the date of the Executive's death.

(c)   Disability. The Executive's employment hereunder may be terminated during the Term if the Executive is incapable of performing his principal duties hereunder because of physical or mental incapacity for a period of 45 consecutive working days or for more than 90 working days in any 12-month period ("Disability"). In the event that the Executive's employment is to be terminated pursuant to this Section 6(c), (i) this Agreement shall terminate on the date specified in the notice of termination delivered to the Executive (subject to Section 8(g) and Section 18); (ii) the Executive shall as of such date resign from all of his positions, duties and authorities hereunder; (iii) the Executive shall be placed on a medical leave of absence until the earlier of (A) expiration of the six-month period commencing on the date his medical leave of absence began, unless there is no reasonable expectation that the Executive will return to employment with the Company, in which case the date the Executive ceases performing services for the Company, (B) the date he qualifies for benefits under the Company's long-term disability plan or (C) the date he is able to return to work; and (iv) the Executive shall continue to be paid his Base Salary until such medical leave of absence ends. In the case of a termination of the Executive's employment pursuant to this Section 6(c), for purposes of calculating benefits pursuant to clauses (B) and (C) below, the Termination Date shall be the date upon which the Executive's medical leave of absence commences, and for all other purposes, the Termination Date shall be the date upon which the Executive's medical leave of absence ends. In the event the Executive's employment is terminated pursuant to this Section 6(c), the Executive (or his representative, as applicable) shall be entitled to: (A) the Accrued Benefits; (B) payments in cash equal to one year's Base Salary and Flexible Benefits Allowance as in effect on the Termination Date; (C) the Pro Rata Annual Bonus; and (D) the continuation of health and welfare benefits at the levels in effect as of the Termination Date at no additional cost to the Executive than that which was in effect as of the Termination Date for the one-year period immediately following the Termination Date; provided, however, that such benefits shall be reduced to the extent comparable benefits are made available to the Executive from a successor employer, and the Executive shall be obligated to report such benefits to the Company. The amounts payable pursuant to clauses (B) and (C) of the preceding sentence shall be paid, subject to Section 22 hereof, in twelve equal monthly payments commencing on the first day of the month following the Executive's Termination Date. It is acknowledged and agreed by the Executive that he shall be precluded from terminating his employment hereunder for Good Reason in the event that his employment hereunder is terminated pursuant to this Section 6(c).

4

(d)     For Cause; Without Good Reason.  The Executive's employment hereunder may be terminated during the Term (i) by the Company for Cause (as defined below) or (ii) by the Executive without Good Reason (as defined below).  In the event that the Company terminates the Executive's employment hereunder for Cause, the Termination Date shall be the date specified in the notice of termination for Cause delivered by the Company to the Executive.  In the event that the Executive terminates his employment hereunder without Good Reason, the Termination Date shall be no earlier than 30 days following the date on which a notice of termination is delivered by the Executive to the Company.  In the event that the Executive's employment hereunder is terminated pursuant to this Section 6(d), the Executive shall be entitled to the Accrued Benefits.

(e)     Without Cause; For Good Reason; Change in Control.  The Executive's employment hereunder may be terminated during the Term (i) by the Company without Cause, (ii) by the Executive for Good Reason or (iii) by the Executive for any reason during the three-month period immediately following a Change in Control.  In the event that the Executive's employment is terminated pursuant to this Section 6(e) (whether by the Company or by the Executive), the Termination Date shall be no earlier than 30 days following the date on which a notice of termination is delivered by one party to the other.  In the event that the Executive's employment is terminated pursuant to this Section 6(e), the Executive (or his estate or representative, as the case may be) shall be entitled to receive the Accrued Benefits, and the other payments and benefits set forth in this Section 6(e).  The Executive (or his estate or representative, as the case may be) shall be entitled to payments in cash equal to two times the sum of the Flexible Benefits Allowance and one hundred and sixty percent (160%) of the Base Salary as in effect on the Termination Date.  The benefits described in the preceding sentence shall be paid, subject to Section 22 hereof, in twenty four equal monthly payments commencing on the first day of the month following the Executive's Termination Date.  The Executive shall be entitled for two years following the Termination Date to executive level career outplacement services by a firm selected by the Executive and paid for as incurred by the Company.  In addition, for the first eighteen months following the Termination Date, the Executive shall receive continuation of health and welfare benefits at the levels in effect as of the Termination Date at no additional cost to the Executive than that which was in effect as of the Termination Date; provided, that such benefits shall be reduced to the extent comparable benefits are made available to the Executive from a successor employer, and the Executive shall be obligated to report such benefits to the Company.  If the Executive is not receiving accident and health insurance coverage from another employer at the end of such eighteen month period at the levels in effect as of the Termination Date, the Company shall pay the Executive a lump sum amount equal to six times the monthly COBRA health benefit continuation premium for the Executive's coverage under the Company's accident and health insurance coverage.

(f)     Definition of "Cause", "Good Reason" and "Change in Control."

For purposes of this Agreement, "Cause" means:  (i) the willful failure of the Executive to perform his material duties with the Company which have been duly assigned to the Executive and which duties are commensurate with those of the position for which Executive is then employed, and which failure is not cured (if capable of cure) within 15 days after receipt of written notice of such failure, which notice identifies the manner in which the Executive has willfully failed to perform, (ii) the engaging by the Executive in willful conduct which is

5

demonstrably injurious to the Company, monetarily or otherwise, (iii) the conviction of the Executive of any crime or offense constituting a felony, (iv) the conviction of the Executive for a violation of criminal law involving the Company and its business or (v) a failure by the Executive to comply with any material provision of this Agreement, which failure is not cured (if capable of cure) within 15 days after receipt of written notice of such non-compliance by the Executive. Termination of the Executive for Cause shall mean termination by action of at least a majority of the Company's Board of Directors, at a meeting duly called and held upon at least 15 days' written notice to the Executive specifying the particulars of the action or inaction, alleged to constitute Cause and at which meeting the Executive and his counsel were entitled to be present and given adequate opportunity to be heard. For purposes of clauses (i) and (ii) of this definition, action or inaction by the Executive shall not be considered "willful" unless done or omitted by him (A) intentionally or not in good faith and (B) without reasonable belief that his action or inaction was in the best interest of the Company, and shall not include failure to act by reason of total or partial incapacity due to physical or mental illness.

For purposes of this Agreement, "Good Reason" means the occurrence of one or more of the following events: (i) a material adverse alteration in the nature or status of the Executive's position, duties, responsibilities or authority from those in effect as of the Effective Date; (ii) a material reduction in the Executive's Base Salary or level of employee benefits (other than across-the-board reductions applied similarly to all of the Company's senior executives); (iii) failure to pay or provide any of the compensation set forth in this Agreement (except for an across-the-board deferral of compensation applied similarly to all of the Company's senior executives) which is not cured within fifteen (15) days after receipt by the Company of written notice thereof; (iv) the relocation of the Executive's principal place of employment more than 30 miles from its location as of the Effective Date except for required travel on the Company's business; (v) assignment of duties or responsibilities to the Executive which are materially inconsistent with the provisions of this Agreement; (vi) failure to continue the Executive on the Board following his initial election or appointment to the Board; or (vii) a failure by the Company to comply with any material provision of this Agreement, which failure is not cured (if capable of cure) within 15 days after receipt of written notice of such non-compliance by the Company..

For purposes of this Agreement, a Change in Control shall be deemed to have occurred upon the first of the following to occur after the Effective Date:

(i)     any Person (within the meaning of Section 3(a)(9) of the Securities and Exchange Act of 1934, as amended (the "Exchange Act"), as modified and used in Sections 13(d) and 14(d) thereof) becomes the "Beneficial Owner" (within the meaning of Rule 13d-3 under the Exchange Act) of fifty percent (50%) or more of either (1) the then-outstanding Common Stock or (2) the combined voting power of the then-outstanding voting securities of the Company entitled to vote generally in the election of directors;

(ii)     the following individuals cease for any reason to constitute a majority of the number of directors then serving: individuals who, as of the Effective Date, constitute the Board and any new director (other than a director whose initial assumption of office is in connection with an actual or threatened election contest,

6

including but not limited to a consent solicitation, relating to the election of directors of the Company) whose appointment or election by the Board or nomination for election by the Company's stockholders was approved or recommended by a vote of at least a majority of the directors then still in office who either were directors on the date hereof or whose appointment, election or nomination for election was previously so approved or recommended;

(iii)    there is consummated a merger or consolidation of the Company or any direct or indirect subsidiary of the Company with any other corporation, other than a merger or consolidation which would result in the voting securities of the Company outstanding immediately prior to such merger or consolidation continuing to represent (either by remaining outstanding or by being converted into voting securities of the surviving entity or any parent thereof) at least fifty percent (50%) of the combined voting power of the securities of the Company or such surviving entity or any parent thereof outstanding immediately after such merger or consolidation; or

(iv)    the stockholders of the Company approve a plan of complete liquidation or dissolution of the Company or there is consummated an agreement for the sale or disposition by the Company of all or substantially all of its assets.

Notwithstanding anything contained in this Agreement to the contrary (including, without limitation, this Section 6(f)), no transaction entered into, or other event occurring, pursuant to, as a result of, or in any way in connection with, the Restructuring shall constitute a "Change in Control" under this Agreement.

(g)    INTENTIONALLY LEFT BLANK

(h)    Additional Payments:

(i)    If any of the payments or benefits received or to be received by the Executive in connection with a Change in Control or the Executive's termination of employment (whether pursuant to the terms of this Agreement or any other plan, arrangement or agreement with the Company, any Person whose actions result in a Change in Control or any Person affiliated with the Company or such Person) (all such payments and benefits, excluding the Gross-Up Payment, being hereinafter referred to as the "Total Payments") will be subject to the excise tax imposed under Section 4999 of the Internal Revenue Code of 1986, as amended (the "Code" and such excise tax, the "Excise Tax"), the Company shall pay to the Executive an additional amount (the "Gross-Up Payment") such that the net amount retained by the Executive, after deduction of any Excise Tax on the Total Payments and any federal, state and local income and employment taxes incurred by the Executive in connection with payment of the Gross-Up Payment, shall be equal to the Total Payments.

(ii)    For purposes of determining whether any of the Total Payments will be subject to the Excise Tax and the amount of such Excise Tax, (A) all of the Total Payments shall be treated as "parachute payments" (within the meaning of

7

section 280G(b)(2) of the Code) unless, in the opinion of tax counsel ("Tax Counsel") reasonably acceptable to the Executive and selected by the accounting firm which was, immediately prior to the Change in Control, the Company's independent auditor (the "Auditor"), such payments or benefits (in whole or in part) do not constitute parachute payments, including by reason of section 280G(b)(4)(A) of the Code, (B) all "excess parachute payments" within the meaning of section 280G(b)(1) of the Code shall be treated as subject to the Excise Tax unless, in the opinion of Tax Counsel, such excess parachute payments (in whole or in part) represent reasonable compensation for services actually rendered (within the meaning of section 280G(b)(4)(B) of the Code) in excess of the Base Amount allocable to such reasonable compensation, or are otherwise not subject to the Excise Tax, and (C) the value of any noncash benefits or any deferred payment or benefit shall be determined by the Auditor in accordance with the principles of sections 280G(d)(3) and (4) of the Code. For purposes of determining the amount of the Gross Up Payment, the Executive shall be deemed to pay federal income tax at the highest marginal rate of federal income taxation in the calendar year in which the Gross Up Payment is to be made and state and local income taxes at the highest marginal rate of taxation in the state and locality of the Executive's residence or the Executive's place of business, whichever is higher, on the Termination Date (or if there is not yet a Termination Date, then the date on which the Gross-Up Payment is calculated for purposes of this Section 6(h)), net of the maximum reduction in federal income taxes which could be obtained from deduction of such state and local taxes.

(iii)     In the event that the Excise Tax is finally determined to be less than the amount taken into account hereunder in calculating the Gross-Up Payment, the Executive shall repay to the Company, within five business days following the time that the amount of such reduction in the Excise Tax is finally determined, the portion of the Gross-Up Payment attributable to such reduction (including that portion of the Gross-Up Payment attributable to the Excise Tax and federal, state and local income and employment taxes imposed on the Gross-Up Payment being repaid by the Executive), to the extent that such repayment results in a reduction in the Excise Tax and a dollar-for-dollar reduction in the Executive's taxable income and wages for purposes of federal, state and local income and employment taxes, plus interest on the amount of such repayment at 120% of the rate provided in section 1274(b)(2)(B) of the Code. Notwithstanding the foregoing, in the event any portion of the amount to be repaid to the Company has been paid to any tax authority, repayment thereof shall not be required until actual refund or credit of such portion has been made to Executive, and interest payable to the Company shall not exceed the interest received or credited to Executive by such tax authority. In the event that the Excise Tax is determined to exceed the amount taken into account hereunder in calculating the Gross-Up Payment (including by reason of any payment the existence or amount of which cannot be determined at the time of the Gross-Up Payment), the Company shall make an additional Gross-Up Payment in respect of such excess (including any interest, penalties or additions payable by the Executive with respect to such excess and the Gross-Up Payment attributable to the Excise Tax and federal, state, and local income and employment taxes imposed on the Gross-Up Payment being made to the Executive) within five business days following the time that the amount of such excess is finally determined. The Executive and the Company shall each reasonably cooperate with the other in connection with any administrative or judicial

8

proceedings concerning the existence or amount of liability for Excise Tax with respect to the Total Payments.

(iv)     The payments provided in this Section 6(h) hereof shall be made not later than the thirtieth day following the Date of Termination (or if there is no Date of Termination, then the date on which the Gross-Up Payment is calculated for purposes of this Section 6(h)) (but in no event after the last day of the calendar year following the calendar year in which the expense is incurred).

(i)     No Mitigation. Upon termination of the Executive's employment with the Company, subject to the Executive's affirmative obligations pursuant to Section 6(c) and 6(e), the Executive shall be under no obligation to seek other employment or otherwise mitigate the obligations of the Company under this Agreement.

7.     Directors' and Officers' Insurance; Indemnification. In addition to any rights to indemnification to which the Executive is entitled under the Company's Restated Certificate of Incorporation and Bylaws, the Company shall indemnify the Executive at all times during and after the Employment Period to the maximum extent permitted under the Delaware Business Corporation Act or any successor provision thereof, and any and all applicable state law, and shall pay the Executive's expenses (including reasonable attorneys' fees and expenses, which shall be paid in advance by the Company as incurred, subject to recoupment in accordance with applicable law) in defending any civil action, suit or proceeding in advance of the final disposition of such action, suit or proceeding to the maximum extent permitted under such applicable state laws for the Executive's action or inaction on behalf of the Company under the terms of this Agreement including but not limited to any acts or alleged acts arising out of events prior to the Executive's employment by the Company which obligation shall survive the termination of the Executive's employment or the termination of the other provisions of this Agreement.

8.     Confidential Information; Removal of Documents; Noncompetition; etc. For purposes of this Section 8, "Company" shall mean the Company, its subsidiaries and affiliates.

(a)     Confidentiality. Except as otherwise provided in this Agreement, at all times during and after the Employment Period, the Executive shall keep secret and retain in strictest confidence, any and all Confidential Information (as defined below) relating to the Company, and shall use such Confidential Information only in furtherance of the performance by the Executive of the Executive's duties to the Company and not for personal benefit or the benefit of any interest adverse to the Company's interests. For purposes of this Agreement, "Confidential Information" shall mean any information including without limitation plans, specifications, models, samples, data, customer lists and customer information, computer programs and documentation, and other technical and/or business information, in whatever form, tangible or intangible, that can be communicated by whatever means available at such time, that relates to the Company's current Business or future business contemplated during the Employment Period, products, services and development, or information received from others that the Company is obligated to treat as confidential or proprietary; provided, however, that such Confidential Information shall not include any information that (i) has become generally

9

available to the public other than as a result of a disclosure by the Executive, or (ii) was available to or became known to the Executive prior to the disclosure of such information on a non-confidential basis without breach of any duty of confidentiality from any party to the Company, and the Executive shall not disclose such Confidential Information to any person or entity other than the Company, except as may be required by law or court or administrative order (in which event the Executive shall so notify the Company as promptly as practicable). Upon termination of the Executive's employment hereunder for any reason, the Executive shall return to the Company all copies, reproductions and summaries of Confidential Information in the Executive's possession and erase the same from all media in the Executive's possession, and, if the Company so requests, shall certify in writing that the Executive has done so. All Confidential Information is and shall remain the property of the Company (or, in the case of information that the Company receives from a third party which it is obligated to treat as confidential, then the property of such third party).

(b)     Non-Competition.

(i)     During the Employment Period, the Executive shall not engage in Competition with the Company. For purposes of this Agreement, "Competition" by the Executive shall mean the Executive's engaging in, or otherwise directly or indirectly being employed by or acting as a consultant or lender to, or being a director, officer, employee, principal, agent, stockholder, member, owner or partner of, or permitting the Executive's name to be used in connection with the activities of any other business or organization anywhere which competes, directly or indirectly, with the Business of the Company as the same shall be constituted at the Termination Date or which, during the six-month period prior to the Executive's termination, the Company had made substantial plans with the intention of establishing operations.

(ii)     For twenty-four months following the Termination Date, Executive shall not engage in Competition with the Company in any locality or region in which the Company had operations at the time of, or within six months prior to, the Executive's termination, or in which, during the six-month period prior to the Executive's termination, the Company had made substantial plans with the intention of establishing operations in such locality or region; provided, however, that it shall not be a violation of this sub-paragraph for the Executive to become the registered or beneficial owner of up to three percent (3%) of any class of the capital stock of a competing corporation registered under the Exchange Act, provided that the Executive does not actively participate in the business of such corporation until such time as this covenant expires.

(c)     Non-Solicitation. During the Employment Period and for twenty-four months following the Termination Date, the Executive agrees that the Executive shall not, directly or indirectly, for the Executive's benefit or for the benefit of any other person, firm or entity, engage any of the following conduct:

(i)     solicit from any customer doing business with the Company as of the Termination Date, business of the same or of a similar nature to the business of the Company with such customer;

10

(ii)    solicit from any known potential customer of the Company business of the same or of a similar nature to that which has been the subject of a known written or oral bid, offer or proposal by the Company, or of substantial preparation with a view to making such a bid, proposal or offer, within six months prior to the Executive's termination;

(iii)    solicit the employment or services of, or hire, any person who was known to be employed by or was a known consultant to the Company upon the termination of the Executive's employment, or within six months prior thereto; or

(iv)    otherwise interfere with the business or accounts of the Company.

(d)    Intellectual Property.  All Intellectual Property (as defined below) and Technology (as defined below) created, developed, obtained or conceived of by the Executive during the Employment Period, and all business opportunities presented to the Executive during the Employment Period, shall be owned by and belong exclusively to the Company, provided that they reasonably relate to the Business, and the Executive shall (i) promptly disclose any such Intellectual Property, Technology or business opportunity to the Company, and (ii) execute and deliver to the Company, without additional compensation, such instruments as the Company may require from time to time to evidence its ownership of any such Intellectual Property, Technology or business opportunity.  For purposes of this Agreement, (A) the term "Intellectual Property" means and includes any and all trademarks, trade names, service marks, service names, patents, copyrights, and applications therefor, and (B) the term "Technology" means and includes any and all trade secrets, proprietary information, invention, discoveries, know-how, formulae, processes and procedures.

(e)    The Executive acknowledges that the services to be rendered by the Executive to the Company are of a special and unique character, which gives this Agreement a peculiar value to the Company, the loss of which may not be reasonably or adequately compensated for by damages in an action at law, and that a material breach or threatened breach by the Executive of any of the provisions contained in this Section 8 shall cause the Company irreparable injury.  The Executive therefore agrees that the Company shall be entitled, in addition to any other right or remedy, to a temporary, preliminary and permanent injunction, without the necessity of proving the inadequacy of monetary damages or the posting of any bond or security, enjoining or restraining the Executive from any such violation or threatened violations.

(f)    The Executive further acknowledges and agrees that due to the uniqueness of the Executive's services and confidential nature of the information the Executive shall possess, the covenants set forth herein are reasonable and necessary for the protection of the business and goodwill of the Company.

(g)    Continuing Operation.  Any termination of the Executive's employment or of this Agreement shall have no effect on the continuing operation of this Section 8.

11

9. Stockholder Agreement. As a precondition to receiving any award under the LTIP, Executive shall execute a management stockholders agreement that is acceptable to Executive and to the Company.

10. Severability. It is the desire and intent of the parties that the provisions of this Agreement shall be enforced to the fullest extent permissible under the laws and public policies applied in each jurisdiction in which enforcement is sought. Accordingly, if any particular provision or portion of this Agreement shall be adjudicated to be invalid or unenforceable, this Agreement shall be deemed amended to delete therefrom the portion thus adjudicated to be invalid or unenforceable, such deletion to apply only with respect to the operation of such provision in the particular jurisdiction in which such adjudication is made.

11. Notices. All communications, requests, consents and other notices provided for in this Agreement shall be in writing and shall be deemed given if delivered by hand or mailed by first class mail, postage prepaid, to the last known address of the recipient.

12. Governing Law. This Agreement shall be governed by and construed and enforced in accordance with the laws of the State of Delaware, without regard to its conflicts of laws provisions.

13. Assignment. Neither this Agreement nor any rights or duties hereunder may be assigned by the Executive without the prior written consent of the Company. The Company shall have the right at any time to assign this Agreement to its successors and assigns; provided, however, that the assignee or transferee is the successor to all or substantially all of the business and assets of the Company and such assignee or transferee expressly assumes all of the obligations, duties and liabilities of the Company set forth in this Agreement.

14. Amendments. No provisions of this Agreement shall be altered, amended, revoked or waived except by an instrument in writing, signed by each party to this Agreement.

15. Binding Effect. Except as otherwise provided herein, this Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective legal representatives, heirs, successors and assigns.

16. Execution in Counterparts. This Agreement may be executed in any number of counterparts, each of which shall be deemed an original, but all of which together shall constituted one and the same instrument.

17. Arbitration. Any dispute, controversy or question arising under, out of, or relating to this Agreement (or the breach thereof), or, the Executive's employment with the Company or termination thereof, shall be referred for arbitration in the State of Michigan to a neutral arbitrator selected by the Executive and the Company and this shall be the exclusive and sole means for resolving such dispute. Such arbitration shall be conducted in accordance with the National Rules for Resolution of Employment Disputes of the American Arbitration Association. The arbitrator shall have the discretion to award reasonable attorneys' fees, costs and expenses to the prevailing party. Judgment upon the award rendered by the arbitrator may be entered in any court having jurisdiction thereof.

12

18.     Entire Agreement. This Agreement sets forth the entire agreement and understanding of the parties and supersedes all prior understandings, agreements (including, without limitation, the Original Agreement) or representations by or between the parties, whether written or oral, which relate in any way to the subject matter hereof.

19.     Survivorship. The provisions of this Agreement necessary to carry out the intention of the parties as expressed herein shall survive the termination or expiration of this Agreement.

20.     Waiver. Except as provided herein, the waiver by either party of the other party's prompt and complete performance, or breach or violation, of any provision of this Agreement shall not operate nor be construed as a waiver of any subsequent breach or violation, and the failure by any party hereto to exercise any right or remedy which it may possess hereunder shall not operate nor be construed as a bar to the exercise of such right or remedy by such party upon the occurrence of any subsequent breach or violation.

21.     Captions. The captions of this Agreement are for convenience and reference only and in no way define, describe, extend or limit the scope or intent of this Agreement or the intent of any provision hereof.

22.     Construction. The parties acknowledge that this Agreement is the result of arm's-length negotiations between sophisticated parties each afforded representation by legal counsel. Each and every provision of this Agreement shall be construed as though both parties participated equally in the drafting of same, and any rule of construction that a document shall be construed against the drafting party shall not be applicable to this Agreement.

23.     Code Section 409A. Notwithstanding any provision in this Agreement to the contrary, any payment triggered by a termination of employment, to the extent and up to the amount necessary to ensure that such payments are not subject to penalties and interest under Code Section 409A (including but not limited to payments under Sections 6(c), (e) and (h)), shall not commence until at least six months after the Executive's termination of employment. To the extent payments under this Agreement are not exempt from Code Section 409A, and absent this provision, would be paid during the first six month period following the Executive's termination of employment, those payments shall be withheld and the amount of the payments withheld will be paid in a lump sum, without interest, during the seventh month after termination; provided that, if the Executive dies during such six-month period, any such delayed payments shall be immediately payable to the Executive's estate or representative. If and to the extent that any payment or benefit under this Agreement is determined by the Company to constitute "non-qualified deferred compensation" subject to Code Section 409A and is payable to the Executive by reason of the Executive's termination of employment, then such payment or benefit shall be made or provided to the Executive only upon a "separation from service" as defined for purposes of Code Section 409A. The Company shall not have any liability or be responsible for any claim related to the incurrence by the Executive or any other person of any tax, interest expense, loss of tax benefit, or any other obligation or liability, in each case, arising under or related to Code Section 409A.

13

24.    Tax Withholding.  All compensation payable pursuant to this Agreement shall be subject to reduction by all applicable withholding, social security and other federal, state and local taxes and deductions.

*[signatures on following page]*

14

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first above written.

By: _____
       Curtis J. Clawson

HAYES LEMMERZ INTERNATIONAL, INC.

By: _____
Name: 
Title:

681983-Chicago Server 1A - MSW

**H-2 Fred Bentley, Chief Operation Officer and President, Global Wheel Group**