## EXECUTIVE EMPLOYMENT AGREEMENT

THIS AGREEMENT (the "Agreement") is made as of the__th day of [        ], 2009 (the "Agreement Date"), by and between Hayes Lemmerz International, Inc. (the "Company") and Patrick C. Cauley (the "Executive")..

### PRELIMINARY STATEMENTS

1.       The Executive currently serves as the Company's General Counsel, pursuant to an employment agreement dated March 25, 2004, as amended thereafter (the "Original Agreement").

2.       The Company desires to continue to employ Executive as General Counsel, and the Executive desires to continue to be employed by the Company in said capacity; and

3.       Each party desires to set forth in writing the terms and conditions of their understandings and agreements.

**NOW, THEREFORE**, in consideration of the mutual covenants and obligations contained herein, the Company hereby agrees to employ the Executive and the Executive hereby accepts such employment upon the terms and conditions set forth in this Agreement, which shall take effect on the plan effective date (the "Effective Date") of the Joint Plan of Reorganization of Hayes Lemmerz International, Inc. and its Affiliated Debtors and Debtors-In Possession, dated as of September 2, 2009 (as the same may be amended or modified, the "Plan of Reorganization"). In the event the Plan of Reorganization does not become effective, this Agreement shall be of no force and effect.

1.       <u>Employment</u>.  The Company agrees to continue to employ the Executive and the Executive agrees to continue to be employed on a full-time basis by the Company for the period and upon the terms and conditions hereinafter set forth.

2.       <u>Term; Employment Period</u>.  The term of this Agreement (the "Term") shall commence on the Agreement Date (the "Effective Date") and continue until terminated pursuant to Section 6 of this Agreement.  The period during which the Executive is employed by the Company pursuant to this Agreement is referred to herein as the "Employment Period."  The date on which the termination of the Executive's employment hereunder shall become effective is referred to herein as the "Termination Date."

3.       <u>Position and Duties</u>.  During the Employment Period, the Executive shall serve as Vice President, General Counsel and Secretary of the Company and shall have such responsibilities, duties and authority as are customarily and associated with such positions and shall exercise such responsibilities, duties and authority consistent with the foregoing as the Company's Chief Executive Officer or the Company's Board of Directors (the "Board") shall

determine from time to time. During the Employment Period, the Executive shall report to the Company's Chief Executive Officer or the Chief Executive Officer's designee. The Executive shall devote substantially all his working time and efforts to the business and affairs of the Company and shall use his best efforts to carry out his responsibilities faithfully and efficiently in a professional manner. Notwithstanding the foregoing, it is understood that during the Employment Period, subject to any conflict of interest policies of the Company and Section 8, the Executive may (x) serve in any capacity with any civic, charitable, educational or professional organization provided that such service does not materially interfere with his duties and responsibilities hereunder and (y) make and manage personal investments of his choice, and with the prior consent of the Company's Chief Executive Officer, which shall not be unreasonably withheld, serve on the board of directors of one (1) for-profit business enterprise.

4. Place of Performance. During the Employment Period, the Executive's place of performance of his services shall be at the Company's Northville, Michigan Headquarters, except for required travel by the Executive on the Company's business or as may be reasonably required by the Company.

5. Compensation and Benefits.

(a) Salary. During the Employment Period, the Company shall pay to the Executive an initial annual base salary of Three Hundred and Fifteen Thousand Dollars ($315,000) (as the same may be increased from time to time, the "Base Salary"), such salary to be paid in periodic installments in accordance with the Company's payroll practices as in effect from time to time. The Base Salary shall be reviewed annually by the compensation committee of the Board and may be increased from time to time in accordance with normal business practices of the Company and, if so increased, shall not thereafter be reduced.

(b) Cash-Based Incentives. Following the expiration of the KEIP (as defined below) during the Employment Period, the Executive shall be eligible to earn an annual bonus under the Company's Short-Term Incentive Plan, or a successor plan thereto, as in effect from time to time (the "Incentive Plan"), subject to achievement of performance goals determined by the Board in accordance with the terms of the Incentive Plan (such annual bonus, the "Annual Bonus").Such performance goals shall include (i) a threshold level below which no Annual Bonus shall be paid, (ii) a normative level that is tied to the budget, which if obtained, would result in an Annual Bonus of sixty percent (60%) of the Base Salary and (iii) an upside level, which if obtained, would increase the Annual Bonus to a maximum of one hundred twenty percent (120%) of the Base Salary. The Annual Bonus shall be payable in a cash lump sum at such time as bonuses are ordinarily paid in accordance with the terms of the Incentive Plan, but in no event later than 120 days after the end of each fiscal year of the Company. Except as otherwise specifically provided in this Agreement, the Executive shall only be eligible to receive the Annual Bonus if the Executive is employed by the Company through the last day of February in the year in which the Annual Bonus is to be paid.

(c) Equity Based Incentives. In accordance with the Plan of Reorganization, the Board shall establish a long term equity incentive program ( the "LTIP").

2

The Executive shall be entitled to participate in the LTIP. Prior to making any grants to Executive, the Board shall consult with the CEO on such grants.

(d)     Key Employee Incentive Plan.  The Executive shall participate in the Company's Key Employee Incentive Plan (the "KEIP"), in accordance with its terms, and as approved by the "Bankruptcy Court" in connection with the "Restructuring" (as each such term is defined in the KEIP).  If the KEIP is not approved by the Bankruptcy Court prior to the Effective Date, the Executive shall be entitled to payments under this Agreement in the amounts and under the terms and conditions set forth in the Company's Motion for Order Approving the Implementation of Key Employee Incentive Plan and Short Term Incentive Plan filed with the Bankruptcy Court on July 29, 2009.

(e)     Expenses.  During the Employment Period, the Company shall promptly reimburse the Executive for all reasonable out-of-pocket expenses incurred by the Executive in connection with the business of the Company and the performance of his duties under this Agreement in accordance with the terms of the Company's policies as in effect from time to time.

(f)     Benefit Plans.  During the Employment Period, the Executive shall be entitled to participate in all of the employee benefit plans, programs, agreements and arrangements(including without limitation the supplemental executive retirement plan) generally provided to senior executives of the Company, as such are in effect from time to time, on a basis no less favorable than that provided to such senior executives.

(g)     Perquisites.  During the Employment Period, the Executive shall be entitled to participate in those perquisites provided to senior executives of the Company, as such are in effect from time to time after the Effective Date, on a basis no less favorable than that provided to such senior executives.  In addition, the Company shall pay Executive an annual flexible benefits allowance (the "Flexible Benefits Allowance") of Thirty Five Thousand Dollars ($35,000), such allowance to be paid in periodic installments in accordance with the Company's payroll practices as in effect from time to time. The Flexible Benefits Allowance shall be reviewed annually by the Compensation Committee of the Board and may be increased from time to time and, if so increased, shall not thereafter be reduced.

(h)     Vacations.  During the Employment Period, the Executive shall be entitled to vacation time, paid holidays and personal days, determined in accordance with the Company's policy with respect to its senior executives as in effect from time to time, it being understood that the Executive shall be entitled to not less than four weeks' vacation in any 12-month period during the Employment Period thereafter.

6.     Termination of Employment.

(a)     Accrued Benefits.  In the event of the termination of the Executive's employment hereunder for any reason during the Term, the Executive (or his estate or representative, as applicable) shall be entitled to receive any Base Salary, Annual Bonus,

3

vacation time and expenses that have in each case accrued but are unpaid as of the Termination Date, as well as any post-termination benefits(including but not limited to vested awards under the LTIP) to which he may be entitled pursuant to the Company's retirement, insurance and other benefit plans, programs and arrangements as in effect immediately prior to the Termination Date (the "Accrued Benefits").

(b)     Death. The Executive's employment hereunder shall terminate as of the date of his death. Upon the termination of the Executive's employment hereunder because of his death during the Term, the Executive's estate or representative, as the case may be, shall be entitled to receive the Accrued Benefits and a lump sum payment in cash equal to (i) one year's Base Salary as in effect on the Termination Date and (ii) the product of (x) sixty percent (60%) of the Base Salary as in effect on the Termination Date, multiplied by a fraction (y) the numerator of which shall be the number of months (including fractions thereof) worked by the Executive during the Company's fiscal year in which the Termination Date occurs and (z) the denominator of which shall be the number 12 (such amount under this clause (ii), the "Pro Rata Annual Bonus"). Such amounts shall be paid as soon as administratively feasible following the Executive's death but in no event later than April 15 of the calendar year following the Executive's death. In addition, those immediate family members who were participating in the Company's medical benefit plan as of the date of the Executive's death shall continue to participate in the Company's medical benefit plan at active employee contribution rates for the one-year period immediately following the date of the Executive's death.

(c)     Disability. The Executive's employment hereunder may be terminated during the Term if the Executive is incapable of performing his principal duties hereunder because of physical or mental incapacity for a period of 45 consecutive working days or for more than 90 working days in any 12-month period ("Disability"). In the event that the Executive's employment is to be terminated pursuant to this Section 6(c), (i) this Agreement shall terminate on the date specified in the notice of termination delivered to the Executive (subject to Section 8(g) and Section 18); (ii) the Executive shall as of such date resign from all of his positions, duties and authorities hereunder; (iii) the Executive shall be placed on a medical leave of absence until the earlier of (A) expiration of the six-month period commencing on the date his medical leave of absence began, unless there is no reasonable expectation that the Executive will return to employment with the Company, in which case the date the Executive ceases performing services for the Company, (B) the date he qualifies for benefits under the Company's long-term disability plan or (C) the date he is able to return to work; and (iv) the Executive shall continue to be paid his Base Salary until such medical leave of absence ends. In the case of a termination of the Executive's employment pursuant to this Section 6(c), for purposes of calculating benefits pursuant to clauses (B) and (C) below the Termination Date shall be the date upon which the Executive's medical leave of absence commences, and for all other purposes, the Termination Date shall be the date upon which the Executive's medical leave of absence ends. In the event the Executive's employment is terminated pursuant to this Section 6(c), the Executive (or his representative, as applicable) shall be entitled to: (A) the Accrued Benefits; (B) a lump sum payment in cash equal to one year's Base Salary and Flexible Benefits Allowance as in effect on the Termination Date; (C) the Pro Rata Annual Bonus; and (D) the continuation of health and welfare benefits at the levels in effect as of the Termination Date at no additional cost to the

4

Executive than that which was in effect as of the Termination Date for the one-year period immediately following the Termination Date; provided, however, that such benefits shall be reduced to the extent comparable benefits are made available to the Executive from a successor employer, and the Executive shall be obligated to report such benefits to the Company. The amounts payable pursuant to clauses (B) and (C) of the preceding sentence shall be paid in the month following the Executive's Termination Date. It is acknowledged and agreed by the Executive that he shall be precluded from terminating his employment hereunder for Good Reason in the event that his employment hereunder is terminated pursuant to this Section 6(c).

(d)    For Cause; Without Good Reason. The Executive's employment hereunder may be terminated during the Term (i) by the Company for Cause (as defined below) or (ii) by the Executive without Good Reason (as defined below). In the event that the Company terminates the Executive's employment hereunder for Cause, the Termination Date shall be the date specified in the notice of termination for Cause delivered by the Company to the Executive. In the event that the Executive terminates his employment hereunder without Good Reason, the Termination Date shall be no earlier than 30 days following the date on which a notice of termination is delivered by the Executive to the Company. In the event that the Executive's employment hereunder is terminated pursuant to this Section 6(d), the Executive shall be entitled to the Accrued Benefits.

(e)    Without Cause; For Good Reason. The Executive's employment hereunder may be terminated during the Employment Period (i) by the Company without Cause or (ii) by the Executive for Good Reason. In the event that the Executive's employment is terminated pursuant to this Section 6(e) (whether by the Company or by the Executive), the Termination Date shall be no earlier than 30 days following the date on which a notice of termination is delivered by one party to the other. In the event that the Executive's employment is terminated pursuant to this Section 6(e), the Executive (or his estate or representative, as the case may be) shall be entitled to receive the Accrued Benefits and the other payments and benefits set forth in this Section 6(e). The Executive (or his estate or representative, as the case may be) shall be entitled to the following severance benefits (A) a lump sum payment in cash equal to one year's Base Salary and Flexible Benefits Allowance as in effect on the Termination Date; (B) the Pro Rata Annual Bonus; and (C) the title to the Executive's Company vehicle. The benefits described in the preceding sentence shall be paid in the month following the Executive's Termination Date. Severance benefits provided to the Executive under this paragraph shall also include: (x) continuation of health and welfare benefits for one year at the levels in effect as of the Termination Date at no additional cost to the Executive than that which was in effect as of the Termination Date; provided, that such benefits shall be reduced to the extent comparable benefits are made available to the Executive from a successor employer, and the Executive shall be obligated to report such benefits to the Company; and (y) executive level career outplacement services for the period beginning on the Termination Date and ending December 31 of second calendar year following termination by a mutually agreeable outplacement firm and paid for as incurred by the Company.

(f)    Definition of "Cause" and "Good Reason".

5

For purposes of this Agreement, "Cause" means: (i) the willful failure of the Executive to perform his material duties with the Company which have been duly assigned to the Executive and which duties are commensurate with those of the position for which Executive is then employed, and which failure is not cured (if capable of cure) within 15 days after receipt of written notice of such failure, which notice identifies the manner in which the Executive has willfully failed to perform, (ii) the engaging by the Executive in willful conduct which is demonstrably injurious to the Company, monetarily or otherwise, (iii) the conviction of the Executive of any crime or offense constituting a felony, (iv) the conviction of the Executive for a violation of criminal law involving the Company and its business, or (v) a failure by the Executive to comply with any material provision of this Agreement, which failure is not cured (if capable of cure) within 15 days after receipt of written notice of such non-compliance by the Executive. Termination of the Executive for Cause shall mean termination by action of at least a majority of the Company's Board of Directors, at a meeting duly called and held upon at least 15 days' written notice to the Executive specifying the particulars of the action or inaction alleged to constitute Cause and at which meeting the Executive and his counsel were entitled to be present and given adequate opportunity to be heard. For purposes of clauses (i) and (ii) of this definition, action or inaction by the Executive shall not be considered "willful" unless done or omitted by him (A) intentionally or not in good faith and (B) without reasonable belief that his action or inaction was in the best interest of the Company, and shall not include failure to act by reason of total or partial incapacity due to physical or mental illness.

For purposes of this Agreement, 'Good Reason' means the occurrence of one or more of the following events if the Executive gives notice of the event to the Company within 90 days of the event and the Company fails to remedy such event within 30 days of receiving notice from the Executive: (i) a material adverse alteration in the nature or status of the Executive's position, duties, responsibilities or authority from those in effect as of the Effective Date; (ii) a material reduction in the Executive's Base Salary or level of employee benefits (other than across-the-board reductions applied similarly to all of the Company's senior executives occurring after the second anniversary of the Effective Date); (iii) a failure to pay or provide a material amount of the compensation set forth in this Agreement (except for an across-the-board deferral of compensation applied similarly to all of the Company's senior executives occurring after the second anniversary of the Effective Date); (iv) the relocation of the Executive's principal place of employment more than 30 miles from its location as of the Effective Date except for required travel on the Company's business; (v) assignment of duties or responsibilities to the Executive which are materially inconsistent with the provisions of this Agreement; or (vi) a failure by the Company to comply with any material provision of this Agreement.

(g) <u>Change in Control Severance Provisions</u>. The provisions set forth in Attachment A hereto are hereby incorporated into this Agreement. The Executive hereby acknowledges that in the event he becomes entitled to the payment set forth in Section 6.1(A) of Attachment A hereto, that such payment will be in lieu of any other payments to be made pursuant to the terms of this Agreement.

For purposes of this Agreement, a Change in Control shall be deemed to have occurred upon the first of the following to occur after the Effective Date:

6

(i)    any Person (within the meaning of Section 3(a)(9) of the Securities and Exchange Act of 1934, as amended (the "Exchange Act"), as modified and used in Sections 13(d) and 14(d) thereof) becomes the "Beneficial Owner" (within the meaning of Rule 13d-3 under the Exchange Act) of fifty percent (50%) or more of either (1) the then-outstanding Common Stock or (2) the combined voting power of the then-outstanding voting securities of the Company entitled to vote generally in the election of directors;

(ii)    the following individuals cease for any reason to constitute a majority of the number of directors then serving: individuals who, as of the Effective Date, constitute the Board and any new director (other than a director whose initial assumption of office is in connection with an actual or threatened election contest, including but not limited to a consent solicitation, relating to the election of directors of the Company) whose appointment or election by the Board or nomination for election by the Company's stockholders was approved or recommended by a vote of at least a majority of the directors then still in office who either were directors on the date hereof or whose appointment, election or nomination for election was previously so approved or recommended;

(iii)    there is consummated a merger or consolidation of the Company or any direct or indirect subsidiary of the Company with any other corporation, other than a merger or consolidation which would result in the voting securities of the Company outstanding immediately prior to such merger or consolidation continuing to represent (either by remaining outstanding or by being converted into voting securities of the surviving entity or any parent thereof) at least fifty percent (50%) of the combined voting power of the securities of the Company or such surviving entity or any parent thereof outstanding immediately after such merger or consolidation; or

(iv)    the stockholders of the Company approve a plan of complete liquidation or dissolution of the Company or there is consummated an agreement for the sale or disposition by the Company of all or substantially all of its assets.

Notwithstanding anything contained in this Agreement to the contrary (including, without limitation, this Section 6(g)), no transaction entered into, or other event occurring, pursuant to, as a result of, or in any way in connection with, the Restructuring shall constitute a "Change in Control" under this Agreement.

(h)    Release Agreement. Notwithstanding anything to the contrary contained in this Section 6, the Executive shall be required to execute the Company's then current standard release agreement as a condition to receiving any of the payments and benefits provided for in this Section 6 or Attachment A. It is acknowledged and agreed that the then current standard release agreement shall be a mutual release and shall not diminish or terminate Executive's rights under this Agreement including, but not limited to, those delineated in Sections

6(i), 7 and 16 herein. The time period for executing such release (and the period available to revoke it) shall be in accordance with the Company's then current standard practice but in no event shall the execution period extend beyond 60 days following the Executive's Termination Date.

(i)     No Mitigation. Upon termination of the Executive's employment with the Company, subject to the Executive's affirmative obligations pursuant to Section 6(c) and 6(e), the Executive shall be under no obligation to seek other employment or otherwise mitigate the obligations of the Company under this Agreement.

7.     Directors' and Officers' Insurance; Indemnification. In addition to any rights to indemnification to which the Executive is entitled under the Company's Restated Certificate of Incorporation and Bylaws, the Company shall indemnify the Executive at all times during and after the Employment Period to the maximum extent permitted under the Delaware Business Corporation Act or any successor provision thereof, and any and all applicable state law, and shall pay the Executive's expenses (including reasonable attorneys' fees and expenses, which shall be paid in advance by the Company as incurred, subject to recoupment in accordance with applicable law) in defending any civil action, suit or proceeding in advance of the final disposition of such action, suit or proceeding to the maximum extent permitted under such applicable state laws for the Executive's action or inaction on behalf of the Company under the terms of this Agreement including but not limited to any acts or alleged acts arising out of events prior to the Executive's employment by the Company which obligation shall survive the termination of the Executive's employment or the termination of the other provisions of this Agreement.

8.     Confidential Information; Removal of Documents; Non-Competition; etc. For purposes of this Section 8, "Company" shall mean the Company, its subsidiaries and affiliates.

(a)     Confidentiality. Except as otherwise provided in this Agreement, at all times during and after the Employment Period, the Executive shall keep secret and retain in strictest confidence, any and all Confidential Information (as defined below) relating to the Company, and shall use such Confidential Information only in furtherance of the performance by the Executive of the Executive's duties to the Company and not for personal benefit or the benefit of any interest adverse to the Company's interests.  For purposes of this Agreement, "Confidential Information" shall mean any information including without limitation plans, specifications, models, samples, data, customer lists and customer information, computer programs and documentation, and other technical and/or business information, in whatever form, tangible or intangible, that can be communicated by whatever means available at such time, that relates to the Company's current Business or future business contemplated during the Employment Period, products, services and development, or information received from others that the Company is obligated to treat as confidential or proprietary; provided, however, that such Confidential Information shall not include any information that (i) has become generally available to the public other than as a result of a disclosure by the Executive, or (ii) was available to or became known to the Executive prior to the disclosure of such information on a non-confidential basis without breach of any duty of confidentiality from any party to the Company, and the Executive shall not disclose such

8

Confidential Information to any person or entity other than the Company, except as may be required by law or court or administrative order (in which event the Executive shall so notify the Company as promptly as practicable). Upon termination of the Executive's employment hereunder for any reason, the Executive shall return to the Company all copies, reproductions and summaries of Confidential Information in the Executive's possession and erase the same from all media in the Executive's possession, and, if the Company so requests, shall certify in writing that the Executive has done so. All Confidential Information is and shall remain the property of the Company (or, in the case of information that the Company receives from a third party which it is obligated to treat as confidential, then the property of such third party).

(b)    Non-Competition.

(i)    During the Employment Period, the Executive shall not engage in Competition with the Company. For purposes of this Agreement, "Competition" by the Executive shall mean the Executive's engaging in, or otherwise directly or indirectly being employed by or acting as a consultant or lender to, or being a director, officer, employee, principal, agent, stockholder, member, owner or partner of, or permitting the Executive's name to be used in connection with the activities of any other business or organization anywhere which competes, directly or indirectly, with the Business of the Company as the same shall be constituted at the Termination Date or which, during the six-month period prior to the Executive's termination, the Company had made substantial plans with the intention of establishing operations.

(ii)    For the one year period commencing on the Termination Date, the Executive shall not engage in Competition with the Company in any locality or region in which the Company had operations at the time of, or within six months prior to, the Executive's termination, or in which, during the six-month period prior to the Executive's termination, the Company had made substantial plans with the intention of establishing operations in such locality or region; provided, however, that it shall not be a violation of this sub-paragraph or the sub-paragraph hereinabove for the Executive to be or become the registered or beneficial owner of up to three percent (3%) of any class of the capital stock of a competing corporation registered under the Exchange Act, provided that the Executive does not actively participate in the business of such corporation until such time as this covenant expires.

(c)    Non-Solicitation. During the Employment Period and for the one year period commencing on the Termination Date, the Executive agrees that the Executive shall not, directly or indirectly, for the Executive's benefit or for the benefit of any other person, firm or entity, engage any of the following conduct:

(i)    solicit from any customer doing business with the Company as of the Termination Date, business of the same or of a similar nature to the business of the Company with such customer;

(ii)    solicit from any known potential customer of the Company business of the same or of a similar nature to that which has been the subject of a known written or oral bid, offer or proposal by the Company, or of substantial preparation with a view to making such a bid, proposal or offer, within six months prior to the Executive's termination;

(iii)    solicit the employment or services of, or hire, any person who was known to be employed by or was a known consultant to the Company upon the termination of the Executive's employment, or within six months prior thereto; or

(iv)    otherwise interfere with the business or accounts of the Company.

(d)    Intellectual Property.  All Intellectual Property (as defined below) and Technology (as defined below) created, developed, obtained or conceived of by the Executive during the Employment Period, and all business opportunities presented to the Executive during the Employment Period, shall be owned by and belong exclusively to the Company, provided that they reasonably relate to the Business, and the Executive shall (i) promptly disclose any such Intellectual Property, Technology or business opportunity to the Company, and (ii) execute and deliver to the Company, without additional compensation, such instruments as the Company may require from time to time to evidence its ownership of any such Intellectual Property, Technology or business opportunity.  For purposes of this Agreement, (A) the term "Intellectual Property" means and includes any and all trademarks, trade names, service marks, service names, patents, copyrights, and applications therefor, and (B) the term "Technology" means and includes any and all trade secrets, proprietary information, invention, discoveries, know-how, formulae, processes and procedures.

(e)    The Executive acknowledges that the services to be rendered by the Executive to the Company are of a special and unique character, which gives this Agreement a peculiar value to the Company, the loss of which may not be reasonably or adequately compensated for by damages in an action at law, and that a material breach or threatened breach by the Executive of any of the provisions contained in this Section 8 shall cause the Company irreparable injury.  The Executive therefore agrees that the Company shall be entitled, in addition to any other right or remedy, to a temporary, preliminary and permanent injunction, without the necessity of proving the inadequacy of monetary damages or the posting of any bond or security, enjoining or restraining the Executive from any such violation or threatened violations.

(f)    The Executive further acknowledges and agrees that due to the uniqueness of the Executive's services and confidential nature of the information the Executive shall possess, the covenants set forth herein are reasonable and necessary for the protection of the business and goodwill of the Company.

(g)    Continuing Operation.  Any termination of the Executive's employment or of this Agreement shall have no effect on the continuing operation of this Section 8.

10

9.    Stockholder Agreement. As a precondition to receiving any award under the LTIP, Executive shall execute a management stockholders agreement that is acceptable to Executive and the Company.

10.    Severability. It is the desire and intent of the parties that the provisions of this Agreement shall be enforced to the fullest extent permissible under the laws and public policies applied in each jurisdiction in which enforcement is sought. Accordingly, if any particular provision or portion of this Agreement shall be adjudicated to be invalid or unenforceable, this Agreement shall be deemed amended to delete therefrom the portion thus adjudicated to be invalid or unenforceable, such deletion to apply only with respect to the operation of such provision in the particular jurisdiction in which such adjudication is made.

11.    Notices. All communications, requests, consents and other notices provided for in this Agreement shall be in writing and shall be deemed give if delivered by hand or mailed by first class mail, postage prepaid, to the last known address of the recipient.

12.    Governing Law. This Agreement shall be governed by and construed and enforced in accordance with the laws of the State of Delaware, without regard to its conflicts of laws provisions.

13.    Assignment. Neither this Agreement nor any rights or duties hereunder may be assigned by the Executive without the prior written consent of the Company. The Company shall have the right at any time to assign this Agreement to its successors and assigns; provided, however, that the assignee or transferee is the successor to all or substantially all of the business and assets of the Company and such assignee or transferee expressly assumes all of the obligations, duties and liabilities of the Company set forth in this Agreement.

14.    Amendments. No provisions of this Agreement shall be altered, amended, revoked or waived except by an instrument in writing, signed by each party to this Agreement.

15.    Binding Effect. Except as otherwise provided herein, this Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective legal representatives, heirs, successors and assigns.

16.    Execution in Counterparts. This Agreement may be executed in any number of counterparts, each of which shall be deemed an original, but all of which together shall constituted one and the same instrument.

17.    Arbitration. Any dispute, controversy or question arising under, out of, or relating to this Agreement (or the breach thereof), or, the Executive's employment with the Company or termination thereof, shall be referred for arbitration in the State of Michigan to a neutral arbitrator selected by the Executive and the Company and this shall be the exclusive and sole means for resolving such dispute. Such arbitration shall be conducted in accordance with the National Rules for Resolution of Employment Disputes of the American Arbitration Association. The arbitrator shall have the discretion to award reasonable attorneys' fees, costs and expenses to

11

the prevailing party. Judgment upon the award rendered by the arbitrator may be entered in any court having jurisdiction thereof.

18.     Entire Agreement. This Agreement sets forth the entire agreement and understanding of the parties and supersedes all prior understandings, agreements (including, without limitation, the Original Agreement) or representations by or between the parties, whether written or oral, which relate in any way to the subject matter hereof.

19.     Survivorship. The provisions of this Agreement necessary to carry out the intention of the parties as expressed herein shall survive the termination or expiration of this Agreement.

20.     Waiver. Except as provided herein, the waiver by either party of the other party's prompt and complete performance, or breach or violation, of any provision of this Agreement shall not operate nor be construed as a waiver of any subsequent breach or violation, and the failure by any party hereto to exercise any right or remedy which it may possess hereunder shall not operate nor be construed as a bar to the exercise of such right or remedy by such party upon the occurrence of any subsequent breach or violation.

21.     Captions. The captions of this Agreement are for convenience and reference only and in no way define, describe, extend or limit the scope or intent of this Agreement or the intent of any provision hereof.

22.     Construction. The parties acknowledge that this Agreement is the result of arm's-length negotiations between sophisticated parties each afforded representation by legal counsel. Each and every provision of this Agreement shall be construed as though both parties participated equally in the drafting of same, and any rule of construction that a document shall be construed against the drafting party shall not be applicable to this Agreement.

23.     Code Section 409A Payment Delay. Notwithstanding any provision in this Agreement (or the attached Severance Agreement) to the contrary, any payment triggered by a termination of employment to the extent and up to the amount necessary to ensure that such payments are not subject to penalties and interest under Code Section 409A shall not commence until at least six months after the Executive's termination of employment. To the extent such payments, absent this provision, would be paid during the first six month period following the Executive's termination of employment, those payments shall be withheld and the amount of the payments withheld will be paid in a lump sum, without interest, during the seventh month after termination; provided that, if the Executive dies during such six-month period, any such delayed payments shall be immediately payable to the Executive's estate or representative.

If and to the extent that any payment or benefit under this Agreement is determined by the Company to constitute "non-qualified deferred compensation" subject to Code Section 409A and is payable to the Executive by reason of the Executive's termination of employment, then such payment or benefit shall be made or provided to the Executive only upon a "separation from service" as defined for purposes of Code Section 409A. The Company shall not

12

have any liability or be responsible for any claim related to the incurrence by the Executive or any other person of any tax, interest expense, loss of tax benefit, or any other obligation or liability, in each case, arising under or related to Code Section 409A.

24.    Tax Withholding. All compensation payable pursuant to this Agreement shall be subject to reduction by all applicable withholding, social security and other federal, state and local taxes and deductions.

13

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first above written.

EXECUTIVE

By:_____
    Patrick C. Cauley

HAYES LEMMERZ INTERNATIONAL, INC.

By:_____
Name: Curtis J. Clawson
Title:   President and Chief Executive Officer

10301891.2

14

*Attachment A*

## SEVERANCE AGREEMENT

1.  Defined Terms.  Unless otherwise defined in this Attachment A, the terms that are defined in the Employment Agreement (the "Employment Agreement") shall have the same meanings when used herein as that are ascribed to such terms in the Employment Agreement.

2.  Term of Agreement.  The Term of this Agreement shall commence on the Effective Date hereof and shall continue in effect through the third anniversary thereof; provided, however, that commencing on the first anniversary of the Effective Date and each anniversary thereafter (each such date a "Renewal Date"), the Term shall automatically be extended for one additional year unless, on or prior to such Renewal Date, the Company or the Executive shall have given notice not to extend the Term; and further provided, however, that if a Change in Control shall have occurred during the Term, the Term shall expire no earlier than twenty-four (24) months beyond the month in which such Change in Control occurred.

3.  Immediate Effect of Change in Control.  Promptly following a Change in Control, but in no event later than April 15 of the calendar year following the Change in Control, the Executive shall be entitled to the immediate payment of all unpaid compensation amounts (including the pro rata bonus payment for the current fiscal year under any bonus plan for which he is eligible ("Pro-rata Bonus") and all unpaid bonuses with respect to any prior fiscal year) with respect to the Executive's employment.  For purposes of this Section 3, Pro-rata Bonus shall be an amount equal to the product of (1) the product of (x) the Executive's base salary as in effect immediately prior to the Change in Control and (y) the greater of (A) the Executive's normative bonus percentage for the fiscal year in which the Change in Control occurs and (B) the Executive's estimated bonus percentage calculated in good faith by the Company's Finance Department determined by projecting performance through the end of the fiscal year in which the Change in Control occurs and (2) a fraction, the numerator of which is the number of days in the fiscal year in which the Change in Control occurs through the date of the Change in Control, and the denominator of which is 365.  The Pro-rata Bonus paid shall be subtracted from the amount otherwise due the Executive as a bonus for the fiscal year in which the Change in Control occurs, but such Pro-rata Bonus becomes a vested benefit upon a Change in Control and in no event shall the Executive have to repay all or any portion of the Pro-rata Bonus.

4.  Company's Covenants Summarized.  In order to induce the Executive to remain in the employ of the Company, the Company agrees, under the conditions described herein, to pay the Executive the Severance Payments and the other payments and benefits described herein.  Except as provided in Section 9.1 hereof, no Severance Payments shall be payable under this Agreement unless there shall have been (or, under the terms of the second sentence of Section 6.1 hereof, there shall be deemed to have been) a termination of the Executive's employment with the Company on or following a Change in Control and during the Term.  This Agreement shall not be construed as creating an express or implied contract of employment and, except as otherwise agreed in writing between the Executive and the Company, the Executive shall not have any right to be retained in the employ of the Company.

A-15

5. Compensation Other Than Severance Payments.

5.1  Following a Change in Control and during the Term, during any period that the Executive fails to perform the Executive's full-time duties with the Company as a result of incapacity due to physical or mental illness, the Company shall pay the Executive's full salary to the Executive at the rate in effect at the commencement of any such period, together with all compensation and benefits payable to the Executive under the terms of any compensation or benefit plan, program or arrangement (other than the Company's short- or long-term disability plan, as applicable, to the extent such benefits would be duplicative and their nonpayment would not prejudice Executive's future entitlement to benefits) maintained by the Company during such period, until the Executive's employment is terminated by the Company for Disability.

5.2  If the Executive's employment shall be terminated for any reason on or following a Change in Control and during the Term, the Company shall pay the Executive's full salary to the Executive through the Date of Termination at the rate in effect immediately prior to the Date of Termination or, if higher, the rate in effect immediately prior to the first occurrence of an event or circumstance constituting Good Reason, together with all compensation and benefits payable to the Executive through the Date of Termination under the terms of the Company's compensation and benefit plans, programs or arrangements as in effect immediately prior to the Date of Termination or, if more favorable to the Executive, as in effect immediately prior to the first occurrence of an event or circumstance constituting Good Reason (including all unpaid bonuses with respect to any prior fiscal year). In addition, if the Executive's employment is terminated on or following a Change in Control and during the Term, other than (A) by the Company for Cause, (B) by reason of death or Disability, or (C) by the Executive without Good Reason, then the Company shall pay Executive an amount equal to the product of (1) the product of (x) the Executive's base salary as in effect immediately prior to the Date of Termination, or, if higher, as in effect immediately prior to the first occurrence of an event or circumstance constituting Good Reason (the greater of such amounts, the "Base Salary") and (y) the Executive's normative bonus percentage for the year in which the Date of Termination occurs, or if higher, the normative bonus percentage for the fiscal year in which the Change in Control occurs or the normative bonus percentage in effect immediately prior to the first occurrence of an event or circumstance constituting Good Reason (the greatest of such percentages, the "Bonus Percentage") and (2) a fraction, the numerator of which is the number of days in the fiscal year in which the Date of Termination occurs through the date of the Date of Termination, and the denominator of which is 365; it being understood that, if the Date of Termination is in the same fiscal year as the Change in Control, the Pro-rata Bonus calculated pursuant to Section 3 shall be subtracted from the amount payable pursuant to this sentence of Section 5.2 but shall not reduce the amount payable below zero.

5.3  If the Executive's employment shall be terminated for any reason on or following a Change in Control and during the Term, the Company shall pay to the Executive the Executive's normal post-termination compensation and benefits as such payments become due.  Such post-termination compensation and benefits shall be determined under, and paid in accordance with, the Company's retirement, insurance and other compensation or benefit plans, programs and arrangements as in effect immediately prior to the Date of Termination or, if more favorable to the

Executive, as in effect immediately prior to the occurrence of the first event or circumstance constituting Good Reason.

6. Severance Payments.

6.1 If the Executive's employment is terminated on or following a Change in Control and during the Term, other than (A) by the Company for Cause, (B) by reason of death or Disability, or (C) by the Executive without Good Reason, then the Company shall pay the Executive the amounts, and provide the Executive the benefits, described in this Section 6.1 ("Severance Payments") and Section 6.2, in addition to any payments and benefits to which the Executive is entitled under Section 5 hereof or otherwise (except as provided herein). For purposes of this Agreement, the Executive's employment shall be deemed to have been terminated following a Change in Control by the Company without Cause or by the Executive with Good Reason, if (i) the Executive's employment is terminated by the Company without Cause prior to a Change in Control (whether or not a Change in Control ever occurs) and such termination was at the request or direction of a Person who enters into an agreement with the Company the consummation of which would constitute a Change in Control, (ii) the Executive terminates his employment for Good Reason prior to a Change in Control (whether or not a Change in Control ever occurs) and the circumstance or event which constitutes Good Reason occurs at the request or direction of such Person, or (iii) the Executive's employment is terminated by the Company without Cause or by the Executive for Good Reason and such termination or the circumstance or event which constitutes Good Reason is otherwise in connection with or in anticipation of a Change in Control (whether or not a Change in Control ever occurs).

(A) In lieu of any further salary payments to the Executive for periods subsequent to the Date of Termination and in lieu of any severance benefit otherwise payable to the Executive (whether pursuant to any employment agreement, plan, policy or otherwise), the Company shall pay to the Executive a lump sum severance payment, in cash, equal to two times the sum of (i) the Base Salary and Flexible Benefits Allowance and (ii) the product of (x) the Base Salary and (y) the Bonus Percentage. Such amounts shall be paid within the period described in Section 6.3.

(B) For the twenty-four (24) month period immediately following the Date of Termination, the Company shall arrange to provide the Executive and his dependents with life, disability, accident and health insurance benefits substantially similar to those provided to the Executive and his dependents immediately prior to the Date of Termination or, if more favorable to the Executive, those provided to the Executive and his dependents immediately prior to the first occurrence of an event or circumstance constituting Good Reason, at no greater cost to the Executive than the Executive's cost immediately prior to such date or occurrence (the "Executive's Cost"). Unless the Executive consents to a different method (after taking into account the effect of such method on the calculation of "parachute payments" pursuant to Section 6.2 hereof), the health insurance benefits described in this Section 6.1(B) shall be provided through a third-party insurer. In the event continued accident and health insurance coverage under this Section 6.1(B) is provided through the Company's self-insured health plan such coverage shall be limited to the first eighteen months following the Date of Termination. If the Executive is not receiving accident and health insurance coverage from another employer at the end of such eighteen month period, the Company shall pay the Executive a lump sum amount equal to six times the monthly COBRA health benefit

A-17

continuation premium for the Executive's coverage under the Company's accident and health insurance coverage. Benefits otherwise receivable by the Executive pursuant to this Section 6.1(B) shall be reduced to the extent benefits of the same type are received by or made available to the Executive by another employer of the Executive during the twenty four (24) month period following the Executive's termination of employment (and any such benefits received by or made available to the Executive shall be reported to the Company by the Executive); provided, however, that the Company shall reimburse the Executive for the excess, if any, of the cost of such benefits to the Executive over such cost immediately prior to the Date of Termination or, if more favorable to the Executive, the first occurrence of an event or circumstance constituting Good Reason.

(C)    For purposes of COBRA health benefit continuation under section 4980B of the Code, the cessation of benefits pursuant to Section 6.1(B) shall be treated as though such cessation is the "qualifying event" under section 4980B(f)(3) of the Code for purposes of determining the period of coverage.

(D)    The Company shall pay to the Executive a lump sum amount equal to one hundred thousand dollars ($100,000). Such amount shall be paid in the month following the Date of Termination.

(E)    The Company shall, at its sole expense as incurred, provide Executive with "key executive level" outplacement services for the period ending on December 31 of the second calendar year following the Termination Date at a cost of no more than fifteen percent (15%) of the sum of (i) Base Salary and (ii) the Bonus Percentage multiplied by Base Salary.

6.2    (A)    Whether or not the Executive becomes entitled to the Severance Payments, if any of the payments or benefits received or to be received by the Executive in connection with a Change in Control or the Executive's termination of employment (whether pursuant to the terms of this Agreement or any other plan, arrangement or agreement with the Company, any Person whose actions result in a Change in Control or any Person affiliated with the Company or such Person) (all such payments and benefits, excluding the Gross-Up Payment, being hereinafter referred to as the "Total Payments") will be subject to the Excise Tax, the Company shall pay to the Executive an additional amount (the "Gross-Up Payment") such that the net amount retained by the Executive, after deduction of any Excise Tax on the Total Payments and any federal, state and local income and employment taxes and any penalties, interest or fees incurred by the Executive as a result of any payment under Section 6.2 being made later than five business days prior to the due date of the excise tax with respect to which it is paid and any Excise Tax upon the Gross-Up Payment, shall be equal to the Total Payments.

(B)    For purposes of determining whether any of the Total Payments will be subject to the Excise Tax and the amount of such Excise Tax, (i) all of the Total Payments shall be treated as "parachute payments" (within the meaning of section 280G(b)(2) of the Code) unless, in the opinion of tax counsel ("Tax Counsel") reasonably acceptable to the Executive and selected by the accounting firm which was, immediately prior to the Change in Control, the Company's independent auditor (the "Auditor"), such payments or benefits (in whole or in part) do not constitute parachute payments, including by reason of section 280G(b)(4)(A) of the Code, (ii) all "excess

parachute payments" within the meaning of section 280G(b)(1) of the Code shall be treated as subject to the Excise Tax unless, in the opinion of Tax Counsel, such excess parachute payments (in whole or in part) represent reasonable compensation for services actually rendered (within the meaning of section 280G(b)(4)(B) of the Code) in excess of the Base Amount allocable to such reasonable compensation, or are otherwise not subject to the Excise Tax, and (iii) the value of any noncash benefits or any deferred payment or benefit shall be determined by the Auditor in accordance with the principles of sections 280G(d)(3) and (4) of the Code.  For purposes of determining the amount of the Gross-Up Payment, the Executive shall be deemed to pay federal income tax at the highest marginal rate of federal income taxation in the calendar year in which the Gross-Up Payment is to be made and state and local income taxes at the highest marginal rate of taxation in the state and locality of the Executive's residence or the Executive's place of business, whichever is higher, on the Date of Termination (or if there is not yet a Date of Termination, then the date on which the Gross-Up Payment is calculated for purposes of this Section 6.2), net of the maximum reduction in federal income taxes which could be obtained from deduction of such state and local taxes.

(C)     In the event that the Excise Tax is finally determined to be less than the amount taken into account hereunder in calculating the Gross-Up Payment, the Executive shall repay to the Company, within five (5) business days following the time that the amount of such reduction in the Excise Tax is finally determined, the portion of the Gross-Up Payment attributable to such reduction (including that portion of the Gross-Up Payment attributable to the Excise Tax and federal, state and local income and employment taxes imposed on the Gross-Up Payment being repaid by the Executive), to the extent that such repayment results in a reduction in the Excise Tax and a dollar-for-dollar reduction in the Executive's taxable income and wages for purposes of federal, state and local income and employment taxes, plus interest on the amount of such repayment at 120% of the rate provided in section 1274(b)(2)(B) of the Code.  Notwithstanding the foregoing, in the event any portion of the amount to be repaid to the Company has been paid to any tax authority, repayment thereof shall not be required until actual refund or credit of such portion has been made to Executive, and interest payable to the Company shall not exceed the interest received or credited to Executive by such tax authority.  In the event that the Excise Tax is determined to exceed the amount taken into account hereunder in calculating the Gross-Up Payment (including by reason of any payment the existence or amount of which cannot be determined at the time of the Gross-Up Payment), the Company shall make an additional Gross-Up Payment in respect of such excess (including any interest, penalties or additions payable by the Executive with respect to such excess and the Gross-Up Payment attributable to the Excise Tax and federal, state, and local income and employment taxes imposed on the Gross-Up Payment being made to the Executive) within five (5) business days following the time that the amount of such excess is finally determined.  The Executive and the Company shall each reasonably cooperate with the other in connection with any administrative or judicial proceedings concerning the existence or amount of liability for Excise Tax with respect to the Total Payments.

6.3  The payments provided in subsections (A), of Section 6.1 hereof and in Section 6.2 hereof shall be made not later than the fifth day following the Date of Termination (or if there is no Date of Termination, then the date on which the Gross-up Payment is calculated for purposes of Section 6.2 hereof); provided, however, that if the amounts of such payments cannot be finally determined on or before such day, the Company shall pay to the Executive on such day an estimate,

A-19

as determined in good faith by the Company or, in the case of payments under Section 6.2 hereof, in accordance with Section 6.2 hereof, of the minimum amount of such payments to which the Executive is clearly entitled and shall pay the remainder of such payments (together with interest on the unpaid remainder (or on all such payments to the extent the Company fails to make such payments when due) at 120% of the rate provided in section 1274(b)(2)(B) of the Code) as soon as the amount thereof can be determined but in no event later than the thirtieth (30th) day after the Date of Termination.    In the event that the amount of the estimated payments exceeds the amount subsequently determined to have been due, such excess shall constitute a loan by the Company to the Executive, payable on the fifth (5th) business day after demand by the Company (together with interest at 120% of the rate provided in section 1274(b)(2)(B) of the Code).

6.4  The Company also shall pay to the Executive all legal fees and expenses incurred by the Executive in disputing in good faith any issue hereunder relating to the termination of the Executive's employment, in seeking in good faith to obtain or enforce any benefit or right provided by this Agreement or in connection with any tax audit or proceeding to the extent attributable to the application of section 4999 of the Code to any payment or benefit provided hereunder.    Such payments shall be made within five (5) business days after delivery of the Executive's written requests for payment accompanied with such evidence of fees and expenses incurred as the Company reasonably may require (but in no event after the last day of the calendar year following the calendar year in which the expense is incurred).

7.  Termination Procedures and Compensation During Dispute.

7.1  Notice of Termination.  After a Change in Control and during the Term, any purported termination of the Executive's employment (other than by reason of death) shall be communicated by written Notice of Termination from one party hereto to the other party hereto in accordance with Section 10 of the Employment Agreement.   For purposes of this Agreement, a "Notice of Termination" shall mean a notice which shall indicate the specific termination provision in this Agreement relied upon and shall set forth in reasonable detail the facts and circumstances claimed to provide a basis for termination of the Executive's employment under the provision so indicated. Further, a Notice of Termination for Cause is required to include a copy of a resolution duly adopted by the affirmative vote of not less than three-quarters (3/4) of the entire membership of the Board at a meeting of the Board which was called and held for the purpose of considering such termination (after reasonable notice to the Executive and an opportunity for the Executive, together with the Executive's counsel, to be heard before the Board) finding that, in the good faith opinion of the Board, the Executive was guilty of conduct set forth in clause (i) or (ii) of the definition of Cause herein, and specifying the particulars thereof in detail.

7.2  Date of Termination.  "Date of Termination," with respect to any purported termination of the Executive's employment after a Change in Control and during the Term, shall mean (i) if the Executive's employment is terminated for Disability, thirty (30) days after Notice of Termination is given (provided that the Executive shall not have returned to the full-time performance of the Executive's duties during such thirty (30) day period), and (ii) if the Executive's employment is terminated for any other reason, the date specified in the Notice of Termination (which, in the case of a termination by the Company (except in the case of a termination for Cause) and, in the case of a

A-20

termination by the Executive, shall not be less than thirty (30) days from the date such Notice of Termination is given).

7.3 Dispute Concerning Termination. If within fifteen (15) days after any Notice of Termination is given, or, if later, prior to the Date of Termination (as determined without regard to this Section 7.3), the party receiving such Notice of Termination notifies the other party that a dispute exists concerning the termination, the Date of Termination shall be extended until the earlier of (i) the date prior to the date on which the Term ends or (ii) the date on which the dispute is finally resolved, either by mutual written agreement of the parties or by a final judgment, order or decree of an arbitrator or a court of competent jurisdiction (which is not appealable or with respect to which the time for appeal therefrom has expired and no appeal has been perfected); provided, however, that the Date of Termination shall be extended by a notice of dispute only if such notice is given in good faith and the party providing notice pursues the resolution of such dispute with reasonable diligence.

7.4 [intentionally blank]

8. No Mitigation. The Company agrees that, if the Executive's employment with the Company terminates during the Term, the Executive is not required to seek other employment or to attempt in any way to reduce any amounts payable to the Executive by the Company pursuant to this Agreement. Further, the amount of any payment or benefit provided for in this Agreement (other than Section 6.1(B) hereof) shall not be reduced by any compensation earned by the Executive as the result of employment by another employer, by retirement benefits, by offset against any amount claimed to be owed by the Executive to the Company, or otherwise.

9. Successors; Binding Agreement.

9.1 This Agreement shall inure to the benefit of and be binding upon the Company and its successors and assigns. In addition to any obligations imposed by law upon any successor to the Company, the Company will require any successor (whether direct or indirect, by purchase, merger, consolidation or otherwise) to all or substantially all of the business and/or assets of the Company to expressly assume and agree in writing to perform this Agreement in the same manner and to the same extent that the Company would be required to perform it if no such succession had taken place. The Company will require any ultimate parent entity, as defined in 16 C.F.R. 8801,1(a)(3), of any Person who acquires 90% of the outstanding shares of common stock of the Company or the outstanding voting securities of the Company entitled to vote generally in the election of directors (including through a merger in which the Company does not survive or as a result of which the Company becomes a subsidiary of another Person or a consolidation involving the Company and another Person) to assume and agree in writing to perform as a joint and several obligor of the Company (including any successor to the Company), this Agreement in the same manner and to the same extent as the Company. Failure of the Company to obtain such assumption and agreement in writing from a successor or its parent as described in the preceding sentences after notice and a reasonable cure period (not to exceed ten days from the date such notice is received) shall be a breach of this Agreement and shall entitle the Executive to compensation from the Company in the same amount and on the same terms as the Executive would be entitled to hereunder if the Executive were to terminate the Executive's employment for Good Reason after a Change in Control, except that, for

purposes of implementing the foregoing, the date on which any such succession becomes effective shall be deemed the Date of Termination.

9.2 This Agreement shall inure to the benefit of and be enforceable by the Executive's personal or legal representatives, executors, administrators, successors, heirs, distributees, devisees and legatees. If the Executive shall die while any amount would still be payable to the Executive hereunder (other than amounts which, by their terms, terminate upon the death of the Executive) if the Executive had continued to live, all such amounts, unless otherwise provided herein, shall be paid in accordance with the terms of this Agreement to the executors, personal representatives or administrators of the Executive's estate.

10. **Insurance and Indemnification.** From and after a Change in Control, including after the termination of Executive's employment, the Company shall indemnify, defend and hold the Executive harmless from and against any and all expenses, liabilities, damages, costs, judgments, penalties, fines and amounts paid in settlement, incurred in good faith by Executive in connection with any proceeding involving Executive by reason of Executive's being or having been an officer, director, employee or agent of the Company (or any affiliate of the Company) to the fullest extent permitted by law, whether or not Executive is, or is threatened to be made, a party to any threatened, pending, or completed proceeding, and whether or not Executive is successful in such proceeding. In addition, upon receipt from Executive of (i) a written request for an advancement of reasonable expenses which Executive reasonably believes will be subject to indemnification hereunder and (ii) a written undertaking by Executive to repay any such amounts if it shall ultimately be determined that the Executive is not entitled to indemnification under this Agreement or otherwise, the Company shall advance such expenses to Executive or pay such expenses for Executive, all in advance of the final disposition of any such matter. From and after a Change in Control, including after the termination of Executive's employment hereunder, Executive shall have coverage under a director's and officer's liability insurance policy in amounts no less than, and on terms no less favorable than those, provided to senior executive officers of the Company from time to time.

11. **Definitions.** For purposes of this Agreement, the following terms shall have the meanings indicated below:

(A) "Affiliate" shall have the meaning set forth in Rule 12b-2 promulgated under Section 12 of the Exchange Act.

(B) "Agreement" shall mean this Attachment A to the Employment Agreement.

(B) "Auditor" shall have the meaning set forth in Section 6.2 hereof.

(C) "Base Amount" shall have the meaning set forth in section 280G(b)(3) of the Code.

(D) "Code" shall mean the Internal Revenue Code of 1986, as amended from time to time.

(E) "Company" shall mean Hayes Lemmerz International, Inc. and, except in determining under Section 15(G) hereof whether or not any Change in Control of the Company has occurred,

shall include any successor to its business and/or assets which assumes and agrees to perform this Agreement by operation of law, or otherwise.

(F) "Excise Tax" shall mean any excise tax imposed under section 4999 of the Code or any similar state or local tax or any interest or penalties incurred by Executive with respect to such excise tax.

(G) "Person" shall have the meaning given in Section 3(a)(9) of the Exchange Act, as modified and used in Sections 13(d) and 14(d) including a "group" within the meaning of Section 13(d)(3) thereof, except that such term shall not include (i) the Company or any of its subsidiaries, (ii) a trustee or other fiduciary holding securities under an employee benefit plan of the Company or any of its Affiliates, (iii) an underwriter temporarily holding securities pursuant to an offering of such securities, or (iv) a corporation owned, directly or indirectly, by the stockholders of the Company in substantially the same proportions as their ownership of stock of the Company.

(H) "Retirement" shall be deemed the reason for the termination by the Executive of the Executive's employment if such employment is terminated in accordance with the Company's retirement policy, including early retirement, generally applicable to its salaried employees.

A-23

## Exhibit I

**Modifications to Supplemental Executive Retirement Plan**

**PLAN EXHIBIT I**

## Modifications to the Supplemental Executive Retirement Plan

Section 6.7 of the Plan provides that the Debtors shall assume any remaining obligations under the Hayes Lemmerz International, Inc. Executive Retirement Plan, restated as of January 1, 2005 (the "SERP"), subject to any modifications required by the Requisite DIP Lenders and as identified on this Plan Exhibit I. The following proposed modification of the SERP shall be effective immediately upon entry of the Confirmation Order without any further action by the Debtors or any other party, subject only to the occurrence of the Plan Effective Date:

> Notwithstanding anything contained in the SERP to the contrary (including, without limitation, Section 11.13 thereof), no transaction entered into, or other event occurring, pursuant to, as a result of, or in any way in connection with, the confirmation of the Plan shall constitute a "Change of Control" under and as defined in the SERP.

I-2

## Exhibit J

## Amended Schedule of Rejected Contracts and Leases

PLAN EXHIBIT J

**Hayes Lemmerz International, Inc. et al**
**Amended Schedule of Rejected Contracts and Leases**

| Counterparty(ies) | Description of Contract(s) |
|---|---|
| Brembo North America, Inc., Hayes Lemmerz International – Homer, Inc. Hayes Lemmerz International – Frenos S.A. de C.V. Brembo S.p.A.[1] | Stock Purchase Agreement by and among Brembo North America, Inc. and HLI Brakes Holding Company, Inc., dated as of November 9, 2007. |
| | Transition Services Agreement dated November 9, 2007, by and among Brembo North America, Inc. and its subsidiaries Hayes Lemmerz International – Homer, Inc. and Hayes Lemmerz International – Frenos S.A. de C.V. and HLI Operating Company, Inc. |
| Daniel D. Minor Todd G. Carlson Hayes Lemmerz International – Equipment and Engineering, Inc. | Stock Purchase Agreement dated June 30, 2005, by and among Daniel D. Minor, Todd G. Carlson, Hayes Lemmerz International – Equipment and Engineering, Inc. and HLI Services Holding Company, Inc. |
| Diversified Machine, Inc., Hayes Lemmerz International – Bristol, Inc. Hayes Lemmerz International – Montague, Inc.[2] | Stock Purchase Agreement dated as of February 1, 2007, by and among Diversified Machine, Inc., HLI Operating Company, Inc. and HLI Suspension Holding Company. |
| Harvey Industries LLC Harvey Property Management LLC Spacer Industries, Inc. | Asset Purchase Agreement dated as of July 3, 2007 by and among Harvey Industries LLC, Harvey Property Management LLC, Spacer Industries, LLC, Hayes Lemmerz International – Wabash, Inc. and HLI Operating Company, Inc. |
| | Transition Services Agreement dated July 3, 2007 by and among Harvey Industries LLC and HLI Operating Company, Inc. |
| Harvey Industries LLC | Equipment Lease Agreement dated 2008 between Hayes Lemmerz International – Laredo, Inc. and Harvey Industries LLC |
| Integrity Interactive, Inc. | Service Agreement dated February 7, 2005 and all Renewal Agreements thereto between Integrity Interactive Corporation and |

---

[1]   The Debtors do not reject, and in accordance with section 7.1 of the Plan of Reorganization, intend to assume (i) Lease Agreement dated November 9, 2007 by and between HLI Operating Company, Inc. and Brembo North America, Inc. and (ii) First Addendum to Lease Agreement dated July 31, 2008 and any and all subsequent addenda thereto.

[2]   The Debtors do not reject, and in accordance with section 7.1 of the Plan of Reorganization, intend to assume Escrow Agreement by and among Diversified Machine, Inc., HLI Operating Company, Inc. and HLI Suspension Holding Company, Inc.

| | Hayes Lemmerz International, Inc. |
|---|---|
| Minor Investments, LLC<br>TRA Investments, LLC<br>AWB Investments, LLC<br>Whitebox Hedged High Yield/ Cadillac Cashing Acquisitions, LTD<br>Hayes Lemmerz International – Cadillac, Inc.[3] | Stock Purchase Agreement dated December 5, 2005, between Minor Investments, LLC, TRA Investments, LLC, AWB Investments, LLC, Whitebox Hedged High Yield/Cadillac Casting Acquisition, Ltd., Hayes Lemmerz International – Cadillac, Inc. and HLI Suspension Holding Company, Inc. |
| | Transition Services Agreement dated December 5, 2005 by and among Hayes Lemmerz International – Cadillac, Inc. and HLI Operating Company, Inc. |
| OCE Imagistics, Inc. | Printer/plotter lease |
| Precision Partners Holding Company<br>Hayes Lemmerz International – Mexico, Inc.<br>Hayes Lemmerz International – Hub and Drum, Inc.<br>Hayes Lemmerz Mexico, S.A. de C.V. | Stock Purchase Agreement dated October 14, 2005, by and among Precision Partners Holding Company, HLI Operating Company, Inc., HLI Commercial Highway Holding Company, Inc. and Hayes Lemmerz International – Commercial Highway, Inc. |
| | Transition Services Agreement by and among Hayes Lemmerz International – Mexico, Inc., Hayes Lemmerz International – Hub and Drum, Inc., Hayes Lemmerz Mexico, S.A. de C.V and HLI Operating Company, Inc. |
| Rudeveca | Asset Purchase Agreement |
| Shareholder.com | Subscriber Agreement dated November 29, 2008. |
| Hayes Brake Controller Company, LLC<br>Syncro Corporation | Asset Purchase Agreement dated October 17, 2005 by and among Hayes Brake Controller Company, LLC and Hayes Lemmerz International – Commercial Highway, Inc. |
| TDS (Germany) | Remote Service Management (SAP) |
| Tetra Financial Group | Letter of intent for sale and leaseback of buildings and equipment, Sedalia, MO facility dated January 21, 2009. |
| Tetra Financial Group | Letter of intent for sale and leaseback of buildings and equipment, Sedalia, MO facility dated February 9, 2009. |
| Thomson Financial, LLC | Client Agreement Number 00003963.0 and all addenda thereto. |

---

[3] The Debtors do not reject, and in accordance with section 7.1 of the Plan of Reorganization, intend to assume the Supply and Purchase Agreement dated December 5, 2005 by and between Hayes Lemmerz International – Southfield, Inc., Hayes Lemmerz International – Montague, Inc., Hayes Lemmerz International – Wabash, Inc, Hayes Lemmerz International – Laredo, Inc. and Hayes Lemmerz International – Cadillac, Inc.

## Exhibit K

### Material Terms of Post-Plan Effective Date Secured Term Loan

**Hayes International, Inc.**
**HLI Operating Company, Inc.**
**Hayes Lemmerz Finance LLC - Luxembourg S.C.A.**
**Summary of Proposed Terms & Conditions**
**Exit Facility**
**$85,000,000 to $125,000,000 New Money Term Loan**
**$100,000,000 Roll-Over Term Loan**

*Not a Commitment: This draft term sheet (this "Term Sheet") is provided for discussion only and does not constitute a financing commitment. Except as expressly provided in any binding written agreement the parties may enter into in the future, no past, present or future action, course of conduct, or failure to act relating to the transactions or proposals referred to in this Term Sheet or relating to the negotiation of the terms of such transactions or proposals shall give rise to or serve as the basis for any obligation or other liability on the part of such persons or any of their affiliates. All terms and conditions of the facilities described herein are (i) subject to definitive documentation to be agreed to among the Borrowers, Deutsche Bank Securities Inc. ("DB"), in its capacity as prospective lead arranger and agent under the Exit Facilities, the DIP Lenders and prospective lenders under the Exit Facility and (ii) subject to change pursuant to agreement by the Borrowers, DB and prospective lenders, in each case, without consent or further order of the Bankruptcy Court.*

*This Term Sheet (i) does not constitute a commitment on the part of, or engagement of, DB, the DIP Lenders, any prospective lenders or any of their respective affiliates to provide, arrange, place, underwrite and/or participate in any or all of the facilities described herein and that neither DB, the DIP Lenders, any prospective lenders or any of their respective affiliates is under any obligation, as a result of this Term Sheet, to provide or offer to provide any such commitment or engagement, (ii) DB cannot make any commitments on behalf of any of its affiliates, the DIP Lenders, prospective lenders or any of their respective affiliates under the Exit Facilities and (iii) any commitment or engagement by DB, the DIP Lenders, any prospective lenders or any of their respective affiliates in respect of the facilities described herein would be evidenced by a separate writing and be subject to, among other things, (w) DB's, the DIP Lenders' and the prospective lenders' satisfaction with the capital structure to finance the facilities described herein, (x) DB's, the DIP Lenders' and the prospective lenders' satisfactory completion of its business, legal, tax, financial and accounting due diligence with respect to the Borrowers, their subsidiaries and the facilities described herein, (y) DB's, the DIP Lenders' and the prospective lenders' receipt of all credit and other internal approvals and our verification of all assumptions we have made and (z) the satisfaction of all conditions DB, the DIP Lenders and any prospective lenders would require to be fulfilled with respect thereto.*

Reference is made to that certain Second Amended and Restated Credit Agreement, dated as of May 30, 2007 (as heretofore amended, modified and supplemented, the "Amended

DIP Credit Agreement") among the HLI Operating Company, Inc., a Delaware corporation ("Hayes" or the "U.S. Borrower") and Hayes Lemmerz Finance LLC - Luxembourg S.C.A., a société en commandite par actions organized under the laws of the Grand Duchy of Luxembourg ("Hayes Luxembourg" or "Luxembourg Borrower", together with the U.S. Borrower, the "Borrowers"), Hayes Lemmerz Finance LLC - Luxembourg S.C.A., a société en commandite par actions organized under the laws of the Grand Duchy of Luxembourg, Hayes Lemmerz International, Inc., a Delaware corporation ("Holdings"), the Lenders and the other parties thereto, as amended by Amendment No. 1, dated as of January 30, 2009, among the Borrowers, Holdings and the Prepetition Administrative Agent, as further amended by Amendment No. 2, dated as of May 12, 2009, among the Borrowers, Holdings, each DIP Lender (as defined therein) party thereto, the DIP Administrative Agent, the DIP Lead Arrangers and the DIP Documentation Agent (in each case as defined therein) and as further amended from time to time. Capitalized terms used but not otherwise defined herein shall have the meaning ascribed to such terms in the Amended DIP Credit Agreement.

| New Money Term Loan ("New Money Term Loan") | |
|---|---|
| **Facility:** | A term loan facility in an aggregate principal amount of $85,000,000 to $125,000,000 (or Euro equivalent) (subject to a sublimit of New Money Term Loans available in Euros to be agreed and a sublimit for New Money Term Loans to be borrowed by Hayes to be agreed) to be used in accordance with the "Purpose" described below and subject to the terms and conditions below. |
| **Borrowers:** | Hayes and Hayes Luxembourg |
| **Term Guarantors:** | All obligations of the Borrowers under the New Money Term Loan portion of the Exit Facility will be unconditionally guaranteed by each of its U.S. subsidiaries, with the exception of certain subsidiaries to be agreed upon ("US Guarantors").<br><br>All obligations of the Luxembourg Borrower under the New Money Term Loan portion of the Exit Facility will be unconditionally guaranteed by each (i) existing and future direct and indirect subsidiary of the Luxembourg Borrower ("Foreign Guarantors") and (ii) Hayes and each of its U.S. subsidiaries, with the exception of certain joint ventures and certain subsidiaries to be agreed upon. |
| **Purpose:** | (a) Up to an amount to be agreed will be used to fund a cash collateral account for the issuance of trade and standby letters of credit for the benefit of the Borrowers and their subsidiaries pursuant to a revolving letter of credit facility with an issuing bank to be determined ("LC Facility") and (b) the remainder of the proceeds of the New Money Term Loan will be used to provide working capital and to fund other general corporate purposes of the Borrowers (including fees and expenses in connection with the Exit |

| | |
|---|---|
| | Facilities and the consummation of the Plan); provided, that, the amount of proceeds received by the U.S. Borrower and the U.S. subsidiaries will not exceed an amount to be agreed. |
| **Currency:** | U.S. Dollars and Euros |
| **Maturity/Tenor:** | 48 months |
| **Pricing:** | For New Money Term Loans in U.S. Dollars: LIBOR+ 700 to 1000 bps with a LIBOR floor of 200 to 300 bps.<br><br>For New Money Term Loans in Euros: EURIBOR+ 700 to 1000 bps with a EURIBOR floor of 200 to 300 bps. |
| **Upfront Fees; Arranger Fee; Agency Fee** | Upfront Fees:  200 to 500 bps to each New Money Term Loan lender or Incremental Term Loan lender on the total New Money Term Loan or Incremental Term Loan (as defined below) funded by such lender, payable in cash upon funding.<br><br>Arranger Fee:  $3.0 million to DB, as lead arranger and bookrunner (in such capacity, the "Lead Arranger"), payable in cash upon closing of the New Money Term Loan.<br><br>Agency Fee:  $125,000 per annum payable in advance to the administrative agent for the New Money Term Loan and the Roll-Over Term Loan. |
| **Amortization:** | 1% per annum payable on a quarterly basis. |
| **Security:** | The New Money Term Loan will secured on a pari passu basis with the Roll-Over Term Loan; provided, that, the Roll-Over Loan may be subordinated in priority to the New Money Term Loan, at the discretion of Lead Arranger, prior to closing.<br><br>The portion of the New Money Term Loan borrowed by the Luxembourg Borrower will be secured by a first-priority lien on all assets of the Luxembourg Borrower, the Foreign Guarantors and the US Guarantors.<br><br>The portion of the New Money Term Loan borrowed by the U.S. Borrower will be secured by a first-priority lien on all assets of the U.S. subsidiaries; provided, however, that a pledge of no more than a 65% pledge of the equity interests in the first tier foreign subsidiaries of Hayes shall be provided[1].<br><br>The New Money Term Loan borrowed by the U.S. Borrower and the New Money Term Loan borrowed by the Luxembourg Borrower will be subject to a pari passu collateral sharing agreement. |

---

[1] The limited credit support for the debt of Hayes is based on an assumption that Luxembourg Borrower is treated as a corporation for U.S. tax purposes and, if such an election is not made, such limitation shall not apply.

| | |
|---|---|
| **Key Financial Covenants:** | Financial covenants will include, but not limited to, provisions establishing, *inter alia*, the maximum leverage, maximum CapEx, and minimum fixed charge coverage ratio. |
| **Affirmative Covenants:** | Substantially similar to the Amended DIP Agreement with agreed upon modifications. |
| **Negative Covenants:** | Substantially similar to the Amended DIP Agreement with agreed upon modifications. |
| **Events of Default:** | Substantially similar to the Amended DIP Agreement with agreed upon modifications. |
| **Mandatory Prepayments:** | Mandatory Prepayments under the New Money Term Loan will include, but are not limited to:<br>• 100% of net cash proceeds from any incurrence of indebtedness, equity issuance, or asset sales after the closing date, subject to exceptions to be agreed<br>• an excess cash flow sweep to agreed |
| **Conditions to Effectiveness:** | • Borrowers have entered into an LC Facility in form and substance satisfactory to the DIP Lenders and, contemporaneously with the borrowing the New Money Term Loan, funded the associated LC Facility cash collateral account in amount not less than an amount to be agreed<br>• Borrowers shall have initiated processes with Moody's Investor Services and Standard and Poor's to obtain ratings of the New Money Term Loan within a reasonable time period after closing<br>• Customary conditions precedent for transaction of this type<br>• Satisfaction of all conditions set forth in Sections 11.1 and 11.2 of the Plan of Reorganization (or waiver on one of more conditions in accordance with Section 11.3 of the Plan of Reorganization)<br>• Other conditions as requested by the Requisite DIP Lenders |
| **Other:** | A standby uncommitted term loan facility (the "<u>Incremental Term Loan</u>", which shall be considered part of the New Money Term Loan), in one or more series, in an aggregate amount not exceeding $50,000,000 (or Euro equivalent) to be used in accordance with the "Purpose" described above and subject to the terms and conditions below.  Following a request by the Borrowers, Incremental Term Loans may be made available by any of the New Money Term Loan lenders, in their sole discretion, with the consent of a majority of Exit Facility lenders.  The New Money Term Loan will include a "most favored nation" provision with respect to any of the terms and conditions offered with respect to such Incremental Term Loan that are more favorable than the terms and conditions of the New Money Term Loan. |

| Roll-Over Term Loan ("Roll-Over Term Loan") | |
|---|---|
| **Facility:** | A term loan facility in an aggregate principal amount of $100,000,000 (or Euro equivalent) (subject to a limitation of Roll-Over Loan denominated in Euros to be agreed) to be agreed to be used in accordance with the "Purpose" described below and subject to the terms and conditions below. |
| **Borrower:** | Hayes and Hayes Luxembourg, in amounts to each Borrower to be agreed. |
| **Term Guarantors:** | All obligations of the Borrowers under the Roll-Over Term Loan portion of the Exit Facility will be unconditionally guaranteed by the US Guarantors.<br><br>All obligations of the Luxembourg Borrower under the Roll-Over Term Loan portion of the Exit Facility will be unconditionally guaranteed by each (i) the Foreign Guarantors and (ii) Hayes and each of its U.S. subsidiaries, with the exception of certain joint ventures and certain subsidiaries to be agreed upon. |
| **Purpose:** | Roll-Over Term Loan will be used to amend, restate and continue the DIP Facilities without any incremental new proceeds being provided to the Borrowers.<br><br>Subject to Requisite DIP Lender consent, amounts in the Collateral Account pursuant to the Amended DIP Agreement shall be made fully available to the Borrowers concurrently with the closing of the Exit Facilities. |
| **Currency:** | US Dollars and Euros |
| **Maturity/Tenor:** | 60 months |
| **Pricing:** | For Roll-Over Term Loans in U.S. Dollars: LIBOR + 900 to 1200 bps with a LIBOR floor of 200 to 300 bps.<br><br>For Roll-Over Term Loans in Euros: EURIBOR+ 900 to 1200 bps with a EURIBOR floor of 200 to 300 bps. |
| **Amortization:** | 1% per annum payable on a quarterly basis. |
| **Security:** | The Roll-Over Term Loan will be secured on a pari passu basis with the New Money Term Loan; provided, that, the Roll-Over Loan may be subordinated in priority to the New Money Term Loan, at the discretion of Lead Arranger, prior to closing.<br><br>The portion of the Roll-Over Term Loan borrowed by the Luxembourg Borrower will be secured by a first-priority lien on all assets of the Luxembourg Borrower, the Foreign Guarantors and the US Guarantors.<br><br>The portion of the Roll-Over Term Loan borrowed by the U.S. |

| | Borrower will be secured by a first-priority lien on all assets of Hayes, the US Guarantor; provided, however, that a pledge of no more than a 65% pledge of the equity interests in the first tier foreign subsidiaries of Hayes shall be provided[2].<br><br>The Roll-Over Term Loan borrowed by the U.S. Borrower and the Roll-Over Term Loan borrowed by the Luxembourg Borrower will be subject to a pari passu collateral sharing agreement. |
|---|---|
| **Key Financial Covenants:** | Financial covenants will include, but not limited to, provisions establishing, *inter alia*, the maximum leverage, maximum CapEx, and minimum fixed charge coverage ratio. |
| **Affirmative Covenants:** | Substantially similar to the Amended DIP Agreement with agreed upon modifications. |
| **Negative Covenants:** | Substantially similar to the Amended DIP Agreement with agreed upon modifications. |
| **Events of Default:** | Substantially similar to the Amended DIP Agreement with agreed upon modifications. |
| **Mandatory Prepayments:** | Mandatory Prepayments under the Roll-Over Term Loan will include, but are not limited to:<br>• 100% of net cash proceeds from any incurrence of indebtedness, equity issuance, or asset sales after the closing date, subject to exceptions to be agreed<br>• an excess cash flow sweep to agreed |
| **Conditions to Effectiveness:** | • Customary conditions precedent for transaction of this type<br>• Borrowers shall have initiated processes with Moody's Investor Services and Standard and Poor's to obtain ratings of the Roll-Over Term Loan within a reasonable time period after closing<br>• Satisfaction of all conditions set forth in Sections 11.1 and 11.2 of the Plan of Reorganization (or waiver on one of more conditions in accordance with Section 11.3 of the Plan of Reorganization)<br>• Other conditions as requested by the Requisite DIP Lenders |

## AMENDMENTS

This term sheet and the terms and conditions of the loan facilities contemplated herein shall be subject to amendment by the Requisite DIP Lenders.

## INTERCREDITOR ARRANGEMENTS

Each of the facilities described above will be subject intercreditor arrangements in one or more agreements subject to terms to be agreed upon.

## STRUCTURE AND TERMS FLEX

---

[2] The limited credit support for the debt of Hayes is based on an assumption that Luxembourg Borrower is treated as a corporation for U.S. tax purposes and, if such an election is not made, such limitation shall not apply.

The Lead Arranger shall be entitled to change the interest rate margins, LIBOR Floor or other pricing terms (notwithstanding the indicative pricing above), Up-Front Fees, terms and structure of the New Money Term Loan and the Roll-Over Term Loan (collectively, the "Exit Facilities") (including, without limitation, the call protection in respect of the Exit Facilities, requiring an original issue discount, requiring additional collateral security for either Exit Facility, changing the collateral security priority with respect to either Exit Facility, creating additional senior or senior subordinated facilities and/or one or more subordinated and/or junior subordinated facilities, and/or substituting portions of the Exit Facilities with other financings of the Borrowers and/or its Subsidiaries or Affiliates including debt securities (including senior or subordinated, with interest payable thereon in cash and/or "in-kind"), asset based financings and/or securitizations), if the Lead Arranger determines that such changes are advisable for 100% of the Exit Facilities to be placed.

## Exhibit L

## Form of Warrants Agreement

**L-1 Form of Series A & B Warrants Agreement**

HAYES LEMMERZ INTERNATIONAL, INC.

and

MELLON INVESTOR SERVICES LLC,

as Warrant Agent

———————————————

WARRANT AGREEMENT

Dated as of _____, 2009

———————————————

Warrants to Purchase Common Stock, par value $.01 per share

———————————————

**TABLE OF CONTENTS**

**Page**

ARTICLE I ISSUANCE OF WARRANTS AND EXECUTION AND DELIVERY OF WARRANT CERTIFICATES ................................................................2

    Section 1.01        Issuance of Warrants .........................................................2
    Section 1.02        Execution and Delivery of Warrant Certificates ...........................2
    Section 1.03        Issuance of Warrant Certificates ...........................................3

ARTICLE II WARRANT PRICE, DURATION AND EXERCISE OF WARRANTS ...............4

    Section 2.01        Exercise Price. .................................................................4

    Section 2.02        Duration of Warrants .........................................................4
    Section 2.03        Exercise of Warrants .........................................................4
    Section 2.04        Reservation of Warrant Shares ..............................................9

ARTICLE III OTHER PROVISIONS RELATING TO RIGHTS OF HOLDERS OF WARRANT ................................................................10

    Section 3.01        No Rights as Stockholder Conferred by Warrants or .....................
                         Warrant Certificates .........................................................10
    Section 3.02        Lost, Mutilated, Stolen or Destroyed Warrant Certificates ............10
    Section 3.03        General Information to be Provided by the Company ...................10
    Section 3.04        Notice of Certain Events .....................................................11

ARTICLE IV EXCHANGE AND TRANSFER ..................................................11

    Section 4.01        Exchange and Transfer .......................................................11
    Section 4.02        Restrictions on Transfer; Restrictive Legend .............................12
    Section 4.03        Treatment of Holders of Warrant Certificates. ...........................14
    Section 4.04        Cancellation of Warrant Certificates. ....................................14

ARTICLE V ADJUSTMENT OF WARRANT PRICE AND NUMBER OF WARRANT SECURITIES ................................................................14

    Section 5.01        Adjustments Generally .......................................................14
    Section 5.02        Stock Dividends; Split-Ups .................................................14
    Section 5.03        Aggregation of Shares .......................................................14
    Section 5.04        Adjustments in Exercise Price ..............................................15
    Section 5.05        Replacement of Securities upon Reorganization .......................15
    Section 5.06        Notices of Changes in Warrant ............................................15
    Section 5.07        No Fractional Shares .........................................................16

i

Section 5.08      Form of Warrant ...........................................................................16
Section 5.09      Extraordinary Transactions ..........................................................16
Section 5.10      De Minimis Adjustments ...............................................................16

ARTICLE VI CONCERNING THE WARRANT AGENT ......................................................16

Section 6.01      Warrant Agent .............................................................................16
Section 6.02      Conditions of Warrant Agent's Obligations ...............................17
Section 6.03      Resignation and Appointment of Successor...............................19

ARTICLE VII REGISTRATION RIGHTS ...........................................................................21

Section 7.01      S-3 Registration ..........................................................................21
Section 7.02      Piggyback Registration ...............................................................21
Section 7.03      Registration Procedures .............................................................22
Section 7.04      Holder Obligations......................................................................25
Section 7.05      Registration Expenses .................................................................26
Section 7.06      Limitations on Subsequent Registration Rights .........................27

ARTICLE VIII MISCELLANEOUS.......................................................................................27

Section 8.01      Amendment ..................................................................................27
Section 8.02      Notices and Demands to the Company and Warrant Agent..........27
Section 8.03      Addresses.....................................................................................28
Section 8.04      Applicable Law............................................................................28
Section 8.05      Obtaining of Governmental Approval .........................................28
Section 8.06      Persons Having Rights Under Warrant Agreement......................28
Section 8.07      Headings......................................................................................28
Section 8.08      Counterparts ...............................................................................28
Section 8.09      Inspection of Agreement..............................................................28
Section 8.10      Notices to Holders of Warrants ..................................................29
Section 8.11      Binding Effects............................................................................29
Section 8.12      Severability..................................................................................29

## WARRANT AGREEMENT

THIS AGREEMENT dated as of_____, 2009 (the "Effective Date") between HAYES LEMMERZ INTERNATIONAL, INC., a Delaware corporation (the "Company"), and MELLON INVESTOR SERVICES LLC, a New Jersey limited liability company, as Warrant Agent (the "Warrant Agent").

### W I T N E S S E T H :

WHEREAS, on May 11, 2009, the Company and certain of the Company's direct and indirect subsidiaries each filed a voluntary petition in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") initiating cases under chapter 11 of title 11 of the United States Code §§ 101-1330 and continued in the possession of their assets and in the management of their businesses pursuant to sections 1107 and 1108 of the Bankruptcy Code; and

WHEREAS, the [Plan of Reorganization of [Hayes Lemmerz International, Inc., et al.], as confirmed on [_____], 2009 by an order of the Bankruptcy Court entered on [_____], 2009 (the "Plan"), provides that the Company shall issue to certain holders of the 8.25 % Senior Notes due 2015 of Hayes Lemmerz Finance LLC – Luxembourg S.C.A. (the "Noteholders") and to the Pension Benefit Guaranty Corporation (together with the Noteholders, the "Holders") Series A Warrants of the Company (the "Series A Warrants" or the "Warrants"), entitling the Holders to purchase shares (the "Warrant Shares") of the Company's Class A Common Stock, par value $0.01 per share (the "Common Stock"); and

WHEREAS, the Plan provides that the Company shall also issue to the Holders Series B Warrants of the Company (the "Series B Warrants"), entitling the Holders to purchase shares of the Common Stock; and

WHEREAS, the Company desires the Warrant Agent to act on behalf of the Company in connection with the issuance, transfer, exchange, exercise and replacement of the certificates representing the Warrant Shares (the "Warrant Certificates"), and in this Agreement wishes to set forth, among other things, the form and provisions of the Warrant Certificates and the terms and conditions on which they may be issued, transferred, exchanged, exercised and replaced;

NOW, THEREFORE, in consideration of the premises and of the mutual agreements herein contained, the parties hereto agree as follows:

## ARTICLE I
## ISSUANCE OF WARRANTS AND EXECUTION AND DELIVERY OF WARRANT CERTIFICATES

Section 1.01    Issuance of Warrants.  The Warrants shall be evidenced by one or more Warrant Certificates.  Each Warrant evidenced thereby, shall represent the right, subject to the provisions contained herein and therein, to purchase one share of the Warrant Shares.  The Company, on the date hereof shall deliver to each Holder duly executed Warrant Certificates registered in the name of each Holder for the number of Warrant Shares required pursuant to the Plan.  Upon exercise for cash, the Warrants shall initially entitle the Holders of such Warrants to 555,555 shares of Common Stock, as such amount may be adjusted from time to time pursuant to this Agreement.

Section 1.02    Execution and Delivery of Warrant Certificates.

(a)    Each Warrant, shall be evidenced by a Warrant Certificate in registered form substantially in the form set forth in Exhibit A hereto, shall be dated and may have such letters, numbers or other marks of identification or designation and such legends or endorsements printed, lithographed or engraved thereon as the officers of the Company executing the same may approve (execution thereof to be conclusive evidence of such approval) and as are not inconsistent with the provisions of this Agreement, or as may be required to comply with any law or with any rule or regulation made pursuant thereto.  The Warrant Certificates shall be signed on behalf of the Company by its chairman or vice chairman of the Board of Directors of the Company (the "Board of Directors"), the chief financial officer, the president, any vice president, any assistant vice president, the treasurer or any assistant treasurer of the Company, which may but need not be attested by its secretary or one of its assistant secretaries.  Such signatures may be manual or facsimile signatures of such authorized officers and may be imprinted or otherwise reproduced on the Warrant Certificates.  The Warrant Certificates shall be subject to all of the terms and conditions of the Warrant Agreement, which terms and conditions shall be incorporated therein by reference and made a part thereof.  Notwithstanding anything contained herein to the contrary, if any terms or conditions of the Warrant Certificates shall be found to conflict with any terms or conditions of the Warrant Agreement, the Warrant Agreement shall control.

(b)    No Warrant Certificate shall be valid for any purpose, and no Warrant evidenced thereby shall be exercisable, until such Warrant Certificate has been countersigned by the Warrant Agent by manual or facsimile signature.  Such signature by the Warrant Agent upon any Warrant Certificate executed by the Company shall be conclusive evidence, and the only evidence, that the Warrant Certificate so countersigned has been duly issued hereunder.

(c)    In case any officer of the Company who shall have signed any of the Warrant Certificates either manually or by facsimile signature shall cease to be such officer before the Warrant Certificates so signed shall have been countersigned and delivered by the Warrant Agent as provided herein, such Warrant Certificates may be countersigned and delivered notwithstanding that the person who signed such Warrant Certificates ceased to be

2

such officer of the Company; and any Warrant Certificate may be signed on behalf of the Company by such persons as, at the actual date of the execution of such Warrant Certificate, shall be the proper officers of the Company, although at the date of the execution of this Agreement any such person was not such officer.

(d)     The term "Holder," when used with respect to any Warrant Certificate, shall mean any person in whose name at the time such Warrant Certificate shall be registered upon the books to be maintained by the Warrant Agent for that purpose.

Section 1.03    Issuance of Warrant Certificates.

(a)     Warrant Certificates evidencing the right to purchase the Warrant Shares (except as provided in Sections 2.03, 3.02 and 4.01) may be executed by the Company and delivered to the Warrant Agent upon the execution of this Warrant Agreement. The Warrant Agent shall, upon receipt of a written order of the Company, Warrant Certificates duly executed on behalf of the Company and all other information reasonably requested by the Warrant Agent, countersign Warrant Certificates evidencing Warrants representing the right to purchase Warrant Shares and shall deliver such Warrant Certificates to or upon the order of the Company. Subsequent to such original issuance of the Warrant Certificates, the Warrant Agent shall countersign a Warrant Certificate only if the Warrant Certificate is issued in exchange or substitution for one or more previously countersigned Warrant Certificates or in connection with their transfer as hereinafter provided.

(b)     Pending the preparation of definitive Warrant Certificates evidencing Warrants, the Company may execute and the Warrant Agent, upon receipt of a written order of the Company and all other information reasonably requested by the Warrant Agent, shall countersign and deliver temporary Warrant Certificates evidencing such Warrants (printed, lithographed, typewritten or otherwise produced, in each case in form satisfactory to the Warrant Agent). Such temporary Warrant Certificates shall be issuable substantially in the form of the definitive Warrant Certificates but with such omissions, insertions and variations as may be appropriate for temporary Warrant Certificates, all as may be determined by the Company with the concurrence of the Warrant Agent. Such temporary Warrant Certificates may contain such reference to any provisions of this Warrant Agreement as may be appropriate. Every such temporary Warrant Certificate shall be executed by the Company and shall be countersigned by the Warrant Agent upon the same conditions and in substantially the same manner, and with like effect, as the definitive Warrant Certificates. Without unreasonable delay, the Company shall execute and shall furnish definitive Warrant Certificates and thereupon such temporary Warrant Certificates may be surrendered in exchange therefor without charge pursuant to and subject to the provisions of Section 4.01, and the Warrant Agent shall countersign and deliver in exchange for such temporary Warrant Certificates definitive Warrant Certificates of authorized denominations evidencing a like aggregate number of Warrants evidenced by such temporary Warrant Certificates. Until so exchanged, such temporary Warrant Certificates shall be entitled to the same benefits under this Warrant Agreement as definitive Warrant Certificates.

3

## ARTICLE II
## WARRANT PRICE, DURATION AND EXERCISE OF WARRANTS

Section 2.01    Exercise Price.    The initial exercise price for each Warrant shall be $[   ] (the "Exercise Price"), subject to adjustment as provided herein.[1]

Section 2.02    Duration of Warrants.    Subject to the provisions of this Agreement, each Warrant may be exercised in whole or in part at any time prior to the Expiration Date, as defined herein, on any day other than a Saturday, Sunday or a day on which banking institutions in the State of New York and New Jersey are authorized or obligated by law or executive order to close (a "Business Day") prior to 5:00 p.m. New York City time, at the offices of the Warrant Agent designated for such purpose (the "Warrant Agent Office") on _____, 2016; *provided however, that* any Warrants not exercised in connection with a Sale Transaction (as defined below) in which the holders of Common Stock receive only cash consideration, shall automatically expire upon consummation of such Sale Transaction (in either case, such date and such time, the "Expiration Date"); *provided further, that* for the avoidance of doubt, the foregoing provision shall not affect a Holder's entitlement to replacement securities pursuant to Section 5.05 hereof.  Each Warrant not exercised at or before the Expiration Date shall become void, and all rights of the Holder and any beneficial owners of the Warrant Certificate evidencing such Warrant under this Agreement shall cease.  The Company shall promptly notify the Warrant Agent in writing upon the occurrence of the Expiration Date and, if such notification is given orally, the Company shall confirm same in writing on or prior to the Business Day next following.  Until such notice is received by the Warrant Agent, the Warrant Agent may presume conclusively for all purposes that the Expiration Date has not occurred.

Section 2.03    Exercise of Warrants.

(a)    Warrants may be exercised, at the option of the Holder, in whole or in part, at any time or from time to time, by presentation of the Warrant Certificate duly executed and properly completed and simultaneous payment of the Exercise Price to the Company. Payment of the Exercise Price shall be made, (i) by certified or official bank check payable to the

---

[1]  The respective Exercise Prices of the Series A Warrants and Series B Warrants shall be determined by (a) (i) subtracting from the below-referenced aggregate enterprise values, the Company's term debt as of the Plan Effective Date (excluding borrowings under any revolving credit or receivables financing facilities) and (ii) adding back to the below-referenced aggregate enterprise values the Company's cash on hand as of the Plan Effective Date (provided that for purposes of determining the Exercise Price, cash on hand shall not include "trapped cash" as of the Plan Effective Date, as determined by the Company on a basis consistent with past practice, or cash collateralizing letters of credit or guarantees outstanding as of the Plan Effective Date), and (b) dividing the resulting amount by (i) the sum of the number of shares of Common Stock outstanding on the Plan Effective Date, and (ii) in the case of the Series A Warrants, all Warrant Shares to be issued upon exercise of all Series A Warrants, and, in the case of the Series B Warrants, all Warrant Shares to be issued upon exercise of all Warrants.  The Exercise Price for the Series A Warrants shall be equivalent to the per share price of the Common Stock on the Plan Effective Date, assuming the Company had on the Plan Effective Date an aggregate enterprise value of $350 million and the Exercise Price for the Series B Warrants shall be equivalent to the per share price of the Common Stock on the Plan Effective Date, assuming the Company had on the Plan Effective Date an aggregate enterprise value of $375 million.

4

Company, or by wire transfer in immediately available funds, in the amount of the aggregate Exercise Price for such Warrant Shares or (ii) if exercising in connection with a Triggering Event (as defined below) or at anytime on or after the expiration of all lock-up periods imposed by the underwriters of a firm commitment underwritten public offering of shares of the Common Stock of the Company (an "IPO"), by Cashless Exercise (as defined and in the manner described below in Section 2.03(c)). The Company shall give or cause to be given written notice to the Warrant Agent, in the manner set forth in Section 8.03, and to each Holder, by press release or at the last address set forth for such Holder in the register books of the Warrant Agent, of an IPO or any Triggering Event; provided that such notice of any Triggering Event shall be given to the Holders not less than thirty (30) days prior to any such Triggering Event. Failure to give such notice, or any defect therein, shall not affect the legality or validity of such event. As used herein, a "Triggering Event" shall mean: (i) immediately prior to the consummation of a Sale Transaction pursuant to which the Holders of the Warrants have the opportunity to exchange all of their Warrant Shares for cash and/or readily marketable securities and (ii) upon receipt from the Company of a notice regarding completion of a Company Valuation (as defined below) and a "Sale Transaction" shall mean: (i) a merger, consolidation, or other similar transaction or series of transactions to which the Company is a party and pursuant to which (a) the Company is not the surviving person in such transaction or (b) if the Company is the surviving person, the holders of shares of Common Stock immediately prior to such transaction (including for this purpose the shares issuable upon exercise of the Warrants and shares of Common Stock to be issued or reserved for issuance under any management incentive plan of the Company (the "Management Incentive Shares")) represent less than 50% of the shares of Common Stock outstanding immediately following such transaction (including for this purpose the shares issuable upon exercise of the Series A Warrants and Series B Warrants and the Management Incentive Shares), (ii) the sale or other disposition of all or substantially all of the assets of the Company and its subsidiaries, taken as a whole, (iii) a sale, other disposition or issuance, in a single transaction or series of related transactions, of 35% or more of the then outstanding shares of Common Stock, and (iv) any other transaction in which holders of Common Stock have "drag along" rights pursuant to and to the extent provided in that certain Stockholders Agreement entered into on the date hereof among the Company and its stockholders (as may be amended, the "Stockholders Agreement").

(b)    In the event that a Triggering Event or an IPO has not occurred prior to the 90th day prior to the Expiration Date (the "Valuation Date"), the Board of Directors shall as promptly as practicable thereafter select, and provide notice to the holders of the Series A Warrants and Series B Warrants of such selection (the "Appraisal Notice"), of a qualified nationally recognized independent investment banking firm that has not provided any material services to the Company within the twenty four (24) month period prior to the Valuation Date (as selected pursuant to this Section 2.03(b), an "Independent Appraiser") to determine the aggregate enterprise value of the Company as of the Valuation Date, together with the per share value of the Common Stock calculated based upon the aggregate enterprise value of the Company as of the Valuation Date without regard to marketability or other similar liquidity discounts (a "Company Valuation"). The Company's selection of an Independent Appraiser set forth in the Appraisal Notice shall be deemed to be acceptable to the holders of the Series A Warrants and Series B Warrants, if the Company has not, within ten (10) days from the date the Company delivered the Appraisal Notice to the holders of the Series A Warrants and Series B Warrants, received written notice from holders of not less than a majority of the Series A Warrants and

5

Series B Warrants taken together (the "Requisite Holders"), indicating the Requisite Holders' reasonable opposition to the Company's choice of Independent Appraiser and the basis of such opposition, together with the names of three (3) alternate Independent Appraisers (each, an "Alternate Appraiser") which are acceptable to the Requisite Holders (an "Opposition Notice"). If the Company timely receives from the Requisite Holders an Opposition Notice, it shall be entitled, in its sole discretion, to choose any of the Alternate Appraisers to perform the Company Valuation; provided, that if none of the Alternate Appraisers are reasonably acceptable to the Company, the Company shall so notify the Requisite Holders and the Company and the Requisite Holders shall each choose one Independent Appraiser, which shall, within five (5) days of their selection, jointly select a third Independent Appraiser not previously selected by the Company or the Requisite Holders to perform the Company Valuation. The selection of the Independent Appraiser pursuant to the provisions of this Section 2.03(b) shall be binding on the Company and the Requisite Holders. The Company shall notify the Holders of the result of the Company Valuation not later than the 30th day prior to the Expiration Date, together with the Current Market Price (as defined below) of the Common Stock, which shall be final and binding on the Company and the Requisite Holders.

(c)    In lieu of paying the aggregate Exercise Price under the conditions specified in Section 2.03(a), each Warrant shall entitle the Holder, at the election of such Holder, to exercise the Warrant by authorizing the Company to withhold from issuance a number of Warrant Shares issuable upon exercise of the Warrant which when multiplied by the Current Market Price of the Common Stock is equal to the aggregate Exercise Price of all Warrants being exercised, and such withheld Warrant Shares shall no longer be issuable under the Warrant (a "Cashless Exercise"). The formula for determining the number of Warrant Shares to be issued in a Cashless Exercise is as follows:

$$X = \frac{(A-B) \times C}{A}$$

where:

X = the number of Warrant Shares issuable upon exercise of the Warrant pursuant to this subsection (c).

A = the Current Market Price of the Common Stock on the Business Day immediately preceding the date on which the Holder delivers the Warrant and pursuant to subsection (e) below.

B = the Exercise Price.

C = the number of Warrant Shares as to which a Warrant is then being exercised including the withheld Warrant Shares.

6

If the foregoing calculation results in a negative number, then no Warrant Shares shall be issuable via a Cashless Exercise.

(d)    For purposes of this Section 2.03, the "Current Market Price" shall equal, in the event the Warrants are exercised (a) following an IPO pursuant to which the shares of Common Stock are listed or admitted to trading on the New York Stock Exchange or the Nasdaq Stock Market (each, a "National Exchange"), the average closing price as reported on such National Exchange of the Common Stock for the ten (10) consecutive trading days immediately prior to the exercise of the Warrant or, if not listed or admitted to trading on a National Exchange, the volume-weighted average of the closing bid and asked prices of the Common Stock in the over-the-counter market during the ten (10) consecutive trading days immediately prior to the exercise of the Warrant; (b) in connection with a Sale Transaction, the per share fair market value of the consideration being paid by the third party in connection with such Sale Transaction or (c) in connection with a Company Valuation, the per share equity value of the Common Stock, as determined by the Independent Appraiser pursuant to Section 2.03(b). The fair market value of the per share consideration to be paid by the third party in a Sale Transaction shall be determined by adding (i) the per share cash consideration, (ii) for consideration in the form of publicly traded securities, if the per share valuation of such securities is not otherwise set forth in the definitive agreement entered into in connection with such Sale Transaction, the average closing price for the ten (10) consecutive trading days ending on the second (2nd) Business Day prior to the Sale Transaction, and (iii) the per share fair market value of consideration in the form of any other securities or assets as determined in good faith by the Board of Directors of the Company.

(e)    The date on which payment in full of the Exercise Price is received by the Warrant Agent or deemed to be received in the case of a Cashless Exercise shall, subject to receipt of the Warrant Certificate as aforesaid, be deemed to be the date on which the Warrant is exercised. The Warrant Agent shall promptly deposit all funds received by it in payment for the exercise of Warrants in an account of the Company maintained with it (or in such other account as may be designated by the Company) and shall promptly advise the Company, by telephone or by facsimile transmission or other form of electronic communication available to both parties when a payment for the exercise of Warrants is received and the amount so deposited to its account. The Warrant Agent shall promptly confirm such advice to the Company in writing. Notwithstanding anything in this Agreement to the contrary, the Warrant Agent shall have no duty or obligation to determine, investigate or confirm the sufficiency of any payment received by it or the determination by the Company as to the Exercise Price or the number of Warrant Shares to be issued upon an exercise of such Warrants.

(f)    Upon such surrender of a Warrant Certificate, payment of the Exercise Price, or the deemed payment of the Exercise Price in connection with a Cashless Exercise, and a written order of the Company, the Warrant Agent shall requisition from the transfer agent for the Common Stock (the "Transfer Agent") for issuance and delivery to or upon the written order of the Holder of such Warrant Certificate and in such name or names as the Holder may designate, a certificate or certificates for the Warrant Shares issuable upon the exercise of the Warrant or Warrants evidenced by such Warrant Certificate, less any Warrant Shares withheld in connection with a Cashless Exercise. Upon receipt thereof, the Company shall, as promptly as practicable, and in any event within three (3) Business Days thereafter,

7

cause to be issued to the Holder the aggregate number of whole Warrant Shares issuable upon such exercise and deliver to the Holder written confirmation that such Warrant Shares have been duly issued and recorded on the books of the Company as hereinafter provided. The Warrant Shares so issued shall be registered in the name of the Holder or such other name as shall be designated in the order delivered by the Holder. Such certificate or certificates shall be deemed to have been issued and any person so designated to be named therein shall be deemed to have become the holder of record of such Warrant Shares as of the date of surrender of such Warrant Certificate at the Warrant Agent Office duly executed by the Holder thereof and upon payment of the Exercise Price or the deemed payment of the Exercise Price in connection with a Cashless Exercise. Notwithstanding any provision herein to the contrary, the Company shall not be required to register Warrant Shares in the name of any person who acquired any Warrant or any Warrant Shares otherwise than in accordance with this Agreement.

(g)  In case an exercise of Warrants is in part only, a new Warrant or Warrants of like tenor, calling in the aggregate on the face or faces of the Warrant Certificate or Warrant Certificates for the number of shares of Common Stock equal (without giving effect to any adjustment thereof) to the number of such shares called for on the face of the Warrant Certificate minus the number of such shares designated by the Holder upon such exercise together with any Warrant Shares withheld in connection with a Cashless Exercise, shall be issued and delivered to the Holder or its registered assigns.

(h)  Neither the Warrant Agent nor the Company shall be required to pay any stamp or other tax or other charge required to be paid in connection with any transfer involved in the issuance of the Warrant Shares, and in the event that any such transfer is involved, neither the Warrant Agent nor the Company shall be required to issue or deliver any Warrant Share until it has been established to the Company's and the Warrant Agent's satisfaction that *such tax or other charge* has been paid or that no such tax or other charge is due.

(i)  Any exercise of a Warrant pursuant to the terms of this Agreement shall be irrevocable and shall constitute a binding agreement between the Holder and the Company, enforceable in accordance with its terms; *provided however, that* if a Holder validly exercises its Warrants by way of a Cashless Exercise in connection with the occurrence of a Triggering Event, and such Triggering Event is not subsequently consummated, then such exercise shall be automatically revoked and such Warrant shall continue in full force and effect.

(j)  The Warrant Agent shall:

(i)  examine all exercised Warrants and all other documents delivered to it by or on behalf of Holders as contemplated hereunder to ascertain whether or not, on their face, such exercised Warrants and any such other documents have been executed and completed in accordance with their terms and the terms hereof;

(ii)  where an exercised Warrant or other document appears on its face to have been improperly completed or executed or some other irregularity in connection with the exercise of the Warrants exists, the Warrant Agent shall endeavor to inform the appropriate parties (including the person

8

submitting such instrument) of the need for fulfillment of all requirements, specifying those requirements which appear to be unfulfilled;

(iii)     inform the Company of and cooperate with and assist the Company in resolving any reconciliation problems between exercised Warrants received and delivery of Warrants to the Warrant Agent's account; and

(iv)     advise the Company no later than five (5) Business Days after receipt of an exercised Warrant, of (i) the receipt of such exercised Warrant and the number of Warrants exercised in accordance with the terms and conditions of this Agreement, (ii) the percentage of the then outstanding Series A Warrants represented by such exercise and (iii) such other information as the Company shall reasonably require.

(k)     All questions as to the validity, form and sufficiency (including time of receipt) of an exercised Warrant will be determined by the Company in its sole discretion, which determination shall be final and binding. The Company reserves the right to reject any and all exercised Warrants not in proper form or for which any corresponding agreement by the Company to exchange would, in the opinion of the Company, be unlawful. Such determination by the Company shall be final and binding on the Holders, absent manifest error. Moreover, the Company reserves the absolute right to waive any of the conditions to the exercise of Warrants or defects in the exercise thereof with regard to any particular exercise of Warrants. Neither the Company nor the Warrant Agent shall be under any duty to give notice to the Holders of the Warrants of any irregularities in any exercise of Warrants, nor shall it incur any liability for the failure to give such notice.

(l)     Prior to a Qualified Public Offering (as defined in the Stockholders Agreement), as a condition to the issuance of Warrant Shares pursuant to the exercise of the Warrant, each Holder shall be required to execute and become a party to (unless such Holder is already a party thereto) any Stockholders Agreement in effect at the time of exercise of such Holder's Warrant.

Section 2.04     Reservation of Warrant Shares

(a)     For the purpose of enabling it to satisfy any obligation to issue Warrant Shares upon exercise of Warrants, the Company will at all times through the Expiration Date, reserve and keep available out of its aggregate authorized but unissued or treasury shares of Common Stock, the number of Warrant Shares deliverable upon the exercise of all outstanding Warrants, and the Company's Transfer Agent is hereby irrevocably authorized and directed at all times to reserve such number of authorized and unissued or treasury shares of Common Stock as shall be required for such purpose. The Company will keep a copy of this Agreement on file with the Transfer Agent. The Warrant Agent is hereby irrevocably authorized to requisition from time to time from such Transfer Agent stock certificates issuable upon exercise of outstanding Warrants, and the Company will supply such Transfer Agent with duly executed stock certificates for such purpose.

9

(b)   The Company covenants that all shares of Common Stock issued upon exercise of the Warrants will, upon issuance in accordance with the terms of this Agreement, be fully paid and nonassessable and free from all taxes, liens, charges and security interests created by or imposed upon the Company with respect to the issuance and holding thereof.

## ARTICLE III
## OTHER PROVISIONS RELATING TO RIGHTS OF HOLDERS OF WARRANT

Section 3.01   No Rights as Stockholder Conferred by Warrants or Warrant Certificates.   No Warrant Certificate or Warrant evidenced thereby shall, and nothing contained in this Agreement or in the Warrant Certificate shall be construed to, entitle the Holder or any beneficial owner thereof to any of the rights of a holder or beneficial owner of Warrant Shares, including, without limitation, the right to vote or to consent or to receive notice as a stockholder in respect of any meeting of stockholders for the election of directors of the Company or any other matter, to receive dividends on Warrant Shares or any rights whatsoever as stockholders of the Company.

Section 3.02   Lost, Mutilated, Stolen or Destroyed Warrant Certificates.   Upon receipt by the Warrant Agent of evidence reasonably satisfactory to it and the Company of the ownership of and the loss, mutilation, theft or destruction of any Warrant Certificate and of such security or indemnity as may be required by the Company and the Warrant Agent to hold each of them and any agent of them harmless and, in the case of mutilation of a Warrant Certificate, upon surrender thereof to the Warrant Agent for cancellation, then, in the absence of notice to the Company or the Warrant Agent that such Warrant Certificate has been acquired by a bona fide purchaser, the Company shall execute, and an authorized officer of the Warrant Agent shall manually countersign or countersign by facsimile and deliver, in exchange for or in lieu of the lost, mutilated, stolen or destroyed Warrant Certificate, a new Warrant Certificate of the same tenor and evidencing a like number of Warrants.  Upon the issuance of any new Warrant Certificate under this Section 3.02, the Company may require the payment of a sum sufficient to cover any stamp or other tax or other charge that may be imposed in relation thereto and any other expenses (including the fees and expenses of the Warrant Agent) in connection therewith. Every substitute Warrant Certificate executed and delivered pursuant to this Section 3.02 in lieu of any lost, mutilated, stolen or destroyed Warrant Certificate shall represent an additional contractual obligation of the Company, whether or not the lost, stolen or destroyed Warrant Certificate shall be at any time enforceable by anyone, and shall be entitled to the benefits of this Agreement equally and proportionately with any and all other Warrant Certificates duly executed and delivered hereunder.  The provisions of this Section 3.02 are exclusive and shall preclude (to the extent lawful) all other rights and remedies with respect to the replacement of lost, mutilated, stolen or destroyed Warrant Certificates.  Notwithstanding anything in this Agreement to the contrary, the Warrant Agent shall have no obligation to take any action whatsoever with respect to such an exchange unless and until such payments required under this section have been made.

Section 3.03   General Information to be Provided by the Company.   The Company shall provide to each Holder the same information and reports to which a holder of the

Common Stock is entitled pursuant to Section 3.01 and 3.03 of the Stockholders Agreement, subject to execution of an appropriate confidentiality agreement by each such Holder.

Section 3.04    Notice of Certain Events.  The Company shall (i) provide at least fifteen (15) days prior written notice to each Holder, at the last address set forth for such Holder in the register books of the Warrant Agent, of any record date relating to the payment by the Company of a cash dividend on the Common Stock and (ii) provide prior notice, not later than the time notice is given to eligible stockholders under the Stockholders Agreement, at the last address set forth for such Holder in the register books of the Warrant Agent, of any transaction involving the right of a holder of New Common Stock to exercise "tag along" rights under the Stockholders Agreement.

## ARTICLE IV
## EXCHANGE AND TRANSFER

Section 4.01    Exchange and Transfer.

(a)    Upon surrender at the Warrant Agent Office, Warrant Certificates evidencing Warrants may be exchanged for Warrant Certificates in other authorized denominations evidencing such Warrants or the transfer thereof may be registered in whole or in part; provided, however, that such other Warrant Certificates shall evidence the same aggregate number of Warrants as the Warrant Certificates so surrendered.

(b)    The Warrant Agent shall keep, at the Warrant Agent Office, books in which, subject to such reasonable regulations as it may prescribe, it shall register Warrant Certificates and exchanges and transfers of outstanding Warrant Certificates upon surrender of such Warrant Certificates to the Warrant Agent at the Warrant Agent Office for exchange or registration of transfer, properly endorsed.

(c)    No service charge shall be made for any exchange or registration of transfer of Warrant Certificates, however, the Warrant Agent and/or the Company may require payment of a sum sufficient to cover any stamp or other tax or other charge that may be imposed in connection with any such exchange or registration of transfer.  Neither the Warrant Agent nor the Company shall be required to pay any stamp or other tax or other charge required to be paid in connection with such transfer, and neither the Warrant Agent nor the Company shall be required to issue or deliver any Warrant Share until it has been established to the Company's and the Warrant Agent's satisfaction that such tax or other charge has been paid or that no such tax or other charge is due.

(d)    Whenever any Warrant Certificates, are so surrendered for exchange or registration of transfer, an authorized officer of the Warrant Agent, upon the request of the Company, shall manually countersign or countersign by facsimile and deliver to the person or persons entitled thereto a Warrant Certificate or Warrant Certificates, duly authorized and executed by the Company, as so requested.  The Warrant Agent shall not effect any exchange or

11

registration of transfer which will result in the issuance of a Warrant Certificate, evidencing a fraction of a Warrant or a number of full Warrants and a fraction of a Warrant.

(e)     All Warrant Certificates, issued upon any exchange or registration of transfer of Warrant Certificates shall be the valid obligations of the Company, evidencing the same obligations, and entitled to the same benefits under this Agreement, as the Warrant Certificates surrendered for such exchange or registration or transfer.

## Section 4.02     Restrictions on Transfer; Restrictive Legend

(a)     Prior to a Qualified Public Offering (as defined in the Stockholders Agreement), the Warrants shall not be transferable, other than transfers to (i) other Holders, (ii) holders of the Common Stock and (iii) the Company; *provided, however that,* a Holder shall be entitled to transfer its Warrants in whole or in part (but in part only if there are sixty (60) or fewer holders of the Series A Warrants and the Series B Warrants, taken together), if such Holder is an individual, to any member of his immediate family or any estate or trust in which he is the settlor or otherwise by will or the laws of descent or distribution, and if such Holder is not an individual, to such Holder's partners, members or Affiliates, provided that in each case, such transferee agrees in writing to be bound by the terms of the Warrant Agreement prior to such transfer. As used herein, "Affiliates" shall mean, with respect to any specified person, any other person directly or indirectly controlling or controlled by or under direct or indirect common control with such specified person. For the purposes of this definition, "control" when used with respect to any specified person means the power to direct the management and policies of such person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise; and the terms "controlling" and "controlled" have meanings correlative to the foregoing.

(b)     Notwithstanding Section 4.02(a), each Holder shall not transfer any Warrants unless (i) such transfer complies with the provisions of this Agreement, and (ii) (x) such transfer is pursuant to an effective registration statement under the Securities Act of 1933, as amended, and the rules and regulations promulgated thereunder (the "Securities Act") and has been registered under all applicable state securities or "blue sky" laws or (y) if reasonably requested by the Company, such Holder shall have furnished the Company with an opinion of counsel, which opinion of counsel shall be reasonably satisfactory to the Company, to the effect that no such registration is required because of the availability of an exemption from registration under the Securities Act and all applicable state securities or "blue sky" laws.

(c)     Prior to a Qualified Public Offering (as defined in the Stockholders Agreement, without the prior written consent of the Board of Directors, a Holder shall not transfer any Warrants if, as a result of such transfer, any class of equity securities of the Company would be held of record by more than two hundred twenty-five (225) persons or otherwise in circumstances that the Board of Directors determines could require the Company to file reports under the Securities Exchange Act of 1934, as amended, and the rules and regulations promulgated thereunder (the "Exchange Act"), if it is not otherwise then subject to such requirements.

12

(d)    All such transfers of Warrants will be subject to the Company's being provided advance written notice of the proposed transfer and terms of such transfer.

(e)    Notwithstanding anything herein to the contrary, the Warrants shall be subject to restrictions on transfer intended to preserve the value of tax attributes (including net operating losses) if (i) the Board of Directors determines that such restrictions on transfer are reasonably necessary to preserve the value of such tax attributes and (ii) substantially similar restrictions apply to or will also be imposed on the holders of Common Stock.

(f)    Any attempted or purported transfer of all or a portion of the Warrants held by a Holder in violation of this Section 4.02 shall be null and void and of no force or effect whatsoever, such purported transferee will not be treated as an owner of the Warrants for purposes of this Agreement or otherwise, and the Company will not register such transfer.

(g)    Each Warrant Certificate and certificate representing Warrant Shares issued upon the exercise of a Warrant shall be stamped or otherwise imprinted with a legend in the following or a comparable form:

> THE SECURITIES REPRESENTED BY THIS CERTIFICATE (THE "SECURITIES") WERE ORIGINALLY ISSUED IN RELIANCE UPON AN EXEMPTION FROM THE REGISTRATION REQUIREMENT OF SECTION 5 OF THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), PROVIDED BY SECTION 1145 OF THE BANKRUPTCY CODE, 11 U.S.C. 1145. THE SECURITIES HAVE NOT BEEN REGISTERED UNDER THE ACT OR ANY STATE SECURITIES LAW, AND TO THE EXTENT THE HOLDER OF THE SECURITIES IS AN "UNDERWRITER," AS DEFINED IN SECTION 1145(B)(1) OF THE BANKRUPTCY CODE, THE SECURITIES MAY NOT BE SOLD OR TRANSFERRED IN THE ABSENCE OF AN EFFECTIVE REGISTRATION STATEMENT UNDER THE ACT OR AN EXEMPTION FROM REGISTRATION THEREUNDER.

If at the time of issuance of Warrant Shares the Stockholders Agreement is still in effect, each certificate representing Warrant Shares issued upon the exercise of a Warrant shall also be stamped or otherwise imprinted with a legend in the following or a comparable form:

> THE SALE, ASSIGNMENT, PLEDGE, ENCUMBRANCE OR OTHER TRANSFER OF THE SECURITIES REPRESENTED BY THIS CERTIFICATE IS RESTRICTED BY THE TERMS OF, AND THE HOLDER HEREOF IS SUBJECT TO CERTAIN OTHER OBLIGATIONS PURSUANT TO, THE PROVISIONS OF A STOCKHOLDERS AGREEMENT, DATED AS OF [____], 2009, AMONG THE COMPANY AND CERTAIN HOLDERS OF ITS SECURITIES, A COPY OF WHICH IS ON FILE AT THE PRINCIPAL EXECUTIVE OFFICE OF THE COMPANY.

(h)    A holder (or its transferee, as applicable) shall be entitled to receive from the Company, without expense, new securities of like tenor not bearing the legends set forth above when (i) such Warrant Certificates or restricted shares of Common Stock shall

13

have been (A) effectively registered under the Securities Act and disposed of in accordance with a registration statement covering such securities, (B) disposed of pursuant to the provisions of Rule 144 or any comparable rule under the Securities Act, or (C) when, in the written reasonable opinion of independent counsel for the holder thereof experienced in Securities Act matters, which counsel and opinion shall be reasonably satisfactory to the Company, such restrictions are no longer required in order to insure compliance with the Securities Act (including when the provisions of Rule 144(k) or any comparable rule under the Securities Act have been satisfied) and (ii) in the case of the restricted shares of Common Stock only, such restricted shares of Common Stock are no longer subject to the Stockholders Agreement.

Section 4.03   Treatment of Holders of Warrant Certificates.  Each Holder of a Warrant Certificate, by accepting the same, consents and agrees with the Company, the Warrant Agent and every subsequent Holder of such Warrant Certificate that until the transfer of such Warrant Certificate is registered on the books of such Warrant Agent, the Company and the Warrant Agent may treat the registered Holder of such Warrant Certificate as the absolute owner thereof for any purpose and as the person entitled to exercise the rights represented by the Warrants evidenced thereby, any notice to the contrary notwithstanding.

Section 4.04   Cancellation of Warrant Certificates.  Any Warrant Certificate surrendered for exchange or registration of transfer or exercise of the Warrants evidenced thereby shall, if surrendered to the Company, be delivered to the Warrant Agent, and all Warrant Certificates surrendered or so delivered to the Warrant Agent shall be promptly cancelled by the Warrant Agent and shall not be reissued and, except as expressly permitted by this Agreement, no Warrant Certificate shall be issued hereunder in exchange therefor or in lieu thereof.  The Warrant Agent shall cause all cancelled Warrant Certificates to be destroyed and shall deliver a certificate of such destruction to the Company.

**ARTICLE V**
**ADJUSTMENT OF WARRANT PRICE AND NUMBER OF WARRANT SECURITIES**

Section 5.01   Adjustments Generally.  The Exercise Price, the number of Warrant Shares issuable upon exercise of Warrants and the number of Warrants outstanding are subject to adjustment from time to time upon the occurrence of the events enumerated in this Article V, as determined to be necessary or appropriate in the reasonable discretion of the Board of Directors of the Company.

Section 5.02   Stock Dividends; Split-Ups.  If after the date hereof, and subject to the provisions of Section 5.07, the number of outstanding shares of Common Stock is increased by a stock dividend payable in shares of Common Stock, or by a split-up of shares of Common Stock, or other similar event, then, on the effective date of such stock dividend, split-up or similar event, the number of shares of Common Stock issuable on exercise of each Warrant shall be increased in proportion to such increase in outstanding shares of Common Stock.

Section 5.03   Aggregation of Shares.  If after the date hereof, and subject to the provisions of Section 5.07, the number of outstanding shares of Common Stock is decreased by a consolidation, combination, reverse stock split or reclassification of shares of Common Stock or

14

other similar event, then, on the effective date of such consolidation, combination, reverse stock split, reclassification or similar event, the number of shares of Common Stock issuable on exercise of each Warrant shall be decreased in proportion to such decrease in outstanding shares of Common Stock.

Section 5.04    Adjustments in Exercise Price.    Whenever the number of shares of Common Stock purchasable upon the exercise of the Warrants is adjusted, as provided in Sections 5.02 and 5.03, the Exercise Price shall be adjusted (to the nearest cent) by multiplying such Exercise Price immediately prior to such adjustment by a fraction (x) the numerator of which shall be the number of shares of Common Stock purchasable upon the exercise of the Warrants immediately prior to such adjustment, and (y) the denominator of which shall be the number of shares of Common Stock so purchasable immediately thereafter.

Section 5.05    Replacement of Securities upon Reorganization.    In case of any reclassification or reorganization of the outstanding shares of Common Stock (other than a change covered by Section 5.02 or 5.03 or that solely affects the par value of such shares of Common Stock), or in the case of any merger or consolidation of the Company with or into another corporation (other than a consolidation or merger in which the Company is the continuing corporation and that does not result in any reclassification or reorganization of the outstanding shares of Common Stock), or in the case of any sale or conveyance to another corporation or entity of the assets or other property of the Company as an entirety or substantially as an entirety in connection with which the Company is dissolved, except in each case, with respect to any such transaction pursuant to which holders of the outstanding Common Stock are entitled to receive cash consideration for such shares, the Holders shall thereafter have the right to purchase and receive, upon the basis and upon the terms and conditions specified in the Warrants and in lieu of the shares of the Warrant Shares immediately theretofore purchasable and receivable upon the exercise of the rights represented thereby, the kind and amount of shares of stock or other securities or property (including cash) receivable upon such reclassification, reorganization, merger or consolidation, or upon a dissolution following any such sale or transfer, that the Holder would have received if such Holder had exercised his, her or its Warrant(s) immediately prior to such event; and if any reclassification also results in a change in shares of Common Stock covered by Section 5.02 or 5.03, then such adjustment shall be made pursuant to Sections 5.02, 5.03, 5.04 and this Section 5.05. The provisions of this Section 5.05 shall similarly apply to successive reclassifications, reorganizations, mergers or consolidations, sales or other transfers.

Section 5.06    Notices of Changes in Warrant.    Upon every adjustment of the Exercise Price or the number of shares issuable upon exercise of a Warrant, the Company shall give written notice thereof to the Warrant Agent, which notice shall state the Exercise Price resulting from such adjustment and the increase or decrease, if any, in the number of shares of Common Stock purchasable at such price upon the exercise of a Warrant, setting forth in reasonable detail the method of calculation and the facts upon which such calculation is based. Upon the occurrence of any event specified in Section 5.02, 5.03, 5.04, 5.05 or 5.09, then, in any such event, the Company shall give or cause to be given written notice to each Holder, by press release or at the last address set forth for such Holder in the register books of the Warrant Agent, of the record date or the effective date of the event. Failure to give such notice, or any defect therein, shall not affect the legality or validity of such event. The Warrant Agent shall be fully

15

protected in relying upon such a certificate and shall have no duty to investigate or inquire as to whether such adjustment is accurate, and shall not be deemed to have knowledge of, and shall not be required to take any action with respect to any adjustments, unless and until the Warrant Agent shall have received such a certificate.

Section 5.07   No Fractional Shares.  Notwithstanding any provision contained in this Agreement to the contrary, the Company shall not issue fractional shares upon exercise of Warrants.  If, by reason of any adjustment made pursuant to this Article V, any Holder would be entitled, upon the exercise of such Warrant, to receive a fractional interest in a share of Common Stock, the Company shall, upon such exercise, round down to the nearest whole number the number of the shares of Common Stock to be issued to the Holder.  The Warrant Agent shall not be required to effect any registration of transfer or exchange that will result in the issuance of a Warrant Certificate for a fraction of a share of Common Stock.

Section 5.08   Form of Warrant.  The form of Warrant or Warrant Certificate need not be changed because of any adjustment pursuant to this Article V, and Warrants Certificates issued after such adjustment may state the same Exercise Price and the same number of shares as is stated in the Warrant Certificates initially issued pursuant to this Agreement. However, the Company may at any time in its sole discretion make any change in the form of Warrant or Warrant Certificate that the Company may deem appropriate and that does not affect the substance thereof, and any Warrant Certificates thereafter issued or countersigned, whether in exchange or substitution for an outstanding Warrant Certificate or otherwise, may be in the form as so changed.

Section 5.09   Extraordinary Transactions.  If the Company, shall distribute property (other than cash or shares of Common Stock) to the holders of Common Stock, other than as described in Section 5.02, 5.03 or 5.05, in connection with a spin-off, sale of a material subsidiary or similar extraordinary transaction (an "Extraordinary Transaction"), then in connection with such Extraordinary Transaction, the number of shares of Common Stock issuable upon exercise of the Warrants and/or the Warrant Price, as appropriate, shall be equitably and proportionately adjusted to reflect such Extraordinary Transaction, as determined in good faith by the Company's Board of Directors.

Section 5.10   De Minimis Adjustments.  No adjustment in the number of Warrant Shares purchasable hereunder shall be required unless such adjustment would require an increase or decrease of at least one percent (1%) in the number of Warrant Shares purchasable upon the exercise of each Warrant; provided, however, that any adjustments which by reason of this paragraph (c) are not required to be made shall be carried forward and taken into account in any subsequent adjustment.  All calculations shall be made to the nearest cent and to the nearest one-hundredth of a Warrant Share, as the case may be.

## ARTICLE VI
### CONCERNING THE WARRANT AGENT

Section 6.01   Warrant Agent.

16

The Company hereby appoints the Warrant Agent to act as agent of the Company in respect of the Warrants and the Warrant Certificates upon the express terms and subject to the conditions herein and in the Warrant Certificates (and no implied terms); and the Warrant Agent hereby accepts such appointment. The Warrant Agent shall have the powers and authority granted to and conferred upon it in the Warrant Certificates and herein and such further powers and authority to act on behalf of the Company as the Company may hereafter grant to or confer upon it. All of the terms and provisions with respect to such powers and authority contained in the Warrant Certificates are subject to and governed by the terms and provisions hereof.

Section 6.02    Conditions of Warrant Agent's Obligations.

(a)    The Warrant Agent accepts its obligations herein set forth upon the express terms and conditions hereof (and no implied terms), including the following, to all of which the Company agrees and to all of which the rights hereunder of the Holders from time to time of the Warrant Certificates shall be subject:

(i)    *Compensation and Indemnification.* The Company agrees promptly to pay the Warrant Agent the compensation to be agreed upon with the Company for all services rendered by the Warrant Agent and to reimburse the Warrant Agent for reasonable out-of-pocket expenses (including the reasonable fees and expenses of its counsel) incurred by the Warrant Agent without gross negligence, bad faith or willful misconduct (each as determined by a final, non-appealable judgment of a court of competent jurisdiction) on its part in connection with the preparation, delivery, acceptance, administration, execution and amendment of this Agreement and the exercise and performance of its duties hereunder. The Company also agrees to indemnify the Warrant Agent for, and to hold it harmless against, any loss, liability, suit, action, proceeding, judgment, claim, settlement, cost or expense (including the reasonable fees and expenses of its counsel) incurred without gross negligence, bad faith or willful misconduct on the part of the Warrant Agent (each as determined by a final, non-appealable judgment of a court of competent jurisdiction), for any action taken, suffered or omitted to be taken by the Warrant Agent in connection with the preparation, delivery, acceptance, administration, execution and amendment of this Agreement and the exercise and performance of its duties hereunder, including the costs and expenses of defending against any claim of liability arising therefrom, directly or indirectly. The provisions of this Section 6.02(a)(i) shall survive the termination of this Agreement and the replacement, removal or resignation of the Warrant Agent.

(ii)    *Agent for the Company.* In acting under this Agreement and in connection with the Warrants and the Warrant Certificates, the Warrant Agent is acting solely as agent of the Company and does not assume any obligation or relationship of agency or trust for or with any of the Holders of Warrant Certificates or beneficial owners of Warrants.

17

(iii)     *Counsel.* The Warrant Agent may consult with counsel satisfactory to it in its reasonable judgment (who may be counsel for the Company or in-house counsel of the Warrant Agent), and the advice of such counsel shall be full and complete authorization and protection in respect of any action taken, suffered or omitted to be taken by it hereunder, in the absence of gross negligence, bad faith or willful misconduct, and in accordance with the advice of such counsel.

(iv)     *Documents.* Subject to Section 2.03(j), the Warrant Agent shall be protected and shall incur no liability for or in respect of any action taken, suffered or omitted to be taken by it in reliance upon any Warrant Certificate, notice, direction, consent, certificate, affidavit, statement or other paper or document reasonably believed by it to be genuine and to have been presented or signed by the proper parties.

(v)     *Certain Transactions.* The Warrant Agent, and its officers, directors, employees, agents and affiliates, may become the owner of, or acquire any interest in, Warrants, with the same rights that it or they would have if it were not the Warrant Agent hereunder, and, to the extent permitted by applicable law, it or they may engage or be interested in any financial or other transaction with the Company and may act on, or as depository, trustee or agent for, any committee or body of holders of Warrant Shares or other obligations of the Company as freely as if it were not the Warrant Agent hereunder.

(vi)     *No Liability for Interest.* The Warrant Agent shall have no liability for interest on any monies at any time received by it pursuant to any of the provisions of this Agreement or of the Warrant Certificates.

(vii)     *No Liability for Invalidity.* The Warrant Agent shall not be under any responsibility with respect to the validity or sufficiency of this Agreement or the execution and delivery hereof (except the due authorization to execute this Agreement and the due execution and delivery hereof by the Warrant Agent) or subject to Section 2.03(j), with respect to the validity or execution of any Warrant Certificates (except its countersignature thereof).

(viii)     *No Liability for Recitals.* The recitals contained herein shall be taken as the statements of the Company and the Warrant Agent assumes no liability for the correctness of the same.

(ix)     *No Implied Obligations.* The Warrant Agent shall be obligated to perform only such duties as are herein and in the Warrant Certificates specifically set forth and no implied duties or obligations shall be read into this Agreement or the Warrant Certificates against the Warrant Agent. The Warrant Agent shall not be under any obligation to expend or risk its own funds or take any action hereunder or at the request of any Warrant Holder or other Person which may tend to involve it in any expense or liability, unless it has received indemnity reasonably satisfactory to it or the payment of which within a

18

reasonable time is not, in its opinion, assured to it. The Warrant Agent shall not be accountable or under any duty or responsibility for the use by the Company of any of the Warrant Certificates countersigned by the Warrant Agent and delivered by it to the Company pursuant to this Agreement or for the application by the Company of the proceeds of the Warrant Certificates. The Warrant Agent shall have no duty or responsibility in case of any default by the Company in the performance of its covenants or agreements contained herein or in the Warrant Certificates or in the case of the receipt of any written demand from a Holder of a Warrant Certificate with respect to such default, including, without limiting the generality of the foregoing, any duty or responsibility to initiate or attempt to initiate any proceedings at law or otherwise or, except as provided in Section 8.02, to make any demand upon the Company.

(x)     *Agents.* The Warrant Agent may execute any of the trusts or powers hereunder or perform any duties hereunder either directly or by or through agents or attorneys-in-fact, provided reasonable care has been exercised in the selection and continued employment of such agent or attorney-in-fact.

(xi)     *Liability.* Notwithstanding anything in this Agreement to the contrary, in no event shall the Warrant Agent be liable for special, indirect, punitive, incidental or consequential loss or damage of any kind whatsoever (including but not limited to lost profits), even if the Warrant Agent has been advised of the likelihood of the loss or damage and regardless of the form of the action. Any liability of the Warrant Agent under this Agreement shall be limited to the amount of annual fees paid by the Company to the Warrant Agent. The provisions of this Section 6.02(a)(xi) shall survive the termination of this Agreement and the replacement, removal or resignation of the Warrant Agent.

(xii)     *Force Majeure.* In no event shall the Warrant Agent be responsible or liable for any failure or delay in the performance of its obligations under this Agreement arising out of or caused by, directly or indirectly, forces beyond its reasonable control, including without limitation strikes, work stoppages, accidents, acts of war or terrorism, civil or military disturbances, nuclear or natural catastrophes or acts of God, and interruptions, loss or malfunctions of utilities, communications or computer (software or hardware) services ("Force Majeure"). In the event of any such excused delay, the time for performance shall be extended for a period equal to the time lost by reason of the delay; *provided, however*, that the Warrant Agent shall use all commercially reasonable efforts to avoid and to remove such causes of non-performance and shall continue performance hereunder promptly following the removal of such causes.

Section 6.03    <u>Resignation and Appointment of Successor.</u>

19

(a)     The Company agrees, for the benefit of the Holders from time to time of the Warrant Certificates, that there shall at all times be a Warrant Agent hereunder until all the Warrants have been exercised or are no longer exercisable.

(b)     The Warrant Agent may at any time resign as such by giving written notice of its resignation to the Company, specifying the desired date on which its resignation shall become effective; provided, however, that such date shall be not less than 30 days after the date on which such notice is given unless the Company agrees to accept shorter notice. Upon receiving such notice of resignation, the Company shall promptly appoint a successor Warrant Agent (which shall be a bank or trust company in good standing, authorized under the laws of the jurisdiction of its organization to exercise corporate trust powers) by written instrument in duplicate signed on behalf of the Company, one copy of which shall be delivered to the resigning Warrant Agent and one copy to the successor Warrant Agent. The Company may, at any time and for any reason, remove the Warrant Agent and appoint a successor Warrant Agent (qualified as aforesaid) by written instrument in duplicate signed on behalf of the Company and specifying such removal and the date when it is intended to become effective, one copy of which shall be delivered to the Warrant Agent being removed and one copy to the successor Warrant Agent. Any resignation or removal of the Warrant Agent and any appointment of a successor Warrant Agent shall become effective upon acceptance of appointment by the successor Warrant Agent as provided in this subsection (b). In the event a successor Warrant Agent has not been appointed and accepted its duties within 30 days of the Warrant Agent's notice of resignation, the Warrant Agent may apply to any court of competent jurisdiction for the designation of a successor Warrant Agent. Upon its resignation, replacement or removal, the Warrant Agent shall be entitled to the payment by the Company of the compensation and to the reimbursement of all reasonable out-of-pocket expenses incurred by it hereunder as agreed to in Section 6.02(a).

(c)     The Company shall remove the Warrant Agent and appoint a successor Warrant Agent if the Warrant Agent (i) shall become incapable of acting, (ii) shall be adjudged bankrupt or insolvent, (iii) shall commence a voluntary case or other proceeding seeking liquidation, reorganization or other relief with respect to it or its debts under any bankruptcy, insolvency or other similar law now or hereafter in effect or seeking the appointment of a trustee, receiver, liquidator, custodian or other similar official of it or any substantial part of its property, (iv) shall consent to, or shall have had entered against it a court order for, any such relief or to the appointment of or taking possession by any such official in any involuntary case or other proceedings commenced against it, (v) shall make a general assignment for the benefit of creditors or (vi) shall fail generally to pay its debts as they become due. Upon the appointment as aforesaid of a successor Warrant Agent and acceptance by it of such appointment, the predecessor Warrant Agent shall, if not previously disqualified by operation of law, cease to be Warrant Agent hereunder.

(d)     Any successor Warrant Agent appointed hereunder shall execute, acknowledge and deliver to its predecessor and the Company an instrument accepting such appointment hereunder, and thereupon such successor Warrant Agent, without any further act, deed or conveyance, shall become vested with all the authority, rights, powers, immunities, duties and obligations of such predecessor with like effect as if originally named as Warrant Agent hereunder, and such predecessor shall thereupon become obligated to transfer, deliver and

20

pay over, and such successor Warrant Agent shall be entitled to receive, all monies, securities and other property on deposit with or held by such predecessor as Warrant Agent hereunder.

(e)    Any person into which the Warrant Agent hereunder may be merged or converted or any person with which the Warrant Agent may be consolidated, or any person resulting from any merger, conversion or consolidation to which the Warrant Agent shall be a party, or any person to which the Warrant Agent shall sell or otherwise transfer all or substantially all the assets and business of the Warrant Agent, provided that it shall be qualified as aforesaid, shall be the successor Warrant Agent under this Agreement without the execution or filing of any paper or any further act on the part of any of the parties hereto.

## ARTICLE VII
## REGISTRATION RIGHTS

Section 7.01    S-3 Registration.  Until the earlier of such time that all Warrant Shares have been issued and the Expiration Date, and so long as the Current Market Price of the shares of Common Stock is greater than 85% of the Exercise Price of the Warrants and the Company is eligible to use Form S-3 or any successor thereto, the Company shall use its commercially reasonable efforts to register and maintain under the Act on Form S-3 or any successor thereto (an "S-3 Registration"), for sale upon the exercise of the Warrants, the Warrant Shares.  Whenever the Company is required by this Section 7.01 to use its commercially reasonable efforts to effect the registration of Warrant Shares, each of the applicable procedures and requirements of Sections 7.03(b), 7.03(c) and 7.03(i) shall apply to such registration.  As used herein, "Registration Statement" shall mean any registration statement of the Company filed under the Securities Act that covers any of the Warrant Shares pursuant to the provisions of this Article VII, including the related Prospectus, all amendments and supplements to such registration statement, including pre- and post-effective amendments, all exhibits thereto and all material incorporated by reference or deemed to be incorporated by reference in such registration statement.  The term "Registration Statement" shall also include any registration statement filed pursuant to Rule 462(b) to register additional securities in connection with any offering.  As used herein, "Prospectus" shall mean the prospectus included in any Registration Statement (including a prospectus that discloses information previously omitted from a prospectus filed as part of an effective registration statement in reliance upon Rule 430A), as amended or supplemented by any prospectus supplement, with respect to the terms of the offering of any portion of the Warrant Shares covered by such Registration Statement and all other amendments and supplements to such prospectus, including post-effective amendments, and all material incorporated by reference or deemed to be incorporated by reference in such prospectus, including any free writing prospectus.

Section 7.02    Piggyback Registration.

(a)    Right to Piggyback.  If there shall not be currently effective an S-3 Registration and the Exercise Price of the Warrants is greater than the Current Market Price of the Common Stock, then at any time the Company proposes to file a registration statement under the Securities Act with respect to a public offering by the Company for its own account of

21

securities of the same type as the Warrant Shares (other than a registration statement (i) in connection with the IPO, or (ii) on Form S-8 or Form S-4 or any successor forms thereto, or (iii) filed solely in connection with a dividend reinvestment plan or an employee benefit plan covering only officers or directors of the Company or its Affiliates), the Company shall give written notice of such proposed filing to the Holders and holders of Warrant Shares at least fifteen (15) days before the anticipated filing date. Such notice shall offer such holders the opportunity to register such amount of Warrant Shares as they may request (a "Piggyback Registration"). Subject to 7.02(b), the Company shall include in each such Piggyback Registration all Warrant Shares with respect to which the Company has received written requests for inclusion therein within ten (10) days after notice has been given to the Holders and holders of Warrant Shares. Each such holder shall be permitted to withdraw all or any portion of the Warrant Shares of such holder from a Piggyback Registration at any time prior to the effective date of such Piggyback Registration.

(b)   Priority on Piggyback Registrations. The Company shall permit the Holders and holders of Warrant Shares to include all such Warrant Shares on the same terms and conditions as any similar securities, if any, of the Company or any other persons included therein. Notwithstanding the foregoing, if the Company or the managing underwriter or underwriters participating in such offering advise the Holders and holders of Warrant Shares in writing that the total amount of securities requested to be included in such Piggyback Registration exceeds the amount which can be sold in (or during the time of) such offering without delaying or jeopardizing the success of the offering (including the price per share of the securities to be sold), then the amount of securities to be offered for the account of the such holders and other holders of securities who have piggyback registration rights with respect thereto shall be reduced (to zero if necessary) pro rata on the basis of the number of Common Stock or Common Stock equivalents requested to be registered by each such holder or other holder participating in such offering.

(c)   Right to Abandon. Nothing in this Section 7.02 shall create any liability on the part of the Company to the Holders or holders of any Warrant Shares if the Company in its sole discretion should decide not to file a registration statement proposed to be filed pursuant to Section 7.02(a) or to withdraw such registration statement subsequent to its filing, regardless of any action whatsoever that a holder may have taken, whether as a result of the issuance by the Company of any notice hereunder or otherwise. Any such determination not to file or to withdraw a registration statement shall not affect the obligations of the Company to pay or to reimburse all Registration Expenses pursuant to Section 7.05.

Section 7.03   Registration Procedures. In connection with the registration obligations of the Company pursuant to and in accordance with Sections 7.01 and 7.02 (and subject to Sections 7.01 and 7.02), the Company shall use commercially reasonable efforts to effect such registration to permit the sale of such Warrant Shares in accordance with the intended method or methods of disposition thereof, and pursuant thereto the Company shall as expeditiously as possible:

(a)   prepare and file with the Securities and Exchange Commission ("SEC") a Registration Statement for the sale of the Warrant Shares on any form for which the Company then qualifies or which counsel for the Company shall deem appropriate in accordance

22

with such Holders' or Warrant Shares holders' intended method or methods of distribution thereof, and, subject to the Company's right to terminate or abandon a registration pursuant to Section 7.02(c), use commercially reasonable efforts to cause such Registration Statement to become effective and remain effective as provided herein;

(b)    prepare and file with the SEC such amendments (including post-effective amendments) to such Registration Statement, and such supplements to the related Prospectus, as may be required by the rules, regulations or instructions applicable to the Securities Act during the applicable period in accordance with the intended methods of disposition specified by the holders whose Warrant Shares are covered by such Registration Statement, make generally available earnings statements satisfying the provisions of Section 11(a) of the Securities Act (provided that the Company shall be deemed to have complied with this Section 7.03 if it has complied with Rule 158 under the Securities Act), and cause the related Prospectus as so supplemented to be filed pursuant to Rule 424 under the Securities Act; provided, however, that before filing a Registration Statement or Prospectus, or any amendments or supplements thereto (other than reports required to be filed by it under the Exchange Act that are incorporated or deemed to be incorporated by reference into the Registration Statement and the Prospectus except to the extent that such reports related primarily to the offering), the Company shall furnish to the holders whose Warrant Shares are covered by such Registration Statement and their counsel for review and comment, copies of all documents required to be filed;

(c)    notify the holders whose Warrant Shares are covered by such Registration Statement promptly and (if requested) confirm such notice in writing, (i) when a Prospectus or any Prospectus supplement or post-effective amendment has been filed, and, with respect to such Registration Statement or any post-effective amendment, when the same has become effective, (ii) of any request by the SEC for amendments or supplements to such Registration Statement or the related Prospectus or for additional information regarding the Company or the Holders, (iii) of the issuance by the SEC of any stop order suspending the effectiveness of such Registration Statement or the initiation of any proceedings for that purpose, (iv) of the receipt by the Company of any notification with respect to the suspension of the qualification or exemption from qualification of any of the Warrant Shares for sale in any jurisdiction or the initiation or threatening of any proceeding for such purpose, and (v) of the happening of any event that requires the making of any changes in such Registration Statement, Prospectus or documents incorporated or deemed to be incorporated therein by reference so that they will not contain any untrue statement of a material fact or omit to state any material fact required to be stated therein or necessary to make the statements therein not misleading;

(d)    use commercially reasonable efforts to prevent the issuance of any order suspending the effectiveness of such Registration Statement or the qualification or exemption from qualification of any Warrant Shares for sale in any jurisdiction in the United States, and to obtain the lifting or withdrawal of any such order at the earliest practicable time;

(e)    furnish to the holder whose Warrant Shares are covered by such Registration Statement and who so requests in writing, each counsel for such holders and each managing underwriter, if any, without charge, one conformed copy of such Registration Statement, as declared effective by the SEC, and of each post-effective amendment thereto, in each case including financial statements and schedules and all exhibits and reports incorporated

23

or deemed to be incorporated therein by reference; and deliver, without charge, such number of copies of the preliminary prospectus, any amended preliminary prospectus, any free writing prospectus, each final Prospectus and any post-effective amendment or supplement thereto, as such holder may reasonably request in order to facilitate the disposition of the Warrant Shares of such holder covered by such Registration Statement in conformity with the requirements of the Securities Act;

(f)     prior to any public offering of Warrant Shares covered by such Registration Statement, use commercially reasonable efforts to register or qualify such Warrant Shares for offer and sale under the securities or "Blue Sky" laws of such jurisdictions as the holders of such Warrant Shares shall reasonably request in writing; provided, however, that the Company shall in no event be required to qualify generally to do business as a foreign corporation or as a dealer in any jurisdiction where it is not at the time required to be so qualified or to execute or file a general consent to service of process in any such jurisdiction where it has not theretofore done so or to take any action that would subject it to general service of process or taxation in any such jurisdiction where it is not then subject;

(g)     upon the occurrence of any event contemplated by Section 7.03(c)(v), prepare a supplement or post-effective amendment to such Registration Statement or the related Prospectus or any document incorporated or deemed to be incorporated therein by reference and file any other required document so that, as thereafter delivered to the purchasers of the Warrant Shares being sold thereunder, such Prospectus will not contain an untrue statement of a material fact or omit to state any material fact required to be stated therein or necessary to make the statements therein, in light of the circumstances under which they were made, not misleading;

(h)     use commercially reasonable efforts to cause all Warrant Shares covered by such Registration Statement to be listed on each securities exchange or automated interdealer quotation system, if any, on which similar securities issued by the Company are then listed or quoted, or, if none, on such securities exchange or automated interdealer quotation system reasonably selected by the Company;

(i)     on or before the effective date of such Registration Statement, provide the transfer agent of the Company for the Warrant Shares with printed certificates for the Warrant Shares covered by such Registration Statement, which are in a form eligible for deposit with The Depository Trust Company;

(j)     if such offering is an underwritten offering, make available for inspection by any holder whose Warrant Shares are included in such Registration Statement, any underwriter participating in any offering pursuant to such Registration Statement, and any attorney, accountant or other agent retained by any such holder or underwriter (collectively, the "Inspectors"), all financial and other records and other information, pertinent corporate documents and properties of any of the Company and its subsidiaries and affiliates (collectively, the "Records"), as shall be reasonably necessary to enable them to exercise their due diligence responsibilities; provided, however, that the Records that the Company determines, in good faith, to be confidential and which it notifies the Inspectors in writing are confidential shall not be disclosed to any Inspector unless such Inspector signs a confidentiality agreement reasonably

24

satisfactory to the Company, which shall permit the disclosure of such Records in such Registration Statement or the related Prospectus if (i) necessary to avoid or correct a material misstatement in or material omission from such Registration Statement or Prospectus or (ii) the release of such Records is ordered pursuant to a subpoena or other order from a court of competent jurisdiction; provided further, however, that (A) any decision regarding the disclosure of information pursuant to subsection (i) shall be made only after consultation with counsel for the applicable Inspectors and the Company and (B) with respect to any release of Records pursuant to subsection (ii), each holder of Warrant Shares shall, promptly after learning that disclosure of such Records is sought in a court having jurisdiction, give notice to the Company so that the Company, at the Company's expense, may undertake appropriate action to prevent disclosure of such Records;

(k)    if such offering is an underwritten offering, enter into such agreements (including an underwriting agreement in form, scope and substance as is customary in underwritten offerings) and take all such other appropriate and reasonable actions requested by the holders of a majority of the Warrant Shares being sold in connection therewith (including those reasonably requested by the managing underwriters) in order to expedite or facilitate the disposition of such Warrant Shares, and in such connection, (i) use commercially reasonable efforts to obtain opinions of counsel to the Company and updates thereof (which counsel and opinions (in form, scope and substance) shall be reasonably satisfactory to the managing underwriters and counsel to the holders of the Warrant Shares being sold), addressed to each selling holder of Warrant Shares covered by such Registration Statement and each of the underwriters as to the matters customarily covered in opinions requested in underwritten offerings and such other matters as may be reasonably requested by such counsel and underwriters, (ii) use commercially reasonable efforts to obtain "cold comfort" letters and updates thereof from the independent certified public accountants of the Company (and, if necessary, any other independent certified public accountants of any subsidiary of the Company or of any business acquired by the Company for which financial statements and financial data are, or are required to be, included in the Registration Statement), addressed to each selling holder of Warrant Shares covered by the Registration Statement (unless such accountants shall be prohibited from so addressing such letters by applicable standards of the accounting profession) and each of the underwriters, such letters to be in customary form and covering matters of the type customarily covered in "cold comfort" letters in connection with underwritten offerings, (iii) if requested and if an underwriting agreement is entered into, provide indemnification provisions and procedures customary for underwritten public offerings. The above shall be done at each closing under such underwriting or similar agreement, or as and to the extent required thereunder.

Section 7.04    Holder Obligations. The Company may require each holder of Warrant Shares covered by a Registration Statement to furnish such information regarding such holder and such holder's intended method of disposition of such Warrant Shares as it may from time to time reasonably request in writing. If any such information is not furnished within a reasonable period of time after receipt of such request, the Company may exclude such holder's Warrant Shares from such Registration Statement. In addition if such offering is an underwritten offering, the Company may require the holders of Warrants and Warrant Shares to enter into such agreements (including an underwriting agreement in form, scope and substance as is customary in underwritten offerings) and take all such other appropriate and reasonable actions requested by the Company (including that such holders exercise their Warrants and any other

25

actions reasonably requested by the managing underwriters) in order to expedite or facilitate the disposition of such Warrant Shares;

(b)    Upon receipt of any notice from the Company of the happening of any event of the kind described in Section 7.03(c)(ii), 7.03(c)(iii), 7.03(c)(iv) or 7.03(c)(v), each holder of Warrant Shares covered by a Registration Statement shall discontinue disposition of any Warrant Shares covered by such Registration Statement or the related Prospectus until receipt of the copies of the supplemented or amended Prospectus contemplated by Section 7.03(g), or until such holder is advised in writing by the Company that the use of the applicable Prospectus may be resumed, and has received copies of any amended or supplemented Prospectus or any additional or supplemental filings which are incorporated, or deemed to be incorporated, by reference in such Prospectus and, if requested by the Company, the Holder shall deliver to the Company (at the expense of the Company) all copies then in its possession, other than permanent file copies then in such holder's possession, of the Prospectus covering such Warrant Shares at the time of receipt of such request;

(c)    Each holder of Warrant Shares covered by a Registration Statement shall not to utilize any material other than the applicable current preliminary prospectus, free writing prospectus, road show or Prospectus in connection with the offering of such Warrant Shares; and

(d)    If (i) the Company shall file a registration statement (other than in connection with the registration of securities issuable pursuant to an employee stock option, stock purchase or similar plan or pursuant to a merger, exchange offer or a transaction of the type specified in Rule 145(a) under the Securities Act) with respect to an underwritten public offering of Common Stock or securities convertible into, or exchangeable or exercisable for, such securities, (ii) with reasonable prior notice, the managing underwriter or underwriters of a public offering advises the Company in writing (in which case the Company shall notify the Holders) that a public sale or distribution of Warrant Shares would materially adversely impact such offering and (iii) the underwriter or underwriters have obtained written lock-up agreements from the Company, each executive officer of the Company and the stockholders party to the Stockholders Agreement ("Lock-up Agreements"), then each Holder shall, to the extent not inconsistent with applicable law, refrain from effecting any public sale or distribution of Warrant Shares during the ten (10) days prior to the effective date of such registration statement and until the earlier of the abandonment of such offering and the expiration of all lock-up periods imposed in connection with the Lock-Up Agreements. Notwithstanding the foregoing, any obligations of the Holders under this Section 7.04(d) shall terminate in the event that the Company or any underwriter terminates, releases or waives, in whole of in part, the Lock-up Agreements with respect to the Company, any executive officer of the Company or any such other person who has been granted registration rights by the Company.

Section 7.05    Registration Expenses. Whether or not any Registration Statement is filed or becomes effective, the Company shall pay all costs, fees and expenses incident to the Company's performance of or compliance with this Article VII, including (i) all registration and filing fees, including NASD filing fees, (ii) all fees and expenses of compliance with securities or "Blue Sky" laws, including reasonable fees and disbursements of counsel in connection therewith, (iii) printing expenses (including expenses of printing certificates for Warrant Shares

26

and of printing prospectuses if the printing of prospectuses is requested by the Holders or holders of Warrant Shares or the managing underwriter, if any) and expenses associated with a road show, (iv) messenger, telephone and delivery expenses, (v) fees and disbursements of counsel for the Company, (vi) fees and disbursements of all independent certified public accountants of the Company (including expenses of any "cold comfort" letters required in connection with this Agreement) and all other persons retained by the Company in connection with such Registration Statement, (vii) fees and disbursements of one counsel, other than the Company's counsel, selected by holders of a majority of the Warrant Shares being registered, to represent all such holders, (viii) fees and disbursements of underwriters customarily paid by the issuers or sellers of securities and (ix) all other costs, fees and expenses incident to the Company's performance or compliance with this Article VII. Notwithstanding the foregoing, the fees and expenses of any persons retained by any holder, other than one counsel for all such holders, and any discounts, commissions or brokers' fees or fees of similar securities industry professionals and any transfer taxes relating to the disposition of the Warrant Shares by a holder, will be payable by such holder and the Company will have no obligation to pay any such amounts.

Section 7.06   Limitations on Subsequent Registration Rights.   After the date of the IPO and before the Expiration Date, the Company shall not grant registration rights to any third party which are senior to or *pari passu* with the registration rights granted pursuant to this Article VII, unless the Company has obtained the written consent of holders of Warrants representing at least a majority in number of the Warrant Shares then issuable upon the exercise of outstanding Warrants.

### ARTICLE VIII
### MISCELLANEOUS

Section 8.01   Amendment. The terms of the Warrants may be amended by the Company together with the affirmative vote or consent of the Holders of a majority of the Warrants. The Company and the Warrant Agent may from time to time supplement or amend this Agreement without the approval of any Holders in order to cure any ambiguity, manifest error or other mistake in this Agreement, or to correct or supplement any provision contained herein that may be defective or inconsistent with any other provision herein, or to make any other provisions in regard to matters or questions arising hereunder that the Company and the Warrant Agent may deem necessary or desirable and that shall not adversely affect, alter or change the interests of any Holder. Notwithstanding anything to the contrary herein, upon the delivery of a certificate from an appropriate officer of the Company, which states that the proposed supplement or amendment is in compliance with the terms of this Section 8.01 and, provided such supplement or amendment does not change the Warrant Agent's own rights, duties, liabilities, immunities or obligations hereunder, the Warrant Agent shall execute such supplement or amendment. Any amendment, modification or waiver effected pursuant to and in accordance with the provisions of this Section 8.01 will be binding upon all Holders and upon each future Holder, the Company and the Warrant Agent. In the event of any amendment, modification or waiver, the Company will give prompt notice thereof to all Holders.

Section 8.02   Notices and Demands to the Company and Warrant Agent. If the Warrant Agent shall receive any notice or demand addressed to the Company by the Holder of a

27

Warrant Certificate pursuant to the provisions of the Warrant Certificates, the Warrant Agent shall promptly forward such notice or demand to the Company.

Section 8.03    Addresses.  Any communication from the Company to the Warrant Agent with respect to this Agreement shall be addressed to Mellon Investor Services LLC, 200 W. Monroe Street, Suite 1590, Chicago, IL 60606, Attention:  Georg Drake, with a copy to Mellon Investor Services LLC, 480 Washington Boulevard, Jersey City, NJ 07310, Attention: Legal Department, and any communication from the Warrant Agent to the Company with respect to this Agreement shall be addressed to Hayes Lemmerz International, Inc., 15300 Centennial Drive, Northville, MI 48167, Attention: General Counsel (or such other address as shall be specified in writing by the Warrant Agent or by the Company).  For the avoidance of doubt, the Company may satisfy its obligation to provide the Warrant Agent with a written order or direction pursuant to this Agreement through the use of electronic mail delivered to the Warrant Agent.

Section 8.04    Applicable Law.  The validity, interpretation and performance of this Agreement and each Warrant Certificate issued hereunder and of the respective terms and provisions hereof and thereof shall be governed by, and construed in accordance with, the laws of the State of Delaware.

Section 8.05    Obtaining of Governmental Approval.  The Company from time to time will use its best efforts to obtain and keep effective any and all permits, consents and approvals of governmental agencies and authorities and to make any necessary filings under federal or state securities laws, which may become requisite in connection with the issuance, sale, transfer and delivery of the Warrant Certificates, the exercise or conversion of the Warrants, the issuance, sale, transfer and delivery of the Warrant Shares.

Section 8.06    Persons Having Rights Under Warrant Agreement.  Nothing contained in the Warrant shall be construed as conferring upon the Holder the right to vote or to consent or to receive notice as a stockholder in respect of any meeting of stockholders for the election of directors of the Company or any other matter, to receive dividends or any rights whatsoever as stockholders of the Company.  Each Holder shall be entitled to receive the same information and reports to which a holder of the Common Stock is entitled pursuant to the Stockholders Agreement then in effect, subject to execution of an appropriate confidentiality agreement.

Section 8.07    Headings.  The descriptive headings of the several Articles and Sections of this Agreement are inserted for convenience only and shall not control or affect the meaning or construction of any of the provisions hereof.

Section 8.08    Counterparts.  This Agreement may be executed in any number of counterparts, each of which as so executed shall be deemed to be an original, but such counterparts shall together constitute but one and the same instrument.

Section 8.09    Inspection of Agreement.  A copy of this Agreement shall be available at all reasonable times at the principal corporate trust office of the Warrant Agent for

28

inspection by the Holder of any Warrant Certificate. The Warrant Agent may require such Holder to submit his Warrant Certificate for inspection by it.

Section 8.10   Notices to Holders of Warrants. Any notice to Holders of Warrants evidenced by Warrant Certificates which by any provisions of this Warrant Agreement is required or permitted to be given shall be given by first class mail prepaid at such Holder's address as it appears on the books of the Warrant Agent.

Section 8.11   Binding Effects. This Agreement shall inure to the benefit and shall be binding upon the Company, the Warrant Agent and the Holders and their respective heirs, legal representatives, successors and assigns. Nothing in this Agreement, express or implied, is intended to or shall confer on any Person other than the Company, the Warrant Agent and the Holders, or their respective heirs, legal representatives, successors or assigns, any rights, remedies, obligations or liabilities under or by reason of this Agreement.

Section 8.12   Severability. In the event that any one or more of the provisions contained herein, or the application thereof in any circumstances, is held invalid, illegal or unenforceable, the validity, legality and enforceability of any such provisions in every other respect and of the remaining provisions contained herein and therein shall not be affected or impaired thereby; provided, that if any such excluded term, provision, covenant or restriction shall materially adversely affect the rights, immunities, duties or obligations of the Warrant Agent, the Warrant Agent shall be entitled to resign by giving not less than ten (10) days prior written notice to the Company. In the event a successor Warrant Agent has not been appointed and accepted its duties within ten (10) days of the Warrant Agent's notice of resignation, the Warrant Agent may apply to any court of competent jurisdiction for the designation of a successor Warrant Agent.

[SIGNATURE PAGE FOLLOWS]

29

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed.

HAYES LEMMERZ INTERNATIONAL, INC.

By: _____

      Name:

      Title:

MELLON INVESTOR SERVICES LLC

By: _____

      Name:

      Title:

EXHIBIT A

[FORM OF WARRANT CERTIFICATE]

[Face]

EXERCISABLE ONLY IF AUTHENTICATED BY THE WARRANT
AGENT AS PROVIDED HEREIN

VOID AFTER THE CLOSE OF BUSINESS ON _____, 2016
HAYES LEMMERZ INTERNATIONAL, INC.

Warrant Certificate representing
Series A[2] Warrants to purchase
Class A Common Stock, par value $0.01 per share
as described herein

Warrants

This certifies that [_____] or registered assigns is the registered owner of the above indicated number of Series A Warrants[3] (each, a "Warrant"), each Warrant entitling such registered owner to purchase, one share of the Class A Common Stock, par value $0.01 per share (the "Warrant Shares") of Hayes Lemmerz International, Inc. (the "Company") on the following basis.

The Warrant may be exercised in whole or in part at any time on or before the close of business on _____, 2016; *provided that*, any Warrants not exercised in connection with a Sale Transaction in which the holders of Common Stock receive only cash consideration, shall automatically expire upon consummation of such Sale Transaction (in either case, such date and such time, the "Expiration Date"); *provided further, that* for the avoidance of doubt, the foregoing proviso shall not affect a Holder's entitlement to replacement securities pursuant to Section 5.05 of the Warrant Agreement. Each Warrant not exercised at or before the Expiration Date shall become void, and all rights of the Holder and any beneficial owners of the Warrant Certificate evidencing such Warrant under the Warrant Agreement shall cease.

Prior to the Expiration Date, each Warrant shall entitle the Holder thereof, subject to the provisions of this Agreement, to purchase from the Company one Warrant Share at the Exercise Price of [$____ ] (the "Exercise Price"). The Holder of this Warrant Certificate may exercise

---

[2] Series B Warrant Certificate will state "Series B"

[3] Series B Warrant Certificate will state "Series B"

the Warrants evidenced hereby, in whole or in part, by surrendering this Warrant Certificate, with the purchase form set forth hereon duly completed, accompanied by payment in full, in lawful money of the United States of America, in immediately available funds, or deemed payment in full in connection with a "cashless" exercise, the Exercise Price for each Warrant exercised, to the Warrant Agent (as hereinafter defined), or its successor as warrant agent (the "Warrant Agent") at the addresses specified on the reverse hereof and upon compliance with and subject to the conditions set forth herein and in the Warrant Agreement dated as of _____, 2009 (the "Warrant Agreement"). Capitalized terms used, but not otherwise defined, herein, shall have the meaning ascribed to such terms in the Warrant Agreement.

The term "Holder" as used herein shall mean the person in whose name at the time this Warrant Certificate shall be registered upon the books to be maintained by the Warrant Agent for that purpose pursuant to Section 4.01 of the Warrant Agreement.

Any whole number of Warrants evidenced by this Warrant Certificate may be exercised to purchase Warrant Shares in registered form. Upon any exercise of fewer than all of the Warrants evidenced by this Warrant Certificate, a new Warrant or Warrants of like tenor, calling in the aggregate on the face or faces of this Warrant Certificate or Warrant Certificates for the number of shares of Common Stock equal (without giving effect to any adjustment thereof) to the number of such shares called for on the face of the Warrant Certificate minus the number of such shares designated by the Holder upon such exercise together with any Warrant Shares withheld in connection with a Cashless Exercise, shall be issued and delivered to the Holder or its registered assigns.

This Warrant Certificate is issued under and in accordance with the Warrant Agreement, between the Company and the Warrant Agent and is subject to the terms and provisions contained in the Warrant Agreement, to all of which terms and provisions the Holder of this Warrant Certificate consents by acceptance hereof. Copies of the Warrant Agreement are on file at the above-mentioned office of the Warrant Agent.

After authentication by the Warrant Agent and prior to the expiration of this Warrant Certificate, this Warrant Certificate may be exchanged at the corporate trust office of the Warrant Agent for Warrant Certificates representing the same aggregate number of Warrants.

Neither this Warrant Certificate nor the Warrant evidenced hereby, shall, and nothing contained in the Warrant Agreement shall be construed to entitle the registered owner hereof, or any beneficial owner, to any of the rights of a registered holder or beneficial owner of the Warrant Shares, including, without limitation, the right to vote or to consent or to receive notice as a stockholder in respect of any meetings of stockholders for the election of directors of the Company or any other matter, to receive dividends on Warrant Shares or any rights whatsoever as stockholders of the Company.

Reference is hereby made to the further provisions of this Warrant Certificate set forth on the reverse hereof, which further provisions shall for all purposes have the same effect as if set forth at this place.

A-2

A-3

This Warrant Certificate shall not be valid or obligatory for any purpose until authenticated by the Warrant Agent.

A-3

IN WITNESS WHEREOF, the Company has caused this Warrant Certificate to be duly executed.

Dated:_____

HAYES LEMMERZ INTERNATIONAL, INC

By:_____

Attest:

_____

Certificate of Authentication

This is one of the Warrant Certificates referred to in the within-mentioned Warrant Agreement.

_____
MELLON INVESTOR SERVICES LLC,
       As Warrant Agent

By:_____
       Authorized Signature

A-4

[REVERSE] [FORM OF WARRANT CERTIFICATE]
(Instructions for Exercise of Warrants)

To exercise any Warrants evidenced hereby, the Holder of this Warrant Certificate must pay by certified check or official bank check or by bank wire transfer, in each case, in immediately available funds, unless such exercise is a Cashless Exercise, then by tendering Warrants equal to, the aggregate Exercise Price in full for each of the Warrants exercised, to _____, ,_____, Attn: _____, which payment should specify the name of the Holder of this Warrant Certificate and the number of Warrants exercised by such Holder. A Cashless Exercise shall only be permitted in connection with an IPO or a Triggering Event, as provided in the Warrant Agreement. In addition, the Holder of this Warrant Certificate should complete the information required below and present in person or mail by registered mail this Warrant Certificate to the Warrant Agent at the addresses set forth below.

[FORM OF EXERCISE]
(To be executed upon exercise of Warrants.)

The undersigned hereby irrevocably elects to exercise _____ Warrants, represented by this Warrant Certificate, to purchase _____ shares of Class A Common Stock, par value $0.01 per share (the "Warrant Shares") of Hayes Lemmerz International, Inc. and represents that he has tendered payment for such Warrant Shares by (check one):

☐    certified check or official bank check or by bank wire transfer, in each case, in immediately available funds, to the order of Hayes Lemmerz International, Inc., c/o [      ] in the amount of $_____ ,

or

☐    tendering _____ Warrants, in connection with a Cashless Exercise, as set forth in Section 2.03(c) of the Warrant Agreement, equal to the aggregate Exercise Price,

in accordance with the terms of the Warrant Agreement. The undersigned requests the Warrant Shares to which the Holder is entitled be in fully registered form, in the authorized denominations, registered in such names and delivered, all as specified in accordance with the instructions set forth below.

If said amount of Warrant Shares is less than all of the Warrant Shares purchasable hereunder, the undersigned requests that a new Warrant Certificate or Warrants of like tenor representing the remaining balance of the Warrants evidenced hereby be issued and delivered to the undersigned unless otherwise specified in the instructions below.

Dated:_____

Name_____
         (Please Print)

A-5

---

(Insert Social Security or Other
Identifying Number of Holder)

Address _____

_____

Signature_____

        (Signed exactly as name appears
        on the other side of this Warrant
        Certificate)

            This Warrant may be exercised at the following addresses:

            By hand at   _____

                        _____

                        _____

                        _____

            By mail at   _____

                        _____

                        _____

                        _____

(Instructions as to form and delivery of Warrant Shares and/or Warrant Certificates):

**(NOTE:  The signature(s) must be medallion guaranteed by a commercial bank or trust company in the United States or by a member firm of the New York Stock Exchange)**

A-6

A-7

[FORM OF ASSIGNMENT]

(TO BE EXECUTED TO TRANSFER THE WARRANT CERTIFICATE)

FOR VALUE RECEIVED _____ hereby sells, assigns and transfers unto
Please insert social
security or other
identifying number)

_____

_____

(Please print name and address
including zip code)

___ the right represented by the within Warrant Certificate and does hereby irrevocably constitute
and appoint _____, Attorney, to transfer said Warrant Certificate on the books of
the Warrant Agent with full power of substitution.

Dated: _____

_____
Signature
(Signed exactly as name appears on the
other side of this Warrant Certificate)

Signature Guarantee:

_____

Participant in a recognized Signature
Guarantee Medallion Program (or other
signature guarantor program reasonably
acceptable to the Warrant Agent)

**(NOTE:  The signature(s) must be medallion guaranteed by a commercial bank or trust
company in the United States or by a member firm of the New York Stock Exchange)**

A-7