SCHEDULE 1

**HLI - Share Count Analysis**

*Scenarios Assume Cash Settlement of Exercised Warrants*

| | |
|---|---|
| Shares Outstanding at Emergence | 10,000,000 |
| Shares Authorized | 20,000,000 |

| | |
|---|---|
| Tranche A Warrants | 555,555 |
| Tranche B Warrants | 555,555 |

| | |
|---|---|
| Pre-petition debt held by DIP Lenders | $ 285,584,531 |
| Pre-petition Consenting Lenders | 192,432,416 |
| Pre-petition Non-Consenting Lenders | 28,324,933 |
| Total Pre-Petition Debt | $ 506,341,880 |
| Equity to Pre-petition Lenders Under Plan | 4% |

| | Emergence | | Exercise of Tranche A Only Pre Anti-Dilution | | Exercise of Tranche A/B Warrants Pre Anti-Dilution | |
|---|---|---|---|---|---|---|
| DIP Lenders | 8,450,000 | 84.50% | 8,450,000 | 80.05% | 8,450,000 | 76.05% |
| Pre-Petition Lenders | | | | | | |
| Pre-Petition Lender Consent Fee | 850,000 | 8.50% | 850,000 | 8.05% | 850,000 | 7.65% |
| Pre-Petition Consenting Lender Equity | 348,677 | 3.49% | 348,677 | 3.30% | 348,677 | 3.14% |
| Tranche C/D Anti-Dilution Warrants | 0 | 0.00% | 0 | 0.00% | 0 | 0.00% |
| Total Consenting Pre-Petition Lenders | 1,198,677 | 11.99% | 1,198,677 | 11.36% | 1,198,677 | 10.79% |
| Non-consenting Pre-Petition Lender Equity | 51,323 | 0.51% | 51,323 | 0.49% | 51,323 | 0.46% |
| Total Pre-Petition Lenders | 1,250,000 | 12.50% | 1,250,000 | 11.84% | 1,250,000 | 11.25% |
| Foreign Creditor Distribution | | | | | | |
| PBGC/Noteholders | 300,000 | 3.00% | 300,000 | 2.84% | 300,000 | 2.70% |
| Tranche A/B Warrants Exercised | 0 | 0.00% | 555,555 | 5.26% | 1,111,110 | 10.00% |
| Tranche E/F Anti-Dilution Warrants | 0 | 0.00% | 0 | 0.00% | 0 | 0.00% |
| Total Foreign Creditor Distribution | 300,000 | 3.00% | 855,555 | 8.11% | 1,411,110 | 12.70% |
| Total Shares | 10,000,000 | 100.00% | 10,555,555 | 100.00% | 11,111,110 | 100.00% |

## Exhibit M

## Form of Stockholders' Agreement, Registration Rights Agreement and Management Stockholders' Agreement

**PLAN EXHIBIT M**

### Registration Rights Agreement, Stockholders' Agreement, and Management Stockholders Agreement

The forms of Registration Rights Agreement and Stockholders' Agreement are attached hereto. The Plan provides that any party that receives the New Common Stock or similar equity based incentives through or on account of any management incentive plan or the like shall be required to execute a separate management stockholders agreement acceptable to the executive and Reorganized Hayes prior to receipt of such New Common Stock or incentive. Specific awards of New Common Stock or similar equity based incentives to Reorganized Hayes' management, or the implementation of any management incentive plan or the like, will not occur until after the Plan Effective Date. Accordingly, the Debtors and the Requisite DIP Lenders have agreed that such a management stockholders agreement will negotiated by the Board of Directors (the "Board") of Reorganized Hayes after the Plan Effective Date and be implemented in connection with any long-term incentive plan or other management incentive or similar plan implemented by the Board of Reorganized Hayes.

M-2

Execution Version

STOCKHOLDERS AGREEMENT

among

HAYES LEMMERZ INTERNATIONAL, INC.

and

EACH OF THE STOCKHOLDERS

of

HAYES LEMMERZ INTERNATIONAL, INC.
NAMED ON THE SIGNATURE PAGES HERETO

Dated as of _____, 2009

TABLE OF CONTENTS

Page

ARTICLE I DEFINITIONS ........................................................................................1

ARTICLE II BOARD OF DIRECTORS AND GOVERNANCE ................................6

    SECTION 2.1    Election of Directors; Number and Composition of the Board. ...................6

    SECTION 2.2    Action by the Board ........................................................................7

    SECTION 2.3    D&O Indemnification Agreement; Expenses ........................................7

    SECTION 2.4    Actions Requiring Stockholder Approval; Director Approval. ...................7

ARTICLE III ACCESS TO INFORMATION ............................................................10

    SECTION 3.1    General Information to be Provided by the Company ...............................10

    SECTION 3.2    Right to Access ..............................................................................11

    SECTION 3.3    Notice of Certain Events...................................................................11

ARTICLE IV CERTIFICATE OF INCORPORATION AND BYLAWS ..................11

ARTICLE V TRANSFERS OF SHARES ..................................................................12

    SECTION 5.1    Restrictions on Transfers; Permitted Transferees. ..................................12

    SECTION 5.2    Drag-Along Right............................................................................13

    SECTION 5.3    Tag-Along Rights............................................................................15

    SECTION 5.4    Legend on Certificates......................................................................16

    SECTION 5.5    No Circumvention of Stock Transfer Restrictions...................................17

ARTICLE VI ADDITIONAL AGREEMENTS..........................................................17

    SECTION 6.1    Preemptive Rights. ..........................................................................17

    SECTION 6.2    Confidentiality ...............................................................................19

    SECTION 6.3    Environmental, Health and Safety Covenants .......................................19

ARTICLE VII MISCELLANEOUS ..........................................................................20

    SECTION 7.1    Term ............................................................................................20

    SECTION 7.2    Modifications .................................................................................20

    SECTION 7.3    Action by Stockholders ....................................................................20

    SECTION 7.4    Applicability ..................................................................................20

    SECTION 7.5    Notices..........................................................................................21

    SECTION 7.6    Binding Effect................................................................................22

    SECTION 7.7    Entire Agreement ...........................................................................22

SECTION 7.8    Counterparts..................................................................................22

SECTION 7.9    Headings .......................................................................................22

SECTION 7.10   Bylaws ..........................................................................................22

SECTION 7.11   Further Acts and Assurances .........................................................22

SECTION 7.12   Governing Law; Consent to Jurisdiction and Service of Process ................22

SECTION 7.13   Injunctive Relief............................................................................23

SECTION 7.14   Severability ...................................................................................23

SECTION 7.15   Recapitalization, Etc......................................................................23

Exhibit A          Certificate of Incorporation

Exhibit B          Bylaws

STOCKHOLDERS AGREEMENT

This STOCKHOLDERS AGREEMENT, dated as of [_____], 2009 (this "Agreement"), is entered into among HAYES LEMMERZ INTERNATIONAL, INC., a Delaware corporation (the "Company") and the Stockholders.  Capitalized terms not otherwise defined herein have the meanings set forth in Article I.

WITNESSETH:

WHEREAS, on May 11, 2009, the Company and certain of the Company's direct and indirect subsidiaries each filed a voluntary petition in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") initiating cases under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") §§ 101-1330 and continued in the possession of their assets and in the management of their businesses pursuant to sections 1107 and 1108 of the Bankruptcy Code;

WHEREAS, the [First] Amended Joint Plan of Reorganization of Hayes Lemmerz International, Inc., et al., as confirmed on [_____], 2009 by an order of the Bankruptcy Court entered on [_____], 2009 (the "Plan"), provides that the Company shall issue to the Stockholders shares of Class A Common Stock and/or shares of Class B Common Stock; and

WHEREAS, in connection with the consummation of the transactions contemplated by the Plan, and as required pursuant to the Plan as a condition to the receipt of such shares, the Company and the Stockholders are entering into this Agreement to provide certain rights and obligations among them.

NOW, THEREFORE, in consideration of the premises set forth herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties, intending to be legally bound hereby, agree as follows:

ARTICLE I

DEFINITIONS

The following terms shall have the definitions set forth below:

"Acceptance Notice" has the meaning set forth in Section 6.1(c).

"Affiliate" means, with respect to any specified Person, any other Person directly or indirectly controlling or controlled by or under direct or indirect common control with such specified Person.  For the purposes of this definition, "control" when used with respect to any specified Person means the power to direct the management and policies of such Person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise; and the terms "controlling" and "controlled" have meanings correlative to the foregoing.

"Agreement" has the meaning set forth in the preamble of this Agreement.

"Bankruptcy Code" has the meaning set forth in the preamble of this Agreement.

"Bankruptcy Court" has the meaning set forth in the preamble of this Agreement.

"Breaching Drag-Along Stockholder" has the meaning set forth in Section 5.2(e) of this Agreement.

"Beneficial Ownership" or "Beneficially Own" shall have the meaning given such term in Rule 13d-3 under the Exchange Act and a Person's Beneficial Ownership of securities shall be calculated in accordance with the provisions of such Rule; provided, however, that for purposes of determining any Person's Beneficial Ownership, such Person shall be deemed to be the Beneficial Owner of any Common Stock which may be acquired by such Person (disregarding any legal impediments to such Beneficial Ownership), whether within sixty (60) days or thereafter, upon the conversion, exchange, redemption or exercise of any warrants, options, rights, or other securities issued by the Company or any subsidiary thereof. Notwithstanding anything to the contrary set forth herein, prior to the pledgee commencing action to foreclose upon any shares of Common Stock pledged in any Qualified Pledge, any such pledged shares of Common Stock will be deemed Beneficially Owned by the pledging party.

"Board" means the Board of Directors of the Company.

"Business Day" means any day other than a Saturday, a Sunday or a day on which banks in New York, New York are authorized or obligated by law or executive order to close.

"Bylaws" means the Amended and Restated Bylaws of the Company, as amended from time to time.

"Certificate of Incorporation" means the Amended and Restated Certificate of Incorporation of the Company, as amended from time to time.

"Class A Common Stock" means the Company's Class A common stock, par value of $0.01 per share.

"Class B Common Stock" means the Company's Class B common stock, par value of $0.01 per share.

"Common Stock" means the Company's Class A Common Stock and Class B Common Stock.

"Common Stock Equivalents" means securities (including, without limitation, options or warrants) exercisable, exchangeable or convertible into Common Stock, whether immediately, upon the happening of any event or the passage of time, or otherwise.

"Company" has the meaning set forth in the preamble of this Agreement.

"Confidential Information" means any information, including all financial information provided pursuant to Article III, concerning the organization, business, technology, trade secrets, know-how, finance, transactions or affairs of a Person (whether conveyed in written, oral or in

any other form and whether such information has been furnished before, on or after the date of this Agreement) that is not known to the public or otherwise publicly available.

"DGCL" means the Delaware General Corporation Law.

"Dilutive Securities" has the meaning set forth in Section 6.1.

"Drag-Along Buyer" has the meaning set forth in Section 5.2(a).

"Drag-Along Proxy Holder" has the meaning set forth in Section 5.2(e).

"Drag-Along Right" has the meaning set forth in Section 5.2(a).

"EHS" has the meaning set forth in Section 6.3.

"Eligible Stockholder" has the meaning set forth in Section 3.1.

"Equity Incentive Plan" means any employee stock option plan, stock purchase plan, employee benefit plan, employment contract or any similar benefit or incentive program or agreement covering management, directors, employees or consultants of the Company and its subsidiaries approved by the Board, where the primary purpose of such plan, program or agreement is not to raise capital for the Company.

"Exchange Act" means the Securities Exchange Act of 1934, as amended, and the rules and regulations of the SEC promulgated thereunder.

"Initial Holders" means the Stockholders designated as such on the signature pages hereto.

"Majority Sale" has the meaning set forth in Section 5.2(a).

"Majority Sale Closing Date" has the meaning set forth in Section 5.2(b).

"Majority Sale Notice" has the meaning set forth in Section 5.2(b).

"Non-Initiating Stockholders" has the meaning set forth in Section 5.2(a).

"Notice of Preemptive Rights" has the meaning set forth in Section 6.1(b).

"Other Purchasers" has the meaning set forth in Section 6.1(d).

"Parties" means collectively the Company and any Person who becomes a party to this Agreement. Each of the Parties are referred to as a "Party."

"Permitted Transferee" has the meaning set forth in Section 5.1(e).

"Person" means an individual, corporation, partnership, limited liability company, joint venture, association, joint stock company, trust or unincorporated organization, or government or any agency or political subdivision thereof.

3

"Plan" has the meaning set forth in the preamble of this Agreement.

"Preemptive Offer" has the meaning set forth in Section 6.1(b).

"Pro Rata Portion" means:

(a) For purposes of Section 5.2 (with respect to each class of Shares to be Transferred pursuant to the Drag-Along Rights), a number of such class of Shares determined by multiplying (i) the aggregate number of such class of Shares Beneficially Owned by the Non-Initiating Stockholder by (ii) a fraction, the numerator of which is the aggregate number of such class of Shares proposed to be Transferred by the Proposing Stockholders to the Drag-Along Buyer and the denominator of which is the aggregate number of such class of Shares Beneficially Owned by the Proposing Stockholders.

(b) For purposes of Section 5.3 (with respect to each class of Shares to be transferred pursuant to the tag-along rights), (x) with respect to each Tagging Stockholder, a number of such class of Shares determined by multiplying (i) the total number of such class of Shares proposed to be Transferred by the Proposing Stockholder to the Proposed Transferee, by (ii) a fraction, the numerator of which is the number of such class of Shares Beneficially Owned by the Tagging Stockholder and the denominator of which is the aggregate number of such class of Shares Beneficially Owned by all Stockholders.

(c) For purposes of Section 6.1 (with respect to preemptive rights), a number of Dilutive Securities determined by multiplying (i) the aggregate number of Dilutive Securities the Company proposes to issue on the relevant issuance date by (ii) a fraction, the numerator of which is the number of Shares Beneficially Owned by the relevant Stockholder immediately prior to such date and the denominator of which is the aggregate number of Shares Beneficially Owned by all Stockholders.

"Proposed Transferee" has the meaning set forth in Section 5.3(a).

"Proposing Stockholders" has the meaning set forth in Section 5.2(a).

"Qualified Pledge" means a bona fide pledge of Common Stock in connection with a secured borrowing transaction, the pledgee with respect to which is a financial institution in the business of engaging in secured lending and similar transactions which has entered into such transaction in the ordinary course of such business.

"Qualified Public Offering" means a bona fide underwritten public offering of Shares by a nationally recognized investment banking firm that is registered under the Securities Act and (i) that results in net proceeds to the Company of not less than $75 million; and (ii) following which the Shares are listed on a United States national securities exchange.

"Registration Rights Agreement" means the Registration Rights Agreement, dated as of the date hereof, among the Parties hereto, as amended from time to time in accordance with its terms.

4

"Representative" means a Person's employees, directors, officers, advisors and other representatives (including attorneys, accountants and consultants).

"SEC" means the United States Securities and Exchange Commission, or any other Federal agency at the time administering the Securities Act or the Exchange Act.

"Securities Act" means the Securities Act of 1933, as amended, and the rules and regulations of the SEC promulgated thereunder.

"Series A Warrants" means the Series A Warrants contemplated to be issued to certain noteholders and the Pension Benefit Guaranty Corporation under the Plan.

"Series B Warrants" means the Series B Warrants contemplated to be issued to certain noteholders and the Pension Benefit Guaranty Corporation under the Plan.

"Series C Warrants" means the Series C Warrants contemplated to be issued to certain prepetition lenders under the Plan.

"Series D Warrants" means the Series D Warrants contemplated to be issued to certain prepetition lenders under the Plan.

"Series E Warrants" means the Series E Warrants contemplated to be issued to certain noteholders and the Pension Benefit Guaranty Corporation under the Plan.

"Series F Warrants" means the Series F Warrants contemplated to be issued to certain noteholders and the Pension Benefit Guaranty Corporation under the Plan.

"Shares" means shares of Common Stock, including any subdivisions, combinations, splits or reclassifications thereof.

"Stockholder Excess Election" has the meaning set forth in Section 6.1(c).

"Stockholders" means each Party (other than the Company) named on the signature pages to this Agreement, any Person who is a Transferee or a Permitted Transferee of Shares, whether from another Stockholder or from the Company, who is required by this Agreement to agree to be bound by the terms and conditions of this Agreement, and any other Person who otherwise becomes a party to this Agreement pursuant to the terms of this Agreement. The term "Stockholder" means any one of the Stockholders and, in the case of a Stockholder who is a natural person, the term "Stockholder" also includes such Stockholder's legal representatives, executors or administrators when the context so requires.

"Tag-Along Notice" has the meaning set forth in Section 5.3(b).

"Tagging Stockholder" has the meaning set forth in Section 5.3(a).

"Tag-Along Transfer" has the meaning set forth in Section 5.3(a).

"Transfer" means any sale, transfer, assignment, conveyance or other disposition, including without limitation by merger, operation of law, bequest or pursuant to any domestic relations order, whether voluntarily or involuntarily, provided, that (i) any sale, transfer, assignment, conveyance or other disposition to the Company or any subsidiary of the Company shall not be a Transfer and (ii) no Transfer of shares of Common Stock shall be deemed to have occurred as a result of the entry into, modification of or existence of any Qualified Pledge until such time as the pledgee commences any action to foreclose upon such shares of Common Stock or any shares of Common Stock are delivered upon settlement or termination of such Qualified Pledge (whichever occurs first).

"Transferee" means any Person acquiring Shares from the Company, regardless of the method of transfer.

"Warrants" means the Series A Warrants, Series B Warrants, Series C Warrants, Series D Warrants, Series E Warrants and Series F Warrants.

"Warrant Shares" means Shares issued pursuant to the exercise of the Warrants.

"Unallocated Share" has the meaning set forth in Section 6.1(c).

ARTICLE II

BOARD OF DIRECTORS AND GOVERNANCE

SECTION 2.1        Election of Directors; Number and Composition of the Board.

(a)    Each Stockholder agrees to vote (or shall cause to be voted) all Shares beneficially owned by such Stockholder, to the extent such Shares are entitled to so vote pursuant to the Certificate of Incorporation, to ensure that the number of directors constituting the entire Board shall be seven (7). The initial Board shall consist of [_____] and the Chief Executive Officer. The Chief Executive Officer shall be employed under an employment agreement which provides that, upon any termination of such Person's employment (whether by the Company or the executive, and regardless of whether or not for "cause"), such executive shall, upon any request by the Board, immediately resign as a director of the Company, any subsidiary of the Company and any other Person for which such executive is serving, at the request of the Company, as a director, member, manager, trustee or other similar capacity. Each such director shall serve for a term expiring at the annual meeting of Stockholders held in the year following the year of their election, and until their successors are elected and qualified, subject to any earlier resignation or termination in accordance with the terms of this Agreement and the Certificate of Incorporation and Bylaws of the Company.

(b)    Prior to each annual meeting of Stockholders, a nominating committee of the Board, consisting of all non-employee directors, shall nominate a slate of six (6) directors who shall stand for election at such meeting.

(c)    Any director or the entire Board may be removed, with or without cause, by vote of the holders of a majority of the outstanding stock entitled to so vote. Any

6

vacancies and newly created directorships resulting from any increase in the authorized number of directors may initially be filled by a majority vote of the remaining directors, and shall thereafter be filled, at the next meeting of the Stockholders, by the affirmative vote of a majority of the Stockholders entitled to so vote.

(d)   For so long as a Stockholder holds at least one million (1,000,000) Shares, the Company shall invite and permit a representative of such Stockholder to attend all meetings of the Board (whether in person, telephonically or otherwise) solely in a nonvoting observer capacity (each, a "Board Observer") and, in this respect, shall give such Board Observer copies of all notices, minutes, consents, and other materials that the Company provides to its directors. The Company shall not be required to invite and permit a Board Observer to attend meetings of any committee of the Board, provided that the Company shall give such Board Observer copies of all notices, minutes, consents, and other materials related to such Board committee meetings that the Company provides to the entire Board. Notwithstanding the foregoing, (i) the Company reserves the right to withhold any information and to exclude such Board Observer from any meeting or portion thereof if (A) access to such information or attendance at such meeting could adversely affect the attorney-client privilege between the Company and its counsel; (B) access to such information or attendance at such meeting could result in disclosure of trade secrets to such Stockholder or its Board Observer; or (C) access to such information or attendance at such meeting could result in a conflict of interest between such Stockholder or its Board Observer and the Company or its counsel; and (ii) each Board Observer shall, prior to being given any information or being permitted to attend any meetings, enter into an agreement with the Company providing that such Board Observer shall hold in confidence and trust and act in a fiduciary manner with respect to all information provided to them or learned by them in connection with the observer rights described herein, except to the extent otherwise required by law and any other regulatory process to which such Stockholder is subject.

SECTION 2.2   Action by the Board.   Except as otherwise set forth in this Agreement or in the Company's Bylaws, all actions taken by the Board shall be taken by a majority vote of the directors present at any meeting at which a quorum is present, provided, however, that any transaction between the Company or any of its subsidiaries on one hand, and a director, officer or Stockholder or an Affiliate thereof on the other hand, shall be approved by a majority vote of the disinterested directors.

SECTION 2.3   D&O Indemnification Agreement; Expenses.

(a)   The Company shall enter into an Indemnification Agreement with each director upon his or her appointment in such form as is adopted by the Board.

(b)   The Company shall reimburse the directors for all reasonable, documented out-of-pocket expenses incurred in connection with performing their duties and the directors and any Board Observers for all reasonable, documented out-of-pocket expenses incurred in connection with attending meetings of the Board.

SECTION 2.4   Actions Requiring Stockholder Approval; Director Approval.

7

(a)    The Company shall not, and, as specified, shall not permit any of its subsidiaries to, take any of the following actions, through mergers, consolidations or otherwise, without first obtaining the affirmative vote or written consent of the holders of not less than a majority of the outstanding shares of Common Stock, voting together as a single class:

(i)    any authorization of, or increase in the number of authorized shares of, any class of capital stock ranking *pari passu* with or senior to the Common Stock as to dividends or liquidation preference, including additional Common Stock;

(ii)    any amendment to the Company's Certificate of Incorporation or Bylaws;

(iii)    any amendment to this Agreement;

(iv)    any change in the authorized number of directors of the Board to a number other than seven (7);

(v)    any sale, lease or other disposition of all or substantially all of the assets of the Company through one or more transactions (for purposes of this Section 2.4(a)(v), any sale, lease or other disposition of assets of any subsidiary of the Company through one or more transactions will be deemed to be a sale, lease or disposition of assets of the Company if such sale, lease or disposition would constitute all or substantially all of the assets of the Company and its subsidiaries on a consolidated basis);

(vi)    any recapitalization, reorganization, consolidation or merger of the Company or any of its subsidiaries, other than recapitalizations, reorganizations, consolidations or mergers between the Company and any of its wholly owned subsidiaries or between any of the Company's wholly owned subsidiaries;

(vii)    any issuance or entry into an agreement for the issuance of any equity securities or any securities convertible or exercisable for equity securities (A) of the Company, which, in the aggregate with all other issuances permitted by this Section 2.4(a)(vii), would exceed seven hundred fifty thousand (750,000) shares (on an as converted basis) or (B) of any of its subsidiaries, except for (a) in the case of clause (A), the issuance of the Warrants and any Warrant Shares, (b) in the case of clause (A), issuances of Common Stock or securities convertible or exercisable for Common Stock reserved for grant pursuant to any Equity Incentive Plan and (c) in the case of clause (B), any issuances between the Company and any of its wholly owned subsidiaries or between any of the Company's wholly owned subsidiaries;

(viii)    the initiation or completion of a public offering of the securities of the Company or of any of its subsidiaries; and

(ix)    any redemption, purchase or other acquisition by the Company or any of its subsidiaries of any of its or its subsidiaries' capital stock, except for (a) purchases approved or ratified by the Board of Common Stock or securities convertible or exercisable for Common Stock from employees, directors and consultants of the Company upon termination of

8

employment or affiliation and (b) purchases between the Company and any of its wholly owned subsidiaries or between any of the Company's wholly owned subsidiaries.

(b)     The Board shall not take any of the following actions with respect to the Company or any of its subsidiaries without first obtaining the affirmative vote or written consent of a supermajority of not less than five of the directors elected by the Stockholders under Section 2.1 hereof:

(i)     any authorization, declaration or payment of any dividend (other than dividends payable solely in Shares) on any share of the capital stock of the Company or any subsidiary, other than the authorization and payment of dividends on the Common Stock;

(ii)     the incurrence of any debt that is (a) convertible into capital stock of the Company or of any of its subsidiaries, or (b) in an amount (1) greater than $5 million (other than borrowings under a revolving credit or similar agreement, which agreement has been previously approved pursuant to these provisions) or (2) which would cause the Company's or any of its subsidiaries' aggregate indebtedness to exceed $220 million, excluding, in all cases, the incurrence of indebtedness between the Company and any of its wholly owned subsidiaries or between or among any of the Company's wholly owned subsidiaries;

(iii)     the appointment or termination of the Chief Executive Officer or any person with substantially equivalent responsibilities;

(iv)     the creation of a committee of the Board of Directors or changing of the scope of authority of a committee of the Board of Directors;

(v)     any acquisition of all or substantially all of the properties or assets of any other Person;

(vi)     any acquisition of or any investment in (whether by merger, consolidation or otherwise) any other Person including consideration paid by the Company or its subsidiaries (including by way of assumption of liabilities) in excess of $2.5 million;

(vii)     any fundamental change in the Company's or any of its material subsidiaries' existing lines of business or entry by the Company or any of its subsidiaries into a new significant line of business or material alteration of the Company's or any of its subsidiaries' business plan;

(viii)     any adoption of and any substantial alterations to the Company's annual budget;

(ix)     any increase in the number of Shares reserved for grant pursuant to any Equity Incentive Plans in an amount greater than seventy-five thousand (75,000) shares;

(x)     any creation or acquisition of equity interests in any subsidiaries other than a subsidiary in which the Company is, directly or indirectly, the sole record or beneficial holder of all the equity interests;

9

(xi)    the appointment or change of the independent auditor for the Company or any of its material subsidiaries;

(xii)    the settling of any litigation, arbitration or administration proceeding for an amount in excess of $1 million or that provides for any material limitation on the conduct of the business by the Company or any of its subsidiaries;  and

(xiii)    any single or series of related capital expenditures in excess of $4 million.

## ARTICLE III

## ACCESS TO INFORMATION

SECTION 3.1        General Information to be Provided by the Company.

(a)    The Company shall provide to each Stockholder the following information:

(i)    within forty-five (45) days after the end of each of the first three fiscal quarters for the Company each fiscal year, unaudited quarterly financial statements for the quarterly period then ended and the comparable period in the prior year (including a narrative comparing the results of operations and financial position of the Company in the most recent period to the corresponding period in the prior fiscal year (which narrative need not contain all of the information that would be required in a "Management's Discussion and Analysis" pursuant to Regulation S-K under the Exchange Act); and

(ii)    within one hundred twenty (120) days after the end of each fiscal year, audited financial statements for the Company and its consolidated subsidiaries for such year (including a narrative comparing the results of operations and financial position of the Company in the most recent period to the corresponding period in the prior fiscal year (which narrative need not contain all of the information that would be required in a "Management's Discussion and Analysis" pursuant to Regulation S-K under the Exchange Act), together with a copy of the audit report of the Company's independent public accountants.

(b)    The Company shall provide to each Stockholder holding at least one million (1,000,000) Shares (an "Eligible Stockholder") the following information:

(i)    as soon as practicable after the end of each month, but in any event within thirty (30) days thereafter, an unaudited consolidated balance sheet of the Company and its subsidiaries, as of the end of each such monthly period, and unaudited statements of income, retained earnings and cash flows of the Company and its subsidiaries for such period and for the current fiscal year to date, setting forth in each case in comparative form the figures for the corresponding periods for the previous fiscal year, all in reasonable detail and prepared in accordance with the Company's normal financial reporting practices; and

10

(ii)    as soon as practicable prior to the end of each fiscal year, a budget for the next fiscal year and, as soon as prepared, any other budgets or revised budgets prepared by the Company.

Notwithstanding anything in this Agreement to the contrary, the Company shall not be required to provide any of the foregoing to any Stockholder whom the Company reasonably determines to be a direct competitor of the Company or to any Stockholder who owns a controlling interest in a Person whom the Company reasonably determines to be a direct competitor of the Company.

SECTION 3.2        Right to Access.

(a)    Each Eligible Stockholder shall have the right, upon reasonable notice and at reasonable times, to meet with the management of the Company and any of its subsidiaries and to have access to the auditors and other Representatives of the Company and any of its subsidiaries, provided however, that the Company or subsidiary shall have a right to limit such access if the Company or subsidiary determines that it is necessary or desirable to do so in order for the Company to preserve any privilege that the Company or subsidiary is entitled to claim.

(b)    The Company shall hold quarterly conference calls with the Stockholders to discuss the results of the Company's operations and the financial performance of the Company and to answer questions related thereto.

SECTION 3.3        Notice of Certain Events.  The Company shall, within a reasonable time after the occurrence of an event described below, provide notice to the Stockholders of (i) any litigation or administrative proceeding commenced against the Company or any of its subsidiaries which, were the Company subject to the Exchange Act, would be required to be reported in a Current Report on Form 8-K or in an Annual Report on Form 10-K and (ii) any default or event of default under an agreement which, if the Company were subject to the reporting requirements under the Exchange Act, would be required to be included in a Current Report on Form 8-K pursuant to Item 2.04 of such Form.  Such notice must contain all material facts and circumstances surrounding such event but shall not be required to contain all of the information that would be required under the applicable Item in a Current Report on Form 8-K.

ARTICLE IV

CERTIFICATE OF INCORPORATION AND BYLAWS

The Stockholders acknowledge and agree that in connection with the execution of this Agreement, the Certificate of Incorporation and the Bylaws of the Company shall be as set forth in Exhibits A and B hereto, respectively.  The Certificate of Incorporation shall, at all times during the term of this Agreement and, with respect to clause (b) below, for so long as any person designated by any Stockholder serves on the Board, provide (a) that the Company elects not to be governed by Section 203 of the DGCL and (b) for a renunciation of corporate opportunities presented to any Stockholder (and their respective Affiliates and nominees for election as a director) to the extent permitted by Section 122(17) of the DGCL and substantially on the terms and conditions set forth in Exhibit A.

11

ARTICLE V

TRANSFERS OF SHARES

SECTION 5.1          Restrictions on Transfers; Permitted Transferees.

(a)      Each Stockholder, severally and not jointly, agrees and acknowledges that such Stockholder will not Transfer any Shares unless (i) such Transfer complies with the provisions of this Agreement, and (ii) (x) such Transfer is pursuant to an effective registration statement under the Securities Act and has been registered under all applicable state securities or "blue sky" laws or (y) unless waived by the Company in writing, such Stockholder shall have furnished the Company with an opinion of counsel, which opinion of counsel shall be reasonably satisfactory to the Company, to the effect that no such registration is required because of the availability of an exemption from registration under the Securities Act and all applicable state securities or "blue sky" laws.  A Stockholder will not be required to obtain an opinion of counsel for (i) any transaction made pursuant to SEC Rule 144 except in cases where the Company, based on the opinion of counsel, has reasonable basis to believe that an issue of law exists with respect to such transaction or (ii) any transaction in which such Stockholder Transfers Shares to an Affiliate of such Stockholder for no consideration.

(b)      Without the prior written consent of the Board, no Stockholder may Transfer any Shares if, as a result of such Transfer, any class of equity securities of the Company would be held of record by more than two hundred and twenty-five (225) Persons (which calculation shall, for purposes of this Section 5.1(b), include the number of holders of any securities exercisable, convertible or exchangeable into equity securities of such class) or otherwise in circumstances that the Board determines could require the Company to file reports under the Exchange Act, if it is not otherwise then subject to such requirements.

(c)      A Transferee of Shares pursuant to this Article V who is a Permitted Transferee must (i) satisfy the requirements of this Article V, (ii) execute a joinder in form and substance satisfactory to the Company agreeing to be bound by the terms and provisions of this Agreement and assuming all of the Transferring Stockholder's then existing and future liabilities arising under or relating to this Agreement, and (iii) represent that the Transfer was made in accordance with this Agreement, the Certificate of Incorporation and all applicable securities laws and regulations.  Written notice of joinder of a Person to this Agreement as a Stockholder shall be sent promptly by the Transferring Stockholder to the Company.  Any attempted or purported Transfer of all or a portion of the Shares held by such Stockholder in violation of this Article V shall be null and void *ab initio* and of no force or effect whatsoever, such Stockholder will not be treated as an owner of Shares for purposes of this Agreement or otherwise, and the Company will not register such Transfer of Shares.  If all or any portion of a Stockholder's Shares are Transferred in violation of the other provisions of this Article V, involuntarily, by operation of law or otherwise, then without limiting any other rights and remedies available to the other Parties under this Agreement or otherwise, the Transferee of such Shares (or portion thereof) shall not be permitted to become a Party to this Agreement or be entitled to any rights as a Stockholder hereunder, and the Stockholder whose Shares have been Transferred in violation of the provisions of this Article V shall, together with its Affiliates, lose all rights it may have pursuant to Sections 2.1, 3.2, 5.2, 5.3, and 6.1,

12

but will continue to be bound by all obligations hereunder, unless each other Stockholder consents in writing to such Transferee becoming a Stockholder, which consent shall be granted or withheld in each Stockholder's sole discretion.

(d)     Except as specifically contemplated hereby, or in connection with a Qualified Pledge, no Stockholder shall grant any proxy or enter into or agree to be bound by any voting trust with respect to any Shares, nor enter into any stockholder agreements or arrangements of any kind with any person with respect to any Shares inconsistent with the provisions of this Agreement (whether or not such agreements and arrangements are with other Stockholders or holders of Shares who are not Parties to this Agreement), including but not limited to, agreements or arrangements with respect to the acquisition, disposition or voting of Shares, nor shall any Stockholder act, for any reason, as a member of a group or in concert with any other Persons in connection with the acquisition, disposition or voting of Shares in any manner which is inconsistent with the provisions of this Agreement.

(e)     None of the restrictions contained in this Article V (other than Sections 5.1(a), 5.1(b), 5.1(c) and 5.5) shall apply:  (i) to any Transfer or assignment for consideration or as a gift (including by will or the laws of descent) by any Stockholder to any spouse, child, parent, sibling or grandchild of a Stockholder, or by any of such relatives to such Stockholder or to any one or more of such relatives, or by any Stockholder or any such relatives to a trust of which there are no principal beneficiaries other than such Stockholder and/or one or more of such relatives; (ii) to any Transfer to a legal representative of a Stockholder in the event any Stockholder becomes mentally incompetent; and (iii) with respect to a Stockholder which is not an individual, to any Transfer by such Stockholder to any Affiliate thereof (in each of cases (i) through (iii) a "Permitted Transferee").

SECTION 5.2        Drag-Along Right.

(a)     In the event that any Stockholder or any group of Stockholders acting together or pursuant to a common plan or arrangement (the "Proposing Stockholders"), proposes to sell, or otherwise dispose of, in one transaction or a series of related transactions, to a Person or a group of Persons, other than an Affiliate of one or more of the transferring Stockholders (a "Drag-Along Buyer"), Shares representing more than fifty percent (50%) of the then outstanding Shares (a "Majority Sale"), such Proposing Stockholder(s) shall have the right (the "Drag-Along Right") to require each of the other Stockholders (the "Non-Initiating Stockholders") to Transfer to the Drag-Along Buyer its Pro Rata Portion of Shares in such Majority Sale, upon the same terms and subject to the same conditions as are applicable to the Proposing Stockholders.

(b)     The Proposing Stockholders shall provide written notice of such Majority Sale to the Non-Initiating Stockholders (a "Majority Sale Notice") specifying the number of Shares proposed to be Transferred by the Proposing Stockholders and the other material terms and conditions of the proposed Transfer, including the purchase price payable for the Shares, the identity of the Drag-Along Buyer and the date of closing of the purchase and sale contemplated by the Majority Sale Notice (the "Majority Sale Closing Date"), which Majority Sale Closing Date shall be not less than fifteen (15) Business Days following the delivery of the Majority Sale Notice to the Non-Initiating Stockholders.  In determining the

13

proposed purchase price per Share referred to in the immediately preceding sentence, there shall be taken into account (and the Non-Initiating Stockholders shall receive their Pro Rata Portion of) any other consideration or value to be received from the Drag-Along Buyer, directly or indirectly, by the Proposing Stockholders in connection with or relating to the Majority Sale, including without limitation, by way of any "non-compete," consulting, management or other payments, any value provided under other agreements entered into in connection with the transaction or otherwise. The Majority Sale Notice shall also specify each Non-Initiating Stockholder's Pro Rata Portion of the Shares to be Transferred and the estimated amount of the proceeds to be distributed to such Non-Initiating Stockholder upon completion of the Majority Sale.   Notwithstanding the foregoing, no Non-Initiating Stockholder shall be required to make any representation or warranty, or provide any indemnity to any person, in connection with any Majority Sale other than with respect to the unencumbered title to its Shares and its power, authority and legal right to Transfer such Shares, and the aggregate liability or loss as a result of such representations, warranties, indemnities or other agreements shall not exceed the proceeds such Non-Initiating Stockholder received in connection with such Transfer.

(c)     At the closing of the Majority Sale, the Proposing Stockholders and the Non-Initiating Stockholders shall deliver to the Drag-Along Buyer certificates representing their Shares, duly endorsed in blank for Transfer or accompanied by stock powers duly endorsed in blank.  Upon receipt by the Drag-Along Buyer of such certificates representing the Shares, the Drag-Along Buyer shall pay to each such Proposing Stockholder and Non-Initiating Stockholder the consideration payable at the closing pursuant to such transaction. The Drag-Along Buyer shall provide written notice to the Company of any failure of any Non-Initiating Stockholder to deliver any share certificates.  Upon receipt of such notice, the Company shall refrain from recording the Transfer of such Non-Initiating Stockholder's Shares on the books and records of the Company and shall promptly direct the Company's transfer agent, if any, that the transfer agent shall refrain from recording the Transfer of such Shares on the books and records of the Company.

(d)     If any Majority Sale is structured as a merger, consolidation, amalgamation, or similar transaction each Non-Initiating Stockholder agrees, as applicable, to (i) vote such Shares in favor of, or consent to, such transactions; (ii) waive or refrain from exercising any appraisal, dissenters' or similar rights with respect to such transaction; and (iii) take such other action, consistent with Section 5.2(b), as may reasonably be required to complete the transaction.

(e)     Solely for purposes of Section 5.2(d) and in order to secure the performance of each Stockholder's obligations under Section 5.2(d), each Stockholder hereby irrevocably appoints each other Stockholder that qualifies as a Drag-Along Proxy Holder (as defined below) the attorney-in-fact and proxy of such first Stockholder (with full power of substitution) to vote or provide a written consent with respect to its Shares as described in this paragraph if, and only in the event that, such Stockholder fails to vote or provide a written consent with respect to its Shares in accordance with the terms of Section 5.2(d) (each such Stockholder, a "Breaching Drag-Along Stockholder") within three (3) Business Days of a request for such vote or written consent.  Upon such failure, each Proposing Stockholder shall have and are hereby irrevocably granted a proxy to vote or provide a written consent with

14

respect to each such Breaching Drag-Along Stockholder's Shares solely for the purpose of taking the actions required by Section 5.2(d) (such Proposing Stockholder, a "Drag-Along Proxy Holder"). Each Stockholder intends this proxy to be, and it shall be, irrevocable and coupled with an interest, and each Stockholder will take such further action and execute such other instruments as may be necessary to effectuate the intent of this proxy and hereby revoke any proxy previously granted by it with respect to the matters set forth in Section 5.2(d) with respect to the Shares owned by such Stockholder. Notwithstanding the foregoing, the conditional proxy granted by this Section 5.2(e) shall be deemed to be revoked upon the termination of this Article V in accordance with its terms.

(f)     If the Majority Sale shall not have been consummated within ninety (90) days of the date the Majority Notice was provided (which ninety (90) day period may be extended by notice from the Proposing Stockholders to the Non-Initiating Stockholders for up to two hundred and seventy (270) days in the event any required approval of such sales from any governmental entity, including termination or expiration of the applicable waiting period under the applicable antitrust and competition laws has not then been obtained), the Proposing Stockholders shall return to the Non-Initiating Stockholders all applicable instruments representing Shares that the Non-Initiating Stockholders delivered for Transfer, together with any other documents in the possession of the Proposing Stockholders executed by the Non-Initiating Stockholders in connection with such proposed Majority Sale, if any, and all the restrictions on Transfer contained in this Agreement or otherwise applicable at such time with respect to any Shares shall again be in effect.

SECTION 5.3         Tag-Along Rights.

(a)     If a Proposing Stockholder proposes to Transfer, in one transaction or a series of related transactions, to a third party that is not an Affiliate of such Stockholder (the "Proposed Transferee") Shares representing more than ten percent (10%) of the outstanding Shares or in the event of a Majority Sale, if Drag-Along Rights are not exercised pursuant to Section 5.2 (each such proposed Transfer, a "Tag-Along Transfer"), each Non-Initiating Stockholder shall have the right to participate in the Tag-Along Transfer by Transferring up to its Pro Rata Portion to the Proposed Transferee on the same terms and conditions as those proposed by the Proposing Stockholder (each such participating Stockholder, other than the Proposing Stockholder, the "Tagging Stockholder").

(b)     The Proposing Stockholder shall give written notice (a "Tag-Along Notice") to each other Stockholder of a Tag-Along Transfer, setting forth the number and class(es) of Shares proposed to be so Transferred, the name and address of the Proposed Transferee, the proposed amount and form of consideration and other terms and conditions of payment offered by the Proposed Transferee. The Proposing Stockholder shall deliver or cause to be delivered to each other Stockholder copies of all transaction documents relating to the Tag-Along Transfer as the same become available. The tag-along rights provided by this Section 5.3 must be exercised by a Stockholder by delivery of an irrevocable written notice to the Proposing Stockholder, within a period of fifteen (15) Business Days from the Tag-Along Notice, specifying the portion of its Pro Rata Portion of the Shares (of each class proposed to be Transferred) which it wishes to include in the Tag-Along Transfer. With respect to each class of Shares proposed to be Transferred, if the Proposed Transferee fails to purchase all the

Shares of such class proposed to be Transferred by the Proposing Stockholder and the Tagging Stockholders, then the number of Shares of such class that each such Stockholder is permitted to sell in such Tag-Along Transfer shall be reduced pro rata based on the number of Shares of such class proposed to be Transferred by such Stockholder relative to the aggregate number of Shares of such class proposed to be Transferred by all Stockholders participating in such Tag-Along Transfer. The Proposing Stockholder shall have a period of ninety (90) days following the expiration of the fifteen (15) Business Day notice period mentioned above to sell all the Shares agreed to be purchased by the Proposed Transferee on the terms specified in the notice required by the first sentence of this Section 5.3(b). With respect to each class of Shares proposed to be Transferred, if the Proposed Transferee agrees to purchase more Shares of such class than specified in the Tag-Along Notice in the proposed Transfer, the Stockholders shall also have the same right to participate in the Transfer of such Shares of such class that are in excess of the amount set forth on the Tag-Along Notice on a pro rata basis based on the number of Shares of such class proposed to be Transferred by such Stockholder relative to the aggregate number of Shares of such class proposed to be Transferred by all Stockholders participating in such Tag-Along Transfer.

(c)     Any Transfer of Shares by a Tagging Stockholder to a Proposed Transferee pursuant to this Section 5.3 shall be on the same terms and conditions (including, without limitation, price, time of payment and form of consideration) as to be paid to the Proposing Stockholder. In determining the proposed purchase price per Share referred to in the immediately preceding sentence, there shall be taken into account (and the Tagging Stockholders shall receive their Pro Rata Portion of) any other consideration or value to be received from the Proposed Transferee or its Affiliates, directly or indirectly, by the Proposing Stockholders in connection with or relating to the Tag-Along Transfer, including without limitation, by way of any "non-compete," consulting, management or other payments, any value provided under other agreements entered into in connection with the transaction or otherwise. Notwithstanding the foregoing, no Tagging Stockholder shall be required to make any representation or warranty, agree to any "non-compete" clause, or provide any indemnity to any person, in connection with any Tag-Along Transfer other than with respect to the unencumbered title to its Shares and its power, authority and legal right to Transfer such Shares, and the aggregate liability or loss as a result of such representations, warranties, indemnities or other agreements shall not exceed the proceeds such Tagging Stockholder received in connection with such Tag-Along Transfer. Each Tagging Stockholder shall be responsible for its proportionate share of the costs of the proposed Transfer to the extent not paid or reimbursed by the Proposed Transferee or the Company.

SECTION 5.4     Legend on Certificates. Each outstanding certificate representing Shares that are subject to this Agreement shall bear an endorsement reading substantially as follows:

THE SECURITIES REPRESENTED BY THIS CERTIFICATE (THE "SECURITIES") WERE ORIGINALLY ISSUED IN RELIANCE UPON AN EXEMPTION FROM THE REGISTRATION REQUIREMENT OF SECTION 5 OF THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), PROVIDED BY SECTION 1145 OF THE BANKRUPTCY CODE, 11 U.S.C. 1145. THE SECURITIES HAVE NOT BEEN REGISTERED UNDER

16

THE ACT OR ANY STATE SECURITIES LAW, AND TO THE EXTENT THE HOLDER OF THE SECURITIES IS AN "UNDERWRITER," AS DEFINED IN SECTION 1145(B)(1) OF THE BANKRUPTCY CODE, THE SECURITIES MAY NOT BE SOLD OR TRANSFERRED IN THE ABSENCE OF AN EFFECTIVE REGISTRATION STATEMENT UNDER THE ACT OR AN EXEMPTION FROM REGISTRATION THEREUNDER.

THE SALE, ASSIGNMENT, PLEDGE, ENCUMBRANCE OR OTHER TRANSFER OF THE SECURITIES REPRESENTED BY THIS CERTIFICATE IS RESTRICTED BY THE TERMS OF, AND THE HOLDER HEREOF IS SUBJECT TO CERTAIN OTHER OBLIGATIONS PURSUANT TO, THE PROVISIONS OF A STOCKHOLDERS AGREEMENT, DATED AS OF [____], 2009, AMONG THE COMPANY AND CERTAIN HOLDERS OF ITS SECURITIES, AS MAY BE AMENDED FROM TIME TO TIME IN ACCORDANCE WITH ITS TERMS.  A COPY OF SUCH STOCKHOLDERS AGREEMENT IS ON FILE AT THE PRINCIPAL EXECUTIVE OFFICE OF THE COMPANY.

SECTION 5.5        No Circumvention of Stock Transfer Restrictions.  Each Party agrees that the Transfer restrictions in this Agreement may not be avoided by the holding of Shares directly or indirectly through a Person that can itself be sold in order to dispose of an interest in Shares free of such restrictions.  Any Transfer of any Shares (or other interest) resulting in any change in the control, directly or indirectly, of a Stockholder or of any other Person having control, directly or indirectly, over that Stockholder shall be treated as being a Transfer of the Shares held by that Stockholder, and the provisions of this Agreement that apply in respect of the Transfer of Shares shall thereupon apply in respect of the Shares so held; provided that this Section 5.5 shall not apply in respect of (i) a bona fide Transfer of equity securities of a Person having a direct or indirect interest in any Shares, where that interest does not represent more than ten percent (10%) of the assets of that Person, or (ii) any Transfer to a Permitted Transferee.

ARTICLE VI

ADDITIONAL AGREEMENTS

SECTION 6.1        Preemptive Rights.  In the event that the Company proposes to sell or otherwise issue Common Stock Equivalents or any other equity securities, or any options, rights or warrants to purchase equity securities of the Company (collectively, "Dilutive Securities"), each Stockholder shall have the right to acquire Dilutive Securities, in accordance with the provisions of this Section 6.1.

(b)        Not later than twenty (20) Business Days prior to the anticipated issuance date of Dilutive Securities, the Company shall give written notice (the "Notice of Preemptive Rights") to each Stockholder which shall state the Company's intention to issue Dilutive Securities, the type and amount of Dilutive Securities to be issued, the purchase price therefor, a summary of the other material terms of the proposed issuance and the Pro Rata

17

Portion of such Dilutive Securities which the Stockholder to which the notice is directed may purchase in connection with such issuance.

(c)     Each Stockholder that is an "accredited investor" as defined in Rule 501 promulgated under the Securities Act of 1933, as amended, shall have the right to purchase up to its Pro Rata Portion of such Dilutive Securities at the price and on the terms and conditions specified in the Notice of Preemptive Rights by delivering an irrevocable written notice (the "Acceptance Notice") to the Company no later than fifteen (15) Business Days from the date the Notice of Preemptive Rights is delivered to such Stockholder, at the price and upon the terms specified in the Notice of Preemptive Rights, setting out the number of Dilutive Securities with respect to which such right is being exercised. Such Acceptance Notice shall also include the maximum number of Dilutive Securities the Stockholder would be willing to purchase in the event any other Stockholder elects to purchase less than its Pro Rata Portion of such Dilutive Securities. If any Stockholder fails to elect to purchase its full Pro Rata Portion of such Dilutive Securities, the Company shall allocate any remaining amount among those Stockholders (pro rata in accordance with the Shares then held by each such Stockholder relative to the aggregate number of Shares held by all Stockholders participating in issuance of Dilutive Securities) who have indicated in their Acceptance Notice a desire to purchase Dilutive Securities in excess of their respective Pro Rata Portions (it being understood that if Stockholders elect to purchase more Dilutive Securities than remain available for sale, such allocation shall be made pro rata in accordance with the Shares then held by each such Stockholder relative to the aggregate number of Shares held by all Stockholders participating in issuance of Dilutive Securities); provided that no Stockholder shall be required to purchase more Dilutive Securities than the maximum number set forth in such Stockholder's Acceptance Notice.

(d)     The Company may sell or issue any Dilutive Securities not covered by a Notice of Acceptance to any other Person or Persons, but only upon terms and conditions that are in all respects no more favorable to such other Person or Persons, than those set forth in the Notice of Preemptive Rights. If the Company does not consummate the sale or issuance of all or part of such remaining Dilutive Securities to such other Person or Persons within sixty (60) days after the end of the twenty (20) Business Day period specified in Section 6.1(b), the right provided hereunder shall be deemed to be revived and such Dilutive Securities shall not be issued unless first reoffered to the Stockholders in accordance with this Section 6.1. Concurrently with the closing of the sale or issuance to such other Person or Persons (the "Other Purchasers") of all or part of such Dilutive Securities, each Stockholder shall purchase from the Company, and the Company shall sell or issue to such Stockholder, the securities covered by the Acceptance Notice delivered to the Company by such Stockholder on the terms specified in the Notice of Preemptive Rights. The purchase by a Stockholder of any such securities is subject in all cases to the execution and delivery by the Company and the Stockholder of (a) a purchase agreement or subscription agreement relating to such securities and (b) all other documents in form and substance similar in all material respects, to the extent applicable, to those executed and delivered by the Company and the Other Purchasers.

(e)     If any Stockholder does not deliver an Acceptance Notice within such fifteen (15) day period, such Stockholder shall be deemed to have irrevocably waived any and all rights under this Section 6.1 with respect to the purchase of such Dilutive Securities (but

18

not with respect to future issuances in accordance with this <u>Section 6.1</u>). Any sale of Dilutive Securities by the Company without first giving the Stockholders the rights described in this <u>Section 6.1</u> shall be void and of no force and effect.

(f)    This <u>Section 6.1</u> shall not apply to (i) the sale or issuance of Dilutive Securities pursuant to any Equity Incentive Plan approved by the Board; (ii) the issuance of the Warrant Shares; (iii) the issuance of equity securities pursuant to any merger or business combination transaction involving the Company or any of its subsidiaries or as consideration for the acquisition by the Company or any of its subsidiaries of assets or another business entity in each case, approved as required under <u>Section 2.4</u>; or (iv) any public offering of equity securities registered under the Securities Act.

SECTION 6.2    <u>Confidentiality</u>.  Each Stockholder who has received Confidential Information from the Company or its Representatives agrees that it shall not, and shall cause its Affiliates and Representatives not to, reveal to any Person other than such Stockholder's Affiliates and Representatives any such Confidential Information without the prior written consent of the Company; <u>provided</u> that such undertaking shall not apply to:

(a)    disclosure of Confidential Information that is or has become generally available to the public other than as a result of disclosure by or at the direction of a Party or a Party's Representatives or the Representatives of any Affiliate of any Party in violation of this Agreement;

(b)    disclosures of Confidential Information to the extent necessary or required under any (i) applicable Law, (ii) accounting standard, or (iii) in connection with any judicial process regarding any legal action, suit or proceeding arising out of or relating to this Agreement, in each case after giving prior written notice to the other Parties to the extent practicable under the circumstances, and subject to having undertaken any reasonably available arrangements to protect confidentiality (for example, seeking a protective order in relation to such Confidential Information); or

(c)    disclosures of Confidential Information with respect to the Company by any Stockholder to a third party who is not a competitor to the Company and who has executed a confidentiality agreement whereby such party is bound by the confidentiality provisions of this Agreement.

SECTION 6.3    <u>Environmental, Health and Safety Covenants</u>.

(a)    <u>Notice of EHS Events</u>.  The Company shall provide prompt written notice to each of the Eligible Stockholders of any environmental, health or safety ("<u>EHS</u>") event or matter reasonably likely to adversely impact the Company's operations, including, but not limited to notices of violations; fines or assessments; citations; suits; written complaints or administrative actions alleging violations of EHS laws; serious personal injury or property damage; unauthorized releases, spills or discharges of any significant quantities of hazardous substances into the environment or conditions which may cause the Company to operate in non-compliance with its EHS policies or applicable EHS laws.

19

(b)    <u>Compliance with Labor and Environmental Law</u>.  The Company shall comply with all applicable statutes, laws, ordinances, rules, orders and regulations concerning labor, industrial hygiene and EHS laws.

(c)    <u>EHS Report-Out and Assessment</u>.  The Company shall, at regular intervals, but no less frequently than every three months, provide to the Board a written report describing the compliance of the Company with its EHS policies and applicable EHS laws, and implement such improvements and corrections as may be necessary or appropriate to maintain conformance with such policies and laws.

## ARTICLE VII

## MISCELLANEOUS

SECTION 7.1        <u>Term</u>.  This Agreement shall terminate on the completion of a Qualified Public Offering; <u>provided</u> that the provisions of <u>Section 6.2</u> shall survive the termination of this Agreement.

SECTION 7.2        <u>Modifications</u>.  This Agreement may be modified or amended only by a writing signed by the Company and Stockholders holding a majority of the Shares; <u>provided</u> that (a) any modification or amendment that would adversely affect one or more Stockholders in a way that is disproportionate to its effect on the other Stockholders shall require the consent of such disproportionately affected Stockholders holding a majority of the Shares held by all such disproportionately affected Stockholders; (b) any modification or amendment that would make the transfer restrictions set forth in <u>Article V</u> or the confidentiality obligations set forth in <u>Section 6.2</u> more burdensome on one or more Stockholders, or remove or otherwise adversely amend the preemptive rights set forth in <u>Section 6.1</u> or the drag-along or tag-along rights set forth in <u>Sections 5.2</u> and <u>5.3</u>, respectively, held by one or more Stockholders, shall require the consent of such affected Stockholders holding a majority of the Shares held by all such affected Stockholders; and (c) any specific director designation or board observer rights provided to a Stockholder may only be amended by the Stockholders entitled to such rights.  For the avoidance of doubt, the addition of Parties to this Agreement pursuant to the terms hereof shall not be deemed a modification or amendment of this Agreement.

SECTION 7.3        <u>Action by Stockholders</u>.  Any action required or contemplated by this Agreement to be taken by the Stockholders may be taken by delivery of a written consent executed on behalf of one or more of such holders holding the requisite number of Shares, and the Company shall be entitled to rely upon any such written consent without prior notice to or consultation with any Person.

SECTION 7.4        <u>Applicability</u>.  This Agreement shall apply to all Shares beneficially owned by a Stockholder at all times, whether such Shares are acquired prior to or after the date hereof.

20

SECTION 7.5        Notices.  All notices, requests, waivers and other communications made pursuant to this Agreement shall be in writing and shall be deemed to have been effectively given (a) when personally delivered to the Party to be notified; (b) when sent by confirmed facsimile to the Party to be notified at the number set forth below; (c) when sent by email to the Party to be notified at the email address set forth below; (d) three (3) Business Days after deposit in the United States mail postage prepaid by certified or registered mail return receipt requested and addressed to the Party to be notified as set forth below; or (e) one (1) Business Day after deposit with a national overnight delivery service, postage prepaid, addressed to the Party to be notified as set forth below with next-business-day delivery guaranteed, in each case as follows:

In the case of the Company, to:

> Hayes Lemmerz International, Inc.
> [ADDRESS]
> Attention: [_____]
> Telephone: [_____]
> Facsimile: [_____]
> Email: [_____]

> With a copy (which shall not constitute notice) to:

> [NAME]
> [ADDRESS]
> Attention: [_____]
> Telephone: [_____]
> Facsimile: [_____]
> Email: [_____]

In the case of the Initial Holders:

> To the names and addresses set forth on the signature pages hereto.

> With a copy (which copy shall not constitute notice) to:

> Milbank, Tweed, Hadley & McCloy LLP
> 1 Chase Manhattan Plaza
> New York, New York  10005
> Attention: Thomas C. Janson
> Telephone: (212) 530-5000
> Facsimile: (212) 530-5219
> Email: tjanson@milbank.com

In the case of any other Stockholder, to such Stockholder at its address set forth in the stock ledger of the Company.

21

A Party may change its address for purposes of notice hereunder by giving ten (10) days' notice of such change to all other Parties in the manner provided in this Section 7.5.

SECTION 7.6        Binding Effect. This Agreement shall be binding upon and inure to the benefit of the respective successors and assigns of the Parties hereto.

SECTION 7.7        Entire Agreement. This Agreement (together with the documents attached as exhibits hereto and any documents or agreements specifically contemplated hereby) supersedes all prior discussions and agreements among any of the Parties hereto (and their Affiliates) with respect to the subject matter hereof and contains the entire understanding of the Parties with respect to the subject matter hereof.

SECTION 7.8        Counterparts. This Agreement may be executed in counterparts, each of which shall be signed by the Company and one or more Stockholders, and all of which are deemed to be one and the same agreement binding upon the Company and each of the Stockholders.

SECTION 7.9        Headings. The headings of the various sections of this Agreement have been inserted for convenience of reference only and shall not be deemed to be a part of this Agreement.

SECTION 7.10        Bylaws. If and to the extent that any provision of this Agreement conflicts with or is inconsistent with any provision of the Bylaws of the Company, such provision of this Agreement shall be controlling and, to the extent practicable, the conflicting or inconsistent provision of the Bylaws shall be construed in a manner consistent with such provision of this Agreement. It is hereby agreed that the Bylaws shall not be amended to be inconsistent with this Agreement.

SECTION 7.11        Further Acts and Assurances. Each Party shall give such further assurance, provide such further information, take such further actions and execute and deliver such further documents and instruments as are, in each case, within its power to give, provide and take so as to give full force and effect to the provisions of this Agreement.

SECTION 7.12        Governing Law; Consent to Jurisdiction and Service of Process. This Agreement shall be governed by and construed in accordance with the laws of the State of Delaware, without regard to its conflicts of law doctrine. Each Party hereby submits to the exclusive jurisdiction of the Chancery Court of the State of Delaware or the United States District Court for the District of Delaware and any judicial proceeding brought against any of the Parties on any dispute arising out of this Agreement or any matter related hereto shall be brought in such courts. Each Party hereby irrevocably waives, to the fullest extent permitted by law, any objection it may have or hereafter have to the laying of the venue of any such proceeding brought in such a court and any claim that any such proceeding brought in such a court has been brought in an inconvenient forum. Each Party hereby consents to process being served in any such proceeding by the mailing of a copy thereof by registered or certified mail, postage prepaid, to the address specified in Section 7.5, or in any other manner permitted by law. EACH PARTY HERETO HEREBY KNOWINGLY, VOLUNTARILY, AND INTENTIONALLY WAIVES

22

ANY RIGHTS IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY SUCH ACTION OR PROCEEDING.

SECTION 7.13    Injunctive Relief. It is hereby agreed and acknowledged that it will be impossible to measure in money the damages that would be suffered if the Parties fail to comply with any of the obligations imposed on them by this Agreement and that in the event of any such failure, an aggrieved person will be irreparably damaged and will not have an adequate remedy at law.  Any such person shall, therefore, be entitled to seek injunctive relief, including specific performance, to enforce such obligations, and if any action should be brought in equity to enforce any of the provisions of this Agreement, none of the Parties shall raise the defense that there is an adequate remedy at law.

SECTION 7.14    Severability. The invalidity or unenforceability of any provisions of this Agreement in any jurisdiction shall not affect the validity, legality or enforceability of the remainder of this Agreement in such jurisdiction or the validity, legality or enforceability of any provision of this Agreement in any other jurisdiction, it being intended that all rights and obligations of the Parties shall be enforceable to the fullest extent permitted by law.

SECTION 7.15    Recapitalization, Etc. In the event that any capital stock or other securities are issued in respect of, in exchange for, or in substitution of, shares of capital stock of the Company by reason of any reorganization, recapitalization, reclassification, merger, consolidation, spin-off, partial or complete liquidation, stock dividend, split-up, sale of assets, distribution to stockholders or combination of shares or any other change in the Company's capital structure, appropriate adjustments shall be made to the provisions of this Agreement so as to fairly and equitably preserve, as far as practicable, the original rights and obligations of the Parties hereto under this Agreement.

*[Signature Page Follows]*

23

IN WITNESS WHEREOF, each of the Parties has caused this Agreement to be executed and delivered by its duly authorized officer as of the date first above written.

HAYES LEMMERZ INTERNATIONAL, INC.

By: _____
Name:
Title:

**STOCKHOLDER**

By: _____

Name: _____

Title: _____

NY1:#3515464

Execution Version

REGISTRATION RIGHTS AGREEMENT

among

HAYES LEMMERZ INTERNATIONAL, INC.

and

EACH OF THE STOCKHOLDERS

of

HAYES LEMMERZ INTERNATIONAL, INC.
PARTY HERETO

Dated as of _____, 2009

TABLE OF CONTENTS

Page

1.    Definitions.................................................................................................................1

2.    Demand Registration. ................................................................................................4

3.    Piggyback Registration. ............................................................................................7

4.    Holdback Agreement.................................................................................................8

5.    Registration Procedures ............................................................................................8

6.    Registration Expenses..............................................................................................12

7.    Underwriting Requirements.....................................................................................12

8.    Indemnification .......................................................................................................13

9.    Rule 144 Information...............................................................................................16

10.    Miscellaneous.........................................................................................................16

REGISTRATION RIGHTS AGREEMENT

This REGISTRATION RIGHTS AGREEMENT, dated as of [_____] (this "Agreement"), is entered into among HAYES LEMMERZ INTERNATIONAL, INC., a Delaware corporation (the "Company"), and the Holders.  Capitalized terms not otherwise defined herein have the meanings set forth in Section 1.

WITNESSETH:

WHEREAS, on May 11, 2009, the Company and certain of the Company's direct and indirect subsidiaries each filed a voluntary petition in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") initiating cases under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") §§ 101-1330 and continued in the possession of their assets and in the management of their businesses pursuant to sections 1107 and 1108 of the Bankruptcy Code;

WHEREAS, the [First] Amended Joint Plan of Reorganization of Hayes Lemmerz International, Inc., et al., as confirmed on [_____], 2009 by an order of the Bankruptcy Court entered on [_____], 2009 (the "Plan"), provides that the Company shall issue to the Holders shares  of Class A Common Stock and/or shares of Class B Common Stock (the "Shares");

WHEREAS, the Shares to be issued to the Holders pursuant to the Plan are being issued in reliance upon Section 1145 of the Bankruptcy Code ("Section 1145") without registration under the Securities Act or any state securities laws;

WHEREAS, notwithstanding the provisions of Section 1145, resales of the Shares may be required to be registered under the Securities Act and applicable state securities laws, depending upon the status of a Holder or the intended method of distribution of the Shares; and

WHEREAS, in order to induce the Holders to complete the transactions contemplated by the Plan, on the effective date of the Plan, the Company is granting to the Holders certain rights to cause the Company to register the Shares and certain other Registrable Securities, on the terms and subject to the conditions set forth herein.

NOW, THEREFORE, in consideration of the premises set forth herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, intending to be legally bound hereby, agree as follows:

1.    Definitions.  As used in this Agreement, the following terms shall have the following meanings:

"Advice" shall have the meaning set forth in Section 5(k).

"Affiliate" means, with respect to any specified Person, any other Person directly or indirectly controlling or controlled by or under direct or indirect common control with such specified Person.  For the purposes of this definition, "control" when used with respect to any

1

specified Person means the power to direct the management and policies of such Person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise; and the terms "controlling" and "controlled" have meanings correlative to the foregoing.

"Bankruptcy Code" has the meaning set forth in the preamble.

"Bankruptcy Court" has the meaning set forth in the preamble.

"Business Day" means any day (other than a day which is a Saturday, Sunday or legal holiday in the States of New York) on which banks are open for business in the States of New York.

"Capital Stock" means, with respect to any Person, any and all shares, interests, participations or other equivalents (however designated) of corporate stock issued by such person, including each class of common stock and preferred stock of such person.

"Class A Common Stock" means the Company's Class A common stock, par value $0.01 per share.

"Class B Common Stock" means the Company's Class B common stock, par value $0.01 per share.

"Common Stock" means the Company's (a) Class A Common Stock and (b) Class B Common Stock, and any other shares of Capital Stock into which such Class A Common Stock or Class B Common Stock shall have been changed or any other shares of Capital Stock resulting from any reclassification of such Class A Common Stock or Class B Common Stock.

"Company" shall have the meaning set forth in the introductory clauses hereof.

"Delay Period" shall have the meaning set forth in Section 2(d).

"Demand Notice" shall have the meaning set forth in Section 2(a).

"Demand Registration" shall have the meaning set forth in Section 2(b).

"Effectiveness Period" shall have the meaning set forth in Section 2(c).

"Exchange Act" means the Securities Exchange Act of 1934, as amended, and the rules and regulations of the SEC promulgated thereunder.

"free writing prospectus" shall have the meaning set forth in Rule 405 under the Securities Act.

"Hold Back Period" shall have the meaning set forth in Section 4.

"Holder" means each person identified as a Holder on the signature pages hereto who is the record or beneficial owner of Registrable Securities, together with its successors and permitted assigns who becomes a party to this Agreement.

2

"Indemnified Party" shall have the meaning set forth in Section 8(c).

"Indemnifying Party" shall have the meaning set forth in Section 8(c).

"Initial Holder" means the Holders designated as such on the signature pages hereto.

"Initial Outstanding Amount" shall have the meaning set forth in Section 2(a)(ii).

"Inspectors" shall have the meaning set forth in Section 5(j).

"Interruption Period" shall have the meaning set forth in Section 5(k).

"IPO" means the initial public offering of Common Stock of the Company.

"Losses" shall have the meaning set forth in Section 8(a).

"Marketing Materials" shall have the meaning set forth in Section 8(a).

"Person" means any individual, corporation, limited liability company, partnership, joint venture, association, joint-stock company, trust, unincorporated organization or government or any agency or political subdivision thereof.

"Piggyback Registration" shall have the meaning set forth in Section 3(a).

"Plan" shall have the meaning ascribed to it in the preamble.

"Prospectus" means the prospectus included in any Registration Statement (including a prospectus that discloses information previously omitted from a prospectus filed as part of an effective registration statement in reliance upon Rule 430A), as amended or supplemented by any prospectus supplement, with respect to the terms of the offering of any portion of the Registrable Securities covered by such Registration Statement and all other amendments and supplements to such prospectus, including post-effective amendments, and all material incorporated by reference or deemed to be incorporated by reference in such prospectus, including any free writing prospectus.

"Records" shall have the meaning set forth in Section 5(j).

"Registrable Securities" means (i) the Shares and (ii) any additional shares of Common Stock acquired by any Holder after the date hereof, including any shares of Common Stock issued or distributed by way of a dividend, stock split or other distribution in respect of the Shares or acquired by way of any rights offering or similar offering made in respect of the Shares, in each case, if the shares of Common Stock would, in the hands of such Holder, not be freely transferable in accordance with the intended method of disposition (x) in accordance with Section 1145 or (y) under Rule 144 under the Securities Act, without regard to any volume or holding period restriction under Rule 144 under the Securities Act  As to any particular Registrable Securities, once issued, such securities shall cease to be Registrable Securities when (i) a registration statement with respect to the sale of such Registrable Securities shall have become effective under the Securities Act and such securities shall have been disposed of in

3

accordance with such registration statement, (ii) they shall have been distributed to the public pursuant to Rule 144 under the Securities Act, or (iii) they shall have ceased to be outstanding.

"Registration" means registration under the Securities Act of an offering of Registrable Securities pursuant to a Demand Registration or a Piggyback Registration.

"Registration Statement" means any registration statement of the Company filed under the Securities Act that covers any of the Registrable Securities pursuant to the provisions of this Agreement, including the related Prospectus, all amendments and supplements to such registration statement, including pre- and post-effective amendments, all exhibits thereto and all material incorporated by reference or deemed to be incorporated by reference in such registration statement. The term "Registration Statement" shall also include any registration statement filed pursuant to Rule 462(b) to register additional securities in connection with any offering.

"road show" means any "road show" as defined in Rule 433 under the Securities Act, including an electronic road show.

"SEC" means the Securities and Exchange Commission or any other governmental agency at the time administering the Securities Act.

"Securities Act" means the Securities Act of 1933, as amended, and the rules and regulations of the SEC promulgated thereunder.

"Shares" shall have the meaning ascribed to it in the preamble.

"Shelf Registration" shall have the meaning set forth in Section 2(b).

"underwritten registration" or "underwritten offering" means a registration under the Securities Act in which securities of the Company are sold to an underwriter for reoffering to the public.

"Warrant Agreements" shall have the meaning set forth in Section 10(a).

2.   Demand Registration.

(a)   (i)   The Holders of a majority of the Registrable Securities shall have the right, commencing on the 2nd anniversary of the date of this Agreement, by written notice (the "Demand Notice") given to the Company, to request the Company to register under and in accordance with the provisions of the Securities Act all or any portion of the Registrable Securities designated by such Holders. For the avoidance of doubt, the foregoing right shall persist if a Demand Registration pursuant to the provisions of this Section 2(a)(i) does not become effective.

(ii)   At any time after the date that the Company becomes subject to the periodic reporting requirements under Section 13 or 15(d) of the Exchange Act, any Holder or group of Holders holding, in the aggregate, ten percent (10%) or more of the Registrable Securities issued and outstanding immediately following the effective date of the Plan (the "Initial Outstanding Amount"), shall have the right to request the Company to register under and

4

in accordance with the provisions of the Securities Act all or any portion of the Registrable Securities designated by such Holder(s); provided, however, that (i) the Registrable Securities requested to be registered constitute at least ten percent (10%) of the Initial Outstanding Amount, and (ii) prior to the time the Company is eligible to use Form S-3 for the registration of Registrable Securities for resale, such Holder(s), in the aggregate, shall only be entitled to four (4) Demand Registrations pursuant to the provisions of this Section 2(a)(ii) unless any Demand Registration does not become effective or is not maintained in effect for the respective periods set forth in Section 2(c), in which case the relevant Holder(s) will be entitled to an additional Demand Registration pursuant hereto.  Following the time that the Company becomes eligible for use of Form S-3, such Holder or group of Holders holding, in the aggregate, ten percent (10%) or more of the Initial Outstanding Amount, shall have the right to request the Company to register under and in accordance with the provisions of the Securities Act all or any portion of the Registrable Securities designated by such Holder(s); provided, however, that such Registrable Securities represent at least ten percent (10%) of the Initial Outstanding Amount.

(iii)   Upon receipt of a Demand Notice, the Company shall promptly (and in any event within ten (10) Business Days from the date of receipt of such Demand Notice), notify all other Holders of the receipt of such Demand Notice and allow them the opportunity to include Registrable Securities held by them in the proposed registration by submitting their own Demand Notice.   In connection with any Demand Registration in which more than one Holder participates, in the event that such Demand Registration involves an underwritten offering and the managing underwriter or underwriters participating in such offering advise in writing the Holders of Registrable Securities to be included in such offering that the total number of Registrable Securities to be included in such offering exceeds the amount that can be sold in (or during the time of) such offering without delaying or jeopardizing the success of such offering (including the price per share of the Registrable Securities to be sold), then the Registrable Securities to be offered shall be distributed amongst the participating Holders *pro rata* according to each Holder's overall percentage of ownership in the Company.  In the event of such a pro-rata distribution, to the extent that any Holder (or Holders) has not submitted a Demand Notice, or withdraws from the underwriting, then those Shares that would have been allocated *pro-rata* to the non-participating Holder if they had participated shall be distributed amongst the participating Holders, *pro rata* according to each participating Holder's overall percentage of ownership in the Company.

(b)   The Company, within 45 days of the date on which the Company receives a Demand Notice given by Holders in accordance with Section 2(a), shall file with the SEC, and the Company shall thereafter use its best efforts to cause to be declared effective as promptly as practicable, a Registration Statement on the appropriate form for the registration and sale, in accordance with the intended method or methods of distribution, of the total number of Registrable Securities specified by the Holders in such Demand Notice (a "Demand Registration").   Any Demand Registration may, at the request of the Holders submitting the Demand Notice, be a "shelf" registration (a "Shelf Registration") pursuant to Rule 415 under the Securities Act, provided, however, in the case of a Demand Notice requesting a Shelf Registration on behalf of a Holder or a group of Holders holding less than fifty percent (50%) of the Registrable Securities, that the Company is at the time eligible to use Form S-3 for the registration of such Registrable Securities for resale.

5

(c)     The Company shall use commercially reasonable efforts to keep each Registration Statement filed pursuant to this Section 2 continuously effective and usable for the resale of the Registrable Securities covered thereby (i) in the case of a Registration that is not a Shelf Registration, for a period of one hundred twenty (120) days from the date on which the SEC declares such Registration Statement effective and (ii) in the case of a Shelf Registration, for a period of two (2) years from the date on which the SEC declares such Registration Statement effective, in either case (x) until such earlier date as all of the Registrable Securities covered by such Registration Statement have been sold pursuant to such Registration Statement, and (y) as such period may be extended pursuant to this Section 2. The time period for which the Company is required to maintain the effectiveness of any Registration Statement shall be extended by the aggregate number of days of all Delay Periods, the Hold Back Period (if applicable) and all Interruption Periods occurring with respect to such Registration and such period and any extension thereof is hereinafter referred to as the "Effectiveness Period."

(d)     The Company shall be entitled to postpone the filing of any Registration Statement otherwise required to be prepared and filed by the Company pursuant to this Section 2, or suspend the use of any effective Registration Statement under this Section 2, for a reasonable period of time (a "Delay Period"), if the Board of Directors of the Company determines in the Board of Directors' reasonable judgment and in good faith that the registration and distribution of the Registrable Securities covered or to be covered by such Registration Statement would materially interfere with any pending material financing, acquisition or corporate reorganization or other material corporate development involving the Company or any of its subsidiaries or would require premature disclosure thereof and promptly gives the Holders written notice of such determination, containing a general statement of the reasons for such postponement and an approximation of the period of the anticipated delay; provided, however, that (i) the aggregate number of days included in all Delay Periods during any consecutive twelve (12) months shall not exceed the aggregate of (x) forty-five (45) days minus (y) the number of days occurring during the Hold Back Period (if applicable) and all Interruption Periods during such consecutive twelve (12) months and (ii) a period of at least forty-five (45) days shall elapse between the termination of any Delay Period, Hold Back Period (if applicable) or Interruption Period and the commencement of the immediately succeeding Delay Period. If the Company shall so postpone the filing of a Registration Statement, the Holders of Registrable Securities to be registered shall have the right to withdraw the request for registration by giving written notice from the Holders of a majority of the Registrable Securities that were to be registered to the Company within forty-five (45) days after receipt of the notice of postponement or, if earlier, the termination of such Delay Period (and, in the event of such withdrawal, such request shall not be counted for purposes of determining the number of requests for registration to which the Holders of Registrable Securities are entitled pursuant to this Section 2). The Company shall not be entitled to initiate or continue a Delay Period unless it shall (A) concurrently prohibit sales by all other security holders under registration statements covering securities held by such other security holders and (B) in accordance with the Company's policies from time to time in effect, forbid purchases and sales in the open market by directors and executive officers of the Company.

(e)     The Company shall not include any securities (whether for its own account or otherwise) that are not Registrable Securities in any Registration Statement filed pursuant to this Section 2 without the prior written consent of the Holders of a majority in number of the

6

Registrable Securities covered by such Registration Statement. Any such securities so included shall be subject to the cut-back provisions of Section 2(a)(iii).

(f)    Holders of a majority in number of the Registrable Securities to be included in a Registration Statement pursuant to this Section 2 may, at any time prior to the effective date of the Registration Statement relating to such Registration, revoke such request by providing a written notice to the Company revoking such request. Any such Demand Request so withdrawn shall not be counted for purposes of determining the number of requests for registration to which the Holders of Registrable Securities are entitled pursuant to this Section 2 if the Holders of Registrable Securities who revoked such request reimburse the Company for all its out-of-pocket expenses incurred in the preparation, filing and processing of the Registration Statement; provided, however, that, if such revocation was based on (i) the Company's failure to comply in any material respect with its obligations hereunder or (ii) the institution by the Company of a Delay Period or the occurrence of the Hold Back Period (if applicable) or any Interruption Period, such reimbursement shall not be required.

3.    Piggyback Registration.

(a)    Right to Piggyback. If at any time the Company proposes to file a registration statement under the Securities Act with respect to a public offering by the Company for its own account of securities of the same type as the Registrable Securities (other than a registration statement (i) in connection with the IPO, or (ii) on Form S-8 or Form S-4 or any successor forms thereto, or (iii) filed solely in connection with a dividend reinvestment plan or an employee benefit plan covering only officers or directors of the Company or its Affiliates), then the Company shall give written notice of such proposed filing to the Holders at least fifteen (15) days before the anticipated filing date. Such notice shall offer the Holders the opportunity to register such amount of Registrable Securities as they may request (a "Piggyback Registration"). Subject to Section 3(b), the Company shall include in each such Piggyback Registration all Registrable Securities with respect to which the Company has received written requests for inclusion therein within ten (10) days after notice has been given to the Holders. Each Holder shall be permitted to withdraw all or any portion of the Registrable Securities of such Holder from a Piggyback Registration at any time prior to the effective date of such Piggyback Registration.

(b)    Priority on Piggyback Registrations. The Company shall permit the Holders to include all such Registrable Securities on the same terms and conditions as any similar securities, if any, of the Company or any other persons included therein. Notwithstanding the foregoing, if the Company or the managing underwriter or underwriters participating in such offering advise the Holders in writing that the total amount of securities requested to be included in such Piggyback Registration exceeds the amount which can be sold in (or during the time of) such offering without delaying or jeopardizing the success of the offering (including the price per share of the securities to be sold), then the amount of securities to be offered for the account of the Holders and other holders of securities who have piggyback registration rights with respect thereto shall be reduced (to zero if necessary) pro rata on the basis of the number of Common Stock equivalents requested to be registered by each such Holder or other holder participating in such offering.

7

(c)     Right To Abandon. Nothing in this Section 3 shall create any liability on the part of the Company to the Holders if the Company in its sole discretion should decide not to file a registration statement proposed to be filed pursuant to Section 3(a) or to withdraw such registration statement subsequent to its filing, regardless of any action whatsoever that a Holder may have taken, whether as a result of the issuance by the Company of any notice hereunder or otherwise. Any such determination not to file or to withdraw a registration statement shall not affect the obligations of the Company to pay or to reimburse all Registration Expenses pursuant to Section 6.

4.     Holdback Agreement. If the Company shall file a registration statement (other than in connection with the registration of securities issuable pursuant to an employee stock option, stock purchase or similar plan or pursuant to a merger, exchange offer or a transaction of the type specified in Rule 145(a) under the Securities Act) with respect to the IPO, and (i) with reasonable prior notice, the managing underwriter or underwriters, if any, advises the Company in writing (in which case the Company shall notify the Holders) that a public sale or distribution of Registrable Securities would materially adversely impact such offering and (ii) the underwriter or underwriters have obtained written holdback agreements from the Company, each executive officer of the Company and each other person who has been granted registration rights by the Company, then each Holder shall, to the extent not inconsistent with applicable law, refrain from effecting any public sale or distribution of Registrable Securities during the ten (10) days prior to the effective date of such registration statement and until the earlier of (A) the abandonment of such offering and (B) ninety (90) days from the effective date of such registration statement (the "Hold Back Period"). Notwithstanding the foregoing, any obligations of the Holders under this Section 4 shall terminate in the event that the Company or any underwriter terminates, releases or waives, in whole of in part, the holdback agreements with respect to the Company, any executive officer of the Company or any such other person who has been granted registration rights by the Company.

5.     Registration Procedures. In connection with the registration obligations of the Company pursuant to and in accordance with Sections 2 and 3 (and subject to Sections 2 and 3), the Company shall use commercially reasonable efforts to effect such registration to permit the sale of such Registrable Securities in accordance with the intended method or methods of disposition thereof, and pursuant thereto the Company shall as expeditiously as possible:

(a)     prepare and file with the SEC a Registration Statement for the sale of the Registrable Securities on any form for which the Company then qualifies or which counsel for the Company shall deem appropriate in accordance with such Holders' intended method or methods of distribution thereof, and, subject to the Company's right to terminate or abandon a registration pursuant to Section 3(c), use commercially reasonable efforts to cause such Registration Statement to become effective and remain effective as provided herein;

(b)     prepare and file with the SEC such amendments (including post-effective amendments) to such Registration Statement, and such supplements to the related Prospectus, as may be required by the rules, regulations or instructions applicable to the Securities Act during the applicable period in accordance with the intended methods of disposition specified by the

8

Holders of the Registrable Securities covered by such Registration Statement, make generally available earnings statements satisfying the provisions of Section 11(a) of the Securities Act (provided that the Company shall be deemed to have complied with this Section if it has complied with Rule 158 under the Securities Act), and cause the related Prospectus as so supplemented to be filed pursuant to Rule 424 under the Securities Act; provided, however, that before filing a Registration Statement or Prospectus, or any amendments or supplements thereto (other than reports required to be filed by it under the Exchange Act that are incorporated or deemed to be incorporated by reference into the Registration Statement and the Prospectus except to the extent that such reports related primarily to the offering), the Company shall furnish to the Holders of Registrable Securities covered by such Registration Statement and their counsel for review and comment, copies of all documents required to be filed;

(c)     notify the Holders of any Registrable Securities covered by such Registration Statement promptly and (if requested) confirm such notice in writing, (i) when a Prospectus or any Prospectus supplement or post-effective amendment has been filed, and, with respect to such Registration Statement or any post-effective amendment, when the same has become effective, (ii) of any request by the SEC for amendments or supplements to such Registration Statement or the related Prospectus or for additional information regarding the Company or the Holders, (iii) of the issuance by the SEC of any stop order suspending the effectiveness of such Registration Statement or the initiation of any proceedings for that purpose, (iv) of the receipt by the Company of any notification with respect to the suspension of the qualification or exemption from qualification of any of the Registrable Securities for sale in any jurisdiction or the initiation or threatening of any proceeding for such purpose, and (v) of the happening of any event that requires the making of any changes in such Registration Statement, Prospectus or documents incorporated or deemed to be incorporated therein by reference so that they will not contain any untrue statement of a material fact or omit to state any material fact required to be stated therein or necessary to make the statements therein not misleading;

(d)     use commercially reasonable efforts to prevent the issuance of any order suspending the effectiveness of such Registration Statement or the qualification or exemption from qualification of any Registrable Securities for sale in any jurisdiction in the United States, and to obtain the lifting or withdrawal of any such order at the earliest practicable time;

(e)     furnish to the Holder of any Registrable Securities covered by such Registration Statement, each counsel for such Holders and each managing underwriter, if any, without charge, one conformed copy of such Registration Statement, as declared effective by the SEC, and of each post-effective amendment thereto, in each case including financial statements and schedules and all exhibits and reports incorporated or deemed to be incorporated therein by reference; and deliver, without charge, such number of copies of the preliminary prospectus, any amended preliminary prospectus, any free writing prospectus, each final Prospectus and any post-effective amendment or supplement thereto, as such Holder may reasonably request in order to facilitate the disposition of the Registrable Securities of such Holder covered by such Registration Statement in conformity with the requirements of the Securities Act;

(f)     prior to any public offering of Registrable Securities covered by such Registration Statement, use commercially reasonable efforts to register or qualify such Registrable Securities for offer and sale under the securities or "Blue Sky" laws of such jurisdictions as the Holders of

9

such Registrable Securities shall reasonably request in writing; provided, however, that the Company shall in no event be required to qualify generally to do business as a foreign corporation or as a dealer in any jurisdiction where it is not at the time required to be so qualified or to execute or file a general consent to service of process in any such jurisdiction where it has not theretofore done so or to take any action that would subject it to general service of process or taxation in any such jurisdiction where it is not then subject;

(g)    upon the occurrence of any event contemplated by Section 5(c)(v), prepare a supplement or post-effective amendment to such Registration Statement or the related Prospectus or any document incorporated or deemed to be incorporated therein by reference and file any other required document so that, as thereafter delivered to the purchasers of the Registrable Securities being sold thereunder (including upon the termination of any Delay Period), such Prospectus will not contain an untrue statement of a material fact or omit to state any material fact required to be stated therein or necessary to make the statements therein, in light of the circumstances under which they were made, not misleading;

(h)    use commercially reasonable efforts to cause all Registrable Securities covered by such Registration Statement to be listed on each securities exchange or automated interdealer quotation system, if any, on which similar securities issued by the Company are then listed or quoted, or, if none, on such securities exchange or automated interdealer quotation system reasonably selected by the Company;

(i)    on or before the effective date of such Registration Statement, provide the transfer agent of the Company for the Registrable Securities with printed certificates for the Registrable Securities covered by such Registration Statement, which are in a form eligible for deposit with The Depository Trust Company;

(j)    if such offering is an underwritten offering, make available for inspection by any Holder of Registrable Securities included in such Registration Statement, any underwriter participating in any offering pursuant to such Registration Statement, and any attorney, accountant or other agent retained by any such Holder or underwriter (collectively, the "Inspectors"), all financial and other records and other information, pertinent corporate documents and properties of any of the Company and its subsidiaries and affiliates (collectively, the "Records"), as shall be reasonably necessary to enable them to exercise their due diligence responsibilities; provided, however, that the Records that the Company determines, in good faith, to be confidential and which it notifies the Inspectors in writing are confidential shall not be disclosed to any Inspector unless such Inspector signs a confidentiality agreement reasonably satisfactory to the Company, which shall permit the disclosure of such Records in such Registration Statement or the related Prospectus if (i) necessary to avoid or correct a material misstatement in or material omission from such Registration Statement or Prospectus or (ii) the release of such Records is ordered pursuant to a subpoena or other order from a court of competent jurisdiction; provided further, however, that (A) any decision regarding the disclosure of information pursuant to subsection (i) shall be made only after consultation with counsel for the applicable Inspectors and the Company and (B) with respect to any release of Records pursuant to subsection (ii), each Holder of Registrable Securities agrees that it shall, promptly after learning that disclosure of such Records is sought in a court having jurisdiction, give notice

10

to the Company so that the Company, at the Company's expense, may undertake appropriate action to prevent disclosure of such Records;

(k)     not later than the effective date of a registration statement, the Company shall provide to the Holders the CUSIP number for all Registrable Securities; and

(l)     if such offering is an underwritten offering, enter into such agreements (including an underwriting agreement in form, scope and substance as is customary in underwritten offerings) and take all such other appropriate and reasonable actions requested by the Holders of a majority of the Registrable Securities being sold in connection therewith (including those reasonably requested by the managing underwriters) in order to expedite or facilitate the disposition of such Registrable Securities, and in such connection, (i) use commercially reasonable efforts to obtain opinions of counsel to the Company and updates thereof (which counsel and opinions (in form, scope and substance) shall be reasonably satisfactory to the managing underwriters and counsel to the Holders of the Registrable Securities being sold), addressed to each selling Holder of Registrable Securities covered by such Registration Statement and each of the underwriters as to the matters customarily covered in opinions requested in underwritten offerings and such other matters as may be reasonably requested by such counsel and underwriters, (ii) use commercially reasonable efforts to obtain "cold comfort" letters and updates thereof from the independent certified public accountants of the Company (and, if necessary, any other independent certified public accountants of any subsidiary of the Company or of any business acquired by the Company for which financial statements and financial data are, or are required to be, included in the Registration Statement), addressed to each selling holder of Registrable Securities covered by the Registration Statement (unless such accountants shall be prohibited from so addressing such letters by applicable standards of the accounting profession) and each of the underwriters, such letters to be in customary form and covering matters of the type customarily covered in "cold comfort" letters in connection with underwritten offerings, (iii) if requested and if an underwriting agreement is entered into, provide indemnification provisions and procedures customary for underwritten public offerings, but in any event no less favorable to the indemnified parties than the provisions set forth in Section 8. The above shall be done at each closing under such underwriting or similar agreement, or as and to the extent required thereunder.

The Company may require each Holder of Registrable Securities covered by a Registration Statement to furnish such information regarding such Holder and such Holder's intended method of disposition of such Registrable Securities as it may from time to time reasonably request in writing. If any such information is not furnished within a reasonable period of time after receipt of such request, the Company may exclude such Holder's Registrable Securities from such Registration Statement.

Each Holder of Registrable Securities covered by a Registration Statement agrees that, upon receipt of any notice from the Company of the happening of any event of the kind described in Section 5(c)(ii), 5(c)(iii), 5(c)(iv) or 5(c)(v), that such Holder shall discontinue disposition of any Registrable Securities covered by such Registration Statement or the related Prospectus until receipt of the copies of the supplemented or amended Prospectus contemplated by Section 5(g), or until such Holder is advised in writing (the "Advice") by the Company that the use of the applicable Prospectus may be resumed, and has received copies of any amended or

11

supplemented Prospectus or any additional or supplemental filings which are incorporated, or deemed to be incorporated, by reference in such Prospectus (such period during which disposition is discontinued being an "Interruption Period") and, if requested by the Company, the Holder shall deliver to the Company (at the expense of the Company) all copies then in its possession, other than permanent file copies then in such holder's possession, of the Prospectus covering such Registrable Securities at the time of receipt of such request.

Each Holder of Registrable Securities covered by a Registration Statement further agrees not to utilize any material other than the applicable current preliminary prospectus, free writing prospectus, road show or Prospectus in connection with the offering of such Registrable Securities.

6. Registration Expenses. Whether or not any Registration Statement is filed or becomes effective, the Company shall pay all costs, fees and expenses incident to the Company's performance of or compliance with this Agreement, including (i) all registration and filing fees, including NASD filing fees, (ii) all fees and expenses of compliance with securities or "Blue Sky" laws, including reasonable fees and disbursements of counsel in connection therewith, (iii) printing expenses (including expenses of printing certificates for Registrable Securities and of printing prospectuses if the printing of prospectuses is requested by the Holders or the managing underwriter, if any) and expenses associated with a road show, (iv) messenger, telephone and delivery expenses, (v) fees and disbursements of counsel for the Company, (vi) fees and disbursements of all independent certified public accountants of the Company (including expenses of any "cold comfort" letters required in connection with this Agreement) and all other persons retained by the Company in connection with such Registration Statement, (vii) fees and disbursements of one counsel, other than the Company's counsel, selected by Holders of a majority of the Registrable Securities being registered, to represent all such Holders, (viii) fees and disbursements of underwriters customarily paid by the issuers or sellers of securities and (ix) all other costs, fees and expenses incident to the Company's performance or compliance with this Agreement. Notwithstanding the foregoing, the fees and expenses of any persons retained by any Holder, other than one counsel for all such Holders, and any discounts, commissions or brokers' fees or fees of similar securities industry professionals and any transfer taxes relating to the disposition of the Registrable Securities by a Holder, will be payable by such Holder and the Company will have no obligation to pay any such amounts.

7. Underwriting Requirements.

(a) Subject to Section 7(c), any Holder shall have the right, by written notice, to request that any Demand Registration provide for an underwritten offering.

(b) In the case of any underwritten offering pursuant to a Demand Registration, the Holders of a majority of the Registrable Securities to be disposed of in connection therewith shall select the institution or institutions that shall manage or lead such offering, which institution or institutions shall be reasonably satisfactory to the Company. In the case of any underwritten offering pursuant to a Piggyback Registration, the Company shall select the institution or institutions that shall manage or lead such offering.

12

(c)     In the case of any Piggyback Registration that is an underwritten offering, no Holder shall be entitled to participate in an underwritten offering unless and until such Holder has entered into an underwriting or other agreement with such institution or institutions for such offering in such form as the Company and such institution or institutions shall reasonably determine; provided, that no holder of Registrable Securities included in any underwritten registration shall be required to make any representation or warranties to the Company or the underwriters (other than representations and warranties regarding such holder and such holder's ownership of the shares to be sold pursuant to such underwriting) or to undertake any indemnification or contribution obligations to the Company or any underwriter with respect thereto, other than as specifically provided in Section 8.

8.     Indemnification.

(a)     Indemnification by the Company.  The Company shall, without limitation as to time, indemnify and hold harmless, to the fullest extent permitted by law, each Holder of Registrable Securities whose Registrable Securities are covered by a Registration Statement or Prospectus, the officers, directors and agents and employees of each of them, each Person who controls each such Holder (within the meaning of Section 15 of the Securities Act or Section 20 of the Exchange Act) and the officers, directors, agents and employees of each such controlling person, to the fullest extent lawful, from and against any and all losses, claims, damages, liabilities, judgment, costs (including costs of investigation or preparation and reasonable attorneys' fees) and expenses (collectively, "Losses"), as incurred, arising out of or based upon (w) any untrue or alleged untrue statement of a material fact contained in such Registration Statement or Prospectus or in any amendment or supplement thereto in any preliminary prospectus, any free writing prospectus, any information the Company has filed or is required to file pursuant to Rule 433(d) under the Securities Act, or any other material or information provided to or made available to investors by, or with the approval of, the Company in connection with the offering, including any road show for the offering (collectively, "Marketing Materials"), (x) any omission or alleged omission of a material fact required to be stated therein or necessary to make the statements therein not misleading, except insofar as the same are based upon information furnished in writing to the Company by or on behalf of such Holder expressly for use in the Marketing Materials, (y) any untrue statement or alleged untrue statement of a material fact in the information conveyed to any purchaser at the time of the sale to such purchaser, or the omission or alleged omission to state therein a material fact required to be stated therein, or (z) any violation by the Company of any federal, state or common law rule or regulation applicable to the Company and relating to action required of or inaction by the Company in connection with any such registration; provided, however, that the Company shall not be liable to any such Holder to the extent that any such Losses arise out of or are based upon an untrue statement or alleged untrue statement or omission or alleged omission made in any preliminary prospectus if (i) having previously been furnished by or on behalf of the Company with copies of the Prospectus, such Holder failed to send or deliver a copy of the Prospectus with or prior to the delivery of written confirmation of the sale of Registrable Securities by such Holder to the person asserting the claim from which such Losses arise and (ii) the Prospectus would have corrected in all material respects such untrue statement or alleged untrue statement or such omission or alleged omission; and provided further, however, that the Company shall not be liable in any such case to the extent that any such Losses arise out of or are based upon an

13

untrue statement or alleged untrue statement or omission or alleged omission in the Prospectus, if (A) such untrue statement or alleged untrue statement, omission or alleged omission is corrected in all material respects in an amendment or supplement to the Prospectus and (B) having previously been furnished by or on behalf of the Company with copies of the Prospectus as so amended or supplemented, such Holder thereafter fails to deliver such Prospectus as so amended or supplemented, prior to or concurrently with the sale of Registrable Securities.

(b)     Indemnification by Holder of Registrable Securities.   In connection with any Registration Statement in which a Holder is participating, such Holder shall furnish to the Company in writing such information as the Company reasonably requests for use in connection with the Marketing Materials and agrees to indemnify, severally and not jointly with the other Holders and to the full extent permitted by law, the Company, its directors, officers, agents or employees, each Person who controls the Company (within the meaning of Section 15 of the Securities Act and Section 20 of the Exchange Act) and the directors, officers, agents or employees of such controlling Persons, from and against all Losses arising out of or based upon (x) any untrue or alleged untrue statement of a material fact contained in the Marketing Materials or (y) any omission or alleged omission of a material fact required to be stated therein or necessary to make the statements therein not misleading, to the extent, but only to the extent, that such untrue or alleged untrue statement or omission or alleged omission is based upon and is consistent with information so furnished in writing by or on behalf of such Holder to the Company expressly for use in such Marketing Materials.  No Holder shall be held liable for any damages in excess of the total amount of proceeds received by such Holder from the sale of the Registrable Securities sold by such Holder (net of all underwriting discounts and commissions) under that particular Registration Statement.

(c)     Conduct of Indemnification Proceedings.   If any Person shall be entitled to indemnity hereunder (an "Indemnified Party"), such Indemnified Party shall give prompt notice to the party from which such indemnity is sought (the "Indemnifying Party") of any claim or of the commencement of any proceeding with respect to which such Indemnified Party seeks indemnification or contribution pursuant hereto; provided, however, that the delay or failure to so notify the Indemnifying Party shall not relieve the Indemnifying Party from any obligation or liability except to the extent that the Indemnifying Party has been materially prejudiced by such delay or failure.  The Indemnifying Party shall have the right, exercisable by giving written notice to an Indemnified Party promptly after the receipt of written notice from such Indemnified Party of such claim or proceeding, to assume, at the Indemnifying Party's expense, the defense of any such claim or proceeding, with counsel reasonably satisfactory to such Indemnified Party; provided, however, that (i) an Indemnified Party shall have the right to employ separate counsel in any such claim or proceeding and to participate in the defense thereof, but the fees and expenses of such counsel shall be at the expense of such Indemnified Party unless: (1) the Indemnifying Party agrees to pay such fees and expenses; (2) the Indemnifying Party fails promptly to assume the defense of such claim or proceeding or fails to employ counsel reasonably satisfactory to such Indemnified Party; or (3) the named parties to any proceeding (including impleaded parties) include both such Indemnified Party and the Indemnifying Party, and such Indemnified Party shall have been advised by counsel that there may be one or more legal defenses available to it that are in addition to or are inconsistent with those available to the Indemnifying Party or that a conflict of interest is likely to exist among such Indemnified Party and any other indemnified parties (in which case the Indemnifying Party shall not have the right

14

to assume the defense of such action on behalf of such Indemnified Party); and (ii) subject to subsection (3) above, the Indemnifying Party shall not, in connection with any one such claim or proceeding or separate but substantially similar or related claims or proceedings in the same jurisdiction, arising out of the same general allegations or circumstances, be liable for the fees and expenses of more than one firm of attorneys (together with appropriate local counsel) at any time for all of the indemnified parties.   Whether or not such defense is assumed by the Indemnifying Party, such Indemnified Party shall not be subject to any liability for any settlement made without its consent, which consent shall not be unreasonably withheld, conditioned or delayed.  The Indemnifying Party shall not consent to entry of any judgment or enter into any settlement that does not include as an unconditional term thereof the giving by the claimant or plaintiff to such Indemnified Party of a release, in form and substance reasonably satisfactory to the Indemnified Party, from all liability in respect of such claim or litigation for which such Indemnified Party would be entitled to indemnification hereunder.

(d)     Contribution.  If the indemnification provided for in this Section 8 is applicable in accordance with its terms but is legally unavailable to an Indemnified Party in respect of any Losses, then each applicable Indemnifying Party, in lieu of indemnifying such Indemnified Party, shall contribute to the amount paid or payable by such Indemnified Party as a result of such Losses, in such proportion as is appropriate to reflect the relative fault of the Indemnifying Party, on the one hand, and such Indemnified Party, on the other hand, in connection with the actions, statements or omissions that resulted in such Losses as well as any other relevant equitable considerations.  The relative fault of such Indemnifying Party, on the one hand, and Indemnified Party, on the other hand, shall be determined by reference to, among other things, whether any action in question, including any untrue statement of a material fact or omission or alleged omission to state a material fact, has been taken by, or relates to information supplied by, such Indemnifying Party or Indemnified Party, and the parties' relative intent, knowledge, access to information and opportunity to correct or prevent any such action, statement or omission.  The amount paid or payable by a party as a result of any Losses shall be deemed to include any legal or other fees or expenses incurred by such party in connection with any investigation or proceeding.   The parties hereto agree that it would not be just and equitable if contribution pursuant to this Section 8(d) were determined by pro rata allocation or by any other method of allocation that does not take account of the equitable considerations referred to in the immediately preceding paragraph.   Notwithstanding the provision of this Section 8(d), an Indemnifying Party that is a Holder shall not be required to contribute any amount which is in excess of the amount by which the total proceeds received by such Holder from the sale of the Registrable Securities sold by such Holder (net of all underwriting discounts and commissions) exceeds the amount of any damages that such Indemnifying Party has otherwise been required to pay by reason of such untrue or alleged untrue statement or omission or alleged omission.  No person guilty of fraudulent misrepresentation (within the meaning of Section 11(f) of the Securities Act) shall be entitled to contribution from any Person who was not guilty of such fraudulent misrepresentation.

15

9.    Rule 144 Information. With a view to making available the benefits of certain rules and regulations of the Commission which may at any time permit the sale of the Registrable Securities to the public without registration, after such time as a registration statement relating to the Common Stock of the Company has been declared effective under either the Securities Act or the Exchange Act, the Company agrees to use its best efforts to:

(a)    Make and keep public information available, as those terms are understood and defined in Rule 144 under the Securities Act, at all times after the earlier of (a) such time as a registration statement relating to the Common Stock of the Company has been declared effective under either the Securities Act or the Exchange Act or (b) the date that the Company becomes subject to the periodic reporting requirements under Section 13 or 15(d) of the Exchange Act, for so long as the Company remains subject to the periodic reporting requirements under Section 13 or 15(d) of the Exchange Act.

(b)    Use its best efforts to file with the Commission in a timely manner all reports and other documents required of the Company under the Securities Act and the Exchange Act (at any time after it has become subject to such reporting requirements).

(c)    Furnish to any Holder forthwith upon request a written statement by the Company as to its compliance with the reporting requirements of Rule 144 under the Securities Act (at any time after 90 days after the effective date of the first registration statement filed by the Company for an offering of its securities to the general public), and of the Securities Act and the Securities Exchange Act of 1934 (at any time after it has become subject to such reporting requirements), a copy of the most recent annual or quarterly report of the Company, and such other reports and documents of the Company and other information in as such Holder may reasonably request in availing itself of any rule or regulation of the Commission allowing such Holder to sell any such securities without registration.

10.    Miscellaneous.

(a)    Limitations on Subsequent Registration Rights.    After the date of this Agreement and prior to the IPO, and except as set forth in each of the Warrant Agreements between the Company and Mellon Investor Services, LLC dated as of even date herewith (the "Warrant Agreements"), the Company shall not grant registration rights to any third party other than pursuant to the terms of this Agreement unless the Company has obtained the written consent of Holders of at least a majority in number of the Registrable Securities then outstanding; provided that after the IPO, the Company shall not grant registration rights to any third party which are senior to or pari passu with the registration rights granted to Holders hereunder unless the Company has obtained the written consent of Holders of at least a majority in number of the Registrable Securities then outstanding.

(b)    Termination. This Agreement and the obligations of the Company and the Holders hereunder (other than with respect to Section 8) shall terminate on the first date on which no Registrable Securities remain outstanding.

(c)    Notices. All notices, requests, waivers and other communications made pursuant to this Agreement shall be in writing and shall be deemed to have been effectively given (i) when

16

personally delivered to the party to be notified; (ii) when sent by confirmed facsimile to the party to be notified at the number set forth below; (iii) when sent by email to the party to be notified at the email address set forth below; (iv) three (3) Business Days after deposit in the United States mail postage prepaid by certified or registered mail return receipt requested and addressed to the party to be notified as set forth below; or (v) one (1) Business Day after deposit with a national overnight delivery service, postage prepaid, addressed to the party to be notified as set forth below with next-business-day delivery guaranteed, in each case as follows:

In the case of the Company, to:

> Hayes Lemmerz International, Inc.
> [ADDRESS]
> Attention: [_____]
> Telephone: [_____]
> Facsimile: [_____]
> Email: [_____]

> With a copy (which shall not constitute notice) to:

> [NAME]
> [ADDRESS]
> Attention: [_____]
> Telephone: [_____]
> Facsimile: [_____]
> Email: [_____]

In the case of the Initial Holders:

> To the names and addresses set forth on the signature pages hereto.

> With a copy (which copy shall not constitute notice) to:

> Milbank, Tweed, Hadley & McCloy LLP
> 1 Chase Manhattan Plaza
> New York, New York  10005
> Attention:  Thomas C. Janson
> Telephone:  (212) 530-5000
> Facsimile:  (212) 530-5219
> Email: tjanson@milbank.com

In the case of any other Holder, to such Holder at its address set forth in the stock ledger of the Company.

(d)    Separability. If any provision of this Agreement shall be declared to be invalid or unenforceable, in whole or in part, such invalidity or unenforceability shall not affect the remaining provisions hereof which shall remain in full force and effect.

(e)    Assignment. This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective heirs, devisees, legatees, legal representatives, successors and assigns. The rights to cause the Company to register Registrable Securities pursuant to Sections 2 and 3 may be assigned in connection with any transfer or assignment by a Holder of Registrable Securities, provided that: (i) such transfer may otherwise be effected in accordance with applicable securities laws; (ii) such transfer is effected in compliance with the restrictions on transfer contained in this Agreement and in any other agreement between the Company and the Holder; and (iii) such assignee or transferee is (A) an affiliate of the Holder (B) a partner or member of the Holder or an affiliate of the Holder or (C) holds (after giving effect to such transfer) (I) at least 2% of the issued and outstanding shares or (II) all shares of Registrable Securities held by a Holder if transferred to a single entity. No transfer or assignment will divest a Holder or any subsequent owner of such rights and powers unless all Registrable Securities are transferred or assigned.

(f)    Entire Agreement. This Agreement represents the entire agreement of the parties and shall supersede any and all previous contracts, arrangements or understandings between the parties hereto with respect to the subject matter hereof.

(g)    Amendments and Waivers. Except as otherwise provided herein, the provisions of this Agreement may not be amended, modified or supplemented, and waivers or consents to departures from the provisions hereof may not be given, unless the Company has obtained the written consent of Holders of at least a majority in number of the Registrable Securities then outstanding.

(h)    Publicity. No public release or announcement concerning the transactions contemplated hereby shall be issued by any party without the prior consent of the other parties, except to the extent that such party is advised by counsel that such release or announcement is necessary or advisable under applicable law or the rules or regulations of any securities exchange, in which case the party required to make the release or announcement shall to the extent practicable provide the other party with an opportunity to review and comment on such release or announcement in advance of its issuance.

(i)    Expenses. Whether or not the transactions contemplated hereby are consummated, except as otherwise provided herein, all costs and expenses incurred in connection with the execution of this Agreement shall be paid by the party incurring such costs or expenses, except as otherwise set forth herein.

(j)    Interpretation.

(i)    The headings contained in this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement.

(ii)    The meaning assigned to each term defined herein shall be equally applicable to both the singular and the plural forms of such term and vice versa, and words

18

denoting either gender shall include both genders as the context requires. Where a word or phrase is defined herein, each of its other grammatical forms shall have a corresponding meaning.

(iii)    The terms "hereof", "herein" and "herewith" and words of similar import shall, unless otherwise stated, be construed to refer to this Agreement as a whole and not to any particular provision of this Agreement.

(iv)    When a reference is made in this Agreement to a Section, paragraph, Exhibit or Schedule, such reference is to a Section, paragraph, Exhibit or Schedule to this Agreement unless otherwise specified.

(v)    The word "include", "includes", and "including" when used in this Agreement shall be deemed to include the words "without limitation", unless otherwise specified.

(vi)    A reference to any party to this Agreement or any other agreement or document shall include such party's predecessors, successors and permitted assigns.

(k)    Counterparts. This Agreement may be executed in two or more counterparts, all of which shall be one and the same agreement, and shall become effective when counterparts have been signed by each of the parties and delivered to each other party.

(l)    Governing Law. This Agreement shall be construed, interpreted, and governed in accordance with the internal laws of New York.

(m)    Calculation of Time Periods. Except as otherwise indicated, all periods of time referred to herein shall include all Saturdays, Sundays and holidays; provided, however, that if the date to perform the act or give any notice with respect to this Agreement shall fall on a day other than a Business Day, such act or notice may be timely performed or given if performed or given on the next succeeding Business Day.

*[Signature Page Follows]*

19

IN WITNESS WHEREOF, each of the Parties has caused this Agreement to be executed and delivered by its duly authorized officer as of the date first above written.

HAYES LEMMERZ INTERNATIONAL, INC.

By: _____

    Name:

    Title:

INITIAL HOLDER

By: _____

Name: _____

Title: _____

Address: _____

_____

_____

*[signature page to Registration Rights Agreement]*

#4819-7660-3396

## Exhibit N

## Director Indemnification Agreement

Execution Version

HAYES LEMMERZ INTERNATIONAL, INC.

DIRECTOR INDEMNIFICATION AGREEMENT

[NAME OF DIRECTOR/INDEMNITEE]

[     ], 2009

## HAYES-LEMMERZ INTERNATIONAL, INC.

### DIRECTOR INDEMNIFICATION AGREEMENT

This Director Indemnification Agreement (this "*Agreement*") has been made and executed this [___] day of [_____], 2009, by and between Hayes-Lemmerz International, Inc., a Delaware corporation (the "*Company*"), and [_____], an individual resident of [_____] (the "*Indemnitee*").

WHEREAS, it is essential for the Company to retain and attract as directors the most capable persons available;

WHEREAS, Indemnitee [is currently serving][has agreed to serve] as a director of the Company;

WHEREAS, both the Company and Indemnitee recognize the increased risk of litigation and other claims being asserted against directors of public companies in today's environment;

WHEREAS, basic protection against undue risk of personal liability of directors heretofore has been provided through insurance coverage providing reasonable protection at reasonable cost, and Indemnitee has relied on the availability of such coverage; but it has become increasingly more difficult to obtain such insurance on terms providing reasonable protection at reasonable cost;

WHEREAS, Article 7.4 of the Bylaws of the Company (the "*By-Laws*"), as currently in effect, requires the Company to indemnify and advance expenses to its directors to the full extent permitted by law and the Indemnitee [has been serving and continues to serve][has agreed to serve] as a director of the Company in part in reliance on such provisions;

WHEREAS, in recognition of the Indemnitee's need for substantial protection against personal liability in order to enhance the Indemnitee's continued service to the Company in an effective manner, the Indemnitee's reliance on the aforesaid By-Law provisions, and, in part, to provide the Indemnitee with specific contractual assurance that the protection provided by the By-Laws will be available to the Indemnitee (regardless of, among other things, any amendment to or revocation of such By-Laws or any change in the composition of the Company's Board of Directors or any Change of Control the Company), the Company wishes to provide in this Agreement for the indemnification of and the advancing of expenses to the Indemnitee to the fullest extent (whether partial or complete) permitted by law, and, to the extent insurance is maintained, for the continued coverage of the Indemnitee under the Company's directors' and officers' liability insurance policies; and

WHEREAS, the Board of Directors of the Company has determined that (i) it is essential to the best interests of the Company's stockholders that the Company act to assure such

2

persons that there will be increased certainty of such protection in the future, and that (ii) it is reasonable, prudent and necessary for the Company contractually to obligate itself to indemnify such persons to the fullest extent permitted by applicable law as provided in this Agreement so that they will continue to act in their capacity as directors of the Company free from undue concern that they will not be so indemnified.

NOW THEREFORE, in consideration of the premises and the mutual promises and covenants contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Company and the Indemnitee, intending to be legally bound hereby, agree as follows:

### Section 1.    *Indemnification.*

The Company hereby irrevocably agrees to indemnify the Indemnitee to the fullest extent permitted by applicable Delaware law, as in effect from time to time. Without diminishing the scope of the indemnification provided by this Section, the rights of indemnification of the Indemnitee provided hereunder shall include, but shall not be limited to, those rights hereinafter set forth in this Agreement, except that no indemnification shall be available to the Indemnitee:

A.    on account of any suit in which judgment is rendered against the Indemnitee for disgorgement of profits made from the purchase or sale by the Indemnitee of securities of the Company pursuant to the provisions of Section 16(b) of the Securities Exchange Act of 1934, as amended (the "*Exchange Act*"), or similar provisions of any federal, state or local statutory law;

B.    on account of conduct of the Indemnitee which is finally adjudged by a court of competent jurisdiction to have been knowingly fraudulent or to constitute willful misconduct;

C.    in any circumstance where such indemnification is expressly prohibited by applicable law; or

D.    in connection with any Proceeding (or part thereof) initiated by the Indemnitee, or any Proceeding by the Indemnitee against the Company or its directors, officers, employees or other Indemnitees, (i) unless (x) such indemnification is expressly required to be made by law, (y) the Proceeding was authorized by the Board of Directors of the Company, or (z) such indemnification is provided by the Company in its sole discretion, pursuant to the powers vested in the Company under applicable law, or (ii) except as provided in Sections 9 and 13 hereof.

### Section 2.    *Actions Other Than by or in the Right of the Company.*

The Indemnitee shall be entitled to the indemnification rights provided in this Section 2 if he was or is a party or is threatened to be made a party to any Proceeding, other than an action by or in the right of the Company, arising out of or relating to any Indemnifiable Claim. Pursuant to this Section 2, the Indemnitee shall be indemnified against all Expenses, judgments, penalties, fines and amounts paid in settlement which were actually and reasonably

3

incurred by him in connection with such Proceeding unless it is finally determined by a court of competent jurisdiction that he did not act in good faith and in a manner he reasonably believed to be in or not opposed to the best interests of the Company, and, with respect to any criminal action or Proceeding, if he had no reasonable cause to believe his conduct was unlawful.

For purposes of this Agreement, the following terms have the meanings ascribed to them below:

"*Affiliate*" means, with respect to any specified Person, any other Person directly or indirectly controlling or controlled by or under direct or indirect common control with such specified Person. For the purposes of this definition, "control" when used with respect to any specified Person means the Power to direct the management and policies of such Person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise; and the terms "controlling" and "controlled" have meanings correlative to the foregoing.

"*Certificate*" means the Amended and Restated Certificate of Incorporation of Hayes Lemmerz International, Inc., as in effect on the date hereof, and as subsequently amended.

"*Expenses*" means all expenses and other costs incurred by or on behalf of an Indemnitee, including, without limitation, all attorneys' fees and other costs, expenses and obligations paid or incurred in connection with investigating, defending, being a witness in, participating in (including on appeal), or preparing to defend, be a witness in or participate in, any Proceeding relating to any Indemnifiable Claim.

"*Indemnifiable Claim*" means any event or occurrence related to or arising out of the fact that the Indemnitee is or was a director, officer, employee or agent of the Company, or is or was serving at the request of the Company as a director, officer, employee or agent or fiduciary of any other entity, including, but not limited to, another corporation, partnership, joint venture or trust, or by reason of any act or omission by him in any such capacity.

"*Person*" means an individual, corporation, partnership, limited liability company, joint venture, association, joint stock company, trust or unincorporated organization, or government or any agency or political subdivision thereof.

"*Proceeding*" shall mean any threatened, pending or completed action, suit or proceeding, or any inquiry or investigation, whether instituted by the Company or any other party, that the Indemnitee in good faith believes might lead to the institution of any such action, suit or proceeding, whether civil, criminal, administrative or investigative in nature.

**Section 3.**      *Actions by or in the Right of the Company.*

The Indemnitee shall be entitled to the indemnification rights provided in this Section 3 if he is was or is a party or is threatened to be made a party to any Proceeding brought by or in the right of the Company to procure a judgment in its favor arising out of or relating to any Indemnifiable Claim. Pursuant to this Section 3, the Indemnitee shall be indemnified against all Expenses and amounts paid in settlement actually incurred by him in connection with such Proceeding, unless it is finally judicially determined that he did not act in good faith and in a manner he reasonably believed to be in or not opposed to be the best interests of the Company;

4

*provided, however*, that no such indemnification shall be made in respect of any claim, issue, or matter as to which applicable law expressly prohibits such indemnification by reason of any adjudication of liability of the Indemnitee to the Company, unless and only to the extent that the Court of Chancery of the State of Delaware or the court in which such action or suit was brought shall determine upon application that, despite the adjudication of liability but in view of all the circumstances of the case, the Indemnitee is fairly and reasonably entitled to indemnify for such expenses and costs which such court shall deem proper.

### Section 4.    *Additional Indemnity.*

In addition to, and without regard to any limitations on, the indemnification provided in Sections 1, 2 and 3 of this Agreement, the Company shall, and hereby does, irrevocably agree to indemnify and hold harmless the Indemnitee against all Expenses, judgments, penalties, fines and amounts paid in settlement actually incurred by him on his behalf if, in connection with any Proceeding arising out of or related to an Indemnifiable Claim, including, without limitation, all liability arising out of negligence or active or passive wrongdoing of the Indemnitee unless it is finally judicially determined by a court of competent jurisdiction that such indemnification is unlawful.

### Section 5.    *Indemnification for Expenses and Costs of Successful Party.*

Notwithstanding the other provisions of this Agreement, to the extent that the Indemnitee has served on behalf of the Company as a witness or other participant in any claim, action or Proceeding, or has been successful, on the merits or otherwise, in defense of any action, suit or Proceeding referred to in Sections 1 through 4 hereof, or in defense of any claim, issue or matter therein, including, but not limited to, the dismissal of any action without prejudice, he shall be indemnified against all Expenses incurred by him in connection therewith.

### Section 6.    *Partial Indemnification.*

If the Indemnitee is entitled under any provision of this Agreement to indemnification by the Company for some or a portion of the Expenses, costs, judgments, fines and amounts paid in settlement actually incurred by him in connection with any Proceeding, but is not entitled to indemnification for the total amount thereof, the Company shall nevertheless indemnify the Indemnitee for the portion of such Expenses, costs, judgments, penalties, fines and amounts paid in settlement actually incurred by him to which the Indemnitee is entitled. Without limiting the generality of the foregoing, if any Proceeding is brought against the Indemnitee in his capacity as a director, officer, or employee and as a shareholder or as a director officer, employee or agent of any shareholder or other person, the presumption shall be that recovery is sought by reason of the Indemnitee's status as a director, officer or employee of the Company.

### Section 7.    *Determination of Entitlement to Indemnification.*

It is the intention of the parties that this Agreement provide the Indemnitee with rights to indemnification that are as favorable as may be permitted by Delaware law and the public policy of the State of Delaware. Accordingly, the parties agree that the following procedures and presumptions shall apply in the event that there is any question as to whether the

5

Indemnitee is entitled to indemnification under this Agreement.

(a) To obtain indemnification under this Agreement, the Indemnitee shall submit to the Company a written request for indemnification, including an identification of the action, Proceeding or claim giving rise to such request. In addition, at the request of the Company, the Indemnitee shall also provide such other documentation and information as is reasonably requested by the Company and which is reasonably available to the Indemnitee and reasonably necessary to determine whether and to what extent the Indemnitee is entitled to indemnification. The Secretary of the Company shall, promptly upon receipt of such a request for indemnification, advise the Board of Directors in writing that the Indemnitee has requested indemnification. Any Expenses incurred by the Indemnitee in connection with his request for indemnification hereunder shall be borne by the Company.

(b) Upon written request by the Indemnitee for indemnification under Section 7(a), the entitlement of the Indemnitee to indemnification pursuant to the terms of this Agreement shall be determined by the following person or persons, who shall be empowered to make such determination: (a) in the event that no Change of Control has occurred, by (i) the Board of Directors of the Company, by a majority vote of a quorum consisting of Disinterested Directors; or (ii) if such a quorum is not obtainable or, even if obtainable, if either the Board of Directors, by the majority vote of Disinterested Directors, or the Indemnitee, by notice to the Company, so elects, by Independent Counsel in a written opinion to the Board of Directors, a copy of which shall be delivered to the Indemnitee and (b) in the event that a Change of Control has occurred, by Independent Counsel in a written opinion to the Board of Directors, a copy of which shall be delivered to the Indemnitee. The term "*Disinterested Director*" means a Director of the Company who is not or was not a party to the Proceeding in respect of which indemnification is being sought by the Indemnitee. The term "*Independent Counsel*" means a law firm or a member of a law firm that neither is presently nor in the past five years has been retained to represent: (i) the Company or the Indemnitee in any matter material to either such party, or (ii) any other party to the Proceeding giving rise to a claim for indemnification hereunder. Notwithstanding the foregoing, the term "*Independent Counsel*" shall not include any person who, under the applicable standards of professional conduct then prevailing, would have a conflict of interest in representing either the Company or the Indemnitee in an action to determine the Indemnitee's right to indemnification under this Agreement.

(c) If the determination of entitlement to indemnification is to be made by Independent Counsel pursuant to Section 7(b) hereof, the Independent Counsel shall be selected by the Indemnitee. The Indemnitee shall notify the Company in writing of the identity of the Independent Counsel so selected. The Company may, within 10 days after such written notice of selection shall have been given, deliver to the Indemnitee a written objection to such selection; *provided, however,* that such objection may be asserted only on the ground that the Independent Counsel so selected does not meet the requirements for serving as Independent Counsel as set forth in Section 7(b), and the objection shall set forth with particularity the factual basis of such assertion. Absent a proper and timely objection, the person so selected shall act as Independent Counsel. If a written objection is made and substantiated, the Independent Counsel selected may not serve as Independent Counsel unless and until such objection is withdrawn or a court has determined that such objection is without merit. If, within 20 days after submission by Indemnitee of a written request for indemnification pursuant to Section 7(a) hereof, no

6

Independent Counsel shall have been selected and not objected to, either the Company or Indemnitee may petition the Court of Chancery of the State of Delaware or other court of competent jurisdiction for resolution of any objection which shall have been made to the Indemnitee's selection of Independent Counsel and/or for the appointment as Independent Counsel of a person selected by the court or by such other person as the court shall designate, and the person with respect to whom all objections are so resolved or the person so appointed shall act as Independent Counsel under this Agreement hereof. The Company shall pay any and all reasonable fees and expenses of Independent Counsel incurred by such Independent Counsel in connection with acting pursuant to this Agreement, and the Company shall pay all reasonable fees and expenses incident to the procedures of this Section 7(c), regardless of the manner in which such Independent Counsel was selected or appointed.

(d)    In making a determination with respect to entitlement to indemnification hereunder, the person or persons or entity making such determination shall presume that the Indemnitee is entitled to indemnification under this Agreement. Anyone seeking to overcome this presumption shall have the burden of proof and the burden of persuasion by clear and convincing evidence.

(e)    The Indemnitee shall be deemed to have acted in good faith if the Indemnitee's action is based on the records or books of account of the Company, including financial statements, or on information supplied to the Indemnitee by the officers of the Company in the course of their duties, or on the advice of legal counsel for the Company or on information or records given or reports made to the Company by an independent certified public accountant or by an appraiser or other expert selected with reasonable care by the Company. In addition, the knowledge and/or actions, or failure to act, of any other director, or of any officer, agent or employee of the Company shall not be imputed to the Indemnitee for purposes of determining the right to indemnification under this Agreement. Whether or not the foregoing provisions of this Section 7(e) are satisfied, it shall in any event be presumed that the Indemnitee has at all times acted in good faith and in a manner he reasonably believed to be in or not opposed to the best interests of the Company. Anyone seeking to overcome this presumption shall have the burden of proof and the burden of persuasion by clear and convincing evidence.

(f)    If the person, persons or entity empowered or selected under Section 7 to determine whether the Indemnitee is entitled to indemnification shall not have made a determination within 45 days after receipt by the Company of the written request therefore, the requisite determination of entitlement to indemnification shall be deemed to have been made and the Indemnitee shall be entitled to such indemnification absent a misstatement by the Indemnitee of a material fact, or an omission of a material fact necessary to make the Indemnitee's statement not materially misleading, in connection with the request for indemnification, or a prohibition of such indemnification under applicable law; provided, however, that such 45-day period may be extended for a reasonable time, not to exceed an additional 30 days, if the person, persons or entity making such determination with respect to entitlement to indemnification in good faith requires such additional time to obtain or evaluate documentation and/or information relating thereto. Pending any such determination, the Company shall advance Expenses as provided in Section 8, subject to the undertaking set forth in Section 8 to repay such amounts if it is ultimately determined that the Indemnitee is not entitled to indemnification hereunder.

7

(g)     The Company acknowledges that a settlement or other disposition short of final judgment may be successful if it permits a party to avoid expense, delay, distraction, disruption and uncertainty.  In the event that any Proceeding to which the Indemnitee is a party is resolved in any manner other than by adverse judgment against the Indemnitee (including, without limitation, settlement of such Proceeding with or without payment of money or other consideration) it shall be presumed that the Indemnitee has been successful on the merits or otherwise in such Proceeding.  Anyone seeking to overcome this presumption shall have the burden of proof and the burden of persuasion by clear and convincing evidence.  In addition, the termination of any Proceeding by judgment, order, or conviction, or upon a plea of *nolo contendere* or its equivalent, shall not, of itself: (a) create a presumption that the Indemnitee did not act in good faith and in a manner which he reasonably believed to be in or not opposed to the best interests of the Company, and, with respect to any criminal action or Proceeding, that the Indemnitee had reasonable cause to believe that his conduct was unlawful; or (b) otherwise adversely affect the rights of the Indemnitee to indemnification, except as may be provided herein.

### Section 8.     *Advancement of Expenses and Costs.*

All Expenses actually incurred by the Indemnitee shall be paid by the Company in advance of the final disposition of such action, suit or Proceeding, if so requested by the Indemnitee, within 20 days after the receipt by the Company of a statement or statements from the Indemnitee requesting such advance or advances.  The Indemnitee may submit such statements from time to time.  The Indemnitee's entitlement to such expenses shall include those incurred in connection with any Proceeding by the Indemnitee seeking an adjudication or award in arbitration pursuant to this Agreement.  Such statement or statements shall reasonably evidence the expenses and costs incurred by him in connection therewith and shall include or be accompanied by an undertaking by or on behalf of the Indemnitee to repay such amount if it is ultimately determined that the Indemnitee is not entitled to be indemnified against such expenses and costs by the Company pursuant to this Agreement or otherwise.  Any such repayment obligation shall be unsecured and shall be interest free.  In addition, in the event that a Change of Control has occurred, the Company shall, upon the request of the Indemnitee, deposit in an escrow account with a financial institution reasonably satisfactory to the Indemnitee an amount equal to the Expenses reasonably projected by counsel to the Indemnitee to be incurred over the next six months in connection with defending, or investigating or preparing to defend, any Proceeding with respect to which the Indemnitee is entitled to indemnification or advancement of Expenses, and shall, from time to time upon request of the Indemnitee replenish the amount of such escrow deposit so that, after the date of such additional deposit, the amount of such escrow account is at least equal to such reasonably projected Expenses over the ensuing six month period.

### Section 9.     *Remedies of the Indemnitee in Cases of Determination not to Indemnify or to Advance Expenses.*

In the event that a determination is made that the Indemnitee is not entitled to indemnification hereunder or if payment has not been timely made or if Expenses are not timely advanced pursuant to Section 8, the Indemnitee shall be entitled to a final adjudication following a determination of entitlement to indemnification pursuant to Sections 7 in an appropriate court

8

of the State of Delaware or any other court of competent jurisdiction of his entitlement to such indemnification or advance. Alternatively, the Indemnitee may, at his option, seek an award in arbitration to be conducted by a single arbitrator pursuant to the rules of the American Arbitration Association, such award to be made within 60 days following the filing of the demand for arbitration. The Company shall not oppose the Indemnitee's right to seek any such adjudication or award in arbitration or any other claim. Such judicial Proceeding or arbitration shall be made *de novo* and the Indemnitee shall not be prejudiced by reason of a determination (if so made) that he is not entitled to indemnification. If a determination is made or deemed to have been made pursuant to the terms of Section 7 hereof that the Indemnitee is entitled to indemnification, the Company shall be bound by such determination and shall be precluded from asserting that such determination has not been made or that the procedure by which such determination was made is not valid, binding and enforceable. The Company further agrees to stipulate in any such court or before any such arbitrator that the Company is bound by all the provisions of this Agreement and is precluded from making any assertions to the contrary. If the court or arbitrator shall determine that the Indemnitee is entitled to any indemnification hereunder, the Company shall pay all reasonable expenses (including attorneys' fees) and costs actually incurred by the Indemnitee in connection with such adjudication or award in arbitration (including, but not limited to, any appellate Proceedings).

### Section 10. *Change of Control.*

(a) A "*Change of Control*" shall be deemed to have occurred if (i) any "person" (as such term is used in Sections 13(d) and 14(d) of the Exchange Act, other than a trustee or other fiduciary holding securities under an employee benefit plan of the Company or a corporation owned directly or indirectly by the stockholders of the Company in substantially the same proportions as their ownership of stock of the Company, is or becomes the "beneficial owner" (as defined in Rule 13d-3 under the Exchange Act), directly or indirectly, of securities of the Company representing [20]% or more of the total voting power represented by the Company's then outstanding Voting Securities (as defined below), or (ii) during any period of two consecutive years, individuals who at the beginning of such period constitute the Board of Directors of the Company and any new director whose election by the Board of Directors or nomination for election by the Company's stockholders was approved by a vote of at least two-thirds (2/3) of the directors then still in office who either were directors at the beginning of the period or whose election or nomination for election was previously so approved, cease for any reason to constitute a majority thereof, or (iii) the stockholders of the Company approve a merger or consolidation of the Company with any other corporation, other than a merger or consolidation which would result in the Voting Securities of the Company outstanding immediately prior thereto continuing to represent (either by remaining outstanding or by being converted into Voting Securities of the surviving entity) at least [80]% of the total voting power represented by the Voting Securities of the Company or such surviving entity outstanding immediately after such merger or consolidation, or the stockholders of the Company approve a plan of complete liquidation of the Company or an agreement for the sale or disposition by the Company of (in one transaction or a series of transactions) all or substantially all the Company's assets. The term "*Voting Securities*" means any securities of the Company that vote generally in the election of directors.

(b) The Company agrees that if there is a Change in Control of the Company

9

(other than a Change in Control which has been approved by a majority of the Company's Board of Directors who were directors immediately prior to such Change in Control) then with respect to all matters thereafter arising concerning the rights of the Indemnitee to indemnity payments and Expense advances under this Agreement or any other agreement, Company By-law or provision in the Certificate now or hereafter in effect relating to claims for Indemnifiable Events, the Company shall seek legal advice only from Independent Legal Counsel selected by the Indemnitee. The Company agrees to pay the reasonable fees of the Independent Legal Counsel referred to above and to indemnify fully such counsel against any and all expenses (including attorneys' fees), claims, liabilities and damages arising out of or relating to this Agreement or its engagement pursuant hereto.

### Section 11.    *Non-Exclusivity; Insurance.*

(a)    The indemnification and advancement of Expenses provided by this Agreement shall not be deemed exclusive of any other rights to which the Indemnitee may now or in the future be entitled under any provision of the Certificate or By-laws of the Company, any vote of stockholders or Disinterested Directors, any provision of law or otherwise. No amendment, or alteration of this Agreement or of any provision hereof shall limit or restrict any right of the Indemnitee under this Agreement in respect of any action taken or omitted by such Indemnitee prior to such amendment or alteration. To the extent that a change in the Delaware General Corporation Law, whether by statute or judicial decision, permits greater indemnification than would be afforded currently under the Certificate, Bylaws and this Agreement, it is the intent of the parties hereto that the Indemnitee shall enjoy by this Agreement the greater benefits so afforded by such change. No right or remedy herein conferred is intended to be exclusive of any other right or remedy, and every other right and remedy shall be cumulative and in addition to every other right and remedy given hereunder or now or hereafter existing at law or in equity or otherwise. The assertion or employment of any right or remedy hereunder, or otherwise, shall not prevent the concurrent assertion or employment of any other right or remedy.

(b)    To the extent that the Company maintains an insurance policy or policies providing liability insurance for directors, officers, employees, or agents or fiduciaries of the Company or of any other corporation, partnership, joint venture, trust, employee benefit plan or other enterprise that such person serves at the request of the Company, the Indemnitee shall be covered by such policy or policies in accordance with its or their terms to the maximum extent of the coverage available for any director, agent or fiduciary under such policy or policies. If, at the time of the receipt of a notice of a Proceeding pursuant to the terms hereof, the Company has director and officer liability insurance in effect, the Company shall give prompt notice of the commencement of such Proceeding to the insurers in accordance with the procedures set forth in the respective policies. The Company shall thereafter take all necessary or desirable action to cause such insurers to pay, on behalf of the Indemnitee, all amounts payable as a result of such Proceeding in accordance with the terms of such policies.

### Section 12.    *Additional Provisions Regarding Third Party Indemnification of the Indemnitee.*

10

The Company acknowledges that the Indemnitee may be entitled to, or may be provided, indemnification by another Person (a *"Third Party Indemnitor"*) in respect of the Indemnitee's service as a director for Expenses, judgments, penalties, fines and amounts paid in settlements with respect to an Indemnifiable Claim for which the Indemnitee is also entitled to seek indemnification hereunder (the *"Company Indemnified Expenses"*). The Company acknowledges and agrees that, as between the Company and its subsidiaries, on the one hand, and the Third Party Indemnitor and its Affiliates (other than the Company and its subsidiaries), on the other hand, the Company shall be primarily liable to the Indemnitee with respect to any Company Indemnified Expenses and any liability of the Third Party Indemnitor or its Affiliates to the Indemnitee shall be secondary liability. In recognition of the primary liability of the Company, the Company agrees that, in the event that the Third Party Indemnitor or any of its Affiliates pays any Company Indemnified Expenses to or on behalf of the Indemnitee, reimburses the Indemnitee for any Company Indemnified Expenses paid by the Indemnitee or advances amounts to the Indemnitee (including by way of any loan) for the payment of Company Indemnified Expenses, then (i) the Company shall pay to the Third Party Indemnitor any amounts so paid, reimbursed or advanced, to the extent that the Indemnitee would have been entitled to indemnification of such Company Indemnified Expenses and (ii) the Third Party Indemnitor shall be subrogated to all of the rights of the Indemnitee with respect to any claim that the Indemnitee could have brought against the Company or any subsidiary with respect to any Company Indemnified Expenses that have been paid, reimbursed or advanced to or on behalf of the Indemnitee. All such payments to the Third Party Indemnitor shall be made within 5 business days of the receipt by the Company of written notice from the Third Party Indemnitor of such payment, reimbursement or advance, accompanied by documentation showing, in reasonable detail, the Company Indemnified Expenses so paid, reimbursed or advanced by the Third Party Indemnitor or any of its Affiliates. The Third party Indemnitor shall be an express third party beneficiary of this Agreement and the Company agrees, upon request of the Indemnitee or the Third Party Indemnitor, to enter into an agreement with the Third Party Indemnitor evidencing this agreement. The Company shall also reimburse the Third Party Indemnitor and its Affiliates for all expenses, including legal expenses, incurred in enforcing this Section 12.

### Section 13.    *Attorneys' Fees and Other Expenses to Enforce Agreement.*

In the event that the Indemnitee is subject to or intervenes in any Proceeding in which the validity or enforceability of this Agreement is at issue or seeks an adjudication or award in arbitration to enforce his rights under, or to recover damages for breach of, this Agreement, the Indemnitee, if he prevails in whole or in part in such action, shall be entitled to recover from the Company and shall be indemnified by the Company against any actual Expenses reasonably incurred by him in connection therewith.

### Section 14.    *Duration of Agreement.*

This Agreement shall continue until and terminate upon the later of: (a) 10 years after the Indemnitee has ceased to serve as a director, officer, employee, agent or fiduciary of the Company or to serve at the request of the Company as a director, officer, employee, agent or fiduciary of any other entity, including, but not limited to, another corporation, partnership, joint venture or trust, and (b) the final termination of all pending or threatened Proceedings to which

11

the Indemnitee may be subject by reason of the fact that he is or was a director, officer, employee, agent or fiduciary of the Company or is or was serving at the request of the Company as a director, officer, employee, agent or fiduciary of any other entity, including, but not limited to, another corporation, partnership, joint venture or trust, or by reason of any act or omission by him in any such capacity. The indemnification provided under this Agreement shall continue as to the Indemnitee even though he may have ceased to be a director or officer of the Company. This Agreement shall be binding upon the Company and its successors and assigns and shall inure to the benefit of the Indemnitee and his spouse, successors, assigns, heirs, devisees, executors, administrators or other legal representatives.

### Section 15.    *Severability.*

If any provision or provisions of this Agreement shall be held invalid, illegal or unenforceable for any reason whatsoever, (a) the validity, legality and enforceability of the remaining provisions of this Agreement (including, but not limited to, all portions of any Sections of this Agreement containing any such provision held to be invalid, illegal, or unenforceable) shall not in any way be affected or impaired thereby, and (b) to the fullest extent possible, the provisions of this Agreement (including, but not limited to, all portions of any paragraph of this Agreement containing any such provision held to be invalid, illegal or unenforceable, that are not themselves invalid, illegal or unenforceable) shall be construed so as to give effect to the intent manifest by the provision held invalid, illegal or unenforceable.

### Section 16.    *Counterparts.*

This Agreement may be executed in one or more counterparts, each of which shall for all purposes be deemed to be an original but all of which together shall constitute one and the same Agreement. Only one such counterpart signed by the party against whom enforceability is sought shall be required to be produced to evidence the existence of this Agreement.

### Section 17.    *Captions.*

The captions and headings used in this Agreement are inserted for convenience only and shall not be deemed to constitute part of this Agreement or to affect the construction thereof.

### Section 18.    *Modification and Waiver.*

No supplement, modification or amendment of this Agreement shall be binding unless executed in writing by both parties hereto. No waiver of any of the provisions of this Agreement shall be deemed or shall constitute a waiver of any other provisions hereof (whether or not similar) nor shall such waiver constitute a continuing waiver.

### Section 19.    *Notices.*

All notices, requests, demands or other communications hereunder shall be in writing and shall be deemed to have been duly given if (i) delivered by hand with receipt acknowledged by the party to whom said notice or other communication shall have been directed or if (ii) mailed by certified or registered mail, return receipt requested, with postage prepaid, on

12

the date shown on the return receipt:

> If to the Indemnitee, at the address set forth on the signature page hereof.

> If to the Company, to:

> Hayes Lemmerz International, Inc.

> Attention:
> Facsimile:

or to such other address as may be furnished to the Indemnitee by the Company or to the Company by the Indemnitee, as the case may be.

**Section 20.** *Governing Law.*

The parties hereto agree that this Agreement shall be governed by, and construed and enforced in accordance with, the laws of the State of Delaware, applied without giving effect to any conflicts-of-law principles.

*[Signature Pages Follow]*

13

IN WITNESS WHEREOF, the parties hereto have executed this Agreement on the day and year first above written.

HAYES LEMMERZ INTERNATIONAL, INC.

By: _____
       Name:
       Title:

**INDEMNITEE:**

_____
Name:

Address for Notices:

_____
_____
_____

Facsimile:   _____

With a copy (which shall not constitute notice) to:

_____
_____
_____

Facsimile:   _____

**Exhibit B**

## Plan Confirmation Notice

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

- - - - - - - - - - - - - - - - - - x
                                    :
In re:                              :    Chapter 11
                                    :
HAYES LEMMERZ INTERNATIONAL,        :    Case No. 09-11655 (MFW)
INC., et al.,[1]                    :
                                    :
          Debtors.                  :    Jointly Administered
                                    :
- - - - - - - - - - - - - - - - - - x    **Related Docket No. [__]**

**NOTICE OF (A) ENTRY OF FINDINGS OF FACT, CONCLUSIONS OF LAW AND
ORDER CONFIRMING THE MODIFIED FIRST AMENDED JOINT PLAN OF
REORGANIZATION OF HAYES LEMMERZ INTERNATIONAL, INC. AND ITS
AFFILIATED DEBTORS AND DEBTORS-IN-POSSESSION (B) PLAN EFFECTIVE
DATE AND (C) BAR DATES FOR FILING ADMINISTRATIVE CLAIMS,
PROFESSIONAL CLAIMS AND CONTRACT/LEASE REJECTION DAMAGES CLAIMS**

**PLEASE TAKE NOTICE that:**

1.      On November [•], 2009, the United States

Bankruptcy Court for the District of Delaware (the "Bankruptcy

_____

[1]   The following of Hayes' U.S. subsidiaries and affiliates (including the last four digits of their respective taxpayer identification numbers) have filed petitions for relief under chapter 11 concurrently with Hayes (2578) and have obtained joint administration therewith: Hayes Lemmerz Finance LLC (7731), Hayes Lemmerz International Import, Inc. (1655), Hayes Lemmerz International – California, Inc. (2337), Hayes Lemmerz International – Commercial Highway, Inc. (7674), Hayes Lemmerz International - Georgia, Inc. (6122), Hayes Lemmerz International - Howell, Inc. (9246), Hayes Lemmerz International – Huntington, Inc. (0825), Hayes Lemmerz International – Kentucky, Inc. (8246), Hayes Lemmerz International – Laredo, Inc. (8656), Hayes Lemmerz International – New York, Inc. (9278), Hayes Lemmerz International – Sedalia, Inc. (7670), Hayes Lemmerz International – Technical Center, Inc. (7519), Hayes Lemmerz International – Wabash, Inc. (0301), HLI Brakes Holding Company, Inc. (2575), HLI Commercial Highway Holding Company, Inc. (2828), HLI Netherlands Holdings, Inc. (0015), HLI Operating Company, Inc. (7742), HLI Parent Company, Inc. (7832), HLI Powertrain Holding Company, Inc. (8269), HLI Realty, Inc. (1885), HLI Services Holding Company, Inc. (7840), HLI Suspension Holding Company, Inc. (0061), and HLI Wheels Holding Company, Inc. (7882) (collectively with Hayes, the "U.S. Debtors"). With the exception of Hayes Lemmerz Finance LLC – Luxembourg S.C.A. (Luxembourg: 0646; USA: 7731) (the "Non-U.S. Debtor"), none of the foreign affiliates or subsidiaries of Hayes are Debtors in these chapter 11 cases. The mailing address for each of the U.S. Debtors is 15300 Centennial Drive, Northville, Michigan 48168.

Court") entered the Findings of Fact, Conclusions of Law and Order Confirming the Modified First Amended Joint Plan of Reorganization of Hayes Lemmerz International, Inc. and its Affiliated Debtors and Debtors-in-Possession[2] (the "Confirmation Order"). The Confirmation Order was duly docketed in the Office of the Clerk of the United States Bankruptcy Court for the District of Delaware (Docket No. ___).

2.    Copies of the Confirmation Order and Plan can be obtained at the Debtors' restructuring website at http://www.hayeslemmerzreorg.com or on the Bankruptcy Court's website at http://www.deb.uscourts.gov (registration required). In addition, copies of the Confirmation Order and Plan may be obtained by written request to the Debtors' claims agent at The Garden City Group, Inc., P.O. Box 9000 #6531, Merrick, NY 11566-9000 (Attn: Hayes Lemmerz International, Inc.). The Confirmation Order and Plan are also available upon written request to counsel for the Debtors at the addresses set forth below.

---

[2]    Unless otherwise defined herein, capitalized terms used herein shall have the meanings ascribed to such terms in the Modified First Amended Joint Plan Of Reorganization Of Hayes Lemmerz International, Inc. And Its Affiliated Debtors And Debtors-In-Possession (the "Plan") or the Confirmation Order, as applicable.

2

3.    On _____, 2009, the Plan became effective in accordance with its terms as set forth in Sections 11.2 and 11.3 of the Plan (the "Plan Effective Date").

4.    In accordance with Article IX of the Plan, all Administrative Claims shall be served and filed with the Bankruptcy Court, so as to be actually received no later than the date which is thirty (30) days after the Plan Effective Date, unless otherwise ordered by the Bankruptcy Court (the "Administrative Claims Bar Date"), on Skadden, Arps, Slate, Meagher & Flom LLP, One Rodney Square, P.O. Box 636, Wilmington, Delaware 19899-0636 (Attn: Kimberly A. LaMaina, Esq.), counsel for the Reorganized Debtors.

5.    In accordance with Article IX of the Plan, all final requests for Payment of Professional Claims pursuant to sections 327, 328, 330, 331, 503(b), or 1103 of the Bankruptcy Code must be served and filed with the Bankruptcy Court, so as to be actually received no later than the date which is forty-five (45) days after the Plan Effective Date, unless otherwise ordered by the Bankruptcy Court, on each of (i) Skadden, Arps, Slate, Meagher & Flom LLP, One Rodney Square, P.O. Box 636, Wilmington, DE 19899-0636 (Attn: Anthony W. Clark, Esq. and Kimberly A. LaMaina, Esq.) and Skadden, Arps, Slate, Meagher & Flom LLP, 155 North Wacker Drive, Suite 2700, Chicago, IL 60606

3

(Attn: J. Eric Ivester, Esq. and Stephen D. Williamson, Esq.); (ii) the Office of the United States Trustee, J. Caleb Boggs Federal Bldg., 844 North King Street, Room 2207, Lockbox 35, Wilmington, DE 19801 (Attn: Joseph J. McMahon, Jr., Esq.); (iii) Lowenstein Sandler PC, 65 Livingston Avenue, Roseland, NJ 07068 (Attn: Kenneth A. Rosen, Esq.); (iv) Bifferato Gentilotti LLC, 800 N. King Street, Plaza Level, Wilmington, DE 19801 (Attn: Garvan F. McDaniel, Esq.); (v) Milbank, Tweed, Hadley & McCloy LLP, 1 Chase Manhattan Plaza, New York, NY 10005 (Attn: Abhilash M. Raval, Esq., Tyson Lomazow, Esq., and Brian Kinney, Esq.); (vi) Morris, Nichols, Arsht & Tunnell LLP, Chase Manhattan Centre, 18th Floor, 1201 North Market Street, Wilmington, DE 19899 (Attn: Robert J. Dehney); (vii) Weil, Gotshal & Manges LLP, 767 Fifth Avenue, New York, NY 10153 (Attn: Lori Fife, Esq.); (viii) Stahl Cowen Crowley Addis LLC, 55 West Monroe Street, Suite 1200, Chicago, IL 60603 (Attn: Jon D. Cohen, Esq. and Trent P. Cornell, Esq.); (ix) Schnader Harrison Segal & Lewis LLP, 824 N. Market Street, Suite 1001, Wilmington, DE 19801 (Attn. Richard A. Barkasy, Esq.); and (x) counsel to any other official committees appointed in these cases.

6. In accordance with Section 7.5 of the Plan, if the rejection of an executory contract or unexpired lease pursuant to the Plan results in a Claim, then such Claim shall

4

be forever barred and shall not be enforceable against either the Debtors or the Reorganized Debtors or such entities' properties unless a proof of claim is filed with the clerk of the Bankruptcy Court within thirty (30) days after service of the earlier of (a) notice of entry of the Confirmation Order or (b) other notice that the executory contract or unexpired lease has been rejected, and served upon: Skadden, Arps, Slate, Meagher & Flom LLP, One Rodney Square, P.O. Box 636, Wilmington, Delaware 19899-0636 (Attn: Kimberly A. LaMaina, Esq.).

5

7.    In accordance with Section 9.2 of the Plan, any Person who requests compensation or expense reimbursement for making a substantial contribution in the Bankruptcy Cases pursuant to Bankruptcy Code sections 503(b)(3), 503(b)(4), and 503(b)(5) must file an application with the clerk of the Bankruptcy Court, on or before the date which is 30 days after the date of the Confirmation Hearing, and serve the application upon: Skadden, Arps, Slate, Meagher & Flom LLP, One Rodney Square, P.O. Box 636, Wilmington, Delaware 19899-0636 (Attn: Kimberly A. LaMaina, Esq.) or be forever barred from seeking such compensation or expense reimbursement.

Dated:  Wilmington, Delaware
        November __, 2009

SKADDEN, ARPS, SLATE, MEAGHER
  & FLOM LLP

By: _____
    Anthony W. Clark (I.D. No. 2051)
    Kimberly A. LaMaina (I.D. No. 4568)
    One Rodney Square
    P.O. Box 636
    Wilmington, DE 19899
    (302) 651-3000
    - and -
    J. Eric Ivester
    Stephen D. Williamson
    Bennett S. Silverberg (New York Office)
    155 North Wacker Drive, Suite 2700
    Chicago, Illinois 60606
    (312) 407-0700

Counsel for Debtors and
  Debtors-in-Possession

6

## Miscellaneous:

09-11655-MFW Hayes Lemmerz International, Inc.

| | | |
|---|---|---|
| Type: bk | Chapter: 11 v | Office: 1 (Delaware) |
| Assets: y | Judge: MFW | Case Flag: CLMSAGNT, PlnDue, LEAD, MEGA |

### U.S. Bankruptcy Court

### District of Delaware

Notice of Electronic Filing

The following transaction was received from Kimberly A. LaMaina entered on 11/3/2009 at 3:14 PM EST and filed on 11/3/2009
**Case Name:**       Hayes Lemmerz International, Inc.
**Case Number:**     09-11655-MFW
**Document Number:** 831

**Docket Text:**
Certification of Counsel *Attaching Final Form of Proposed Findings of Fact, Conclusions of Law and Order Confirming the Modified First Amended Joint Plan of Reorganization of Hayes Lemmerz International, Inc. and Its Affiliated Debtors and Debtors In Possession, Dated November 3, 2009* Filed by Hayes Lemmerz International, Inc.. (Attachments: # (1) Exhibit 1) (LaMaina, Kimberly)

The following document(s) are associated with this transaction:

**Document description:** Main Document
**Original filename:** C:\temp\CONVERT\Certification.pdf
**Electronic document Stamp:**
[STAMP bkecfStamp_ID=983460418 [Date=11/3/2009] [FileNumber=7807625-0]
[a3d5bf5f0305ab33532f4b2291199ef06c004952e45db9173b2f6ff3159fac5e4fd2
d67b298b8f5324366a481b8cfb23f2996d73b970aea02a2d07488150c3a3]]
**Document description:** Exhibit 1
**Original filename:** C:\temp\CONVERT\Exhibit 1 Confirmation Order.pdf
**Electronic document Stamp:**
[STAMP bkecfStamp_ID=983460418 [Date=11/3/2009] [FileNumber=7807625-1]
[0c043ce84cc8007b90869163aca208b8bf8bcf2541e03c593fe95877a588c12203ec
e58721ac5c4503dba7afe3a4e4666e534f9ab109b9f39a9fce2aa3e5f5be]]

**09-11655-MFW Notice will be electronically mailed to:**

Colin Albaugh on behalf of Creditor Pension Benefit Guaranty Corporation
albaugh.colin@pbgc.gov, efile@pbgc.gov

Richard A. Barkasy on behalf of Creditor Official Committee of Retirees of Hayes Lemmerz Corporation and its Debtor Affiliates
rbarkasy@schnader.com

Christopher R. Belmonte on behalf of Interested Party Moody's Investors Service
cbelmonte@ssbb.com, pbosswick@ssbb.com

Melissa S. Byrd on behalf of Creditor Tata Technologies, Inc.
MByrd@Dykema.com

Eric D. Carlson on behalf of Creditor Ford Motor Company
carlson@millercanfield.com

Marc Stephen Casarino on behalf of Creditor ACE American Insurance Company
casarinom@whiteandwilliams.com, debankruptcy@whiteandwilliams.com

Craig C. Chiang on behalf of Creditor Oracle USA, Inc
cchiang@buchalter.com, cmcintire@buchalter.com